# Exhibit D

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |

**NOTICE OF FILING SECOND INTERIM REPORT OF JOHN J. RAY III TO THE
INDEPENDENT DIRECTORS: THE COMMINGLING AND MISUSE OF
CUSTOMER DEPOSITS AT FTX.COM**

**PLEASE TAKE NOTICE** that, on April 9, 2023, FTX Trading, Ltd. and its affiliated debtors and debtors-in-possession (collectively, the "Debtors"), filed the *First Interim Report of John J. Ray III to the Independent Directors on Control Failures at the FTX Exchanges* [D.I. 1242-1] with the United States Bankruptcy Court for the District of Delaware (the "Court").

**PLEASE TAKE FURTHER NOTICE** that the Debtors hereby file the *Second Interim Report of John J. Ray III to the Independent Directors: The Commingling and Misuse of Customer Deposits at FTX.com* (the "Second Interim Report"), attached hereto as **Exhibit A**.

**PLEASE TAKE FURTHER NOTICE** that copies of the Second Interim Report and other pleadings filed in the above-captioned chapter 11 cases may be obtained free of charge from the website maintained by the Debtors' noticing and claims agent at https://restructuring.ra.kroll.com/FTX/. You may also obtain copies from the Court's website at www.deb.uscourts.gov for a fee.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

---

[1]    The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063 respectively.  Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.  The principal place of business of Debtor Emergent Fidelity Technologies Ltd is Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St. John's, Antigua and Barbuda.

{1368.002-W0071376.}

Dated: June 26, 2023
      Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Matthew R. Pierce*
Adam G. Landis (No. 3407)
Kimberly A. Brown (No. 5138)
Matthew R. Pierce (No. 5946)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
E-mail: landis@lrclaw.com
       brown@lrclaw.com
       pierce@lrclaw.com

-and-

**SULLIVAN & CROMWELL LLP**
Andrew G. Dietderich (admitted *pro hac vice*)
James L. Bromley (admitted *pro hac vice*)
Brian D. Glueckstein (admitted *pro hac vice*)
Alexa J. Kranzley (admitted *pro hac vice*)
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
E-mail: dietdericha@sullcrom.com
       bromleyj@sullcrom.com
       gluecksteinb@sullcrom.com
       kranzleya@sullcrom.com

*Counsel for the Debtors*
*and Debtors-in-Possession*

# **Exhibit A**

**SECOND INTERIM REPORT OF JOHN J. RAY III TO THE
INDEPENDENT DIRECTORS:
THE COMMINGLING AND MISUSE OF CUSTOMER
DEPOSITS AT FTX.COM**

June 26, 2023

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION .................................................................................................1

II.   THE FTX GROUP'S REPRESENTATIONS ABOUT THE PROTECTION OF
CUSTOMER DEPOSITS ......................................................................................3

    A.    Background on the Separation of Customer and Corporate Funds.........................4

    B.    Statements to U.S. Officials, the Public and Other Third Parties ...........................5

III.  THE COMMINGLING OF CUSTOMER DEPOSITS ........................................7

    A.    The Primary Deposit Accounts ..............................................................10

    B.    Commingling of Funds from the Primary Deposit Accounts ...............................14

    C.    Lack of Commitment in Terms of Service to Protect Customer Deposits ...........16

    D.    Falsity of Claim to Reconcile Trading Balances ...................................................17

IV.  THE ROLE OF ATTORNEY-1 IN FACILITATING THE COMMINGLING OF
CUSTOMER DEPOSITS ....................................................................................17

    A.    False Statements to a U.S. Bank .............................................................................18

    B.    Retaliation against an Employee Who Raised Concerns about
Commingling ..........................................................................................................19

    C.    Creation of the Sham Payment Agent Agreement ................................................20

V.    USE OF COMMINGLED FUNDS FOR THE FTX GROUP'S OWN
EXPENDITURES.................................................................................................23

    A.    Political Donations..................................................................................................24

    B.    "Charitable" Donations ...........................................................................................25

    C.    Venture Investments and Acquisitions ..................................................................27

    D.    Luxury Real Estate in the Bahamas .......................................................................28

VI.  TOTAL LOSSES TO CUSTOMERS..................................................................30

## I.     Introduction

The rise of the global digital asset industry has created novel opportunities and challenges for consumers, businesses, financial markets, regulators, and others.  Rapid advances in blockchain technology have made decentralized finance and digital asset transactions not only possible, but widely accessible and inexpensive for consumers.  At the same time, the industry has grappled with challenges common to all businesses that handle financial assets, which can be used to facilitate criminal activity, can be stolen by hackers and, as the FTX Group's collapse has revealed, can be misappropriated by those who have promised to protect them.[1]

The FTX Group portrayed itself as the vanguard of customer protection efforts in the crypto industry.  Its co-founder and CEO, Sam Bankman-Fried, claimed to support federal legislation to safeguard consumers' digital assets, and touted the FTX exchanges' purported procedures to protect fiat currency and crypto deposits, including in testimony he provided to the U.S. Senate.  In 2021, the FTX Group released, and urged Congress to read, its "key principles" for regulation of the crypto industry, which included the primary goals of "ensuring customer and investor protection, promoting market integrity, preventing financial crimes, and ensuring overall system safety and soundness."[2]  In an accompanying press release, Bankman-Fried declared "the protection of investors and the public as a top priority" for the FTX exchanges.

---

[1]      The "FTX Group" refers to FTX Trading Ltd., West Realm Shires Services Inc., d/b/a FTX.US, Alameda Research LLC, and their directly and indirectly owned subsidiaries. "The Debtors" comprise the approximately one hundred entities associated with the FTX Group listed at https://restructuring.ra.kroll.com/FTX.

[2]      FTX International, *FTX Issues Key Principles for Market Regulation of Crypto-Trading Platforms*, PR NEWSWIRE (Dec. 3, 2021), https://www.prnewswire.com/news-releases/ftx-issues-key-principles-for-market-regulation-of-crypto-trading-platforms-301437175.html; FTX US, *FTX's Key Principles for Market Regulation of Crypto-Trading Platforms* (Dec. 3, 2021), https://www.ftxpolicy.com/posts/ftx-key-principles; *Examining Digital Assets - Risks, Regulation, and Innovation: Hearing before the. S. Comm. on Agric., Nutrition and Forestry*,

The image that the FTX Group sought to portray as the customer-focused leader of the digital age was a mirage.  In fact, as set forth in this report, from the inception of the FTX.com exchange, the FTX Group commingled customer deposits and corporate funds, and misused them with abandon.  Bankman-Fried, along with FTX.com's co-founder, Gary Wang, and Director of Engineering, Nishad Singh (the "FTX Senior Executives"), and others at their direction, used commingled customer and corporate funds for speculative trading, venture investments, and the purchase of luxury properties, as well as for political and other donations designed to enhance their own power and influence.

The FTX Senior Executives did not commingle and misuse customer deposits by accident.  Commingling and misuse occurred at their direction, and by their design.  Bankman-Fried, with the assistance of a senior FTX Group attorney ("Attorney-1") and others, lied to banks and auditors, executed false documents, and moved the FTX Group from jurisdiction to jurisdiction, taking flight from the United States to Hong Kong to the Bahamas, in a continual effort to enable and avoid detection of their wrongdoing.  In doing so, they showed little of the concern for customers that they publicly professed.

Based on the Debtors' current analysis, as of the petition date, approximately \$8.7 billion in customer-deposited assets was misappropriated from the FTX.com exchange, the vast majority of which was in the form of cash and stablecoin.[3]  The Debtors' ongoing work to trace and recover assets, and maximize recoveries for stakeholders, has been complicated by the

---

117th Cong. (2022) (testimony of Sam Bankman-Fried), https://www.agriculture.senate.gov/imo/media/doc/Testimony_Bankman-Fried_0209202211.pdf

[3]  The FTX exchanges did not distinguish or differentiate between cash and stablecoin held in customer accounts, but treated them collectively as "e-money."  As a result of this lack of recordkeeping, the Debtors are unable to provide a breakdown of the cash and stablecoin in a customer account.

extensive commingling and misuse of funds that occurred there.  Notwithstanding extensive

work by experts in forensic accounting, asset tracing and recovery, and blockchain analytics,

among other areas, it is extremely challenging to trace substantial assets of the Debtors to any

particular source of funding, or to differentiate between the FTX Group's operating funds and

deposits made by its customers.

       Like the First Interim Report, this second interim report is issued in furtherance of

the Debtors' stated objectives for the bankruptcy, including transparency.[4]  In issuing it, the

Debtors intend to provide transparency both about facts they have uncovered about the operation

of FTX.com, and important issues they are navigating as they seek to maximize recoveries.  Also

like the First Interim Report, this report reflects the Debtors' current understanding based on

their analysis to date.  It is important to recognize that this analysis is ongoing, incomplete and

subject to change.  The Debtors will continue to provide reporting on their analysis and findings

as their work progresses.

**II.    The FTX Group's Representations about the Protection of Customer Deposits**

       The FTX Group touted a commitment to protecting customer deposits from

misuse or misallocation, and publicly championed legislative and regulatory efforts to protect

crypto industry customers.  Through its website, social media, and in statements and submissions

to Congress, regulators and other third parties, the FTX Group represented that it maintained a

---

[4]     These goals are:  (1) implementation of controls, (2) asset protection and recovery, (3) transparency and investigation, (4) efficiency and coordination with any non-U.S. proceedings and (5) maximization of value.  First Day Declaration of John Ray III, Dkt. 24 ("First Day Declaration") ¶ 6; *see also* First Interim Report of John J. Ray III to the Independent Directors on Control Failures at the FTX Exchanges, April 9, 2023, *available at* https://restructuring.ra.kroll.com/FTX/Home- DownloadPDF?id1=MTQ5MDc2OQ%3D%3D&id2=0, ("First Interim Report") at 1-2.

strict separation of customer and corporate funds, including by maintaining customer funds in omnibus bank accounts "for the benefit of" ("FBO") FTX exchange customers.  At all times, with the exception of isolated jurisdictions, the FTX Group's representations in this regard were false.[5]

###### A.      Background on the Separation of Customer and Corporate Funds

In claiming that it separated customer and corporate funds, the FTX Group represented that it was engaging in a practice common in many industries that is designed to protect customers.[6]  Separation avoids the commingling of customer funds with the proprietary assets or working capital of the company holding those funds, and enables the ready identification of customer funds and reliable recordkeeping with respect to them.  This separation mitigates the risk that the company might misuse customer funds for its own purposes, and facilitates the return of customer funds if the company holding them experiences financial distress.

The designation of a bank account as "FBO" signifies that assets in the account are maintained separately from those of the entity that maintains the account (*e.g.*, the account holder), for the benefit of a specific beneficiary (*e.g.*, customers).  Generally speaking, an FBO

---

[5]      In accordance with regulations in Japan, Cyprus, and Singapore, the FTX Group did segregate customer funds in those jurisdictions.  Unless otherwise noted, the findings in this report do not include these jurisdictions, and the report does not address FTX.US, as to which the Debtors' investigation remains ongoing.

[6]      Apart from common practice, companies in certain industries are subject to regulatory requirements concerning the separation and/or protection of customer assets.  *See, e.g.*, 17 C.F.R. § 240.15c3-3(b)(1), (e) (2023) (applicable to broker-dealers); 17 C.F.R. § 275.206(4)-2 (2023) (applicable to investment advisers); 17 C.F.R. § 1.20(a),(e) and (f) (2023) (applicable to futures commission merchants with respect to futures customers); 12 C.F.R. § 9.13(b) (applicable to national banks engaged in fiduciary activities).  While depository institutions generally are not required to segregate funds underpinning ordinary customer deposits, they are subject to a host of capital, liquidity and other legal and regulatory requirements that are designed to protect depositors from losses.

account holder does not have full control over the funds in the account, although it functions as a custodian for the account and can direct the account's cash movements. The widely used "FBO" designation serves to clarify the ownership and purpose of the account, ensuring that the funds in the account are used as intended and providing transparency about the identity of the ultimate beneficiaries of the account.

**B.      Statements to U.S. Officials, the Public and Other Third Parties**

The FTX Group represented to U.S. officials, the public and other third parties that it separated and protected exchange customer deposits, and it positioned itself as a vocal advocate of regulation requiring other crypto companies to do the same.

On February 9, 2022, Bankman-Fried testified before a committee of the U.S. Senate in a hearing entitled "Examining Digital Assets - Risks, Regulation, and Innovation." In written testimony submitted for his appearance, Bankman-Fried touted the FTX Group's recent publication of *FTX's Key Principles for Ensuring Investor Protections on Digital-Asset Platforms* ("*Key Principles*").[7] According to Bankman-Fried:

> We identified the most important components of an investor-protection regime . . . and how FTX offers those protections today . . . These components include:
>
> - maintaining adequate liquid resources to ensure the platform can return the customer's assets upon request;
> - ensuring the environment where customer assets are custodied, including digital wallets, [is] kept secure;
> - ensuring appropriate bookkeeping or ledgering of assets and disclosures to protect against misuse or misallocation of customer assets;
> - ensuring appropriate management of risks including market, credit/counterparty, and operational risks; and

---

[7]     *Examining Digital Assets - Risks, Regulation, and Innovation:  Hearing Before the S. Comm. on Agric., Nutrition and Forestry,* 117th Cong. (2022) (testimony of Sam Bankman-Fried), https://www.agriculture.senate.gov/imo/media/doc/Testimony_Bankman-Fried_0209202211.pdf.

- avoiding or managing conflicts of interest.[8]

The *Key Principles* further represented that:

> FTX has policies and procedures for its platforms today that. . . maintain[] liquid assets for customer withdrawals, including a sufficient balance of digital assets funded by the company for its non-U.S. platform. The resources are funded to provide sufficient cover against user losses under certain events and extreme scenarios in order to, among other purposes, ensure a customer without losses can redeem its assets from the platform on demand.

> FTX regularly reconciles customers' trading balances against cash and digital assets held by FTX.  Additionally, as a general principle FTX segregates customer assets from its own assets across our platforms . . . .[9]

The *Key Principles* were attached as an exhibit to Bankman-Fried's written testimony.  The FTX Group also published the *Key Principles* on the websites of the FTX exchanges, and provided them to the White House, the House of Representatives' Financial Services Committee, the Department of the Treasury, the Federal Reserve Board, the Office of the Comptroller of the Currency, the Securities and Exchange Commission, the Commodity Futures Trading Commission, the Consumer Financial Protection Bureau, and the New York State Department of Financial Services.[10]

Bankman-Fried also used social media to portray himself as a champion for the protection of customer assets in the crypto industry.  On August 9, 2021, he tweeted "as always,

---

[8]     *Id.* at 11-12.

[9]     *Id.* at 31-31, 34.

[10]    *FTX's Key Principles for Ensuring Investor Protections on Digital-Asset Platforms*, FTX US (Mar. 10, 2022), http://web.archive.org/web/20221114012002/https://www.ftxpolicy.com/posts/investor-protections; *Digital Assets and the Future of Finance: Understanding the Challenges and Benefits of Financial Innovation in the United States:  Hearing Before the H. Comm. on Fin. Serv.*, 117th Cong. (2021) (testimony of Sam Bankman-Fried), https://democrats-financialservices.house.gov/uploadedfiles/hhrg-117-ba00-wstate-bankman-frieds-20211208.pdf.

our users' funds and safety come first.  We will always allow withdrawals. . . ,"[11] and on June 27, 2022, he tweeted:  "Backstopping customer assets should always be primary.  Everything else is secondary."  On November 7, 2022—months after discussing internally that over $8 billion in fiat currency alone was missing from the FTX exchanges, and four days before the FTX Group filed its bankruptcy petition—Bankman-Fried tweeted that "[w]e have a long history of safeguarding client assets, and that remains true today."[12]

As set forth below, all of the statements referenced above from the FTX Group's *Key Principles*, and Bankman-Fried's Senate testimony and social media posts, were false.

## III.    The Commingling of Customer Deposits

Like many companies in the crypto industry, FTX Trading Ltd. had difficulty establishing banking relationships.  U.S. banks, which were essential for conducting U.S. dollar transactions, generally were either unwilling to provide services to crypto businesses, or required applicants to undergo enhanced due diligence and register as a money services business ("MSB"), with associated regulatory requirements that FTX Trading Ltd. sought to avoid.  As Bankman-Fried acknowledged in an interview in 2021:

> Especially in 2017, if you named your company like "We Do Cryptocurrency Bitcoin Arbitrage Multinational Stuff," no one's going to give you a bank account. . . . [T]hey're just going to be like . . . we've been warned about companies with this name.  You know, you're going to have to go through the

---

[11]     @SBF_FTX, Twitter (June 27, 2022, 1:29 PM), https://twitter.com/SBF_FTX/status/1541473744119631872; @SBF_FTX, Twitter (August 9, 2022, 2:49 AM), https://twitter.com/SBF_FTX/status/1426623866790379522.

[12]     The Tweet has since been deleted from Bankman-Fried's Twitter account.  *See* Helen Partz, *FTX founder Sam Bankman-Fried removes 'assets are fine' from twitter*, COINTELEGRAPH (Nov. 9, 2022), https://cointelegraph.com/news/ftx-founder-sam-bankman-fried-removes-assets-are-fine-flood-from-twitter.

enhanced [due diligence] process. And I don't want to bother with that right now; it's almost lunchtime. . . . But everyone wants to serve a research institute.[13]

To evade banks' restrictions, at the direction of the FTX Senior Executives, FTX Group funneled customer deposits and withdrawals in fiat currency through bank accounts of Alameda Research Ltd. ("Alameda") and other affiliates, and made misrepresentations to banks about the purpose for which it was using the accounts. At the same time, also at the FTX Senior Executives' direction, the FTX Group used those accounts for many other purposes, commingling and misusing vast sums of customer and corporate funds in the process. Simply put, as a former Alameda employee explained to the Debtors, the FTX Group made no meaningful distinction between customer funds and Alameda funds.

Because the commingling and misuse of FTX.com customer deposits occurred for several years, it is extraordinarily challenging to trace the source of funding for particular FTX Group transactions, or to differentiate between FTX Group operating funds and FTX.com customer deposits. This section describes some of the Debtors' ongoing analysis to attempt to trace the sources and uses of customer funds, focusing primarily on several U.S. dollar-denominated accounts that the FTX Group used to receive customer deposits and fund customer withdrawals, including accounts in the names of Alameda Research Ltd. ("Alameda-4456" and "Alameda-4605"), North Dimension, Inc. ("North Dimension-8738" and "North Dimension-8746"), and FTX Digital Markets Ltd. ("FTX DM") ("FTX DM-2564" and "FTX DM-2549") (collectively, the "Primary Deposit Accounts").[14] These accounts were at all times controlled

---

[13]     Real Vision Finance, *Building an Arbitrage Infrastructure for Traders*, FULL EPISODE with Sam Bankman-Fried, CEO of FTX, YOUTUBE (June 2, 2021), https://www.youtube.com/watch?v=YLCnGXawUj0.

[14]     The accounts described here and throughout this report refer to the last four digits of the relevant entities' account number for simplicity.

directly or indirectly by Bankman-Fried, although other FTX Group employees, at times, also controlled them.

At the outset, it is important to emphasize that the FTX Group, at the FTX Senior Executives' direction, used many bank accounts besides the Primary Deposit Accounts to receive customer deposits and fund customer withdrawals. These include, for example, accounts in the names of FTX DM ("<u>FTX DM-7814</u>" and "<u>FTX DM-3799</u>"), and FTX Trading Ltd. ("<u>FTX Trading-1596</u>," "<u>FTX Trading-6659</u>," and "<u>FTX Trading-9964(S)</u>")[15] which the FTX Group labeled internally as FBO accounts, as well as other accounts in the names of Alameda Research Ltd. ("<u>Alameda 9485(S)</u>") and FTX Trading Ltd. ("<u>FTX Trading-9018</u>"); customer and corporate funds were commingled in all of these accounts and used for corporate expenditures and the benefit of Bankman-Fried, Singh and other senior employees operating the FTX exchanges, including in the examples discussed in Section V of this report. Second, the FTX Group also regularly transferred funds from the Primary Deposit Accounts to other bank accounts that did not receive customer deposits directly, but that it designated internally as FBO accounts. Corporate and customer funds from these accounts were similarly commingled and misused in the same fashion. Finally, the Primary Deposit Accounts received many transfers from other FTX Group accounts, many of which themselves held commingled funds as a result of the FTX Group's regular practice of transferring funds among its accounts.

---

[15]     Account numbers with the (S) designation represent accounts on a bank platform which allowed for instantaneous transfers of funds to other accounts on the same platform.

A.      **The Primary Deposit Accounts**

1.      **Alameda**

By the time FTX.com launched in April 2019, Alameda had been engaged in trading for more than a year and had established accounts with certain U.S. banks for dollar-denominated transactions.  Rather than establishing new bank accounts in the name of FTX Trading Ltd., the FTX Group instead used Alameda's existing bank accounts to receive customer deposits and fund customer withdrawals for the FTX.com exchange.  Between at least November 16, 2019 and August 30, 2020, wire instructions provided to FTX.com customers for the purpose of making fiat currency deposits were printed on Alameda letterhead, and instructed FTX.com customers to send funds to one of more than a dozen different Alameda bank accounts, depending on the specific fiat currency at issue.  These included Alameda-4456, one of the Primary Deposit Accounts, which was initially the FTX Group's designated account for customers' U.S. dollar deposits.

As a result, from the inception of FTX.com, Alameda's bank accounts received substantial funds from FTX.com customers.  For 2020 alone, for example, the Debtors have already confirmed that Alameda-4456 received over $250 million in deposits from customers directly, over $250 million from Alameda's trading counterparties, and over $4 billion from other Alameda accounts that were funded, in part, by customer deposits.  Analysis of the source of funds in this and other accounts is ongoing.

2.      **North Dimension**

During 2020, certain of Alameda's banks raised questions about Alameda's wire activity, and certain banks began rejecting wires to or from Alameda.  For example, in May 2020, a representative of a bank where Alameda maintained an account that received customer deposits wrote to Alameda that he "noticed references to 'FTX,' a related company that offers

crypto derivatives exchange services and is also owned by Samuel Bankman-Fried."  Given this observation, the representative asked whether the account would "be[] used to settle trades for their derivatives exchange platform (FTX Trading)?"

Rather than tell the truth to the bank—*i.e.*, that it not only intended to, but had in fact been using the Alameda account for FTX.com customer transactions for nearly a year—the FTX Group lied.  Specifically, at the direction of a senior FTX Group executive, an Alameda employee falsely responded that "customers occasionally confuse FTX and Alameda" but that "all incoming/outgoing wires are to settle trades with Alameda Research."

Thereafter, in an effort to avoid scrutiny, the FTX Group incorporated a new, wholly owned entity called North Dimension Inc. ("North Dimension").  North Dimension's purpose was to enable the FTX Group to obtain bank accounts through which it could operate the FTX.com exchange.  To obtain the accounts, as set forth in Section IV.A, at the direction of a senior FTX Group attorney, Attorney-1, the FTX Group falsely represented to a bank that North Dimension was a crypto trading firm with substantial operations, when in fact North Dimension was a shell company with no operations.  Beginning in April 2021, the FTX Group opened North Dimension-8738 and -8746, two of the Primary Deposit Accounts, and began instructing FTX.com customers to wire funds to them.[16]

By at least September 2021, however, certain customers' banks had begun questioning, and sometimes rejected, wires to or from the North Dimension accounts.  An internal document created by the FTX Group in November 2021 listed the "known banks that

---

[16]     Notwithstanding these instructions, some customers continued to send their deposits to Alameda bank accounts, which continued to accept them.

don't want to work with us," and identified numerous banks that had rejected wires to or from North Dimension accounts, Alameda accounts, or both.

As with the Primary Deposit Accounts in the name of Alameda, the FTX Senior Executives allowed customer and non-customer funds to be commingled in the North Dimension accounts. While analysis is ongoing as to a substantial portion of the balances, by December 31, 2021, the North Dimension accounts had received at least $1 billion in customer deposits, as well as funds transferred from various other FTX Group accounts (many of which themselves held commingled funds) totaling at least $2 billion. Also like the Primary Deposit Accounts in the name of Alameda, the FTX Group used the North Dimension accounts both to fund customer withdrawals and to fund corporate and other expenditures at the direction, and for the benefit, of the FTX Senior Executives, including in the examples set forth in Section V.

### 3. FTX Digital Markets

While Bankman-Fried claimed publicly to welcome regulation of the crypto industry, in late 2020, when Hong Kong announced plans to regulate crypto exchanges,[17] Bankman-Fried and the other FTX Senior Executives immediately sought to leave the jurisdiction. With assistance from Attorney-1, the FTX Senior Executives sought to move to a country in which they faced less regulatory risk. As Ellison described it in October 2021, the

---

[17]    *Hong Kong wants cryptocurrency trading platforms to be regulated¸* Reuters (Nov. 2, 2020), https://www.reuters.com/article/crypto-currencies-hongkong-regulator-idUSKBN27J07U.

FTX Group moved to the Bahamas because, with respect to its regulatory environment, the Bahamas was "friendly" and "cutting back on red tape."[18]

In moving to the Bahamas, where they incorporated FTX DM in July 2021, the FTX Senior Executives sought to minimize any substantive change to or scrutiny of their business. Thus, for example, on behalf of the FTX Group, in July 2021, Attorney-1 offered a former Bahamian government official, acting as an attorney, a $1 million "bonus" to procure a necessary business license for FTX DM within ten weeks. The attorney obtained the license less than six weeks later.

Thereafter, FTX DM sought to open bank accounts in the U.S. in its name. Despite the fact that FTX DM had no contractual relationship with FTX customers with respect to custody of fiat currency or the payment of fee revenue, FTX DM claimed in its account opening application that it intended to open both a "[c]ustodial" bank account to process FTX exchange customer funds, and an operating account that would be funded "from the parent company and also internal transfers from the [c]ustodial account (fees from customers)." The bank opened the FTX DM accounts in December 2021.[19] After that date, the FTX Group appears to have used the FTX DM accounts, like other accounts, on a commingled basis for many purposes, including the cycling of money to and from customers to meet withdrawal requests when necessary and various investments, donations and expenditures. With respect to

---

[18]      Andrew R. Chow, *After FTX Implosion, Bahamian Tech Entrepreneurs Try to Pick Up the Pieces*, Time (March 30, 2023), https://time.com/6266711/ftx-bahamas-crypto/.

[19]      While the FTX Group began processing most wires through the FTX DM accounts after this time, it continued to accept certain customer deposits in the North Dimension and Alameda accounts as well.

-13-

customer withdrawals, the FTX Group appears to have used the FTX DM accounts in part as a pass-through vehicle to funnel at least $5.4 billion in customer deposits to FTX Trading Ltd.

### B.     Commingling of Funds from the Primary Deposit Accounts

Figure 1 below is a diagram reflecting the Debtors' analysis to date of the flow of funds into and out of the Primary Deposit Accounts from the inception of the FTX.com exchange in April 2019 through November 11, 2022, the date of the FTX Group's bankruptcy petition. The diagram illustrates the sources of funding of the Primary Deposit Accounts, including FTX.com customers; the outflows from the Primary Deposit Accounts, including to FTX Group entities; and the further outflows from those FTX Group entities to other Debtors and non-Debtors.  In other words, the diagram illustrates where FTX.com customer deposits into the Primary Deposit Accounts were sent, as identified to date.

Of note, besides the Primary Deposit Accounts, many other Debtor accounts depicted in the diagram received deposits directly from FTX.com exchange customers.  Any entity that received transfers of less than $500,000 in total is not depicted, and the diagram does not otherwise depict the size or relative size of the transfers, as substantial analysis is ongoing in this area.  It should be noted, however, that given the FTX Group's lack of appropriate recordkeeping, the fungible nature of cash, the lack of detail in certain bank account records, and other issues, it may not ultimately be possible to trace all the sources and uses of funds for FTX Group bank accounts.  Certain FTX Group expenditures that the Debtors have been able to trace in part to customer funds are set forth in Section V.

Case 22-11068-JTD   Doc 1704-1   Filed 06/26/23   Page 18 of 36



**Figure 1**

Primary Deposit Accounts: Sources and Uses of Funds
USD Transfers, April 2019 through Petition Date

C.      **Lack of Commitment in Terms of Service to Protect Customer Deposits**

Notably, while the FTX Group claimed publicly that it protected and separated customer deposits, FTX Trading Ltd. made no such representation in its Terms of Service Agreement ("Terms of Service") with customers.  In fact, the Terms of Service were silent on what FTX Trading Ltd. would do with customer fiat currency, and made no claim that the company would segregate, custody, secure or otherwise protect it.  Given the extensive commingling of customer deposits from the inception of the FTX.com exchange, this discrepancy between the FTX Group's public and contractual commitments is telling.

The FTX Group knew how to create a contractual agreement to separate and protect customer deposits when it suited the FTX Group to do so.  In its terms of service with customers in Japan, for example, one of the few jurisdictions in which exchange customer deposits were actually protected and separated, FTX Japan Co. Ltd. represented that fiat currency deposits were held in "a segregated user management trust" that was "managed separately from the Company's money. . . ."  By contrast, and even though they were occasionally revised, the Terms of Service never stated that FTX Trading Ltd. separated and protected customer fiat currency deposits.  Instead, in the isolated instances in which a customer inquired directly on the subject, employees lied.  For example, in June 2022, when a potential customer inquired, after reviewing the Terms of Service, "how and where client assets. . . fiat/e-money balances" were maintained, "e.g. omnibus FBO account, in FTX partner bank etc, legal ownership?," a senior employee of FTX Trading Ltd. responded, consistent with Bankman-Fried's Senate testimony

-16-

that FTX custodied customer assets, that "[f]iat is held in FBO omnibus accounts."  As set forth above, with only limited exceptions, that response was false.

> **D.      Falsity of Claim to Reconcile Trading Balances**

The FTX Group lied in its *Key Principles* that it "regularly reconcile[d] customers' trading balances" against funds held by the exchanges.[20]  In fact, the Debtors have identified no evidence that the FTX Group performed any meaningful reconciliation prior to making this claim on its website and in materials provided to Congress, federal agencies, and other third parties.

At times, the FTX Senior Executives, with Caroline Ellison and certain other employees, estimated their growing liabilities in internal communications.  By August 2022, the FTX Senior Executives and Ellison privately estimated that the FTX.com exchange owed customers over $8 billion in fiat currency that it did not have.  They did not disclose the shortfall, but at that time, for the first time, they created a sham customer account on FTX.com to reflect the hidden fiat currency liability.  To minimize the risk of scrutiny, the FTX Senior Executives and Ellison referred to this sham account only as "our Korean friend's account."  The account reflected that their "Korean friend" owed the FTX.com exchange $8.9 billion.

> **IV.    The Role of Attorney-1 in Facilitating the Commingling of Customer Deposits**

A senior FTX Group attorney, Attorney-1, actively facilitated and covered up the FTX Group's commingling of customer and corporate funds.  Attorney-1 caused and allowed

---

[20]      *FTX's Key Principles for Ensuring Investor Protections on Digital-Asset Platforms*, FTX US (Mar. 10, 2022),
http://web.archive.org/web/20221114012002/https://www.ftxpolicy.com/posts/investor-protections.

false information to be conveyed to customers, banks, auditors, investors, and other third parties, including as set forth in the following examples.

### A.    False Statements to a U.S. Bank

As discussed above, after U.S. banks started rejecting wires involving customers to and from certain Alameda bank accounts, the FTX Group lied to a U.S. bank ("Bank-1") to induce it to open new accounts in the name of North Dimension, which the FTX Group falsely claimed was a crypto trading firm.  In fact, the FTX Senior Executives, Attorney-1 and other senior FTX Group employees secretly intended to use, and did use, the North Dimension accounts to receive customer deposits and fund customer withdrawals for FTX.com.  Attorney-1 and Bankman-Fried played leading roles in carrying out this deception.

Specifically, Attorney-1 instructed an FTX Group employee to copy and paste into the application for North Dimension's bank accounts the information that Alameda had previously submitted on its own applications to open its bank accounts.  The employee did so, and as a result, the application submitted to Bank-1 falsely represented that North Dimension "operates a cryptocurrency trading business."  In response to a due diligence questionnaire that Bank-1 required as part of the application process for trading businesses, the FTX Group further falsely described North Dimension as a proprietary and OTC trading firm with 2,000 counterparties and average monthly trading volume of $10 million.  Bankman-Fried signed and certified that this response to the bank's questionnaire was correct and complete to the best of his knowledge and belief.

In fact, as Attorney-1 and Bankman-Fried well knew, the information provided to Bank-1 about North Dimension was false.  Unlike Alameda, which was a crypto trading and market-making firm with employees, operations and trading activity, North Dimension had no business operations or employees.  Attorney-1, who had assisted in incorporating North

Dimension, was also identified to Bank-1 in a false and misleading fashion as North Dimension's General Counsel and Chief Compliance Officer.

Although Attorney-1, Bankman-Fried and others also knew that they intended to use a North Dimension account to process customer deposits and withdrawals for the FTX exchanges, that information was not disclosed on the application to open the account. Further, in response to Bank-1's question in the application, "Is the business a money services business (MSB)?" the FTX Group falsely responded "No." But as Attorney-1 well knew, the FTX Group intended to use the North Dimension account to receive and pay funds to customers, and thus was acting as a money services business.

Attorney-1 also knowingly directed others to create a false and misleading corporate register of members and managers to be provided to Bank-1 in connection with the North Dimension application. Specifically, after Bank-1 asked for a copy of the register, Attorney-1 directed a law firm to create a register. Attorney-1 provided the law firm with the names of the individuals to be identified as members or managers of North Dimension. The register of members was subsequently provided to Bank-1 in order to give North Dimension, a purely shell company, a false air of legitimacy.

**B.    Retaliation against an Employee Who Raised Concerns about Commingling**

After a less senior attorney at the FTX Group discovered and raised concerns that North Dimension accounts were being used to fund FTX exchange customer withdrawals, Attorney-1 fired the attorney, who had been hired less than three months earlier.

Specifically, in early 2022, an FTX Group attorney observed a lack of internal documentation and recordkeeping regarding the FTX Group's corporate organization and intercompany relationships. In the course of investigating, the attorney learned that Alameda owned North Dimension, and that the FTX Group was using North Dimension accounts to fund

-19-

FTX exchange customers' withdrawals. The attorney began asking questions about this practice, as he understood that Alameda was a proprietary trading firm that was not involved in handling exchange customer funds, and that it did not have a license to act as a money services business.

Attorney-1 responded by calling the attorney and asking him to meet in person the same day, a Saturday. When the attorney arrived to the meeting as requested, Attorney-1 fired him. The attorney confronted Attorney-1 about the serious operational and control deficiencies he had identified in his short time at the FTX Group. The attorney also expressed disbelief that Attorney-1 had never told him that Alameda had issues with respect to acting as an unlicensed money services business. Attorney-1 provided no substantive response to any of these points.

Days later, the now-terminated attorney emailed Attorney-1 to say he was "still reeling from being summarily fired on Saturday after raising the concerns we discussed." He nonetheless urged Attorney-1 to address "the most pressing issues" facing the company, including with the assistance of an outside law firm, and noted that doing so would require Attorney-1 to tell the law firm "the whole truth." There is no evidence that Attorney-1 raised these matters with anyone outside the FTX Group.

This incident occurred just weeks after Bankman-Fried provided false information to a U.S. Senate committee that the FTX exchanges secured assets deposited by customers, ensured sufficient liquid resources to meet customer withdrawal requests, and maintained appropriate recordkeeping and disclosures to protect against misuse or misallocation of assets. The Debtors have identified on Attorney-1's hard drive a final copy of the false written testimony that Bankman-Fried provided to Congress.

### C.   Creation of the Sham Payment Agent Agreement

With the participation of Bankman-Fried, Attorney-1 also created and directed the creation of sham agreements that purported to legitimize certain improper transfers and

arrangements of the FTX Group, and that facilitated the FTX Group's commingling and misuse of assets and other misconduct.  As an example, from January to April 2021, Attorney-1 conceived of, drafted and backdated—by nearly two years—a sham intercompany agreement for the sole purpose of providing it to an external auditor that had been retained to prepare an audited financial statement of FTX Trading Ltd. in connection with a contemplated initial public offering ("IPO") of the company.

As described above, from the inception of FTX.com in April 2019 until the end of August 2020, exchange customers were directed to send fiat deposits to Alameda bank accounts, which continued to receive customer deposits even after that time.  Then, in January 2021 as FTX prepared for an audit, Attorney-1 asked an outside law firm to prepare a "cash management" agreement that could provide an "explanation" for why Alameda held "FTX cash . . . for the benefit of the FTX customers."  Attorney-1's statement that Alameda held cash "for the benefit" of FTX customers was false to the extent it suggested that Alameda secured, segregated, or otherwise allowed only customers to direct the spending of cash that customers deposited for credit to their FTX exchange accounts.

Attorney-1 also directed that the agreement state that "FTX gets first dibs on Alameda's cash," an apparent attempt to paper over the fact that—as Attorney-1 was aware—there were no existing limitations on Alameda's ability to spend FTX exchange customers' cash for its own purposes.  In accordance with Attorney-1's directions, the draft agreement the law firm subsequently provided stated that Alameda provided "cash management" services for FTX Trading Ltd., and that assets of FTX Trading Ltd. held by Alameda pursuant to the agreement would be deemed a loan to Alameda.

After receiving the draft agreement, Attorney-1 took no steps to finalize or implement it.  Instead, beginning in March 2021, Attorney-1 prepared his own version of the sham agreement that did not reflect any loan to Alameda.  Pursuant to Attorney-1's version, a draft of which he initially titled "Intercompany Treasury Management and Subordination Agreement" and the final draft of which he titled "Payment Agent Agreement," Alameda provided mere "payment services" pursuant to which it would "complete payments . . . as directed by FTX from time to time," and receive assets from FTX "to be held and/or transferred . . . as quickly as commercially possible."  In reality, as Attorney-1 well knew, Alameda never transferred and had no intention of transferring customer deposits to FTX "as quickly as commercially possible" or, in fact, at all.

In addition to being false in substance, the Payment Agent Agreement also appears to have been significantly backdated.  While metadata reflects that Attorney-1 created the Payment Agent Agreement on April 12, 2021, and that the executed version was last modified on April 16, 2021, the agreement purports to have an "Effective Date" of June 1, 2019—nearly two years earlier.  This effective date appears only once in the agreement, in typewritten form on the signature page, which Bankman-Fried signed on behalf of both Alameda and FTX Trading.  Notably, while Bankman-Fried regularly executed agreements electronically using DocuSign, which electronically records the date and time of execution, Bankman-Fried signed the sham Payment Agent Agreement using a wet signature.[21]  On the same signature page, a footer reads, "Intercompany Treasury Management and Subordination Agreement," a

---

[21]    An earlier draft of the sham agreement that Attorney-1 created, which, according to the metadata, Bankman-Fried edited, purported to require Alameda to warrant that it "maintain[ed] total assets in cryptocurrency and/or cash in one or more accounts held on FTX in an amount that net of all liabilities is valued at least 1.5 times the balance owed" to FTX Trading Ltd. under the agreement.  This provision was not included in the executed Payment Agent Agreement.

relic of the first draft of the sham agreement that Attorney-1 created in March 2021—nearly two years after Bankman-Fried supposedly signed it.

Bankman-Fried and the FTX Group also used the sham Payment Agent Agreement to support their claim to the outside auditor that fiat currency of FTX.com customers did not need to be recorded in FTX Trading Ltd.'s audited financials. FTX Trading Ltd. informed its auditor that, pursuant to the agreement, Alameda "provides cash management services to FTX." A member of FTX Trading Ltd.'s external accounting team who was closely involved in the audit explained in an e-mail to the FTX Group's external counsel working on the IPO that pursuant to this "cash management agreement," Alameda "manages the fiat aspects for customers." She explained, because "we have been using Alameda as our payment processor, we have not recorded the customer fiat nor their crypto balances on our books as an asset or liability."

After Attorney-1 caused the outside auditor to be provided with the Payment Agent Agreement, the outside auditor prepared an audited financial statement of FTX Trading Ltd. that inaccurately and misleadingly characterized FTX Trading Ltd.'s relationship with Alameda, and did not record any fiat currency of FTX.com customers. While the IPO was not ultimately consummated, the FTX Group proceeded to share the false and misleading audited financials with potential investors in connection with its $400 million Series C financing that closed in January 2022.

## V.    Use of Commingled Funds for the FTX Group's Own Expenditures

Following substantial forensic analysis, which remains ongoing, the Debtors have been able to identify certain transactions that appear clearly to have been funded in part with commingled customer deposits. These include political and "charitable" donations, venture investments and acquisitions, and the purchase of luxury real estate for senior FTX Group

employees in the Bahamas, as described below.  Certain of the transactions were funded directly from the Primary Deposit Accounts.  Others were funded from accounts that had received funds from the Primary Deposit Accounts, including FTX Trading Ltd.-9018(S) ("FTX Trading-9018(S)"), FTX Trading-9964(S), and Alameda-9485(S), several of which also received customer deposits directly and/or were labeled internally as "FBO."

### A. Political Donations

Bankman-Fried, Singh and another FTX Group insider made more than $100 million in political donations funded through purported "loans" from the FTX Group.  Singh has pleaded guilty to conspiring to make unlawful political contributions and defraud the Federal Elections Commission ("FEC"), and Bankman-Fried has been charged with the same crime.  The funds they and the other FTX Group insider used to make these political donations were often transferred from FTX Group bank accounts that included commingled customer and corporate funds.

For example, during the period April 2022 through June 2022, one FTX Group executive received wire transfers totaling at least $26 million from North Dimension-8738, a Primary Deposit Account.  During the three months preceding these transfers, this Primary Deposit Account received at least $360 million in customer deposits, as well $330 million in deposits from other FTX Group accounts, many of which had previously received customer funds.  Based on the Debtors' analysis of bank and public records, upon receiving the commingled funds from this Primary Deposit Account, the executive used them to make at least $12.7 million in political contributions.

As another example, on November 19, 2021, Singh made a $500,000 contribution to a Political Action Committee ("PAC") called People for Progressive Governance, which was formed by the president of Bankman-Fried's super PAC, Protect our Future.  Singh made this

political contribution using funds he received from Alameda-4456, a Primary Deposit Account. Specifically, on November 17, 2021, the Alameda-4456 account transferred $1 million to Singh's personal bank account. Two days later, Singh transferred $500,000 from his personal bank account to the PAC.

While transfers to these FTX Group executives for political contributions were sometimes described as "loans" in the FTX Group's QuickBooks general ledger, the evidence identified by the Debtors indicates the transfers were "loans" in name only. The Debtors have identified virtually no loan agreements or similar documentation, and as to the little purported documentation that exists (for a single, small "loan") there is no evidence it was ever intended to be repaid. The Debtors have identified no evidence that the relevant executives paid any interest on the supposed "loans" at any time, or repaid any of the more than $100 million they "borrowed" for political contributions.

Many recipients of these political contributions have either returned the funds to the Debtors or turned them to over to the U.S. Department of Justice.

**B.    "Charitable" Donations**

Bankman-Fried and other FTX Group executives also frequently made donations to individuals and nonprofit organizations from Primary Deposit Accounts that held commingled funds. In February 2021, Bankman-Fried announced the establishment of the FTX Foundation (a/k/a FTX Philanthropy), which would make grants for a range of purportedly altruistic endeavors.[22] The FTX Group committed publicly to contribute at least "1% of FTX's revenue

---

[22]    FTX FOUNDATION,https://web.archive.org/web/20220809135211/https://ftxfoundation.org/.

from fees" to the FTX Foundation.[23]  In fact, under the direction and control of Bankman-Fried, the FTX Foundation was financed in part with commingled customer funds.

The FTX Foundation grants were funded via transfers from a variety of bank accounts, including North Dimension-8738 and Alameda-4456 (Primary Deposit Accounts), as well as Alameda-4464 and FTX Trading-9018, all of which contained commingled customer and corporate funds.  The FTX Foundation used these funds to make grants to individuals and nonprofits.

In addition to receiving transfers of commingled funds, the FTX Foundation also regularly directed the payment of "grants" directly from FTX Group bank accounts that held commingled customer and corporate funds.  For example, on May 19, 2022, the FTX Foundation authorized a $300,000 grant to an individual to "[w]rite a book about how to figure out what humans' utility function is (are)," and transferred the funds to this individual from North Dimension-8738, a Primary Deposit Account.  On June 30, 2022, the FTX Foundation funded a $400,000 grant to an entity that posted animated videos on YouTube related to "rationalist and [Effective Altruism] material," again causing the funds to be wired directly from North Dimension-8738, a Primary Deposit Account.

Bankman-Fried and other FTX Group executives also directed commingled funds to Guarding Against Pandemics, Inc. ("GAP"), and related entities.  GAP, a tax-exempt entity with the stated mission of mitigating global pandemic-related risks, worked closely with Guarding Against Pandemics PAC, a political action committee run by Bankman-Fried's younger brother.  The Debtors have to date identified more than $20 million that the FTX Group

---

[23]      FTX, *The FTX Foundation for Charitable Giving*, MEDIUM (Feb. 8, 2021), https://ftx.medium.com/the-ftx-foundation-for-charitable-giving-5ae53178dce.

wired to GAP and affiliated entities from an Alameda Research Ltd. account that held commingled customer funds that it received from Alameda-4456, a Primary Deposit Account.

### C. Venture Investments and Acquisitions

The FTX Senior Executives also used commingled customer funds to finance venture investments and acquisitions. For example, with growing concern that the close relationship between Alameda and the FTX exchanges was drawing unwanted attention, Bankman-Fried decided to invest in a new cryptocurrency hedge fund, Modulo Capital, Inc. ("Modulo"), which was started by two of his associates. Between June and November 2022, at the direction of Bankman-Fried, the FTX Group transferred approximately $450 million to Modulo.[24] The funds were transferred from Alameda-9485, which in turn received funds from (among other FTX Group accounts) FTX Trading-9964(S),[25] an account that, although designated internally as "corporate," had in fact received customer deposits between January and November 2022. On May 19, 2022, at Bankman-Fried's direction, the FTX Group transferred an additional $25 million to Modulo from another account that had received transfers of commingled funds from North Dimension-8738 and Alameda-4605, both Primary Deposit Accounts.

In early May 2023, as part of a resolution with the Debtors, Modulo returned approximately $407 million to the Debtors and also released its claims as to $56 million in assets held on the FTX.com exchange, which together represented approximately 98% of the funds the FTX Group had transferred to Modulo.

---

[24] $25 million was sent directly to Modulo Capital, Inc. The remainder was sent to Modulo Capital Alpha Fund LP.

[25] On November 1, 2022, Modulo wired $200,000,000 to Alameda-9485(S), purportedly to return a wire that Alameda had mistakenly sent Modulo earlier.

### D.    Luxury Real Estate in the Bahamas

As has been widely reported, at the direction of Bankman-Fried and other FTX executives, the FTX Group spent over $243 million on real estate in the Bahamas, including multi-million dollar luxury properties for FTX Group employees and their friends and family. The FTX Group funded these real estate purchases from accounts that held commingled customer and corporate funds.

The FTX Group purchased most of this real estate through a subsidiary, FTX Property Holdings Ltd., which was incorporated in the Bahamas in July 2021 at the request of Attorney-1.[26]  Because FTX Property Holdings did not have its own bank account, however, FTX DM funded the purchases using its operating account in the Bahamas ("FTX DM-0275").[27] Figure 2 below shows the FTX Group bank accounts that contributed funding for the real estate purchases by FTX Property Holdings.  Although the precise flow of funds differed slightly from one purchase to the next,[28] commingled funds from FTX Trading-9018 were ultimately transferred to FTX DM-0275, from which they were used to purchase the properties.

---

[26]    At least three properties were purchased in May or June 2021 for FTX Group insiders before FTX DM and FTX Property Holdings were incorporated.

[27]    Several of the properties were purchased in Bahamian Dollars, rather than U.S. Dollars. For these, FTX DM transferred funds from a U.S. dollar-denominated account, FTX DM-0275, to a Bahamian dollar-denominated account ("FTX DM-0150"), to pay for those properties.

[28]    In the case of the three properties that were purchased in May or June 2021 prior to the incorporation of FTX DM and FTX Property Holdings, an FTX Trading Ltd. account ("FTX Trading-8563") funded the real estate purchases.  In the case of one purchase in September 2021, Alameda-4456 funded the deposit on the property, while the balance of the purchase price was funded by FTX Trading-9018 transferring funds to FTX DM-0275.

**Figure 2**



During the period May through October 2021, Alameda-9485(S) received at least $472.8 million in customer funds. Thereafter, between October 2021 and January 2022, Alameda-9485(S) transferred a total of approximately $2.2 billion of commingled funds to FTX Trading-9018(S), an account that also received deposits directly from customers during at least the period October 2021 through March 2022. In turn, from October 2021 through January 2022, FTX Trading-9018(S) transferred approximately $588 million of commingled funds to FTX Trading-9018.

Finally, FTX Trading-9018 made the following six transfers of commingled funds to FTX DM-0275, which totaled approximately $402,000,000, and constituted substantially all funds in the account:

- $2 million on or around September 22, 2021;

- $50 million on or around October 6, 2021;

- $50 million on or around October 28, 2021;

- $100 million on or around December 29, 2021;

- $150 million on or around March 17, 2022;

- $50 million on or around August 9, 2022.

Using these commingled funds, at the direction of Bankman-Fried and other senior executives, the FTX Group purchased more than 30 properties, including a $30,000,000 six bedroom, 11,500 square foot penthouse in the Albany resort community in the Bahamas in January 2022.  The property, known as the Orchid Penthouse, was home to Bankman-Fried, Singh, Wang, Ellison and others prior to the FTX Group's collapse.  In addition, also at the direction of Bankman-Fried and other senior executives, the FTX Group used these commingled funds to purchase the properties described in Appendix A to this report.

## VI.    Total Losses to Customers

As noted above, the FTX Senior Executives and Ellison informally tracked the size of FTX.com's undisclosed, fiat currency liability to customers that resulted from the extensive commingling and misuse of FTX.com customer deposits.  While their estimate in August 2022 of a cash liability of $8.9 billion, which they reflected in the sham "Korean friend" account, has made headlines, in fact, their estimate was even higher at times.  In March 2022, for example, Ellison estimated in private notes that FTX.com had a cash deficit alone of over $10 billion.  As to assets on the exchange, as discussed in the First Interim Report, through

modifications that Singh made to the exchanges' codebase in 2019, the FTX Senior Executives separately allowed Alameda to borrow on FTX.com effectively without limit, and with no risk of auto-liquidation, no matter how negative its net positions were.

On May 12, 2022, Bankman-Fried testified before a committee of the U.S. House of Representatives in a hearing entitled, "Changing Market Roles: The FTX Proposal and Trends in New Clearinghouse Models."  During his testimony, Bankman-Fried referenced the "LME nickel fiasco," a then-recent incident in which an investor with an $8 billion short position in nickel went into default, causing harm to counterparties who were exposed to the investor's credit risk.[29]  According to Bankman-Fried, FTX.com customers would not face such harms due to the exchanges' superior risk-management system, which prevented customers from becoming exposed to risk in the event of another party's default.  In providing this testimony, Bankman-Fried failed to disclose that Alameda, the crypto fund he owned with Wang, was uniquely exempt from the system's operation.  Bankman-Fried failed to disclose that he had directed and facilitated the commingling of billions of dollars of FTX.com customer deposits in Alameda and other bank accounts that he owned and controlled.  And Bankman-Fried failed to disclose that, as of the time he testified, he had directed and facilitated the misuse of commingled funds from those bank accounts in an amount far larger than what was lost by the nickel trader.

---

[29]    *Changing Market Roles: The FTX Proposal and Trends in New Clearinghouse Models: Hearing before the H.R. Comm. on Agric.*, 117th Cong. (2022) (testimony of Sam Bankman-Fried), https://www.congress.gov/event/117th-congress/house-event/LC69154/text?s=1&r=3; FTX, *Risk Management:  Avoiding the Next "LME Nickel" Market Incident* (Apr. 12, 2022), http://web.archive.org/web/20230201060359/https://www.ftxpolicy.com/posts/risk-management.

Based on the Debtors' ongoing analysis, as of the petition date, the FTX.com exchange owed customers approximately $8.7 billion.   The vast majority of the deficit—over $6.4 billion—was in the form of fiat currency and stablecoin that had been misappropriated.[30]

Despite the ongoing challenges created by the commingling of customer deposits and corporate assets, and other mismanagement of the FTX Group, the Debtors continue to make substantial progress in their ongoing efforts to identify, secure and recover assets for the estate. To date, the Debtors have recovered approximately $7 billion in liquid assets, and they anticipate additional recoveries.  The Debtors will continue to provide updates on their ongoing recovery efforts and investigation as their work progresses.

---

[30]     This figure excludes Alameda's balances on the FTX US, Japan, Singapore, and Cyprus local exchanges.

**Appendix A:**
**Bahamas Properties Purchased by the FTX Group Using Commingled Customer Funds**

| Property | Approximate Purchase Price | Approximate Closing Date |
|---|---|---|
| **Residential Properties** | | |
| Albany Charles Unit 3A | US$7,235,000 | 11/30/2021 |
| Albany Charles Unit 4B | US$7,000,000 | 4/29/2022 |
| Old Fort Bay Lot A | US$16,400,000 | 4/7/2022 |
| Sandyports Lots 15 & 16 | B$1,920,000 (B$1,391,000 and B$529,000) | 12/31/2021 |
| One Cable Beach Unit 209 | B$950,000 | 6/30/2021 |
| One Cable Beach Unit 112 | US$1,371,871 | 6/14/2021 |
| One Cable Beach Unit 311 | US$2,000,000 | 6/3/2021 |
| Turnberry Lot #39 | B$880,000 | 1/25/2022 |
| Albany Charles Unit 3B | US$6,750,000 | 3/31/2022 |
| Albany Charles Unit 4A | US$7,500,000 | 12/3/2021 |
| Albany Charles Unit 5A | US$10,250,000 | 11/10/2022 |
| Albany Cube Unit 1B | US$3,310,886.79 | 11/9/2021 |
| Albany Gemini Unit 1D | US$4,750,000 | 6/9/2022 |
| Albany Honeycomb Unit 2A | US$7,000,000 | 1/18/2022 |
| Albany Honeycomb Unit 2C | US$5,500,000 | 8/2/2022 |
| Albany Honeycomb Unit 3E | US$6,250,000 | 4/11/2022 |
| Albany Orchid Unit 1A | US$5,500,000 | 9/13/2022 |
| Albany Orchid Unit 3B | US$7,311,320.75 | 11/19/2021 |
| Albany Orchid Penthouse | US$30,000,000 | 1/18/2022 |
| Albany Tetris Unit D2 | US$8,900,000 | 12/30/2021 |
| Albany Tetris Unit 2E | US$7,850,000 | 5/30/2022 |
| Albany Tetris Unit 3D | US$7,478,873.24 | 12/30/2021 |
| Albany Lot 44 | US$11,000,000 | 2/16/2022 |
| Ocean Terraces | US$17,500,000 | 3/8/2022 |
| One Cable Beach Unit 207 | US$1,540,000 | 7/15/2022 |
| One Cable Beach Unit 309 | US$1,395,000 | 7/18/2022 |
| One Cable Beach Unit 603 | US$975,000 | 8/11/2022 |
| One Cable Beach Unit G12 | US$1,295,000 | 7/15/2022 |
| Old Fort Bay Lots 5A & 5B | B$9,000,000 | 5/19/2022 |
| **Commercial Properties** | | |
| Bayside Estates – Pictet | US$4,500,000 | 2/3/2022 |
| Blake Road | B$875,000 | 6/15/2022 |
| Pineapple House | B$1,800,000 | 7/22/2022 |
| Veridian Corporate Center Units 18, 24, 25, 26, 27, 30 | US$8,550,000 | 12/30/2021 |
| Veridian Corporate Center Unit 23 | US$2,290,000 | 4/8/2022 |
| Veridian Corporate Center Units 2-22, 28 and 29 | B$14,500,000 | 9/29/2022 |