**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

IN RE:

**FTX CRYPTOCURRENCY EXCHANGE**
**COLLAPSE LITIGATION**

23-md-03076-KMM

THIS DOCUMENT RELATES TO:

Promoters and Digital Creators

**ADMINISTRATIVE CLASS ACTION COMPLAINT**
**AND DEMAND FOR JURY TRIAL:**
**Promoters and Digital Creator Defendants**

## **TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................... 7

PARTIES .......................................................................................................................... 19

JURISDICTION AND VENUE ........................................................................................ 26

FACTUAL ALLEGATIONS ............................................................................................ 27

    A.   The Rise of FTX ................................................................................................... 27

    B.   FTX's Key Players ............................................................................................... 31

    C.   The Basics of a Cryptocurrency Exchange ......................................................... 37

    D.   The Mechanics of the Fraudulent Scheme .......................................................... 43

    E.   The Fraud's Collapse ........................................................................................... 52

    F.   FTX Files for Bankruptcy .................................................................................... 61

    G.   Crypto Sector a Hotbed for Illicit Activity and Fraudulent Conduct .................. 69

    H.   The SEC's Approach to Cryptocurrency. ............................................................ 74

    I.   FTX's offer and sale of YBAs, which are unregistered securities. ..................... 88

    J.   FTX's offer and sale of FTT Tokens, which are unregistered securities ............ 98

    K.   Using the FTX Platform itself necessarily required transacting in unregistered securities. 98

    L.   FTX Aggressively and Deceptively Marketed its Platform ............................... 103

    M.   The Defendants' Roles in the Fraud ................................................................... 112

    N.   Material Ties to Florida ..................................................................................... 284

CLASS ACTION ALLEGATIONS ................................................................................ 290

    A.   Class Definitions ............................................................................................... 290

    B.   Numerosity ......................................................................................................... 291

    C.   Commonality/Predominance .............................................................................. 292

    D.   Typicality ........................................................................................................... 293

    E.   Adequacy of Representation ............................................................................... 293

    F.   Requirements of Fed. R. Civ. P. 23(b)(3) ......................................................... 293

    G.   Superiority .......................................................................................................... 294

    H.   Requirements of Fed. R. Civ. P. 23(b)(2) ......................................................... 295

    I.   Requirements of Fed. R. Civ. P. 23(c)(4) ......................................................... 295

J.   Nature of Notice to the Proposed Class. .................................................................... 296

COUNT ONE ................................................................................................................. 296

COUNT TWO ................................................................................................................ 297

COUNT THREE ............................................................................................................. 298

COUNT FOUR ............................................................................................................... 299

COUNT FIVE ................................................................................................................. 301

COUNT SIX ................................................................................................................... 302

COUNT SEVEN ............................................................................................................. 303

COUNT EIGHT .............................................................................................................. 304

COUNT NINE ................................................................................................................ 305

COUNT TEN .................................................................................................................. 306

COUNT ELEVEN ........................................................................................................... 307

COUNT TWELVE .......................................................................................................... 308

COUNT THIRTEEN ....................................................................................................... 309

COUNT FOURTEEN ...................................................................................................... 310

PRAYER FOR RELIEF ................................................................................................... 311

In accordance with this Court's Order (Dkt. 61 at 1), Plaintiffs hereby file this Administrative Class Action Complaint and Demand for Jury Trial pursuant to Rule 42 of the Federal Rules of Civil Procedure as the controlling document for pre-trial purposes with regards to the FTX Promoter and Influencer Defendants, as named herein, and as transferred to this Court from the following actions:

- *Lam v. Bankman-Fried* (N.D. Cal.)

- *Garrison v. Bankman-Fried et al* (S.D. Fl.)

- *Garrison et al v. Paffrath et al* (S.D. Fl.)

- *Norris et al v. Brady et al.* (S. D. Fl.)

- *Podalsky et al v. Bankman-Fried et al* (S.D. Fl.)

- *Garrison v. Jung* (8:23-cv-01969) (D. Md.)

- *Garrison v. Singh* (2:23-cv-11764) (E.D. Mich.)

- *Garrison v. Stephan et al* (2:23-cv-01138) (D. Nev.)

- *Garrison v. Golden State Warriors* (3:23-cv-03628) (N.D. Cal.)

- *Garrison v. Osaka et al* (2:23-cv-05951) (C. D. Cal.)

- *Garrison v. Creators Agency LLC* (2:23-cv-00139) (D.Wyo)

Plaintiffs are not otherwise joining or merging these actions, which retain their individual nature for all other purposes, including venue, transferor forum, personal jurisdiction, and subject matter jurisdiction.

Plaintiffs use the following defined terms throughout:

- "Alameda" refers to Alameda Research, LLC and its subsidiaries.

- "Auditor Defendants" refers to Prager Metis CPAs, LLC and Armanino LLP.

- "Bank Defendants" refers to Defendants Deltec Bank & Trust Company Ltd. ("Deltec"), Farmington State Bank d/b/a Moonstone Bank ("Moonstone"), and Jean Chalopin.

- "Domestic VC Defendants" collectively refers to Sequoia Capital Operations, LLC ("Sequoia"), Thoma Bravo, LP ("Thoma Bravo"), Paradigm Operations LP ("Paradigm"), SkyBridge Capital II, LLC ("SkyBridge"), Multicoin Capital Management LLC ("Multicoin Capital"), Tiger Global Management, LLC ("Tiger"), Ribbit Management Company, LLC ("Ribbit Capital"), Altimeter Capital Management, LP ("Altimeter"), and K5 Global Advisor, LLC ("K5 Global").

- "FTT" refers to the native cryptocurrency exchange token of the FTX Platform ecosystem.

- "FTX" refers collectively to FTX Trading LTD and its subsidiaries d/b/a FTX ("FTX Trading") and West Realm Shires Inc. and its subsidiaries ("WRS"). WRS includes, without limitation, its subsidiary West Realm Shires Services Inc. d/b/a FTX US ("FTX US").

- "FTX Group" refers collectively to FTX and Alameda.

- "FTX Insider Defendants" refers to Samuel Bankman-Fried, Caroline Ellison, Gary Wang, and Nishad Singh.

- "FTX Platform" refers to FTX's mobile application and/or web-based cryptocurrency investment service that places cryptocurrency trade orders on behalf of users.

- "Law Firm Defendant" refers to Defendant Fenwick & West LLP.

- "MDL Defendants" collectively refers to all Defendants named in the seven Administrative Class Action Complaints.

- "Multinational VC Defendants" refers to Defendants Sino Global Capital Limited ("Sino Global"), Softbank Group Corp. ("Softbank Group"), and Temasek Holdings (Private) Limited ("Temasek Holdings") together with its wholly owned subsidiary, Temasek International (USA) LLC ("Temasek USA" and, together with Temasek Holdings, "Temasek").

- "Promoter and Digital Creator Defendants" or "Brand Ambassador Defendants" refers to Thomas Brady, Gisele Bündchen, Kevin O'Leary, Udonis Haslem, David Ortiz, Stephen Curry, Golden State Warriors, LLC, Shaquille O'Neal, William Treavor Lawrence, Shohei Ohtani, Noami Osaka, Solomid Corporation d/b/a Team Solomid, TSM and/or TSM FTX, Graham Stephan, Andrei Jikh, Jaspreet Singh, Brian Jung, Jeremy Lefebvre, Tom Nash, Erika Kullberg and Creators Agency, LLC.

- "YBAs" refers to the Yield-Bearing Accounts offered by FTX on the FTX Platform.

Plaintiffs, on behalf of themselves and all others similarly situated, sue the MDL Defendants for their respective actions, as outlined herein,[1] which contributed to the collapse of the FTX Group, including but not limited to 1) aiding and abetting and/or actively participating in the FTX Group's massive, multibillion dollar global fraud, and 2) promoting, offering, or selling unregistered securities such as FTX's yield-bearing accounts ("YBA") and FTX's native cryptocurrency token ("FTT"), which caused Plaintiffs substantial harm. Plaintiffs, on behalf of themselves and all others similarly situated, allege the following based upon personal knowledge

---

[1] At the request of the Court at the June 21, 2023 Status Conference, Plaintiffs have separated their complaint into seven versions, each of which contains a similar set of general allegations and the specific allegations as to a single group of MDL Defendants. Because certain claims, such as civil conspiracy, are pled across multiple groups of MDL Defendants, Plaintiffs hereby incorporate by reference the other versions of the complaint.

as to Plaintiffs and Plaintiffs' own acts, and upon an investigation conducted by and through counsel.

Plaintiffs, on behalf of themselves and all others similarly situated, sue the MDL Defendants for their respective actions, as outlined herein[2], which contributed to the collapse of the FTX Group, including but not limited to 1) aiding and abetting and/or actively participating in the FTX Group's massive, multibillion dollar global fraud, and 2) promoting, offering, or selling unregistered securities such as FTX's yield-bearing accounts ("YBA") and FTX's native cryptocurrency token ("FTT"), which caused Plaintiffs substantial harm. Plaintiffs, on behalf of themselves and all others similarly situated, allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and upon an investigation conducted by and through counsel

## **INTRODUCTION**

1.      The FTX disaster is the largest financial fraud in US history. Defendant Sam Bankman-Fried ("SBF"), FTX Group's founder and former CEO, is on house arrest awaiting his criminal trial scheduled for October of this year. FTX Group's new CEO—who helped wind down Enron—concluded the fraud here was worse than Enron. Billions of dollars have been stolen from investors across the globe.

2.      SBF and his FTX Group caused billions of dollars in losses to Plaintiffs, through at least two separate schemes, both of which contributed to the downfall of the FTX Group.

---

[2] At the request of the Court at the June 21, 2023 Status Conference, Plaintiffs have separated their complaint into seven versions, each of which contains a similar set of general allegations and the specific allegations as to a single group of MDL Defendants. Because certain claims, such as civil conspiracy, are pled across multiple groups of MDL Defendants, Plaintiffs hereby incorporate by reference the other iterations of the complaint.

3.      On one hand, SBF and the FTX Group stole customer deposits and used billions of dollars in customer funds to support the operations and investments of FTX and Alameda, to fund speculative venture investments, to make charitable and political contributions, and to personally enrich SBF himself, all while publicly touting the safety of the investment and the segregation of customer funds. The FTX Platform maintained by the FTX Group was truly a house of cards, a Ponzi scheme where the FTX Group shuffled customer funds between their opaque affiliated entities, using new investor funds obtained through investments in the FTX Platform, the YBAs, FTT, and/or loans to pay interest and investment withdrawals to the old ones and to attempt to maintain the appearance of liquidity.

4.      On the other hand, the FTX Group offered and sold securities without proper registration, thereby depriving Plaintiffs of financial and risk-related disclosures that would have impacted their calculus as to whether to invest in the FTX Group. Rather than heed the myriad warnings from the SEC dating as far back as 2017, the FTX Group chose instead to skirt US regulation through deception.

5.      This conduct violates numerous laws, including laws related to the sale of unregistered securities, consumer protection, professional malpractice, fraud, and conversion.

6.      As outlined herein, MDL Defendants directly perpetrated, conspired to perpetrate, and/or aided and abetted the FTX Group's multi-billion-dollar frauds for their own financial and professional gain.

7.      Because of these schemes, the FTX Group imploded, and over $30 billion in value evaporated almost overnight when the FTX Group filed its emergency Chapter 11 bankruptcy petition in Delaware.

8.      The first filed action transferred into this MDL was filed in Florida against the Brand Ambassador Defendants and resulted from the FTX Group's multi-billion-dollar frauds.[3] It was revealed how these famous celebrities and influencers were paid hundreds of millions of dollars through bribes to promote FTX under the now admittedly false narrative that investors and consumers could "trust" FTX because the Brand Ambassador Defendants "knew FTX" and "were all in" and therefore investors should invest their money too. These defendants never denied these allegations out right in the multiple motions to dismiss that they filed; instead, their primary defense was that they were not subject to personal jurisdiction in Florida.

9.      The *Garrison* plaintiffs sought to create this MDL, arguing that the MDL Defendants' jurisdictional arguments would fall by the wayside when all the actions were consolidated.   Subsequently, the *Garrison* plaintiffs amended their complaint to add the Declaration of Dan Friedberg, making it clear that Miami was the epicenter of the FTX fraud. With those developments, the MDL Defendants' must now face the merits.

10.      Since the initial complaints in this MDL were filed, it has become even more clear that Florida law applies to all Class Members on the securities-related claims. Judge Rakoff's recent Terraform opinion, discussed further below, demonstrates that the FTX Platform, YBAs, and FTT are all securities. This leaves the MDL Defendants with no defense regarding whether the violations occurred; they can only argue that they, personally, did not aid and abet any violations.

11.      The MDL Defendants will surely point to one another in an attempt to minimize their involvement and absolve their liability in this lawsuit. But to be sure, every single MDL Defendant is responsible for the damages that Class Members have sustained. As further detailed

---

[3] *Garrison v. Bankman-Fried*, S.D. Fla. Case No. 1:22-cv-23753-KMM.

herein, every MDL Defendant was a necessary player in pushing the FTX fraud to the unprecedented extent it reached, and all made exorbitant amounts of money in the process of doing so. For instance, the Law Firm Defendants suggested and implemented the plans. Just the same, the Bank Defendants helped move the money, the advertising agencies help create the false narratives, the Brand Ambassador Defendants gave them instant credibility and the Domestic and Multinational VC Defendants, unfortunately, stamped it with their approval.

12.     FTX will be involved in federal bankruptcy proceedings for many years and there is no guarantee that <u>any of the victims</u> will be able to see <u>any recovery</u> from those proceedings. This class action, pending in the Southern District of Florida as a Multi-District Litigation, may be the only avenue for any of the victims to recover any of their damages.

13.     What's more, FTX would not have been successful in perpetrating this fraudulent scheme on Plaintiffs and Class Members around the globe without key events that took place in and emanated from right here in Miami, Florida, which not only eventually became FTX's official headquarters but was their de facto domestic headquarters for years before FTX's eventual collapse. According to the Declaration of Dan Friedberg, attached as **Exhibit B**, FTX maintained an office in Miami, Florida, since early 2021, long before FTX eventually moved its Domestic headquarters to Brickell in late 2022. *Id.*, ¶ 20. Since early 2021, FTX's Miami office was run by Mr. Avinash Dabir, who was based in Miami and originally worked for Blockfolio as Director of Product and Partnership before FTX later acquired Blockfolio in late 2020.[4] *Id.* Dabir eventually became FTX's Vice President of Business Development. *Id.* Friedberg met with Mr. Dabir often and is very familiar with Mr. Dabir and his activities. *Id.*

---

[4] *See* https://www.coindesk.com/markets/2020/08/25/ftx-exchanges-150m-deal-for-mobile-first-blockfolio-is-a-retail-trading-play/ (accessed May 10, 2023); *see also* https://www.crunchbase.com/organization/blockfolio/people (accessed May 10, 2023).

14.     Mr. Dabir operated from FTX's Miami office, and he was focused on formulating and executing FTX's important celebrity partnerships. *Id.*, ¶ 21. Mr. Dabir had a lot of prior experience working with some of the major sports industries, including the NBA. *Id.*

15.     According to Friedberg, Mr. Dabir was very good at his job, and it was his idea to expend significant resources on FTX's sports and celebrity-based partnerships. *Id.*, ¶ 22. Mr. Dabir specifically started by suggesting FTX form a Partnership with the Miami Heat and the naming rights to the Miami Arena. *Id.* FTX announced the Partnership in March 2021, and included FTX purchasing the naming rights of the Miami Heat stadium for 19 years in a deal worth approximately $135 million. *Id.*

16.     The naming of the "FTX Arena" served as an important centerpiece for FTX's efforts to reach other FTX partnerships with celebrities and other well-known partners. *Id.*, ¶ 23. Mr. Dabir was the senior FTX executive responsible for creating, consummating, and implementing deals between FTX and other Partners, such as Major League Baseball, the MLB Umpire's Association, TSM, the Mercedes Formula 1 team, Tom Brady, Stephen Curry, the Golden State Warriors, Naomi Osaka, Larry David, and Shohei Ohtani. *Id.*

17.     Having Larry David agree to conduct a commercial for FTX during the 2022 Super Bowl was a very big event for FTX because, according to Friedberg, it was the first time that he had ever agreed to serve as a spokesperson for any product. *Id.*, ¶ 24. Mr. Dabir deserves much of the credit for creating that idea and concept and collaborating with Mr. David and his team, resulting in the award-winning Super Bowl FTX commercial that aired with the Super Bowl in 2022. *Id.*

18.     Released on March 31, 2022, Mr. Dabir appeared on the popular cryptocurrency podcast *The Joe Pomp Show*, where he was interviewed by Mr. Pompliano for over half an hour

on specifically the efforts he undertook and oversaw from his FTX base of operations in Miami, Florida, to create, consummate, and implement, among other things, the FTX arena deal and the Larry David Superbowl commercial. A transcript of the podcast is attached as **Exhibit C**.

19.     Mr. Dabir begins by introducing himself as "Vice President of Business Development at FTX, so I handle a lot of our sports partnerships as well as doing some of the interesting things in real estate as well." Ex. B at 2. He then explains that "the end goal" is really how does FTX "acquire more users." *Id.*

20.     After first acknowledging and agreeing with Mr. Pompliano that FTX was at that point the "leaders" in the sports partnership category and that "it started with Miami Heat Arena," Mr. Dabir explained that he led the effort to obtain the FTX Arena deal because he "had previously worked at the NBA" and that he identified Miami because it had "a great market," a "multicultural, great team," and the "Crypto Buzz was like growing here in Miami." *Id.*, at 2–3. Dabir explained that a contributing factor to the deal was "the fact that this was during COVID where, you know, a decent amount of live event businesses were-were short on revenue," which "opened up the door where we could have that conversation" with Miami-Dade County and the Miami Heat. *Id.*, at 4.

21.     Mr. Dabir also explained that it was crucial "to get approval from a local government, plus the Heat and the NBA who had their own diligence teams looking into" the FTX Arena deal because it "really sort of validated not only just FTX but the cryptocurrency industry in general." *Id.*, at 4.

22.     In order to close the FTX Arena deal, according to Mr. Dabir, FTX confidentially disclosed to Miami-Dade County and the Miami Heat FTX's balance sheet—which was comprised almost entirely of customer funds—and he explained to Mr. Pompliano that "there are ways to

structure these deals in a way where, you know, you can front load some of the funds, right, to-to provide some more comfort." *Id*.

23.    Mr. Dabir explained that there were multiple ways that FTX measured the success of their Brand Ambassador program, with the "obvious one [being] straight up conversion," as in "[h]ow many people in Florida download the app or around the Miami area, download the app, register, deposit, trade, you know, it's that standard sort of funnel that's very easy to track." *Id.*, at 6. But the other method, according to Mr. Dabir, is the "intangible element" of "trust" and "legitimacy" that comes from "building trust and value through brand association," like "I've already heard of FTX because of FTX Arena, or I saw your Super Bowl spot with-with Larry David." *Id.*

24.    Mr. Dabir also explains how he oversaw and participated in the creation of Larry David's now infamous 2022 Super Bowl ad, and recounting, "when we saw the script, we were like, this script is awesome. And then-then we're like, 'We have to get Larry David, right?' And then, you know, the teams went to work to try, and I don't know if that commercial works, if it's not Larry David, right?" *Id.*, 7.

25.    Crucially, all FTX employees or agents who were involved in the Larry David Super Bowl commercial ultimately reported to Avi Dabir, who had final approval of all aspects of the commercial from his base of operations in Miami.

26.    Mr. Dabir also went into detail about his dealings with Tom Brady and Giselle Bündchen and how the individual FTX Brand Ambassador partnership deals worked. *Id.,* 9. Importantly, not only was Mr. Dabir directly involved in negotiating and consummating the individual FTX Brand Ambassador partnership deals from his base in Miami, he also explains that

Defendants Brady and Bündchen were instrumental in bringing other FTX Brand Ambassadors into the fold, such as Defendant Curry. *Id.*

27.     The question of whether the promotion of the FTX Platform, the sale of every YBA and/or FTT is (or is not) the sale of "unregistered securities" has practically been answered in the affirmative through various regulatory statements, guidance, and actions issued by the Securities and Exchange Commission and other regulatory entities. For example, on November 1, 2017, in the "SEC Statement Urging Caution Around Celebrity Backed ICOs,"[5]

> In the SEC's Report of Investigation concerning The DAO,[6] the Commission warned that virtual tokens or coins sold in ICOs may be securities, and those who offer and sell securities in the United States must comply with the federal securities laws. Any celebrity or other individual who promotes a virtual token or coin that is a security must disclose the nature, scope, and amount of compensation received in exchange for the promotion. A failure to disclose this information is a violation of the anti-touting provisions of the federal securities laws. **Persons making these endorsements may also be liable** for potential violations of the anti-fraud provisions of the federal securities laws, **for participating in an unregistered offer and sale of securities**, and for acting as unregistered brokers. The SEC will continue to focus on these types of promotions to protect investors and to ensure compliance with the securities laws.

28.     The SEC and state securities regulators over the past 5 years, have already found liable numerous celebrities, cryptocurrency brokers and exchanges just like FTX for offering this exact same type of interest-bearing account and native token, finding that exchanges such as BlockFi,[7] Voyager,[8] and Celsius[9] all offered these same products as unregistered securities.

---

[5]     https://www.sec.gov/news/public-statement/statement-potentially-unlawful-promotion-icos (accessed May 11, 2023).

[6] https://www.sec.gov/litigation/investreport/34-81207.pdf (accessed May 11, 2023).

[7] https://www.sec.gov/news/press-release/2022-26 (accessed May 11, 2023).

[8]     https://coingeek.com/6-us-regulators-crackdown-on-voyager-digital-over-interest-bearing-accounts/ (accessed May 11, 2023).

[9]

https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=&cad=rja&uact=8&ved

29.     A second narrow issue that is common to the entire Proposed Class, whose focus is also solely objective, is whether these Defendants violated state consumer laws by failing to abide by any of the FTC's long-established rules and regulations, specifically on what is required for a celebrity endorsement of cryptocurrency.

30.     We all need to be clear. This is <u>not</u> a case where Plaintiffs made a "risky" investment in stock or cryptocurrency, or that they lost money speculating on various cryptocurrency projects. Plaintiffs' claims arise simply from the purchase of and investment in the FTX Platform, FTT, and/or a YBA, a savings type of account with FTX that every customer who signed up for the FTX app received by default, and which, as explained below, was guaranteed to generate returns on their significant holdings in the accounts, regardless of whether those assets were held as USD, legal tender or cryptocurrency, and regardless of whether any trades were made with the assets held on the FTX Platform or in the YBA. In other words, the FTX Platform and YBAs were portrayed to be like a bank account, something that was "very safe" and "protected." That is the narrative that Defendants pushed in promoting the FTX Platform and the offer and sale of YBAs and/or FTT, all of which are unregistered securities. For that, Defendants are liable for Plaintiffs' losses, jointly and severally and to the same extent as if they were themselves the FTX Group.

31.     Literally overnight, Plaintiffs' assets, including FTT,[10] held on the FTX Platform and/or in their YBAs were robbed from them as FTX imploded and former-CEO, Sam Bankman-

---

=2ahUKEwjvjNvg27j7AhWfRTABHfwzDe4QFnoECAsQAQ&url=https%3A%2F%2Fwww.nj.gov%2Foag%2Fnewsreleases21%2FCelsius-Order-9.17.21.pdf&usg=AOvVaw0Zd94fuhFSsOoGKM-vQ3YI (accessed May 11, 2023).

[10] Although the FTX Group purported to maintain a separation between the US and International platform—in large part because it knew its products offered on the international exchange were securities required to be registered with securities regulators—the separation was merely a farce

Fried, filed a Chapter 11 bankruptcy petition in Delaware on an emergency basis. This happened

because, as explained by the new CEO of the failed FTX Group:

> I have over 40 years of legal and restructuring experience. I have been the Chief Restructuring Officer or Chief Executive Officer in several of the largest corporate failures in history. I have supervised situations involving allegations of criminal activity and malfeasance (Enron). I have supervised situations involving novel financial structures (Enron and Residential Capital) and cross-border asset recovery and maximization (Nortel and Overseas Shipholding). Nearly every situation in which I have been involved has been characterized by defects of some sort in internal controls, regulatory compliance, human resources and systems integrity.
>
> ***Never*** in my career have I seen such a complete failure of corporate controls and such a **complete absence of trustworthy financial information** as occurred here. From compromised systems integrity and faulty regulatory oversight abroad, to the concentration of control in the hands of a very small group of inexperienced, **unsophisticated** and **potentially compromised** individuals, **this situation is <u>unprecedented</u>**.

*See In re: FTX Trading Ltd, et al.*, No. 22-11068 (JTD), ECF No. 24, ¶¶ 4–5 (D. Del. Nov. 17,

2022) (emphasis added).

      32.    The Cryptocurrency National Disaster is growing by the billions almost every day.

More crypto companies are filing new federal bankruptcy petitions each day, all running for

---

and was easily circumvented (which was something that the FTX Group encouraged) through the use of, for instance, a VPN. *See* https://blockduo.com/ftx-usa/ ("FTX, like other crypto exchanges, uses something called geo-blocking to stop users from restricted countries from using the exchange. They do this by seeing where your IP address is, and if it is from one of the banned countries, they will block you from the site. With the now wide availability of VPNs, this can be bypassed") (accessed May 11, 2023). The use of VPNs to circumvent geo-blocking for cryptocurrency exchanges is a well-known and widely used method encouraged by the exchanges to rake in as many new U.S.-based customers as possible to keep new funds loading onto their platform. *See CFTC v. Changpeng Zhao, et al.,* No. 1:23-cv-01887, ECF No. 1 (N.D. Ill. Mar. 27, 2023) (CFTC enforcement action brought because "Binance and its officers, employees, and agents have instructed U.S. customers to use virtual private networks ('VPNs') to obscure their location; allowed customers that had not submitted proof of their identity and location to continue to trade on the platform long after announcing such conduct was prohibited; and directed VIP customers with ultimate beneficial owners, key employees who control trading decisions, trading algorithms, and other assets all located in the United States to open Binance accounts under the name of newly incorporated shell companies to evade Binance's compliance controls.").

protection from the billions of dollars of losses they directly caused to thousands of investors here in Florida and across the globe. This is by far the largest securities national disaster, greatly surpassing the Madoff Ponzi Scheme, and could very likely become a complex international litigation disaster, similar to how the hundreds of thousands of asbestos cases swamped all courts across the globe. Unless a workable, coordinated, and organized structure is established now, at the very onset of these proceedings, here in Miami, which served as the epicenter for the crypto fraud, the FTX victims will continue to suffer and the only people to benefit will be the professionals in the bankruptcy and civil courts.

33.     The Deceptive and failed FTX Platform all emanated from here in Miami, Florida, FTX's domestic headquarters and the host of the largest and most famous International World Cryptocurrency Conventions. FTX's fraudulent scheme was designed to take advantage of unsophisticated investors from across the globe, who utilize mobile apps to make their investments. As a result, consumers around the globe collectively sustained billions of dollars in damages. FTX organized and emanated its fraudulent plan from its worldwide headquarters located here in Miami, Florida. Miami became the "hot spot" for crypto companies, hosting the most investments in crypto startups as well as the annual Bitcoin Miami 2022 Global Forum. Several crypto companies, including crypto exchange Blockchain.com, Ripple and FTX.US, moved their headquarters to Miami. Others, including fellow exchange eToro, expanded their U.S. presence with offices in Miami. FTX was already very familiar with Miami, signing a deal worth more than $135 million dollars for the naming rights of the waterfront arena, where 3-time NBA Champions the Miami Heat play.

34.     Plaintiffs also bring this action against YouTube and social media financial influencers and promoters who shared financial advice and actively promoted FTX and its yield-

bearing-accounts ("YBAs") to their millions of followers. Though FTX paid Defendants handsomely to push its brand and encourage their followers to invest, Defendants did not disclose the nature and scope of their sponsorships and/or endorsement deals, payments and compensation, nor conduct adequate (if any) due diligence.

35.     With the rise to prominence of the internet and social media, a new multi-billion-dollar cottage industry of "Influencers" has been created. Evidence has now been uncovered that reveals Influencers played a major role in the FTX disaster and in fact, FTX could not have arisen to such great heights without the massive impact of these Influencers, who hyped the FTX Platform for undisclosed payments ranging from tens of thousands of dollars to multimillion-dollar bribes.[11] Indeed, the most searched companies on the internet today are cryptocurrency brands. According to the NBA 2021–2022 Marketing & Partnerships Annual Report by Sponsor United, the cryptocurrency industry had a higher search volume during that year than the entire Alcohol & Beverages industry.

36.     It is paramount to understand that the Florida state law claims asserted in this action **do not require "reliance" or "deceit."** The law merely requires the named Plaintiffs (and eventually the certified class) to have suffered damages as a result of: (a) purchasing an "unregistered security," and (b) that was promoted by the Defendants for their financial benefit and/or the financial benefit of FTX.

37.     The reality is that anyone around the world with a computer can now be a promoter. Many of these paid FTX Influencers have since asked for forgiveness, because many of these Influencers rely mainly on their alleged independence and impartiality in attracting people to join

---

[11] For example, the company Coinbound touts that: We help crypto brands go viral using Web3's top influencers. An influencer marketing agency built for crypto. https://coinbound.io/influencers/ (accessed March 15, 2023).

their fanbase.[12] This Action is brought to hold liable those Influencers who specifically violated the law under these acts and will serve as precedent to warn and guide Influencers in the future.

38.     State and federal regulators have been required to quickly modify and adjust to all of the changing sources of promoters and marketers. Starting with sponsors on radio, then television and motion pictures and today, to the wild west of the internet, the number of companies that specialize in promoting on social media have sky-rocketed. According to studies, those aged 18 to 34 are more likely to build an interest in an investment specifically from social media, instead of traditional news websites.[13]

## **PARTIES**

39.     **Plaintiff Brandon Orr** is a citizen and resident of the State of Arizona. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Orr purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the MDL Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Orr has sustained damages for which the MDL Defendants are liable.

40.     **Plaintiff Leandro Cabo** is a citizen and resident of the State of California. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Cabo purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the MDL Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Cabo has sustained damages for which the MDL Defendants are liable.

---

[12]     https://www.businessinsider.com/influencers-sponsored-by-ftx-say-sorry-to-fans-2022-11 (accessed March 15, 2023).

[13]     https://www.theguardian.com/money/2021/aug/22/as-finfluencers-spread-through-social-media-beware-the-pitfalls (accessed March 15, 2023).

41.     **Plaintiff Ryan Henderson** is a citizen and resident of the State of California. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Henderson purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the MDL Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Henderson has sustained damages for which the MDL Defendants are liable.

42.     **Plaintiff Michael Livieratos** is a citizen and resident of the State of Connecticut. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Livieratos purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the MDL Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Livieratos has sustained damages for which the MDL Defendants are liable.

43.     **Plaintiff Alexander Chernyavsky** is a citizen and resident of the State of Florida. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Chernyavsky purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the MDL Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Chernyavsky has sustained damages for which the MDL Defendants are liable.

44.     **Plaintiff Gregg Podalsky** is a citizen and resident of the State of Florida. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Podalsky purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the MDL Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Podalsky has sustained damages for which the MDL Defendants are liable.

45.      **Plaintiff Vijeth Shetty** is a citizen and resident of the State of Florida. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Shetty purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the MDL Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Shetty has sustained damages for which the MDL Defendants are liable.

46.      **Plaintiff Chukwudozie Ezeokoli** is a citizen and resident of the State of Illinois. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Ezeokoli purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the MDL Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Ezeokoli has sustained damages for which the MDL Defendants are liable.

47.      **Plaintiff Michael Norris** is a citizen and resident of the State of New Jersey. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Norris purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the MDL Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Norris has sustained damages for which the MDL Defendants are liable.

48.      **Plaintiff Edwin Garrison** is a citizen and resident of the State of Oklahoma. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Garrison purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the MDL Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Garrison has sustained damages for which the MDL Defendants are liable.

49.      **Plaintiff Shengyun Huang** is a citizen and resident of the State of Virginia. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Huang purchased or held

legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the MDL Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Huang has sustained damages for which the MDL Defendants are liable.

50.     **Plaintiff Julie Papadakis** is a citizen and resident of the State of Virginia. She is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Papadakis purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the MDL Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Papadakis has sustained damages for which the MDL Defendants are liable.

51.     **Plaintiff Vitor Vozza** is a citizen and resident of the Federal Republic of Brazil. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Vozza purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the MDL Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Vozza has sustained damages for which the MDL Defendants are liable.

52.     **Plaintiff Kyle Rupprecht** is a citizen and resident of the Dominion of Canada. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Rupprecht purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the MDL Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Rupprecht has sustained damages for which the MDL Defendants are liable.

53.     **Plaintiff Warren Winter** is a citizen and resident of the Federal Republic of Germany. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Winter purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or

invested through an FTX Platform. As a result of the MDL Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Winter has sustained damages for which the MDL Defendants are liable.

54.     **Plaintiff Sunil Kavuri** is a citizen and resident of the United Kingdom of Great Britain and Northern Ireland. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Kavuri purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the MDL Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Kavuri has sustained damages for which the MDL Defendants are liable.

55.     The "**<u>Defendants</u>**" are all persons and/or companies that (1) agreed to serve as "Brand Ambassadors" or "Digital Creators" for FTX; (2) all admittedly advertised and promoted the sale of the FTX Platform, YBAs and/or FTT, and; (3) failed to disclose, in any of their marketing campaigns and/or advertisements, that they were paid millions of dollars by FTX and profited from the sale of cryptocurrency, the FTX Platform, YBAs and/or FTT , in clear violation of SEC, FTC and various federal and state regulations. The "Digital Creators" are persons who provided investor information and advice on an array of topics, including cryptocurrency generally and FTX on their YouTube channels. YouTube is the second largest search engine, which generates content that is accessible across the globe.

56.     **Defendant Thomas Brady**, former NFL quarterback for the Tampa Bay Buccaneers and New England Patriots, is a brand ambassador of FTX, and is a citizen and resident of Miami-Dade County, Florida.

57.     **Defendant Gisele Bündchen**, one of the world's highest-paid models and a brand ambassador for FTX, is a citizen and resident of Miami-Dade County, Florida.

58.     **Defendant Kevin O'Leary**, "Mr. Wonderful," a businessman, television personality appearing regularly on Shark Tank, and brand ambassador for FTX, is a citizen and resident of Miami Beach, Florida.

59.     **Defendant Udonis Haslem**, a recently retired American professional basketball player for the Miami Heat of the NBA and brand ambassador of FTX, is a citizen and resident of Miami-Dade County, Florida.

60.     **Defendant David Ortiz**, former designated hitter and first baseman in the MLB and a brand ambassador for FTX, is a citizen and resident of the State of Florida.

61.     **Defendant Stephen Curry**, professional basketball player for the Golden State Warriors and brand ambassador for FTX, is a citizen and resident of the State of California.

62.     **Defendant Golden State Warriors LLC** is a professional basketball team in the NBA that officially launched their partnership with FTX in 2022 with the unveiling of the FTX logo on the court at the Chase Center. Golden State Warriors LLC is a corporation operating and existing under the laws of the State of California.

63.     **Defendant Shaquille O'Neal**, former professional NBA basketball star, sports analyst, entrepreneur, and FTX brand ambassador, is a citizen and resident of Collin County, Texas.

64.     **Defendant William Trevor Lawrence**, the quarterback for the Jacksonville Jaguars of the NFL and a brand ambassador for FTX, is a citizen and resident of the state of Mississippi.

65.     **Defendant Shohei Ohtani**, a professional baseball pitcher, designated hitter and outfielder for the Los Angeles Angels of the MLB and a brand ambassador for FTX, is a citizen and resident of the State of California.

66.     **Defendant Naomi Osaka**, a professional tennis player and brand ambassador for FTX, is a citizen and resident of Beverly Hills, California.

67.     **Defendant Lawrence Gene David**, an American comedian, writer, actor, television producer, and FTX brand ambassador, is a citizen and resident of Los Angeles, California.

68.     **Defendant Solomid Corporation, d/b/a Team Solomid, TSM, and/or TSM FTX**, a professional esports organization that inked a $210 million naming rights deal with FTX Group on June 4, 2021, is a corporation operating and existing under the laws of the State of California.[14]

69.     Defendant, **Graham Stephan**, a YouTube star with over 4.1 million subscribers to his YouTube channels, was paid to endorse FTX, and is a citizen and resident of Las Vegas, Nevada.

70.     Defendant, **Andrei Jikh**, a YouTube star with over 2.2 million subscribers to his YouTube pages, was paid to endorse FTX, and is a citizen and resident of Las Vegas, Nevada.

71.     Defendant, **Jaspreet Singh**, a YouTube star with over 1.4 million subscribers to his YouTube channel, "Minority Mindset," was paid to endorse FTX, and is a citizen and resident of Detroit, Michigan.

72.     Defendant, **Brian Jung**, a YouTube star with over 1.3 million subscribers to his YouTube channel, was paid to endorse FTX, and is a citizen and resident of Washington, D.C.

---

[14] Esports is short for electronic sports. It is a form of organized competition using video games, usually in the form of multiplayer video game competitions between individuals or teams.

73.     Defendant, **Jeremy Lefebvre**, a YouTube star with over 700,000 subscribers to his YouTube page, Financial Education, was paid to endorse FTX, and is a citizen and resident of Las Vegas, Nevada.

74.     Defendant, **Tom Nash**, a YouTube star with over 283,000 subscribers to his YouTube page, was paid to endorse FTX, and is a citizen and resident of Sydney, Australia.

75.     Defendant, **Erika Kullberg** is, upon information and belief, a founder of Defendant, Creators Agency LLC ("Creators Agency") and is currently identified on Creative Agency's website as one of its "Finance/Business Creators" with 18 million social media followers.

76.     Defendant, **Creators Agency** is a talent management firm and digital ad network which promoted FTX. Upon information and belief, Creators Agency is organized and existing under the laws of the State of Delaware and has its principal place of business in Tokyo, Japan.

## JURISDICTION AND VENUE

77.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A) because this is a class action for a sum exceeding $1,000,000,000.00 (one billion dollars), exclusive of interest and costs, and in which at least one class member is a citizen of a state different than the Defendants.

78.     This Court has jurisdiction over every Defendant in this multi-district litigation because every Defendant was transferred to this forum from a transferor court which had personal jurisdiction over that Defendant.

79.     Under 28 U.S.C. § 1407, venue is proper pursuant to the valid transfer and Fed. R. Civ. P. 42 pre-trial consolidation of these cases in this District by the Judicial Panel on Multidistrict Litigation.

80.     All conditions precedent to the institution and maintenance of this action have been performed, excused, waived, or have otherwise occurred.

## FACTUAL ALLEGATIONS

**A.      The Rise of FTX**

81.     In May 2019, SBF and his co-founders, Gary Wang and Nishad Singh, launched FTX, which, along with various subsidiaries, affiliates and related entities, operated the FTX Platform, which FTX purported to be a centralized digital asset exchange aimed at "the mass market and first-time users" of cryptocurrencies.

82.     FTX portrayed itself as a trustworthy and law-abiding member of the cryptocurrency industry, focused not only on profits, but also on investor and client protection. In public statements, including in testimony before the United States Senate, SBF stated that FTX had adopted "principles for ensuring investor protections on digital asset-platforms" including "avoiding or managing conflicts of interest," and that "[a]s a general principle[,] FTX segregate[s] customer assets from its own assets across our platforms." SBF spent millions on advertisements to portray FTX as the "safest and easiest way to buy and sell crypto" and "the most trusted way to buy and sell" digital assets.[15]

83.     All the while, however, FTX was doing none of these things. Instead of managing conflicts, the FTX Group actively embraced them, using FTX Trading, FTX.US, and Alameda funds interchangeably to prop up the enterprise. Contrary to SBF's statements, FTX had no focus on investor protection and did not segregate customer funds. Rather, FTX used customer assets as an interest-free source of capital for Alameda's and SBF's private ventures.

84.     FTX was conceived in Northern California before transitioning its headquarters to

---

[15] *See United States of America v. Samuel Bankman-Fried a/k/a "SBF"*, S5 Cr. 673 (LAK), Dkt. 115, Superseding Indictment at ¶ 2 (March 28, 2023).

Chicago, Illinois, and ultimately landing its domestic operations in Miami, Florida, where FTX US was headquartered and where, in early 2021, FTX purchased the naming rights to the Miami Heat's waterfront arena for more than $135 million, one of many sports venues on which FTX paid to have its name emblazoned and one of many extravagant purchases made with Class Members' funds.

85.     Beginning no later than early 2019, for FTX Trading, and no later than May 22, 2020, for FTX US, Class Members could open "yield-bearing accounts" ("YBAs") and/or other accounts, and deposit a wide assortment of cryptocurrencies, as well fiat currency, including U.S. dollars, into the accounts ("Class Member funds") through the FTX website or through FTX's mobile app.

86.     FTX lured Class Members to make such deposits with promises of guaranteed 8% annual percent yield on assets equivalent up to $10,000 USD and guaranteed 5% annual percent yield on amounts between $10,000 USD and $100,000 USD, each of which compounded hourly upon a Class Member's deposit of funds. At no time did FTX register the YBAs pursuant to any federal or state securities law, as discussed more fully below.

87.     By structuring the rates of returns in this way, FTX targeted nascent investors— i.e., those under the age of 30 and/or new to trading, both inexperienced and unsophisticated—by tying higher rates of return to lower deposit amounts with "no fees and no minimum balances."

88.     Unlike a traditional brokerage, FTX took custody of Class Members' assets, which FTX promised to safeguard. In its terms of service, FTX represented to Class Members that "[a]ll cryptocurrency or dollars (or other supported currencies) that are held in your account are held by FTX.US for your benefit;" that "[t]itle to cryptocurrency represented in your FTX.US Account shall at all times remain with you and shall not transfer to FTX.US.;" and that "FTX.US does not

represent or treat assets in your FTX.US Account as belonging to FTX.US." FTX Trading's terms of service similarly represented that no customer funds were "the property of, or shall be loaned to, FTX Trading," and that FTX Trading "does not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading."

89.     FTX assured Class Members that their assets were safe and could be withdrawn at any time, claiming on its website that "FTX does back the principal generating the yield with its own funds and equity." SBF further promised, on Twitter in August 2021, "[FTX] will always allow withdrawals (except in cases of suspected money laundering/theft/etc.)."

90.     FTX also promised to protect against the risk that any customer would engage in self-dealing on the exchange or otherwise try to manipulate the market. For example, FTX claimed to offer "wash trading protection," representing that it implemented "exchange controls that actively prevent a party trading with themselves." Additionally, FTX represented, in its terms of service, that "FTX.US does not permit self-trades in order to manipulate markets, reported statistics, or cause liquidations."

91.     FTX also purported to protect against the risk that any customer would become overleveraged or undercollateralized on the platform. For this, FTX touted its "risk-engine," an automated monitoring system that required FTX customers to pledge additional collateral to their accounts as trades went bad and, if the customer failed to do so, liquidated that customer's assets. FTX detailed its auto-liquidating "risk engine" and other purported risk management procedures in a public proposal to the U.S. Commodity Futures Trading Commission ("CFTC"), in which FTX sought permission to trade non-intermediated margin products (i.e., without any intermediary to hold customer funds):

> A participant's margin level is recalculated every 30 seconds as positions are
> marked to market, and if the collateral on deposit falls below maintenance margin

level, FTX's automated system will begin to liquidate the portfolio. The automated system will liquidate 10 percent of a portfolio at a time by placing offsetting orders on the central limit order book. Once the liquidation process results in collateral on deposit that exceeds the margin requirement, the liquidation will stop. Because the liquidation is done automatically and positions are marked to market every 30 seconds, these liquidations can occur at any time, on a "24-7" basis.

92.     FTX claimed that this and other risk management procedures distinguished it from other cryptocurrency exchanges and ensured that Class Member funds were protected from losses by other users. For example, on May 11, 2022, SBF tweeted that "the margin mode is safe and conservative: real time risk engines mean you neither have to preemptively liquidate days early, nor risk positions going underwater for days." The next day, SBF testified before the U.S. House of Representatives Committee on Agriculture that:

> In our risk model the collateral is held directly at the clearinghouses, the collateral for all the positions. There is CFTC oversight of that collateral, and it is guaranteed to be there to not be used for anything else, to be **segregated**, and that is a difference with traditional models. It provides an extra guarantee of the assets backing these positions. (emphasis added).

At that hearing, in response to Chairwoman Jahana Hayes' concern that FTX's risk monitoring system "could create an opening for fraud and abuse, particularly towards new customers that are entering the digital asset market for the first time," SBF assured that in FTX's model, "there is a lot of capital which is held directly with CFTC oversight [and] **segregated** accounts for margin for the customers' positions, which also provides a capital backstop . . . ." (emphasis added).

93.     More generally, in television commercials, in print advertising, through interviews and spokespeople, on Twitter, TikTok, Instagram, and Facebook, and in other publications, FTX repeatedly peddled itself as "the safest and easiest way to buy and sell crypto," and SBF repeatedly promised that "our users' funds and safety come first." In highlighting FTX's purported safety, SBF and other FTX executives falsely represented that FTX was insured by the Federal Deposit Insurance Corporation ("FDIC")—including in a tweet by FTX US President Brett Harrison that

"direct deposits from employers to FTX US are stored in individually FDIC-insured bank accounts in the users' names," and "stocks are held in FDIC-insured . . . accounts"—until the FDIC ordered that FTX cease and desist in a letter dated August 18, 2022.

94.     SBF's carefully curated public persona complemented FTX's veneer of safety and was critical to FTX's meteoric rise. SBF came to be "the best-known proponent of the 'effective altruism' social movement which believes in prioritizing donations to projects that will have the largest impact on the most people." In touting his commitment to the movement, SBF explained on YouTube and to journalists that "I wanted to get rich, not because I like money but because I wanted to give that money to charity," and that "I pretty quickly run out of really effective ways to make yourself happier by spending money . . . I don't want a yacht."

95.     But in truth, SBF *did* want a yacht, and he wanted Formula One teams, BMWs, beachfront condos, and cocaine-fueled parties. And he got those things—with Class Member funds. SBF's association with altruism and charity, and his public denouncements of greed and excess, generated a false trustworthiness among the public and provided necessary goodwill for FTX, each critical to hide his lavish spending of Class Member funds.

96.     On the basis of these reassurances, along with other representations described herein, FTX grew to become one of the largest cryptocurrency exchanges in the world—at its peak, the exchange's trading volumes reached approximately $21 billion *per day* and its valuation topped $32 billion within three years of its founding.

**B.     FTX's Key Players**

    ***I.     Defendant Sam Bankman-Fried***

97.     The FTX Group was founded in 2019 and began as an exchange or marketplace for the trading of crypto assets. FTX was established by Samuel Bankman-Fried, Gary (Zixiao) Wang and Nishad Singh, with operations commencing in May 2019. FTX was purportedly established

to build a digital asset trading platform and exchange for the purpose of a better user experience, customer protection, and innovative products. FTX built the FTX.com exchange to develop a platform robust enough for professional trading firms and intuitive enough for first-time users.

98.     Prior to that, the Silicon Valley-born, MIT-educated Bankman-Fried, also known as SBF, launched his quantitative crypto trading firm, Alameda, in November 2017,[16] after stints in the charity world and at trading firm Jane Street.[17] Quantitative trading consists of trading strategies based on quantitative analysis, which rely on mathematical computations and number crunching to identify trading opportunities.

99.     On January 3, 2023, Bankman-Fried pled not guilty to eight criminal charges during a hearing before the U.S. District Court for the Southern District of California in USA v. SBF, 1:22-cr-00673-LAK-1. On February 23, 2023, a superseding indictment was unsealed. It added four more charges, including charges for conspiracy to commit bank fraud and unlicensed money transmitting business, and money laundering. Id., Doc. 80. With his trial scheduled for October 2023, Bankman-Fried faces over 100 years in prison for crimes predicated on his lying to investors and stealing billions of dollars of his customers' money.

### II.     *Defendant Caroline Ellison*

100.     By 2018, Defendant Bankman-Fried had persuaded Defendant Ellison to join him at Alameda. Defendant Ellison described the recruitment as follows: "This was very much like, 'oh, yeah, we don't really know what we're doing,'" Ellison told *Forbes* magazine in an interview regarding her initial impressions of Alameda.

---

[16] https://www.businessinsider.com/ftx-crypto-king-sam-bankman-fried-rise-and-fall-2022-11 (accessed May 11, 2023).

[17]     https://www.businessinsider.com/ftx-sbf-crypto-saga-explained-what-happened-what-it-means-2022-11?inline-endstory-related-recommendations= (accessed May 11, 2023).

101.    In late 2018, the headquarters of Alameda was relocated to Hong Kong. The team at Alameda included Defendant Bankman-Fried's close friends (and later co-founders for FTX) Nishad Singh and Gary Wang. Defendant Caroline Ellison was also part of the group and, upon moving to Hong Kong, the group lived like college students and fiercely traded crypto.

102.    After Defendant Bankman-Fried established FTX in 2019, Defendant Ellison began taking more responsibility at Alameda.

103.    In October 2021, Ellison was appointed as co-CEO of Alameda with Sam Trabucco after Bankman-Fried resigned from the firm in an effort to give the appearance of putting distance between the exchange and trading shop he founded. As co-CEO, Ellison helped oversee Alameda's expansion beyond its initial market-neutral, but relatively low-profit business as a market maker for low-volume cryptocurrencies into riskier trading strategies, according to a Twitter thread detailing that shift. For instance, Alameda traders began exploring yield farming in decentralized finance (DeFi). Ellison became sole CEO in August 2022, following Trabucco's sudden and unexpected departure from the firm, when he shifted his role from Co-CEO to adviser of the company.[18]

104.    Leading up to the collapse of FTX, Ellison lived with nine other FTX or Alameda colleagues in Bankman-Fried's $30 million penthouse in the Bahamas. She reportedly paid SBF rent, and was occasionally in a romantic relationship with him. In 2021, Ellison tweeted about recreational stimulant use. Upon information and belief, Ellison left the Bahamas and moved back to Hong Kong.

---

[18] https://www.coindesk.com/business/2022/08/24/co-ceo-of-crypto-trading-firm-alameda-research-sam-trabucco-steps-down/ (accessed May 11, 2023).

105.    "Young people tend to be too risk averse," Ellison said in a more recent Alameda podcast episode.[19]

106.    In December 2022, Ellison pled guilty to criminal charges stemming from FTX's collapse, including conspiracy to commit wire fraud, conspiracy to commit commodities fraud, conspiracy to commit securities fraud, and conspiracy to commit money laundering.

### III.    Defendant Gary Wang

107.    Wang is not like his co-founder Sam Bankman-Fried, who loves fame and putting himself at the center of public attention. In fact, there's little public information about Wang, who has been described as a shady but critical player in the rise and fall of FTX.

108.    Wang met Bankman-Fried at a math camp in high school. Later, they became college roommates at the Massachusetts Institute of Technology, where Wang got degrees in mathematics and computer science and Bankman-Fried received a bachelor's in physics.[20]

109.    Before co-founding Alameda (and later FTX), Wang worked at Google. He claims to have built a system to aggregate prices across public flight data, according to an introduction on the Future Fund's website.[21] When Bankman-Fried left the Jane Street Hedge Fund to start Alameda in 2017, Wang left the tech giant.

110.    The startup has its beginnings in a three-bedroom Berkeley apartment – the downstairs served as its office. The firm shifted to Hong Kong, in part to take advantage of arbitrage opportunities in Asian bitcoin markets – including the price discrepancy between BTC in Japan and BTC everywhere else.

---

[19] https://www.youtube.com/watch?v=zfcb9JAgWBs (accessed May 11, 2023).

[20] https://blog.ftx.com/blog/raising-the-bar/ (accessed May 11, 2023)

[21] https://ftxfuturefund.org/about/ (accessed May 11, 2023).

111.    It's there that Wang and Bankman-Fried funneled funds from Alameda to build its bespoke derivatives exchange. Bankman-Fried told Insider that he is not a good coder: "I don't code. I'm trash. I have not written any of FTX's code base. That's all a lot of other really impressive people at FTX. That's not me at all."[22]

112.    At the age of 28, Wang topped *Forbes*' 2022 list of the world's billionaires under 30 with a net worth of $5.9 billion in April. SBF sent his congratulations to Wang in public, tweeting that "I couldn't be prouder" when the list came out.[23]

113.    In December 2022, Wang pled guilty to criminal charges stemming from FTX's collapse, including conspiracy to commit wire fraud, conspiracy to commit commodities fraud, and conspiracy to commit securities fraud.

### IV.     Defendant Nishad Singh

114.    Nishad Singh joined Alameda in the early days, when the five-person trading firm was based in a Berkeley, California, apartment. He went from finding and exploiting arbitrage opportunities in crypto markets to being appointed director of engineering at FTX.

115.    Singh is and was a close confidant of Bankman-Fried, having shared multiple apartments with the FTX founder over the years, including most recently a 10-person luxury penthouse in Nassau, the Bahamas.

---

[22]    https://www.businessinsider.com/crypto-trading-billionaire-sam-bankman-fried-ftx-alameda-surprising-facts-2021-12#5-people-often-think-hes-a-programmer-but-hes-not-5  (accessed  May 11, 2023).

[23]    https://twitter.com/SBF_FTX/status/1511324242612297738?ref_src=twsrc%5Etfw%7Ctwcamp%5Etweetembed%7Ctwterm%5E1511324242612297738%7Ctwgr%5E8e0ce65ea02f827b72be96dde8f9484a3ba3e41c%7Ctwcon%5Es1_&ref_url=https%3A%2F%2Fwww.usatoday.com%2Fstory%2Fmoney%2F2022%2F04%2F05%2Fcryptocurrency-ceo-donate-charity%2F7272175001%2F (accessed May 11, 2023).

116.    He is rumored to be just one of three people who controlled the keys to the exchange's matching engine, and admittedly was informed of a plan to backstop losses at Alameda with FTX customer funds.[24]

117.    Although Singh's LinkedIn profile is down and his Twitter account is locked, the University of California, Berkeley graduate talked about why he left his dream job at Facebook to join Alameda in a FTX podcast.[25]

118.    "I spent maybe about a month doing weekends and nights at Alameda," he said, discussing a period of time when his "day job" was as a software engineer working on applied machine learning at Facebook. "At some point, it became obvious that was kind of stupid … so I took some time off and really gave my 100% working at Alameda," Singh said.

119.    Singh visited Alameda in the first month of its existence, where he witnessed Bankman-Fried execute a sequence of trades that he described as "super profitable, easy to understand and there were lots available." Feeling inspired, he took a job.

120.    After spending one and a half years as a core Alameda engineer, Singh took a role as the head of engineering at the then-newly launched FTX derivative exchange in 2019, where he was allowed to code with "minimal supervision." He has provided code to a number of Bankman-Fried-related projects, including the decentralized exchange Serum on Solana.

121.    "Nishad was one of my brother's best friends in high school. He's shown the fastest and most sustained professional growth I've ever witnessed," Bankman-Fried wrote in a company

---

[24]    https://www.wsj.com/articles/alameda-ftx-executives-are-said-to-have-known-ftx-was-using-customer-funds-11668264238?mod=latest_headlines (accessed May 11, 2023).

[25]    https://www.youtube.com/watch?v=rl0Rq2cUSIQ (accessed May 11, 2023).

blog.[26] Singh also assisted Wang in building most of FTX's "technological infrastructure" and managed the development team.

122.    Although pitched as a community-run and- organized exchange, people familiar with the matter told CoinDesk the true power over Serum rested with FTX Group, which then held the program's access keys.[27] A similar relationship may be in place at FTX's core properties.[28]

123.    On February 28, 2023, Nishad Singh, who was one of SBF's best friends, a core Alameda engineer, and head of FTX's engineering, also pled guilty to criminal counts for conspiracy to commit fraud and conspiracy to commit money laundering. He agreed to cooperate with prosecutors' investigation into Bankman-Fried and apologized for his role in FTX's scheme.

124.    November 12, 2022, *The Wall Street Journal* reported that Bankman-Fried, Ellison, Wang, and Singh were aware that FTX had used customer assets to cover Alameda's trading losses and repay its outstanding debts.

## C.    The Basics of a Cryptocurrency Exchange

125.    In many ways, centralized cryptocurrency exchanges, including FTX, are analogous to banks albeit for the cryptocurrency industry. There is a big difference, however, in regards to the way a cryptocurrency exchange and a bank are and should be authorized to utilize customer assets.

---

[26] https://blog.ftx.com/blog/raising-the-bar/ (accessed May 11, 2023).

[27] https://www.coindesk.com/business/2022/11/12/ftx-hack-spooks-solana-defi-community-igniting-revolution-at-alameda-controlled-serum-dex/ (accessed May 11, 2023).

[28] https://www.wsj.com/articles/alameda-ftx-executives-are-said-to-have-known-ftx-was-using-customer-funds-11668264238?mod=latest_headlines (accessed May 11, 2023).

126.    More specifically, cryptocurrency exchanges accept deposits of cryptocurrency, and often fiat currency on behalf of their customers. Once that cryptocurrency is received by the exchange then it has dominion and control over those assets.

127.    The exchange then credits the applicable customer account with the appropriate amount of cryptocurrency or fiat assets the exchange received. This credit can be regarded as a liability of the exchange to its customer.

128.    If, for example, cryptocurrency was deposited to the customer's exchange account, the customer could then take that credit received from the exchange, and:

   a) Trade it for another cryptocurrency

   b) Trade it for fiat currency

   c) Leave it as a balance on the exchange account (leaving an open liability of the exchange to the customer)

   d) Withdraw it (withdrawal could be done prior to or after a trade or conversion)

These things could be done in whole or in part. Ledger entries would (and should) be made internally by the exchange to account for changes in positions and applicable balances.

129.    The exchange accounts should very much be regarded as being custodial in nature. This means that the customer does not *control* access to the assets 'in' their account. The customer needs to make a request to the exchange to be able to access and send those balances. The exchange then debits the user account and sends the assets. Whether or not such requests are processed are dependent on the willingness, ability, and approval of the exchange.

130.    One major factor the affects the exchange's ability to process such requests is whether or not they have the assets and/or capital necessary to do so.

131.    For any non-yield-bearing account, this *shouldn't* be a problem, since exchanges *should* have enough assets in custody for the benefit of their customers to cover their liabilities to

their customers, and on a 1:1 basis. FTX's terms of service seems to guarantee this, although FTX clearly violated their own terms of service:

> *"Title to your Digital Assets shall at all times remain with you and shall not transfer to FTX Trading. As the owner of Digital Assets in your Account, you shall bear all risk of loss of such Digital Assets. FTX Trading shall have no liability for fluctuations in the fiat currency value of Digital Assets held in your Account."*

> *"None of the Digital Assets in your Account are the property of, or shall or may be loaned to, FTX Trading; FTX Trading does not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading."*

> *"You control the Digital Assets held in your Account. At any time, subject to outages, downtime, and other applicable policies (including the Terms), you may withdraw your Digital Assets by sending them to a different blockchain address controlled by you or a third party."[29]*

132.    While FTX violated their own terms of service, it would also have been true that some of these claims would have been demonstrably false to begin with even if there was hypothetically no wrongdoing on the part of FTX. This is because FTX exchange accounts (or any exchange account with any centralized custodial exchange, including Coinbase for example) are custodial in nature. *Id.* This means that the customer does not control access to the assets 'in' their account. The customer needs to make a request to the exchange to be able to access and send those balances. It is very much the exchange that controls the assets, not their customer. However, it should also be noted that the digital assets aren't technically 'in' the account at all. At a technical level, an exchange account cannot hold or store cryptocurrency. The account stores a record of a liability or an IOU to the exchange's customer. When a user purchases cryptocurrency on an exchange, they aren't technically purchasing that cryptocurrency; they are purchasing an IOU for

---

[29]    https://help.ftx.com/hc/article_attachments/9719619779348/FTX_Terms_of_Service.pdf
(accessed May 11, 2023).

that cryptocurrency. Because this concept of buying and storage can be difficult to understand, it's somewhat common for newcomers to associate such IOUs as being the same as storing cryptocurrency assets 'on' their account, even though it's not technically true.

133.   With any yield-bearing account, it could generally be expected for an exchange to take those customers and leverage, loan or invest them in some way, and hopefully receive enough assets back to be able to pay out their customers back their principal, in addition to yield or interest earned, when applicable customers attempt to redeem or withdraw those funds.

134.   While the existence of such loans associated with assets deposited to yield-bearing accounts was known, the substantial risks associated with such loans, and by extension the yield-bearing accounts in general was not adequately represented.

135.   The main functional differences between banks and cryptocurrency exchanges is such that exchanges are largely unregulated, and that exchanges (and by extension exchange accounts and the users who use them) are subject to a lot of additional risks compared to that of a bank account.

136.   Banks are, of course, subject to a variety of capital control requirements to ensure protection of consumer assets. Banks are regulated with regards to the type of assets that they can invest customer assets in. Banks are subject to regular financial audits. Banks have regulatory oversight to ensure the protection of consumer assets. And of course, bank accounts have FDIC insurance so that bank account holders have coverage in case a bank, despite such measures, becomes insolvent. *Id.*

137.   Exchanges, on the other hand, are not subject to capital control requirements. While almost all exchanges will indicate that they 'securely' store all customer assets 1:1 in 'cold storage,' there is no regulatory requirement in most jurisdictions (including the US) for exchanges

to do so, nor is there any requirement for exchanges to offer any transparency regarding their solvency or use of customer assets to regulators or to the general public.

138.    Other than by an exchange's own terms of service (which wasn't adhered to in this case), exchanges are not prevented from whether they invest customer assets elsewhere, and if so, what types of investments they enter into, or loans they provide, regardless of the inherent level of risk. And exchanges have no requirement to have any type of insurance equivalent to FDIC insurance. While some exchanges will sometimes claim they have 'insurance,' the terms and conditions associated with that insurance are typically completely unknown to investors, and often this insurance will bear little to no resemblance to FDIC insurance; in essence the term 'insurance' is used as a marketing ploy to help instill customer confidence in the exchange, even when such confidence may not be warranted.

139.    Due to the aforementioned reasons and risks surrounding the lack of regulation, as well as various types of cybersecurity-related risks that aren't applicable to banks but are critically important for exchanges, cryptocurrency exchanges are generally not and should not be considered a 'safe' place to store assets, whether cryptocurrency assets or fiat assets.

140.    The inherent riskiness associated with storing assets on a cryptocurrency exchange is well-known to the vast majority of well-educated and knowledgeable cryptocurrency users. This is evidenced by the frequent expression 'not your keys, not your coins,' essentially meaning that if you don't *control* the cryptocurrency in your account, it's not really yours. 'Your' cryptocurrency belongs to the exchange if you elect to store it 'on' the exchange, and if they renege or are unable to fulfill their liability to you, you as the beneficial cryptocurrency owner of the cryptocurrency, have effectively lost your money.

141.    This is further referenced by the extensive track record of the many cryptocurrency exchanges that have shut down and ultimately failed,[30] often in spectacular fashion. The most common reasons for an exchange's failure include:

    a)  The exchange borrowing against customer assets (either to fund business operations or lending them out in an effort to generate a profit) leading to insolvency;

    b)  The exchange trading or leveraging customer assets in an effort to generate a profit, leading to insolvency;

    c)  A hack or theft by an external actor;

    d)  Embezzlement, or theft by an internal actor, typically founder(s) of the exchange; or

    e)  Disappeared suddenly, for no apparent reason (typically taking customer assets with them).

142.    When exchanges do shut down (and this happens relatively frequently) it rarely happens in an organized and orderly fashion, and it's incredibly rare for customers that had assets on the exchange to get all their assets back; in many cases, they end up getting nothing back.

143.    Suffice to say cryptocurrency exchanges are generally not a safe place to store assets, even amongst exchanges that don't offer a yield-bearing program. When exchanges have a yield-bearing program, or otherwise elect to leverage or loan our customer assets (with or without customer consent), it significantly increases the risk of the exchange failing and becoming insolvent. Cryptocurrency exchanges can do a variety of things to minimize such risks and improve safety. However, what an exchange says, and what they actually do are two different things entirely. It is common for CEOs and executives of exchanges that have failed or in the process of failing to describe their exchange as 'safe,' 'secure,' 'well-regulated,' 'compliant,' 'transparent,' or in a good financial position even when the exact opposite is true. *Id.* FTX was not an exception

---

[30] https://www.cryptowisser.com/exchange-graveyard/ (accessed May 11, 2023).

to this trend. One should not assume or believe that an exchange is any of these things just because they say it.

144.    This is not to suggest that exchanges cannot be a much safer place to store assets. They can be with appropriate regulation and oversight. In fact, it appears that for FTX Japan[31] specifically, those investors will be made whole or almost whole due to sensible regulations that were put in place in light of the lessons learned from the failures of Mt. Gox and Coincheck exchanges in Japan.

### D.    The Mechanics of the Fraudulent Scheme

145.    The FTX fraud was straightforward, albeit thoroughly concealed from unsuspecting Class Members.

146.    With the promise of higher-than-average returns and leading-edge safeguards, and by way of FTX's material omissions further detailed herein, FTX lured Class Members to deposit U.S. dollars and crypto-based assets into speculative investments, including YBAs, on the FTX exchange.

147.    Contrary to FTX's representations to its customers that "FTX.US does not represent or treat assets in your FTX.US Account as belonging to FTX.US," and unlike many of its competitors, including Coinbase Global, the largest U.S.-based exchange, FTX did not segregate customer funds or designate them for the customer's benefit, instead commingling those funds in several "omnibus" accounts held by FTX.

148.    Under the cloak of this wide-ranging con game, FTX insiders including SBF facilitated the routing of billions of dollars in purported profits of FTX, which were in reality Class

---

[31]  https://www.coindesk.com/consensus-magazine/2022/12/13/japan-was-the-safest-place-to-be-an-ftx-customer/

Member funds, to the insiders, and their families, friends, and other acquaintances through purported personal "loans," bonuses, "investments," and all other means of transfer, including real estate purchases and hundreds of millions of dollars in charitable and political contributions. Class Member funds were also used to fuel uncapped spending on illicit drugs, naming rights to sports arenas, concert sponsorships, luxury cars, and private jets.

149.    Frequently, SBF routed his fraudulent scheme through Alameda LLC ("Alameda"), a cryptocurrency hedge fund that he independently owned. SBF and Mr. Wang formed Alameda two years before launching FTX and split ownership of Alameda 90% and 10%, respectively. SBF led Alameda as CEO until October 2021, from which time he continued to control the company and maintained ultimate authority over its trading, borrowing/lending, and investment activity.

150.    Until his scheme collapsed, SBF, along with a number of his lieutenants, publicly maintained that Alameda and FTX were "wholly separate entitit[ies] . . . at arm's length," and, despite their overlapping ownership by SBF, the companies were kept "separate in terms of day-to-day operations" by way of "a Chinese wall . . . to ensure that [Alameda wouldn't get] any sort of special treatment from FTX."

151.    Contrary to these representations, SBF operated FTX and Alameda as a common enterprise. The two companies shared offices for some time, as well as key personnel and other resources critical to the companies' operations.

152.    SBF routinely funneled Class Member funds through Alameda and/or other entities that SBF separately owned, sometimes as bogus "related party transactions." For example, financial statements for FTX Trading, now available to the public for the first time, disclose "a related party receivable" valued at $1.2 billion (equivalent to 44% of the company's assets); a $362 million "related party payable"; $250 million in payments (equivalent to 25% of the company's

revenues) to a related party for "software royalties;" and a series of related party transactions described only as "currency management" activities. The same financial statements identify that these transactions were for the benefit of SBF, noting that the "primary shareholder [i.e., SBF] is also the primary shareholder of several related entities which do business with the company."

153.    Other times, SBF misappropriated Class Member funds as "loans, including for example, a $1 billion 'loan' to himself; a $543 million 'loan' to Mr. Singh; and a $55 million 'loan' to Ryan Salame, another FTX executive." SBF and other insiders received billions in dollars in purported "loans" from Alameda. None of these "loans" have ever been repaid, nor was there any reason to believe at the time the "loans" were made that they would or could be repaid. The FTX insiders effectively looted the company. Even during the crypto boom, the FTX insiders could not reasonably have repaid these loans, and no reasonable lender would have loaned such large amounts. In fact, none of these loans were ever repaid, nor upon information and belief was any interest ever paid on the loans.

154.    More often, SBF looted Class Member funds directly, without the cover of sham related party transactions or insider loans. For many years, SBF directed that FTX customer funds be wired to bank accounts held by North Dimension, a wholly owned subsidiary of Alameda. North Dimension was a fake electronics retailer created by SBF to disguise its ties to FTX. North Dimension shared an address with FTX US in Berkeley, California, and published a website through which customers often "had trouble actually purchasing products" and was "rife with misspellings and bizarre product prices," including "sale prices that were hundreds of dollars above a regular price." For example, North Dimension advertised a $410.00 "Ipad 11 'ich Cell Phone" for the sale price of $899.00:

Once wired to North Dimension's accounts, Class Member funds were commingled with Alameda's and misappropriated by SBF. SBF has admitted to looting Class Member funds in this way, explaining to reporters after the fraud was revealed that "people wired $8b to Alameda and . . . it was never delivered to FTX."

155.    SBF found diverse ends for which to misappropriate Class Members funds, including to pay for Alameda's leveraged trades and investments, which had grown riskier over time. Initially, Alameda primarily traded in high-risk arbitrage, purchasing cryptocurrencies on one exchange and quickly selling them on other exchanges for higher prices. Later, Alameda pivoted to "yield farming," investing in cryptocurrencies that paid interest-like returns. Alameda's entrée into yield farming was not without internal controversy—in early 2021, Caroline Ellison, Alameda's CEO, expressed concerns about the riskiness of Alameda's yield farming investment strategy to no avail. Ms. Ellison was correct to observe that Alameda's bets had grown dodgier. At the time, Sam Trabucco, another Alameda executive, tweeted that Alameda's investing strategies increasingly relied on "intuition" and other unconventional measures, including "Elon Musk's social media posts." As noted above, Ms. Ellison has since pleaded guilty to misappropriating FTX customer assets to fund Alameda's risky bets and to cover Alameda's colossal losses.

156.    SBF used Class Member funds to underwrite Alameda's risky operations in other ways. Though SBF publicly claimed that Alameda was a "regular user" of FTX, contrary to that representation, FTX exempted Alameda from the automated "risk engine" described above, allowing Alameda to avoid liquidation under the monitoring system. Compounding FTX's—and, though they did not know it, Class Members'—exposure to Alameda, SBF allowed Alameda to maintain a negative balance in its FTX accounts and steadily increased Alameda's negative balance cap over time. Through these cheats, Alameda was not only able to evade collateralizing its position on the exchange; Alameda also was able to maintain a negative balance on the exchange and utilize the exchange to trade and withdraw assets without limit, giving it an estimated "line of credit" of $65 billion, collateralized by the customer deposits on the exchange. Alameda lacked any ability to repay this line of credit, having spent the money on insider transfers and purported "loans," gifts, and questionable investments.

157.    With these exemptions—exemptions offered to no other customers on the exchange—FTX extended Alameda a de facto limitless line of credit, which Alameda used to invest $8 billion in risky startups and esoteric cryptocurrencies—highly illiquid investments purchased on credit from FTX, funded with Class Member assets. SBF also misappropriated Class Member funds to inflate the balance sheets of Alameda, which were largely backed by FTT, a cryptocurrency that FTX contrived from thin air and issued to Alameda at no cost. FTX represented that, as "the backbone of the FTX ecosystem," FTT was widely distributed, but contrary to that representation, most FTT tokens issued were held by FTX and/or Alameda. As of June 30, 2022, Alameda's largest assets were tied to FTT, including "unlocked FTT" totaling $3.66 billion, and "FTT collateral" totaling $2.16 billion. Using Class Member funds and to the benefit of Alameda, SBF manipulated the value of FTT by implementing a "rolling program of buying back and

burning [FTT] tokens," a process which consumed a third of FTX's revenue. By artificially increasing the value of FTT in this way, SBF increased the value of collateral available to Alameda, with which SBF was able to borrow billions of dollars from third party lenders in furtherance of his fraudulent scheme.

158.    Upon information and belief, SBF also employed Alameda to funnel Class Member funds from FTX US to his other companies. Just days before FTX filed for bankruptcy protection, Alameda withdrew over $200 million from FTX US; Alameda then transferred $142.4 million of those funds to FTX Trading's international accounts, exhibiting, according to industry experts, that Alameda had been serving as a "bridge between FTX US and FTX [Trading]" for some time.

159.    The improper relationship between Alameda and FTX was well known to the companies' insiders, and completely concealed from Class Members. As Ellison, former co-CEO of Alameda, told a federal judge in Manhattan when entering her guilty plea:

> From approximately March 2018 through November 2022, I worked at Alameda Research, a cryptocurrency trading firm principally owned by Sam Bankman-Fried.
>
> From 2019 through 2022, I was aware that Alameda was provided access to a borrowing facility on FTX.com, the cryptocurrency exchange run by Mr. Bankman-Fried. I understood that FTX executives had implemented special settings on Alameda's FTX.com account that permitted Alameda to maintain negative balances in various fiat currencies and crypto currencies. In practical terms, this arrangement permitted Alameda access to an unlimited line of credit without being required to post collateral, without having to pay interest on negative balances and without being subject to margin calls or FTX.com's liquidation protocols. I understood that if Alameda's FTX accounts had significant negative balances in any particular currency, it meant that Alameda was borrowing funds that FTX's customers had deposited onto the exchange.
>
> While I was co-CEO and then CEO, I understood that Alameda had made numerous large illiquid venture investments and had lent money to Mr. Bankman-Fried and other FTX executives. I also understood that Alameda had financed these investments with short-term and open-term loans worth several billion dollars from external lenders in the cryptocurrency industry. When many of those loans were recalled by Alameda's lenders in and around June 2022, I agreed with others to borrow several billion dollars from FTX to repay those loans. I understood that FTX would need to use customer funds to finance its loans to Alameda. I also

understood that many FTX customers invested in crypto derivatives and that most FTX customers did not expect that FTX would lend out their digital asset holdings and fiat currency deposits to Alameda in this fashion. From in and around July 2022 through at least October 2022, I agreed with Mr. Bankman-Fried and others to provide materially misleading financial statements to Alameda's lenders. In furtherance of this agreement, for example, we prepared certain quarterly balance sheets that concealed the extent of Alameda's borrowing and the billions of dollars in loans that Alameda had made to FTX executives and to related parties. I also understood that FTX had not disclosed to FTX's equity investors that Alameda could borrow a potentially unlimited amount from FTX, thereby putting customer assets at risk. I agreed with Mr. Bankman-Fried and others not to publicly disclose the true nature of the relationship between Alameda and FTX, including Alameda's credit arrangement.

I also understood that Mr. Bankman-Fried and others funded certain investments in amounts more than $10,000 with customer funds that FTX had lent to Alameda. The investments were done in the name of Alameda instead of FTX in order to conceal the source and nature of those funds. I am truly sorry for what I did. I knew that it was wrong. And I want to apologize for my actions to the affected customers of FTX, lenders to Alameda and investors in FTX. Since FTX and Alameda collapsed in November 2022, I have worked hard to assist with the recovery of assets for the benefit of customers and to cooperate with the government's investigation. I am here today to accept responsibility for my actions by pleading guilty.[32]

160.    *The Wall Street Journal* recently reported that Ellison told Alameda staffers in a video call that she was one of four people (along with Sam Bankman-Fried, Gary Wang, and Nishad Singh) who were aware of the decision to send FTX customer funds to Alameda, to help the fund meet its liabilities.[33]

---

[32]        https://www.johnreedstark.com/wp-content/uploads/sites/180/2022/12/Ellison-Hearing-Transcript.pdf (accessed May 11, 2023)

[33]        https://www.wsj.com/articles/alameda-ftx-executives-are-said-to-have-known-ftx-was-using-customer-funds-11668264238 (accessed May 11, 2023).

161.     Similarly, Nishad Singh, head of FTX's engineering and one of SBF's best friends, has admitted that he knew by mid-2022 that Alameda was borrowing FTX customer funds and that customers were not aware.[34]

162.     FTX co-founder Gary Wang likewise explained his knowledge of the companies' interconnectedness in his guilty plea:

> Between 2019 and 2022, as part of my employment at FTX, I was directed to and agreed to make certain changes to the platform's code. I executed those changes, which I knew would Alameda Research special privileges on the FTX platform. I did so knowing that others were representing to investors and customers that Alameda had no such special privileges and people were likely investing in and using FTX based in part on those misrepresentations. I knew what I was doing was wrong. I also knew that the misrepresentations were being made by telephone and internet, among other means, and that assets traded on FTX included some assets that the U.S. regulators regard as securities and commodities.

163.     FTX had a handful of insiders and employees with virtually limitless power to direct transfers of fiat currency and crypto assets and to hire and fire employees, with no effective oversight, internal controls, or checks on the exercise of these powers. FTX failed to establish or maintain any semblance of fundamental financial and accounting controls. This is particularly shocking given that at its peak, FTX operated in hundreds of jurisdictions, controlled billions of dollars of assets, engaged in as many as 26 million transactions per day, and had millions of users. Board oversight was effectively non-existent. With few exceptions, FTX lacked independent or experienced finance, accounting, human resources, information security, and cybersecurity personnel or leadership. Nor was there any effective internal audit function. Some FTX entities did not produce any financial statements. Some were deemed impossible to audit.

---

[34]     https://www.reuters.com/legal/ftxs-singh-agrees-plead-guilty-us-criminal-charges-lawyer-says-2023-02-28/ (accessed May 11, 2023).

164.    FTX insiders paid out millions of dollars in hush money to keep whistleblowers from exposing the fraud, money laundering, and price manipulation. FTX even hired the attorneys of these whistleblowers to help keep these complaints from the public.

165.    At no time did FTX disclose the foregoing to Class Members, including that:

I.   SBF was siphoning Class Member funds to his friends and family members or for his own personal use;

II.   FTX was not segregating Class Member funds, instead commingling those funds in FTX's omnibus accounts and treating those funds as FTX's own;

III. FTX directed that Class Member funds be wired directly into accounts held by North Dimension, a subsidiary of Alameda;

IV. FTX and Alameda were not, in fact, "wholly separate entities at arm's length," and were instead operated as a common enterprise;

V.   SBF was looting Class Member funds under the guise of non-arm's length "related party transactions" and "loans" often by way of Alameda;

VI. SBF routinely transferred Class Member funds out of accounts held by FTX to those held by Alameda;

VII.      SBF was using Class Member funds to underwrite his speculative personal investments at Alameda, and his charitable and political contributions;

VIII.      Alameda was exempt from the "risk engine" and other FTX protocols in place to prevent a user from becoming undercollateralized or overleveraged on the exchange;

IX. With the foregoing exemption, Alameda engaged in margin trading on the FTX platform, exposing Class Members to the risk of Alameda's loss;

X.   FTX used Class Member funds to manipulate the price of FTT, which was not "widely distributed," but instead concentrated in the hands of FTX and Alameda; and

XI. FTX did not have in place fundamental internal controls, including an independent board of director or a CFO.

166.    Had Class Members known of these material omissions, they would not have deposited funds into accounts on the FTX exchange and SBF's fraud would not have succeeded. In late 2022, the fraud finally collapsed, and the misconduct was revealed.

**E.      The Fraud's Collapse**

167.    The FTX.com exchange was extremely successful since its launch in May 2019. In 2022, around $15 billion of assets were traded daily on the platform, which represented approximately 10% of global volume for crypto trading. The FTX Group's team grew to over 300 employees globally. Although the FTX Group's primary international headquarters is in the Bahamas, its domestic US base of operations is located in Miami, Florida.[35]

168.    FTX quickly became one of the most utilized avenues for nascent investors to purchase cryptocurrency. By the time FTX filed for bankruptcy protection, customers had entrusted billions of dollars to it, with estimates ranging from $10-to-$50 **billion dollars**.

169.    Bankman-Fried got rich off FTX and Alameda, with the two companies netting $350 million and $1 billion in profit, respectively, in 2020 alone, according to Bloomberg.

170.    At his peak, Bankman-Fried was worth $26 billion. At 30, he had become a major political donor, gotten celebrities like the Co-Defendants in this action to vociferously promote FTX, and secured the naming rights to the arena where the NBA's Miami Heat play.[36]

171.    Beginning in mid-2022, the value of cryptocurrencies rapidly declined, and SBF began to bail out troubled crypto firms that, if they were to fail, would bring down FTX with them

---

[35]      https://www.coindesk.com/business/2022/09/27/crypto-exchange-ftx-is-moving-its-us-headquarters-from-chicago-to-miami/ (accessed May 11, 2023).

[36]      https://www.businessinsider.com/ftx-sbf-crypto-saga-explained-what-happened-what-it-means-2022-11?inline-endstory-related-recommendations= (accessed May 11, 2023).

and reveal SBF's fraud. For example, in the summer of 2022, FTX extended a $400 million revolving credit facility to BlockFi, a crypto lender. At the time, BlockFi held as collateral for loans hundreds of millions of dollars in FTT, the cryptocurrency that FTX had engineered to prop up Alameda. If BlockFi failed, the liquidation of those tokens would crash FTT, and in turn, Alameda, whose assets were primarily backed by the token. FTX's $400 million loan kept BlockFi temporarily afloat, and FTX engaged in a number of similar transactions, propping up failing crypto companies in order to keep the fraud alive, as 2022 progressed.

172.    Despite SBF's attempts to keep troubled crypto firms afloat, the value of digital currencies continued to decline throughout 2022, and FTX's liquidity crunch tightened. By the end of summer 2022, SBF needed another $1 billion to keep his fraudulent scheme running. He looked to Silicon Valley and to sovereign wealth funds in the Middle East, but he was unable to successfully close any further investments in FTX, despite many solicitations. Without this influx of capital, FTX's exposure to margin calls heightened and, in November 2022, SBF's house of cards finally collapsed.

173.    In early November 2022, crypto publication CoinDesk released a bombshell report that called into question just how stable Bankman-Fried's empire really was.[37] On November 2, 2022, news broke that Alameda's balance sheet was propped up by the FTX-manipulated FTT, revealing the close ties between FTX and Alameda to the public for the first time. FTX had lent billions, including most of its cryptocurrency reserves, to Alameda, first as capital for trading, and eventually to cover Alameda's massive losses.

---

[37]     https://www.businessinsider.com/ftx-sbf-crypto-saga-explained-what-happened-what-it-means-2022-11?inline-endstory-related-recommendations= (accessed May 11, 2023).

174.    Prior to the collapse of the FTX Group, Bankman-Fried's cryptocurrency empire was publicly ostensibly broken into two main parts: FTX (his exchange) and Alameda (his trading firm), both giants in their respective industries. But even though they are two separate businesses, the division breaks down in a key place: on Alameda's balance sheet, which was full of FTX – specifically, the FTT token issued by the exchange that grants holders a discount on trading fees on its marketplace. It shows Bankman-Fried's trading giant Alameda rests on a foundation largely made up of a coin that a sister company invented, not an independent asset like a fiat currency or another crypto. The situation adds to evidence that the ties between FTX and Alameda are unusually close.[38]

175.    Days later, on November 6, 2022, Changpeng Zhao, CEO of Binance, the world's largest cryptocurrency exchange and FTX's most powerful competitor, tweeted that he intended to sell Binance's $580 million holding of FTT, which threatened to crash the price of FTX's token and, in turn, Alameda's balance sheet. Mr. Zhao's announcement triggered demand for $5 billion in customer withdrawals, which FTX promptly halted due to a lack of funds. The value of FTT plunged 32%, but rallied once again with Bankman-Fried's surprise announcement on Tuesday, November 8, that Binance would buy FTX, effectively bailing it out.[39]

176.    But, after a 24-hour diligence period, Binance backed out of the deal, denying a critical capital injection to SBF. Mr. Zhao explained his reasons for the about-face: "Sam, I'm sorry. We won't be able to continue this deal. Way too many issues. CZ." Binance cited findings during due diligence, as well as reports of mishandled customer funds and the possibility of a

---

[38]    https://www.coindesk.com/business/2022/11/02/divisions-in-sam-bankman-frieds-crypto-empire-blur-on-his-trading-titan-alamedas-balance-sheet/ (accessed May 11, 2023).

[39]    https://markets.businessinsider.com/news/currencies/ftx-6-billion-withdrawals-72-hours-sam-bankman-fried-binance-2022-11 (accessed May 11, 2023).

federal investigation.[40] In truth, there were always too many issues—issues with the interconnectedness between Alameda and FTX, issues with FTX's total lack of internal controls, issues with SBF's looting of Class Member funds, the news of which sent FTT plunging even further — Bankman-Fried saw 94% of his net worth wiped out in a single day.[41] This triggered panic selling of FTT and a run on FTX, thereby ensuring the firm's swift demise.

177.    Bankman-Fried issued a 22-tweet-long explanation of where he believed he and the FTX Group went wrong:[42]



---

40    https://markets.businessinsider.com/news/currencies/ftx-crash-sec-cftc-probes-asset-liability-shortfall-6-billion-2022-11 (accessed May 11, 2023).

41     https://www.businessinsider.com/ftx-ceo-crypto-binance-sam-bankman-fried-wealth-wiped-out-2022-11 (accessed May 11, 2023).

42    https://twitter.com/SBF_FTX/status/1590709189370081280 (accessed May 11, 2023).



**SBF** ✓ @SBF_FTX · Nov 10

3) So here's an update on where things are.

[THIS IS ALL ABOUT FTX INTERNATIONAL, THE NON-US EXCHANGE. FTX US USERS ARE FINE!]

[TREAT ALL OF THESE NUMBERS AS ROUGH.  THERE ARE APPROXIMATIONS HERE.]

💬 259          ⇄ 639          ♡ 3,873          ↥



**SBF** ✓ @SBF_FTX · Nov 10

4) FTX International currently has a total market value of assets/collateral higher than client deposits (moves with prices!).

But that's different from liquidity for delivery--as you can tell from the state of withdrawals.  The liquidity varies widely, from very to very little.

💬 174          ⇄ 636          ♡ 3,592          ↥



**SBF** ✓ @SBF_FTX · Nov 10

5) The full story here is one I'm still fleshing out every detail of, but as a very high level, I fucked up twice.

The first time, a poor internal labeling of bank-related accounts meant that I was substantially off on my sense of users' margin.  I thought it was way lower.

💬 251          ⇄ 749          ♡ 3,407          ↥



**SBF** ✔ @SBF_FTX · Nov 10

6) My sense before:

Leverage: 0x
USD liquidity ready to deliver: 24x average daily withdrawals

Actual:

Leverage: 1.7x
Liquidity: 0.8x Sunday's withdrawals

Because, of course, when it rains, it pours.  We saw roughly $5b of withdrawals on Sunday--the largest by a huge margin.

💬 241          ⟲ 907          ♡ 3,823          ⬆



**SBF** ✔ @SBF_FTX · Nov 10

7) And so I was off twice.

Which tells me a lot of things, both specifically and generally, that I was shit at.

And a third time, in not communicating enough.  I should have said more. I'm sorry--I was slammed with things to do and didn't give updates to you all.

💬 116          ⟲ 278          ♡ 2,882          ⬆



**SBF** ✔ @SBF_FTX · Nov 10

8) And so we are where we are.  Which sucks, and that's on me.

I'm sorry.

💬 155          ⟲ 357          ♡ 3,122          ⬆



SBF ✓ @SBF_FTX · Nov 10

9) Anyway: right now, my #1 priority--by far--is doing right by users.

And I'm going to do everything I can to do that.  To take responsibility, and do what I can.

💬 162          ↻ 357          ♡ 3,715          ⬆

SBF ✓ @SBF_FTX · Nov 10

10) So, right now, we're spending the week doing everything we can to raise liquidity.

I can't make any promises about that.  But I'm going to try.  And give anything I have to if that will make it work.

💬 164          ↻ 394          ♡ 3,377          ⬆



SBF ✓ @SBF_FTX · Nov 10

11) There are a number of players who we are in talks with, LOIs, term sheets, etc.

We'll see how that ends up.

💬 87          ↻ 234          ♡ 2,625          ⬆



SBF ✓ @SBF_FTX · Nov 10

12) Every penny of that--and of the existing collateral--will go straight to users, unless or until we've done right by them.

After that, investors--old and new--and employees who have fought for what's right for their career, and who weren't responsible for any of the fuck ups.

💬 102          ↻ 274          ♡ 3,007          ⬆



**SBF** ✔ @SBF_FTX · Nov 10

13) Because at the end of the day, I was CEO, which means that *I* was responsible for making sure that things went well. *I*, ultimately, should have been on top of everything.

I clearly failed in that. I'm sorry.

💬 180    ⟲ 423    ♡ 4,122    ⬆️



**SBF** ✔ @SBF_FTX · Nov 10

14) So, what does this mean going forward?

I'm not sure--that depends on what happens over the next week.

But here are some things I know.

💬 129    ⟲ 235    ♡ 2,502    ⬆️



**SBF** ✔
@SBF_FTX

15) First, one way or another, Alameda Research is winding down trading.

They aren't doing any of the weird things that I see on Twitter--and nothing large at all. And one way or another, soon they won't be trading on FTX anymore.

9:13 AM · Nov 10, 2022 · Twitter Web App

**405** Retweets   **201** Quote Tweets   **3,911** Likes

💬    ⟲    ♡    ⬆️



**SBF** ✓ @SBF_FTX · Nov 10
Replying to @SBF_FTX
16) Second, in any scenario in which FTX continues operating, its first priority will be radical transparency--transparency it probably always should have been giving.

Giving as close to on-chain transparency as it can: so that people know *exactly* what is happening on it.

💬 214          ⟲ 320          ♡ 2,255          ⬆



**SBF** ✓ @SBF_FTX · Nov 10
17) All of the stakeholders would have a hard look at FTX governance.  I will not be around if I'm not wanted.

All of the stakeholders--investors, regulators, users--would have a large part to play in how it would be run.

Solely trust.

💬 137          ⟲ 198          ♡ 1,878          ⬆



**SBF** ✓ @SBF_FTX · Nov 10
18) But all of that isn't what matters right now--what matters right now is trying to do right by customers.  That's it.

💬 144          ⟲ 158          ♡ 1,970          ⬆



**SBF** ✓ @SBF_FTX · Nov 10
19) A few other assorted comments:

This was about FTX International.  FTX US, the US based exchange that accepts Americans, was not financially impacted by this shitshow.

It's 100% liquid.  Every user could fully withdraw (modulo gas fees etc).

Updates on its future coming.

💬 406          ⟲ 760          ♡ 2,776          ⬆







## F.    FTX Files for Bankruptcy

178.    On November 11th, unable to obtain a bailout, and facing an insurmountable liquidity crisis, the FTX Group filed for Chapter 11 bankruptcy and Bankman-Fried resigned as CEO.[43]

179.    At or around the same time as Bankman-Fried's *mea culpa* tweets and discussions

---

[43]    https://markets.businessinsider.com/news/currencies/ftx-bankruptcy-sam-bankman-fried-ceo-crypto-binance-alameda-markets-2022-11 (accessed May 11, 2023).

with reporters, an FTX balance sheet was leaked which shows that FTX held approximately $900 million in liquid assets against $8.9 billion of liabilities, with a negative $8 billion entry described as a "hidden, poorly internally labeled fiat@ account."[44]

180.    Later, *The Wall Street Journal* reported that in a video meeting with Alameda employees on November 9, 2022 (the day prior to Bankman-Fried's November 10, 2022 litany of tweets), Alameda CEO Caroline Ellison said that she, Bankman-Fried, and two other FTX executives, Singh and Wang, were aware of the decision to send customer funds directly to Alameda. Ellison even admitted that "FTX used customer money to help Alameda meet its liabilities."[45] Ellison elaborated on these statements on the record when pleading guilty to eight counts of conspiracy to commit wire fraud, securities fraud, and money laundering, among other conspiracies.[46]

181.    The same source explained that FTX's biggest customer was Alameda, which, instead of holding money, was borrowing billions from FTX users using FTX's in-house cryptocurrency, FTT token, as collateral, then trading it. When the price of the FTT nosedived 75% in a day, making the collateral insufficient to cover the trade, both FTX and Alameda suffered massive liquidity crises. *Id.*

182.    On December 13, 2022, the SEC filed a civil action against Bankman-Fried for securities fraud in the United States District Court for the Southern District of New York. *SEC v. SBF*, 1:22-cv-10501, Doc. 1 (S.D.N.Y.) In that complaint, the SEC alleged:

---

[44] https://www.bloomberg.com/opinion/articles/2022-11-14/ftx-s-balance-sheet-was-bad#xj4y7vzkg (last accessed February 22, 2023)

[45]    https://www.wsj.com/articles/alameda-ftx-executives-are-said-to-have-known-ftx-was-using-customer-funds-11668264238 (last accessed February 22, 2023)

[46]    https://www.wsj.com/articles/alameda-ftx-executives-are-said-to-have-known-ftx-was-using-customer-funds-11668264238 (last accessed December 16, 2022).

When prices of crypto assets plummeted in May 2022, Alameda's lenders demanded repayment on billions of dollars of loans. Despite the fact that Alameda had, by this point, already taken billions of Bankman-Fried of FTX customer assets, it was unable to satisfy its loan obligations. Bankman-Fried directed FTX to divert billions more in customer assets to Alameda to ensure that Alameda maintained its lending relationships, and that money could continue to flow in from lenders and other investors. *Id.* ¶ 4

Through the summer of 2022, he directed hundreds of millions more in FTX customer funds to Alameda, which he then used for additional venture investments and for "loans" to himself and other FTX executives.

183.    The SEC alleged that "Bankman-Fried diverted FTX customer funds to Alameda in essentially two ways: (1) by directing FTX customers to deposit fiat currency (e.g., U.S. Dollars) into bank accounts controlled by Alameda; and (2) by enabling Alameda to draw from a virtually limitless "line of credit" at FTX, which was funded by FTX customer accounts." *Id.* ¶ 32.

184.    The bankruptcy court appointed John J. Ray III, a 40-year industry veteran who oversaw the liquidation of Enron, to replace SBF as FTX's CEO. Mr. Ray quickly uncovered fundamental deficiencies in basic accounting, corporate governance, and other controls by FTX. These deficiencies were so startling that Mr. Ray remarked he had never "seen such a complete failure of corporate controls and such a complete absence of trustworthy financial information as occurred here." Moreover, Mr. Ray uncovered that:

*First*, customer assets from FTX.com were commingled with assets from the Alameda trading platform.

*Second*, Alameda used client funds to engage in margin trading which exposed customer funds to massive losses.

*Third*, the FTX Group went on a spending binge in late 2021 through 2022, during which approximately $5 billion was spent buying a myriad of businesses and investments, many of which may be worth only a fraction of what was paid for them.

*Fourth*, loans and other payments were made to insiders in excess of $1 billion.

***Fifth***, Alameda's business model as a market maker required deploying funds to various third-party exchanges which were inherently unsafe, and further exacerbated by the limited protection offered in certain foreign jurisdictions.

185.    On April 9, 2023, Ray III filed in the FTX Bankruptcy his First Interim Report to the Independent Directors on Control Failures at the FTX Exchanges. *See In re: FTX Trading Ltd.,* No. 1:22-bk-11068-JTD, ECF No. 1242-1 (Bankr. Dist. Del. Apr. 9, 2023), attached as Exhibit A (the "First Interim Rpt.").

186.    Defining the "FTX Group" as a de facto singular entity comprised of FTX Trading, FTX.US, and Alameda, collectively, Mr. Ray begins by explaining that:

> the Debtors have had to overcome unusual obstacles due to the FTX Group's lack of appropriate record keeping and controls in critical areas, including, among others, management and governance, finance and accounting, as well as digital asset management, information security and cybersecurity. Normally, in a bankruptcy involving a business of the size and complexity of the FTX Group, particularly a business that handles customer and investor funds, there are readily identifiable records, data sources, and processes that can be used to identify and safeguard assets of the estate. Not so with the FTX Group.
>
> Upon assuming control, the Debtors found a pervasive lack of records and other evidence at the FTX Group of where or how fiat currency and digital assets could be found or accessed, and extensive commingling of assets. This required the Debtors to start from scratch, in many cases, simply to identify the assets and liabilities of the estate, much less to protect and recover the assets to maximize the estate's value. This challenge was magnified by the fact that the Debtors took over amidst a massive cyberattack, itself a product of the FTX Group's lack of controls, that drained approximately $432 million worth of assets on [November 11, 2022,] the date of the bankruptcy petition (the "November 2022 Breach"), and threatened far larger losses absent measures the Debtors immediately implemented to secure the computing environment.
>
> Despite the public image it sought to create of a responsible business, the FTX Group was tightly controlled by a small group of individuals who showed little interest in instituting an appropriate oversight or control framework. These individuals stifled dissent, commingled and misused corporate and customer funds, lied to third parties about their business, joked internally about their tendency to lose track of millions of dollars in assets, and thereby caused the FTX Group to collapse as swiftly as it had grown. In this regard, while the FTX Group's failure is novel in the unprecedented scale of harm it caused in a nascent industry, many of its root causes are familiar: hubris, incompetence, and greed.

First Interim Rpt., 2-3.

187.    After summarizing the history of the three main FTX Group entities, the current efforts to retain advisors to assist in investigating the FTX Group's available financial records and interview witnesses, Mr. Ray provides a comprehensive review of the FTX Group's control failures that led to its eventual collapse, including (1) lack of management and governance controls; (2) lack of financial and accounting controls; and (3) lack of digital asset management, information security and cybersecurity controls. *Id.*, 11–37.

188.    According to Mr. Ray, "[t]he FTX Group lacked appropriate management, governance, and organizational structure," and the "management and governance of the FTX Group was largely limited to Bankman-Fried, Singh, and Wang. Among them, Bankman-Fried was viewed as having the final voice in all significant decisions." *Id.,* 11. The trio "controlled nearly every significant aspect of the FTX Group," despite being "not long out of college and with no experience in risk management or running a business," and "[b]oard oversight, moreover, was effectively non-existent." *Id.*

189.    The FTX Group also "lacked an appropriate organizational structure. Rather than having an ultimate parent company able to serve as a central point for decision-making that could also direct and control its subsidiaries, the FTX Group was organized as a web of parallel corporate chains with various owners and interest, all under the ultimate control of Bankman-Fried." *Id.,* 8. The FTX Group dd not even have a comprehensive organizational chart until the end of 2021, lacked any tracking of intercompany relationships and ownership of particular entities, and "did not even have current and complete lists of who its employees were." *Id.,* 8–9.

190.    The FTX Group also suffered from a near complete failure to observe corporate formalities, especially when it came to managing the finances of the FTX Group, for instance:

a)  Failure to maintain "personnel who were experienced and knowledgeable enough to account accurately for assets and liabilities, understand and hedge against risk, or compile and validate financial reports," *Id.,* 11;

b)  Failure to maintain adequate "policies and procedures relating to accounting, financial reporting, treasury management, and risk management," *Id.*;

c)  Failure to maintain an accurate and appropriate accounting system, in that 56 FTX Group entities did not produce financial statements of *any* kind, 35 used QuickBooks in conjunction with Google documents, Slack communications, shared drives, and Excel spreadsheets, *Id.,* 12–13;

d)  Recordkeeping was so poor that Bankman-Fried described Alameda as "hilariously beyond any threshold of any auditor being able to even get partially through an audit," adding:

> Alameda is unauditable. I don't mean this in the sense of "a major accounting firm will have reservations about auditing it"; I mean this in the sense of "*we* are only able to ballpark what its balances are, let alone something like a comprehensive transaction history." We sometimes find $50m of assets lying around that we lost track of; such is life.

*Id.,* 14;

e)  "Key accounting reports necessary to understand the FTX Group's assets and liabilities, such as statements of cash flows, statements of equity, intercompany and related party transaction matrices, and schedules of customer entitlements, did not exist or were not prepared regularly," *Id.,* 14–15;

f)  "Copies of key documentation – including executed loan agreements, intercompany agreements, acquisition and investment documents, bank and brokerage account

statements, and contract and account information of all types – were incomplete, inaccurate, contradictory, or missing entirely." *Id.,* 15;

g) the FTX Group "did not maintain reliable lists of bank or trading accounts, cryptocurrency wallets, or authorized signatories," and let "[t]housands of deposit checks . . . collect[] like junk mail," *Id.,* 15;

h) "Although the FTX Group consisted of many, separate entities, transfers of funds among those entities were not properly documented, rendering tracing of funds extremely challenging," including using Slack, Signal, and Telegram with "disappearing messages" enabled, and often approving expenses and invoices on Slack by "emoji," *Id.*;

i) "The FTX Group did not observe any discernable corporate formalities when it came to intercompany transactions. Assets and liabilities were routinely shuffled among the FTX Group entities and insiders without proper process or documentation. Alameda routinely provided funding for corporate expenditures (*e.g.*, paying salaries and other business expenses) whether for Alameda, for various other Debtors, or for FTX DM, and for venture investments or acquisitions whether for Alameda or for various other Debtors. Alameda also transferred funds to insiders to fund personal investments, political contributions, and other expenditures—some of which were nominally 'papered' as personal loans with below-market interest rates and a balloon payment due years in the future." *Id.,* 17;

j) Often times, intercompany and insider transfers were recorded in a manner "that was inconsistent with the apparent purpose of the transfers," for instance, tens of millions of dollars being transferred from Alameda to Bankman-Fried, personally,

but recorded in the general ledger as "Investment in Subsidiaries: Investments-Cryptocurrency," often times recorded in a way that intercompany transactions did not balance across relevant entities, nor were they recorded with specificity regarding which digital assets were involved in the transfer and their value when transferred, *Id.*;

k)   On both FTX International and US exchanges, Alameda was a customer that traded "for its own account as well as engaging in market-making activities, and, in that capacity, it was granted extraordinary privileges by the FTX Group," such as granting Alameda "an effectively limitless ability to trade and withdraw assets from the exchange regardless of the size of Alameda's account balance, and to exempt Alameda from the auto-liquidation process that applied to other customers," effectively allowing it to borrow and/or withdraw up to $65 billion from the FTX Platform, *Id.,* 18–22; and finally

l)   There were "extensive deficiencies in the FTX Group's controls with respect to digital asset management, information security, and cybersecurity," which was "particularly surprising given that the FTX Group's business and reputation depended on safeguarding crypto assets," and "[a]s a result of these control failures," which included (i) maintaining the majority of customer assets in "hot" wallets that are easily hacked, (ii) failing to safeguard private keys but storing them in an Amazon Web Services account, (iii) failing to employ multi-signature capabilities or Multi-Party Computation, (iv) failing to restrict FTX Group employee user access to sensitive infrastructure, such as omnibus wallets holding billions of dollars in assets, and (v) failing to enforce multi-factor authentication

for employees and other commonsense safeguards to protect customer assets and sensitive data—all of which leads to the irrefutable conclusion that "the FTX Group exposed crypto assets under its control to a grave risk of loss, misuse, and compromise, and lacked a reasonable ability to prevent, detect, respond to, or recover from a significant cybersecurity incident, including the November 2022 Breach." *Id.,* 22–37.

191.    Mr. Ray concludes that "[t]he FTX Group's profound control failures placed its crypto assets and funds at risk from the outset." *Id.,* 39.

## G.    Crypto Sector a Hotbed for Illicit Activity and Fraudulent Conduct

192.    From its inception, cryptocurrency has been fueled by illicit activity and the crypto sector continues to be rife with frauds and scams. For a detailed breakdown on the illicit use of cryptocurrency, see the U.S. Department of Justice's report from September 2022 titled: "The Role of Law Enforcement In Detecting, Investigation, And Prosecuting Criminal Activity Related to Digital Assets." The report was issued pursuant to the March 9, 2022 Executive Order on Ensuring Responsible Development of Digital Assets and is the latest report on cryptocurrency released by [47] dating back to 2018, all of which detail the dire harms caused by cryptocurrency. DoJ notes that "[t]he rise of the Bitcoin network paralleled the development of Silk Road, AlphaBay, and other illegal online marketplaces…" and the department classified digital asset crime into three categories: "(1) cryptocurrency as a means of payment for, or manner of facilitating, criminal activity; (2) the use of digital assets as a means of concealing illicit financial activity; and (3) crimes involving or affecting the digital assets ecosystem." The September report

---

[47]    https://www.justice.gov/opa/pr/justice-department-announces-report-digital-assets-and-launches-nationwide-network (accessed May 11, 2023).

details several high-profile cases involving the illicit use of cryptocurrency. One case is the darknet marketplace Silk Road, which accepted payment only in Bitcoin, and was shut down by the FBI in 2013 after having facilitated sales revenue totaling over 9.5 million Bitcoin, equivalent to roughly $1.2 billion at the time.

193.     Cryptocurrency is increasingly being used by organized crime syndicates and nation states for illicit purposes. In January 2022, the Government Accountability Office (GAO) issued a report finding that "[v]irtual currency is increasingly used illicitly to facilitate human and drug trafficking."[48] Cryptocurrency is also being used by Iran, Russia, and North Korea to bypass U.S. economic and financial sanctions.[49] According to the United Nations, "money raised by North Korea's criminal cyber operations are helping to fund the country's illicit ballistic missile and nuclear programs."[50] North Korea's brazenness was revealed to the public earlier this year when a well-known "Web 3" video game, Axie Infinity, was hacked and $620 million in the cryptocurrency ether was stolen. "Chainalysis estimates that North Korea stole approximately $1 billion in the first nine months of 2022 from decentralized crypto exchanges alone," one of the reasons why Anne Neuberger, US deputy national security adviser for cyber security, said in July

---

[48] Virtual Currencies: Additional Information Could Improve Federal Agency Efforts to Counter Human and Drug Trafficking [Reissued with Revisions Feb. 7, 2022] | U.S. GAO (accessed May 11, 2023).

[49] Russia Could Use Cryptocurrency to Mitigate U.S. Sanctions - The New York Times (nytimes.com) (accessed May 11, 2023), Iran Plans Uses Crypto for Imports to Get Around Sanctions (gizmodo.com) (accessed May 11, 2023), This is how North Korea uses cutting-edge crypto money laundering to steal millions | MIT Technology Review(accessed May 11, 2023).

[50] How North Korea became a mastermind of crypto cybercrime | Ars Technica (accessed May 11, 2023).

2022 that North Korea "uses cyber to gain …. up to a third of their funds for their missile program."[51]

194.    Cryptocurrency has also fueled a surge in ransomware that has victimized American businesses, health care systems, and state and local governments. In May of 2022, the majority staff on the Homeland Security & Governmental Affairs Committee released a startling report on ransomware.[52] The report notes that in 2021, "ransomware attacks impacted at least 2,323 local governments, schools, and healthcare providers in the United States" and that the FBI "received 3,729 ransomware complaints with adjusted losses of more than $49.2 million." The report acknowledges that these numbers underestimate the true scale of the problem because many ransomware victims do not report to authorities. As evidence, they cite data from blockchain analytics company Chainalysis that found "malign actors received at least $692 million in cryptocurrency extorted as part of ransomware attacks" in 2020. The report notes that "cryptocurrency, typically Bitcoin, has become a near universal form of ransom payment in ransomware attacks, in part, because cryptocurrency enables criminals to extort huge sums of money from victims across diverse sectors with incredible speed." The link between cryptocurrency and ransomware became clear to the public in the wake of the Colonial Pipeline hack in May 2021, which disrupted gasoline supplies in the southeastern U.S. In the wake of that breach, several commentators argued for a ban, or heavy regulation, of cryptocurrency.[53]

195.    Everyday consumers have also fallen victim to various cryptocurrency-related scams. The Consumer Financial Protection Bureau (CFPB) published 2,404 cryptocurrency related

---

[51] Id.

[52] HSGAC Majority Cryptocurrency Ransomware Report.pdf (senate.gov) (accessed May 11, 2023).

[53] Ban Cryptocurrency to Fight Ransomware - WSJ (accessed May 11, 2023).

consumer complaints in its Consumer Complaint Database during 2021, and more than 1,000 cryptocurrency-related complaints during 2022 year-to-date.[54] According to the September DoJ report: "The CFPB has also received hundreds of servicemember complaints involving cryptocurrency assets or exchanges in the last 12 months, approximately one-third of which concerned frauds or scams."[55] In June 2022, the Federal Trade Commission issued a report finding that "since the start of 2021 more than 46,000 people have reported losing over $1 billion in crypto to scams<u>https://www.ftc.gov/news-events/data-visualizations/data-spotlight/2022/06/reports-show-scammers-cashing-crypto-craze</u> – that's about one out of every four dollars reported lost, more than *any* other payment method."[56] The median individual loss was a staggering $2,600.

196.     Another September 2022 report from the Treasury Department, issued pursuant to the Executive Order, also called out the risks and harms to consumers from cryptocurrency:

> "Consumers and investors are exposed to improper conduct in the crypto-asset ecosystem for a variety of reasons, including a lack of transparency as well as the fact that crypto-assets have relatively novel and rapidly developing applications. This leads to frequent instances of operational failures, market manipulation, frauds, thefts, and scams. While the data for populations vulnerable to disparate impacts remains limited, available evidence suggests that crypto-asset products may present heightened risks to these groups, and the potential financial inclusion benefits of crypto-assets largely have yet to materialize."[57]

197.     There is also a long history of consumer losses associated with centralized exchanges, FTX being the latest. One of the first cryptocurrency exchange failures was Japan-

---

[54] <u>Justice Department Announces Report on Digital Assets and Launches Nationwide Network | OPA | Department of Justice</u> (accessed May 11, 2023).

[55] *Id.*

[56] <u>Reports show scammers cashing in on crypto craze | Federal Trade Commission (ftc.gov)</u> (accessed May 11, 2023).

[57] <u>Crypto-Assets: Implications for Consumers, Investors, and Businesses (treasury.gov)</u> (accessed May 11, 2023).

based Mt. Gox in 2014. Mt. Gox was handling over 70% of bitcoin transactions worldwide by the time it ceased operations after the exchange was hacked and the majority of cryptocurrency held by the exchange on behalf of customers was stolen. Creditors to Mt. Gox are still waiting for their funds, a sign that does not bode well for FTX creditors, to the extent they seek recovery directly from the FTX Group through the bankruptcy proceedings.[58]

198.    All of the above-mentioned problems with cryptocurrency are well known and one of the big reasons why consumers are hesitant to purchase or use cryptocurrency. According to Pew Research, 16% of Americans have invested in cryptocurrency while another 71% are not invested although they have heard at least a little about cryptocurrency.[59] For those in the latter group, concerns around fraud and scams are likely playing a role in their resistance to crypto investing.

199.    For those who choose to invest in cryptocurrency, the damages can be overwhelming, as with the FTX fraud. The losses sustained by SBF's victims are staggering. FTX stole more than $8 billion in Class Member funds, the bulk of which has now vanished. Many Class Members came of working age in the recession and, later, the COVID-19 pandemic, and as a result have spent their lives working long hours for low wages, often across multiple jobs or in the gig economy. Unlike Defendants, these Class Members do not have money to burn. They are not "crypto-bros." They are financially vulnerable, and SBF, with the help of his co-conspiring Defendants, exploited their vulnerability for tremendous financial gain. Now, while SBF rests comfortably at his parents' home in Palo Alto, flush with the resources to post $250 million bail, SBF's victims are left with nothing.

---

[58] [What to Watch in the FTX Bankruptcy as Details Remain Scarce - WSJ](#)

[59] [46% of cryptocurrency investors in US say it did worse than expected | Pew Research Center](#)

**H.      The SEC's Approach to Cryptocurrency.**

**I.      Overview**

200.     Despite the crypto industry's cries for "regulatory clarity," the SEC's stance on cryptocurrency has been clear and consistent from the beginning. Critics of the SEC's stance toward cryptocurrency overlook an important aspect of U.S. securities law – securities regulation is not meant to be precise but is instead intentionally drafted to be broad and all-encompassing; clarity is not just uncommon; it is deliberately avoided. This is why the definitions of "security" in Section 2(a)(1) of the Securities Act of 1933 (Securities Act), 15 U.S.C. 77b(a)(1), and Section 3(a)(10) of the Securities Exchange Act of 1934 (Exchange Act), 15 U.S.C. 78c(a)(10), include not only conventional securities, such as "stock[s]" and "bond[s]," but also the more general term "investment contract."

201.     Along these lines, in *Reves v. Ernst & Young*, the Supreme Court stated that:

"The fundamental purpose undergirding the Securities Acts is 'to eliminate serious abuses in a largely unregulated securities market.' *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 421 U.S. 849 (1975). **In defining the scope of the market that it wished to regulate, Congress painted with a broad brush. It recognized the virtually limitless scope of human ingenuity, especially in the creation of 'countless and variable schemes devised by those who seek the use of the money of others on the promise of profits**, *SEC v. W.J. Howey Co.*, 328 U.S. 293, 328 U.S. 299 (1946), and determined that the best way to achieve its goal of protecting investors was 'to define the term "security" in sufficiently broad and general terms so as to include within that definition the many types of instruments that in our commercial world fall within the ordinary concept of a security.' . . . Congress therefore did not attempt precisely to cabin the scope of the Securities Acts . . . Rather, it enacted a definition of 'security' sufficiently broad to encompass virtually any instrument that might be sold as an investment." (emphasis added)"[60]

---

[60]https://scholar.google.com/scholar_case?case=18068523124125938239&q=Reves+v.+Ernst+%26+Young&hl=en&as_sdt=400006&as_vis=1 (accessed May 11, 2023).

202.    Crafted to contemplate not only known securities arrangements at the time, but also any prospective instruments created by those who seek the use of others' money on the promise of profits, the definition of "security" is broad, sweeping, and designed to be flexible to capture new instruments that share the common characteristics of stocks and bonds. As Supreme Court Justice (and former SEC Commissioner (1935) and Chair (1936-37)) William O. Douglas opined in Superintendent of Insurance v. Bankers Life and Casualty Co.:

> "We believe that section 10(b) and Rule 10b-5 prohibit all fraudulent schemes in connection with the purchase or sale of securities, whether the artifices employed involve a garden type variety fraud, or present a unique form of deception. Novel or atypical methods should not provide immunity from the securities laws."

203.    Federal courts have already confirmed the SEC's jurisdiction in numerous crypto-related emergency asset freeze hearings where the issue is always considered and affirmed, same as it has been by hundreds of federal courts across the country since the *Howey* Decision, which the Supreme Court adopted over 75 years ago.[61] That decision resulted in the *Howey* Test, which is used to determine the presence of an investment contract. The *Howey* Test stipulates that an investment contract exists if there is an "investment of money in a common enterprise with a reasonable expectation of profits to be derived from the efforts of others."[62] The *Howey* Test is the principal method used by the SEC to determine if a given cryptocurrency is a security.

204.    The SEC has used multiple distribution channels to share its message and concerns regarding crypto, digital trading platforms, initial coin offerings, and other digital asset products and services over the past decade. The SEC first made investors aware of the dangers of investing

---

[61] https://supreme.justia.com/cases/federal/us/328/293/ (accessed May 11, 2023).

[62] Id.

in cryptocurrency in 2013 when the Office of Investor Education and Advocacy issued an Investor Alert on "Ponzi Schemes Using Virtual Currencies."[63]

205.    A year later, the same office issued an Investor Alert on "Bitcoin and Other Virtual Currency-Related Investments."[64] In 2017, the Commission took the rare step of releasing a Section 21(a) Report of Investigation that looked at the facts and circumstances of The DAO, which offered and sold approximately 1.15 billion DAO Tokens in exchange for a total of approximately 12 million Ether ("ETH") over a one-month period in 2016.[65] The SEC applied the *Howey* Test to the DAO tokens and concluded they were securities under the Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act"). While The DAO, and DAO tokens, were no longer operational at the time due to a high-profile hack that resulted in the theft of most DAO tokens, the Commission chose to release the report so as "to advise those who would use a Decentralized Autonomous Organization ("DAO Entity"), or other distributed ledger or blockchain-enabled means for capital raising, to take appropriate steps to ensure compliance with the U.S. federal securities laws."[66]

206.    In 2019, the SEC released a "Framework for "Investment Contract" Analysis of Digital Assets" which provided additional details on when a digital asset has the characteristics of an investment contract and "whether offers and sales of a digital asset are securities transactions."[67]

---

[63] ia_virtualcurrencies.pdf (sec.gov) (accessed May 11, 2023).

[64] Investor Alert: Bitcoin and Other Virtual Currency-Related Investments | Investor.gov (accessed May 11, 2023).

[65] https://www.sec.gov/litigation/investreport/34-81207.pdf (accessed May 11, 2023).

[66] Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO (accessed May 11, 2023).

[67] SEC.gov | Framework for "Investment Contract" Analysis of Digital Assets (accessed May 11, 2023).

207.    In addition, the SEC has publicized its position on cryptocurrency in countless enforcement actions,[68] multiple speeches,[69] Congressional testimony,[70] and several official SEC statements[71] and proclamations.[72] Current SEC Chairman, Gary Gensler, has spoken frequently about the perils and illegality of crypto lending platforms and decentralized finance,[73] warning that their failure to register with the SEC may violate U.S. securities laws.[74] In one interview, Gensler said:

> "The law is clear, it's not about waving a wand. Congress spoke about this in 1934 . . . When a [digital] platform has securities on it, it is an exchange, and it's a question of whether they're registered or they're operating outside of the law and I'll leave it at that."[75]

208.    On September 8, 2022, Chair Gensler gave a speech reflecting on the flexibility of the securities laws and the SEC's consistency in applying these laws to cryptocurrency.[76] Gensler noted that of the 10,000 different cryptocurrencies in the market, "the vast majority are securities,"

---

[68] SEC.gov | Crypto Assets and Cyber Enforcement Actions (accessed May 11, 2023).

[69] https://www.sec.gov/news/speech/gensler-aspen-security-forum-2021-08-03 (accessed May 11, 2023).

[70] https://www.sec.gov/news/testimony/gensler-2021-05-26 (accessed May 11, 2023).

[71] https://www.sec.gov/news/public-statement/statement-clayton-2017-12-11 (accessed May 11, 2023).

[72] https://www.sec.gov/news/public-statement/enforcement-tm-statement-potentially-unlawful-online-platforms-trading (accessed May 11, 2023).

[73] https://www.theblock.co/post/113416/gensler-speech-crypto-defi-lending-sec (accessed May 11, 2023).

[74] https://ca.finance.yahoo.com/news/crypto-platforms-dont-register-with-sec-outside-the-law-gensler-164215740.html (accessed May 11, 2023).

[75] https://www.theblock.co/post/113416/gensler-speech-crypto-defi-lending-sec (accessed May 11, 2023).

[76] SEC.gov | Kennedy and Crypto (accessed May 11, 2023).

a position that was also held by his predecessor, Jay Clayton.[77] Gensler went on to note that the SEC has spoken with a "pretty clear voice" when it comes to cryptocurrency "through the DAO Report, the Munchee Order, and dozens of Enforcement actions, all voted on by the Commission" and that "[n]ot liking the message isn't the same thing as not receiving it."[78]

209.    The judicial record supports Chair Gensler's assertions. The SEC has taken over 100 crypto-related enforcement actions and has not lost a single case.[79]

210.    What follows are summaries of five cases that will help inform this litigation.

    **II.    SEC v. KIK**

211.    In Kik[80], the SEC's complaint[81], filed in the U.S. District Court for the Southern District of New York on June 4, 2019, alleged that Kik sold digital asset securities to U.S. investors without registering their offer and sale as required by the U.S. securities laws. Kik argued that the SEC's lawsuit against it should be considered "void for vagueness."[82]

212.    The court granted the SEC's motion for summary judgment on September 30, 2020, finding that undisputed facts established that Kik's sales of "Kin" tokens were sales of investment contracts (and therefore of securities) and that Kik violated the federal securities laws when it conducted an unregistered offering of securities that did not qualify for any exemption from registration requirements. The court further found that Kik's private and public token sales were a single integrated offering.

---

[77] Id.

[78] Id.

[79] SEC Cryptocurrency Enforcement: 2021 Update (cornerstone.com) (accessed May 11, 2023).

[80] https://www.sec.gov/news/press-release/2020-262 (accessed May 11, 2023).

[81] https://www.sec.gov/news/press-release/2019-87 (accessed May 11, 2023).

[82]     https://www.financemagnates.com/cryptocurrency/news/sec-seeks-to-block-kik-subpoenas-refutes-void-for-vagueness-claim/ (accessed May 11, 2023).

### III.   SEC v. Telegram

213.    In Telegram,[83] the SEC filed a complaint[84] on October 11, 2019, alleging that the company had raised capital to finance its business by selling approximately 2.9 billion "Grams" to 171 initial purchasers worldwide. The SEC sought to preliminarily enjoin Telegram from delivering the Grams it sold, which the SEC alleged were securities that had been offered and sold in violation of the registration requirements of the federal securities laws.

214.    Telegram argued[85] that the SEC has "engaged in improper 'regulation by enforcement' in this nascent area of the law, failed to provide clear guidance and fair notice of its views as to what conduct constitutes a violation of the federal securities laws, and has now adopted an ad hoc legal position that is contrary to judicial precedent and the publicly expressed views of its own high-ranking officials."

215.    On March 24, 2020, the U.S. District Court for the Southern District of New York issued a preliminary injunction[86] barring the delivery of Grams and finding that the SEC had shown a substantial likelihood of proving that Telegram's sales were part of a larger scheme to distribute the Grams to the secondary public market unlawfully.

216.    Without admitting or denying the allegations in the SEC's complaint, the defendants consented to the entry of a final judgment enjoining them from violating the registration provisions of Sections 5(a) and 5(c) of the Securities Act of 1933. The judgment ordered the defendants to disgorge, on a joint and several basis, $1,224,000,000.00 in ill-gotten gains from the

---

[83] https://www.sec.gov/news/press-release/2020-146 (accessed May 11, 2023).

[84] https://www.sec.gov/news/press-release/2019-212 (accessed May 11, 2023).

[85]    https://www.financemagnates.com/cryptocurrency/news/sec-vs-telegram-will-gram-tokens-ever-be-distributed/ (accessed May 11, 2023).

[86] SEC v. Telegram: A Groundbreaking Decision in Cryptocurrency Enforcement? | Insights | Greenberg Traurig LLP (gtlaw.com) (accessed May 11, 2023).

sale of Grams, with credit for the amounts Telegram pays back to initial purchasers of Grams. It also ordered Telegram Group Inc. to pay a civil penalty of $18,500,000. For the next three years, Telegram is further required to give notice to the SEC staff before participating in the issuance of any digital assets.

### IV.    SEC v. BlockFi

217.    In BlockFi Lending LLC, the first SEC case ever involving a crypto-lending program, on February 22, 2022, the SEC charged BlockFi [87]with failing to register the offers and sales of its retail crypto-lending product and also charged BlockFi with violating the registration provisions of the Investment Company Act of 1940.

218.    BlockFi argued for "increased regulatory clarity" but lost.[88]

219.    To settle the SEC's charges, BlockFi agreed to pay a $50 million penalty, cease its unregistered offers and sales of the lending product, BlockFi Interest Accounts (BIAs), and bring its business within the provisions of the Investment Company Act within 60 days. BlockFi's parent company also announced that it intends to register under the Securities Act of 1933 the offer and sale of a new lending product. In parallel actions, BlockFi agreed to pay an additional $50 million in fines to 32 states to settle similar charges.

### V. SEC Wells Notice to Coinbase

220.    In 2021, Coinbase began marketing a cryptocurrency lending product called Lend. The Lend program purported to allow some Coinbase customers to "earn interest on select assets on Coinbase, starting with 4% APY on USD Coin (USDC)."[89] According to Coinbase, its lawyers

---

[87] https://lnkd.in/d-Xy45ec (accessed May 11, 2023).

[88] https://blockfi.com/pioneering-regulatory-clarity (accessed May 11, 2023).

[89] The SEC has told us it wants to sue us over Lend. We don't know why. - Blog (coinbase.com) (accessed May 11, 2023).

reached out to the SEC to discuss its Lend product, at which point SEC staff instead served Coinbase with a Wells Notice, informing Coinbase of their intention to seek approval from the SEC Commissioners to file a civil enforcement action against Coinbase for violating the federal securities laws.

221.     According to Coinbase, the SEC issued the Wells Notice because of Coinbase's failure to file a registration statement with the SEC for the offering of its Lend product, which the SEC believed was a security.[90]

222.     The two cases that Coinbase claims the SEC cites as support for its *Wells* Notice are *SEC v. Howey* and *Reves v. Ernst & Young*. *Reves* addressed the question of whether a product is a "note" and hence a security (applying the so-called "Familial Resemblance Test").

223.     Under the Lend program, Coinbase customers were clearly investing "money" at Coinbase and placing their faith in Coinbase to generate a profit for them. Lend investors would have no say in how Coinbase runs the Lend program and Coinbase was not going to permit Lend investors to participant in Lend-related decisions. Given these facts, Lend was clearly an investment contract.

224.     Under *Reves*, Lend may have also been a "note" and hence a security. Although the term "note" is included in the statutory definition of a security, case law has determined that not every "note" is a security. The definition specifically excludes notes with a term of less than nine months and courts have carved out a range of exemptions over the years for commercial paper type notes such as purchase money loans and privately negotiated bank loans. To reconcile these varying cases, the U.S. Supreme Court in *Reves* established the "family resemblance test," to determine whether a note is a security.

---

[90] *Id.*

225.    Per the "family resemblance test," a presumption that a note is a security can only be rebutted if the note bears a resemblance to one of the enumerated categories on a judicially developed list of exceptions, as follows: 1) a note delivered in consumer financing; 2) a note secured by a mortgage on a home; 3) a short-term note secured by a lien on a small business or some of its assets; 4) a note evidencing a character loan to a bank customer; 5) a short-term note secured by an assignment of accounts receivable; and 6) a note which simply formalizes an open-account debt incurred in the ordinary course of business (such as a trade payable for office supplies); and vii) a note evidencing loans by commercial banks for current operations.

226.    The "family resemblance" analysis requires:

- A consideration of the motivation of the seller and buyer (e.g. is the seller looking for investment and the buyer looking for profit?);

- The plan of distribution of the note (e.g. is the product being marketed as an investment?);

- The expectation of the creditor/investor (e.g. would the investing public reasonably expect the application of the securities laws to the product); and

- The presence of an alternative regulation (e.g. will the product be registered as a banking product and the offered registered as a bank?).

227.    Applying the family resemblance test to Lend reveals the presence of a note. First, Coinbase likened the Lend program to that of a savings account, where the Lend customer is looking for a profitable investment and Coinbase is looking for investors. Second, Coinbase marketed the Lend program as an investment. Third, investors would expect that securities regulation applies. Fourth, Coinbase is not a bank, so their so-called savings account falls under no other regulatory jurisdiction and protection.

228.     Given the clear facts of the case, Coinbase decided to cancel the Lend program.[91]

## VI. SEC v. Binance

229.     In Binance, the SEC filed a complaint[92] on June 5, 2023, in the United States District Court for the District of Columbia against several of the Binance entities including Binance.com, U.S.-based affiliates, and the founder Changpeng Zhao. The SEC alleges that Binance.com and the other defendants violated thirteen securities laws, including selling various unregistered securities and a staking-as-a-service program; operating an unregistered exchange, broker-dealer, and clearing agency across interstate lines; covertly controlling Binance.US to evade U.S. securities laws; secretly allowing U.S. high-value traders to remain on the international platform; and commingling billions of U.S. assets with Zhao-owned entities. The SEC seeks a preliminary injunction to, among other relief, freeze and repatriate defendants' U.S. assets. The SEC also seeks to permanently enjoin defendants from directly or indirectly violating the Exchange and Securities Acts, disgorge illegal gains, and award civil damages.

## VII. SEC v. Coinbase

230.     In Coinbase, the SEC filed a complaint[93] on June 6, 2023, in the United States District Court for the Southern District of New York against Coinbase and Coinbase Global. The SEC alleges that the Coinbase entities have violated multiple securities laws, including making billions of dollars from selling various unregistered securities and a staking-as-a-service program; and operating an unregistered exchange, broker-dealer, and clearing agency across interstate lines. The SEC seeks to permanently enjoin defendants from directly or indirectly violating the Exchange

---

[91]https://www.theverge.com/2021/9/20/22684169/coinbase-crypto-lend-feature-discontinued-sec-lawsuit-threats (accessed June 27, 2023).
[92]https://www.sec.gov/files/litigation/complaints/2023/comp-pr2023-101.pdf.
[93] https://www.sec.gov/litigation/complaints/2023/comp-pr2023-102.pdf.

and Securities Acts, disgorge illegal gains, and award civil damages. "Coinbase was fully aware of the applicability of the federal securities laws to its business activities, but deliberately refused to follow them," stated Gurbir S. Grewal, Director of the SEC's Division of Enforcement.[94]

### VIII. SEC v. Terraform Labs Pte. Ltd.

231.    In one of the most recent developments in the crypto space, on July 31, 2023, Judge Jed Rakoff in the Southern District of New York entered an order denying a motion to dismiss claims that defendants, a crypto-assets company and its founder, were responsible for a multibillion-dollar fraud that involved the development, marketing, offer and sale of crypto-assets that the SEC alleged were unregistered securities. *SEC v. Terraform Labs Pte. Ltd., et al.*, No 1:23-cv-01346-JSR, ECF No. 51 (S.D.N.Y. July 31, 2023).[95]

232.    This is a significant ruling for several reasons.

233.    First, it supports the fact that YBAs and FTT are unregistered securities.

234.    Second, Judge Rakoff explicitly rejects a key component of his colleague, Judge Analisa Torres' reasoning in her order on cross-motions for summary judgment in *SEC v. Ripple Labs, Inc., et al.*, No. 1:20-cv-10832, ECF No. 874 (S.D.N.Y. July 13, 2023), which drew a distinction between crypto-assets sold directly by the issuer and on the secondary market.[96]

235.    Third, Judge Jed Rakoff is a highly regarded jurist who is considered an expert in securities law and business law. In fact, Todd Baker, an attorney and Senior Fellow at the Richman Center for Business, Law & Public Policy at Columbia Business and Law Schools called Judge

---

[94] https://www.sec.gov/news/press-release/2023-102.

[95] https://storage.courtlistener.com/recap/gov.uscourts.nysd.594150/gov.uscourts.nysd.594150.51.0_1.pdf (accessed August 6, 2023).

[96] https://assets.bwbx.io/documents/users/iqjWHBFdfxIU/rVqyLFyEZnz8/v0

Rakoff, in a *Financial Times* article, the "[T]he most respected securities authority in the federal judiciary."[97]

236.    The relevant points of comparison in Judge Rakoff's decision to the FTX MDL are his analysis around the Luna token and UST stablecoin, which bear similarities to the FTT token and YBAs, respectively.

237.    With respect to the Luna token, Judge Rakoff found that a common enterprise and expectation of profit existed because Terraform labs used proceeds from LUNA coin sales to develop the Terraform blockchain and represented that that these improvements would increase the value of the Luna tokens. This is similar to the FTT token, which was an exchange token. Given FTT's features, it was clearly designed to go up in value as the FTX platform grew and became more popular with crypto traders. In fact, in their complaint alleging, amongst other things, that FTT is an unregistered security, the SEC states:

> FTX used the pooled proceeds from FTT sales to fund the development, marketing, business operations, and growth of FTX, depending on the success of FTX and its management team in developing, operating, and marketing the trading platform. If demand for trading on the FTX platform increased, demand for the FTT token could increase, such that any price increase in FTT would benefit holders of FTT equally and in direct proportion to their FTT holdings. The large allocation of tokens to FTX incentivized the FTX management team to take steps to attract more users onto the trading platform and, therefore, increase demand for, and increase the trading price of, the FTT token.[98]

238.    The SEC makes a similar allegation with respect to Luna in the Terraform Labs action and Judge Rakoff sides with the SEC. From his decision:

> The SEC's theory for horizontal commonality as to these other coins, however, rests on a different but equally plausible theory. As to the LUNA tokens, for instance, the SEC has demonstrated horizontal commonality by alleging that the defendants' used proceeds from LUNA coin sales to develop the Terraform

---

[97] https://www.ft.com/content/5e5a3c4a-7508-4db8-ab23-1ff17c87c880

[98] comp-pr2022-234.pdf (sec.gov)

blockchain and represented that these improvements would increase the value of the LUNA tokens themselves. See Amended Complaint ¶¶ 46-47, 49-51. In other words, by alleging that the defendants "pooled" the proceeds of LUNA purchases together and promised that further investment through these purchases would benefit all LUNA holders, the SEC has adequately pled that the defendants and the investors were joined in a common, profit-seeking enterprise.[99]

239.    Also, of relevance to the FTX MDL is Judge Rakoff's conclusion that the algorithmic stablecoin, UST, also met the *Howey* standard for investment contracts. Note that this is the first time the SEC has alleged that a stablecoin is an investment contract, and the SEC's reasons for making this allegation also support the assertion that YBAs are securities.

240.    While UST, like most stablecoins, was supposed to be tied one-for-one to the US dollar, Terraform and Kwon marketed "UST coins as profitable investment opportunities—as opposed to just stable stores of value—in meetings with U.S. investors, investment conferences in major U.S. cities, and on social media platforms."[100]

241.    Then, in 2021, Terraform launched the "Anchor Protocol" which was an "investment pool into which owners of UST coins could deposit their coins and earn a share of whatever profits the pool generated."

242.    Judge Rakoff found that "the fact that most of the UST coins were deposited in the Anchor Protocol independently rendered these tokens investment contracts, indeed investments that were touted as being capable of being able to generate future profits of as much as 20%."[101] Judge Rakoff goes on to say:

> In essence, the UST tokens were allegedly "pooled" together in the Anchor Protocol and, through the managerial efforts of the defendants, were expected to generate

---

[99] https://assets.bwbx.io/documents/users/iqjWHBFdfxIU/rwwEEo0YbENc/v0 at 36

[100] *Id.* at Page 4

[101] *Id.* at Page 34

profits that would then be re-distributed to all those who deposited their coins into the Anchor Protocol—in other words, on a pro-rata basis."[102]

243.    This closely resembles the facts surrounding YBAs and Judge Rakoff's finding that UST met the requirements for an investment contract supports the conclusion that YBAs are also unregistered securities.

244.    Judge Rakoff also explicitly rejects a key element of Judge Torres' analysis in the *Ripple* decision, stating:

> It may also be mentioned that the Court declines to draw a distinction between these coins based on their manner of sale, such that coins sold directly to institutional investors are considered securities and those sold through secondary market transactions to retail investors are not. In doing so, the Court rejects the approach recently adopted by another judge of this District in a similar case*, SEC v. Ripple Labs Inc.*, 2023 WL 4507900 (S.D.N.Y. July 13, 2023).[103]

245.    Judge Rakoff goes on to explain that *Howey* and its progeny never made such a distinction, nor does it matter, for purposes of *Howey* analysis, whether a purchaser "bought the coins directly from the defendants or, instead, in a secondary resale transaction."[104]

246.    After noting that "in theory, the tokens, if taken by themselves, might not qualify as investment contracts," Judge Rakoff evaluated—"as the Supreme Court did in *Howey*"— "whether the crypto-assets and the 'full set of contracts, expectations, and understandings centered on the sales and distribution of [these tokens]' amounted to an 'investment contract' under federal securities laws."[105]

247.    Judge Rakoff's rejection of the *Ripple* decision's secondary market distinction and fulsome *Howey* analysis support Plaintiffs' assertion that FTT and YBAs are unregistered

---

[102] *Id.* at Page 36

[103] *Id.* at 40

[104] *Id.* at 41

[105] *Id.* at 32–33.

securities. FTT purchasers, on the FTX Platform or elsewhere, did not necessarily know who the seller was. But, as Judge Rakoff explains, knowledge of the seller's identity is not necessary to prove that purchasers expected profits based on the efforts of FTX, who is the ***issuer*** of these assets, and not simply a platform where the assets traded.

## I.   FTX's offer and sale of YBAs, which are unregistered securities.

248.   Beginning in 2019, the FTX Group began offering the YBAs to public investors through its Earn program. Plaintiff and other similarly situated individuals invested in FTX's YBAs.

249.   The details of the Earn program are still listed on the FTX website,[106] and additional information on Earn is described in a declaration submitted in the Voyager Chapter 11 proceedings by Joseph Rotunda, Director of Enforcement of the Texas State Securities Board, on October 14, 2022.[107]

250.   Under the section titled "How can I earn yield on my FTX deposits?" on the FTX website, the company describes the Earn program thusly:

"You can now earn yield on your crypto purchases and deposits, as well as your fiat balances, in your FTX app! By opting in and participating in staking your supported assets in your FTX account, you'll be eligible to earn up to 8% APY on your assets."[108]

251.   On the same webpage, the company also states:

The **first $10,000** USD value in your deposit wallets will earn **8%** APY. Amounts held **above $10,000 up to $100,000** USD in value (subject to market fluctuations) will earn **5%** APY.[109]

---

[106] FTX App Earn – FTX Exchange (accessed May 11, 2023).

[107] 1175310142280000000134.pdf (stretto.com) (accessed May 11, 2023).

[108] FTX App Earn – FTX Exchange (accessed May 11, 2023).

[109] *Id.*

252.    Nowhere on the website does FTX describe how this yield will be generated; readers are given the impression that the yield will come from "staking your supported assets in your FTX account" although nowhere does the company describe what staking actually is.

253.    Staking is a technical concept that applies to the blockchain consensus mechanism called Proof of Stake, which some cryptocurrencies utilize.[110] Staking serves a similar function to cryptocurrency mining, in that it is the process by which a network participant gets selected to add the latest batch of transactions to the blockchain and earn some crypto in exchange. While the exact mechanism will vary from project to project, in general, users will put their token on the line (i.e., "stake") for a chance to add a new block onto the blockchain in exchange for a reward. Their staked tokens act as a guarantee of the legitimacy of any new transaction they add to the blockchain. The network chooses validators based on the size of their stake and the length of time they've held it. Thus, the most invested participants are rewarded. If transactions in a new block are discovered to be invalid, users can have a certain amount of their stake burned by the network, in what is known as a slashing event.[111]

254.    Some within the crypto community argue that staking is not a security because it is simply part of the code by which specific cryptocurrencies operate. In other words, some argue that staking programs are different from lending programs because user assets are not actually being "lent" out to third parties. But in September 2022, SEC Chairman Gary Gensler told reporters that "cryptocurrencies and intermediaries that allow holders to 'stake' their coins might pass" the *Howey* Test.[112] According to Gensler, "From the coin's perspective…that's another

---

[110] For example, Ethereum, Tezos, Cosmos, Solana, and Cardano all use Proof of Stake.

[111] The staking definition comes from the Coinbase website: What is staking? | Coinbase (accessed May 11, 2023).

[112] Ether's New 'Staking' Model Could Draw SEC Attention - WSJ (accessed May 11, 2023).

indicia that under the *Howey* test, the investing public is anticipating profits based on the efforts of others." The Wall Street Journal noted that if an intermediary such as a crypto exchange offers staking services to its customers, Mr. Gensler said, it "looks very similar—with some changes of labeling—to lending."[113]

255.    Based upon information – included and not included – on the FTX website, it does not appear that the company is adhering to the technical, commonly understood, definition of staking. *See* Ex. A ¶¶ 36–42. The most telling indicator is that the company permits any cryptocurrency listed on their platform to be eligible for staking, even coins that do not use Proof of Stake. *Id.* ¶ 39. The FTX website specifically states that Bitcoin and Dogecoin can generate yield under the Earn program, even though these coins use the Proof of Work consensus mechanism (meaning you CANNOT technically stake Bitcoin or Dogecoin). Therefore, it is not at all clear where the promised yield is coming from.

256.    Applying *Howey* to the FTX Earn program reveals that Earn is an investment contract. An investment contract is present because users are clearly entrusting their funds to FTX. Users have to "opt-in" so that FTX may take possession over user assets and deploy them in a manner that will generate yield. As noted above, it is not clear how that yield is generated, but it is clear that FTX is deploying customer assets in a discretionary manner. Therefore, the efforts of FTX are instrumental in generating the users' yield and of course users have an expectation of profit because FTX is advertising yields of up to 8% APY:

> From a securities perspective, the *Howey* Test defines an investment contract as:
> a.  An investment of money
> > i.   Cryptocurrency is a medium of exchange and way of transferring value in a measurable and quantifiable way. It is increasingly used as a means of payment, although it is more commonly used as a

---

[113] Id.

speculative investment at this point in time. Whether or not cryptocurrency can be defined as 'money' is in part a matter of semantics that can vary based on considers the fundamental features of money to be, and what criteria needs to be achieved in order for something to be considered money. Suffice to say, when examining aspects such as fungibility, durability, portability, divisibility, scarcity, transferability, acting as a medium of exchange, acting as a unit of account, and acting as a store of value, it could be argued that some cryptocurrencies fulfill many of these criterion as good as or even better than fiat currencies.

b.  In a common enterprise

  i.  FTX customer assets are almost always consolidated in wallets operated an controlled by FTX at least initially. These wallets are typically referred to as 'hot wallets' or 'consolidation wallets.' From these wallets, cryptocurrency can be move to other FTX-controlled wallets, or it can be used to pay back other customers performing withdrawals, but FTX can and did send (and loan) out such assets to other entities, including Alameda 'Alameda.' The blockchains data contains an immutable and verifiable record of data that shows that FTX customer deposits went into accounts operated by a common enterprise, namely, FTX.

c.  With the expectation of profit

  i.  FTX customers are promised yield when they participate in the Earn program. And at up to 8% yield, that is a considerable amount that would be considerably in excess to that of a savings account at a bank. But it was also far riskier than investing money in a savings account at a bank. FTX goes out of their way to advertise this yield, and indicate that such earnings are to be calculated on the "investment portfolio" that is stored 'in' the FTX app.[114]

d.  To be derived from the efforts of others

  i.  The FTX Yield-bearing account was portrayed as passive income stream. A customer needs to do nothing more than ensure they are subscribed to the yield program, and that they have deposited assets (of crypto or even fiat) in order to earn the 5% or 8% yield, which they clearly indicate is counted hourly. There is no further work or action needed on the part of the user.

  ii.  The work that 'others' (namely FTX) would need to do would including, at a baseline, sending transactions. But it would also require FTX to make an effort by leveraging and investing the money elsewhere which could theoretically come about either via

---

[114]  https://help.ftx.com/hc/en-us/articles/10573545824532-FTX-App-Earn (accessed May 11, 2023).

giving out loans, employing trading strategies, 'staking,' making other investments, or giving out loans to entities (such as Alameda) that would employ such strategies.

146.     The FTX Earn program was most likely a note per *Reves* as well. First, FTX offered Earn to obtain crypto assets for the general use of its business, namely, to run its activities to pay interest to Earn investors, and users purchased YBAs and were automatically opted-in to Earn to receive interest on their crypto assets. Second, Earn was offered and sold to a broad segment of the general public. Third, FTX promoted Earn as an investment; on their website, FTX notes that Earn users will receive "yield earnings" on their "investment portfolio."[115] Fourth, no alternative regulatory scheme or other risk reducing factors exist with respect to Earn. Note that the above analysis mirrors that provided by the SEC in their BlockFi order.[116]

147.     FTX maintains that it does not offer for sale any product that constitutes a "security" under federal or state law. Under federal securities laws as construed by the United States Supreme Court in its decision *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946) and by the SEC, an investment contract is a form of security under United States securities laws when (1) the purchaser makes an investment of money or exchanges another item of value (2) in a common enterprise (3) with the reasonable expectation of profits to be derived from the efforts of others.

148.     The YBAs were "securities" as defined by the United States securities laws and as interpreted by the Supreme Court, the federal courts, and the SEC. The FTX Group offered variable interest rewards on crypto assets held in the YBAs on the FTX Platform, which rates were determined by the FTX Group in their sole discretion. In order to generate revenue to fund the promised interest, the FTX Group pooled the YBA assets to engage in lending and staking

---

[115] FTX App Earn – FTX Exchange (accessed May 11, 2023).

[116] https://www.sec.gov/news/press-release/2022-26 (accessed May 11, 2023).

activities from which they derived revenue to pay interest on the YBAs. These activities make the YBAs a "security" under state and federal law.

149.    On October 14, 2022, Director of Enforcement of the Texas State Securities Board, Joseph Rotunda, filed a declaration in the Chapter 11 bankruptcy proceedings pending in connection with the collapse of the Voyager Digital cryptocurrency exchange, *In re: Voyager Digital Holdings, Inc., et al.*, Case No. 22-10943 (MEW), ECF No. 536 (Bankr. S.D.N.Y. Oct. 14, 2022), in which he explained how the YBAs are in fact "an offering of unregistered securities in the form of yield-bearing accounts to the residents of the United States." *Id.*, at 6. In his declaration, the pertinent portions of which are reproduced in full for ease of reference, Rotunda explains:

I am also familiar with FTX Trading LTD ("FTX Trading") dba FTX as described herein. As more fully explained throughout this declaration, I am aware that FTX Trading, along with West Realm Shires Services Inc. dba FTX US ("FTX US"), may be offering unregistered securities in the form of yield-bearing accounts to residents of the United States. These products appear similar to the yield-bearing depository accounts offered by Voyager Digital LTD et al., and the Enforcement Division is now investigating FTX Trading, FTX US, and their principals, including Sam Bankman-Fried.

I understand that FTX Trading is incorporated in Antigua and Barbuda and headquartered in the Bahamas. It was organized and founded in part by Mr. Bankman-Fried, and FTX Trading appears to be restricting operations in the United States. For example, domestic users accessing the webpage for FTX Trading at ftx.com are presented with a pop-up window that contains a disclaimer that reads in part as follows:

> Did you mean to go to FTX US? FTX US is a US licensed cryptocurrency exchange that welcomes American users.
> You're accessing FTX from the United States. You won't be able to use any of FTX.com's services, though you're welcome to look around the site.
> FTX US claims to be regulated as a Money Services Business with FinCEN (No. 31000195443783) and as a money transmitter, a seller of payment instruments

and in other non-securities capacities in many different states. It is not, however, registered as a money transmitter or in any other capacity with the Texas Department of Banking and it is not registered as a securities dealer with the Texas State Securities Board.

FTX US owns 75 percent or more of the outstanding equity of FTX Capital Markets (CRD No. 158816) ("FTX Capital"), a firm registered as a broker-dealer with the United States Securities and Exchange Commission, the Financial Industry Regulatory Authority Inc., and 53 state and territorial securities regulators. FTX Capital's registration as a dealer in Texas became effective on May 7, 2012, and the registration continues to remain in force and effect.

FTX US maintains a website at https://ftx.us that contains a webpage for smartphone applications for FTX (formerly Blockfolio)[117] (the "FTX Trading App") and FTX US Pro. Users appear able to click a link in this webpage to download the FTX Trading App even when they reside in the United States.

On October 14, 2022, I downloaded and installed the FTX Trading App on my smartphone. I created an account with FTX Trading through the FTX Trading App and linked the FTX account to an existing personal bank account. During the process, I provided my full first and last name and entered my residential address in Austin, Texas. I also accessed hyperlinks in the FTX Trading App that redirected to the Privacy Policy and Terms of Service. Although I was from the United States and was using the application tied to FTX Trading, the Privacy Policy and Terms of Service were from FTX US - not FTX Trading.

I thereafter used the FTX Trading App to initiate the transfer of $50.00 from my bank account to the FTX account and then transferred .1 ETH from a 3.0 wallet to the FTX account. The transfer of funds from my bank account to the FTX account

---

[117] Based upon information and belief, FTX Trading acquired Blockfolio LLC ("Blockfolio") in or around August 2020. At the time, Blockfolio managed a cryptocurrency application. FTX Trading appears to have thereafter rebranded Blockfolio and its smartphone application as FTX. Now, users can download the FTX Trading App from Apple's App Store or Google's Google Play Store. Although FTX rebranded Blockfolio, the application listing in Apple's App Store still shows the application with developed by Blockfolio.

will take up to six days to complete but the transfer of ETH was processed within a few minutes.

The FTX Trading App showed that I was eligible to earn a yield on my deposits. It also explained the "Earn program is provided by FTX.US" – not FTX Trading. It also represented that "FTX Earn rewards are available for US users on a promotional basis."

I recall the FTX Trading App's default settings were automatically configured to enable the earning of yield. The application also contained a link for additional information about yield. I accessed the link and was redirected to a recent article published by "Blockfolio Rebecca" under help.blockfolio.com. The article began as follows:

> You can now earn yield on your crypto purchases and deposits, as well as your fiat balances, in your FTX Trading App! By opting in and participating in staking your supported assets in your FTX account, you'll be eligible to earn up to 8% APY on your staked assets. THIS APY IS ESTIMATED AND NOT GUARANTEED AS DESCRIBED BELOW.

The article also described the payment of yield. It contained a section titled *How do you calculate APY? Does my balance compound daily?* that read, in part, as follows:

> FTX will deposit yield earnings from the staked coins, calculated hourly, on the investment portfolio that is stored in your FTX Trading App. Yield will be compounded on principal and yield you have already earned. Any cryptocurrency that you have deposited on FTX as well as any fiat balance you may have on your account, will earn yield immediately after you have opted into the program.
>
> The first $10,000 USD value in your deposit wallets will earn 8% APY. Amounts held above $10,000 up to $10MM USD in value (subject to market fluctuations) will earn 5% APY. In this scenario, your yield earned on the coins will look something like the examples below the table.

The article also contained a section titled Is this available in my country? This section explained that "FTX Trading App Earn is available to FTX Trading App customers that are in one of the FTX permitted jurisdictions." It contained a hyperlink to an article titled *Location Restrictions* published by FTX Crypto

Derivatives Exchange under help.ftx.com. This article described various restrictions on operations in certain countries and locations and read in part as follows:

> **FTX** does not onboard or provide services to corporate accounts of entities located in, established in, or a resident of the **United States of America, Cuba, Crimea and Sevastopol, Luhansk People's Republic, Donetsk People's Republic, Iran, Afghanistan, Syria, or North Korea**. FTX also does not onboard corporate accounts located in or a resident of **Antigua or Barbuda**. FTX also does not onboard any users from Ontario, and FTX does not permit non-professional investors from Hong Kong purchasing certain products.
>
> **FTX does not onboard or provide services to personal accounts of current residents of the United States of America, Cuba, Crimea and Sevastopol, Luhansk People's Republic, Donetsk People's Republic, Iran, Afghanistan, Syria, North Korea, or Antigua and Barbuda**. There may be partial restrictions in other jurisdictions, potentially including Hong Kong, Thailand, Malaysia, India and Canada. In addition, FTX does not onboard any users from Ontario, does not permit non-professional investors from Hong Kong purchasing certain products, and does not offer derivatives products to users from Brazil.
>
> FTX serves all Japanese residents via FTX Japan.

(emphasis in original)

Despite the fact I identified myself by name and address, the FTX Trading App now shows that I am earning yield on the ETH. The yield is valued at 8 percent APR.

Based upon my earning of yield and an ongoing investigation by the Enforcement Division of the Texas State Securities Board, the yield program appears to be an investment contract, evidence of indebtedness and note, and as such appears to be regulated as a security in Texas as provided by Section 4001.068 of the Texas Securities Act. At all times material to the opening of this FTX account, FTX Trading and FTX US have not been registered to offer or sell securities in Texas. FTX Trading and FTX US may therefore be violating Section 4004.051 of the Texas Securities Act. Moreover, the yield program described herein has not been registered or permitted for sale in Texas as generally required by Section 4003.001 of the Securities Act, and as such FTX Trading and FTX US may be violation Section 4003.001 by offering unregistered or unpermitted

securities for sale in Texas. Finally, FTX Trading and FTX US may not be fully disclosing all known material facts to clients prior to opening accounts and earning yield, thereby possibly engaging in fraud and/or making offers containing statements that are materially misleading or otherwise likely to deceive the public. Certain principals of FTX Trading and FTX US may also be violating these statutes and disclosure requirements. Further investigation is necessary to conclude whether FTX Trading, FTX US and others are violating the Securities Act through the acts and practices described in this declaration.

The Enforcement Division of the Texas State Securities Board understands that FTX US placed the highest bid for assets of Voyager Digital LTD et al., a family of companies variously accused of misconduct in connection with the sale of securities similar to the yield program promoted by FTX Trading and FTX US. FTX US is managed by Sam Bankman-Fried (CEO and Founder), Gary Wang (CTO and Founder) and Nishad Singh (Head of Engineering). The same principals hold the same positions at FTX Trading, and I was able to access the yield-earning product after following a link to the FTX Trading App from FTX US's website. The FTX Trading App also indicated the Earn program is provided by FTX US. As such, FTX US should not be permitted to purchase the assets of the debtor unless or until the Securities Commissioner has an opportunity to determine whether FTX US is complying with the law and related and/or affiliated companies, including companies commonly controlled by the same management, are complying with the law.

I hereby authorize the Texas Attorney General's Office and any of its representatives to use this declaration in this bankruptcy proceeding.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 14, 2022 in Austin, Texas.

/s Joseph Jason Rotunda

By: Joseph Jason Rotunda

**J.      FTX's offer and sale of FTT Tokens, which are unregistered securities.**

150.    The FTT token that contributed to FTX's demise is also an investment contract per the *Howey* Test. FTT is an exchange token created by FTX that entitles holders to benefits on the FTX exchange. According to crypto news site CoinDesk, "such benefits often include trading fee discounts, rebates and early access to token sales held on the platform."[118] Exchange tokens can be very profitable for their issuers because the exchanges that issue them tend to keep a significant number of tokens for themselves, which they can pump in price through speeches, social media posts, and other announcements. Economically, exchange tokes are akin to equity, although the holders of exchange tokens have no legal rights or interests in the issuer. As the exchange issuer grows in size and prominence, and trading volume increases on the exchange, the value of the exchange token will likely increase. Thus, the value of FTT increased as the FTX exchange became more well-known and utilized.[119]

151.    FTT passes the *Howey* Test because the token was controlled by FTX; the company could create or destroy FTT at will. And the value of FTT was based upon the success of FTX, therefore the "efforts" of others prong of the Howey Test is implicated. It is also clear that investors bought FTT because they thought it would go up in price; this is the same reason why most, if not all, investors buy any given cryptocurrency. In fact, Binance CEO Changpeng "CZ" Zhao agreed to accept FTT tokens as part of FTX's buyout of Binance's equity stake in FTX.[120]

**K.      Using the FTX Platform itself necessarily required transacting in unregistered**

---

[118] https://www.coindesk.com/learn/what-is-an-exchange-token/ (accessed May 11, 2023).

[119] See FTT price history here: https://coinmarketcap.com/currencies/ftx-token/ (accessed May 11, 2023).

[120]     https://www.investors.com/news/binance-to-buy-ftx-international-operations-as-liquidity-crunch-sparks-crypto-selloff/ (accessed May 11, 2023).

**securities.**

152.    Another avenue through which FTX users may have been exposed to a securities transaction was through the basic structure of the FTX Platform.

153.    Despite cryptocurrency and blockchain's foundational premise being the ability to transmit value peer-to-peer using a trustless and decentralized database that cannot be censured by any third party, cryptocurrency exchanges operate more like traditional banks.

154.    When you buy Bitcoin through a centralized cryptocurrency exchange, there is no corresponding transaction to the Bitcoin blockchain. Rather, the exchange simply maintains its own database that indicates which cryptocurrencies it owes to its customers. This is similar to how banks operate. Money deposited in a checking account is not actually "ours." The money becomes the bank's and we are owed a debt by the bank which is governed by the terms and conditions of the account.

155.    Cryptocurrency exchanges should then be in custody of enough cryptocurrency on the blockchain to cover what it owes customers. Custody can be done using hot or cold digital wallets (hot wallets are connected to the internet, cold wallets are not) with best practice being for exchanges to hold the majority of cryptocurrency (crypto which they are holding on behalf of customers) in multiple cold wallets. Best practice would also dictate that exchanges hold customer assets in separate wallets from exchange assets, and that each customer's assets would be held in a distinct wallet.

156.    According to the first day declaration by John Ray, FTX kept its crypto in a common pool used to fund undisclosed and unreasonably risky investments:

> The FTX Group did not keep appropriate books and records, or security controls, with respect to its digital assets. Mr. Bankman-Fried and [Alameda co-founder Gary] Wang controlled access to digital assets of the main businesses in the FTX Group (with the exception of LedgerX, regulated by the CFTC, and certain other

regulated and/or licensed subsidiaries). Unacceptable management practices included the use of an unsecured group email account as the root user to access confidential private keys and critically sensitive data for the FTX Group companies around the world, the absence of daily reconciliation of positions on the blockchain, the use of software to conceal the misuse of customer funds, the secret exemption of Alameda from certain aspects of FTX.com's auto-liquidation protocol, and the absence of independent governance as between Alameda (owned 90% by Mr. Bankman-Fried and 10% by Mr. Wang) and the Dotcom Silo (in which third parties had invested).

The Debtors have located and secured only a fraction of the digital assets of the FTX Group that they hope to recover in these Chapter 11 Cases. The Debtors have secured in new cold wallets approximately $740 million of cryptocurrency that the Debtors believe is attributable to either the WRS, Alameda and/or Dotcom Silos. The Debtors have not yet been able to determine how much of this cryptocurrency is allocable to each Silo, or even if such an allocation can be determined. These balances exclude cryptocurrency not currently under the Debtors' control as a result of (a) at least $372 million of unauthorized transfers initiated on the Petition Date, during which time the Debtors immediately began moving cryptocurrency into cold storage to mitigate the risk to the remaining cryptocurrency that was accessible at the time, (b) the dilutive 'minting' of approximately $300 million in FTT tokens by an unauthorized source after the Petition Date and (c) the failure of the co-founders and potentially others to identify additional wallets believed to contain Debtor assets.[121]

157.   In the declaration, Mr. Ray presents several rough balance sheets for the various FTX silos, while noting that he does not have confidence in them, and that "the information therein may not be correct as of the date stated."[122] Most telling is a footnote that appears on the balance sheets for the exchange businesses: "Customer custodial fund assets are comprised of fiat customer deposit balances. Balances of customer crypto assets deposited are not presented."[123] Ray notes that U.S. and overseas exchanges "may have significant liabilities" but that "such liabilities are

---

[121] 042020648197.pdf (pacer-documents.s3.amazonaws.com) (accessed May 11, 2023).

[122] *Id.*

[123] *Id.*

not reflected in the financial statements prepared while these companies were under the control of
Mr. Bankman-Fried."[124]

158.     To further complicate matters, recent statements given by Sam Bankman-Fried to
the Wall Street Journal (WSJ) suggest that about half of the balance owed by Alameda to FTX
was from wire transfers that customers made to FTX via Alameda in the early days before FTX
had a bank account.[125] This money was intended to fund customers' accounts at FTX. Bankman-
Fried claims some customers continued to use that route after FTX had a bank account and that
over time, "FTX customers deposited more than $5 billion in those Alameda accounts."[126] The
WSJ acknowledged that these funds "could have been recorded in two places—both as FTX
customer funds and as part of Alameda's trading positions" and that "such double-counting would
have created a huge hole in FTX's and Alameda's balance sheets, with assets that weren't really
there."[127]

159.     The relationship between FTX and Alameda was critical to the exchange's eventual
collapse. After suffering large losses in the wake of several high profile crypto-firm failures in the
spring and summer of 2022 (Alameda most likely was exposed to crypto hedge fund Three Arrows
Capital), FTX.com lent out some of its customer assets that it did control to Alameda.[128]
Presumably, the exchange benefitted from the interest paid by Alameda for the loaned crypto assets

---

[124] *Id.*

[125]     https://www.wsj.com/articles/ftx-founder-sam-bankman-fried-says-he-cant-account-for-
billions-sent-to-alameda-
11670107659?st=g35ia0eu0bjwqzn&reflink=desktopwebshare_permalink   (accessed  May  11,
2023).

[126] FTX customers deposited more than $5 billion in those Alameda accounts.

[127] *Id.*

[128] https://newsletter.mollywhite.net/p/the-ftx-collapse-the-latest-revelations   (accessed  May  11,
2023).

– although some have suggested that the loans were made for free.[129] Alameda could then use the customer assets as cheap collateral for margined trades with other parties (obtaining collateral from other sources would have been much more expensive).[130]

160.    It appears that Alameda did post collateral to secure the loans of customer crypto assets that it received, but that collateral took the form of FTT tokens. FTT tokens were the so-called "native token" of the FTX exchange: FTX created FTT and issued it to both institutional and retail investors without registering with any regulator or undergoing any audit or other external due diligence. FTX could create unlimited amounts of FTT if it wished.

161.    In short, there appear to have been two sets of leveraged transactions involved. First, Alameda borrowed assets from FTX's customers, providing FTT tokens as collateral for those loans. Second, Alameda engaged in margin trading, essentially borrowing money to execute risky trading strategies: these trades were secured by the assets Alameda had borrowed from FTX customers' accounts. Leverage makes trades potentially more lucrative, but also makes them more vulnerable to adverse market movements. In an Alameda balance sheet linked to CoinDesk in early November, Alameda's largest asset holdings were listed as being FTT tokens (it is possible that it received these in a kind of bailout from FTX). Other assets listed on that balance sheet included SOL tokens (issued by the Solana blockchain, in which Sam Bankman-Fried was an early investor)

---

[129]   https://www.cnbc.com/2022/11/13/sam-bankman-frieds-alameda-quietly-used-ftx-customer-funds-without-raising-alarm-bells-say-sources.html (accessed May 11, 2023).

[130] For a more general discussion of the conflicts of interest inherent in these relationships, see https://www.coppolacomment.com/2022/11/the-ftx-alameda-nexus.html (accessed May 11, 2023).

and SRM tokens (issued by the Serum exchange that Sam Bankman-Fried co-founded).[131] Alameda had few assets that hadn't been created out of thin air by FTX or FTX-related entities.

L.     **FTX Aggressively and Deceptively Marketed its Platform**

162.    From its inception, cryptocurrency has been fueled by illicit activity and the crypto sector continues to be rife with frauds and scams. For a detailed breakdown on the illicit use of cryptocurrency, see the U.S. Department of Justice's report from September 2022 titled: "The Role of Law Enforcement In Detecting, Investigation, And Prosecuting Criminal Activity Related to Digital Assets."[132] The report was issued pursuant to the March 9, 2022 Executive Order on Ensuring Responsible Development of Digital Assets and is the latest report on cryptocurrency released by DoJ dating back to 2018, all of which detail the dire harms caused by cryptocurrency. DoJ notes that "[t]he rise of the Bitcoin network paralleled the development of Silk Road, AlphaBay, and other illegal online marketplaces…" and the department classified digital asset crime into three categories: "(1) cryptocurrency as a means of payment for, or manner of facilitating, criminal activity; (2) the use of digital assets as a means of concealing illicit financial activity; and (3) crimes involving or affecting the digital assets ecosystem." The September report details several high-profile cases involving the illicit use of cryptocurrency. One case is the darknet marketplace Silk Road, which accepted payment only in Bitcoin, and was shut down by the FBI in 2013 after having facilitated sales revenue totaling over 9.5 million Bitcoin, equivalent to roughly $1.2 billion at the time.[133]

---

[131]    https://www.coindesk.com/business/2022/11/02/divisions-in-sam-bankman-frieds-crypto-empire-blur-on-his-trading-titan-alamedas-balance-sheet/ (accessed May 11, 2023).

[132]    https://www.justice.gov/opa/pr/justice-department-announces-report-digital-assets-and-launches-nationwide-network (accessed May 11, 2023).

[133]https://web.archive.org/web/20140220003018/https://www.cs.columbia.edu/~smb/UlbrichtCriminalComplaint.pdf (accessed May 11, 2023).

163.    Cryptocurrency is increasingly being used by organized crime syndicates and nation states for illicit purposes. In January 2022, the Government Accountability Office (GAO) issued a report finding that "[v]irtual currency is increasingly used illicitly to facilitate human and drug trafficking."[134] Cryptocurrency is also being used by Iran, Russia, and North Korea to bypass U.S. economic and financial sanctions.[135] According to the United Nations, "money raised by North Korea's criminal cyber operations are helping to fund the country's illicit ballistic missile and nuclear programs."[136] North Korea's brazenness was revealed to the public earlier this year when a well-known "Web 3" video game, Axie Infinity, was hacked and $620 million in the cryptocurrency ether was stolen. "Chainalysis estimates that North Korea stole approximately $1 billion in the first nine months of 2022 from decentralized crypto exchanges alone," one of the reasons why Anne Neuberger, US deputy national security adviser for cyber security, said in July 2022 that North Korea "uses cyber to gain …. up to a third of their funds for their missile program."[137]

164.    Cryptocurrency has also fueled a surge in ransomware that has victimized American businesses, health care systems, and state and local governments. In May of 2022, the majority staff on the Homeland Security & Governmental Affairs Committee released a startling

---

[134] Virtual Currencies: Additional Information Could Improve Federal Agency Efforts to Counter Human and Drug Trafficking [Reissued with Revisions Feb. 7, 2022] | U.S. GAO (accessed May 11, 2023).

[135] Russia Could Use Cryptocurrency to Mitigate U.S. Sanctions - The New York Times (nytimes.com) (accessed May 11, 2023), Iran Plans Uses Crypto for Imports to Get Around Sanctions (gizmodo.com) (accessed May 11, 2023), This is how North Korea uses cutting-edge crypto money laundering to steal millions | MIT Technology Review(accessed May 11, 2023).

[136] How North Korea became a mastermind of crypto cybercrime | Ars Technica (accessed May 11, 2023).

[137] Id.

report on ransomware.[138] The report notes that in 2021, "ransomware attacks impacted at least 2,323 local governments, schools, and healthcare providers in the United States" and that the FBI "received 3,729 ransomware complaints with adjusted losses of more than $49.2 million." The report acknowledges that these numbers underestimate the true scale of the problem because many ransomware victims do not report to authorities. As evidence, they cite data from blockchain analytics company Chainalysis that found "malign actors received at least $692 million in cryptocurrency extorted as part of ransomware attacks" in 2020. The report notes that "cryptocurrency, typically Bitcoin, has become a near universal form of ransom payment in ransomware attacks, in part, because cryptocurrency enables criminals to extort huge sums of money from victims across diverse sectors with incredible speed." The link between cryptocurrency and ransomware became clear to the public in the wake of the Colonial Pipeline hack in May 2021, which disrupted gasoline supplies in the southeastern U.S. In the wake of that breach, several commentators argued for a ban, or heavy regulation, of cryptocurrency.[139]

165.    Everyday consumers have also fallen victim to various cryptocurrency-related scams. The Consumer Financial Protection Bureau (CFPB) published 2,404 cryptocurrency related consumer complaints in its Consumer Complaint Database during 2021, and more than 1,000 cryptocurrency-related complaints during 2022 year-to-date.[140] According to the September DoJ report: "The CFPB has also received hundreds of servicemember complaints involving cryptocurrency assets or exchanges in the last 12 months, approximately one-third of which

---

[138] HSGAC Majority Cryptocurrency Ransomware Report.pdf (senate.gov) (accessed May 11, 2023).

[139] Ban Cryptocurrency to Fight Ransomware - WSJ (accessed May 11, 2023).

[140] Justice Department Announces Report on Digital Assets and Launches Nationwide Network | OPA | Department of Justice (accessed May 11, 2023).

concerned frauds or scams."[141] In June 2022, the Federal Trade Commission issued a report finding that "since the start of 2021 more than 46,000 people have reported losing over $1 billion in crypto to scams https://www.ftc.gov/news-events/data-visualizations/data-spotlight/2022/06/reports-show-scammers-cashing-crypto-craze – that's about one out of every four dollars reported lost, more than *any* other payment method."[142] The median individual loss was a staggering $2,600.

166.    Another September 2022 report from the Treasury Department, issued pursuant to the Executive Order, also called out the risks and harms to consumers from cryptocurrency:

> "Consumers and investors are exposed to improper conduct in the crypto-asset ecosystem for a variety of reasons, including a lack of transparency as well as the fact that crypto-assets have relatively novel and rapidly developing applications. This leads to frequent instances of operational failures, market manipulation, frauds, thefts, and scams. While the data for populations vulnerable to disparate impacts remains limited, available evidence suggests that crypto-asset products may present heightened risks to these groups, and the potential financial inclusion benefits of crypto-assets largely have yet to materialize."[143]

167.    There is also a long history of consumer losses associated with centralized exchanges, FTX being the latest. One of the first cryptocurrency exchange failures was Japan-based Mt. Gox in 2014. Mt. Gox was handling over 70% of bitcoin transactions worldwide by the time it ceased operations after the exchange was hacked and the majority of cryptocurrency held by the exchange on behalf of customers was stolen. Creditors to Mt. Gox are still waiting for their funds, a sign that does not bode well for FTX creditors, to the extent they seek recovery directly from the FTX Group through the bankruptcy proceedings.[144]

---

[141] *Id.*

[142] Reports show scammers cashing in on crypto craze | Federal Trade Commission (ftc.gov) (accessed May 11, 2023).

[143] Crypto-Assets: Implications for Consumers, Investors, and Businesses (treasury.gov) (accessed May 11, 2023).

[144] What to Watch in the FTX Bankruptcy as Details Remain Scarce - WSJ

168.     All of the above-mentioned problems with cryptocurrency are well known and one of the big reasons why consumers are hesitant to purchase or use cryptocurrency. According to Pew Research, 16% of Americans have invested in cryptocurrency while another 71% are not invested although they have heard at least a little about cryptocurrency.[145] For those in the latter group, concerns around fraud and scams are likely playing a role in their resistance to crypto investing.

169.     These valid concerns are one reason why crypto firms like FTX turn to celebrity endorsers. The FTX advertising campaign is particularly pernicious because it implicitly acknowledges cryptocurrency's problems while holding FTX out as the "safe" place to invest in cryptocurrency (note statements by O'Leary, Brady, and Curry, below). These statements were untrue, as FTX turned out to be a house of cards that misappropriated customer assets.

170.     FTX's paid endorser program was clearly designed to use the positive reputation associated with specific celebrities to convince consumers that FTX was a safe place to buy and sell cryptocurrency.

171.     FTX's brand ambassadors and ad campaigns that utilized those brand ambassadors had a critical role in portraying FTX as being 'safe' and 'compliant.':

> In Stephen Curry's FTX commercial, FTX's alleged safety is quite blatant stated when he claims
>
> *"With FTX, I have everything I need to buy, sell, and trade crypto safely"*
>
> Kevin O'Leary, another FTX brand ambassador stated:
>
> *"To find crypto investment opportunities that met my own rigorous standards of compliance, I entered into this relationship with FTX. It has some of the best crypto exchange offerings I've seen on the market. FTX leverages best-in-class tech to provide a quality trading experience with low fees for both professional and retail investors alike, while at the same time*

---

[145] 46% of cryptocurrency investors in US say it did worse than expected | Pew Research Center

*providing the reporting platform that serves both internal and regulatory compliance requirements"*

Given that FTX continually misappropriated customer assets, didn't have appropriate capital controls or reasonable compliance policies in place, these claims weren't just unfounded; they were downright false.

Mr. O'Leary's assertion that FTX was a compliant exchange is even more damaging than that of the typical celebrity, however. This is because Mr. O'Leary is known for being a *Shark* on the TV show *Shark Tank* whereby Shark's make investments in startups. With those investments comes due diligence. Mrb O'Leary's endorsement of FTX certainly makes it seem that he did appropriate due diligence into FTX, when obviously, whatever due diligence that he did was grossly inadequate.

Mr. O'Leary appears to admit that his own due diligence was inadequate, and that he relied on the due diligence of others:

*"I obviously know all the institutional investors in this deal. We all look like idiots. Let's put that on the table. We relied on each other's due diligence, but we also relied on another investment theme that I felt drove a lot of interest in FTX[146] "*

Mr. O'Leary is also a strategic investor in Canada's largest cryptocurrency exchange, 'WonderFi.' The name is derived from Mr. O'Leary's nickname, 'Mr. Wonderful.' Mr. O'Leary's involvement in WonderFi could naturally lead one to believe that he knew how to perform adequate due diligence on exchanges, and that he would do so on FTX before investing and acting as a brand ambassador.

172.    Other organizations and individuals, with presumably more to gain, did find red flags at FTX and turned down FTX and/or Sam Bankman-Fried's money. The nonprofits Our World Data and MITRE declined offered gifts of $7.5 million and $485,000, respectively, from the FTX Future Fund due to undisclosed red flags.[147] In addition, CME Group CEO Terry Duffy

---

[146]     https://dailyhodl.com/2022/12/09/kevin-oleary-says-ftx-collapse-makes-him-and-other-investors-in-the-crypto-exchange-look-like-idiots/

[147] https://www.moneyweb.co.za/moneyweb-crypto/sam-bankman-frieds-red-flags-were-seen-in-all-corners-of-his-empire/ (accessed May 11, 2023).

allegedly told Sam Bankman-Fried that he was "an absolute fraud" upon having an initial conversation with Mr. Bankman-Fried.[148].

173.    Based upon the information that has been released by FTX's new CEO John Ray as part of the company's bankruptcy filings, it is clear that anyone who bothered to spend 20 minutes reviewing FTX's operations pre-collapse would have identified significant red flags. In his first day pleading in support of FTX's chapter 11 petitions, Mr. Ray noted:

> "Never in my career have I seen such a complete failure of corporate controls and such a complete absence of trustworthy financial information as occurred here. From compromised systems integrity and faulty regulatory oversight abroad, to the concentration of control in the hands of a very small group of inexperienced, unsophisticated and potentially compromised individuals, this situation is unprecedented."[149]

174.    Mr. Ray's pleading contains a number of troubling findings, among them, (1) FTX did not have centralized control of its cash; (2) FTX had no dedicated human resources department, which has hindered Mr. Ray's team from preparing a complete list of who worked for the FTX Group;(3) a lack of disbursement controls that resulted in employees submitting payment requests via on-line chat and these requests being approved by managers responding with personalized emojis; (4) corporate funds were used to purchase homes and personal items for employees, and; (5) a lack of books and records and the absence of lasting records of decision-making.

175.    It is hard to imagine that anyone who has done business with FTX, including paid endorsers, would not have personally witnessed one or more of the deficiencies identified by Mr.

---

[148]    https://www.cnbc.com/2022/11/23/absolute-fraud-cmes-terry-duffy-says-he-saw-trouble-before-ftx-collapse-.html (accessed May 11, 2023).

[149] https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=&ved=2ahUKEwiok r3C_-L7AhWsnGoFHRdBC2kQFnoECBAQAQ&url=https%3A%2F%2Fpacer-documents.s3.amazonaws.com%2F33%2F188450%2F042020648197.pdf&usg=AOvVaw38wQ JwnmP5fFftiyYkNjSG (accessed May 11, 2023).

Ray. All FTX endorsers have extensive business dealings beyond FTX and surely would be able to identify business practices that are unusually problematic. Of course, the same can be said for prominent venture capital (VC) firms that invested in FTX.

176.    Furthermore, many customers were not opting to use FTX because of who their investors were. Instead, many customers relied on the testimonials of paid celebrity endorsers and these celebrities knew why they were being compensated. Indeed, the whole point behind paying celebrities to endorse a product is to increase sales.

177.    Thus, celebrities like the Brand Ambassador Defendants have a moral and legal obligation to know that what they are promoting is unlikely to cause physical or financial damage to customers.

178.    In addition to the conduct of Defendant Sam Bankman-Fried, as described in this Complaint, some of the biggest names in sports and entertainment have either invested in FTX or been brand ambassadors for the company. A number of them hyped FTX to their social media fans, driving retail consumer adoption of the FTX Platform.

179.    In March 2021, FTX became the first company in the crypto industry to name an arena. This helped lend credibility and recognition to the FTX brand and gave the massive fanbase of basketball exposure to the FTX Platform.

180.    FTX's explanation for using stars like Brady, Bunchden, and the other Defendants was no secret. "We're the newcomers to the scene," said then-FTX.US President Brett Harrison, referring to the crypto services landscape in the U.S. "The company needs to familiarize consumers with its technology, customer service and offerings, while competing with incumbents like

Coinbase Global Inc. or Kraken," Mr. Harrison said. "We know that we had to embark on some kind of mass branding, advertising, sponsorship type work in order to be able to do that," he said.[150]

181.    In other words, the FTX Group needed celebrities like Defendants to continue funneling investors into the FTX Ponzi scheme, and to promote and substantially assist in the sale of unregistered securities, including the YBAs. Below are representative statements and advertisements Defendants made to drive the offers and/or sales of the YBAs, which Plaintiff and Class Members will supplement as the case progresses and discovery unfolds.

182.    The promotions should not be viewed in isolation, but rather as a part of a wide-ranging conspiracy to promote and sell unregistered securities, and to aid and abet the FTX Group's fraud and conversion perpetrated on Plaintiffs and the Classes.

183.    On or around September 10, 2021, FTX tweeted out a list of its promoters who were part of the "You In?" campaign, asking its audience whether they are "in" as well.

---

[150]        https://www.wsj.com/articles/tom-brady-and-gisele-bundchen-to-star-in-20-million-campaign-for-crypto-exchange-11631116800?mod=article_inline (accessed May 11, 2023).



**M.    The Defendants' Roles in the Fraud**

184.    Each group of Defendants contributed both to the perpetration of the fraud, and to the sale of unregistered securities, in a vital way.

185.    The individual role of each Defendant is outlined below, and more fully expounded upon within the individual chapter of the complaint in which they are named.

### a)   **Defendants Tom Brady and Gisele Bündchen**



186.     Tom Brady was a star quarterback with worldwide name recognition, who many consider to be the greatest of all time. He played for the University of Michigan, and then professionally with the New England Patriots for 20 seasons and the Tampa Bay Buccaneers for 3 seasons.

187.     Gisele Bündchen is a supermodel, fashion icon, and businesswoman who achieved worldwide notoriety through her modeling and advertising campaigns, including those with Under Armour, Chanel No. 5, and Victoria's Secret.

188.     Gisele Bündchen and Tom Brady married in February 2009, and divorced in October 2022.

189.     During the relevant time period, Brady and Bündchen resided in Indian Creek, Miami-Dade County, Florida.

### a)   **Brady and Bündchen Partnered with FTX to Promote Its Platform.**

190.     In spring 2021, Brady and Bündchen partnered with FTX to provide it with spokesperson and marketing services pursuant to a written agreement. Those services included but

were not limited to posting on social media, making personal appearances, and appearing in television and print advertising.

191.    In exchange for those services, Brady and Bündchen received a substantial total compensation package.

192.    Shortly thereafter, Brady and Bündchen also took equity stakes in FTX Trading Ltd. Bündchen was given the title of Environmental and Social Initiatives Head at FTX. Brady and Bündchen made numerous statements across platforms to induce individuals to invest in the FTX Platform, YBAs and/or FTT.

193.    Because of their compensation structure, the more success that they had in influencing consumers to make investments on the FTX platform, the more Brady and Bündchen stood to profit financially.

194.    Bankman-Fried touted that Bündchen and Brady took an equity stake in the company as a means of promotion, including on nationally distributed podcasts. For example, Bankman-Fried, as a guest on Unchained on July 2, 2021, discussed how the arrangement came about. On the podcast, Bankman-Fried stated that he believed that Brady had designed and produced his partnership announcement message with his own team.

195.    Brady and Bündchen did not disclose the form or number of payments received under their agreements to the public when promoting FTX.

196.    Brady and Bündchen partnered with FTX and provided services in accordance with their agreements, and in accordance with their own interests as owners. For example, they posted on social media, appeared in images and videos used to promote FTX, and made personal appearances at FTX events. Specific examples of their promotions of FTX are below.

197.    Brady and Bündchen also joined the company's $20-million ad campaign in 2021.

198.    They filmed a commercial together called "FTX. You In?" showing them telling acquaintances to join the FTX platform. This ad first aired on national television on September 8, 2021 and was subsequently re-aired and re-published on television, the internet, and across social media.

199.    The ad ran on NBC during the NFL kickoff game between the Tampa Bay Buccaneers and the Dallas Cowboys, played in Tampa Bay, on September 9, 2021. It also ran during NFL broadcasts throughout September and October of 2021.

200.    A version of this ad aired during the 2021 Super Bowl to a nationwide audience.

201.    They also starred in a second commercial in which Brady is shown executing a trade on the FTX platform on his cellular phone. Brady explains, "I mean trading crypto. FTX is the safest and easiest way to buy and sell crypto. It's the best way to get in the game." Bündchen states, "yeah, yeah, trade. We're telling everyone." This ad first aired on national television on October 18, 2021, and was subsequently re-aired and re-published on television, the internet, and across social media.

202.    Brady appeared in a third commercial almost a year later. In the third commercial, Brady is again depicted using the FTX platform on his cellular phone while walking off a football field. A man asks, "FTX, that's the crytpo app right?" Brady responded, "Now it's for all kinds of investing. It's better. And I like better." This ad first aired on national television on September 12, 2022, and was subsequently re-aired and re-published on television, the internet, and across social media.

203.    None of these three commercials disclose the fact that Brady and Bündchen were paid brand ambassadors for FTX or owned equity in FTX Trading Ltd. None disclose the amount of type of compensation received by either party.

204. The commercials may be viewed here: https://www.youtube.com/watch?v=_aCGMyrFn-8. A shorter version of the first commercial which aired during the Superbowl is available here: https://www.youtube.com/watch?v=4p4z2wsjhmM.



205. In approximately April 28, 2022, Bündchen and Brady appeared alongside Bankman-Fried on behalf of FTX at the Salt Crypto Bahamas Conference.







206.    FTX promoted Brady's appearance across its social media platforms including

Twitter.



207.    FTX also shared videos of portions of the event across its social media platforms.

*23-md-03076*



208.    Brady and Bankman-Fried posted several TikToks during the event, appearing together to promote FTX. Those videos are no longer accessible to the public but can be obtained in discovery.

209.    Vogue published an article after the appearance, on April 28, 2022, which quoted Bündchen at length discussing her relationship with FTX:

> As the first face of cryptocurrency exchange FTX, Bündchen stars alongside CEO and founder Sam Bankman-Fried in sleek imagery shot by longtime collaborator Nino Muñoz. The pictures are striking, but their purpose is substance rather than style. They both mark Bündchen's new role as FTX's Head of Environmental and Social Initiatives, and announce Bankman-Fried's pledge to donate a billion dollars to charitable causes over the next year. "Whenever someone is willing to commit to change, I'm willing to help," shared Bündchen at the SALT Crypto conference in Nassau, Bahamas yesterday. "Sam is making such an important statement with this, and I've found that inspirational." https://www.vogue.com/article/Gisele-Bündchen-ftx-cyrpto-philanthropy-campaign-interview

*23-md-03076*

210.    In that interview, Bündchen described her role with FTX as a partnership: "What made me excited about this partnership was the impact they can have. Much more than anything a single individual can accomplish on their own."

211.    In approximately April 28, 2022, at the Salt Crypto Bahamas Conference, FTX launched its first print ad campaign called "In On," which featured Bündchen alongside Bankman-Fried.



Bündchen in the new FTX Campaign   Photo: Nino Muñoz, Courtesy of FTX

212.    Ads in this campaign ran across all forms of media, including social media, and were both electronically accessible and physically distributed within all 50 states.

213.    For example, the four-page FTX spread below appeared in *The New Yorker*.



Crypto entrepreneur © Images from the WSJ's Jason Zweig          Supermodel © Images from the WSJ's Jason Zweig

214.    Similar ads from this campaign ran in *Vogue* (American and International), *GQ*, and *Vanity Fair* In approximately June 2022. These magazines have worldwide distribution networks.

215.    Bankman-Fried discussed the impact Bündchen could have on the brand in an interview with *Fast Company*, published in approximately April 28, 2022.

> A staunch utilitarian, Bankman-Fried is also aware of the power of celebrity in multiplying impact—hence, he says Bündchen might be the ideal voice for FTX. "She has an amazingly positive brand," says Bankman-Fried. "We're excited for her to help amplify the message, and to get people both in the industry and outside of it on board"—this time, perhaps, from the Dior-and-Chanel haute-couture demographic.   https://www.fastcompany.com/90747008/gisele-Bündchen-hopes-to-sell-you-on-cryptos-potential-for-good-in-upcoming-vogue-ads

216.    FTX re-tweeted promotional material shared by Bankman-Fried and its brand ambassadors.



217.    In approximately September 1, 2022, FTX engaged in a sweepstakes with Tom Brady and a company he co-founded, Autograph, which was promoted across social media networks.







218.    In approximately November 2022, Brady, Bündchen, and others scrubbed their social media accounts to remove promotional content for FTX. As a result, discovery is likely to uncover many additional, actionable, statements.[151]

219.    Furthermore, certain FTX resources, like its podcast database, are no longer publicly accessible, and may reveal further actional statements once obtained.

220.    The overarching objective of the partnership was for Brady and Bündchen, through a series of promotions and media campaigns, to help FTX successfully solicit or attempt to solicit investors in FTX's crypto-related securities from Florida and nationwide.

221.    As Brady and Bündchen expected and understood when entering their partnerships with FTX, their promotions would be widely viewed across the world, including in the U.S. and in Florida, where Brady and Bündchen resided, and where FTX had its domestic home office.

222.    Brady and Bündchen also knew and intended that their promotions would be disseminated to consumers in Florida and elsewhere, not just on FTX's social media outlets, but that said promotions would also be linked, published, and reposted across innumerable media outlets on the internet and elsewhere.

**b)  Brady and Bündchen Had Financial Incentives to Induce Class Members to Invest in FTX and to Trust the Platform.**

223.    Bankruptcy filings show that Tom Brady held 1,144,861 common shares of FTX at the time of its collapse. The same filings show that Gisele Bündchen held around 686,761 common shares at the time of its collapse.[152]

---

[151] https://www.gawker.com/celebrity/tom-brady-has-scrubbed-his-timeline-of-ftx-tweets

[152] *In re FTX Trading* Ltd, 22-cv-11068-JTD (Bankr. D. De.), Dkt. 450.

224.     Brady and Bündchen had a financial incentive to induce Plaintiffs to invest with FTX. They were paid, at least in part, in FTX stock and/or stock options – the value of which depended on the financial success of FTX.

225.     Further, Brady and Bündchen had every incentive to be effective promoters of FTX in order to continue the brand ambassador relationship and continue receiving payment for their services.

**c)   The Promotions Were Deceptive and Unlawful.**

226.     Brady and Bündchen did not disclose that they were being compensated by FTX for promoting the sale of FTX securities.

227.     Brady and Bündchen made deceptive statements in their promotions, including statements like, "The most trusted way to buy & sell crypto," "FTX is the safest and easiest way to buy and sell crypto. It's the best way to get in the game," "We're telling everyone," and "Now it's for all kinds of investing. It's better. And I like better." Brady and Bündchen's ads, and the entire "You In?" campaign, conveyed the messages that everyone – regardless of socioeconomic status – would benefit from using FTX.

**d) Brady and Bündchen Knew or Should Have Known They Were Soliciting or Assisting FTX to Solicit Investments in Unregistered Securities and/or that they were aiding and abetting FTX Group's fraud and/or conversion.**

228.     Given Brady's and Bündchen's substantial investment experience and vast resources to obtain outside advisors (which Bündchen says she had), they knew or should have known of potential concerns about FTX selling unregistered crypto securities and/or that they were aiding and abetting FTX Group's fraud and/or conversion, especially to millions of their followers. This is especially true in light of the rampant mismanagement and myriad red flags that the FTX Group's regular business practices set off.

229.    In a March 2023 interview, Bündchen told the media that "I'm no different than everyone else that trusted the hype." Bündchen said she believed FTX was a "sound and great thing based on what my financial advisers told me." *See* https://nypost.com/2023/03/22/gisele-Bündchen-says-she-was-blindsided-by-ftx-collapse-wants-justice/.

   **f)    The Promotions Were Directed at Plaintiffs in Florida, and Customers Nationwide.**

230.    Brady's and Bündchen's promotions were published on public social media accounts, published in magazines with nationwide distribution, and aired on local and national television broadcasts – including during the Super Bowl. They were accessible to plaintiffs nationwide, including in Florida.

231.    Brady's and Bündchen's promotions were published on public social media accounts, published in magazines with nationwide distribution, and aired on local and national television broadcasts – including during the Super Bowl. They were accessible to plaintiffs nationwide, including in Florida.

232.    The partnership between FTX, Brady, and Bündchen specifically targeted Florida residents because they were Florida residents and Brady played for a Florida professional sports team, the Tampa Bay Buccaneers, during the relevant time period. Their social media followers, and fans in general, are likely to be drawn disproportionately from Florida. Likewise, Florida media is likely to cover his interviews, promotions, and other activity because he is of interest to fans of his team.

   **ii.    Defendant Kevin O'Leary**



233.    Kevin O'Leary is a businessman, investor, and television personality. After founded and then subsequently selling a technology company SoftKey, later The Learning Company ("TLC"), O'Leary became involved in a variety of investment ventures, founding the mutual fund company O'Leary Funds, Inc., founding O'Leary Ventures, an early stage venture capital investment company, and launching an exchange traded fund.

234.    Since 2009, O'Leary has appeared on the investment-focused television program Shark Tank, where his nickname, "Mr. Wonderful," was popularized.

235.    O'Leary is a sophisticated investor with substantial financial knowledge.

a)      **O'Leary Partnered with FTX to Promote Its Platform.**

236.    On August 10, 2021, FTX (US and International) announced that it entered a "long-term relationship with entrepreneur, venture capitalist, and Shark Tank investor, Kevin O'Leary." It further explained that "Mr. O'Leary will be taking an equity stake in both FTX Trading Ltd. &

West Realm Shires Services Inc. along with being paid in crypto to serve as an ambassador and spokesperson for FTX."[153]

237.    The overarching objective of the partnership was for O'Leary, through a series of promotions and media campaigns, to help FTX successfully solicit or attempt to solicit investors in FTX's crypto-related securities from Florida and nationwide.

238.    As O'Leary expected and understood when entering its partnership with FTX, the team's promotions would be widely viewed nationwide, including in Florida, where O'Leary knew or should have known FTX had its domestic home office (including because the arena of NBA's Miami Heat had been renamed "FTX Arena").

239.    On information and belief, O'Leary also knew and intended that the team's promotions would be disseminated to consumers in Florida and elsewhere not just on FTX's official social media outlets, but that said promotions would also be linked, published, or reposted across innumerable media outlets on the internet and elsewhere.

   **b) O'Leary Engaged in a Sustained and Aggressive Promotion and Advertising Campaign.**

240.    "Mr. Wonderful," both a brand ambassador and an FTX shareholder, made several public statements designed to induce consumers to invest in the FTX Platform, YBAs and/or FTT.

241.    "To find crypto investments opportunities that met my own rigorous standards of compliance, I entered into this relationship with @FTX_Official," Mr. O'Leary said on Twitter last year. Mr. O'Leary ***recently deleted the tweet***.

---

[153]    https://www.prnewswire.com/news-releases/ftx-and-kevin-oleary-announce-long-term-investment-and-spokesperson-relationship-301352189.html (accessed May 9, 2023).

242.    CNBC reported that "O'Leary promoted FTX aggressively on Twitter and online, touting his close connection with disgraced founder Sam Bankman-Fried."[154]

243.    Later O'Leary deleted *all* of his tweets mentioning FTX that were made prior to November 12, 2022. [155]

244.    O'Leary has acknowledged that he did commercials for FTX.[156]

245.    He also served as a judge for the FTX Charity Hackathon in Miami in March of 2022.[157]

246.    On March 11, 2022, O'Leary appeared on NBC 6 South Florida to explain his involvement with FTX and his role in judging the FTX Charity Hackathon alongside co-Defendants, Udonis Haslem and David Ortiz.[158]

247.    During that appearance, O'Leary was questioned by the anchor, "you just don't do anything— you're very selective with who you decide to work with, so why did you decide to work with the FTX foundation group on this?"[159]

248.    O'Leary responded "I love the company. I like its mission. I like what they're doing in terms of innovating and financial services around crypto. They're one of the largest players around the world, and I also use the platform myself to hold my digital currencies. So, you know,

---

[154]       https://www.cnbc.com/2022/12/08/ftx-spokesman-kevin-oleary-says-he-lost-15-million-crypto-payday.html (accessed May 9, 2023).

[155] https://twitter.com/search?q=(from%3A%40Kevinolearytv)%20ftx&src=typed_query&f=live (accessed May 9, 2023).

[156]   https://www.youtube.com/watch?v=pIXq1pfvG0g (acknowledging commercials as part of promotional deal at timestamp 2:04) (accessed May 9, 2023).

[157] https://ftxcharityhackathon.com/ (accessed May 11, 2023).

[158]   https://www.nbcmiami.com/entertainment/6-in-the-mix/shark-tank-star-kevin-oleary-taking-part-in-charity-hackathon/2711510/ (accessed May 9, 2023).

[159] *Id.*

I'm very integrated with them. But this idea, which is Sam's—and his father Joseph as well is involved in it—is terrific. It's a family mission, and I love companies that have this kind of desire to help others, not just with profits. This is what every corporation in America should be doing." [160]

249.   The anchor then went on to ask, "Kevin I know that you were a naysayer at one point, and now you're on this train–where was the change of heart, what happened?" [161]

250.   O'Leary responded, "Well, when things change, I change. And what changed was the regulator. All of a sudden we saw in different countries, like the United Arab Emirates, Switzerland, Germany, and up in Canada, they're all innovating in crypto. And now we have a decree from the President, yesterday, that he thinks we should start looking at this because it's great innovation. We've got a bill coming. There's a lot of momentum towards this because it's financial innovation. I tell everybody the same thing: bitcoin is not a coin, it's software. Ethereum is software. Polygon is software. HBAR is software. if you're willing to buy Microsoft as a stock or you're willing to buy Alphabet or Google, it's all software. So why wouldn't you want to invest in this as well? And so, at the end of the day, I think this is great financial innovation, FTX is right at the cutting edge of it, and on top of it they want to give back." [162]

251.   And recently, on October 12, 2022, O'Leary stated confidently that FTX was totally compliant and a safe place to hold assets. O'Leary stated that: "I have to disclose I'm a paid spokesperson to a FTX and shareholder there, too, cause we mentioned him and I'm a big advocate for Sam because he has two parents who are compliance lawyers. If there's ever a place I could be

---

[160] *Id.*

[161] *Id.*

[162] *Id.*

*23-md-03076*

that I'm not gonna get in trouble it's going to be in FTX so you know that's there they're great people but he gets the job in compliance which is why he's working so hard to get regulation."[163]



252.     He went on to state that "[t]here are a lot of signs right now that point to things looking bad. Crypto has taken a big hit and investors are wondering if things will turn around. If you follow history and the pattern of things, you know that this is RIGHT ON TRACK and we'll soon see a resurgence with crypto. Do you think we're entering a Bullish period? Let me know in the comments!"[164]

### c) O'Leary Had Financial Incentives to Induce Class Members to Invest in FTX and to Trust the Platform.

253.     Bankruptcy filings show that O'Leary, through his company O'Leary Productions, held 139,000 shares of Class A Common Stock, 25,944 shares of Common Stock, 12,631 Series A Preferred Shares, and 6,486 Series B-1 Preferred Shares at the time of its collapse. (*In re FTX Trading* Ltd, 22-cv-11068-JTD (Bankr. D. De.), Dkt. 450).

---

[163] *See* https://www.youtube.com/watch?v=iwD_zWgyUz8 beginning at 17:32 (accessed May 11, 2023)

[164] *Id.*

*23-md-03076*

254.   O'Leary reported that he was paid $15 million by FTX for him to act as a spokesperson.[165] He acknowledged this payment for his service as a paid promoter in written testimony provided to the Senate Banking Committee on December 14, 2022.[166]

255.   O'Leary had a financial incentive to induce Plaintiffs to invest with FTX. He was paid, in substantial part, in FTX stock and/or stock options − the value of which depended on the financial success of FTX. O'Leary reported that he lost this payment because of FTX's collapse.[167] In his Senate testimony, O'Leary also acknowledged that the collapse of FTX was "painful" for "account holders."[168]

256.   Because of his compensation structure, the more success that O'Leary had in influencing consumers to make investments on the FTX platform, the more O'Leary stood to profit financially.

257.   Further, O'Leary had every incentive to be an effective promoter of FTX in order to continue the ambassador relationship and continue receiving payment for his services.

**d)  The Promotions Were Deceptive and Unlawful.**

258.   O'Leary's extension promotion of FTX was deceptive because it promoted FTX as a safe investment.

259.   O'Leary deceptively promoted FTX as an investment even though he knew or should have known that it was not in fact a prudent investment for his followers.

---

[165]   https://www.cnbc.com/2022/12/08/ftx-spokesman-kevin-oleary-says-he-lost-15-million-crypto-payday.html.

[166]   https://www.banking.senate.gov/imo/media/doc/O'Leary%20Testimony%2012-14-221.pdf.

[167]   https://www.cnbc.com/2022/12/08/ftx-spokesman-kevin-oleary-says-he-lost-15-million-crypto-payday.html.

[168]   https://www.banking.senate.gov/imo/media/doc/O'Leary%20Testimony%2012-14-221.pdf.

260.    O'Leary subsequently admitted, in an interview on CNBC, that he did not do enough due diligence regarding his involvement with and promotion of FTX.[169] He also admitted that he "owes everybody that follows [him]" the data that would be obtained by doing a forensic audit of FTX.[170]

### e) O'Leary Knew or Should Have Known He was Soliciting or Assisting FTX to Solicit Investments in Unregistered Securities and/or that he was aiding and abetting FTX Group's fraud and/or conversion.

261.    Given O'Leary's substantial investment experience and vast resources to obtain outside advisors (which he certainly had), he knew or should have known of potential concerns about FTX selling unregistered crypto securities and/or that he was aiding and abetting FTX Group's fraud and/or conversion, especially to millions of his followers. This is especially true in light of the rampant mismanagement and myriad red flags that the FTX Group's regular business practices set off, as more fully described hereinabove.

### f) The Promotions Were Directed at Plaintiffs in Florida, and Customers Nationwide.

262.    O'Leary has substantial connections to the State of Florida. O'Leary maintains a home on Miami Beach, Fla., where he quarantined during the COVID-19 pandemic.[171]

---

[169] https://www.youtube.com/watch?v=-jo93yUGpQc (video dated December 8, 2022).

[170] *Id.*

[171] https://www.instagram.com/p/B-UUsDVncqo/.



263.    In a YouTube video posted on May 11, 2022, O'Leary described living in Miami and his search for additional home to purchase: "I'm one of those guys. I'm living in a condo. My wife is shopping for a home."[172]

264.    O'Leary has repeatedly returned to Florida for business and investment purposes. Recently, he headlined the Ecommerce Experience Evolution conference that took place in Miami on February 23, 2023.[173]

265.    On February 9, 2022, O'Leary joined "for a Shark-worthy pre-construction Yupix virtual tour of the country's hottest real estate project, Miami's E11EVEN Residences Beyond."[174]

266.    O'Leary's FTX promotions were published on public social media accounts and made available by the Internet. They were accessible to plaintiffs nationwide, including in Florida.

---

[172] https://www.youtube.com/watch?v=HpWiqglGVGQ.

[173] https://www.prweb.com/releases/2023/2/prweb19175414.htm

[174] https://worldredeye.com/2022/02/kevin-oleary-at-e11even-hotel-residences-sales-center/

267.    The partnership between FTX and O'Leary specifically targeted residents of Florida because he maintains a home in Florida and Florida is a repeated focus of O'Leary's business and investment interests. O'Leary also personally appeared on behalf of FTX at the FTX Arena in Miami for the FTX Hackathon and Crypto Summit.



### iii.    **Defendant Udonis Haslem**



268.     Udonis Haslem was the captain of the Miami Heat, NBA team, and a Miami legend.

### a) Haslem Partnered with FTX to Promote Its Platform.

269. In approximately June 2021, Haslem partnered with FTX to provide it with spokesperson and marketing services pursuant to a written agreement. Those services included posting on social media, appearing in a commercial, and participating in promotional events.

270.     In exchange for these services, Haslem received a substantial total compensation package. This compensation package included compensation tied to the performance of FTX, such as stock, stock options, or tokens. Because of his compensation structure, the more success that Haslem had in influencing consumers to make investments on the FTX platform, the more he stood to profit financially.

271.     Haslem did not disclose the form or number of payments received under either agreement to the public when promoting FTX.

### b) Haslem Engaged in a Sustained and Aggressive Promotion and Advertising Campaign.

272.     Haslem partnered with FTX and provided services in accordance with his agreement. For example, he appeared in a commercial for FTX, created and shared content on social media, and appeared at FTX events. Specific examples of his promotions of FTX follow:

273.     In approximately October 21, 2021, Haslem appeared in a commercial for FTX as part of the "You In?" campaign, targeting Miami residents. Haslem shared that video on his social media channels. Haslem's commercials ran during network television broadcasts of Miami Heat games, and in the arena during games.

274.   In       the       ad,       which       may       be       viewed       here:
https://www.youtube.com/watch?v=4sD8uLYzzwM, Haslem states "FTX has arrived in 305. So,

I just got one question: Are you in, Miami?" Others respond "If he's in, I'm in." Haslem concludes

"Our city. Our team. FTX. You in, Miami?"



275.   In approximately October 28, 2021, Haslem advertised an FTX promotion

soliciting new account sign-ups.



276.    In approximately November 2021, Haslem shared an FTX promotion for a trip to the Sports Illustrated Awards, where he was to be a presenter.

*23-md-03076*





277.    In approximately November 18, 2021, Haslem posted a video of himself discussing the FTX Hackathon and encouraging Miami, Broward, and Palm Beach area students to apply.



278.   In approximately December 1, 2021, Haslem re-tweeted an announcement from FTX regarding the listing of Ethereum NFTs.

*23-md-03076*



279.    In approximately February 13, 2022, Haslem appeared in a video on Twitter, which he posted to his account, advertising an FTX promotion.



*23-md-03076*



280.    In approximately March 12, 2022, Haslem attended the FTX Hackathon Finals and Crypto Summit in the FTX Arena, Miami, Florida as a special judge. He promoted the event on his social media platforms, including by tagging fellow brand ambassador Defendants Kevin O'Leary and David Ortiz.



**Udonis Haslem** @ThisIsUD · Mar 12, 2022

See y'all at the $1m @FtxHackathon Finals & Crypto Summit tomorrow! The 🐐 - FTX co-founder & CEO Sam Bankman-Fried and other experts will be out there for crypto and NFT talk. It's free so I wanna see the whole city out there! Register: bit.ly/registerftx #OG⚓

FEATURING
FTX HACKATHON FINALS & CRYPTO SUMMIT

COUNTDOWN
FTX HACKATHON FINALS & CRYPTO SUMMIT
**TOMORROW**
MARCH 13, 2022

**SAM BANKMAN-FRIED**
FTX CO-FOUNDER & CEO
FTX US

○ 4          ⇄ 10          ♡ 45



**Udonis Haslem** @ThisIsUD · Mar 11, 2022

Yo @davidortiz aka BIG PAPI lol! We gonna be judging the @FTX_Official @FtxHackathon this Sunday... We about to make some dreams come true!

○ 3          ⇄ 5          ♡ 26

**Udonis Haslem** @ThisIsUD · Mar 11, 2022    ···

The @FtxHackathon is a new kind of opportunity to put teamwork and caring for others at the forefront of solving pressing problems... right here at home. Meet me out there this Sunday 3/13 @ the FTX Arena! It's free to attend so register here: bit.ly/registerftx

#OG ⚓



○ 3       ↻ 5       ♡ 17       ᵢₗᵢ       ⬆

**Udonis Haslem** @ThisIsUD · Mar 10, 2022    ···

What you doing this Sunday March 13? Come through to the $1,000,000 @FtxHackathon Finals & Crypto Summit at @FTXArena! It's free and I'll be out there judging the finalists with @WhitneyCummings @kevinolearytv @davidortiz. Register here: bit.ly/registerftx

#OG ⚓



○ 3       ↻ 4       ♡ 14       ᵢₗᵢ       ⬆

281.    In approximately March 31, 2022, Haslem tweeted a throwback to the Sport Illustrated Awards, tagging FTX.



282.    In approximately April 18, 2022, Haslem shared a video on Twitter advertising a promotional effort with FTX.



283.    Furthermore, certain FTX resources, like its podcast database, are no longer publicly accessible, and may reveal further actional statements once obtained.

284.    The overarching objective of the partnership was for Haslem, through a series of promotions and media campaigns, to help FTX successfully solicit or attempt to solicit investors in FTX's crypto-related securities from Florida and nationwide.

285.    As Haslem expected and understood when entering into a partnership with FTX, his promotions would be widely viewed nationwide, especially in Florida where he resides and plays professionally, and where he knew or should have known FTX had its domestic home office.

286.     On information and belief, Haslem also knew and intended that his promotions would be disseminated to consumers in Florida and elsewhere not just on FTX's official social media outlets, but also that said promotions would be linked, published, or reposted across innumerable media outlets on the internet and elsewhere.

### c) Haslem Had Financial Incentives to Induce Class Members to Invest in FTX and to Trust the Platform.

287.     Bankruptcy filings show that Haslem held 11,446 common shares of FTX at the time of its collapse. (*In re FTX Trading* Ltd, 22-cv-11068-JTD (Bankr. D. De.), Dkt. 450).

288.     Haslem had a financial incentive to induce Plaintiffs to invest with FTX. He was paid, at least in part, in FTX stock and/or stock options − the value of which depended on the financial success of FTX.

289.     Further, Haslem had every incentive to be an effective promoter of FTX in order to continue the ambassador relationship and continue receiving payment for his services.

### d) The Promotions Were Deceptive and Unlawful.

290.     Haslem did not disclose that he was being compensated by FTX for promoting the sale of FTX securities.

291.     Haslem's advertisements were designed to lead viewers to believe that the investment was safe and suitable for everyone, regardless of knowledge level or socioeconomic status.

292.     Haslem also made deceptive statements in his promotions, including statements like, he was "100% in" on FTX, despite the fact that he later revealed after the collapse of FTX that he had never put any of his own money into the FTX Platform, and was instead paid $15 million in equity in the FTX Platform instead.

**e) Haslem Knew or Should Have Known He was Soliciting or Assisting FTX to Solicit Investments in Unregistered Securities and/or that He was Aiding and Abetting FTX Group's Fraud and/or Conversion.**

293.    Given Haslem's substantial investment experience and vast resources to obtain outside advisors (which he had), he knew or should have known of potential concerns about FTX selling unregistered crypto securities and/or that he was aiding and abetting FTX Group's fraud and/or conversion, especially to millions of his followers. This is especially true in light of the rampant mismanagement and myriad red flags that the FTX Group's regular business practices set off, as more fully described hereinabove.

294.    A December 2022 article posted on heatnation.com states that Haslem lost $15 million, none of which was his own money but rather compensation he had taken for his marketing role with the company as equity. The article quotes Haslem as stating: *"I didn't put no money in; I took it in equity," "I feel bad for the people that were hurt and lost money and really got caught up in that foolishness."*[175]

**f) The Promotions Were Directed at Plaintiffs in Florida, and Customers Nationwide.**

295.    Haslem's promotions were published on public social media accounts and aired on local and national television broadcasts. They were accessible to plaintiffs nationwide, including in Florida. Haslem made personal appearances on behalf of FTX in Miami.

296.    The partnership between FTX and Haslem specifically targeted Florida residents because Haslem is Miami's hometown hero (as recognized during the Sports Illustrated Awards), and he has played college and professional sports in the state his entire career. His social media followers, and fans in general, are likely to be drawn disproportionately from Florida. Likewise,

---

[175]  https://heatnation.com/media/udonis-haslem-reveals-ftx-gypped-him-out-of-15m/.

*23-md-03076*

Florida media is likely to cover his interviews, promotions, and other activities because he is of interest to fans of his team.

### iv.    **Defendant David Ortiz**



297.    David Ortiz, also known as "Big Papi," is a former professional baseball player who is regarded as one of the greatest designated hitters of all time. He played for the Minnesota Twins from 1997 to 2002, and is most well-known for his time playing for the Red Sox, from 2003 to 2016. He was elected to the Baseball Hall of Fame in 2022.

298.    During the relevant time period, Ortiz resided in Pinecrest, Miami-Dade County, Florida.

**a)  Ortiz Partnered with FTX to Promote Its Platform.**

299.    In approximately October 2021, Ortiz partnered with FTX as a brand ambassador, which included promoting the platform and releasing collections of NFTs through the FTX app.

300.    In exchange for promoting FTX, Ortiz received compensation in cryptocurrency and NFTs from FTX.



**b) Ortiz Engaged in a Sustained and Aggressive Promotion and Advertising Campaign.**

301.    The overarching objective of the partnership was for Mr. Ortiz, through a series of promotions and media campaigns, to help FTX successfully solicit or attempt to solicit investors in FTX's crypto-related securities from Florida and nationwide.

302.    Ortiz was part of the FTX "You In?" ad campaign, and his ad began running to nationwide audiences during the first game of the 2021 World Series.

303.    In the ad, which can be found here, https://www.ispot.tv/ad/qSlm/ftx-big-papi-is-in, Ortiz is watching a game on the television when he receives a phone call from The Moon. Inspired by the "moonblast" home run scored on the field, The Moon frantically tells David about opportunities to get into cryptocurrency with FTX. David decides it's an offer he can't refuse and joins fellow sports stars Stephen Curry and Tom Brady on the platform. FTX announces it is the official crypto exchange of MLB.



304.    FTX served as a title sponsor for the David Ortiz Golf Classic In approximately November 2021 and pledged to make contributions to Ortiz's charity, David Ortiz's Children's Fund. Ortiz promoted the sponsorship and golf tournament on Twitter and other online pages, including on his personal website: https://davidortiz.com/red-sox-legend-david-ortiz-signs-multiyear-ftx-deal/ (last visited May 8, 2023).



**David Ortiz** ✔
@davidortiz

Can't make it to The David Ortiz Celebrity Golf Classic this weekend? Dont worry... We're kicking off the #ortizclassic AUCTION right here on Twitter Hit the link in @DavidOrtizFund bio and check out all the amazing items! Bid now before it's gone 👀

#DOCFkids #OrtizClassic



10:11 AM · Nov 17, 2021

305.    Ortiz also served as a judge for the FTX Hackathon Finals and Crypto Summit In approximately March 13, 2022.





306.     Despite being orchestrated to appear to ordinary consumers as a genuine and non-commercial expression of support by Mr. Ortiz replying that "@FtxHackathon really giving away $1m to the best idea . . . that's doing it real big" (followed by several emojis), in fact, these campaigns were carefully orchestrated and contractually required.

307.     With respect to Mr. Ortiz's promotional activity and social media comments on this date and other dates, Plaintiffs have not yet been able to discover facts bearing on the contacts

between Ortiz (directly or through his agents) and FTX's employees in Florida for purposes of receiving instructions about the timing or scripts for these promotions.

308.    On information and belief, Ortiz scrubbed his social media accounts to remove promotional content for FTX. As a result, discovery is likely to uncover many additional actionable statements.

### c)  Ortiz Had Financial Incentives to Induce Class Members to Invest in FTX and to Trust the Platform.

309.    Ortiz had a financial incentive to induce Plaintiff's to invest with FTX. He was paid, at least in part, in FTX cryptocurrency and NFTs – the value of which depended on the financial success of FTX.

310.    Further, Ortiz had every incentive to be an effective promoter of FTX in order to continue the ambassador relationship and continue receiving payment for his services.

### d)  The Promotions Were Deceptive and Unlawful.

311.    Starting in October 2021, Ortiz and FTX launched a series of campaigns designed to bring cryptocurrency and investing in the FTX Platform, including YBAs and/or FTT, to the masses. Ortiz did not disclose that he was being compensated by the entity offering and selling the security for promoting the sale of FTX securities to the masses.

312.    Ortiz made deceptive statements in his Twitter posts and advertising commercial promoting FTX, including statements that he "is in" on FTX.

313.    Mr. Ortiz and FTX launched a commercial campaign designed to bring cryptocurrency and investing in the FTX Platform, including YBAs and/or FTT, to the masses. Mr. Ortiz did not properly disclose that he was being compensated by the entity offering and selling the security, and in some instances, he intentionally disguised or downplayed the fact that he was being paid for promoting FTX.

**e) Ortiz Knew or Should Have Known He was Soliciting or Assisting FTX to Solicit Investments in Unregistered Securities and/or that He was aiding and abetting FTX Group's fraud and/or conversion.**

314.    Given Ortiz's substantial investment experience (after retiring from professional baseball, he launched a private equity fund with other former professional baseball players) and vast resources to obtain outside advisors (which he had), he knew or should have known of potential concerns about FTX selling unregistered crypto securities and/or that he was aiding and abetting FTX Group's fraud and/or conversion, especially to millions of his followers. This is especially true in light of the rampant mismanagement and myriad red flags that the FTX Group's regular business practices set off, as more fully described hereinabove.

**f) The Promotions Were Directed at Plaintiffs in Florida, and Customers Nationwide.**

315.    Ortiz's promotions were published on public social media accounts and aired on local and national television broadcasts. They were accessed by plaintiffs nationwide, including in Florida.

316.    Ortiz, as a nationally known and famous former professional baseball player, has considerable influence on baseball fans nationwide and has a wide social media following, further allowing him to direct his unlawful promotions towards plaintiffs in Florida and nationwide.

317.    The partnership between FTX and Ortiz specifically targeted Florida residents because Ortiz was a Florida resident during the relevant time period, and Ortiz's charity golf event which FTX sponsored also took place in Florida. Ortiz also appeared in Florida on FTX's behalf at the FTX Hackathon and Crypto Summit.

**v.    <u>Defendant Steph Curry</u>**



318.   Steph Curry is an American professional basketball player for the Golden State Warriors of the NBA. He is widely regarded as one of the greatest basketball players of all time and the greatest shooter in NBA history. This perennial All-Star has been named the NBA Most Valuable Player twice, won four NBA championships, and received an NBA Finals MVP Award.

**a)  Steph Curry Partnered with FTX to Promote Its Platform.**

319.   In approximately September 7, 2021, FTX partnered with Curry as a brand ambassador, through his company SC30 Inc., to provide FTX with spokesperson and marketing services. Those services included but were not limited to posting on social media, creating an exclusive NFT collection, and appearing in commercial advertising.



320.    The overarching objective of the partnership was for Curry, through a series of promotions and media campaigns, to help FTX successfully solicit or attempt to solicit investors in FTX's crypto-related securities from Florida and nationwide.

321.    In exchange for his services, Curry received a substantial total compensation package, including an equity stake in FTX.[176] Because of his compensation structure, the more

---

[176] https://www.goldenstateofmind.com/2022/11/17/23453998/curry-dressed-like-mime-no-reason; https://www.cbssports.com/nfl/news/ftx-collapse-tom-brady-stephen-curry-shohei-ohtani-among-sports-figures-named-in-class-action-lawsuit/

success that Curry had in influencing consumers to make investments on the FTX platform, the more Curry stood to profit financially.

322.     FTX's renaming of the "FTX Arena" in 2021 in Downtown Miami for the NBA franchise the Miami Heat served as an important centerpiece for FTX's efforts to form partnerships with other celebrities such as Curry.

323.     FTX's senior executive responsible for creating, consummating, and implementing deals between FTX and Curry was Avinash Dabir, who originally worked for Blockfolio, which FTX later acquired, and eventually became FTX's Vice President of Business Development.

324.     Since early 2021, FTX maintained an office in Miami that was run by Mr. Dabir, who operated from our Miami office to formulate and execute FTX's important celebrity partnerships, including the partnership with Curry.

325.     On information and belief, the negotiation and execution of Curry's agreement with FTX involved communications between Curry or his authorized representatives (including representatives of his company SC30 Inc.) and Mr. Dabir in FTX's offices in Miami. On information in belief, Curry understood the counterparty to his contractual negotiations based its domestic operations in Florida.

326.     Curry also directly or indirectly transacts business in Florida through his company SC30 Agency LLC (in which Curry is a member through his family trust), which is a Delaware company with the same principal address as SC30 Inc. in California. But Curry's company SC30 Agency LLC is registered to do business in Florida and maintains an authorized agent in Plantation, Florida.

**b)  Curry Engaged in a Sustained and Aggressive Promotion and Advertising Campaign.**

327. Curry partnered with FTX and provided services in accordance with his agreement, and in keeping with his own interests as an owner of an equity stake in FTX. For example, Curry posted on social media and appeared in images and videos used to promote FTX.

328. Curry made numerous statements across platforms to induce individuals to invest in the FTX Platform and obtain YBAs and/or FTT.

329. Curry did not disclose the form or amount of payments received under his agreement to the public when promoting FTX.

330. The purpose of Curry being an ambassador was to expand the reach of the crypto firm and "tout the viability of cryptocurrency to new audiences around the world," as FTX said in a press release.[177]In other words, to drive adoption of the FTX Platform and to facilitate the sales of the unregistered FTX Platform, YBAs and/or FTT to unsuspecting and unwitting retail consumers.

331. "I'm excited to partner with a company that demystifies the crypto space and eliminates the intimidation factor for first-time users," Curry said in a statement, highlighting that "first-time," inexperienced users were among the intended targets of the campaign.[178]

332. Curry's foundation, Eat.Learn.Play. also partnered with FTX on charitable initiatives.[179]

333. Additional examples of Curry's specific promotions of FTX follow:

---

[177]    https://www.prnewswire.com/news-releases/nba-superstar-stephen-curry-becomes-global-ambassador-and-shareholder-of-leading-cryptocurrency-exchange-ftx-through-long-term-partnership-301370497.html (accessed May 11, 2023).

[178] *Id*.

[179] *Id.*; https://fortune.com/2021/09/07/nba-steph-curry-ftx-deal-cryptocurrency-platform/

334.    Starting In approximately March of 2022, Curry had his own nationwide ad campaign pushing the FTX Platform, known as the "#notanexpert" campaign.[180] Throughout the ad, Curry repeatedly denies being cast as an expert in cryptocurrency, culminating in his statement that "I'm not an expert, ***and I don't need to be.*** With FTX I have everything I need to buy, sell, and trade crypto ***safely.***" [181]

335.    As Curry expected and understood when entered his partnership with FTX, his advertisements were widely viewed nationwide, including in Florida, where Curry knew or should have known FTX had its domestic home office (including because the arena of NBA's Miami Heat had been renamed "FTX Arena" long before Curry's FTX promotion campaign).

336.    On information and belief, Curry also knew and intended that his promotions would be disseminated to consumers in Florida and elsewhere not just on FTX's official social media outlets (where some promotional materials are still accessible: https://twitter.com/FTX_Official/status/1508881676436492291), but that said promotions would also be linked, published, or reposted across innumerable media outlets on the internet and elsewhere.

---

[180]     https://www.youtube.com/watch?v=gsy2N-XI04o     (accessed     May     11,     2023). https://twitter.com/FTX_Official/status/1508881676436492291

[181] *Id.*



337.    Curry also knew or should have known that the more views, clicks, and exposure generated by his promotions about FTX, the more consumers would be influenced to invest in FTX's crypto-related securities.

338.    Curry also had his own line of NFTs that were only accessible via FTX. Dubbed the "2974 Collection," he partnered with the company to mint 2,974 unique images celebrating each of his career three-pointers up to the date he broke the NBA's all-time record for scoring threes. The NFTs were sold for $499 a piece with all proceeds going to his charitable foundation.

339.    In approximately December 20, 2021, Curry announced his first NFT collection exclusively available on the FTX platform. The co-branding promotion was intended to drive traffic to FTX and thereby generate consumer investments in FTX crypto-securities. But while Curry indicated that sale of "unique art pieces" was solely motivated by charity and "[a]ll profits

to charity," he failed to disclose that, based on his own compensation package from FTX, he also stood to financially profit from this and other promotions by driving FTX's business.



340.    In approximately March 15, 2022, Curry posted a tweet teasing a special promotion for holders of his exclusive FTX NFTs.



341.    Curry had merchandising tie-ins with his FTX exclusive NFTs. In approximately June 10, 2022, during his NBA Finals Game 4 entrance, Curry unveiled merchandise that was available exclusively to Curry's 2974 Collection NFT holders. This initiative promised to offer collection holders unique and one-of-a-kind experiences that connect them with Curry. To purchase the gear, customers had to hold their 2974 Collection NFTs in an FTX digital wallet.[182]

342.    The 2974 Collection NFT has produced over $4.4 Million in trading volume on the FTX U.S. NFT platform and distributed over 100 NFT memorabilia giveaways.[183]

---

[182]    https://thesource.com/2022/06/11/stephen-curry-drops-surprise-2974-merch-during-nba-finals-game-24/

[183]    *Id.*

343.     In addition to these initiatives, as part of the promotional partnership Curry placed his brand and public image behind FTX to boost FTX's profile.

344.     In approximately October 19, 2021, FTX tweeted a post celebrating the start of the NBA regular season, tagged Curry, and included the original announcement video for the partnership between FTX and Curry.



345.     In approximately December 14, 2021, FTX tweeted a congratulations at Curry for

the latter's accomplishment of becoming the all-time three-point scorer in NBA history.



346.     In approximately June 16, 2022, FTX tweeted a congratulations at Curry and the

Golden State Warriors for winning the 2022 NBA championship.



347.    Curry also amplified and "signal boosted" many stand-alone FTX tweets by replying to the posts. In practical effect, this disseminated the FTX posts to the tens of millions of people who follow Curry's social media activity. These seemingly "natural" promotions by Curry do not have the same formality of standard advertising, and in some respects, they are more insidious.

348.    For example, in approximately February 13, 2022, Curry tweeted interest in participating in the Bitcoin giveaway connected to FTX's 2022 Super Bowl commercial.



349.     Despite being orchestrated to appear to ordinary consumers as a genuine and non-commercial expression of support by Curry that "This [FTX sweepstakes] dope! But can I enter though?" (adding several emojis), in fact, these campaigns were carefully orchestrated in Florida and contractually required. Curry was being compensated for his participation, like a planted audience member in a magic show. In fact, these particular FTX promotions coincided with Curry's attendance at the Super Bowl Championship in Los Angeles, whose broadcast was partly sponsored by a multi-million-dollar FTX promotional campaign featuring Larry David, which was the centerpiece of FTX's promotional blitz tied to the game.

*23-md-03076*

350.    In approximately December 3, 2021, Curry replied to an announcement from FTX regarding the listing of Ethereum NFTs. His reply references the fact that he edited the announcement video for his partnership with FTX.



351.    With respect to Curry's promotional activity and social media comments on this date and numerous other dates, Plaintiff has not yet been able to discover facts bearing on the contacts between Curry (directly or through his agents) and FTX's employees in Florida for purposes of receiving instructions or scripts for these promotions.

352.    Curry also replied to posts announcing other celebrity promotions and collaborations. In approximately Oct 27, 2021, Curry welcomed David Ortiz, using his nickname "Big Papi," into the FTX promotional "family."



353.    In approximately June 4, 2021, Curry replied to the announcement of the partnership between FTX and the e-sports team TSM.



### c) Curry Had Financial Incentives to Induce Class Members to Invest in FTX and to Trust the Platform.

354.     As a global ambassador and shareholder of FTX,[184] Curry had a financial incentive to induce Plaintiffs to invest with FTX. Curry was paid, at least in part, in FTX stock and/or stock options – the value of which depended on the financial success of FTX.[185]

355.     Further, Curry had every incentive to be an effective promoter of FTX to continue the ambassador relationship, continue receiving payment for his services, and continue supporting his philanthropic activities which partnered with FTX.

---

[184] https://twitter.com/FTX_Official/status/1435398083140018182

[185]     https://www.goldenstateofmind.com/2022/11/17/23453998/curry-dressed-like-mime-no-reason;     https://www.cbssports.com/nfl/news/ftx-collapse-tom-brady-stephen-curry-shohei-ohtani-among-sports-figures-named-in-class-action-lawsuit/

**d)  The Promotions Were Deceptive and Unlawful.**

356.    Curry and FTX launched a commercial campaign designed to bring cryptocurrency and investing in the FTX Platform, including YBAs and/or FTT, to the masses. Curry did not properly disclose that he was being compensated by the entity offering and selling the security, and in some instances, on information and belief he intentionally disguised or downplayed the fact he was being paid for promoting FTX.

357.    Curry made deceptive statements in his promotions, including statements like, "With FTX I have everything I need to buy, sell, and trade crypto safely."

**e)  Curry Knew or Should Have Known He was Soliciting or Assisting FTX to Solicit Investments in Unregistered Securities and/or that He was aiding and abetting FTX Group's fraud and/or conversion.**

358.    Given Curry's substantial investment experience (through his investment arm SC30) and vast resources to obtain outside advisors (which he had), he knew or should have known of potential concerns about FTX selling unregistered crypto securities and/or that he was aiding and abetting FTX Group's fraud and/or conversion, especially to millions of his loyal followers and fans. When Curry engaged in the promotions, the legal risks of promoting investments in cryptocurrency trading platforms were well known. This is especially true in light of the rampant mismanagement and myriad red flags that the FTX Group's regular business practices set off, as more fully described hereinabove.

**f)  The Promotions Were Directed at Plaintiffs in Florida, and Customers Nationwide.**

359.    Curry's promotions were published on public social media accounts accessible to plaintiffs nationwide, including in Florida.

360.    Curry, as a nationally known and famous professional basketball player, has considerable influence on basketball fans nationwide and has a wide social media following,

further allowing him to direct his unlawful promotions towards plaintiffs in Florida and nationwide.

361.    Curry also provided spokesperson services while playing for the Golden State Warriors, including while playing against teams from Florida at home in California, and while playing against Florida teams in Florida, including but not limited to December 6, 2021, against Orlando in San Francisco; January 3, 2022, against Miami in San Francisco; October 27, 2022, against Miami in San Francisco; November 1, 2022, against Miami in Miami; November 3, 2022, against Orlando in Orlando.

362.    Curry has further contacts with Florida and, on information, has engaged in business activity in Florida through SC30 Agency LLC, which is a Delaware company that shares the same principal address as Curry's company SC30, Inc. and is authorized to transact business in Florida. SC30 Agency LLC has a registered agent located in Plantation, Florida.

### vi.    **Defendant Golden State Warriors**



Official Crypto Platform and NFT Marketplace
of the **Golden State Warriors**

363.    The Golden State Warriors (the "Warriors") are an American professional basketball team in the NBA and based in San Francisco, California. The team plays its home games at the Chase Center. They have won four NBA championship titles in the last decade and are one of the most recognizable NBA teams in the league.

**a)    The Warriors Partnered with FTX to Promote Its Platform.**

364.    On or around December 14, 2021, the Warriors and FTX announced a first-of-its-kind cryptocurrency partnership in professional sports, with the unveiling of the FTX logo on the court at the Chase Center. As the Warriors' Official Cryptocurrency Platform and NFT Marketplace, the franchise announced it would drop NFTs on FTX.US, beginning in early 2022. The partnership between the Warriors and FTX was the first international rights partner for the team, granting both the Warriors and FTX a visible market presence, inclusive of logo and likeness, internationally.[186]

365.    FTX's renaming of the "FTX Arena" in 2021 in Downtown Miami for the NBA franchise the Miami Heat served as an important centerpiece for FTX's efforts to form partnerships with ambassadors like the Warriors.

366.    FTX's senior executive responsible for creating, consummating, and implementing deals between FTX and promotors was Avinash Dabir, who originally worked for Blockfolio, which FTX later acquired, and eventually became FTX's Vice President of Business Development.

367.    Since early 2021, FTX maintained an office in Miami that was run by Mr. Dabir, who operated from the Miami office to formulate and execute FTX's important celebrity partnerships, including the partnership with the Warriors.

---

[186] https://www.nba.com/warriors/warriors-ftx-partnership-20211214

368.    The negotiation and execution of the Warriors agreement with FTX involved communications between the Warriors and Mr. Dabir in FTX's offices in Miami. On information and belief, the Warriors understood the counterparty to the contractual negotiations based its domestic operations in Florida.

369.    In announcing the partnership, Warriors President and Chief Operating Officer Brandon Schneider said: "Cryptocurrency has a well-established worldwide community and is going to continue to be a major part of the sports, media and entertainment industries, . . . In our conversations with FTX, we quickly realized our joint desire to innovate around cryptocurrency integration and adoption, including the role NFTs play in global fan engagement."[187]

370.    The deal also included the Warriors' G League team, the Golden Guardians and Warriors Gaming Squad (affiliated esports teams), in-arena signage at Chase Center, and virtual floor signage at Warriors games.[188]

371.    The NBA encourages teams to negotiate international sponsorship arrangements and shares in the revenue derived from such partnerships. In the 2021-22 season, the NBA's second largest category of sponsorships came from the crypto industry. NBA teams partnered with, among others, Crypto.com, Webull, Coinbase, FTX and Socios.

372.    The deal terms were not made public, but, upon information and belief, the deal was a multiyear pact valued north of $10 million total.[189] The Warriors netted another $2 million from NFT sales.[190]

---

[187] *Id.*

[188] https://www.instagram.com/p/CYiBaq8JLx7/ (accessed May 11, 2023).

[189]    https://www.cnbc.com/2021/12/14/ftx-to-pay-golden-state-warriors-10-million-for-global-rights.html

[190] *Id.*

**b)  The Warriors Engaged in a Sustained and Aggressive Promotion and Advertising Campaign.**

373.    The Warriors and FTX launched a partnership designed to bring cryptocurrency and investing in the FTX Platform, including YBAs and/or FTT, to the masses of Warriors fans across the country and world.

374.    FTX US President Brett Harrison said at the outset of the partnership: "The FTX US NFT Platform will provide a leading, safe and secure venue for the Warriors international fan base to access exclusive collectables from the franchise. Alongside the NFT drops, working with the Warriors will increase our ability to create a positive change, not only domestically but internationally, with one of the most prestigious professional sport franchises in the world."[191]

375.    One of the main features of the partnership was the Warriors advertising FTX on their home court and throughout the area during home basketball games. These advertisements could be seen by the fans in the arena and by viewers of the game broadcast. The Warriors offered FTX hours of screen time giving their stamp of approval of FTX to viewers and fans in Texas, Florida, and across the country.

376.    The Warriors also promoted FTX through its social media platforms. In approximately May 9, 2022, the Warriors tweeted a promotion for their home playoff game against the Memphis Grizzlies and noted that the game was presented by FTX. These kinds of "presented by" posts were common during the period of the FTX partnership. This promotion also included each fan in attendance receiving an NFT Digital Collectible.

---

[191] https://www.nba.com/warriors/warriors-ftx-partnership-20211214



377.     In approximately April 12, 2022, the Warriors worked with FTX to offer their own

NFT Collection. The Golden State Warriors 2022 Playoff NFT Collection was made up of 3,000

NFTs, featuring 12 unique designs randomly assigned when minted on the blockchain on FTX US,

the team's Official NFT Marketplace. The NFT collection was minted exclusively on the FTX US

NFT marketplace. Each NFT sold for $499.99. Fans must have had a FTX US account to mint and

participate in the 1-of-1 auction. The Playoff NFT is a digital collectible that doubled as an

*23-md-03076*

entrance pass into the GSW community on Discord. The NFTs granted fans access to member-only benefits, exclusive Warriors swag and white-list access to future NFT drops.[192]



378.    The Warriors partnered with FTX to have physical merchandise as well. For example, one of the last FTX-Warriors promotions was a Jordan Poole bobblehead given to the first 10,000 fans at a game against the San Antonio Spurs, In approximately November 15, 2022.[193]

---

[192] https://www.nba.com/warriors/news/warriors-ftx-2022-playoff-nft-collection-20220412

[193]                https://www.sportsbusinessjournal.com/Daily/Issues/2022/11/15/Marketing-and-Sponsorship/Warriors-stop-FTX-promotions-bankruptcy.aspx



379.    As the Warriors expected and understood when entering its partnership with FTX, the team's promotions would be widely viewed nationwide, including in Florida, where the Warriors knew or should have known FTX had its domestic home office (including because the arena of NBA's Miami Heat had been renamed "FTX Arena").

380.    On information and belief, the Warriors also knew and intended that the team's promotions would be disseminated to consumers in Florida and elsewhere not just on FTX's official social media outlets, but that said promotions would also be linked, published, or reposted across innumerable media outlets on the internet and elsewhere.

### c) The Warriors Had Financial Incentives to Induce Class Members to Invest in FTX and to Trust the Platform.

381.    As an international rights partner of FTX, the Warriors had a financial incentive to induce Plaintiffs to invest with FTX. The Warriors had every incentive to be an effective promoter of FTX to continue the partnership relationship and receive payouts for the successful sale of the Warriors' NFT Collection.

### d) The Promotions Were Deceptive and Unlawful.

382.    The Warriors did not disclose that they were being compensated by FTX for promoting the sale of unregistered FTX securities.

### e) The Warriors Knew or Should Have Known They Were Soliciting Or Assisting FTX to Solicit Investments In Unregistered Securities and/or that they were aiding and abetting FTX Group's Fraud and/or Conversion.

383.    While negotiating with FTX, the Warriors were on notice of the potential legal compliance risks associated with the promotion and partnership.

384.    The NBA itself warned teams that to enter a sponsorship deal with a cryptocurrency company, the team needed to ensure regulatory compliance of the crypto product, and obtain NBA approval.

385.    To ensure regulatory compliance, at a minimum, the Warriors must have conducted due diligence to understand how FTX was pooling investments in a common enterprise and using those assets to generate the promised returns. Otherwise, it would be impossible to ensure FTX was not selling or offering to sell securities or perpetrating fraud or conversion on its customers. The Warriors disregarded their obligations to themselves and their fans and went for the money instead.

**f) The Promotions Were Directed at Plaintiffs in Florida, and Customers Nationwide.**

386.     The partnership between the Warriors and FTX included in arena and virtual FTX signage at home NBA games, as well as national promotions through the media and social media. On information and belief, the Warriors knew and intended these promotions would reach people in Florida and nationwide, including because they were displayed at games against Florida teams, which were covered by Florida media.

387.     The Warriors provided promotional services while hosting NBA games against teams from Florida including but not limited to December 6, 2021, against Orlando in San Francisco; January 3, 2022, against Miami in San Francisco; October 27, 2022, against Miami in San Francisco. The broadcasts of these games, with a viewership heavily skewed to Florida, included promotions of FTX.

388.     In approximately January 3, 2022, the Warriors hosted the Miami Heat for a regular season NBA game. The national broadcast included FTX promotions on the home Warriors court. The screenshot shows Defendant Curry shooting the ball with an FTX logo in the corner of the court. The promotions are also included in any rebroadcast of the game including highlights of the game on YouTube.[194] The YouTube video of the game highlights has been viewed 1.9 million times.

---

[194] https://www.youtube.com/watch?v=_Qi7twvAfts&ab_channel=NBA



389.    In approximately October 27, 2022, the Warriors hosted the Miami Heat for a regular season NBA game. The national broadcast included FTX promotions on the home Warriors court. The screenshot shows Defendant Curry holds the ball with an FTX logo in the corner of the court.[195] The YouTube video of the game highlights has been viewed 2.4 million times.



---

[195] https://www.youtube.com/watch?v=e8tT9QcMzsM&ab_channel=NBA

390.     Games against Curry and the Warriors are often some of the most viewed games of the season for the visiting team. Fans of Florida teams were more likely to tune in against the high-profile Warriors than almost any other team. Therefore, the Warriors knew and intended to benefit from the attention and viewership of Florida residents whenever they broadcast a game against Florida teams like Miami and Orlando.

### vii.     **Defendant Shaquille O'Neal**

391.     O'Neal was a professional basketball player from 1992 through 2011, a businessman and entrepreneur, and—lately—a paid promoter of FTX.

392.     At the beginning of his professional career, O'Neal was drafted by the Orlando Magic as the first overall pick in the 1992 NBA draft. He remained with the Orlando Magic for four years until 1996.[196] While playing for the Orlando Magic, O'Neal won Rookie of the Year (1992 – 1993) and led Orlando to the NBA Finals in 1995.[197]

393.     O'Neal later played for the Miami Heat starting in 2004 until midway through the 2007–08 season, when he was traded to the Phoenix Suns, then to the Cleveland Cavaliers for the 2009–10 season.[198] In 2011, after a season with the Boston Celtics, O'Neal announced his retirement from professional basketball.[199]

394.     As a former player for two professional franchises in Florida, the Magic and the Heat, O'Neal had a tremendous fan base in the state of Florida and was frequently covered by Florida media.

---

[196] https://www.nba.com/stats/player/406/career (Shaquille O'Neal).

[197] https://shaq.com/about (accessed May 8, 2023).

[198] https://www.nba.com/stats/player/406/career (Shaquille O'Neal).

[199] https://twitter.com/SHAQ/status/75996821360615425 ("im retiring Video: http://bit.ly/kvLtE3 #ShaqRetires") (accessed May 8, 2023).

395.    Off the basketball court, O'Neal's career has included acting, music, television, and gaming.[200] He has maintained his involvement with basketball by serving as an analyst on Inside The NBA.[201]

396.    O'Neal's business career includes hosting and promoting events, such as Shaq's Fun House ("Part Music Festival. Part Carnival.")[202]; owning restaurants like Big Chicken[203]; and founding the financial guidance and incoming boosting app, the Steady App.[204]

397.    O'Neal-owned Big Chicken describes O'Neal own business career as follows:

> Shaquille O'Neal is one of the world's most successful athlete-turned-businessmen, whose accomplishments both on and off the court have translated into a highly sought-after consumer brand. As an entrepreneur, sports analyst, DJ, restaurateur, and brand ambassador, Shaquille O'Neal's signature "Business of Fun" mantra resonates throughout each of his countless endeavors.[205]

### a) O'Neal Partnered with FTX to Promote Its Platform.

398.    In approximately June 1, 2022, Defendant Shaquille O'Neal, former professional NBA basketball star, sports analyst, and entrepreneur, unveiled his partnership with FTX, stating in a video posted on FTX's Twitter account that "I'm excited to be partnering with FTX to help make crypto accessible for everyone. I'm all in. Are you?"[206]

---

[200] https://shaq.com/about (accessed May 8, 2023).

[201] *Id.*

[202] https://shaqsfunhouse.com/ (accessed May 8, 2023).

[203] https://www.bigchicken.com/blue-origin (accessed May 8, 2023).

[204] https://www.steadyapp.com/about-us (accessed May 8, 2023).

[205] https://www.bigchicken.com/blue-origin (accessed May 8, 2023).

[206] https://twitter.com/FTX_Official/status/1532119977381208066?s=20&t=5wTm55FDE6c0cCD9vCndYg (accessed May 11, 2023).



399.    The overarching objective of the partnership was for O'Neal, through a series of

promotions and media campaigns, to help FTX successfully solicit or attempt to solicit investors

in FTX's crypto-related securities from Florida and nationwide.

400.    As O'Neal expected and understood when entering its partnership with FTX, the

team's promotions would be widely viewed nationwide, including in Florida, where O'Neal knew

or should have known FTX had its domestic home office (including because the arena of NBA's

Miami Heat had been renamed "FTX Arena").

401.    On information and belief, O'Neal also knew and intended that the team's

promotions would be disseminated to consumers in Florida and elsewhere not just on FTX's

official social media outlets, but that said promotions would also be linked, published, or reposted across innumerable media outlets on the internet and elsewhere.

  **b) O'Neal Engaged in a Sustained and Aggressive Promotion and Advertising Campaign**

402. Prior to the official unveiling of his partnership with FTX, in approximately January 2022, O'Neal unveiled the sponsorship by FTX of Shaq's Fun House, O'Neal's recurring "part music festival, part carnival" event. On January 5, 2022, O'Neal posted to Instagram regarding the Shaq's Fun House, inviting his millions of followers to "[j]oin [him] at my part music festival, part carnival experience @ShaqsFunHouse presented by @FTX_Official."[207] He tagged @FTX_Official in his commentary and included FTX in the image advertising the event.



---

[207] https://www.instagram.com/p/CYWysInrVNC/.

403.    On January 7, 2022, O'Neal again posted a video to Instagram regarding the Shaq's Fun House Event, which he described as "presented by @FTX_official," and informed his followers that tickets were on sale.[208]



404.    On January 9, 2022—for the third time within one week—O'Neal posted to Instagram regarding the Shaq's Fun House event, which once again featured the sponsorship of the event by FTX.[209]

---

[208] https://www.instagram.com/p/CYcMQKQpJRo/.

[209] https://www.instagram.com/p/CYhLk1NLZEE/.



405.     That same week, O'Neal promoted the Shaq's Fun House event "presented by FTX" on Twitter, as well, tweeting his promotions on January 5 and January 7.[210]

406.     On January 18, 2022, O'Neal again promoted his Shaq's Fun House event on Instagram with a new video, which continued to include the sponsorship by FTX.[211]

---

[210]          https://twitter.com/SHAQ/status/1478768583316590601          (January          5); https://twitter.com/SHAQ/status/1479524696932724743 (January 7).

[211] https://www.instagram.com/p/CY424wSsLAY/.



407.    A week later, on January 25, 2022, Shaqsfunhouse—the Instagram account for O'Neal's event—promoting the upcoming event with a post regarding the "Shaq-sized @ftx_official Ferris Wheel," which features the FTX name at the center of the Ferris wheel. The same post exhorted followers to "look for FTX QR codes 🎡 throughout the night."[212]

---

[212] https://www.instagram.com/tv/CZK60ijIoUf/.



408.    That same day, on January 25, 2022, Shaqsfunhouse posted to Instagram a video promoting the upcoming Shaq's Fun House event, which included video footage of O'Neal himself promoting the event, and he noted that the event was presented by FTX.[213]

---

[213] https://www.instagram.com/tv/CZLPFABoe_9/.

*23-md-03076*



409.    On January 28, 2022, Shaqsfunhouse again posted to Instagram a promotion of the even, tagging FTX and including FTX multiple times on the promotional poster.[214]

---

[214] https://www.instagram.com/p/CZSXZgjvpOg/.



410.    The day after the event itself FTX posted to Instagram a promotion video featuring

O'Neal.[215] O'Neal was filmed narrating the introduction to the video himself, saying, "Hey this is

Shaquille O'Neal. FTX presents Shaq's Fun House."

---

[215] https://www.instagram.com/tv/CZ4M57DjjoQ/.

*23-md-03076*



411.    The video confirms that FTX logos were posted prominently at the event itself.[216]

---

[216] *Id.*



412.    After the event O'Neal also posted on Instagram to thank his "my friends over at FTX for making this the biggest and baddest party of the 🏈 Big Weekend!"[217] The images from this post also confirm that FTX's name—and QR codes—were emblazoned across the carnivalesque event itself.

---

[217] https://www.instagram.com/p/CaBTjzNgUwm/?hl=en.





*23-md-03076*



413.    O'Neal shared this same message by twitter as well.[218]

---

[218] https://twitter.com/SHAQ/status/1493767180495859712.



414.    Once again, on March 3, 2022, O'Neal took to Instagram to thank FTX, among

others, for the Shaq's Fun House event.[219]

---

[219] https://www.instagram.com/p/CapxdbJtImf/.



415.    O'Neal tweeted a similar message on March 3, 2022, expressing gratitude about

Shaq's Fun House Los Angeles "presented by @ftx_official."[220]

---

[220] https://twitter.com/SHAQ/status/1499445020562231304.



416.   On March 29, 2022, O'Neal replied to Stephen Curry's tweet promoting FTX. Initially, FTX itself had tweeted, "Want to learn more about crypto? As the world's leading crypto expert, @stephencurry30 has got you covered...or does he?" Curry responded, "Do I look like a crypto expert?! 😭 Thankfully @FTX_Official got me http://ftx.us/notanexpert and @Shaq stop

playin..." In turn, O'Neal bolstered Curry's credibility by responding, "I don't care what anyone says he's a crypto expert."[221]



417.    The coordinated promotional activity between FTX and multiple of its celebrity promotors on March 29, 2022, is but one example of the carefully orchestrated activity between Defendants to accomplish the objective of influencing and soliciting consumers to invest in FTX's crypto-related securities, while making misstatements or material omissions of fact (such as the

---

[221] https://twitter.com/SHAQ/status/1508886959728447488.

compensation the celebrities were receiving for their promotions, which they purposely and deceptively portrayed unplanned, bono fide banter between megastars, which was simply untrue).

418.     Despite being orchestrated to appear to ordinary consumers as a genuine and non-commercial expression of support by O'Neal that "I don't care what anyone says he's a crypto expert," in fact, these campaigns were carefully orchestrated and contractually required.

419.     With respect to O'Neal's promotional activity and social media comments on this date and numerous other dates, Plaintiffs have not yet been able to discover facts bearing on the contacts between O'Neal (directly or through his agents) and FTX's employees in Florida for purposes of receiving instructions about the timing or scripts for these promotions.

420.     On May 4, 2022, O'Neal tweeted at @FTX_Official inquiring whether it had "an extra ticket" for FTX Off the Grid, which was happening in Miami. @FTX_Official responded: "Absolutely @shaq We got you 👉 http://ftxoffthegrid.com." O'Neal in turn replied: "I'm in @FTX_Official. Got my NFT. See you there."[222]

---

[222] https://twitter.com/SHAQ/status/1521960873639784449.

*23-md-03076*



*23-md-03076*



421.    After months of promoting FTX's sponsorship of Shaq's Fun House, FTX and O'Neal announced their formal partnership. On June 1, 2022, FTX tweeted: "We couldn't keep it secret any longer! We're partnering with...the one...the only... @SHAQ! (a.k.a. Shaqtoshi)." O'Neal then re-tweeted this post.[223]

---

[223] https://twitter.com/FTX_Official/status/1532119977381208066.



422.     In the video that FTX tweeted on June 1, 2022—and that O'Neal re-tweeted—

O'Neal says: "I'm excited to be partnering with FTX to help make crypto accessible for everyone.

I'm all in. Are you?"

423.   That same day, O'Neal tweeted that he had "teamed up with @FTX_Official to help make crypto more accessible for everyone." He provided a code to "earn" $10 if a user "trade[s]" $100 and provided a direct link for users to begin their "journey."[224]



---

[224] https://twitter.com/SHAQ/status/1532120526788886528.

424.     One week later, O'Neal was a guest on Episode 114 of "The FTX Podcast –
Builders and Innovators in the Cryptocurrency Industry," which was hosted by Tristan Yver.[225]

425.     The FTX Podcast promoted the episode with the following description:

> Join us for this episode to get a real, genuine heartfelt feel expressed by Shaq throughout
> the conversation & insight to how/why he approaches life & business the way he does. Shaq also
> shares about his crypto project 'Astrals' he has with his son & their partnership with Solana! Thank
> you, Shaq, for your time, energy and insight![226]

426.     On the podcast, O'Neal describes his business philosophy, how he became involved
with cryptocurrency, and his own personal cryptocurrency project, Astrals, which he began with
his family.

427.     On June 8, 2022, the host of the podcast, Tristan Yver, tweeted about the episode,
which O'Neal subsequently tweeted to his followers: "An @FTX_Official podcast with @SHAQ.
This one was a lot of fun!" [227]

### c)  O'Neal Had Financial Incentives to Induce Class Members to Invest in FTX and to Trust the Platform.

428.     O'Neal had every incentive to be effective promoters of FTX in order to continue
the ambassador relationship and continue receiving payment for his services. Indeed, after FTX
began to collapse, O'Neal defended his involvement with FTX by claiming that he was "just" a
"paid spokesperson for a commercial."[228]

### d)  The Promotions Were Deceptive and Unlawful.

---

[225] https://open.spotify.com/episode/2lq0BHiZb88xNRdZ9wUes4.

[226] https://open.spotify.com/episode/2lq0BHiZb88xNRdZ9wUes4.

[227] https://twitter.com/yver__/status/1534572563904573443?cxt=HHwWhsC9mbnn8ssqAAAA.

[228]        https://www.cnbc.com/2022/12/15/shaq-on-crypto-ftx-post-collapse-i-was-just-a-paid-spokesperson.html.

429.   O'Neal's promotion of FTX was deceptive because it promoted widely FTX, which would necessarily entail investment in unregistered securities. Because the FTX Platform, YBAs and/or FTT should have been registered as securities but were not, they could not be sold lawfully.

430.   In promoting the sale of unregistered securities, O'Neal's post was deceptive to his followers and to any viewers of the post.

431.   O'Neal and FTX launched a commercial campaign designed to bring cryptocurrency and investing in the FTX Platform, including YBAs, to the masses. O'Neal did not properly disclose that he was being compensated by the entity offering and selling the security, and in some instances, on information and belief, he intentionally disguised or downplayed the fact that he was being paid for promoting FTX.

432.   O'Neal's advertisements were designed to lead viewers to believe that the investment was safe and suitable for everyone, regardless of knowledge level or socioeconomic status.

### e)   O'Neal Knew or Should Have Known He Was Soliciting or Assisting FTX to Solicit Investments in Unregistered Securities and/or that He was Aiding and Abetting FTX Group's Fraud and/or Conversion.

433.   Given O'Neal's substantial investment experience—including his entrepreneurial activities ranging from Shaq's Fun House to Big Chicken—and vast resources to obtain outside advisors (which he had), he knew or should have known of potential concerns about FTX selling unregistered crypto securities and/or that he was aiding and abetting the FTX Group's fraud and/or conversion, especially promoting FTX to his 30.4 million followers on Instagram and followers on other platforms. This is especially true in light of the rampant mismanagement and myriad red flags that the FTX Group's regular business practices set off, as more fully described throughout.

*23-md-03076*

434.    In his conversation on Episode 114 of The FTX Podcast, O'Neal explained that one of his favorite words from a business book that had guided him is "due diligence."[229] He explained further that when "things that are too good to be true, stay away from it." Under his philosophy, even if "It looks so good, and I want to invest, you just stay away from it." He also explained that his philosophy was that "I like asking questions. If I don't know something, I'll ask."

435.    With respect to cryptocurrency, O'Neal explained on Episode 114 that he initially did not know about cryptocurrency when it became popular, but learned about it and, subsequently, he and his family started his own project called Astrals.

436.    Based on his investment and business experience, investment philosophy, and knowledge of cryptocurrency, O'Neal knew or should have known of potential concerns about FTX selling unregistered crypto securities and/or that he was aiding and abetting FTX Group's fraud and/or conversion.

f)    **The Promotions Were Directed at Plaintiffs in Florida, and Customers Nationwide.**

437.    O'Neal's promotions were published on public social media accounts and on podcast platforms with national distribution. They were accessible to plaintiffs nationwide, including in Florida.

438.    The partnership between FTX and O'Neal specifically targeted Florida residents because he conducted his sponsorship campaign, at least in part, from Miami, Fla., played for two Florida professional sports teams for substantial periods of his career, and planned and promoted events in Florida. His social media followers, and fans in general, are likely to be drawn disproportionately from Florida. Likewise, Florida media is likely to cover his interviews,

---

[229] https://open.spotify.com/episode/2lq0BHiZb88xNRdZ9wUes4.

promotions, and other activities because he is of interest to current and former fans of the Orlando Magic and the Miami Heat.

439.    As part of O'Neal's promotional campaign for FTX, he appears on Episode 114 of "The FTX Podcast," hosted by Tristan Yver, which was released on June 8, 2022.[230] O'Neal recorded the episode with Yver from Miami, Florida, telling Yver on the podcast, "Loosen up brother, loosen up . . . You're in Miami, relax."

440.    Yver tweeted about the podcast episode from his @yver__ account, which O'Neal then re-tweeted from his @SHAQ account. Yver's tweet—and O'Neals re-tweet—included a one-minute video excerpt of the podcast conversation, which had 54,300 views.

---

[230] https://open.spotify.com/episode/2lq0BHiZb88xNRdZ9wUes4 ("Welcome to episode 114 of the FTX Podcast with special guest Shaquille O'Neal and your host Tristan Yver! Shaquille is a family man, basketball superstar, businessman, TV personality, music artist, crypto project entrepreneur, role model & humanitarian.").



441. O'Neal's professional involvement with the State of Florida goes back three decades, beginning with being drafted to the Orlando Magic in 1992. In addition to his four years with the Orlando Magic, O'Neal played for the Miami Heat from 2004 through 2008.

442. In 2018, O'Neal began hosting "Shaq's Fun House," which describes itself as "Part Music Festival. Part Carnival."[231] The inaugural Fun House was held in Miami in 2018, which

---

[231] https://shaqsfunhouse.com/ (accessed May 8, 2023).

*23-md-03076*

included O'Neal himself serving as a D.J. ("DJ Diesel"), alongside others. Building on O'Neal's basketball career, Shaq's Fun House's inaugural edition included participation from Superbowl Champion Rob Gronkowski.[232] Shaq's Fun House returned to Miami in 2019 and 2020.

443.    After the 2019 Fun House, Shaq posted to Instagram, inviting his followers who "missed the most epic miami music week party of all time" to watch the video online as well.[233]



444.    Before the January 2020 Shaq's Fun House in Miami, O'Neal posted a video including himself to Instagram in order to invite his followers to the Miami event and exhorting them to "See [Him] in Miami."[234]

---

[232]    https://www.sbnation.com/lookit/2018/3/24/17159226/shaq-gronk-fun-house-dance-battle-video.

[233]    https://www.instagram.com/p/By_XwXeFyUE/.

[234]    https://www.instagram.com/p/B7TyWemlWyC/.



445.     Through the present day, O'Neal continues to conduct his promotional and business activities in Florida.

446.     In February 2020, O'Neal was in Miami for the Super Bowl ("The Big Game") and used this time "when I was in Miami" to post to Instagram to promote insurance sold by The General—one of O'Neal's promotional campaigns.[235]

---

[235] https://www.instagram.com/p/B8R9GZPFvax/



447.    The next month he remained in Florida and posted to Instagram regarding a music event occurring in Fort Lauderdale, saying, "Ft lauderdale was crazy last night #Springbreak2020."[236]

---

[236] https://www.instagram.com/p/B9gcb14F2N9/



448.    In June 2020, because of the COVID-19 pandemic, O'Neal co-hosted a joint event,

"Shaq's Fun House vs. Gronk Beach," which was performed in Orlando, Fla., and broadcast

virtually. In 2021, again because of COVID-19 pandemic, O'Neal hosted a livestreamed "Shaq

Bowl" from Tampa, instead of a Fun House. He promoted the event on Instagram again.[237]

---

[237] https://www.instagram.com/p/CKl-SsQDWqW/



449.   O'Neal also became involved in political activities in South Florida, posting to Instagram a political endorsement for Aramis Ayala, then a candidate for Florida's Tenth Congressional District.[238]

---

[238] https://www.instagram.com/p/CPo2uhwlsi8/.



450.   In 2021 and 2022, O'Neal promoted the Invicta watch brand from South Florida. On July 16, 2021, O'Neal was at Sawgrass Mills Mall in Sunrise, Fla., promoting his "#SHAQ collection" at the Invicta Store, which he promoted on Instagram on July 14, 2021.[239]

---

[239] https://www.instagram.com/p/CRUuxbdDnY4/

*23-md-03076*



451.    Again, on December 2, 2022, O'Neal was in person at the Sawgrass Mall in South Florida to promote the Invicta watch brand. He posted about this appearance that same day on Instagram, asking "Whose [*sic*] ready to meet me at #SawgrassMall in #SouthFlorida TODAY."[240]

---

[240] https://www.instagram.com/p/ClrI_55O-W9/.

*23-md-03076*



452.     In an event occurring on May 6 – 7, 2022, O'Neal performed as "DJ Diesel" in Orlando, Florida. O'Neal posted to Instagram on his @djdiesel account to promote the event on January 16, 2022.[241]

---

[241] https://www.instagram.com/p/CYzJMEwJ8gJ/.

*23-md-03076*



453.    On September 9, 2022, O'Neal performed as "DJ Diesel" in Tallahassee, Fla.[242]

---

[242] https://www.iheart.com/content/2022-06-23-shaq-is-djing-in-a-city-near-you-this-summer-see-the-tour-dates/ (accessed May 9, 2023).



*23-md-03076*

454.    On October 31, 2022, O'Neal performed as "DJ Diesel" in Gainesville, Fla.[243]



viii.    **Defendant Trevor Lawerence**

---

[243] https://www.iheart.com/content/2022-06-23-shaq-is-djing-in-a-city-near-you-this-summer-see-the-tour-dates/ (accessed May 9, 2023).



455.    William Trevor Lawrence was the first overall pick in the 2021 NFL Draft and is now the star starting quarterback for the Jacksonville Jaguars. He won a National Championship in college at Clemson University and was the highest-rated prospect heading into the NFL Draft—leading NFL fans to hope their teams would "Tank for Trevor," i.e., lose games so they could get the number one pick in the Draft and select Lawrence.[244]

---

[244]    https://nypost.com/2020/09/30/what-trevor-lawrence-thinks-of-tank-for-trevor-nfl-draft-slogan/

**a) Lawrence Partnered with FTX to Promote Its Platform.**

456.     In approximately April 2021, Lawrence partnered with FTX—through one of FTX's investment apps Blockfolio—as a brand ambassador, which included posting on social media and appearing in promotional and marketing materials.

457.     In August 2020, FTX announced the acquisition of Blockfolio, then the market's leading mobile news and portfolio tracking app. Coindesk reported that "the deal is a strategic play for FTX, whose clientele consists largely of quants and professional traders, to attract more retail customers."[245]   The app became known as FTX: Blockfolio at the time of the merger, and subsequently transitioned to FTX app. An FTX press release on the name change quotes Bankman-Fried as stating: "The rebrand of FTX: Blockfolio to FTX puts the final cap on our acquisition of Blockfolio, doubling down on our commitment to being the number one crypto trading platform for both retail and institutional users. Rebranding Blockfolio shows our commitment to mobile trading, and is just another step in growing our brand on a global scale and will allow us to bring new features to market and better the user experience."[246]

458.     In exchange for these services, Lawrence received a substantial total compensation package of "multi-million" dollars.[247] Lawrence received a "significant signing bonus" paid completely in cryptocurrency, a first-of-its-kind deal that was heavily promoted in the media.[248]

---

[245] https://www.coindesk.com/markets/2020/08/25/ftx-exchanges-150m-deal-for-mobile-first-blockfolio-is-a-retail-trading-play/

[246] https://www.prnewswire.com/news-releases/ftx-blockfolio-app-rebrands-to-ftx-301343419.html

[247] https://www.nytimes.com/2021/04/26/business/dealbook/ceo-pay-pandemic.html

[248] https://www.forbes.com/sites/chriscason/2021/04/26/trevor-lawrence-makes-first-investment-move-with-first-of-its-kind-partnership-with-blockfolio/?sh=344e295347ef

459.     FTX COO Sina Nader said that Lawrence's deal with FTX "speaks to increasing awareness and mindshare when it comes to what people are aware of in finance. Once you start to see names like Trevor Lawrence, and prominent people in entertainment, the taboo is officially shattered. People are realizing that crypto is a real thing."[249]

460.     The overarching objective of the partnership was for Mr. Lawrence, through a series of promotions and media campaigns, to help FTX successfully solicit or attempt to solicit investors in FTX's crypto-related securities from Florida and nationwide.

**b) Lawrence Engaged in a Sustained and Aggressive Promotion and Advertising Campaign.**

461.     In approximately April 2021, Lawrence appeared in widespread advertisements announcing and promoting his partnership with Blockfolio, garnering substantial attention, and reaching a large nationwide audience.[250]

---

[249] https://decrypt.co/69064/nfl-trevor-lawrence-signs-endorsement-deal-with-blockfolio-ftx

[250] https://www.colormatics.com/case-study/ftx-trevor-lawrence/



*23-md-03076*

# The Future of Money Joins the Future of Football



Blockfolio was previously positioned as the #1 cryptocurrency platform outside of the U.S, but all of this was about to change. Their newfound partnership with NFL draft pick, Trevor Lawrence, would give them the edge they needed to dominate the crypto market. Lawrence's endorsement deal was the first in which a significant signing bonus was cryptocurrency. The bonus consisted of well-known and mainstream crypto coins, such as Bitcoin and Ethereum, but also emerging coins that reflect the future of the crypto industry, such as Solana.

*23-md-03076*

# Reaching the Nation

The results of the campaign exceeded all expectations, gaining **1,531,250 clicks** with a **CTR** of **.17%**, for a total of **878,766,913 impressions.**





462.     In approximately June 16, 2021, Lawrence appeared on "The FTX Podcast." He

discussed how the decision factors to go to Clemson paralleled to the FTX Blockfolio Team.[251]

---

[251]        https://blockpaths.com/the-ftx-podcast-67-trevor-lawrence-the-jacksonville-jaguars-quarterback/



**BLOCKPATHS**
@blockpaths

···

(The FTX Podcast #67 – Trevor Lawrence the Jacksonville Jaguars Quarterback) at blockpaths.com

URL: blockpaths.com/exchanges/the-...



8:39 AM · Jun 16, 2021



463.    In approximately October 7, 2021, Lawrence posted and appeared in an advertisement promoting FTX sign-ups and linking to Blockfolio's website. Lawrences said that FTX was the "safe" way "to start your journey with cryptocurrency," and that he was "in."



464.     As he expected and understood when entering into his partnership with FTX, Mr. Lawrence's promotions would be viewed nationwide, including in Florida, where Mr. Lawrence knew or should have known FTX had its domestic home office (including because the arena of NBA's Miami Heat had been renamed "FTX Arena").

465.     On information and belief, Mr. Lawrence also knew and intended that his promotions would be disseminated to consumers in Florida and elsewhere not just on FTX's official social media outlets, but that said promotions would also be linked, published, or reposted across innumerable media outlets on the internet and elsewhere.

### c)  Lawrence Had Financial Incentives to Induce Class Members to Invest in FTX and to Trust the Platform.

466.     Lawrence had a financial incentive to induce Plaintiff's to invest with FTX. He was paid, at least in part, in FTX cryptocurrency — the value of which depended on the financial success of FTX.

467.     Further, Lawrence had every incentive to be an effective promoter of FTX in order to continue the ambassador relationship and continue receiving payment for his services.

### d)  The Promotions Were Deceptive and Unlawful.

468.     Lawrence did not disclose that he was being compensated by FTX for promoting the sale of FTX securities.

469.     Lawrence made deceptive statements in his promotions, including that FTX was "the safe and easy way to start your crypto journey" and that FTX was a "long-term partner in the space that I could trust."[252]

---

[252] https://www.forbes.com/sites/chriscason/2021/04/26/trevor-lawrence-makes-first-investment-move-with-first-of-its-kind-partnership-with-blockfolio/?sh=344e295347ef

e) **Lawrence Knew or Should Have Known He Was Soliciting and/or Assisting FTX to Solicit Investments in Unregistered Securities and/or that He was Aiding and Abetting FTX Group's Fraud and/or Conversion.**

470.    Given Lawrence's experience with sponsorship deals (Lawrence also endorsed deals with Adidas and Gatorade before being drafted) and vast resources to obtain outside advisers (which he had), he knew or should have known of potential concerns about FTX selling unregistered crypto securities and/or that he was aiding and abetting FTX Group's fraud and/or conversion, especially to millions of his followers. This is especially true in light of the rampant mismanagement and myriad red flags that the FTX Group's regular business practices set off, as more fully described throughout.

f) **The Promotions Were Directed at Plaintiffs in Florida, and Customers Nationwide.**

471.    Lawrence's promotions were published on public social media accounts and displayed on many websites. They were accessible to plaintiffs nationwide, including in Florida.

472.    The partnership between FTX and Lawrence specifically targeted Florida residents because Lawrence is a Florida resident and Jacksonville's biggest athletic star, as the starting quarterback and cornerstone franchise player of the Jacksonville Jaguars (the only major professional sports team in Jacksonville). His social media followers, and fans in general, are likely to be drawn disproportionately from Florida. Likewise, Florida media is likely to cover his interviews, promotions, and other activities because he is of interest to fans of his team. As the number-one overall pick in the NFL Draft, and one of the best and most famous players in the NFL, Lawrence generates significant attention nationwide, as well.\

ix.    **Defendant Shohei Ohtani**



473. Shohei Ohtani is a global icon and history-making professional baseball superstar from Japan, most widely known for his versatility, playing successfully in the MLB as an outfielder, designated hitter, and pitcher. He currently plays for the Los Angeles Angels.

**Front Office Sports** ✔ @FOS · Apr 7, 2022

Shohei **Ohtani** is now:

— Making $20M+ a year off endorsements
— MLB The Show 22's cover athlete
— An **FTX** global ambassador
— AL MVP
— Signed on with brands like Hugo Boss, ASICS, Kowa, and Japan Airlines

Today, he's on the cover of @TIME 🖼️



○ 6        ⟲ 135        ♡ 618        ılıl        ⬆️

### a)  Ohtani Partnered with FTX to Promote Its Platform.

474.    In approximately November 2021, Ohtani partnered with FTX to provide it with spokesperson and marketing services pursuant to a written agreement. Those services included appearing in a commercial and as a spokesperson for the brand.

475.    Ohtani's signed on as a long-term global ambassador with both FTX US and FTX International.[253]



---

[253]   https://www.prnewswire.com/news-releases/mlb-superstar-shohei-ohtani-joins-ftx-as-global-ambassador-through-long-term-partnership-301425911.html (accessed May 11, 2023).

476.    In exchange for these services, Ohtani received a substantial total compensation package.  Ohtani received all of his compensation in equity and cryptocurrencies. Because of his compensation structure, the more success that Ohtani had in influencing consumers to make investments on the FTX platform, the more Ohtani stood to profit financially.

477.    In an interview with CNN about the Ohtani partnership, Bankman-Fried stated: "We are really excited to give our partners a stake because it means we are aligned. As much as we are rooting for them on the field, hopefully they are rooting for us to do well in our arena."[254]

478.    Ohtani did not disclose the form or amount of payments received under the agreement to the public when promoting FTX.

**b) Ohtani Engaged in a Sustained and Aggressive Promotion and Advertising Campaign.**

479.    Ohtani partnered with FTX and provided services in accordance with his agreement. For example, he appeared in commercials for FTX and acted as a spokesperson. Specific examples of his promotions of FTX follow:

480.    In approximately November 16, 2021, FTX shared the news of Ohtani's signing on its twitter account.

---

[254] https://www.cnn.com/2021/11/16/business/bitcoin-crypto-ftx-ohtani/index.html

*23-md-03076*







481.     In approximately January 31, 2022, FTX tweeted about its relationship with Ohtani, congratulating Ohtani for being on the cover of a MLB video game.



482.    In approximately April 2022, Ohtani appeared in a commercial for FTX which poked fun at a contest he ran years prior to come up with his nickname. One character in the commercial suggests, "The Great Cryptohani" since "he's also into crypto, NFTs."[255]

---

[255]    https://www.thedrum.com/news/2022/04/07/ftx-dubs-mlb-all-star-shohei-ohtani-the-great-cryptohtani

483.    Ohtani appeared in a second commercial that aired In approximately August 2022 on regional and national television, which featured the claim that Ohtani "Hits. Pitches. Invests. Does it all on the platform that trades it all, FTX." That ad can be viewed at the following link: https://www.youtube.com/watch?v=Is72XSKuUqA.

484.    In approximately August 1, 2022, FTX tweeted an image of an FTX billboard featuring Ohtani.





485.  Ohtani also provided spokesperson services while playing for the Los Angeles Angels, including while playing against teams from Florida at home, and while playing against Florida teams in Florida, including but not limited to April 11-12, 2022 against Miami in Los Angeles, May 9-11, 2022 against Tampa Bay in Los Angeles, July 5-6, 2022 against Miami in Miami, and August 22-25, 2022 against Tampa Bay in Tampa.

486.   Commercials and promotional images were shared and re-broadcast across social media. Nationwide network, and local networks such as NBC Miami, routinely covered Ohtani's career. [256]



487.   Because some social media posts have been removed, and some FTX resources are not publicly accessible, additional advertisements may be located in discovery.

488.   The overarching objective of the partnership was for Ohtani, through a series of promotions and media campaigns, to help FTX successfully solicit or attempt to solicit investors in FTX's crypto-related securities from Florida and nationwide.

---

[256] https://www.nbcmiami.com/tag/shohei-ohtani/.

489.     As Ohtani expected and understood when entering his partnership with FTX, his promotions would be widely viewed worldwide, including in Florida, where he knew or should have known FTX had its domestic home office (including because the arena of the NBA's Miami Heat had been renamed FTX Arena).

490.     On information and belief, Ohtani also knew and intended that the team's promotions would be disseminated to consumers in Florida and elsewhere not just on FTX's official social media outlets, but also that said promotions would be linked, published, or reposted across innumerable media outlets on the internet and elsewhere.

**c) Ohtani Had Financial Incentives to Induce Class Members to Invest in FTX and to Trust the Platform.**

491.     Ohtani had a financial incentive to induce Plaintiffs to invest with FTX. He owned an equity stake in FTX, and was paid in cryptocurrency and equity − the value of which depended on the financial success of FTX.

492.     Further, Ohtani had every incentive to be effective promoters of FTX in order to continue the ambassador relationship and continue receiving payment for his services.

**d) The Promotions Were Deceptive and Unlawful.**

493.     Ohtani did not disclose that he was being compensated by FTX for promoting the sale of FTX securities.

494.     Ohtani made deceptive statements in his promotions, including statements that he "does it all on the platform."

**e) Ohtani Knew or Should Have Known He Was Soliciting or Assisting FTX to Solicit Investments in Unregistered Securities, and/or that He was Aiding and Abetting FTX Group's Fraud and/or Conversion.**

495.     Given Ohtani's experience with sponsorship deals and vast resources to obtain outside advisors (which he had), he knew or should have known of potential concerns about FTX

selling unregistered crypto securities and/or that he was aiding and abetting FTX Group's fraud and/or conversion, especially to millions of his fans. This is especially true in light of the rampant mismanagement and myriad red flags that the FTX Group's regular business practices set off, as more fully described hereinabove.

f) **The Promotions Were Directed at Plaintiffs in Florida, and Customers Nationwide.**

496. Ohtani's promotions were published on public social media accounts and aired on local and national television broadcasts. They were accessible to plaintiffs nationwide, including in Florida.

497. The partnership between FTX and Ohtani specifically targeted Florida residents because Ohtani played MLB games in Florida, and against Florida teams in Los Angeles – both of which were covered by Florida media – while acting as a brand ambassador for FTX.

x. <u>**Defendant Naomi Osaka**</u>



a) **Naomi Osaka Partnered with FTX to Promote Its Platform.**

*23-md-03076*

498.    Defendant Naomi Osaka, a 24-year-old professional tennis player and four-time Grand Slam singles champion, became a brand ambassador for FTX with the express purpose of "getting more women to start investing in crypto."[257]

499.    Osaka wore the FTX logo on the kit she wore at tournaments, including the 2022 Miami Open. [258]

500.    Osaka and FTX launched a commercial designed to bring cryptocurrency and investing in the FTX Platform, including YBAs, to the masses. Osaka did not properly disclose that she was being compensated by the entity offering and selling the security

501.    Osaka's essential objective as an FTX ambassador, for which she was highly compensated, was ultimately to assist FTX in its campaign to solicit investments in crypto-related securities offered on its platform.

502.    In exchange for an equity stake in FTX and payments in unspecified amounts of cryptocurrency, Osaka directed and produced content in association with the FTX Group designed to promote the offer and sale of the unregistered FTX Platform, YBAs and/or FTT securities, hoping "she will reach a global audience."[259]

a) **Naomi Osaka Engaged in a Sustained and Aggressive Promotion and Advertising Campaign.**

503.    Osaka confirmed her involvement by tweeting a glitzy new FTX ad to her 1.1 million   Twitter   followers,   which   can   be   viewed   here: https://www.youtube.com/watch?v=w0dLcBDuq5A

---

[257]  https://coinmarketcap.com/alexandria/article/naomi-osaka-tennis-star-teams-up-with-ftx-and-she-s-getting-paid-in-crypto-too (accessed May 11, 2023).

[258] *Id.*

[259] *Id.*



504.    It shows the tennis star competing in a comic-strip. Accompanied by overly dramatic music, she says: "They thought they made the rules for us. They thought they could control us. They were wrong."

505.    The video then cuts to a boardroom full of marketing executives talking about the ad in a tongue-in-cheek way — and discussing other ideas… including Osaka heading to the moon. An idea to have a QR code bouncing around the screen (a clear nod to Coinbase's Super Bowl spot) is dismissed for being "boring."

506.    They settle on letting Osaka speaking for herself — and play a mock-up of the tennis ace giving an interview to a news channel where she says: "I'm Naomi Osaka and I'm proud to partner with FTX. Making cryptocurrency accessible is a goal that FTX and I are striving towards." The ad ends with the tagline: "Naomi is in. You in?"

*23-md-03076*

507.    Osaka, in accord with her partnership agreement with FTX, engaged in a sustained and aggressive promotion campaign, specifically targeting vulnerable young woman in a perverse attempt to mitigate societal inequality.[260]

508.    As part of this partnership, Osaka was tasked with producing content that would "focus on bringing women on the platform" and to "further democratize the space."[261]

509.    Furthermore, Osaka wore tennis gear with the FTX logo on it following her announcement, starting with the 2022 Miami Open, including the during the final.



250





510.    After winning her quarter-final and semi-final match, Osaka tweeted pictures of herself celebrating, while wearing the tennis gear with the FTX logo.





**b) Naomi Osaka Had Financial Incentives to Induce Class Members to Invest in FTX and to Trust the Platform.**

511.    Osaka had a financial incentive to induce Plaintiffs to invest with FTX. She held an equity stake in FTX–the value of which depended on the financial success of FTX.

 



## Naomi Osaka

Athlete. Entrepreneur. Advocate. Icon. Four-time Grand Slam singles champion and recipient of seven titles on the WTA Tour, Naomi is now an FTX shareholder and ambassador.

512.     Further, Osaka had every incentive to be an effective promoter of FTX in order to continue the ambassador relationship and continue receiving payment for her services.

513.     Moreover, Osaka received compensation in crypto. The value of cryptocurrencies were inextricably linked to the success of FTX trading platform, providing Osaka with even greater incentive to ensure the success of FTX.

**c)  The Promotions were Deceptive and Unlawful.**

514.     Osaka's partnership agreement with FTX provided her with an equity stake in FTX. Because of her compensation structure, the more success that Osaka had in influencing consumers to make investments on the FTX platform, the more Osaka stood to profit financially.

515.     FTX's success was, in part, conditional upon Osaka's ability to use her fame and platform to bring vulnerable investors, especially women, into FTX's fray.

@naomiosaka will wear the FTX logo during competitions, starting with today's Miami Open.



516.   Osaka had a great incentive to engage in deceptive and unlawful promotions in order to ensure the financial success of FTX.

517.   Given her resources, access to advisors and outside counsel, and her prior investment experience, Osaka knew or should have known that the promotions she engaged in were deceptive and unlawful.

**d) Naomi Osaka Knew or Should Have Known She was Soliciting or Assisting FTX to Solicit Investments in Unregistered Securities and/or the She was Aiding and Abetting FTX Group's Fraud and/or Conversion.**

518.  Given Osaka's substantial investment experience, including with Sweetgreen and DraftKings, and the vast resources to obtain outside advisors (which she had), she knew or should have known of potential concerns about FTX selling unregistered crypto securities and/or that she was aiding and abetting FTX Group's fraud and/or conversion, especially to millions of their followers.

**e) The Promotions Were Directed at Plaintiffs in Florida, and Customers Nationwide.**

519.  Osaka's promotions were published on public social media accounts, and aired on local and national television broadcasts. They were accessible to plaintiffs nationwide, including in Florida.

520.  Moreover, the partnership between FTX and Osaka specifically targeted Florida residents because she began her promotion campaign at the 2022 Miami Open tennis tournament.

521.  Osaka wore gear with the FTX logo throughout the tournament, including during the presentation and acceptance of her runner-up throw following her loss in the finals.

522.  The overarching objective of the partnership was for Osaka, through a series of promotions and media campaigns, to help FTX successfully solicit or attempt to solicit investors inf FTX's crypto-related securities from Florida and nationwide

523.  As Osaka expected and understood when entering its partnership with FTX, her promotions would be widely viewed nationwide, including in Florida, where she knew or should have known FTX had its domestic home office (including because the first major tennis event where she wore FTX gear was at the 2022 Miami Open, where she lost in the finals).

524.    On information and belief, Osaka also knew and intended that her promotions would be disseminated to consumers in Florida and elsewhere not just on FTX's official social media outlets, but that said promotions would also be linked, published, or reposted across innumerable media outlets on the internet and elsewhere.

525.    Osaka trained and lived in Florida at the Harold Solomon Tennis Academy and the ProWorld Tennis Academy. Her family moved there when she was 15 years old. She competes yearly in Miami.[262]



xi.    **Defendant Larry David**

---

[262] https://www.miamiherald.com/sports/tennis/article250244875.html



**a) Larry David Worked with FTX To Promote its Platform.**

526.    For his part, the legendary comedian and creator of *Seinfeld* and *Curb Your Enthusiasm*, Larry David, created an ad for the FTX Group called "Don't Miss Out on Crypto," which aired during the 2022 Super Bowl.

527.    The ad—the only commercial David has ever appeared in—featured David being a skeptic on such historically important inventions as the wheel, the fork, the toilet, democracy, the light bulb, the dishwasher, the Sony Walkman, and, of course, FTX, and cautioned viewers, "Don't be like Larry." The ad can be viewed here: https://www.youtube.com/watch?v=hWMnbJJpeZc

528.    Larry David was first approached to take part in the FTX Super Bowl commercial in the Fall of 2021.[263]

529.    Although David "gets asked to do commercials 'pretty regularly'" he had, until that point, declined to appear in any due to creative disagreements between himself, on the one hand, and advertisement agencies and executives, on the other.

---

[263] https://variety.com/2022/tv/news/larry-david-super-bowl-commercial-ftx-cryptocurrency-jeff-schaffer-1235180358/ (accessed May 8, 2023).

530. However, that all changed after David learned about FTX's idea. Indeed, David and his long-time collaborator "were completely in lockstep with" FTX's idea of using the contrarian comic's well-known wit and persona to advertise the emerging crypto exchange app and reach a wide-pool of potential users.

531. Embracing David's constructed antagonism for cryptocurrency was part of FTX's broader, manipulative marketing strategy. According to Bankman-Fried, FTX wanted to "meet people where they are—and that means embracing skepticism."

**b) Larry David Engaged in a Sustained and Aggressive Advertising Campaign.**

532. The FTX Super Bowl ad features an exaggerated version of Larry David in various historical contexts, deriding inventions such as the wheel, the fork, electricity, the toilet, and democracy.

533. It concludes with an individual sitting in Larry David's office holding an iPhone with the FTX logo, stating, "like I was saying, it's FTX, a safe and easy way to get into crypto."

534. David responds "I don't think so. And I'm never wrong about this stuff. Never."

535. The advertisement concludes with the commercial's tagline: Don't Be Like Larry.

536. The clear implication from the commercial is to reject David's hesitancy and invest in crypto through FTX's "safe and easy" online platform.

537. The commercial was extremely popular following its original airing. Following its airing, FTX became one of the most retweeted brands during the Super Bowl, and won the "Most Comical" honorific from *USA Today*'s Ad Meter.[264]

---

[264]   https://admeter.usatoday.com/lists/usa-today-ad-meter-replay-ratings-2022-final-results/ (accessed May 11, 2023).

538.    Following the commercial, David and his team provided interviews with the *New York Times* and *Variety Magazine* where they discussed the process of making the commercial and their enthusiasm when first approached.[265]

### c) Larry David Had Financial Incentives to Induce Class Members to Invest in FTX and to Trust the Platform.

539.    While David was no doubt excited to showcase his creativity to a broader audience, it came at a serious cost. He used his celebrity, fame, and comedic wit to advertise and promote a risky financial device to millions of unsophisticated and vulnerable potential investors.

540.    But David did not care. The vast viewership provided by an event like the Super Bowl provided him with a massive crowd of viewers with their eyes glued to their television screens.

541.    David had a financial incentive to induce Plaintiffs to invest with FTX. In exchange for his comedic wit and acting services, Mr. David was substantially compensated. Indeed, upon information and belief, hiring David almost doubled the already hefty $13 million price tag of a prime-time Super Bowl commercial.[266]

542.    Further, David had every incentive to be an effective promoter of FTX in order to continue the creative relationship and have more opportunities to work with FTX in the future.

### d) The Promotions were Deceptive and Unlawful.

543.    Given David's resources and access to advisors and counsel, he knew or should have known that FTX's platform was built atop a fragile house of cards.

---

[265] See *supra* 144; https://www.nytimes.com/2022/02/13/business/media/larry-david-super-bowl-ftx-crypto.html (accessed May 7, 2023)

[266]    https://www.theblock.co/post/134339/why-larry-david-was-the-perfect-anti-sponsor-of-ftxs-super-bowl-ad-according-to-jeff-schaffer (accessed May 8, 2023)

544.    Because David knew or should have known about FTX's financial fragility, his promotion of the FTX platform as an "easy and safe way to get into crypto" was deceptive and unlawful.

### e) Larry David Knew or Should Have Known He was Soliciting or Assisting FTX to Solicit Investments in Unregistered Securities and/or that He was Aiding and Abetting FTX Group's Fraud and/or Conversion.

545.    Given David's investment experience and vast resources to obtain outside advisors (which he had), David knew or should have known of potential concerns about FTX selling unregistered crypto securities and/or that he was aiding and abetting FTX Group's fraud and/or conversion, especially to millions of his followers. This is especially true in light of the rampant mismanagement and myriad red flags that the FTX Group's regular business practices set off, as more fully described hereinabove.

546.    David agreed to be a part of the advertisement in November 2021, yet failed to properly investigate the brand and product he was tasked with promoting to hundreds of millions of people.[267]

### f) The Promotions were Directed at Plaintiffs in Florida, and Customers Nationwide.

547.    First, as explained above, the deal with David for the Super Bowl commercial was created, consummated, implemented, and/or overseen by FTX VP of Business Development Avi Dabir, from his base of operations in Miami, Florida. *See* Exs. A, B.

548.    The Super Bowl is one of the most watched events in the United States, regularly generating close to 100 million viewers through traditional television networks and modern online streaming platforms.

---

[267] https://www.nytimes.com/2022/02/13/business/media/larry-david-super-bowl-ftx-crypto.html (accessed May 7, 2023)

*23-md-03076*

549.    Indeed, the 2022 Super Bowl had 99.18 million television viewers and 11.2 million streaming viewers. This provided David and FTX a perfect opportunity to expose over 100 million individuals to FTX's deceitful scheme.[268]

550.    Due to its national reach, millions of Florida residents also watched the 2022 Super Bowl. According to Nielsen ratings, for example, the city of Jacksonville, Florida, the most populous city in the state, had the tenth highest local market rating in the country.[269]

551.    But it did not stop there. According to the official FTX Twitter account, the commercial had been viewed close to 50 million times by April 30, 2022, less than two months after it aired on February 13th:



552.    The ad was (and is to this day) still being shared all across YouTube, ensuring its impact months after the original air date.[270]

[268]    https://www.sportsmediawatch.com/super-bowl-ratings-historical-viewership-chart-cbs-nbc-fox-abc/ (accessed May 8, 2023).

[269]    https://thespun.com/more/top-stories/the-10-u-s-cities-that-had-most-super-bowl-56-viewers (accessed May 7, 2023).

[270]    https://www.youtube.com/watch?v=hWMnbJJpeZc    (accessed   May   8,   2023); https://www.youtube.com/watch?v=FEX64-2Tphw    (accessed   May   8,   2023); https://www.youtube.com/watch?v=PmhOBkmJjpM (accessed May 8, 2023).

553.    Furthermore, according to data analytics and software company Edo, Inc., David's ad had a 6.5x greater consumer engagement than the median Super Bowl ad.[271] Consumer engagement was also driven by a promotion by FTX, where they promised to give away Bitcoin if social media users followed the FTX twitter account and "retweeted the ad."[272]

554.    Moreover, FTX strategically bought an advertisement slot right before the end of the first-half, before the Super Bowl half-time show. This primetime spot ensured that even viewers with little to no interest in the game would be tuning in to watch the musical performance, which featured an array of hip-hop icons including Snoop Dogg, Dr. Dre, Eminem, and 50 Cent.

555.    FTX's plan worked. David's comedic charm enthralled potential investors, and FTX saw a 130% boost in downloads week-over-week on February 13, followed by 80% growth the next day.[273] The FTX app jumped up Apple's App Store download rankings right after the Super Bowl.[274]

**xii.    Defendant TSM (Team SoloMid)**

---

[271]    https://www.globenewswire.com/news-release/2022/02/14/2384508/0/en/Super-Bowl-LVI-Sees-Advertising-Boom-as-Marketers-Get-Back-in-the-Game.html (accessed May 8, 2023)

[272]    https://www.globenewswire.com/news-release/2022/02/14/2384508/0/en/Super-Bowl-LVI-Sees-Advertising-Boom-as-Marketers-Get-Back-in-the-Game.html (accessed May 8, 2023)

[273]    https://techcrunch.com/2022/02/17/super-bowl-ads-boosted-crypto-app-downloads-by-279-led-by-coinbase/ (accessed May 9, 2023).

[274]    https://www.protocol.com/bulletins/coinbase-super-bowl-results (accessed May 8, 2023).



556.    TSM is the most valuable esports organization in the world, an elite, holistic gaming brand comprised of championship esports teams, world-class influencers, and gaming strategy sites that level up the entry-level player all the way to professional.[275] Self-described as a "platform of champions," TSM seeks to provide maximum value through the competitive excellence of its teams and the creation of exciting, educational, and entertaining content that deliver the ultimate esports and gaming fan experience.

**a) TSM Partnered with FTX to Promote its Platform.**

557.    "Esports," or competitive video gaming, have experienced a meteoric rise in popularity over the past few years, particularly with younger audiences. Once considered a niche hobby, esports have become a global phenomenon with millions of viewers and participants worldwide. The growth of esports has been fueled by several factors, including the proliferation

---

[275] https://www.crunchbase.com/organization/team-solomid (accessed May 11, 2023).

of online streaming platforms, the increasing accessibility of gaming technology, and the emergence of professional leagues and teams.

558.    One of the main reasons why esports have become so popular with younger audiences are their accessibility. Unlike traditional sports that require specialized equipment and physical abilities, esports only require a computer or gaming console and an internet connection. This makes it easier for younger people to participate in esports from the comfort of their own homes. Additionally, many games that are popular in esports, such as League of Legends and Fortnite, are free to play, which further lowers the barrier to entry.

559.    Another factor that has contributed to the rise of esports is the widespread availability of online streaming platforms such as Twitch and YouTube. These platforms have made it easier than ever for fans to watch their favorite esports tournaments and events from anywhere in the world. They have also provided a platform for amateur players to showcase their skills and build a following, which can help them break into the professional scene.

560.    The emergence of professional leagues and teams has also played a significant role in the rise of esports. Major companies such as Activision Blizzard, Riot Games, and Epic Games have invested heavily in creating structured leagues and tournaments for their respective games. This has helped to professionalize the industry and provide more opportunities for aspiring players to make a career in esports. These professional leagues and teams have also attracted major sponsors and investors, which has helped to raise the profile of esports even further.

561.    When it comes to esports, TSM is an industry leader. Founded in 2009 by Andy "Reginald" Dinh, TSM has become one of the most successful esports organizations in the world. With teams in games such as League of Legends, Valorant, and Fortnite, TSM has won multiple championships and established itself as a titan in the industry.

562.     TSM is perhaps best known for its role in popularizing esports in the United States. TSM was one of the first organizations to bring esports to a mainstream audience in North America, and it helped to establish a competitive scene in games such as League of Legends, paving the way for other esports organizations and players in the region. TSM's success and popularity has helped to legitimize esports as a legitimate form of entertainment and competition, attracting major sponsors and investors to the scene.

563.     In recent years, TSM made headlines in the esports industry with its groundbreaking partnership with FTX. On June 4, 2021, TSM announced a 10-year, $210 million naming rights deal with FTX. The deal included requirements for TSM to purchase $1 million of FTX's native security, FTT, which TSM used to pay its employees and players, and options for employees to purchase Solana on FTX US exchanges and be reimbursed by FTX. This multi-year, multimillion-dollar deal not only highlighted the growing influence of esports but also showcased the increasing involvement of cryptocurrency and blockchain technology in the industry.[276]

564.     FTX's renaming of the "FTX Arena" in 2021 in Downtown Miami for the NBA franchise the Miami Heat served an important centerpiece for FTX's efforts to form partnerships with ambassadors like TSM.

565.     FTX's senior executive responsible for creating, consummating, and implementing deals between FTX and promotors was Avinash Dabir, who originally worked for Blockfolio, which FTX later acquired, and eventually became FTX's Vice President of Business Development.

---

[276] *See* https://www.prnewswire.com/news-releases/tsm-and-ftx-sign-210-million-naming-rights-partnership-largest-in-esports-history-301305740.html (Last visited May 11, 2023); *see also* https://www.washingtonpost.com/video-games/esports/2022/11/16/tsm-ftx-naming-deal-suspended/ (Last visited May 11, 2023).

566.    Since early 2021, FTX maintained an office in Miami that was run by Mr. Dabir, who operated from FTX's Miami office to formulate and execute FTX's important celebrity partnerships, including the partnership with TSM.

567.    On information and belief, the negotiation and execution of the TSM agreement with FTX involved communications between TSM and Mr. Dabir in FTX's offices in Miami. On information in belief, TSM understood the counterparty to the contractual negotiations based its domestic operations in Florida.

568.    The collaboration between TSM and FTX marked one of the largest sponsorships deals in esports history. The partnership involved the complete rebranding of TSM, a strong brand name synonymous to North American esports, with the team officially becoming "TSM FTX." This partnership between TSM and FTX is significant for several reasons.

569.    First, it demonstrated the increasing mainstream acceptance of esports as a valuable marketing platform to access millions of viewers. FTX recognized the immense reach and engagement of esports audiences, particularly among younger demographics, and saw an opportunity to align its brand with one of the most successful esports organizations in the world, further solidifying the notion that esports had become a lucrative avenue for companies looking to connect with younger audiences.

570.    Second, the collaboration highlighted the growing presence of cryptocurrency and blockchain technology in the esports ecosystem. As part of the deal, FTX secured naming rights for TSM's training facility, which was renamed the "FTX Training Center." FTX's involvement showcased the potential synergies between esports and cryptocurrency, as both industries catered to a tech-savvy and digitally native audience. This partnership also provided FTX with an opportunity to reach a younger demographic through the esports audience and a platform for FTX

to raise awareness about cryptocurrencies and blockchain technology among millions of esports fans and participants worldwide.

571.    Third, with esports fans and participants primarily composed of younger individuals born in 1981 and later, the partnership with TSM helped FTX connect with a younger demographic that is more receptive to cryptocurrency and blockchain technology. This partnership helped to integrate the FTX brand into the TSM ecosystem, providing greater visibility and exposure to FTX's target audience and previously skeptical investors.

572.    Fourth, the partnership also provided FTX with a platform to educate esports fans and participants about cryptocurrency and blockchain technology. FTX conducted educational campaigns and promotions during esports events, showcasing the potential benefits of using cryptocurrency and blockchain for esports transactions and sponsorships. The partnership allowed FTX to establish a foothold in the esports industry and build brand recognition among a tech-savvy and digitally native audience.

573.    Furthermore, TSM's success in esports helped to increase FTX's credibility and legitimacy as a sponsor and partner. TSM has a large and passionate fanbase, known as the "TSM Army," that is highly engaged and loyal to the brand. By aligning with TSM, FTX was able to tap into this fanbase and leverage their enthusiasm to promote FTX's brand and offerings. This helped FTX gain greater credibility and acceptance among esports fans and participants, who tend to be skeptical of traditional forms of advertising.

574.    In the end, the exposure to younger demographics and tech-forward TSM fans was not a positive for either the cryptocurrency or esports industries. TSM had been promoting unregistered securities in the name of one of the largest financial fraudsters in recent memory. Through this partnership, the champion of cryptocurrency in the gaming industry lost money for

countless members of the TSM Army. Not only did fans lose their entire investments coffers, but any fan that also followed TSM's lead and purchased the unregistered security FTT has witnessed their investment change from $34 per security to slightly over $1 each, as of the date of filing. *See* https://cointelegraph.com/news/ftx-crypto-exchange-seals-210m-naming-rights-deal-for-esports-behemoth-tsm/amp (Last accessed May 10, 2023).

### b) TSM Engaged in a Sustained and Aggressive Advertising Campaign.

575.    On June 3, 2021, for $210 million paid equally on an annual basis over the course of 10 years, TSM announced that it was changing its name to TSM FTX.[277] The deal was debuted with a fancy video describing how the relationship started—TSM's CEO, Andy Dinh, and FTX's chief executive, Bankman-Fried, have a shared passion for "League of Legends."[278] This was, at the time, one of the largest sports deals in existence, made with the most valuable esports company in the United States, in the middle of the COVID-19 Pandemic and on the heels of FTX's FTX Arena deal.[279] In short, the deal caused FTX Group's popularity to skyrocket, helping to catapult it to the forefront of the nascent crypto exchange industry.

576.    Esports exploded in popularity, with people stuck at home searching for online entertainment and ways to invest and make money, sometimes in unconventional (and risky) ways.[280] Interest in video games had increased significantly over the year leading up to the

---

[277] https://www.nytimes.com/2021/06/04/sports/esports-name-change-tsm-ftx.html (accessed May 11, 2023)

[278] https://www.washingtonpost.com/video-games/esports/2022/11/16/tsm-ftx-naming-deal-suspended/ (accessed May 11, 2023)

[279] *Id.*; *see also* https://www.forbes.com/sites/christinasettimi/2020/12/05/the-most-valuable-esports-companies-2020/ (accessed May 11, 2023).

[280] https://www.nytimes.com/2021/06/04/sports/esports-name-change-tsm-ftx.html (accessed May 11, 2023)

announcement—including in esports, where some professional players make millions of dollars and vie for championships in leagues devoted to games like Fortnite and League of Legends.[281] More than 57 million people in North America watched an e-sports event in 2020, according to Newzoo, a gaming analytics firm.[282]

577.  As part of its deal with FTX, TSM announced that "TSM FTX will distribute cryptocurrency to each of its players and employees" and would purchase "$1 million worth of FTT, FTX's native token" and distribute cryptocurrency to its players and employees.[283]  At that time, the price per FTT hovered as just under $35—by November 16, 2022, it dropped to under $2.[284]

578.  TSM's success in esports helped to increase FTX's credibility and legitimacy as a sponsor and partner. TSM has a large and passionate fan base, known as the "TSM Army," that is highly engaged and loyal to the brand. By aligning with TSM, FTX was able to tap into this fanbase and leverage their enthusiasm to promote FTX's brand and offerings. This helped FTX gain greater credibility and acceptance among esports fans and participants, who tend to be skeptical of traditional forms of advertising.

579.  As part of its partnership with FTX, TSM ran promotions like the first ever TSM FTX Aurory NFT release deal, where TSM announced on October 1, 2021, the creation of the

---

[281] *Id.*

[282] *Id.*

[283] https://www.prnewswire.com/news-releases/tsm-and-ftx-sign-210-million-naming-rights-partnership-largest-in-esports-history-301305740.html (last accessed May 11, 2023)

[284] https://www.washingtonpost.com/video-games/esports/2022/11/16/tsm-ftx-naming-deal-suspended/ (last accessed May 11, 2023)

organization's first-ever collection of NFTs, designed by Aurory, the blockchain-based game and NFT ecosystem.[285]

580.    The four individual NFTs were a collaboration with Aurory, a gaming project that uses NFTs powered by the cryptocurrency Solana and Serum.[286] The tokens, also known as 'Aurorians,' are each sporting TSM merch and apparel, including the iconic 2017 LCS-winning jersey and the brand-new 2021 version featuring the TSM FTX logo.[287] These exclusive avatars have multiple functions both in and out of the game, including acting as a player's visual identity, allowing owners early access to play future game modes before they are made public, exclusive access to special modes and rewards, and much more.[288]



581.    As part of its partnership with FTX, TSM team members actively promoted FTX to a broader audience, beyond just the esports community. TSM's roster of players and content creators have a substantial following on social media platforms such as Twitter, Instagram, and YouTube, which they utilized to amply promote FTX and its products.

---

[285] https://web.archive.org/web/20220331024235/https://tsm.gg/news/first-ever-tsm-ftx-aurory-nft-release-deal-crypto-esports (accessed May 11, 2023).

[286] *Id.*

[287] *Id.*

[288] *Id.*

582.     TSM team members created content promoting FTX's offerings and educational campaigns around cryptocurrency and blockchain technology. This content included sponsored social media posts, videos, and live streams, which showcased FTX's logo and brand messaging to their followers, helping FTX gain greater visibility and reach among a broader audience, beyond just esports fans.

583.     TSM team members also actively engaged with FTX's audience through social media and other platforms, providing feedback and responding to queries related to cryptocurrency and blockchain technology. This helped FTX to build trust and credibility with its audience, as TSM team members are widely respected and trusted by their fans.

584.     TSM team members also used their personal brands to create buzz and excitement around FTX's sponsorship deals with other organizations and sports teams, further extending FTX's reach and impact. This approach helped to position FTX as a leader in the sports and entertainment industry, and helped to solidify the brand's place in the minds of consumers and investors.

585.     As TSM expected and understood when entering its partnership with FTX, the team's promotions would be widely viewed nationwide, including in Florida, where TSM knew or should have known FTX had its domestic home office (including because the arena of NBA's Miami Heat had been renamed "FTX Arena").

586.     On information and belief, TSM also knew and intended that the team's promotions would be disseminated to consumers in Florida and elsewhere not just on FTX's official social media outlets, but that said promotions would also be linked, published, or reposted across innumerable media outlets on the internet and elsewhere.

c) **TSM Had Financial Incentives to Induce Class Members to Invest in FTX and to Trust the Platform**

587.    TSM, as one of the most identifiable esports brands, used its broad global reach to advertise and promote a risky financial device to its users—millions of unsophisticated and vulnerable potential investors, particularly in the 18-to-34 year age range.[289] It was paid by FTX not only to promote the brand through placing FTX logos on jerseys, team branding, and social media, but changed its actual name—"the equivalent of the New England Patriots, who play in Gillette Stadium, rebranding as the New England Patriots Gillettes."[290]

588.    TSM had a financial incentive to induce Plaintiffs to invest with FTX. At the time FTX and TSM announced their deal, TSM's CEO Andy Dinh said that the deal "gives us [TSM] a strong foothold to really grow our brand globally." TSM reportedly used its sponsorship funds to attract start players with higher salaries and open offices in China, Europe and South America.[291] Thus, as TSM became more successful, so did FTX. And, of course, FTX's success helped TSM grow its brand.

589.    Further, TSM had every incentive to be an effective promoter of FTX in order to continue the symbiotic relationship and have more opportunities to work with FTX in the future.

### d)  The Promotions were Deceptive and Unlawful

590.    Given TSM's resources and access to advisors and counsel, TSM knew or should have known that FTX's platform was built atop a fragile house of cards.

---

[289] https://dataprot.net/statistics/gamer-demographics/#:~:text=The%20demographic%20of%20gamers%20that,18%20and%2034%20years%20old.&text=The%20average%20esports%20fan%20is,older%20member%20of%20Generation%20Z (last accessed May 11, 2023)

[290] https://www.nytimes.com/2021/06/04/sports/esports-name-change-tsm-ftx.html (last accessed May 11, 2023)

[291] https://www.sportsbusinessjournal.com/Daily/Issues/2021/06/07/Technology/tsm-esports-signs-210-million-sponsorship-with-ftx-crypto-exchange (last accessed May 11, 2023)

591.    Because TSM knew or should have known about FTX's financial fragility, its promotion of the FTX platform as an "easy and safe way to get into crypto" was deceptive and unlawful.

**e)  TSM Knew or Should Have Known It was Soliciting or Assisting FTX to Solicit Investments in Unregistered Securities and/or that It was Aiding and Abetting FTX Group's Fraud and/or Conversion.**

592.    Given TSM's prominence and vast resources to obtain outside advisors (which it had), TSM knew or should have known of potential concerns about FTX selling unregistered crypto securities and/or that it was aiding and abetting FTX Group's fraud or conversion, especially to the tens of millions of its users. This is especially true in light of the rampant mismanagement and myriad red flags that the FTX Group's regular business practices set off, as more fully described hereinabove.

593.    TSM agreed to be a part of the advertisement in June 2021, yet failed to properly investigate the brand and product it promoted to tens of millions of people.[292]

594.    To ensure regulatory compliance, at a minimum, TSM must have conducted due diligence to understand how FTX was pooling investments in a common enterprise and using those assets to generate the promised returns. Otherwise, it would be impossible to ensure FTX was not selling or offering to sell securities. TSM disregarded their obligations to themselves and their fans.

**f)  The Promotions were Directed at Plaintiffs in Florida, and Customers Nationwide.**

---

[292]  https://www.nytimes.com/2022/02/13/business/media/larry-david-super-bowl-ftx-crypto.html (accessed May 7, 2023)

595.    First, as explained above, the deal with TSM was created, consummated, implemented, and/or overseen by FTX VP of Business Development Avi Dabir, from his base of operations in Miami, Florida. *See* Exs. A, B.

596.    TSM is one of the largest, if not the largest, esports organizations with a global reach.

597.    TSM's place at the top of the sports industry provided it and FTX a perfect opportunity to expose millions of individuals to FTX's deceitful scheme.[293]

598.    Due to its international reach, millions of Florida residents who are users of TSM were exposed to the FTX promotion.

599.    by the advertisements that Wasserman played a role in, including ones mentioned throughout that featured Tom Brady and Stephen Curry.

### xiii.    **Digital Creators Defendants**

600.    Digital Creators Defendants partnered with FTX to promote its platform to investors.

601.    Crypto firms like FTX turned to celebrity and social media endorsers to position themselves as the "safe" option among cryptocurrency exchanges. The FTX advertising campaign is particularly pernicious because it implicitly acknowledges cryptocurrency's problems while holding FTX out as the "safe" place to invest in cryptocurrency, which were proven untrue, as FTX turned out to be a house of cards that misappropriated customer assets.

602.    FTX's paid endorser program was patently designed to use the positive reputation associated with specific YouTube and other social network influencers to convince consumers that

---

[293]    https://www.sportsmediawatch.com/super-bowl-ratings-historical-viewership-chart-cbs-nbc-fox-abc/ (accessed May 8, 2023).

FTX was a safe place to buy and sell cryptocurrency. As Mr. Sibenik explains, FTX's brand ambassadors had a critical role in portraying FTX as being "safe" and "compliant." Ex. A ¶ 44–49.

603.    FTX not only deployed well-known celebrities such as Stephen Curry and Kevin O'Leary as brand ambassadors, *id.*, but it also engaged in aggressive global digital marketing, particularly through influencer "crypto marketing" on YouTube and other social networks.

604.    "Crypto marketing" is the execution of marketing and advertising efforts with the goal of raising awareness, acquiring users, or driving growth for a cryptocurrency or blockchain-related product. Popular crypto marketing strategies include influencer marketing, community growth, social media management, and grassroots digital marketing, and tout great results and valuable case studies, specifically with promoting cryptocurrency.[294]

605.    Social media "influencers" are individuals who have amassed a large following on platforms such as Instagram, YouTube, and TikTok, and use their influence to promote products, services, and ideas. Social media influencers are characterized by a huge number of highly loyal and engaged social media followers, who share a rapport with their fans and are perceived as everyday people who are experts in their niches.

606.    Unlike mainstream celebrities, influencers do not shroud their lives in an air of mystery and present themselves as real-life consumers who share authentic and valuable information with their followers.[295] They create content that resonates with their followers, often by sharing their personal experiences, lifestyle choices, and preferences. By doing so, they

---

[294] Ultimate Cryptocurrency Marketing Strategy Guide for 2022 | Coinbound (last accessed March 15, 2023).

[295] The Rise of Influencer Marketing: All You Need to Know | Shane Barker (last accessed March 15, 2023).

establish a sense of authenticity and relatability with their audience, which can be incredibly compelling.

607.    Influencer marketing thus involves collaborating with a social media influencer to increase brand visibility and strengthen a brand's reputation. When executed correctly, it helps win more customers from target audiences and earn more revenue. What differentiates influencer marketing from other types of celebrity marketing is that it is perceived as more authentic and trustworthy, because, owing to an influencer's rapport with their fans, their recommendations are not dismissed as fake and sponsored endorsements. *Id.* Instead, their followers often swear by the recommendations made by their favorite influencer. *Id.* Because their audience trusts them, the audience are more likely to follow their recommendations, which can lead to increased sales for the products they promote.

608.    While influencer digital marketing is more expensive than other types of paid media, studies done on the subject show that the majority of marketing teams have found the return of investment ("ROI") on influencer marketing to be higher than that of other forms of online growth tactics.[296] According to a recent study, influencer marketing delivers an ROI of $6.5 for every $1 spent. This is far higher than the ROI of other forms of digital marketing.[297] Digital content creators also can more precisely target their marketing efforts by using highly sophisticated analytic tools such as Google Analytics to measure their site's traffic, where its coming from, and who is visiting their sites.[298]

---

[296] Everything You Need to Know About Crypto Influencer Marketing (coinbound.io) (last accessed March 15, 2023).

[297] *Id*; The Rise of Influencer Marketing: All You Need to Know | Shane Barker (last accessed March 15, 2023).

[298] Ultimate Cryptocurrency Marketing Strategy Guide for 2022 | Coinbound (last accessed March 15, 2023).

609.    As such, digital marketing through social media is extremely effective at influencing consumer decisions. According to a survey from the National Association of Professional Financial Advisors (NAPFA), more than one-quarter of Gen Zers learn about finance from social media. The survey results also show that more than one-third (39%) of Americans under 65 receive their financial advice from social media.[299] When it comes to where they are getting financial advice, YouTube is one the most popular platforms for Gen Z (63%) and Millennials (71%) to discuss financial planning and investment in cryptocurrency.[300] More than 60% of the respondents who received their information online say they have acted on that advice.[301]

610.    YouTube, which allows for long-form video content which can exist in perpetuity, is one of the most effective social media channels for targeting cryptocurrency audiences and has found its way into the daily routine of millions of cryptocurrency enthusiasts worldwide.[302]

611.    Many of the most famous finance and money social media influencers collaborated with FTX, working under the umbrella of Defendant, Creators Agency, a talent management for digital creators. Creators Agency touts its expansive reach, claiming to have reached "millions," including 2.94B+ YouTube views and 27M+ YouTube Subscribers. Though not all Creative Agency clients endorsed FTX, many of the talent it manages—including certain of the Defendants—

---

[299] https://www.napfa.org/social-media-survey (last accessed March 15, 2023).; http://s3.napfa.cql-aws.com.s3.amazonaws.com/files/Consumer/NAPFA%20Fall%202021%20Full%20Report.pdf

[300]        https://www.thebalancemoney.com/8-personal-finance-influencers-you-should-know-6544780 (last accessed March 15, 2023); https://www.napfa.org/social-media-survey (last accessed March 15, 2023).

[301] *Id.*

[302] Everything You Need to Know About Crypto Influencer Marketing (coinbound.io) (last accessed March 15, 2023).

netted hundreds of thousands, if not millions of dollars from signed contracts procured and/or facilitated by the agency.

612.   For their part, the Defendants, Graham Stephan, and Tom Nash, who prior to FTX's collapse promoted FTX as a safe investment to their legions of followers, have now scrubbed their YouTube channels of all video clips endorsing FTX and praising Sam Bankman-Fried. In their place, the YouTube Influencers have substituted *mea culpas* and apology videos acknowledging their significant role in promoting FTX and causing billions of dollars of investor losses.[303]

613.   Similarly, Defendant Graham Stephan had built a loyal fanbase on YouTube by sharing financial advice. After aggressively promoting FTX, he posted a video titled "My response to FTX" to his YouTube channel (with over 4.22 million subscribers) on November 28, 2022 in which he states: "FTX US has been a recurring sponsor here on the channel since spring of this year. . . I can't even begin to share how devastated and sorry I am. . . I made the mistake of working with a platform who operates within an industry that does not already have proper consumer protections in place. . . [O]n the most basic level, I made the mistake of assuming that Sam Bankman-Fried's image had anything to do with his credibility. . . I fell into his trap of effective altruism."[304]

---

[303]   https://markets.businessinsider.com/news/stocks/personal-finance-influencers-sponsored-by-ftx-say-sorry-to-fans-2022-11 (last accessed March 15, 2023); https://www.marketwatch.com/story/my-bad-the-youtube-financial-influencer-network-paid-to-pump-ftx-11669066275 (last accessed March 15, 2023); https://www.yahoo.com/now/social-media-influencers-fed-bankman-150327348.html?guccounter=1&guce_referrer=aHR0cHM6Ly93d3cuZ29vZ2xlLmNvbS8&guce_referrer_sig=AQAAAFrNFPdXzgk_rsYJLmGipe0izPCSeyp9dftZXdh3UKccPhgIT5hGLIBUr4EomSeyDd8qFMKHI2U6E-SjCbOo3Z95op0l0nkbEJQI8zAioDqWsrUB20ugMHs7VihR81OwoUOwlbB9vCuN1IhofQkBjiMacwXy6b3F7ASrvOGN3pgb (last accessed March 15, 2023);

[304]   https://www.youtube.com/watch?v=jcy9PyMvNqc (accessed March 15, 2023)

614.    Defendant Tom Nash, who apparently posted a video following FTX's bankruptcy in which he claimed to only have worked with FTX US, which he falsely represented in the video to be "100% operational, nothing is going on with FTX US," has since taken down that video, along with several other videos in which he gave full-throated endorsements of FTX.

615.    Endorsements by the Defendants are even more dangerous, because of their broad public reach. People are more likely to watch YouTube than network television. Micro-celebrities and social media influencers thus can have outsized influence on their audience, particularly those that espouse financial advice. FTX capitalized on this dynamic, and sponsored several of those content creators, particularly on YouTube.

616.    Other organizations and individuals, with presumably more to gain, did find red flags at FTX and turned down FTX and/or Sam Bankman-Fried's money. The nonprofits Our World Data and MITRE declined offered gifts of $7.5 million and $485,000, respectively, from the FTX Future Fund due to undisclosed red flags.[305] In addition, CME Group CEO Terry Duffy allegedly told SBF that he was "an absolute fraud" upon having an initial conversation with him.[306]

617.    Based upon the information that has been released by FTX's new CEO, John Ray as part of the company's bankruptcy filings, anyone who bothered to spend 20 minutes reviewing FTX's operations pre-collapse would have identified significant red flags. In his first day pleading in support of FTX's chapter 11 petitions, Mr. Ray noted:

> Never in my career have I seen such a complete failure of corporate controls and such a complete absence of trustworthy financial information

---

[305] https://www.moneyweb.co.za/moneyweb-crypto/sam-bankman-frieds-red-flags-were-seen-in-all-corners-of-his-empire/ (accessed March 15, 2023).

[306]      https://www.cnbc.com/2022/11/23/absolute-fraud-cmes-terry-duffy-says-he-saw-trouble-before-ftx-collapse-.html (accessed March 15, 2023).

as occurred here. From compromised systems integrity and faulty regulatory oversight abroad, to the concentration of control in the hands of a very small group of inexperienced, unsophisticated and potentially compromised individuals, this situation is unprecedented.[307]

618.    Mr. Ray's pleading contains a number of troubling findings, among them: 1) FTX did not have centralized control of its cash, 2) FTX had no dedicated human resources department, which has hindered Mr. Ray's team from preparing a complete list of who worked for the FTX Entities, 3) A lack of disbursement controls that resulted in employees submitting payment requests via on-line chat and these requests being approved by managers responding with personalized emojis, 4) Corporate funds were used to purchase homes and personal items for employees, and 5) A lack of books and records and the absence of lasting records of decision-making.

619.    It is hard to imagine that anyone who has done business with FTX, including paid endorsers, would not have personally witnessed one or more of the deficiencies identified by Mr. Ray. All FTX endorsers have extensive business dealings beyond FTX and surely would be able to identify business practices that are unusually problematic.

620.    Instead, tens of thousands of customers relied on the testimonials of paid endorsers such as the Defendants who knew why they were being compensated. Indeed, the whole point behind paying influencers to endorse a product is to increase sales. Thus, influencers have a moral and legal obligation to know that what they are promoting is unlikely to cause physical or financial damage to customers.

---

[307]https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=&ved=2ahUKEwiokr3C-L7AhWsnGoFHRdBC2kQFnoECBAQAQ&url=https%3A%2F%2Fpacer-documents.s3.amazonaws.com%2F33%2F188450%2F042020648197.pdf&usg=AOvVaw38wQJwnmP5fFftiyYkNjSG (accessed March 15, 2023).

621.     In addition to the conduct of SBF, as described in this Complaint, some of the biggest names in sports and entertainment have either invested in FTX and/or been paid to serve as brand ambassadors for the company. Several of them hyped FTX to their social media fans, driving retail consumer adoption of the FTX Platform.

622.     In April 2021, FTX became the first company in the crypto industry to name an arena. This helped lend credibility and recognition to the FTX brand and gave the massive fanbase of basketball exposure to the FTX Platform.

623.     FTX's explanation for using social media influencers -- micro-celebrities in their own right -- and stars like Tom Brady and supermodel Gisele Bunchden was no secret: "We're the newcomers to the scene," said then-FTX.US President Brett Harrison, referring to the crypto services landscape in the U.S. "The company needs to familiarize consumers with its technology, customer service and offerings, while competing with incumbents like Coinbase Global Inc. or Kraken," Mr. Harrison said. "We know that we had to embark on some kind of mass branding, advertising, sponsorship type work in order to be able to do that," he said.[308]

624.     In other words, the FTX Entities needed influencers like Defendants to continue funneling investors into the FTX Ponzi scheme, and to promote and substantially assist in the sale of the YBAs, which are unregistered securities.

**N.     Material Ties to Florida**

625.     The connections to Florida in this consolidated case are numerous.

626.     According to the Declaration of Dan Friedberg, attached as Exhibit B, FTX maintained an office in Miami, Florida, since early 2021, long before FTX eventually announced

---

[308]          https://www.wsj.com/articles/tom-brady-and-gisele-bundchen-to-star-in-20-million-campaign-for-crypto-exchange-11631116800?mod=article_inline (accessed March 15, 2023).

the move of its Domestic headquarters to Brickell in late 2022. *Id.*, ¶ 20. Since early 2021, FTX's Miami office was run by Mr. Avinash Dabir, FTX's Vice President of Business Development. *Id.* Friedberg met with Mr. Dabir often and is very familiar with Mr. Dabir and his activities. *Id.*

627.   Mr. Dabir, from the Miami office, focused on formulating and executing FTX's important celebrity partnerships. *Id.*, ¶ 21. Mr. Dabir was the senior FTX executive responsible for creating, consummating, and implementing deals between FTX and other Partners, such as Major League Baseball, the MLB Umpire's Association, TSM, the Mercedes Formula 1 team, Tom Brady, Stephen Curry, the Golden State Warriors, Naomi Osaka, Larry David, and Shohei Ohtani. *Id.*, ¶ 23.

628.   It was Mr. Dabir's idea to expend significant resources on FTX's sports and celebrity-based partnerships. *Id.*, ¶ 22. Mr. Dabir specifically started by suggesting FTX form a Partnership with the Miami Heat and the naming rights to the Miami Arena. *Id.* FTX announced the Partnership in March 2021, and included FTX purchasing the naming rights of the Miami Heat stadium for 19 years in a deal worth approximately $135 million. *Id.*

629.   Mr. Dabir deserves much of the credit for the collaboration with Mr. David that resulted in the award-winning Super Bowl FTX commercial that aired with the Super Bowl in 2022. *Id.*, ¶ 24. Crucially, all FTX employees or agents who were involved in the Larry David Super Bowl commercial ultimately reported to Avi Dabir, who had final approval of all aspects of the commercial from his base of operations in Miami.

630.   Released on March 31, 2022, Mr. Dabir appeared on the popular cryptocurrency podcast The Joe Pomp Show, where he was interviewed by Mr. Pompliano for over half an hour on specifically the efforts he undertook and oversaw from his FTX base of operations in Miami, Florida, to create, consummate, and implement, among other things, the FTX arena deal and the

Larry David Superbowl commercial. A transcript of the podcast is attached as Exhibit C.

631.    Mr. Dabir begins by introducing himself as "Vice President of Business Development at FTX, so I handle a lot of our sports partnerships as well as doing some of the interesting things in real estate as well." Ex. B at 2. He then explains that "the end goal" is really how does FTX "acquire more users." *Id.,* at 9. After first acknowledging and agreeing with Mr. Pompliano that FTX was at that point the "leaders" in the sports partnership category and that "it started with Miami Heat Arena," Mr. Dabir explained that he led the effort to obtain the FTX Arena deal because he "had previously worked at the NBA" and that he identified Miami because it had "a great market," a "multicultural, great team," and the "Crypto Buzz was like growing here in Miami." *Id.*, at 2–3.

632.    Mr. Dabir also explained that it was crucial "to get approval from a local government, plus the Heat and the NBA who had their own diligence teams looking into" the FTX Arena deal because it "really sort of validated not only just FTX but the cryptocurrency industry in general." *Id.*, at 4.

633.    Mr. Dabir went into detail about his dealings with Tom Brady and Giselle Bündchen and how the individual FTX Brand Ambassador partnership deals worked. *Id.*, 9. Importantly, not only was Mr. Dabir directly involved in negotiating and consummating the individual FTX Brand Ambassador partnership deals from his base in Miami, he also explains that Defendants Brady and Bündchen were instrumental in bringing other FTX Brand Ambassadors into the fold, such as Defendant Curry. *Id.*

634.    In addition to coordinating the promoter campaigns from Miami, Florida, FTX

announced it was moving its official U.S. headquarters from Chicago to Miami in 2022.[309] This move happened before FTX declared bankruptcy.

635.    The promotional campaigns came from the brain trust of FTX in Miami, but many of the promotions also took place in Florida as a cryptocurrency hub.

636.    FTX served as a title sponsor for the David Ortiz Golf Classic in Florida on or about November 2021 and pledged to make contributions to Ortiz's charity, David Ortiz's Childrens Fund. Ortiz promoted the sponsorship and golf tournament on Twitter and other online pages, including on his personal website: https://davidortiz.com/red-sox-legend-david-ortiz-signs-multiyear-ftx-deal/ (last visited May 8, 2023).

637.    In March of 2022, Defendants O'Leary, Haslem, and Ortiz served as judges for the FTX Charity Hackathon at the crypto summit hosted by FTX in Miami.[310]



638.    On March 11, 2022, Mr. O'Leary appeared on NBC 6 South Florida to explain his

[309]    https://www.coindesk.com/business/2022/09/27/crypto-exchange-ftx-is-moving-its-us-headquarters-from-chicago-to-miami/ (accessed July 18, 2023).

[310] https://ftxcharityhackathon.com/ (accessed May 11, 2023).

involvement with FTX and his role in judging the competition.[311] During that appearance, Mr. O'Leary praised the company saying "I love the company. I like its mission. I like what they're doing in terms of innovating and financial services around crypto." *Id.*

639.    In March of 2022, Ms. Osaka began her FTX promotion campaign at the 2022 Miami Open tennis tournament. Osaka wore gear with the FTX logo throughout the tournament, including during the presentation and acceptance of her runner-up throw following her loss in the finals.

640.    On April 18, 2022, Mr. Haslem, a star for and captain of the Miami Heat, shared a video on Twitter advertising a promotional effort with FTX that promised a giveaway to Miami area small businesses.



641.    As part of Mr. O'Neal's promotional campaign for FTX, he appears on Episode

---

[311]   https://www.nbcmiami.com/entertainment/6-in-the-mix/shark-tank-star-kevin-oleary-taking-part-in-charity-hackathon/2711510/ (accessed May 9, 2023).

114 of "The FTX Podcast," hosted by Tristan Yver, which was released on June 8, 2022.[312] O'Neal recorded the episode with Yver from Miami, Florida, telling Yver on the podcast, "Loosen up brother, loosen up . . . You're in Miami, relax."

642.    Mr. O'Neal also promoted FTX in Miami with his Astrals project, announcing in the official Discord on August 29, 2022, using an emoji of Shaq's face, that they funded an Astrals marketing event at Solana Miami, and "[w]e will be in attendance with the likes of Solana Pay, FTX, Ledger, MagicEden, Phantom and more!".[313]



643.    Between July 5 and 6 of 2022, Mr. Ohtani played in two games against Miami in Miami, and between August 22 and 25 of 2022, Mr. Ohtani played four games against Tampa Bay in Tampa.

644.    In November of 2022, Mr. Curry played in two NBA games against Florida teams in Florida. On November 1, 2022, Mr. Curry played against Miami in Miami and on November 3, 2022, against Orlando in Orlando.

645.    Furthermore, Defendants Brady, Bündchen, O'Leary, Haslem, Lawrence, and Ortiz resided in Florida while working for FTX. Other Defendants including Defendants Curry, Ohtani,

---

[312] https://open.spotify.com/episode/2lq0BHiZb88xNRdZ9wUes4 ("Welcome to episode 114 of the FTX Podcast with special guest Shaquille O'Neal and your host Tristan Yver! Shaquille is a family man, basketball superstar, businessman, TV personality, music artist, crypto project entrepreneur, role model & humanitarian.").

[313] https://discord.com/channels/928105025392214027/928185412961308792/10138788637570 58120 (accessed May 15, 2023).

and Osaka competed in professional sports while in Florida working for FTX.

## CLASS ACTION ALLEGATIONS

646.    As detailed below in the individual counts, Plaintiffs bring this lawsuit on behalf of themselves and all others similarly situated, pursuant to Rule 23(a), (b)(2), (b)(3), and/or (c)(4) of the Federal Rules of Civil Procedure.

**A.    Class Definitions**

647.    Plaintiffs Vozza, Rupprecht, Winter, and Kavuri seek to represent the following International Classes and Plaintiffs Orr, Cabo, Henderson, Livieratos, Chernyavsky, Podalsky, Shetty, Ezeokoli, Norris, Garrison, Huang, and Papadakis seek to represent the following Nationwide Classes

>  **(1) International Class:** All persons or entities residing outside the United States who, within the applicable limitations period, purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform, purchased or enrolled in a YBA, or purchased FTT.
>
>  **(2) Nationwide Class:** All persons or entities in the United States who, within the applicable limitations period, purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform, purchased or enrolled in a YBA, or purchased FTT.

Excluded from the Classes are MDL Defendants and their officers, directors, affiliates, legal representatives, and employees, the FTX Group and their officers, directors, affiliates, legal representatives, and employees, any governmental entities, any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

648.    Plaintiffs reserve the right to modify or amend the definition of the proposed Classes, or to include additional classes or subclasses, before or after the Court determines whether such certification is appropriate as discovery progresses. Plaintiffs seek certification of the Classes in part because all offers of the FTX Platform, YBAs and/or FTT to Plaintiffs and the Class Members (in which MDL Defendants each materially assisted, substantially participated, and/or personally participated) were made by FTX from their principal place of business in Miami, Florida, and thus every single offer to sell cryptocurrency, the FTX Platform, YBAs and/or FTT stems from a transactional occurrence that emanated from the State of Florida.

**B.    Numerosity**

649.    The Classes are comprised of thousands, if not millions, of consumers globally, to whom FTX offered and/or sold cryptocurrency, the FTX Platform, YBAs and/or FTT. Moreover, thousands, if not millions, of consumers worldwide have executed trades on the FTX Platform within the applicable limitations period. Membership in the Classes are thus so numerous that joinder of all members is impracticable. The precise number of class members is currently unknown to Plaintiffs but is easily identifiable through other means, such as through FTX's corporate records or self-identification.

## C.    Commonality/Predominance

650.    This action involves common questions of law and fact, which predominate over any questions affecting individual class members. These common legal and factual questions include, but are not limited to, the following:

(a)  whether Bankman-Fried, the FTX Insiders, and/or FTX committed fraud;

(b)  whether the MDL Defendants agreed with Bankman-Fried, the FTX Insiders, and/or FTX to commit fraud;

(c)  whether the MDL Defendants had the requisite degree of knowledge of Bankman-Fried's, the FTX Insiders', and/or FTX's fraud;

(d)  whether the FTX Platform, YBAs and/or FTT were unregistered securities under federal, Florida, California, or other law;

(e)  whether MDL Defendants' participation and/or actions in FTX's offerings and sales of the FTX Platform, YBAs and/or FTT violate the provisions of applicable securities law;

(f)  the type and measure of damages suffered by Plaintiffs and the Class;

(g)  whether MDL Defendants' practices violate the FDUTPA, the California Unfair Competition Law, or other state consumer-protection statutes;

(h)  whether Plaintiffs and Class members have sustained monetary loss and the proper measure of that loss;

(i)  whether Plaintiffs and Class members are entitled to injunctive relief;

(j)  whether Plaintiffs and Class members are entitled to declaratory relief; and

(k)  whether Plaintiffs and Class members are entitled to consequential damages, punitive damages, statutory damages, disgorgement, and/or other legal or equitable appropriate remedies as a result of MDL Defendants' conduct.

### D.        Typicality

651.    Plaintiffs' claims are typical of the claims of the members of the Classes because all members were injured through the uniform misconduct described above, namely that Plaintiffs and all class members were offered and/or sold FTX's FTX Platform, YBAs and/or FTT because of MDL Defendants' actions and/or participation in the offering and sale of these unregistered securities, that MDL Defendants aided and abetted the fraud and conversion perpetrated by Bankman-Fried, the FTX Insiders, and/or FTX, or that MDL Defendants agreed with Bankman-Fried, the FTX Insiders, and/or FTX to commit fraud. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all such members. Further, there are no defenses available to any MDL Defendant that are unique to Plaintiffs.

### E.        Adequacy of Representation

652.    Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs have retained counsel experienced in complex consumer and securities class action litigation, and Plaintiffs intend to prosecute this action vigorously. Plaintiffs have no adverse or antagonistic interests to those of the Classes. Plaintiffs anticipate no difficulty in the management of this litigation as a class action. To prosecute this case, Plaintiffs have chosen the undersigned law firms, which have the financial and legal resources to meet the substantial costs and legal issues associated with this type of consumer class litigation.

### F.        Requirements of Fed. R. Civ. P. 23(b)(3)

653.    The questions of law or fact common to Plaintiffs' and each Class member's claims predominate over any questions of law or fact affecting only individual members of the Classes. All claims by Plaintiffs and the unnamed members of the Classes are based on the common course of conduct by the MDL Defendants (1) in marketing, offering, and/or selling the FTX Platform, YBAs and/or FTT, which are unregistered securities, (2) in receiving secret undisclosed

compensation for their promotion of the FTX Platform, (3) in aiding and abetting fraud and/or
conversion by Bankman-Fried, FTX and the FTX Insiders, and/or (4) in agreeing with Bankman-
Fried, the FTX Insiders, and/or FTX to commit fraud.

654.     The common course of conduct by the MDL Defendants includes, but is not limited
to their promotion, offer, sale, solicitation, material assistance, substantial participation in, and/or
personal participation in the offer or sale of the FTX Platform, YBAs, and/or FTT, and/or their
aiding and abetting of the FTX Group's Ponzi scheme, fraud, and/or conversion of billions of
dollars of customer assets.

655.     Common issues predominate when, as here, liability can be determined on a class-
wide basis, even when there will be some individualized damages determinations.

146.     As a result, when determining whether common questions predominate, courts
focus on the liability issue, and if the liability issue is common to the Classes as is in the case at
bar, common questions will be held to predominate over individual questions.

**G.     Superiority**

147.     A class action is superior to individual actions for the proposed Classes, in part
because of the non-exhaustive factors listed below:

(a) Joinder of all Class members would create extreme hardship and inconvenience for
the affected customers as they reside nationwide and throughout the state;

(b) Individual claims by Class members are impracticable because the costs to pursue
individual claims exceed the value of what any one Class member has at stake. As
a result, individual Class members have no interest in prosecuting and controlling
separate actions;

(c) There are no known individual Class members who are interested in individually
controlling the prosecution of separate actions;

(d) The interests of justice will be well served by resolving the common disputes of potential Class members in one forum;

(e) Individual suits would not be cost effective or economically maintainable as individual actions; and

(f) The action is manageable as a class action.

## H.    Requirements of Fed. R. Civ. P. 23(b)(2)

148.    The MDL Defendants have acted and refused to act on grounds generally applicable to the Classes by engaging in a common course of conduct of aiding and abetting the offering and/or selling of the FTX Platform, YBAs and/or FTT, which are unregistered securities, and violating state consumer-protection laws, thereby making appropriate final injunctive relief or declaratory relief with respect to the classes as a whole.

149.    The MDL Defendants have acted and refused to act on grounds generally applicable to the Classes by engaging in a common course of conduct of uniformly identical and uniform misrepresentations and omissions in receiving secret undisclosed compensation for their promotion of the FTX Platform, thereby making appropriate final injunctive relief or declaratory relief with respect to the classes as a whole.

## I.    Requirements of Fed. R. Civ. P. 23(c)(4)

150.    As it is clear that one of the predominant issues regarding the MDL Defendants' liability is whether the FTX Platform, YBAs and/or FTT that FTX offered and/or sold are unregistered securities, utilizing Rule 23(c)(4) to certify the Class for a class wide adjudication on this issue would materially advance the disposition of the litigation as a whole.

151.    As it is clear that another predominant issue regarding the MDL Defendants' liability is whether they have violated the consumer protection and securities laws of Florida in making identical and uniform misrepresentations and omissions regarding the functionality of the

FTX Platform, and/or in receiving secret undisclosed compensation for their promotion of the FTX Platform, utilizing Rule 23(c)(4) to certify the Classes for a class wide adjudication on this issue would materially advance the disposition of the litigation as a whole.

**J.     Nature of Notice to the Proposed Class.**

152.   The names and addresses of all Class Members are contained in the business records maintained by FTX and are readily available to FTX. The Class Members are readily and objectively identifiable. Plaintiffs contemplate that notice will be provided to Class Members by e-mail, mail, and published notice.

<u>**COUNT ONE**</u>

**Violations of the Florida Statute Section 517.07,
The Florida Securities and Investor Protection Act
<u>(Plaintiffs Individually and on behalf of the Classes)</u>**

153.   Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–662 above, as if fully set forth herein.

154.   Section 517.07(1), Fla. Stat., provides that it is unlawful and a violation for any person to sell or offer to sell a security within the State of Florida unless the security is exempt under Fla. Stat. § 517.051, is sold in a transaction exempt under Fla. Stat. § 517.061, is a federally covered security, or is registered pursuant to Ch. 517, Fla. Stat.

155.   Section 517.211 extends liability to any "director, officer, partner, or agent of or for the seller, if the director, officer, partner, or agent has personally participated or aided in making the sale, is jointly and severally liable to the purchaser in an action for rescission, if the purchaser still owns the security, or for damages, if the purchaser has sold the security."

156.   The FTX Platform, YBAs and/or FTT sold and offered for sale to Plaintiffs are each a security pursuant to Fla. Stat. § 517.021(22)(a).

157.    The FTX Platform, YBAs and/or FTT sold and offered for sale to Plaintiffs were not:

a.    exempt from registration under Fla. Stat. § 517.051;

b.    a federal covered security;

c.    registered with the Office of Financial Regulations (OFR); or

d.    sold in a transaction exempt under Fla. Stat. § 517.061.

158.    The FTX Entities sold and offered to sell the unregistered YBAs to Plaintiffs.

159.    The Defendants are agents of the FTX Entities pursuant to Fla. Stat. § 517.211.

160.    The FTX Entities, with the Defendants' material assistance, offered and sold the unregistered YBAs to Plaintiffs and the members of the Class. As a result of this assistance, the Defendants violated Fla. Stat. § 517.07 et seq. and Plaintiffs and members of the Class sustained damages as herein described.

## COUNT TWO

### For Violations of the Florida Deceptive and Unfair Trade Practices Act, § 501.201, Florida Statutes, *et seq.* (Plaintiffs Individually and on behalf of the Classes)

161.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–662 above, as if fully set forth herein.

162.    This cause of action is brought pursuant to the Florida Deceptive and Unfair Trade Practices Act, section 501.201, Fla. Stat., *et seq.* ("FDUTPA"). The stated purpose of the FDUTPA is to "protect the consuming public . . . from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." § 501.202(2), Fla. Stat.

163.    Plaintiffs and Class members are consumers as defined by section 501.203, Fla. Stat. Defendants are engaged in trade or commerce within the meaning of the FDUTPA.

164.    Florida Statute section 501.204(1) declares unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."

165.    The Defendants' unfair and deceptive practices as described herein were consumer-oriented and are objectively materially likely to mislead–and have materially misled–consumers acting reasonably in the circumstances.

166.    The Defendants have violated the FDUTPA by engaging in the unfair and deceptive practices as described herein, which offend public policies and are immoral, unethical, unscrupulous and injurious to consumers.

167.    Plaintiffs and consumers in the Classes have been aggrieved by the Defendants' unfair and deceptive practices and acts of false advertising by paying into the Ponzi scheme that was the FTX Platform and in the amount of their lost investments.

168.    The harm suffered by Plaintiffs and consumers in the Classes was directly and proximately caused by the deceptive and unfair practices of the Defendants, as more fully described herein.

169.    Pursuant to sections 501.211(2) and 501.2105, Fla. Stat., Plaintiffs and consumers in the Classes make claims for actual damages, attorneys' fees, and costs.

170.    The Defendants still utilize many of the deceptive acts and practices described above. Plaintiffs and the other members of the Classes have suffered and will continue to suffer irreparable harm if the Defendants continue to engage in such deceptive, unfair, and unreasonable practices. Section 501.211(1) entitles Plaintiffs and the Classes to obtain both declaratory or injunctive relief to put an end to the Defendants' unfair and deceptive scheme.

### **COUNT THREE**

**Civil Conspiracy**
**(Plaintiffs Individually and on behalf of the Classes)**

171.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–662 above, as if fully set forth herein.

172.    The FTX Entities and the Defendants made numerous misrepresentations and omissions to Plaintiffs and Class Members about the FTX Platform to promote false confidence in and to drive consumers to invest in what was ultimately a Ponzi scheme. This mislead customers and customers with the false impression that any cryptocurrency assets held on the FTX Platform were safe and were not being invested in unregistered securities.

173.    The FTX Entities entered into one or more agreements with each of the Defendants with the purpose of making these misrepresentations and/or omissions to induce Plaintiffs and consumers to invest in the YBAs and/or use the FTX Platform.

174.    The Defendants engaged in unlawful acts with the FTX Entities, namely, the misrepresentations and omissions made to Plaintiffs and the Classes and the sale of unregistered securities.

175.    The Defendants' conspiracy substantially assisted or encouraged the wrongdoing conducted by the FTX Entities; further, the Defendants had knowledge of such fraud and/or wrongdoing, because of their experience and relationship with the FTX Entities, as described above and as such, knew that the representations made to Plaintiffs were deceitful and fraudulent.

176.    The Defendants' conspiracy with the FTX Entities to commit fraud caused damages to Plaintiffs and the Classes in the amount of their lost investments.

**COUNT FOUR**

**Aiding and Abetting Fraud**

**(Plaintiffs Individually and on behalf of the Global Classes, or in the alternative, Plaintiffs Garrison, Lindeen, Podalsky, Chernyavsky, and Piano Individually and on behalf of the Nationwide Classes, or in the alternative, Plaintiffs Podalsky, Lindeen, and Chernyavsky on behalf of the Florida Subclasses)**

177.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–662 as if fully set forth herein.

178.     The FTX Insiders and FTX Group made numerous misrepresentations and omissions to Plaintiffs and Class Members about the FTX Platform to induce confidence and to drive consumers to invest in cryptocurrency through the FTX Platform, and to deposit funds into what was ultimately a fraudulent house of cards. Defendants actively joined these efforts by misleading customers and prospective customers with the false impression that cryptocurrency assets held on the FTX Platform were safe and with material omissions regarding how investor funds would be used. Bankman-Fried, the FTX Insiders, and the FTX Group knew these statements to be false.

179.     Plaintiffs and the Class members reasonably relied upon Bankman-Fried, the FTX Insiders, and the FTX Group's material misrepresentations and omissions to invest in cryptocurrency through the FTX Platform to their detriment.

180.     Defendants participated in, substantially assisted, and facilitated Bankman-Fried's, the FTX Insiders', and the FTX Group's fraudulent misconduct, with knowledge that such fraud was cheating investors. For example, while either knowing or consciously disregarding Bankman-Fried's and the FTX Group's and Insiders' misconduct and red flags, Defendants still promoted and/or solicited the FTX Platform, YBAs, and/or FTT, to Plaintiffs and the Classes as described hereinabove, making the various misrepresentations and omissions as set forth hereinabove.

181.     Defendants substantially benefitted from Bankman-Fried's, the FTX Insiders', and FTX Group's scheme, as described herein.

182.     Plaintiffs and the Class members suffered damages as a direct and proximate result of each of Defendants aiding and abetting the fraudulent scheme, in an amount to be determined at trial.

## COUNT FIVE

### Aiding and Abetting Conversion

**(Plaintiffs Individually and on behalf of the Global Classes, or in the alternative, Plaintiffs Garrison, Lindeen, Podalsky, Chernyavsky, and Piano Individually and on behalf of the Nationwide Classes, or in the alternative, Plaintiffs Podalsky, Lindeen, and Chernyavsky on behalf of the Florida Subclasses)**

183.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–662 as if fully set forth herein.

184.     The funds deposited by Class Members into the FTX Platform were personal property of the Plaintiffs and Class Members. Bankman-Fried and FTX Group wrongfully interfered with Plaintiffs' possessory interest in a specific, identifiable sum of money. The amount that each plaintiff had in their FTX account that they could not withdraw.

185.     Plaintiffs' funds were their own. They each had a possessory interest in the sum of money they invested in the FTX Platform.

186.     Defendants, based on their knowledge of the FTX Group's operations obtained through due diligence, ongoing monitoring, and partnership, acquired knowledge of FTX's conversion of Plaintiffs' funds.

187.     Notwithstanding this knowledge, and by reason of the conduct described herein, Defendants substantially aided, abetted, and/or participated with FTX in the conversion of funds that belonged to Plaintiffs.

188.     Defendants' actions, in combination with the actions of FTX, are a proximate cause of actual damages to Plaintiffs and class members. Defendants are jointly and severally liable for participating in the conversion of Plaintiffs' funds.

<u>**COUNT SIX**</u>

**Declaratory Judgment**
**(Federal Declaratory Judgment Act)**
<u>**(Plaintiffs Individually and on behalf of the Classes)**</u>

189.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–662 as if fully set forth herein.

190.     There is a bona fide, actual, present and practical need for the declaratory relief requested herein; the declaratory relief prayed for herein deal with a present, ascertained or ascertainable state of facts and a present controversy as to a state of facts; contractual and statutory duties and rights that are dependent upon the facts and the law applicable to the facts; the parties have an actual, present, adverse and antagonistic interest in the subject matter; and the antagonistic and adverse interests are all before the Court by proper process for final resolution.

191.     Plaintiffs and the members of the Classes have an obvious and significant interest in this lawsuit.

192.     Plaintiffs and members of the Classes purchased YBAs, based in part on justifiable reliance on the Defendants' misrepresentations and omissions regarding the FTX Platform as further described hereinabove.

193.     If the true facts had been known, including but not limited to that the YBAs are unregistered securities, the FTX Platform does not work as represented, and Defendants were paid exorbitant sums of money to peddle FTX to the nation, Plaintiffs and the Classes would not have purchased YBAs in the first place.

194.     Thus, there is a justiciable controversy over whether the YBAs were sold illegally, and whether the Defendants illegally solicited their purchases from Plaintiff and the Class.

195.     Plaintiff and the Class seek an order declaring that the YBAs were securities that the FTX Platform did not work as represented, and Defendants were paid exorbitant sums of money to peddle FTX to the nation.

<div style="border:1px solid black; text-align:center;">

**THE CALIFORNIA CLAIMS, AS AN ALTERNATIVE TO THE NATIONWIDE CLAIMS**
**COUNT SEVEN**

</div>

**For Violations of the Unfair Competition Law Business & Professions Code § 17200,**
***et seq.***
**(In the alternative, Plaintiff Piano Individually and on behalf of the California Subclasses)**

196.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1-662 above, as if fully set forth herein.

197.     California's Unfair Competition Law, Business & Professions Code §§ 17200 *et seq.* (the "UCL") prohibits acts of unlawful and unfair competition, including any "unlawful, unfair or fraudulent business act or practice," any "unfair, deceptive, untrue or misleading advertising" and any act prohibited by Business & Profession Code §17500.

198.     Defendants have committed business acts and practices that violate the UCL by aiding and abetting the breaches of fiduciary duties, fraudulent and unfair conduct, and unlawful conduct. Defendants' conduct as alleged above constitutes unlawful competition in that, for the reasons set forth above, said acts and practices violate the Corporations Code.

199.     The conduct of Defendants as alleged above also constitutes unfair competition in that, for the reasons set forth above, the acts and practices offend public policy and are unethical, oppressive, and unscrupulous, and are substantially injurious to the public.

200.     Defendants' conduct was a proximate cause of the injuries to Plaintiffs and the California Class alleged herein, and it caused and continues to cause substantial injury to Plaintiffs and the members of the California Class. By reason of the foregoing, Defendants should be required to pay restitution to Plaintiffs and members of the California Class.

<u>**COUNT EIGHT**</u>
**Violations of the California Securities Law**
**Cal. Corp. Code §§ 25110 *et seq.***
**(In the alternative, Plaintiff Piano individually and on behalf of the California Subclasses)**

201.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–662 above, as if fully set forth herein.

202.     Section 25110 of the California Securities Law ("CSL") prohibits the offer or sale by any person in California of securities that are not qualified through registration. CSL section 25503 affords a statutory cause of action to victimized investors for violations of section 25110. Additionally, section 25504.1 extends liability under Section 25503 to any person who materially assists in a violation of section 25110 and makes them jointly and severally liable with any other person liable under section 25503.

203.     Defendants materially assisted and/or personally participated with the FTX Group in the offering and selling of the FTX Platform, the YBAs and/or FTT Tokens Securities in California without being properly registered or qualified for offer or sale either with any federal or California regulator in violation of section 25503. [52]

---

[52]     Plaintiffs contend that secondary liability for materially assisting a strict liability violation of the qualification requirements of a violation pursuant to section 255030 does not require proof that MDL Defendants intended "to deceive or defraud." However, Plaintiffs in the alternative contend that even if so, MDL Defendants' knowledge of and participation in FTX Group's non-compliance with the CSL establishes their intent to deceive investors regarding the FTX Platform, the YBAs and/or FTT Tokens.

204.    Moreover, CSL section 25210(b) provides: "No person shall, … on behalf of an issuer, effect any transaction in, or induce or attempt to induce the purchase or sale of, any security in this state unless [a licensed] broker-dealer and agent have complied with any rules as the commissioner may adopt for the qualification and employment of those agents."

205.    Defendants breached section 25210(b) by encouraging the FTX Group to offer and sell the FTX Platform, YBAs and/or FTT Tokens Securities despite the fact that such securities were not qualified under the CSL.

206.    Additionally, CSL section 25501.5 affords a statutory cause of action to victimized investors for violations of Section 25210(b).

207.    Defendants are accordingly joint and severally liable to Plaintiffs for recessionary damages under section § 25504.1.

208.    Plaintiffs hereby conditionally tender their FTX Group Securities in accordance with section § 25503.

### COUNT NINE
**Aiding and Abetting Fraud**

**(In the alternative, Plaintiff Piano Individually and on behalf of the California Subclasses)**

209.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–662 as if fully set forth herein.

210.    The FTX Insiders and FTX Group made numerous misrepresentations and omissions to Plaintiffs and Class Members about the FTX Platform to induce confidence and to drive consumers to invest in cryptocurrency through the FTX Platform, and to deposit funds into what was ultimately a fraudulent house of cards. Defendants misled customers and prospective customers with the false impression that cryptocurrency assets held on the FTX Platform were safe

and with material omissions regarding how investor funds would be used. Bankman-Fried, the FTX Insiders, and the FTX Group knew these statements to be false.

211.    Plaintiffs and the Class members reasonably relied upon Bankman-Fried, the FTX Insiders, and the FTX Group's material misrepresentations and omissions to invest in cryptocurrency through the FTX Platform to their detriment.

212.    Defendants participated in, substantially assisted, and facilitated Bankman-Fried's, the FTX Insiders', and the FTX Group's fraudulent misconduct, with knowledge that such fraud was cheating investors. For example, while either knowing or consciously disregarding Bankman-Fried's and the FTX Group's and Insiders' misconduct and red flags, Defendants still promoted and/or solicited the FTX Platform, YBAs, and/or FTT, to Plaintiffs and the Classes as described hereinabove, making the various misrepresentations and omissions as set forth hereinabove.

213.    Defendants substantially benefitted from Bankman-Fried's, the FTX Insiders', and FTX Group's scheme.

214.    Plaintiffs and the Class members suffered damages as a direct and proximate result of each of Defendants' aiding and abetting the fraudulent scheme, in an amount to be determined at trial.

## COUNT TEN
### Aiding and Abetting Conversion

**(In the alternative, Plaintiff Piano Individually and on behalf of the California Subclasses)**

215.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–662 as if fully set forth herein.

216.    The funds deposited by Class Members into the FTX Platform were personal property of the Plaintiffs and Class Members. Bankman-Fried and FTX Group wrongfully

interfered with Plaintiffs' possessory interest in a specific, identifiable sum of money. The amount that each plaintiff had in their FTX account that they could not withdraw.

217.    Plaintiffs' funds were their own. They each had a possessory interest in the sum of money they invested in the FTX Platform.

218.    Defendants, based on their knowledge of the FTX Group's operations obtained through due diligence, ongoing monitoring, and partnership, acquired knowledge of FTX's conversion of Plaintiffs' funds.

219.    Notwithstanding this knowledge, and by reason of the conduct described herein, Defendants substantially aided, abetted, and/or participated with FTX in the conversion of funds that belonged to Plaintiffs.

220.    Defendants' actions, in combination with the actions of FTX, are a proximate cause of actual damages to Plaintiffs and class members. Defendants are jointly and severally liable for participating in the conversion of Plaintiffs' funds.

## COUNT ELEVEN
### Civil Conspiracy

**(In the alternative, Plaintiff Piano Individually and on behalf of the California Subclasses)**

221.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–662 above, as if fully set forth herein.

222.    The FTX Group and Defendants made numerous misrepresentations and omissions to Plaintiffs and Class Members about the FTX Platform in order to induce confidence and to drive consumers to invest in what was ultimately a Ponzi scheme, misleading customers and prospective customers with the false impression that any cryptocurrency assets held on the FTX Platform were

safe and with material misrepresentations and/or omissions regarding how customer funds would be used. Defendants knew these statements to be false.

223.    The FTX Group entered into one or more agreements with Defendants with the purpose of making these misrepresentations and/or omissions to induce Plaintiff and consumers to invest in the YBAs, FTT and/or use the FTX Platform. Defendants each stood to benefit financially from assisting with this fraud as each would receive the financial and other benefits described hereinabove.

224.    Defendants engaged in unlawful acts with the FTX Group, namely, the misrepresentations and omissions made to Plaintiffs and the Classes and the sale of unregistered securities as further described hereinabove.

225.    Defendants' conspiracy substantially assisted or encouraged the wrongdoing conducted by the FTX Group; further, Defendants had knowledge of such fraud and/or wrongdoing, because of their experience and relationship with the FTX Group, as described above and as such, knew that the representations made to Plaintiffs were deceitful and fraudulent. Accordingly, each of the Defendants knew that the material misrepresentations and omissions relating to the safety of the FTX Platform would result in injury to FTX's customers, including Plaintiffs and the Class members.

226.    Defendants' conspiracy with the FTX Group to commit fraud caused damages to Plaintiffs and the Classes in the amount of their lost investments.

---

**IN THE ALTERNATIVE, THE OKLAHOMA CLAIMS**

---

**COUNT TWELVE**

**Violations of the Oklahoma Consumer Protection Act**
**Okla. Stat. Ann. tit. 15, § 751 *et seq*.**
**(In the alternative, Plaintiff Garrison individually and on behalf of the Oklahoma Subclasses)**

227.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–662 above, as if fully set forth herein.

228.    This cause of action is brought pursuant to the Oklahoma Consumer Protection Act ("OCPA")section 751 *et seq*.

229.    The Oklahoma Consumer Protection Act provides that an "unfair trade practice" is "any practice which offends established public policy or if the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." § 752(14). It declares unlawful any unfair or deceptive trade practice "as defined in section 752." § 753(20).

230.    Plaintiffs and Class members are persons as defined by section 752(1). Defendants are engaged in a "consumer transaction" as defined by section 752(2), and as described more fully herein.

231.    Defendants have violated the OCPA by engaging in the unfair and deceptive practices as described herein, which offend public policies and are immoral, unethical, unscrupulous and injurious to consumers.

232.    Plaintiffs and consumers in the Class have been aggrieved by Defendants' unfair and deceptive practices in the amount of their lost investments.

233.    The harm suffered by Plaintiffs and consumers in the Class was directly and proximately caused by the deceptive and unfair practices of Defendants', as more fully described herein.

234.    Pursuant to section 761.1 of the OCPA, Plaintiffs and consumers in the Class make claims for actual damages, attorneys' fees and costs.

## COUNT THIRTEEN

### Violations of the Oklahoma Uniform Securities Act of 1980

**Okla. Stat. Tit. 71, §§ 1-101 *et seq*.**
**(In the alternative, Plaintiff Garrison individually and on behalf of the Oklahoma Subclasses)**

235.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–662 above, as if fully set forth herein.

236.    71 Section 1-301 of the Oklahoma Securities Act ("OSA") makes it unlawful to sell a security in Oklahoma unless the security is registered, exempted, or the security is a covered security as defined in the act.

237.    The FTX Platform, YBAs and/or FTT Tokens are each a security pursuant to 71 Okla. Stat. § 1-102(32), as described more fully herein.

238.    As a result of these actions, Defendants violated section 1-102(32) and are liable to Plaintiffs pursuant to section 1-509 for both primary and secondary violations of Oklahoma securities law, as described more fully hereinabove.

**COUNT FOURTEEN**
**Aiding and Abetting Fraud**

**(In the alternative, Plaintiff Garrison individually and on behalf of the Oklahoma Subclasses)**

239.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–662 as if fully set forth herein.

240.    The FTX Insiders and FTX Group made numerous misrepresentations and omissions to Plaintiffs and Class Members about the FTX Platform to induce confidence and to drive consumers to invest in cryptocurrency through the FTX Platform, and to deposit funds into what was ultimately a fraudulent house of cards. Defendants misled customers and prospective customers with the false impression that cryptocurrency assets held on the FTX Platform were safe and with material omissions regarding how investor funds would be used. Bankman-Fried, the FTX Insiders, and the FTX Group knew these statements to be false.

241.    Plaintiffs and the Class members reasonably relied upon Bankman-Fried, the FTX Insiders, and the FTX Group's material misrepresentations and omissions to invest in cryptocurrency through the FTX Platform to their detriment.

242.    Defendants participated in, substantially assisted, and facilitated Bankman-Fried's, the FTX Insiders', and the FTX Group's fraudulent misconduct, with knowledge that such fraud was cheating investors. For example, while either knowing or consciously disregarding Bankman-Fried's and the FTX Group's and Insiders' misconduct and red flags, Defendants still promoted and/or solicited the FTX Platform, YBAs, and/or FTT, to Plaintiffs and the Classes as described hereinabove, making the various misrepresentations and omissions as set forth hereinabove.

243.    Defendants substantially benefitted from Bankman-Fried's, the FTX Insiders', and FTX Group's scheme, as described herein.

244.    Plaintiffs and the Class members suffered damages as a direct and proximate result of each of Defendants aiding and abetting the fraudulent scheme, in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs pray for a judgment on behalf of themselves and the Classes:

a.    Certifying the Class as requested herein;

b.    Awarding actual, direct and compensatory damages;

c.    Awarding restitution and disgorgement of revenues;

d.    Awarding declaratory relief as permitted by law or equity, including declaring the Defendants' practices as set forth herein to be unlawful;

e.      Awarding injunctive relief as permitted by law or equity, including enjoining the Defendants from continuing those unlawful practices as set forth herein, and directing the Defendants to identify, with Court supervision, victims of their conduct and pay them all money they are required to pay;

f.      Awarding statutory, punitive, and multiple damages, as appropriate;

g.      Awarding attorneys' fees and costs; and

h.      Providing such further relief as may be just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a jury trial as to all claims so triable.

| **Plaintiffs' Co-Lead Counsel** | |
|---|---|
| By: */s/ Adam Moskowitz*<br>Adam M. Moskowitz<br>Florida Bar No. 984280<br>Joseph M. Kaye<br>Florida Bar No. 117520<br>**THE MOSKOWITZ LAW FIRM, PLLC**<br>Continental Plaza<br>3250 Mary Street, Suite 202<br>Coconut Grove, FL 33133<br>Office: (305) 740-1423<br>adam@moskowitz-law.com<br>joseph@moskowitz-law.com<br>service@moskowitz-law.com | By: */s/ David Boies*<br>David Boies<br>Alex Boies<br>Brooke Alexander<br>**BOIES SCHILLER FLEXNER LLP**<br>333 Main Street<br>Armonk, NY 10504<br>Office: (914) 749-8200<br>dboies@bsfllp.com<br>aboies@bsfllp.com<br>balexander@bsfllp.com |
| **FTX Promoter Committee Members** | |
| Barbara C. Lewis<br>Florida Bar No. 118114<br>**The Moskowitz Law Firm, PLLC**<br>Continental Plaza<br>3250 Mary Street, Suite 202<br>Coconut Grove, FL 33133<br>Office: (305) 740-1423<br>barbara@moskowitz-law.com<br>service@moskowitz-law.com | K. Rachel Lanier<br>Alex J. Brown<br>Davis LaBarre<br>**The LANIER LAW FIRM, P.C.**<br>10940 W. Sam Houston Pkwy N<br>Houston, TX 77064<br>Telephone: (713) 659-5200<br>Facsimile: (713) 659-2204<br>Rachel.Lanier@lanierlawfirm.com<br>Alex.Brown@lanierlawfirm.com<br>Davis.LaBarre@lanierlawfirm.com |

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on August 7, 2023, a true and correct copy of the foregoing

was sent via electronic mail to counsel for Defendants.

/s/ *Adam M. Moskowitz*
Adam M. Moskowitz

23-md-03076