**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

23-md-03076-KMM

**IN RE:**

**FTX CRYPTOCURRENCY EXCHANGE
COLLAPSE LITIGATION**

THIS DOCUMENT RELATES TO:

Auditor Defendants

<u>**ADMINISTRATIVE CLASS ACTION COMPLAINT
AND DEMAND FOR JURY TRIAL:
Auditor Defendants**</u>

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ..................................................................................................3

PARTIES ..............................................................................................................7

JURISDICTION AND VENUE .........................................................................12

FACTUAL ALLEGATIONS ..............................................................................13

    A.    The Rise of FTX ....................................................................................13

    B.    FTX's Key Players ................................................................................18

        I.       Defendant Sam Bankman-Fried.............................................18

        II.     Defendant Caroline Ellison...................................................19

        III.    Defendant Gary Wang ...........................................................20

        IV.   Defendant Nishad Singh .........................................................22

    C.    The Basics of a Cryptocurrency Exchange ...........................................24

    D.    The Mechanics of the Fraudulent Scheme............................................27

    E.    The Fraud's Collapse ............................................................................35

    F.    FTX Files for Bankruptcy .....................................................................45

    G.    The Crypto Sector is a Hotbed for Illicit Activity and Fraudulent Conduct..........52

    H.    The SEC's Approach to Cryptocurrency. .............................................57

        1.     Overview...................................................................................57

        2.     SEC v. KIK .............................................................................61

        3.     SEC v. Telegram .....................................................................62

        4.     SEC v. BlockFi .......................................................................63

        5.     SEC Wells Notice to Coinbase ...............................................64

        6.     SEC v. Binance .......................................................................66

        7.     SEC v. Coinbase .....................................................................67

        8.     SEC v. Terraform Labs Pte. Ltd. ..........................................67

    I.    FTX's offer and sale of YBAs, which are unregistered securities. .......71

    J.    FTX's offer and sale of FTT Tokens, which are unregistered securities..............81

    K.    Using the FTX Platform itself necessarily required transacting in unregistered securities...................................................................82

    L.    FTX Aggressively and Deceptively Marketed its Platform....................86

    M.    The MDL Defendants' Roles in the Fraud .........................................94

    N.    Material Ties to Florida .......................................................................106

O.    The Wrongdoing of the Auditor Defendants ..........................................111

      1.    The Auditor Defendants Wrongfully Issued Clean Audit
            Reports for FTX ..........................................................................111

      2.    The Auditor Defendants Knew Their Audit Reports Were
            Being Used to Curry Favor and the Trust of Current and
            Prospective Customers and Investors in FTX ............................118

      3.    Given the Complete Lack of Internal Financial and
            Accounting Controls, Corporate Governance Controls, and
            Inappropriate Financial Accounting and Reporting
            Systems, The Auditor Defendants Were Prohibited From
            Issuing Clean Audit Reports on FTX Trading's and FTX
            US's Financial Statements ..........................................................121

      4.    The Numerous Red Flags the Auditor Defendants Knew of
            or Ignored ...................................................................................129

      5.    Additional GAAS Violations by the Auditor Defendants ..........130

      6.    The Auditor Defendants Violated GAAS by Acting as
            "Cheerleaders" for FTX and Bankman-Fried .............................133

      7.    Armanino's wrongful public support of FTX and
            Bankman-Fried ...........................................................................134

      8.    Prager Metis Wrongfully Touted and Promoted FTX on its
            Own Website ...............................................................................136

CLASS ACTION ALLEGATIONS ............................................................137

      A.    Class Definitions........................................................................138

      B.    Numerosity..................................................................................139

      C.    Commonality/Predominance........................................................139

      D.    Typicality ....................................................................................140

      E.    Adequacy of Representation ........................................................141

      F.    Requirements of Fed. R. Civ. P. 23(b)(3) ...................................141

      G.    Superiority...................................................................................142

      H.    Requirements of Fed. R. Civ. P. 23(b)(2) ...................................142

      I.    Requirements of Fed. R. Civ. P. 23(c)(4) ...................................143

      J.    Nature of Notice to the Proposed Class. ......................................143

CLAIMS FOR RELIEF ...............................................................................144

      COUNT I ...............................................................................................144

      COUNT II ..............................................................................................145

      COUNT III..............................................................................................147

COUNT IV ....................................................................................................................... 148

COUNT V ......................................................................................................................... 150

COUNT VI ........................................................................................................................ 152

COUNT VII ....................................................................................................................... 155

COUNT VIII ...................................................................................................................... 158

COUNT IX ........................................................................................................................ 160

COUNT X .......................................................................................................................... 161

COUNT XI ......................................................................................................................... 164

COUNT XII ........................................................................................................................ 166

COUNT XIII ...................................................................................................................... 167

COUNT XIV ...................................................................................................................... 170

COUNT XV ........................................................................................................................ 171

COUNT XVI ...................................................................................................................... 173

COUNT XVII ..................................................................................................................... 174

COUNT XVIII .................................................................................................................... 175

COUNT XIX ...................................................................................................................... 176

COUNT XX ........................................................................................................................ 178

PRAYER FOR RELIEF .....................................................................................................179

DEMAND FOR JURY TRIAL ..........................................................................................180

In accordance with this Court's Order (Dkt. 61 at 1), Plaintiffs hereby file this Administrative Class Action Complaint and Demand for Jury Trial pursuant to Rule 42 of the Federal Rules of Civil Procedure as the controlling document for pre-trial purposes, including Rule 12(b)(6), with regards to Defendants Prager Metis CPAs, LLC and Armanino LLP (the "Auditor Defendants"), as named herein, and as transferred to this Court from the following actions:

- *Pierce v. Samuel Bankman-Fried, et al.*, Case No. 3:22-cv-07444-JSC (N.D. Cal.)

- *Hawkins v. Samuel Bankman-Fried, et al.*, Case No. 3:22-cv-07620-JSC (N.D. Cal.)

- *Papadakis v. Samuel Bankman-Fried, et al.*, Case No. 3:23-cv-00024-JSC (N.D. Cal.)

- *O'Keefe v. Sequoia Capital Operations, LLC, et al.*, Case No. 1:23-cv-20700-JEM (S.D. Fla.)

- *Siskind v. Sequoia Capital Operations, LLC, et. al.,* Case No. 1:23-cv-22144-KMM (S.D. Fla.)

- *Cabo v. Sequoia Capital Operations, LLC, et. al.*, Case No. 3:23-cv-02222-JSC (N.D. Cal.)

Plaintiffs are not otherwise joining or merging these actions, which retain their individual nature for all other purposes, including venue, transferor forum, personal jurisdiction, and subject matter jurisdiction.[1]

Plaintiffs use the following defined terms throughout:

- "MDL Defendants" collectively refers to all Defendants named in the seven Administrative Class Action Complaints.

- "FTX Insider Defendants" or "FTX Insiders") refers to Samuel Bankman-Fried (or "SBF"), Caroline Ellison, Gary Wang, and Nishad Singh.

---

[1] *Gelboim v. Bank of Am. Corp.*, 574 U.S. 405, 413 n.3 (2015).

- "Auditor Defendants" refers to Prager Metis CPAs, LLC and Armanino LLP.

- "VC Defendants" collectively refers to Sequoia Capital Operations, LLC ("Sequoia"), Thoma Bravo, LP ("Thoma Bravo"), Paradigm Operations LP ("Paradigm"), SkyBridge Capital II, LLC ("SkyBridge"), Multicoin Capital Management LLC ("Multicoin Capital"), Tiger Global Management, LLC ("Tiger"), Ribbit Management Company, LLC ("Ribbit Capital"), Altimeter Capital Management, LP ("Altimeter"), and K5 Global Advisor, LLC ("K5 Global")

- "Multinational VC Defendants" refers to Defendants Sino Global Capital Limited ("Sino Global"), Softbank Group Corp. ("Softbank Group"), and Temasek Holdings (Private) Limited ("Temasek Holdings") together with its wholly owned subsidiary, Temasek International (USA) LLC ("Temasek USA" and, together with Temasek Holdings, "Temasek").

- "Law Firm Defendant" refers to Defendant Fenwick & West LLP.

- "Promoter and Digital Creator Defendants" or "Brand Ambassador Defendants" refers to Thomas Brady, Gisele Bündchen, Kevin O'Leary, Udonis Haslem, David Ortiz, Stephen Curry, Golden State Warriors, LLC, Shaquille O'Neal, William Treavor Lawrence, Shohei Ohtani, Noami Osaka, Solomid Corporation d/b/a Team Solomid, TSM and/or TSM FTX, Graham Stephan, Andrei Jikh, Jaspreet Singh, Brian Jung, Jeremy Lefebvre, Tom Nash, Erika Kullberg and Creators Agency, LLC.

- "Bank Defendants" refers to Defendants Deltec Bank & Trust Company Ltd. ("Deltec"), Farmington State Bank d/b/a Moonstone Bank ("Moonstone"), and Jean Chalopin.

- FTX Trading LTD and its subsidiaries d/b/a FTX ("FTX Trading") and West Realm Shires Inc. and its subsidiaries ("WRS"), are together referred to herein as "FTX." WRS includes, without limitation, its subsidiary West Realm Shires Services Inc. d/b/a FTX US ("FTX US"). FTX and Alameda Research, LLC and its subsidiaries ("Alameda") collectively make up the "FTX Group."

Plaintiffs, on behalf of themselves and all others similarly situated, sue MDL Defendants for their respective actions, as outlined herein,[2] which contributed to the collapse of the FTX Group, including but not limited to 1) aiding and abetting and/or actively participating in the FTX Group's massive, multibillion dollar global fraud, and 2) promoting, offering, or selling unregistered securities such as FTX's yield-bearing accounts ("YBA") and FTX's native cryptocurrency token ("FTT"), which caused Plaintiffs substantial harm. Plaintiffs, on behalf of themselves and all others similarly situated, allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and upon an investigation conducted by and through counsel.

## **INTRODUCTION**

1.     The FTX disaster is the largest financial fraud in US history. Defendant Sam Bankman-Fried ("SBF"), FTX Group's founder and former CEO, is on house arrest awaiting his criminal trial scheduled for October of this year. FTX Group's new CEO—who helped wind down Enron—concluded the fraud here was worse than Enron. Billions of dollars have been stolen from investors across the globe.

---

[2] At the request of the Court at the June 21, 2023 Status Conference, Plaintiffs have separated their complaint into seven versions, each of which contains a similar set of general allegations and the specific allegations as to a single group of MDL Defendants. Because certain claims, such as civil conspiracy, are pled across multiple groups of MDL Defendants, Plaintiffs hereby incorporate by reference the other versions of the complaint.

2.      SBF and his FTX Group caused billions of dollars in losses to Plaintiffs, through at least two separate schemes, both of which contributed to the downfall of the FTX Group.

3.      On one hand, SBF and the FTX Group stole customer deposits and used billions of dollars in customer funds to support the operations and investments of FTX and Alameda, to fund speculative venture investments, to make charitable and political contributions, and to personally enrich SBF himself, all the while publicly touting the safety of the investment and the segregation of customer funds. The FTX Platform maintained by the FTX Group was truly a house of cards, a Ponzi scheme where the FTX Group shuffled customer funds between their opaque affiliated entities, using new investor funds obtained through investments in the FTX Platform, the YBAs, FTT, and/or loans to pay interest and investment withdrawals to the old ones and to attempt to maintain the appearance of liquidity.

4.      On the other hand, the FTX Group offered and sold securities without proper registration, thereby depriving Plaintiffs of financial and risk-related disclosures that would have impacted their calculus as to whether to invest in the FTX Group. Rather than heed the myriad warnings from the SEC dating as far back as 2017, the FTX Group chose instead to skirt US regulation through deception.

5.      This conduct violates numerous laws, including laws related to the sale of unregistered securities, consumer protection, professional malpractice, the California Unfair Competition Law, the California False Advertising Law, the California Corporations Code, the Florida Deceptive and Unfair Trade Practices Act, the Florida Securities and Investor Protection Act, and various common law causes of action as detailed herein.

6.      As outlined herein, MDL Defendants directly perpetrated, conspired to perpetrate, and/or aided and abetted the FTX Group's multi-billion-dollar frauds for their own financial and professional gain.

7.      Because of these schemes, the FTX Group imploded, and over $30 billion in value evaporated almost overnight when the FTX Group filed its emergency Chapter 11 bankruptcy petition in Delaware.

8.      The first filed action transferred into this MDL was filed in Florida against the Brand Ambassador Defendants and resulted from the FTX Group's multi-billion-dollar frauds.[3] It was revealed how these famous celebrities and influencers were paid hundreds of millions of dollars through bribes to promote FTX under the now admittedly false narrative that investors and consumers could "trust" FTX because the Brand Ambassador Defendants "knew FTX" and "were all in" and therefore investors should invest their money too. These defendants never denied these allegations out right in the multiple motions to dismiss that they filed; instead, their primary defense was that they were not subject to personal jurisdiction in Florida.

9.      The *Garrison* plaintiffs sought to create this MDL, arguing that Defendants' jurisdictional arguments would fall by the wayside when all the actions were consolidated. Subsequently, the *Garrison* plaintiffs amended their complaint to add the Declaration of Dan Friedberg, making it clear that Miami was the epicenter of the FTX fraud.  With those developments, Defendants' must now face the merits.

10.      Since the initial complaints in this MDL were filed, it has become even more clear that Florida law applies to all Class Members on the securities-related claims. Judge Rakoff's recent Terraform opinion, discussed further below, demonstrates that the FTX Platform, YBAs,

---

[3]  *Garrison v. Bankman-Fried*, S.D. Fla. Case No. 1:22-cv-23753-KMM.

and FTT are all securities. This leaves the MDL Defendants with no defense regarding whether the violations occurred; they can only argue that they, personally, did not aid and abet any violations.

11.     The MDL Defendants will surely point to one another in an attempt to minimize their involvement and absolve their liability in this lawsuit. But to be sure, every single MDL Defendant is responsible for the damages that Class Members have sustained. As further detailed herein, every MDL Defendant was a necessary player in pushing the FTX fraud to the unprecedented extent it reached, and all made exorbitant amounts of money in the process of doing so. For instance, the Law Firm Defendants suggested and implemented the plans.[4] Just the same, the Bank Defendants helped move the money, the advertising agencies help create the false narratives, the Brand Ambassador Defendants gave them instant credibility and the Domestic and Multinational VC Defendants, unfortunately, stamped it with their approval.

12.     FTX will be involved in federal bankruptcy proceedings for many years and there is no guarantee that any of the victims will be able to see any recovery from those proceedings. This class action, pending in the Southern District of Florida as a Multi-District Litigation, may be the only avenue for any of the victims to recover any of their damages.

13.     Upon FTX's filing for bankruptcy on November 11, 2022, John Ray was appointed as CEO of FTX. Mr. Ray has a long career in corporate restructurings and had previously served as Chief Restructuring Officer or CEO in several of the largest corporate failures in history, including Enron.

---

[4] Indeed, in SBF's criminal trial, which is set for later this year, one of his main defenses is that he relied on the legal advice from MDL Defendants Fenwick & West LLP (in addition to Sullivan & Cromwell LLP.).

14.     Indeed, it did not take long for Mr. Ray to discover that FTX was a house of cards. On November 17, 2022, just six days after he became CEO of FTX, Ray informed the bankruptcy court that: "Never in my career have I seen such a complete failure of corporate controls and such a complete absence of trustworthy financial information as occurred here." He called the situation "unprecedented." He quickly found a complete lack of the most basic internal accounting and financial controls, systems and policies, the absence of which were massive and glaring.

15.     Despite these glaring problems easily discovered by Mr. Ray and the dozens of red flags that were obvious, the Auditor Defendants issued clean audit reports on the financial statements of FTX Trading and FTX US for the fiscal years 2020 and 2021, thereby falsely stating that all was in order with those entities' financial statements. In so doing, the Auditor Defendants blatantly violated the numerous professional standards to which they were subject.

16.     Further, when FTX and SBF publicly touted to his approximately one million social media followers that FTX's financial statements were accurate and had passed audits, the Auditor Defendants stood silent. Worse yet, and in further violation of the professional standards to which they were subject, the Auditor Defendants gave legitimacy to FTX and SBF by expressing public support of them on the internet and social media.

17.     The Auditor Defendants were a major part of the wrongdoing at FTX. With their access to FTX books and records they were in a unique position to put an end to this massive fraud. They did the opposite and blessed financial statements riddled with falsity helping to cause this unprecedented financial fiasco that has harmed so many.

## PARTIES

18.     **Plaintiff Brandon Orr** is a citizen and resident of the State of Arizona. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Orr purchased or held legal

title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the MDL Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Orr has sustained damages for which Defendants are liable.

19.     **Plaintiff Leandro Cabo** is a citizen and resident of the State of California. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Cabo purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the MDL Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Cabo has sustained damages for which Defendants are liable.

20.     **Plaintiff Ryan Henderson** is a citizen and resident of the State of California. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Henderson purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the MDL Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Henderson has sustained damages for which Defendants are liable.

21.     **Plaintiff Michael Livieratos** is a citizen and resident of the State of Connecticut. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Livieratos purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the MDL Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Livieratos has sustained damages for which Defendants are liable.

22.     **Plaintiff Alexander Chernyavsky** is a citizen and resident of the State of Florida. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Chernyavsky purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency

deposited or invested through an FTX Platform. As a result of the MDL Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Chernyavsky has sustained damages for which Defendants are liable.

23.     **Plaintiff Gregg Podalsky** is a citizen and resident of the State of Florida. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Podalsky purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the MDL Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Podalsky has sustained damages for which Defendants are liable.

24.     **Plaintiff Vijeth Shetty** is a citizen and resident of the State of Florida. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Shetty purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the MDL Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Shetty has sustained damages for which Defendants are liable.

25.     **Plaintiff Chukwudozie Ezeokoli** is a citizen and resident of the State of Illinois. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Ezeokoli purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the MDL Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Ezeokoli has sustained damages for which Defendants are liable.

26.     **Plaintiff Michael Norris** is a citizen and resident of the State of New Jersey. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Norris purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through

an FTX Platform. As a result of the MDL Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Norris has sustained damages for which Defendants are liable.

27.     **Plaintiff Edwin Garrison** is a citizen and resident of the State of Oklahoma. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Garrison purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the MDL Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Garrison has sustained damages for which Defendants are liable.

28.     **Plaintiff Shengyun Huang** is a citizen and resident of the State of Virginia. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Huang purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the MDL Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Huang has sustained damages for which Defendants are liable.

29.     **Plaintiff Julie Papadakis** is a citizen and resident of the State of Virginia. She is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Papadakis purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the MDL Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Papadakis has sustained damages for which Defendants are liable.

30.     **Plaintiff Vitor Vozza** is a citizen and resident of the Federal Republic of Brazil. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Vozza purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the MDL Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Vozza has sustained damages for which Defendants are liable.

31.     **Plaintiff Kyle Rupprecht** is a citizen and resident of the Dominion of Canada. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Rupprecht purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the MDL Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Rupprecht has sustained damages for which Defendants are liable.

32.     **Plaintiff Warren Winter** is a citizen and resident of the Federal Republic of Germany. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Winter purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the MDL Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Winter has sustained damages for which Defendants are liable.

33.     **Plaintiff Sunil Kavuri** is a citizen and resident of the United Kingdom of Great Britain and Northern Ireland. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Kavuri purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the MDL Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Kavuri has sustained damages for which Defendants are liable.

34.     **Defendant** Armanino LLP (or "Armanino") maintains a principal place of business at 12657 Alcosta Boulevard, Suite 500, San Ramon, California, and its website advertises Armanino as an accounting and consulting firm. Armanino's website indicates that it has provided

services in Florida (such as Volunteer Vacations)[1] and that it considers itself a "national" firm working in all fifty states.[2]  Upon information and belief, Armanino received fees and other remuneration for engagements or consulting work performed for FTX US.  Armanino is registered to do business in Florida, and in California as Armanino Holdings LP.

35.     **Defendant** Prager Metis CPAs, LLC (or "Prager Metis" or "Prager") maintains its principal place of business at 14 Penn Plaza, Suite 1800, New York, New York, 10122.  During the period it was auditing FTX Trading, upon information and belief and current information on Prager's website, Prager maintained offices in locations including Miami and/or Miami Lakes, Florida five offices in California and an office in the "Metaverse".  Prager's website advertises its services as an accounting and consulting firm. Upon information and belief, Prager received fees and other remuneration for engagements or consulting work performed for FTX Trading.   Prager Metis is registered to do business in California and Florida.[5]

## <u>JURISDICTION AND VENUE</u>

36.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A) because this is a class action for a sum exceeding $1,000,000,000.00 (one billion dollars), exclusive of interest and costs, and in which at least one class member is a citizen of a state different than the MDL Defendants.

---

[1] https://www.armanino.com/articles/reflecting-on-the-past-year-and-looking-forward-to-2023/(last visited July 15, 2023).

[2] https://www.armanino.com/articles/reexamining-definition-of-national-firm/#:~:text=And%20while%2C%20for%20years%2C%20Armanino%20has%20been%20serving,to%20effectively%20serve%20clients%20located%20anywhere%20from%20anywhere. (last visited July 15, 2023).

[5] Armanino and Prager may sometimes be referred to herein as the "Auditor Defendants".

37.     This Court has jurisdiction over every MDL Defendant in this multi-district litigation because every MDL Defendant was transferred to this forum from a transferor court which had personal jurisdiction over that MDL Defendant.

38.     Under 28 U.S.C. § 1407, venue is proper pursuant to the valid transfer and Fed. R. Civ. P. 42 pre-trial consolidation of these cases in this District by the Judicial Panel on Multidistrict Litigation.

39.     All conditions precedent to the institution and maintenance of this action have been performed, excused, waived, or have otherwise occurred.

## **FACTUAL ALLEGATIONS**

**A.     The Rise of FTX**

40.     In May 2019, SBF and his co-founders, Gary Wang and Nishad Singh, launched FTX, which, along with various subsidiaries, affiliates and related entities, operated the FTX Platform, which FTX purported to be a centralized digital asset exchange aimed at "the mass market and first-time users" of cryptocurrencies.

41.     FTX portrayed itself as a trustworthy and law-abiding member of the cryptocurrency industry, focused not only on profits, but also on investor and client protection. In public statements, including in testimony before the United States Senate, SBF stated that FTX had adopted "principles for ensuring investor protections on digital asset-platforms" including "avoiding or managing conflicts of interest," and that "[a]s a general principle[,] FTX segregate[s] customer assets from its own assets across our platforms." SBF spent millions on advertisements to portray FTX as the "safest and easiest way to buy and sell crypto" and "the most trusted way to buy and sell" digital assets.[6]

---

[6] *See United States of America v. Samuel Bankman-Fried a/k/a "SBF"*, S5 Cr. 673 (LAK), Dkt. 115, Superseding Indictment at ¶ 2 (March 28, 2023).

42.     All the while, however, FTX was doing none of these things. Instead of managing conflicts, the FTX Group actively embraced them, using FTX Trading, FTX US, and Alameda funds interchangeably to prop up the enterprise. Contrary to SBF's statements, FTX had no focus on investor protection and did not segregate customer funds. Rather, FTX used customer assets as an interest-free source of capital for Alameda's and SBF's private ventures.

43.     FTX was conceived in Northern California before transitioning its headquarters to Chicago, Illinois, and ultimately landing its domestic operations in Miami, Florida, where FTX US was headquartered and where, in early 2021, FTX purchased the naming rights to the Miami Heat's waterfront arena for more than $135 million, one of many sports venues on which FTX paid to have its name emblazoned and one of many extravagant purchases made with Class Members' funds.

44.     Beginning no later than early 2019, for FTX Trading, and no later than May 22, 2020, for FTX US, Class Members could open "yield-bearing accounts" ("YBAs") and/or other accounts, and deposit a wide assortment of cryptocurrencies, as well fiat currency, including U.S. dollars, into the accounts ("Class Member funds") through the FTX website or through FTX's mobile app.

45.     FTX lured Class Members to make such deposits with promises of guaranteed 8% annual percent yield on assets equivalent up to $10,000 USD and guaranteed 5% annual percent yield on amounts between $10,000 USD and $100,000 USD, each of which compounded hourly upon a Class Member's deposit of funds. At no time did FTX register the YBAs pursuant to any federal or state securities law, as discussed more fully below.

46.     By structuring the rates of returns in this way, FTX targeted nascent investors— i.e., those under the age of 30 and/or new to trading, both inexperienced and unsophisticated—by

tying higher rates of return to lower deposit amounts with "no fees and no minimum balances."

47.     Unlike a traditional brokerage, FTX took custody of Class Members' assets, which FTX promised to safeguard. In its terms of service, FTX represented to Class Members that "[a]ll cryptocurrency or dollars (or other supported currencies) that are held in your account are held by FTX.US for your benefit;" that "[t]itle to cryptocurrency represented in your FTX.US Account shall at all times remain with you and shall not transfer to FTX.US.;" and that "FTX.US does not represent or treat assets in your FTX.US Account as belonging to FTX.US." FTX Trading's terms of service similarly represented that no customer funds were "the property of, or shall be loaned to, FTX Trading," and that FTX Trading "does not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading."

48.     FTX assured Class Members that their assets were safe and could be withdrawn at any time, claiming on its website that "FTX does back the principal generating the yield with its own funds and equity." In addition, FTX posted a document on its website entitled "FTX's Key Principles for Ensuring Investor Protections on Digital-Asset Platforms," which stated that FTX "segregates customer assets from its own assets across our platforms." The document also represented that FTX maintained "liquid assets for customer withdrawals . . . [to] ensure a customer without losses can redeem its assets from the platform on demand." SBF further promised, on Twitter in August 2021, "[FTX] will always allow withdrawals (except in cases of suspected money laundering/theft/etc.)."

49.     FTX also promised to protect against the risk that any customer would engage in self-dealing on the exchange or otherwise try to manipulate the market. For example, FTX claimed to offer "wash trading protection," representing that it implemented "exchange controls that actively prevent a party trading with themselves." Additionally, FTX represented, in its terms of

service, that "FTX.US does not permit self trades in order to manipulate markets, reported statistics, or cause liquidations."

50.     FTX also purported to protect against the risk that any customer would become overleveraged or undercollateralized on the platform. For this, FTX touted its "risk-engine," an automated monitoring system that required FTX customers to pledge additional collateral to their accounts as trades went bad and, if the customer failed to do so, liquidated that customer's assets. FTX detailed its auto-liquidating "risk engine" and other purported risk management procedures in a public proposal to the U.S. Commodity Futures Trading Commission ("CFTC"), in which FTX sought permission to trade non-intermediated margin products (i.e., without any intermediary to hold customer funds):

> A participant's margin level is recalculated every 30 seconds as positions are marked to market, and if the collateral on deposit falls below maintenance margin level, FTX's automated system will begin to liquidate the portfolio. The automated system will liquidate 10 percent of a portfolio at a time by placing offsetting orders on the central limit order book. Once the liquidation process results in collateral on deposit that exceeds the margin requirement, the liquidation will stop. Because the liquidation is done automatically and positions are marked to market every 30 seconds, these liquidations can occur at any time, on a "24-7" basis.

51.     FTX claimed that this and other risk management procedures distinguished it from other cryptocurrency exchanges and ensured that Class Member funds were protected from losses by other users. For example, on May 11, 2022, SBF tweeted that "the margin mode is safe and conservative: real time risk engines mean you neither have to preemptively liquidate days early, nor risk positions going underwater for days." The next day, SBF testified before the U.S. House of Representatives Committee on Agriculture that:

> In our risk model the collateral is held directly at the clearinghouses, the collateral for all the positions. There is CFTC oversight of that collateral, and it is guaranteed to be there to not be used for anything else, to be **segregated**, and that is a difference with traditional models. It provides an extra guarantee of the assets backing these positions. (emphasis added).

52.     At that hearing, in response to Chairwoman Jahana Hayes' concern that FTX's risk monitoring system "could create an opening for fraud and abuse, particularly towards new customers that are entering the digital asset market for the first time," SBF assured that in FTX's model, "there is a lot of capital which is held directly with CFTC oversight [and] **segregated** accounts for margin for the customers' positions, which also provides a capital backstop . . . ." (emphasis added).

53.     More generally, in television commercials, in print advertising, through interviews and spokespeople, on Twitter, TikTok, Instagram, and Facebook, and in other publications, FTX repeatedly peddled itself as "the safest and easiest way to buy and sell crypto," and SBF repeatedly promised that "our users' funds and safety come first." In highlighting FTX's purported safety, SBF and other FTX executives falsely represented that FTX was insured by the Federal Deposit Insurance Corporation ("FDIC")—including in a tweet by FTX US President Brett Harrison that "direct deposits from employers to FTX US are stored in individually FDIC-insured bank accounts in the users' names," and "stocks are held in FDIC-insured . . . accounts"—until the FDIC ordered that FTX cease and desist in a letter dated August 18, 2022.

54.     SBF's carefully curated public persona complemented FTX's veneer of safety and was critical to FTX's meteoric rise. SBF came to be "the best-known proponent of the 'effective altruism' social movement which believes in prioritizing donations to projects that will have the largest impact on the most people." In touting his commitment to the movement, SBF explained on YouTube and to journalists that "I wanted to get rich, not because I like money but because I wanted to give that money to charity," and that "I pretty quickly run out of really effective ways to make yourself happier by spending money . . . . I don't want a yacht."

55.     But in truth, SBF did want a yacht, and he wanted Formula One teams, BMWs,

beachfront condos, and cocaine-fueled parties. And he got those things—with Class Member funds. SBF's association with altruism and charity, and his public denouncements of greed and excess, generated a false trustworthiness among the public and provided necessary goodwill for FTX, each critical to hide his lavish spending of Class Member funds.

56.     On the basis of these reassurances, along with other representations described herein, FTX grew to become one of the largest cryptocurrency exchanges in the world—at its peak, the exchange's trading volumes reached approximately $21 billion per day and its valuation topped $32 billion within three years of its founding.

## B.     FTX's Key Players

### I.     *Defendant Sam Bankman-Fried*

57.     The FTX Group was founded in 2019 and began as an exchange or marketplace for the trading of crypto assets. FTX was established by Samuel Bankman-Fried, Gary (Zixiao) Wang and Nishad Singh, with operations commencing in May 2019. FTX was purportedly established to build a digital asset trading platform and exchange for the purpose of a better user experience, customer protection, and innovative products. FTX built the FTX.com exchange to develop a platform robust enough for professional trading firms and intuitive enough for first-time users.

58.     Prior to that, the Silicon Valley-born, MIT-educated Bankman-Fried, also known as SBF, launched his quantitative crypto trading firm, Alameda, in November 2017,[7] after stints in the charity world and at trading firm Jane Street.[8] Quantitative trading consists of trading strategies based on quantitative analysis, which rely on mathematical computations and number

---

[7] https://www.businessinsider.com/ftx-crypto-king-sam-bankman-fried-rise-and-fall-2022-11 (accessed May 11, 2023).

[8] https://www.businessinsider.com/ftx-sbf-crypto-saga-explained-what-happened-what-it-means-2022-11?inline-endstory-related-recommendations= (accessed May 11, 2023).

crunching to identify trading opportunities.

59.     On January 3, 2023, Bankman-Fried pled not guilty to eight criminal charges during a hearing before the U.S. District Court for the Southern District of New York in USA v. SBF, 1:22-cr-00673-LAK-1. On February 23, 2023, a superseding indictment was unsealed. It added four more charges, including charges for conspiracy to commit bank fraud and unlicensed money transmitting business, and money laundering. Id., Doc. 80. With his trial scheduled for October 2023, Bankman-Fried faces over 100 years in prison for crimes predicated on his lying to investors and stealing billions of dollars of his customers' money.

## II.     *Defendant Caroline Ellison*

60.     By 2018, Defendant Bankman-Fried had persuaded Defendant Ellison to join him at Alameda. Defendant Ellison described the recruitment as follows: "This was very much like, 'oh, yeah, we don't really know what we're doing,'" Ellison told *Forbes* magazine in an interview regarding her initial impressions of Alameda.

61.     In late 2018, the headquarters of Alameda was relocated to Hong Kong. The team at Alameda included Defendant Bankman-Fried's close friends (and later co-founders for FTX) Nishad Singh and Gary Wang. Defendant Caroline Ellison was also part of the group and, upon moving to Hong Kong, the group lived like college students and fiercely traded crypto.

62.     After Defendant Bankman-Fried established FTX in 2019, Defendant Ellison began taking more responsibility at Alameda.

63.     In October 2021, Ellison was appointed as co-CEO of Alameda with Sam Trabucco after Bankman-Fried resigned from the firm in an effort to give the appearance of putting distance between the exchange and trading shop he founded. As co-CEO, Ellison helped oversee Alameda's expansion beyond its initial market-neutral, but relatively low-profit business as a market maker for low-volume cryptocurrencies into riskier trading strategies, according to a Twitter thread

detailing that shift. For instance, Alameda traders began exploring yield farming in decentralized finance (DeFi). Ellison became sole CEO in August 2022, following Trabucco's sudden and unexpected departure from the firm, when he shifted his role from Co-CEO to adviser of the company.[9]

64.     Leading up to the collapse of FTX, Ellison lived with nine other FTX or Alameda colleagues in Bankman-Fried's $30 million penthouse in the Bahamas. She reportedly paid SBF rent, and was occasionally in a romantic relationship with him. In 2021, Ellison tweeted about recreational stimulant use. Upon information and belief, Ellison left the Bahamas and moved back to Hong Kong.

65.     "Young people tend to be too risk averse," Ellison said in a more recent Alameda podcast episode.[10]

66.     In December 2022, Ellison pled guilty to criminal charges stemming from FTX's collapse, including conspiracy to commit wire fraud, conspiracy to commit commodities fraud, conspiracy to commit securities fraud, and conspiracy to commit money laundering.

### III.     Defendant Gary Wang

67.     Wang is not like his co-founder Sam Bankman-Fried, who loves fame and putting himself at the center of public attention. In fact, there's little public information about Wang, who has been described as a shady but critical player in the rise and fall of FTX.

---

[9] https://www.coindesk.com/business/2022/08/24/co-ceo-of-crypto-trading-firm-alameda-research-sam-trabucco-steps-down/ (accessed May 11, 2023).

[10] https://www.youtube.com/watch?v=zfcb9JAgWBs (accessed May 11, 2023).

68.     Wang met Bankman-Fried at a math camp in high school. Later, they became college roommates at the Massachusetts Institute of Technology, where Wang got degrees in mathematics and computer science and Bankman-Fried received a bachelor's in physics.[11]

69.     Before co-founding Alameda (and later FTX), Wang worked at Google. He claims to have built a system to aggregate prices across public flight data, according to an introduction on the Future Fund's website.[12] When Bankman-Fried left the Jane Street Hedge Fund to start Alameda in 2017, Wang left the tech giant.

70.     The startup has its beginnings in a three-bedroom Berkeley apartment – the downstairs served as its office. The firm shifted to Hong Kong, in part to take advantage of arbitrage opportunities in Asian bitcoin markets – including the price discrepancy between BTC in Japan and BTC everywhere else.

71.     It's there that Wang and Bankman-Fried funneled funds from Alameda to build its bespoke derivatives exchange. Bankman-Fried told Insider that he is not a good coder: "I don't code. I'm trash. I have not written any of FTX's code base. That's all a lot of other really impressive people at FTX. That's not me at all."[13]

72.     At the age of 28, Wang topped *Forbes*' 2022 list of the world's billionaires under 30 with a net worth of $5.9 billion in April. SBF sent his congratulations to Wang in public, tweeting that "I couldn't be prouder" when the list came out.[14]

---

[11] https://blog.ftx.com/blog/raising-the-bar/ (accessed May 11, 2023)

[12] https://ftxfuturefund.org/about/ (accessed May 11, 2023).

[13] https://www.businessinsider.com/crypto-trading-billionaire-sam-bankman-fried-ftx-alameda-surprising-facts-2021-12#5-people-often-think-hes-a-programmer-but-hes-not-5 (accessed May 11, 2023).

[14] https://twitter.com/SBF_FTX/status/1511324242612297738?ref_src=twsrc%5Etfw%7Ctwcamp%5Etweetembed%7Ctwterm%5E1511324242612297738%7Ctwgr%5E8e0ce65ea02f827b72be

73.    In December 2022, Wang pled guilty to criminal charges stemming from FTX's collapse, including conspiracy to commit wire fraud, conspiracy to commit commodities fraud, and conspiracy to commit securities fraud.

### IV.    Defendant Nishad Singh

74.    Nishad Singh joined Alameda in the early days, when the five-person trading firm was based in a Berkeley, California, apartment. He went from finding and exploiting arbitrage opportunities in crypto markets to being appointed director of engineering at FTX.

75.    Singh is and was a close confidant of Bankman-Fried, having shared multiple apartments with the FTX founder over the years, including most recently a ten-person luxury penthouse in Nassau, the Bahamas.

76.    He is rumored to be just one of three people who controlled the keys to the exchange's matching engine, and admittedly was informed of a plan to backstop losses at Alameda with FTX customer funds.[15]

77.    Although Singh's LinkedIn profile is down and his Twitter account is locked, the University of California, at Berkeley graduate talked about why he left his dream job at Facebook to join Alameda in a FTX podcast.[16]

78.    "I spent maybe about a month doing weekends and nights at Alameda," he said, discussing a period of time when his "day job" was as a software engineer working on applied

---

96dde8f9484a3ba3e41c%7Ctwcon%5Es1_&ref_url=https%3A%2F%2Fwww.usatoday.com%2Fstory%2Fmoney%2F2022%2F04%2F05%2Fcryptocurrency-ceo-donate-charity%2F7272175001%2F (accessed May 11, 2023).

[15]    https://www.wsj.com/articles/alameda-ftx-executives-are-said-to-have-known-ftx-was-using-customer-funds-11668264238?mod=latest_headlines (accessed May 11, 2023).

[16]    https://www.youtube.com/watch?v=rl0Rq2cUSIQ (accessed May 11, 2023).

machine learning at Facebook. "At some point, it became obvious that was kind of stupid … so I took some time off and really gave my 100% working at Alameda," Singh said.

79.     Singh visited Alameda in the first month of its existence, where he witnessed Bankman-Fried execute a sequence of trades that he described as "super profitable, easy to understand and there were lots available." Feeling inspired, he took a job.

80.     After spending one and a half years as a core Alameda engineer, Singh took a role as the head of engineering at the then-newly launched FTX derivative exchange in 2019, where he was allowed to code with "minimal supervision." He has provided code to a number of Bankman-Fried-related projects, including the decentralized exchange Serum on Solana.

81.     "Nishad was one of my brother's best friends in high school. He's shown the fastest and most sustained professional growth I've ever witnessed," Bankman-Fried wrote in a company blog.[17] Singh also assisted Wang in building most of FTX's "technological infrastructure" and managed the development team.

82.     Although pitched as a community-run and- organized exchange, people familiar with the matter told CoinDesk the true power over Serum rested with FTX Group, which then held the program's access keys.[18] A similar relationship may be in place at FTX's core properties.[19]

83.     On February 28, 2023, Nishad Singh, who was one of SBF's best friends, a core Alameda engineer, and head of FTX's engineering, also pled guilty to criminal counts for

---

[17] https://blog.ftx.com/blog/raising-the-bar/ (accessed May 11, 2023).

[18] https://www.coindesk.com/business/2022/11/12/ftx-hack-spooks-solana-defi-community-igniting-revolution-at-alameda-controlled-serum-dex/ (accessed May 11, 2023).

[19] https://www.wsj.com/articles/alameda-ftx-executives-are-said-to-have-known-ftx-was-using-customer-funds-11668264238?mod=latest_headlines (accessed May 11, 2023).

conspiracy to commit fraud and conspiracy to commit money laundering. He agreed to cooperate with prosecutors' investigation into Bankman-Fried and apologized for his role in FTX's scheme.

84.     On November 12, 2022, _The Wall Street Journal_ reported that Bankman-Fried, Ellison, Wang, and Singh were aware that FTX had used customer assets to cover Alameda's trading losses and repay its outstanding debts.

## C.     The Basics of a Cryptocurrency Exchange

85.     In many ways, centralized cryptocurrency exchanges, including FTX, are analogous to banks albeit for the cryptocurrency industry. There is a big difference, however, in regards to the way a cryptocurrency exchange and a bank are and should be authorized to utilize customer assets.

86.     More specifically, cryptocurrency exchanges accept deposits of cryptocurrency, and often fiat currency on behalf of their customers. Once that cryptocurrency is received by the exchange then it has dominion and control over those assets.

87.     The exchange then credits the applicable customer account with the appropriate amount of cryptocurrency or fiat assets the exchange received. This credit can be regarded as a liability of the exchange to its customer.

88.     If, for example, cryptocurrency was deposited to the customer's exchange account, the customer could then take that credit received from the exchange, and:

a)  Trade it for another cryptocurrency

b)  Trade it for fiat currency

c)  Leave it as a balance on the exchange account (leaving an open liability of the exchange to the customer)

d)  Withdraw it (withdrawal could be done prior to or after a trade or conversion)

These things could be done in whole or in part. Ledger entries would (and should) be made internally by the exchange to account for changes in positions and applicable balances.

89.    The exchange accounts should very much be regarded as being custodial in nature. This means that the customer does not *control* access to the assets "in" their account. The customer needs to make a request to the exchange to be able to access and send those balances. The exchange then debits the user account and sends the assets. Whether or not such requests are processed are dependent on the willingness, ability, and approval of the exchange.

90.    One major factor the affects the exchange's ability to process such requests is whether or not they have the assets and/or capital necessary to do so.

91.    For any non-yield-bearing account, this *shouldn't* be a problem, since exchanges *should* have enough assets in custody for the benefit of their customers to cover their liabilities to their customers, and on a 1:1 basis. FTX's terms of service seems to guarantee this, although FTX clearly violated their own terms of service:

> Title to your Digital Assets shall at all times remain with you and shall not transfer to FTX Trading. As the owner of Digital Assets in your Account, you shall bear all risk of loss of such Digital Assets. FTX Trading shall have no liability for fluctuations in the fiat currency value of Digital Assets held in your Account.
>
> None of the Digital Assets in your Account are the property of, or shall or may be loaned to, FTX Trading; FTX Trading does not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading.
>
> You control the Digital Assets held in your Account. At any time, subject to outages, downtime, and other applicable policies (including the Terms), you may withdraw your Digital Assets by sending them to a different blockchain address controlled by you or a third party.[20]

---

[20]    https://help.ftx.com/hc/article_attachments/9719619779348/FTX_Terms_of_Service.pdf (accessed May 11, 2023).

92.     While FTX violated their own terms of service, it would also have been true that some of these claims would have been demonstrably false to begin with even if there was hypothetically no wrongdoing on the part of FTX. This is because FTX exchange accounts (or any exchange account with any centralized custodial exchange, including Coinbase for example) are custodial in nature. *Id.* This means that the customer does not control access to the assets 'in' their account. The customer needs to make a request to the exchange to be able to access and send those balances. It is very much the exchange that controls the assets, not their customer. However, it should also be noted that the digital assets aren't technically 'in' the account at all. At a technical level, an exchange account cannot hold or store cryptocurrency. The account stores a record of a liability or an IOU to the exchange's customer. When a user purchases cryptocurrency on an exchange, they aren't technically purchasing that cryptocurrency; they are purchasing an IOU for that cryptocurrency. Because this concept of buying and storage can be difficult to understand, it's somewhat common for newcomers to associate such IOUs as being the same as storing cryptocurrency assets 'on' their account, even though it's not technically true.

93.     With any yield-bearing account, it could generally be expected for an exchange to take those customers and leverage, loan or invest them in some way, and hopefully receive enough assets back to be able to pay out their customers back their principal, in addition to yield or interest earned, when applicable customers attempt to redeem or withdraw those funds.

94.     While the existence of such loans associated with assets deposited to yield-bearing accounts was known, the substantial risks associated with such loans, and by extension the yield-bearing accounts in general was not adequately represented.

95.     The main functional differences between banks and cryptocurrency exchanges is such that exchanges are largely unregulated, and that exchanges (and by extension exchange

accounts and the users who use them) are subject to a lot of additional risks compared to that of a bank account.

96.     Banks are, of course, subject to a variety of capital control requirements to ensure protection of consumer assets. Banks are regulated with regard to the type of assets in which they can invest customer assets in. Banks are subject to regular financial audits. Banks have regulatory oversight to ensure the protection of consumer assets. And of course, bank accounts have FDIC insurance so that bank account holders have coverage in case a bank, despite such measures, becomes insolvent. *Id.*

97.     Exchanges, on the other hand, are not subject to capital control requirements. While almost all exchanges will indicate that they 'securely' store all customer assets 1:1 in 'cold storage,' there is no regulatory requirement in most jurisdictions (including the US) for exchanges to do so, nor is there any requirement for exchanges to offer any transparency regarding their solvency or use of customer assets to regulators or to the general public.

98.     Other than by an exchange's own terms of service (which wasn't adhered to in this case), exchanges are not prevented from whether they invest customer assets elsewhere, and if so, what types of investments they enter into, or loans they provide, regardless of the inherent level of risk. And exchanges have no requirement to have any type of insurance equivalent to FDIC insurance.

### D.     The Mechanics of the Fraudulent Scheme

99.     The FTX fraud was straightforward, albeit thoroughly concealed from unsuspecting Class Members.

100.     With the promise of higher-than-average returns and leading-edge safeguards, and by way of FTX's material omissions further detailed herein, FTX lured Class Members to deposit

U.S. dollars and crypto-based assets into speculative investments, including YBAs, on the FTX exchange.

101.    Contrary to FTX's representations to its customers that "FTX.US does not represent or treat assets in your FTX.US Account as belonging to FTX.US," and unlike many of its competitors, including Coinbase Global, the largest U.S.-based exchange, FTX did not segregate customer funds or designate them for the customer's benefit, instead commingling those funds in several "omnibus" accounts held by FTX.

102.    Under the cloak of this wide-ranging con game, FTX insiders including SBF facilitated the routing of billions of dollars in purported profits of FTX, which were in reality Class Member funds, to the insiders, and their families, friends, and other acquaintances through purported personal "loans," bonuses, "investments," and all other means of transfer, including real estate purchases and hundreds of millions of dollars in charitable and political contributions. Class Member funds were also used to fuel uncapped spending on illicit drugs, naming rights to sports arenas, concert sponsorships, luxury cars, and private jets.

103.    Frequently, SBF routed his fraudulent scheme through Alameda LLC ("Alameda"), a cryptocurrency hedge fund that he independently owned. SBF and Mr. Wang formed Alameda two years before launching FTX and split ownership of Alameda 90% and 10%, respectively. SBF led Alameda as CEO until October 2021, from which time he continued to control the company and maintained ultimate authority over its trading, borrowing/lending, and investment activity.

104.    Until his scheme collapsed, SBF, along with a number of his lieutenants, publicly maintained that Alameda and FTX were "wholly separate entitit[ies] . . . at arm's length," and, despite their overlapping ownership by SBF, the companies were kept "separate in terms of day-

to-day operations" by way of "a Chinese wall . . . to ensure that [Alameda wouldn't get] any sort of special treatment from FTX."

105.    Contrary to these representations, SBF operated FTX and Alameda as a common enterprise. The two companies shared offices for some time, as well as key personnel and other resources critical to the companies' operations.

106.    SBF routinely funneled Class Member funds through Alameda and/or other entities that SBF separately owned, sometimes as bogus "related party transactions." For example, financial statements for FTX Trading, now available to the public for the first time, disclose "a related party receivable" valued at $1.2 billion (equivalent to 44% of the company's assets); a $362 million "related party payable"; $250 million in payments (equivalent to 25% of the company's revenues) to a related party for "software royalties;" and a series of related party transactions described only as "currency management" activities. The same financial statements identify that these transactions were for the benefit of SBF, noting that the "primary shareholder [i.e., SBF] is also the primary shareholder of several related entities which do business with the company."

107.    Other times, SBF misappropriated Class Member funds as "loans, including for example, a $1 billion 'loan' to himself; a $543 million 'loan' to Mr. Singh; and a $55 million 'loan' to Ryan Salame, another FTX executive." SBF and other insiders received billions in dollars in purported "loans" from Alameda. None of these "loans" have ever been repaid, nor was there any reason to believe at the time the "loans" were made that they would or could be repaid. The FTX insiders effectively looted the company. Even during the crypto boom, the FTX insiders could not reasonably have repaid these loans, and no reasonable lender would have loaned such large amounts. In fact, none of these loans were ever repaid, nor upon information and belief was any interest ever paid on the loans.

108.    More often, SBF looted Class Member funds directly, without the cover of sham related party transactions or insider loans. For many years, SBF directed that FTX customer funds be wired to bank accounts held by North Dimension, a wholly owned subsidiary of Alameda. North Dimension was a fake electronics retailer created by SBF to disguise its ties to FTX. North Dimension shared an address with FTX US in Berkeley, California, and published a website through which customers often "had trouble actually purchasing products" and was "rife with misspellings and bizarre product prices," including "sale prices that were hundreds of dollars above a regular price." For example, North Dimension advertised a $410.00 "Ipad 11 'ich Cell Phone" for the sale price of $899.00:



109.    Once wired to North Dimension's accounts, Class Member funds were commingled with Alameda's and misappropriated by SBF. SBF has admitted to looting Class Member funds in this way, explaining to reporters after the fraud was revealed that "people wired $8b to Alameda and . . . it was never delivered to FTX."

110.    SBF found diverse ends for which to misappropriate Class Members funds, including to pay for Alameda's leveraged trades and investments, which had grown riskier over time. Initially, Alameda primarily traded in high-risk arbitrage, purchasing cryptocurrencies on one exchange and quickly selling them on other exchanges for higher prices. Later, Alameda pivoted to "yield farming," investing in cryptocurrencies that paid interest-like returns. Alameda's

entrée into yield farming was not without internal controversy—in early 2021, Caroline Ellison, Alameda's CEO, expressed concerns about the riskiness of Alameda's yield farming investment strategy to no avail. Ms. Ellison was correct to observe that Alameda's bets had grown dodgier. At the time, Sam Trabucco, another Alameda executive, tweeted that Alameda's investing strategies increasingly relied on "intuition" and other unconventional measures, including "Elon Musk's social media posts." As noted above, Ms. Ellison has since pleaded guilty to misappropriating FTX customer assets to fund Alameda's risky bets and to cover Alameda's colossal losses.

111.    SBF used Class Member funds to underwrite Alameda's risky operations in other ways. Though SBF publicly claimed that Alameda was a "regular user" of FTX, contrary to that representation, FTX exempted Alameda from the automated "risk engine" described above, allowing Alameda to avoid liquidation under the monitoring system. Compounding FTX's—and, though they did not know it, Class Members'—exposure to Alameda, SBF allowed Alameda to maintain a negative balance in its FTX accounts and steadily increased Alameda's negative balance cap over time. Through these cheats, Alameda was not only able to evade collateralizing its position on the exchange; Alameda also was able to maintain a negative balance on the exchange and utilize the exchange to trade and withdraw assets without limit, giving it an estimated "line of credit" of $65 billion, collateralized by the customer deposits on the exchange. Alameda lacked any ability to repay this line of credit, having spent the money on insider transfers and purported "loans," gifts, and questionable investments.

112.    With these exemptions—exemptions offered to no other customers on the exchange—FTX extended Alameda a de facto limitless line of credit.

113. Upon information and belief, SBF also employed Alameda to funnel Class Member funds from FTX US to his other companies. Just days before FTX filed for bankruptcy protection, Alameda withdrew over $200 million from FTX US; Alameda then transferred $142.4 million of those funds to FTX Trading's international accounts, exhibiting, according to industry experts, that Alameda had been serving as a "bridge between FTX US and FTX [Trading]" for some time.

114. The improper relationship between Alameda and FTX was well known to the companies' insiders, and completely concealed from Class Members. As Ellison, former co-CEO of Alameda, told a federal judge in Manhattan when entering her guilty plea:

> From approximately March 2018 through November 2022, I worked at Alameda Research, a cryptocurrency trading firm principally owned by Sam Bankman-Fried.
>
> From 2019 through 2022, I was aware that Alameda was provided access to a borrowing facility on FTX.com, the cryptocurrency exchange run by Mr. Bankman-Fried. I understood that FTX executives had implemented special settings on Alameda's FTX.com account that permitted Alameda to maintain negative balances in various fiat currencies and crypto currencies. In practical terms, this arrangement permitted Alameda access to an unlimited line of credit without being required to post collateral, without having to pay interest on negative balances and without being subject to margin calls or FTX.com's liquidation protocols. I understood that if Alameda's FTX accounts had significant negative balances in any particular currency, it meant that Alameda was borrowing funds that FTX's customers had deposited onto the exchange.
>
> While I was co-CEO and then CEO, I understood that Alameda had made numerous large illiquid venture investments and had lent money to Mr. Bankman-Fried and other FTX executives. I also understood that Alameda had financed these investments with short-term and open-term loans worth several billion dollars from external lenders in the cryptocurrency industry. When many of those loans were recalled by Alameda's lenders in and around June 2022, I agreed with others to borrow several billion dollars from FTX to repay those loans. I understood that FTX would need to use customer funds to finance its loans to Alameda. I also understood that many FTX customers invested in crypto derivatives and that most FTX customers did not expect that FTX would lend out their digital asset holdings and fiat currency deposits to Alameda in this fashion. From in and around July 2022 through at least October 2022, I agreed with Mr. Bankman-Fried and others to provide materially misleading financial statements to Alameda's lenders. In furtherance of this agreement, for example, we prepared certain quarterly balance sheets that concealed the extent of Alameda's borrowing and the billions of dollars in loans that Alameda had made to FTX executives and to related parties. I also

understood that FTX had not disclosed to FTX's equity investors that Alameda could borrow a potentially unlimited amount from FTX, thereby putting customer assets at risk. I agreed with Mr. Bankman-Fried and others not to publicly disclose the true nature of the relationship between Alameda and FTX, including Alameda's credit arrangement.

I also understood that Mr. Bankman-Fried and others funded certain investments in amounts more than $10,000 with customer funds that FTX had lent to Alameda. The investments were done in the name of Alameda instead of FTX in order to conceal the source and nature of those funds. I am truly sorry for what I did. I knew that it was wrong. And I want to apologize for my actions to the affected customers of FTX, lenders to Alameda and investors in FTX. Since FTX and Alameda collapsed in November 2022, I have worked hard to assist with the recovery of assets for the benefit of customers and to cooperate with the government's investigation. I am here today to accept responsibility for my actions by pleading guilty.[21]

115.   *The Wall Street Journal* recently reported that Ellison told Alameda staffers in a video call that she was one of four people (along with Sam Bankman-Fried, Gary Wang, and Nishad Singh) who were aware of the decision to send FTX customer funds to Alameda, to help the fund meet its liabilities.[22]

116.   Similarly, Nishad Singh, head of FTX's engineering and one of SBF's best friends, has admitted that he knew by mid-2022 that Alameda was borrowing FTX customer funds and that customers were not aware.[23]

117.   FTX co-founder Gary Wang likewise explained his knowledge of the companies' interconnectedness in his guilty plea:

Between 2019 and 2022, as part of my employment at FTX, I was directed to and agreed to make certain changes to the platform's code. I executed those changes, which I knew would Alameda Research special privileges on the FTX platform. I

---

[21]     https://www.johnreedstark.com/wp-content/uploads/sites/180/2022/12/Ellison-Hearing-Transcript.pdf (accessed May 11, 2023)

[22]     https://www.wsj.com/articles/alameda-ftx-executives-are-said-to-have-known-ftx-was-using-customer-funds-11668264238 (accessed May 11, 2023).

[23]     https://www.reuters.com/legal/ftxs-singh-agrees-plead-guilty-us-criminal-charges-lawyer-says-2023-02-28/ (accessed May 11, 2023).

did so knowing that others were representing to investors and customers that Alameda had no such special privileges and people were likely investing in and using FTX based in part on those misrepresentations. I knew what I was doing was wrong. I also knew that the misrepresentations were being made by telephone and internet, among other means, and that assets traded on FTX included some assets that the U.S. regulators regard as securities and commodities.

118. FTX had a handful of insiders and employees with virtually limitless power to direct transfers of fiat currency and crypto assets and to hire and fire employees, with no effective oversight, internal controls, or checks on the exercise of these powers. FTX failed to establish or maintain any semblance of fundamental financial and accounting controls. This is particularly shocking given that at its peak, FTX operated in hundreds of jurisdictions, controlled billions of dollars of assets, engaged in as many as 26 million transactions per day, and had millions of users. Board oversight was effectively non-existent. With few exceptions, FTX lacked independent or experienced finance, accounting, human resources, information security, and cybersecurity personnel or leadership. Nor was there any effective internal audit function. Some FTX entities did not produce any financial statements. Some were deemed impossible to audit.

119. FTX insiders paid out millions of dollars in hush money to keep whistleblowers from exposing the fraud, money laundering, and price manipulation. FTX even hired the attorneys of these whistleblowers to help keep these complaints from the public.

120. At no time did FTX disclose the foregoing to Class Members, including that:

I. SBF was siphoning Class Member funds to his friends and family members or for his own personal use;

II. FTX was not segregating Class Member funds, instead commingling those funds in FTX's omnibus accounts and treating those funds as FTX's own;

III. FTX directed that Class Member funds be wired directly into accounts held by North Dimension, a subsidiary of Alameda;

IV. FTX and Alameda were not, in fact, "wholly separate entities at arm's length," and were instead operated as a common enterprise;

V.  SBF was looting Class Member funds under the guise of non-arm's length "related party transactions" and "loans" often by way of Alameda;

VI.  SBF routinely transferred Class Member funds out of accounts held by FTX to those held by Alameda;

VII.  SBF was using Class Member funds to underwrite his speculative personal investments at Alameda, and his charitable and political contributions;

VIII.  Alameda was exempt from the "risk engine" and other FTX protocols in place to prevent a user from becoming undercollateralized or overleveraged on the exchange;

IX.  With the foregoing exemption, Alameda engaged in margin trading on the FTX platform, exposing Class Members to the risk of Alameda's loss;

X.  FTX used Class Member funds to manipulate the price of FTT, which was not "widely distributed," but instead concentrated in the hands of FTX and Alameda; and

XI.  FTX did not have in place fundamental internal controls, including an independent board of director or a CFO.

121.  Had Class Members known of these material omissions, they would not have deposited funds into accounts on the FTX exchange and SBF's fraud would not have succeeded. In late 2022, the fraud finally collapsed, and the misconduct was revealed.

**E.  The Fraud's Collapse**

122.  The FTX.com exchange was extremely successful since its launch in May 2019. In 2022, around $15 billion of assets were traded daily on the platform, which represented approximately 10% of global volume for crypto trading. The FTX Group's team grew to over 300 employees globally. Although the FTX Group's primary international headquarters is in the Bahamas, its domestic US base of operations is located in Miami, Florida.[24]

123.  FTX quickly became one of the most utilized avenues for nascent investors to

---

[24]  https://www.coindesk.com/business/2022/09/27/crypto-exchange-ftx-is-moving-its-us-headquarters-from-chicago-to-miami/ (accessed May 11, 2023).

purchase cryptocurrency. By the time FTX filed for bankruptcy protection, customers had entrusted billions of dollars to it, with estimates ranging from $10-to-$50 **billion dollars**.

124.    Bankman-Fried got rich off FTX and Alameda, with the two companies netting $350 million and $1 billion in profit, respectively, in 2020 alone, according to Bloomberg.

125.    At his peak, Bankman-Fried was worth $26 billion. At 30, he had become a major political donor, gotten celebrities like the Co-Defendants in this action to vociferously promote FTX, and secured the naming rights to the arena where the NBA's Miami Heat play.[25]

126.    Beginning in mid-2022, the value of cryptocurrencies rapidly declined, and SBF began to bail out troubled crypto firms that, if they were to fail, would bring down FTX with them and reveal SBF's fraud. For example, in the summer of 2022, FTX extended a $400 million revolving credit facility to BlockFi, a crypto lender. At the time, BlockFi held as collateral for loans hundreds of millions of dollars in FTT, the cryptocurrency that FTX had engineered to prop up Alameda. If BlockFi failed, the liquidation of those tokens would crash FTT, and in turn, Alameda, whose assets were primarily backed by the token. FTX's $400 million loan kept BlockFi temporarily afloat, and FTX engaged in a number of similar transactions, propping up failing crypto companies in order to keep the fraud alive, as 2022 progressed.

127.    Despite SBF's attempts to keep troubled crypto firms afloat, the value of digital currencies continued to decline throughout 2022, and FTX's liquidity crunch tightened. By the end of summer 2022, SBF needed another $1 billion to keep his fraudulent scheme running. He looked to Silicon Valley and to sovereign wealth funds in the Middle East, but he was unable to successfully close any further investments in FTX, despite many solicitations. Without this influx

---

[25]     https://www.businessinsider.com/ftx-sbf-crypto-saga-explained-what-happened-what-it-means-2022-11?inline-endstory-related-recommendations= (accessed May 11, 2023).

of capital, FTX's exposure to margin calls heightened and, in November 2022, SBF's house of cards finally collapsed.

128.    In early November 2022, crypto publication CoinDesk released a bombshell report that called into question just how stable Bankman-Fried's empire really was.[26] On November 2, 2022, news broke that Alameda's balance sheet was propped up by the FTX-manipulated FTT, revealing the close ties between FTX and Alameda to the public for the first time. FTX had lent billions, including most of its cryptocurrency reserves, to Alameda, first as capital for trading, and eventually to cover Alameda's massive losses.

129.    Prior to the collapse of the FTX Group, Bankman-Fried's cryptocurrency empire was publicly ostensibly broken into two main parts: FTX (his exchange) and Alameda (his trading firm), both giants in their respective industries. But even though they are two separate businesses, the division breaks down in a key place: on Alameda's balance sheet, which was full of FTX – specifically, the FTT token issued by the exchange that grants holders a discount on trading fees on its marketplace. It shows Bankman-Fried's trading giant Alameda rests on a foundation largely made up of a coin that a sister company invented, not an independent asset like a fiat currency or another crypto. The situation adds to evidence that the ties between FTX and Alameda are unusually close.[27]

130.    Days later, on November 6, 2022, Changpeng Zhao, CEO of Binance, the world's largest cryptocurrency exchange and FTX's most powerful competitor, tweeted that he intended to sell Binance's $580 million holding of FTT, which threatened to crash the price of FTX's token

---

[26]    https://www.businessinsider.com/ftx-sbf-crypto-saga-explained-what-happened-what-it-means-2022-11?inline-endstory-related-recommendations= (accessed May 11, 2023).

[27]    https://www.coindesk.com/business/2022/11/02/divisions-in-sam-bankman-frieds-crypto-empire-blur-on-his-trading-titan-alamedas-balance-sheet/ (accessed May 11, 2023).

and, in turn, Alameda's balance sheet. Mr. Zhao's announcement triggered demand for $5 billion in customer withdrawals, which FTX promptly halted due to a lack of funds. The value of FTT plunged 32%, but rallied once again with Bankman-Fried's surprise announcement on Tuesday, November 8, that Binance would buy FTX, effectively bailing it out.[28]

131.    But, after a 24-hour diligence period, Binance backed out of the deal, denying a critical capital injection to SBF. Mr. Zhao explained his reasons for the about-face: "Sam, I'm sorry. We won't be able to continue this deal. Way too many issues. CZ." Binance cited findings during due diligence, as well as reports of mishandled customer funds and the possibility of a federal investigation.[29] In truth, there were always too many issues—issues with the interconnectedness between Alameda and FTX, issues with FTX's total lack of internal controls, issues with SBF's looting of Class Member funds, the news of which sent FTT plunging even further — Bankman-Fried saw 94% of his net worth wiped out in a single day.[30] This triggered panic selling of FTT and a run on FTX, thereby ensuring the firm's swift demise.

132.    Bankman-Fried issued a 22-tweet-long explanation of where he believed he and the FTX Group went wrong:[31]

---

[28]   https://markets.businessinsider.com/news/currencies/ftx-6-billion-withdrawals-72-hours-sam-bankman-fried-binance-2022-11 (accessed May 11, 2023).

[29]   https://markets.businessinsider.com/news/currencies/ftx-crash-sec-cftc-probes-asset-liability-shortfall-6-billion-2022-11 (accessed May 11, 2023).

[30]   https://www.businessinsider.com/ftx-ceo-crypto-binance-sam-bankman-fried-wealth-wiped-out-2022-11 (accessed May 11, 2023).

[31]   https://twitter.com/SBF_FTX/status/1590709189370081280 (accessed May 11, 2023).



SBF ✔ @SBF_FTX · Nov 10
1) I'm sorry.  That's the biggest thing.

I fucked up, and should have done better.

💬 11K       ⟲ 21.4K       ♡ 59.3K       ⬆

SBF ✔ @SBF_FTX · Nov 10
2) I also should have been communicating more very recently.

Transparently--my hands were tied during the duration of the possible Binance deal; I wasn't particularly allowed to say much publicly.  But of course it's on me that we ended up there in the first place.

💬 218       ⟲ 391       ♡ 4,939       ⬆

SBF ✔ @SBF_FTX · Nov 10
3) So here's an update on where things are.

[THIS IS ALL ABOUT FTX INTERNATIONAL, THE NON-US EXCHANGE. FTX US USERS ARE FINE!]

[TREAT ALL OF THESE NUMBERS AS ROUGH.  THERE ARE APPROXIMATIONS HERE.]

💬 259       ⟲ 639       ♡ 3,873       ⬆

SBF ✔ @SBF_FTX · Nov 10
4) FTX International currently has a total market value of assets/collateral higher than client deposits (moves with prices!).

But that's different from liquidity for delivery--as you can tell from the state of withdrawals.  The liquidity varies widely, from very to very little.

💬 174       ⟲ 636       ♡ 3,592       ⬆



**SBF** ✔ @SBF_FTX · Nov 10

5) The full story here is one I'm still fleshing out every detail of, but as a very high level, I fucked up twice.

The first time, a poor internal labeling of bank-related accounts meant that I was substantially off on my sense of users' margin.  I thought it was way lower.

💬 251          ⇄ 749          ♡ 3,407          ⬆



**SBF** ✔ @SBF_FTX · Nov 10

6) My sense before:

Leverage: 0x
USD liquidity ready to deliver: 24x average daily withdrawals

Actual:

Leverage: 1.7x
Liquidity: 0.8x Sunday's withdrawals

Because, of course, when it rains, it pours.  We saw roughly $5b of withdrawals on Sunday--the largest by a huge margin.

💬 241          ⇄ 907          ♡ 3,823          ⬆



**SBF** ✔ @SBF_FTX · Nov 10

7) And so I was off twice.

Which tells me a lot of things, both specifically and generally, that I was shit at.

And a third time, in not communicating enough.  I should have said more. I'm sorry--I was slammed with things to do and didn't give updates to you all.

💬 116          ⇄ 278          ♡ 2,882          ⬆



**SBF** ✓ @SBF_FTX · Nov 10
8) And so we are where we are.  Which sucks, and that's on me.

I'm sorry.

💬 155   🔁 357   ♡ 3,122   ↥

**SBF** ✓ @SBF_FTX · Nov 10
9) Anyway: right now, my #1 priority--by far--is doing right by users.

And I'm going to do everything I can to do that.  To take responsibility, and do what I can.

💬 162   🔁 357   ♡ 3,715   ↥

**SBF** ✓ @SBF_FTX · Nov 10
10) So, right now, we're spending the week doing everything we can to raise liquidity.

I can't make any promises about that.  But I'm going to try.  And give anything I have to if that will make it work.

💬 164   🔁 394   ♡ 3,377   ↥

**SBF** ✓ @SBF_FTX · Nov 10
11) There are a number of players who we are in talks with, LOIs, term sheets, etc.

We'll see how that ends up.

💬 87   🔁 234   ♡ 2,625   ↥



SBF ✓ @SBF_FTX · Nov 10

12) Every penny of that--and of the existing collateral--will go straight to users, unless or until we've done right by them.

After that, investors--old and new--and employees who have fought for what's right for their career, and who weren't responsible for any of the fuck ups.

💬 102      🔁 274      ♡ 3,007      ⬆️



SBF ✓ @SBF_FTX · Nov 10

13) Because at the end of the day, I was CEO, which means that *I* was responsible for making sure that things went well.  *I*, ultimately, should have been on top of everything.

I clearly failed in that.  I'm sorry.

💬 180      🔁 423      ♡ 4,122      ⬆️



SBF ✓ @SBF_FTX · Nov 10

14) So, what does this mean going forward?

I'm not sure--that depends on what happens over the next week.

But here are some things I know.

💬 129      🔁 235      ♡ 2,502      ⬆️

Case No. 1:23-md-03076-KMM



**SBF** ✔
@SBF_FTX

15) First, one way or another, Alameda Research is winding down trading.

They aren't doing any of the weird things that I see on Twitter--and nothing large at all.  And one way or another, soon they won't be trading on FTX anymore.

9:13 AM · Nov 10, 2022 · Twitter Web App

**405** Retweets   **201** Quote Tweets   **3,911** Likes



**SBF** ✔ @SBF_FTX · Nov 10
Replying to @SBF_FTX

16) Second, in any scenario in which FTX continues operating, its first priority will be radical transparency--transparency it probably always should have been giving.

Giving as close to on-chain transparency as it can: so that people know *exactly* what is happening on it.

214    320    2,255



**SBF** ✔ @SBF_FTX · Nov 10

17) All of the stakeholders would have a hard look at FTX governance.  I will not be around if I'm not wanted.

All of the stakeholders--investors, regulators, users--would have a large part to play in how it would be run.

Solely trust.

137    198    1,878



SBF ✔ @SBF_FTX · Nov 10
18) But all of that isn't what matters right now--what matters right now is trying to do right by customers.  That's it.

💬 144     🔁 158     ♡ 1,970     ⬆

SBF ✔ @SBF_FTX · Nov 10
19) A few other assorted comments:

This was about FTX International.  FTX US, the US based exchange that accepts Americans, was not financially impacted by this shitshow.

It's 100% liquid.  Every user could fully withdraw (modulo gas fees etc).

Updates on its future coming.

💬 406     🔁 760     ♡ 2,776     ⬆

SBF ✔ @SBF_FTX · Nov 10
20) At some point I might have more to say about a particular sparring partner, so to speak.

But you know, glass houses.  So for now, all I'll say is:

well played; you won.

💬 1,532     🔁 3,303     ♡ 8,047     ⬆

SBF ✔ @SBF_FTX · Nov 10
21) NOT ADVICE, OF ANY KIND, IN ANY WAY

I WAS NOT VERY CAREFUL WITH MY WORDS HERE, AND DO NOT MEAN ANY OF THEM IN A TECHNICAL OR LEGAL SENSE; I MAY WELL HAVE NOT DESCRIBED THINGS RIGHT though I'm trying to be transparent.  I'M NOT A GOOD DEV AND PROBABLY MISDESCRIBED SOMETHING.

💬 908     🔁 1,055     ♡ 3,463     ⬆



## F.    FTX Files for Bankruptcy

133.    On November 11th, unable to obtain a bailout, and facing an insurmountable liquidity crisis, the FTX Group filed for Chapter 11 bankruptcy and Bankman-Fried resigned as CEO.[32]

134.    At or around the same time as Bankman-Fried's *mea culpa* tweets and discussions with reporters, an FTX balance sheet was leaked which shows that FTX held approximately $900 million in liquid assets against $8.9 billion of liabilities, with a negative $8 billion entry described as a "hidden, poorly internally labeled fiat@ account."[33]

135.    Later, *The Wall Street Journal* reported that in a video meeting with Alameda employees on November 9, 2022 (the day prior to Bankman-Fried's November 10, 2022 litany of tweets), Alameda CEO Caroline Ellison said that she, Bankman-Fried, and two other FTX executives, Singh and Wang, were aware of the decision to send customer funds directly to Alameda. Ellison even admitted that "FTX used customer money to help Alameda meet its liabilities."[34] Ellison elaborated on these statements on the record when pleading guilty to eight

---

[32]    https://markets.businessinsider.com/news/currencies/ftx-bankruptcy-sam-bankman-fried-ceo-crypto-binance-alameda-markets-2022-11 (accessed May 11, 2023).

[33]    https://www.bloomberg.com/opinion/articles/2022-11-14/ftx-s-balance-sheet-was-bad#xj4y7vzkg (last accessed February 22, 2023)

[34]    https://www.wsj.com/articles/alameda-ftx-executives-are-said-to-have-known-ftx-was-using-customer-funds-11668264238 (last accessed February 22, 2023)

counts of conspiracy to commit wire fraud, securities fraud, and money laundering, among other conspiracies.[35]

136.    The same source explained that FTX's biggest customer was Alameda, which, instead of holding money, was borrowing billions from FTX users using FTX's in-house cryptocurrency, FTT token, as collateral, then trading it. When the price of the FTT nosedived 75% in a day, making the collateral insufficient to cover the trade, both FTX and Alameda suffered massive liquidity crises. *Id.*

137.    On December 13, 2022, the SEC filed a civil action against Bankman-Fried for securities fraud in the United States District Court for the Southern District of New York. *SEC v. SBF*, 1:22-cv-10501, Doc. 1 (S.D.N.Y.) In that complaint, the SEC alleged:

> When prices of crypto assets plummeted in May 2022, Alameda's lenders demanded repayment on billions of dollars of loans. Despite the fact that Alameda had, by this point, already taken billions of Bankman-Fried of FTX customer assets, it was unable to satisfy its loan obligations. Bankman-Fried directed FTX to divert billions more in customer assets to Alameda to ensure that Alameda maintained its lending relationships, and that money could continue to flow in from lenders and other investors. *Id.* ¶ 4

> Through the summer of 2022, he directed hundreds of millions more in FTX customer funds to Alameda, which he then used for additional venture investments and for "loans" to himself and other FTX executives.

138.    The SEC alleged that "Bankman-Fried diverted FTX customer funds to Alameda in essentially two ways: (1) by directing FTX customers to deposit fiat currency (e.g., U.S. Dollars) into bank accounts controlled by Alameda; and (2) by enabling Alameda to draw from a virtually limitless "line of credit" at FTX, which was funded by FTX customer accounts." *Id.* ¶ 32.

139.    The bankruptcy court appointed John J. Ray III, a 40-year industry veteran who

---

[35]    https://www.wsj.com/articles/alameda-ftx-executives-are-said-to-have-known-ftx-was-using-customer-funds-11668264238 (last accessed December 16, 2022).

oversaw the liquidation of Enron, to replace SBF as FTX's CEO. Mr. Ray quickly uncovered

fundamental deficiencies in basic accounting, corporate governance, and other controls by FTX.

These deficiencies were so startling that Mr. Ray remarked he had never "seen such a complete

failure of corporate controls and such a complete absence of trustworthy financial information as

occurred here." Moreover, Mr. Ray uncovered that:

> **First**, customer assets from FTX.com were commingled with assets from the
> Alameda trading platform.

> **Second**, Alameda used client funds to engage in margin trading which exposed
> customer funds to massive losses.

> **Third**, the FTX Group went on a spending binge in late 2021 through 2022, during
> which approximately $5 billion was spent buying a myriad of businesses and
> investments, many of which may be worth only a fraction of what was paid for
> them.

> **Fourth**, loans and other payments were made to insiders in excess of $1 billion.

> **Fifth**, Alameda's business model as a market maker required deploying funds to
> various third-party exchanges which were inherently unsafe, and further
> exacerbated by the limited protection offered in certain foreign jurisdictions.

140.    On April 9, 2023, Ray III filed in the FTX Bankruptcy his First Interim Report to

the Independent Directors on Control Failures at the FTX Exchanges. *See In re: FTX Trading Ltd.,*

No. 1:22-bk-11068-JTD, ECF No. 1242-1 (Bankr. Dist. Del. Apr. 9, 2023), attached as **Exhibit** A

(the "First Interim Rpt.").

141.    Defining the "FTX Group" as a de facto singular entity comprised of FTX Trading,

FTX.US, and Alameda, collectively, Mr. Ray begins by explaining that:

> the Debtors have had to overcome unusual obstacles due to the FTX Group's lack
> of appropriate record keeping and controls in critical areas, including, among
> others, management and governance, finance and accounting, as well as digital
> asset management, information security and cybersecurity. Normally, in a
> bankruptcy involving a business of the size and complexity of the FTX Group,
> particularly a business that handles customer and investor funds, there are readily

identifiable records, data sources, and processes that can be used to identify and safeguard assets of the estate. Not so with the FTX Group.

Upon assuming control, the Debtors found a pervasive lack of records and other evidence at the FTX Group of where or how fiat currency and digital assets could be found or accessed, and extensive commingling of assets. This required the Debtors to start from scratch, in many cases, simply to identify the assets and liabilities of the estate, much less to protect and recover the assets to maximize the estate's value. This challenge was magnified by the fact that the Debtors took over amidst a massive cyberattack, itself a product of the FTX Group's lack of controls, that drained approximately $432 million worth of assets on [November 11, 2022,] the date of the bankruptcy petition (the "November 2022 Breach"), and threatened far larger losses absent measures the Debtors immediately implemented to secure the computing environment.

Despite the public image it sought to create of a responsible business, the FTX Group was tightly controlled by a small group of individuals who showed little interest in instituting an appropriate oversight or control framework. These individuals stifled dissent, commingled and misused corporate and customer funds, lied to third parties about their business, joked internally about their tendency to lose track of millions of dollars in assets, and thereby caused the FTX Group to collapse as swiftly as it had grown. In this regard, while the FTX Group's failure is novel in the unprecedented scale of harm it caused in a nascent industry, many of its root causes are familiar: hubris, incompetence, and greed.

First Interim Rpt., 2-3.

142.   After summarizing the history of the three main FTX Group entities, the current efforts to retain advisors to assist in investigating the FTX Group's available financial records and interview witnesses, Mr. Ray provides a comprehensive review of the FTX Group's control failures that led to its eventual collapse, including (1) lack of management and governance controls; (2) lack of financial and accounting controls; and (3) lack of digital asset management, information security and cybersecurity controls. *Id.*, 11–37.

143.   According to Mr. Ray, "[t]he FTX Group lacked appropriate management, governance, and organizational structure," and the "management and governance of the FTX Group was largely limited to Bankman-Fried, Singh, and Wang. Among them, Bankman-Fried was viewed as having the final voice in all significant decisions." *Id.,* 11. The trio "controlled

nearly every significant aspect of the FTX Group," despite being "not long out of college and with no experience in risk management or running a business," and "[b]oard oversight, moreover, was effectively non-existent." *Id.*

144.   The FTX Group also "lacked an appropriate organizational structure. Rather than having an ultimate parent company able to serve as a central point for decision-making that could also direct and control its subsidiaries, the FTX Group was organized as a web of parallel corporate chains with various owners and interest, all under the ultimate control of Bankman-Fried." *Id.,* 8. The FTX Group dd not even have a comprehensive organizational chart until the end of 2021, lacked any tracking of intercompany relationships and ownership of particular entities, and "did not even have current and complete lists of who its employees were." *Id.,* 8–9.

145.   The FTX Group also suffered from a near complete failure to observe corporate formalities, especially when it came to managing the finances of the FTX Group, for instance:

a.   Failure to maintain "personnel who were experienced and knowledgeable enough to account accurately for assets and liabilities, understand and hedge against risk, or compile and validate financial reports," *Id.,* 11;

b.   Failure to maintain adequate "policies and procedures relating to accounting, financial reporting, treasury management, and risk management," *Id.*;

c.   Failure to maintain an accurate and appropriate accounting system, in that 56 FTX Group entities did not produce financial statements of *any* kind, 35 used QuickBooks in conjunction with Google documents, Slack communications, shared drives, and Excel spreadsheets, *Id.,* 12–13;

d.   Recordkeeping was so poor that Bankman-Fried described Alameda as "hilariously beyond any threshold of any auditor being able to even get partially through an

audit," adding:

> Alameda is unauditable. I don't mean this in the sense of "a major accounting firm will have reservations about auditing it"; I mean this in the sense of "*we* are only able to ballpark what its balances are, let alone something like a comprehensive transaction history." We sometimes find $50m of assets lying around that we lost track of; such is life.

*Id.,* 14;

e.   "Key accounting reports necessary to understand the FTX Group's assets and liabilities, such as statements of cash flows, statements of equity, intercompany and related party transaction matrices, and schedules of customer entitlements, did not exist or were not prepared regularly," *Id.,* 14–15;

f.   "Copies of key documentation – including executed loan agreements, intercompany agreements, acquisition and investment documents, bank and brokerage account statements, and contract and account information of all types – were incomplete, inaccurate, contradictory, or missing entirely." *Id.,* 15;

g.   the FTX Group "did not maintain reliable lists of bank or trading accounts, cryptocurrency wallets, or authorized signatories," and let "[t]housands of deposit checks . . . collect[] like junk mail," *Id.,* 15;

h.   "Although the FTX Group consisted of many, separate entities, transfers of funds among those entities were not properly documented, rendering tracing of funds extremely challenging," including using Slack, Signal, and Telegram with "disappearing messages" enabled, and often approving expenses and invoices on Slack by "emoji," *Id.*;

i.   "The FTX Group did not observe any discernable corporate formalities when it came to intercompany transactions. Assets and liabilities were routinely shuffled

among the FTX Group entities and insiders without proper process or documentation. Alameda routinely provided funding for corporate expenditures (*e.g.*, paying salaries and other business expenses) whether for Alameda, for various other Debtors, or for FTX DM, and for venture investments or acquisitions whether for Alameda or for various other Debtors. Alameda also transferred funds to insiders to fund personal investments, political contributions, and other expenditures—some of which were nominally 'papered' as personal loans with below-market interest rates and a balloon payment due years in the future." *Id.,* 17;

j.  Often times, intercompany and insider transfers were recorded in a manner "that was inconsistent with the apparent purpose of the transfers," for instance, tens of millions of dollars being transferred from Alameda to Bankman-Fried, personally, but recorded in the general ledger as "Investment in Subsidiaries: Investments-Cryptocurrency," often times recorded in a way that intercompany transactions did not balance across relevant entities, nor were they recorded with specificity regarding which digital assets were involved in the transfer and their value when transferred, *Id.*;

k.  On both FTX International and US exchanges, Alameda was a customer that traded "for its own account as well as engaging in market-making activities, and, in that capacity, it was granted extraordinary privileges by the FTX Group," such as granting Alameda "an effectively limitless ability to trade and withdraw assets from the exchange regardless of the size of Alameda's account balance, and to exempt Alameda from the auto-liquidation process that applied to other customers," effectively allowing it to borrow and/or withdraw up to $65 billion from the FTX

Platform, *Id.,* 18–22; and finally

l.  There were "extensive deficiencies in the FTX Group's controls with respect to digital asset management, information security, and cybersecurity," which was "particularly surprising given that the FTX Group's business and reputation depended on safeguarding crypto assets," and "[a]s a result of these control failures," which included (i) maintaining the majority of customer assets in "hot" wallets that are easily hacked, (ii) failing to safeguard private keys but storing them in an Amazon Web Services account, (iii) failing to employ multi-signature capabilities or Multi-Party Computation, (iv) failing to restrict FTX Group employee user access to sensitive infrastructure, such as omnibus wallets holding billions of dollars in assets, and (v) failing to enforce multi-factor authentication for employees and other commonsense safeguards to protect customer assets and sensitive data—all of which leads to the irrefutable conclusion that "the FTX Group exposed crypto assets under its control to a grave risk of loss, misuse, and compromise, and lacked a reasonable ability to prevent, detect, respond to, or recover from a significant cybersecurity incident, including the November 2022 Breach." *Id.,* 22–37.

146.  Mr. Ray concludes that "[t]he FTX Group's profound control failures placed its crypto assets and funds at risk from the outset." *Id.,* 39.

**G.   The Crypto Sector is a Hotbed for Illicit Activity and Fraudulent Conduct**

147.  From its inception, cryptocurrency has been fueled by illicit activity and the crypto sector continues to be rife with frauds and scams. For a detailed breakdown on the illicit use of cryptocurrency, see the U.S. Department of Justice's report from September 2022 titled: "The Role of Law Enforcement In Detecting, Investigation, And Prosecuting Criminal Activity Related to

Digital Assets."[CIT] The report was issued pursuant to the March 9, 2022 Executive Order on Ensuring Responsible Development of Digital Assets and is the latest report on cryptocurrency released by [36] dating back to 2018, all of which detail the dire harms caused by cryptocurrency. DoJ notes that "[t]he rise of the Bitcoin network paralleled the development of Silk Road, AlphaBay, and other illegal online marketplaces..." and the department classified digital asset crime into three categories: "(1) cryptocurrency as a means of payment for, or manner of facilitating, criminal activity; (2) the use of digital assets as a means of concealing illicit financial activity; and (3) crimes involving or affecting the digital assets ecosystem." The September report details several high-profile cases involving the illicit use of cryptocurrency. One case is the darknet marketplace Silk Road, which accepted payment only in Bitcoin, and was shut down by the FBI in 2013 after having facilitated sales revenue totaling over 9.5 million Bitcoin, equivalent to roughly $1.2 billion at the time.

148.    Cryptocurrency is increasingly being used by organized crime syndicates and nation states for illicit purposes. In January 2022, the Government Accountability Office (GAO) issued a report finding that "[v]irtual currency is increasingly used illicitly to facilitate human and drug trafficking."[37] Cryptocurrency is also being used by Iran, Russia, and North Korea to bypass U.S. economic and financial sanctions.[38] According to the United Nations, "money raised by North

---

[36]    https://www.justice.gov/opa/pr/justice-department-announces-report-digital-assets-and-launches-nationwide-network (accessed May 11, 2023).

[37] Virtual Currencies: Additional Information Could Improve Federal Agency Efforts to Counter Human and Drug Trafficking [Reissued with Revisions Feb. 7, 2022] | U.S. GAO (accessed May 11, 2023).

[38] Russia Could Use Cryptocurrency to Mitigate U.S. Sanctions - The New York Times (nytimes.com) (accessed May 11, 2023), Iran Plans Uses Crypto for Imports to Get Around Sanctions (gizmodo.com) (accessed May 11, 2023), This is how North Korea uses cutting-edge crypto money laundering to steal millions | MIT Technology Review(accessed May 11, 2023).

Korea's criminal cyber operations are helping to fund the country's illicit ballistic missile and nuclear programs."[39] North Korea's brazenness was revealed to the public earlier this year when a well-known "Web 3" video game, Axie Infinity, was hacked and $620 million in the cryptocurrency ether was stolen. "Chainalysis estimates that North Korea stole approximately $1 billion in the first nine months of 2022 from decentralized crypto exchanges alone," one of the reasons why Anne Neuberger, US deputy national security adviser for cyber security, said in July 2022 that North Korea "uses cyber to gain …. up to a third of their funds for their missile program."[40]

149.    Cryptocurrency has also fueled a surge in ransomware that has victimized American businesses, health care systems, and state and local governments. In May of 2022, the majority staff on the Homeland Security & Governmental Affairs Committee released a startling report on ransomware.[41] The report notes that in 2021, "ransomware attacks impacted at least 2,323 local governments, schools, and healthcare providers in the United States" and that the FBI "received 3,729 ransomware complaints with adjusted losses of more than $49.2 million." The report acknowledges that these numbers underestimate the true scale of the problem because many ransomware victims do not report to authorities. As evidence, they cite data from blockchain analytics company Chainalysis that found "malign actors received at least $692 million in cryptocurrency extorted as part of ransomware attacks" in 2020. The report notes that "cryptocurrency, typically Bitcoin, has become a near universal form of ransom payment in

---

[39] How North Korea became a mastermind of crypto cybercrime | Ars Technica (accessed May 11, 2023).

[40] Id.

[41] HSGAC Majority Cryptocurrency Ransomware Report.pdf (senate.gov) (accessed May 11, 2023).

ransomware attacks, in part, because cryptocurrency enables criminals to extort huge sums of money from victims across diverse sectors with incredible speed." The link between cryptocurrency and ransomware became clear to the public in the wake of the Colonial Pipeline hack in May 2021, which disrupted gasoline supplies in the southeastern U.S. In the wake of that breach, several commentators argued for a ban, or heavy regulation, of cryptocurrency.[42]

150.    Everyday consumers have also fallen victim to various cryptocurrency-related scams. The Consumer Financial Protection Bureau (CFPB) published 2,404 cryptocurrency related consumer complaints in its Consumer Complaint Database during 2021, and more than 1,000 cryptocurrency-related complaints during 2022 year-to-date.[43] According to the September DoJ report: "The CFPB has also received hundreds of servicemember complaints involving cryptocurrency assets or exchanges in the last 12 months, approximately one-third of which concerned frauds or scams."[44] In June 2022, the Federal Trade Commission issued a report finding that "since the start of 2021 more than 46,000 people have reported losing over $1 billion in crypto to scams[https://www.ftc.gov/news-events/data-visualizations/data-spotlight/2022/06/reports-show-scammers-cashing-crypto-craze](https://www.ftc.gov/news-events/data-visualizations/data-spotlight/2022/06/reports-show-scammers-cashing-crypto-craze) – that's about one out of every four dollars reported lost, more than *any* other payment method."[45] The median individual loss was a staggering $2,600.

151.    Another September 2022 report from the Treasury Department, issued pursuant to the Executive Order, also called out the risks and harms to consumers from cryptocurrency:

"Consumers and investors are exposed to improper conduct in the crypto-asset

---

[42] [Ban Cryptocurrency to Fight Ransomware - WSJ](#) (accessed May 11, 2023).

[43] [Justice Department Announces Report on Digital Assets and Launches Nationwide Network | OPA | Department of Justice](#) (accessed May 11, 2023).

[44] *Id.*

[45] [Reports show scammers cashing in on crypto craze | Federal Trade Commission (ftc.gov)](#) (accessed May 11, 2023).

ecosystem for a variety of reasons, including a lack of transparency as well as the fact that crypto-assets have relatively novel and rapidly developing applications. This leads to frequent instances of operational failures, market manipulation, frauds, thefts, and scams. While the data for populations vulnerable to disparate impacts remains limited, available evidence suggests that crypto-asset products may present heightened risks to these groups, and the potential financial inclusion benefits of crypto-assets largely have yet to materialize."[46]

152.    There is also a long history of consumer losses associated with centralized exchanges, FTX being the latest. One of the first cryptocurrency exchange failures was Japan-based Mt. Gox in 2014. Mt. Gox was handling over 70% of bitcoin transactions worldwide by the time it ceased operations after the exchange was hacked and the majority of cryptocurrency held by the exchange on behalf of customers was stolen. Creditors to Mt. Gox are still waiting for their funds, a sign that does not bode well for FTX creditors, to the extent they seek recovery directly from the FTX Group through the bankruptcy proceedings.[47]

153.    All of the above-mentioned problems with cryptocurrency are well known and one of the big reasons why consumers are hesitant to purchase or use cryptocurrency. According to Pew Research, 16% of Americans have invested in cryptocurrency while another 71% are not invested although they have heard at least a little about cryptocurrency.[48] For those in the latter group, concerns around fraud and scams are likely playing a role in their resistance to crypto investing.

154.    For those who choose to invest in cryptocurrency, the damages can be overwhelming, as with the FTX fraud. The losses sustained by SBF's victims are staggering. FTX stole more than $8 billion in Class Member funds, the bulk of which has now vanished. Many

---

[46] Crypto-Assets: Implications for Consumers, Investors, and Businesses (treasury.gov) (accessed May 11, 2023).

[47] What to Watch in the FTX Bankruptcy as Details Remain Scarce - WSJ

[48] 46% of cryptocurrency investors in US say it did worse than expected | Pew Research Center

Class Members came of working age in the recession and, later, the COVID-19 pandemic, and as a result have spent their lives working long hours for low wages, often across multiple jobs or in the gig economy. Unlike MDL Defendants, these Class Members do not have money to burn. They are not "crypto-bros." They are financially vulnerable, and SBF, with the help of his co-conspiring MDL Defendants, exploited their vulnerability for tremendous financial gain. Now, while SBF rests comfortably at his parents' home in Palo Alto, flush with the resources to post $250 million bail, SBF's victims are left with nothing.

**H.    The SEC's Approach to Cryptocurrency.**

   **1.    Overview**

155.    Despite the crypto industry's cries for "regulatory clarity," the SEC's stance on cryptocurrency has been clear and consistent from the beginning. Critics of the SEC's stance toward cryptocurrency overlook an important aspect of U.S. securities law – securities regulation is not meant to be precise but is instead intentionally drafted to be broad and all-encompassing; clarity is not just uncommon; it is deliberately avoided. This is why the definitions of "security" in Section 2(a)(1) of the Securities Act of 1933 (Securities Act), 15 U.S.C. 77b(a)(1), and Section 3(a)(10) of the Securities Exchange Act of 1934 (Exchange Act), 15 U.S.C. 78c(a)(10), include not only conventional securities, such as "stock[s]" and "bond[s]," but also the more general term "investment contract."

156.    Along these lines, in *Reves v. Ernst & Young*, the Supreme Court stated that:

"The fundamental purpose undergirding the Securities Acts is 'to eliminate serious abuses in a largely unregulated securities market.' *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 421 U.S. 849 (1975). **In defining the scope of the market that it wished to regulate, Congress painted with a broad brush. It recognized the virtually limitless scope of human ingenuity, especially in the creation of 'countless and variable schemes devised by those who seek the use of the money of others on the promise of profits**, *SEC v. W.J. Howey Co.*, 328 U.S. 293, 328 U.S. 299 (1946), and determined that the best way to achieve its goal

of protecting investors was 'to define the term "security" in sufficiently broad and general terms so as to include within that definition the many types of instruments that in our commercial world fall within the ordinary concept of a security.' . . . Congress therefore did not attempt precisely to cabin the scope of the Securities Acts . . . Rather, it enacted a definition of 'security' sufficiently broad to encompass virtually any instrument that might be sold as an investment." (emphasis added)"[49]

157.     Crafted to contemplate not only known securities arrangements at the time, but also any prospective instruments created by those who seek the use of others' money on the promise of profits, the definition of "security" is broad, sweeping, and designed to be flexible to capture new instruments that share the common characteristics of stocks and bonds. As Supreme Court Justice (and former SEC Commissioner (1935) and Chair (1936-37)) William O. Douglas opined in *Superintendent of Insurance v. Bankers Life and Casualty Co.*:

"We believe that section 10(b) and Rule 10b-5 prohibit all fraudulent schemes in connection with the purchase or sale of securities, whether the artifices employed involve a garden type variety fraud, or present a unique form of deception. Novel or atypical methods should not provide immunity from the securities laws."[50]

158.     Federal courts have already confirmed the SEC's jurisdiction in numerous crypto-related emergency asset freeze hearings where the issue is always considered and affirmed, same as it has been by hundreds of federal courts across the country since the *Howey* decision, which the Supreme Court adopted over 75 years ago.[51] That decision resulted in the *Howey* Test, which is used to determine the presence of an investment contract. The *Howey* Test stipulates that an investment contract exists if there is an "investment of money in a common enterprise with a reasonable expectation of profits to be derived from the efforts of others."[52] The *Howey* Test is the

---

[49] https://scholar.google.com/scholar_case?case=18068523124125938239&q=Reves+v.+Ernst+%26+Young&hl=en&as_sdt=400006&as_vis=1 (accessed May 11, 2023).

[50] 404 U.S 6, 12 n.7.

[51] https://supreme.justia.com/cases/federal/us/328/293/ (accessed May 11, 2023).

[52] Id.

principal method used by the SEC to determine if a given cryptocurrency is a security.

159.   The SEC has used multiple distribution channels to share its message and concerns regarding crypto, digital trading platforms, initial coin offerings, and other digital asset products and services over the past decade. The SEC first made investors aware of the dangers of investing in cryptocurrency in 2013 when the Office of Investor Education and Advocacy issued an Investor Alert on "Ponzi Schemes Using Virtual Currencies."[53]

160.   A year later, the same office issued an Investor Alert on "Bitcoin and Other Virtual Currency-Related Investments."[54] In 2017, the Commission took the rare step of releasing a Section 21(a) Report of Investigation that looked at the facts and circumstances of The DAO, which offered and sold approximately 1.15 billion DAO Tokens in exchange for a total of approximately 12 million Ether ("ETH") over a one-month period in 2016.[55] The SEC applied the *Howey* Test to the DAO tokens and concluded they were securities under the Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act"). While The DAO, and DAO tokens, were no longer operational at the time due to a high-profile hack that resulted in the theft of most DAO tokens, the Commission chose to release the report so as "to advise those who would use a Decentralized Autonomous Organization ("DAO Entity"), or other distributed ledger or blockchain-enabled means for capital raising, to take appropriate steps to ensure compliance with the U.S. federal securities laws."[56]

---

[53] ia_virtualcurrencies.pdf (sec.gov) (accessed May 11, 2023).

[54] Investor Alert: Bitcoin and Other Virtual Currency-Related Investments | Investor.gov (accessed May 11, 2023).

[55] https://www.sec.gov/litigation/investreport/34-81207.pdf (accessed May 11, 2023).

[56] Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO (accessed May 11, 2023).

161.    In 2019, the SEC released a "Framework for "Investment Contract" Analysis of Digital Assets" which provided additional details on when a digital asset has the characteristics of an investment contract and "whether offers and sales of a digital asset are securities transactions."[57]

162.    In addition, the SEC has publicized its position on cryptocurrency in countless enforcement actions,[58] multiple speeches,[59] Congressional testimony,[60] and several official SEC statements[61] and proclamations.[62] Current SEC Chairman, Gary Gensler, has spoken frequently about the perils and illegality of crypto lending platforms and decentralized finance,[63] warning that their failure to register with the SEC may violate U.S. securities laws.[64] In one interview, Gensler said:

> "The law is clear, it's not about waving a wand. Congress spoke about this in 1934 . . . When a [digital] platform has securities on it, it is an exchange, and it's a question of whether they're registered or they're operating outside of the law and I'll leave it at that."[65]

---

[57] SEC.gov | Framework for "Investment Contract" Analysis of Digital Assets (accessed May 11, 2023).

[58] SEC.gov | Crypto Assets and Cyber Enforcement Actions (accessed May 11, 2023).

[59] https://www.sec.gov/news/speech/gensler-aspen-security-forum-2021-08-03 (accessed May 11, 2023).

[60] https://www.sec.gov/news/testimony/gensler-2021-05-26 (accessed May 11, 2023).

[61] https://www.sec.gov/news/public-statement/statement-clayton-2017-12-11 (accessed May 11, 2023).

[62] https://www.sec.gov/news/public-statement/enforcement-tm-statement-potentially-unlawful-online-platforms-trading (accessed May 11, 2023).

[63] https://www.theblock.co/post/113416/gensler-speech-crypto-defi-lending-sec (accessed May 11, 2023).

[64] https://ca.finance.yahoo.com/news/crypto-platforms-dont-register-with-sec-outside-the-law-gensler- 164215740.html (accessed May 11, 2023).

[65] https://www.theblock.co/post/113416/gensler-speech-crypto-defi-lending-sec (accessed May 11, 2023).

163.    On September 8, 2022, Chair Gensler gave a speech reflecting on the flexibility of the securities laws and the SEC's consistency in applying these laws to cryptocurrency.[66] Gensler noted that of the 10,000 different cryptocurrencies in the market, "the vast majority are securities," a position that was also held by his predecessor, Jay Clayton.[67] Gensler went on to note that the SEC has spoken with a "pretty clear voice" when it comes to cryptocurrency "through the DAO Report, the Munchee Order, and dozens of Enforcement actions, all voted on by the Commission" and that "[n]ot liking the message isn't the same thing as not receiving it."[68]

164.    The judicial record supports Chair Gensler's assertions. The SEC has taken over 100 crypto-related enforcement actions and has not lost a single case.[69]

165.    What follows are summaries of five cases that will help inform this litigation.

**2.    SEC v. KIK**

166.    In Kik,[70] the SEC's complaint,[71] filed in the U.S. District Court for the Southern District of New York on June 4, 2019, alleged that Kik sold digital asset securities to U.S. investors without registering their offer and sale as required by the U.S. securities laws. Kik argued that the SEC's lawsuit against it should be considered "void for vagueness."[72]

167.    The court granted the SEC's motion for summary judgment on September 30, 2020, finding that undisputed facts established that Kik's sales of "Kin" tokens were sales of investment

---

[66] SEC.gov | Kennedy and Crypto (accessed May 11, 2023).

[67] Id.

[68] Id.

[69] SEC Cryptocurrency Enforcement: 2021 Update (cornerstone.com) (accessed May 11, 2023).

[70] https://www.sec.gov/news/press-release/2020-262 (accessed May 11, 2023).

[71] https://www.sec.gov/news/press-release/2019-87 (accessed May 11, 2023).

[72]    https://www.financemagnates.com/cryptocurrency/news/sec-seeks-to-block-kik-subpoenas-refutes-void-for-vagueness-claim/ (accessed May 11, 2023).

contracts (and therefore of securities) and that Kik violated the federal securities laws when it conducted an unregistered offering of securities that did not qualify for any exemption from registration requirements. The court further found that Kik's private and public token sales were a single integrated offering.

### 3.      SEC v. Telegram

168.    In Telegram,[73] the SEC filed a complaint[74] on October 11, 2019, alleging that the company had raised capital to finance its business by selling approximately 2.9 billion "Grams" to 171 initial purchasers worldwide. The SEC sought to preliminarily enjoin Telegram from delivering the Grams it sold, which the SEC alleged were securities that had been offered and sold in violation of the registration requirements of the federal securities laws.

169.    Telegram argued[75] that the SEC has "engaged in improper 'regulation by enforcement' in this nascent area of the law, failed to provide clear guidance and fair notice of its views as to what conduct constitutes a violation of the federal securities laws, and has now adopted an ad hoc legal position that is contrary to judicial precedent and the publicly expressed views of its own high-ranking officials."

170.    On March 24, 2020, the U.S. District Court for the Southern District of New York issued a preliminary injunction[76] barring the delivery of Grams and finding that the SEC had shown a substantial likelihood of proving that Telegram's sales were part of a larger scheme to distribute the Grams to the secondary public market unlawfully.

---

[73] https://www.sec.gov/news/press-release/2020-146 (accessed May 11, 2023).

[74] https://www.sec.gov/news/press-release/2019-212 (accessed May 11, 2023).

[75]      https://www.financemagnates.com/cryptocurrency/news/sec-vs-telegram-will-gram-tokens-ever-be-distributed/ (accessed May 11, 2023).

[76] SEC v. Telegram: A Groundbreaking Decision in Cryptocurrency Enforcement? | Insights | Greenberg Traurig LLP (gtlaw.com) (accessed May 11, 2023).

171.    Without admitting or denying the allegations in the SEC's complaint, the defendants consented to the entry of a final judgment enjoining them from violating the registration provisions of Sections 5(a) and 5(c) of the Securities Act of 1933. The judgment ordered the defendants to disgorge, on a joint and several basis, $1,224,000,000.00 in ill-gotten gains from the sale of Grams, with credit for the amounts Telegram pays back to initial purchasers of Grams. It also ordered Telegram Group Inc. to pay a civil penalty of $18,500,000. For the next three years, Telegram is further required to give notice to the SEC staff before participating in the issuance of any digital assets.

**4.      SEC v. BlockFi**

172.    In BlockFi Lending LLC, the first SEC case ever involving a crypto-lending program, on February 22, 2022, the SEC charged BlockFi [77] with failing to register the offers and sales of its retail crypto-lending product and also charged BlockFi with violating the registration provisions of the Investment Company Act of 1940.

173.    BlockFi argued for "increased regulatory clarity" but lost. [78]

174.    To settle the SEC's charges, BlockFi agreed to pay a $50 million penalty, cease its unregistered offers and sales of the lending product, BlockFi Interest Accounts (BIAs), and bring its business within the provisions of the Investment Company Act within 60 days. BlockFi's parent company also announced that it intends to register under the Securities Act of 1933 the offer and sale of a new lending product. In parallel actions, BlockFi agreed to pay an additional $50 million in fines to 32 states to settle similar charges.

---

[77] https://lnkd.in/d-Xy45ec (accessed May 11, 2023).

[78] https://blockfi.com/pioneering-regulatory-clarity (accessed May 11, 2023).

**5.      SEC Wells Notice to Coinbase**

175.     In 2021, Coinbase began marketing a cryptocurrency lending product called Lend. The Lend program purported to allow some Coinbase customers to "earn interest on select assets on Coinbase, starting with 4% APY on USD Coin (USDC)."[79] According to Coinbase, its lawyers reached out to the SEC to discuss its Lend product, at which point SEC staff instead served Coinbase with a *Wells Notice,* informing Coinbase of their intention to seek approval from the SEC Commissioners to file a civil enforcement action against Coinbase for violating the federal securities laws.

176.     According to Coinbase, the SEC issued the Wells Notice because of Coinbase's failure to file a registration statement with the SEC for the offering of its Lend product, which the SEC believed was a security.[80]

177.     The two cases that Coinbase claims the SEC cites as support for its *Wells* Notice are *SEC v. Howey* and *Reves v. Ernst & Young*. *Reves* addressed the question of whether a product is a "note" and hence a security (applying the so-called "Familial Resemblance Test").

178.     Under the Lend program, Coinbase customers were clearly investing "money" at Coinbase and placing their faith in Coinbase to generate a profit for them. Lend investors would have no say in how Coinbase runs the Lend program and Coinbase was not going to permit Lend investors to participant in Lend-related decisions. Given these facts, Lend was clearly an investment contract.

179.     Under *Reves*, Lend may have also been a "note" and hence a security. Although the term "note" is included in the statutory definition of a security, case law has determined that not

---

[79] The SEC has told us it wants to sue us over Lend. We don't know why. - Blog (coinbase.com) (accessed May 11, 2023).

[80] *Id.*

every "note" is a security. The definition specifically excludes notes with a term of less than nine months and courts have carved out a range of exemptions over the years for commercial paper type notes such as purchase money loans and privately negotiated bank loans. To reconcile these varying cases, the U.S. Supreme Court in *Reves* established the "family resemblance test," to determine whether a note is a security.

180.    Per the "family resemblance test," a presumption that a note is a security can only be rebutted if the note bears a resemblance to one of the enumerated categories on a judicially developed list of exceptions, as follows: 1) a note delivered in consumer financing; 2) a note secured by a mortgage on a home; 3) a short-term note secured by a lien on a small business or some of its assets; 4) a note evidencing a character loan to a bank customer; 5) a short-term note secured by an assignment of accounts receivable; and 6) a note which simply formalizes an open-account debt incurred in the ordinary course of business (such as a trade payable for office supplies); and vii) a note evidencing loans by commercial banks for current operations.

181.    The "family resemblance" analysis requires:

- A consideration of the motivation of the seller and buyer (e.g. is the seller looking for investment and the buyer looking for profit?);

- The plan of distribution of the note (e.g. is the product being marketed as an investment?);

- The expectation of the creditor/investor (e.g. would the investing public reasonably expect the application of the securities laws to the product); and

- The presence of an alternative regulation (e.g. will the product be registered as a banking product and the offered registered as a bank?).

182.     Applying the family resemblance test to Lend reveals the presence of a note. First, Coinbase likened the Lend program to that of a savings account, where the Lend customer is looking for a profitable investment and Coinbase is looking for investors. Second, Coinbase marketed the Lend program as an investment. Third, investors would expect that securities regulation applies. Fourth, Coinbase is not a bank, so their so-called savings account falls under no other regulatory jurisdiction and protection.

183.     Given the clear facts of the case, Coinbase decided to cancel the Lend program.[81]

**6.      SEC v. Binance**

184.     In Binance, the SEC filed a complaint[82] on June 5, 2023, in the United States District Court for the District of Columbia against several of the Binance entities including Binance.com, U.S.-based affiliates, and the founder Changpeng Zhao. The SEC alleges that Binance.com and the other defendants violated thirteen securities laws, including selling various unregistered securities and a staking-as-a-service program; operating an unregistered exchange, broker-dealer, and clearing agency across interstate lines; covertly controlling Binance.US to evade U.S. securities laws; secretly allowing U.S. high-value traders to remain on the international platform; and commingling billions of U.S. assets with Zhao-owned entities. The SEC seeks a preliminary injunction to, among other relief, freeze and repatriate defendants' U.S. assets. The SEC also seeks to permanently enjoin defendants from directly or indirectly violating the Exchange and Securities Acts, disgorge illegal gains, and award civil damages.

---

[81]https://www.theverge.com/2021/9/20/22684169/coinbase-crypto-lend-feature-discontinued-sec-lawsuit-threats (accessed June 27, 2023).
[82]https://www.sec.gov/files/litigation/complaints/2023/comp-pr2023-101.pdf.

### 7.      SEC v. Coinbase

185.     In Coinbase, the SEC filed a complaint[83] on June 6, 2023, in the United States District Court for the Southern District of New York against Coinbase and Coinbase Global. The SEC alleges that the Coinbase entities have violated multiple securities laws, including making billions of dollars from selling various unregistered securities and a staking-as-a-service program; and operating an unregistered exchange, broker-dealer, and clearing agency across interstate lines. The SEC seeks to permanently enjoin defendants from directly or indirectly violating the Exchange and Securities Acts, disgorge illegal gains, and award civil damages. "Coinbase was fully aware of the applicability of the federal securities laws to its business activities, but deliberately refused to follow them," stated Gurbir S. Grewal, Director of the SEC's Division of Enforcement.[84]

### 8.      SEC v. Terraform Labs Pte. Ltd.

186.     In one of the most recent developments in the crypto space, on July 31, 2023, Judge Jed Rakoff in the Southern District of New York entered an order denying a motion to dismiss claims that defendants, a crypto-assets company and its founder, were responsible for a multibillion-dollar fraud that involved the development, marketing, offer and sale of crypto-assets that the SEC alleged were unregistered securities. *SEC v. Terraform Labs Pte. Ltd., et al.*, No 1:23-cv-01346-JSR, ECF No. 51 (S.D.N.Y. July 31, 2023).[85]

187.     This is a significant ruling for several reasons.

188.     First, it supports the fact that YBAs and FTT are unregistered securities.

---

[83] https://www.sec.gov/litigation/complaints/2023/comp-pr2023-102.pdf.
[84] https://www.sec.gov/news/press-release/2023-102.
[85] https://storage.courtlistener.com/recap/gov.uscourts.nysd.594150/gov.uscourts.nysd.594150.51.0_1.pdf (accessed August 6, 2023).

189.     Second, Judge Rakoff explicitly rejects a key component of his colleague, Judge Analisa Torres' reasoning in her order on cross-motions for summary judgment in *SEC v. Ripple Labs, Inc., et al.*, No. 1:20-cv-10832, ECF No. 874 (S.D.N.Y. July 13, 2023), which drew a distinction between crypto-assets sold directly by the issuer and on the secondary market.[86]

190.     Third, Judge Jed Rakoff is a highly regarded jurist who is considered an expert in securities law and business law. In fact, Todd Baker, an attorney and Senior Fellow at the Richman Center for Business, Law & Public Policy at Columbia Business and Law Schools called Judge Rakoff, in a *Financial Times* article, the "[T]he most respected securities authority in the federal judiciary."[87]

191.     The relevant points of comparison in Judge Rakoff's decision to the FTX MDL are his analysis around the Luna token and UST stablecoin, which bear similarities to the FTT token and YBAs, respectively.

192.     With respect to the Luna token, Judge Rakoff found that a common enterprise and expectation of profit existed because Terraform labs used proceeds from LUNA coin sales to develop the Terraform blockchain and represented that that these improvements would increase the value of the Luna tokens. This is similar to the FTT token, which was an exchange token. Given FTT's features, it was clearly designed to go up in value as the FTX platform grew and became more popular with crypto traders. In fact, in their complaint alleging, amongst other things, that FTT is an unregistered security, the SEC states:

> FTX used the pooled proceeds from FTT sales to fund the development, marketing, business operations, and growth of FTX, depending on the success of FTX and its management team in developing, operating, and marketing the trading platform. If demand for trading on the FTX platform increased, demand for the FTT token could increase, such that any price increase in FTT would benefit holders of FTT equally

---

[86] https://assets.bwbx.io/documents/users/iqjWHBFdfxIU/rVqyLFyEZnz8/v0

[87] https://www.ft.com/content/5e5a3c4a-7508-4db8-ab23-1ff17c87c880

and in direct proportion to their FTT holdings. The large allocation of tokens to FTX incentivized the FTX management team to take steps to attract more users onto the trading platform and, therefore, increase demand for, and increase the trading price of, the FTT token.[88]

193.    The SEC makes a similar allegation with respect to Luna in the Terraform Labs action and Judge Rakoff sides with the SEC. From his decision:

> The SEC's theory for horizontal commonality as to these other coins, however, rests on a different but equally plausible theory. As to the LUNA tokens, for instance, the SEC has demonstrated horizontal commonality by alleging that the defendants' used proceeds from LUNA coin sales to develop the Terraform blockchain and represented that these improvements would increase the value of the LUNA tokens themselves. See Amended Complaint ¶¶ 46-47, 49-51. In other words, by alleging that the defendants "pooled" the proceeds of LUNA purchases together and promised that further investment through these purchases would benefit all LUNA holders, the SEC has adequately pled that the defendants and the investors were joined in a common, profit-seeking enterprise.[89]

194.    Also, of relevance to the FTX MDL is Judge Rakoff's conclusion that the algorithmic stablecoin, UST, also met the *Howey* standard for investment contracts. Note that this is the first time the SEC has alleged that a stablecoin is an investment contract, and the SEC's reasons for making this allegation also support the assertion that YBAs are securities.

195.    While UST, like most stablecoins, was supposed to be tied one-for-one to the US dollar, Terraform and Kwon marketed "UST coins as profitable investment opportunities—as opposed to just stable stores of value—in meetings with U.S. investors, investment conferences in major U.S. cities, and on social media platforms."[90]

---

[88] comp-pr2022-234.pdf (sec.gov)

[89] https://assets.bwbx.io/documents/users/iqjWHBFdfxIU/rwwEEo0YbENc/v0 at 36

[90] *Id.* at Page 4

196.    Then, in 2021, Terraform launched the "Anchor Protocol" which was an "investment pool into which owners of UST coins could deposit their coins and earn a share of whatever profits the pool generated."

197.    Judge Rakoff found that "the fact that most of the UST coins were deposited in the Anchor Protocol independently rendered these tokens investment contracts, indeed investments that were touted as being capable of being able to generate future profits of as much as 20%."[91] Judge Rakoff goes on to say:

> In essence, the UST tokens were allegedly "pooled" together in the Anchor Protocol and, through the managerial efforts of the defendants, were expected to generate profits that would then be re-distributed to all those who deposited their coins into the Anchor Protocol—in other words, on a pro-rata basis."[92]

198.    This closely resembles the facts surrounding YBAs and Judge Rakoff's finding that UST met the requirements for an investment contract supports the conclusion that YBAs are also unregistered securities.

199.    Judge Rakoff also explicitly rejects a key element of Judge Torres' analysis in the *Ripple* decision, stating:

> It may also be mentioned that the Court declines to draw a distinction between these coins based on their manner of sale, such that coins sold directly to institutional investors are considered securities and those sold through secondary market transactions to retail investors are not. In doing so, the Court rejects the approach recently adopted by another judge of this District in a similar case*, SEC v. Ripple Labs Inc.*, 2023 WL 4507900 (S.D.N.Y. July 13, 2023).[93]

---

[91] *Id.* at Page 34

[92] *Id.* at Page 36

[93] *Id.* at 40

200.     Judge Rakoff goes on to explain that *Howey* and its progeny never made such a distinction, nor does it matter, for purposes of *Howey* analysis, whether a purchaser "bought the coins directly from the defendants or, instead, in a secondary resale transaction."[94]

201.     After noting that "in theory, the tokens, if taken by themselves, might not qualify as investment contracts," Judge Rakoff evaluated—"as the Supreme Court did in *Howey*"— "whether the crypto-assets and the 'full set of contracts, expectations, and understandings centered on the sales and distribution of [these tokens]' amounted to an 'investment contract' under federal securities laws."[95]

202.     Judge Rakoff's rejection of the *Ripple* decision's secondary market distinction and fulsome *Howey* analysis support Plaintiffs' assertion that FTT and YBAs are unregistered securities. FTT purchasers, on the FTX Platform or elsewhere, did not necessarily know who the seller was. But, as Judge Rakoff explains, knowledge of the seller's identity is not necessary to prove that purchasers expected profits based on the efforts of FTX, who is the ***issuer*** of these assets, and not simply a platform where the assets traded.

**I.     FTX's offer and sale of YBAs, which are unregistered securities.**

203.     Beginning in 2019, the FTX Group began offering the YBAs to public investors through its Earn program. Plaintiff and other similarly situated individuals invested in FTX's YBAs.

204.     The details of the Earn program are still listed on the FTX website,[96] and additional information on Earn is described in a declaration submitted in the Voyager Chapter 11 proceedings

---

[94] *Id.* at 41

[95] *Id.* at 32–33.

[96] FTX App Earn – FTX Exchange (accessed May 11, 2023).

by Joseph Rotunda, Director of Enforcement of the Texas State Securities Board, on October 14, 2022.[97]

205.    Under the section titled "How can I earn yield on my FTX deposits?" on the FTX website, the company describes the Earn program thusly:

"You can now earn yield on your crypto purchases and deposits, as well as your fiat balances, in your FTX app! By opting in and participating in staking your supported assets in your FTX account, you'll be eligible to earn up to 8% APY on your assets."[98]

206.    On the same webpage, the company also states:

The **first $10,000** USD value in your deposit wallets will earn **8%** APY. Amounts held **above $10,000 up to $100,000** USD in value (subject to market fluctuations) will earn **5%** APY.[99]

207.    Nowhere on the website does FTX describe how this yield will be generated; readers are given the impression that the yield will come from "staking your supported assets in your FTX account" although nowhere does the company describe what staking actually is.

208.    Staking is a technical concept that applies to the blockchain consensus mechanism called Proof of Stake, which some cryptocurrencies utilize.[100] Staking serves a similar function to cryptocurrency mining, in that it is the process by which a network participant gets selected to add the latest batch of transactions to the blockchain and earn some crypto in exchange. While the exact mechanism will vary from project to project, in general, users will put their token on the line (i.e., "stake") for a chance to add a new block onto the blockchain in exchange for a reward. Their staked tokens act as a guarantee of the legitimacy of any new transaction they add to the

---

[97] 1175310142280000000134.pdf (stretto.com) (accessed May 11, 2023).

[98] FTX App Earn – FTX Exchange (accessed May 11, 2023).

[99] *Id.*

[100] For example, Ethereum, Tezos, Cosmos, Solana, and Cardano all use Proof of Stake.

blockchain. The network chooses validators based on the size of their stake and the length of time they've held it. Thus, the most invested participants are rewarded. If transactions in a new block are discovered to be invalid, users can have a certain amount of their stake burned by the network, in what is known as a slashing event.[101]

209.     Some within the crypto community argue that staking is not a security because it is simply part of the code by which specific cryptocurrencies operate. In other words, some argue that staking programs are different from lending programs because user assets are not actually being "lent" out to third parties. But in September 2022, SEC Chairman Gary Gensler told reporters that "cryptocurrencies and intermediaries that allow holders to 'stake' their coins might pass" the *Howey* Test.[102] According to Gensler, "From the coin's perspective…that's another indicia that under the *Howey* test, the investing public is anticipating profits based on the efforts of others." The Wall Street Journal noted that if an intermediary such as a crypto exchange offers staking services to its customers, Mr. Gensler said, it "looks very similar—with some changes of labeling—to lending."[103]

210.     Based upon information – included and not included – on the FTX website, it does not appear that the company is adhering to the technical, commonly understood, definition of staking. *See* Ex. A ¶¶ 36–42. The most telling indicator is that the company permits any cryptocurrency listed on their platform to be eligible for staking, even coins that do not use Proof of Stake. *Id.* ¶ 39. The FTX website specifically states that Bitcoin and Dogecoin can generate yield under the Earn program, even though these coins use the Proof of Work consensus

---

[101] The staking definition comes from the Coinbase website: What is staking? | Coinbase (accessed May 11, 2023).

[102] Ether's New 'Staking' Model Could Draw SEC Attention - WSJ (accessed May 11, 2023).

[103] Id.

mechanism (meaning you CANNOT technically stake Bitcoin or Dogecoin). Therefore, it is not at all clear where the promised yield is coming from.

211.    Applying *Howey* to the FTX Earn program reveals that Earn is an investment contract. An investment contract is present because users are clearly entrusting their funds to FTX. Users have to "opt-in" so that FTX may take possession over user assets and deploy them in a manner that will generate yield. As noted above, it is not clear how that yield is generated, but it is clear that FTX is deploying customer assets in a discretionary manner. Therefore, the efforts of FTX are instrumental in generating the users' yield and of course users have an expectation of profit because FTX is advertising yields of up to 8% APY:

> From a securities perspective, the *Howey* Test defines an investment contract as:
> a. An investment of money
>    i. Cryptocurrency is a medium of exchange and way of transferring value in a measurable and quantifiable way. It is increasingly used as a means of payment, although it is more commonly used as a speculative investment at this point in time. Whether or not cryptocurrency can be defined as 'money' is in part a matter of semantics that can vary based on considers the fundamental features of money to be, and what criteria needs to be achieved in order for something to be considered money. Suffice to say, when examining aspects such as fungibility, durability, portability, divisibility, scarcity, transferability, acting as a medium of exchange, acting as a unit of account, and acting as a store of value, it could be argued that some cryptocurrencies fulfill many of these criterion as good as or even better than fiat currencies.
> b. In a common enterprise
>    i. FTX customer assets are almost always consolidated in wallets operated an controlled by FTX at least initially. These wallets are typically referred to as 'hot wallets' or 'consolidation wallets.' From these wallets, cryptocurrency can be move to other FTX-controlled wallets, or it can be used to pay back other customers performing withdrawals, but FTX can and did send (and loan) out such assets to other entities, including Alameda 'Alameda.' The blockchains data contains an immutable and verifiable record of data that shows that FTX customer deposits went into accounts operated by a common enterprise, namely, FTX.

   c.  With the expectation of profit

       i.  FTX customers are promised yield when they participate in the Earn program. And at up to 8% yield, that is a considerable amount that would be considerably in excess to that of a savings account at a bank. But it was also far riskier than investing money in a savings account at a bank. FTX goes out of their way to advertise this yield, and indicate that such earnings are to be calculated on the "investment portfolio" that is stored 'in' the FTX app.[104]

   d.  To be derived from the efforts of others

       i.  The FTX Yield-bearing account was portrayed as passive income stream. A customer needs to do nothing more than ensure they are subscribed to the yield program, and that they have deposited assets (of crypto or even fiat) in order to earn the 5% or 8% yield, which they clearly indicate is counted hourly. There is no further work or action needed on the part of the user.

       ii.  The work that 'others' (namely FTX) would need to do would including, at a baseline, sending transactions. But it would also require FTX to make an effort by leveraging and investing the money elsewhere which could theoretically come about either via giving out loans, employing trading strategies, 'staking,' making other investments, or giving out loans to entities (such as Alameda) that would employ such strategies.

212.    The FTX Earn program was most likely a note per *Reves* as well. First, FTX offered Earn to obtain crypto assets for the general use of its business, namely, to run its activities to pay interest to Earn investors, and users purchased YBAs and were automatically opted-in to Earn to receive interest on their crypto assets. Second, Earn was offered and sold to a broad segment of the general public. Third, FTX promoted Earn as an investment; on their website, FTX notes that Earn users will receive "yield earnings" on their "investment portfolio."[105] Fourth, no alternative regulatory scheme or other risk reducing factors exist with respect to Earn. Note that the above

---

[104]  https://help.ftx.com/hc/en-us/articles/10573545824532-FTX-App-Earn (accessed May 11, 2023).

[105]  FTX App Earn – FTX Exchange (accessed May 11, 2023).

analysis mirrors that provided by the SEC in their BlockFi order.[106]

213.    FTX maintains that it does not offer for sale any product that constitutes a "security" under federal or state law. Under federal securities laws as construed by the United States Supreme Court in its decision *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946) and by the SEC, an investment contract is a form of security under United States securities laws when (1) the purchaser makes an investment of money or exchanges another item of value (2) in a common enterprise (3) with the reasonable expectation of profits to be derived from the efforts of others.

214.    The YBAs were "securities" as defined by the United States securities laws and as interpreted by the Supreme Court, the federal courts, and the SEC. The FTX Group offered variable interest rewards on crypto assets held in the YBAs on the FTX Platform, which rates were determined by the FTX Group in their sole discretion. In order to generate revenue to fund the promised interest, the FTX Group pooled the YBA assets to engage in lending and staking activities from which they derived revenue to pay interest on the YBAs. These activities make the YBAs a "security" under state and federal law.

215.    On October 14, 2022, Director of Enforcement of the Texas State Securities Board, Joseph Rotunda, filed a declaration in the Chapter 11 bankruptcy proceedings pending in connection with the collapse of the Voyager Digital cryptocurrency exchange, *In re: Voyager Digital Holdings, Inc., et al.*, Case No. 22-10943 (MEW), ECF No. 536 (Bankr. S.D.N.Y. Oct. 14, 2022), in which he explained how the YBAs are in fact "an offering of unregistered securities in the form of yield-bearing accounts to the residents of the United States." *Id*., at 6. In his declaration, the pertinent portions of which are reproduced in full for ease of reference, Rotunda explains:

---

[106] https://www.sec.gov/news/press-release/2022-26 (accessed May 11, 2023).

I am also familiar with FTX Trading LTD ("FTX Trading") dba FTX as described herein. As more fully explained throughout this declaration, I am aware that FTX Trading, along with West Realm Shires Services Inc. dba FTX US ("FTX US"), may be offering unregistered securities in the form of yield-bearing accounts to residents of the United States. These products appear similar to the yield-bearing depository accounts offered by Voyager Digital LTD et al., and the Enforcement Division is now investigating FTX Trading, FTX US, and their principals, including Sam Bankman-Fried.

I understand that FTX Trading is incorporated in Antigua and Barbuda and headquartered in the Bahamas. It was organized and founded in part by Mr. Bankman-Fried, and FTX Trading appears to be restricting operations in the United States. For example, domestic users accessing the webpage for FTX Trading at ftx.com are presented with a pop-up window that contains a disclaimer that reads in part as follows:

> Did you mean to go to FTX US? FTX US is a US licensed cryptocurrency exchange that welcomes American users.

> You're accessing FTX from the United States. You won't be able to use any of FTX.com's services, though you're welcome to look around the site.

FTX US claims to be regulated as a Money Services Business with FinCEN (No. 31000195443783) and as a money transmitter, a seller of payment instruments and in other non-securities capacities in many different states. It is not, however, registered as a money transmitter or in any other capacity with the Texas Department of Banking and it is not registered as a securities dealer with the Texas State Securities Board.

FTX US owns 75 percent or more of the outstanding equity of FTX Capital Markets (CRD No. 158816) ("FTX Capital"), a firm registered as a broker-dealer with the United States Securities and Exchange Commission, the Financial Industry Regulatory Authority Inc., and 53 state and territorial securities regulators. FTX Capital's registration as a dealer in Texas became effective on May 7, 2012, and the registration continues to remain in force and effect.

FTX US maintains a website at https://ftx.us that contains a webpage for smartphone applications for FTX (formerly Blockfolio)[107] (the "FTX Trading App") and FTX US Pro. Users appear able to click a link in this webpage to download the FTX Trading App even when they reside in the United States.

On October 14, 2022, I downloaded and installed the FTX Trading App on my smartphone. I created an account with FTX Trading through the FTX Trading App and linked the FTX account to an existing personal bank account. During the process, I provided my full first and last name and entered my residential address in Austin, Texas. I also accessed hyperlinks in the FTX Trading App that redirected to the Privacy Policy and Terms of Service. Although I was from the United States and was using the application tied to FTX Trading, the Privacy Policy and Terms of Service were from FTX US - not FTX Trading.

I thereafter used the FTX Trading App to initiate the transfer of $50.00 from my bank account to the FTX account and then transferred .1 ETH from a 3.0 wallet to the FTX account. The transfer of funds from my bank account to the FTX account will take up to six days to complete but the transfer of ETH was processed within a few minutes.

The FTX Trading App showed that I was eligible to earn a yield on my deposits. It also explained the "Earn program is provided by FTX.US" – not FTX Trading. It also represented that "FTX Earn rewards are available for US users on a promotional basis."

I recall the FTX Trading App's default settings were automatically configured to enable the earning of yield. The application also contained a link for additional information about yield. I accessed the link and was redirected to a recent article published by "Blockfolio Rebecca" under help.blockfolio.com. The article began as follows:

---

[107] FTX acquired Blockfolio LLC ("Blockfolio") in or around August 2020. At the time, Blockfolio managed a cryptocurrency application. FTX thereafter rebranded Blockfolio and its smartphone application as FTX. Now, users can download the FTX Trading App from Apple's App Store or Google's Google Play Store. Although FTX rebranded Blockfolio, the application listing in Apple's App Store still shows the application developed by Blockfolio.

You can now earn yield on your crypto purchases and deposits, as well as your fiat balances, in your FTX Trading App! By opting in and participating in staking your supported assets in your FTX account, you'll be eligible to earn up to 8% APY on your staked assets. THIS APY IS ESTIMATED AND NOT GUARANTEED AS DESCRIBED BELOW.

The article also described the payment of yield. It contained a section titled *How do you calculate APY? Does my balance compound daily?* that read, in part, as follows:

FTX will deposit yield earnings from the staked coins, calculated hourly, on the investment portfolio that is stored in your FTX Trading App. Yield will be compounded on principal and yield you have already earned. Any cryptocurrency that you have deposited on FTX as well as any fiat balance you may have on your account, will earn yield immediately after you have opted into the program.

The first $10,000 USD value in your deposit wallets will earn 8% APY. Amounts held above $10,000 up to $10MM USD in value (subject to market fluctuations) will earn 5% APY. In this scenario, your yield earned on the coins will look something like the examples below the table.

The article also contained a section titled Is this available in my country? This section explained that "FTX Trading App Earn is available to FTX Trading App customers that are in one of the FTX permitted jurisdictions." It contained a hyperlink to an article titled *Location Restrictions* published by FTX Crypto Derivatives Exchange under help.ftx.com. This article described various restrictions on operations in certain countries and locations and read in part as follows:

**FTX** does not onboard or provide services to corporate accounts of entities located in, established in, or a resident of the **United States of America, Cuba, Crimea and Sevastopol, Luhansk People's Republic, Donetsk People's Republic, Iran, Afghanistan, Syria, or North Korea**. FTX also does not onboard corporate accounts located in or a resident of **Antigua or Barbuda**. FTX also does not onboard any users from Ontario, and FTX does not permit non-professional investors from Hong Kong purchasing certain products.

**FTX does not onboard or provide services to personal accounts of current residents of the United States of America, Cuba, Crimea and Sevastopol, Luhansk People's Republic, Donetsk People's Republic, Iran, Afghanistan, Syria, North Korea, or Antigua and Barbuda**. There may be partial restrictions in other jurisdictions, potentially including Hong Kong, Thailand, Malaysia, India and Canada. In addition, FTX does not onboard any users from Ontario, does not permit non-professional investors from Hong Kong purchasing certain products, and does not offer derivatives products to users from Brazil.

FTX serves all Japanese residents via FTX Japan.

(emphasis in original)

Despite the fact I identified myself by name and address, the FTX Trading App now shows that I am earning yield on the ETH. The yield is valued at 8 percent APR.

Based upon my earning of yield and an ongoing investigation by the Enforcement Division of the Texas State Securities Board, the yield program appears to be an investment contract, evidence of indebtedness and note, and as such appears to be regulated as a security in Texas as provided by Section 4001.068 of the Texas Securities Act. At all times material to the opening of this FTX account, FTX Trading and FTX US have not been registered to offer or sell securities in Texas. FTX Trading and FTX US may therefore be violating Section 4004.051 of the Texas Securities Act. Moreover, the yield program described herein has not been registered or permitted for sale in Texas as generally required by Section 4003.001 of the Securities Act, and as such FTX Trading and FTX US may be violation Section 4003.001 by offering unregistered or unpermitted securities for sale in Texas. Finally, FTX Trading and FTX US may not be fully disclosing all known material facts to clients prior to opening accounts and earning yield, thereby possibly engaging in fraud and/or making offers containing statements that are materially misleading or otherwise likely to deceive the public. Certain principals of FTX Trading and FTX US may also be violating these statutes and disclosure requirements. Further investigation is necessary to conclude whether FTX Trading, FTX US and others are violating the Securities Act through the acts and practices described in this declaration.

The Enforcement Division of the Texas State Securities Board understands that FTX US placed the highest bid for assets of Voyager Digital LTD et al., a family of companies variously accused of misconduct in connection with the sale of securities similar to the yield program promoted by FTX Trading and FTX US. FTX US is managed by Sam Bankman-Fried (CEO and Founder), Gary Wang (CTO and Founder) and Nishad Singh (Head of Engineering). The same principals hold the same positions at FTX Trading, and I was able to access the yield-earning product after following a link to the FTX Trading App from FTX US's website. The FTX Trading App also indicated the Earn program is provided by FTX US. As such, FTX US should not be permitted to purchase the assets of the debtor unless or until the Securities Commissioner has an opportunity to determine whether FTX US is complying with the law and related and/or affiliated companies, including companies commonly controlled by the same management, are complying with the law.

I hereby authorize the Texas Attorney General's Office and any of its representatives to use this declaration in this bankruptcy proceeding.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 14, 2022 in Austin, Texas.

<u>/s Joseph Jason Rotunda</u>

By: Joseph Jason Rotunda

### J.        FTX's offer and sale of FTT Tokens, which are unregistered securities.

216.    The FTT token that contributed to FTX's demise is also an investment contract per the *Howey* Test. FTT is an exchange token created by FTX that entitles holders to benefits on the FTX exchange. According to crypto news site CoinDesk, "such benefits often include trading fee discounts, rebates and early access to token sales held on the platform."[108] Exchange tokens can

---

[108] https://www.coindesk.com/learn/what-is-an-exchange-token/ (accessed May 11, 2023).

be very profitable for their issuers because the exchanges that issue them tend to keep a significant number of tokens for themselves, which they can pump in price through speeches, social media posts, and other announcements. Economically, exchange tokes are akin to equity, although the holders of exchange tokens have no legal rights or interests in the issuer. As the exchange issuer grows in size and prominence, and trading volume increases on the exchange, the value of the exchange token will likely increase. Thus, the value of FTT increased as the FTX exchange became more well-known and utilized.[109]

217.    FTT passes the *Howey* Test because the token was controlled by FTX; the company could create or destroy FTT at will. And the value of FTT was based upon the success of FTX, therefore the "efforts" of others prong of the Howey Test is implicated. It is also clear that investors bought FTT because they thought it would go up in price; this is the same reason why most, if not all, investors buy any given cryptocurrency. In fact, Binance CEO Changpeng "CZ" Zhao agreed to accept FTT tokens as part of FTX's buyout of Binance's equity stake in FTX.[110]

## K.    Using the FTX Platform itself necessarily required transacting in unregistered securities.

218.    Another avenue through which FTX users may have been exposed to a securities transaction was through the basic structure of the FTX Platform.

219.    Despite cryptocurrency and blockchain's foundational premise being the ability to

---

[109] See FTT price history here: https://coinmarketcap.com/currencies/ftx-token/ (accessed May 11, 2023).

[110]    https://www.investors.com/news/binance-to-buy-ftx-international-operations-as-liquidity-crunch-sparks-crypto-selloff/ (accessed May 11, 2023).

transmit value peer-to-peer using a trustless and decentralized database that cannot be censured by any third party, cryptocurrency exchanges operate more like traditional banks.

220.    When you buy Bitcoin through a centralized cryptocurrency exchange, there is no corresponding transaction to the Bitcoin blockchain. Rather, the exchange simply maintains its own database that indicates which cryptocurrencies it owes to its customers. This is similar to how banks operate. Money deposited in a checking account is not actually "ours." The money becomes the bank's and we are owed a debt by the bank which is governed by the terms and conditions of the account.

221.    Cryptocurrency exchanges should then be in custody of enough cryptocurrency on the blockchain to cover what it owes customers. Custody can be done using hot or cold digital wallets (hot wallets are connected to the internet, cold wallets are not) with best practice being for exchanges to hold the majority of cryptocurrency (crypto which they are holding on behalf of customers) in multiple cold wallets. Best practice would also dictate that exchanges hold customer assets in separate wallets from exchange assets, and that each customer's assets would be held in a distinct wallet.

222.    According to the first day declaration by John Ray, FTX kept its crypto in a common pool used to fund undisclosed and unreasonably risky investments:

> The FTX Group did not keep appropriate books and records, or security controls, with respect to its digital assets. Mr. Bankman-Fried and [Alameda co-founder Gary] Wang controlled access to digital assets of the main businesses in the FTX Group (with the exception of LedgerX, regulated by the CFTC, and certain other regulated and/or licensed subsidiaries). Unacceptable management practices included the use of an unsecured group email account as the root user to access confidential private keys and critically sensitive data for the FTX Group companies around the world, the absence of daily reconciliation of positions on the blockchain, the use of software to conceal the misuse of customer funds, the secret exemption of Alameda from certain aspects of FTX.com's auto-liquidation protocol, and the absence of independent governance as between Alameda (owned 90% by Mr.

Bankman-Fried and 10% by Mr. Wang) and the Dotcom Silo (in which third parties had invested).

The Debtors have located and secured only a fraction of the digital assets of the FTX Group that they hope to recover in these Chapter 11 Cases. The Debtors have secured in new cold wallets approximately $740 million of cryptocurrency that the Debtors believe is attributable to either the WRS, Alameda and/or Dotcom Silos. The Debtors have not yet been able to determine how much of this cryptocurrency is allocable to each Silo, or even if such an allocation can be determined. These balances exclude cryptocurrency not currently under the Debtors' control as a result of (a) at least $372 million of unauthorized transfers initiated on the Petition Date, during which time the Debtors immediately began moving cryptocurrency into cold storage to mitigate the risk to the remaining cryptocurrency that was accessible at the time, (b) the dilutive 'minting' of approximately $300 million in FTT tokens by an unauthorized source after the Petition Date and (c) the failure of the co-founders and potentially others to identify additional wallets believed to contain Debtor assets.[111]

223.    In the declaration, Mr. Ray presents several rough balance sheets for the various FTX silos, while noting that he does not have confidence in them, and that "the information therein may not be correct as of the date stated."[112] Most telling is a footnote that appears on the balance sheets for the exchange businesses: "Customer custodial fund assets are comprised of fiat customer deposit balances. Balances of customer crypto assets deposited are not presented."[113] Ray notes that U.S. and overseas exchanges "may have significant liabilities" but that "such liabilities are not reflected in the financial statements prepared while these companies were under the control of Mr. Bankman-Fried."[114]

224.    To further complicate matters, recent statements given by Sam Bankman-Fried to the Wall Street Journal (WSJ) suggest that about half of the balance owed by Alameda to FTX

---

[111] 042020648197.pdf (pacer-documents.s3.amazonaws.com) (accessed May 11, 2023).

[112] *Id.*

[113] *Id.*

[114] *Id.*

was from wire transfers that customers made to FTX via Alameda in the early days before FTX had a bank account.[115] This money was intended to fund customers' accounts at FTX. Bankman-Fried claims some customers continued to use that route after FTX had a bank account and that over time, "FTX customers deposited more than $5 billion in those Alameda accounts."[116] The WSJ acknowledged that these funds "could have been recorded in two places—both as FTX customer funds and as part of Alameda's trading positions" and that "such double-counting would have created a huge hole in FTX's and Alameda's balance sheets, with assets that weren't really there."[117]

225.     The relationship between FTX and Alameda was critical to the exchange's eventual collapse. After suffering large losses in the wake of several high profile crypto-firm failures in the spring and summer of 2022 (Alameda most likely was exposed to crypto hedge fund Three Arrows Capital), FTX.com lent out some of its customer assets that it did control to Alameda.[118] Presumably, the exchange benefitted from the interest paid by Alameda for the loaned cryptoassets – although some have suggested that the loans were made for free.[119] Alameda could then use the customer assets as cheap collateral for margined trades with other parties (obtaining collateral from

---

[115]     https://www.wsj.com/articles/ftx-founder-sam-bankman-fried-says-he-cant-account-for-billions-sent-to-alameda-11670107659?st=g35ia0eu0bjwqzn&reflink=desktopwebshare_permalink  (accessed  May  11, 2023).

[116] FTX customers deposited more than $5 billion in those Alameda accounts.

[117] *Id.*

[118]  https://newsletter.mollywhite.net/p/the-ftx-collapse-the-latest-revelations  (accessed  May  11, 2023).

[119]     https://www.cnbc.com/2022/11/13/sam-bankman-frieds-alameda-quietly-used-ftx-customer-funds-without-raising-alarm-bells-say-sources.html (accessed May 11, 2023).

other sources would have been much more expensive).[120]

226.    It appears that Alameda did post collateral to secure the loans of customer cryptoassets that it received, but that collateral took the form of FTT tokens. FTT tokens were the so-called "native token" of the FTX exchange: FTX created FTT and issued it to both institutional and retail investors without registering with any regulator or undergoing any audit or other external due diligence. FTX could create unlimited amounts of FTT if it wished.

227.    In short, there appear to have been two sets of leveraged transactions involved. First, Alameda borrowed assets from FTX's customers, providing FTT tokens as collateral for those loans. Second, Alameda engaged in margin trading, essentially borrowing money to execute risky trading strategies: these trades were secured by the assets Alameda had borrowed from FTX customers' accounts. Leverage makes trades potentially more lucrative, but also makes them more vulnerable to adverse market movements. In an Alameda balance sheet linked to CoinDesk in early November, Alameda's largest asset holdings were listed as being FTT tokens (it is possible that it received these in a kind of bailout from FTX). Other assets listed on that balance sheet included SOL tokens (issued by the Solana blockchain, in which Sam Bankman-Fried was an early investor) and SRM tokens (issued by the Serum exchange that Sam Bankman-Fried co-founded).[121] Alameda had few assets that hadn't been created out of thin air by FTX or FTX-related entities.

## L.    FTX Aggressively and Deceptively Marketed its Platform

228.    Cryptocurrency has also fueled a surge in ransomware that has victimized American businesses, health care systems, and state and local governments. In May of 2022, the

---

[120] For a more general discussion of the conflicts of interest inherent in these relationships, see https://www.coppolacomment.com/2022/11/the-ftx-alameda-nexus.html (accessed May 11, 2023).

[121] https://www.coindesk.com/business/2022/11/02/divisions-in-sam-bankman-frieds-crypto-empire-blur-on-his-trading-titan-alamedas-balance-sheet/ (accessed May 11, 2023).

majority staff on the Homeland Security & Governmental Affairs Committee released a startling report on ransomware.[122] The report notes that in 2021, "ransomware attacks impacted at least 2,323 local governments, schools, and healthcare providers in the United States" and that the FBI "received 3,729 ransomware complaints with adjusted losses of more than $49.2 million." The report acknowledges that these numbers underestimate the true scale of the problem because many ransomware victims do not report to authorities. As evidence, they cite data from blockchain analytics company Chainalysis that found "malign actors received at least $692 million in cryptocurrency extorted as part of ransomware attacks" in 2020. The report notes that "cryptocurrency, typically Bitcoin, has become a near universal form of ransom payment in ransomware attacks, in part, because cryptocurrency enables criminals to extort huge sums of money from victims across diverse sectors with incredible speed." The link between cryptocurrency and ransomware became clear to the public in the wake of the Colonial Pipeline hack in May 2021, which disrupted gasoline supplies in the southeastern U.S. In the wake of that breach, several commentators argued for a ban, or heavy regulation, of cryptocurrency.[123]

229.    Everyday consumers have also fallen victim to various cryptocurrency-related scams. The Consumer Financial Protection Bureau (CFPB) published 2,404 cryptocurrency related consumer complaints in its Consumer Complaint Database during 2021, and more than 1,000 cryptocurrency-related complaints during 2022 year-to-date.[124] According to the September DoJ report: "The CFPB has also received hundreds of servicemember complaints involving

---

[122] HSGAC Majority Cryptocurrency Ransomware Report.pdf (senate.gov) (accessed May 11, 2023).

[123] Ban Cryptocurrency to Fight Ransomware - WSJ (accessed May 11, 2023).

[124] Justice Department Announces Report on Digital Assets and Launches Nationwide Network | OPA | Department of Justice (accessed May 11, 2023).

cryptocurrency assets or exchanges in the last 12 months, approximately one-third of which concerned frauds or scams."[125] In June 2022, the Federal Trade Commission issued a report finding that "since the start of 2021 more than 46,000 people have reported losing over $1 billion in crypto to scams   https://www.ftc.gov/news-events/data-visualizations/data-spotlight/2022/06/reports-show-scammers-cashing-crypto-craze – that's about one out of every four dollars reported lost, more than *any* other payment method."[126] The median individual loss was a staggering $2,600.

230.    Another September 2022 report from the Treasury Department, issued pursuant to the Executive Order, also called out the risks and harms to consumers from cryptocurrency:

> "Consumers and investors are exposed to improper conduct in the crypto-asset ecosystem for a variety of reasons, including a lack of transparency as well as the fact that crypto-assets have relatively novel and rapidly developing applications. This leads to frequent instances of operational failures, market manipulation, frauds, thefts, and scams. While the data for populations vulnerable to disparate impacts remains limited, available evidence suggests that crypto-asset products may present heightened risks to these groups, and the potential financial inclusion benefits of crypto-assets largely have yet to materialize."[127]

231.    There is also a long history of consumer losses associated with centralized exchanges, FTX being the latest. One of the first cryptocurrency exchange failures was Japan-based Mt. Gox in 2014. Mt. Gox was handling over 70% of bitcoin transactions worldwide by the time it ceased operations after the exchange was hacked and the majority of cryptocurrency held by the exchange on behalf of customers was stolen. Creditors to Mt. Gox are still waiting for their funds, a sign that does not bode well for FTX creditors, to the extent they seek recovery directly

---

[125] *Id.*

[126] Reports show scammers cashing in on crypto craze | Federal Trade Commission (ftc.gov) (accessed May 11, 2023).

[127] Crypto-Assets: Implications for Consumers, Investors, and Businesses (treasury.gov) (accessed May 11, 2023).

from the FTX Group through the bankruptcy proceedings.[128]

232.    All of the above-mentioned problems with cryptocurrency are well known and one of the big reasons why consumers are hesitant to purchase or use cryptocurrency. According to Pew Research, 16% of Americans have invested in cryptocurrency while another 71% are not invested although they have heard at least a little about cryptocurrency.[129] For those in the latter group, concerns around fraud and scams are likely playing a role in their resistance to crypto investing.

233.    These valid concerns are one reason why crypto firms like FTX turn to celebrity endorsers. The FTX advertising campaign is particularly pernicious because it implicitly acknowledges cryptocurrency's problems while holding FTX out as the "safe" place to invest in cryptocurrency (note statements by O'Leary, Brady, and Curry, below). These statements were untrue, as FTX turned out to be a house of cards that misappropriated customer assets.

234.    FTX's paid endorser program was clearly designed to use the positive reputation associated with specific celebrities to convince consumers that FTX was a safe place to buy and sell cryptocurrency.

235.    FTX's brand ambassadors and ad campaigns that utilized those brand ambassadors had a critical role in portraying FTX as being 'safe' and 'compliant.':

In Stephen Curry's FTX commercial, FTX's alleged safety is quite blatant stated when he claims

*"With FTX, I have everything I need to buy, sell, and trade crypto safely"*

Kevin O'Leary, another FTX brand ambassador stated:

---

[128] What to Watch in the FTX Bankruptcy as Details Remain Scarce - WSJ

[129] 46% of cryptocurrency investors in US say it did worse than expected | Pew Research Center

*"To find crypto investment opportunities that met my own rigorous standards of compliance, I entered into this relationship with FTX. It has some of the best crypto exchange offerings I've seen on the market. FTX leverages best-in-class tech to provide a quality trading experience with low fees for both professional and retail investors alike, while at the same time providing the reporting platform that serves both internal and regulatory compliance requirements"*

Given that FTX continually misappropriated customer assets, didn't have appropriate capital controls or reasonable compliance policies in place, these claims weren't just unfounded; they were downright false.

Mr. O'Leary's assertion that FTX was a compliant exchange is even more damaging than that of the typical celebrity, however. This is because Mr. O'Leary is known for being a *Shark* on the TV show *Shark Tank* whereby Shark's make investments in startups. With those investments comes due diligence. Mr. O'Leary's endorsement of FTX certainly makes it seem that he did appropriate due diligence into FTX, when obviously, whatever due diligence that he did was grossly inadequate.

Mr. O'Leary appears to admit that his own due diligence was inadequate, and that he relied on the due diligence of others:

*"I obviously know all the institutional investors in this deal. We all look like idiots. Let's put that on the table. We relied on each other's due diligence, but we also relied on another investment theme that I felt drove a lot of interest in FTX[130]"*

Mr. O'Leary is also a strategic investor in Canada's largest cryptocurrency exchange, 'WonderFi.' The name is derived from Mr. O'Leary's nickname, 'Mr. Wonderful.' Mr. O'Leary's involvement in WonderFi could naturally lead one to believe that he knew how to perform adequate due diligence on exchanges, and that he would do so on FTX before investing and acting as a brand ambassador.

236.   Other organizations and individuals, with presumably more to gain, did find red flags at FTX and turned down FTX and/or Sam Bankman-Fried's money. The nonprofits Our World Data and MITRE declined offered gifts of $7.5 million and $485,000, respectively, from

---

[130]   https://dailyhodl.com/2022/12/09/kevin-oleary-says-ftx-collapse-makes-him-and-other-investors-in-the-crypto-exchange-look-like-idiots/

the FTX Future Fund due to undisclosed red flags.[131] In addition, CME Group CEO Terry Duffy allegedly told Sam Bankman-Fried that he was "an absolute fraud" upon having an initial conversation with Mr. Bankman-Fried.[132]

237.    Based upon the information that has been released by FTX's new CEO John Ray as part of the company's bankruptcy filings, it is clear that anyone who bothered to spend 20 minutes reviewing FTX's operations pre-collapse would have identified significant red flags. In his first day pleading in support of FTX's chapter 11 petitions, Mr. Ray noted:

> "Never in my career have I seen such a complete failure of corporate controls and such a complete absence of trustworthy financial information as occurred here. From compromised systems integrity and faulty regulatory oversight abroad, to the concentration of control in the hands of a very small group of inexperienced, unsophisticated and potentially compromised individuals, this situation is unprecedented."[133]

238.    Mr. Ray's pleading contains a number of troubling findings, among them: 1.) FTX did not have centralized control of its cash, 2.) FTX had no dedicated human resources department, which has hindered Mr. Ray's team from preparing a complete list of who worked for the FTX Group, 3.) A lack of disbursement controls that resulted in employees submitting payment requests via on-line chat and these requests being approved by managers responding with personalized emojis, 4.) Corporate funds were used to purchase homes and personal items for employees, and 5.) A lack of books and records and the absence of lasting records of decision-making.

---

[131] https://www.moneyweb.co.za/moneyweb-crypto/sam-bankman-frieds-red-flags-were-seen-in-all-corners-of-his-empire/ (accessed May 11, 2023).

[132]    https://www.cnbc.com/2022/11/23/absolute-fraud-cmes-terry-duffy-says-he-saw-trouble-before-ftx-collapse-.html (accessed May 11, 2023).

[133] https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=&ved=2ahUKEwiok r3C_-L7AhWsnGoFHRdBC2kQFnoECBAQAQ&url=https%3A%2F%2Fpacer-documents.s3.amazonaws.com%2F33%2F188450%2F042020648197.pdf&usg=AOvVaw38wQ JwnmP5fFftiyYkNjSG (accessed May 11, 2023).

239.     It is hard to imagine that anyone who has done business with FTX, including paid endorsers, would not have personally witnessed one or more of the deficiencies identified by Mr. Ray. All FTX endorsers have extensive business dealings beyond FTX and surely would be able to identify business practices that are unusually problematic.

240.     Instead, many customers relied on the testimonials of paid celebrity endorsers and these celebrities knew why they were being compensated. Indeed, the whole point behind paying celebrities to endorse a product is to increase sales.

241.     Thus, celebrities like the Promoter and Digital Creator Defendants have a moral and legal obligation to know that what they are promoting is unlikely to cause physical or financial damage to customers.

242.     In addition to the conduct of Defendant Sam Bankman-Fried, as described in this Complaint, some of the biggest names in sports and entertainment have either invested in FTX or been brand ambassadors for the company. A number of them hyped FTX to their social media fans, driving retail consumer adoption of the FTX Platform.

243.     In March 2021, FTX became the first company in the crypto industry to name an arena. This helped lend credibility and recognition to the FTX brand and gave the massive fanbase of basketball exposure to the FTX Platform.

244.     FTX's explanation for using stars like Brady, Bunchden, and the other Promoter and Digital Creator Defendants was no secret. "We're the newcomers to the scene," said then-FTX.US President Brett Harrison, referring to the crypto services landscape in the U.S. "The company needs to familiarize consumers with its technology, customer service and offerings, while competing with incumbents like Coinbase Global Inc. or Kraken," Mr. Harrison said. "We know that we had to embark on some kind of mass branding, advertising, sponsorship type work

in order to be able to do that," he said.[134]

245.    In other words, the FTX Group needed celebrities like the Promoter and Digital Creator Defendants to continue funneling investors into the FTX Ponzi scheme, and to promote and substantially assist in the sale of unregistered securities, including the YBAs. Below are representative statements and advertisements the Promoter and Digital Creator Defendants made to drive the offers and/or sales of the YBAs, which Plaintiff and Class Members will supplement as the case progresses and discovery unfolds.

246.    The promotions should not be viewed in isolation, but rather as a part of a wide-ranging conspiracy to promote and sell unregistered securities, and to aid and abet the FTX Group's fraud and conversion perpetrated on Plaintiffs and the Classes.

247.    On or around September 10, 2021, FTX tweeted out a list of its promoters who were part of the "You In?" campaign, asking its audience whether they are "in" as well.

---

[134]        https://www.wsj.com/articles/tom-brady-and-gisele-bundchen-to-star-in-20-million-campaign-for-crypto-exchange-11631116800?mod=article_inline (accessed May 11, 2023).



## M.   The MDL Defendants' Roles in the Fraud

248.   Each group of MDL Defendants contributed both to the perpetration of the fraud, and to the sale of unregistered securities, in a vital way.

249.   The individual role of each MDL Defendant is outlined below, and more fully expounded upon within the individual version of the complaint in which they are named.

250.    Samuel Bankman-Fried stole billions of dollars from FTX clients' deposits and used them to cover costs at FTX's sister company, a crypto hedge fund called alameda Research. He did so with the hep of three key people, Caroline Ellison, Gary Wang, and Nishad Singh, who were part of Bankman-Fried's inner circle. Many of them were friends going back years before the creation of FTX. Together, they were the brain trust of FTX and the architects of the FTX fraud, and are referred to herein as the "FTX Insider Defendants."

251.    The public accounting firms of Prager Metis CPAs, LLC and Armanino LLP (the Auditor Defendants), were the auditors of FTX Trading and FTX US, respectively. In those roles, and in violation of the professional standards to which they were subject,  Prager  Metis and Armanino issued reports in which they opined, respectively, that the financial statements of FTX Trading and FTX US for the years ending 2020 and 2021 were presented in accordance with generally accepted accounting principles (or GAAP) and that they had performed audits of such financial statements in accordance with generally accepted auditing standards (or GAAS). Reports such as the type issued here by the Auditor Defendants are generally referred to as "clean" audit reports. Given the virtual absence of accounting and financial systems and controls, corporate governance structures, and other controls at FTX – things that were so glaring and obvious that Mr. Ray discovered them within just days of being appointed as FTX's CEO in connection with the FTX bankruptcy – the Auditor Defendants never should have issued, and in fact were prohibited by the professional standards to which they were subject, their clean audit reports. Nor should they have allowed, as they did, FTX and SBF to tout that FTX had passed financial statement audits.  Finally, in further violation of the professional rules and standards to which they were subject, the Auditor Defendants issued statements of support on the internet and social media of FTX and SBF. The Auditor Defendants played a significant role in the FTX fiasco in that their

actions gave legitimacy and credibility to FTX and SBF, which FTX and SBF used to curry favor with customers and investors and give them the sense that FTX could be entrusted with their money.

252.    FTX's campaign to build public and investor trust relied on significant financial and public support from certain venture capital fund Defendants.  Sequoia Capital Operations, LLC ("Sequoia"), Thoma Bravo, LP ("Thoma Bravo"), Paradigm Operations LP ("Paradigm"), SkyBridge Capital II, LLC ("SkyBridge"), Multicoin Capital Management LLC ("Multicoin Capital"), Tiger Global Management, LLC ("Tiger"), Ribbit Management Company, LLC ("Ribbit Capital"), Altimeter Capital Management, LP ("Altimeter"), and K5 Global Advisor, LLC ("K5 Global") (collectively, the VC Defendants) poured over $800 million into FTX, both financing and directly participating in FTX's public campaign to create an air of legitimacy for the FTX Platform.  The VC Defendants made numerous deceptive and misleading statements of their own about FTX's business, finances, operations, and prospects for the purpose of inducing customers to invest, trade, and/or deposit assets with FTX.  They also vouched for the safety and stability of the FTX Platform, advertised FTX's purported attempts to become properly regulated, and otherwise promoted the fabricated integrity of the FTX Group and SBF.

253.    Defendants Temasek Holdings (Private) Limited ("Temasek Holdings") is a global commercial investment company owned by the Government of Singapore, with a portfolio valued at nearly $300 billion. Temasek Holdings operates in the United States primarily through its wholly owned subsidiary, Temasek International (USA) LLC ("Temasek USA" and, together with Temasek Holdings, "Temasek"). After undertaking an extensive, 8-month-long due diligence process involving, e.g., FTX's business model, applicable regulations, audited financials, and corporate governance, Temasek invested $275 million in FTX. Temasek "continued to monitor

performance and engage management on business strategy, as well as legal, policy and regulatory matters" even post investment, advising FTX with regard to "upgrad[ing] regulatory and legal functions" and to "strengthen [its] leadership." Temasek was in a particularly good position to offer such advice; upon information and belief, its executive, Antony Lewis, served on FTX's advisory board, which held meetings at least through March 2022.

254.    Defendant Softbank Group Corp. ("Softbank Group") is a Japanese multinational investment company venture capital fund formed as a Delaware limited partnership by Defendant Softbank Group Corp. ("Softbank Group" and, together with Softbank, "Softbank Defendants"), a Japanese holding company. Softbank Group invested in FTX through its Softbank Vision Fund, which is managed by Defendants SoftBank Investment Advisers (UK) Limited ("Softbank Investment Advisers") and Softbank Global Advisers Limited ("Softbank Global Advisers"), and engaged in the misconduct referenced herein in order to increase the value of those investments. SoftBank Vision Fund is one of the largest technology funds in the world, totaling approximately $56 billion, with its U.S. base in Silicon Valley, California. Softbank Group has a worldwide reputation for being a "unicorn company . . . whisperer," and startups such as FTX fortunate enough to count it among its investors gain "a major credibility building moment." SoftBank Group employed its "dedicated review department" to conduct due diligence on FTX's "business, technology, business model, market size, business plan, competitive environment, financial condition, legal compliance, etc." prior to making its reported $100 million dollar investment. Upon information and belief, SoftBank Group continued to enjoy unique influence over and insight into FTX following its investment through its executives—CEO Rajeev Misra and Partner Tom Cheung—who served on FTX's advisory board, which held meetings at least through March 2022. It sought to pave the way for FTX to expand into the derivatives clearinghouse arena by

lobbying the CFTC to grant FTX the necessary licenses with claims that FTX's proposal would reduce risks to the consumer.

255.    Defendant Sino Global Capital Limited ("Sino Global") is a venture capital firm based in Hong Kong with hundreds of millions in assets under management. Sino Global "supported the FTX vision" "[f]rom the very beginning" and "worked with [FTX] to make it a reality," including by investing an undisclosed amount in the "mid-seven figures" in FTX. In conjunction with its investment, Sino Global—in the words of its managing partner Matthew Graham—did "a hell of a lot of due diligence" and eventually embarked on a "deep relationship" with FTX. Sino Global's reputation, due diligence representations, ultimate investment, and ongoing relationship lent an air of legitimacy to FTX, as Mr. Graham recognized following one round of funding: "Today, SBF is no longer merely a titan of crypto. He's now a titan of business . . . ." As FTX's value skyrocketed, Sino Global stood to make an enormous return on its investment, but it benefitted from its ties to FTX in more direct ways: Sino Global accepted a $60 million investment from Alameda and yet another investment of an undisclosed amount from SBF, each of which, upon information and belief, having been comprised of Class Member funds. It further partnered with FTX and Alameda as co-general partners in the $200 million Liquid Value I fund, Sino Global's first ever outside venture fund.  Together, Temasek, Softbank, and Sino Global are referred to as the "Multinational VC Defendants."

256.    Defendant Fenwick was FTX's principal outside law firm.  Headquartered in Mountain View, California, Fenwick was ideally located in the heart of Silicon Valley, near to FTX's California operations. Fenwick provided services to the FTX Group entities that went well beyond those a law firm should and usually does provide. When asked by FTX Group executives for counsel, Fenwick lawyers were eager to craft not only creative, but illegal strategies.  Fenwick

helped set up the shadowy entities through which Bankman-Fried and the FTX Insiders operated a fraud, structured acquisitions by the FTX US in ways to circumvent regulatory scrutiny, advised on FTX US's regulatory dodge, more generally, and supplied personnel necessary to execute on the strategies that they proposed.  In this manner, Fenwick conspired with and aided and abetted the fraud, conversion, negligence, and respective breaches of fiduciary duties of the FTX entities.

257.    Defendants Deltec, Moonstone, and Jean Chalopin (together, the Bank Defendants) primarily assisted SBF in trafficking Class Member funds across the U.S. border. Defendant Deltec, at Mr. Chalopin's direction, provided one-of-a-kind digital asset banking services to FTX and, upon information and belief, served as a primary vehicle through which SBF routed Class Member funds offshore, beyond the reach of U.S. regulators and law enforcement. Defendant Moonstone, also at the direction of Mr. Chalopin, provided complementary services, assisting SBF in funneling more than $50 million in Class Member funds to entities he separately owned through accounts at the bank.

258.    Promoters are Defendants who agreed to serve as brand ambassadors, advertised and promoted the sale of the FTX Platform, YBAs and/or FTT, and failed to disclose in any of their marketing campaigns or advertisements that they were paid millions of dollars by FTX. All in clear violation of SEC, FTC, and various federal and state regulations.

259.    Digital Creators are YouTube and social media financial influencers who promoted FTX as financial advice and promoted the sale of the FTX Platform, YBAs and/or FTT, to their millions of followers.  The Promoter and Digital Creator Defendants include the individuals and entities listed in the paragraphs below.

260.    On or about spring 2021, Tom Brady and Gisele Bündchen partnered with FTX to provide it with spokesperson and marketing services pursuant to a written agreement.  Those

services included but were not limited to posting on social media, making personal appearances, and appearing in television and print advertising. Brady and Bündchen also took equity stakes in FTX Trading Ltd. Bündchen was given the title of Environmental and Social Initiatives Head at FTX. Brady and Bündchen made numerous statements across platforms to induce individuals to invest in the FTX Platform, YBAs and/or FTT.

261.     On August 10, 2021, FTX (US and International) announced that it entered a "long-term relationship with entrepreneur, venture capitalist, and Shark Tank investor, Kevin O'Leary." It further explained that "Mr. O'Leary will be taking an equity stake in both FTX Trading Ltd. & West Realm Shires Services Inc. along with being paid in crypto to serve as an ambassador and spokesperson for FTX."[135] The overarching objective of the partnership was for O'Leary, through a series of promotions and media campaigns, to help FTX successfully solicit or attempt to solicit investors in FTX's crypto-related securities from Florida and nationwide.

262.     On or about June 2021, Udonis Haslem partnered with FTX to provide it with spokesperson and marketing services pursuant to a written agreement. Those services included posting on social media, appearing in a commercial, and participating in promotional events.

263.     On or about October 2021, David Ortiz partnered with FTX as a brand ambassador, which included promoting the platform and releasing collections of NFTs through the FTX app.

264.     On or about September 7, 2021, FTX partnered with Steph Curry as a brand ambassador, through his company SC30 Inc., to provide FTX with spokesperson and marketing services. Those services included but were not limited to posting on social media, creating an exclusive NFT collection, and appearing in commercial advertising. The overarching objective of

---

[135]     https://www.prnewswire.com/news-releases/ftx-and-kevin-oleary-announce-long-term-investment-and-spokesperson-relationship-301352189.html (accessed May 9, 2023).

the partnership was for Mr. Curry, through a series of promotions and media campaigns, to help FTX successfully solicit or attempt to solicit investors in FTX's crypto-related securities from Florida and nationwide.



265.    On or around December 14, 2021, the Warriors and FTX announced a first-of-its-kind cryptocurrency partnership in professional sports, with the unveiling of the FTX logo on the court at the Chase Center. As the Warriors' Official Cryptocurrency Platform and NFT Marketplace, the franchise announced it would drop NFTs on FTX.US, beginning in early 2022. The partnership between the Warriors and FTX was the first international rights partner for the

team, granting both the Warriors and FTX a visible market presence, inclusive of logo and likeness, internationally.[136]

266.    On or about June 1, 2022, Defendant Shaquille O'Neal, former professional NBA basketball star, sports analyst, and entrepreneur, unveiled his partnership with FTX, stating in a video posted on FTX's Twitter account that "I'm excited to be partnering with FTX to help make crypto accessible for everyone. I'm all in. Are you?"[137]



267.    On or about April 2021, William Trevor Lawrence partnered with FTX—through one of FTX's investment apps Blockfolio[138]—as a brand ambassador, which included posting on

---

[136] https://www.nba.com/warriors/warriors-ftx-partnership-20211214

[137] https://twitter.com/FTX_Official/status/1532119977381208066?s=20&t=5wTm55FDE6c0cCD9vCndYg (accessed May 11, 2023).

[138] In August 2020, FTX announced the acquisition of Blockfolio, then the market's leading mobile news and portfolio tracking app. Coindesk reported that "the deal is a strategic play for FTX, whose clientele consists largely of quants and professional traders, to attract more retail customers."[138] The app became known as FTX: Blockfolio at the time of the merger, and

social media and appearing in promotional and marketing materials.



268.    On or about November 2021, Shohei Ohtani partnered with FTX to provide it with spokesperson and marketing services pursuant to a written agreement. Those services included appearing in a commercial and as a spokesperson for the brand. Ohtani signed on as a long-term

---

subsequently transitioned to FTX app. An FTX press release on the name change quotes Bankman-Fried as stating: "The rebrand of FTX: Blockfolio to FTX puts the final cap on our acquisition of Blockfolio, doubling down on our commitment to being the number one crypto trading platform for both retail and institutional users. Rebranding Blockfolio shows our commitment to mobile trading, and is just another step in growing our brand on a global scale and will allow us to bring new features to market and better the user experience."[138]

global ambassador with both FTX US and FTX International.[139]



269.     Defendant Naomi Osaka became a brand ambassador for FTX, with the express purpose of "getting more women to start investing in crypto."[140] Ms. Osaka wore the FTX logo on the kit she wore at tournaments, including the 2022 Miami Open.[141] Ms. Osaka and FTX launched

---

[139]   https://www.prnewswire.com/news-releases/mlb-superstar-shohei-ohtani-joins-ftx-as-global-ambassador-through-long-term-partnership-301425911.html (accessed May 11, 2023).

[140]   https://coinmarketcap.com/alexandria/article/naomi-osaka-tennis-star-teams-up-with-ftx-and-she-s-getting-paid-in-crypto-too (accessed May 11, 2023).

[141]   *Id.*

a commercial designed to bring cryptocurrency and investing in the FTX Platform, including YBAs, to the masses.



270.    For his part, the legendary comedian and creator of *Seinfeld* and *Curb Your Enthusiasm*, Larry David, created and starred in an ad for the FTX Group called "Don't Miss Out on Crypto," which aired during the 2022 Super Bowl. David and his long-time collaborator "were completely in lockstep with" FTX's idea of using the contrarian comic's well-known wit and persona to advertise the emerging crypto exchange app and reach a wide-pool of potential users. Indeed, embracing David's constructed antagonism for cryptocurrency was part of FTX's broader, manipulative marketing strategy. According to Bankman-Fried, FTX wanted to "meet people where they are—and that means embracing skepticism."

271.    On June 3, 2021, for $210 million paid equally on an annual basis over the course

of 10 years, TSM (e-sports) announced that it was changing its name to TSM FTX.[142] This was, at the time, the one of the largest sports deals in existence, made with the most valuable e-sports company in the United States, in the middle of the COVID-19 Pandemic and on the heels of FTX's FTX Arena deal.[143] In short, the deal caused FTX Group's popularity to skyrocket, helping to catapult it to the forefront of the nascent crypto exchange industry. As part of its deal with FTX, TSM announced that "TSM FTX will distribute cryptocurrency to each of its players and employees" and would purchase "$1 million worth of FTT, FTX's native token" and distribute cryptocurrency to its players and employees.[144] At that time, the price per FTT hovered as just under $35 – by November 16, 2022, it dropped to under $2.[145]

**N.    Material Ties to Florida**

272.    The connections to Florida in this consolidated case are numerous.

273.    According to the Declaration of Dan Friedberg, attached as **Exhibit** B, FTX maintained an office in Miami, Florida, since early 2021, long before FTX eventually announced the move of its Domestic headquarters to Brickell in late 2022. *Id.*, ¶ 20. Since early 2021, FTX's Miami office was run by Mr. Avinash Dabir, FTX's Vice President of Business Development. *Id.* Friedberg met with Mr. Dabir often and is very familiar with Mr. Dabir and his activities. *Id.*

274.    Mr. Dabir, from the Miami office, focused on formulating and executing FTX's important celebrity partnerships. *Id.*, ¶ 21. Mr. Dabir was the senior FTX executive responsible for

---

[142]    https://www.nytimes.com/2021/06/04/sports/esports-name-change-tsm-ftx.html    (accessed May 11, 2023)

[143]    *Id.*; *see also*   https://www.forbes.com/sites/christinasettimi/2020/12/05/the-most-valuable-esports-companies-2020/ (accessed May 11, 2023).

[144]    https://www.prnewswire.com/news-releases/tsm-and-ftx-sign-210-million-naming-rights-partnership-largest-in-esports-history-301305740.html (last accessed May 11, 2023)

[145]    https://www.washingtonpost.com/video-games/esports/2022/11/16/tsm-ftx-naming-deal-suspended/ (last accessed May 11, 2023)

creating, consummating, and implementing deals between FTX and other Partners, such as Major League Baseball, the MLB Umpire's Association, TSM, the Mercedes Formula 1 team, Tom Brady, Stephen Curry, the Golden State Warriors, Naomi Osaka, Larry David, and Shohei Ohtani. *Id.*, ¶ 23.

275. It was Mr. Dabir's idea to expend significant resources on FTX's sports and celebrity-based partnerships. *Id.*, ¶ 22. Mr. Dabir specifically started by suggesting FTX form a Partnership with the Miami Heat and the naming rights to the Miami Arena. *Id.* FTX announced the Partnership in March 2021, and included FTX purchasing the naming rights of the Miami Heat stadium for 19 years in a deal worth approximately $135 million. *Id.*

276. Mr. Dabir deserves much of the credit for the collaboration with Mr. David that resulted in the award-winning Super Bowl FTX commercial that aired with the Super Bowl in 2022. *Id.*, ¶ 24. Crucially, all FTX employees or agents who were involved in the Larry David Super Bowl commercial ultimately reported to Avi Dabir, who had final approval of all aspects of the commercial from his base of operations in Miami.

277. Released on March 31, 2022, Mr. Dabir appeared on the popular cryptocurrency podcast The Joe Pomp Show, where he was interviewed by Mr. Pompliano for over half an hour on specifically the efforts he undertook and oversaw from his FTX base of operations in Miami, Florida, to create, consummate, and implement, among other things, the FTX arena deal and the Larry David Superbowl commercial. A transcript of the podcast is attached as **Exhibit** C.

278. Mr. Dabir begins by introducing himself as "Vice President of Business Development at FTX, so I handle a lot of our sports partnerships as well as doing some of the interesting things in real estate as well." Ex. B at 2. He then explains that "the end goal" is really how does FTX "acquire more users." *Id.,* at 9. After first acknowledging and agreeing with Mr.

Pompliano that FTX was at that point the "leaders" in the sports partnership category and that "it started with Miami Heat Arena," Mr. Dabir explained that he led the effort to obtain the FTX Arena deal because he "had previously worked at the NBA" and that he identified Miami because it had "a great market," a "multicultural, great team," and the "Crypto Buzz was like growing here in Miami." *Id.*, at 2–3.

279.    Mr. Dabir also explained that it was crucial "to get approval from a local government, plus the Heat and the NBA who had their own diligence teams looking into" the FTX Arena deal because it "really sort of validated not only just FTX but the cryptocurrency industry in general." *Id.*, at 4.

280.    Mr. Dabir went into detail about his dealings with Tom Brady and Giselle Bündchen and how the individual FTX Brand Ambassador partnership deals worked. *Id.*, 9. Importantly, not only was Mr. Dabir directly involved in negotiating and consummating the individual FTX Brand Ambassador partnership deals from his base in Miami, he also explains that Defendants Brady and Bündchen were instrumental in bringing other FTX Brand Ambassadors into the fold, such as Defendant Curry. *Id.*

281.    In addition to coordinating the promoter campaigns from Miami, Florida, FTX announced it was moving its official U.S. headquarters from Chicago to Miami in 2022.[146] This move happened before FTX declared bankruptcy.

282.    The promotional campaigns came from the brain trust of FTX in Miami, but many of the promotions also took place in Florida as a cryptocurrency hub.

283.    FTX served as a title sponsor for the David Ortiz Golf Classic in Florida on or about

---

[146]    https://www.coindesk.com/business/2022/09/27/crypto-exchange-ftx-is-moving-its-us-headquarters-from-chicago-to-miami/ (accessed July 18, 2023).

November 2021 and pledged to make contributions to Ortiz's charity, David Ortiz's Childrens Fund. Ortiz promoted the sponsorship and golf tournament on Twitter and other online pages, including on his personal website: https://davidortiz.com/red-sox-legend-david-ortiz-signs-multiyear-ftx-deal/ (last visited May 8, 2023).

284.    In March of 2022, Defendants O'Leary, Haslem, and Ortiz served as judges for the FTX Charity Hackathon at the crypto summit hosted by FTX in Miami.[147]



285.    On March 11, 2022, Mr. O'Leary appeared on NBC 6 South Florida to explain his involvement with FTX and his role in judging the competition.[148] During that appearance, Mr. O'Leary praised the company saying "I love the company. I like its mission. I like what they're doing in terms of innovating and financial services around crypto." *Id.*

286.    In March of 2022, Ms. Osaka began her FTX promotion campaign at the 2022 Miami Open tennis tournament. Osaka wore gear with the FTX logo throughout the tournament, including during the presentation and acceptance of her runner-up throw following her loss in the

---

[147] https://ftxcharityhackathon.com/ (accessed May 11, 2023).
[148]    https://www.nbcmiami.com/entertainment/6-in-the-mix/shark-tank-star-kevin-oleary-taking-part-in-charity-hackathon/2711510/ (accessed May 9, 2023).

finals.

287.    On April 18, 2022, Mr. Haslem, a star for and captain of the Miami Heat, shared a video on Twitter advertising a promotional effort with FTX that promised a giveaway to Miami area small businesses.



288.    As part of Mr. O'Neal's promotional campaign for FTX, he appears on Episode 114 of "The FTX Podcast," hosted by Tristan Yver, which was released on June 8, 2022.[149] O'Neal recorded the episode with Yver from Miami, Florida, telling Yver on the podcast, "Loosen up brother, loosen up . . . You're in Miami, relax."

289.    Mr. O'Neal also promoted FTX in Miami with his Astrals project, announcing in the official Discord on August 29, 2022, using an emoji of Shaq's face, that they funded an Astrals marketing event at Solana Miami, and "[w]e will be in attendance with the likes of Solana Pay,

---

[149] https://open.spotify.com/episode/2lq0BHiZb88xNRdZ9wUes4 ("Welcome to episode 114 of the FTX Podcast with special guest Shaquille O'Neal and your host Tristan Yver! Shaquille is a family man, basketball superstar, businessman, TV personality, music artist, crypto project entrepreneur, role model & humanitarian.").

FTX, Ledger, MagicEden, Phantom and more!".[150]



290.    Between July 5 and 6 of 2022, Mr. Ohtani played in two games against Miami in Miami, and between August 22 and 25 of 2022, Mr. Ohtani played four games against Tampa Bay in Tampa.

291.    In November of 2022, Mr. Curry played in two NBA games against Florida teams in Florida. On November 1, 2022, Mr. Curry played against Miami in Miami and on November 3, 2022, against Orlando in Orlando.

292.    Furthermore, Defendants Brady, Bündchen, O'Leary, Haslem, Lawrence, and Ortiz resided in Florida while working for FTX. Other Defendants including Defendants Curry, Ohtani, and Osaka competed in professional sports while in Florida working for FTX.

**O.    The Wrongdoing of the Auditor Defendants**

**1.    The Auditor Defendants Wrongfully Issued Clean Audit Reports for FTX**

293.    Armanino and Prager Metis issued clean audit reports on the year end 2020 and 2021 financial statements of West Realm Shires Inc. [a/k/a/ FTX US] and FTX Trading Ltd. [a/k/a FTX Trading], respectively.

294.    Armanino's Audit Report for FTX US, dated March 30, 2022, stated:

---

[150] https://discord.com/channels/928105025392214027/928185412961308792/10138788637570 58120 (accessed May 15, 2023).

**Opinion**

We have audited the accompanying consolidated financial statements of West Realm Shires Inc. (a Delaware corporation) (the "Company"), which comprise the consolidated balance sheets as of December 31, 2021 and 2020, and the related consolidated statements of operations, stockholders' equity, and cash flows for the year ended December 31, 2021 and for the period from January 29, 2020 (inception) through December 31, 2020, and the related notes to the consolidated financial statements.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of West Realm Shires Inc. as of December 31, 2021 and 2020, and the results of their operations and their cash flows for the year ended December 31, 2021 and for the period from January 29, 2020 (inception) through December 31, 2020, in accordance with accounting principles generally accepted in the United States of America.

**Basis for Opinion**

We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Our responsibilities under those standards are further described in the Auditor's Responsibilities for the Audit of the Financial Statements section of our report. We are required to be independent of West Realm Shires Inc. and to meet our other ethical responsibilities in accordance with the relevant ethical requirements relating to our audits. We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

**Responsibilities of Management for the Financial Statements**

Management is responsible for the preparation and fair presentation of these consolidated financial statements in accordance with accounting principles generally accepted in the United States of America, and for the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of consolidated financial statements that are free from material misstatement, whether due to fraud or error.

In preparing the consolidated financial statements, management is required to evaluate whether there are conditions or events, considered in the aggregate, that raise substantial doubt about West Realm Shires Inc.'s ability to continue as a going concern within

one year after the date that the financial statements are available to be issued.

**Auditor's Responsibilities for the Audit of the Financial Statements**

Our objectives are to obtain reasonable assurance about whether the consolidated financial statements as a whole are free from material misstatement, whether due to fraud or error, and to issue an auditor's report that includes our opinion. Reasonable assurance is a high level of assurance but is not absolute assurance and therefore is not a guarantee that an audit conducted in accordance with auditing standards generally accepted in the United States of America will always detect a material misstatement when it exists. The risk of not detecting a material misstatement resulting from fraud is higher than for one resulting from error, as fraud may involve collusion, forgery, intentional omissions, misrepresentations, or the override of internal control. Misstatements are considered material if there is a substantial likelihood that, individually or in the aggregate, they would influence the judgment made by a reasonable user based on the consolidated financial statements.

In performing an audit in accordance with auditing standards generally accepted in the United States of America, we:

- Exercise professional judgment and maintain professional skepticism throughout the audit.

- Identify and assess the risks of material misstatement of the consolidated financial statements, whether due to fraud or error, and design and perform audit procedures responsive to those risks. Such procedures include examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements.

- Obtain an understanding of internal control relevant to the audit in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of West Realm Shires Inc.'s internal control. Accordingly, no such opinion is expressed.

- Evaluate the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluate the overall presentation of the consolidated financial statements.

- Conclude whether, in our judgment, there are conditions or events, considered in the aggregate, that raise substantial doubt about West Realm Shires Inc.'s ability to continue as a going concern for a reasonable period of time.

We are required to communicate with those charged with governance regarding, among other matters, the planned scope and timing of the audit, significant audit findings, and certain internal control related matters that we identified during the audit.

295.   Prager Metis's Audit Report for FTX Trading, dated April 2, 2022, stated:

**Opinion**

We have audited the accompanying consolidated financial statements of FTX Trading Ltd. and subsidiaries, which comprise the consolidated balance sheets as of December 31, 2021 and 2020, and the related consolidated statements of comprehensive income, shareholders' equity, and cash flows for the years then ended, and the related notes to the financial statements, collectively referred to as "the financial statements".

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of FTX Trading Ltd. and subsidiaries as of December 31, 2021 and 2020, and the results of their operations and their cash flows for the years then ended in accordance with accounting principles generally accepted in the United States of America.

**Basis for Opinion**

We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Our responsibilities under those standards are further described in the Auditor's Responsibilities for the Audit of the Financial Statements section of our report. We are required to be independent of FTX Trading Ltd. and subsidiaries and to meet our other ethical responsibilities in accordance with the relevant ethical requirements relating to our audits. We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

**Responsibilities of Management for the Financial Statements**

Management is responsible for the preparation and fair presentation of the financial statements in accordance with accounting principles generally accepted in the United States of America, and for the

design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.

In preparing the financial statements, management is required to evaluate whether there are conditions or events, considered in the aggregate, that raise substantial doubt about FTX Trading Ltd. and subsidiaries' ability to continue as a going concern within one year after the date that the financial statements are available to be issued.

**Auditor's Responsibilities for the Audit of the Financial Statements**

Our objectives are to obtain reasonable assurance about whether the financial statements as a whole are free from material misstatement, whether due to fraud or error, and to issue an auditor's report that includes our opinion. Reasonable assurance is a high level of assurance but is not absolute assurance and therefore is not a guarantee that an audit conducted in accordance with generally accepted auditing standards will always detect a material misstatement when it exists. The risk of not detecting a material misstatement resulting from fraud is higher than for one resulting from error, as fraud may involve collusion, forgery, intentional omissions, misrepresentations, or the override of internal control. Misstatements are considered material if there is a substantial likelihood that, individually or in the aggregate, they would influence the judgment made by a reasonable user based on the financial statements.

In performing an audit in accordance with generally accepted auditing standards, we:

- Exercise professional judgment and maintain professional skepticism throughout the audit.

- Identify and assess the risks of material misstatement of the financial statements, whether due to fraud or error, and design and perform audit procedures responsive to those risks. Such procedures include examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements.

- Obtain an understanding of internal control relevant to the audit in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion

on the effectiveness of FTX Trading Ltd. and subsidiaries' internal control. Accordingly, no such opinion is expressed.

- Evaluate the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluate the overall presentation of the financial statements.

- Conclude whether, in our judgment, there are conditions or events, considered in the aggregate, that raise substantial doubt about FTX Trading Ltd. and subsidiaries' ability to continue as a going concern for a reasonable period of time.

We are required to communicate with those charged with governance regarding, among other matters, the planned scope and timing of the audit, significant audit findings, and certain internal control related matters that we identified during the audit.

296.     When an auditor issues a report stating that financial statements are presented in accordance with accounting principles generally accepted in the United States (or "GAAP") and that it conducted an audit of such financial statements in accordance with auditing standards generally accepted in the United States (or "GAAS"), without noting any qualifications or exceptions, such as the reports Armanino and Prager Metis issued here, as outlined above, it is generally referred to as a "clean" audit report or opinion. Indeed, in addition to the statements noted herein and below about the audits and FTX's financial statements made on social media or FTX's website – statements that the Auditor Defendants never refuted in any way – media reports also refer to the fact that the Auditor Defendants issued clean audit reports on FTX's financial statements. For example, a November 17, 2022 Wall Street Journal Article entitled *FTX Auditors Doubled as Crypto Industry Cheerleaders,* the authors of which apparently had seen the audit reports and financial statements, states that Prager Metis "gave FTX Trading a ***clean*** audit opinion for last year, the financial statements show." The article goes on to state that "Armanino's audit opinion for last year for FTX US, a smaller company focused on U.S. customers, was also ***clean***."

(emphasis added)[151]

297.    A "clean" audit report or opinion on a company's financial statements is generally understood to mean that the auditor conducted an audit of such financial statements in accordance with Generally Accepted Auditing Standards ("GAAS") as established by the American Institute of Certified Public Accountants' ("AICPA") and  as set forth in its Statements on Auditing Standards and that based on such audit the auditor has determined that the company's financial statements are free from material misstatement, whether due to error or fraud, and conform to the guidelines set forth by accounting principles generally accepted in the United States, otherwise known as and referred to as GAAP.

298.    For reasons alleged herein, the Auditor Defendants never should have issued clean audit reports or opinions on FTX Trading's and FTX US's financial statements or allow the FTX entities and Bankman-Fried to tout that the FTX entities' financial statements passed GAAP audits and were in order. Indeed, in doing so, and as alleged in more detail herein, the Auditor Defendants violated virtually all of the most basic tenets of GAAS, to which they were subject, including, but not limited to, those set forth at AU-C Section 200 entitled *Overall Objectives of the Independent Auditor and the Conduct of an Audit in Accordance with Generally Accepted Auditing Standards*.[152]

299.    AU-C Section 200 requires that in performing an audit of financial statements that will result in the auditor issuing a report and opinion on such the auditor must obtain reasonable

---

[151] *See also*, Financial Times, *FTX US auditor Armanino defends work for failed crypto exchange*, December 23, 2022 stating: "California-based Armanino gave a ***clean*** bill of health to 2020 and 2021 financial statements from FTX US…" (Emphasis added)

[152] "AU-C Section __" refers to a provision of the Codification of Statements of Auditing Standards established by the AICPA's Auditing Standards Board, which is the foundation of GAAS.

assurance that the financial statements are free from material misstatement, whether due to error or fraud. To do so, the standard requires, *inter alia*, that the auditor must: (i) be truly "Independent" in appearance and fact from the audit client; (ii) plan and perform the audit with appropriate "professional skepticism"; (iii) exercise appropriate "professional judgement" in planning and performing the audit; (iv) obtain sufficient and appropriate audit evidence to enable the auditor to draw reasonable conclusions on which to base the auditor's opinion; comply with all of the relevant ethical requirements set forth in the AICPA's Code of Professional Conduct concerning financial statement audit engagements, including, but not limited exercising "due care," which requires the auditor to "discharge its professional responsibilities with competence and to have the appropriate capabilities to perform the audit and enable an appropriate auditor's report to be issued'; and (v) "not represent compliance with GAAS in the auditor's report unless the auditor has complied with the requirements of this section and all other AU-C sections relevant to the audit."

2.     **The Auditor Defendants Knew Their Audit Reports Were Being Used to Curry Favor and the Trust of Current and Prospective Customers and Investors in FTX**

300.     FTX Trading and FTX US were both private entities. Accordingly, their respective financial statements were not required to be audited. As experienced auditors and public accountants, Prager Metis and Armanino must have known this. Moreover, they knew or should have known that the reason they were being asked by FTX Trading and FTX US to issue audit reports on their respective financial statements was so that the FTX Group could say their financial statements were audited and thereby curry support and confidence of current and prospective customers and investors.

301.     Indeed, as alleged at paragraph 51 of the SEC's Complaint against Bankman-Fried, "FTX investors were provided with FTX's audited financial statements, and FTX represented in its purchase agreements that those financial statements 'fairly present in all material respects the

financial condition and operating results of' FTX".[153]

302.     FTX's website also touted the fact that its financial statements were audited, proclaiming under its "Security Policy" and under the heading "Financial Audit" as early as September 27, 2021 (and possibly even earlier) that: "FTX has successfully undergone a US GAAP financial audit for 2020 and plans to continue undergoing regular audits." And, by at least November 19, 2022 (and possibly even earlier) FTX's website stated, under the same headings that: FTX has successfully undergone a US GAAP financial audit for 2021 and plans to continue undergoing regular audits." [154]  A similar representation specific to FTX.US was available online as early as August 5, 2022 (and possibly earlier) in a document entitled "FTX US Regulation and Licensure Information" stating: "FTX US has successfully received a US GAAP financial audit."[155]

303.     Further highlighting the importance of instilling confidence in customers and potential customers that FTX was subject to accounting oversight, throughout 2021 and 2022, Bankman-Fried repeatedly represented that FTX had purportedly completed several successful GAAP audits. For example, Bankman-Fried tweeted on July 31, 2021 that FTX was the "first (?) crypto exchange to complete a GAAP audit."  Similarly, Bankman-Fried tweeted on August 26, 2021 that FTX had officially passed US GAAP audits. Bankman-Fried still tweeted on November

---

[153] *See SEC v. SBF*, 1:22-cv-10501, Doc. 1 (S.D.N.Y.)

[154] *See* https://help.ftx.com/hc/en-us/articles/360031171351-Security-Policy (last visited December 14, 2022).   **This Security Policy was available on the website as early as March 2020 with respect to the statement about the 2020 financial audit, and was later updated with respect to the 2021 financial audit.**

[155] https://assets-global.website-files.com/625f3cf193eb0bdbf6469cba/62cdd5db020a38b180c56541_Regulatory%20and%20Consumer%20Disclosure%20Page.pdf#:~:text=West%20Realm%20Shires%20Services%20Inc.%20%28%22FTX%20US%22%29%20is,to%20consumers%20all%20applicable%20risks%20of%20the%20service)  (last visited August 1, 2023).

6, 2022 that "FTX keeps audited financials . . . ." All of this was done as a way to falsely reassure the world that all was sound at FTX, and the Auditor Defendants did nothing to stop it or refute the statements.  Images of these tweets are as follows:

**Tweet**

**SBF**
@SBF_FTX

1) Yesterday, FTX became the first (?) crypto derivatives exchange to complete a GAAP audit!

2:19 AM · Jul 31, 2021

**154** Retweets   **65** Quotes   **2,112** Likes   **39** Bookmarks

Tweet your reply!                                                    Reply

**SBF** @SBF_FTX · Jul 31, 2021
2) Whatever its actual impacts, typing that certainly makes me _feel_ old and wise.

> **SBF** @SBF_FTX · Jul 30, 2021
> 1) Today, we are older, and wiser
>
> but hopefully, we are still young

> 4                           3                          232

**SBF** @SBF_FTX · Jul 31, 2021
3) A huge thanks to everyone who helped get us there!

16                           2                          260



**3.** **Given the Complete Lack of Internal Financial and Accounting Controls, Corporate Governance Controls, and Inappropriate Financial Accounting and Reporting Systems, The Auditor Defendants Were Prohibited From Issuing Clean Audit Reports on FTX Trading's and FTX US's Financial Statements**

304.    As noted above, John Ray, who took over as the FTX Group's CEO in the wake of

FTX's filing for bankruptcy on November 11, 2022, was shocked at what he discovered about the

FTX Group. Indeed, the complete lack of internal controls and appropriate financial information

was so blatant and obvious that by November 17, 2022, just days after his taking over as CEO of

FTX, Ray had determined and stated:

"Never in my career have I seen such a complete failure of corporate controls and such a complete absence of trustworthy financial information as occurred here. From compromised systems integrity and faulty regulatory oversight abroad, to the concentration of control in the hands of a very small group of inexperienced, unsophisticated and potentially compromised individuals, this situation is unprecedented."[156]

305.    Things were so bad and obvious that by November 17, 2022 Ray was able to determine and conclude among other things that:

- "The Debtors [FTX] did not have the type of disbursement controls that I believe are appropriate for a business enterprise."

- "In the Bahamas, I understand that corporate funds of the FTX Group were used to purchase homes and other personal items for employees and advisors. I understand that there does not appear to be documentation for certain of these transactions as loans, and that certain real estate was recorded in the personal name of these employees and advisors on the records of the Bahamas."

- "The FTX Group did not keep appropriate books and records, or security controls, with respect to digital assets."

- "One of the most pervasive failures of the FTX.com business in particular is the absence of lasting records of decision-making. Mr. Bankman-Fried often communicated by using applications that were set to auto-delete after a short period of time, and encouraged employees to do the same."[157]

306.    Indeed, within just days of taking over as CEO of FTX, Ray had determined that things were so bad at FTX that the he expressed having "substantial concerns as to the information presented" in the financial statements audited by and reported on by Armanino and Prager Metis and further stated  that: "As a practical matter, I do not believe it appropriate for stakeholders or the Court to rely on the audited financial statements as a reliable indication of the financial circumstances of these Silos [referring to FTX US and FTX Trading]."[158]

---

[156] Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings, Case No. 22-11068 – JTD, (U.S. Bkptcy. Ct., Dist. of Delaware, Nov. 17, 2022) ("Ray Decl.") (Doc. No. 24) at 5.
[157] *Id.* at paragraphs 62, 63, 65, 71.
[158] *Id.* at paragraphs 55-56.

307.    By early April 2023 Mr. Ray further concluded and stated that the "FTX Group *lacked fundamental financial and accounting controls.*" (Emphasis added) First Interim Rpt. at 10. Details outlining the litany of gross internal financial, accounting and corporate governance problems and failures, inadequate or non-existent accounting and financial reporting systems, controls and supporting documentation, among other problematic issues at the FTX Group found by Mr. Ray and noted in his First Interim Rpt. included the following, among others:

a.    Failure to maintain "personnel who were experienced and knowledgeable enough to account accurately for assets and liabilities, understand and hedge against risk, or compile and validate financial reports," *Id.*, 11;

b.    "As a general matter, policies and procedures relating to accounting, financial reporting, treasury management, and risk management *did not exist, were incomplete, or were highly generic and not appropriate for a firm handling substantial financial assets.*" *Id.* (Emphasis added);

c.    Failure to maintain an accurate and appropriate accounting system, in that 56 FTX Group entities did not produce financial statements of *any* kind, 35 used QuickBooks in conjunction with Google documents, Slack communications, shared drives, and Excel spreadsheets, *Id.*, 12–13;

d.    Recordkeeping was so poor that Bankman-Fried described Alameda as "hilariously beyond any threshold of any auditor being able to even get partially through an audit," adding:
Alameda is unauditable. I don't mean this in the sense of "a major accounting firm will have reservations about auditing it"; I mean this in the sense of "*we* are only able to ballpark what its balances are, let alone something like a comprehensive transaction history." We sometimes find $50m of assets lying around that we lost track of; such is life.

*Id.*, 14;

e.    "Key accounting reports necessary to understand the FTX Group's assets and liabilities, such as statements of cash flows, statements of equity, intercompany and related party transaction matrices, and schedules of customer entitlements, did not exist or were not prepared regularly," *Id.*, 14–15;

f.    "Copies of key documentation – including executed loan agreements, intercompany agreements, acquisition and investment documents, bank and brokerage account statements, and contract and account information of all

123

types – were incomplete, inaccurate, contradictory, or missing entirely." *Id.,*
15;

g.      the FTX Group "did not maintain reliable lists of bank or trading accounts,
cryptocurrency wallets, or authorized signatories," and let "[t]housands of
deposit checks . . . collect[] like junk mail," *Id.,* 15;

h.      "Although the FTX Group consisted of many, separate entities, transfers of
funds among those entities were not properly documented, rendering tracing
of funds extremely challenging," including using Slack, Signal, and
Telegram with "disappearing messages" enabled, and often approving
expenses and invoices on Slack by "emoji," *Id.*;

i.      "The FTX Group did not observe any discernable corporate formalities
when it came to intercompany transactions. Assets and liabilities were
routinely shuffled among the FTX Group entities and insiders without
proper process or documentation. Alameda routinely provided funding for
corporate expenditures (*e.g.*, paying salaries and other business expenses)
whether for Alameda, for various other Debtors, or for FTX DM, and for
venture investments or acquisitions whether for Alameda or for various
other Debtors. Alameda also transferred funds to insiders to fund personal
investments, political contributions, and other expenditures—some of
which were nominally 'papered' as personal loans with below-market
interest rates and a balloon payment due years in the future." *Id.,* 17;

j.      Often times, intercompany and insider transfers were recorded in a manner
"that was inconsistent with the apparent purpose of the transfers," for
instance, tens of millions of dollars being transferred from Alameda to
Bankman-Fried, personally, but recorded in the general ledger as
"Investment in Subsidiaries: Investments-Cryptocurrency," often times
recorded in a way that intercompany transactions did not balance across
relevant entities, nor were they recorded with specificity regarding which
digital assets were involved in the transfer and their value when transferred,
*Id.*;

k.      On both FTX International and US exchanges, Alameda was a customer
that traded "for its own account as well as engaging in market-making
activities, and, in that capacity, it was granted extraordinary privileges by
the FTX Group," such as granting Alameda "an effectively limitless ability
to trade and withdraw assets from the exchange regardless of the size of
Alameda's account balance, and to exempt Alameda from the auto-
liquidation process that applied to other customers," effectively allowing it
to borrow and/or withdraw up to $65 billion from the FTX Platform, *Id.,*
18–22.

308.    There were "extensive deficiencies in the FTX Group's controls with respect to

digital asset management, information security, and cybersecurity," which was "particularly surprising given that the FTX Group's business and reputation depended on safeguarding crypto assets," and "[a]s a result of these control failures," which included (i) maintaining the majority of customer assets in "hot" wallets that are easily hacked, (ii) failing to safeguard private keys but storing them in an Amazon Web Services account, (iii) failing to employ multi-signature capabilities or Multi-Party Computation, (iv) failing to restrict FTX Group employee user access to sensitive infrastructure, such as omnibus wallets holding billions of dollars in assets, and (v) failing to enforce multi-factor authentication for employees and other commonsense safeguards to protect customer assets and sensitive data—all of which leads to the irrefutable conclusion that "the FTX Group exposed crypto assets under its control to a grave risk of loss, misuse, and compromise, and lacked a reasonable ability to prevent, detect, respond to, or recover from a significant cybersecurity incident, including the November 2022 Breach." *Id.,* 22–37.

309.    Various provisions of GAAS, including but not limited to AU-C Section 315A, mandate that in connection with planning and performing an audit of an entity's financial statements an auditor must gain an understanding of the entity's "environment", which includes, *inter alia*, gaining an understanding not only of the entity's industry, relevant regulatory and other external factors, nature of its operations, ownership and governance structures, and the way the entity is structured and financed. The auditor must also gain an understanding as to the entity's internal accounting controls and accounting reporting systems, processes, policies and procedures. It must do all of this as part of its duty to evaluate and consider the risk that the entity's financial statements might be materially misstated if there are inadequacies or deficiencies in any of these areas.

310.    Given the complete lack of controls, systems, governance, policies, procedures and

documentation at the FTX Group, - things that were so blatant and obvious that Mr. Ray was able to determine such almost immediately upon becoming the CEO of FTX – the Auditor Defendants must  have either known of or recklessly disregarded these overwhelming problems and never should have, and were prohibited from, issuing their respective clean reports on FTX Trading's and FTX US's financial statements.

311.   Ironically, although it completely disregarded its obligations under GAAS concerning internal controls in connection with the FTX US audit, Armanino publicly acknowledged such obligations in an article it posted on its website, dated June 21, 2017, entitled "Why and How Auditors Assess Internal Controls".   As stated in Armanino's article:

> Assessment of internal controls is part of today's auditing requirements and helps identify risk factors….
>
> The American Institute of Certified Public Accountants (AICPA) issues technical Q&As to address member inquiries on certain issues, and they recently shed some light on this subject. Here's a set of five common questions and answers that the AICPA issued in April to help clarify an auditor's responsibility for assessing a client's internal controls.
>
> Are auditors required to obtain an understanding of business processes relevant to financial reporting in every audit engagement?
>
> Yes, the auditing standards require an auditor to understand a client's information system, including the related business processes and communication relevant to financial reporting. …
>
> Does an auditor's understanding of internal  controls encompass more than control activities?
>
> Yes, an auditor must understand each component of the client's financial reporting controls….
>
> Should the auditor evaluate the design of controls and determine whether they've been implemented every year?
>
> Yes, each year auditors must evaluate the design of the financial reporting controls that are related to the audit and determine if they've been properly implemented. This requires more than just inquiring with company personnel. Auditors must use additional procedures — such as observations, inspection or tracing transactions

through the information system — to obtain an understanding of controls relevant to the audit….

Which control activities are considered relevant in every audit?

Auditors are specifically expected to understand controls that address "significant" risks….

312.     Prager Metis has also acknowledged the importance of internal controls in various media publications, including in a posting since September 26, 2020 on its online webpage entitled Audit, Review & Compilation, wherein it states, in pertinent part that:

At Prager Metis we understand your audit is more than just numbers and compliance. Our experts work closely with you to understand your company, your industry and your world including your internal controls to help ensure you get the most valuable information from our services. By utilizing our risk-based audit approach, combined with our proactive communication, we are able to shift our focus from examining the quality of the financial statements to building quality into the financial reporting process.

Audit reports include customized reviews, analyses, audited financial statements, a peer review, and recommendations for improving controls, systems, and costs. All examinations are completed in strict accordance with the generally accepted auditing standards (GAAS) of the American Institute of Certified Public Accountants, as well as Prager Metis's own internal controls.[159]

313.     Notably, each of the Auditor Defendants publicly professed to being well versed in issues concerning cryptocurrency and the auditing needs related thereto.

314.     Prager Metis, for example, maintained a copy of an October 2019 article on its website entitled "Accounting Professionals Need to Understand Cryptocurrency and Blockchain" and states "[s]imply put, blockchain = accounting ledger."[160]  Prager also advertises on its website as specializing in new technologies, claiming its "team of experts focuses on industries spanning in digital assets" and proudly represents it "is the first CPA firm to officially open its Metaverse

---

[159] https://pragermetis.com/services/audit-and-accounting/audit-review-compilation/ (last visited July 31, 2023).
[160] https://pragermetis.com/insights/accounting-professionals-need-to-understand-cryptocurrency-and-blockchain/ (last visited July 31, 2023).

headquarters in the metaverse platform Decentraland."[161]   Similar statements are on a Prager webpage featuring its work for Digital Assets, wherein it states that Prager is "at the forefront of evolving regulations and actively participate in discussions regarding accounting policies in the cryptocurrency and blockchain industry."[162]

315.    Armanino's representations concerning its purported auditing and accounting prowess for cryptocurrency are equally touted on its website.  Among other things, Armanino advertises that it is the "first accounting firm to formalize and complete a 'Proof of Reserves' for a digital asset exchange.  With a combination of traditional audit and industry tools, we are able to provide much-needed transparency to users of virtual asset service providers."  The firm's website references it having the "first audit and assurance platform, on TrustExplorer . . . ."  As explained in one article, "[t]he Armanino TrustExplorer program is a proprietary, Armanino-owned and controlled software solution that offers asset-backed token projects and their holders a new level of trust and transparency, by providing a current, third-party view of the tokens in circulation and the related collateralized fiat funds (such as U.S. dollars) that back them."[163]   Further, a series of articles on the Armanino website also demonstrate its purported knowledge of what "best" accounting practices are for crypto startups and other advice.[164]

---

[161] https://pragermetis.com/metaverse/ (last visited July 31, 2023).

[162] https://pragermetis.com/industries/digital-assets/ (last visited July 31, 2023).

[163] https://medium.com/armanino-blockchain/armanino-trustexplorer-a-software-solution-for-the-future-of-digital-assets-e92a4482908a (last visited July 31, 2023).

[164] https://www.armanino.com/articles/crypto-startups-token-projects-thrive-with-accounting-best-practices/ (last visited July 31, 2023); https://www.armanino.com/articles/proof-of-reserves-elevating-trust-transparency-digital-asset-ecosystems/ (last visited July 31, 2023); https://www.armanino.com/articles/armanino-trustexplorer-a-software-solution-for-the-future-of-digital-assets/ (last visited July 31, 2023); https://www.armanino.com/articles/blockchain-crypto-resource-center/ (last visited July 31, 2023); https://www.armanino.com/articles/auditing-misconceptions-digital-assets/ (last visited July 31, 2023); https://www.armanino.com/software/trustexplorer/real-time-attest/ (last visited July 31, 2023).

### 4.      The Numerous Red Flags the Auditor Defendants Knew of or Ignored

316.    The plethora of gross internal control failures, lack of or outright non-existence of internal controls, accounting systems, policies and procedures and documentation, as described above and uncovered quickly by Mr. Ray, were also clear "red flags" that should have put the Auditor Defendants on notice that the financial statements of FTX Trading and FTX US were materially misstated and were essentially un-auditable in accordance with GAAS.

317.    Additionally, as alleged above, and ignored by Armanino, contrary to FTX's representations to its customers that "FTX.US does not represent or treat assets in your FTX.US Account as belonging to FTX.US," FTX US did not actually segregate customer funds or designate them for the customer's benefit, instead commingling those funds in several "omnibus" accounts held by FTX.

318.    Moreover, as alleged above, Bankman-Fried, along with his lieutenants, publicly maintained that Alameda and FTX were "wholly separate entit[ies] …at arm's length," and, despite their overlapping ownership by SBF, the companies were kept "separate in terms of day-to-day operations" by way of "a Chinese wall… to ensure that [Alameda wouldn't get] any sort of special treatment from FTX." As we now know, (and what the Auditor Defendants knew or ignored) contrary to these representations, SBF operated FTX and Alameda as a common enterprise. The two companies shared offices for some time, as well as key personnel and other resources critical to the companies' operations.

319.    The numerous and material related party transactions described above by and among the FTX Group, which were not appropriately disclosed in the FTX Trading and FTX US's respective financial statements, was also a significant red flag known to or simply ignored by the Auditor Defendants. Indeed, the Auditor Defendants violated their obligations under GAAS with respect to related party relationships and transactions, including, but not limited to, those set forth

at AU-C Section 550.

320.    Also known to or simply ignored by the Auditor Defendants and should have called into question the veracity of anything they were being told by FTX Management and/or SBF, were the outright lies they made about FTX being FDIC insured. As noted above, in television commercials, print advertising, through interviews and spokespeople, on Twitter, TikTok, Instagram, and Facebook, and in other publications, FTX repeatedly peddled itself as "the safest and easiest way to buy and sell crypto," and SBF repeatedly promised that "our users' funds and safety come first." In highlighting FTX's purported safety, SBF and other FTX executives falsely represented that FTX was insured by the FDIC—including in a tweet on July 20, 2022 that was later deleted on August 19, 2022 by FTX US President Brett Harrison that "direct deposits from employers to FTX US are stored in individually FDIC-insured bank accounts in the users' names," and "stocks are held in FDIC-insured . . . accounts"—until the FDIC ordered that FTX cease and desist in a letter dated August 18, 2022.

321.    As Francine Mckenna, Wharton School lecturer, former auditor and financial journalist noted her November 18, 2022 Coindesk article about what transpired at FTX, the first red flag that should have put the Auditor Defendants on notice that something was amiss from the very beginning was the fact that the FTX Group hired two different accounting firms to audit the affiliated companies of FTX Trading and FTX US. As Ms. McKenna points out, this was very odd given the relationship between FTX Trading and FTX US and suggests that perhaps this was done as a way to keep each of the two firms from seeing "the whole picture" of what was going on at the FTX Group.

### 5.    Additional GAAS Violations by the Auditor Defendants

322.    In issuing their clean audit reports on FTX' financial statements, and allowing FTX and/or Bankman-Fried to publicly tout that it had received clean audit reports from its auditors,

the Auditor Defendants violated the following provisions of GAAS, in addition to those noted above:

(a)   The standard concerning appropriate planning of an audit, as outlined in AU-C Section 300.

(b)   The standard pertaining to the terms of the audit engagement, including acceptance and continuance of the engagement, as outlined in AU-C Section 210 requiring, *inter alia*, the auditor establish that certain preconditions for an audit are present, including, but not limited to, a determination that management understands its responsibilities as preparers of the financial statements and that the auditors have unrestricted access to records and personnel, as needed, as well as that the financial reporting framework to be applied in preparation of the financial statements is acceptable.

(c)   In addition, AU-C Section 210 requires the necessity of a disclaimer of opinion, or not accepting the engagement at all if management "of an entity that is not required by law or regulation impose to have an audit impose a limitation on the scope of the auditor's work."

(d)   The standard requiring that an auditor gain an appropriate understanding of the entity whose financial statements it is auditing and its environment, including, but not limited to, as outlined in AU-C Section 315A, which requires that the auditor obtain an understanding of:

i.    Relevant industry, regulatory, and other external factors, including the applicable financial reporting framework;

ii.   The nature of the entity, including its (i) operations; (ii) its ownership and governance structures; (iii) the types of investments that the entity is making and plans to make, including investments made in entities formed to accomplish specific objectives; (iv) the way that the entity is structured and how it is financed. The auditor should also gain an understanding of the information systems being used by the entity and consider whether such are appropriate for the entity.

(e)   The standard concerning communicating internal control related matters identified in an audit, as set forth in AU-C Section 265, which states, *inter alia*, that: "The auditor is required to obtain an understanding of internal control relevant to the audit when identifying and assessing the risks of material misstatement."

(f)   The standard, as outlined in AU-C Section 315, requiring the auditor to perform audit procedures designed to identify the areas that represent

specific risks relevant to the audit, including the existence of unusual transactions and events and amounts, ratios and trends that warrant investigation.

(g)     The standard requiring the auditor to perform appropriate procedures to obtain reasonable assurance that the financial statements as a whole are free from material misstatement, whether caused by fraud or error as outlined in the provisions set forth at AU-C Section 240.

(h)     The standard requiring that the auditor consider the laws and regulations the audited entity is subject to and must comply with as set forth at AU-C Section 250.

(i)     The standard requiring that the audit be planned in a manner that will appropriately consider that the entity's financial statements do not contain material misstatements, as outlined in AU-C Section 320 entitled *Materiality in Planning and Performing an Audit.*

(j)     The standard requiring the auditor to obtain appropriate audit evidence to support its opinion, including, but not limited to, the provisions concerning such as outlined in AU-C Sections 501 and 501A.

(k)     The standard requiring the auditor to test the propriety of the audited entity's accounting estimates, including fair value accounting estimates and related disclosures, as outlined in AU-C Section 540A.

(l)     The standard requiring the auditor to perform audit procedures to identify, assess, and respond to the risks of material misstatement in the financial statements arising from the entity's failure to appropriately account for or disclose related party relationships, transactions, or balances as required by AU-C Section 550.

(m)     The standard concerning the auditor's responsibilities relating to subsequent events and subsequently discovered facts, as outlined in AU-C Section 560, which requires, *inter alia*, that the auditor (a) " obtain sufficient appropriate audit evidence about whether events occurring between the date of the financial statements and the date of the auditor's report that require adjustment of, or disclosure in, the financial statements are appropriately reflected in those financial statements in accordance with the applicable financial reporting framework and (b) respond appropriately to facts that become known to the auditor after the date of the auditor's report that, had they been known to the auditor at that date, may have caused the auditor to revise the auditor's report."

(n)     The standard requiring the auditor to consider the entity's ability to continue as a going concern, as outlined in AU-C Section 570.

(o)    The standard requiring the auditor to consider omitted procedures after its report release date, as outlined in AU-C Section 585, which requires the auditor to (a) "assess the effect of omitted procedures of which the auditor becomes aware on the auditor's present ability to support the previously expressed opinion on the financial statements, and (b) respond appropriately."

(p)    The standard concerning the issuance of audit reports and opinions as outlined in AU-C Section 700 entitled *Forming an Opinion and Reporting on Financial Statements*.

(q)    The standard concerning communicating key audit matters in the independent auditor's report, as outlined in AU-C Section 701.

**6.      The Auditor Defendants Violated GAAS by Acting as "Cheerleaders" for FTX and Bankman-Fried**

323.    Auditor independence is one of the most important and fundamental foundations of GAAS. An auditor must be independent of an audit client in ***both appearance and fact***. Indeed, if an auditor is not independent, "the auditor is precluded from issuing a report under GAAS." See AU-C Sections 200.15 and A17.  The ethical requirements relating to auditor independence in connection with an audit of financial statements set forth by the AICPA's Code of Professional Conduct (the "Code") are also incorporated by reference as part of GAAS and must also be complied with. See, AU-C Section 200.A15-.A17.

324.    The Code prohibits auditors from engaging in any type of conduct that may in fact or appearance threaten to compromise the auditor's independence. Pursuant to the Code, an auditor's independence is impaired when, *inter alia*, the auditor promotes or advocates an audit client's interests or position. Indeed, the Code notes, by way of example, that an auditor may not endorse an audit client's services or products. See, Code at 1.000.010.11. and 1.210.010.13.

325.    The Code also recognizes the special role CPAs play in the business community and, accordingly, mandates that they "exercise sensitive professional and moral judgments in all their activities." Code at 0.300.020. In recognizing the CPA's obligations and responsibilities to

the "public", the Code notes that: "The accounting profession's public consists of *clients,* credit grantors, governments, employers, investors, the business and financial community, and others who rely on the objectivity and integrity of *members* to maintain the orderly functioning of commerce. This reliance imposes a public interest responsibility on *members.*" *Id.* at 0.300.030. The Code further requires that in recognition of their special role to the public that CPAs always perform their professional responsibilities with the highest level of integrity. *Id.* at 0.300.040. [165]

326.    Notwithstanding the prohibitions from doing so, the Auditor Defendants breached their duty of independence by issuing their clean reports on FTX Trading and FTX US, but they further breached their duty of independence by publicly touting, promoting and expressing support to FTX and Bankman-Fried.

### 7.    Armanino's wrongful public support of FTX and Bankman-Fried

327.    On December 8, 2021, while engaged as FTX US's auditor, Armanino tweeted "[l]et's go buddy!" while tagging Bankman-Fried in advance of one of the several occasions where Bankman-Fried testified before Congress about FTX and its trading platforms. [166]

---

[165] Upon information and belief, both Armanino and Prager Metis are members of the AICPA.

[166] Bankman-Fried testified before Congress on at least two other occasions in February and May 2022, making a series of false assurances about the "extremely successful" nature of the FTX.com exchange, the growing size of its "compliance and customer support," the "highly performant and reliable exchanges" of the FTX "platforms," that "FTX has designed and offered a platform with a market structure that is risk reducing," and that "FTX segregates customer assets from its own assets across our platforms," among other materially false and misleading statements concerning the FTX Entities.  The substance of the December 2021, February 2022 and May 2022 testimony of Bankman-Fried is available at the following links: https://www.ftxpolicy.com/posts/testimony-may-12;                https://www.ftxpolicy.com/posts/testimony-feb-9                and https://www.ftxpolicy.com/posts/testimony-of-sam-bankman-fried-december-8-2021.



328.    In response to a tweet by Bankman-Fried following his testimony to Congress, Armanino replied that Bankman-Fried was "working on all our behalf today!"

329.    And, when Bankman-Fried, testified before the Senate in February 2022, Noah Buxton, founder of Armanino's Blockchain practice, publicly noted that he listened to the testimony and tweeted, "Just getting to listen to this testimony late in the day. Nice work @PerianneDC and @SBF_FTX laying down the knowledge. [Prayer hands emoji, thumbs up emoji]."



8. **Prager Metis Wrongfully Touted and Promoted FTX on its Own Website**

330.    In June 2022, while engaged as FTX Trading's auditor, Prager posted the following on its website:



331.    As set forth in the Prager Metis June 2022 post (above), Prager states that FTX.US "offer[s] U.S. traders a platform that inspires their loyalty."  Prager's "support" of FTX.US includes telling consumers that Prager has a "relationship" with FTX.US, that FTX.US is a "major player" in the crypto market, and that the platform offered "inspires . . . loyalty," a very meaningful endorsement from a large U.S. based auditing firm designed to provide comfort to customers and encourage use of FTX.US's services and offerings.  Indeed, at the time of the posting (which appears to have been shared on various other popular social media platforms such as Twitter, LinkedIn and Facebook), it is understood that Prager served as the auditor for FTX Trading, not FTX.US. Nevertheless, Prager Metis appears to have gone out of its way to publicly tout its

"relationship" with FTX US, which was clearly associated in the public's eye as being related to FTX, for the purpose of giving legitimacy and a basis of confidence in FTX by FTX customers and investors.

332.    As referenced in a December 5, 2022 online article by Going Concern News Desk entitled "If There Was a PCAOB in the Metaverse, It Would Probably Find a Bunch of Errors in Prager Metis's Audits Too" (the "December 5 Going Concern Article"), "[a]uditors should not be friends with their clients."   As a November 17, 2022 Wall Street Journal article astutely characterized the conduct, FTX's auditors acted like "crypto industry cheerleaders."   The December 5 Going Concern Article hearkens back to the "Let's go buddy" support Armanino voiced toward Bankman-Fried in connection with his December 2021 hearing before a Congressional committee, noting that making the statement "does not appear independent.  At all! Quite the opposite, actually! Let's try a little harder, people."

333.    The Auditor Defendants knew or recklessly disregarded that by publicly touting, promoting, and expressing support for FTX and Bankman-Fried as described above, they were violating their required duty of independence under GAAS and giving credibility to FTX and Bankman-Fried. Moreover, they knew or recklessly disregarded that their public "endorsements" and statements supporting FTX and Bankman-Fried would lead to current and prospective customers and investors entrusting their assets with FTX.

## CLASS ACTION ALLEGATIONS

334.    As detailed below in the individual counts, Plaintiffs bring this lawsuit on behalf of themselves and all others similarly situated, pursuant to Rule 23(a), (b)(2), (b)(3), and/or (c)(4) of the Federal Rules of Civil Procedure.

### A.   Class Definitions

335.   Plaintiffs Vozza, Rupprecht, Winter, and Kavuri seek to represent the following International Classes and Plaintiffs Orr, Cabo, Henderson, Livieratos, Chernyavsky, Podalsky, Shetty, Ezeokoli, Norris, Garrison, Huang, and Papadakis seek to represent the following Nationwide Classes:

> **(1) <u>International Class</u>:** All persons or entities residing outside the United States who, within the applicable limitations period, purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform, purchased or enrolled in a YBA, or purchased FTT.

> **(2) <u>Nationwide Class</u>:** All persons or entities in the United States who, within the applicable limitations period, purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform, purchased or enrolled in a YBA, or purchased FTT.

Excluded from the Classes are MDL Defendants and their officers, directors, affiliates, legal representatives, and employees, the FTX Group and their officers, directors, affiliates, legal representatives, and employees, any governmental entities, any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

336.   Plaintiffs reserve the right to modify or amend the definition of the proposed Classes, or to include additional classes or subclasses, before or after the Court determines whether such certification is appropriate as discovery progresses. Plaintiffs seek certification of the Classes in part because all offers of the FTX Platform, YBAs and/or FTT to Plaintiffs and the Class Members (in which MDL Defendants each materially assisted, substantially participated, and/or

personally participated) were made by FTX from their principal place of business in Miami, Florida, and thus every single offer to sell cryptocurrency, the FTX Platform, YBAs and/or FTT stems from a transactional occurrence that emanated from the State of Florida.

## B.    Numerosity

337.    The Classes are comprised of thousands, if not millions, of consumers globally, to whom FTX offered and/or sold cryptocurrency, the FTX Platform, YBAs and/or FTT. Moreover, thousands, if not millions, of consumers worldwide have executed trades on the FTX Platform within the applicable limitations period. Membership in the Classes are thus so numerous that joinder of all members is impracticable. The precise number of class members is currently unknown to Plaintiffs but is easily identifiable through other means, such as through FTX's corporate records or self-identification.

## C.    Commonality/Predominance

338.    This action involves common questions of law and fact, which predominate over any questions affecting individual class members. These common legal and factual questions include, but are not limited to, the following:

(a) whether Bankman-Fried, the FTX Insiders, and/or FTX committed fraud;

(b) whether the MDL Defendants agreed with Bankman-Fried, the FTX Insiders, and/or FTX to commit fraud;

(c) whether the MDL Defendants had the requisite degree of knowledge of Bankman-Fried's, the FTX Insiders', and/or FTX's fraud;

(d) whether the FTX Platform, YBAs and/or FTT were unregistered securities under federal, Florida, California, or other law;

(e) whether MDL Defendants' participation and/or actions in FTX's offerings and sales of the FTX Platform, YBAs and/or FTT violate the provisions of applicable securities law.

(f) the type and measure of damages suffered by Plaintiffs and the Class.

(g) whether MDL Defendants' practices violate the FDUTPA, the California Unfair Competition Law, or other state consumer-protection statutes;

(h) whether Plaintiffs and Class members have sustained monetary loss and the proper measure of that loss;

(i) whether Plaintiffs and Class members are entitled to injunctive relief;

(j) whether Plaintiffs and Class members are entitled to declaratory relief; and

(k) whether Plaintiffs and Class members are entitled to consequential damages, punitive damages, statutory damages, disgorgement, and/or other legal or equitable appropriate remedies as a result of MDL Defendants' conduct.

**D.      Typicality**

339.    Plaintiffs' claims are typical of the claims of the members of the Classes because all members were injured through the uniform misconduct described above, namely that Plaintiffs and all class members were offered and/or sold FTX's Platform, YBAs and/or FTT because of MDL Defendants' actions and/or participation in the offering and sale of these unregistered securities, that MDL Defendants aided and abetted the fraud and conversion perpetrated by Bankman-Fried, the FTX Insiders, and/or FTX, or that MDL Defendants agreed with Bankman-Fried, the FTX Insiders, and/or FTX to commit fraud. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all such members. Further, there are no defenses available to any MDL Defendant that are unique to Plaintiffs.

### E.    Adequacy of Representation

340.    Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs have retained counsel experienced in complex consumer and securities class action litigation, and Plaintiffs intend to prosecute this action vigorously. Plaintiffs have no adverse or antagonistic interests to those of the Classes. Plaintiffs anticipate no difficulty in the management of this litigation as a class action. To prosecute this case, Plaintiffs have chosen the undersigned law firms, which have the financial and legal resources to meet the substantial costs and legal issues associated with this type of consumer class litigation.

### F.    Requirements of Fed. R. Civ. P. 23(b)(3)

341.    The questions of law or fact common to Plaintiffs' and each Class member's claims predominate over any questions of law or fact affecting only individual members of the Classes. All claims by Plaintiffs and the unnamed members of the Classes are based on the common course of conduct by MDL Defendants (1) in marketing, offering, and/or selling the FTX Platform, YBAs and/or FTT, which are unregistered securities, (2) in receiving secret undisclosed compensation for their promotion of the FTX Platform, (3) in aiding and abetting fraud and/or conversion by Bankman-Fried, FTX and the FTX Insiders, and/or (4) in agreeing with Bankman-Fried, the FTX Insiders, and/or FTX to commit fraud.

342.    The common course of conduct by MDL Defendants includes, but is not limited to their promotion, offer, sale, solicitation, material assistance, substantial participation in, and/or personal participation in the offer or sale of the FTX Platform, YBAs, and/or FTT, and/or their aiding and abetting of the FTX Group's Ponzi scheme, fraud, and/or conversion of billions of dollars of customer assets.

343.    Common issues predominate when, as here, liability can be determined on a class-wide basis, even when there will be some individualized damages determinations.

344.     As a result, when determining whether common questions predominate, courts focus on the liability issue, and if the liability issue is common to the Classes as is in the case at bar, common questions will be held to predominate over individual questions.

## G.     Superiority

345.     A class action is superior to individual actions for the proposed Classes, in part because of the non-exhaustive factors listed below:

> (a) Joinder of all Class members would create extreme hardship and inconvenience for the affected customers as they reside nationwide and throughout the state;

> (b) Individual claims by Class members are impracticable because the costs to pursue individual claims exceed the value of what any one Class member has at stake. As a result, individual Class members have no interest in prosecuting and controlling separate actions;

> (c) There are no known individual Class members who are interested in individually controlling the prosecution of separate actions;

> (d) The interests of justice will be well served by resolving the common disputes of potential Class members in one forum;

> (e) Individual suits would not be cost effective or economically maintainable as individual actions; and

> (f) The action is manageable as a class action.

## H.     Requirements of Fed. R. Civ. P. 23(b)(2)

346.     MDL Defendants have acted and refused to act on grounds generally applicable to the Classes by engaging in a common course of conduct of aiding and abetting the offering and/or selling of the FTX Platform, YBAs and/or FTT, which are unregistered securities, and violating state consumer-protection laws, thereby making appropriate final injunctive relief or declaratory

relief with respect to the classes as a whole.

347.     MDL Defendants have acted and refused to act on grounds generally applicable to the Classes by engaging in a common course of conduct of uniformly identical and uniform misrepresentations and omissions in receiving secret undisclosed compensation for their promotion of the FTX Platform, thereby making appropriate final injunctive relief or declaratory relief with respect to the classes as a whole.

## I.     Requirements of Fed. R. Civ. P. 23(c)(4)

348.     As it is clear that one of the predominant issues regarding MDL Defendants' liability is whether the FTX Platform, YBAs and/or FTT that FTX offered and/or sold are unregistered securities, utilizing Rule 23(c)(4) to certify the Class for a class wide adjudication on this issue would materially advance the disposition of the litigation as a whole.

349.     As it is clear that another predominant issue regarding MDL Defendants' liability is whether they have violated the consumer protection and securities laws of Florida in making identical and uniform misrepresentations and omissions regarding the functionality of the FTX Platform, and/or in receiving secret undisclosed compensation for their promotion of the FTX Platform, utilizing Rule 23(c)(4) to certify the Classes for a class wide adjudication on this issue would materially advance the disposition of the litigation as a whole.

## J.     Nature of Notice to the Proposed Class.

350.     The names and addresses of all Class Members are contained in the business records maintained by FTX and are readily available to FTX. The Class Members are readily and objectively identifiable. Plaintiffs contemplate that notice will be provided to Class Members by e-mail, mail, and published notice.

## CLAIMS FOR RELIEF

## COUNT I

## RICO – Conspiracy (18 U.S.C. § 1962(d))

351.    Plaintiffs reallege and restate the above paragraphs as if fully set forth herein and further state as follows.

352.    As alleged in the Consolidated Amended Complaint against the FTX Insiders, MDL No. 3076, 23-md-03076-KMM, (the "Insider Complaint"), the Operator/Manager Defendants violated 18 U.S.C. § 1962(c). The allegations in Paragraphs 318–341 of the Insider Complaint are incorporated as if fully set forth herein.

353.    Armanino and Prager Metis conspired with the Operator/Manager Defendants to conduct or participate, directly or indirectly, in the conduct of the affairs of the enterprises through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d). In particular, Armanino and Prager Metis intended to or agreed to further an endeavor of the Operator / Manager Defendants which, if completed, would satisfy all of the elements of a substantive RICO criminal offense (18 U.S.C. § 1962(c)) and adopted the goal of furthering or facilitating the criminal endeavor.

354.    Armanino and Prager Metis conspired in the conduct of the criminal endeavors of the Operator/Manager Defendants with actual knowledge of the unlawful nature of the enterprise or with willful blindness amounting to knowledge of the unlawful nature of the enterprise. As recounted throughout this Complaint, Armanino and Prager Metis were exposed to indications of the fraudulent nature of the Operator/Manager Defendants' endeavors so obvious that they must have been aware of danger posed to Plaintiffs by these endeavors, or have strongly suspected that they were involved in such an enterprise but deliberately avoided learning more.

355.     Plaintiffs were injured by overt acts that are acts of racketeering or otherwise unlawful under the RICO statute, which included (among other acts) the acts of wire fraud and obstruction of justice committed through the enterprises alleged in the Insider Complaint.

356.     As a direct and proximate result of, and by reason of, the activities of the Operation / Manager Defendants, Armanino and/or Prager Metis, and their conduct in violation of 18 U.S.C. § 1962(d), Plaintiffs were injured in their business or property, within the meaning of 18 U.S.C. § 1964(c).  Among other things, Plaintiffs were deprived of the substantial assets in their FTX accounts. Plaintiffs are, therefore, entitled to recover threefold the damages sustained together with the cost of the suit, including costs, reasonable attorneys' fees and reasonable experts' fees.

## COUNT II

### For Misleading Advertising in Violation of Florida Statute § 817.41

357.     Plaintiffs repeat and re-allege each of the allegations set forth above, as if fully set forth herein.

358.     One or more of the Plaintiffs reviewed the FTX, FTX Insider Defendants' and/or Auditor Defendants' misrepresentations set forth above, including the misrepresentations that FTX had received a "GAAP" audit, had been audited, one or more of the Plaintiffs reviewed copies or excerpts of the Auditor Defendants' Audit Reports and/or one or more of the Plaintiffs reviewed the expressions of public support by the Auditor Defendants for FTX and SBF, as alleged herein. In particular, the Auditor Defendants' expressions of public support for FTX and SBF, alleged herein, were posted via social media or on the internet, and thus widely disseminated, including before the public in the State of Florida and/or portions of the public of the State of Florida. Similarly, FTX and SBF posted on social media or on the internet statements that FTX was audited and/or had secured a "GAAP" audit, facts of which the Auditor Defendants knew or should have

known were being represented by the other Defendants on social media and/or the internet.  For purposes of this Count, the Audit Reports, the Auditor Defendants' statements of support for FTX and SBF, and the references by SBF and FTX to the "audit(s)" provided by the Auditor Defendants are collectively referred to as the "Promotional Material".

359.     At all times material hereto, Defendants' Promotional Material, including materials referenced above, which one or more of the Plaintiffs reviewed, contained the statements and descriptions set forth above.

360.     At all times material hereto, Defendants' Promotional Material, which one or more of the Plaintiffs reviewed, contained misrepresentations of material facts, including:

361.     The Auditor Defendants knew or should have known of the falsity of the aforementioned misrepresentations.

362.     The Auditor Defendants intended or recklessly disregarded that the misrepresentations would induce Plaintiffs and the Classes to rely and act on them.

363.     The Auditor Defendants' misrepresentations that FTX's financial statements conformed to GAAP and/or were audited in accordance with GAAS, were made in bad faith and with malice or reckless indifference to the Plaintiffs' and consumers' interests.  Similarly, the Auditor Defendants' statements of support for FTX and SBF were made in bad faith and with malice or reckless indifference to the Plaintiffs' and consumers' interests.  The Auditor Defendants knew, or recklessly disregarded, that FTX's financial condition was materially misstated and its internal controls non-existent, including as detailed in the First Interim Rpt., and therefore the Auditor Defendants had no basis to issue statements in support of FTX and/or SBF, as alleged herein.

364.     Plaintiffs and the Classes have suffered injury as a result of the misrepresentations

alleged herein.

365.    Wherefore, Plaintiffs respectfully request that judgment be entered in favor of Plaintiffs and the Classes and against the Auditor Defendants for misleading advertising in violation of Fla. Stat. 817.41 and that Plaintiffs and the Classes be awarded actual damages, costs, attorney's fees, and punitive damages pursuant to Fla. Stat. 817.41(6) and that an injunction be issued enjoining the Auditor Defendants from disseminating the misleading Promotional Materials described hereinabove, plus such other and further relief the Court deems necessary and just.

## COUNT III

### Violations of the Florida Statute Section 517.07, The Florida Securities and Investor Protection Act

366.    Plaintiffs repeat and re-allege each of the allegations set forth above, as if fully set forth herein.

367.    Section 517.07(1), provides that it is unlawful and a violation for any person to sell or offer to sell a security within the State of Florida unless the security is exempt under Fla. Stat. § 517.051, is sold in a transaction exempt under Fla. Stat. § 517.061, is a federal covered security, or is registered pursuant to Fla. Stat. Ch. 517.

368.    Section 517.211(1) extends liability for any sale made in violation of Fla. Stat. 517.07 to any "director, officer, partner, or agent of or for the seller, if the director, officer, partner, or agent has personally participated or aided in making the sale, is jointly and severally liable to the purchaser in an action for rescission, if the purchaser still owns the security, or for damages, if the purchaser has sold the security."

369.    The FTX Platform, the YBAs, and/or FTT are each a security pursuant to Fla. Stat. § 517.021(22)(a).

370.    The FTX Platform, the YBAs and/or FTT sold and offered for sale to Plaintiffs and Class Members were not:

  a.  exempt from registration under Fla. Stat. § 517.051;

  b.  a federal covered security;

  c.  registered with the Office of Financial Regulations (OFR); or

  d.  sold in a transaction exempt under Fla. Stat. § 517.061.

371.    FTX , FTX Insider Defendants and/or one or more of the MDL Defendants sold and offered to sell the unregistered FTX Platform, YBAs, and/or FTT to Plaintiffs and Class Members.

372.    The Auditor Defendants are agents of FTX and/or FTX Insider Defendants pursuant to Fla. Stat. 517.211(1).

373.    FTX, FTX Insider Defendants and/or MDL Defendants, with the Auditor Defendants' material assistance and personal participation, offered and sold the unregistered FTX Platform, YBAs, and/or FTT to Plaintiffs and Class Members. This assistance included the statements of support for FTX and/or SBF alleged herein, as well as the provision of materially false Audit Reports intended to curry favor with Plaintiffs and the Classes as an endorsement of the safety of trading on the FTX Platform, enrolling in the YBAs and/or acquiring the FTT.  As a result of this assistance, the Auditor Defendants violated Fla. Stat. § 517.07, *et seq.* and Plaintiffs and Class Members sustained damages as herein described.

374.    Plaintiffs hereby conditionally tender their FTX Group securities.

### <u>COUNT IV</u>

**Violations of the Florida Statute Section 517.301,**
**The Florida Securities and Investor Protection Act**

375.    Plaintiffs repeat and re-allege each of the allegations set forth above, as if fully set

forth herein.

376.    Section 517.301 provides that is unlawful and a violation for any person "in connection with the offer, sale, or purchase of any investment or security, including any security exempted under the provisions of Fla. Stat. 517.051, and including any security sold in a transaction exempted under the provisions of Fla. Stat. 517.061, directly or indirectly" "to employ any device, scheme, or artifice to defraud," "to obtain money or property by means of any untrue statement or material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading," or "to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a person." Section 517.301 further provides that is unlawful and a violation for any person to "publish, give publicity to, or circulate any notice, circular, advertisement, newspaper, article, letter, investment service, communication, or broadcast which, though not purporting to offer a security for sale, describes such security for a consideration received or to be received directly or indirectly from an issuer, underwriter, or dealer, or from an agent or employee of an issuer, underwriter, or dealer without fully disclosing the receipt, whether past or prospective, of such consideration and the amount of the consideration" and "in any matter within the jurisdiction of the office, to knowingly and willfully falsify, conceal, or cover up, by trick, scheme, or device, a material fact, make any false, fictitious, or fraudulent statement of representation, or make or use any false writing or document, knowing the same to contain any false, fictitious, or fraudulent statement or entry."

377.    Section 517.211(2) extends liability to any "person purchasing or selling a security in violation" of Fla. Stat. 517.301, and to every "director, officer, partner, or agent of or for the purchaser or seller, if the director, officer, partner, or agent has personally participated or aided in

making the sale or purchase, is jointly and severally liable to the person selling the security to or purchasing the security from such person in an action for rescission, if the plaintiff still owns the security, or for damages, if the plaintiff has sold the security."

378.    The Auditor Defendants are agents of FTX and/or the FTX Insider Defendants pursuant to Fla. Stat. § 517.211(2).

379.    FTX ,the FTX Insider Defendants, with the Auditor Defendants and one or more of the MDL Defendants, engaged in a scheme to sell unregistered securities to Plaintiffs and the Classes, by use of materially false statements, including the clean Audit Reports and the Auditor Defendants' statements of support for FTX and SBF, as alleged herein.

380.    As a result of the above conduct, the Auditor Defendants violated Fla. Stat. § 517.301 and Plaintiffs and Class Members sustained damages as described herein.

381.    Plaintiffs hereby conditionally tender their FTX Group securities.

## <u>COUNT V</u>

**For Violations of the Florida Deceptive and Unfair Trade Practices Act,
§ 501.201, Florida Statutes, *et seq*.**

382.    Plaintiffs repeat and re-allege each of the allegations set forth above, as if fully set forth herein.

383.    This cause of action is brought pursuant to the Florida Deceptive and Unfair Trade Practices Act, section 501.201, Fla. Stat., et seq. ("FDUTPA"). The stated purpose of the FDUTPA is to "protect the consuming public . . . from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." § 501.202(2), Fla. Stat.

384.    Plaintiffs and Class members are consumers as defined by section 501.203, Fla. Stat. The Auditor Defendants are engaged in trade or commerce within the meaning of the

FDUTPA.

385.    Florida Statute section 501.204(1) declares unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."

386.    The Auditor Defendants' unfair and deceptive practices as described herein are objectively likely to mislead – and have misled – consumers acting reasonably in the circumstances.

387.    The Auditor Defendants have violated the FDUTPA by engaging in the unfair and deceptive practices as described herein, which offend public policies and are immoral, unethical, unscrupulous and injurious to consumers.

388.    Plaintiffs and consumers in the Classes have been aggrieved by the Auditor Defendants' unfair and deceptive practices and acts of issuing materially false Audit Reports and engaging in the promotion of FTX, that was part of the marketing scheme used by the MDL Defendants in order to cause customers/consumers to deposit funds or set up the FTX Platform, YBAs and/or FTT with FTX, as described herein, resulting in the loss of their investments.

389.    The harm suffered by Plaintiffs and consumers in the Classes was directly and proximately caused by the deceptive and unfair practices of the Auditor Defendants, as more fully described herein.

390.    Pursuant to sections 501.211(2) and 501.2105, Fla. Stat., Plaintiffs and consumers in the Classes make claims for actual damages, attorneys' fees and costs.

391.    The Auditor Defendants still utilize many of the deceptive acts and practices described above. Plaintiffs and the other members of the Classes have suffered and will continue to suffer irreparable harm if the Auditor Defendants continue to engage in such deceptive, unfair,

and unreasonable practices. Section 501.211(1) entitles Plaintiffs and the Classes to obtain both declaratory or injunctive relief.

## COUNT VI

**For Violations of California's Unfair Competition Law,
Cal. Bus. & Prof. Code § 17200, *et seq*.**

392.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

393.    This Count is asserted against the Auditor Defendants and is based upon the California Unfair Competition Law ("UCL"), which prohibits any "unlawful, unfair, or fraudulent business act or practice." Cal. Bus. & Prof. Code §17200.

394.    The Auditor Defendants' practices set forth herein were unlawful, unfair and fraudulent, as set forth below.  These deceptive practices described herein are likely to mislead— and clearly have misled—consumers acting reasonably under the circumstances into depositing funds and/or assets into the FTX Platform, YBAs and/or in FTTs with FTX and/or maintaining such investments.

**(A)    Unlawful:**

395.    The Auditor Defendants have also violated the unlawful provision of the UCL by touting and/or advertising FTX and issuing the Audit Reports for FTX, in a manner that constitutes the issuance of negligent and/or intentional misrepresentations or constitutes other actionable claims under common law, applicable regulations or professional standards of conduct, including those related to auditor independence, as alleged herein.  The Auditor Defendants issued Audit Reports that failed to comply with GAAS and applicable professional standards (including the AICPA's Code of Professional Conduct outlined herein), and these Audit Reports, or the fact of their existence, were used by FTX to solicit customers to enter and/or maintain funds and/or assets

with or in the FTX Platform, YBAs and/or in FTTs or transfer money or property to FTX.

**(B)** **Fraudulent:**

396.    A practice is "fraudulent" pursuant to the UCL if members of the general public were or are likely to be deceived.

397.    The Auditor Defendants touted and/or advertised for FTX in the tweets and social media statements alleged herein, and issued Audit Reports for FTX that included statements that were deceptive to the public. For example, the Auditor Defendants' respective certifications and representations that FTX's financial statements complied with GAAP and that they conducted audits of such financial statements in accordance with GAAS constitutes a fraudulent practice under the UCL, as it was likely to deceive Plaintiffs and the Classes members into believing that their cryptocurrency assets were financially secure, that FTX had adequate internal controls and measures to protect the safety of their cryptocurrency assets, and caused Plaintiffs and the Classes to continue to entrust their cryptocurrency assets to FTX despite the existence of a significant risk of financial fraud and ultimately, collapse.

**(C)** **Unfair:**

398.    The Auditor Defendants' failure to conduct GAAS compliant audits of FTX's financial statements and their respective certifications that FTX's financial statements complied with GAAP, and the Auditor Defendants' promotion of FTX and SBF  while working as auditors of FTX, was conduct that violated GAAS and that was unethical, unscrupulous, and substantially injurious to Plaintiffs and the Classes and thus constitutes an unfair practice under the UCL.

399.    The Auditor Defendants' practices were also contrary to legislatively declared and public policies that seek to protect consumers from misleading statements and professional misconduct, as reflected by laws and rules such as the Accountancy Act (Cal. Bus. & Prof. Code § 5000), standards of professional conduct for accountants, the Federal Trade Commission Act (15

U.S.C. § 45), the Consumers Legal Remedies Act (Cal. Civ. Code § 1750), and California False Advertising Law (Cal Bus. & Prof. Code § 17500). The harm these practices caused to Plaintiffs and the Classes outweigh their utility, if any.

400.    The Auditor Defendants knew, or should have known, that their representations concerning FTX's financial statements and their respective audits of such were false or inaccurate. The Auditor Defendants knew or should have known that their promotion of FTX and SBF violated rules of professional conduct to which they were subject and that their statements and representations regarding the financial statements, FTX, and SBF would induce Plaintiffs and the Classes to entrust or continue entrusting their assets to FTX. The conduct undertaken and engaged in by the Auditor Defendants to market and sale the maintain funds and/or assets with or in the FTX Platform, YBAs and/or FTTs or transfer money or property to FTX is, and was, unfair pursuant to the UCL because it was immoral, unethical, unscrupulous, or substantially injurious to consumers in inducing them to maintain funds and/or assets with or in the FTX Platform, YBAs and/or in FTTs or transfer money or property to FTX when these investments were operated contrary to the Terms of Use and User Agreements and/or what was represented to consumers as alleged herein, including the omission of the material fact that the maintain funds and/or assets with or in the FTX Platform, YBAs and/or in FTTs would be run in the nature of a Ponzi scheme.

401.    The utility of the Auditor Defendants' conduct, if any, does not remotely outweigh the gravity of the harm to consumers, who were victims of the Defendants' misconduct. The Auditor Defendants' conduct with respect to the operation of FTX is unfair because the consumer injury is substantial, not outweighed by benefits to consumers or competition, and not one that consumers, can reasonably avoid. Plaintiffs and the Classes would not have deposited funds into, or maintain funds and/or assets with, the FTX Platform, YBAs and/or in FTTs or transfer money

or property to the FTX Platform, YBAs and/or FTT with FTX, had they known that the statements were misrepresentations and deceitful.

402.     As alleged herein, the harm suffered by Plaintiffs and the Classes was directly and proximately caused by the deceptive and unfair practices of the Auditor Defendants related to the financial condition of FTX, the FTX Platform, YBAs and/or FTT.  Plaintiffs and the Classes lost money or property as a result of the Defendants' conduct alleged herein.

403.     In accordance with California Business & Professions Code § 17203, Plaintiffs seek an order enjoining the Auditor Defendants from continuing to conduct business through fraudulent or unlawful acts and practices. In accordance with California Business & Professions Code § 17203, Plaintiffs seek an order enjoining the Auditor Defendants from continuing to conduct business through fraudulent or unlawful acts and practices.  On behalf of the Classes, Plaintiffs also seek an order for the restitution of all monies and assets they deposited and/or maintained with, or in, the FTX Platform, YBAs and/or in FTTs as a result of these acts of fraudulent, unfair, or unlawful competition.

## COUNT VII

### Violation of California's False Advertising Law,
### Cal. Bus. & Prof. Code § 17500, *et seq*.

404.     Plaintiffs allege each of the foregoing paragraphs as if fully set forth herein.

405.     This Count is asserted against the Auditor Defendants and is based upon California's False Advertising Law ("FAL"), which prohibits any statement in connection with the sale of goods "which is untrue or misleading." Cal. Bus. & Prof. Code § 17500.  Specifically, Section 17500 provides, in pertinent part, that:

It is unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services, professional or otherwise, or anything of any nature whatsoever or to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated before the public in this state, or to make or disseminate or cause to be made or disseminated from this state before the public in any state, in any newspaper or other publication, or any advertising device, or by public outcry or proclamation, or in any other manner or means whatever, including over the Internet, any statement, concerning that real or personal property or those services, professional or otherwise, or concerning any circumstance or matter of fact connected with the proposed performance or disposition thereof, which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading, or for any person, firm, or corporation to so make or disseminate or cause to be so made or disseminated any such statement as part of a plan or scheme with the intent not to sell that personal property or those services, professional or otherwise, so advertised at the price stated therein, or as so advertised.

406.    The Auditor Defendants made statements in support of FTX, including the issuance of the Audit Reports.  As detailed herein, the Audit Reports were untrue or misleading.

407.    Each of the Auditor Defendants maintained operations in California and FTX obtained monies and assets from customers in California.  One or more of the statements made by the Auditor Defendants alleged herein were made or disseminated or caused to be made or disseminated before the public in the State of California, or made or disseminated or caused to be made or disseminated from the State of California before the public in any state in the manner set

forth in Section 17500, and these statements were designed to deceive consumers into investing with and/or maintaining investments with, FTX, including but not limited to, depositing or maintaining funds and/or assets with or in the FTX Platform, YBAs and/or in FTTs, or transferring any other money or property to FTX .

408.     The Auditor Defendants' issuance of Audit Reports certifying that the reports were prepared in accordance with GAAS and that the underlying financial statements of FTX complied with GAAP, were untrue and misleading statements when made.  As alleged herein, FTX had virtually no record keeping according to Ray, no internal controls and as a result, Ray has advised that the FTX financial statements should not be relied upon. As the initial complaint in the SEC Action provides, the financial statements are materially misleading.

409.     The Auditor Defendants knew, or in the exercise of reasonable care should have known, that their Audit Reports were untrue or misleading. The Auditor Defendants failed to adequately inform Plaintiffs and the Classes of the untrue or misleading nature of the Audit Reports.

410.     One or more of the Plaintiffs, and other members of the Classes, made investments and/or deposited funds and/or assets with FTX and transferred such funds and/or assets (whether in the FTX Platform, YBAs or FTTs) in reliance, in whole or in part, on the Auditor Defendants' Audit Reports, or the fact of their existence, and would not have so invested or would have invested at a lower amount, if they had known the truth that, among other things, the Audit Reports were untrue and misleading and that the financial statements of FTX were materially misleading.

411.     When the truth about FTX and the FTX Platform, YBAs or FTTs began to be publicly revealed, as alleged herein, harm resulted to Plaintiffs and the Classes as a result of FTX's need for bankruptcy protection, and the resulting government investigations have begun to

demonstrate the depth of the deceit practiced upon Plaintiffs and the Classes by the Defendants

and the business practices in which they caused the FTX to engage or facilitated FTX to operate.

412.     Based upon the conduct alleged herein, the Auditor Defendants are liable pursuant

to Cal. Bus. & Prof. Code § 17500.

## COUNT VIII

### Violations of the California Corporate Securities Law,
### Cal. Corp. Code §§ 25000, *et seq.*

413.     Plaintiffs repeat and re-allege each of the allegations set forth above, as if fully set

forth herein.

414.     Section 25110 of the California Corporate Securities Law ("CSL") prohibits the

offer or sale by any person in California of securities that are not qualified through registration.

CSL § 25503 affords a statutory cause of action to victimized investors for violations of CSL §

25110. Additionally, CSL § 25504.1 extends liability under CSL § 25503 to any person who

materially assists in a violation of CSL § 25110 and makes them jointly and severally liable with

any other person liable under CSL § 25503.

415.     The Auditor Defendants materially aided and/or assisted FTX, the FTX Insider

Defendants and/or one or more of the MDL Defendants in the offering and selling of the FTX

Platform, it's YBAs and/or FTT in California without being properly registered or qualified for

offer or sale either with any federal or California regulator in violation of CSL § 25503. [167]

---

[167] Plaintiffs contend that secondary liability for materially assisting a strict liability violation of
the qualification requirements of a violation pursuant to section 25503 does not require proof that
the Auditor Defendants intended to "deceive or defraud."  However, Plaintiffs in the alternative
contend that even if so, the Auditor Defendants' knowledge of and participation in FTX Group's

416. CSL § 25401 makes it unlawful for any person to offer or sell a security in California, or to buy or offer to buy a security in California, by means of any written or oral communication that includes an untrue statement of material fact or omits to state a material fact necessary to make the statements made, in light of the circumstances under which the statements were made, not misleading. CSL § 25501 affords a statutory cause of action to anyone that purchased a security from any person who violates CSL § 25401. Additionally, CSL § 25504 extends liability under CSL § 25501 to every broker-dealer or agent who materially aids in the act or transaction constituting the underlying violation of CSL § 25401 and makes them jointly and severally liable with any other person liable under CSL § 25501.

417. The Auditor Defendants materially aided FTX, the FTX Insider Defendants and/or one or more of the MDL Defendants, in the offering and selling of the FTX Platform, it's YBAs, and/or FTT in California by means of written communications in the Audit Reports and their social media and/or internet statements of support for FTX and SBF, which communications included untrue statements of material fact and or omitted material fact(s) necessary to the make the statements, in light of the circumstances under which the statements were made, not misleading, for reasons alleged herein.

418. Moreover, CSL § 25210(b) provides that no "person shall, …on behalf of an issuer, effect any transaction in, or induce or attempt to induce the purchase or sale of, any security in this state unless that" issuer or "broker-dealer and agent have complied with any rules as the commissioner may adopt for the qualification and employment of those agents.

---

non-compliance with the CSL establishes their intent to deceive investors and customers regarding the FTX Platform, the YBAs and/or the FTTs.  Notably, as alleged herein, the issuance of clean Audit Reports in view of the true financial condition of FTX and non-existent internal controls, including the facts set forth in the First Interim Rpt., substantiate the Auditor Defendants' conduct rising to the level of intentional deceit and fraudulent conduct.

419.    The Auditor Defendants breached CSL § 25210(b) by inducing or attempting to induce the purchase or sale of the FTX securities offered via the FTX Platform, YBAs and/or FTT despite the fact that such securities were not qualified under the CSL.

420.    Additionally, CSL § 25501.5 affords a statutory cause of action to victimized investors for violations of CSL § 25210(b).

421.    The Auditor Defendants are accordingly jointly and severally liable with the MDL Defendants named herein to Plaintiffs and Class Members for recessionary damages under CSL §§ 25504 and/or 25504.1.

422.    Plaintiffs hereby conditionally tender their FTX securities in accordance with CSL §§ 25501 and/or 25503.

## COUNT IX

### Professional Negligence

423.    Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

424.    The Auditor Defendants violated GAAS as FTX's auditors, including through the issuance of their audit reports and then failing to amend or retract their opinions in the reports. As noted, FTX directly disclosed to these investors and customers the fact or existence of these Audit Reports as a means of inducing investors and customers to transfer their assets into FTX's possession and control, where they were lost or converted and not returned despite all of the Plaintiffs' withdrawal attempts.  In violating GAAS, violating the Code of Conduct and engaging in acts contrary to conformity with the required standards of independence, the Auditor Defendants failed to use the reasonable care required of an auditor under like circumstances.

425.     If they had complied with GAAS, prior to commencing work on the audits, the

Auditor Defendants should and would, through routine preparation, preliminary investigation, and observations, have recognized the need for caution and necessity of proceeding with a higher level of thoroughness and professional skepticism than with a more traditional audit client in view of all of the numerous red flags alleged herein.

426.    The Auditor Defendants' improper Audit Reports, and support for FTX and/or SBF, prevented Plaintiffs and members of the Classes from making an informed decisions whether or not to utilize FTX services, and whether to continue utilizing same prior to losing possession and ownership of their cryptocurrency assets.   Plaintiffs allege herein the numerous GAAS violations by the Auditor Defendants, which constitute professional malpractice, and that the Auditor Defendants either knew or should have known, and were negligent in not considering, including the many red flags and adverse facts set forth in the First Interim Rpt..

427.    As a direct result of the Auditor Defendants' negligence in performing their professional responsibilities in a manner exceedingly below the standards required by GAAS and the AICPA Code of Ethics (by improperly promoting and expressing support of FTX and SBF), Plaintiffs and the Classes have sustained extensive damage in the form of actual monetary losses and consequential damages.

## COUNT X

### Fraudulent Concealment

428.    Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

429.    This Count is asserted against the Auditor Defendants and is based upon the claim of fraudulent concealment under common law.

430.    The Auditor Defendants issued clean Audit Reports certifying that they conducted GAAS compliant audits of the financial statements of FTX, without qualifications or exceptions, and that the financial statements were presented in conformance with GAAP.  These Audit Reports were materially false as the financial statements of FTX did not conform to GAAP, were not audited in accordance with GAAS, and the Auditor Defendants failed to comply with the professional standards (including the AICPA Code of Ethics), including that of independence, in connection with the issuance of the Audit Reports.

431.    Specifically, while the Audit Reports were materially false, the Audit Reports also give rise to a claim for materially misleading omissions by the Auditor Defendants because Plaintiffs and the Classes would not have transacted with FTX had they known true nature of FTX, the FTX Platform, YBAs and/or FTT, or that the Audit Reports should not be relied upon because the financial statements of the FTX Entities were materially misleading, as alleged herein.  The omitted facts include, by way of example, the items revealed in the First Interim Rpt., alleged herein.

432.    As alleged herein, the FTX Insider Defendants caused FTX to market and sale the FTX Platform, YBAs, FTT and/or FTX's products and services to Plaintiffs and the Classes despite having knowledge of the true nature of FTX, the FTX Platform, the YBAs, the FTTs, as well as the financial condition of FTX.  The FTX Insider Defendants were aided in the marketing and sale of the FTX Platform, YBAs, FTT and/or other products and services offered by FTX by the Auditor Defendants' issuance of their clean Audit Reports and the Auditor Defendants' other promotional activities alleged herein.

433.    As alleged herein, FTX, the FTX Insider Defendants  and the MDL Defendants intended that Plaintiffs and the Classes would rely on the FTX Insider Defendants' statements

alleged herein, including those about FTX securing audits of its financial statements, and statements regarding the safety and nature of FTX, the FTX Platform, YBAs and/or FTT, to increase the number of customers using, enrolling in, and/or depositing assets with one or more of these offerings by FTX. Further, the Auditor Defendants intended, or recklessly disregarded, that Plaintiffs and the Classes would rely upon the fact that FTX had been audited by these firms, and on the positive promotional statements issued by the Auditor Defendants as alleged herein.

434.    Plaintiffs and the Classes were not aware of the true nature and lack of safety of the FTX Platform, YBAs and/or FTT and could not reasonably have discovered those true characteristics.  Similarly, Plaintiffs and the Classes were not aware of the true nature of FTX's financial condition, lack of proper accounting procedures and internal controls, that the "[a]udited financial statements' do not include information about Alameda's undocumented 'line of credit' from FTX", or that the Audit Reports were not issued in conformity with GAAS, and could not reasonably have discovered those true characteristics.

435.    One or more of the Plaintiffs, and the Classes, relied on the MDL Defendants' statements (those by the Auditor Defendants and FTX/ FTX Insider Defendants concerning the "audit" status of FTX) in that they deposited funds with or related to using, enrolling in, and/or depositing assets with one or more of these offerings by FTX, which they would not have done had they known the true financial condition of FTX,  lack of internal controls at FTX, and/or that their assets and/or funds would not be segregated or used in the manner as alleged herein and by Plaintiffs in the complaints on file in this MDL Action.

436.    Plaintiffs and the Classes had the right to rely on FTX, the FTX Insider Defendants' and Auditor Defendants' statements concerning the audit status of FTX.  Plaintiffs and the Classes had the right to rely on these, and other false statements and omissions by these defendants that

are alleged herein, which created the false impression that the FTX Platform, YBAs and/or FTT were safe and reliable based on reasonable purchaser expectations that FTX would remain solvent as it was undergoing regular audits (that would in due course have – if done properly under GAAS – alerted Plaintiffs and the Classes to the true financial condition of FTX. Based upon the representations by the Auditor Defendants and the FTX Insider Defendants on behalf of FTX, one or more Plaintiffs and the Classes relied on the assertions that FTX's financial statements were accurate and its practices conformed to the representations set forth herein, and that the Auditor Defendants had each conducted a GAAS compliant audit in connection with issuing the Audit Reports, and had been independent while undertaking the engagements for FTX.

437.    The MDL Defendants, including the Auditor Defendants, had an affirmative duty to disclose the true nature of the financial condition of FTX, the FTX Platform, YBAs and/or FTT to prospective and actual customers and investors because they were in a superior position to know the true nature of FTX and using, enrolling in, and/or depositing assets with one or more of these offerings by FTX.

438.    Each of the MDL Defendants, including the Auditor Defendants, fraudulently concealed the nature of FTX, the financial condition of FTX, the lack of a proper GAAS audit, the failure of the financial statements of FTX to conform to GAAP, as well as the nature and use of customer funds deposited with, and into, the FTX Platform, YBAs and/or FTT, and this conduct caused damage to Plaintiffs and the Classes.

## COUNT XI

### Negligent Misrepresentation

439.    Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

440.     Plaintiffs bring this claim against each of the Auditor Defendants for negligent representation.

441.     The Auditor Defendants issued the clean Audit Reports, the fact of which they knew or recklessly disregarded  would be relied on by Plaintiffs and members of the Classes as providing additional assurance as to the financial condition of FTX and that the FTX Platform, YBAs and/or FTT were operated in the manner as represented to Plaintiffs and the Classes (including that the assets in the YBAs and other investment platforms were segregated).  As alleged herein, based upon the red flags and state of FTX's internal controls and condition, the Auditor Defendants were negligent in issuing the Audit Reports and in making public statements supporting FTX and SBF, because they knew or should have known that the Audit Reports, among other things, contained materially false statements concerning the financial condition of FTX (and the conformance of its financial statements to GAAP), and that  the Auditor Defendants conducted their audits in accordance with GAAS.  The Auditor Defendants also knew, or should have known as a result of their auditing work, that FTX was not operating in accordance with the public representations made by the MDL Defendants to Plaintiffs and the Classes.

442.     A reasonable consumer is not in the same position as the Auditor Defendants to know or detect that the financial statements of FTX and its operations were being conducted in a manner contrary to that represented.

443.     The representations made by Auditor Defendants in connection with FTX were material and would have been considered by a reasonable consumer in making decisions engage in any transactions with FTX, such as the FTX Platform, YBAs and/or FTT.

444.     Plaintiffs and the members of the Classes traded on the FTX Platform, purchased FTTs and/or opened YBAs, and transferred money or property to FTX for those purposes and in

the belief that these investments would be operated in accordance with the representations made

by the Defendants, and as confirmed by the fact that the Auditor Defendants had certified FTX's

financial statements as compliant with GAAP, pursuant to a GAAS audit. And when FTX and/or

SBF made the statements alleged herein concerning FTX's financial statements or audits, the

Auditor Defendants remained silent. Moreover, they expressed public support of FTX and/or SBF.

445.    As a result, one or more of the Plaintiffs, and members of the Classes, justifiably

relied on the Auditor Defendants' Audit Reports, or the existence thereof, or statements of support

for FTX and SBF, and as a result of such reliance, were directly and proximately injured by the

Auditor Defendants' negligence in failing to inform Plaintiffs and members of the Classes of the

true nature of the operations of the FTX Platform, YBAs and/or FTT and use of their assets and

money contained within those investments.

## COUNT XII

### Intentional Misrepresentation

446.    Plaintiffs repeat and re-allege each and every allegation contained in the foregoing

paragraphs as if fully set forth herein.

447.    The Auditor Defendants represented, in connection with the issuance of their clean

Audit Reports, that their audits of FTX's financial statements complied with GAAS and that the

financial statements of FTX Trading and FTX US were presented conformance with GAAP.  The

Auditor Defendants also issued statements on social media and/or the internet about support for

FTX and/or SBF, and were on notice that FTX and SBF were also citing to FTX securing audits

as a basis to encourage investors and customers that transacting business with FTX was safe.

448.    The representations of the Auditor Defendants were false because, as alleged

herein, the audits of FTX were not done in conformance with GAAS and the underlying financial statements of FTX did not comply with GAAP.  As a result of the materially false Audit Reports and undisclosed financial condition of FTX, of which the Auditor Defendants knew or should have known (and was immediately apparent to Ray after the initiation of the bankruptcy proceedings), the Auditor Defendants had no basis for making public statements in support of FTX and SBF.

449.    Accordingly, the Auditor Defendants knew the representations were false when made they made and/or they made the representations recklessly and without regard for the truth of what was being represented.

450.    The Auditor Defendants made the representations alleged herein with the intent or reckless disregard that such would induce Plaintiffs and the Classes to rely on the representations. Specifically, the Auditor Defendants made the representations in the Audit Reports, and the representations concerning their support for FTX and/or SBF, knowing and /or recklessly disregarding that their representations would be used by FTX and SBF to curry favor with Plaintiffs and the Classes.

451.    One or more of the Plaintiffs, and the Classes, reasonably relied on the representations set forth above and/or the fact that the financial statements of the FTX Entities were purportedly audited.

452.    Plaintiffs and the Classes were harmed.

453.    The reliance by one or more of the Plaintiffs, and the Classes, on the Auditor Defendants' representations and public statements concerning FTX and/or SBF were a substantial factor in causing the harm to the Plaintiffs and the Classes.

## COUNT XIII

### Fraud

454.     Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

455.     At the time Plaintiffs and members of the Classes agreed to trade on the FTX Platform, open YBAs and/or purchase FTTs, the Auditor Defendants did not disclose, but concealed and misrepresented the true facts related to the financial statements and financial condition of FTX, as alleged herein.

456.     The Auditor Defendants represented, in issuing the clean Audit Reports, that the audits of FTX complied with GAAS and that the financial statements of FTX Trading and FTX US were presented in conformance with GAAP.  The Auditor Defendants also issued statements on social media and/or the internet about support for FTX and/or SBF, and were on notice that FTX and SBF were also citing to FTX securing audits as a basis to encourage investors and customers that transacting business with FTX was safe.

457.     The representations of the Auditor Defendants were false because the audits of FTX were not done in conformance with GAAS and the underlying financial statements did not comply with GAAP, as alleged herein.  As a result of the materially false Audit Reports and undisclosed financial condition of FTX, of which the Auditor Defendants knew or should have known (and was immediately apparent to Ray after the initiation of the bankrupty proceedings), the Auditor Defendants had no basis for making public statements in support of FTX and SBF.

458.     The Auditor Defendants knew, or should have known, that the representations were false when made and/or they made the representations recklessly and without regard for the truth of what was being represented as alleged herein.

459.     The Auditor Defendants also knew that the omissions and misrepresentations

regarding the FTX Platform, YBAs and/or FTT and FTX's use of customer funds and asserts were material, and that a reasonable consumer would rely upon the Auditor Defendants' representations (and corresponding omissions) in making the decision to trade on the FTX Platform, open YBAs and/or purchase FTTs and therefore send money or assets to the Defendants.

460.    The Auditor Defendants in fact intended to deceive, or recklessly disregarded that their actions would deceive, Plaintiffs and members of the Classes.

461.    Plaintiffs and members of the Classes did not know, nor could they have known through reasonable diligence, about how their monies and assets in the FTX Platform, YBAs and/or FTT would be used by FTX, the FTX Insider Defendants and/or one or more of the other MDL Defendants  in the manner alleged herein that was contrary to the representations made to the Plaintiffs and the Classes.

462.    Plaintiffs and the members of the Classes were reasonable in relying on the Auditor Defendants' misrepresentations (and corresponding omissions), or the facts that the Auditor Defendants had audited FTX, in making their decision to send money or assets to the Defendants for purposes of trading on the FTX Platform, opening YBAs and/or purchasing FTTs.

463.    Plaintiffs and members of the Classes had a right to rely on the Auditor Defendants' misrepresentations (and corresponding omissions), or the facts that the Auditor Defendants had audited FTX, in making their decision to send money or assets to the MDL Defendants for purposes of trading on the FTX Platform, opening YBAs and/or purchasing FTTs.

464.    One or more of the Plaintiffs, and members of the Classes, sustained damages as a result of their reliance on the Auditor Defendants' omissions and misrepresentations, thus causing Plaintiffs and members of the Classes to sustain actual losses and damages in a sum to be determined at trial, including punitive damages.

## COUNT XIV

## Civil Conspiracy

465.     Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

466.     This Count is asserted against the Auditor Defendants and is based upon the claim of civil conspiracy under common law.

467.     As alleged herein, the FTX Insider Defendants made material misrepresentations and omissions to Plaintiffs and the Classes concerning their securing of audits of FTX Trading and FTX US, which audits were provided by the Auditor Defendants, and which the Auditor Defendants knew allowed FTX and/or SBF to make unrefuted statements to Plaintiffs and the Classes about FTX's financial statements and audits thereon.  In addition, the Auditor Defendants issued  statements of public support for FTX and/or SBF, alleged herein, which the Auditor Defendants knew or recklessly disregarded would induce confidence in the offerings by FTX and convince Plaintiffs and the Classes (investors and consumers) to invest in what was a patently misleading and deceptive scheme, thus deceiving Plaintiffs and the Classes that their investments in FTX were safe and that their assets and/or funds were being used by FTX in the manner represented by FTX and the FTX Insider Defendants.

468.     Each of the MDL Defendants, including the Auditor Defendants, engaged in concerted unlawful acts, particularly in the form of misrepresentations and omissions made to Plaintiffs and members of the Classes for the purposes of inducing them to invest with FTX and in the FTX Platform, YBAs and/or FTTs.  As alleged herein, Bankman-Fried and various of the FTX Insider Defendants entered into at least one agreement with the other MDL Defendants, including the Auditor Defendants, for the express purpose of making misrepresentations or

omissions in order to induce and convince Plaintiffs and the Classes to invest in the FTX Platform, YBAs and/or FTTs and invest their money and/or assets in FTX. Defendants each stood to benefit financially from assisting with this fraud as each would receive the financial and other benefits described herein above.

469.     The conspiracy substantially aided the wrongdoing conducted by FTX and Bankman-Fried. Additionally, each of the MDL Defendants (including the Auditor Defendants) had knowledge of or recklessly disregarded and turned a blind eye to the fraud and wrongdoing by FTX as a result of their experience and relationship with FTX, and thus knew or should have known that the representations that FTX and/or SBF made about, among other things, FTX's financial statements and audits thereon,  were deceitful and fraudulent when made.

470.     As alleged herein, the Auditor Defendants knew or should have known that the representations about the financial statements of FTX financial statements conforming with GAAP and other supportive statements concerning FTX and/or SBF alleged herein, were deceitful and fraudulent when made. The actions and inactions of the Auditor Defendants alleged herein lent to FTX a necessary appearance of legitimacy and security, which in turn helped to conceal the fraud, and the Defendants leveraged these endorsements in promoting FTX to the public.

471.     This conspiracy caused damages to Plaintiffs and the Classes in the amount of the money they invested in the FTX Entities that was lost as a result of the misconduct by FTX, the FTX Insider Defendants, the Auditor Defendants and/or one or more of the MDL Defendants that resulted in the insolvency and dissipation of customer money and/or assets.

## COUNT XV

### Aiding and Abetting Fraud

472.     Plaintiffs repeat and re-allege each and every allegation contained in the foregoing

paragraphs as if fully set forth herein.

473.     This Count is asserted against the Auditor Defendants for aiding and abetting the fraud undertaken by FTX, the FTX Insider Defendants and one or more of the MDL Defendants FTX, as alleged herein.

474.     As alleged herein, FTX and the FTX Insider Defendants made material misrepresentations and omissions to Plaintiffs and members of the Classes regarding, among other things, the financial statements of FTX and audits thereon, the nature and safety of FTX, the FTX Platform, YBAs and/or FTTs in order to induce confidence in the FTX Platform, YBAs and/or FTTs, and convince consumers to trade on the FTX Platform, open YBAs and/or purchase FTTs .

475.     The Auditor Defendants knew or recklessly disregarded that the representations by FTX and the FTX Insider Defendants , alleged herein, including that the financial statements of the FTX.US and FTX Trading entities were presented in conformance with GAAP, were deceitful and fraudulent when made.

476.     Armanino provided substantial assistance to the FTX Insider Defendants and to FTX.US (*i.e.* the WRS Silo).  Prager provided substantial assistance to the FTX Insider Defendants and to FTX Trading (*i.e.* the Dot Com Silo).  As alleged herein, each of the Auditor Defendants issued clean Audit Reports despite knowingly or recklessly disregarding engaging in acts that violated GAAS, including auditor independence rules, and while knowing that the financial reporting and accuracy of the financial statements of  FTX US  (for Armanino) and the FTX Trading (for Prager) were either materially misstated or lacking in proper support, based on the facts alleged herein   Facts alleged herein further supporting the lack of independence and substantial assistance include Prager publicly touting its "support" of FTX US and posting on social media that it has a "relationship" with FTX US.  Similarly, Armanino has tweeted support

of Bankman-Fried as its "buddy."  Plaintiffs allege, upon information and belief, that the Auditor Defendants provided knowing or reckless substantial assistance to FTX and the Individual Defendants in connection with the fraudulent conduct alleged herein.

477.    The Auditor Defendants' conduct caused damages to Plaintiffs and the Classes in the amount of the money they invested in FTX that was lost as a result of the misconduct by FTX and the MDL Defendants that resulted in the insolvency and dissipation of customer assets.

## COUNT XVI

### Aiding and Abetting Violations of Cal. Bus. & Prof. Code §§ 17200, *et seq.*

478.    Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

479.    This Count is asserted against the Auditor Defendants and is based upon the violations of Section 17200 alleged in the _____ complaint as to the FTX Insider Defendants .

480.    As alleged herein, the Auditor Defendants knew the conduct of FTX and the FTX Insider Defendants constituted violations of Section 17200 and the Auditor Defendants gave substantial assistance or encouragement to FTX  and/or the FTX Insider Defendants to so act.

481.    The Auditor Defendants knew that their clean Audit Reports concerning the financial statements of FTX Trading and FTX US, their failure to refute public statements made by FTX and/or SBF concerning FTX's financial statements and audits thereon and other statements concerning FTX or SBF alleged herein, were deceitful and fraudulent when made. The Auditor Defendants facilitated the violations of statutory and common law alleged herein by their actions which they knew or recklessly disregarded FTX and the FTX Insider Defendants would use to solicit and/or maintain customers.  As a result, the Auditor Defendants provided substantial assistance or encouragement to FTX and/or the FTX Insider Defendants to engage in violations of

Section 17200.

482.    The Auditor Defendants' conduct caused damages to Plaintiff and the Classes in the amount of the money they invested in FTX that was lost as a result of the misconduct by FTX and the FTX Insider Defendants that resulted in the insolvency and dissipation of customer assets.

## **COUNT XVII**

### **Aiding and Abetting Breaches of Fiduciary Duty**

483.    Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

484.    This Count is asserted against the Auditor Defendants and is based upon the claims of breach of fiduciary duty by the FTX Insider Defendants alleged herein.

485.    The Auditor Defendants aided and abetted the breaches of fiduciary duty by the FTX Insider Defendants, as alleged herein.

486.    As alleged herein, each of the Auditor Defendants knew or recklessly disregarded that the conduct of FTX and the FTX Insider Defendants constituted a breach of fiduciary duty based upon the violations of statutory and common law alleged herein, and each of the Auditor Defendants gave substantial assistance or encouragement to FTX and/or the FTX Insider Defendants to so act.

487.    The Auditor Defendants' conduct caused damages to Plaintiffs and the Classes in the amount of the money they invested in FTX that was lost as a result of the misconduct by FTX and the FTX Insider Defendants that resulted in the insolvency and dissipation of customer assets.

488.    As a direct and proximate cause of the breaches of fiduciary duty by FTX and the FTX Insider Defendants, and the aiding and abetting of those breaches of fiduciary duty by each of the Auditor Defendants, Plaintiffs and the Classes have been damaged and harmed in an amount

to be determined at trial, and have been unable to access or withdraw their funds and/or assets originally deposited in, or that were represented to be on deposit in, the YBAs, trading on the FTX Platform, and/or held in the form of FTTs.

## COUNT XVIII

### Aiding and Abetting Conversion

489.    Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

490.    The funds and/or assets deposited by Plaintiffs and members of the Classes for trading on the FTX Platform, to open YBAs and/or that they used to purchase FTTs were personal property of the Plaintiffs and members of the Classes (collectively the "Assets").

491.    Plaintiffs and the Classes deposited the Assets and were told that the Assets would be maintained for them, and Plaintiffs and the members of the Classes each owned and had the right to possess the Assets they respectively deposited.  Specifically, FTX and the FTX Insider Defendants represented to Plaintiff and the Classes that they had the right to withdraw their Assets, and that the Assets would be segregated, as set forth in the Terms of Use and User Agreements. As set forth herein, the Assets were not maintained in accordance with the Terms of Use and/or User Agreements at all relevant times alleged herein, and the Assets have been converted by FTX and/or the FTX Insider Defendants for purposes not set forth in the Terms of Use and User Agreements, have been misappropriated by the FTX Insider Defendants and/or have been frozen due to the Bankruptcy Proceedings.

492.    FTX and the FTX Insider Defendants substantially interfered with the Assets of the Plaintiffs and the Classes, including in their respective YBAs, by knowingly and/or intentionally taking possession of the property to use for purposes not authorized by the Plaintiffs and the

Classes, spending the Assets (or liquidating the Assets) for use for items not authorized pursuant to the Terms of Use and User Agreements, and/or refusing to return the Assets after Plaintiffs and members of the Classes customers demanded return of their Assets.

493.    Plaintiffs and the members of the Classes did not consent to the use of their Assets in the manner alleged above.

494.    Plaintiffs and members of the Classes have been harmed by being denied access to, and possession of, their Assets.

495.    The conduct of FTX and the FTX Insider Defendants was a substantial factor in causing the harm alleged herein to Plaintiffs and the Classes.

496.    The Auditor Defendants, based on their knowledge of the FTX's operations obtained through their relationship with FTX knew of or recklessly disregarded knowledge of FTX's conversion of the Assets of Plaintiffs and the members of the Classes.

497.    Notwithstanding this knowledge or reckless disregard of such, and by reason of the conduct described herein, the Auditor Defendants substantially aided, abetted, and/or participated with FTX in the conversion of funds that belonged to Plaintiffs and members of the Classes.

498.    The Auditor Defendants' actions, in combination with the actions of FTX, are a proximate cause of actual damages to Plaintiffs and members of the Classes. The Auditor Defendants are jointly and severally liable for participating in the conversion of the funds of Plaintiffs and members of the Classes.

## COUNT XIX

### Declaratory Judgment
### (Declaratory Judgment Act, Florida Statutes §§ 86.011 *et seq.*)

499.    Plaintiffs reallege and incorporate by reference the allegations contained in the

paragraphs above as if fully set forth herein.

500.     This Count is asserted against the Auditor Defendants under Florida Statutes §§ 86.011, et seq.

501.     There is a bona fide, actual, present and practical need for the declaratory relief requested herein; the declaratory relief prayed for herein deal with a present, ascertained or ascertainable state of facts and a present controversy as to a state of facts; contractual and statutory duties and rights that are dependent upon the facts and the law applicable to the facts; the parties have an actual, present, adverse and antagonistic interest in the subject matter; and the antagonistic and adverse interests are all before the Court by proper process for final resolution.

502.     Plaintiffs and the members of the Classes have an obvious and significant interest in this lawsuit.

503.     Plaintiffs and members of the Classes deposited funds and/or assets on the FTX Platform, opened YBAs and/or purchased FTTs, based in part on justifiable reliance on the Auditor Defendants' misrepresentations and omissions regarding the financial condition and financial statements of the FTX Entities as further described hereinabove.

504.     If the true facts had been known, including but not limited to that the Auditor Defendants issued false clean Audit Reports, the FTX Platform, YBAs and/or FTT are unregistered securities, the FTX Platform does not work as represented, and that the Auditor Defendants were paid substantial fees to provide auditing services so the FTX Entities could peddle the FTX Platform, YBAs and FTTs nationwide. Plaintiffs and members of the Classes would not have used the FTX Platform, opened the YBAs and/or purchased the FTTs absent the air of legitimacy created by FTX  and the FTX Insider Defendants being able to announce that FTX had secured audited financials.

505.     Thus, there is a justiciable controversy over whether the FTX Platform, YBAs and/or FTT were sold illegally, and whether the Auditor Defendants illegally solicited and/or participate in the soliciting purchases of unregistered securities by Plaintiffs and the members of the Classes.

506.     Plaintiffs and the members of the Classes seek an order declaring that the FTX Platform, YBAs and/or FTT were securities required to be registered with the SEC and state regulatory authorities, that the FTX Platform did not work as represented, and the Auditor Defendants were paid exorbitant sums of money to assist FTX  and the FTX Insider Defendants in peddling FTX nationwide.

## COUNT XX

### Declaratory Judgment,
### Cal. Code Civ. Proc. § 1060

507.     Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

508.     This Count is asserted against the Auditor Defendants under Cal. Code Civ. Proc. § 1060.

509.     There is a *bona fide* actual and present need for the declaratory relief requested herein; the declaratory relief prayed for herein deals with a present, ascertained or ascertainable state of facts, and a present controversy as to that state of facts; contractual and statutory duties and rights are dependent on those facts and law applicable to the facts; the parties have an actual, present, adverse, and directly antagonistic interest in the subject matter; and the antagonistic and adverse interests are all before this Court by proper process for final resolution.

510.     Plaintiffs and the Classes have an obvious and significant interest in the outcome

of this action.

511.    Plaintiffs and the Classes deposited funds and/or assets into the FTX Platform, YBAs and/or FTTs with FTX, based in part on justifiable reliance on the Auditor Defendants' actions alleged herein.

512.    If Plaintiffs and the Classes knew the true facts surrounding the financial condition and financial statements of FTX, Plaintiffs and the Classes would not have deposited funds and/or assets into the FTX Platform, YBAs and/or FTTs with FTX.

513.    A justiciable controversy exists as to whether the FTX Platform, YBAs and/or FTT were marketed, offered and/or sold illegally and whether the Auditor Defendants conspired with, and/or provided substantial assistance to, FTX and the FTX Insider Defendants, in unlawfully and/or illegally soliciting deposits of funds and/or assets from Plaintiffs and members of the Classes.

514.    Plaintiffs and the Classes thus seek an order declaring that the FTX Platform, YBAs and/or FTTs were unregistered securities and were required to be registered with the SEC and state regulatory authorities, that the Auditor Defendants received payment or financial benefits from the issuance of their false clean Audit Reports a fact used to entice or curry favor of customers and potential customers of FTX, including Plaintiffs and members of the Classes.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs pray for a judgment on behalf of themselves and the Classes:

    a.    Certifying the Classes as requested herein;

    b.    Awarding actual, direct and compensatory damages;

    c.    Awarding restitution and disgorgement of revenues;

    d.    Awarding declaratory relief as permitted by law or equity, including declaring the MDL Defendants' practices as set forth herein to be unlawful;

Case No. 1:23-md-03076-KMM

e.    Awarding injunctive relief as permitted by law or equity, including enjoining the MDL Defendants from continuing those unlawful practices as set forth herein, and directing the MDL Defendants to identify, with Court supervision, victims of their conduct and pay them all money they are required to pay;

f.    Awarding statutory, punitive, and multiple damages, as appropriate;

g.    Awarding attorneys' fees and costs; and

h.    Providing such further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial as to all claims so triable.

Respectfully submitted on August 7, 2023,

| **Plaintiffs' Co-Lead Counsel** ||
|---|---|
| By: */s/ Adam Moskowitz*<br>Adam M. Moskowitz<br>Florida Bar No. 984280<br>Joseph M. Kaye<br>Florida Bar No. 117520<br>**THE MOSKOWITZ LAW FIRM, PLLC**<br>Continental Plaza<br>3250 Mary Street, Suite 202<br>Coconut Grove, FL 33133<br>Office: (305) 740-1423<br>adam@moskowitz-law.com<br>joseph@moskowitz-law.com<br>service@moskowitz-law.com | By: */s/ David Boies*<br>David Boies<br>Alex Boies<br>Brooke Alexander<br>**BOIES SCHILLER FLEXNER LLP**<br>333 Main Street<br>Armonk, NY 10504<br>Office: (914) 749-8200<br>dboies@bsfllp.com<br>aboies@bsfllp.com<br>balexander@bsfllp.com |
| **FTX Auditor Committee Members** ||
| Laurence D. King<br>Kathleen A. Herkenhoff<br>**KAPLAN FOX & KILSHEIMER LLP**<br>1999 Harrison Street, Suite 1560<br>Oakland, CA  94612<br>Telephone:  (415) 772-4700<br>*lking@kaplanfox.com*<br>*kherkenhoff@kaplanfox.com* | Frederic S. Fox<br>Joel B. Strauss<br>**KAPLAN FOX & KILSHEIMER LLP**<br>800 Third Avenue, 38th Floor<br>New York, NY 10022<br>Telephone:  212-687-1980<br>*ffox@kaplanfox.com*<br>*jstrauss@kaplanfox.com* |

Case No. 1:23-md-03076-KMM

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a true and correct copy of the forgoing was filed on August 7, 2023, via the Court's CM/ECF system, which will send notification of such filing to all attorneys of record.

*/s/ Adam M. Moskowitz*

Adam M. Moskowitz