**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 1:23-md-3076-KMM

**In RE**

**FTX CRYPTOCURRENCY**
**EXCHANGE COLLAPSE LITIGATION**

THIS DOCUMENT RELATES TO:

Law Firms

**<u>DEFENDANT FENWICK & WEST LLP'S MOTION TO DISMISS</u>**
**<u>PLAINTIFFS' ADMINISTRATIVE CLASS ACTION COMPLAINT</u>**
**<u>PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE</u>**
**<u>12(B)(6) AND 9(B), AND MEMORANDUM OF LAW IN SUPPORT</u>**

## TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................. 1

II.     THE COMPLAINT'S ALLEGATIONS ............................................................. 4

III.    ARGUMENTS AND AUTHORITIES................................................................. 8

      A.      Plaintiffs Fail to State a Claim for Conspiracy or Aiding-and-Abetting Liability Because They Do Not Allege That Fenwick Acted Outside the Scope of Its Representation of FTX (Counts 1–8)................................................. 9

      B.      Plaintiffs Fail to State a Claim for Aiding-and-Abetting Liability Because They Do Not Allege Essential Elements of Those Claims (Counts 2–7). ........... 15

      C.      Plaintiffs Fail to State a RICO Claim Because They Do Not Allege That Fenwick Agreed to Participate in the Alleged Enterprise or That There Even Was a Cognizable RICO Enterprise (Count 8)........................................... 22

IV.     CONCLUSION.................................................................................................... 26

V.      REQUEST FOR HEARING............................................................................... 27

Defendant FENWICK & WEST LLP ("**Fenwick**") moves to dismiss Plaintiffs' Administrative Class Action Complaint ("**Complaint**") [D.E. 153] for failure to state a claim upon which relief can be granted.

## I.   INTRODUCTION

For more than 50 years, Fenwick has provided legal counsel to some of the country's most respected, admired, and innovative companies on matters that have transformed both our economy and our way of life, from the incorporation of Apple Computer to the IPOs of such blue-chip technology firms as Oracle, eBay, and Facebook. Now, without any basis in fact or law, Plaintiffs seek to hold Fenwick liable for alleged damages resulting from the collapse of one client—the cryptocurrency trading platform, FTX.[1]

Plaintiffs do not contend that Fenwick orchestrated the fraudulent scheme that led to FTX's collapse. On the contrary, the Complaint repeatedly contends that Sam Bankman-Fried, FTX's founder and former CEO, masterminded and carried out that fraud for his own benefit and that of his friends and associates. *See, e.g.*, Compl. ¶ 165 ("Samuel Bankman-Fried stole billions of dollars from FTX clients' deposits and used them to cover costs at FTX's sister company, a crypto hedge fund called [A]lameda Research."); *id.* ¶ 105 ("SBF looted Class Member funds directly, without the cover of sham related party transactions or insider loans."); *id.* ¶ 116(a) ("SBF was siphoning Class Member funds to his friends and family members or for his own personal use.").

Fenwick did not represent Bankman-Fried or the other FTX insiders who executed the alleged scheme. Rather, Plaintiffs allege that Fenwick "served as legal counsel . . . for FTX US and FTX Trading Ltd.," Compl. ¶ 190—the corporate entities that Bankman-Fried and his

---

[1]   FTX is defined in the Complaint as FTX Trading Ltd. and West Realm Shires Services Inc. d/b/a FTX US, along with various subsidiaries, affiliates, and related entities. *See* Dkt. 153 ("Compl.") at 5.

associates purportedly "looted" for their personal benefit. And Fenwick was hardly the only law firm representing FTX. Like most companies with a valuation in the tens of billions of dollars, *see id.* ¶ 53, FTX employed numerous law firms to handle a wide range of matters including regulatory compliance, acquisitions, intellectual property, tax issues, and more. *See, e.g.*, *In re: FTX Trading Ltd., et al.*, No. 22-11068 (Bankr. D. Del.), Dkt. 28-2 at 10–18 (identifying more than 10 law firms that performed work for FTX); Compl. ¶ 9 n.4.

Plaintiffs nonetheless claim that Fenwick—alone among FTX's many lawyers—should be held liable for conspiring in, and aiding and abetting, Bankman-Fried's purported fraud, negligence, fiduciary breach, and conversion of customer funds because it provided routine legal services that, despite being lawful on their own terms, were improperly *used* by Bankman-Fried in furtherance of his fraud. The Court should reject this theory of liability, which strikes at the heart of the legal profession, as other courts have routinely done.

It is black-letter law that an attorney cannot be held liable for conspiracy or aiding and abetting a client's wrong "'as long as [his] conduct falls within the scope of the representation of the client.'" *Chance v. Cook*, 50 F.4th 48, 51 (11th Cir. 2022) (quoting *Farese v. Scherer*, 342 F.3d 1223, 1232 (11th Cir. 2003)); *see also Domanus v. Locke Lord LLP*, 847 F.3d 469, 482 (7th Cir. 2017) ("Claims that lawyers have conspired with their clients are insufficient in the absence of allegations that the arrangement involves more than standard legal representation."). And here, the Complaint affirmatively alleges that the acts on which Plaintiffs premise liability "were committed within the scope of Fenwick's employment and in furtherance of the firm's business." Compl. ¶¶ 256, 264, 272, 280, 288, 294, 306, 309. This is unsurprising, as those acts—including "establish[ing] and draft[ing] the incorporation papers" for certain FTX affiliates, *id.* ¶ 204, "provid[ing] legal and commercial advice on a number of FTX's business transactions," *id.* ¶ 211,

and "help[ing] FTX US to develop 'compliance' procedures," *id.* ¶ 216—all fall within the standard services provided by law firms.  Allowing conspiracy and aiding-and-abetting liability to turn on the provision of such routine services "would most certainly have a chilling effect on the zealous advocacy we expect out of lawyers," *Chance*, 50 F.4th at 51, and would render lawyers subject to civil liability whenever a client misuses legal advice to commit a tort.

Even if Plaintiffs could theoretically state a claim for conspiracy and aiding-and-abetting liability based on Fenwick's provision of legal services to FTX (and they cannot), they have failed to plausibly allege facts to support such a claim.  Because each of Plaintiffs' claims sounds in fraud, they must satisfy Rule 9(b)'s heightened pleading standard.  Plaintiffs cannot meet this standard because they fail to "set forth particular allegations about 'the who, what, when, where, and how' of the circumstances giving rise to the cause[s] of action," *Perkins v. Nat'l LGBTQ Task Force, Inc.*, 580 F. Supp. 3d 1236, 1239 (S.D. Fla. 2021)—specifically, Fenwick's actual knowledge of Bankman-Fried's fraud, its substantial assistance in that fraud, and the causal link between Fenwick's alleged assistance and Plaintiffs' harm.

Plaintiffs also fail to allege a RICO claim against Fenwick.  Although the Complaint asserts that Fenwick conspired to engage in a RICO enterprise, it does not allege an actual agreement by Fenwick to participate in this enterprise—and it certainly fails to do so with the particularity required by Rule 9(b).  Nor does the Complaint plead facts alleging a cognizable RICO enterprise.  The Eleventh Circuit has held that "plaintiffs may not plead the existence of a RICO enterprise between a corporate defendant and its agents or employees acting within the scope of their roles for the corporation." *Cisneros v. Petland, Inc.*, 972 F.3d 1204, 1215 (11th Cir. 2020).  But the RICO enterprise alleged here comprises *only* FTX and its employees and agents.

For each of these reasons, the Court should dismiss Plaintiffs' claims against Fenwick. And because Plaintiffs cannot amend their Complaint to state a valid claim, the Court should dismiss those claims with prejudice. *See Birdette v. Saxon Mortgage*, 502 F. App'x 839, 841 (11th Cir. 2012) ("A court need not allow an amendment where . . . amendment would be futile." (citing *Bryant v. Dupree*, 252 F.3d 1161, 1163 (11th Cir. 2001))).

## II.    THE COMPLAINT'S ALLEGATIONS

Sam Bankman-Fried (or "SBF") and his associates launched FTX in 2019 as a centralized exchange for the trading of cryptocurrency. Compl. ¶ 38.[2] Within a few short years, FTX was hosting $21 billion in trades per day. *Id.* ¶ 53. But according to the Complaint, FTX was nothing more than "a house of cards." *Id.* ¶ 3. Contrary to its representations to the public, "FTX did not segregate customer funds or designate them for the customer's benefit, instead commingling those funds in several 'omnibus' accounts held by FTX." *Id.* ¶ 98. And from those accounts, Plaintiffs say Bankman-Fried and his associates "shuffled customer funds between their opaque affiliated entities, using new investor funds obtained through investments in the FTX Platform, the YBAs, FTT, and/or loans to pay interest and investment withdrawals to the old ones and to attempt to maintain the appearance of liquidity." *Id.* ¶ 3. The Complaint alleges that, worse still, "FTX Insiders including SBF facilitated the routing of billions of dollars in purported profits of FTX, which were in reality Class Member funds, to the insiders, and their families, friends, and other acquaintances," which were then "used to fuel uncapped spending on illicit drugs, naming rights to sports arenas, concert sponsorships, luxury cars, and private jets." *Id.* ¶ 99. Bankman-Fried also allegedly used these customer funds to prop up the balance sheet of Alameda Research LLC,

---

[2]    Fenwick identifies the relevant allegations because the Court must accept them as true for purposes of this Motion, but Fenwick reserves all rights to contest the veracity of those allegations.

a cryptocurrency hedge fund owned by Bankman-Fried and an associate, by artificially inflating the value of FTT, a cryptocurrency distributed by FTX and held in large part by Alameda. *Id.* ¶ 116(j). When the value of cryptocurrency began to decline in mid-2022, FTT's value declined with it, and Bankman-Fried's alleged fraud was exposed. *Id.* ¶ 123.

Although the Complaint alleges that it was FTX and its insiders that "stole" Class Member funds for their personal gain, Compl. ¶ 150,[3] the Complaint seeks damages from Fenwick, a respected law firm that, the Complaint asserts, provided routine legal services to FTX. But Fenwick was not the personal lawyer of Bankman-Fried or any of the other FTX insiders who conceived and executed the fraudulent scheme. Nor was Fenwick the only law firm or lawyer representing FTX. On the contrary, FTX—which had a "valuation [that] topped $32 billion" at its peak, *id.* ¶ 53—was represented by many top-flight law firms, including multiple AmLaw 10 firms. *See In re: FTX Trading Ltd., et al.*, No. 22-11068 (Bankr. D. Del.), Dkt. 28-2 at 10–18.

Plaintiffs allege that Fenwick can nevertheless be held liable because Fenwick purportedly "provided services to the FTX Group entities that went well beyond those a law firm should and usually does provide," Compl. ¶ 15—services that Bankman-Fried used to carry out the alleged scheme. But none of the alleged services provided by Fenwick went beyond (let alone *well* beyond) routine legal services. Stripped of Plaintiffs' rhetorical flourishes, legal conclusions, and unsupported inferences, those alleged services can be reduced to three basic acts—(1) employing lawyers that eventually left Fenwick of their own accord to join FTX; (2) forming corporations

---

[3]     The Complaint "is the controlling document for pre-trial purposes . . . with regard to the Law Firm Defendant," which has been named in two of the actions in this MDL. Compl. at 4 (citing *O'Keefe v. Sequoia Capital Operations, LLC*, No. 1:23-cv-20700-KMM (S.D. Fla.); *Cabo v. Fenwick & West LLP*, No. 3:23-cv-03944-JCS (N.D. Cal.)). Although other actions that have been consolidated in this MDL name Bankman-Fried as a defendant, neither of the actions against Fenwick do so.

that Bankman-Fried subsequently used to perpetrate his fraud; and (3) advising FTX on regulatory compliance in the new world of cryptocurrency trading.  Specifically, the Complaint alleges:

- "Fenwick supplied a pipeline of key personnel to FTX Group, namely attorneys Daniel Friedberg and Can Sun, who went directly from Fenwick to FTX Group entities." Compl. ¶ 191.

- "Fenwick helped to establish and draft the incorporation papers for North Dimension Inc. ('North Dimension') and its sister company, North Wireless Dimension, the fake electronics retailer that Bankman-Fried employed as a front to conceal his wiring of Class Member funds into accounts held by Alameda." *Id.* ¶ 204.

- "As to the North Dimension entities, Fenwick drafted memoranda and otherwise advised FTX US, often through their former partner Friedberg, regarding FTX US's regulatory obligations, including its obligations under the Federal and State Money Transmission Rules." *Id.* ¶ 207.

- Fenwick "propos[ed] to Friedberg that an 'Intercompany Treasury Management and Loan Agreement' be entered into [] under which Alameda would perform 'treasury management functions' for FTX.  Fenwick attorneys would go on to draft intercompany agreements for FTX entities and Alameda to allocate costs and manage the flow of cash among these entities." *Id.* ¶ 210.

- "Fenwick also provided legal and commercial advice on a number of FTX's business transactions, including FTX Trading Ltd.'s Series B and B-1 capital raises." *Id.* ¶ 211.

- "One transaction of particular note was FTX US's October 2021 acquisition of LedgerX LLC . . . , for which Fenwick provided legal and commercial counsel. LedgerX was a digital currency futures and options exchange regulated by the CFTC,

which had granted licenses to LedgerX to operate as a Designated Contract Market ('DCM'), a Swap Execution Facility ('SEF'), and a Derivatives Clearing Organization ('DCO').  These licenses provided access to U.S. commodities derivatives markets as a regulated exchange, and, with its acquisition of LedgerX, FTX acquired that access in one fell swoop.  With the help of Fenwick, FTX was able to leverage these three licenses in subsequent applications to the CFTC and other regulators."  *Id.* ¶ 212.

- "In a filing with the CFTC, FTX US disclosed that 'FTX US monitors both Federal and State level development with its outside legal counsel, Fenwick & West LLP.  FTX US has worked closely with Fenwick & West LLP on the development of its BSA program, as well as documentation and compliance assessments.'  Fenwick helped FTX US to develop 'compliance' procedures designed to skirt FTX's regulatory obligations and/or conceal its noncompliance therewith."  *Id.* ¶ 216.

Plaintiffs do not allege that any one of these acts (or all of them) is independently wrongful, much less actionable.  Rather, Plaintiffs contend that they support liability because "Fenwick learned that the FTX entities were breaching their fiduciary duties to customers, acting inconsistently with their representations to customers, and even misappropriating customer funds," yet continued to "provide legal assistance despite this knowledge."  Compl. ¶ 203.  But Plaintiffs allege only three sources of that purported knowledge: (1) an inference from the fact that "[t]he provision of Fenwick's services required due diligence and monitoring," *id.* ¶ 199; (2) Fenwick's "close ties with its former attorneys in Friedberg and Sun," *id.* ¶ 203; and (3) purported "communications with FTX executives," *id.* ¶ 208.  As to the alleged communications, the Complaint identifies only a single January 2021 email and follow-up in which Friedberg informed Fenwick that "'[s]ome FTX cash and crypto is held by Alameda for the benefit of FTX customers.

As we wade into the audit, the explanation here is important.  We propose a 'cash management' agreement between the affiliates somehow where FTX gets first dibs on Alameda's cash.'"  *Id.* ¶ 208.  Although the Complaint alleges that "Friedberg was concerned by the possible release of information revealing that FTX was keeping customer money outside of FTX entities," it specifically acknowledges that Fenwick dutifully (and accurately) informed its client that such disclosure was essential: "[W]e'll need to disclose . . . the material terms of all related party transactions."  *Id.* ¶ 209.  A lawyer's representation of a client and knowledge of their employees does not make them omniscient as to the client's inner workings.

The Complaint alleges claims for (1) civil conspiracy, (2) aiding and abetting fraud, (3) aiding and abetting the negligence of FTX US, (4) aiding and abetting the negligence of FTX Trading, Ltd., (5) aiding and abetting fiduciary breach by FTX US, (6) aiding and abetting fiduciary breach by FTX Trading Ltd., (7) aiding and abetting conversion, and (8) conspiracy to violate the federal RICO statute, 18 U.S.C. § 1962(d).  It seeks certification of a class of international and domestic FTX customers, compensatory damages, restitution and disgorgement, attorney's fees, and injunctive relief.  *See* Compl., Prayer for Relief.  For the reasons set forth below, each of these claims against Fenwick is fatally deficient, and the Complaint should be dismissed in its entirety.

## III.    ARGUMENTS AND AUTHORITIES

"[T]o survive a motion to dismiss under [Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  This factual matter must consist of more than mere labels, legal conclusions, or a "formulaic recitation of the elements of a cause of action."  *Id.*  "Where a complaint pleads facts

that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.*

Plaintiffs' Complaint fails to meet this pleading standard against Fenwick for three reasons. *First*, Plaintiffs fail to allege that Fenwick acted outside the scope of its representation of FTX, which is an essential element of any conspiracy or aiding-and-abetting claim against a law firm. *Second*, Plaintiffs fail to allege that Fenwick knew of Bankman-Fried's alleged fraud, and they likewise fail to allege facts from which the Court can reasonably infer such knowledge. Plaintiffs also fail to allege that Fenwick substantially assisted that fraud or caused Plaintiffs' alleged damages. *Third*, Plaintiffs do not adequately allege that Fenwick agreed to participate in a RICO enterprise, which is a necessary element of the RICO conspiracy claim pleaded in the Complaint, or even that there *was* a cognizable RICO enterprise in the first place.

### A. Plaintiffs Fail to State a Claim for Conspiracy or Aiding-and-Abetting Liability Because They Do Not Allege That Fenwick Acted Outside the Scope of Its Representation of FTX (Counts 1–8).

Although conspiracy and aiding-and-abetting claims typically allow for broad liability against a party that knowingly furthers the wrong of another, plaintiffs must allege more when such a claim is leveled against a lawyer in connection with the acts of a client. Courts have long recognized that the special relationship that exists between a lawyer and his client requires an extra layer of protection when a plaintiff accuses a lawyer of conspiring with, or aiding and abetting, his client in the commission of a tort. As the Eleventh Circuit has observed, "'[t]he right of a litigant to independent and zealous counsel is at the heart of our adversary system and, indeed, invokes constitutional concerns.'" *Farese*, 342 F.3d at 1231 (quoting *Heffernan v. Hunter*, 189 F.3d 405, 413 (3d Cir. 1999)). But if an attorney could be held liable as a co-conspirator whenever he provides legal services to a client who goes on to use those services to further its own misconduct, it "would most certainly have a chilling effect upon the zealous advocacy we expect out of

lawyers." *Chance*, 50 F.4th at 51.  For this reason, courts in the Eleventh Circuit and beyond have

held that "as long as an attorney's conduct falls within the scope of the representation of his client,

such conduct is immune from an allegation of a . . . conspiracy." *Farese*, 342 F.3d at 1232; *see*

*also Domanus*, 847 F.3d at 482 (affirming dismissal of a RICO conspiracy claim against attorneys

because "[c]laims that lawyers have conspired with their clients are insufficient in the absence of

allegations that the arrangement involves more than standard legal representation"); *RSM*

*Production Corp. v. Freshfields Bruckhaus Deringer U.S. LLP*, 682 F.3d 1043, 1051 (D.C. Cir.

2012) (upholding dismissal of a RICO conspiracy claim against a law firm because "the complaint

alleges no conduct by Freshfields beyond the provision of normal legal services in arbitration and

so fails to support a reasonable inference that Freshfields 'agree[d] to assist others in the

commission of unlawful acts.'"); *In re Mojo Brands Media, LLC*, 2022 WL 2389185, at *11

(Bankr. M.D. Fla. Apr. 12, 2022) ("To substantially assist a breach of fiduciary duty 'the lawyer

must actively participate in the breach . . . .'  In other words, . . . providing routine legal services

to a client is not enough."); *Miller v. Harden*, 2006 WL 5083825, at *6 (M.D. Fla. Sept. 7, 2006)

(noting that a "conspiracy cannot exist when an attorney's conduct falls within the broad scope of

representation of his client").

  Plaintiffs repeatedly—and affirmatively—allege that the acts for which they seek to hold

Fenwick liable "were committed within the scope of Fenwick's employment and in furtherance of

the firm's business."  Compl. ¶ 256 (Count 2); *id.* ¶ 264 (Count 3); *id.* ¶ 272 (Count 4); *id.* ¶ 280

(Count 5); *id.* ¶ 288 (Count 6); *id.* ¶ 294 (Count 7); *id.* ¶¶ 306, 309 (Count 8).  Indeed, as discussed

above, *see supra* at 6–7, Plaintiffs premise liability on Fenwick's provision of routine legal

services:  "Fenwick agreed with its co-conspirator(s) to commit the overt acts alleged herein, each

in furtherance of fraud and conversion of Class Members' property, including (1) *forming shell*

*entities*, including North Dimension and North Wireless Dimension, through which FTX Group siphoned misappropriated Class Members' funds; (2) *structuring acquisitions and other transactions* by which FTX US expanded its product offerings—and, by extension, its reach to victims—and through which FTX US dodged regulatory scrutiny to obtain necessary licenses to operate in desired markets; and (3) generating for the FTX entities the appearance of legitimate operations, *strict adherence to regulatory obligations*, and *esteem for legal compliance*, which permitted the scheme to grow in scale and persist in duration." Compl. ¶ 239 (emphases added).

As the Supreme Court has made clear, "determining whether a complaint states a plausible claim is context specific, requiring the reviewing court to draw on its experience and common sense." *Iqbal*, 556 U.S. at 663–64. Because forming companies, structuring acquisitions, and advising clients on regulatory compliance are precisely the types of routine legal services that thousands of lawyers across the country provide every single day, Plaintiffs' allegations stop well "short of the line between possibility and plausibility of entitlement to relief." *Id.* at 678. Indeed, if Plaintiffs' allegations *were* sufficient to state a claim against Fenwick for conspiracy and aiding-and-abetting liability, then any lawyer could be hauled into court and forced to answer for his client's misconduct. That is not the law.

To be sure, Plaintiffs elsewhere state—in apparent contradiction with the preceding allegations—that "Fenwick provided services to the FTX Group entities that went well beyond those a law firm should and usually does provide." Compl. ¶ 15. But Plaintiffs ground this claim solely on conclusory assertions that Fenwick lawyers supposedly "craft[ed] not only creative, but illegal strategies" and "advised on FTX US's regulatory dodge." *Id.* These are not factual allegations but legal conclusions that a court is not required to credit on a motion to dismiss. *See*

*Iqbal*, 556 U.S. at 678 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.").

Plaintiffs may claim the Complaint alleges that Fenwick acted outside the scope of its representation by stating that Fenwick "provided legal *and commercial* advice on a number of FTX's business transactions," Compl. ¶ 211 (emphasis added), including FTX Trading Ltd.'s Series B and B-1 capital raises and FTX US's acquisition of LedgerX, *id.* ¶¶ 211–12. But it is widely acknowledged that the scope of an attorney's representation extends to providing commercial and business advice. *See, e.g.*, *United States v. Chen*, 99 F.3d 1495, 1501–02 (9th Cir. 1996) ("If a person hires a lawyer for advice, there is a rebuttable presumption that the lawyer is hired 'as such' to give 'legal advice,' whether the subject of the advice is criminal or civil, business, tort, domestic relations, or anything else. . . . That the lawyers were 'involved in business decision-making' . . . is irrelevant."); *Chance v. Cook*, 2020 WL 13559018, at *4 (N.D. Fla. Mar. 23, 2020) ("[T]he scope of an attorney's representation is broad, and not limited to defending cases on the merits."); *Staley v. Gilead Scis., Inc.*, 2021 WL 4318403, at *2–3 (N.D. Cal. July 16, 2021) (collecting cases holding that attorney-client relationship applies, and protects communications, even where an attorney advises on business decisions). In fact, "[s]o long as [the attorneys'] actions 'were motivated not by personal concerns but by concerns for their clients,' they are not 'susceptible to characterization as a conspiracy[.]'" *Cook*, 2020 WL 13559018, at *4 (quoting *Farese*, 342 F.3d at 1332).

There can be little doubt that a law firm—especially a full-service firm like Fenwick that forms corporations, advises on regulatory compliance, and negotiates the acquisition of subsidiaries on a daily basis—acts for the benefit of its client when it provides commercial advice in the context of that work. Indeed, the Model Rules of Professional Conduct explicitly state that

"[i]n rendering advice, a lawyer may refer not only to law but to other considerations such as moral, *economic*, social and political factors, that may be relevant to the client's situation." Model Rules of Professional Conduct, Rule 2.1 (emphasis added); *cf. Bellsouth Advertising & Pub. Corp. v. American Business Lists, Inc.*, 1992 WL 338392, at *8 (N.D. Ga. Sept. 8, 1992) ("The mere mention of business considerations is not enough to compel disclosure of otherwise privileged material. . . . Legal advice should remain protected along with 'nonlegal considerations, discussed between client and counsel that are relevant to that consultation[.]'").

Florida law likewise prohibits conspiracy claims against a lawyer acting within the scope of his representation under the "intra-corporate conspiracy doctrine," which provides that members of a corporation cannot conspire with themselves. This doctrine "stems from basic agency principles that attribute the acts of agents of a corporation to the corporation, so that all of their acts are considered to be those of a single legal actor." *Mancinelli v. Davis*, 217 So. 3d 1034, 1037 (Fla. 4th DCA 2017) (quotation marks omitted). "Because a civil conspiracy requires 'an agreement between two or more parties,' 'it is not possible for a single legal entity consisting of the corporation and its agents to conspire with itself.'" *Id.*[4]

---

[4] Florida law governs under well-established choice-of-law principles. "[T]he test to determine which law applies to aiding and abetting claims is provided by the Restatement (Second) Conflict of Laws § 145." *In re Estategias en Valores, S.A.*, 628 B.R. 722, 734 (Bankr. S.D. Fla. 2021). Under that test, the court will apply "the local law of the state which . . . has the most significant relationship to the occurrence and the parties." Restatement (Second) Conflict of Laws § 145(1). In financial misconduct cases, courts have typically held that the state where the misconduct is centered has the most significant relationship. *See, e.g.*, *Amegy Bank Nat'l Ass'n v. DB Private Wealth Mortg., Ltd.*, 2014 WL 791503, at *5 (M.D. Fla. Feb. 24, 2014) (applying Georgia law because "most of the alleged conduct of conversion, aiding and abetting, and conspiracy all occurred in Georgia"); *In re Estategias en Valores*, 628 B.R. at 735 (applying Colombian law because, among other things, "Estraval was incorporated under Colombian law and had done business in Colombia for 16 years before it was forced into liquidation"). Here, that is Florida. And notably, Plaintiffs appear to agree that Florida law governs. *See* Compl. ¶ 10 ("Since the initial complaints in this MDL were filed, it has become even more clear that Florida

Florida courts routinely apply the intra-corporate conspiracy doctrine to bar claims alleging that a lawyer conspired with his client. In *Lipsig v. Ramlawi*, 760 So. 2d 170 (Fla. 3d DCA 2000), for example, the plaintiff alleged that a lawyer conspired with his client to exclude him from a partnership. *Id.* at 174. The court rejected the claim, concluding that the lawyer "acted on behalf of and at the direction of the [client]." *Id.* at 181. Similarly, in *Richard Bertram, Inc. v. Sterling Bank & Trust*, 820 So. 2d 963 (Fla. 4th DCA 2002), the court held the plaintiff could not state a claim for civil conspiracy against a yacht seller's attorney because "the attorney's acts are the acts of the principal, the client." *Id.* at 966.

The only recognized exception to the intra-corporate conspiracy doctrine occurs where "the agent has a personal stake in the activities that are separate and distinct from the corporation's interest." *Cedar Hills Props. Corp. v. Eastern Fed. Corp.*, 575 So. 2d 673, 676 (Fla. 1st DCA 1991). Ordinary compensation does not constitute a sufficient personal stake for purposes of this exception. *See Mancinelli*, 217 So. 3d at 1037–38 (concluding that "the allegations in C3's complaint do not show that Davis had a 'personal stake' in the conspiracy different from that of the corporation" because "[a]ny benefits Davis received as a result of his allegedly tortious actions, including increased compensation, were merely incidental to the benefits [Davis's employer] received"). Yet receiving ordinary legal fees for its services is the *only* stake Fenwick is alleged to have had in its purported conspiracy with FTX. *See, e.g.*, Compl. ¶ 217 ("In aiding the FTX entities with their wrongdoing, Fenwick was motivated by the substantial fees it would enjoy in return for the services it rendered."); *id.* ¶ 306 ("[I]n exchange for Fenwick's counsel in these matters, FTX paid Fenwick significant fees.").

---

law applies to all Class Members on the securities-related claims."); *id.* ¶ 234 ("[A]nother predominant issue regarding the MDL Defendants' liability is whether they have violated the consumer protection and securities laws of Florida.").

Because the Complaint does not—and cannot—allege that Fenwick acted beyond the scope of its representation of FTX or provided anything other than ordinary legal services to the company in purported furtherance of Bankman-Fried's fraud, each of the eight conspiracy and aiding-and-abetting claims fail as a matter of law and should be dismissed.  And because the Complaint affirmatively concedes that all of the acts for which it seeks to hold Fenwick liable were performed within the scope of Fenwick's representation of FTX, the Complaint should be dismissed with prejudice.[5]

### B. Plaintiffs Fail to State a Claim for Aiding-and-Abetting Liability Because They Do Not Allege Essential Elements of Those Claims (Counts 2–7).

Even if the allegations in the Complaint were not based on Fenwick's work within the scope of its representation of FTX, Plaintiffs' claims for aiding and abetting fraud, negligence, fiduciary breach, and conversion should be dismissed for failure to adequately plead necessary elements of those claims.  Although only one of those four claims expressly invokes fraud, all of them sound in fraud—and, as a result, all of them must satisfy Rule 9(b)'s heightened pleading standard.  *See Yuanxiao Feng v. Walsh*, 2020 WL 5822420, at *15 (S.D. Fla. Sept. 14, 2020) ("[T]he following claims are generally subject to Rule 9(b)'s heightened pleading requirements because those claims are rooted in fraud: Aiding and Abetting Conversion . . . ; Aiding and Abetting Breach of Fiduciary Duty."); *Cozzarelli v. Inspire Pharms. Inc.*, 549 F.3d 618, 629 (4th Cir. 2008) ("When a plaintiff makes an allegation that has the substance of fraud . . . , he cannot escape the requirements of Rule 9(b) by adding a superficial label of negligence.").  Under that heightened pleading standard, the Complaint must "set forth particular allegations about the who,

---

[5]      Plaintiffs' RICO claim under 18 U.S.C. § 1962(d) is merely a species of a conspiracy claim. *See* Compl. ¶ 297 ("Fenwick agreed and conspired . . . to violate 18 U.S.C. § 1962(c)."); *Salinas v. United States*, 522 U.S. 52, 63 (1997) ("The relevant statutory phrase in § 1962(d) is 'to conspire.'  We presume Congress intended to use this term in its conventional sense.").

what, when, where, and how of the circumstances giving rise to the cause[s] of action" and "alert defendants to the precise misconduct with which they are accused." *Perkins, Inc.*, 580 F. Supp. 3d at 1239 (quotation marks omitted).

   ***Plaintiffs Fail to Allege Aiding-and-Abetting Liability Generally (Counts 2–7).***   "[A] claim for aiding and abetting contains three elements: '(1) an underlying violation on the part of the primary wrongdoer; (2) knowledge of the underlying violation by the alleged aider and abett[o]r; and (3) the rendering of substantial assistance in committing the wrongdoing by the aider and abettor.'" *Gilbert & Caddy, P.A. v. JP Morgan Chase Bank, N.A.*, 2015 WL 12862724, at *5 (S.D. Fla. Aug. 20, 2015) (quoting *Lawrence v. Bank of America, N.A.*, 455 F. App'x 904, 907 (11th Cir. 2012)).  Additionally, the plaintiff must plead that the conduct was a legal and proximate cause of the plaintiff's injuries. *See Worldspan Marine Inc. v. Comerica Bank*, 2020 WL 1238732, at *14 (S.D. Fla. Feb. 27, 2020) ("Aiding and abetting fraud is a tort in Florida and like all torts, additionally requires a plaintiff to demonstrate injury resulting from the alleged misconduct."). Here, even assuming an underlying violation on the part of FTX, Plaintiffs' claims against Fenwick fail because Plaintiffs have not alleged *any* of the remaining elements.

   *First*, Plaintiffs fail to plausibly allege that Fenwick had actual knowledge of FTX's purported wrongdoing.  Although actual knowledge may be established by either direct or circumstantial evidence, "courts 'stress that the requirement is *actual* knowledge' and the circumstantial evidence must demonstrate that the aider-and-abettor *actually knew* of the underlying wrongs committed." *Wiand v. Wells Fargo Bank, N.A.*, 938 F. Supp. 2d 1239, 1244 (M.D. Fla. 2013) (emphases in original).  Red flags and suspicions do not create actual knowledge. *See Platinum Estates, Inc. v. TD Bank, N.A.*, 2012 WL 760791, at *4–5 (S.D. Fla. Mar. 8, 2012) ("Plaintiff has failed to allege sufficiently the requisite degree of scienter, because 'red flags or

aroused suspicions do not constitute actual awareness of one's role in a fraudulent scheme.'");
*Cordell,* 2012 WL 13148744, at *5 (S.D. Fla. July 11, 2012) ("'Red flags,' or 'aroused suspicions,'
do not constitute actual awareness."). Thus, even in a case involving a Ponzi scheme, the provision
of routine services does not satisfy the "actual knowledge" standard. *See Lawrence v. Bank of
America, N.A.*, 455 F. App'x 904, 907 (11th Cir. 2012). Nor does reckless conduct. *See Wiand*,
938 F. Supp. 2d at 1247 ("There is no authority in Florida tort law for imposing aiding-and-
abetting liability on a bank that is reckless but lacks actual knowledge of an underlying wrong.").
Instead, there must be a "conscious and specific motivation" to aid the underlying misconduct.
*Court Appointed Receiver of Lancer Offshore v. Citgo Group, Ltd.*, 2008 WL 926513, at *6 (S.D.
Fla. Mar. 31, 2008).

      Plaintiffs' claims do not meet this standard. The Complaint alleges that Fenwick acquired
knowledge of FTX's misconduct through (1) "[t]he provision of Fenwick's services[, which]
required due diligence and monitoring," Compl. ¶ 199, (2) Fenwick's "close ties with its former
attorneys in Friedberg and Sun," *id.* ¶ 203, and (3) purported "communications with FTX
executives," *id.* ¶ 208. But these threadbare allegations fall far short of specifying the precise
claimed misconduct, as required by Rule 9(b).

      For example, although Plaintiffs allege that Fenwick's due diligence would have included
"reviewing the organizational documents for the FTX entities, including certificates of
incorporation or formation, by-laws and other agreements" and "reviewing finance documents
including intracompany loans or other related party agreements, guarantees and promissory notes,"
Compl. ¶ 199, Plaintiffs do not identify which of these documents (if any) would have disclosed
Bankman-Fried's scheme. In fact, all Plaintiffs allege is that "through th[is] work and diligence,
Fenwick would have necessarily been aware of the *representations* FTX US and FTX Trading Ltd.

made to their customers and/or regulators," *id.* ¶ 200 (emphasis added)—not FTX's alleged *breach* of those representations.[6]  This is not enough to satisfy Rule 9(b)'s particularity requirement.  *See West Coast Roofing & Waterproofing, Inc. v. John Manville, Inc.*, 287 F. App'x 81, 86 (11th Cir. 2008) ("To satisfy Rule 9(b)'s 'particularity' standard, we generally require that a complaint identify (1) the precise statements, documents or misrepresentations made; (2) the time and place of and persons responsible for the statement; [and] (3) the content and manner in which the statements misled the plaintiff.").

Likewise, the "communications with FTX executives" identified in the Complaint consist of excerpts from a single back-and-forth with Daniel Friedberg—the only communication alleged to have occurred between Fenwick and either Friedberg or Can Sun—in which Friedberg purportedly sought legal advice about how to properly account for "'[s]ome FTX cash and crypto [that] is held by Alameda for the benefit of FTX customers.'"  Compl. ¶ 208.  While Plaintiffs contend that this gave Fenwick actual notice that FTX had breached its "duty to exercise reasonable care with its customer deposits," *id.*, the email does no such thing.  Rather, as far as the excerpts selectively provided by Plaintiffs reveal, this exchange simply sought advice on an intercompany cash management agreement—an agreement that Fenwick insisted FTX would need to publicly disclose.  *Id.* ¶ 209.  Plaintiffs' selective quotations from a privileged and confidential email do not plausibly allege that Fenwick knew of FTX's alleged violation.

---

[6]     Indeed, Plaintiffs' other allegations show that FTX's recordkeeping practices would have made it difficult for *anyone*—including Fenwick—to uncover wrongdoing based on document review.  *See, e.g.*, Compl. ¶ 141(h) ("'[T]ransfers of funds among those entities were not properly documented, rendering tracing of funds extremely challenging,' including using Slack, Signal, and Telegram with 'disappearing messages' enabled and often approving expenses and invoices on Slack by 'emoji.'").

*Second*, Plaintiffs fail to plausibly allege that Fenwick substantially assisted Bankman-Fried in his alleged fraud.  "Substantial assistance occurs when a defendant affirmatively assists, helps conceal, or fails to act when required to do so, thereby enabling the breach to occur."  *Groom v. TD Bank, N.A.*, 2012 WL 50250, at *4 (M.D. Fla. Jan. 9, 2012); *see also Johnson v. Branch Banking & Trust Co.*, 2015 WL 13791141, at *6 (M.D. Fla. Sept. 16, 2015) (definition of "substantial assistance" applied in the context of aiding and abetting fraud).  In other words, substantial assistance requires more than providing routine legal services for a client or "conducting activities that make up the 'daily grist of the mill.'"  *In re Cascade Int'l Securities Litig.*, 840 F. Supp. 1558, 1566 (S.D. Fla. 1993), *on reconsideration*, 894 F. Supp. 437 (S.D. Fla. 1995).

The only assistance allegedly provided by Fenwick consisted of routine legal services—such as forming subsidiaries, structuring acquisitions, and advising on legal compliance and regulatory obligations—that FTX and its insiders subsequently used to commit fraudulent and wrongful acts.  *See* Compl. ¶¶ 263, 271, 279, 287 294, 254.  But as discussed above, *see supra* at 11–13, these acts fall fully within the scope of Fenwick's representation of FTX, or any client.  Accordingly, courts have rejected aiding-and-abetting claims against lawyers based on materially similar allegations.

In *Schatz v. Rosenberg*, 943 F.2d 485 (4th Cir. 1991), for example, the Fourth Circuit considered whether "a lawyer provides 'substantial assistance' in aiding and abetting tortious conduct if he prepares and disseminates documents containing material misrepresentations or omissions."  *Id.* at 497.  The court answered in the negative, explaining that "the 'substantial assistance' element requires that a lawyer be more than a scrivener for a client; the lawyer must actively participate in soliciting sales or negotiating the terms of the deal on behalf of a client to

have 'substantially assisted'" the allegedly wrongful behavior.  *Id.*  Put differently, "a plaintiff must prove that a defendant rendered 'substantial assistance' *to the primary . . . violation*, not merely to the person committing the violation."  *Id.* (emphasis added); *see also id.* at 495 ("[L]awyers do not vouch for the probity of their clients when they draft documents reflecting their clients' promises, statements, or warranties.").

Plaintiffs do not allege that Fenwick substantially assisted the "primary" tortious conduct identified in the Complaint.  Rather, Plaintiffs allege only that Fenwick substantially assisted *FTX* by providing indisputably lawful and ordinary legal services—such as the incorporation of entities and provision of regulatory advice—which FTX then supposedly misused (or ignored) to execute the alleged scheme.  As a result, Plaintiffs have not plausibly alleged substantial assistance.

*Third*, Plaintiffs fail to plausibly allege with the required specificity that Fenwick's conduct was the proximate cause of their injury.  The Complaint asserts that the purported fraud was executed "through at least two separate schemes" allegedly perpetrated by FTX insiders, "both of which contributed to the downfall of the FTX Group": (1) "SBF and the FTX Group stole customer deposits and used billions of dollars in customer funds" for personal purposes, and (2) "FTX Group offered and sold securities without proper registration, thereby depriving Plaintiffs of financial and risk-related disclosures that would have impacted their calculus as to whether to invest in the FTX Group."  Compl. ¶¶ 2-4.  Regarding the first alleged scheme, Fenwick's only alleged involvement was assisting in the incorporation of two "shell" entities through which Bankman-Fried misappropriated client funds; the Complaint provides no factual detail about the role of these two entities in the broader scheme, including how much money was diverted through them and whether and how Bankman-Fried and his associates chose to divert funds through those entities as compared to other artifices, such as personal loans.  The Complaint certainly alleges nothing done

or known by Fenwick beyond the incorporation of the entities.  *See id.* ¶ 104.  Regarding the second alleged scheme, the Complaint alleges that Fenwick helped FTX acquire LedgerX LLC, through which FTX acquired "access to the U.S. commodities derivatives markets as a regulated exchange."  Compl. ¶ 212.  But Plaintiffs do not allege that this was unlawful or that it allowed FTX to issue unregistered securities.  At bottom, the Complaint does not create a plausible inference that Fenwick's conduct proximately caused harm that was plainly the result of numerous overlapping schemes orchestrated by Bankman-Fried and his associates.

For each of these reasons, Plaintiffs' aiding-and-abetting claims (Counts 2–7) must be dismissed.

**Plaintiffs Fail to Allege Fenwick Aided and Abetted a Fiduciary Breach (Counts 5–6).**

Counts 5 and 6 of the Complaint, for aiding and abetting FTX US's and FTX Trading Ltd.'s breach of their fiduciary duties to customers, fail for the same reason all of Plaintiffs' claims fail— Plaintiffs fail to allege that Fenwick acted outside the scope of its representation to advance the alleged breach of fiduciary duty.  But this Count also fails for an additional reason:  Plaintiffs have not alleged specific facts regarding what fiduciary duties, if any, FTX had to consumers, and without such allegations, Plaintiffs cannot plausibly allege that Fenwick aided and abetted the violation of those purported duties.

"Fiduciary relationships can be created expressly or impliedly under Florida law."  *Arbitrajes Financieros, S.A. v. Bank of America, N.A.*, 605 F. App'x 820, 823 (11th Cir. 2015).  "Those expressly created are either by contract, such as principal/agent or attorney/client, or through legal proceedings, such as trustee/beneficiary and guardian/ward."  *Capital Bank v. MCB, Inc.*, 644 So. 2d 515, 518 (Fla. 3d DCA 1994).  An implied fiduciary relationship, by contrast, is "premised upon the specific factual situation surrounding the transaction and the relationship of

the parties." *Id.*  Implied fiduciary relationships typically arise "when 'confidence is reposed by one party and a trust accepted by the other.'" *Id.* (quoting *Dale v. Jennings*, 107 So. 175, 179 (Fla. 1925)).  In determining whether an implied fiduciary relationship exists, courts consider whether the alleged fiduciary "1) takes on extra services for a customer, 2) receives any greater economic benefit than from a typical transaction, or 3) exercises extensive control" over a customer.  *Id.* at 519.

Plaintiffs do not allege that they had an express fiduciary relationship with FTX.  And while Plaintiffs hint at an implied fiduciary relationship, *see* Compl. ¶¶ 276, 284, they fail to allege such a relationship with the specificity required.  *See Capital Bank*, 644 So. 2d at 518 (concluding that, in the ordinary case, "the relationship between a bank and its borrower is that of creditor to debtor, in which parties engage in arms-length transactions, and the bank owes no fiduciary responsibilities").

As a result, Plaintiffs' claims for aiding and abetting breach of fiduciary duty (Counts 5 and 6) fail and must be dismissed.

**C.      Plaintiffs Fail to State a RICO Claim Because They Do Not Allege That Fenwick Agreed to Participate in the Alleged Enterprise or That There Even Was a Cognizable RICO Enterprise (Count 8).**

Plaintiffs' RICO claim arises from the same alleged conduct that underpins their seven other claims.  The Complaint alleges that "Bankman-Fried directed and controlled a RICO enterprise through a pattern of racketeering activity . . . to execute a scheme to defraud" FTX customers.  Compl. ¶ 298.  This enterprise purportedly "shared a common purpose, which was to (i) convince and assuage potential and existing customers to entrust FTX US and FTX Trading Ltd. with their assets, (ii) conceal their misappropriation of customers' funds and conflict-of-interest activities, and (iii) make their ill-gotten gains available for the co-conspirators['] personal use in interstate and foreign commerce." *Id.* ¶ 300.  Crucially, however, the Complaint pleads that

all of the alleged predicate acts were perpetrated by FTX insiders Bankman-Fried, Caroline Ellison, or Friedberg. *See id.* ¶ 302. Although the Complaint alleges that "Fenwick agreed and conspired with Bankman-Fried, Friedberg, FTX Group entities, and others to violate 18 U.S.C. § 1962," *id.* ¶ 297, Fenwick's alleged participation in the alleged conspiracy was limited to "agreeing to provide and providing legal services to FTX US and FTX Trading Ltd., including through advice and counsel to Friedberg, an officer of both FTX entities." *Id.* ¶ 306.

Plaintiffs' attempt to plead a RICO conspiracy claim is no more successful than their attempts to plead aiding-and-abetting liability. "To state a claim under RICO a plaintiff must allege each of the following four elements: '(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'" *Durham v. Business Mgmt. Assocs.*, 847 F.2d 1505, 1511 (11th Cir. 1988) (quoting *Sedima S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)). And because Plaintiffs allege a RICO *conspiracy*, they must also allege that Fenwick "agreed to participate in the affairs of [the] enterprise." *United States v. Flores*, 572 F.3d 1254, 1267 (11th Cir. 2009); *see also United States v. Green*, 981 F.3d 945, 952 (11th Cir. 2020) ("[T]he elements of a RICO conspiracy focus on the *agreement* to commit a crime."). Plaintiffs must plead each of these elements with the particularity required by Rule 9(b). *See Ambrosia Coal & Constr. Co. v. Pages Morales*, 482 F.3d 1309, 1316 (11th Cir. 2007) ("Civil RICO claims, which are essentially a certain breed of fraud claims, must be pled with an increased level of specificity."); *Dowbenko v. Google Inc.*, 582 F. App'x 801, 805–06 (11th Cir. 2014) ("Because Mr. Dowbenko appears to hinge his RICO claim on a pattern of fraudulent activity, his 'substantive RICO allegations must comply not only with the plausibility criteria articulated in *Twombly* and *Iqbal* but also with Fed. R. Civ. P. 9(b)'s heightened pleading standard.'"). The Complaint fails to state a valid RICO conspiracy claim for at least two reasons.

*First*, the Complaint is devoid of any allegation that Fenwick *agreed* to participate in any RICO enterprise. *See United States v. Starrett*, 55 F.3d 1525, 1543 (11th Cir. 1995) ("To establish a RICO conspiracy under 18 U.S.C. § 1962(d), the government must prove that the defendants 'objectively manifested, through words or actions, an agreement to participate in the conduct of the affairs of the enterprise.'"). Such an agreement "may be shown in two ways: (1) showing an agreement on the overall objective of the conspiracy, or (2) showing that a defendant agreed to commit personally two predicate acts, thereby agreeing to participate in a 'single objective.'" *United States v. Browne*, 505 F.3d 1229, 1264 (11th Cir. 2007). The Complaint alleges neither.

As noted above, *see supra* at 22–23, the Complaint does not allege that Fenwick personally committed any of the purported RICO conspiracy's predicate acts. On the contrary, each of the alleged predicate acts was performed by FTX insiders, such as Bankman-Fried, Ellison, or Friedberg. *See* Compl. ¶ 302.

Nor does the Complaint allege that Fenwick agreed in any way to the overall objective of the conspiracy. According to the Complaint, "Fenwick formed an illegal agreement to violate the" RICO statute by "commit[tin]g overt acts in furtherance of [the conspiracy's] activities," including forming "shell" entities, structuring acquisitions, and advising on legal and regulatory issues. *Id.* ¶¶ 308, 310. But to agree to join a RICO conspiracy, "[o]ne must *knowingly* agree to perform services of a kind which facilitate the activities of those who are operating the enterprise in an illegal manner." *Brouwer v. Raffensperger, Hughes & Co.*, 199 F.3d 961, 967 (7th Cir. 2000) (emphasis added). The provision of routine legal services does not establish such knowledge. And although the Complaint asserts "Fenwick's knowledge" of the FTX insiders' misconduct, Compl. ¶ 309, these conclusory allegations fail to satisfy the pleading standard under Rule 9(b), *see supra* at 17–19.

The Seventh Circuit's decision in *Domanus* is instructive.  There, the plaintiffs alleged that a law firm engaged in a RICO conspiracy with a group of shareholders to loot the assets of a company.  847 F.3d at 479.  The court explained that "[t]he first step is to allege that each defendant—that is, the individual lawyers and the [law] firms—knew about this conspiracy." *Id.* "Although a conspirator does not need to know the intricacies and full dimensions of the scheme in order to be liable . . . , he must be aware of its essential scope and nature." *Id.*  The court held that allegations indicating the lawyers were exposed to materials that "raised a red flag" about the shareholders' wrongdoing was insufficient to show that the law firm actually *knew* of the conspiracy.  *Id.* at 480.  And in the absence of such knowledge, the court concluded that there could be no agreement.  *See id.* ("[T]he fact that someone *should have known* about a scheme or fraudulent activity is not enough to show that the person actually knew." (emphasis added)); *id.* at 481 (noting that to prove knowledge under a willful blindness theory, a plaintiff must allege "a subjective belief that there is a high probability that the fact is true, coupled with deliberate steps to avoid learning the fact").

As in *Domanus*, the Complaint here alleges, at most, that Fenwick should have known that the FTX insiders were engaged in misconduct.  But as in *Domanus*, those allegations are insufficient to establish knowledge of a RICO conspiracy and, in turn, an agreement to participate in it.

*Second*, Plaintiffs' RICO claim fails because the Complaint does not allege "any *enterprise engaged in . . . a pattern of racketeering activity.*"  18 U.S.C. § 1962(c) (emphasis added).  The existence of such an enterprise is an essential element of any RICO claim.  The RICO statute defines an enterprise to "include[] any individual, partnership, corporation, association, or other legal entity, or any union or group of individuals associated in fact although not a legal entity."

*Id.* § 1961(d). But as the Eleventh Circuit has squarely held, "plaintiffs may not plead the existence of a RICO enterprise between a corporate defendant and its agents or employees acting within the scope of their roles for the corporation." *Cisneros*, 972 F.3d at 1215 (quoting *Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340, 1357 (11th Cir. 2016)).

Here, the only enterprise Plaintiffs allege is one between a corporate entity (FTX) and its agents or employees, which "included Bankman-Fried, Ellison, Friedberg, [and] the FTX Group." Compl. ¶ 299; *see also id.* ¶ 301 ("Bankman-Fried was at all times the leader, assisted by Ellison, Wang, Singh, and Friedberg, who reported to Bankman-Fried as co-owners and/or as part of his inner circle."). The Complaint plainly alleges that all of these individuals were employees of FTX. *See, e.g., id.* ¶¶ 54–81, 191–193, 195, 58–59. Indeed, the Complaint identifies "Samuel Bankman-Fried, Caroline Ellison, Gary Wang, and Nishad Singh" as "FTX Insider Defendants." *Id.* at 5; *see also id.* ¶¶ 54–81 (identifying Bankman-Fried, Ellison, Wang, and Singh as "FTX's Key Players"). The litany of alleged co-conspirators completely fails to establish a RICO enterprise because, as alleged, it comprises merely the company, employees, and attorney agents. *See Daigneault v. Eaton Corp.*, 2008 WL 2604929 (D. Conn. June 16, 2008) (entity, employees, and attorneys did not constitute distinct RICO enterprise when employees and attorneys were acting as employees of company when predicate acts were committed).

Because Plaintiffs' Complaint fails to establish the most fundamental elements of a RICO conspiracy—an agreement by Fenwick to participate in the RICO enterprise and an underlying enterprise—the Court should dismiss this claim (Count 8).

## IV.   CONCLUSION

This Court should dismiss each of the eight claims asserted in the Complaint under Rule 12(b)(6) and 9(b) because Plaintiffs have failed to plausibly allege any of those claims. And

because Plaintiffs are unable to amend their Complaint to state a valid claim for relief, the Court should dismiss those claims with prejudice.

## V.      REQUEST FOR HEARING

Pursuant to Local Rule 7.1(b)(2), Fenwick respectfully requests that the Court hold a hearing on Fenwick's Motion to Dismiss.  Oral argument will assist the Court in addressing the Complaint's vague and conclusory allegations.  Fenwick estimates that sixty (60) minutes is an appropriate length of time for arguing the motion to dismiss and Plaintiffs' opposition thereto.

Respectfully submitted,

*/s/ Nicole K. Atkinson*
DAVID R. ATKINSON
Florida Bar No.: 767239
datkinson@gunster.com
mmargolese@gunster.com
eservice@gunster.com
NICOLE K. ATKINSON
Florida Bar No.: 167150
natkinson@gunster.com
STEPHEN C. RICHMAN
Florida Bar No.: 1015692
srichman@gunster.com
jfirogenis@gunster.com
GUNSTER, YOAKLEY & STEWART, P.A.
Brickell World Plaza
600 Brickell Avenue, Suite 3500
Miami, FL 33131
Tel: (305) 376-6000, (561) 655-1980
Fax: (305) 376-6010, (561) 655-5677

KEVIN S. ROSEN (*pro hac vice*)
krosen@gibsondunn.com
MICHAEL HOLECEK
Florida Bar No.: 1035950
mholecek@gibsondunn.com
SAMUEL ECKMAN (*pro hac vice*)
seckman@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue

Los Angeles, CA 90071
Tel: (213) 229-7000
Fax: (213) 229-7520

*Counsel for Defendant Fenwick & West LLP*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 21, 2023, I electronically filed the foregoing with the Clerk of Court using CM/ECF, and that the foregoing document is being served on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to electronically receive Notices of Electronic Filing.

*/s/ Nicole K. Atkinson*
Nicole K. Atkinson