# Exhibit L

**PLAINTIFFS' OMNIBUS MOTION TO LIFT DISCOVERY STAY AND FOR LEAVE TO CONDUCT JURISDICTIONAL DISCOVERY, AND, IF NECESSARY TO AMEND THEIR COMPLAINTS WITH ANY FACTS ARISING FROM SUCH DISCOVERY**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

RYAN SALAME,

Defendant.

**SUPERSEDING INFORMATION**

S7 22 Cr. 673 (LAK)

## Overview

1. From at least in or about 2020, up to and including in or about November 2022, RYAN SALAME, the defendant, engaged in multiple conspiracies to advance the interests of Samuel Bankman-Fried, a/k/a "SBF," and the cryptocurrency companies Bankman-Fried founded and controlled—including FTX.com ("FTX") and Alameda Research ("Alameda")—through the operation of an unlawful money transmitting business and violations of the federal election law. Specifically, from at least in or about 2020, up to and including in or about November 2022, SALAME conspired to operate Alameda and its affiliates on behalf of FTX as a means for transmitting funds on behalf of FTX customers, even though SALAME and his co-conspirators never obtained the required federal money transmitting licenses for Alameda and the relevant affiliates. From at least in or about 2020, up to and including in or about November 2022, SALAME conspired to influence cryptocurrency regulation in Washington, D.C. by steering tens of millions of dollars of illegal campaign contributions to both Democrats and Republicans.

### Background on Alameda Research, FTX, and RYAN SALAME

2. In or about November 2017, Samuel Bankman-Fried, a/k/a "SBF," founded Alameda, a quantitative cryptocurrency trading firm incorporated in Delaware, which had operations in the United States, Hong Kong, and The Bahamas. In or around May 2019, Bankman-

Fried founded FTX Trading Ltd., a global cryptocurrency exchange that, through several subsidiary entities, did business as FTX. Among other products, FTX offered customers a "spot market" for trading cryptocurrency in exchange for other cryptocurrencies or traditional currency, also known as fiat (referred to below generally as "dollars"), such as U.S. dollars.

3. From its launch, FTX grew rapidly. By in or about 2020, FTX was one of the largest digital asset exchanges in the world based on trading volume, and by in or about early 2022, FTX claimed to handle approximately $15 billion in daily trading volume on its platforms.

4. RYAN SALAME, the defendant, joined Alameda in or about 2019. In or about 2021, he was named the head of Alameda's settlements team and had primary responsibility over other staff to process customer fiat deposits and withdrawals. SALAME was later named co-CEO of FTX's Bahamian affiliate FTX Digital Markets Ltd. in or about October 2021.

**SALAME and Others Conspired to Operate an Unlicensed Money Transmitting Business**

5. From FTX's founding in or about 2019, Samuel Bankman-Fried, a/k/a "SBF," sought to use the United States financial system, and in particular, bank accounts in the United States, to promote FTX's business. After FTX launched in or around May 2019, and in order to attract customers and their assets, including U.S. dollars, FTX needed bank accounts that would allow FTX customers to deposit dollars with FTX that could be used to purchase cryptocurrency assets and pay for transactions. When FTX was founded, however, many U.S. banks were reluctant to do business with cryptocurrency companies, and those banks that were willing to open accounts for cryptocurrency companies had extensive customer due diligence and licensing requirements, with which FTX was not compliant.

6. Because FTX did not have its own bank accounts for holding customer deposits, for a period of time in or around 2019 and 2020, FTX instructed customers to wire dollar deposits

2

to bank accounts that were owned or controlled by Alameda. These Alameda accounts had been opened as trading accounts and had been used almost exclusively for Alameda's trading purposes until they were also employed as accounts for FTX to receive and transmit its customer deposits and withdrawals. Alameda never informed the banks where these accounts were held that these accounts in Alameda's name began to be used in substantial part by FTX to accept customer deposits for, and as a vehicle for customer withdrawals from, FTX's cryptocurrency exchange.

7. In or about October 2019, RYAN SALAME, the defendant, and others attempted to open an account for FTX at a bank in California ("Bank-1") where Alameda already had bank accounts. Bank-1 made clear, however, that it would not open an account for customer deposits and withdrawals absent evidence that FTX was licensed and registered, including federal registration as a money services business, and that, in any event, Bank-1 would need to conduct an enhanced due diligence process before opening any account used to process customer deposits and withdrawals.

8. In or about January 2020, Samuel Bankman-Fried, a/k/a "SBF," contacted Bank-1 about opening an FTX account. Bankman-Fried learned from Bank-1 that Bankman-Fried should not attempt to open an account for FTX, an international platform, at that time. He was further told that if he wished to open an account to process customer deposits and withdrawals for FTX.US, FTX's business in the United States, FTX.US would need to register as a money services business. While Bankman-Fried did later register FTX.US as a money services business in 2020, no attempts were made to make FTX a licensed money services business. Bankman-Fried and RYAN SALAME, the defendant, never sought to have FTX or Alameda comply with the regulatory requirements of licensure. Instead, FTX continued to use Alameda trading accounts to accept customer deposits and process customer withdrawals.

3

9. In part to obscure the relationship between FTX and Alameda, and in order to overcome Bank-1's refusal to open a bank account for FTX without extensive due diligence and licensing, in or about August 2020, Samuel Bankman-Fried, a/k/a "SBF," directed the incorporation of a new U.S.-based entity, North Dimension. RYAN SALAME, the defendant, Bankman-Fried, and others chose the name "North Dimension" in part to conceal that there was a relationship between North Dimension and Alameda from banks approving transactions with the North Dimension bank account.

10. Aware of the fact that Bank-1 would not open an exchange account or account for receiving customer deposits for an entity without the appropriate registration and enhanced due diligence, RYAN SALAME, the defendant, Samuel Bankman-Fried, a/k/a "SBF," and other Alameda employees told Bank-1 a false story, namely, that North Dimension sought to open an account to function as a trading account connected to Alameda's existing trading accounts, instead of the truth, which was that the North Dimension account would function as an account to receive and transmit FTX customer deposits. At the direction of SALAME and Bankman-Fried, among others, employees of Alameda completed an account application that falsely stated that the purpose of the North Dimension bank account was for "trading" and "market making." Bank-1 was also given a completed North Dimension due diligence questionnaire—which Bankman-Fried signed—that falsely stated that North Dimension "trades on multiple cryptocurrency exchanges worldwide for its own account" and that North Dimension "also participates in direct peer-to-peer, OTC purchases and sales with certain third parties for its own account." Furthermore, despite the fact that North Dimension was created for the purpose of transmitting customer deposits on and off the FTX exchange, the due diligence questionnaire falsely claimed that North Dimension was not a money services business. SALAME was aware that false information was provided to Bank-

1 as part of this questionnaire.

11. In or about April 2021, Bank-1 approved the opening of the North Dimension account, without enhanced due diligence or review by Bank-1's executive committee, as would have been required had the true purposes of North Dimension's account been disclosed to Bank-1.

12. Once the North Dimension bank account was opened, FTX directed customer dollar deposits to the North Dimension account. Thereafter, when FTX customers deposited or withdrew fiat currency, Alameda personnel, who maintained control over the North Dimension account and acted under the direction and supervision of RYAN SALAME, the defendant, Samuel Bankman-Fried, a/k/a "SBF," and their co-conspirators, manually credited or subtracted the customer's FTX account with the corresponding amount of fiat currency on an internal ledger system. Customers could then convert their deposits to a range of cryptocurrencies and traditional currencies, engage in various types of trading, and make withdrawals denominated in various types of cryptocurrencies and traditional currencies. FTX charged fees and generated revenues from many of these activities, using the fraudulently obtained access to a U.S. bank account. Customers could also convert various cryptocurrencies and traditional currencies to dollars on their FTX account, and withdraw the dollars from FTX. FTX sent customer withdrawals by wire transfer from the North Dimension bank account, and by at least summer 2021 charged a fee for dollar withdrawals.

**SALAME and Others Made Unlawful Political Contributions to Acquire Political Influence**

13. Beginning in or around 2020, Samuel Bankman-Fried, a/k/a "SBF," began donating large sums of funds to political candidates, at least in part to improve his personal standing in Washington, D.C., increase FTX's profile, and curry favor with candidates that could help pass legislation favorable to FTX or Bankman-Fried's personal agenda, including legislation concerning regulatory oversight over FTX and its industry. To accomplish these goals, Bankman-

Fried caused substantial contributions to be made in support of candidates of both major political parties and across the political spectrum. Bankman-Fried, however, did not want to be known as a left-leaning partisan, or to have his name publicly attached to Republican candidates. In order to obscure his association with certain contributions, Bankman-Fried conspired with others, including RYAN SALAME, the defendant, to make those contributions in the names of SALAME and Nishad Singh, another FTX executive. As SALAME explained in a private message to a confidant, the purpose of these bipartisan donations would be "to weed out anti crypto dems for pro crypto dems and anti crypto repubs for pro crypto repubs," and that donations would likely be routed through SALAME "to weed out that republican side."

14. Between in or about the fall of 2021 and the November 2022 election, RYAN SALAME, the defendant, Samuel Bankman-Fried, a/k/a "SBF," and Nishad Singh collectively made millions of dollars in contributions, including in "hard money" contributions to federal candidates from both major political parties. The money used to make these political donations originated from Alameda bank accounts, and included funds that had been deposited by FTX customers. Notwithstanding his awareness of the campaign finance laws, in order to conceal the true source of the funds, SALAME agreed with others that funds for contributions would be transferred from Alameda's bank accounts, which also contained FTX customer funds, to bank accounts in the name of the political donors, and then quickly transferred from those individuals' bank accounts to political campaigns.

15. To further conceal the scheme, RYAN SALAME, the defendant, and his co-conspirators recorded the outgoing wire transfers from Alameda to individuals' bank accounts for purposes of making contributions as Alameda "loans" or "expenses." But unlike other loans that were made to FTX executives, including to Samuel Bankman-Fried, a/k/a "SBF," Nishad Singh,

and SALAME, most of these outgoing wire payments were not documented in agreements or on term sheets, and there were no set interest rates, no interest payments, no collateral, and no evidence of repayment.

16. In total, RYAN SALAME, the defendant, and his co-conspirators made over 300 political contributions, totaling tens of millions of dollars, that were unlawful because they were made in the name of a straw donor or paid for with corporate funds. In dozens of instances, use of straw donors allowed Samuel Bankman-Fried, a/k/a "SBF," to evade contribution limits on individual donations to candidates to whom Bankman-Fried had already donated. As a result of this fraudulent conduct, SALAME and his co-conspirators caused false information to be reported by campaigns and PACs to the Federal Election Commission ("FEC"), which had the result of impairing and impeding the FEC's reporting and enforcement functions.

## STATUTORY ALLEGATIONS

### COUNT ONE
(Conspiracy to Make Unlawful Political Contributions and Defraud the FEC)

The United States Attorney charges:

17. The allegations contained in paragraphs 1 through 16 of this Information are repeated and realleged as if fully set forth herein.

18. From at least in or about 2020, up to and including in or about November 2022, in the Southern District of New York, and elsewhere, RYAN SALAME, the defendant, and others known and unknown, knowingly did combine, conspire, confederate, and agree together and with each other to defraud the United States, in violation of Title 18, United States Code, Section 371, and willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit offenses against the United States by engaging in violations of federal law involving the making, receiving, and reporting of a contribution, donation, or expenditure, in

violation of Title 52, United States Code, Sections 30109(d)(1)(A) & (D).

19. It was part and an object of the conspiracy that RYAN SALAME, the defendant, and others known and unknown, would and did knowingly and willfully make contributions to candidates for federal office, joint fundraising committees, and independent expenditure committees in the names of other persons, aggregating to $25,000 and more in a calendar year, in violation of Title 52, United States Code, Sections 30122 and 30109(d)(1)(A) & (D).

20. It was a further part and object of the conspiracy that RYAN SALAME, the defendant, and others known and unknown, would and did knowingly and willfully make contributions to candidates for federal office and joint fundraising committees by a corporation, aggregating to $25,000 and more in a calendar year, in violation of Title 52, United States Code, Sections 30118 and 30109(d)(1)(A).

21. It was a further part and object of the conspiracy that RYAN SALAME, the defendant, and others known and unknown, would and did defraud the United States, and an agency thereof, by impairing, obstructing, and defeating the lawful functions of a department and agency of the United States through deceitful and dishonest means, to wit, the Federal Election Commission's function to administer federal law concerning source and amount restrictions in federal elections, including the prohibitions applicable to corporate contributions and conduit contributions, in violation of Title 18, United States Code, Section 371.

Overt Act

22. In furtherance of the conspiracy and to effect the illegal objects thereof, the following overt act, among others, was committed in the Southern District of New York and elsewhere: in or about 2022, RYAN SALAME, the defendant, and one or more other conspirators agreed to and did make corporate contributions to candidates and committees in the Southern

District of New York that were reported in the name of another person.

(Title 18, United States Code, Section 371.)

### COUNT TWO
### (Conspiracy to Operate an Unlicensed Money Transmitting Business)

The United States Attorney further charges:

23. The allegations contained in paragraphs 1 through 16 of this Information are repeated and realleged as if fully set forth herein.

24. From at least in or about October 2019, up to and including in or about November 2022, in the Southern District of New York and elsewhere, RYAN SALAME, the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit an offense against the United States, to wit, operation of an unlicensed money transmitting business, in violation of Title 18, United States Code, Section 1960.

25. It was a part and an object of the conspiracy that RYAN SALAME, the defendant, and others known and unknown, would and did knowingly conduct, control, manage, supervise, direct, and own all and part of an unlicensed money transmitting business affecting interstate and foreign commerce, which failed to comply with the money transmitting business registration requirements under Section 5330 of Title 31, United States Code, and regulations prescribed under such section, in violation of Title 18, United States Code, Section 1960.

Overt Act

26. In furtherance of the conspiracy and to effect the illegal object thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere: Alameda and FTX employees, under the supervision of RYAN SALAME, the

9

defendant, caused FTX customers to send wire transfers and sent wire transfers to FTX customers, some of which were received in and were transmitted through the Southern District of New York.

(Title 18, United States Code, Section 371.)

### FORFEITURE ALLEGATION

27. As a result of committing the offense alleged in Count Two of this Information, RYAN SALAME, the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), any and all property, real and personal, involved in said offense, or any property traceable to such property, including but not limited to a sum of money in United States currency representing the amount of property involved in said offense.

28. If any of the above-described forfeitable property, as a result of any act or omission of the defendant: (a) cannot be located upon the exercise of due diligence; (b) has been transferred or sold to, or deposited with, a third person; (c) has been placed beyond the jurisdiction of the Court; (d) has been substantially diminished in value; or (e) has been commingled with other property which cannot be subdivided without difficulty; it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) and Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendant up to the value of the above forfeitable property.

(Title 18, United States Code, Section 982;
Title 21, United States Code, Section 853; and
Title 28, United States Code, Section 2461.)

*Damian Williams/SLR*
DAMIAN WILLIAMS
United States Attorney