## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| **IN RE:** | MDL No. 3076 |
| | 23-md-03076-KMM |
| **FTX CRYPTOCURRENCY EXCHANGE COLLAPSE LITIGATION** | |
| | |
| THIS DOCUMENT RELATES TO: | |
| Law Firms | |

### PLAINTIFFS' RESPONSE TO DEFENDANT
### FENWICK & WEST LLP'S MOTION TO DISMISS [ECF No. 276]

Plaintiffs hereby respond to Defendant Fenwick & West LLP's Motion to Dismiss Plaintiffs'

Administrative Class Action Complaint (D.E. 276) (the "Motion"). The Administrative Class Action

Complaint for the Law Firms against Fenwick (D.E. 153) (the "Complaint") relates for purposes of

Federal Rule of Civil Procedure 12(b)(6) to the two separate actions against Fenwick, *Cabo v.

Fenwick & West LLP*, Case No. 3:23-cv-03944-JCS (N.D. Cal.) and *O'Keefe v. Sequoia Capital

Operations, LLC et al.*, Case No. 1:23-cv-20700-KMM (S.D. Fla.).

### I. INTRODUCTION

FTX entities misappropriated hundreds of millions of dollars from customers both in the

United States and worldwide. But they needed lots of help to do it. Much of that help came from

professionals in various industries, including the legal industry. The law firm of Fenwick & West

LLP ("Fenwick") played an essential role in FTX's scheme, namely by creating legal entities that

1

served as funnels through which customers' money and assets moved from FTX customer accounts to those controlled by FTX insiders.

The central premise of Fenwick's motion to dismiss is that, under Florida law, lawyers can effectively aid and abet or conspire with their clients to commit fraud and other breaches so long as they only perform routine legal work when doing so. The Court should reject Fenwick's argument for multiple reasons.

As an initial matter, Florida law does ***not*** apply; California law does. Because Fenwick ignores California law throughout its brief, its motion to dismiss is legally dead on arrival. And California law does ***not*** grant legal immunity to lawyers who perform only routine legal work. Nor, for that matter, does Florida law. Liability attaches if a lawyer ***knows*** about a client's bad acts and ***assists*** in carrying out those acts, regardless of the form that takes.

Once the proper legal framework is in place, the Court should easily find that the Plaintiffs have sufficiently alleged that Fenwick conspired with—and aided and abetted—the FTX entities. Even without the benefit of discovery, Plaintiffs have pled facts establishing that Fenwick (1) knew that the FTX entities had made various misleading representations to customers about how it was treating their money; (2) knew that the FTX entities were acting expressly contrary to those representations; (3) helped the FTX entities move customer money and assets in express violation of their representations; and (4) acknowledged that, if the truth about FTX's various "related party transactions" were ever to see the light of day, it would be "very problematic." On that point, Fenwick was right. These allegations are more than sufficient to state legal claims against Fenwick for conspiracy and aiding and abetting.

## II. STANDARD

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009) (internal citation omitted). This requirement "give[s] the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citation and alterations omitted). "When considering a motion to dismiss, the court takes the plaintiff's factual allegations as true and construes them in the light most favorable to the plaintiff." *GO Traders, S.A. v. Intertex Miami, LLC*, No. 1:18-CV-21372-KMM, 2018 WL 7287151, at *1 (S.D. Fla. Oct. 24, 2018)

As to choice of law, "[f]ederal courts sitting in diversity generally apply the forum state's choice-of-law rules." *Geniva O'Keefe v. Pick Five Imports, Inc.*, No. 8:18-CV-1496-T-35AEP, 2019 WL 13083614, at *3 (M.D. Fla. June 14, 2019). But "in multidistrict litigation, the transferee court usually must follow the choice-of-law rules of the forum state ***of each transferor court***." *In re January 2021 Short Squeeze Trading Litig.*, 584 F. Supp. 3d 1161, 1179 (S.D. Fla. 2022) (emphasis added); *Boardman Petroleum, Inc. v. Federated Mut. Ins. Co.*, 135 F.3d 750, 752 (11th Cir. 1998) ("[W]hen a case is transferred from one forum to another, the transferor court's choice-of-law rules apply to the transferred case even after the transfer occurs.").

### III. ARGUMENT

A.    **California law applies to both *Cabo v. Fenwick & West* (the California action) and *O'Keefe v. Sequoia Capital Operations, LLC, et al.* (the Florida action).**

The Complaint encompasses two separate actions—*Cabo v. Fenwick & West* (an action filed in the Northern District of California) and *O'Keefe v. Sequoia Capital Operations, LLC.* (an action filed in the Southern District of Florida).

3

1. **Fenwick fails to meet its burden of proving Florida law applies to the *Cabo* (California) action.**

In *Cabo*, the transferor court was a California court, so California's choice of law rules apply.[1] "The presumption in California is that California law will apply unless a party litigant timely invokes the law of a foreign state." *Geniva O'keefe*, 2019 WL 13083614, at *3 (citing *Washington Mut. Bank, FA v. Superior Court*, 24 Cal. 4th 906, 919, 15 P.3d 1071, 1080 (CA 2001)). In such event, "the proponent of the foreign state law bears the burden of showing a compelling reason justifying displacement of California law." *Id.* (internal quotation marks omitted)). "To meet its burden, [the foreign law proponent] must satisfy California's three-step governmental interest test used to resolve choice of law issues[.]" *Zwerling v. Ford Motor Co.*, No. 5:19-CV-03622-EJD, 2022 WL 783207, at *5 (N.D. Cal. Mar. 14, 2022)

Fenwick has plainly failed to carry its burden in justifying this displacement of California law. Fenwick does not even cite the governing "governmental interest test," much less attempt to prove why it displaces California law. Instead, Fenwick merely ***assumes*** Florida's choice-of-law rules apply. That assumption is erroneous and fatal to any argument that Florida law applies to *Cabo*.

2. **The Court should apply California law to the *O'Keefe* (Florida) action.**

With respect to the Florida action, *O'Keefe*, because it was transferred from the Southern District of Florida, Florida's choice-of-law rules apply. *In re Takata Airbag Prod. Liab. Litig.*, No. 14-24009-CV, 2016 WL 5848843, at *3 (S.D. Fla. Sept. 21, 2016) ("Florida's choice of law rules apply to [plaintiffs]' claims because their cases were either transferred into the MDL from the Southern District of Florida or filed directly into the MDL.").

---

[1] Plaintiffs have not waived the right to have the law of the transferor forum apply to *Cabo*. *See* Compl. at 4 (citing *Gelboim v. Bank of Am. Corp.*, 574 U.S. 405, 413 n.3 (2015) and noting that, while the Complaint was controlling for pre-trial purposes, both actions "retain their individual nature for all other purposes, including . . . transferer forum.")).

"Florida's choice of law rules for tort actions are based on the 'most significant relationship' test outlined in the Restatement (Second) of Conflict of Laws." *In re: Takata Airbag Prod. Liab. Litig.*, No. 14-24009-CV, 2016 WL 6072406, at *4 (S.D. Fla. Oct. 14, 2016).

> Courts consider four types of contacts when determining whether one state has a more significant relationship to the matter than another state. The four factors are as follows: (1) the place where the injury occurred; (2) the place where the conduct causing the injury occurred; (3) the domicile, residence nationality, place of incorporation and place of business of the parties; and (4) the place where the relationship, if any, between the parties is centered.

*Id.* Under the Restatement's most significant relationship test, "[t]he relative importance of the contacts mentioned above varies somewhat with the nature of the tort involved." Restatement (Second) of Conflict of Laws § 145 cmt. f (1971). By way of example, if the tort involved is "fraudulent representations" the "place of injury is less significant." *Id.*

The most significant relationship test requires application of California law to the *O'Keefe* case. The first contact—the place where the injury occurred—does not counsel either Florida or California law because the Plaintiff, Mr. O'Keefe, is a resident of Mississippi and sustained his injury there. But the balance of the factors all point to California. As to factors two and three, they both point to California because Fenwick (1) is headquartered in Mountain View, California—"near to Bankman-Fried and FTX's California operations"; (2) has ***primarily*** California offices; and (3) 100 of its 150 partners reside in California. Compl. ¶¶ 13, 32; *see Ali v. Hudson Ins. Co.*, No. 3:15-CV-816-J-34PDB, 2016 WL 1090018, at *4 n.3 (M.D. Fla. Mar. 21, 2016) (noting that, "under Florida's choice-of-law rules," California law applied to the tort claims because, in addition to the injuries occurring in California, "the allegedly injurious conduct occurred in California; several of the parties are domiciled or incorporated or otherwise do business in California"); *Grupo Televisa, S.A. v. Telemundo Communs. Grp., Inc.*, 485 F.3d 1233, 1241 (11th Cir. 2007) (determining primary location as one where "contacts are both numerically and qualitatively more significant."); *Templeton v. Catlin Specialty Ins. Co.*, 612 F. App'x 940, 963 n.21 (10th Cir. 2015) ("Under Colorado's 'most significant

relationship' test, California law applies because Mr. Fehn, Mr. Sherwin, and Ms. Davidi are all California-licensed attorneys and California has the most significant interest in governing the conduct of its licensed attorneys.").

As to *O'Keefe* case as well, Fenwick fails to apply the governing law. In a footnote, arguing that the Court should apply Florida law, Fenwick cites two cases for the proposition that a court should apply the law of the state "where the misconduct is centered." Mot. at 13 n.4. But these cases only help prove that the Court should apply the law of California, which is where the misconduct here was centered.

In *Amegy Bank National Association v. DB Private Wealth Mortgage, Ltd.*, No. 2:12-CV-243-FTM-38, 2014 WL 791503, at *5 (M.D. Fla. Feb. 24, 2014), the plaintiff (Amegy Bank) sued two defendants (Deutsche Bank entities) for, among other things, aiding and abetting fraud[2], civil conspiracy, and conversion. Amegy Bank had its principal place of business in Texas and the Deutsche Bank entities in New York. *Id.* (citing ECF No. 60 at ¶¶ 1.1–1.3). According to the complaint, Amegy had lent money to a man named Johnson and obtained, certain stock shares owned by Johnson as collateral for the loan. *Id.* at *1–2. Amegy Bank alleged that Deutsche Bank, despite being aware of Amegy's security interest in the stock, facilitated Johnson's sale of those shares. *Id.* at *2. Each party argued the court should apply a different law (Amegy proposing Texas and Deutsche Bank proposing New York or Georgia). *Id.* at *4. The court, applying Florida's "most significant relationship" test, ruled that Georgia law applied. *Id.* at *6. In so ruling, the court focused on Deutsche Bank's conduct, which had occurred in Georgia. The court wrote:

> Here, the claims are all brought against Deutsche Bank with regard to Deutsche Bank's alleged tortious conduct that occurred in Georgia. Defendants communicated with Johnson when they were in Georgia . . . . Defendants researched Johnson and his credit history when they were in Georgia . . . . Johnson, even though not a party in this matter,

---

[2] Although the Westlaw opinion identifies the cause of action as simply "aiding and abetting," the underlying complaint makes clear that the claim was for aiding and abetting fraud. *See* Case No. 2:12-CV-00243-SPC-CM, ECF No. 60 at ¶6.2 (M.D. Fla. Oct. 4, 2013).

also sold the Host Stock in Georgia. Deutsche Bank obtained the Host Stock certificate in Georgia . . . . Therefore it appears that most of the alleged conduct of conversion, aiding and abetting, and conspiracy all occurred in Georgia. The Court has not been directed to any persuasive evidence to the contrary.

*Id.* at *5.

Here, Fenwick's misconduct emanated from California, where the law firm is headquartered and has half of its U.S. offices; and certainly not out of Florida, where Fenwick has no office.[3] Indeed, unlike in *Amegy*, where the court applied Georgia law ***despite*** defendants having their principal places of business in New York, Fenwick is headquartered in California and its alleged conduct occurred there. *Amegy* thus counsels the application of California law, not Florida law.

*In re Estategias en Valores, S.A.*, 628 B.R. 722 (Bankr. S.D. Fla. 2021), the other case Fenwick cites, also counsels application of California law. There, the plaintiff alleged that the defendant (again, Deutsche Bank) aided and abetted a Colombian entity's breach of fiduciary duties and fraudulent scheme. *Id.* at 727. But critically, the plaintiff alleged that Deutsche Bank did so by pouring money into the country of Colombia. *Id.* at 735 (reasoning that "Deutsche Bank invested in Colombia"). Here, by contrast, there are no allegations that Fenwick directed its advice and counsel to Florida. By contrast, the misconduct here—the advice and counsel by Fenwick lawyers—occurred in California, where Fenwick primarily operated. It is hard to see what, if anything at all, Florida has to do with the claims against Fenwick.

Though no more need be said, Plaintiff wishes to address Fenwick's statement that Plaintiffs "appear to agree that Florida law governs." Mot. 13, n.4. Fenwick's hedging use of the word "appears" is telling. *Id.* To support its point, Fenwick cites portions of the Complaint where Plaintiff alleged that Florida law applies to "securities" and "consumer protection" claims. *Id.* No such claims have been

---

[3] https://www.fenwick.com/firm/offices

brought against Fenwick. In sum, as to the *O'Keefe* case, the Court must apply California law when analyzing whether the Complaint states a claim.

**B.      Lawyers do not have immunity from aiding and abetting or conspiracy claims.**

Fenwick's main argument taken to its logical conclusion, is that, so long as lawyers wear their lawyer hats when advising and counseling their clients, lawyers cannot aid and abet or conspire with their clients to commit acts of negligence or intentional torts. Fenwick is wrong.

Under California law, a lawyer providing "ordinary business services" may nevertheless aid and abet their client in committing a tort. In short, if the lawyer knew their services were assisting the client in committing a tort, the lawyer is liable. *See In re First All. Mortg. Co.*, 471 F.3d 977, 995 (9th Cir. 2006) ("'[O]rdinary business transactions' a bank performs for a customer can satisfy the substantial assistance element of an aiding and abetting claim if the bank actually knew those transactions were assisting the customer in committing a specific tort.") (quoting *Casey v. U.S. Bank Nat'l Assn.*, 127 Cal. App. 4th 1138, 1145 (Cal. App. Ct. 2005)).

The case of *Hunter v. Citibank, N.A.*, No. C 09-02079 JW, 2011 WL 7483457, at *1 (N.D. Cal. June 16, 2011) is illustrative. There, a law firm moved for summary judgment on the plaintiff's claim that the law firm had aided and abetted its client's breach of fiduciary duties. *Id.* Like Fenwick here, the law firm argued that "conduct within the scope of 'ordinary business services' ought not satisfy the substantial assistance element of an aiding and abetting claim as applied to lawyers in their professional role." *Id.* The district court rejected the argument. *Id.* Citing *Casey v. U.S. Bank National Association*, where a California appellate court held that a bank performing ordinary business transactions could nevertheless aid and abet a client, the district court held that the same rule should apply to lawyers. *Hunter*, 2011 WL 7483457, at *2. The court wrote:

> While the facts on which *Casey* rested involved aiding and abetting liability brought against banks, nothing in the opinion cabined the holding to financial entities or indicated that the principle would not be so applied against attorney business transactions. Nor did Defendant present any case under California law in support of its

Motion for Summary Judgment or this present Motion asserting the principle that attorneys should be so excepted.

*Id.*

Other courts have acknowledged that this is how California law works. *See Abrams v. McGuireWoods LLP*, 518 B.R. 491, 504 (N.D. Ind. 2014) (noting, in discussing aiding and abetting claims against lawyers, that "California courts, for instance, have held that ordinary business transactions can constitute substantial[] assistance so long as the aider and abettor knows the services will help their client commit the breach"). No court has interpreted California law differently.

For its part, Fenwick argues that, when a plaintiff sues a lawyer for aiding or abetting or conspiracy, she must allege that the lawyer "acted outside the scope" of his or her representation. Again, that is not the law in California, which is why, when advancing this argument, Fenwick fails to cite a ***single*** case applying California law. Instead, Fenwick cites (1) cases where the plaintiff alleged that lawyers violated ***federal*** law by conspiring with clients and (2) a case where the plaintiff alleged that a law firm violated ***Florida*** law by aiding and abetting a company in committing a breach of fiduciary duty. *See* Mot. 9–10. The cases are inapposite to claims brought under California law (and, indeed, Florida law does not support Fenwick's argument either, as discussed below). Fenwick's argument rests on a mistaken legal premise and must be rejected.

**C.    The Plaintiffs sufficiently allege claims for aiding and abetting.**

Plaintiffs state claims for aiding and abetting fraud (Counts 2 and 3), negligence (Count 4), breach of fiduciary duties (Counts 5 and 6), and conversion (Count 7). Fenwick does not (because it cannot) deny that Plaintiffs were the victims of fraud, conspiracy, and conversion perpetrated by Samuel Bankman-Fried, and other FTX executives. Instead, Fenwick takes issue with the pleading of only three elements common to each of the aiding and abetting claims: (1) Fenwick's "actual knowledge" of wrongdoing, (2) "substantial assistance" by Fenwick, and (3) proximate cause. Mot. 16–20. To be clear, Fenwick does not challenge the adequacy of the pleading of ***any*** other elements

of Counts 2, 3, 4, and 7. But, as to Counts 5 and 6, Fenwick also argues (4) that Plaintiffs fail to allege a fiduciary duty. None of these arguments is persuasive.

### 1. The Plaintiffs sufficiently allege Fenwick had actual knowledge of the wrongdoing.

As a threshold matter, Fenwick is incorrect about the standard that applies to pleading "actual knowledge." Mot. 15. Of course, claims that sound in fraud must be alleged "with particularity," Fed. R. Civ. P. 9(b), meaning, "specific[ally] enough to give defendants notice of the particular misconduct . . . so that they can defend against the charge and not just deny that they have done anything wrong." *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009) (internal citation omitted). However, "[m]alice, intent, ***knowledge***, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b) (emphasis added); *Chang v. Wells Fargo Bank, N.A.*, No. 19-CV-01973-HSG, 2020 WL 1694360, at *5 (N.D. Cal. Apr. 7, 2020) (in finding "knowledge" adequately pleaded for aiding and abetting claim, noting that particular knowledge allegations of who, when, what and how were "not the standard at this stage" under Rule 9(b)); *Lorenz v. East West Bancorp, Inc.*, No. 2:15-cv-06336-CASFFMX, 2016 WL 199392 at *7 & n.4 (C.D. Cal. Jan. 14, 2016) ("For purposes of pleading an aiding and abetting fraud claim, . . . actual knowledge of the underlying fraud may be averred generally," and "need not be pled with the particularity typically required by Rule 9(b)") (internal quotation marks and citations omitted). Thus, the pleader bears only "the burden of alleging the nature of the knowledge a defendant purportedly possessed." *Neilson v. Union Bank of Cal., N.A.*, 290 F. Supp. 2d 1101, 1119 (C.D. Cal. 2003).

Under California law, Plaintiffs' allegations of knowledge are adequately pleaded. "To allege aiding and abetting, a plaintiff must show that the defendant knowingly: (1) substantially assisted or encouraged another to breach a duty, or (2) substantially assisted another's tort through an independently tortious act." *ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023, 1039 (9th Cir. 2016) (denying motion to dismiss aiding and abetting fraud claim against law firm) (citing *Casey,* 127 Cal.

App. 4th at 1144). When evaluating the sufficiency of the first element, California courts look first to whether there is a direct, general allegation of actual knowledge. If so, the next question is whether the complaint pleads sufficient facts to make that allegation plausible as required by *Twombly*. *Evans v. ZB, N.A.,* 779 F. App'x 443, 445 (9th Cir. 2019) ("[W]e first determine whether Plaintiffs' 44-page complaint specifically alleges that CB&T knew IMG was misrepresenting itself as a legitimate business and misappropriating funds, and whether Plaintiffs have alleged specific supporting facts that make their allegations of actual knowledge plausible."). Thus, a "direct allegation (really, assertion) of actual knowledge is a critical threshold consideration in cases applying California aiding and abetting law[.]" *Chang*, 2020 WL 1694360, at *4.

A California district court decision, *Neilson*, is instructive regarding this analysis. *Nielson* was a class action in which investors sued four banks for allegedly assisting a crooked investment adviser, Reed Slatkin, in running "a classic Ponzi scheme." 290 F. Supp. at 1108. When the scheme collapsed, investors collectively lost $250 million. *Id.* at 1109. Among other claims leveled against the banks, the plaintiffs sued for aiding and abetting breach of fiduciary duty and aiding and abetting fraud. The plaintiffs alleged the banks substantially assisted Slatkin's scheme by providing a steady flow of new funds, a "mechanism for managing investors' custodial accounts," and "an aura of legitimacy that allowed the scheme to flourish." *Neilson,* 290 F. Supp. 2d at 1109. The banks moved to dismiss, arguing, among other things, that the plaintiffs failed to plead the "knowledge" element of the aiding and abetting claims. *Id.* at 1118.

The court denied this motion.

It began its analysis by finding that the complaint directly alleged the requisite knowledge on the part of the banks: the "Banks knew Slatkin was committing fraud," and had "knowledge of his crimes." *Id.* at 1120. The court then found that plaintiffs supported these "general allegations" by "detail[ing] the manner in which the Ponzi scheme operated, describ[ing] Slatkin's fraudulent

transactions, and outlin[ing] the Banks' involvement in these activities." *Id.* They also alleged, "in particular, that the Banks utilized atypical banking procedures to service Slatkin's accounts, raising an inference that they knew of the Ponzi scheme and sought to accommodate it by altering their normal ways of doing business." *Id.* Importantly, the *Nielson* court acknowledged that "the complaint d[id] not directly state that the Banks knew Slatkin was running a Ponzi scheme and stealing investor funds[.]" *Id.* at 1121.  Nonetheless, knowledge of the scheme was "the net effect of allegations that the Banks knew of Slatkin's 'fraud,' 'actively participated' in the Ponzi scheme with knowledge of his 'crimes,' and accommodated him by using atypical banking procedures to service his accounts." *Id.*

In the Complaint, Plaintiffs easily meet the pleading standard. Among the factual allegations, in a section clearly entitled, "Fenwick's Knowledge of & Assistance in FTX's Wrongdoing," Plaintiffs directly allege actual knowledge and detail how Fenwick acquired it, including that:

- Fenwick "gain[ed] deep insight into the FTX entities' convoluted organizational structure, abject lack of internal controls, and dubious business practices." Compl. ¶ 198;

- " . . . Fenwick learned that the FTX entities were breaching their fiduciary duties to customers, acting inconsistently with their representations to customers, and even misappropriating customer funds." *Id.* ¶ 203;

- "Fenwick was privy to the nature of reckless treatment of FTX customer funds through their communications with FTX executives and their own services." *Id.* ¶ 208; and

- "Fenwick knew . . . that FTX was keeping customer money outside of FTX entities." *Id.* ¶ 209.

Plaintiffs then directly allege knowledge in each of the individual counts, *i.e.* in Count 2, by asserting that "Fenwick acquired knowledge of FTX Trading Ltd. and FTX US's misrepresentations and omissions to customers, untruthful conduct, and misappropriation of Class Members' funds," Compl. ¶ 253, and that "Fenwick knew that FTX Trading Ltd. and FTX US had omitted certain material facts . . . . to induce confidence in their platforms . . . " *id.* ¶ 255; in Counts 3 and 4, by asserting that "Fenwick acquired knowledge of [the FTX entities'] negligence, comprised

of [their] omissions, untruthful conduct, and misappropriation of Class Members' funds," *id.* ¶ 262-63, in Counts 5 and 6, by stating that " . . . Fenwick acquired knowledge of [the FTX entities'] fiduciary duties to Class Members and breaches thereof," *id.* ¶ 278, and in Count 7, by stating that, " . . . Fenwick's attorneys acquired knowledge that such conversion was occurring," *id.* ¶ 293.

Fenwick claims these allegations are "threadbare" because they do not show that Fenwick knew of "Bankman-Fried's scheme" and so do not meet "Rule 9(b)." Mot. 17, 18. This argument ignores the allegations and misapplies the law. Again, Rule 9(b)'s "particularity" requirement does not apply to allegations of knowledge. Even so, Plaintiffs do set forth factual details describing how Fenwick acquired knowledge of the fraud—namely, that customer funds were required to be, but were not being "held" in customer accounts for their "benefit." Compl. ¶¶ 201, 202.

The Complaint supports the assertion that "Fenwick learned that the FTX entities were . . . acting inconsistently with their representations to customers, and even misappropriating customer funds," *id.* ¶ 203, referencing the specific documents, communications, and work experience that informed Fenwick. Plaintiffs allege that Fenwick reviewed and in some cases drafted FTX's foundational documents, which required that customer funds be held for their benefit, including the "'FTX terms of service,'" "organizational documents," "certificates of incorporation or formation," "by-laws," and "customer contracts." *Id.* ¶¶ 199, 200. Notwithstanding this knowledge, Fenwick "helped to create accounts and entities where and through which misappropriated customer funds were diverted," *id.* ¶ 203, and drafted "intracompany loans or other related party agreements, guarantees and promissory notes," that facilitated those transfers, *id.* ¶ 199. Not only that, but Plaintiffs specifically identify several such transactions, *i.e.*, the August 2020 incorporation of "North Dimension Inc. ("North Dimension") and its sister company, North Wireless Dimension, the fake electronics retailer." *Id.* ¶ 204.

Perhaps most damning is Plaintiffs' allegation that "[i]n January 2021," FTX executive Dan Friedberg "**emailed Fenwick attorneys and expressly told them that not only did Alameda hold FTX cash and cryptocurrency** (a breach of FTX US's duty to exercise reasonable care with its customer deposits) but that 'we' (referring to FTX and Fenwick) needed to come up with any justification for the arrangement." Compl. ¶ 208 (emphasis added). The implication of this statement is clear. Even so, the Complaint spells it out: "Fenwick knew that Friedberg was concerned by the possible release of information revealing that FTX was keeping customer money outside of FTX entities." *Id.* ¶ 209.

In the face of these allegations, Fenwick's claim that Plaintiffs do not allege that "Fenwick knew of FTX's alleged violation," is itself threadbare. Mot. 18. Fenwick fails to support its argument with any relevant legal authority, not bothering to apply the governing California law. Mot. 17. Under that law, Plaintiffs' allegations are more than adequate. *See Evans*, 779 F.App'x at 444–47 (reversing dismissal of aiding and abetting claim brought under California law); *McCraner v. Wells Fargo & Co.*, 21-CV-1246-LAB-WVG, 2023 WL 2728719, at \*5 (S.D. Cal. Mar. 30, 2023) (denying motion to dismiss where allegations sufficient for "actual knowledge" element where they "support[ed] an inference that Wells Fargo must have known" of the fraudulent activity); *Chang*, 2020 WL 1694360, at \*5 (denying motion to dismiss where "Plaintiffs allege[d] a number of facts in support of their claim that Wells Fargo actually knew that Equitybuild was commingling money from investors"); *Benson v. JP Morgan Chase Bank, N.A.*, No. C-09-5272 EMC, 2010 WL 1526394 at \* 3, \*5 (N.D. Cal. 2010) (noting that where "Plaintiffs support[ed] these allegations of knowledge with more detailed factual allegations," they satisfied the plausibility standard).

Fenwick also contends that it could not have known of the pervasive wrongdoing because of sloppy record-keeping at FTX. Mot. 18, n. 6. Again, Plaintiffs' allegations belie this conclusion. The "many issues plaguing the FTX entities were so obvious" that when Mr. John J. Ray III was

appointed to serve as CEO and take over the FTX entities on November 11, 2022, it "only took six days . . . to conclude that the failures were greater than anything he had encountered in his 40-year career packed with legal and restructuring experience." Compl. ¶ 218. He remarked specifically on "the concentration of control in the hands of a very small group of inexperienced, unsophisticated and potentially compromised individuals," who have since been indicted criminally and many of whom have admitted guilt. *Id.* ¶ 219. For Fenwick, with "deep insight into the FTX entities' convoluted organizational structure, abject lack of internal controls, and dubious business practices," Compl. ¶ 198, the wrongdoing at FTX was apparent.

Notably, Plaintiffs are not required to allege facts showing that theirs is the most likely explanation of the facts, only that theirs is plausible. *See Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011) ("If there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6)."). Certainly, the Complaint pleads facts sufficient to establish the plausibility of Plaintiffs' claim that Fenwick had actual knowledge of the wrongdoing allegedly aided and abetted. *Chang,* 2020 WL 1694360, at *5 ("Whether Plaintiffs will be able to *prove* their allegation of actual knowledge is a question for another day.").

### 2.  Plaintiffs sufficiently allege that Fenwick substantially assisted the wrongdoing.

The substantial assistance prong of aiding and abetting is met if a defendant substantially assists or encourages the third-party tortfeasor. Moreover, besides the fraud claim (Count 2), this element need not be pleaded with specificity. As in this case, plaintiffs may allege some fraudulent and non-fraudulent conduct in support of their claims. "In such cases, only the allegations of fraud are subject to Rule 9(b)'s heightened pleading requirements." *Vess v. Ciba–Geigy Corp. USA*, 317 F.3d 1097, 1104 (9th Cir. 2003). For example, Plaintiffs' conversion claim, Count 7, is a strict liability tort. *Sims v. AT&T Mobility Servs. LLC*, 955 F. Supp. 2d 1110, 1118 (E.D. Cal. 2013). The

knowing assistance required to plead liability for aiding and abetting conversion need only be pleaded generally. *See, e.g.*, *Impac Warehouse Lending Grp. v. Credit Suisse First Boston LLC,* 270 F. App'x 570, 572 (9th Cir. 2008) (applying Rule 8 standard to conversion claim, but Rule 9(b) standard to fraud claim). The same is true for Counts 3-6, pleaded in the alternative to the fraud claim.

Plaintiffs allege the substantial assistance element by asserting that, as FTX's "principal outside law firm," Fenwick "played a key role in the downfall of FTX," Compl. ¶ 13, in that the law firm "craft[ed] . . . illegal strategies," "set up the shadowy entities," "structured acquisitions by the FTX US in ways to circumvent regulatory scrutiny, advised on FTX US's regulatory dodge, more generally, and supplied personnel necessary to execute on the strategies that they proposed," *id.* ¶ 15. In fact, Fenwick's role in the scheme was so central that, as Plaintiffs allege, Bankman-Fried defended himself against criminal charges (in preliminary filings) on the basis "that he relied on the legal advice" from Fenwick. *Id.* ¶ 11 n.4.

Plaintiffs detail how Fenwick advised and assisted FTX, including by alleging:

- "Not only did Fenwick provide legal assistance despite this knowledge, but it helped to create accounts and entities where and through which misappropriated customer funds were diverted." Compl. ¶ 203;

- "Through the formation and management of these entities, and in advising FTX US on its representations to regulators, Fenwick helped obfuscate where FTX US was holding customer money." *Id.* ¶ 206;

- "Fenwick drafted memoranda and otherwise advised FTX US, often through their former partner Friedberg, regarding FTX US's regulatory obligations, including its obligations under the Federal and State Money Transmission Rules." *Id.* ¶ 207;

- "Fenwick assisted FTX's regulatory dodge" in drafting disclosures and "[i]n a filing with the CFTC," and in "help[ing] FTX US to develop 'compliance' procedures designed to skirt FTX's regulatory obligations and/or conceal its noncompliance therewith." *Id.* ¶ 216.

Plaintiffs also give specific examples. In one instance, a former Fenwick partner and FTX executive Friedberg instructed Fenwick attorneys to create new "subsidiaries asap," *id.* ¶ 205, which

Fenwick obliged by creating "North Wireless Dimension, the fake electronics retailer that Bankman-Fried employed as a front to conceal his wiring of Class Member funds into accounts held by Alameda" *id.* ¶ 204. When Friedberg told Fenwick that he needed an "explanation," *id.* ¶ 208, as to why "FTX was keeping customer money outside of FTX entities," *id.* ¶ 209, Fenwick was quick to assist, offering a cover-up: "an 'Intercompany Treasury Management and Loan Agreement'" under which Alameda would perform "treasury management functions" for FTX," *id.* ¶ 210. Importantly, and as alleged, Fenwick acknowledged ***in a written message*** to Friedberg that public disclosure of the true "intercompany relationships" would be "very problematic," indicating Fenwick's appreciation of the impropriety of the transfers to Alameda. *Id.* ¶ 209.

And Plaintiffs include still more assistance allegations in the individual counts. *See* Compl. ¶ 254 ("Fenwick substantially assisted and encouraged [FTX's] fraud, including by (1) forming shell entities . . .; [and] (2) structuring acquisitions . . . by which FTX . . . dodged regulatory scrutiny"); ¶¶ 263, 271, 279, 287 ("Fenwick substantially assisted and encouraged" the FTX entities' wrongdoing including by "forming shell entities . . . through which [the FTX entities] siphoned Class Members funds."); ¶ 294 ("Fenwick substantially assisted and encouraged the conversion of customer funds . . . .").

Under California law, Plaintiffs' allegations of substantial assistance are sufficient to meet the heightened particularity standard of Rule 9(b) that applies to Count 2. *See United States ex rel. Lee v. SmithKline Beecham, Inc.*, 245 F.3d 1048, 1051 (9th Cir. 2001) ("Rule 9(b) may not require [the plaintiff] to allege, in detail, all facts supporting each and every instance of [fraud] over a multi-year period," but it does require a plaintiff to allege specific facts to give defendant notice of the particular misconduct).

Fenwick argues that the only substantial assistance alleged "consisted of routine legal services." Mot. 19. For the reasons already discussed, *supra* 8-9, this is incorrect as a matter of law.

In fact, routine services **can** satisfy this element of an aiding and abetting claim if the defendant knows their services are in furtherance of a tort. *See In re First All. Mortg. Co.*, 471 F.3d at 995; *Casey*, 127 Cal. App. 4th at 1145. Thus, "[k]nowledge is the crucial element." *Casey*, 127 Cal. App. 4th at 1145. In fact, in *Casey,* the court "reject[ed]" outright the defendant "banks' challenge to the sufficiency of the substantial assistance allegations, and focus[ed] instead on whether the Trustee adequately alleged the knowledge element of the aiding and abetting claim." *Id.* As already established above, Plaintiffs plead Fenwick's actual knowledge, which coupled with Fenwick's undisputed services, satisfies the assistance element. *See, e.g., EcoHub, LLC, v. Recology Inc*., No. 22-CV-09181-TSH, 2023 WL 6725632, at *10 (N.D. Cal. Oct. 11, 2023) ("Advice or encouragement to act operates as a moral support to a tortfeasor and if the act encouraged is known to be tortious it has the same effect upon the liability of the adviser as participation or physical assistance.").

Fenwick next argues that Plaintiffs "only allege that Fenwick substantially assisted *FTX*," not any "tortious conduct." Mot. 20. Also incorrect. Again, Plaintiffs allege that Fenwick knowingly facilitated the "primary" tortious conduct – the comingling and misappropriation of customer funds. *See* Compl. ¶¶ 3, 40, 277, 285. Namely, "Fenwick helped to establish and draft the incorporation papers for . . . a front to conceal [Bankman-Fried's] wiring of Class Member funds into accounts held by Alameda," *id.* ¶ 204, and through "the formation and management of these entities . . . Fenwick helped obfuscate where FTX US was holding customer money," *id.* ¶ 206.

Fenwick "helped to design the FTX entities licensing by acquisition strategy in furtherance of Bankman-Fried's fraud." Compl. ¶ 215. It did so by providing "legal and commercial counsel" to FTX in connection with its "October 2021 acquisition of LedgerX LLC[,] . . . a digital currency futures and options exchange regulated by the CFTC, which had granted licenses to LedgerX." *Id.* ¶ 212. That is, by acquiring LedgerX, FTX was able to obtain "access to the U.S. commodities derivatives markets as a regulated exchange," "[w]ith the help of Fenwick, FTX was able to leverage

these three licenses" in its CFTC application. *Id.* In this transaction, and more broadly, "Fenwick helped FTX US . . . to skirt FTX's regulatory obligations and/or conceal its noncompliance therewith." *Id.* ¶ 216.

Lastly, Fenwick assisted the FTX scheme by lending a sense of false legitimacy to the scheme. *Benson v. JPMorgan Chase Bank, N.A.*, No. C-09-5272 EMC, 2010 WL 1526394, at \*4 (N.D. Cal. Apr. 15, 2010) (substantial assistance where bank "gave a false sense of legitimacy to the illicit activities."). Indeed, Defendants helped funnel users to FTX by providing links directly to FTX. *See Ray v. BlueHippo Funding, LLC*, No. C06-01807 JSW, 2008 WL 1995113 (N.D. Cal. May 6, 2008) (direct links gave "'an aura of respectability and further encouraged participation.'"). As alleged, Fenwick's role "generating for the FTX entities the appearance of legitimate operations, strict adherence to regulatory obligations, and esteem for legal compliance, which permitted the scheme to grow in scale and persist in duration." Compl. ¶ 254. An example of this is alleged – Fenwick's "licensing by acquisition strategy," *id.* ¶ 215, allowed FTX US to disclose publicly that "FTX US monitors both Federal and State level development with its outside legal counsel, Fenwick & West LLP. FTX US has worked closely with Fenwick & West LLP on the development of its BSA program, as well as documentation and compliance assessments." *Id.* ¶ 216.

At least some of these allegations detailed above plausibly establish the substantial assistance element. *See, e.g.*, *EcoHub*, 2023 WL 6725632, at \*10 (finding certain allegations of substantial assistance "insufficient to make out a claim," but that "some of the allegations against Recology constitute conduct plausibly inferring aiding and abetting Nortech's breach of the duty of care").

Again, in its Motion, Fenwick does not apply or even cite the governing California law. Fenwick cites only Florida cases, applying Florida law, and one Maryland case. Fenwick thus provides no authority for its arguments.

Further, the Maryland case Fenwick highlights is inapposite. In *Schatz v. Rosenberg*, plaintiffs brought securities law claims under section 10(b) of the Securities Exchange Act of 1934 against a business seller and its law firm for omissions and misrepresentations in closing documents. 943 F.2d 485, 497 (4th Cir. 1991). Given that the firm "did no more than 'paper the deal' or act as a scrivener," the court found that the law firm lacked "the requisite 'knowledge' or scienter of a securities violation required for aider and abettor liability" – absent were the requisite allegations that the firm "actively participate[d] in soliciting sales or negotiating terms of the deal . . . ." *Id.* at 496. Of course, this standard does not apply in this case. Plaintiffs have not alleged any §10(b) claim, and Fenwick is alleged to have done much more than "paper a deal."[4]

### 3. Plaintiffs sufficiently allege that Fenwick proximately caused their damages.

Plaintiffs' theory of causation is that Fenwick provided key services to the FTX entities that "permitted the scheme to grow in scale and persist in duration" Compl. ¶¶ 239, 254, such that Fenwick was a "substantial factor" in causing Plaintiffs to lose their money, *id.* ¶¶ 251, 255, 257, 265, 273, 281, 289 295.

In arguing that Plaintiffs fail to plead causation, Fenwick mischaracterizes and ignores the allegations. Plaintiffs do not allege that "Fenwick's *only* involvement" was in forming "'shell' entities." Mot. 20 (emphasis added). As set forth above, Plaintiffs allege many instances of Fenwick's assistance to the scheme. *Supra* 15-19, citing Compl. ¶¶ 11, 13, 15, 203-210, 216, 254, 263, 271, 279, 287, 294. These services are alleged to have been performed "in furtherance of Bankman-Fried's fraud." *Id.* ¶ 215; *see McCraner*, 2023 WL 2728719, at *6 (complaint pleaded aiding and abetting claim where Wells Fargo "used atypical banking procedures to accommodate the

---

[4] Likewise, the Florida case, *In re Cascade International Securities Litigation*, is not relevant. There, the court considered the substantial assistance element of an aiding and abetting securities fraud claim under the *Schatz* standard, not applicable here. 840 F. Supp. 1558, 1565 (S.D. Fla. 1993). *See* Mot. 19.

Enterprises," helped "Apex-affiliated shell companies," and "conceal[ed] Barnett and Apex's association with the shells").

Nor is it true that the "Complaint provides no factual detail about the role" of the "shell entities" "in the broader scheme." Mot. 20. Plaintiffs clearly explain that "[t]hrough the formation and management of these entities . . . Fenwick helped obfuscate where FTX US was holding customer money." Compl. ¶ 15. "Specifically, beginning in April 2021,  . . . the [North Dimension] bank accounts received tens of millions of dollars in customer funds from FTX.com. The funds in these accounts were then commingled with other FTX Group funds, and ultimately were used by the FTX Insiders to back highly speculative and unhedged cryptocurrency trading and fund hundreds of so-called 'venture investments,' as well as to make purported personal 'loans,' bonuses, real estate purchases, and charitable and political contributions for the FTX founders." *Id.* ¶ 206. Contrary to Fenwick's contention, the role of these entities in the larger scheme is set forth.

Whether Fenwick's activities in fact caused Plaintiffs' damages presents issues of fact to be proven through discovery and at trial. *See JP Morgan Chase Bank v. Winnick*, 406 F. Supp. 2d 247, 257 (S.D.N.Y. 2005) ("Whether Armstrong's actual contribution on any given transaction was sufficient to be a proximate cause of the Banks' losses is ultimately a fact issue to be resolved after fuller development of the record").

**4.   Plaintiffs sufficiently allege that FTX owed a fiduciary duty.**

In support of the dismissal of Counts 5 and 6, Fenwick recycles its argument that Fenwick did not act "outside the scope of its representation" and additionally argues that Plaintiffs fail to allege the duty owed by FTX to its customers. The first argument should be rejected for the reasons above *supra*  8-9, 17-18. The second argument also fails.

"Whether a fiduciary relationship exists in any given situation is a question of fact." *Negrete v. Fidelity and Guar. Life Ins. Co.,* 444 F. Supp. 2d 998, 1003 (C.D. Cal. 2006) (citing *Michelson v.*

*Hamada,* 29 Cal. App. 4th 1566 (Cal. Ct. App. 1994)). Under California law, a fiduciary duty can arise from a contract or be implied from the relationship. *See Lynch v. Cruttenden & Co.*, 18 Cal. App. 4th 802, 809 (Cal. Ct. App. 1993) ("A fiduciary relationship is created where a person reposes trust and confidence in another and the person in whom such confidence is reposed obtains control over the other person's affairs."). For example, although ordinarily the relationship between a bank and its depositor "is not fiduciary," *Simi Mgmt. Corp. v. Bank of Am., N.A.*, 930 F. Supp. 2d 1082, 1100 (N.D. Cal. 2013), California courts recognize that, under "special circumstances," a bank may enter a "special relationship" with a depositor and owe fiduciary duties. *Copesky v. Superior Court*, 229 Cal. App. 3d 678, 690, n.12 (Cal. Ct. App. 1991).

One way a bank forms such a "special relationship" is by "affirmatively offer[ing] trust and other specifically fiduciary services." *Id.*;  *In re Conseco Ins. Co. Annuity Mktg. & Sales Pracs. Litig.,* Nos. C-05-04726 RMW, C-06-00537 RMW, 2007 WL 486367 at *7 (N.D. Cal. Feb. 12, 2007) (a fiduciary relationship "arise[s] where one holds himself out as acting in a position of trust, such as an agent or stockbroker") (citing *Solomon v. N. Am. Life & Cas. Ins. Co.,* 151 F.3d 1132, 1138 (9th Cir. 1998)); *Abbit v. ING USA Annuity & Life Ins. Co.*, 999 F. Supp. 2d 1189, 1199 (S.D. Cal. 2014) (finding plaintiffs alleged a fiduciary relationship with issuer of annuity where issuer falsely "promise[d]" security and "continued commitment, thanking them for ongoing trust and confidence . . . as their 'preferred financial services provider.'").

Based upon this authority, Plaintiffs asserted two bases for the fiduciary duties of the FTX entities: (1) contractual, and (2) implied, through their respective positions as trusted custodians of customer funds. In Counts 5 and 6 of the Complaint, Plaintiffs allege as to FTX.US and FTX Ltd.:

> As a custodian of Class Member funds, and by virtue of the representations [FTX] made to customers, [FTX] owed fiduciary duties to Class Members, including duties of care and loyalty, and were obligated to discharge those duty in good faith, with the care that a fiduciary in a similar position would exercise and in a manner reasonably believed to be in the best financial interests of Class Members. Given FTX US's

representations to its customers, [FTX] acted akin to a trustee with respect to its customers.

Compl. ¶¶ 276, 284. In addition, Plaintiffs take care to allege FTX's various contractual and extra-contractual representations supporting a fiduciary duty. *Id.* ¶¶ 201, 202. In fact, not only did the terms of service use of both FTX.US and FTX Trading Ltd. promise that FTX would hold customer assets "for your benefit" and would not "treat" customer assets "as belonging to [FTX]," *id.*, but FTX touted in their marketing and on their webpage their commitment to safeguarding funds. "Unlike a traditional brokerage, FTX took custody of Class Members' assets, which FTX promised to safeguard," *Id.* ¶ 45, "portrayed itself as a trustworthy and law-abiding member of the cryptocurrency industry, focused . . . on investor and client protection," and asserted that it was the "'safest and easiest way to buy and sell crypto' and 'the most trusted way to buy and sell' digital assets," *id.* ¶ 39. As alleged, FTX assured "Class Members that their assets were safe and could be withdrawn at any time," and that "FTX 'segregates customer assets from its own assets across our platforms.'" *Id.* ¶ 46.

Thus, Plaintiffs allege that FTX's relationship with customers was not that of a debtor-creditor (like a bank), but that FTX acted as a trustee, holding customers' assets strictly for their "benefit." Plausibly, Plaintiffs allege a "special relationship," sufficient to create a fiduciary duty. *See In re Bank of Am. California Unemployment Benefits Litig.*, No. 21-MD-2992-LAB-MSB, 2023 WL 3668535, at *31 (S.D. Cal. May 25, 2023) (finding that bank contract with cardholders was subject to "a plausible reading of the provision" that was "sufficient" at the "pleading stage," to give rise to a fiduciary duty).

**D.    RICO is well pled.**

Plaintiffs set forth a RICO conspiracy claim under 18 U.S.C. § 1962(d), which requires "that the conspirators agreed to participate directly or indirectly in the affairs of an enterprise through a pattern of racketeering activity."  *United States v. Castro,* 89 F.3d 1443, 1451 (11th Cir. 1996).[5]

Fenwick raises two issues with this claim, neither of which has merit.

**First**, Fenwick argues that Plaintiffs fail to allege any agreement by Fenwick "to participate" in the conspiracy. Mot. 24. Fenwick acknowledges this element is satisfied by allegations that the defendant "knowingly agree[d] to perform services" to "facilitate the activities" of the enterprise, *id.*, yet ignores Plaintiffs' allegations establishing exactly that. Plaintiffs set forth that:

- "Fenwick facilitated the scheme to defraud and RICO enterprise by agreeing to provide and providing legal services," Compl. ¶ 306;

- "Fenwick had the specific intent to participate in the overall RICO enterprise, which is evidenced by its . . . assistance in facilitating the misappropriation of customer funds and the concealment of that misappropriation," *id.* ¶ 307;

- "Fenwick reasonably calculated this assistance to shield the comingling and misappropriation of customer funds and to generally obfuscate the scheme to defraud Plaintiffs and members of the Class," *id.*;

- "Fenwick agreed, at least impliedly, with Friedberg and/or one or more of his co-conspirators to commit overt acts . . . including (1) forming shell entities . . .; (2) structuring acquisitions and other transactions . . . [to] dodge[] regulatory scrutiny; and (3) generating for the FTX entities the appearance of legitimate operations . . . ." *id.* ¶ 308;

- "Fenwick participated with the FTX Group entities, Friedberg, and Bankman-Fried in a fraudulent scheme against Class Members," *id.* ¶ 309;

- "Fenwick formed an illegal agreement to violate the substantive provisions of the RICO statute . . ." *id.* ¶ 310.

---

[5] Although Fenwick does not engage in the appropriate choice of law analysis as to the state law claims, it is correct in citing Eleventh Circuit RICO law. *See Murphy v. F.D.I.C.*, 208 F.3d 959, 966 (11th Cir. 2000) ("Since the federal courts are all interpreting the same federal law, uniformity does not require that transferee courts defer to the law of the transferor circuit.")

These allegations support the allegation that "Fenwick agreed and conspired with Bankman-Fried, Friedberg, FTX Group entities," Compl. ¶ 297, and follow and incorporate the factual allegations discussed above, *supra* 15-19, as to Fenwick's participation.

Importantly, Plaintiffs allege that played an affirmative role in the concealment of the FTX scheme – the misappropriation of customer funds, including by transfer to Alameda. *See* Compl. ¶¶ 3, 40, 277, 285. It was Fenwick that created the North Dimension entities and suggested the loan agreement to conceal the arrangement, even though Fenwick knew the true "intercompany relationships" were "very problematic." *Id.* ¶¶ 204-210. In *United States v. Browne*, the court affirmed a RICO conspiracy conviction, citing testimony that "demonstrated how Browne concealed the affairs of the enterprise from discovery," including by "refus[ing] to permit D1–MEBA officials to audit the books and records of NFOPAPE, even when he knew it would lead to the loss of his position at D1–MEBA/FOPE." 505 F.3d 1229, 1265 (11th Cir. 2007). Fenwick's knowing role in the scheme is similarly alleged.

Fenwick is incorrect that Plaintiffs "must plead each" RICO element "with particularity." Mot. 23. As with Plaintiffs' fraud claim, the knowledge element of RICO may be pleaded generally. *See Millstein v. Holtz*, No. 21-CV-61179-RAR, 2022 WL 3594915, at *5 (S.D. Fla. Aug. 23, 2022) (in denying motion to dismiss RICO claim, noting that "'knowledge, and other conditions of a person's mind may be alleged generally'" under Rule 9).

Also, "[i]t is well-settled that a conspirator need not be fully informed about his co-conspirators' specific criminal acts provided that he agreed to participate in the broader criminal conspiracy and the acts evincing participation were not outside of the scope of the illegal agreement." *United States v. Yannotti,* 541 F.3d 112, 122 (2d Cir. 2008) (citations omitted). As the *Brouwer* case, on which Fenwick relies, clarifies, the test for RICO conspiracy liability "is not a bright line." *Brouwer v. Raffensperger, Hughes & Co.*, 199 F.3d 961, 967 (7th Cir. 2000) (reversing summary

judgment entered on RICO claim in favor law firm). Further, the agreement to conspire can be found through "circumstantial evidence of a scheme." *United States v. Browne*, 505 F.3d 1229, 1264 (11th Cir. 2007) (emphasis added); A complaint satisfies the pleading burden where it describes the defendant's participation in the broader alleged criminal conspiracy and their role. Even if there is no "explicit pact to commit a pattern of racketeering in violation of the substantive provisions of the statute," allegations that "read in their totality, clearly suggest that such an agreement was made" will suffice. *In re Sahlen & Associates, Inc. Sec. Litig.*, 773 F. Supp. 342, 370 (S.D. Fla. 1991) (denying motion to dismiss where complaint detailed "a grand scheme collectively and knowingly carried out by Defendants to overstate the financial condition of SAI and maintain an artificially high market price for the SAI stock"); *see In re Managed Care Litig.*, 135 F. Supp. 2d 1253, 1266 (S.D. Fla. 2001) (element of RICO agreement adequately pleaded, given allegation that "Defendants agreed among themselves to further a scheme to defraud, and that as a consequence the Plaintiffs were injured"); *Boca Raton Cmty. Hosp., Inc. v. Tenet Healthcare Corp.*, 502 F. Supp. 2d 1237, 1254–55 (S.D. Fla. 2007), *aff'd sub nom. Boca Raton Cmty. Hosp., Inc. v. Tenet Health Care Corp.*, 582 F.3d 1227 (11th Cir. 2009) ("Because it is rare that a party can produce direct evidence of an express agreement between parties to conduct an illegal activity, most conspiracies are inferred from the defendant's behavior.").

Fenwick again protests that it merely engaged in "routine legal services," which "does not establish [the] knowledge" required to plead RICO. Mot. 24. But, as to this claim as well, routine services can suffice. In *In re Managed Care Litig.*, 298 F. Supp. 2d 1259, 1281 (S.D. Fla. 2003), for example, the court rejected the argument that routine business practices in dealing with claims for reimbursement and participation in trade associations were not "'probative of conspiracy.'" *Id.* The court found sufficient the plaintiff's allegations confirming "an agreement to the overall objective of

the conspiracy," the "functional necessity" of that agreement, and "conduct from which the requisite agreement c[ould] be inferred." *Id.*

Fenwick claims *Domanus v. Locke Lord LLP* is instructive. It is not. The American lawyers in that case were allegedly involved in a conspiracy to commit "fraudulent activity that had occurred years before they were engaged," and entirely in Poland. 847 F.3d 469, 480 (7th Cir. 2017). The court found that the only allegations supporting the firms' knowledge of the scheme were "unsavory billing practices," but there were "no allegations suggesting that the lawyers knew about the . . . efforts to loot the business before the time of their engagement." *Id.* Fenwick worked alongside FTX executives and actively assisted the ongoing conspiracy. The Seventh Circuit case *Domanus* is not persuasive on these facts.

**<u>Second</u>**, Fenwick claims that Plaintiffs cannot allege a RICO "enterprise," because all the conspirators "were employees of FTX." Mot. 26. Not so. The RICO enterprise alleged was between *several* individuals and the "FTX Group entities," which is defined in the Complaint to include *several distinct* corporate entities, including FTX Trading LTD, West Realm Shires Inc., and Alameda Research, LLC. Compl. at 5; ¶¶ 297, 299. Moreover, Caroline Ellison is never alleged to have been an agent of either FTX Trading or FTX US, and at all times worked for Alameda. Compl. ¶¶ 57-60. And the RICO "person" is Bankman Fried. *See United States v. Goldin Indus., Inc.*, 219 F.3d 1268, 1271 (11th Cir. 2000) (en banc) ("We now agree with our sister circuits that, for the purposes of 18 U.S.C. § 1962(c), the indictment must name a RICO person distinct from the RICO enterprise.")

A RICO conspiracy is pleaded on these facts, notwithstanding that certain conspirators may have been FTX employees. Mot. 26. There is a Supreme Court case on point that Fenwick overlooks: *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 158 (2001). There, a boxing promoter sued Don King, also a promoter, for RICO violations. The Supreme Court held that Mr. King was distinct from the RICO enterprise, even though he was the corporation's sole shareholder and its employee.

*Id.* at 163; *see also Boca Raton Cmty. Hosp., Inc.,* 502 F. Supp. 2d at 1253 (citing *Kushner,* 533 U.S. at 163) (CEO and sole shareholder could be RICO person and part of RICO enterprise consisting of himself and the company).

Citing *Kushner* in another RICO case, the Eleventh Circuit held that "[c]orporations and their agents are distinct entities and, thus, agents may be held liable for their own conspiratorial actions" such that the "intracorporate conspiracy doctrine cannot be invoked to defeat a § 1962(d) claim." *Kirwin v. Price Communications Corp.*, 391 F.3d 1323, 1327 (11th Cir. 2004). In fact, the rule upon which Fenwick relies, "[t]he prohibition against the unity of person and enterprise applies only when the singular person or entity is defined as both the person and ***the only entity comprising the enterprise***." *Goldin,* 219 F.3d at 1275 (emphasis added). It does not apply here, where several distinct entities are alleged to have participated in the enterprise. *See, e.g.*, *David Antoniono Invs., LLC v. Hutchens*, No. 15-61233-CIV, 2018 WL 7636331, at *3 (S.D. Fla. Sept. 24, 2018) (even alter-ego allegations did not "diminish" the enterprise as being alleged as "an association-in-fact of the entities," and so "not synonymous or indistinct" from their manager); *CGC Holding Co., LLC v. Hutchens*, 974 F.3d 1201, 1213 (10th Cir. 2020) ("while using shell companies as shams to perpetuate frauds might eliminate any separateness between the wrongdoer and his shell corporation in the business corporations context (i.e., through veil piercing), it does not destroy the separateness that RICO requires").

Given this binding precedent as to § 1962(d) liability, Fenwick's argument must be rejected.[6]

---

[6] Fenwick's cases are also easily distinguished. In *Daigneault v. Eaton Corp.*, No. CIV.A. 06CV1690 JCH, 2008 WL 2604929, at *3 (D. Conn. June 16, 2008), "all of the employees and attorneys alleged to constitute the RICO enterprise were acting as employees or agents of Eaton" – a single corporate entity. Similarly in *Cisneros v. Petland, Inc.*, a RICO claim was alleged against a puppy-mill, "Petland Kennesaw," but it was alleged only that it conspired with "its salespeople" and a hired agent, Dr. Waller." 972 F.3d 1204, 1215 (11th Cir. 2020). Although Dr. Waller did have a "distinct entity," the complaint itself made "clear that Waller acted as an agent of Petland Kennesaw," in alleging that he was paid monthly" for his work and took "specific direction" from Petland Kennesaw. *Id.*

**E.      If Florida law applies to the *O'Keefe* (Florida) case, the result is the same.**

As discussed above, California law applies to the state law claims brought in the *O'Keefe* (Florida) Action. Still, even if this Court were to apply Florida law to *O'Keefe*, it would reach the same result. Plaintiff will briefly explain why Fenwick's arguments fail under Florida law.

**1.  Lawyers do not have immunity from aiding and abetting or conspiracy claims.**

Fenwick's argument that a plaintiff suing a lawyer for aiding or abetting or conspiracy must allege that the lawyer "acted outside the scope" of his or her representation is also wrong under Florida law.

The case of *Logan v. Morgan, Lewis & Bockius LLP*, 350 So. 3d 404 (Fla. 2d DCA 2022)—a case applying Florida law to aiding and abetting and conspiracy claims brought against a law firm—is illustrative. There, a plaintiff sued Morgan Lewis for (1) aiding and abetting a breach of fiduciary duty by one of the firm's clients, (2) aiding and abetting fraud by one of the firm's clients, and (3) conspiring with that same client. *Id.* at 407. In short, the plaintiff alleged that Morgan Lewis lawyers provided its client with what amounted to a "whitewashed opinion" on specific tax issues, thereby enabling the client to misrepresent to others (including the plaintiff) that its "investment strategy was legal" and not an illegal tax shelter. *Id.* at 408-09. Morgan Lewis moved to dismiss both the aiding and abetting and conspiracy claims. *Id.* at 409. Although the trial court granted the motion, the Second District Court of Appeal reversed the trial court on appeal. *Id.* at 409, 415.

With respect to the aiding and abetting claim, Morgan Lewis, like Fenwick here, argued that it simply "provide[d] legal advice to its client in the normal scope of its representation." *Id.* at 411. The Second District Court of Appeal rejected the argument, noting that "contrary to Morgan Lewis's suggestion, no blanket rule insulates attorneys from liability for aiding and abetting a tort that harms a third party." *Id.* Citing multiple cases applying Florida law, the court "recognized that attorneys and law firms can be liable under Florida law for aiding and abetting when they knowingly help their

clients breach a fiduciary duty to or defraud another." *Id.* at 411–12. According to the court, the plaintiff had sufficiently pled such knowledge. *Id.* at 412.

With respect to the civil conspiracy claim, Morgan Lewis, like Fenwick here, argued "that attorneys and law firms are merely extensions of their clients and therefore cannot conspire with their clients to tortiously harm third parties." *Id.* The court rejected that argument, noting that it "misapprehends Florida law." *Id.* The Second DCA acknowledged that certain courts applying federal law or the law of other states had "refused to extend civil conspiracy liability to attorneys, relying on the 'intracorporate conspiracy' doctrine and the premise that the attorney was merely acting as an agent of his or her client within the scope of legal representation." *Id.* at 413. But the court noted that "[e]ven those cases, however, recognize that an attorney acting outside the scope of representation can conspire with his or her client" and that the plaintiff "alleges that Morgan Lewis agreed to assist [its client] in committing criminal tax fraud and defrauding others—conduct that plainly falls outside the scope of legitimate legal representation." *Id.*

Applying *Logan*, the Complaint sufficiently alleges claims against Fenwick for aiding and abetting and civil conspiracy under Florida law. In sum, the Plaintiffs' allegations make clear that Fenwick knew that FTX was playing a shell game with customer money and helped construct entities (*e.g.*, North Dimension and North Wireless Dimension) that enabled FTX to misappropriate customer funds. Compl. ¶¶ 200–202, 204–10, 263. As alleged, when Dan Friedberg, an FTX officer and former Fenwick partner, specifically asked Fenwick what public disclosures would "likely be required with respect to the intercompany relationships between Alameda Group and FTX," Fenwick acknowledged that the disclosures "could be very problematic given that this'd [sic] likely draw in all of our intercompanies." *Id.* at ¶ 209. In other words, Fenwick recognized, in real-time, that if the truth about FTX's movement of customer money between entities—***a movement Fenwick had assisted with***— were to come to light, it "could be very problematic." *See id.*

For its part, Fenwick relies on a handful of Florida cases. None counsels a different outcome.

With respect to aiding and abetting, Fenwick cites *In re Mojo Brands Media, LLC*, No. 6:15-BK-03871-LVV, 2022 WL 2389185, at *1 (Bankr. M.D. Fla. Apr. 12, 2022) for the proposition that a lawyer "providing routine legal services to a client is not enough" to aid and abet. But that case cites South Dakota and Minnesota cases for that proposition, not any Florida case. And, as already discussed above, the *Logan* court cited cases applying Florida law for the contrary position. *Logan*, 350 So. 3d at 412 (citing *Grape Leaf Cap., Inc. v. Lafontant*, 316 So. 3d 760, 761 (Fla. 3d DCA 2021), *Cordell Consultant, Inc. Money Purchase Plan & Tr. v. Abbott*, 561 F. App'x 882, 884–86 (11th Cir. 2014), *Int'l Cmty. Corp. v. Young*, 486 So. 2d 629, 630 (Fla. 5th DCA 1986)).

With respect to conspiracy, Fenwick relies on the same "intracorporate conspiracy doctrine" that Morgan Lewis tried to invoke in *Logan*. The Court should reject the argument for the same reason that the Second District Court of Appeal rejected it in *Logan*. It "misapprehends" Florida law and, by alleging that Fenwick conspired with FTX entities to commit fraud, Plaintiff sufficiently alleged conduct outside the scope of representation. Notably, none of the Florida cases cited by Fenwick that applied the intracorporate conspiracy doctrine—*Mancinelli v. Davis*, 217 So. 3d 1034, 1036 (Fla. 4th DCA 2017), *Lipsig v. Ramlawi*, 760 So. 2d 170, 180 (Fla. 3d DCA 2000), and *Cedar Hills Properties Corp. v. E. Fed. Corp.*, 575 So. 2d 673, 676 (Fla. 1st DCA 1991)—addressed a claim that a law firm had conspired with a client to commit ***fraud***.

**2. The Plaintiffs sufficiently allege claims for aiding and abetting.**

**a. The Plaintiffs sufficiently allege that Fenwick had knowledge of the wrongdoing.**

On the knowledge element of aiding and abetting, there is no material difference between California and Florida law. As Fenwick acknowledges, under Florida law, Plaintiffs need only "plausibly allege" that Fenwick knew of FTX's alleged violations, based on "circumstantial evidence." Mot. 16. Further, "actual knowledge" may be alleged "generally," *Johnson v. Branch*

*Banking and Tr. Co.*, No. 3:14-cv-1151-J-39JRK, 2015 WL 13791141, at \*6 (M.D. Fla. Jul. 16, 2015).

Thus, for the reasons already set forth, construing all inferences in favor of Plaintiffs, Plaintiffs'

allegations that Fenwick knowingly assisted FTX's wrongdoing are plausible. *See Gevaerts v. TD

Bank, N.A.,* 56 F. Supp. 3d 1335, 1341–42 (S.D. Fla. 2014) (denying motion to dismiss aiding and

abetting claims where plaintiffs alleged knowledge based upon a duty to report overdraws and an

overdraw alert system).

     Fenwick does not cite a single Florida case with precedential value that militates in favor of

dismissal. For example, Fenwick argues that "red flags" do not create "actual knowledge," and cites

several (mostly unpublished) cases regarding the liability **of banks** for Ponzi schemes, finding that

"red flags" arising from suspicious banking activity are insufficient to allege aiding-and-abetting

liability. Mot. 16–17, citing *Lawrence v. Bank of America, N.A.*, 455 F. App'x 904, 907 (11th Cir.

2012)[7]; *Wiand v. Wells Fargo Bank, N.A.*, 938 F. Supp. 2d 1238, 1244 (M.D. Fla. 2013); *Platinum

Estates, Inc. v. TD Bank, N.A.*, No. 11-60670-CIV, 2012 WL 760791, at \*3 (S.D. Fla. Mar. 8, 2012);

*Gilbert & Caddy, P.A. v. JP Morgan Chase Bank, N.A.* No. 15-CV-60653-BLOOM/Valle, 2015 WL

12862724, at \*5 (S.D. Fla. Aug. 20, 2015)). This proposition is uncontroversial, but irrelevant here.

The allegations in the Complaint go well beyond "unusual trends" that Fenick "should have

recognized as suspicious." *Wiand*, 938 F. Supp. at 1245.

     Fenwick cites *Cordell Consultant, Inc. Money Purchase Plan & Tr. v. Abbott*, which involved

a law firm allegedly aiding a fraud, but where the court engaged in only a cursory analysis. No. 11-

80416-CIV, 2012 WL 13148744, at \*7 (S.D. Fla. July 11, 2012). It found that because plaintiffs did

---

[7] "*Lawrence* does not bind this Court." *Coquina Invs. v. Rothstein*, No. 10-60786-CIV, 2012 WL
4479057, at \*19 (S.D. Fla. Sept. 28, 2012), *aff'd sub nom. Coquina Invs. v. TD Bank, N.A.*, 760 F.3d
1300 (11th Cir. 2014). As another court in this district pointed out in rejecting *Lawrence*, "[i]t is well-
established that an unpublished opinion is not controlling authority and may not be persuasive where
its facts are materially different from the present case." *Id.* (citing *Bonilla v. Baker Concrete Constr.,
Inc.,* 487 F.3d 1340, 1345 n. 7 (11th Cir. 2007)).

not establish the knowledge element of the underlying fraud claim, they also had not pled the aiding and abetting claim. *Id.* Here, Fenwick does not challenge that the underlying fraud occurred. Also, when the *Cordell* plaintiffs amended their complaint, the Eleventh Circuit ultimately found that the plaintiffs adequately alleged claims against the lawyers for aiding and abetting fraud and civil conspiracy. *Cordell Consultant, Inc. Money Purchase Plan & Tr. v. Abbott*, 561 F. App'x 882, 885–86 (11th Cir. 2014). Finally, *West Coast Roofing & Waterproofing, Inc. v. Johns Manville, Inc.*, 287 F.App'x 81, 86 (11th Cir. 2008) does not even involve an aiding and abetting claim.

Thus, none of Fenwick's cases supports dismissal due to any deficiency in the pleading of the knowledge element of the aiding and abetting claims.

### b. Plaintiffs sufficiently allege that Fenwick substantially assisted the wrongdoing.

California and Florida law are also materially similar as to the substantial assistance element. As the Eleventh Circuit in *Chang v. JPMorgan Chase Bank, N.A.*, 845 F.3d 1087, 1098 (11th Cir. 2017), explained, "[s]ubstantial assistance occurs when a defendant affirmatively assists, helps conceal[,] or fails to act when required to do so, thereby enabling the breach to occur." Florida law recognizes that an attorney "substantially assist[s]" a wrongdoer, where, as here, that attorney "facilitate[es]" improper transfers of funds held for the benefit of one, to another. *Grape Leaf Capital, Inc.*, 316 So. 3d at 761 (complaint stated a claim where it alleged that attorney "'substantially assisted'" tortfeasor "when he 'faciliat[ed] the distribution' of settlement proceeds from the wrongful death defendant's insurance carrier to Lafontant directly instead of arranging for the proceeds to be deposited into the 'restricted depository account'"). Notably, claims based upon aiding and abetting allegations, like those here, which "purely concern[] the law firm's role in 'advising, directing and assisting' the conspirators to 'transfer assets and  business opportunities . . . .'" have been permitted to proceed. *Guarino v. Mandel*, 327 So. 3d 853, 865–66 (Fla. 4th DCA 2021) (shareholders plausibly alleged that law firm committed aiding and abetting breach of fiduciary duty, as required to warrant

an evidentiary hearing on specific jurisdiction) (quoting party affidavit). The Complaint contains sufficient allegations to support the substantial assistance element under Florida law *See Trinity Graphic, USA, Inc. v. Tervis Tumbler Co.*, 320 F. Supp. 3d 1285, 1297 (M.D. Fla. 2018) (denying motion to dismiss aiding and abetting claim).

Fenwick cites *Groom v. Bank of America*, where plaintiffs merely alleged that banks failed to "monitor" and act upon "suspicious activities." No. 8:08-CV-2567-JDW-EAJ, 2012 WL 50250, at *4 (M.D. Fla. Jan. 9, 2012). *Groom* is thus another case involving alleged "red flags" in banking transactions. The court applied established Florida law that an allegation of a "'failure to act . . . is not substantial assistance.'" *Id.* (quoting *Hines v. FiServ, Inc.*, No. 8:08-CV-2569-T-30AEP, 2010 WL 1249838, at *4 (M.D. Fla. Mar. 25, 2010)). In citing *Groom*, Fenwick "misses the mark," just as the firm did in *Logan*, discussed above. In *Logan*, the court found that "Morgan Lewis did not merely remain silent or fail to act; instead . . . Morgan Lewis provided the tax executives with affirmative assistance." 350 So. 3d at 411. In this case too, inaction is not the basis of the claims against Fenwick; instead Fenwick allegedly provided affirmative assistance to the FTX scheme.

Also unhelpful is *Johnson v. Branch Banking & Trust Company*, a report and recommendation of a magistrate judge. No. 3:14-CV-1151-J-39JRK, 2015 WL 13791141 (M.D. Fla. July 16, 2015). There, because the fraud claim had not been adequately pleaded with particularity, the aiding and abetting claim also failed. *Id.* at *7. The underlying fraud here is undisputed. *Logan v. Morgan, Lewis & Bockius LLP* ought to be more persuasive to this Court than these cases cited by Fenwick.

    **c.   Plaintiffs sufficiently allege that FTX breached fiduciary duties.**

Under Florida law, fiduciary relationships are either expressly or impliedly created. Fenwick, citing only Florida law, admits as much. Mot. 21–22. Thus, by the same analysis above, Counts 5 and 6 are sufficiently pled under Florida law to state a claim. *Supra* 21–24.

In sum, if the Court applies Florida law to the *O'Keefe* case, the result would be the same.

**F.      Alternatively, the Motion should be dismissed without prejudice.**

Even if the Court were to find Plaintiffs' allegations insufficient, dismissal with prejudice is not warranted. Under California law, the "court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (citations and quotations omitted); *Perlman v. Wells Fargo Bank, N.A.*, 559 F. App'x 988, 996 (11th Cir. 2014) (reversing denial of leave to amend claims for aiding and abetting against bank).

Here, amendment would not be futile. Plaintiffs can correct any deficiencies with additional facts regarding Fenwick's role in the FTX collapse, including by incorporating the various statements made by Sam Bankman-Fried during his ongoing criminal trial regarding the key role of Fenwick.

None of Fenwick's cases counsels in favor of dismissal of this first complaint *with prejudice*. In *Wiand*, for example, the plaintiff-receiver was given three opportunities to plead its aiding and abetting claims against a bank in connection with a Ponzi scheme, before the complaint was finally dismissed with prejudice. 938 F. Supp. 2d at 1242. In *Platinum Estates, Inc.*, the court dismissed the claim against T.D. Bank for aiding and abetting the Rothstein fraud, without prejudice to replead. 2012 WL 760791, at *6. Dismissal with prejudice is not warranted here either.

Accordingly, Plaintiffs respectfully request, in the alternative to denying the motion outright, that the Court dismiss claims without prejudice and set a deadline by which Plaintiffs may file a motion for leave to amend their complaint.

## CONCLUSION

For all these reasons, Plaintiffs respectfully request that the Court deny the Motion.

## REQUEST FOR HEARING

Pursuant to Local Rule 7.1(b), Plaintiffs respectfully request a 30-minute hearing on the Motion. This case presents matters of great public interest and legal complexity and a hearing will

give the parties an opportunity to present their arguments and answer any questions the Court may

have.

      Dated: November 6, 2023                     Respectfully submitted,

**By:** */s/ Adam Moskowitz*
Adam M. Moskowitz
Florida Bar No. 984280
Joseph M. Kaye
Florida Bar No. 117520
**THE MOSKOWITZ LAW FIRM, PLLC**
Continental Plaza
3250 Mary Street, Suite 202
Coconut Grove, FL 33133
Office: (305) 740-1423
adam@moskowitz-law.com
joseph@moskowitz-law.com
service@moskowitz-law.com

*Co-Lead Counsel*

| | |
|---|---|
| William M. Audet | Rachel Wagner Furst |
| California Bar No. 117456 | Fla. Bar No.: 41555 |
| Kurt David Kessler | John R. Byrne |
| California Bar No. 327334 | Fla. Bar. No: 0126294 |
| Ling Yue Kuang | Francisco R. Maderal |
| California Bar No. 296873 | Fla. Bar. No. 41481 |
| **AUDET & PARTNERS, LLP** | **MADERAL BYRNE & FURST, PLLC** |
| 711 Van Ness Avenue. Suite 500 | 2800 Ponce de Leon Blvd., Suite 1100 |
| San Francisco, CA 94102-3229 | Coral Gables, Florida 33134 |
| 415-568-2555 | Tel.: (305) 520-5690 |
| 415-568-2556 | Fax: (305) 520-5698 |
| waudet@audetlaw.com | rachel@maderalbyrne.com |
| kkessler@audetlaw.com | john@maderalbyrne.com |
| lkuang@audetlaw.com | frank@maderalbyrne.com |

*FTX Other Professionals Committee Co-Chair*       *FTX Other Professionals Committee Co-Chair*

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on November 6, 2023, a true and correct copy of the foregoing was filed electronically with the Clerk of the Court, by using the CM/ECF system which will send an electronic notification of such filing to all counsel of record.

By: */s/Adam Moskowitz*
**Adam M. Moskowitz**