# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## MDL No. 3076

## CASE NO. 1:23-md-03076-KMM

IN RE:

FTX Cryptocurrency Exchange Collapse Litigation

**THIS DOCUMENT RELATES TO:**

**Auditor Defendants.**

## PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS
## BY THE AUDITOR DEFENDANTS [ECF No. 281]

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ...................................................................................................... 1

II.     STATEMENT OF FACTS ........................................................................................ 3

    A.      The False "Clean" 2020 & 2021 Audit Reports ..................................................... 3

    B.      "Clean" Audit Reports Improper Due to Lack of Internal Controls ...................... 3

    C.      The Auditors Knew Their Audit Reports Were Used to Lure Customers .............. 4

    D.      Acting as FTX/SBF's Cheerleaders & Promoters Violates GAAS ...................... 5

    E.      Congressional Testimony Set the Stage for SBF's "Audit" Narrative ................. 5

III.    LEGAL ARGUMENT ............................................................................................... 7

    A.      The Complaint Meets Fed. R. Civ. P. Rule 12(b)(6) Standards, and Rules 8(a) and 9(b) ................................................................................................................. 7

    B.      Alternative Pleading is Permitted; Thus the Complaint is Not Ambiguous .......... 8

    C.      Materiality of "Cheerleading"/"Promotional" Statements is Adequately Pled ..... 9

    D.      The Auditors' Unsound Argument That the Audit Reports Were Nonpublic or That They Did Nothing to Induce Plaintiffs' Reliance Fails ............................... 10

    E.      An 18 U.S.C. § 1962(d) Rico Conspiracy Claim is Pled .................................... 11

        1.      Plaintiffs Allege a RICO Conspiracy Agreement ..................................... 11

        2.      The RICO Allegations Are Not Irrational/Economic Motive Not Required ................................................................................................... 13

    F.      Conspiracy is Adequately Pled ........................................................................... 15

    G.      Negligent Misrepresentation is Adequately Pled ................................................ 16

    H.      Professional Negligence is Adequately Pled ...................................................... 20

    I.      California Corporate Securities Law ("CSL") Counts are Adequately Pled ........ 21

    J.      California Unfair Competition Law ("UCL") and Aiding and Abetting UCL Violations Are Pled ............................................................................................. 22

        1.      Plaintiffs Allege the Auditors' Unlawful, Unfair, and Fraudulent Acts ... 22

        2.      Plaintiffs Allege Reliance Under the UCL .............................................. 24

        3.      Plaintiffs Are Entitled to Equitable Relief Under the UCL ..................... 24

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

4.      Plaintiffs Allege Aiding and Abetting Liability Under the UCL ............. 24

K.      Non-Florida Plaintiffs Have Standing to Bring Florida Statutory Claims; Non-California Plaintiffs Have Standing to Bring California Statutory Claims .......... 25

L.      Violation Of The Florida Misleading Advertising Statute § 817.41 and California's False Advertising Law are Adequately Pled ..................................... 27

1.      Plaintiffs Adequately Allege Reliance. ...................................................... 27

2.      Florida Law Does Not Require That Representations Be "Public Statements" .............................................................................................. 27

3.      The False "Clean" Audit Reports Themselves Were Misstatements Of Fact ............................................................................................................. 29

M.      Florida Securities Counts Are Adequately Pled ................................................. 29

N.      The FDUTPA Count is Adequately Pled ............................................................. 30

1.      The Auditors Engaged In Unconscionable, Deceptive And Unfair Practices .................................................................................................... 30

2.      FDUTPA Claims Apply to the Acts Alleged in the AC .......................... 31

O.      The Fraud-Based Counts Are Adequately Pled ................................................. 32

P.      Aiding and Abetting Fraud is Adequately Pled ................................................. 35

Q.      Aiding and Abetting Conversion and Breach of Fiduciary Duty is Adequately Pled ................................................................................................................... 38

R.      Declaratory and Injunctive Relief Counts Are Adequately Pled .......................... 38

IV.     CONCLUSION ............................................................................................................. 38

REQUEST FOR HEARING ................................................................................................. 39

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Advanced Fluid Systems, Inc. v. Huber,*
　28 F. Supp. 3d 306 (M.D. Pa. 2014) ....................................................................... 27

*Am. Dental Ass'n. v. Cigna Corp.,*
　605 F.3d 1283 (11th Cir. 2010) ........................................................................ 11, 12

*Apollo Cap. Fund, LLC v. Roth Cap. Partners, LLC,*
　158 Cal. App. 4th 226, 70 Cal. Rptr. 3d 199 (Cal. Ct. App. 2007) ............................ 16, 21, 22

*Arthur Young & Co. v. Mariner Corp.,*
　630 So. 2d 1199 (Fla. Dist. Ct. App. 1994) .............................................................. 29

*Ashcroft v. Iqbal,*
　556 U.S. 662 (2009) .............................................................................................. 7

*Barnext Offshore, Ltd. v. Ferretti Grp. USA, Inc.,*
　2012 WL 1570057 (S.D. Fla. May 2, 2012) ............................................................ 26

*Benson v. JPMorgan Chase Bank, N.A.,*
　2010 WL 1526394 (N.D. Cal. Apr. 15, 2010) ......................................................... 35

*Bey v. Gottlieb,*
　2020 WL 2764266 (S.D. Fla. Mar. 31, 2020) ........................................................... 6

*Bily v. Arthur Young & Co.,*
　3 Cal. 4th 370, 11 Cal. Rptr. 2d 51 (Cal. 1992), *as modified* (Nov. 12, 1992) ......................... 20

*BluestarExpo, Inc. v. Enis,*
　568 F. Supp. 3d 1332 (S.D. Fla. 2021) ............................................................... 8, 32

*Brady v. Medtronic, Inc.,*
　2015 WL 11181971 (S.D. Fla. Mar. 30, 2015) ..................................................... 19, 29

*Bruhl v. PricewaterhouseCoopers Int'l., Ltd.,*
　2006 WL 84318886 (S.D. Fla. Apr. 3, 2006) ....................................................... 34, 35

*Bruhl v. PricewaterhouseCoopers International, Ltd.*
　2006 WL 8431888 (S.D. Fla. Apr. 3, 2006) ............................................................ 34

*Burrows v. Purchasing Power, LLC,*
　2012 WL 9391827 (S.D. Fla. Oct. 18, 2012) ........................................................... 31

*Cardenas v. Toyota Motor Corp.,*
　418 F. Supp. 3d 1090 (S.D. Fla. 2019) .................................................................. 12

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

*Cellular Plus, Inc. v. Superior Court*,
  14 Cal. App. 4th 1224 18 Cal. Rptr. 2d 308 (Cal. Ct. App. 1993) ........................................... 15

*Clear Spring Property and Casualty Company v. Bluewater Adventures of Sarasota,*
  2022 WL 18027821 (S.D. Fla. Dec. 6, 2022), *report and recommendation adopted,*
  2022 WL 18024868 (S.D. Fla. Dec. 30, 2022) ........................................................................... 10

*Clear Spring Property and Casualty LLC v. Viking Power LLC*,
  608 F. Supp. 3d 1220 (S.D. Fla. Mar. 11, 2022) ...................................................................... 10

*Copart, Inc. v. Sparta Consulting, Inc.*,
  339 F. Supp. 3d 959 (E.D. Cal. 2018) ............................................................................... 23, 24

*Decarlo v. Costco Wholesale Corp.*,
  2020 WL 1332539 (S.D. Cal. Mar. 23, 2020) ........................................................................... 24

*Deno v. State Farm Gen. Ins. Co*.,
  2022 WL 4112358 (N.D. Cal. Sept. 9, 2022) ............................................................................ 17

*Devco Premium Fin. Co. v. N. River Ins. Co*.,
  450 So. 2d 1216 (Fla. Dist. Ct. App. 1984) .............................................................................. 30

*Doe v. CVS Pharmacy, Inc*.,
  982 F.3d 1204 (9th Cir. 2020), *cert. granted in part*, 141 S. Ct. 2882 (Jul. 2, 2021) .............. 23

*Edelson v. Travel Insured International, Inc.*,
  2021 WL 4334075 (S.D. Cal. Sept. 23, 2021) ........................................................................... 24

*Eli Lilly & Co. v. Tyco Integrated Sec., LLC.*,
  2015 WL 11251732 (S.D. Fla. Feb. 10, 2015) .......................................................................... 26

*Emcore Corp. v. PricewaterhouseCoopers LLP*,
  102 F. Supp. 2d 237 (D.N.J. 2000) ........................................................................................... 14

*Fed. Deposit Ins. Corp. for BankUnited F.S.B. v. Kunzmann Appraisals, Inc*.,
  2013 WL 12284408 (S.D. Fla. Jan. 8, 2013) ............................................................................ 20

*First Fla. Bank, N.A. v. Max Mitchell & Co*.,
  558 So. 2d 9 (Fla. 1990) ........................................................................................................... 21

*Fla. Women's Med. Clinic, Inc. v. Sultan*,
  656 So. 2d 931 (Fla. Dist. Ct. App. 1995) ................................................................................ 16

*Gardner v. Am. Home Mortg. Servicing, Inc.*,
  691 F. Supp. 2d 1192 (E.D. Cal. 2010) .................................................................................... 23

*Gilison v. Flagler Bank*,
  303 So. 3d 999 (Fla. Dist. Ct. App. 2020) ................................................................................ 15

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

*GO Traders, S.A. v. Intertex Miami, LLC*,
  2018 WL 7287151 (S.D. Fla. Oct. 24, 2018) ............................................................ 7

*Goldstein v. Firer*,
  2022 WL 17343638 (S.D. Fla. Nov. 16, 2022), *report and recommendation adopted*,
  2022 WL 17344853 (S.D. Fla. Nov. 30, 2022) ......................................................... 26

*Gustin v. Bank*,
  859 Fed. App'x 889 (11th Cir. 2021) ...................................................................... 32

*HCM High Yield Opportunity Fund, LP v. Skandinaviska Enskilda Banken AB*,
  2001 WL 36186526 (S.D. Fla. Dec. 14, 2001) ......................................................... 26

*Hensley-Maclean v. Safeway, Inc.*,
  2014 WL 1364906 (N.D. Cal. Apr. 7, 2014) ............................................................ 22

*Hodges v. Comcast Cable Commc'ns, LLC*,
  21 F.4th 535 (9th Cir. 2021) .................................................................................. 38

*Hodges v. Monkey Capital, LLC*,
  2018 WL 9686569 (S.D. Fla. Aug. 14, 2018) .......................................................... 31

*Holmes v. Baker*,
  166 F. Supp. 2d 1362 (S.D. Fla. 2001) .................................................................... 29

*Honig v. Hansen*, 2022 WL 1239632 (S.D.N.Y. Apr. 27, 2022), *reconsideration denied*,
  2022 WL 2108594 (S.D.N.Y. June 10, 2022) .................................................... 21, 22

*In re Adobe Sys., Inc. Priv. Litig.*,
  66 F. Supp. 3d 1197 (N.D. Cal. 2014) ................................................................ 22, 23

*In re Checkers Sec. Litig.*,
  858 F. Supp. 1168 (M.D. Fla. 1994) ....................................................................... 30

*In re Enron Corp. Sec., Deriv. & ERISA Litig.*,
  235 F. Supp. 2d 549 (S.D. Tex. 2002) ..................................................................... 22

*In re Glob. Crossing, Ltd. Sec. Litig.*,
  322 F. Supp. 2d 319 (S.D.N.Y. 2004) ...................................................................... 15

*In re Harris*,
  3 F.4th 1339 (11th Cir. 2021) ................................................................................ 16

*In re Otoh*,
  2020 WL 6226068 (N.D. Ga. Oct. 22, 2020) ........................................................... 32

*In re Refco Inc. Sec. Litig.*,
  892 F. Supp. 2d 534 (S.D.N.Y. Aug. 30, 2012) ....................................................... 11

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

*In re Sahlen & Associates Inc. Sec. Litig.*,
    773 F. Supp. 342 (S.D. Fla. 1991) ........................................................ 14

*In re Sunbeam Sec. Litig.*,
    89 F. Supp. 2d 1326 (S.D. Fla. 1999) ............................................... 32, 33

*In re Sunterra Corp. Sec. Litig.*,
    199 F. Supp. 2d 1308 (M.D. Fla. 2002) ............................................... 29

*In Re Tobacco II Cases*,
    46 Cal. 4th 298 (Cal. 2009) ................................................................. 27

*In re Van Wagoner Funds, Inc. Sec. Litig.*,
    382 F. Supp. 2d 1173 (N.D. Cal. Jul. 27, 2004) ............................... 13, 14

*In re Woodbridge Invs. Litig.*,
    2020 WL 4529739 (C.D. Cal. Aug. 5, 2020) ......................................... 24

*J.P. Morgan Sec's., LLC v. Geveran Invests. Ltd.*,
    224 So. 3d 316 (Fla. Dist. Ct. App. 2017) ....................................... 10, 29

*Jacobs v. Coopers & Lybrand, L.L.P.*,
    1999 WL 101772 (S.D.N.Y. Mar. 1, 1999) ........................................... 33

*James D. Hinson Elec. Contracting Co., Inc. v. Bellsouth Telecommunications, Inc.*,
    2008 WL 360803 (M.D. Fla. 2008) ....................................................... 38

*Jara v. Nunez*,
    2015 WL 8659954 (M.D. Fla. Dec. 14, 2015) ......................................... 9

*Kearns v. Ford Motor Co.*,
    567 F.3d 1120 (9th Cir. 2009) .............................................................. 32

*Kelley v. Rambus, Inc.*,
    384 Fed. App'x 570 (9th Cir. 2010) ...................................................... 17

*Kerman-Ray of the House of Carr v. City & Cnty. of Denver*,
    2016 WL 7178320 (D. Colo. Dec. 8, 2016) ........................................... 8, 9

*Kirschner v. Bennett*,
    2012 WL 13060078 (S.D.N.Y. June 18, 2012) ....................... 11, 35, 36, 37

*Kitchens of the Oceans, Inc. v. McGladrey & Pullen, LLP*,
    832 So. 2d 270 (Fla. Dist. Ct. App. 2002) ........................................... 20

*Lawrence v. Bank of Am., N.A.*,
    455 F. App'x 904 (11th Cir. 2012) ....................................................... 35

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

*LeFebvre v. Syngenta Biotechnology, Inc.*,
  2008 WL 5245056 (N.D. Cal. Dec. 15, 2008) ........................................................... 38

*Lincoln Savings & Loan Assoc. v. Wall, et. al.*,
  743 F. Supp. 901 (D.D.C. 1990) ............................................................................. 1

*Marksman Sec. Corp. v. P.G. Sec., Inc.*,
  2020 WL 12188373 (S.D. Fla. Jun. 25, 2020) ................................................. 27, 28

*Martino v. City Furniture, Inc.*,
  2006 WL 8431417 (S.D. Fla. Jan. 23, 2006) ........................................................ 29

*Millstein v. Holtz*,
  2022 WL 3594915 (S.D. Fla. Aug. 23, 2022) ....................................................... 14

*Milstein v. Holtz*,
  2022 WL 4017172 (S.D. Fla. Sept. 2, 2022) ......................................................... 14

*Moss v. Kroner*,
  197 Cal. App. 4th 860 (2011) ................................................................................. 22

*Murphy v. Olly Pub. Benefit Corp.*,
  2023 WL 210838 (N.D. Cal. Jan. 17, 2023) .......................................................... 24

*Nat'l Org. for Women, Inc. v. Scheidler*,
  510 U.S. 249 (1994) ............................................................................................... 13

*NationsBank N.A. v. KPMG Peat Marwick LLP*,
  813 So. 2d 964 (Fla. Dist. Ct. App. 2002) ...................................................... 17, 18

*Nationwide Mut. Co. v. Ft. Myers Total Rehab Ctr., Inc.*,
  657 F. Supp. 2d 1279 (M.D. Fla. 2009) ................................................................ 38

*Newton v. Am. Debt Servs., Inc.*,
  75 F. Supp. 3d 1048 (N.D. Cal. 2014) ................................................................... 24

*Nutmeg Securities, Ltd. v. McGladrey & Pullen*,
  92 Cal. App. 4th 1435 (Cal. Ct. App. Oct. 23, 2001) .......................................... 21

*Petersen v. Allstate Indem. Co.*,
  281 F.R.D. 413 (C.D. Cal. 2012) ........................................................................... 17

*Pielage v. McConnell*,
  516 F.3d 1282 (11th Cir. 2008) ............................................................................... 7

*Pirozzi v. Apple Inc.*,
  966 F. Supp. 2d 909 (N.D. Cal. 2013) ................................................................... 28

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

*Puri v. Khalsa*,
  674 F. App'x 679 (9th Cir. 2017) ................................................................................... 17

*Raimi v. Furlong*,
  702 So. 2d 1273 (Fla. Dist. Ct. App. 1997) .................................................................... 15

*Reeves v. Ernst & Young*,
  507 U.S. 170 (1993) ......................................................................................................... 14

*Sagastume v. Psychemedics Corp.*,
  2020 WL 8175597 (C.D. Cal. Nov. 30, 2020) ................................................................ 24

*Salinas v. United States*,
  522 U.S. 52 (1997) ........................................................................................................... 12

*Saunders v. Super. Ct.*,
  27 Cal. App. 4th 832 (Cal. Ct. App. 1994) ..................................................................... 22

*Schaffer Family Investors, LLC v. Sonnier*,
  120 F. Supp. 3d 1028 (C.D. Cal. 2015) ........................................................................... 21

*Securities and Exchange Commission v. RBF Trust, LLC*,
  2023 WL 5300185 (S.D. Fla. May 31, 2023) .................................................................... 8

*Sheeran v. Blyth Shipholding S.A.*,
  2015 WL 9048979 (D.N.J. Dec. 16, 2015) ........................................................................ 9

*Skypoint Advisors, LLC v. 3 Amigos Productions LLC*,
  2021 WL 6118098 (M.D. Fla. Dec. 27, 2021) ................................................................ 31

*Smith v. Beverly Hills Club Apartments, LLC*,
  2016 WL 344975 (S.D. Fla. Jan. 28, 2016) ................................................................. 8, 38

*Solar Eclipse Investment Fund VII, LLC v. T-Mobile USA, Inc.*,
  2023 WL 4970325 (S.D. Fla. Jun. 27, 2023) *report and recommendation adopted*, *Luria v. T-Mobile USA, Inc.*, 2023 WL 5138866 (S.D. Fla. Aug. 10, 2023) ............................................ 38

*Sonner v. Premier Nutrition Corp.*,
  971 F.3d 834 (9th Cir. 2020) ........................................................................................... 24

*State Farm Mutual Automobile Ins. Co. v. Performance Orthapaedics & Neurosurgery, LLC*,
  315 F. Supp. 3d 1291 (S.D. Fla. May 9, 2018) ............................................................... 31

*Steel Warehouse Cleveland, LLC v. Velocity Outdoor, Inc.*,
  2023 WL 2264257 (N.D. Ohio Feb. 28, 2023) .................................................................. 9

*Tan v. Quick Box, LLC*,
  2021 WL 1293862 (S.D. Cal. Apr. 7, 2021) .................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

*Thomas v. Hickman*,
  2008 WL 2233566 (E.D. Cal. May 28, 2008) ........................................................................ 20

*Todd Benjamin International, Ltd. v. Grant Thornton International, Ltd.*,
  2023 WL 4457458 (S.D. Fla. July 11, 2023).................................................................. *passim*

*U.S. v. Browne*,
  505 F.3d 1229 (11th Cir. 2007) ......................................................................................... 12

*U.S. v. Ramos*,
  798 Fed. App'x 543 (11th Cir. 2020) ................................................................................ 11

*U.S. v. Russo*,
  796 F.2d 1443 (11th Cir. 1986) ......................................................................................... 13

*U.S. v. Young*,
  906 F.2d 615 (11th Cir. 1990) ........................................................................................... 13

*United States Fire Ins. Co. v. Finemark National Bank & Trust*,
  2022 WL 2132955 (M.D. Fla. Jun. 14, 2022) ................................................................... 38

*United States v. Starrett*,
  55 F.3d 1525 (11th Cir. 1995) ........................................................................................... 12

*Vidor v. Am. Int'l Group, Inc.*,
  491 Fed. App'x 828 (9th Cir. 2012)................................................................................... 17

*Wakefern Food Corp. v. Marchese*,
  2021 WL 3783259 (D.N.J. Aug. 26, 2021) ....................................................................... 28

*Wendruck v. Hartford Life Ins. Co.*,
  2005 WL 8156443 (C.D. Cal. Dec. 13, 2005) ................................................................... 14

*Woods v. Davol, Inc.*,
  2017 WL 3421973 (E.D. Cal. Aug. 9, 2017)...................................................................... 17

**Statutes**

15 U.S.C.
  § 78u-4 (the Private Securities Litigation Reform Act of 1995 [the "PSLRA"]).................... 34

15 U.S.C.A.
  §§ 1051, *et seq.* .................................................................................................................. 27

18 U.S.C.
  § 1962(a) ............................................................................................................................ 12
  § 1962(b) ............................................................................................................................ 12
  § 1962(d) ..................................................................................................................... 11, 12, 14

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

§ 1962(c) ................................................................................................................. 12, 14

Cal. Corp. Code
§ 25003(a) ............................................................................................................... 22
§ 25110 .................................................................................................................... 21
§ 25210(b) ............................................................................................................... 22
§ 25401 .................................................................................................................... 21
§ 25501 .................................................................................................................... 21
§ 25504 .................................................................................................................... 21
§ 25504.1 ................................................................................................................. 21

Fla. Stat.
§ 501.202(2) ............................................................................................................ 30
§ 517.07 ................................................................................................................... 29
§ 517.211(2) ............................................................................................................ 29
§ 517.301 ................................................................................................................. 29
§ 817.40(5) .............................................................................................................. 28
§ 817.41(1) .............................................................................................................. 26, 28

**Rules**

Fed. R. Civ. P.
Rule 12(b)(6) ........................................................................................................... 7, 14
Rule 8 ...................................................................................................................... *passim*
Rule 8(d) .................................................................................................................. 9.
Rule 9(b) .................................................................................................................. 7, 8, 14, 17

## I.     __INTRODUCTION__

In the wake of the 1980s Lincoln Savings & Loan financial fiasco, United States District Judge Stanley Sporkin, himself a CPA, famously asked—"Where [] were the outside accountants and attorneys…"[1] Such question could not be more appropriate here.

Notwithstanding that what transpired at FTX is widely regarded as one of history's biggest financial frauds, the Auditor Defendants issued "clean" audit reports (the "Audit Reports") on the FTX Entities'[2] financial statements, falsely stating they audited such financial statements in accordance with the generally accepted auditing standards ("GAAS") to which they were subject, and that based on such audits had determined that the FTX Entities' respective financial statements were "free from material misstatement, whether due to fraud or error" and were presented in accordance with generally accepted accounting principles ("GAAP"). As the world now knows, nothing could have been further from the truth.

The Auditors cry foul, arguing that Plaintiffs have the benefit of hindsight as to what happened at FTX. Such argument rings hollow given the detailed allegations in the Complaint concerning how, in performing their audits of the FTX Entities' financial statements, the Auditors failed to comply with even the most fundamental and basic principles of GAAS and how FTX's financial statements did not come close to being in accordance with GAAP. Indeed, the books, records, accounting systems and controls at FTX, things the Auditors were required to be familiar with under GAAS, were so obviously and grossly lacking that within just days of taking over as CEO of FTX upon its filing for bankruptcy, John J. Ray III ("Ray"), a very experienced financial executive who oversaw the liquidation of Enron, told the Bankruptcy Court that he did not believe it appropriate for stakeholders or the Court to rely on the very FTX financial statements the Auditors issued their clean Audit Reports on. Ray went on to tell the Bankruptcy Court that in his long career he had never "seen such a complete failure of corporate

---

[1] *Lincoln Savings & Loan Assoc. v. Wall, et. al.,* 743 F. Supp. 901, 920 (D.D.C. 1990). Unless otherwise stated herein, all emphasis is added, and quotations and footnotes omitted.

[2] "FTX Entities" and capitalized terms herein have the same meaning as defined in the "Administrative Class Action Complaint and Demand for Jury Trial: Auditor Defendants" [ECF No. 158] (the "Complaint" or "AC"), and cites to "¶¶ ___" are to paragraphs of the Complaint. "Auditors" has the same meaning as "Auditor Defendants" in the AC. "MTD" or "Motion" refers to ECF No. 281, "Defendants Armanino LLP and Prager Metis CPAs, LLC's Joint Motion to Dismiss Complaint (Dkt. 158)".

controls and such a complete absence of trustworthy financial information as occurred here." He described the situation as "unprecedented."

Moreover, as detailed in the Complaint, the Auditors acted as FTX's "cheerleaders" and promoters and, accordingly, violated GAAS' very strict "independence" requirements and, accordingly, were prohibited from issuing their clean Audit Reports.

The Auditors' argument that they had no obligation or duty to the Plaintiffs and those they represent here, flies in the face of the allegations of the Complaint detailing how and why they knew and/or ignored that FTX and its then CEO, Samuel Bankman-Fried ("SBF")[3], were touting the fact that FTX's financial statements were passing audits as a means to curry favor and the trust of current and prospective FTX customers. Indeed, the American Institute of Certified Public Accountants' Code of Professional Conduct (the "AICPA Code") recognizes the special role CPAs play in the business community and, accordingly, mandates that they "exercise sensitive professional and moral judgments in all their activities." ¶ 325 (citing AICPA Code at 0.300.020, AICPA Code at 0.300.020). In ignoring their obligations as auditors and/or disputing the alleged facts as to how their conduct deviated from those requirements in order to service SBF's narrative, the Auditors have, at best, raised issues of fact not appropriate for resolution on a motion to dismiss.

The Auditors' abdication of GAAS requirements, and "cheerleading" that openly flouted independence requirements, facilitated the Insider Defendants' scheme to lure Plaintiffs and the Class(es) into purchasing unregistered securities offered by, and/or depositing and maintaining their cryptocurrency assets with, the FTX Entities.  The Auditors worked hand in hand with the Insider Defendants to groom customers as part of SBF's narrative that the safety of the FTX Entities was demonstrated by passing "GAAP" audits—a global narrative the Auditors observed SBF pitch to Congress and plaster across social media and the websites of the FTX Entities to gain consumer trust and distinguish the FTX Entities from other cryptocurrency competitors. While Plaintiffs and the Class(es) lost billions in the scheme, the Auditors earned not only fees, but secured bragging rights to having the FTX Entities as clients, part of their respective campaigns to be cryptocurrency auditing experts on the world stage.

---

[3] On November 2, 2023, SBF was convicted in the criminal trial pending against him in the Southern District of New York.  *See* https://www.cnn.com/2023/11/02/business/ftx-sbf-fraud-trial-verdict/index.html (last visited November 2, 2023).

At bottom, the Auditors ask this Court to ignore the Complaint's detailed allegations concerning the critical role they played in helping to facilitate one of history's biggest financial frauds that has resulted in the loss of billions of dollars by thousands of FTX customers. They are essentially asking this Court to give them a free pass. Their Motion should be denied.

## II. STATEMENT OF FACTS

### A. The False "Clean" 2020 & 2021 Audit Reports

On March 30, 2022 and April 2, 2022, Armanino and Prager issued their respective audit reports on the year end 2020 and 2021 financial statements of FTX US and FTX Trading. ¶¶ 293-295. In their respective reports, the Auditors represented that they had performed their audits of the FTX Entities' respective financial statements in accordance with GAAS, which required them to, *inter alia*: (i) exercise professional judgment and maintain professional skepticism; (ii) identify and assess the risk of material misstatement of the company's financial statements whether due to fraud or error; and (iii) obtain an understanding of the internal controls and evaluate the appropriateness of accounting policies in place and used at the companies whose financial statements they were auditing. And, based on their audits, the Auditors concluded that the year end 2020 and 2021 financial statements of the respective FTX Entities were presented in accordance with GAAP and "free from material misstatement, whether due to fraud or error." ¶¶ 294-295. When an auditor issues a report of this nature, it is referred to as a "clean" audit report. ¶¶ 296-297. For the numerous reasons detailed in the Complaint, the Auditors did not comply with GAAS and never should have issued their reports. *E.g.* ¶¶ 298-299.

### B. "Clean" Audit Reports Improper Due to Lack of Internal Controls

While the Auditors essentially argue that they could not have known about the fraudulent activities taking place at FTX at the time of their audits, as noted above, the enormity of the situation at FTX was so glaringly obvious that within just a few days of taking over as CEO of FTX, Ray was able to determine and tell the Bankruptcy Court that he had never before "seen such a complete failure of corporate controls and such a complete absence of trustworthy financial information as occurred here" and described the situation at FTX as "unprecedented." ¶ 304. Ray then went on to describe to the Bankruptcy Court, again, just days after taking over as CEO, some of his conclusions concerning the inadequate, if not outright absence of, accounting books, records and controls at the FTX entities and told the Court that he had "substantial concerns as to the information presented" in the financial statements audited by

Armanino and Prager, further stating that he did "not believe it appropriate for stakeholders or the Court to rely on the audited financial statements as a reliable indication of the financial circumstances of… [FTX US and FTX Trading]." ¶¶ 305-306.

In early April 2023, Ray issued a report to the Bankruptcy Court, in which he stated that the "FTX Group lacked fundamental financial and accounting controls." ¶ 307. As detailed in the Complaint, but apparently ignored by the Auditors, Ray goes on to detail a litany of gross internal financial, accounting and corporate governance problems and failures, inadequate or non-existent accounting and financial reporting systems, controls and supporting documentation, among other problems. ¶¶ 307-308. *See also,* ¶¶ 142-144. The Auditors violated fundamental GAAS principles that required them to know and be familiar with the financial, accounting, corporate governance controls and systems (or lack thereof) in connection with their purported audits of the FTX Entities' financial statements and, given the complete lack of such, were prohibited from issuing their clean Audit Reports. ¶¶ 309-310, 322.[4]

The Complaint details numerous other red flags, including but not limited to improper commingling of customer and company funds and failure to properly disclose related party transactions, that the Auditors either knew of or ignored which should have put them on notice that the financial statements of FTX US and FTX Trading were materially misstated and essentially un-auditable in accordance with GAAS. ¶¶ 316-321.[5]

    **C.**    <u>**The Auditors Knew Their Audit Reports Were Used to Lure Customers**</u>

Because they were private entities, there was no requirement that the financial statements of FTX US and FTX Trading be audited. Thus, the Auditors knew or should have known that the reason they were engaged to issue audit reports was so the FTX Entities could tout them to curry favor and trust with current and prospective customers of and investors in FTX. ¶ 300. Indeed, FTX highlighted on its website that its financial statements had passed audits and SBF repeatedly touted this to his approximately one million social media followers—and the Auditors *did and said nothing to stop him.* ¶¶ 16, 302-303.

---

[4] Notably, both Armanino and Prager publicly acknowledged their obligations to understand the internal accounting controls of companies they audit and, ironically, publicly touted their purported expertise in auditing companies in the cryptocurrency business. ¶¶ 311-315.

[5] The AC alleges a plethora of the Auditors' GAAS violations (¶ 322(a)–(q)), which the Auditors essentially ignore in their MTD.

### D.      Acting as FTX/SBF's Cheerleaders & Promoters Violates GAAS

To make matters worse, the Auditors acted in ways generally unheard of in the audit profession—they publicly touted, promoted and effectively endorsed FTX and SBF while serving as the FTX Entities' auditors. Armanino issued multiple tweets expressing public support of SBF at key moments such as when he was testifying before Congress about FTX in December 2021 and February 2022. ¶¶ 327-329. And Prager posted on its website, which was shared with various popular social media platforms such as Twitter, LinkedIn and Facebook, that it was "proud to support FTX US" and that FTX US was a "major player" in the crypto market and that FTX US's platform "inspires…loyalty." ¶¶ 330-331. This was an unusual and meaningful endorsement from a large U.S. based accounting firm no doubt designed to provide comfort to current and prospective FTX customers. ¶ 331.

The Auditors' acts were highly unusual and outright GAAS violations. Indeed, the AICPA Code, to which the Auditors were subject, prohibits auditors from endorsing, promoting or advocating for an audit client's products or services, like the Auditors did here. ¶¶ 323-326.

### E.      Congressional Testimony Set the Stage for SBF's "Audit" Narrative

The AC at ¶ 327, n.166, incorporates SBF's December 2021, February 2022 and May 2022 testimony, in which he made false assurances that "FTX segregates customer assets from its own assets across our platforms," among other materially false and misleading statements. ¶ 327, n.166. This testimony was publicly available on the FTX website. *Id*. Thus, not only was the testimony available in real time to FTX customers and the Auditors, but in perpetuity on FTX's website (in addition to other posted materials about the audits discussed herein)–at least until the bankruptcy shut down the website.

Shockingly, immediately after the February 9, 2022 testimony, Armanino's Noah D. Buxton ("Buxton") tweeted that he read the testimony and praised it, including for "laying down the knowledge"). ¶ 329. When one considers the text of the February 2022 testimony, the audacity of Armanino/Buxton becomes clear, particularly given that Armanino at that time, having already audited FTX.US for fiscal year 2020 and being in the process of a 2021 audit, knew that it had non-existent internal controls and documentation. The juxtaposition is startling. Notably, on February 9, 2022 SBF testified: "The basic concept here is that there should be controls in place to ensure the custodian has books and records that keep track of and identify which customer owns what, and there is adequate regulatory and customer reporting, as well as

independent auditing, to verify the same." Ex. A at 000041. *See also id.* ("Another key investor-protection principle is making sure there is adequate bookkeeping (and related records) to track the customer's assets, combined with appropriate disclosure and reporting."). Audits, controls and accurate bookkeeping were centerpieces of SBF's narrative for FTX, a narrative that the Auditors knowingly and actively facilitated. Armanino's Buxton publicly endorsing this testimony, including saying it "lay[s] down the knowledge" speaks volumes toward the acts to lure FTX customers.

In the February 9, 2022 testimony, SBF puts heavy emphasis on audits as part of cryptocurrency regulation. *Id.* at 000016-17, 000022-23, 000035. SBF also relayed and/or also stated that "FTX undertakes [its] risk management program without any reliance on intermediaries, depending only on its own systems and personnel" (another red flag), focused on "[k]ey [p]rinciples" to ensure investor protection of assets as including "ensuring appropriate bookkeeping or ledgering of assets and disclosures to protect against misuse or misallocation of customer assets," and made several repeated references to audits as key to making sure that asset backing and reserves are consistent with claims and representations. Ex. A at 000016 and 000038. Notably, during the February 2022 testimony, SBF was critical of the suggestion that platform operators should not be the digital-asset custodian, and tells Congress: "[w]e believe that rather than focus on any perceived conflict, policy makers should instead focus on the first principles described above for asset safekeeping (i.e., regular auditing of cybersecurity aspects of the custody plan along with auditing the actual assets held in custody) . . . ." Ex. A. at 000040.[6]

The attempted excuse that Ray was only able to detect things due to his purported "army of professional advisors" (MTD at 18) is a non-starter. The issue was there was nothing to audit, functionally, due to a lack of internal controls or record-keeping of any functional kind. No army was needed to find that out.[7] Ultimately, few cases are on par with the Auditors' complete

---

[6] The AC incorporates the transcripts for the three Congressional testimony dates and thus the Court may consider them on the motion to dismiss. *Bey v. Gottlieb*, 2020 WL 2764266, at *1 (S.D. Fla. Mar. 31, 2020).

[7] As set out in ¶ 141, Ray was unable to differentiate among the FTX Entities because of the massive intermingling, and so Ray defined the "FTX Group" as a de facto singular entity comprised of FTX Trading, FTX.US, and Alameda, collectively, and explained the enormous scope of the readily apparent issues, including that "[u]pon assuming control, the Debtors found

abdication of auditing responsibility and ethics. The Auditors are not even able to start to build any argument that they had no knowledge or were just auditors because they functionally had nothing to audit, other than perhaps emojis and some QuickBooks information. The audacity of the Auditors' conduct is further highlighted by their publicly proclaiming on their websites the critical importance of internal controls in any audit engagement and their "cryptocurrency" auditing prowess. ¶¶ 311-315. The complete lack of the FTX Entities' internal controls was not just a "red flag" but should have been a full red "stop" sign based upon the knowledge of SBF's Congressional testimony and multiple regulatory actions and warnings from the DOJ and SEC about cryptocurrency fraud. ¶¶ 147-183.

## III.   LEGAL ARGUMENT

### A.   The Complaint Meets Fed. R. Civ. P. Rule 12(b)(6) Standards, and Rules 8(a) and 9(b)

On a Fed. R. Civ. P. Rule 12(b)(6) motion to dismiss, a court construes the complaint in the light most favorable to the plaintiff and accepts its factual allegations as true. *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008); *GO Traders, S.A. v. Intertex Miami, LLC*, 2018 WL 7287151, at *1 (S.D. Fla. Oct. 24, 2018) (Moore, J.). This standard does not require detailed factual allegations, but the complaint must state claims that are plausible. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Todd Benjamin International, Ltd. v. Grant Thornton International, Ltd.*, 2023 WL 4457458, at *6 (S.D. Fla. July 11, 2023).

Pursuant to Fed. R. Civ. P. Rule 8, the Complaint "need only contain 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Id.* at *6 (quoting Fed. R. Civ. P. 8(a)(2)). As set forth herein, several counts in the Complaint need only satisfy Rule 8. Further, for those claims sounding in fraud, Fed. R. Civ. P. Rule 9(b) requires only that the Complaint identify the "precise statements, documents, or misrepresentations made; the time and place of, and the persons responsible for, the alleged statements; the content and manner in which the statements misled the plaintiff; and what the defendant gained through the alleged fraud." *Id.* (*citing W. Coast Roofing & Waterproofing, Inc. v. Johns Manville, Inc.*, 287 F. App'x 81, 86

---

a pervasive lack of records and other evidence at the FTX Group of where or how fiat currency and digital assets could be found or accessed, and extensive commingling of assets." ¶ 141.

(11th Cir. 2008).[8]  Or, stated in simplest terms, "[u]nder Rule 9(b), it is 'sufficient to plead the who, what, when, where, and how of the allegedly false statements and then allege generally that those statements were made with the requisite intent.'" *Securities and Exchange Commission v. RBF Trust, LLC*, 2023 WL 5300185, at *3 (S.D. Fla. May 31, 2023).

Ultimately, "the threshold standard for a plaintiff's complaint to survive dismissal is "exceedingly low." *Smith v. Beverly Hills Club Apartments, LLC*, 2016 WL 344975, at *3 (S.D. Fla. Jan. 28, 2016) (Moore, J.). "[T]he pleader need not provide detailed factual allegations." *Id*. at *3 (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 555 (2007)). Plaintiffs also are not required to plead facts within defendants' knowledge. *Todd Benjamin*, 2023 WL 4457458, at *15 (citing Eleventh Circuit law; noting Rule 9(b) relaxed where "*scheme alleged is especially complex*."); *BluestarExpo, Inc. v. Enis*, 568 F. Supp. 3d 1332, 1343 (S.D. Fla. 2021) (noting that Eleventh Circuit is "not as strict as other circuits when it comes to pleading specific times, dates and places" and that "alternative means are available to satisfy" Rule 9(b)). For the reasons that follow, all counts are adequately alleged.

### B.     <u>Alternative Pleading is Permitted; Thus the Complaint is Not Ambiguous</u>

The Auditors take issue with the Plaintiffs' use of pleading facts about "one or more of the Plaintiffs" (MTD at 10-11) or their reliance. Their argument is unsupported. For example, the Auditors cite *Kerman-Ray of the House of Carr v. City & Cnty. of Denver*, 2016 WL 7178320, at *2 (D. Colo. Dec. 8, 2016) for the unremarkable proposition that the complaint must identify the parties, purportedly seeking to link that logical point to the AC's allegation that "one or more of the Plaintiffs" relied on the Audit Reports (¶ 358). The Auditors then try to extrapolate that into an assertion that Plaintiffs have done that in order to somehow avoid alleging which Plaintiff has a "claim against which defendant." MTD at 11-12. This argument is unsound. The AC identifies each Plaintiff, each Auditor Defendant (a grand total of two) and specifies the Audit Reports issued by each defendant and for which fiscal years, and as to which of the two FTX Entities. ¶¶ 17, 34-35, 293-333. In *Kerman-Ray*, by contrast, *pro se* "Claimants" sued "15

---

[8] Even in cases subject to Fed. R. Civ. P. Rule 9(b) standards, while the "circumstances constituting fraud or mistake" must be alleged with particularity, "conditions of a person's mind," such as malice, intent, and knowledge, may be alleged generally. Fed. R. Civ. P. 9(b)." *Id*. "The 'particularity' requirement serves to "alert[] defendants to the precise misconduct with which they are charged and protecting defendants against spurious charges of immoral and fraudulent behavior." *Id*. (*citing W. Coast Roofing & Waterproofing,* 287 F. App'x at 86).

Defendants, two entities and 13 individuals" and failed to allege "most Defendants' status or relationship to the alleged seizure of Claimants' property," with the court noting the relationship of the defendants to Claimants' property was "unknown". *Id*. at *2. Here, Plaintiffs "clearly identify the parties, who they are, and who did what." *Id*.[9]

Indeed, as explained in *Jara v. Nunez*, 2015 WL 8659954, at *3 (M.D. Fla. Dec. 14, 2015), plaintiffs are allowed to plead in the alternative under Rule 8, so long as no ambiguity is created. In *Jara*, for example, the defendant claimed the allegation that "Defendant 'killed, caused others to kill, and/or conspired to kill Victor Jara'"—was vague and ambiguous. *Id*. at *3. That is not the situation in the present Action.

Further, to the extent each Plaintiff asserts that each of the Auditors issued an Audit Report as to the respective FTX Entities, the Auditors are *incorrect to assume* Plaintiffs could *not* have been consumers placing assets with both (MTD at 1-2), particularly given that funds and/or assets of customers were comingled between the two entities, as discussed in the experience of the Director of Enforcement of the Texas State Securities Board in using the FTX Trading App. ¶ 215. Due to the conduct of the overall scheme and interweaving of the FTX.US and FTX Trading, Ltd. sites, including the FTX Trading App., Plaintiffs sufficiently allege they relied on one or more of the Promotional Materials, which included the Audit Reports. Indeed, Fed. R. Civ. P. Rule 8(d) permits pleading in the alternative.

### C. Materiality of "Cheerleading"/"Promotional" Statements is Adequately Pled

The Auditors assert their statements of support for FTX and SBF were not material. MTD at 13. First, analysis of materiality "presents a mixed question of law and fact that "involve[s]

---

[9] Similarly, *Steel Warehouse Cleveland, LLC v. Velocity Outdoor, Inc.*, 2023 WL 2264257 (N.D. Ohio Feb. 28, 2023) is inapplicable. In *Steel*, the plaintiff alleged that each of the two defendants made a single communication—about a particular steel forecast. *Id*. at *4. Due to the use of "and/or" the pleading "fail[ed] to connect any particular defendant to any particular allegation." *Id*. Here, each of the Auditors are alleged to have issued an Audit Report, with remarkably similar language, and for the same periods of time. This is not a situation, as in *Steel*, where the court was left guessing which defendant made the statement at issue, in large part because the plaintiff treated the two defendants as the same entity (*id*. at *1). In *Sheeran v. Blyth Shipholding S.A.*, 2015 WL 9048979, at *1 (D.N.J. Dec. 16, 2015), the plaintiff sued eight defendants asserting that each "owned, leased, operated, managed, possessed and/or controlled" the ship on which injuries to plaintiff occurred, or other acts (again without any differentiation as to the defendants).

assessments peculiarly within the province of the trier of fact." *Clear Spring Property and Casualty Company v. Bluewater Adventures of Sarasota,* 2022 WL 18027821, *6 (S.D. Fla. Dec. 6, 2022), *report and recommendation adopted*, 2022 WL 18024868 (S.D. Fla. Dec. 30, 2022). As a result, materiality should rarely be decided on a motion to dismiss, particularly where defendants cite no authority for their argument. *See Clear Spring Property and Casualty LLC v. Viking Power LLC*, 608 F. Supp. 3d 1220, 1230-1231 (S.D. Fla. Mar. 11, 2022). Indeed, the Auditors cite no authority for their claim the "cheerleading" statements are not material. Such statements are material by the very nature of the fact that, as set forth above, they are prohibited by professional standards and thus virtually never occur. Further, the standard for materiality depends on the particular cause of action, but even applying the standard for materiality applicable to the Florida Securities Investor Protection Act ("FSIPA") count, for example, the argument fails. As set forth in *J.P. Morgan Sec's., LLC v. Geveran Invests. Ltd*., 224 So. 3d 316, 325 (Fla. Dist. Ct. App. 2017), for a misrepresentation claim under the FSIPA, "materiality must be based on . . . a reasonable investor looking at the total mix of information."

As set forth above, the celebratory endorsements by the Auditors of SBF and FTX were designed to, and did, lure Plaintiffs and customers into placing assets and/or funds with the FTX Entities. ¶¶ 327-332. Plaintiffs allege that the cheerleading statements were done for the purpose of supporting the narrative of SBF to "giv[e] legitimacy and a basis of confidence in FTX by FTX customers and investors." ¶ 331. Plaintiffs also allege that the Auditors' support of the SBF and the FTX Entities was a material fact to Plaintiffs and members of the Class(es) in deciding to place or invest assets with the FTX Entities. *See e.g.* ¶ 443. Materiality is adequately pled.

**D.    The Auditors' Unsound Argument That the Audit Reports Were Nonpublic or That They Did Nothing to Induce Plaintiffs' Reliance Fails**

The Auditors wishful "get out of jail free" card is the taunt that they cannot be liable for nonpublic audit opinions. MTD at 1, 3-5, 10-13, 26.  This is flatly incorrect, particularly here when combined with the globally issued public statements of support each provided to FTX and SBF on social media, punctuated sharply by support following Congressional testimony SBF provided that focused on the need for auditing in cryptocurrency. The Auditors were FTX and SBF's willing puppets, paraded out to assuage concerns about the riskiness of cryptocurrency. In short, the Auditors seek to avoid liability by claiming that they took no acts or made no materially false statements directly to Plaintiffs. As aptly stated in a Southern District of New York decision denying summary judgment to auditor Grant Thornton:

It is true that knowingly watching a fraud go by, and remaining silent about it, will not constitute substantial assistance in the absence of a fiduciary duty to disclose. But Grant Thornton did not just watch a fraud go by. Grant Thornton submitted unqualified audit opinions of RCM that, for purposes of this motion, were knowingly false and materially misrepresented RCM's true financial condition. Thus, Grant Thornton *did* affirmatively act. The Trustee argues—with support from his expert, Dr. Carmichael—that Grant Thornton should have refused to issue an audit opinion at all, or alternatively should have issued a properly qualified opinion. Once Grant Thornton starts down the road of making a false statement, it cannot dismiss these alternatives as an absence of action. If that were true, any fraudster could escape liability by arguing 'I know that, instead of making a misrepresentation, I could have said nothing, but I had no duty to do that because that is an absence of action.' Thus, Grant Thornton's attempt to rely on pure inaction is not availing if it affirmatively committed wrongful conduct.[10]

*Kirschner v. Bennett*, 2012 WL 13060078, at *11 (S.D.N.Y. June 18, 2012). Judge Rakoff of the Southern District of New York issued a decision adopting the report and recommendation in *Kirschner* (referring to it as an "excellent" decision) and issued an opinion *de novo* denying Grant Thornton's motion for summary judgment. *See In re Refco Inc. Sec. Litig.*, 892 F. Supp. 2d 534, 535 (S.D.N.Y. Aug. 30, 2012) (Rakoff, J.). As discussed herein, the *Kirschner* decision is compelling precedent on which to deny dismissal as to several of the counts asserted in the Complaint. The Auditors' additional, introductory arguments as to certain counts requiring some form of intent to deceive/scienter, duty/privity or causation are discussed in Section III(E)-(Q) below.

**E.      An 18 U.S.C. § 1962(d) Rico Conspiracy Claim is Pled**

**1.      Plaintiffs Allege a RICO Conspiracy Agreement**

A 18 U.S.C. § 1962(d) conspiracy claim is stated "in one of two ways: (1) by showing that the defendant agreed to the overall objective of the conspiracy; or (2) by showing that the defendant agreed to commit two predicate acts." *Am. Dental Ass'n. v. Cigna Corp.*, 605 F.3d 1283, 1293 (11th Cir. 2010).[11]   A RICO conspiracy plaintiff is not required to "offer direct

---

[10] The Auditors "never refuted in any way" the reports that the FTX Entities had secured "GAAP" audits or take any steps to prevent reliance on that fact by Plaintiffs or the public. ¶ 296.

[11] As confirmed in *U.S. v. Ramos*, the test is disjunctive. *U.S. v. Ramos*, 798 Fed. App'x 543, 548 (11th Cir. 2020). Plaintiffs plead both the Auditors' agreement to the overall objective of

evidence of a RICO agreement; the existence of [the] conspiracy 'may be inferred from the conduct of the participants.'" *Id*. at 1283.[12]   A Section 1962(d) count need only satisfy Rule 8. *See Cardenas v. Toyota Motor Corp*., 418 F. Supp. 3d 1090, 1102-1103 (S.D. Fla. 2019) (citing Eleventh Circuit authority).

A plaintiff may establish an "agree[ment] to the overall objective" by "circumstantial evidence showing that each defendant must necessarily have known that others were also conspiring to participate in the same enterprise through a pattern of racketeering activity." *United States v. Starrett*, 55 F.3d 1525, 1544 (11th Cir. 1995). As explained in *Salinas v. United States*, 522 U.S. 52 (1997):

> [a] conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor. He may do so in any number of ways short of agreeing to undertake all of the acts necessary for the crime's completion.

*Id*. at 65 (defendant conspired to violate the RICO statute by accepting numerous bribes while knowing about and agreeing to facilitate an ongoing criminal scheme). As set out in *U.S. v. Browne*, 505 F.3d 1229, 1264 (11th Cir. 2007), a defendant can be guilty of conspiracy even if he did not commit the substantive acts that would constitute violations of § 1962(a), (b), or (c).

Plaintiffs submit that the combination of the Auditors' acts: 1) signing off on clean audits for two years of financial statements; 2) for new companies (in a new industry) that had never

---

the FTX conspiracy (raising money from customers while not using the funds as represented), and also, separately that the Auditors each agreed to commit two predicate acts (using the issuance of two years' of Audit Reports by each and the Auditors' "cheerleading" as predicate acts) that were part of the mail fraud and/or wire fraud engaged in in the RICO conspiracy.

[12] In *Bridge v. Phoenix Bond & Indemnity Co*., 553 U.S. 639, 647-61 (2008), the Supreme Court held that where a RICO claim is predicated on alleged mail or wire fraud, a plaintiff need not show that it relied on the defendant's alleged misrepresentations to establish the RICO claim or to establish proximate cause. As alleged, the predicate acts on which the 18 U.S.C. § 1962(c) claims are based, and thus forming the basis of the 18 U.S.C. § 1962(d) conspiracy, are acts of mail fraud, wire fraud and other conduct. *See* ¶ 66 (Ellison's plea); ¶73 (Wang's plea); ¶ 83 (Singh's plea). It is a red-herring to suggest Plaintiffs engaged in "group pleading" of wire fraud (MTD at 22). The allegations are based on the separately entered plea agreements, and the world is well aware that SBF has been on trial for acts including wire fraud.

been audited; and 3) while that the Auditors were on notice that consumers and Congress (indeed the world) were being fed the SBF's concept "we are safe because we are audited" (via Congressional testimony, representations about audits on FTX's website, social media comments by SBF about the audit status of the companies, egged on by the Auditors' "cheerleading") are critical facts when juxtaposed with the non-existent internal controls and deplorable lack of proper documentation of the financial operations of the FTX Entities, and suffice to establish an implied agreement pursuant to RICO. The alleged facts establish the Auditors' implicit agreement to participate in the RICO violations of the Insider Defendants, and their knowledge of the fraud occurring at FTX, if not their willful blindness to it. Indeed, for a RICO conspiracy conviction, the Auditors need only know the essential nature of the RICO plan, not full knowledge of every detail. *See U.S. v. Young*, 906 F.2d 615, 619 (11th Cir. 1990). As Armanino's Buxton Armanino admitted, SBF was "working *on all our* behalf . . . ." ¶ 328. RICO is even broader than ordinary conspiracy and the "RICO net is woven tightly to trap even the smallest fish, those peripherally involved with the enterprise." *U.S. v. Russo*, 796 F.2d 1443, 1462 (11th Cir. 1986).

## 2. The RICO Allegations Are Not Irrational/Economic Motive Not Required

The Auditors' feigned outrage that accountants surely would not violate RICO is a non-starter. Indeed, the Auditors' cases do not support any opposite inference here, such as that the RICO claim is "irrational."  MTD at 23. The Auditors' key case, *In re Van Wagoner Funds, Inc. Sec. Litig.*, 382 F. Supp. 2d 1173, 1185 (N.D. Cal. 2004), does not support their position that "[a] large independent accountant will rarely, if ever, have any rational *economic incentive* to participate in a client's fraud", particularly a "single client", due to "success depend[ing] on maintaining a reputation for honesty and integrity . . . ." *Id*. at 1185. Principally, in *Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 256-61 (1994), the Supreme Court held that neither a RICO enterprise nor the predicate acts of racketeering must have an economic motivation. Indeed, *Van Wagoner* is not a RICO case, but a securities case. *Van Wagoner*, 382 F. Supp. 2d at 1178.

*Van Wagoner's* premise also fails when applied to the Auditors and the facts herein. First, *Van Wagoner* states, an "independent" accountant would not undertake to participate in fraud, and there is no allegation discussed in *Van Wagoner* that E&Y lacked independence. *Id*. Second, the *Van Wagoner* client was a management investment company, a routine client of which E&Y

- 13 -

presumably had scores on hand. *Id*. at 1178. In contrast, FTX was a new cutting-edge client forming the centerpiece of an entire new line of business for the Auditors (cryptocurrency) and around which one even attempted to create auditing in the Metaverse. There is no suggestion that the *Van Wagoner* auditors were engaged in cheerleading, much less on the global stage. Combine that with the Auditors' own advertising of their cryptocurrency auditing prowess to lure in auditing clients to this new line of business, and the disconnect between this Action and the run-of-the mill accounting fraud cases comes into sharp focus. The "irrational" or "no economic motive" for a RICO violation argument fails.

Simply put, there is no "but, I'm an accountant" exception for RICO or common law conspiracy claims. This District has noted the option of pleading a Section 1962(d) claim as to an auditor. *See e.g. In re Sahlen & Associates Inc. Sec. Litig*., 773 F. Supp. 342, 368-371 and n.34-36 (S.D. Fla. 1991) (noting option of 1962(d) claim). Courts have upheld Section 1962(c) claims as to auditors (even after *Reeves v. Ernst & Young,* 507 U.S. 170 (1993)), though here Plaintiffs are not required to assert a Section 1962(c) claim as such is not pled against the Auditors. *See e.g. Wendruck v. Hartford Life Ins. Co.*, 2005 WL 8156443, *2-*3 (C.D. Cal. Dec. 13, 2005) (allegations accountant, "for a substantial fee" was "improperly investigat[ing] claims for the purpose of creating false ground to terminate [disability benefit] claims," gave rise to a § 1962(c) claim for purposes of defeating dismissal); *Emcore Corp. v. PricewaterhouseCoopers LLP*, 102 F. Supp. 2d 237, 263-266 (D.N.J. 2000) (denying dismissal, in part, of Section 1962(c) & (d) counts as to auditor as to whom it was alleged engaged in state and federal securities laws and violated the independence requirement).

In addition to meeting Rule 12(b)(6), and while not required to meet Rule 9(b) standards, the AC lays out the benefits the Auditors secured, and why they let SBF control the narrative of using their "sign off" via the "clean" Audit Reports and other statements to dupe Congress and FTX customers.[13] There is no question the Auditors were paid. ¶¶ 34-35, 504. But, more critically, securing the FTX Entities as clients cannot be understated as it was part of the Auditors' new lines of business in the cryptocurrency niche. ¶¶ 313-315. In 2022, around

---

[13] Plaintiffs note that even if the other RICO counts, such as those as to the Insider Defendants, sound in fraud and is deemed subject to Rule 9(b) standards, that any knowledge requirement still may be generally averred. *See Millstein v. Holtz*, 2022 WL 3594915, at *5 (S.D. Fla. Aug. 23, 2022)*; see also Milstein v. Holtz*, 2022 WL 4017172, at *3 (S.D. Fla. Sept. 2, 2022).

$15 billion of assets were traded daily on the FTX platform, which represented approximately 10% of global volume for crypto trading. ¶ 122.[14]

## F.    Conspiracy is Adequately Pled

Under Florida law, "[a] civil conspiracy requires: (a) an agreement between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff as a result of the acts done under the conspiracy." *Raimi v. Furlong*, 702 So. 2d 1273, 1284 (Fla. Dist. Ct. App. 1997).[15] The agreement can be express or implied. *See Gilison v. Flagler Bank*, 303 So. 3d 999, 1004 (Fla. Dist. Ct. App. 2020).

In upholding a conspiracy claim, on appeal, in *Gilison* as to an implied agreement, the court made clear that the conspirator "only needs to know of the scheme and assist in it in some way to be held responsible for all the acts of his conspirators." 303 So. 3d at 1004. There is no requirement that each coconspirator commit an act in furtherance of the scheme. *Id*. at 1004-1005. In *Gilison*, the plaintiffs, investors making loans to a car dealership, alleged that the dealership's accountants and bank conspired to make the dealership appear to be solvent for an extended period in order to obtain additional loans from investors. As alleged, the failure of the accountants "to engage in generally accepted accounting principles" allowed the "bank to receive the funds owed to the plaintiffs." *Id.* at 1002. The *Gilison* plaintiffs also alleged "the accountants and bank knew Chariots' modus operandi and substantially assisted Chariots' owner and Chariots by maneuvering critical funding into the scheme while hiding the wrongdoing." *Id.* These facts were sufficient to allege a conspiracy claim (as well as claims for fraud and aiding

---

[14] The fervor with which both Auditors were seeking to be leaders in cryptocurrency auditing echoes Arthur Anderson's conduct in *In re Glob. Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 334 (S.D.N.Y. 2004), where the accountant pursued "aggressive marketing of [] novel accounting strategies", including by issuance of strategies promoted in a "White Paper" disseminated in the telecom industry, that raised an inference that investors "would have known of Anderson's role in creating the reporting practices behind GC's [Global Crossing] false statements." *Id*. at 334. Here, each of the Auditors affirmatively held themselves out as experts in cryptocurrency auditing, highlighted by Armanino praising SBF for "working on all our behalf today!" and "laying down the knowledge." ¶¶ 328-329.

[15] California law requires plaintiff to allege: "(1) the formation and operation of the conspiracy, (2) the wrongful act or acts done pursuant thereto, and (3) the damage resulting from such act or acts." *Cellular Plus, Inc. v. Superior Court*, 14 Cal. App. 4th 1224, 1236, 18 Cal. Rptr. 2d 308 (Cal. Ct. App. 1993).

and abetting fraud) and based on the similarity to the alleged facts herein, the conspiracy claim here should also be upheld. The Auditors violated GAAS, with indisputable knowledge and notice of the lack of internal controls at the FTX Entities, and their issuance of the false "clean" Audit Reports played the role in SBF's narrative of safety via the auditing process to encourage customers to continue to place assets with FTX and regulators and Congress to look the other way, at least until the Insider Defendants could no longer keep the fraud going.

###### G.   Negligent Misrepresentation is Adequately Pled

As set out by the Eleventh Circuit in *In re Harris*, 3 F.4th 1339, 1350 (11th Cir. 2021), a negligent misrepresentation claim "does not require the defendant's knowledge that the misrepresentation was false." Rather, "plaintiff can prevail on a lesser showing—that the defendant made the misrepresentation 'without knowledge of its truth or falsity' or that the defendant 'should have known the representation was false.'" *Id*. at 1350 (citing *Osorio v. State Farm Bank, F.S.B.*, 746 F.3d 1242, 1259 (11th Cir. 2014) (setting out the elements of a negligent representation claim under Florida law)).[16]  California law also does not require knowledge of falsity for a negligent misrepresentation claim.[17]

In *Todd Benjamin*, this District recently reaffirmed that "intent to deceive" is not an element of a negligent misrepresentation claim under Florida law in upholding a claim against an auditor. 2023 WL 4457458, at *14. *Todd Benjamin* illustrates the parallel to this Action and

---

[16] Under Florida law, to state a cause of action for negligent misrepresentation, a plaintiff must allege that: "(1) there was a misrepresentation of material fact; (2) the representer either knew of the misrepresentation, made the misrepresentation without knowledge of its truth or falsity, or should have known the representation was false; (3) the representer intended to induce another to act on the misrepresentation; and (4) injury resulted to a party acting in justifiable reliance upon the misrepresentation. *See Fla. Women's Med. Clinic, Inc. v. Sultan*, 656 So. 2d 931, 933 (Fla. Dist. Ct. App. 1995). California law is substantially the same. *See Apollo Cap. Fund, LLC v. Roth Cap. Partners, LLC,* 158 Cal. App. 4th 226, 243, 70 Cal. Rptr. 3d 199, 213 (Cal. Ct. App. 2007) ("The elements of negligent misrepresentation are (1) the misrepresentation of a past or existing material fact, (2) without reasonable ground for believing it to be true, (3) with intent to induce another's reliance on the fact misrepresented, (4) justifiable reliance on the misrepresentation, and (5) resulting damage.").

[17] "In contrast to fraud, negligent misrepresentation does not require knowledge of falsity. A defendant who makes false statements "'honestly believing that they are true, but without reasonable ground for such belief, ... may be liable for negligent misrepresentation....'" [Citation.]" *See Apollo Cap. Fund*, 158 Cal. 4th at 243 (quoting *Bily v. Arthur Young & Co.* 3 Cal. 4th 370, 407, 834 P.2d 745, 767 (Cal. 1992), *as modified* (Nov. 12, 1992)).

why a negligent misrepresentation claim, at a minimum, is pled. As in *Todd Benjamin*, Plaintiffs herein "plead specific misrepresentations in accounting . . . .." *Id*. at *15; *see* ¶¶ 293-299, 307-319, 322-333. In *Todd Benjamin*, the plaintiffs plead the "factual reasons why, based on their accounting work" the auditors "should have known these misrepresentations to be false (*and on this particular allegation, Rule 9(b)'s requirements are at their most 'relaxed' in this Circuit*)." *Id*. at *15.[18] In *Todd Benjamin,* the plaintiffs' allegations included reference to an "unreleased draft audit report" that indicated that officers of the auditors had "knowledge" of the "improper revenue recognition and reporting, inappropriate documentation for amounts receivable related to investment banking work as derivative assets and warrants, lack of audit evidence for loans and improper classification of loan performance and valuation of loans, lack of definite documentation as to repayment of note receivable by TCA Management, and improper and inadequate records maintenance and loan management systems." *Id.* at *3. Plaintiffs' list herein of facts supporting the Auditors' knowledge is equal and most pointedly, based on Ray stepping in for just a few days to do a summary look at FTX's condition. *See* ¶¶ 293-299, 307-319, 322-333.

*NationsBank N.A. v. KPMG Peat Marwick LLP,* 813 So. 2d 964, 967 (Fla. Dist. Ct. App. 2002) is also instructive. In *NationsBank*, plaintiffs pursued a negligent misrepresentation claim as to an accounting firm which had prepared annual audited financial statements that were used

---

[18] As indicated in *Todd Benjamin*, decisions in Florida provide that negligent misrepresentation under Florida law sounds in fraud and thus is held to a Rule 9(b) standard. With regard to a negligent misrepresentation claim under California law, many courts have held to a Rule 8 standard. *See e.g. Petersen v. Allstate Indem. Co.*, 281 F.R.D. 413, 415-418 (C.D. Cal. 2012); *Woods v. Davol, Inc*., 2017 WL 3421973, at *6-*7 (E.D. Cal. Aug. 9, 2017). Many of these decisions refer to the lack of Ninth Circuit authority on this point. In a recent, unpublished decision, the Ninth Circuit evaluated a California negligent misrepresentation claim under Rule 9(b) although the plaintiff therein appears to have conceded the issue. *See Puri v. Khalsa*, 674 F. App'x 679, 689 (9th Cir. 2017) (plaintiff did not dispute that Rule 9(b) applied to negligent misrepresentation claim). Other unpublished Ninth Circuit have evaluated a negligent misrepresentation claim, however, under Rule 9(b). *See Vidor v. Am. Int'l Group, Inc.*, 491 Fed. App'x 828, 829 (9th Cir. 2012); *Kelley v. Rambus, Inc*., 384 Fed. App'x 570, 573 (9th Cir. 2010). Plaintiffs submit that the negligent misrepresentation claims alleged herein do not sound in fraud and are plead in the alternative.  Regardless, however, Rule 9(b) is satisfied, much as it was in a recent decision upholding a negligent misrepresentation claim under California law based upon application of Rule 9(b). *See Deno v. State Farm Gen. Ins. Co*., 2022 WL 4112358, at *3-*4 (N.D. Cal. Sept. 9, 2022).

by lender banks to assess the true financial condition of a borrower and thereby allow the banks to decide whether to renew, increase, or call the amount of a line of credit available to the borrower. *Id.* at 965. The accounting firm prepared audited financial statements during the existence of the line of credit. *Id.*[19]   Ultimately, the borrower sought bankruptcy protection, the banks sued the accounting firm for preparing inaccurate audited financial statements that did not correctly state the borrower's precarious financial condition and upon which the banks had relied. *Id.* at 966. The jury found the accounting firm liable for negligent misrepresentation. *Id.*

The *NationsBank* court, on appeal, determined that claims against accounting firms for negligent misrepresentation were within the ambit of § 522 of the Restatement. *Id.* at 966-67. As explained in *NationsBank*, "liability should extend not only to those with whom the accountant is in privity or near privity, but also to those persons, or classes of persons ... *whom he knows his client intends will so rely.*" *Id.* (original emphasis). *NationsBank* notes that § 552 does not always require the maker of a negligent misrepresentation to intend reliance by a third person; "it is sufficient if the maker knows that his client will give the information to another who will rely on it in making a business decision." *Id.* (finding sufficient evidence that the accounting firm had actual knowledge of the banks' reliance on the annual audited financial statements in deciding whether to continue the line of credit). *Id.* at 967-68.

As to intent to induce reliance, *Todd Benjamin* is particularly instructive. As noted, "[a]gain, where this information regarding *intent to induce reliance* would be 'peculiarly within' GT Cayman's and GT Ireland's knowledge, the Plaintiffs may allege that intent more generally." *Todd Benjamin,* 2023 WL 4457458, at *15. Here, in addition to direct facts alleging the Auditors' social media statements of support for FTX and SBF, including Armanino's "prayer" and "thumbs up" emojis after SBF's testimony before Congress, their alleged knowledge and notice that SBF was tweeting in July and August 2021 about that FTX being the first cryptocurrency company to secure a "GAAP" audit (¶ 303) and that the fact of the audit status was used by FTX online in its written "Security Policy" and "FTX US Regulation and Licensure Information"  to be viewed by consumers and investors (¶ 302), there is no basis for the Auditor Defendants to

---

[19] Notably, the decision was from the post-trial phase, so testimony was available to the plaintiffs, and accounting firm's engagement partner who supervised the borrower's account testified that "early on" he read the line of credit agreement and understood the necessity and the requirement for the annual financial statements. *Id.*

suggest they did not intend to induce reliance nor that that reliance was not justifiable.  Prager has further sunk its own ship by asking for judicial notice of their Audit Report which clearly states it is directed not just to the FTX Trading, Ltd. Board, but to "[s]tockholders." ECF No. 281-3. Thus, Plaintiffs submit there are sufficient allegations in the AC that Plaintiffs' relied,[20] that the Auditors intended Plaintiffs and the members of the proposed Class(es) to rely upon their Audit Reports, the existence of the Audit Reports (as part of the narrative SBF was promoting for FTX), and the other alleged "cheerleading statements."  For these same reasons, Plaintiffs submit that they were third parties of which the Auditors were aware for purposes of the professional negligence or other duty-based claims alleged in the AC.

Indeed, as detailed in ¶ 325, the AICPA Code recognizes the special role CPAs play in the business community and, accordingly, mandates that they "exercise sensitive professional and moral judgments in all their activities." AICPA Code at 0.300.020. In recognizing the CPA's obligations and responsibilities to the "public," the AICPA Code notes that: "The accounting profession's public consists of clients, credit grantors, governments, employers, investors, the business and financial community, and others who rely on the objectivity and integrity of members to maintain the orderly functioning of commerce. This reliance imposes a public interest responsibility on members." *Id*. at 0.300.030. The AICPA Code further requires that in recognition of their special role to the public that CPAs always perform their professional responsibilities with the highest level of integrity. *Id.* at 0.300.040.  Ultimately, however, issues of reasonable reliance are best resolved at later stages of proceedings, not on a dismissal motion. *See*, *e.g., Brady v. Medtronic, Inc.,* 2015 WL 11181971, at *4-*5 (S.D. Fla. Mar. 30, 2015) (discussing reliance for fraudulent misrepresentation claim).

Finally, to the extent any of the counts in the AC require causation, Plaintiffs submit it is adequately pled. Plaintiffs allege that as a result of the Auditors' conclusions provided to the FTX Entities (*i.e.*, FTX passed a "GAAP" audit and/or had been audited), which the Auditors knew SBF and the Insider Defendants would publicize, Plaintiffs and customers placed funds and/or assets with the FTX Entities, affording the Defendants the ability to engage in

---

[20] *See e.g.* ¶ 358. The reliance affirmatively pled by Plaintiffs makes cases cited by the Auditors inapplicable. *See e.g.* MTD at 10 (*citing Colenzo v. Fed. Deposit Ins. Corp.*, 2010 WL 11512212, at *4 (C.D. Cal. Apr. 28, 2010) (plaintiffs' reliance allegations were "absent")).

wrongdoing. ¶¶ 296, 300-303. Plaintiffs lost billions, while the Auditors were paid fees. ¶¶ 7, 34-36, 59, 504. [21]

> **H.**      **Professional Negligence is Adequately Pled**

Plaintiffs allege a claim for professional negligence, regardless of whether Florida or California standards apply. *See e.g. Kitchens of the Oceans, Inc. v. McGladrey & Pullen, LLP*, 832 So. 2d 270, 273 (Fla. Dist. Ct. App. 2002) (setting out elements of Florida professional negligence claim as to accountants and auditors). Plaintiffs need only satisfy Rule 8. *See Fed. Deposit Ins. Corp. for BankUnited F.S.B. v. Kunzmann Appraisals, Inc.*, 2013 WL 12284408, at *4 (S.D. Fla. Jan. 8, 2013) (denying dismissal of complaint, which included count for professional negligence, pursuant to a Rule 8 standard); *Thomas v. Hickman*, 2008 WL 2233566, at *5 (E.D. Cal. May 28, 2008) (Rule 8 is the standard for professional negligence claims).

Plaintiffs submit that the same facts giving rise to the negligent misrepresentation count (Section III(G)) also establish the professional negligence count. The principal attack of the Auditors is that they owed no duty to Plaintiffs or the members of the Class(es), citing *Bily v. Arthur Young & Co.*, 3 Cal. 4th 370, 11 Cal. Rptr. 2d 51 (Cal. 1992), *as modified* (Nov. 12, 1992). MTD at 3, n.1, 14. In *Bily*, however, the court held that an auditor may be held liable to third-parties under certain situations (which the Auditor Defendants of course say do not apply here). *Id.* at 376. As noted in *Bily*, an auditor may be liable for "negligent misrepresentations in an audit report to those persons who act in reliance upon those misrepresentations in a transaction which the auditor intended to influence." *Id.* The auditor may also be liable "to reasonably foreseeable third persons for intentional fraud in the preparation and dissemination of an audit report." *Id.* The question, therefore, is if it was foreseeable that consumers would rely and if the Auditors intended reliance. The answer is yes, as discussed in Section III(G). Indeed, the Supreme Court of Florida adopted the Restatement § 522 approach more than thirty years ago, noting that the privity doctrine had "substantial[ly] ero[ded]" in Florida, and that due to the "heavy reliance" on audited financials in the "contemporary financial world," that "permitting recovery [against accountants] only from those in privity or near privity is unduly restrictive."

---

[21] Additional points as to causation for counts in which the Auditors are only secondary actors will be addressed in briefing opposing motions to dismiss other complaints in the MDL.

*First Fla. Bank, N.A. v. Max Mitchell & Co.*, 558 So. 2d 9, 13 (Fla. 1990); *see also id.* at 12 (noting privity is not required for fraud).[22]

Plaintiffs submit that for purposes of pleading, a professional negligence claim is pled particularly here, where the Auditors knew that SBF and the FTX Entities were representing to consumers that audits had been secured.

## I.      California Corporate Securities Law ("CSL") Counts are Adequately Pled

Plaintiffs allege three separate CSL claims.[23] **First**, Plaintiffs allege the Auditors materially assisted (Cal. Corp. Code § 25504.1) the Insider Defendants in selling unregistered securities in violation of Cal. Corp. Code § 25110.[24] "Materially assisting" may include communicating misrepresentations directly to investors, or otherwise playing a material, facilitating role in the alleged securities law violation. *Schaffer Family Investors, LLC v. Sonnier*, 120 F. Supp. 3d 1028, 1045 (C.D. Cal. 2015). The conduct set out in Sections II(C)-(E) herein establish material assistance and the conduct detailed in Section II establishes intent to deceive. Section 25504.1 does not require strict privity between a plaintiff and the secondary liability defendant. *Honig v. Hansen*, 2022 WL 1239632, at *7 (S.D.N.Y. Apr. 27, 2022), *reconsideration denied,* 2022 WL 2108594 (S.D.N.Y. June 10, 2022); *see also Apollo Cap. Fund,* 158 Cal. App. 4th 226 at 252-53. Defendants in other complaints on file in the Action are named for conduct giving rise to primary liability for CSL counts and thus not addressed herein. *See e.g.* ECF Nos. 178, 179, 182.

**Second**, Plaintiffs allege that the Auditors were agents of the defendants who "materially aided" (per Cal. Corp. Code § 25504) the "act or transaction" (per Cal. Corp. Code § 25501) of a statutorily defined securities transaction undertaken in violation of Cal. Corp. Code § 25401 (material misrepresentations and omissions in written or oral communication) and for which Cal. Corp. Code § 25501 provides a statutory cause of action to the purchaser of the security. For

---

[22] Another decision upholding both negligent misrepresentation and intentional misrepresentation claims as to an auditor is *Nutmeg Securities, Ltd. v. McGladrey & Pullen*, 92 Cal. App. 4th 1435 (Cal. Ct. App. Oct. 23, 2001).

[23] For the first two sub-counts, the claims as to the Auditors necessarily derive from the primary claims against the FTX Insider Defendants.

[24] The Auditors have not presented legal argument as to why the securities at issue were either not securities, or if they were, why they were permitted to be sold without registration.

liability for "materially aid[ing]," the defendant need not have drafted the materially false statements, but rather have "knowledge of the false or misleading nature of the representations in the offering documents" or "knew facts giving it reasonable grounds to know the statements were false or misleading." *Apollo*, 158 Cal. App. 4th at 256. The Auditor Defendants status as "agents" is a factual question that should not be resolved on a dismissal motion, and Plaintiffs amply allege the Auditors knew or had reasonable grounds to know that the Insider Defendants' statements on behalf of FTX about the use of customer and investor funds was false. *See e.g.* Section II. Privity (as to the secondary actor) and loss causation are not required. *See Honig*, 2022 WL 1239632, at *7.

**Third**, Plaintiffs allege the Auditors breached Cal. Corp. Code § 25210(b) by "inducing or attempting to induce the purchase or sale of the FTX [unregistered] securities." ¶ 419. The Auditors predominantly assert that they are not "agents" pursuant to Cal. Corp. Code § 25003(a). MTD at 29. Plaintiffs adequately allege the manner in which the Auditors were acting on behalf of the Insider Defendants in luring customers to FTX, but agency status ultimately is a factual issue that should not be resolved on dismissal. *See Moss v. Kroner*, 197 Cal. App. 4th 860, at 871, n.4 (Cal. Ct. App. 2011). Plaintiffs adequately plead CSL claims.

### J. California Unfair Competition Law ("UCL") and Aiding and Abetting UCL Violations Are Pled[25]

#### 1. Plaintiffs Allege the Auditors' Unlawful, Unfair, and Fraudulent Acts

First, "[t]he 'unlawful' prong of the UCL prohibits 'anything that can properly be called a business practice and that at the same time is forbidden by law.'" *In re Adobe Sys., Inc. Priv. Litig.*, 66 F. Supp. 3d 1197, 1225 (N.D. Cal. 2014). Violation of professional standards may serve as a predicate for a UCL "unlawful" claim. *See, e.g., Saunders v. Super. Ct.*, 27 Cal. App. 4th 832, 839-41 (Cal. Ct. App. 1994) (licensing statute governing certified shorthand reporters may serve as predicate for UCL "unlawful" action). Negligence also serves as a predicate to a UCL claim. *See, e.g., Hensley-Maclean v. Safeway, Inc.*, 2014 WL 1364906, at *8 (N.D. Cal.

---

[25] The Auditors' citation to *In re Enron Corp. Sec., Deriv. & ERISA Litig.*, 235 F. Supp. 2d 549 (S.D. Tex. 2002) to make an argument about their UCL liability is a non-starter as that decision does not address UCL claims. MTD at 32, n. 49. If anything, *Enron* supports Plaintiffs' claims herein as Section 10(b) claims (a higher standard than for the claims herein) were upheld therein as to auditors on dismissal. 235 F. Supp. 2d at 707.

Apr. 7, 2014) (negligence predicate for UCL "unlawful" and "fraudulent" claims); *Gardner v. Am. Home Mortg. Servicing, Inc.*, 691 F. Supp. 2d 1192, 1201 (E.D. Cal. 2010); *Copart, Inc. v. Sparta Consulting, Inc.*, 339 F. Supp. 3d 959, 994 (E.D. Cal. 2018) (testimony that defendant violated professional standards supported unfair UCL claim). Plaintiffs allege violations of applicable professional standards and negligence, among other claims. ¶ 395.

Similarly, Plaintiffs allege UCL violations under the "unfair" prong, that "creates a cause of action for a business practice that is unfair even if not proscribed by some other law." *In re Adobe Sys.*, 66 F. Supp. 3d at 1226. Indeed, the "unfairness" prong of the UCL provides three alternatives for meeting the "unfairness" test, as the Auditors' cited case holds. *See* MTD at 32 (*citing Doe v. CVS Pharmacy, Inc.*, 982 F.3d 1204, 1214 (9th Cir. 2020), *cert. granted in part*, 141 S. Ct. 2882 (Jul. 2, 2021).[26] *Doe*, however, does not support the Auditors' argument because the *Doe* plaintiffs **did not** allege an unfairness count, much less direct the district court to the test for unfairness that defendants' conduct violated. *Id.* at 1214. Here, Plaintiffs allege many grounds for their unfairness claim and separately detail it in ¶¶ 398-403, including that that Auditors' conduct was "unethical, unscrupulous, and substantially injurious to Plaintiffs and the Classes and thus constitutes an unfair practice under the UCL." The Auditors' violations vastly outweigh the utility of their conduct and Plaintiffs allege important public policy considerations and statutes that the Auditors violated. *In re Adobe Sys,* 66 F. Supp. 3d at 1226-28.

Finally, a fraudulent prong UCL claim requires only a showing that "members of the public are likely to be deceived." *Copart, Inc.*, 339 F. Supp. 3d at 985-87 (citing *In re Tobacco II Cases*, 46 Cal. 4th 298, 325 (Cal. 2009)). The Auditors' argument that Plaintiffs could not be deceived by the non-public reports misses the point. MTD at 32-33. Plaintiffs allege that by merely representing and certifying that FTX was audited in accordance with applicable statutes, the public could be deceived into thinking that FTX was secure and stable and that the Audit Reports were truthful. ¶ 397. This, coupled with the allegations that the Auditors acted as

---

[26] As set out in *Doe*, "[u]nder the UCL's unfairness prong, courts consider *either*: (1) whether the challenged conduct is 'tethered to any underlying constitutional, statutory or regulatory provision, or that it threatens an incipient violation of an antitrust law, or violates the policy or spirit of an antitrust law,' . . . (2) whether the practice is 'immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers,' . . .; *or* (3) whether the practice's impact on the victim outweighs 'the reasons, justifications and motives of the alleged wrongdoer.'" *Id.*

"cheerleaders" on social media, gave rise to representations that could—and did—deceive members of the public. *Id.*

### 2.   Plaintiffs Allege Reliance Under the UCL

As explained in Section III(D) & (G), Plaintiffs allege reliance on Defendants' statements. Notably, only the fraudulent prong of the UCL requires a plaintiff to demonstrate actual reliance. *Copart, Inc.*, 339 F. Supp. 3d at 986 (citing *In re Tobacco II Cases*, 46 Cal. 4th 298, 325 (Cal. 2009)).

### 3.   Plaintiffs Are Entitled to Equitable Relief Under the UCL

Generally, a plaintiff may seek equitable relief for past harm only if he has no adequate remedy at law. *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020). "However, no controlling authority prevents a plaintiff from asserting alternative legal remedies at the pleading stage." *Edelson v. Travel Insured International, Inc.*, 2021 WL 4334075, at *6 (S.D. Cal. Sept. 23, 2021); *see also Sonner*, 971 F.3d at 844-45 (dealt with amendment on "eve of trial," not at the inception). "*Sonner* does not require Plaintiffs to 'demonstrate' anything at the pleadings stage[,]" nor does it hold that Plaintiffs may not seek alternative remedies at the pleading stage. *Murphy v. Olly Pub. Benefit Corp.*, 2023 WL 210838, at *11 (N.D. Cal. Jan. 17, 2023); *Sagastume v. Psychemedics Corp.*, 2020 WL 8175597, at *7 (C.D. Cal. Nov. 30, 2020). Here, Plaintiffs have requested monetary damages in addition to forms of equitable relief—that is enough at this stage. *See* ECF No. 158 at page 183.

### 4.   Plaintiffs Allege Aiding and Abetting Liability Under the UCL[27]

The Auditors are correct that "[l]iability may be imposed on those who aid and abet another's violation of the UCL if the individual knows the other's conduct constitutes a violation and gives substantial assistance or encouragement to the other to so act." *Decarlo v. Costco Wholesale Corp.*, 2020 WL 1332539, at *5 (S.D. Cal. Mar. 23, 2020). However, "Defendant[s] contend[] that, under the Federal Rules, Plaintiffs must satisfy Rule 9's heightened particularity standard. But Rule 9 is clear that plaintiffs may plead knowledge generally." *In re Woodbridge*

---

[27] "[N]umerous California courts [] have expressly found that aiding-and-abetting liability exists for UCL claims." *Newton v. Am. Debt Servs., Inc.*, 75 F. Supp. 3d 1048, 1064 (N.D. Cal. 2014) (citing *People v. Toomey,* 157 Cal. App. 3d 1, 15 (Cal. Ct. App. 1984) ("[I]f the evidence establishes defendant's participation in the unlawful practices, either directly or by aiding and abetting the principal, liability under [the UCL] can be imposed.").

*Invs. Litig.*, 2020 WL 4529739, at *5 (C.D. Cal. Aug. 5, 2020); *see* MTD at 32-33. Plaintiffs therefore need only satisfy the normal Rule 8 pleading standard as to actual knowledge—and do.

Under this standard, "[c]ourts have found that a defendant's 'decision to ignore suspicious activity or red flags is sufficient to demonstrate actual knowledge' for aiding and abetting liability." *Tan v. Quick Box, LLC*, 2021 WL 1293862, at *11 (S.D. Cal. Apr. 7, 2021). "Courts have also considered allegations concerning a defendant's knowledge and familiarity with the structure and operation of an alleged fraudulent scheme to be relevant to the actual knowledge inquiry." *Id.* The second element, substantial assistance, "requires that the defendant's actions be a 'substantial factor' in causing the plaintiff's injury." *Id.*

Here, Plaintiffs have alleged that the Auditors, who held themselves out as experts in cryptocurrency accounting, refused to refute FTX's statements, despite knowing their falsity. ¶ 481. Likewise, "Defendants facilitated the violations of statutory and common law alleged herein by their actions which they knew or recklessly disregarded FTX and the FTX Insider Defendants would use to solicit and/or maintain customers." *Id.* Thus, Plaintiffs have alleged aiding and abetting UCL violations.

### K.   Non-Florida Plaintiffs Have Standing to Bring Florida Statutory Claims; Non-California Plaintiffs Have Standing to Bring California Statutory Claims

The Auditors' argument that the Court should dismiss the non-Florida Plaintiffs' other Florida statutory claims against them because their principal places of business are not in Florida, and that Plaintiffs make no allegation that the Auditors' acts took place in Florida is misplaced. MTD at 34. Notably, Plaintiffs' FSIPA claims arise from conduct directly emanating from Florida. The Auditors are FTX's agents, that FTX violated FSIPA, and that FTX has strong ties to and resides in Florida.[28] Therefore, as the Auditors' own authority confirms, because they

---

[28] Prager is registered to do business, and maintains offices, in Florida and the "Metaverse," accessible to anyone in Florida. ¶ 35. Armanino is a "national" firm working in all states and is registered to do business in Florida. ¶ 34. Both provided auditing services to FTX with U.S. headquarters in Florida, and FTX publicized the "clean" Audit Reports from and in Florida. ¶¶ 43, 122, 273, 277-278, 281-282, 336. The Auditors knew, or should have known, that FTX would tout these reports in worldwide marketing, including Florida. ¶¶ 300-303. These Defendants also knew that their social media proclamations about FTX and the "clean" audit reports helped supported and promoted FTX's business in Florida. Even after they learned that FTX widely advertised the "clean" audit reports Auditors failed to correct them. ¶ 296. The Auditors as FTX's agent, participated in the marketing of unregistered securities in Florida,

were agents of sales that took place in Florida, FSIPA applies. *Goldstein v. Firer*, 2022 WL 17343638, at *5 (S.D. Fla. Nov. 16, 2022), *report and recommendation adopted*, 2022 WL 17344853 (S.D. Fla. Nov. 30, 2022) ("[I]f all or part of the sale did occur in Florida, the FSIPA applies."). Thus, Plaintiffs have pled (a) misleading advertising that emanated from Florida, (b) the sale of securities that occurred at least in part in Florida, all that is required under Defendants' case citation[29] (*see HCM High Yield Opportunity Fund, LP v. Skandinaviska Enskilda Banken AB*, 2001 WL 36186526, at *22 (S.D. Fla. Dec. 14, 2001) ("[t]here is no requirement that a plaintiff must plead that the sale occurred in Florida")), and (c) unfair and deceptive practices that occurred at least partially in Florida.[30]

Importantly, the Auditors supported FTX through statements made on various social media platforms—statements that reached all 50 states, including Florida. ¶ 358.[31] Thus, it can be inferred that the combination of assisting FTX in Florida and making deceiving statements championing FTX "generate a sufficient relationship with the State of Florida in order to survive the instant Motion." *Eli Lilly & Co. v. Tyco Integrated Sec., LLC.*, 2015 WL 11251732, at *4-5 (S.D. Fla. Feb. 10, 2015); *see also Barnext Offshore, Ltd. v. Ferretti Grp. USA, Inc.*, 2012 WL 1570057, at *5-6 (S.D. Fla. May 2, 2012) (FDUTPA does not limit its protection to acts occurring exclusively in Florida).

Next, Defendants argue that non-California Plaintiffs lack standing to bring California statutory claims against Prager because they make no allegation that any acts performed by Prager took place in California, and Prager is not based in California. MTD at 34. However, the

---

[29] ¶¶ 372-373 & 378-379, and assisted in the promotion of FTX in Florida and elsewhere. ¶¶ 386-388.

[29] The Auditors rely on *Goldstein*, 2022 WL 17343638, at *5, in which the Court noted that the statute does not reach transactions *only* if they occurred *entirely* outside of Florida. In fact, *Goldstein* cites *HCM*, 2001 WL 36186526, at *22, which applied "the FSIA where bonds were issued by a corporation in Florida, the offering memorandum was sent to Florida, and the purchase occurred in Florida." *Goldstein*, 2022 WL 17343638, at *5. Here, FTX issued securities from Florida.

[30] Auditors' cases do not support their position because acts occurred in Florida.

[31] For the same reasons, Plaintiffs also have standing to bring Count II. *See* MTD at 34; *see also* Fla. Stat. § 817.41(1) ("It shall be unlawful for any person to make or disseminate or cause to be made or disseminated [misleading advertisement] before the general public of the state[.]").

UCL's focus is on the defendant's conduct in service of the statute's larger purpose of protecting the general public against unscrupulous business practices. *In Re Tobacco II Cases,* 46 Cal. 4th 298, 312 (Cal. 2009). Therefore, by making false and misleading statements on social media that were disseminated in California, Prager gave rise to claims under the UCL and FAL. Similarly, the non-California Plaintiffs have standing to bring their California Corporate Securities Law claim against Prager because Prager materially aided FTX "in the offering and selling of the FTX Platform, it's YBAs, and/or FTT **in California** by means of written communications in the Audit Reports and their social media and/or internet statements of support for FTX[.]" ¶ 417.

## L. Violation Of The Florida Misleading Advertising Statute § 817.41 and California's False Advertising Law are Adequately Pled.

As this Court stated in *Marksman Sec. Corp. v. P.G. Sec., Inc.*, 2020 WL 12188373, at *6 (S.D. Fla. Jun. 25, 2020):

> In order to state a claim under § 817.41, a plaintiff must allege '(1) misrepresentation of a material fact; (2) the representor made the misrepresentation without knowledge as to its truth or falsity under circumstances in which he ought to have known its falsity; (3) that the representor intended that the misrepresentation induce another to act on it; (4) that injury resulted to the party acting in justifiable reliance on the misrepresentation.'

### 1. Plaintiffs Adequately Allege Reliance.

The Auditors issued their "clean" audit reports *knowing* that, because the reports were not legally required since FTX was a private company, FTX would publicly tout the "clean" audits to support their marketing, including on the FTX website. ¶¶ 296, 300-303. FTX and its principals repeatedly did so in tweets and other promotional materials. *Id.* Plaintiffs allege that they reasonably relied on these misrepresentations of FTX's financial stability, which incorporated references to the audit reports, as a basis to do or continue to do business with FTX. ¶¶ 360, 362, 435-436, 441, 445, 451. Reliance is adequately alleged.

### 2. Florida Law Does Not Require That Representations Be "Public Statements"

Indeed, the elements for a Florida Misleading Advertising claim, as cited by the Auditors, do not require a "public statement."[32] To the contrary, the claim only requires a

---

[32] The cases the Auditors cite are inapposite because they were decided under the specific requirements of the Lanham Act (the "Act") (15 U.S.C.A. §§ 1051, *et seq.*) *not* state statutory claims. The Court in *Advanced Fluid Systems, Inc. v. Huber,* 28 F. Supp. 3d 306 (M.D. Pa. 2014)

misrepresentation of material fact "made or disseminated before the general public of the state *or any portion thereof*." Fla. Stat. 817.41(1) (emphasis added). Further, as this Court noted in *Marksman*:

> . . . a claim for misleading advertising does not require that the statements were made in connection with a sale or offer for sale. § 817.41. Rather, the statute requires that the statement be made 'with the intent or purpose, either directly or indirectly, of selling ... services ... or to induce the public to enter into any obligation relating to such ... services.' *Id*. And, Plaintiff sufficiently alleges that Defendants made the statement in the Instagram Profile and published the false reviews with the intent to indirectly induce consumers to utilize Defendant P.G. Security's services over Plaintiff's services. 5 Am. Compl. ¶¶ 119, 123, 141, 144; see Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.").[33]

*Marksman*, 2020 WL 12188373, at *6. The Auditors both made (a) statements that they knew or should have known would be disseminated by FTX to the general public, and (b) made public statements themselves in social media promoting their support of FTX. ¶¶ 327-333.[34]

---

merely held an *advertisement,* as expressly defined under the Act, is limited to "commercial advertising or promotion." *Id.* at 334. *Wakefern Food Corp. v. Marchese*, 2021 WL 3783259 (D.N.J. Aug. 26, 2021) merely mentions the Act's "prohibit[ions] concerning 'commercial advertising or promotion.'" *Id.* at *4.

[33] Indeed, as stated in 817.40(5):

> The phrase "misleading advertising" includes any statements made, or disseminated, in oral, written, electronic, or printed form or otherwise, to or before the public, or any portion thereof, which are known, or through the exercise of reasonable care or investigation could or might have been ascertained, to be untrue or misleading, and which are or were so made or disseminated with the intent or purpose, *either directly or indirectly*, of selling or disposing of real or personal property, services of any nature whatever, professional or otherwise, or to induce the public to enter into any obligation relating to such property or services.

Fla. Stat. § 817.40(5) (emphasis added).

[34] Plaintiffs submit that their California False Advertising Law ("FAL") claim should survive dismissal on the same basis as their UCL claim, discussed in Section III(J). *See e.g. Pirozzi v. Apple Inc.,* 966 F. Supp. 2d 909, 923 (N.D. Cal. 2013) (upholding FAL claim on same basis as UCL claim upheld).

### 3. The False "Clean" Audit Reports Themselves Were Misstatements Of Fact

Plaintiffs allege that it should have been self-evident to both Auditors that the operations of the FTX Entities (and lack of internal controls) did not warrant a "clean" audit report. Plaintiffs allege, *inter alia,* that (a) FTX's new CEO quickly observed that the company followed no proper financial or operational controls (*see, e.g,* ¶¶ 14, 237-238 & 304-308), (b) the Auditors, with even minimal performance of their obligations, should have known the "clean" audit reports were unwarranted and false (¶¶ 238, 251, & 304-315), and (c) numerous "red flags" should have been obvious to Defendants. ¶¶ 15, 236-237, 316-321. *See, e.g., In re Sunterra Corp. Sec. Litig*., 199 F. Supp. 2d 1308, 1332 (M.D. Fla. 2002) ("material misstatements made by [the auditor] in its unqualified audit opinion" satisfied the requirement for pleading fraud against the auditor);[35] *Holmes v. Baker*, 166 F. Supp. 2d 1362, 1375 (S.D. Fla. 2001) (misrepresentations pled as "complaint alleges that [the auditor] falsely represented in its audit opinions that [the company's] financial statements . . . were presented in accordance with GAAP and that [auditor]'s audit of [the company's] financial statements had been performed in accordance with GAAS").

### M. Florida Securities Counts Are Adequately Pled

Florida Statute Section 517.211(2) includes agents of the issuer of unregistered securities within those who may be held liable for violations of Sections 517.07 and 517.301 if that person "participated or aided in making the sale." Privity is not required. *J.P. Morgan Sec., LLC v. Geveran Invs. Ltd.*, 224 So. 3d 316, 328 (Fla. Dist. Ct. App. 2017). Nor is loss causation. *Arthur Young & Co. v. Mariner Corp*., 630 So. 2d 1199, 1204 (Fla. Dist. Ct. App. 1994). In the statute, "the use of the word agent is to make liable all those representatives and direct participants in the sale of the security who commit fraud as a means of inducing the purchaser to buy." *Arthur Young*, 630 So. 2d at 1203 (holding accounting firm was agent). Further, the issue of agency is not appropriate for resolution on a dismissal motion. *Brady v. Medtronic, Inc.,* 2015 WL 11181971, at *4 (agency for fraudulent misrepresentation claim).

The Auditors did not just provide false "clean" Audit Reports, but rather did so with the express knowledge that FTX intended to use them to promote FTX's services, including unregistered securities. After SBF's testimony, Armanino tweeted that SBF was "working on *all*

---

[35] Florida's misleading advertising statute incorporates a claim for fraud. *See, e.g, Martino v. City Furniture, Inc.,* 2006 WL 8431417, at *5 (S.D. Fla. Jan. 23, 2006).

our behalf today!" indicating his interest in the company's success. ¶ 328 (emphasis added). This conduct was obvious "cheerleading" and promotion of FTX, as even The Wall Street Journal noted. ¶ 332. These actions exceeded their duties as auditors and violated their duty of independence: they were enmeshed on many levels with FTX. *Id.* Plaintiffs allege that the Auditors "knew or recklessly disregarded that their public 'endorsements' and statements supporting FTX and [SBF] would lead to current and prospective customers and investors entrusting their assets with FTX." ¶ 333.

Plaintiffs plead that the Auditors served as FTX's agents when they assisted FTX in the promotion and sale of unregistered securities through their "the statements of support for FTX and/or SBF alleged herein, as well as the provision of materially false Audit Reports intended to curry favor with Plaintiffs and the Classes as an endorsement of the safety of trading on the FTX Platform, enrolling in the YBAs and/or acquiring the FTT."[36] ¶ 373; *see also id.*, ¶ 379.

The Auditors overstate the holding of *In re Checkers Sec. Litig.*, 858 F. Supp. 1168 (M.D. Fla. 1994). The case states that auditors "may not be held liable under Section 12 *where their conduct consisted only of the performance of their professional services and* they had no financial interest in the sale of securities." *Id.* at 1180. Here, the Auditors did *not* only perform professional services but went out of their way to endorse FTX. As alleged, each of the Auditors had functionally declared themselves as cryptocurrency auditing experts, and service a purported industry leader like the FTX Entities was part of the reciprocal bargain for their role: increased auditing business. For purposes of this Motion, the Auditors are adequately pled to be agents.

### N.    The FDUTPA Count is Adequately Pled

#### 1.    The Auditors Engaged In Unconscionable, Deceptive And Unfair Practices

The Auditors prepared and submitted false "clean" audit reports. Fla. Stat. § 501.202(2) (prohibiting "unconscionable, deceptive, or unfair acts or practices"). Specifically, the Auditors engaged in conduct "objectively likely to mislead – and have misled – consumers acting reasonably in the circumstances" in that they "issu[ed] materially false Audit Reports and

---

[36] *Devco Premium Fin. Co. v. N. River Ins. Co*., 450 So. 2d 1216, 1219 (Fla. Dist. Ct. App. 1984), cited by the Auditors, does *not* state that an auditor can never be an agent but, specifically that their services do not "convert the auditor into something of management's agent who must police the system created by management."

engag[ed] in the promotion of FTX, that was part of the marketing scheme used by the MDL Defendants in order to cause customers/consumers to deposit funds or set up the FTX Platform, YBAs and/or FTT with FTX." ¶¶ 386-388. As alleged in the AC, the Auditors did nothing to stop FTX from touting the audit status of the FTX Entities, nor to issue any statements of withdrawal or caution to the public. *See e.g.* ¶ 296.

Plaintiffs satisfy the three-part test for a FDUTPA claim, as this Court set out in its summary judgment decision in *State Farm Mutual Automobile Ins. Co. v. Performance Orthapaedics & Neurosurgery, LLC*, 315 F. Supp. 3d 1291, 1300 (S.D. Fla. May 9, 2018), which requires (1) a deceptive act or unfair practice, (2) causation, and (3) actual damages. As set out in *State Farm*, an "unfair practice is one that offends established public policy and that is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *Id.* at 1306. Plaintiffs submit a FDUTPA claim is pled. Plaintiffs lost billions of dollars. ¶¶ 7, 36, 59. The Auditors cannot not suggest that these losses are "outweighed by any countervailing benefits to consumers or competition" that the practice produces. *Burrows v. Purchasing Power, LLC*, 2012 WL 9391827, at *5 (S.D. Fla. Oct. 18, 2012). And Plaintiffs could not audit FTX's records and had no access to financial records that would have disclosed FTX's fraud and financial distress so their damages are ones they could not reasonably have "avoided." *Id.* at *5.

As discussed above, the fact that most Plaintiffs did not read the actual audit reports is irrelevant because they learned that the Auditors issued "clean" audit reports and they, and the market, relied on these reports. As set forth in Section III(G), Plaintiffs plead adequate facts to establish causation. *See also State Farm*, 315 F. Supp. 3d at 1309-1310 (noting that FDUTPA claim does not require actual reliance on the misrepresentation or omission at issue, and that questions as to the reasonableness or quantification of damages are fact issues for the jury).

## 2. **FDUTPA Claims Apply to the Acts Alleged in the AC**

"[A]s the securities laws are designed for consumer protection . . . a violation of the securities laws is a per se violation of FDUTPA." *Hodges v. Monkey Capital, LLC*, 2018 WL 9686569, at *7 (S.D. Fla. Aug. 14, 2018). *See also Skypoint Advisors, LLC v. 3 Amigos Productions LLC*, 2021 WL 6118098, at *7 (M.D. Fla. Dec. 27, 2021) (citing *Hodges* and denying summary judgment on FDUTPA claim).

In any case, Plaintiffs FDUTPA claim is not predicated solely on its securities claims, but also on the Auditors' "cheerleading" and independence violations, so this issue is a non-

starter. *See* ¶¶ 386-387, 382. The Court has not yet determined if the transactions at issue involve the sale of unregistered securities, and Plaintiffs are entitled to plead in the alternative. The Auditors assert that they dispute that the YBAs and FTT are securities (MTD at 31), but do not present any argument to refute the allegations in the AC on this point, nor to provide legal support for their position.

### O.   The Fraud-Based Counts Are Adequately Pled

The elements for pleading fraud under Florida law are:

> (1) a false statement of fact; (2) known by the person making the statement to be false at the time it was made; (3) made for the purpose of inducing another to act in reliance thereon; (4) action by the other person in reliance on the correctness of the statement; and (5) resulting damage to the other person.

*Gustin v. Bank*, 859 Fed. App'x 889, 891 (11th Cir. 2021).[37]

*In re Sunbeam Sec. Litig.*, 89 F. Supp. 2d 1326 (S.D. Fla. 1999), is instructive. *Sunbeam* involved alleged accounting improprieties as to a "the one-time restructuring charge" in "excess of $90 million." *Id*. at 1331. This District upheld scienter as to the auditor, rejecting arguments that the "[t]he mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter." *Id.* at 1344.

In facts in line with those alleged herein, and on a far less substantial fraud, *Sunbeam* held that plaintiff alleged that "Arthur Andersen's wrongdoing ran deeper than innocent auditing and accounting slip-ups" and noted key facts such as that the auditor "knew or was severely reckless for not knowing that Sunbeam's internal controls were virtually non-existent—only two people comprised the company's entire internal audit staff—it elected not to expand its audit in violation of a GAAS . . . requirement that it have a sufficient understanding of Sunbeam's internal control structure and plan its audit accordingly." *Id*. Further, the auditor failed to "adhere to

---

[37] Justifiable reliance is not a requirement of a fraudulent misrepresentation claim under Florida law. *Bluestar Expo*, 568 F. Supp. 3d at 1344.  The elements of fraud at federal common law are: "(1) a false representation (2) in reference to a material fact (3) made with knowledge of its falsity (4) and with the intent to deceive (5) with action taken in reliance upon the representation." *In re Otoh*, 2020 WL 6226068, at *5 (N.D. Ga. Oct. 22, 2020). A California common law fraud claim requires: (1) a misrepresentation (such as a false representation, concealment, or nondisclosure); (2) knowledge of falsity (also known as scienter); (3) intent to defraud or to induce reliance; (4) justifiable reliance; and (5) resulting damage. *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1126 (9th Cir. 2009).

GAAS by not identifying numerous 'fraud risk factors' that suggested that there was a significant risk that Sunbeam had fraudulently misstated its financial statements." *Id.* Notably, the *Sunbeam* auditor eventually refused to "consent to the use of its Audit Opinion in an SEC registration statement" but previously had not given "any indication to the public that it no longer stood behind its Audit Opinion." *Id.* at 1345. The Auditors here are more brazen, never seeking to refute or withdraw their Audit Reports or SBF/FTX's touting of such.

     *Sunbeam* also noted that the "sheer magnitude" of the restatements in that case suggested that "Arthur Andersen should have known or was severely reckless not to know that its Unqualified Audit Opinion was misleading." *Id.* at 1345 (*citing In re Leslie Fay Cos., Inc.*, 835 F. Supp. 167, 175 (S.D.N.Y. 1993) ("[i]n cases where small accounting errors only ripple through the corporate books, a court may conclude ... that an accountant's failure to discover his client's fraud was not sufficiently reckless to sustain a 10–b5 claim. On the other hand, when tidal waves of accounting fraud are alleged, it may be determined that the accountant's failure to discover his client's fraud raises an inference of scienter on the face of the pleading."). The fraud here was no small "ripple," but a "tidal wave" of accounting fraud, indeed, just basic outright fraud as Ray spotted immediately. ¶ 146 (Ray: "[t]he FTX Group's profound control failures placed its crypto assets and funds at risk from the outset.").

     *Sunbeam* also noted *Jacobs v. Coopers & Lybrand, L.L.P.*, 1999 WL 101772 (S.D.N.Y. Mar. 1, 1999) is instructive. 89 F. Supp. 2d at 1345. As summarized in *Sunbeam:*

> Coopers ignored "red flags" that should have raised questions in Coopers mind and led it to obtain additional materials, *id.* at *2; Coopers did not adequately plan and supervise its audit, which led to its failure to acquire sufficient evidential material, *id.* at *6; Coopers did not understand its client's internal control structure and therefore did not understand or recklessly disregarded certain weaknesses, *id.* at *7. The court specifically noted that "Plaintiffs' allegations that Coopers had knowledge of [its client's] internal workings and had a history with the company, taken together, support a claim that the failures to observe GAAS in this particular audit amount to a level of recklessness high enough to maintain an action under § 10(b)." *Id.* at *15.

*Id.* at 1345-6. While the Auditors here will/have contended that they did not audit the FTX Entities for any long period, that does not assist their argument, indeed it makes it worse for them. The Auditors knew that the FTX Entities and SBF were the focus of Congressional and regulator inquiry as to the new spectacle of "cryptocurrency" and should have been extremely

concerned about the risk of fraud at companies that used QuickBooks (if at all) and emojis, and was run by a by a "small group of individuals who showed little interest in instituting an appropriate oversight or control framework" and with no independent board of directors. ¶¶ 118-119, 141. Dollar signs replaced judgment and ethics in the Auditors' quest to be portrayed as cryptocurrency experts to secure lucrative clients, rather than being concerned about serving as the watchdog.[38]

Ironically, the Auditors cite in *Bruhl v. PricewaterhouseCoopers International, Ltd.*, 2006 WL 8431888 (S.D. Fla. Apr. 3, 2006) to support their supposed privity argument for a fraudulent concealment claim (the "*Bruhl* Fund Administrator Decision"). MTD at 15, n.19. They fail, however, to alert this Court to the more significant companion decision entered the same date in the *Bruhl* action against auditor Goldstein Golub Kessler, LLP ("GGK"), *Bruhl v. PricewaterhouseCoopers Int'l., Ltd.*, 2006 WL 8431886 (S.D. Fla. Apr. 3, 2006) (the "*Bruhl* Auditor Decision"). In the *Bruhl* Auditor Decision, this District (the "*Bruhl* Auditor Court") upheld both federal securities fraud claims and common law fraud-based claims against the auditor. *Id*. at *4-*5. In rejecting arguments on particularity of the fraud allegations under the heightened pleading standards of the Private Securities Litigation Reform Act of 1995 (the "PSLRA") and Rule 10b-5 of the Securities Exchange Act of 1934 (standards higher than those Plaintiffs herein need to meet), the *Bruhl* Auditor Court held that "by alleging that GGK made material misrepresentations and omissions in all of their annual Audit Opinions[,] Plaintiffs allege how the reports misled them into purchasing and retaining their investments in the Partners Fund." *Id*. at *3. A review of the allegations shows that the plaintiffs alleged "red flags" concerning the valuation of securities and that despite these flags, the auditor stated that the financial statements "presented fairly, in all material respects, the financial position of the partnership," that "the financial statements were free of material misstatements," and that the

---

[38] Prager was sued by the SEC for including indemnification provisions in their engagement letters, a lack of independence. *See Securities and Exchange Commission v. Prager Metis CPAs, LLC et al,* 1:23-cv-23723-RNS (S.D. Fla.) at ECF No. 1 (filed Sept. 29, 2023) (the "SEC Action") (alleging violation of independence in 87 engagement letters from approximately December 2017 to October 2020). ECF No. 1 in SEC Action at ¶¶ 1-3 (noting Prager earned $3 million in fees for this work). Astonishingly, in ¶ 3 in the SEC Action, the SEC alleges that Prager was on notice of the issue by at least early January 2019 "when a new partner who recently had joined Prager raised the issue with senior Prager partners."

"audits were conducted in conformity with generally accepted accounting standards." *Id*. Plaintiffs' allegations here are stronger. The *Bruhl* Auditor Court also rejected the assertion that the complaint failed to allege how any plaintiff was misled by the misstatements, citing the complaint's allegation that the audit opinions were "one of the primary means by which investors were induced to invest in and hold on to securities of the Partners Fund . . . . " *Id*. at *3.

As to scienter, the *Bruhl* Auditor Court rejected the auditor's arguments, finding that the failure to comply with numerous auditing standards, combined with ignoring "'red flags' or warning signs of improprieties" sufficiently stated a claim for securities fraud under the scienter requirement for such claims. *Id*. at *4. The *Bruhl* Auditor Court then held that the common law fraud claims were also sufficiently pled. *Id*. Plaintiffs submit that the same result should hold here.

**P.    Aiding and Abetting Fraud is Adequately Pled**

The test for aiding and abetting is not in substantial dispute for purposes of this motion. Essentially, under Florida law, aiding and abetting requires: "(1) an underlying violation on the part of the primary wrongdoer; (2) knowledge of the underlying violation by the alleged aider and abettor; and (3) the rendering of substantial assistance in committing the wrongdoing by the alleged aider and abettor." *Lawrence v. Bank of Am*., N.A., 455 F. App'x 904, 906 (11th Cir. 2012).[39] The Auditors' attacks are primarily that they lacked knowledge of the fraud by the Insider Defendants and did not provide substantial assistance (such that they were not a substantial factor in causing the harm).

Plaintiffs submit that the *Kirschner* decision, discussed in Section III(D), illustrates that substantial assistance, for purposes of aiding and abetting, does not require a statement or affirmative act, it can be found based on mere concealment of the primary wrongdoer's act or statement. *Kirschner,* 2012 WL 13060078 at *9-*12. This was emphasized recently by this District in *Todd Benjamin*, 2023 WL 4457458, at *15, that "[s]ubstantial assistance occurs when a defendant affirmatively assists, *helps conceal*, or fails to act when required to do so, thereby enabling the breach to occur." *Id*. Indeed, the AC's allegations support the inference that the Auditors were on notice that the centerpiece of the scheme to defraud was to use the even the

---

[39] Under California law, "aiding and abetting" also requires: "(1) that the defendant had actual knowledge of the specific primary wrong and that (2) the defendant substantially assisted it." *Benson v. JPMorgan Chase Bank, N.A.*, 2010 WL 1526394 (N.D. Cal. Apr. 15, 2010).

existence of having an Audit Report to sell FTX and/or its safety to customers, and even Congress.

In *Kirschner*, in addition to the "inaction" argument of an auditor being rejected (*see* Section III(D) above), the *Kirschner* auditor unsuccessfully asserted that there was no claim for substantial assistance in the fraudulent inducement of customers because the audit opinions were not "public" and "none of the customers whose claims remain in this case saw or directly relied on those opinions." *Kirschner*, 2012 WL 13060078 at \*9. *Kirschner* made short shrift of this argument, which it likened to the auditor saying "[t]hey were like a tree in the forest that falls when nobody is around, so they couldn't have caused the FX customers to deposit funds at RCM." *Id.* at \*12. In rejecting the "nonpublic" argument in detail, *Kirschner* held that the auditor's argument "misse[d] the mark" for reasons including:

> 1) The fact that there was no public disclosure of any qualification to the false report—or any refusal to report—is *itself* public information. *See* Expert Report of Barbara Lucas, Koo Ex. 31 at 2-3 (noting that market participants "rely on other publicly available information and/or the absence of negative public information concerning their counterparties"). . . . even if the RCM audit opinions were private, the fact that nothing negative is reported by an auditor creates an inference that RCM is financially healthy. Thus there is at least a jury question as to whether the unqualified audit opinions of RCM did substantially assist the fraud because they effectively operated to conceal RCM's financial situation by creating an inference that there was no problem for an accountant to find. *See JP Morgan Chase Bank v. Winnick*, 406 F. Supp. 2d 247, 256 (S.D.N.Y. 2005) (substantial assistance found if the defendant "affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables the fraud to proceed.") (emphasis added; internal quotation marks omitted). *See also, Frame v. PricewaterhouseCoopersLLP*, 36 Cal. Rptr. 3d 209, 219 (Cal. App. 1st Dist. 2005), *petition for appeal granted*, 41 Cal. Rptr. 872, 132 P.2d 210 (Cal. 2006), *appeal dismissed*, 49 Cal. Rptr. 3d 656, 143 P.3d 657 (2006) ("The absence of a written audit report . . . assisted . . . purported fraudulent scheme by postponing public detection of the fraud and giving [primary wrongdoer] time to solicit and obtain additional investments.").

*Id.* at \*12. *Kirschner* also noted it was a factual question as to "how 'private'" the opinions were because RCM had ordered copies from the auditor and made its financial statements available upon request. *Id.* Noting that it was "true that there is nothing in the record to indicate that the

FX customers in this action requested or received the RCM statements", nonetheless, "under the analysis of substantial assistance above, their lack of specific reliance is not dispositive; substantial assistance can be found by the fact that other members of the public had access to the information and, if the public were informed of RCM's true financial condition, the FX customers would have been made aware of it and would not have done business with RCM." *Id*. This key point in *Kirschner* is evident herein, as it is alleged that some members of the public received the Audit Reports, Prager's is addressed to "stockholders" and the FTX websites included written statements asserting that FTX was audited. Based upon these facts, for a dismissal motion, Plaintiffs submit that substantial assistance is alleged.

Indeed, *Kirschner* explains the distinction in aiding and abetting versus primary liability. As stated, substantial assistance "can take many forms" and does not require reliance on the "*third party's* wrongful act" or for the defendant to have made an affirmative representation, but rather "the defendant's substantial assistance in the primary violation [that] *proximately caused* the harm on which the primary liability is predicated." *Id*. at *10 (explaining that proximate cause is a broader concept and is not limited to reliance). *Kirschner* denied the auditor summary judgment on its argument about substantial assistance because "if RCM's financial condition had been properly disclosed to the public, the customers here would not have placed deposits at RCM." *Id*. at *11.

Finally, even though Plaintiffs need not plead (or prove at this stage) for purposes of the aiding and abetting claims that the Audit Reports were publicly available or disseminated for purposes, one of the Audit Reports already makes clear it was to be disseminated beyond FTX. *See* ECF No. 281-3 (Prager Audit Report addressed to "Board of Directors *and Stockholders* of FTX Trading, Ltd.". *See also* ¶ 301 (SEC complaint alleging FTX investors provided with FTX's audited financials). Neither of the Audit Reports limited to whom the reports could be sent by the FTX Entities. ECF No. 281-1 to 281-3. Most importantly, Plaintiffs allege that they "reviewed the FTX, FTX Insider Defendants' and/or Auditor[s'] misrepresentations . . . including the misrepresentations that FTX had received a 'GAAP' audit, had been audited, one or more of the Plaintiffs reviewed copies or excerpts of the . . . Audit Reports and/or one or more of the Plaintiffs reviewed the expressions of public support by the Auditor[s] for FTX and SBF, as alleged herein." ¶ 358. Plaintiffs adequately plead aiding and abetting fraud.

**Q.      Aiding and Abetting Conversion and Breach of Fiduciary Duty is Adequately Pled**

The Auditors' argument on aiding and abetting conversion and breach of fiduciary duty, particularly under Florida law, boils down to a purported failure to allege that they had "knowledge" of the underlying violation or rendered "substantial assistance."  MTD at 38-39. Plaintiffs submit that these arguments are refuted in Section III(P).  These counts are also subject to Fed. R. Civ. P. Rule 8 standards.  *See e.g. United States Fire Ins. Co. v. Finemark National Bank & Trust*, 2022 WL 2132955, at *1 (M.D. Fla. Jun. 14, 2022) (citing Rule 8 in analysis of conversion claim); *Solar Eclipse Investment Fund VII, LLC v. T-Mobile USA, Inc.*, 2023 WL 4970325, at *9 (S.D. Fla. Jun. 27, 2023) (applying Rule 8 to aiding and abetting conversion claim), *report and recommendation adopted*, *Luria v. T-Mobile USA, Inc.*, 2023 WL 5138866 (S.D. Fla. Aug. 10, 2023).

**R.      Declaratory and Injunctive Relief Counts Are Adequately Pled**

Plaintiffs are entitled to declaratory relief under Florida and California law. *See e.g. Nationwide Mut. Co. v. Ft. Myers Total Rehab Ctr., Inc.*, 657 F. Supp. 2d 1279, 1292-3 (M.D. Fla. 2009); *LeFebvre v. Syngenta Biotechnology, Inc.*, 2008 WL 5245056, at *3 (N.D. Cal. Dec. 15, 2008); ¶¶ 504, 514 (seeking declaratory judgment that the FTX Entities sold unregistered securities). Indeed, this Court may fashion could prevent future misconduct by the Auditors. *See e.g. Hodges v. Comcast Cable Commc'ns, LLC*, 21 F.4th 535, 542 (9th Cir. 2021) (public injunctive relief contemplates "forward-looking injunctions . . . ."). In the interest of preserving the remedies Plaintiffs seek, the Auditors' request should be denied. *See e.g. James D. Hinson Elec. Contracting Co., Inc. v. Bellsouth Telecommunications, Inc.*, 2008 WL 360803, at *4 (M.D. Fla. 2008) (declining to dismiss FDUTPA declaratory and injunctive relief).

**IV.      CONCLUSION**

Plaintiffs respectfully request that the Court deny the Motion.[40]

---

[40] In the event the Court grants any portion of the Motion, leave to amend is respectfully requested. *Smith*, 2016 WL 344975, at *2-*4 (granting leave to amend) (Moore, J.).

## REQUEST FOR HEARING

Pursuant to Local Rule 7.1(b)(2), Plaintiffs respectfully request oral argument in connection with the Auditors' Motion. The Auditors made a similar request in their Motion, estimating thirty minutes per side for argument. *See* MTD at. 40.  While Plaintiffs submit that the liability of the Auditors for each of the counts alleged in the Complaint is straightforward, given the number of counts, the length of briefing, and the fact that any hearing on the Motion may incorporate or reference argument in connection with other dismissal motions the Court may entertain on the same date and time related to the Auditors' coconspirators or defendants as to whom their liability is otherwise connected for aiding and abetting counts, that an estimate of thirty to forty-five minutes per side is appropriate, and respectfully requested.

November 6, 2023                                  Respectfully submitted,

| Plaintiffs' Co-Lead Counsel | |
|---|---|
| By: */s/ Adam Moskowitz*<br>Adam M. Moskowitz<br>Florida Bar No. 984280<br>Joseph M. Kaye<br>Florida Bar No. 117520<br>**THE MOSKOWITZ LAW FIRM, PLLC**<br>Continental Plaza<br>3250 Mary Street, Suite 202<br>Coconut Grove, FL 33133<br>Office: (305) 740-1423<br>adam@moskowitz-law.com<br>joseph@moskowitz-law.com<br>service@moskowitz-law.com | By: */s/ David Boies*<br>David Boies<br>Alex Boies<br>Brooke Alexander<br>**BOIES SCHILLER FLEXNER LLP**<br>333 Main Street<br>Armonk, NY 10504<br>Office: (914) 749-8200<br>dboies@bsfllp.com<br>aboies@bsfllp.com<br>balexander@bsfllp.com |
| Plaintiffs' Auditor Committee Members | |
| Laurence D. King<br>Kathleen A. Herkenhoff<br>**KAPLAN FOX & KILSHEIMER LLP**<br>1999 Harrison Street, Suite 1560<br>Oakland, CA  94612<br>Telephone:  (415) 772-4700<br>*lking@kaplanfox.com*<br>*kherkenhoff@kaplanfox.com* | Frederic S. Fox<br>Joel B. Strauss<br>**KAPLAN FOX & KILSHEIMER LLP**<br>800 Third Avenue, 38th Floor<br>New York, NY 10022<br>Telephone:  212-687-1980<br>*ffox@kaplanfox.com*<br>*jstrauss@kaplanfox.com* |

## **CERTIFICATE OF SERVICE**

On November 6, 2023, I caused the aforementioned document entitled *Plaintiffs'*
*Opposition to Motion to Dismiss by the Auditor Defendants* to be filed the Court's CM/ECF
system which provides e-service of the filed document to the email addresses of the parties
registered for electronic service in this action.

　 　 /s/ *Adam M. Moskowitz*　　　　　　　　　
　 　 Adam M. Moskowitz