**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**
MDL No. 3076
Case No. 1:23-md-03076-KMM

**IN RE:**

**FTX Cryptocurrency Exchange Collapse Litigation**

_____

This document relates to:

Multinational VC Defendants

*O'Keefe v. Sequoia Capital Operations, LLC, et al.*, S.D. Fla.
Case No. 1:23-cv-20700

*O'Keefe v. Temasek Holdings (Private) Ltd., et al.*, N.D. Cal.
Case No. 3:23-cv-3655

*Chernyavsky et al. v. Temasek Holdings (Private) Ltd., et al.*,
S.D. Fla. Case No. 1:23-cv-22960

*Cabo et al. v. Temasek Holdings (Private) Ltd. et al.*, N.D. Cal.
Case No. 3:23-cv-03974

_____ /

**PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS FOR LACK OF PERSONAL
JURISDICTION BY DEFENDANTS TEMASEK HOLDINGS PRIVATE LTD., TEMASEK
INTERNATIONAL USA LLC, AND SINO GLOBAL CAPITAL HOLDINGS, LLC**
**[ECF NO. 300]**

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

PLAINTIFFS' FACTUAL ALLEGATIONS .............................................................................. 2

LAW AND ARGUMENT ..................................................................................................... 4

    A.  Movants' operations establish a *prima facie* showing of personal jurisdiction ...... 4

        1.  Temasek ................................................................................................... 5

        2.  Sino Global ............................................................................................. 7

    B.  The Long-Arm Statutes of Florida and California permit this Court to exercise specific personal jurisdiction over Movants. ......................................................... 9

        1.  Florida .................................................................................................... 9

        2.  California ............................................................................................... 11

    C.  Exercising specific jurisdiction over Movants comports with Due Process. ........ 11

    D.  Deferral of Movants' motion pending jurisdictional discovery is warranted. ...... 14

CONCLUSION ................................................................................................................. 15

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Civil Liberties, Union of Fla. v. Sarasota,*
859 F.3d 1337 (11th Cir. 2017) ................................................................................14

*Asahi Metal Indus. Co. v. Superior Ct. of Cal., Solano Cnty.,*
480 U.S. 102 (1987) .................................................................................................13

*In re Auto. Refinishing Paint Antitrust Litig.,*
358 F.3d 288 (3d Cir. 2004)........................................................................................4

*AXA Equitable Life Ins. Co. v. Infinity Fin. Grp., LLC,*
608 F. Supp. 2d 1349 (S.D. Fla. 2009) ........................................................9, 11, 12

*Basulto v. Netflix, Inc.,*
2023 WL 5271335 (S.D. Fla. Aug. 16, 2023)..........................................................13

*Bluegreen Vacations Unlimited, Inc. v. Montgomery L. Firm LLC,*
2022 WL 17987280 (S.D. Fla. June 17, 2022) ........................................................10

*Bowoto v. Chevron Texaco Corp.,*
312 F. Supp. 2d 1229 (N.D. Cal. 2004) ......................................................................7

*Charles Schwab Corp. v. Bank of Am. Corp.,*
883 F.3d 68 (2d Cir. 2018)..........................................................................................4

*Cohodes v. MiMedx Grp., Inc.,*
2022 WL 15523079 (N.D. Cal. Oct. 27, 2022).......................................................14

*Coschetto v. Hansing,*
539 F.3d 1011 (9th Cir. 2008) .................................................................................14

*Daimler AG v. Baumann,*
571 U.S. 117 (2014)....................................................................................................4

*Eaton v. Dorchester Dev., Inc.,*
692 F.2d 727 (11th Cir. 1982) .................................................................................14

*Execu-Tech Bus. Sys., Inc. v. New Oji Paper Co.,*
752 So. 2d 582 (Fla. 2000)........................................................................................10

*Foman v. Davis,*
371 U.S. 178 (1962)..................................................................................................14

*Forbes v. Concord Advice, LLC*,
    2020 WL 7421383 (M.D. Fla. May 5, 2020) ........................................................................14

*GolTV, Inc. v. Fox Sports Latin Am. Ltd.*,
    277 F. Supp. 3d 1301 (S.D. Fla. 2017) ............................................................................4, 5

*Lauzon v. Joseph Ribkoff, Inc.*,
    77 F. Supp. 2d 1250 (S.D. Fla 1999) ...................................................................................4

*Licciardello v. Lovelady*,
    544 F.3d 1280 (11th Cir. 2008) ..................................................................4, 9, 12, 13

*Lions Gate Ent. Inc. v. TD Ameritrade Servs. Co., Inc.*,
    170 F. Supp. 3d 1239 (C.D. Cal. 2016) .............................................................................13

*Louis Vuitton Malletier, S.A. v. Mosseri*,
    736 F.3d 1339 (11th Cir. 2013) ..................................................................9, 11, 13, 14

*Luigino's Int'l, Inc. v. Miller Int'l Foods, Inc.*,
    2007 WL 1576363 (M.D. Fla. May 30, 2007) ...................................................................10

*Machtinger v. Inertial Airline Servs., Inc.*,
    937 So. 2d 730 (Fla. Dist. Ct. App. 2006) .........................................................................13

*Meier ex rel. Meier v. Sun Int'l Hotels, Ltd.*,
    288 F.3d 1264 (11th Cir. 2002) ...........................................................................................4

*Metro. Life Ins. Co. v. Neaves*,
    912 F.2d 1062 (9th Cir. 1990) ..............................................................................................4

*Nissim Corp. v. ClearPlay, Inc.*,
    351 F. Supp. 2d 1343 (S.D. Fla. 2004) ..............................................................................14

*Oueiss v. Saud*,
    2022 WL 1311114 (S.D. Fla. Mar. 29, 2022) ...................................................................13

*Phan v. Grand Bahama Cruise Line, LLC*,
    2016 WL 5407919 (N.D. Cal. Sep. 28, 2016) .....................................................................7

*Quail Cruises Ship Mgmt., Ltd. v. Agencia de Viagens CVC Tur Limitada*,
    2011 WL 5057203 (S.D. Fla. Oct. 24, 2011)......................................................................10

*Randall v. Offplan Millionaire AG*,
    2018 WL 11252318 (M.D. Fla. Oct. 23, 2018) ..................................................................14

*Sarmiento Lopez v. CMI Lesure Mgmt., Inc.*,
    591 F. Supp. 3d 1232 (S.D. Fla. 2022) ............................................................................4, 5

*Tavakoli v. Doronin*,
    2019 WL 1242669 (S.D. Fla. Mar. 18, 2019)..........................................................13

*United Techs. Corp. v. Mazer*,
    556 F.3d 1260 (11th Cir. 2009) ..........................................................................10

*Vons Companies, Inc. v. Seabest Foods, Inc.*,
    926 P.2d 1085 (1996)..........................................................................................11

*Wendt v. Horowitz*,
    822 So. 2d 1252 (Fla. 2002)...................................................................................9

*Yahoo! Inc. v. La Ligue*,
    433 F.3d 1199 (9th Cir. 2006) ............................................................................11

Plaintiffs file this opposition to Defendants Temasek Holdings Private Ltd. ("Temasek Holdings"), Temasek International USA LLC ("Temasek USA") (together, "Temasek"), and Sino Global Capital Holdings, LLC ("SGCH") (together with Sino Global Capital Limited, "Sino Global")'s Motion to Dismiss the Administrative Complaint for Lack of Personal Jurisdiction (R. Doc. 300).[1]

## INTRODUCTION

Temasek and SGCH ("Movants")[2] attempt to play mere victims in the FTX[3] scheme, as innocent as Plaintiffs. But Plaintiffs' allegations detail how Movants' unique vantage point afforded them a clear view of the fraud, and their role in propelling FTX's ascent with substantial capital, advising through active partnership, and laundering FTX's reputation to attract customers, including Plaintiffs. Plaintiffs further detail the nexus between the FTX conspiracy—and, more specifically, Movants' role therein—and Florida or California. As Plaintiffs allege, Movants were aware of that nexus. That is enough to establish Plaintiffs' prima facie case for jurisdiction.

---

[1] Plaintiffs attach as **Exhibit A** to this opposition the Declaration of Adam Moskowitz.

[2] Sino Global Capital Limited ("SGCL") did not join in Movants' Rule 12(b)(2) motion, because it has not yet been served. *See* R. Doc. 300, at 1 n.1. Because Plaintiffs allege that SGCL operates in the United States through SGCH, *see* CAC, ¶ 34, Plaintiffs refer to allegations of misconduct of Sino Global, as that term is defined herein to include both entities. Given that discovery is stayed, Plaintiffs have been prevented from engaging in jurisdictional discovery regarding, *inter alia*, the relationship between SGCH and SGCL and therefore lack evidence regarding that relationship beyond what is publicly available. Although Plaintiffs' opposition thus only addresses personal jurisdiction over SGCH, many if not all of Plaintiffs' arguments likewise show personal jurisdiction over SGCL, too.

Although Temasek Holdings likewise has not yet been served, it joins the instant motion "to protect its due process rights." *See* R. Doc. 300, at 1 n.1. Temasek Holdings, like SGCH, emphasizes the distinctions between its several affiliated entities that Plaintiffs implicate. Yet, Plaintiffs allege that Temasek Holdings operates in the United States through Temasek USA, *see* CAC, ¶ 29, and define "Temasek" to include both entities, *see id.* ¶ 29 n.5; thus, Plaintiffs discuss those entities jointly. Again, due to a lack of jurisdictional discovery, Plaintiffs generally lack documentary evidence regarding the relationship among the Temasek entities beyond the public record. Plaintiffs pray that this Court will grant their pending request for jurisdictional discovery, R. Doc. 348, including into the relationship between the Sino Global entities, Temasek entities, and FTX and other coconspirators.

[3] "FTX" refers collectively to cryptocurrency exchange FTX Trading Ltd. ("FTX Trading") and its domestic counterpart, West Realm Shires Services Inc. d/b/a FTX US ("FTX US"), both owned by Sam Bankman-Fried ("SBF"). "Alameda" refers to Alameda Research, LLC, the crypto hedge fund that SBF separately owned.

At a minimum, Plaintiffs should be granted leave to pursue jurisdictional discovery to develop their theories of specific jurisdiction.[4] Due to the discovery stay, Plaintiffs make these allegations and present this opposition based on publicly available information only. Movants oppose Plaintiffs' request for jurisdictional discovery, making apparent their desire to avoid litigating this case on the merits. With their motion, Movants submit declarations purporting to disavow relevant contacts with Florida and/or California and asserting corporate distinctness. Yet, these only create material factual disputes that further underscore the need for jurisdictional discovery on Temasek and Sino Global and their contacts with Florida and/or California.

## PLAINTIFFS' FACTUAL ALLEGATIONS

Plaintiffs' jurisdictionally relevant allegations as to Movants are as follows:

- FTX's domestic operations were based in Miami, Florida, where it maintained an office since early 2021.[5] Mr. Avinash Dabir, FTX's Vice President of Business Development, orchestrated from that office FTX's campaign to market itself as the safe alternative to other crypto exchanges.[6] The campaign featured a partnership with the Miami Heat, which included naming rights to the Miami Heat stadium and required Mr. Dabir to work with local Miami government.[7] LedgerX, LLC d/b/a FTX US Derivatives ("FTX Derivatives"), a digital currency futures and options exchange regulated by the CFTC, was also based in Miami, with a longtime Miami resident at its helm.[8] FTX advertised FTX Derivatives as an example of its commitment to transparency and compliance.[9]

- FTX understood the value of its celebrity or promoter partnerships in growing depositors, and it further understood the value of partnerships with reputable venture capitalists to both bring in funding and launder its reputation.[10]

---

[4] Now that SBF's trial has concluded, Plaintiffs filed, on November 3, 2023, their Omnibus Motion to Lift Stay and for Leave to Conduct Jurisdictional Discovery, [ECF No. 348] (the "Omnibus Motion"), which asks the Court to postpone ruling on these motions, grant Plaintiffs leave to conduct jurisdictional discovery, and grant leave to either supplement this Opposition or amend the Consolidated Class Action Complaint, [ECF No. 182] ("CAC"). *See* Omnibus Motion at 2–3 ("[t]he Court finds that jurisdictional discovery is appropriate; additional jurisdictional facts need not be alleged in Plaintiffs' pleading.") (quoting *Paffrath*, ECF No. 93) (Altonaga, C.J.).

[5] CAC, ¶¶ 45, 121, 282.

[6] CAC, ¶¶ 282-83.

[7] CAC, ¶¶ 45, 284, 287-88.

[8] CAC, ¶ 302.

[9] CAC, ¶ 302.

[10] *See* CAC, ¶ 287 (explaining "end goal" of acquiring "more users"), 344.

- Temasek and Sino Global provided both.[11] They infused FTX with hundreds of millions of dollars FTX used to expand its reach.[12] Temasek and Sino Global likewise understood the value their investment brought to FTX in laundering its reputation and, for that reason, advertised the investment.[13] FTX did, too.[14] This in fact grew FTX's deposits, which increased the value of Movants' investment.[15]

- Temasek and Sino Global engaged in extensive due diligence of FTX before and after the investments and advertised those efforts.[16] They were active partners with FTX, and monitored and managed its performance after the investment.[17] Temasek employees Pradyumna Agrawal and Antony Lewis served on FTX's Advisory Board, which met quarterly through at least March 2022, and advised on matters including the publicity campaign and FTX Derivatives strategy.[18] Certain FTX insiders, including Mr. Dexter of FTX Derivatives out of Miami, also served on the Advisory Board.[19] Sino Global's Matthew Graham remained SBF's "close confidante" throughout the scheme.[20]

- Through their due diligence and active partnership, Temasek and Sino Global learned that FTX was not holding customer deposits for the benefit of customers or segregating them from FTX and/or Alameda's own assets, contrary to representations to customers.[21] They likewise understood that FTX's products were unregistered securities.[22] They invested in and touted FTX nonetheless.

- In return for Sino Global's investment, FTX agreed to serve as co general partner with "Sino Global Capital" on its Liquid Value fund.[23] "Sino Global Capital" advertised FTX's participation and bruited its advantages arising from FTX's publicity campaign.[24] "Sino Global Capital" similarly advertised that one of its few team members involved in the fund

---

[11] CAC, ¶ 344.

[12] CAC, ¶¶ 304, 308-09, 312-13, 343, 376.

[13] CAC, ¶¶ 304, 344-49, 351; *see also* GX-320, Ex. 1 to Ex. A (memorializing VC's concerns about lack of controls; "highest order goal" of "paving the best path to FTX building an enduring franchise [i.e., brand, reputation] and (eventually) listing as a public company"; belief that it could "get[] a bunch of premium [VC] names on the cap table ahead of any plans to go public / make inroads into the US"; "long" position on crypto versus on "any particular company"; opinion that SBF's $20 billion FTX valuation was "mismatched").

[14] *See, e.g.*, CAC, ¶¶ 348, 353.

[15] CAC, ¶ 356.

[16] CAC, ¶¶ 319-22, 325, 349, 357-58, 360, 369, 385.

[17] CAC, ¶¶ 322, 349, 357, 358, 360, 361-63, 368, 370-71, 385.

[18] CAC, ¶¶ 361, 363.

[19] CAC, ¶¶ 361, 363.

[20] CAC, ¶ 368.

[21] CAC, ¶¶ 327, 338-39.

[22] CAC, ¶¶ 203-29.

[23] CAC, ¶¶ 35, 253, 264, 316-17.

[24] CAC, ¶¶ 35, 316-18, 327.

was based in Miami, Florida.[25] Sino Global Capital Management LLC, which managed the fund and which Graham owned and managed, maintained its principal office in Miami.[26]

- As long as the scheme continued, the value of Temasek's and Sino Global's investments would continue to rise. This is why they invested in and promoted FTX despite what they learned in due diligence.[27] But the crypto market faltered and caused the liquidity crisis that revealed the fraud and ushered in FTX's collapse.[28] Although Plaintiffs in many cases lost their entire savings, Temasek and Sino Global were able to write off the loss, which was in any case not material when considering their monumental portfolios.[29]

The above allegations establish that this Court may exercise personal jurisdiction over Movants.

## LAW & ARGUMENT

Because the relevant transferor courts are in Florida and California, this Court may exercise personal jurisdiction to the same extent as courts of Florida and/or California.[30] To determine whether personal jurisdiction over a nonresident defendant exists, federal courts examine whether the state's long-arm statute confers jurisdiction; and, if so, whether the exercise of jurisdiction comports with due process.[31] A single forum contact can support jurisdiction.[32] Additionally, agency relationships "may be relevant to the exercise of specific jurisdiction."[33]

### A. Movants' operations establish a *prima facie* showing of personal jurisdiction.

"[G]eneral agency principles apply when determining personal jurisdiction."[34] "In simple terms, agency may be defined as the relation which results where one person [or entity], called the

---

[25] *See* Liquid Value slide deck, Ex. 2 to Ex. A, at p. 4.

[26] *See* SGCM Form ADV, Ex. 3 to Ex. A, at Section 1.F.

[27] *See* CAC, ¶ 374.

[28] CAC, ¶¶ 377-81.

[29] CAC, ¶¶ 382-83.

[30] *See, e.g.*, *In re Auto. Refinishing Paint Antitrust Litig.*, 358 F.3d 288, 297 n.11 (3d Cir. 2004).

[31] *See, e.g.*, *Licciardello v. Lovelady*, 544 F.3d 1280, 1283 (11th Cir. 2008); *Metro. Life Ins. Co. v. Neaves*, 912 F.2d 1062, 1065 (9th Cir. 1990).

[32] *See Lauzon v. Joseph Ribkoff, Inc.*, 77 F. Supp. 2d 1250, 1253 (S.D. Fla 1999).

[33] *See Daimler AG v. Baumann*, 571 U.S. 117, 135, n.13 (2014) (Agency relationships, we have recognized, may be relevant to the existence of *specific* jurisdiction. . . . As such, a corporation can purposefully avail itself of a forum by directing its agents or distributors to take action there."); *see also Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 85 (2d Cir. 2018) (explaining that imputing contacts to principal from agent comports with due process).

[34] *GolTV, Inc. v. Fox Sports Latin Am. Ltd.*, 277 F. Supp. 3d 1301, 1312 (S.D. Fla. 2017); *see Meier ex rel. Meier v. Sun Int'l Hotels, Ltd.*, 288 F.3d 1264, 1272 (11th Cir. 2002). Although the U.S. Supreme Court in *Daimler* curtailed the exercise of *general* jurisdiction via agency principles, it

principal, authorizes another, called the agent, to act for [it] with more or less discretionary power, in business dealings with third persons."[35] Showing agency requires "(1) acknowledgment by the principal that the agent will act for it; (2) the agent's acceptance of the undertaking; and (3) control by the principal over the actions of the agent."[36] "Apparent authority," meanwhile, "arises where a principal allows or causes others to believe the agent possesses . . . authority [to act for the principal], as where the principal knowingly permits the agent to assume such authority or where the principal by his actions or words holds the agent out as possessing it."[37]

      **1. Temasek**

The Court may exercise jurisdiction over Temasek Holdings under an agency theory based on its presence in the U.S. market through its subsidiary Temasek USA or contacts with Florida through its other subsidiaries, Temasek International Pte. Ltd. ("Temasek International") and Artz Fund Investments Pte. Ltd. ("Artz Fund"). Plaintiffs' allegations and public information demonstrate that Temasek USA operated as Temasek Holdings' U.S. agent and was founded expressly to serve as the primary means of access to the U.S. market.[38] Temasek reports that its "'expanded presence in North America reflects the growing investment opportunities in the region' and that the San Francisco office, in particular 'serve[s] as a gateway to investment opportunities and facilitate[s] the deepening of relationships within the Bay area and beyond.'"[39] While Belinda Chan Hian Wun's declaration claims that Temasek Holdings maintains certain corporate formalities and separateness, it does not address this documented principal purpose.

Further, Temasek Holdings operates a joint website that conflates Temasek entities. Temasek describes itself as one "global investment company headquartered in Singapore."[40] Temasek holds out that it has 13 offices across 9 countries (including the United States) without any distinction. Temasek employees' email addresses share the same "temasek.com" domain

---

expressly recognized the continued relevancy of agency relationships to the *specific* jurisdiction analysis. *See Daimler AG*, 571 U.S. at 135, n.13.

[35] *Sarmiento Lopez v. CMI Lesure Mgmt, Inc.*, 591 F. Supp. 3d 1232, 1238 (S.D. Fla. 2022).

[36] *Id.* (citations omitted).

[37] *GolTV, Inc.*, 277 F. Supp. 3d at 1312.

[38] CAC, ¶ 29.

[39] CAC, ¶ 29.

[40] "Temasek at a Glance," https://www.temasek.com.sg/en/about-us/temasek-at-a-glance (last accessed Nov. 3, 2023).

regardless of where they work.[41] Temasek boasts of a "global portfolio" with 21 % of its investments in the Americas, which were made possible by Temasek USA.[42] Ms. Wun's declaration admits that Temasek USA makes investment recommendations *based on objectives and strategies of Temasek Holdings*."[43]

Temasek presents these entities as a single unit in other public statements and reports, including in yearly financial reports.[44] Temasek Holdings and Temasek International maintain interlocking directorates and loci of control. Indeed, "[Temasek International] houses all our management and staff, except the Temasek CEO who continues to be employed under Temasek Holdings (TH)."[45] Temasek's leadership holds itself out as "OneTemasek."[46] Ms. Atherton attests that she is the Managing Director of Temasek USA,[47] but the Temasek website states only that she has been with "Temasek" since 2017 and currently serves as "Joint Head, North America."[48] Similarly, although Ms. Wun maintains that Pradyumna Agrawal is strictly an employee of

---

[41] GX-26, Ex. 4 to Ex. A (listing email addresses for Lewis, Agrawal, and Sijia Chen with the "@temasek.com" domain name), at p. 3; Sijia Chen LinkedIn, Ex. 5 to Ex. A (listing her employer as Monetary Authority of Singapore).

[42] *See supra* note 39 "Temasek at a Glance."

[43] R. Doc. 300-2, ¶ 28; *see also* R. Doc. 300-3, ¶ 7 ("Temasek USA provides research-based investment consulting services to Temasek [International], another Singapore subsidiary of Temasek Holdings, which in turn has an agreement with Temasek Holdings to provide investment research and related services."). Temasek International is Temasek's "wholly owned management and investment arm." *See* "Leadership Succession at Temasek International," https://www.temasek.com.sg/en/news-and-resources/news-room/news/2019/leadership-succession-at-temasek-international (last accessed Nov. 3, 2023).

[44] *See, e.g.*, "Temasek Review 2023," https://www.temasekreview.com.sg/downloads/Temasek-Review-2023-full-version.pdf (last accessed Nov. 3, 2023).

[45] *Id.* at 112.

[46] *Id.* ("Operating as *OneTemasek*, our management team implements the strategy and policy directions set by the Temasek Board to fulfill our three roles as investor, institution, and steward."). E.g., Temasek International's Chairman concurrently serves as Executive Director of Temasek Holdings, to "oversee[] the development of Temasek" and "work closely with [Temasek International's CEO] on commercial strategies and portfolio matters." *See supra* note 42 "Leadership Succession at Temasek International."

[47] *See* R. Doc. 300-3, ¶ 1.

[48] "Our Leadership," https://www.temasek.com.sg/en/about-us/our-leadership#content-temasek-corporate-en-about-us-our-leadership-jcr:content-par-tabbed_content_copy-tabbed_content_item0-tabpar-gridtabs_1827184518_-item (last accessed Nov. 3, 2023).

Temasek International,[49] Temasek holds him (and Ms. Atherton) out as "Senior Management," a group apparently charged with "set[ting] the tone and culture of the team" and "leading the delivery of Temasek's vision and mission."[50] These facts indicate that Temasek USA, Temasek International, and Artz Fund were maintained and operated as Temasek Holdings' agent, created for the express purpose of facilitating access to the U.S. market.[51] At a minimum, these allegations and publicly available information warrant discovery—a request courts routinely permit.[52]

Notably, Temasek has even held itself out in public documents as one unit with respect to its investment in FTX. In early 2022, Mr. Agrawal posted on Twitter regarding "Temasek"'s—*not* Artz Funds' or Temasek International's—partnership with and investment in FTX.[53] Moreover, although Ms. Wun attests that "Temasek Holdings did not invest in FTX," Temasek Holdings represents otherwise in its "Temasek Review 2023" when it states, "*we* are disappointed with the outcome of *our* [FTX] investment, and the negative impact on *our* reputation."[54] On its website, Temasek states, "*We* invested" $210 million in FTX International, and US$65 million in FTX US.[55]

## 2. Sino Global

This court likewise may exercise personal jurisdiction over SGCH under an agency theory as a result of Sino Global entities' contacts with Florida. Like Temasek, Sino Global conflates its entities in public statements. For example, in the Sino Global slide deck referenced in the complaint related to the Liquid Value fund, Sino Global identifies itself only as "Sino Global Capital," without any clarification as to the entity at issue.[56] When Graham, who is, *inter alia*, a

---

[49] *See* R. Doc. 300-2, ¶ 8.

[50] "Our Leadership," https://www.temasek.com.sg/en/about-us/our-leadership#senior-management (last accessed Nov. 3, 2023).

[51] *See Bowoto v. Chevron Texaco Corp.*, 312 F. Supp. 2d 1229, 1244 (N.D. Cal. 2004) (recognizing that "overlap between officers and directors, coupled with other factors tending to show agency, is probative of whether an agency finding is warranted").

[52] *See, e.g.*, *Phan v. Grand Bahama Cruise Line, LLC*, 2016 WL 5407919, at *3 (N.D. Cal. Sep. 28, 2016) (granting discovery where parties had similar web sites, documents, and phone numbers).

[53] R. Doc. 300-2, ¶¶ 313, 346.

[54] *See supra* note 43 "Temasek Review 2023," at p. 11.

[55] "FTX Statement and FAQs," https://www.temasek.com.sg/en/news-and-resources/news-room/statements/2022/statement-FTX#how-did-Temasek-engage-FTX-management (last accessed Nov. 3, 2023).

[56] *See* CAC, ¶¶ 316, 318, 327. Each slide references only "Sino Global Capital."

managing member of SGCH and CEO, managing partner, founder, and "authorized representative" of SGCL, tweeted about "Sino Global Capital"'s investment in and partnership with FTX, he did so as "MattySino," without any clarification about which Sino Global entity he referenced or represented at that time.[57] Finally, in filings with the SEC regarding Sino Global Capital Management LLC, Sino Global listed its website as "https://sinoglobalcapital.com/", its Twitter address as "https://twitter.com/SinoGlobalCap", and its LinkedIn account as "https://www.linkedin.com/company/sinoglobalcapital," further evidencing its public image as one unified "Sino Global Capital."[58] After the collapse, "Sino Global Capital" announced, "*Our investment* into the equity of FTX was made prior to the launch of our fund, and we did not invest any LP capital into FTX," conflating the entities and downplaying the effects of the collapse.[59]

Further, "Sino Global Capital" advertised its presence in Miami and reported the same to regulators. In the slide deck referenced above, Sino Global represented that it had a team member based in Miami.[60] In filings with the SEC, Sino Global Capital Management LLC identified the location of its "Principal Office and Place of Business" as 1111 Brickell Avenue, 10th Floor, Miami, Florida 33131, which it indicates has regular operating hours and is *not* a private residence.[61]Sino Global Capital Management LLC[62] apparently was in the business of investment advising, and it so advised in relation to the joint Sino Global-FTX fund that Plaintiffs reference as evidence of the Sino Global-FTX quid pro quo—i.e., the Liquid Value fund.[63] It further identifies Mr. Graham as the Managing Member of Sino Global Capital Management LLC, owning 75% or more of the company (with no indirect owners to be reported), and as the entity's "control person."[64]

---

[57] *See* R. Doc. 300-1, ¶ 1; Matthew Graham Bloomberg profile, Ex. 6 to Ex. A; CAC, ¶ 345 (including image of Graham's "@mattysino" Twitter handle and tweet regarding "Sino Global Capital"'s investment in FTX).

[58] *See, e.g.*, SGCM Form ADV, Ex. 3 to Ex. A, at Section 1.I.

[59] *See* "Sino Global Capital" tweet (emphasis added), Ex. 7 to Ex. A.

[60] *See* Liquid Value slide deck, Ex. 2 to Ex. A, at p. 4.

[61] *See, e.g.*, SGCM Form ADV, Ex. 3 to Ex. A, at Section F.

[62] Although Sino Global Capital Management LLC is not a defendant in this matter, its contacts with Florida may be imputed to SGCH due to the agency relationship among the entities. *See Meier*, 288 F.3d at 1273. Although Graham asserts that SGCH and SGCL are neither direct nor indirect subsidiaries (and the same may be true of Sino Global Capital Management LLC), this, too, is not determinative. *See id.* ("Agency is not . . . limited to a parent-subsidiary relationship.").

[63] *See id.*, at Section 7.A (Liquid Value is "related person") & 7.B.(1) (and related "private fund").

[64] *See id.*, at Schedule A.

Lastly, Mr. Graham's self-serving declaration fails to rebut that SGCH regularly conducts business in Florida and offers no details regarding other Sino Global entities' Florida ties, whose actions may be imputed to SGCH.[65] Mr. Graham does *not* say that SGCH is not registered to do business in Florida; does not operate, conduct, engage in, or carry on a business or any business venture in Florida; does not maintain a place of business, office, facility, agency, or office in Florida, or otherwise have any physical operations in Florida; or does not regularly do business in Florida.[66] This is in glaring contrast to his testimony regarding SGCH's activities in California, wherein he expressly denies each of the foregoing.[67] He instead concludes that no SGCH employees were involved in the FTX investment "in their capacity with [SGCH]."[68] But Plaintiffs allege that Sino Global comprised only ten people during the relevant period and even fewer of consequence—namely, Mr. Graham. In this context, that Mr. Graham or another SGCH-affiliated individual in Florida might have been donning some other Sino Global entity's hat when they invested Sino Global's money in FTX and undertook the fraudulent and conspiratorial acts alleged cannot allow SGCH to evade facing the consequences of those actions before this Court.

### B. The Long-Arm Statutes of Florida and California permit this Court to exercise specific personal jurisdiction over Movants.

#### 1. Florida

Florida's long-arm statute confers specific jurisdiction over a non-resident defendant if the defendant (1) engages in tortious conduct in-state or (2) participates in a civil conspiracy where at least one act in furtherance occurred in the state.[69] Plaintiffs sufficiently allege both.

A nonresident defendant's "telephonic, electronic, or written communications into Florida may form the basis for personal jurisdiction" where such communications give rise to the plaintiffs' claim of tortious conduct even if the defendant was not physically in the state.[70] Here, Movants made statements or communications that painted FTX as safe and legitimate, from which

---

[65] *See* R. Doc. 300-1.

[66] *See* R. Doc. 300-1.

[67] *See id.*, ¶ 7-9, 16-17, 24.

[68] *Id.*, ¶ 6.

[69] *See, e.g.*, *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1353 (11th Cir. 2013) (regarding tortious conduct); *AXA Equitable Life Ins. Co. v. Infinity Fin. Grp., LLC*, 608 F. Supp. 2d 1349, 1354 (S.D. Fla. 2009) (regarding conspiracy jurisdiction).

[70] *Wendt v. Horowitz*, 822 So. 2d 1252, 1260 (Fla. 2002); *see Licciardello v. Lovelady*, 544 F.3d 1280, 1283 (11th Cir. 2008).

Plaintiffs' aiding and abetting claims arise, online (in interviews, podcasts, via Twitter (now X), and more), which Movants knew to be false from their extensive due diligence efforts and knew would contribute to a growth in depositors.[71] These statements were available online in Florida and were essential to the success of FTX's and Movants' tortious conduct—i.e., exponential increases in depositors and thereby the value of Movants' equity. Separately, Plaintiffs allege that Movants' investments—which also give rise to Plaintiffs' aiding and abetting claims—funded misstatements from FTX's celebrity endorsers in the publicity campaign masterminded, implemented, *and fully available online, on TV, and elsewhere* in Florida.[72]

"[U]nder Florida law, a nonresident defendant commits 'a tortious act within [Florida]' when he commits an act *outside* the state that causes *injury within Florida*."[73] Here, Plaintiffs allege that Movants' misconduct aided and abetted the FTX scheme and injured Plaintiffs, which include named plaintiffs and putative class members in Florida.[74] Further, that injury to Plaintiffs occurred due to FTX's overall failure and collapse, which Plaintiffs allege occurred in Florida.

Movants' attempts to refute conspiracy jurisdiction are equally unavailing. Conspiracy jurisdiction under Florida law is expansive. "Florida courts have held that the state's long-arm statute can support personal jurisdiction over any alleged conspirator where any other co-

---

[71] *See, e.g.*, CAC, ¶¶ 319-42 (regarding knowledge of fraud etc. and Movants' statements on due diligence), 345 (publicizing Sino Global investment), 346 (publicizing Temasek investment), 347 (noting value of Movants' endorsement), 351 (acknowledging value of Sino Global name in building reputation), 386 (alleging effect of Movants' affiliation on reputation).

[72] CAC, ¶ 388. Movants argue that Plaintiffs' allegations show *FTX* committed an array of tortious conduct in Florida. *See* R. Doc. 300, at 10. This of course does not negate Plaintiffs' separate allegations of Movants' tortious conduct in Florida. Plaintiffs included the allegations on FTX's conduct to show (1) Movants' secondary liability and (2) Florida as the heart of the FTX scheme. That the scheme was based in Florida means Movants would have known the resultant harm would be felt in Florida. Thus, the tortious conduct occurred in Florida. *See, e.g.*, *Luigino's Int'l, Inc. v. Miller Int'l Foods, Inc.*, 2007 WL 1576363, at *2 (M.D. Fla. May 30, 2007).

[73] *Louis Vuitton*, 736 F.3d at 1353; *see also Elandia Intern., Inc. v. Ah Koy*, 690 F. Supp. 2d 1317 (S.D. Fla. Feb. 17, 2010). Movants fail entirely to recognize the line of binding cases in the Eleventh Circuit finding that torts occur in Florida when the associated injury occurs there, choosing instead to state only that Plaintiffs fail to allege "a *single* act—much less a tortious act— [by Movants] *in Florida*" R. Doc. 300, at 10. Setting aside that Plaintiffs *have* alleged exactly that, where the injury occurs in Florida, the tort does, too, as a matter of law. *See, e.g.*, *Louis* Vuitton, 736 F.3d at 1353.

[74] CAC, ¶¶ 17-19, 391.

conspirator commits an act in Florida in furtherance of the conspiracy, even if the defendant committed no act in, or had no relevant contact with, Florida."[75]

Plaintiffs allege that Movants formed part of an expansive conspiracy to engage in certain tortious conduct, including in Florida.[76] As summarized above, FTX and SBF were in search of venture capital partners whose association by investment would lend credibility to FTX and enable far-reaching publicity campaigns portraying FTX as a safe and dependable crypto exchange. Movants agreed to fill that role and took steps in furtherance of the scheme, together investing hundreds of millions of dollars, publicizing that investment online, and engendering the desired surge in depositors, such as Plaintiffs. Movants undertook these acts with the knowledge gained through due diligence that FTX was far from the law-abiding and dependable entity it and Movants claimed. These allegations are sufficient to state a claim for, *inter alia*, conspiracy to commit fraud, breach of fiduciary duty, and conversion.[77]

Plaintiffs are not required to allege that Movants engaged in independent conspiratorial acts in Florida to satisfy the long-arm statute.[78] As Movants admit, Plaintiffs have alleged FTX's acts in furtherance of the conspiracy occurring in Florida.[79] Conspiracy jurisdiction is established.

### 2. California

California law permits its courts to exercise jurisdiction on any basis not inconsistent with the Constitution of the United States or of California.[80] Thus, a California court may exercise personal jurisdiction over a nonresident defendant if doing so does not violate due process.

### C. Exercising specific jurisdiction over Movants comports with Due Process.

---

[75] *Bluegreen Vacations Unlimited, Inc. v. Montgomery L. Firm LLC*, 2022 WL 17987280, at *4 (S.D. Fla. June 17, 2022) (citing *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1281-82 (11th Cir. 2009)); *see also Quail Cruises Ship Mgmt., Ltd. v. Agencia de Viagens CVC Tur Limitada*, 2011 WL 5057203, at *3 (S.D. Fla. Oct. 24, 2011). For example, in *Execu-Tech Bus. Sys., Inc. v. New Oji Paper Co.*, 752 So. 2d 582, 585 (Fla. 2000), the Florida Supreme Court reversed a dismissal for lack of personal jurisdiction over a nonresident defendant who allegedly engaged in a nationwide price-fixing conspiracy where a coconspirator made affected sales in Florida. *Id.* The plaintiff argued, and the court held, that the defendant and its coconspirators committed a tort in Florida and therefore "subjected themselves to the jurisdiction of Florida courts." *Id.*

[76] CAC, ¶¶ 496-510.

[77] *See* Plaintiffs' Opposition to Multinational VCs' Rule 12(b)(6) Motion, at pp. 23-28.

[78] *See AXA Equitable Life Ins. Co.*, 608 F. Supp. 2d at 1354.

[79] *See* R. Doc. 300, at 10.

[80] *See, e.g.*, *Vons Companies, Inc. v. Seabest Foods, Inc.*, 926 P.2d 1085, 1091 (1996).

To determine whether exercising personal jurisdiction over a nonresident defendant comports with due process, courts examine: (1) whether the claims "arise out of or relate to" at least one of the defendant's contacts with the forum; (2) whether the nonresident defendant "purposefully availed" himself of the privilege of conducting activities in the forum state, thus invoking the benefit of the forum state's laws; and (3) whether the exercise of jurisdiction comports with "traditional notions of fair play and substantial justice."[81] Plaintiffs' allegations pass this test.

First, Plaintiffs' claims "arise out of" Movants' contacts with Florida. Plaintiffs allege Movants committed intentional torts in Florida, which caused injury in Florida, and which form the basis of their causes of action. Plaintiffs allege that the scheme was based in Florida, particularly with respect to FTX's and Movants' efforts to grow FTX's deposits through a publicity campaign involving Movants' investments and statements, celebrity endorsements obtained using Movants' investment funds, and FTX Derivatives, which is based in Florida. The downfall of FTX occurred in Florida and harmed Florida Plaintiffs and other depositor residents. With respect to Sino Global, its and FTX's Liquid Value fund was run in part from Miami, Florida, and the Sino Global management company overseeing the same maintained its principal office in Miami.[82] A sufficient nexus surely exists between Plaintiffs' claims and Movants' Florida-related conduct.

Likewise, there is sufficient connexity between Plaintiffs' claims and Temasek's California contacts. Temasek USA maintains an office and employees in California.[83] Although Ms. Atherton states that Temasek USA employees were not specifically "charged with" the tasks of "researching, diligencing, negotiating, or making recommendations regarding investments in FTX," she fails to address whether they in fact undertook those tasks. Temasek Holdings created Temasek USA as its vehicle to access the U.S. market—a market that included FTX.[84] Ms. Wun claims that Temasek Holdings maintained corporate separateness, but did not address Temasek USA's principal purpose of enabling Temasek's access to the U.S., and she admits that Temasek Holdings sets the "objectives and strategies" for Temasek USA's investment decisions in the U.S. market.[85] Moreover, Temasek fails to address the interrelatedness evidenced by its concept of

---

[81] *Louis Vuitton*, 736 F.3d at 1355; *Yahoo! Inc. v. La Ligue*, 433 F.3d 1199, 1206 (9th Cir. 2006).

[82] *See* Liquid Value slide deck, Ex. 2 to Ex. A, p. 4; Ex. SGCM Form ADV, Ex. 3 to Ex. A.

[83] *See supra* note 39 "Temasek at a Glance"; CAC, ¶ 29.

[84] CAC, ¶ 29.

[85] R. Doc. 300-2, ¶ 28; *see also* R. Doc. 300-3, ¶ 7.

"OneTemasek."[86] Because Temasek holds itself out as "OneTemasek," agency principles override precious distinctions of corporate separateness.

Second, Plaintiffs' allegations show Movants' purposeful availment. "[T]he Eleventh Circuit has held that allegations of intentional torts support the exercise of personal jurisdiction over a nonresident defendant with no other contacts with the forum."[87] "This occurs when the tort: '(1) [was] intentional; (2) [was] aimed at the forum state; and (3) caused harm that the defendant should have anticipated would be suffered in the forum state.'"[88] "Directing a conspiracy toward Florida establishes sufficient minimum contacts to satisfy due process."[89]

Plaintiffs allege that Movants' tortious conduct was intentional, formed part of a conspiracy undertaken with a Florida resident, and caused harm that would be suffered in Florida. Movants' conduct was aimed at Florida: Movants contributed to the Florida-centered publicity campaign, the FTX scheme was based in Florida and numerous coconspirators' acts in furtherance occurred there, and Sino Global and Temasek participated in ongoing oversight or management of FTX post investment as a "close confidante" or FTX Advisory Board member, respectively. Plaintiffs allege that Temasek representatives on that Advisory Board participated in meetings with Florida residents and advised on the Florida-centered publicity campaign.[90]

With respect to Temasek, purposeful availment is satisfied in both Florida and California. To facilitate Temasek's access to the U.S. market, Temasek USA has offices in the United States,

---

[86] For example, an SBF criminal trial exhibit shows that Temasek International employees Lewis and Agrawal used Temasek USA's office for meetings with SBF. *See* GX-286, Ex. 8 to Ex. A. Plaintiffs should be permitted to take discovery into whether the same occurred in California.

[87] *AXA Equitable Life Ins. Co.*, 608 F. Supp. 2d at 1355 (citing *Licciardello*, 544 F.3d at 1285).

[88] *Louis Vuitton*, 736 F.3d at 1356 (citing *Licciardello*, 544 F.3d at 1285-86, 1287-88).

[89] *Machtinger v. Inertial Airline Servs., Inc.*, 937 So. 2d 730, 736 (Fla. Dist. Ct. App. 2006); *see also Tavakoli v. Doronin*, 2019 WL 1242669, at *11-12 (S.D. Fla. Mar. 18, 2019).

[90] Movants' authorities are distinguishable. In *Basulto v. Netflix, Inc.*, 2023 WL 5271335, at *1 (S.D. Fla. Aug. 16, 2023), none of the acts in furtherance of the conspiracy occurred in Florida and the nonresident defendant's coconspirator was not based there. Thus, the defendants' participation did not show purposeful availment. Similarly, in *Oueiss v. Saud*, 2022 WL 1311114, at *18 (S.D. Fla. Mar. 29, 2022), plaintiff failed to provide "any indication that the [nonresident defendant] was aware of any act in furtherance of the Conspiracy that took place in Florida." Here, Plaintiffs allege acts in furtherance occurring in Florida, including some by Movants, and Plaintiffs allege that Miami, FTX's home and the hub of FTX's publicity campaign, was the nucleus of the FTX scheme. So, Movants' contacts with FTX were with Florida.

including in California, and roughly 200 employees.[91] There can be no doubt that Temasek USA's conduct—at Temasek's behest—was directed nationwide, including in each transferor state.[92]

Lastly, Movants have failed to make a "compelling case" that exercising personal jurisdiction over them in would offend "traditional notions of fair play and substantial justice."[93] Nor can they. Because of the FTX fraud's overriding ties to Florida and the injuries occurring therein, Florida courts have a keen interest in adjudicating the dispute, and Florida serves as a logical central location for Plaintiffs to litigate all FTX-related claims as it was the heart of the scheme. Proceeding against Movants in Florida therefore does not offend "fair play and substantial justice."[94] Alternatively, Temasek, through Temasek USA, has availed itself of the California market in operating an office and employing individuals there.

### D. Deferral of Movants' motion pending jurisdictional discovery is warranted.

To the extent this Court does not deny Movants' motion outright, it should defer ruling on the motion pending jurisdictional discovery or until trial. Plaintiffs have alleged ample facts which demonstrate "more than a hunch' here that discovery will yield jurisdictionally relevant facts."[95]

Though Movants assert that they directed no acts at Florida or California or undertook no acts therein related to FTX, Plaintiffs' allegations are to the contrary. The resulting factual dispute reveals the need for jurisdictional discovery into the relationship between FTX and Temasek, between the Temasek entities and all Temasek employees and those entities, between FTX and Sino Global, between the Sino Global entities and between all Sino Global employees and those entities, and Temasek's and Sino Global's business activities in Florida and California and the

---

[91] CAC, ¶ 29.

[92] See *Lions Gate Ent. Inc. v. TD Ameritrade Servs. Co., Inc.*, 170 F. Supp. 3d 1239, 1262 (C.D. Cal. 2016) (finding nationwide advertisement campaign gave rise to personal jurisdiction in the plaintiff's home forum of California); *see also Asahi Metal Indus. Co. v. Superior Ct. of Cal., Solano Cnty.*, 480 U.S. 102, 112 (1987) ("[D]efendant may indicate an intent or purpose to serve the market in the forum state . . . [by] marketing the product through a distributor who has agreed to serve as the sales agent in the forum State.").

[93] *Louis Vuitton*, 736 F.3d at 1355.

[94] *See id.*

[95] *Cohodes v. MiMedx Grp., Inc.*, 2022 WL 15523079, at *3 (N.D. Cal. Oct. 27, 2022) (citing *Coschetto v. Hansing*, 539 F.3d 1011, 1020 (9th Cir. 2008)).

events comprising the tortious conduct and civil conspiracy alleged.[96] Furthermore, because Plaintiffs' alleged bases of jurisdiction are Movants' intentional torts and participation in civil conspiracy, questions of jurisdiction are inextricably intertwined with the merits of the case. This Court thus should defer ruling on personal jurisdiction until trial.[97]

To the extent that this Court is inclined to agree with Movants that Plaintiffs have not pleaded personal jurisdiction, it is not a "flaw [that] cannot be fixed."[98] Thus, if the Court determines personal jurisdiction presently is in doubt, Plaintiffs request leave to amend.[99]

## CONCLUSION

For the foregoing reasons, Plaintiffs request the Court deny Movants' motion. Plaintiffs alternatively request that this Court will defer ruling on Movants' motion to permit Plaintiffs to conduct jurisdictional discovery or until trial. *See, e.g.,* Omnibus Motion. Lastly, if this Court determines that Plaintiffs' allegations are insufficient to support personal jurisdiction, Plaintiffs request leave to amend.

## REQUEST FOR ORAL ARGUMENT

Plaintiffs respectfully request that the Court hear oral argument on this opposition to the motion, and respectfully submit that thirty minutes should be sufficient for all Parties.

---

[96] *See, e.g.*, *Am. Civil Liberties, Union of Fla. v. Sarasota*, 859 F.3d 1337, 1341 (11th Cir. 2017) (finding error in denying jurisdictional discovery into facts implicating merits and jurisdiction); *Randall v. Offplan Millionaire AG*, 2018 WL 11252318, at *5 (M.D. Fla. Oct. 23, 2018).

[97] *See Eaton v. Dorchester Dev., Inc.*, 692 F.2d 727, 733 (11th Cir. 1982); *Forbes v. Concord Advice, LLC*, 2020 WL 7421383, at *7 (M.D. Fla. May 5, 2020); *Nissim Corp. v. ClearPlay, Inc.*, 351 F. Supp. 2d 1343, 1351 (S.D. Fla. 2004).

[98] *See* R. Doc. 300, at 10.

[99] *See, e.g.*, *Foman v. Davis*, 371 U.S. 178, 182 (1962).

Dated: November 6, 2023                    Respectfully submitted,

| **By:** */s/ Adam Moskowitz* | **By:** */s/ David Boies* |
|---|---|
| Adam M. Moskowitz | David Boies |
| Florida Bar No. 984280 | Alexander Boies |
| Joseph M. Kaye | Brooke A. Alexander |
| Florida Bar No. 117520 | **BOIES SCHILLER FLEXNER LLP** |
| **THE MOSKOWITZ LAW FIRM, PLLC** | 333 Main Street |
| Continental Plaza | Armonk, NY 10504 |
| 3250 Mary Street, Suite 202 | 914-749-8200 |
| Coconut Grove, FL 33133 | dboies@bsfllp.com |
| Office: (305) 740-1423 | aboies@bsfllp.com |
| adam@moskowitz-law.com | balexander@bsfllp.com |
| joseph@moskowitz-law.com | |
| service@moskowitz-law.com | |
| | |
| ***Co-Lead Counsel*** | ***Co-Lead Counsel*** |
| | |
| Joseph R. Saveri | James R. Swanson, La. Bar No. 18455 |
| Christopher Young | Kerry J. Miller, La. Bar. No. 24562 |
| Itak K. Moradi | Molly L. Wells, La. Bar. No. 36721 |
| **JOSEPH SAVERI LAW FIRM** | C. Hogan Paschal, La. Bar No. 38495 |
| 601 California Street, Suite 1000 | **FISHMAN HAYGOOD L.L.P.** |
| San Francisco, CA 94108 | 201 St. Charles Avenue, 46th Floor |
| Telephone: (415) 500-6800 | New Orleans, Louisiana 70170-4600 |
| jsaveri@saverilawfirm.com | (504) 586-5252; (504) 586-5250 fax |
| cyoung@saverilawfirm.com | jswanson@fishmanhaygood.com |
| imoradi@saverilawfirm.com | kmiller@fishmanhaygood.com |
| | mwells@fishmanhaygood.com |
| ***Counsel to Plaintiffs and the Putative*** | hpaschal@fishmanhaygood.com |
| ***Classes*** | |
| | Robert Lieff |
| | P.O. Drawer A |
| | Rutherford, CA 94573 |
| | rlieff@lieff.com |
| | |
| | ***Counsel to Plaintiffs and the Putative*** |
| | ***Classes*** |

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on November 6, 2023, a true and correct copy of the foregoing was filed electronically with the Clerk of the Court, by using the CM/ECF system which will send an electronic notification of such filing to all counsel of record.

By: *<u>/s/ Adam M. Moskowitz</u>*
**Adam M. Moskowitz**

17