**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MDL No. 3076**
**CASE NO. 1:23-md-03076-KMM**

IN RE:

**FTX Cryptocurrency Exchange Collapse MDL Litigation**

————————————————————————————

THIS DOCUMENT RELATES TO:

Bank Defendants

*O'Keefe v. Sequoia Capital Operations, LLC, et al.*, S.D. Fla. Case No. 1:23-cv-20700

*O'Keefe v. Farmington State Bank d/b/a Moonstone Bank, et al.*, E.D. Wa. Case No. 2:23-cv-00213-TOR

————————————————————————————————————/

**OPPOSITION TO DEFENDANT MOONSTONE BANK'S**
**MOTION TO DISMISS PLAINTIFFS' ADMINISTRATIVE CLASS ACTION COMPLAINT AND**
**INCORPORATED MEMORANDUM OF LAW [ECF NO. 262]**

1

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

PLAINTIFFS' FACTUAL ALLEGATIONS ........................................................................ 2

   I.  FTX's fraud and underlying misconduct ...................................................................... 2

   II.  Moonstone's knowing assistance of FTX's underlying misconduct ............................ 7

      A.  Moonstone's cozy history with FTX and its founder, SBF .................................. 7

      B.  Moonstone's knowledge of the FTX fraud.......................................................... 12

      C.  Moonstone's assistance to the FTX fraud, despite knowledge of it ..................... 17

LAW AND ARGUMENT .................................................................................................... 20

   I.     PLAINTIFFS SUFFICIENTLY PLEADED THEIR CLAIMS ..................................... 20

      A.  Plaintiffs sufficiently pleaded that Moonstone aided and abetted fraud, fiduciary
          breach and conversion under Florida and Washington common law .................. 20

          1.  Plaintiffs sufficiently pleaded Moonstone's aider-abettor knowledge ..... 20

             a.  Moonstone knew of FTX's misrepresentations to Class Members
                 and illicit transfers of Class Member funds, such that Moonstone
                 knew of the underlying fraud, fiduciary breach and conversion .. 21

             b.  Moonstone demonstrated indicia of knowledge sufficient under
                 Florida and Washington law ...................................................... 25

          2.  Plaintiffs sufficiently pleaded Moonstone's substantial assistance .......... 26

      B.  Plaintiffs sufficiently pleaded that Moonstone conspired with the FTX Entities
          and other Defendants in furtherance of FTX's fraud, fiduciary breach, and
          conversion ....................................................................................................... 29

      C.  Plaintiffs sufficiently pleaded that Moonstone was unjustly enriched ................ 31

   II.     THIS COURT HAS PERSONAL JURISDICTION OVER MOONSTONE ................. 32

CONCLUSION.................................................................................................................... 33

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Aceto Corp. v. TherapeuticsMD, Inc.*,
  953 F. Supp. 2d 1269 (S.D. Fla.2013) ............................................................ 32

*United States ex rel. Anita Silingo v. WellPoint, Inc.*,
  904 F.3d 667 (9th Cir. 2018) ........................................................................ 21

*AXA Equitable Life Ins. Co. v. Infinity Fin. Grp.*,
  LLC, 608 F. Supp. 2d 1349 (S.D. Fla. 2009) .................................................. 32

*Beck v. Deloitte & Touche, Deloitte, Haskins & Sells, Ernest & Young, L.L.P.*,
  144 F.3d 732 (11th Cir. 1998) ................................................................ 12, 24

*BluestarExpo, Inc. v. Enis*,
  568 F. Supp. 3d 1332 (S.D. Fla. 2021) .......................................................... 30

*Brown v. Transworld Sys. Inc.*,
  2022 WL 17750097 (W.D. Wash. Dec. 15, 2022) ...................................... 30, 31

*Cabot E. Broward 2 LLC v. Cabot*,
  2016 WL 8740484 (S.D. Fla. Dec. 2, 2016) .................................................... 21

*Calvert v. Com. Bank of Washington, N.A.*,
  No. 10-17952, 2013 WL 3487562 (Bankr. W.D. Wash. May 14, 2013) ........... 28

*Chang v. JPMorgan Chase Bank, N.A.*,
  845 F.3d 1087 (11th Cir. 2017) .......................................................... 23, 25, 26

*Chaparro v. Carnival Corp.*,
  693 F.3d 1333 (11th Cir. 2012) .................................................................... 20

*In re Chira*,
  353 B.R. 693 (Bankr. S.D. Fla. 2006) ............................................................ 31

*In re Consol. Meridian Funds*,
  485 B.R. 604 (Bankr. W.D. Wash. 2013) .............................................. 25, 27, 29

*Cordell Consultant, Inc. Money Purchase Plan & Tr. v. Abbott*,
  561 F. App'x 882 (11th Cir. 2014) ................................................................ 21

*Ct. Appointed Receiver of Lancer Offshore, Inc. v. Citco Grp. Ltd.*,
  No. 05-60080CIV, 2008 WL 926509 (S.D. Fla. Mar. 31, 2008) ...................... 27

*Donofrio v. Matassini*,
  503 So. 2d 1278 (Fla. Dist. Ct. App. 1987) .................................................... 30

*Foman v. Davis*,
   371 U.S. 178 (1962) .................................................................................................................. 33

*Gilison v. Flagler Bank*,
   303 So. 3d 999 (Fla. Dist. Ct. App. 2020).......................................................... 20, 25, 31

*Helig Trust v. First Interstate Bank of Wash.*,
   93 Wash. App. 514 1082 (1998) ......................................................................................... 27

*Interlake Porsche & Audi, Inc. v. Bucholz*,
   728 P.2d 597 (Wash. 1986) ......................................................................................... 12, 24

*Irwin Concrete, Inc. v. Sun Coast Properties, Inc.*,
   653 P.2d 1331 (Wash. 1982) .............................................................................................. 32

*Koch v. Royal Wine Merchants, Ltd.*,
   907 F. Supp. 2d 1332 (S.D. Fla. 2012)............................................................................. 30

*Licciardello v. Lovelady*,
   544 F.3d 1280 (11th Cir. 2008) ......................................................................................... 33

*Logan v. Morgan, Lewis & Bockius LLP*,
   350 So. 3d 404 (Fla. Dist. Ct. App. 2022)........................................................................ 31

*In re Mastro*,
   2017 WL 2889659 (Bankr. W.D. Wash. July 6, 2017) ................................... 20, 21, 25, 26

*Money Mailer, LLC v. Brewer*,
   No. C15-1215RSL, 2018 WL 1916665 (W.D. Wash. Apr. 23, 2018) ............................... 31

*Orange Lake Country Club, Inc. v. Reed Hein & Assocs.*,
   LLC, 367 F. Supp. 3d 1360 (M.D. Fla. 2019)................................................................... 29

*Pearson v. Deutsche Bank AG*,
   2023 WL 2610271 (S.D. Fla. Mar. 23, 2023) ............................................................. 12, 24

*Perkumpulan Inv. Crisis Ctr. Dressel—WBG v. Regal Fin. Banccorp, Inc.*,
   781 F. Supp. 2d 1098 (W.D. Wash. 2011) ........................................................................ 30

*Ricchetti v. Starfish Beach S., S.A.*,
   No. 10CV21754, 2010 WL 11451771 (S.D. Fla. Dec. 27, 2010) ..................................... 28

*Romano v. Motorola, Inc.*,
   2007 WL 4199781 (S.D. Fla. Nov. 26, 2007) ................................................................... 32

*Sterling Bus. Forms, Inc. v. Thorpe*,
   82 Wash. App. 446, 918 P.2d 531 (1996) ......................................................................... 30

*Stewart v. Bank of Am., N.A.*,
   No. 8:11-CV-2586-MSS-TBM, 2012 WL 1310 302 (M.D. Fla. Feb. 28, 2012) ................ 28

*In re Takata Airbag Prods. Liab. Litig.*,
    2017 WL 2406711 ................................................................................................................ 32

*United States v. Bankman-Fried*,
    1:22-cr-00673-LAK-3 (S.D.N.Y.) ......................................................................................... 1

*United States v. Corinthian Colleges*,
    655 F.3d 984 (9th Cir. 2011) ................................................................................................ 21

*Universal Express, Inc. v. U.S. Sec. & Exch. Comm'n*,
    177 F. App'x 52 (11th Cir. 2006) ........................................................................................... 1

*White v. Verizon Fla., LLC*,
    2009 WL 10670227 (M.D. Fla. Nov. 9, 2009) ..................................................................... 29

**Statutes**

Bank Secrecy Act ...................................................................................................... 15, 16, 22

Federal Rules of Civil Procedure ............................................................................. 21, 31, 33

**Other Authorities**

Corporate Finance Institute, "How Do Banks Make Money?" ....................................... 32

Floyd Norris, *After Fraud, Regulators Go After A Bank*, N.Y. Times, Oct. 4, 2013 ................ 1

Turner Wright, "Federal Reserve issues enforcement action against FTX-linked US
    bank," Cointelegraph.com (Aug. 17, 2023) ......................................................................... 19

Zeke Faux, *Number Go Up: Inside Crypto's Wild Rise and Staggering Fall* (2023) ............. 9, 10

Plaintiffs file this opposition to the Motion to Dismiss Plaintiffs' Administrative Class Action Complaint and Incorporated Memorandum of Law (R. Doc. 262) filed by Defendant Farmington State Bank d/b/a Moonstone Bank ("Moonstone").[1]

## INTRODUCTION

It is long observed that one "can't run a Ponzi scheme without a bank … Banks are in a unique position to notice what is going on before the money is all gone."[2] This case is no different. The FTX disaster is the largest financial fraud in US history, resulting in billions of dollars in losses to Plaintiffs.[3] Defendant Sam Bankman-Fried ("SBF"), founder and former CEO of FTX Trading Ltd. ("FTX Trading") and its domestic counterpart, West Realm Shires Services Inc. d/b/a FTX US ("FTX US" and collectively with FTX Trading, "FTX"), currently stands trial for seven criminal counts including wire fraud, while his top lieutenants have pleaded guilty to same.[4]

SBF could not have perpetuated a scheme of such tremendous scale alone. SBF needed assistance from a bank, which he found in Defendant Moonstone. SBF's scheme was relatively straightforward, though concealed from the public, Plaintiffs included. In short, SBF took in customer funds, in both fiat and cryptocurrencies, and—rather than segregate those funds and hold them in custody for the benefit of FTX's customers—SBF stole customers' monies, laundered through sham loans and other transfers to Alameda Research, LLC ("Alameda"), the crypto hedge fund that SBF separately owned, and to himself and other FTX insiders for illegitimate purposes.

Moonstone provided necessary assistance to SBF, while from its "unique position" and as a result of its regulatory diligence and monitoring obligations, Moonstone knew FTX was converting customer funds by way of SBF's separately owned Alameda, in breach of its fiduciary duty to its customers and contrary to its representations, *inter alia*, that it was "the safest and easiest way to buy and sell crypto," that it maintained appropriate internal controls and risk management protections, and that it would hold customers' deposits in custody for the customers' benefit and

---

[1] Plaintiffs attach as Exhibit A to this opposition the Declaration of Adam Moskowitz. This Court may consider the documents attached to Exhibit A, because they are matters of public record. *See Universal Express, Inc. v. U.S. Sec. & Exch. Comm'n*, 177 F. App'x 52, 53-54 (11th Cir. 2006).

[2] Floyd Norris, *After Fraud, Regulators Go After A Bank*, N.Y. Times, Oct. 4, 2013, at B1.

[3] R. Doc. 155 at ¶ 1.

[4] *See* Ellison Plea, *United States v. BANKMAN-FRIED*, 1:22-cr-00673-LAK-3, (S.D.N.Y.) ("*United States v. SBF*"), ECF No. 19; Wang Plea, *United States v. SBF*, ECF No. 21; Singh Plea, *United States v. SBF*, ECF. No 102.

segregated from FTX's own assets.[5]

Notwithstanding its knowledge of FTX's misconduct, and in service of its own financial interests, Moonstone rendered critical and substantial assistance to the FTX fraud. Moonstone provided necessary, one-of-a-kind banking services to FTX when other financial institutions would not, including entry to the US banking system by way of the Federal Reserve and by serving as an outpost through which SBF trafficked customer assets offshore to its sister bank in The Bahamas, Defendant Deltec Bank and Trust Company Limited ("Deltec"). Moonstone and Deltec together were led by Defendant Jean Chalopin, a long-time friend of SBF and other FTX insiders. FTX rewarded Moonstone, Deltec, and Mr. Chalopin for their assistance by flushing the banks with tens of millions of dollars in needed capital—and, in the case of Moonstone, Alameda became a shareholder of the bank by way of an $11.5 million investment that doubled the then-value of the bank—and hundreds of millions of dollars of deposits.

## PLAINTIFFS' FACTUAL ALLEGATIONS

**I.    FTX's fraud and underlying misconduct.**

SBF, along with his co-founders Gary Wang and Nishad Singh, launched FTX in May 2019.[6] FTX was conceived in Northern California before ultimately landing its domestic operations in Miami, Florida, where FTX US was headquartered and where, in early 2021, FTX purchased the naming rights to the Miami Heat's waterfront arena for more than $135 million, one of many sports venues on which FTX paid to have its name emblazoned and one of many extravagant purchases made with Class Member funds.[7]

FTX touted itself as the "safest[,] easiest" and "most trusted way to buy and sell" digital assets.[8] For example, FTX purported (1) to have adopted "investor protections" including "avoiding or managing conflicts of interest," (2) to hold customer funds in segregated accounts for the customers' benefit, never taking title to or lending out those assets itself, (3) to implement state-of-the-art risk management controls to prevent any customer from becoming overleveraged on the platform, and (4) to adhere strictly to all regulatory and compliance obligations and embrace tighter regulatory scrutiny of the crypto industry writ large.[9] FTX led the public to believe that its

---

[5] R. Doc. 155, ¶¶ 37, 43-48.
[6] R. Doc. 155, ¶ 36.
[7] R. Doc. 155, ¶ 39.
[8] R. Doc. 155, ¶ 37.
[9] R. Doc. 155, ¶¶ 37, 43-47, 290.

competitive advantage was its safety, transparency, and trustworthiness. On the basis of these representations, FTX grew to become one of the largest cryptocurrency exchanges in the world, with a valuation of $32 billion and trading volumes of $21 billion per day.[10]

FTX's representations were untrue. FTX omitted that it had no fundamental internal controls, risk management procedures or other investor protections in place, it sought only to sidestep, if not flout entirely, its regulatory obligations, it did not hold customer funds in segregated accounts, and in truth, FTX was converting customer deposits, including Class Member funds, siphoning them to SBF so that he could prop up his own speculative ventures and enrich himself, his family, and his friends.[11]

SBF primarily routed the fraud through Alameda, the crypto hedge fund which he and Gary Wang formed two years before launching FTX and owned 90% and 10%, respectively.[12] SBF led Alameda as CEO until October 2021, when he installed Caroline Ellison, his close friend and former romantic partner, as CEO of the crypto hedge fund.[13] Still, SBF continued to control Alameda and maintained ultimate authority over its trading, borrowing, lending, and investment activity.[14] Under SBF's direction, Alameda took in customer funds, either by bank transfer from FTX accounts or by direct deposit into accounts held by North Dimension, a fake electronics dealer that served as Alameda's front.[15] From there, again under SBF's direction, Alameda used customer funds to make highly leveraged trades and other risky investments or transferred the funds to SBF and other insiders in the form of sham "loans."[16] FTX stole more than $8 billion in customer deposits, Class Member funds included, in this way.[17]

In addition to extending to Alameda a *de facto* limitless line of credit, underwritten by Class Member funds, FTX propped up Alameda's balance sheet with FTT, a crypto token minted by FTX that entitled holders to certain benefits on the exchange, such as fee discounts and early access to trades, and which could be traded like any other cryptocurrency.[18] FTX controlled how

---

[10] R. Doc. 155, ¶ 51.
[11] R. Doc. 155, ¶ 3.
[12] R. Doc. 155, ¶ 49.
[13] R. Doc. 155, ¶ 49.
[14] R. Doc. 155, ¶ 49.
[15] R. Doc. 155, ¶ 102.
[16] R. Doc. 155, ¶ 102.
[17] R. Doc. 155, ¶¶ 127, 147.
[18] R. Doc. 155, ¶ 209.

much FTT was issued and to whom, and FTX concentrated distribution of FTT on the balance sheets of Alameda, contrary to its representation that the token was widely distributed.[19] On November 2, 2023, news broke that Alameda's largest asset holdings were FTT tokens, such that Alameda's balance sheet was propped up by the FTX-manipulated token, and the entanglement of FTX and Alameda was revealed to the public for the first time.[20]

Days later, the FTX exchange collapsed, and FTX filed for Chapter 11 bankruptcy.[21] According to its balance sheet, FTX held approximately $900 million in liquid assets and $8.9 billion in liabilities, primarily in the form of a negative $8 billion ledger entry described as a "hidden, poorly internally labeled @fiat account."[22] The source of FTX's $8 billion hole was its siphoning of as much money in customer assets to Alameda, which Alameda burned through or routed to FTX insiders and never paid back.[23] Ms. Ellison later admitted to perpetuating the fraud in this way, and Ellison, Wang, and other FTX insiders have since pleaded guilty to multiple counts of conspiracy to commit wire fraud, securities fraud, and money laundering, among other financial crimes for participating in FTX's misconduct.[24] Class Members, meanwhile, have lost every dollar, coin, token, or other currency entrusted with FTX.

Upon FTX's filing for bankruptcy, John Ray, III, the 40-year veteran who oversaw the liquidation of Enron and whom the bankruptcy court appointed to take over as CEO of FTX, quickly uncovered fundamental deficiencies in recordkeeping, basic accounting, corporate governance and other controls by FTX.[25] So startling were these deficiencies that Mr. Ray remarked he had never "seen such a complete failure of corporate controls and such a complete absence of trustworthy financial information as occurred here."[26] More specifically, these deficiencies, and FTX's misrepresentations to Class Members regarding them, included as follows.

*First,* rather than adopting principles for ensuring investor protections, FTX lacked even the most fundamental internal controls, including any "appropriate management, governance, and organizational structure," any board of directors or other oversight, any of the most basic

---

[19] R. Doc. 155, ¶ 209.
[20] R. Doc. 155, ¶ 121.
[21] R. Doc. 155, ¶ 126.
[22] R. Doc. 155, ¶ 127.
[23] R. Doc. 155, ¶¶ 126-128.
[24] R. Doc. 155, ¶¶ 126-128.
[25] R. Doc. 155, ¶ 132.
[26] R. Doc. 155, ¶ 132.

4

accounting policies, controls or even "personnel who were experienced and knowledgeable enough to account accurately for assets and liabilities, understand and hedge against risk, or compile and validate financial reports," or any digital asset management or cybersecurity protections.[27] FTX instead relied on homespun Excel files, QuickBooks, Google documents, and Slack communications for its financials.[28] Indeed, FTX's recordkeeping was so poor that key accounting reports necessary to understand assets and liabilities, such as statements of cash flows, statements of equity, intercompany and related party transaction matrices, and schedules of customer entitlements, did not exist or were not prepared regularly, while copies of key documentation—including executed loan agreements, intercompany agreements, acquisition and investment documents, bank and brokerage account statements, and contract and account information of all types—were incomplete, inaccurate, contradictory, or missing entirely.[29]

And, rather than avoiding conflicts of interest, FTX actively embraced them, using FTX Trading, FTX US, and Alameda funds interchangeably to prop up the fraudulent scheme.[30] Contrary to FTX's representations that Alameda and FTX were "wholly separate entitit[ies] . . . at arm's length," and, despite their overlapping ownership by SBF, the companies were kept "separate in terms of day- to-day operations" by way of "a Chinese wall . . . to ensure that [Alameda wouldn't get] any sort of special treatment from FTX," SBF operated FTX and Alameda as a common enterprise.[31] The two companies shared offices for some time, as well as key personnel and other resources critical to the companies' operations.[32] Worse, FTX regularly "lent" customer assets to Alameda, which Alameda never repaid and which Alameda "secured" with FTX-minted FTT; Alameda, in turn, used those customer assets as cheap collateral for its highly risky trades.[33]

*Second*, rather than "hold[ing] customer funds in segregated accounts for the customer's benefit," FTX "commingled [customer assets, including Class Member funds] with assets from the Alameda trading platform" and "Alameda used client funds to engage in margin which exposed customer funds to massive losses," while "the FTX Group went on a spending binge in late 2021 through 2022," burning through "approximately $5 billion [on] a myriad of businesses and

---

[27] R. Doc. 155, ¶¶ 132-139.
[28] R. Doc. 155, ¶ 138(c).
[29] R. Doc. 155, ¶ 138(e)-(f).
[30] R. Doc. 155, ¶ 38.
[31] R. Doc. 155, ¶ 98-99.
[32] R. Doc. 155, ¶ 98-99.
[33] R. Doc. 155, ¶¶ 38-39.

investments … worth only a fraction of what was paid for them." [34] FTX also transferred in excess of $1 billion in customer assets, including Class Member funds, to SBF and other insiders, often "nominally 'papered' as personal loans with below-market interest rates and a balloon payment due years in the future."[35] FTX did not observe any discernable corporate formalities when it came to intercompany transactions, routinely shuffling assets and liabilities among FTX, Alameda, insiders and other affiliates, including, for example, on the books of FTX Trading, an unspecified "related party receivable" valued at $1.2 billion (equivalent to 44% of the company's assets); a $362 million "related party payable"; $250 million in payments (equivalent to 25% of the company's revenues) to a related party for "software royalties;" and a series of related party transactions described only as "currency management" activities.[36]

*Third*, rather than "implement state-of-the-art risk management controls to prevent any customer from becoming overleveraged on the platform," FTX had not even the most basic controls in place, such as an independent board of directors or even a CFO.[37] FTX exacerbated its exposure to losses by exempting Alameda from any risk management protections that were in place. For example, FTX "implement[ed] special settings on Alameda's FTX.com account that permitted Alameda … access to an unlimited line of credit without being required to post collateral, without having to pay interest on negative balances and without being subject to margin calls or FTX.com's liquidation protocols."[38]

*Fourth*, contrary to FTX's representations that it was highly regulated, and happily so, and that it maintained strict compliance with all regulatory obligations, FTX sought only to sidestep regulatory oversight at every possibility. For example, though SBF and other FTX executives suggested to customers that FTX was FDIC-insured, it was not.[39] And though in congressional testimony, SBF testified that FTX's "risk engine" would automatically liquidate any customer who became overleveraged, it would not, at least in the case of Alameda, which was exempt from the risk engine protocol.[40] And though FTX touted a devotion to transparency and compliance by way of, for example, its acquisition of LedgerX, LLC, a digital currency futures and options exchange

---

[34] R. Doc. 155, ¶ 218.
[35] R. Doc. 155, ¶ 218.
[36] R. Doc. 155, ¶ 100.
[37] R. Doc. 155, ¶ 339.
[38] R. Doc. 155, ¶¶ 107 (quoting the guilty plea of Alameda CEO Caroline Ellison), 113.
[39] R. Doc. 155, ¶ 48.
[40] R. Doc. 155, ¶ 46.

based in Miami and regulated by the CFTC, SBF later admitted that FTX's public commitments to regulatory compliance were "just PR," and even the LedgerX acquisition was nothing but an avenue for FTX to obtain regulatory licenses by acquisition, rather than undergo the scrutiny of the full application process.[41]

And while these deficiencies were concealed from Class Members, they were immediately apparent to anyone with even limited visibility into FTX's operations. To be sure, Mr. Ray, SBF's court-appointed successor following FTX's bankruptcy, uncovered these deficiencies in a matter of days.[42] Before that, Changpeng Zhao, CEO of Binance, the world's largest cryptocurrency exchange and whom SBF solicited for a bailout just prior to FTX's collapse, uncovered these deficiencies *after only 24 hours* of basic diligence, noting that FTX had "[w]ay too many issues" to consummate any deal.[43]

Moonstone likewise knew of the fundamental deficiencies plaguing the FTX exchange. Through diligence on FTX and close ties with SBF, Moonstone learned that FTX was operated as SBF's personal piggy bank, that as quickly as FTX customer funds flowed into FTX, they flowed back out to other entities SBF separately owned or controlled, and that FTX lacked the most basic internal controls, such that the enterprise was in fact a house of cards.[44] But Moonstone did not care. It, too, had money to make in the scheme, its interests aligned with SBF's, and SBF rewarded Moonstone handsomely for its assistance.[45] With shared objectives and complementary motives, Moonstone conspired with FTX to perpetuate the fraud and committed critical overt acts in furtherance of it, including by providing FTX access to the U.S. banking system, as well as a suite of non-routine, high risk banking services to FTX, accepting and/or transferring Class Member funds into accounts that Moonstone knew were held by entities that SBF separately owned, and helping to fence Class Member funds across the U.S. border.[46]

## II.   Moonstone's knowing assistance of FTX's underlying misconduct.

### A.   Moonstone's cozy history with FTX and its founder, SBF.

Moonstone's involvement in the FTX fraud originated with Defendant Jean Chalopin.

---

[41] R. Doc. 155, ¶¶ 289-291.
[42] R. Doc. 155, ¶ 132.
[43] R. Doc. 155, ¶ 123.
[44] R. Doc. 155, ¶¶ 298, 300-03.
[45] R. Doc. 155, ¶¶ 305, 307.
[46] R. Doc. 155, ¶ 283.

A veteran of the crypto industry, Mr. Chalopin is both Moonstone's chief executive officer and chairman, as well as the largest shareholder and longtime chairman of Defendant Deltec, an offshore bank licensed and operating in The Bahamas.[47] Deltec is one of the only banks in the world that offers a full suite of digital asset services, including multi-currency banking, digital asset custody, trading, market making, lending and borrowing, such that it is one of the few financial institutions through which clients can process cryptocurrency transactions.[48]

Recognizing the unique, if not unusual, suite of services his bank had to offer the crypto industry, Mr. Chalopin spent years assisting the Bahamian government in "transforming the country into a sandbox for digital asset startups."[49] This was no easy task. As Mr. Chalopin tells it, transforming The Bahamas into a crypto haven was like clearing a jungle, requiring a "machete [to] cut the branches."[50] Perhaps helpful in this regard was Ryan Pinder, The Bahamas' Attorney General, who served many years in The Bahamian Parliament before leaving in 2014 to take what he described as a "mind blowing" deal to serve as Chief Legal Officer at Deltec, Mr. Chalopin's bank.[51] With friends in the government, Mr. Chalopin succeeded in lobbying the Bahamian legislature to pass crypto-friendly legislation in 2020.[52] Mr. Chalopin credits these efforts, and the lenient regulation that resulted therefrom, with attracting FTX to The Bahamas (and, in turn, to his bank, Deltec).[53]

FTX and other entities under SBF's control opened no fewer than 17 accounts at Deltec in currencies of various kinds.[54] FTX quickly became one of Deltec's largest customers and transferred Class Member funds into and out of those accounts in furtherance of the FTX fraud,[55] and, the public learned for the first time in the course of SBF's criminal trial, Deltec accepted customer deposits directly into FTX's accounts.[56] At Mr. Chalopin's direction, Deltec assisted FTX in moving Class Member funds offshore through these accounts.[57] These funds included,

---

[47] R. Doc. 155, ¶¶ 29, 31.
[48] R. Doc. 155, ¶¶ 29, 31.
[49] R. Doc. 155, ¶ 284.
[50] R. Doc. 155, ¶ 285.
[51] R. Doc. 155, ¶ 285.
[52] R. Doc. 155, ¶ 288.
[53] R. Doc. 155, ¶ 288.
[54] R. Doc. 155, ¶¶ 287, 304.
[55] R. Doc. 155, ¶¶ 287, 304.
[56] *See* Ex. GX-783, *United States v. SBF*, attached hereto as Ex. 1 to Ex. A (Moskowitz Decl.).
[57] R. Doc. 155, ¶¶ 303, 304.

upon information and belief, not only Class Members' U.S. dollar deposits, but also Class Members' cryptocurrencies, as Deltec is one of few banks with the faculties necessary to do that, including taking custody of cryptocurrencies and trading, lending or borrowing digital assets.[58] FTX could not find these special services in other banks, and FTX relied on the provision of these crypto banking services by Deltec.[59] Deltec benefited greatly from its relationship with FTX, collecting millions of dollars in fees and profiting from hundreds of millions of deposits held in the FTX accounts.[60]

FTX was not the first customer to run a cryptocurrency-based fraud through Deltec and under Mr. Chalopin's watch. In 2018, Mr. Chalopin delivered to Deltec the stablecoin Tether as a customer, which held $1.8 billion dollars on deposit at the bank, approximately half of Deltec's total deposits at the time.[61] Tether was a risky endeavor—Deltec is reportedly "the only financial institution … willing to say it was working with Tether" as of mid-2021.[62] Hesitation to bank Tether was well founded, because Tether was perpetuating a fraud with striking similarity to that perpetuated by FTX. Like FTX, Tether represented to its customers that it had sufficient levels of liquidity to protect the value of the customers' investments, when it did not, because Tether was siphoning hundreds of millions in customer funds to an affiliate, Bitfinex, just as FTX siphoned billions in customer funds to Alameda.[63] The scheme caught the attention of regulators in the United States and, in early 2021, Tether and Bitfinex reached an agreement with the New York Attorney General to settle claims of fraud.[64] Deltec banked Tether throughout the fraud.[65]

The Tether fraud directly implicated FTX, a fact that has come to light in the time since Plaintiffs filed the Administrative Class Action Complaint. Critical to the Tether fraud was its ability to inflate its balance sheet by claiming that it held approximately $30 billion in "commercial paper," i.e. short term loans to corporations for routine expenses such as payroll or inventory, an

---

[58] *See* R. Doc. 155, ¶¶ 303, 337; *see also* R. Doc. 1, *O'Keefe v. Sequoia Capital Operations, LLC et al.*, Case No. 1:23-cv-20700-KMM (S.D. Fla.), ¶ 75.
[59] *See* R. Doc. 155, ¶¶ 303, 337; *see also* R. Doc. 1, *O'Keefe v. Sequoia Capital Operations, LLC et al.*, Case No. 1:23-cv-20700-KMM (S.D. Fla.), ¶ 75.
[60] R. Doc. 155, ¶¶ 303, 304.
[61] R. Doc. 155, ¶ 286.
[62] Zeke Faux, *Number Go Up: Inside Crypto's Wild Rise and Staggering Fall* (2023).
[63] R. Doc. 155, ¶ 287.
[64] R. Doc. 155, ¶ 287.
[65] R. Doc. 155, ¶ 287.

amount that would have made Tether the seventh-largest holder of such debt.[66] In truth, however, Tether engineered such holdings by extending crypto-based IOUs to cryptocurrency exchanges including, upon information and belief, FTX.[67] SBF has admitted, in interviews published for the first time since Plaintiffs filed the instant Complaint, that FTX "wired [Tether] a lot of dollars" and it did so by "going through three different jurisdictions [and] through intermediary banks,"[68] including, upon information and belief, The Bahamas and Deltec, where both Tether and FTX held accounts.

The Tether fraud did not deter Mr. Chalopin nor Deltec, his bank, from expanding their crypto clientele and lucrative crypto business. To do this, Deltec co-sponsored with FTX the Crypto Bahamas summit, where Mr. Chalopin and SBF hosted "an exclusive gathering of the leading investors and builders in the blockchain, digital assets and web3 space."[69] Nearly a dozen FTX executives, including Brett Harrison, President of FTX US, and Zach Dexter, President of LedgerX, were also featured at the conference.[70] Deltec's sponsorship of Crypto Bahamas, at Mr. Chalopin's direction, helped to amplify SBF's reach. The conference was heralded in the press, with *CoinDesk* describing the affair as "a four-day flex of FTX's expanding empire … with a new era of 'corporate crypto' firmly on display," and the *New York Times* reporting, "Bankman-Fried was presiding over the first edition of the Crypto Bahamas conference, a showcase for FTX and a vivid demonstration of his growing celebrity and influence. Everywhere he went, crypto entrepreneurs offered handshakes and fist bumps, patting him on the back as they pitched projects or presented him with branded swag."[71]

Deltec's hosting Crypto Bahamas also helped to normalize the FTX exchange "from the early days of 'shadowy super-coders' hearkening the end of banks."[72] Many news outlets reported the growing acceptance of crypto on display, with *Yahoo! Finance* noting that the summit was an introduction between "traditional investors and crypto native firms," and *Forbes* reporting that the panels  "discussed how digital assets fit into modern investment portfolios and the broader

---

[66] Zeke Faux, *Number Go Up: Inside Crypto's Wild Rise and Staggering Fall* (2023).
[67] Zeke Faux, *Number Go Up: Inside Crypto's Wild Rise and Staggering Fall* (2023).
[68] Zeke Faux, *Number Go Up: Inside Crypto's Wild Rise and Staggering Fall* (2023).
[69] R. Doc. 155, ¶ 293.
[70] R. Doc. 155, ¶ 293.
[71] R. Doc. 155, ¶ 294.
[72] R. Doc. 155, ¶ 295.

maturation of the asset class."[73]

Mr. Chalopin was happy for Deltec to help FTX. At the conference, Mr. Chalopin touted that "Deltec has been a long-time friend of FTX, and it is our pleasure to support them."[74] Mr. Chalopin added "Deltec has probably 20 people on the ground here at the conference today. We are here because we embraced [FTX's] vision of the future."[75] FTX, in turn, was a great friend to Deltec. After an extended failure by Deltec to raise debt capital in New York, Mr. Chalopin turned to FTX and, in October 2021, Deltec's parent company, Deltec International Group, received a $50 million loan from Norton Hall Ltd., an entity controlled by Ryan Salame, CEO of FTX's Bahamian outfit, the same entity through which Alameda "loaned" $55 million to Mr. Salame, paid for with Class Member funds.[76]

In furtherance of his long-time friendship with SBF, and in service of the mutually beneficial relationship between Deltec and FTX, Mr. Chalopin sought opportunity to assist the FTX fraud stateside. Mr. Chalopin found that opportunity in Farmington State Bank, then the 26th smallest of 4,800 banks in the United States with roughly no more than 25 employees and a single branch in Farmington, Washington, a rural town of only 150 residents.[77] So small was Farmington State Bank that, in 2010, the bank's president bragged that it did not offer credit cards and held more deposits than loans outstanding.[78] That changed in 2020, when Mr. Chalopin purchased Farmington State Bank and rebranded it Moonstone, purportedly to target digital assets and to support the "underserved cannabis industry."[79] Mr. Chalopin, who since purchasing Moonstone serves as its chairman and CEO (while concurrently serving as chairman of Deltec), further explained his motivation in acquiring Moonstone as filling a "massive gap in the U.S. for digital asset businesses, [that Moonstone] think[s] we can solve."[80] Moonstone would also fill a massive gap for FTX, which was then lacking sufficient entry points to the U.S. banking system and sufficient go-betweens from the United States to Deltec, FTX's offshore bank in The Bahamas.[81]

---

[73] R. Doc. 155, ¶ 295.
[74] R. Doc. 155, ¶ 296.
[75] R. Doc. 155, ¶ 296.
[76] R. Doc. 155, ¶ 297.
[77] R. Doc. 155, ¶ 306.
[78] R. Doc. 155, ¶ 306.
[79] R. Doc. 155, ¶ 306.
[80] R. Doc. 155, ¶ 305.
[81] R. Doc. 155, ¶ 313.

**B.  Moonstone's knowledge of the FTX fraud.**

By the time Mr. Chalopin purchased Moonstone, the FTX fraud had been operating for at least a year,[82] and Moonstone gained awareness of FTX's underlying misconduct immediately upon Mr. Chalopin's purchase of it. As the newly installed CEO and chairman of Moonstone, Mr. Chalopin brought with him knowledge of FTX's misconduct obtained as chairman of Deltec and long-time friend of SBF.[83] In particular, Mr. Chalopin had the benefit of Deltec's due diligence on FTX and Deltec's regulatory obligation to monitor FTX's banking activity thereafter. Other Deltec clients have explained that this diligence process, reportedly conducted over "several months," includes "an analysis of [the client's] compliance processes, policies and procedures; a full background check of the shareholders, ultimate beneficiaries and officers of [the] company; and, for crypto clients, assessments of [the client's] ability to maintain the USD-peg [i.e., the currency's stability by way of peg to the US dollar] at any moment and [the client's] treasury management policies."[84]

Moreover, as a Bahamian Supervised Financial Institution, Deltec was required to have in place policies that were consistent with the Central Bank of the Bahamas' Guidelines for Supervised Financial Institutions on the Prevention of Money Laundering, Countering the Financing of Terrorism & Proliferation Financing (the "Guidelines").[85] All Supervised Financial Institutions of the Bahamian Central Bank must use these Guidelines to develop responsible procedures to prevent money laundering and terrorist financing.[86] For example:

- Deltec is required to "retain adequate documentation to demonstrate that its [Know Your Customer ("KYC")] procedures have been properly implemented, and that it has carried out the necessary verification procedures." [87] From this, Deltec would have learned SBF was the beneficial owner of FTX and Alameda.

---

[82] R. Doc. 155, ¶¶ 36, 107, 110, 306.

[83] *See, e.g.*, *Beck v. Deloitte & Touche, Deloitte, Haskins & Sells, Ernest & Young, L.L.P.*, 144 F.3d 732, 736 (11th Cir. 1998) ("In normal circumstances, the knowledge of a corporation's directors (and therefore their discovery of malpractice) is imputed to the corporation [under Florida law].");  *Pearson v. Deutsche Bank AG*, 2023 WL 2610271, at *24 (S.D. Fla. Mar. 23, 2023); *Interlake Porsche & Audi, Inc. v. Bucholz*, 728 P.2d 597, 607 (Wash. 1986) ("As an IPA officer and director, Kreybig had knowledge which is imputed to the corporation.").

[84] R. Doc. 155, ¶ 299.

[85] R. Doc. 155, ¶ 300.

[86] R. Doc. 155, ¶ 300.

[87] R. Doc. 155, ¶ 300.

- When seeking to verify the identity of corporate clients, Deltec is required to identify the client's "source of funds."[88]   From this, Deltec would have identified that incoming transfers to FTX's accounts were of customer deposits.

- Moreover, cross-border wire transfers of $1,000 or more must contain complete payer and payee information for Deltec to process such wire transfers.[89]  From this, Deltec would have learned that FTX customer deposits were being transferred to Alameda and other entities that SBF separately owned.

- And, per the Guidelines, where Deltec "observe[s] unusual activity in relation to any client account, [it] should question the customer concerned, even if it means asking difficult questions. If a customer fails to provide credible answers, this should invite further enquiry about his activities, make [Deltec] reconsider the wisdom of doing business with [the client] and, potentially lead to a [Suspicious Transaction Report ("STR")] being filed. [Deltec] should document the results of their enquiries into unusual activity."[90]

Under these regulations, Deltec was obligated to (1) identify the source of funds transferred into, out from, and among FTX's accounts at Deltec; (2) obtain payer and payee information for wire transfers into, out from, and among FTX's accounts for cross-border transfers and transfers in amounts greater than $1,000; and (3) question the customer about any unusual activity observed in the customer's accounts. For FTX, the source of funds was customer assets, including Class Member funds, and the payer and payee were FTX, Alameda, SBF, his friends, family and other FTX insiders.[91] As a result, Deltec—and by extension, Chalopin, Deltec's chairman and largest shareholder—was aware that customer funds were being transferred to Alameda (and other accounts under SBF's control) from FTX.[92]

To be sure, Chalopin learned of FTX's misconduct in courting Alameda to invest in his new bank, Moonstone. Shortly after purchasing Moonstone, Chalopin and his son Janvier Chalopin, Moonstone's chief digital officer, solicited Alameda for start-up capital and, in doing so, "pitched [Alameda] the whole roadmap" to invest in the then tiny bank in rural Washington state.[93] The Chalopins succeeded in securing financial backing from SBF, their long-time friend. In January 2022, Alameda invested $11.5 million in Moonstone—nearly double the bank's net

---

[88] R. Doc. 155, ¶ 300.
[89] R. Doc. 155, ¶ 300.
[90] R. Doc. 155, ¶ 300.
[91] *See* R. Doc. 155, ¶¶ 104, 106, 111, 113, 138(i).
[92] R. Doc. 155, ¶ 301.
[93] R. Doc. 155, ¶ 305.

worth at the time. [94] Alameda was Moonstone's largest investor and, in a press release dispatched from Bellevue, Washington, Chalopin boasted at that time "Alameda['s]investment into … Moonstone Bank signifies the recognition, by one of the world's most innovative financial leaders, of the value of what we are aiming to achieve. This marks a new step into building the future of banking."[95] It also meant that SBF, who owned 90% of Alameda, indirectly held a majority stake in Moonstone, one of the select banks through which he ran the FTX fraud.

     In addition to the ordinary diligence that would come before taking in tens of millions of dollars in investment capital from Alameda, Moonstone obtained information concerning FTX's underlying misconduct from Chalopin's close personal bond with Defendant Dan Friedberg, who helped Chalopin secure Alameda's investment.[96] Friedberg is FTX's general counsel and chief compliance officer, licensed in Washington state and who, at the time, worked for FTX from the Seattle area.[97] Friedberg regularly met with Chalopin, often over dinner and, in or around August 2021, the two began to discuss Alameda's potential investment in Moonstone.[98] Over the course of the negotiations, as reported by FTX and Deltec employees, the Friedberg and Chalopin "spoke highly of one another."[99] Friedberg was considered one of the key decisionmakers within the FTX Group and was routinely identified as a member of the senior executive team.[100] Friedberg served simultaneously as FTX US's Chief Compliance Officer and Alameda's General Counsel, an overlap that Chalopin must have appreciated and one that revealed the total lack of "appropriate management, governance, and organizational structure" of FTX, as well as the conflicts of interest between FTX and Alameda.[101]

---

[94] R. Doc. 155, ¶¶ 305, 307.

[95] R. Doc. 155, ¶¶ 305, 307.

[96] R. Doc. 155, ¶ 307.

[97] R. Doc. 155, ¶ 307.

[98] R. Doc. 155, ¶ 307.

[99] R. Doc. 155, ¶ 307.

[100] R. Doc. 155, ¶ 308.

[101] R. Doc. 155, ¶¶ 307-308. Mr. Chalopin also likely understood that Mr. Friedberg had only recently been associated with another fraud arising from a cheating scheme facilitated by the online poker site Ultimate Bet. *Id.*, ¶ 308. For years prior, Ultimate Bet allowed certain players to employ "God-mode," which allowed them to see the hands held by their unsuspecting competitors. *Id.* Victims of the scandal lost $40 million to the players employing "God-mode" to cheat others. *Id.* At the time, Friedberg was an executive at the software company that managed Ultimate Bet. *Id.* Rather than report the scandal, Mr. Friedberg sought to cover it up, suggesting that Ultimate Bet tell the public that an outside consultant "took advantage of a server flaw by hacking into the

Moonstone, too, had regulatory obligations to understand and monitor FTX's banking activity through FTX's accounts at the bank and, as a bank in the United States, Moonstone must adhere to certain anti-money laundering ("AML") and KYC laws and regulations, including the Bank Secrecy Act ("BSA"), Patriot Act, Anti-Money Laundering Act and regulations promulgated thereunder.[102] These obligations include developing a "Customer Identification Program" and "Customer Due Diligence" procedures reasonably designed to identify and verify all customers and, where applicable, including FTX's beneficial owners, source of funds, and the nature and intended purpose of the business relationship, to the extent warranted by the risk of money laundering or terrorist financing or as required by regulation."[103] Like Deltec, Moonstone, and in turn, Chalopin, Moonstone's chief executive and chairman, would have learned from this diligence (1) that SBF separately owned and controlled FTX and Alameda, and (2) the source of funds into FTX's accounts were FTX customer deposits.

Additionally, because FTX Trading was an offshore money service business ("MSB") incorporated in Antigua, a jurisdiction which the Financial Crimes Enforcement Network ("FinCEN") classifies as "high risk," Moonstone was required to conduct enhanced due diligence and ongoing monitoring of FTX Trading under the U.S. banking regulations and in accordance with the Federal Financial Institutions Examination Council Manual (the "FFEIC Manual"), which sets forth guidelines for compliance with the U.S. banking laws.[104] Specifically, with respect to FTX Trading and other of FTX's offshore MSBs, the FFEIC Manual required Moonstone to (1) understand the intended use and purposes of the accounts and anticipated account activity (both type and volume), (2) understand the types of products and services offered, as well as the location and markets served, and (3) conduct ongoing diligence and monitoring for suspicious activity, in each case in accordance with the BSA.[105] This diligence and monitoring encompassed, for example:

- A review of FTX Trading's BSA/AML program;

- A review of the results of FTX Trading's independent testing of its AML

---

client," and that Ultimate Bet was "unable to identify exactly when" the hacking occurred. *Id.* In 2013, news broke of Mr. Friedberg's attempts to suppress the truth about the scandal. *Id.*
[102] R. Doc. 155, ¶ 309.
[103] R. Doc. 155, ¶ 309.
[104] R. Doc. 155, ¶ 310.
[105] R. Doc. 155, ¶ 310.

program;

- A review of written procedures for the operation of FTX Trading;

- On-site visits;

- A review of list of agents, including locations, within or outside the United States, which will be receiving services directly or indirectly through the FTX Trading account;

- A determination whether FTX Trading has performed due diligence on any third-party servicers or paying agents;

- A review of written agent management and termination practices for FTX Trading;

- A review of written employee screening practices for FTX Trading.[106]

Relevant regulations, including those promulgated by FinCEN, the financial intelligence unit within the Department of Treasury, further require Moonstone to (1) monitor for and report suspicious transactions of $5,000 or more, (2) monitor and report currency transactions in excess of $10,000, (3) implement a customer identification program, and (4) conduct due diligence on its customers, including enhanced due diligence for FTX Trading accounts.[107] Again, like Deltec, Moonstone would have learned from this diligence and monitoring (1) that SBF separately owned and controlled FTX and Alameda, (2) the source of funds into FTX's accounts were FTX customer deposits, and (3) FTX transferred those customer deposits to Alameda and other entities that SBF separately owned.

Moonstone represented to the public that it maintained "first-in-class regulatory, compliance and risk expertise," and so certainly must have satisfied its diligence and monitoring regulatory obligations in keeping with that representation.[108] And that diligence encompassed fraudulent transfers by FTX:  FTX held at least $50 million in accounts at Moonstone and, under information and belief, effected numerous transfers that qualify as suspicious under the regulations, requiring additional monitoring and reporting by Moonstone.[109] To be sure, Caroline

---

[106] R. Doc. 155, ¶ 310.
[107] R. Doc. 155, ¶ 311.
[108] R. Doc. 155, ¶ 309.
[109] R. Doc. 155, ¶¶ 311, 313.

Ellison, in pleading guilty, confessed that FTX transferred customer funds to Alameda in amounts larger than $10,000, triggering the regulatory diligence and reporting requirements of both Deltec and Moonstone.[110] Time has proved these allegations true. On September 7, 2023, one month after Plaintiffs filed their Complaint, Ryan Salame, a former Alameda executive who served as CEO of FTX Digital Markets until FTX's collapse, was arraigned and pleaded guilty to two criminal charges for his participation in the FTX fraud. Salame's indictment confirmed that "[w]hen FTX was founded … many U.S. banks were reluctant to do business with cryptocurrency companies, and those banks that were willing to open accounts for cryptocurrency companies had extensive customer due diligence and licensing requirements, *with which FTX was not compliant.*"[111]

Despite this knowledge, at the direction of Chalopin and to the benefit of both FTX and Alameda (not uncoincidentally, Moonstone's largest shareholder), Moonstone assisted the FTX fraud in critical fashion.

### C.  Moonstone's assistance to the FTX fraud, despite knowledge of it.

Eager to help more with FTX's trafficking of customer deposits offshore, in furtherance of his long-time friendship with SBF, and in service of the mutually beneficial relationship between Deltec and FTX, Chalopin sought an opportunity to assist in funneling customer deposits from the United States to FTX accounts at Deltec. He found that opportunity in Farmington State Bank, then the 26th smallest bank in the United States with no more than 25 employees and a single branch in Farmington, Washington, a rural town of only 150 residents.[112] So small was Farmington State Bank that, in 2010, the bank's president bragged that it did not offer credit cards and held more deposits than loans outstanding.[113] That changed in 2020, when Chalopin purchased Farmington State Bank and rebranded it Moonstone, purportedly to target digital assets and to support the "underserved cannabis industry."[114] Chalopin, who since purchasing Moonstone serves as its chairman and CEO (while concurrently serving as chairman of Deltec), further explained his motivation in acquiring Moonstone as filling a "massive gap in the U.S. for digital asset businesses, [that Moonstone] think[s] we can solve."[115] Moonstone would also fill a

---

[110] R. Doc. 155, ¶ 107.
[111] Salame Indictment, ¶5, attached hereto as Ex. 2 to Ex. A (Moskowitz Decl.).
[112] R. Doc. 155, ¶ 306.
[113] R. Doc. 155, ¶ 306.
[114] R. Doc. 155, ¶ 306.
[115] R. Doc. 155, ¶ 305.

massive gap for FTX, which was then lacking sufficient entry points to the U.S. banking system and sufficient go-betweens from the United States to Deltec, FTX's offshore bank in The Bahamas.

Upon Alameda's investment in Moonstone, and at Chalopin's direction, Moonstone promptly applied, and was approved, to become a member of the Federal Reserve, and FTX gained entry to the U.S. banking system.[116] Moonstone's membership in the Federal Reserve was imperative to the FTX fraud, as SBF needed access to the U.S. banking system, and other major financial institutions in the United States, "[w]ary of an emerging asset class that had been linked to money laundering and illegal drugs, … refused to bank crypto exchanges and started blocking transfers by customers to buy cryptocurrencies."[117] Indeed, Moonstone was one of only three U.S. banks willing to provide banking services to FTX and its affiliates.[118]

According to a former president of the Independent Community Bankers of America, Moonstone's close relationship to Alameda was concerning, and the approval of Moonstone's application to the Federal Reserve, a cause for alarm: "The fact that [Alameda] an offshore hedge fund that was basically a crypto firm was buying a stake in a tiny bank for multiples of its stated book value should have raised massive red flags for the F.D.I.C., state regulators and the Federal Reserve … It's just astonishing that all of this got approved."[119] Plaintiffs now know why the astonishing approval of Moonstone's membership in the Federal Reserve went through. Moonstone lied to the Federal Reserve. On August 17, 2023, just one week after Plaintiffs filed the Complaint, the Federal Reserve announced an enforcement action against Moonstone, because, upon information and belief, at Chalopin's direction, Moonstone did not inform the Federal Reserve, in applying for membership, that Moonstone intended "to pursue a strategy focused on digital banking services or digital assets" (i.e., banking FTX and Alameda), and Moonstone "improperly chang[ed] its business plan" to provide such services (i.e., to FTX and Alameda) without prior notification or approval from the Federal Reserve.[120]

---

[116] R. Doc. 155, ¶ 313.
[117] *See* R. Doc. 155, ¶¶ 303, 337; *see also* R. Doc. 1, *O'Keefe v. Sequoia Capital Operations, LLC et al.*, Case No. 1:23-cv-20700-KMM (S.D. Fla.), ¶ 75.
[118] *See* R. Doc. 155 at ¶¶ 303, 337; *see also* R. Doc. 1, *O'Keefe v. Sequoia Capital Operations, LLC et al.*, Case No. 1:23-cv-20700-KMM (S.D. Fla.), ¶ 75.
[119] R. Doc. 155, ¶ 313.
[120] *See* Turner Wright, "Federal Reserve issues enforcement action against FTX-linked US bank,"

With access to the U.S. banking system by way of Moonstone's membership in the Federal Reserve fraudulently obtained, FTX quickly began to route the fraud through it, depositing $50 million in customer assets, including Class Member funds, across two accounts at the bank.[121] FTX was Moonstone's largest customer, and Moonstone, for its part, benefited tremendously from this quid pro quo.[122] With FTX's accounts, Moonstone's deposits jumped to $71 million in the third quarter of 2020, a 600% increase from Moonstone's historical average.[123]

In pursuit of continued growth and unprecedented profits, Moonstone, at the direction of Chalopin, gladly took action in furtherance of SBF's fraud, primarily by fencing customer assets across the U.S. border and into FTX accounts at Deltec, Moonstone's sister bank in The Bahamas.[124] In testimony before Congress, John Ray noted that the services Moonstone and Deltec provided to FTX were "certainly highly irregular" and transfers between the banks have "gotten [the Bankruptcy Estate's] attention."[125] Mr. Ray elaborated that he is "looking at what dollars were that went from the FTX group to [Moonstone] and looking at the connections of that bank to the Bahamas [i.e., Deltec] …. There's a lot more questions than answers. It's certainly highly irregular and has got our attention." [126] Mr. Ray has not completed his investigation into the "highly irregular" activity involving FTX, Moonstone, and Deltec to date.

Moonstone provided these "highly irregular" services at Chalopin's direction and despite its awareness of FTX's underlying misconduct obtained from Chalopin's long history with SBF, from Moonstone's regulatory-mandated diligence and monitoring, and from Chalopin's solicitation of Alameda for $11.5 million in investments.[127] Nevertheless, Chalopin assisted the FTX fraud by directing Moonstone to take overt acts in furtherance of it, including by providing FTX access to the U.S. banking system, by effecting transfers of customer assets, including Class Member funds, into accounts under SBF's separate ownership and control, and by trafficking

---

Cointelegraph.com (Aug. 17, 2023), *available at* https://cointelegraph.com/news/federal-reserve-issues-enforcement-action-against-ftx-linked-bank, (last accessed Nov. 3, 2023) (summarizing the Federal Reserve's enforcement action and providing a link to the Federal Reserve's cease and desist order arising from same).
[121] R. Doc. 155, ¶ 313.
[122] R. Doc. 155, ¶ 314.
[123] R. Doc. 155, ¶ 314.
[124] R. Doc. 155, ¶¶ 314-315.
[125] R. Doc. 155, ¶ 315.
[126] R. Doc. 155, ¶ 315.
[127] R. Doc. 155, ¶¶ 298, 305, 309-12, 316.

customer assets, including Class Member funds, across the U.S. border and beyond the reach of U.S. law enforcement.[128] SBF could not have perpetuated the fraud without these services, and Class Members would not have suffered injury from the fraud but for Chalopin's knowing and substantial assistance through Moonstone and Deltec.

On the basis of these factual allegations, Plaintiffs assert, on behalf of the putative class, claims of civil conspiracy, aiding and abetting fraud, aiding and abetting fiduciary breach, aiding and abetting conversion, and unjust enrichment against Moonstone, arising under Florida and Washington common law.[129]

## LAW AND ARGUMENT

## I.    PLAINTIFFS SUFFICIENTLY PLEADED THEIR CLAIMS.

To survive a motion to dismiss, a complaint must only contain sufficient factual matter that, when accepted as true, "states a claim for relief that is plausible on its face." *Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1337 (11th Cir. 2012).

### A.    Plaintiffs sufficiently pleaded that Moonstone aided and abetted fraud, fiduciary breach and conversion under Florida and Washington common law.

Moonstone argues that Plaintiffs' claims for aiding and abetting fraud, fiduciary duty and conversion fail for lack of sufficient allegations that it (1) "actually knew" of FTX's underlying misconduct; and (2) rendered substantial assistance in furtherance of FTX's misconduct. Mot. at 10-15. Moonstone is wrong on both counts.

#### 1.    Plaintiffs sufficiently pleaded Moonstone's aider-abettor knowledge.

While Florida law requires that an alleged aider-abettor have "actual knowledge" of the wrongdoings giving rise to plaintiff's claims, that standard is satisfied where "[a] defendant has general awareness that its role was part of an overall improper activity." *Gilison v. Flagler Bank*, 303 So. 3d 999, 1003 (Fla. Dist. Ct. App. 2020). Under Washington law, "[a] defendant's 'conscious avoidance' of knowledge can be enough to satisfy the actual knowledge standard if 'it can almost be said that the defendant actually knew because he or she suspected a fact and realized its probability, but refrained from confirming it in order later to be able to deny knowledge.'" *In re Mastro*, 2017 WL 2889659, at *16 (Bankr. W.D. Wash. July 6, 2017).[130]

---

[128] R. Doc. 155, ¶ 313, 316.

[129] R. Doc. 155, ¶¶ 334-359.

[130] With respect to Plaintiffs' claims that sound in fraud, while "Rule 9(b) requires that the

Further, "actual knowledge may be inferred and proven by circumstantial evidence" and indeed, is "nearly universally" done so. *In re Mastro*, 2017 WL 2889659; *Cabot E. Broward 2 LLC v. Cabot*, 2016 WL 8740484, at \*4 (S.D. Fla. Dec. 2, 2016) (citing *Amegy Bank Nat'l Ass'n v. Deutsche Bank Alex. Brown*, 619 Fed. Appx. 923, 931 (11th Cir. 2015)) ("[A]ctual knowledge of another's wrongful conduct is nearly universally found based upon circumstantial evidence," as "[i]t is difficult to imagine what sort of evidence, other than an admission[,] would constitute direct evidence of [the defendant's] knowledge of [the underlying] wrongful conduct.").).

Plaintiffs' Complaint satisfies these requirements.

### a. Moonstone knew of FTX's misrepresentations to Class Members and illicit transfers of Class Member funds, such that Moonstone knew of the underlying fraud, fiduciary breach and conversion.

Moonstone does not contest that Plaintiffs' adequately alleged FTX engaged in fraud, fiduciary breach, or conversion. The Complaint alleges that fraud was based on FTX's misrepresentations that FTX (1) had adopted investor protections, including "avoiding or managing conflicts of interest," (2) held customer funds in segregated accounts for the customers' benefit, (3) had implemented state-of-the-art risk management controls, and (4) maintained strict regulatory compliance. Nor does Moonstone contest that Plaintiffs' adequately alleged FTX breached its fiduciary duty to customers or that FTX converted customer assets in failing to segregate and hold customer deposits for the customers' benefit, as FTX promised to do, instead siphoning those deposits to and through Alameda to underwrite Alameda's speculative investments and to enrich SBF, his friends, family, and top lieutenants. Instead, Moonstone argues only that Plaintiffs failed to allege that it knew of this misconduct. Moonstone is wrong.

Plaintiffs allege Moonstone was obligated under the Bank Secrecy Act, Patriot Act, Anti-Money Laundering Act and other AML and KYC laws and regulations promulgated thereunder to conduct diligence on FTX before opening its accounts, which diligence must include an

---

circumstances of the fraud [to] be stated with particularity, allegations of knowledge and intent are not subject to the particularity requirement. *Cordell Consultant, Inc. Money Purchase Plan & Tr. v. Abbott*, 561 F. App'x 882, 884 (11th Cir. 2014) (citations omitted); *United States ex rel. Anita Silingo v. WellPoint, Inc.*, 904 F.3d 667, 679 (9th Cir. 2018) ("Although the circumstances of a fraud must be pleaded with particularity, knowledge may be pleaded generally."); *United States v. Corinthian Colleges*, 655 F.3d 984, 996 (9th Cir. 2011) ("Under Rule 9(b), 'circumstances constituting fraud or mistake' must be stated with particularity, but 'malice, intent, knowledge, and other conditions of a persons mind,' including scienter, can be alleged generally." (citing Fed. R. Civ. P. 9(b))).

understanding of FTX's beneficial owners, its source of funds, the types of products and services offered by FTX, the intended use and purposes of the FTX accounts, and the anticipated activity in those accounts.[131] Moreover, these regulations require that Moonstone maintain ongoing diligence and monitoring of FTX's banking activity, including specifically any suspicious transactions of $5,000 or more and any currency transactions in excess of $10,000. [132]

Plaintiffs allege that, from this regulatory-mandated diligence, Moonstone would have learned:

- FTX lacked fundamental internal controls, evidenced by the fact that, for example, it could produce no trustworthy financial documents responsive to Moonstone's diligence requirements, as FTX maintained no "[k]ey accounting reports necessary to understand the FTX Group's assets and liabilities, such as statements of cash flows, statements of equity, intercompany and related party transaction matrices, and schedules of customer entitlements," with FTX relying instead on "Google documents, Slack communications, shared drives, and Excel spreadsheets" for its accounting.[133]

- The intended use and purpose of the FTX accounts was to hold customer assets, including Class Member funds, in custody for the customers' benefit as reiterated in FTX's terms of service (by virtue of the FFEIC Manual's requirement that Moonstone "understand the intended use and purposes of the accounts" and the FinCEN regulatory requirement that Moonstone "implement a customer identification program").[134]

- The beneficial owner of FTX, Alameda, and the FTX affiliates was SBF (which Moonstone would have learned by virtue of its statutorily mandated Customer Identification Program and Customer Due Diligence procedures).[135]

- FTX transferred those customer funds to accounts held by Alameda or other entities that SBF or other FTX insiders separately owned (which Moonstone would have learned by virtue of the FinCEN regulatory requirement that Moonstone "monitor for and report suspicious transactions of $5,000 or more [and] currency transactions in excess of $10,000"), contrary to FTX's representation that it mitigated any and all conflicts of interest, segregated FTX customer deposits, and held those deposits in custody for the customers' benefit.[136]

- FTX did not have appropriate risk management controls, including BSA/AML

---

[131] R. Doc. 155, ¶¶ 309, 310.
[132] R. Doc. 155, ¶¶ 309, 310, 311.
[133] R. Doc. 155, ¶ 138.
[134] R. Doc. 155, ¶ 309.
[135] R. Doc. 155, ¶ 309.
[136] R. Doc. 155, ¶¶ 37, 43-47, 290, 310, 311.

> procedures, in place, such that it was not strictly adherent to its regulatory
> obligations as it claimed (which Moonstone would have learned by virtue of the
> FFEIC Manual's requirement that Moonstone "review FTX Trading's BSA/AML
> program and the results of FTX Trading's independent testing of [that]
> program").[137]

In its motion to dismiss, Moonstone discounts these allegations as asserting only what Moonstone "would have" or "should have" known from "what diligence it 'certainly must have' done." Mot. at 11-12. Moonstone leaves out that, in their Complaint, Plaintiffs quote Moonstone's representation to the public suggesting it *did* conduct this regulatory-mandated diligence and monitoring, giving rise to the inference that Moonstone obtained the knowledge outlined above.[138]

Moreover, Plaintiffs allege that Moonstone learned of facts demonstrating FTX's underlying misconduct from its solicitation of Alameda's $11.5 million investment in Moonstone, which doubled Moonstone's net worth at that time. [139] Plaintiffs allege that Moonstone negotiated the deal at length with Dan Friedberg, who at once served as FTX US's Chief Compliance Officer and Alameda's General Counsel and whose public history is peppered with instances of fraud.[140] Plaintiffs allege that, from those negotiations, Moonstone learned that SBF separately owned and controlled FTX and Alameda but, despite FTX's representations that FTX and Alameda maintained strict corporate separateness, SBF operated FTX and Alameda as a common enterprise, riddled with conflicts of interest. [141] Plaintiffs further allege that Alameda paid for its investments with FTX customer funds, borrowings which Alameda secured with FTT, the FTX-minted cryptocurrency used to artificially prop up Alameda's books. [142] Alameda's $11.5 million capital injection to Moonstone is one such investment, and in confirming that Alameda held sufficient proceeds to fund an investment so large that it doubled Moonstone's net worth, Moonstone would

---

[137] R. Doc. 155, ¶ 310.
[138] R. Doc. 155, ¶ 309. Moonstone is wrong to suggest "explicit allegation[s]" that it knew of FTX's misconduct are required; the rules require only that Plaintiffs plead allegations supporting an inference of knowledge, as they have done in their Administrative Class Action Complaint. *See, e.g.*, *Chang v. JPMorgan Chase Bank, N.A.*, 845 F.3d 1087, 1097 (11th Cir. 2017) ("Even if Chang has no explicit allegation that [defendant] knew about [the underlying] fraud, such a direct allegation was unnecessary because [plaintiff's] allegations support an inference that [plaintiff] knew that [the primary violator] was misappropriating money.").
[139] R. Doc. 155, ¶¶ 305, 307.
[140] R. Doc. 155, ¶¶ 307-08.
[141] R. Doc. 155, ¶¶ 309-12.
[142] *See, e.g.*, R. Doc. 155, ¶ 129.

have seen that those proceeds were backed by cryptocurrency that FTX fashioned from thin air.[143]

This is in addition to the knowledge that Mr. Chalopin acquired as the chairman of Deltec and longtime friend of SBF, knowledge imputed to Moonstone by law.[144] Specifically, Plaintiffs allege Deltec was obligated to conduct similar regulatory diligence and monitoring of the FTX, as well as their account activity, and from that diligence, acquired similar knowledge of FTX's underlying misconduct.[145] Further, Plaintiffs allege that, before taking on and while servicing the FTX's accounts, Deltec banked a very similar fraud for its other multi-billion dollar crypto client, Tether, whose deposits accounted for nearly half of Deltec's total deposits.[146] The New York Attorney General's investigation of the Tether fraud ran through 2021, during which time Alameda distributed one-third of Tether's stablecoin, the lynchpin of the Tether fraud, such that not only was the FTX fraud analogous to Tether's, FTX and Alameda were direct participants in Tether's parallel misconduct through Deltec.[147]

From its regulatory diligence and monitoring of the FTX accounts, its solicitation of investments by Alameda, and Mr. Chalopin's close ties to SBF and other of the FTX Entities' executives, Moonstone could see what FTX's customers, Class Members included, could not. *First,* as to FTX's fraud, Moonstone could see that FTX's representations as to its investor protections, mitigation of conflicts of interest, risk management procedures, regulatory compliance and other fundamental controls, were misleading—in truth, FTX had in place no internal controls, worked only to exacerbate its conflicts of interest with Alameda, exempting it from whatever risk management procedures it purported to have in place, and failed to comply with even its slightest regulatory obligations.

*Second,* as to FTX' s fiduciary breach and conversion, Moonstone could see that FTX was transferring customer deposits to and through Alameda, contrary to its representations that FTX

---

[143] Again, Moonstone's arguments that Plaintiffs allege only what Moonstone "would have" seen are insufficient to warrant dismissal of Plaintiffs' claims. *See* note 130 *supra.*

[144] *See, e.g., Beck v. Deloitte & Touche, Deloitte, Haskins & Sells, Ernest & Young, L.L.P.*, 144 F.3d 732, 736 (11th Cir. 1998) ("In normal circumstances, the knowledge of a corporation's directors (and therefore their discovery of malpractice) is imputed to the corporation [under Florida law]."); *Pearson v. Deutsche Bank AG*, 2023 WL 2610271, at *24 (S.D. Fla. Mar. 23, 2023); *Interlake Porsche & Audi, Inc. v. Bucholz*, 728 P.2d 597, 607 (Wash. 1986) ("As an IPA officer and director, Kreybig had knowledge which is imputed to the corporation.").

[145] R. Doc. 155, ¶ 298; *see also* Opposition to Deltec's Motion to Dismiss, at pp. 9-10.

[146] R. Doc. 155, ¶ 289.

[147] R. Doc. 155, ¶ 287.

would hold those assets in segregated accounts for the customers' benefit and never take title to or lend out those assets itself, constituting breach of FTX's fiduciary duties to its customers and conversion of customers' funds.

These allegations are more than "conclusory"—they plead more than mere knowledge of "symptoms of [a] Ponzi scheme." Mot. at 13. Plaintiffs allege that Moonstone knew FTX's representations as to its investor protections, its conflicts of interest, its risk management procedures, and its regulatory compliance were false. Plaintiffs further allege that Moonstone knew FTX was not, in fact, holding customer deposits in custody, segregated from FTX's own assets and for the customers' benefit, and that FTX was instead siphoning those funds to and through Alameda to enrich SBF and other insiders. Plaintiffs therefore allege that Moonstone knew of FTX's fraud, as well as FTX's breaches of its fiduciary duty to its customers and conversion of the assets that those customers had entrusted to FTX.

### b. Moonstone demonstrated indicia of knowledge sufficient under Florida and Washington law.

Supplementing Plaintiffs' specific allegations of Moonstone's knowledge, Plaintiffs further allege that Moonstone exhibited indicia of knowledge, circumstantial evidence sufficient under Florida and Washington law. These indicia include (1) having exclusive and/or superior access to the primary violator's financial records,[148] (2) receiving kickbacks or otherwise benefiting from the underlying violations,[149] and (3) making false representations on behalf of the underlying violator.[150] With respect to FTX, Moonstone took part in all three.

*First*, Moonstone had access to the FTX Entities' financial records and visibility of the

---

[148] *See, e.g., Gilison*, 303 So.3d at 1003 (finding knowledge adequately pleaded because complaint alleged, inter alia, "the bank was the only lender that had direct access to [primary violator's] financial records and the discrepancies within them").

[149] *See, e.g., id.* ("The [defendant] benefited when [the primary violator] made substantial interest payments to the bank while the plaintiffs' loans remained unpaid."); *Chang v. JPMorgan Chase Bank, N.A.*, 845 F.3d 1087, 1096-97 (11th Cir. 2017) (knowledge supported by allegation that defendant's employee "secretly received $100,000 from [primary violator] paid to an entity she controlled").

[150] *See, e.g., Chang*, 845 F.3d at 1096-97 (allegation that defendant's employee falsely represented the balance in the fraudster's account on defendant's letterhead supported adequate pleading of knowledge). With respect to Washington, see *In re Mastro*, 2017 WL 2889659, at *17 (noting that knowledge of irregular transactions with unusual terms and conditions supports inference of knowledge of misconduct); *In re Consol. Meridian Funds*, 485 B.R. 604, 617 (Bankr. W.D. Wash. 2013) ("[A]ctual knowledge may be inferred and proven by circumstantial evidence.").

transfers from FTX to Alameda that FTX customers, Class Members included, did not, by way of Moonstone's regulatory mandated diligence and monitoring of the FTX Entities and their banking activity. *Second*, Moonstone received a kickback from Alameda in the form of Alameda's $11.5 million investment in Moonstone, at "multiples of its stated book value," i.e., far in excess of what the tiny bank was actually worth at the time. *Third*, Moonstone made a false representation to the Federal Reserve in its application for membership to the benefit of FTX and Alameda, facts that came to light after Plaintiffs filed their Administrative Class Action Complaint. Together with Plaintiffs' specific allegations of Moonstone's knowledge of FTX's misconduct, these indicia of knowledge sufficiently plead that Moonstone knew of FTX's fraud, fiduciary duty, and conversion of FTX customer funds.

### 2. *Plaintiffs sufficiently pleaded Moonstone's substantial assistance.*

In both Florida and Washington, "[s]ubstantial assistance occurs when a defendant affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the [underlying] breach to occur." *Chang*, 845 F.3d at 1098; *In re Mastro*, 2017 WL 2889659, at *16 (same). Plaintiffs adequately alleged with specificity that Moonstone rendered substantial assistance to FTX's fraud, fiduciary breach, and conversion in satisfaction of these standards.

*First*, Plaintiffs' Complaint contains ample allegations of Moonstone's substantial assistance to FTX. For example, Plaintiffs allege Moonstone provided FTX necessary access to the U.S. banking system through its application for membership in the Federal Reserve, and that Moonstone's application for and membership in the Federal Reserve was unusual and concerning, given the fact that Alameda, "an offshore hedge fund that was basically a crypto firm" had purchased a stake in Moonstone "for multiples of its stated book value."[151] The public now knows that Moonstone procured such membership through deceit of the Federal Reserve, concealing that it intended to provide "digital banking services" to the FTX Entities. Moonstone's assistance in this regard was "a service that other U.S. banks refused to provide," and it was one the FTX Entities relied on to perpetuate the fraud.[152] FTX needed the ability to take in customer deposits in the United States, which its accounts at Moonstone allowed it to do, and then traffic those deposits to Alameda beyond the reach of U.S. authorities, which it did so by transfer to accounts held by FTX

---

[151] R. Doc. 155 at ¶ 313.
[152] R. Doc. 155 at ¶¶ 315, 337.

at Deltec, Moonstone's sister bank.[153] In the time since Plaintiffs filed their Administrative Class Action Complaint, the public learned that Moonstone provided this assistance by deceiving the Federal Reserve in applying for membership therein, further underscoring the substantial nature of its assistance in this regard.

*Second*, Plaintiffs allege Moonstone substantially aided FTX's misconduct by effecting its banking transactions to and from FTX, Alameda, and other entities SBF separately owned or controlled, despite knowing that FTX was misappropriating customer assets by way of such transfers. FTX relied on these transfers to siphon customer funds to and through Alameda, offshore and into SBF's coffers. These allegations are bolstered by John Ray's sworn congressional testimony, reporting on his oversight of FTX's bankruptcy post-collapse, to support these allegations in their Complaint, including that the services Moonstone provided to FTX were "certainly highly irregular" such that FTX's transfers from Moonstone to The Bahamas (i.e., Deltec) have "gotten the [Bankruptcy Estate's] attention."[154]

*Third*, Plaintiffs allege, with membership in the Federal Reserve and by effecting transfers to and from FTX accounts both in the United States and abroad, Moonstone substantially assisted FTX in fencing customer funds across U.S. borders and beyond the reach of U.S. law enforcement agencies and officials.

*Fourth*, Moonstone failed to disclose its knowledge of FTX's fraud, fiduciary breach, and conversion despite its obligation to do so, as "[i]t has long been the law in Washington that a bank has a duty to notify a beneficiary if it has both knowledge of [a] fiduciary relationship and knowledge of a breach of fiduciary duty," *In re Consol. Meridian Funds*, 485 B.R. 604, 626 (Bankr. W.D. Wash. 2013) (citing *Helig Trust v. First Interstate Bank of Wash.*, 93 Wash. App. 514, 969, P.2d 1082 (1998)), which aided in concealing the fraud and prolonging its duration.[155] Plaintiffs allege that, by way of its regulatory obligation to understand "the intended use and purpose" of the FTX accounts, Moonstone learned that FTX promised to hold customer assets,

---

[153] R. Doc. 155 at ¶ 313.

[154] R. Doc. 155, ¶ 315.

[155] Notably, Florida law seems to relax the "actual knowledge" standard applicable to allegations of a defendant's failure to act despite its duty to do so. *See, e.g.*, *Ct. Appointed Receiver of Lancer Offshore, Inc. v. Citco Grp. Ltd.*, No. 05-60080CIV, 2008 WL 926509, at *6 (S.D. Fla. Mar. 31, 2008) ("If it is alleged that a defendant has a duty to disclose, liability could be imposed if he acts with a lesser degree of scienter.") (citing *Woods v. Barnett Bank of Ft. Lauderdale*, 765 F.2d 1004, 1010 (11th Cir. 1985)).

including Class Member funds, in custody for the customers' benefit, simultaneously promising never to take title of those assets or use them for its own benefit, promises reiterated in FTX's terms of service.[156] Moonstone therefore knew of the custodial nature of FTX's relationship to its customers and, therefore, the fiduciary duty it owed to each.[157] Moonstone likewise could see that FTX was misappropriating FTX customer funds, in breach of that duty, for reasons summarized in Section I.A.1. Its failure to disclose that misconduct to FTX customers constitutes substantial assistance.

With these allegations, Plaintiffs allege Moonstone (1) affirmatively assisted FTX's fraud, fiduciary breach and conversion, by applying for and obtaining membership in the Federal Reserve, by opening and servicing the FTX Entities' accounts, and by effecting transfers to and from FTX, Alameda and other entities that SBF separately owned and controlled, both here and abroad; (2) helped conceal FTX's misconduct by shielding its involvement from the Federal Reserve; and (3) failed to act when it had the duty to do so, in never disclosing FTX's misconduct to FTX customers upon learning of FTX's fiduciary duty and breach, as required by Washington law. Plaintiffs further allege that each of these forms of assistance proximately caused Class Members' injuries, as FTX could not have perpetuated the fraud without Moonstone's provision

---

[156] R. Doc. 155, ¶ 316.

[157] *See, e.g.*, *Stewart v. Bank of Am., N.A.*, No. 8:11-CV-2586-MSS-TBM, 2012 WL 1310 302, at *3 (M.D. Fla. Feb. 28, 2012) ("Plaintiffs allege that pursuant to the terms of the Claim Procedures, Bank of America was acting as an express escrow agent and as custodian for the insurance funds and that Bank of America owed a duty to Plaintiffs regarding all disbursements from escrow."); *Ricchetti v. Starfish Beach S., S.A.*, No. 10CV21754, 2010 WL 11451771, at *1 (S.D. Fla. Dec. 27, 2010) ("The Subscription Agreement states that Defendant Richards & Associates, P.A. is appointed 'Custodian' and that the firm shall serve as custodian of monies raised in the offering of shares '... until they are invested, pursuant to a custodial agreement....Given the language of the Subscription Agreement, it is not implausible that Defendants had a fiduciary duty to Plaintiff that was breached or that they negligently breached a duty to safeguard her funds when it disbursed to Starfish Holdings, S.A. and did so before the funds were 'invested.'); *Calvert v. Com. Bank of Washington, N.A.*, No. 10-17952, 2013 WL 3487562, at *2 (Bankr. W.D. Wash. May 14, 2013), *amended sub nom. In re Consol. Meridian Funds*, No. BR 10-17952-KAO, 2013 WL 3487732 (Bankr. W.D. Wash. May 21, 2013) ("The [amended complaint] alleges that with the knowledge that the accounts were custodial accounts into which investor funds were deposited for the sole purpose of the funds' investment of those funds in real estate investments, Commerce Bank nonetheless allowed Berg to commingled the funds in the custodial accounts with his own personal and related corporation funds and to misappropriate the funds to buy personal assets and pay personal obligations. . . . [T]hese allegations . . . state a plausible claim for substantial assistance of Berg's breach of fiduciary duty.").

of these services, particularly because no other major U.S. financial institution would service FTX in these ways and, without Moonstone's assistance, FTX could not have taken in customer deposits in the United States and transferred them to Alameda and other of SBF's separately owned entities offshore.[158]

Moonstone nevertheless objects that its aid to FTX constitutes nothing more than "routine banking services," insufficient to constitute "substantial assistance" under the law. Mot. at 15. But in sworn testimony before Congress, Mr. Ray testified that the services provided by Moonstone to the FTX Entities were not at all typical or routine and were instead "highly irregular," rendering Moonstone's objection without basis in the Complaint.[159] Even if Moonstone were correct that the services it provided to FTX were nothing but routine, "ordinary banking transactions which a bank performs for its customer can support a claim for aiding and abetting if the bank has knowledge that the transactions are assisting the customer in committing a specific tort," *In re Consol. Meridian Funds*, 485 B.R. at 626 (citing *In re First Alliance Mortg. Co.*, 471 F.3d 977, 994–95 (9th Cir.2006)), such that Moonstone is liable for providing those services in assistance to FTX.

### B.   Plaintiffs sufficiently pleaded that Moonstone conspired with the FTX Entities and other Defendants in furtherance of FTX's fraud, fiduciary breach, and conversion.

In moving for dismissal of Plaintiffs' civil conspiracy claim, Moonstone argues only (1) Plaintiffs failed to state a claim for aiding and abetting FTX's wrongdoing, a required predicate to a civil conspiracy claim; and (2) Plaintiffs fail to plausibly plead any agreement by Moonstone to act in furtherance of that wrongdoing. Mot. at 15-17. For reasons above, Plaintiffs adequately pleaded claims for Moonstone's aiding and abetting FTX's fraud, fiduciary duty, and conversion, and Moonstone's first argument for dismissal of Plaintiffs' civil conspiracy claim requires no further argument here.

Plaintiffs likewise adequately pleaded Moonstone's agreement to act in furtherance of FTX's misconduct. In Florida, "[n]o requirement exists that parties formalize or even articulate the agreement—the parties' conduct may imply an agreement." *White v. Verizon Fla., LLC*, 2009 WL 10670227, at *2 (M.D. Fla. Nov. 9, 2009). Indeed, "[c]onspiracies are rarely evidenced by explicit agreements and must almost always be proven by inferences that may be fairly drawn from

---

[158] R. Doc. 155, ¶¶ 310, 312.
[159] R. Doc. 155, ¶ 315.

the behavior of the alleged conspirators." *Orange Lake Country Club, Inc. v. Reed Hein & Assocs.*, LLC, 367 F. Supp. 3d 1360, 1368 (M.D. Fla. 2019). Similarly, in Washington, "[a] conspiracy may be based on circumstantial evidence," *Brown v. Transworld Sys. Inc.*, 2022 WL 17750097, at *10 (W.D. Wash. Dec. 15, 2022) (citations omitted), "[s]ince direct evidence of a conspiracy is ordinarily in the possession and control of the alleged conspirators and is seldom attainable." *Sterling Bus. Forms, Inc. v. Thorpe*, 82 Wash. App. 446, 453–54, 918 P.2d 531, 535 (1996).

Plaintiffs' Complaint gives rise to such an inference here. Plaintiffs allege that (1) Moonstone, by way of Defendant Chalopin, had maintained close ties with SBF for many years, and engaged in regular communications with Dan Friedberg, another of the FTX Entities' top executives, (2) as one of the only financial institutions willing to service the FTX Entities in the United States, Moonstone served as the FTX Entities' primary bank and sole entry point to the U.S. banking system, (3) Moonstone knew of FTX's underlying wrongdoing, (4) despite that knowledge, Moonstone effected the FTX Entities' "highly irregular" transfers of customer funds to offshore accounts after, Plaintiffs now know, deceiving the Federal Reserve to obtain the capabilities to do that, (5) in return for its assistance, Moonstone received an $11.5 million investment from Alameda, far exceeding the fair market value of Alameda's stake in the bank, and enjoyed $50 million in deposits from the FTX Entities, catapulting Moonstone from tiny, rural bank to multi-million dollar financial institution, and (5) as a result of Alameda's $11.5 million investment, Alameda became Moonstone's majority shareholder and SBF enjoyed overlapping ownership of Moonstone and the FTX Entities.

These allegations sufficiently establish that Moonstone agreed, at least impliedly, to act in furtherance of FTX's wrongdoing under Florida and Washington law.[160]

---

[160] *See Koch v. Royal Wine Merchants, Ltd.,* 907 F. Supp. 2d 1332, 1347 (S.D. Fla. 2012) (finding allegations of regular communications and other close contacts, plus knowledge of misconduct, sufficient to plead agreement); *BluestarExpo, Inc. v. Enis*, 568 F. Supp. 3d 1332, 1351 (S.D. Fla. 2021) (where defendant knew of and aided the fraud, "the Court is hard pressed to conclude that this was all done without any kind of agreement that plausible supports a civil conspiracy"); *Donofrio v. Matassini*, 503 So. 2d 1278, 1281 (Fla. Dist. Ct. App. 1987) (finding evidence that defendant had knowledge of, participated in, and benefitted from a fraud could give rise to the inference that defendant conspired in furtherance of the fraud); *Perkumpulan Inv. Crisis Ctr. Dressel—WBG v. Regal Fin. Banccorp, Inc.*, 781 F. Supp. 2d 1098, 1117 (W.D. Wash. 2011) (finding civil conspiracy sufficiently pled through allegations that primary violator's accounts made up 10% of defendant bank's deposits, primary violator was a major shareholder, defendant bank "wilfully ignored red flags that should have alerted the bank to problems" with the underlying

Moreover, Florida courts have found that "civil conspiracy does not require more than knowledge and general participation in the conspiracy to commit a civil wrong." *In re Chira*, 353 B.R. 693, 731 (Bankr. S.D. Fla. 2006).[161] Washington law is in accord.[162] Plaintiffs have alleged that Moonstone knew of FTX's fraud, fiduciary breach, and conversion but participated in FTX's wrongdoing anyway, *see* Sections I.A.2, and so have sufficiently pleaded a civil conspiracy claim.

### C. Plaintiffs sufficiently pleaded that Moonstone was unjustly enriched.

Moonstone argues that Plaintiffs' unjust enrichment claim should be dismissed, because Plaintiffs fail to identify (1) any benefit conferred by Plaintiffs to Moonstone; (2) that such benefit was "directly confer[red]" to Moonstone; and (3) and that Plaintiffs were not provided adequate consideration for the benefit. Mot. at 8-9.

Moonstone is wrong that Plaintiffs did not confer a benefit to Moonstone. Most immediately, Plaintiffs allege Alameda's $11.5 million investment in Moonstone, an investment that far exceeded the value of Alameda's stake in Moonstone, with FTX customer deposits, Class Members' funds included. Moreover, Plaintiffs allege that the FTX Entities deposited $50 million in FTX customer assets, Class Members' funds including, in accounts at Moonstone. As "[b]anks generally make money by borrowing money from depositors and … lend[ing] the money out to borrowers, charging the borrowers a higher interest rate and profiting off the interest rate

---

violator, defendant maintained a banking relationship with the violator nonetheless, and defendant enriched itself by way of the fraudulent scheme); *Money Mailer, LLC v. Brewer*, No. C15-1215RSL, 2018 WL 1916665, at *3 (W.D. Wash. Apr. 23, 2018) ("[Plaintiff] alleges that the two companies, through their overlapping owners, officers, and directors, agreed on a scheme to negotiate and charge printing, production, mailing, freight, and delivery fees that were well above the actual cost of the services provided in order to create a secret profit center within the franchise relationship. The Court finds that Brewer has adequately alleged each of the elements of a civil conspiracy.").

[161] *See also Gilison*, 303 So. 3d at 1004 ("A conspirator only needs to know of the scheme and assist in it in some way to be held responsible for all the acts of his conspirators."); *Logan v. Morgan, Lewis & Bockius LLP*, 350 So. 3d 404, 412 (Fla. Dist. Ct. App. 2022) ("A conspirator need not take part in the planning, inception, or successful conclusion of a conspiracy. The conspirator need only know of the scheme and assist it in some way to be held responsible for all of the acts of his coconspirators.").

[162] *See, e.g., Brown*, 2022 WL 17750097, at *10 (plaintiff sufficiently stated a civil conspiracy claim, "even viewed under the heightened pleading standard of Federal Rule of Civil Procedure 9(b)," where defendants, who were alleged to have agreed to "undertake unlawful debt collection efforts" "are on notice of the misconduct underlying [the] claim – sending demand letters, initiating the Collection Actions, and filing affidavits in support of their ownership of the debt, all despite knowing they could not prove their ownership of the debt.").

spread,"[163] the $50 million in FTX customer assets that the FTX Entities held on deposit tremendously benefited Moonstone, serving as a primary profit source for the bank.

Plaintiffs need not plead that these benefits were conferred by Plaintiffs "directly" to Moonstone. Under Florida law, "[a] plaintiff may confer a direct benefit through indirect contact with a defendant through an intermediary." *See In re Takata Airbag Prods. Liab. Litig*., 2017 WL 2406711, at *9 (quoting *Williams v. Wells Fargo Bank N.A*., 2011 WL 4901346, at *5 (S.D. Fla. Oct. 14, 2011) ("It would not serve the principles of justice and equity to preclude an unjust enrichment claim merely because the 'benefit' passed through an intermediary before being conferred on a defendant.")).[164] Similarly, Washington law does not require that a plaintiff benefit the defendant through "direct" contact to sustain an unjust enrichment action. *See, e.g.*, *Irwin Concrete, Inc. v. Sun Coast Properties, Inc.*, 653 P.2d 1331, 1334 (Wash. 1982) (upholding an unjust enrichment claim by contractors who installed a water system in a mall against the bank that had loaned money to the mall's developer because the water system completed and added value to the mall and thereby conferred a benefit on the bank).

Finally, Moonstone's assertion that Plaintiffs were not provided adequate consideration for the benefit conferred is not well founded. Moonstone provided no consideration to Class Members for the benefit conferred by FTX's deposits of FTX customer assets, including Class Members' funds. Those funds are now gone, stolen by FTX, and Plaintiffs, victims of the FTX fraud, are left with nothing.

## II.    THIS COURT HAS PERSONAL JURISDICTION OVER MOONTSONE.

Moonstone concedes that it is subject to personal jurisdiction in Florida, *provided* Plaintiffs adequately plead the intentional torts alleged in the Administrative Class Action Complaint. *See, e.g.*, *AXA Equitable Life Ins. Co. v. Infinity Fin. Grp*., LLC, 608 F. Supp. 2d 1349, 1355 (S.D. Fla. 2009) ("The Eleventh Circuit has held that allegations of intentional torts support the exercise of

---

[163] Corporate Finance Institute, "How Do Banks Make Money?", *available at* https://corporatefinanceinstitute.com/resources/economics/how-do-banks-make-money/, (last accessed Nov. 3, 2023).

[164] *See also Aceto Corp. v. TherapeuticsMD, Inc.*, 953 F. Supp. 2d 1269, 1288 (S.D. Fla.2013) ("There are several recent cases in this district that permit an unjust enrichment claim to stand where the benefit is conferred through an intermediary, pointing out that direct contact, or privity, is not the equivalent of conferring a direct benefit."); *Romano v. Motorola, Inc.*, 2007 WL 4199781, at *2 (S.D. Fla. Nov. 26, 2007) ("Defendant erroneously equates direct contact with direct benefit in arguing because plaintiff here did not purchase either his phone or his batteries from Motorola, plaintiff conferred no direct benefit on Motorola.") (cleaned up)).

personal jurisdiction over a nonresident defendant with no other contacts with the forum.") (citing *Licciardello v. Lovelady*, 544 F.3d 1280, 1285 (11th Cir.2008)). Moonstone, however, argues for dismissal of Plaintiffs' claims for lack of personal jurisdiction for a single reason—"the Complaint does not set forth a viable cause of action for civil conspiracy." Mot. at 18. But for reasons herein, Plaintiffs did adequately plead their claim for civil conspiracy, as they adequately pleaded their claims for aiding and abetting fraud, aiding and abetting fiduciary breach, and aiding and abetting conversion, also intentional torts giving rise to personal jurisdiction in this State. Further, although Moonstone does not address it, a Florida court's exercising personal jurisdiction over it would not offend due process: Plaintiffs allege that Moonstone, through Chalopin, intentionally and tortiously conspired with Miami-based FTX US to fashion the bank a tool to grant FTX the access to the U.S. banking system that it so badly needed, access Moonstone was able to provide only by deceiving the Federal Reserve into granting it necessary licenses, all in order to funnel customer deposits offshore to FTX US accounts at Deltec.[165] This Court therefore has personal jurisdiction over Moonstone.

## CONCLUSION

Plaintiffs respectfully request the Court deny Moonstone's motion to dismiss for failure to state a claim and lack of personal jurisdiction. To the extent this Court does not deny Moonstone's motion outright, it should defer ruling on the motion pending jurisdictional discovery, which Plaintiffs requested leave to propound by formal motion on November 3, 2023, *see* R. Doc. 348, or until trial on the merits. To the extent this Court is inclined to agree with Moonstone that Plaintiffs have insufficiently stated their claims or pleaded personal jurisdiction, Plaintiffs pray that this Court will grant them leave to amend—which should be "freely given" absent undue delay, bad faith, dilatory motive, repeated failures to cure deficiencies, undue prejudice, or futility, none of which is present here—to develop their allegations against Moonstone or to invoke Federal Rule of Civil Procedure 4(k)(2). *See, e.g.*, *Foman v. Davis*, 371 U.S. 178, 182 (1962).

---

[165] *See Licciardello v. Lovelady*, 544 F.3d 1280, 1285 (11th Cir. 2008) ("Jurisdiction may be constitutionally asserted over the nonresident defendant whenever he has by his own purposeful conduct created a 'substantial connection' with the forum state. The Court has made clear, however, that '[s]o long as it creates a "substantial connection" with the forum, even a single act can support jurisdiction.' Intentional torts are such acts, and may support the exercise of personal jurisdiction over the nonresident defendant who has no other contacts with the forum.").

**REQUEST FOR HEARING**

Plaintiffs request a hearing on the Motion to Dismiss in order to provide the Court with additional details and respond to any questions the Court might have.

Dated: November 6, 2023                  Respectfully submitted,


**By:** *_/s/ Adam Moskowitz_____*          **By:** *_/s/ David Boies_*
Adam M. Moskowitz                        David Boies
Florida Bar No. 984280                   Alexander Boies
Joseph M. Kaye                           Brooke A. Alexander
Florida Bar No. 117520                   **BOIES SCHILLER FLEXNER LLP**
**THE MOSKOWITZ LAW FIRM, PLLC**          333 Main Street
Continental Plaza                        Armonk, NY 10504
3250 Mary Street, Suite 202              914-749-8200
Coconut Grove, FL 33133                  dboies@bsfllp.com
Office: (305) 740-1423                   aboies@bsfllp.com
adam@moskowitz-law.com                   balexander@bsfllp.com
joseph@moskowitz-law.com
service@moskowitz-law.com


*Co-Lead Counsel*                        *Co-Lead Counsel*


Joseph R. Saveri                         James R. Swanson, La. Bar No. 18455
Christopher Young                        Kerry J. Miller, La. Bar. No. 24562
Itak K. Moradi                           Molly L. Wells, La. Bar. No. 36721
**JOSEPH SAVERI LAW FIRM**                C. Hogan Paschal, La. Bar No. 38495
601 California Street, Suite 1000        **FISHMAN HAYGOOD L.L.P.**
San Francisco, CA 94108                  201 St. Charles Avenue, 46th Floor
Telephone: (415) 500-6800                New Orleans, Louisiana 70170-4600
jsaveri@saverilawfirm.com                (504) 586-5252; (504) 586-5250 fax
cyoung@saverilawfirm.com                 jswanson@fishmanhaygood.com
imoradi@saverilawfirm.com                kmiller@fishmanhaygood.com
                                         mwells@fishmanhaygood.com
*Counsel to Plaintiffs and the Putative*  hpaschal@fishmanhaygood.com
*Classes*
                                         Robert Lieff
                                         P.O. Drawer A
                                         Rutherford, CA 94573
                                         rlieff@lieff.com

                                         *Counsel to Plaintiffs and the Putative*
                                         *Classes*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on November 6, 2023, a true and correct copy of the foregoing was filed electronically with the Clerk of the Court, by using the CM/ECF system which will send an electronic notification of such filing to all counsel of record.

By: *<u>/s/ Adam M. Moskowitz</u>*
**Adam M. Moskowitz**