**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**
MDL No. 3076
Case No. 1:23-md-03076-KMM

**IN RE:**

**FTX Cryptocurrency Exchange Collapse Litigation**

_____

This Document Relates To:

ALL ACTIONS

_____/


**PLAINTIFFS' OPPOSITION TO DOMESTIC VC DEFENDANTS'**
**MOTION TO DISMISS THE COMPLAINT [ECF NO. 301]**

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ...................................................................................................1

II.     FACTUAL BACKGROUND ....................................................................................2

III.    LEGAL STANDARD .............................................................................................12

IV.     ARGUMENT ..........................................................................................................13

    A.      Plaintiffs Have Met the Pleading Standard for Knowledge of Fraud ..................13

    B.      The Complaint States a Claim for Intentional Misrepresentation ........................15

        1.      Plaintiffs Plead Actionable Affirmative Statements ..................................15

        2.      Plaintiffs Plead Actionable Omissions......................................................17

        3.      Plaintiffs Sufficiently Plead Defendants' Knowledge/Intent....................18

        4.      Plaintiffs Allege Reliance .........................................................................23

        5.      Plaintiffs Allege Damages ........................................................................24

    C.      The Complaint States a Claim for Negligent Misrepresentation .........................25

    D.      Defendants Aided and Abetted FTX and Its Affiliates' Fraud ............................26

    E.      Conspiracy Is Sufficiently Alleged ....................................................................30

    F.      Plaintiffs Allege Plausible Violations of California's UCL and FAL ..................31

        1.      Plaintiffs Sufficiently Plead a Basis for Equitable Relief.........................31

        2.      Plaintiffs Sufficiently Plead Reliance and Causation Under the UCL and FAL ....................................................................................32

        3.      Defendants Misapply the Elements of a UCL Claim................................33

    G.      Plaintiffs' FDUTPA Claims Should Proceed ......................................................34

        1.      Plaintiffs' FDUTPA Claims Are Pleaded with Particularity ....................34

    H.      Plaintiffs Adequately State Claims Under FSIPA ...............................................36

    I.      Plaintiffs Adequately State Claims Under Cal. Corp. Code §25504.1 .................38

**Page**

V.    PLAINTIFFS' DECLARATORY JUDGMENT CLAIM IS NOT DUPLICATIVE OF PLAINTIFFS' OTHER CLAIMS ..................................................................................39

VI.   CONCLUSION...............................................................................................................40

VII.  LEAVE TO AMEND ...................................................................................................40

VIII. REQUEST FOR HEARING..........................................................................................40

4891-6130-7789.v1

# TABLE OF AUTHORITIES

**Page**

## CASES

*Abdo v. Fitzsimmons*,
2018 WL 11220494 (N.D. Cal. May 22, 2018) ....................................................39

*Am. United Life Ins. Co. v. Martinez*,
480 F.3d 1043 (11th Cir. 2007) ........................................................................20

*Amegy Bank Nat'l Ass'n v. Deutsche Bank Alex.Brown*,
619 F. App'x 923 (11th Cir. 2015) ..............................................................13, 14

*Amparan v. Plaza Home Mortg., Inc.*,
2010 WL 3743953 (N.D. Cal. Sept. 23, 2010) ..............................................26, 27

*Anderson v. Lumbermens Mut. Cas. Co.*,
220 F. App'x 739 (9th Cir. 2007) .....................................................................26

*Apollo Cap. Fund, LLC v. Roth Cap. Partners, LLC*,
70 Cal. Rptr. 3d 199 (Cal. Ct. App. 2007) ..........................................................39

*Arthur Young & Co. v. Mariner Corp.*,
630 So. 2d 1199 (Fla. 4th DCA 1994) ................................................................37

*Ave. CLO Fund, Ltd. v. Bank of Am., N.A.*,
723 F.3d 1287 (11th Cir. 2013) ........................................................................19

*Bank of the W. v. Super. Ct. Contra Cnty.*,
833 P.2d 545 (Cal. 1992) ................................................................................31

*Barnext Offshore, Ltd. v. Ferretti Grp. USA, Inc.*,
2012 WL 1570057 (S.D. Fla. May 2, 2012) .........................................................36

*Barrett v. Apple Inc.*,
523 F. Supp. 3d 1132 (N.D. Cal. 2021) ..............................................................27

*Benson v. JPMorgan Chase Bank, N.A.*,
2010 WL 1526394 (N.D. Cal. Apr. 15, 2010) ......................................................28

*Blain v. Liberty Mut. Fire Ins. Co.*,
2023 WL 2436003 (S.D. Cal. Mar. 9, 2023) ..................................................33, 34

*Body Jewelz, Inc. v. Valley Forge Ins. Co.*,
241 F. Supp. 3d 1084 (C.D. Cal. 2017) ........................................................25, 33

**Page**

*Borges v. SmileDirectClub, LLC*,
2022 WL 4269564 (S.D. Fla. Sept. 15, 2022) .......................................................................12

*Brady v. Medtronic, Inc.*,
2015 WL 11181971 (S.D. Fla. Mar. 30, 2015) ......................................................................24

*Cabot E. Broward 2 LLC v. Cabot*,
2016 WL 8739579 (S.D. Fla. Oct. 25, 2016) ........................................................................29

*Carriuolo v. Gen. Motors Co.*,
823 F.3d 977 (11th Cir. 2016) .............................................................................................34

*Carvelli v. Ocwen Fin. Corp.*,
934 F.3d 1307 (11th Cir. 2019) ...........................................................................................16

*Chang v. JPMorgan Chase Bank, N.A.*,
845 F.3d 1087 (11th Cir. 2017) ...........................................................................................21

*Chang v. Wells Fargo Bank, N.A.*,
2020 WL 1694360 (N.D. Cal. Apr. 7, 2020) ........................................................................21

*Cisco Sys., Inc. v. STMicroelectronics, Inc.*,
77 F. Supp. 3d 887 (N.D. Cal. 2014) ...............................................................................18, 20

*City & Cnty. of S.F. v. Purdue Pharma L.P.*,
491 F. Supp. 3d 610 (N.D. Cal. 2020) ..................................................................................32

*Clement v. Lipson*,
999 So. 2d 1072 (Fla. 5th DCA 2008) ..................................................................................38

*Copart, Inc. v. Sparta Consulting, Inc.*,
277 F. Supp. 3d 1127 (E.D. Cal. 2017) ................................................................................17

*Cordell Consultant, Inc. Money Purchase Plan & Tr. v. Abbott*,
561 F. App'x 882 (11th Cir. 2014) ...................................................................................13, 30

*Ct. Appointed Receiver of Lancer Offshore, Inc. v. Citco Grp. Ltd.*,
2008 WL 926513 (S.D. Fla. Mar. 31, 2008) .........................................................................27

*Ct. Appointed Receiver of Lancer Offshore, Inc. v. Citco Grp. Ltd.*,
2011 WL 1233106 (S.D. Fla. Mar. 30, 2011) .......................................................................18

*Dillon v. Axxsys Int'l, Inc.*,
385 F. Supp. 2d 1307 (M.D. Fla. 2005), *aff'd*,
185 F. App'x 823 (11th Cir. 2006) .......................................................................................38

**Page**

*EcoHub, LLC, v. Recology Inc.*,
2023 WL 6725632 (N.D. Cal. Oct. 11, 2023)..........................................................................28

*Emess Cap., LLC v. Rothstein*,
2011 WL 13214308 (S.D. Fla. Dec. 21, 2011) ...............................................................26, 29

*Fla. Emergency Physicians Kang & Assocs., M.D., Inc.*
*v. United Healthcare of Fla., Inc.*,
526 F. Supp. 3d 1282 (S.D. Fla. 2021) ...........................................................................36

*Frayman v. Douglas Elliman Realty, LLC*,
515 F. Supp. 3d 1262 (S.D. Fla. 2021) ...........................................................................35

*Freeney v. Bank of Am. Corp.*,
2015 WL 12535021 (C.D. Cal. Nov. 19, 2015)..........................................................30, 31

*Friedman v. AARP, Inc.*,
855 F.3d 1047 (9th Cir. 2017) .......................................................................................33

*Galstaldi v. Sunvest Cmtys. USA, LLC*,
637 F. Supp. 2d 1045 (S.D. Fla. 2009) ...........................................................................36

*Gavaldon v. StanChart Sec. Int'l, Inc.*,
2019 WL 764031 (S.D. Cal. Feb. 20, 2019) ...................................................................19

*Gilead Scis., Inc. v. AJC Med. Grp., Inc.*,
2021 WL 8534243 (S.D. Fla. Nov. 29, 2021) ..................................................................15

*Gonzales v. Lloyds TSB Bank, PLC*,
532 F. Supp. 2d 1200 (C.D. Cal. 2006) ...........................................................................20

*Gonzalez v. Tr.*,
2015 WL 12081028 (S.D. Cal. Sept. 28, 2015)................................................................34

*Grills v. Philip Morris USA, Inc.*,
645 F. Supp. 2d 1107 (M.D. Fla. 2009)...........................................................................18

*Groom v. Bank of Am.*,
2012 WL 50250 (M.D. Fla. Jan. 9, 2012).........................................................................27

*Hadley v. Kellogg Sales Co.*,
243 F. Supp. 3d 1074 (N.D. Cal. 2017) ...........................................................................34

*Hampton v. Aqua Metals, Inc.*,
2020 WL 6710096 (N.D. Cal. Nov. 16, 2020) ..................................................................16

4891-6130-7789.v1

**Page**

*Harbinger Cap. Partners Master Fund I, Ltd.*
*v. Wachovia Cap. Markets, LLC,*
   347 F. App'x 711 (2d Cir. 2009) ............................................................................25

*Homyk v. ChemoCentryx, Inc.,*
   2023 WL 3579440 (N.D. Cal. Feb. 23, 2023) ...........................................................23

*Howard v. Wilkinson,*
   305 F. Supp. 3d 1327 (M.D. Fla. 2018)....................................................................23

*I.B. ex rel. Fife v. Facebook, Inc.,*
   905 F. Supp. 2d 989 (N.D. Cal. 2012) .....................................................................39

*In re Actimmune Mktg. Litig.,*
   2009 WL 3740648 (N.D. Cal. Nov. 6, 2009) ...........................................................34

*In re Adobe Sys., Inc. Priv. Litig.,*
   66 F. Supp. 3d 1197 (N.D. Cal. 2014) .....................................................................40

*In re Anthem, Inc. Data Breach Litig.,*
   162 F. Supp. 3d 953 (N.D. Cal. 2016) .....................................................................33

*In re Autodesk, Inc. Sec. Litig.,*
   132 F. Supp. 2d 833 (N.D. Cal. 2000) .....................................................................20

*In re BioMarin Pharm. Inc. Sec. Litig.,*
   2022 WL 164299 (N.D. Cal. Jan. 6, 2022)...............................................................23

*In re Enron Corp. Sec., Derivative & ERISA Litig.,*
   761 F. Supp. 2d 504 (S.D. Tex. 2011) .....................................................................20

*In re First All. Mortg. Co.,*
   471 F.3d 977 (9th Cir. 2006) .................................................................24, 27, 29

*In re Outlaw Lab'y, LLP,*
   463 F. Supp. 3d 1068 (S.D. Cal. 2020)....................................................................32

*In re Sahlen & Assocs., Inc. Sec. Litig.,*
   773 F. Supp. 342 (S.D. Fla. 1991) ......................................................................37, 38

*In re Sunterra Corp. Sec. Litig.,*
   199 F. Supp. 2d 1308 (M.D. Fla. 2002)...................................................................40

*In re Tobacco II Cases,*
   207 P.3d 20 (Cal. 2009) .....................................................................................32, 33

4891-6130-7789.v1

**Page**

*Ivie v. Kraft Foods Glob., Inc.*,
   961 F. Supp. 2d 1033 (N.D. Cal. 2013) ..................................................33

*J.P. Morgan Sec., LLC v. Geveran Invs. Ltd.*,
   224 So. 3d 316 (Fla. 5th DCA 2017) .....................................................37

*JP Morgan Chase Bank v. Winnick*,
   406 F. Supp. 2d 247 (S.D.N.Y. 2005).....................................................28

*Ketayi v. Health Enrollment Grp.*,
   2021 WL 2864481 (S.D. Cal. July 8, 2021) ...........................................26

*Kowalsky v. Hewlett-Packard Co.*,
   2011 WL 3501715 (N.D. Cal. Aug. 10, 2011) .......................................34

*Kwikset Corp. v. Super. Ct. Orange Cnty.*,
   246 P.3d 877 (Cal. 2011) ......................................................................31

*Larsen v. Trader Joe's Co.*,
   2012 WL 5458396 (N.D. Cal. June 14, 2012)........................................32

*Leader Trade Sols. Corp. v. Dell World Trade LP, L.L.C.*,
   2010 WL 11506346 (S.D. Fla. Feb. 16, 2010) ......................................15

*LeGrand v. Abbott Lab'ys*,
   2023 WL 1819159 (N.D. Cal. Feb. 8, 2023) .........................................19

*Lewis v. Mercedes-Benz USA, LLC*,
   530 F. Supp. 3d 1183 (S.D. Fla. 2021) .................................................35

*LiMandri v. Judkins*,
   60 Cal. Rptr. 2d 539 (Cal. Ct. App. 1997).............................................18

*Lynn Finkelstein & Co., Inc. v. Ball*,
   2007 WL 9701156 (S.D. Fla. May 15, 2007) ........................................20

*MacDonald v. Ford Motor Co.*,
   37 F. Supp. 3d 1087 (N.D. Cal. 2014) ..................................................33

*Makor Issues & Rts., Ltd. v. Tellabs Inc.*,
   513 F.3d 702 (7th Cir. 2008) ................................................................23

*Markowitz v. Diversified Lending Grp., Inc.*,
   2010 WL 11507662 (C.D. Cal. Feb. 26, 2010).....................................39

*Mascaro Aviation, L.L.C. v. Diamond Aircraft Indus., Inc.*,
   2011 WL 13273580 (S.D. Fla. June 14, 2011) ......................................17

- vii -

**Page**

*Mendocino Env't Ctr. v. Mendocino Cnty.*,
    192 F.3d 1283 (9th Cir. 1999) ...................................................................30

*Meridian Tr. Co. v. Batista*,
    2018 WL 4693533 (S.D. Fla. Sept. 26, 2018) ........................................20

*Millennium Commc'ns & Fulfillment, Inc.*
*v. Off. of Att'y Gen., Dep't of Legal Affs., State of Fla.*,
    761 So. 2d 1256 (Fla. 3d DCA 2000) ....................................................36

*Moore v. Mars Petcare US, Inc.*,
    966 F.3d 1007 (9th Cir. 2020) ................................................23, 24, 32

*MSP Recovery Claims, Series LLC v. Metro. Gen. Ins. Co.*,
    40 F.4th 1295 (11th Cir. 2022) ...............................................................12

*N.R. by Ragan v. Sch. Bd. of Okaloosa Cnty., Fla.*,
    418 F. Supp. 3d 957 (N.D. Fla. 2019)....................................................30

*Neilson v. Union Bank of Cal., N.A.*,
    290 F. Supp. 2d 1101 (C.D. Cal. 2003) ..............................22, 27, 28, 29

*Noboa v. Castillo*,
    2022 WL 2191687 (S.D. Fla. June 17, 2022) ..................................13, 18

*OCM Principal Opportunities Fund, L.P.*
*v. CIBC World Mkts. Corp.*,
    68 Cal. Rptr. 3d 828 (Cal. Ct. App. 2007), *as modified* (Dec. 26, 2007) ..............................24

*Ogdon v. Grand Canyon Univ. Inc.*,
    2023 WL 5054644 (D. Ariz. Aug. 8, 2023)............................................34

*Onemata Corp. v. Rahman*,
    2021 WL 5175544 (S.D. Fla. Oct. 12, 2021)..........................................16

*Pearson v. Deutsche Bank AG*,
    2022 WL 951316 (S.D. Fla. Mar. 30, 2022)...........................................14

*Perkins v. Nat'l LGBTQ Task Force, Inc.*,
    580 F. Supp. 3d 1236 (S.D. Fla. 2021) ..................................................13

*Perlman v. Bank of Am., N.A.*,
    2011 WL 13108060 (S.D. Fla. Dec. 22, 2011)..................................27, 29

*Petersen v. Allstate Indem. Co.*,
    281 F.R.D. 413 (C.D. Cal. 2012) ...........................................................25

- viii -

**Page**

*Point Blank Sols., Inc. v. Toyobo Am., Inc.*,
  2010 WL 4624274 (S.D. Fla. Nov. 4, 2010)............................................................................24

*Pruco Life Ins. Co. v. Brasner*,
  2011 WL 2669651 (S.D. Fla. July 7, 2011)............................................................................24

*Randall v. Scott*,
  610 F.3d 701 (11th Cir. 2010) ...............................................................................................12

*Ray v. BlueHippo Funding, LLC*,
  2008 WL 1995113 (N.D. Cal. May 6, 2008) .........................................................................28

*Ronpak, Inc. v. Elecs. for Imaging, Inc.*,
  2015 WL 179560 (N.D. Cal. Jan. 14, 2015) ....................................................................16, 25

*Rosado v. eBay Inc.*,
  53 F. Supp. 3d 1256 (N.D. Cal. 2014) .............................................................................39, 40

*RxStrategies, Inc. v. CVS Pharmacy, Inc.*,
  390 F. Supp. 3d 1341 (M.D. Fla. 2019)..................................................................................25

*San Diego Gulls Hockey Club, LLC v. ECHL, Inc.*,
  2020 WL 2510519 (C.D. Cal. Jan. 29, 2020) ........................................................................18

*Sapssov v. Health Mgmt. Assocs., Inc.*,
  608 F. App'x 855 (11th Cir. 2015) .........................................................................................17

*Schwarz v. ThinkStrategy Cap. Mgmt. LLC*,
  797 F. Supp. 2d 439 (S.D.N.Y. 2011).....................................................................................19

*SEC v. Arbitrade Ltd.*,
  2023 WL 2785015 (S.D. Fla. Apr. 5, 2023) ..........................................................................29

*SEC v. Quiros*,
  2016 WL 11578637 (S.D. Fla. Nov. 21, 2016)........................................................................29

*SEC v. Spartan Sec. Grp., LTD*,
  2019 WL 2372277 (M.D. Fla. June 5, 2019)..........................................................................29

*Starr v. Baca*,
  652 F.3d 1202 (9th Cir. 2011) ...............................................................................................13

*State Farm Mut. Auto. Ins. Co.*
*v. Performance Orthopaedics & Neurosurgery, LLC*,
  2018 WL 2186496 (S.D. Fla. Feb. 16, 2018) ........................................................................17

**Page**

*State Farm Mut. Auto. Ins. Co.*
*v. Performance Orthopaedics & Neurosurgery, LLC,*
  278 F. Supp. 3d 1307 (S.D. Fla. 2017) ...................................................................19

*Stonecreek–AAA, LLC v. Wells Fargo Bank N.A.,*
  2013 WL 5416970 (S.D. Fla. Sept. 26, 2013) .................................................16, 24

*Sundance Apartments I, Inc. v. Gen. Elec. Cap. Corp.,*
  581 F. Supp. 2d 1215 (S.D. Fla. 2008) ...................................................................36

*Todd Benjamin Int'l, Ltd. v. Grant Thornton Int'l, Ltd.,*
  2023 WL 4457458 (S.D. Fla. July 11, 2023)..............................................14, 25, 26

*Twitter, Inc. v. Taamneh,*
  598 U.S. 471 (2023)................................................................................................27

*United Motors Int'l, Inc. v. Hartwick,*
  2017 WL 888304 (C.D. Cal. Mar. 6, 2017)......................................................30, 31

*United States v. Baxter Int'l, Inc.,*
  345 F.3d 866 (11th Cir. 2003) ................................................................................15

*United States v. Martinelli,*
  454 F.3d 1300 (11th Cir. 2006) ..............................................................................17

*Valderrama v. Rousseau,*
  2012 WL 12925174 (S.D. Fla. Sept. 18, 2012) ......................................................30

*Wang v. Revere Cap. Mgmt., LLC,*
  2023 WL 2198570 (S.D. Fla. Feb. 15, 2023) .........................................................19

*Williams v. Gerber Prods. Co.,*
  552 F.3d 934 (9th Cir. 2008) ..................................................................................16

*Williams v. Nationwide Credit, Inc.,*
  890 F. Supp. 2d 1319 (S.D. Fla. 2012) ...................................................................35

*Woods v. Barnett Bank of Ft. Lauderdale,*
  765 F.2d 1004 (11th Cir. 1985) .........................................................................13, 27

*Woodward v. Metro Bank of Dallas,*
  522 F.2d 84, 97 (5th Cir. 1975)) ............................................................................27

*Zakinov v. Ripple Labs, Inc.,*
  2020 WL 922815 (N.D. Cal. Feb. 26, 2020) ..........................................................39

4891-6130-7789.v1

Page

*Zlotnick v. Premier Sales Grp., Inc.*,
   480 F.3d 1281 (11th Cir. 2007) ........................................................35

## STATUTES, RULES AND REGULATIONS

15 U.S.C.
   §78............................................................................................16, 19
   §80a-1..............................................................................................6

28 U.S.C.
   §2201............................................................................................39

Federal Rules of Civil Procedure
   Rule 9(b) ................................................................................ *passim*
   Rule 12(b)(2)....................................................................................36
   Rule 12(b)(6)..............................................................................12, 13

California Business & Professions Code
   §17200................................................................................31, 32, 33
   §17203............................................................................................31
   §17204............................................................................................31
   §17500........................................................................................31, 32

California Corporations Code
   §25008(a)........................................................................................39
   §25504.1..........................................................................................38

Florida Statutes
   §501.202..........................................................................................36
   §501.203(8)......................................................................................35
   §501.204..................................................................................34, 35, 36
   §517.211..................................................................................36, 37, 38
   §517.301......................................................................................37, 38

4891-6130-7789.v1

I.      **INTRODUCTION**

Falsely describing themselves as ordinary passive investors, the highly sophisticated Domestic VC Defendants ("Defendants")[1] attempt to escape all civil liability by disclaiming any knowledge of the significant corporate governance deficiencies that ultimately led to one of the largest financial frauds in U.S. history. But in truth, Defendants pumped $800 million into FTX, and in exchange Defendants gained ample access to material non-public information from their admitted due diligence, a methodical process sophisticated investors undergo to confirm the truth of what founders tell them. Some Defendants extracted management and control concessions from FTX that gave them even more access to information concerning the operations and growth of the exchange.

Defendants were not victims like FTX's customers. They cannot now claim they were unaware that FTX management had virtually limitless power to direct transfers of fiat currency and crypto assets with no oversight or effective internal controls. Defendants knew, for example, that FTX had no board of directors, no dedicated financial risk or treasury departments, no risk officer, no internal audit function at all, not even a capable accounting system, and made no meaningful distinction between customer funds and their own.

Despite knowing of these undisputed deficiencies, Defendants financed and participated in FTX's public campaign to create an air of legitimacy for FTX. Defendants invested these funds to establish FTX as "the most trusted brand in crypto" and move "assertively into consumer marketing and advertising." ¶¶293, 347, 400. Defendants also made numerous deceptive and misleading statements about FTX's business, finances, and products, to induce customers to invest, trade, or deposit assets with FTX. They vouched for the safety and stability of FTX, advised FTX on how to

---

[1]     Defined terms are the same as those in the Administrative Class Action Complaint and Demand for Jury Trial Domestic Venture Capital Funds ("Complaint"). Unless otherwise noted, all "¶" references are to the Complaint. And "MTD" refers to Defendants' motion to dismiss. ECF 301.

approach regulators, and otherwise promoted the fabricated integrity of the FTX Group and SBF. Simply put, the embezzlement of billions of dollars would not have occurred without Defendants.

Predictably, Defendants now claim that they "were deceived by FTX too" and "lost hundreds of millions of dollars." MTD at 7, 15. But it was not Defendants that lost; it was their clients – Defendants still charged lucrative fees while inflating the value of FTX. ¶¶301, 615. FTX also invested hundreds of millions of comingled customer funds back into certain Defendants' VC funds and partnerships. Defendants also had multiple investments in crypto, profiting while they touted FTX and its affiliated tokens. Their true loss remains entirely unknown, and it's easy to see why even after billions of customer funds remain missing, they concede, "[w]e probably would have made the investment again." ¶567.

Defendants primarily attack the knowledge elements of certain claims, but twist and ignore facts supporting those claims, and conveniently ignore that claims concerning unfair practices, selling unregistered securities, and negligent misrepresentations do not have a knowledge element. Accordingly, Plaintiffs have pled plausible claims for relief that are sufficient to seek the truth and move forward into discovery.

## II.    FACTUAL BACKGROUND

The Complaint's factual allegations are largely undisputed. On July 20, 2021, Paradigm and Ribbit Capital spearheaded FTX's Series B funding round which raised $900 million for FTX. ¶¶317, 376, 471. According to SBF, "[t]he primary goal of the raise was to [find] strategic allies who can help FTX grow its brand" (¶318), and Defendants knew that FTX needed "ad campaigns, sponsorship deals, a charitable wing – and a war chest to pay for it all." ¶343; *see id.* (Sequoia stating that FTX "needed that money from credible sources so it could continue to distinguish itself from the bottom-feeders who came to crypto to fleece the suckers.").

With its new institutional capital, FTX immediately stepped up its media blitz to promote itself as the crypto gold standard. This now infamous advertising involving celebrities, sports stars, and well-known investors cost hundreds of millions of dollars and made FTX one of the Top 10 Marketers in 2021, allowing FTX to boast that its "campaigns and partnerships" garnered "billions of impressions," which worked to funnel unsuspecting customers onto FTX's platform. ¶¶124(b), 294; ¶¶24, 260-261, 263-264, 293, 301, 335, 546-547. This "war chest" was also used for "extensive legal and political spending . . . part of a branding campaign designed to make FTX appear trustworthy." ¶347; ¶¶3, 130, 296, 610.

On July 21, 2021, Sequoia entered into a Management Rights Agreement with FTX, which guaranteed Sequoia rights to "substantially participate in, or substantially influence the conduct of, the management of the company." ¶322. Indeed, Sequoia explicitly told the public that with FTX "we're not just passive money." ¶330. Sequoia, Paradigm, SkyBridge, and Ribbit Capital also entered into a formal Investors' Rights Agreements with FTX – another type of agreement that contractually guarantees rights to control the Company. ¶¶323, 379-380, 403, 475.

On August 24, 2021, FTX and Sequoia, Thoma Bravo, Paradigm, Multicoin Capital, and Ribbit Capital formalized their agreements to join FTX's Advisory Board to advise FTX on various regulatory and operational matters. ¶298.[2] For example, they advised FTX on responding to the SEC and the CFTC's request to increase FTX's default insurance fund in connection with its application to clear derivatives in the U.S. ¶298.

On October 21, 2021, January 26, 2022, and January 31, 2022, Defendants participated in FTX's funding rounds, raising an additional $1.2 billion for FTX. ¶¶300, 324, 327, 364, 380, 403-404, 406, 441, 460-461, 476, 497. These funding rounds valued FTX at increasingly higher

---

[2]   K5 Global's Kives and Baum were given Advisory Board seats in February 2022. ¶506.

valuations, with the last round giving Defendants who invested in the initial July round an appreciation of approximately 80% in less than six months.  Coordinated press releases were published after each round, advertising Defendants' new and additional investments, with glowing statements like "FTX is the high-quality, global crypto exchange the world needs" (¶319) and how FTX is "the global exchange with the best overall product offering" (¶325).  *See* ¶¶317, 321, 326, 352, 357-359, 376-377, 440, 442, 447, 471-472.  At this time, it was also widely reported that FTX was preparing itself to go public, and these statements supported the scheme that FTX was legitimate and safe (*i.e.*, meeting listing requirements).  ¶460.

Also during this time, certain Defendants were quietly accepting FTX's fraudulently comingled customer assets as investments in their own funds: Sequoia accepted at least $75 million, Paradigm $20.3 million, Multicoin Capital $7.5 million, SkyBridge $7.5 million, Altimeter $1.5 million, and K5 Global $700 million.  ¶¶613-623.  All told, the receipt of embezzled assets surpassed Defendants' $800 million total investments into FTX.  ¶¶252, 615.

From the time of their initial investments in July 2021 through just before FTX's collapse, Defendants publicly promoted FTX to attract customers to the exchange.  For example, "[FTX] is so unique in combining innovation with rigorous operations" (¶369); "[t]he exchange that SBF had started to build, FTX, was Goldilocks-perfect" (¶343); and "FTX.COM has become one of the world's most respected cryptocurrency exchanges" (¶321).  Defendants also repeatedly told the public that SBF and FTX were ethical and stated "[t]here was no concerted effort to skirt the law." ¶343; ¶¶332, 337-338, 343, 365.  To attract young, inexperienced investors, Defendants used online platforms, social media, and podcasts.  ¶¶318, 331-332, 335-336, 346, 358, 363-364, 368-369, 388, 418; *see*, *e.g.*, ¶361 (Thoma Bravo: "Only trade #bitcoin ₿ with @FTX_Official."); ¶378 (appearing on FTX sponsored podcast with advertisements to "trade crypto right there on the FTX app"); ¶343

(Sequoia: "it turns out that that fucker was playing *League of Legends* through the entire meeting"). These statements instilled consumer confidence in FTX, induced consumers to place money with FTX, and helped FTX grow from one million users at the Series B round (¶320) to seven million users just prior to its collapse.  ECF 157-1 at 9.

In connection with their FTX investments, Defendants conducted due diligence, a methodical process undertaken to "confirm information previously provided by the company's management and assess the strengths, weaknesses and risks of the company's business and plans."  ¶303; ¶¶14, 329-330, 360, 390, 392, 433, 452, 454, 456-457, 463, 487, 498, 578.  Sequoia, for example, stated "[a]t the time of our investment in FTX, we ran a rigorous diligence process."  ¶543.  Ribbit Capital said "arguably we spend too much time on it, but our principle from the beginning is we underwrite every deal including follow-on decisions."  ¶474.  Indeed, as registered investment advisors, Defendants represented to the SEC that they approached "every potential transaction committed to a diligent, rigorous, and comprehensive due diligence process."  ¶353; *see* ¶¶354-356, 391-392, 433, 452-454, 486-487, 498.  As part of their due diligence, Defendants had access to FTX's data room containing internal FTX financial and business documents.  ¶578.  Specifically, the "extensive research and diligence" included "organizational charts of where the subsidiaries were" and "balance sheets." ¶564; *see* ¶¶574, 583.  Defendants also monitored their investments, receiving ongoing financial statements and access to inside information from "ongoing discussions with FTX team members in several divisions."  ¶546; *see* ¶¶355, 391, 453.

As fiduciaries to their clients, Defendants were required to properly segregate their own assets, and were well aware of the "common practice" of segregating customer assets and the "host of capital, liquidity and other legal and regulatory requirements that are designed to protect

depositors from losses." ¶603.[3]  Thus, Defendants' due diligence would have covered the very issue

that caused the fraud (*i.e.*, FTX's comingled transactions with Alameda).  ¶564.[4]  Defendants were

admittedly concerned enough to ask "are these two companies independent?" and analyzed the

reports they received to see how much of FTX's trading volume was from Alameda.  ¶564.[5]

Defendants also directly conducted due diligence on SBF and Alameda.  In connection with

certain Defendants' cross-investments from FTX to their respective funds, anti-money laundering

("AML") and know your customer ("KYC") laws and regulations, such as the Bank Secrecy Act,

Patriot Act, and Anti-Money Laundering Act, required Defendants to understand where the money

was coming from to thwart the exact type of embezzlement at issue here.  ¶620.  Further,

Defendants' banks required them to "identify and verify all customers and, where applicable,

beneficial owners, source of funds, and the nature and intended purpose of the business

relationship." ¶620.  Under these regulatory regimes, "[i]ndustry practice takes into account whether

the investor is sending its funds from an account in the investor's name" and, for certain high-risk

jurisdictions, such as where FTX was operating, "enhanced due diligence [is] to be performed."

¶619; *see* ¶343 (Sequoia: "[t]he company had based itself offshore precisely because it aspired to

build an advanced risk engine that would support all sorts of hedging strategies.").

On April 26-29, 2022, SkyBridge – in partnership with FTX – held a special event using its

---

[3]  SkyBridge is registered under the Investment Company Act of 1940 and has fiduciary duties even higher than those owed to mostly institutional clients in private funds.  ¶433.

[4]  Defendants also claimed to be experts in the safekeeping of Crypto assets, and made statements about their due diligence on "storage in one or more 'cold wallets' and/or on various Digital Asset exchanges."  ¶356; *see* ¶¶391, 446, 454, 575; ¶412 (Scaramucci viewed SkyBridge "as a bridge to people that are in traditional finance" and Web3).

[5]  Notably, SBF was CEO of FTX and Alameda until October 2021 (¶108), *i.e.*, after the Series B round, and after executives of both companies lived and worked in the same Bahamas penthouse (¶70).

"SALT" branding called Crypto Bahamas, "a four-day flex of FTX's expanding empire – with a new era of 'corporate crypto' firmly on display." ¶¶398-401. SBF explained that rather than "buy[ing] tens of millions of Facebook ads," these types of events allowed FTX to "introduce [its products] to tens of millions of people in a way which doesn't dilute the brand." ¶402. Highlights of the conference included guest appearances, including former President Bill Clinton, which K5 Global arranged, and UK former Prime Minister Tony Blair. ¶¶389, 511. The purpose of this conference was clear: legitimize FTX as the world's leading crypto exchange.

In May 2022, a series of highly publicized cryptocurrency collapses occurred and crypto currencies entered a period of prolonged pricing declines, known as the "Crypto Winter." ¶302. Nevertheless, Defendants used those collapses as an opportunity to publicly claim that FTX was a safe haven and "[SBF] is the new John Pierpont Morgan – he is bailing out cryptocurrency markets the way the original J.P. Morgan did after the crisis of 1907." ¶419; *see* ¶¶368-369, 430.

On May 10-11, 2022, Sequoia, Thoma Bravo, Paradigm, Multicoin Capital, and Ribbit Capital embarked on a coordinated promotion and letter-writing campaign in support of FTX's application to the CFTC.[6] In each letter, these Defendants unequivocally represented that they ***knew*** the operations of FTX and put their full support behind FTX. ¶¶339-347, 367, 384-387, 480-483; *see, e.g.*, ¶386 ("The FTX US structure presents fewer risks to the platform, to the end investor[.]"); ¶482 ("FTX has gone to significant lengths to ensure participant protections[.]"). Ribbit Capital, for example, claimed it knew the inner workings of the very system that was responsible for allowing Alameda to convert customer assets. *See id.* ("FTX constantly monitors customers' collateral positions to determine if they ever fall below the maintenance margin, at which point FTX's system would automatically begin to liquidate those deficient positions."). Defendants recklessly endorsed

---

[6]   SkyBridge' letter to the CFTC in support of FTX is dated March 22, 2022. ¶¶407-408.

FTX while knowing they had no dedicated risk team, and did not even have a Chief Risk Officer or a company-wide controller.  ¶587.

Around August 6, 2022, Anthony Scaramucci's SkyBridge partnered with FTX, which "allowed [SBF] to tap into Scaramucci's connections to politicians, Wall Street and deep-pocketed investors."  ¶423; *see* ¶576.  FTX paid $45.9 million of fraudulently commingled money to SkyBridge in exchange for a 30% stake.  ¶424.[7]  In October 2022, a month before FTX's collapse, Scaramucci took SBF to the Middle East in a failed attempt to infuse FTX with $1 billion in capital, while falsely representing to prospective investors that FTX was still flush with cash.  ¶¶431, 568.

FTX's collapse began on November 2, 2022, when *CoinDesk* published the article "Divisions in Sam Bankman-Fried's Crypto Empire Blur on His Trading Titan Alameda's Balance Sheet." ¶538.  The article reported that FTX and Alameda were financially linked, including that "the majority of the net equity in the Alameda business is actually FTX's own centrally controlled and printed-out-of-thin-air token," FTT and affiliated tokens SRM and SOL, and that FTX had racked up $7.4 billion in loans.  ¶538.  The revelations snowballed from there.  ¶¶538-560.  FTX suspended withdrawals on November 8, 2021 (¶541), and FTX filed for bankruptcy on November 11, 2022 (¶372).  The next day, *The Wall Street Journal* confirmed that FTX was using customer funds to capitalize its operations.  ¶¶549-550.  That same day, the *Financial Times* confirmed that FTX's balance sheet had $9 billion in liabilities and only $900 million in liquid assets, mainly attributed to its own proprietary tokens.  ¶¶551-552.

On November 18, 2022, *CoinDesk* reported that it had received and analyzed the audited

---

[7]   Scaramucci later disclosed that as part of its FTX partnership, SkyBridge bought $30 million worth of FTT, SOL, and SR, and thus would benefit from any increased value of these SBF-affiliated tokens.  ¶424.  SkyBridge used $5 million to pay for upfront costs related to SALT, including by hosting another conference in New York on September 12-14, 2022, where SBF and Scaramucci shared the stage touting FTX.  ¶¶423-424, 427-430.

FTX financial statements and raised at least four glaring red flags that any sophisticated investor would have immediately identified: (1) use of two different auditing firms; (2) no auditor opinion on financial controls; (3) "neither FTX Trading nor FTX US paid any federal income taxes, although they both appeared to be profitable"; and (4) "roundtrip and utterly confounding related-party transactions," including related-party transactions at FTX "so numerous that it is difficult to know where to begin to analyze them." ¶¶554-557.

The financial press immediately recognized Defendants' role in FTX's fraud, and Defendants began to craft the narrative that they too were victims. For example, without mentioning that Defendants knew that FTX paid no income taxes, Sequoia stated that one of the bases of its investment was that "FTX generated approximately $1B in revenue and more than $250M in operating income." ¶543. Sequoia partner Doug Leone further stated at a conference, "I can tell you we've done careful due diligence . . . there's nothing much we could have done differently. . . ." ¶562. Sequoia partner Alfred Lin claimed they did "extensive research and diligence," and despite what is now known to be conspicuous comingling of customer funds between FTX and Alameda on FTX's balance sheet, Lin stated "[w]e looked at balance sheets," "organizational charts of where the subsidiaries were," and Alameda's "percentage of FTX's volume." ¶564. Lin also said "[w]e probably would have made the investment again." ¶567; *see* ¶¶563-567. Scaramucci claimed that Binance's CEO caused FTX's collapse (¶573), when he already knew there was fraud because he was in FTX's "war room" on November 8, 2021 when criminal co-defendant Caroline Ellison admitted to sending customer funds to Alameda. *Compare* ¶532 *with* ¶549. Scaramucci also blamed other "venture capitalists," but eventually also settled on the self-serving narrative that he would not have done "anything different." ¶¶574, 578-579. Multicoin Capital also publically excused its involvement as "that's just capitalism." ¶582. Multicoin Capital's founder Tushar Jain claimed that

what they missed "was the complete lack of governance controls that anyone placed on [Bankman-Fried]," falsely stating that "there's very little that can be done from an oversight perspective." ¶583.

These statements, and Defendants' statements concerning FTX's safety and reliability prior to its collapse, are contradicted by two bankruptcy court reports discussing the true and egregious state of FTX.  ¶¶584-612.  As the First Bankruptcy Report concluded, "*[a]ny number of different controls routinely implemented by financial institutions and exchanges in established financial markets would be expected to have prevented, detected, and escalated these secret privileges to personnel in control functions with sufficient independence and authority to address the issue*."  ¶594.  Even limited due diligence, and certainly the amount Defendants claimed they performed, would have shown that FTX was built on a house of cards.  Some of the staggering facts included:

1.     nonexistent corporate governance – not even a complete entity or employee organization chart – with the three individuals that controlled FTX and Alameda, SBF, Singh, and Wang, having "no experience in risk management or running a business" (¶586);

2.     no CFO, Chief Risk Officer, Global Controller, or Chief Internal Auditor, and no dedicated financial risk, audit, or treasury departments (¶587);

3.     "[k]ey accounting reports necessary to understand the FTX Group's assets and liabilities, such as statements of cash flows, statements of equity, intercompany and related party transaction matrices, and schedules of customer entitlements, did not exist or were not prepared regularly."  ¶590; *see* ¶¶584, 588, 593.

4.     no accounting system "capable of handling large volumes of data" that "[c]ompanies with operations as large and complex as . . . [FTX] normally employ" (¶588);

5.      no "fundamental financial and accounting controls" and no "internal audit function whatsoever," including no personnel with experience in accounting accurately for assets or able to validate financial reports (¶587);

6.      policies and procedures that "did not exist, were incomplete, or were highly generic and not appropriate for a firm handling substantial financial assets" (*id.*);

7.      vague entries on the general ledger without stating the purpose or substance of the transactions (¶593), even an account on FTX's books purportedly recording $8.9 billion but titled merely "our Korean friend's account" (¶609); and

8.      over 1,000 external accounts on other crypto exchanges with "no comprehensive, centralized source of information reflecting the purpose of these accounts, or the credentials to access them" (¶592).

A cursory review of FTX's books and records would quickly demonstrate that there was no segregating or safekeeping of assets, "[e]ach failure was egregious in the context of a business entrusted with customer transactions" (¶595), including that:

1.      "the FTX Group made no meaningful distinction between customer funds and Alameda funds" (¶605);

2.      "[t]he FTX Group did not observe any discernable corporate formalities when it came to intercompany transactions" (¶593);

3.      customers were directed to deposit funds in Alameda accounts, because FTX could not pass bank restrictions (¶¶605-606);

4.      "no evidence that the FTX Group performed any meaningful reconciliation prior to making this claim on its website and in materials provided to Congress, federal agencies, and other third parties" (¶611);

- 11 -

5.      no "readily identifiable records, data sources, and processes that can be used to identify and safeguard assets" (¶584);

6.      "a pervasive lack of records and other evidence at the FTX Group of where or how fiat currency and digital assets could be found or accessed" (¶584); and

7.      no controls "widely understood to be crucial for crypto exchanges," including using "hot wallets," no adequate "system in place to monitor or move to cold wallets"; insecure encryption and technology infrastructure (¶¶595-596), and not "even the most widely accepted controls relating to Identity and Access Management" (¶598).

On January 18, 2023, the CFTC's Commissioner spoke at Wharton saying "FTX appears to have used Sequoia as a credibility and trust enhancer, and it used Sequoia's money to embark on a campaign to gain public trust and distinguish itself as the most trusted brand in crypto.  It appears that Sequoia at least knew its money would be used in this fashion."  ¶347.[8]  Yet it was not just Sequoia, but all of the named Defendants who played major roles in FTX's fraud.

## III.    LEGAL STANDARD

Under Rule 12(b)(6), the Court must "accept[] all well-pleaded allegations as true and constru[e] the allegations in the light most favorable to the plaintiff."  *MSP Recovery Claims, Series LLC v. Metro. Gen. Ins. Co.*, 40 F.4th 1295, 1301 (11th Cir. 2022).[9]  This includes "draw[ing] all reasonable inferences in the plaintiff's favor."  *Randall v. Scott*, 610 F.3d 701, 705 (11th Cir. 2010). The motion should be denied when the plaintiff has pleaded "'enough facts to state a claim for relief that is plausible on its face.'"  *Borges v. SmileDirectClub, LLC*, 2022 WL 4269564, at *2 (S.D. Fla.

---

[8]    The CFTC's prepared remarks quoted in the Complaint can be found here: https://www.cftc.gov/PressRoom/SpeechesTestimony/oparomero5.

[9]    Citations, internal quotations, and footnotes are omitted and emphasis added unless otherwise noted.

Sept. 15, 2022).  "If there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6)."  *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011); *Cordell Consultant, Inc. Money Purchase Plan & Tr. v. Abbott*, 561 F. App'x 882, 884 (11th Cir. 2014) (same).

## IV.    ARGUMENT

### A.    Plaintiffs Have Met the Pleading Standard for Knowledge of Fraud

Under Rule 9(b), "a party must state with particularity the circumstances constituting fraud." This means that Plaintiffs must plead "'the who, what, when, where, and how'" of the fraudulent activity.  *Perkins v. Nat'l LGBTQ Task Force, Inc.*, 580 F. Supp. 3d 1236, 1239 (S.D. Fla. 2021). However, "allegations of knowledge and intent are not subject to the particularity requirement." *Abbott*, 561 F. App'x at 884.  While "conclusory allegations as to the Defendants' knowledge and intent do not alone suffice," allegations that give rise to "reasonable inferences of knowledge and intent that make [the Plaintiffs'] claims plausible" suffice at the pleading stage.  *Noboa v. Castillo*, 2022 WL 2191687, at *4-*5 (S.D. Fla. June 17, 2022).  Knowledge may also be inferred by the "surrounding circumstances and expectations of the parties."   *Woods v. Barnett Bank of Ft. Lauderdale*, 765 F.2d 1004, 1009 (11th Cir. 1985); *see Amegy Bank Nat'l Ass'n v. Deutsche Bank Alex.Brown*, 619 F. App'x 923, 929 (11th Cir. 2015) (finding actual knowledge despite "no direct evidence of [managing director]'s actual knowledge").

Defendants' arguments concerning the knowledge or intent alleged are all based on contentions that Plaintiffs have not pled enough facts to support their claims.  *See* MTD at §§I., II.C., II.D., II.G., III.A., III.B., IV.A. at 27.  However, "'the requirements of Rule 9(b) are satisfied if the complaint provides a reasonable delineation of the underlying acts and transactions allegedly constituting the fraud such that the defendants have fair notice of the nature of plaintiff's claim and

- 13 -

the grounds upon which it is based.'" *Pearson v. Deutsche Bank AG*, 2022 WL 951316, at *5 (S.D.

Fla. Mar. 30, 2022). Plaintiffs here have alleged the particulars of each false statement: "the precise

statements," "the time and place of, and the persons responsible for, the alleged statements," how

"the statements misled the plaintiff" or "what the defendant gained through the alleged fraud." *Todd*

*Benjamin Int'l, Ltd. v. Grant Thornton Int'l, Ltd.*, 2023 WL 4457458, at *6 (S.D. Fla. July 11, 2023).

The Complaint contains a myriad of facts, including Defendants' purportedly extensive due

diligence (¶¶310, 329-330, 353-354, 360, 392-393, 433-434, 452-454, 462-464, 487-488, 498-499,

543, 562-565, 578); documents obtained throughout the due diligence (¶¶310, 564, 566, 574, 578);

what was learned from the due diligence (¶¶310, 329-332, 434, 488, 533, 554-557, 559, 583-599,

601-611); the true state of FTX, showing Defendants' statements about FTX and their due diligence

were false (¶¶307-310, 488, 544-545, 549, 552-553, 574, 577-578, 583-599, 601-612); Defendants'

transactions receiving embezzled customer funds (¶¶612-615, 618, 621); Defendants' legal

obligations to know the source of funds (¶¶616-617, 620-623); Defendants' partnerships and close

relationships with FTX (¶¶298, 318-319, 322-323, 336-342, 347, 357, 360-361, 367, 379, 384-387,

395-399, 401-403, 405, 407, 409-413, 420-421, 423-425, 427-429, 431-432, 437, 444, 446, 476,

479-483, 506-516, 523-530, 547, 568, 571); the amounts given to support FTX (¶¶293, 317, 324,

327-328, 352, 364, 376, 379, 382, 404, 406, 422, 426, 439, 441, 459-461, 471, 476, 494-495, 497,

563, 578); the knowledge of what FTX would do with such support (¶¶295-296, 318, 320, 347, 460,

472, 536); and Defendants' gain (¶¶301, 328, 333, 364, 379, 517-522, 528). *Amegy Bank*, 619 F.

App'x at 929 (conducting due diligence, access to financial information, participation in KYC

process, and close relationship supported inference of actual knowledge).

Applicable here too is that Plaintiffs are "entitled to 'an extra modicum of leeway'" in

pleading their claim[s]" because information concerning FTX's fraud is "'within defendants'

exclusive control.'" *Leader Trade Sols. Corp. v. Dell World Trade LP, L.L.C.*, 2010 WL 11506346, at *9 (S.D. Fla. Feb. 16, 2010) (quoting *United States v. Baxter Int'l, Inc.*, 345 F.3d 866, 881-882 (11th Cir. 2003)).  Further still, "Rule 9(b) may be 'applied less stringently' in cases in which 'the alleged fraud occurred over an extended period of time and the acts were numerous.'" *Gilead Scis., Inc. v. AJC Med. Grp., Inc.*, 2021 WL 8534243, at *11 (S.D. Fla. Nov. 29, 2021).  "In such cases, plaintiffs need allege only 'some examples of actual false claims to lay a complete foundation for the rest of the allegations.'"  *Id.*  This is exactly the case here – where the details of due diligence conducted, what was specifically discussed in meetings with the Advisory Board, or the AML and KYC reviews conducted prior to Defendants accepting FTX's converted assets are all solely under Defendants' control.  MTD at 11-13.  In sum, the Complaint meets the Rule 9(b) standard for level of knowledge required for each of Plaintiffs' claims.

### B.     The Complaint States a Claim for Intentional Misrepresentation

An intentional misrepresentation claim requires:

> (1) a false statement concerning a material fact; (2) knowledge by the person making the statement that the representation is false; (3) the intent by the person making the statement that the representation will induce another to act on it; and (4) reliance on the representation to the injury of the other party.

*Gilead Scis.*, 2021 WL 8534243, at *11.

### 1.     Plaintiffs Plead Actionable Affirmative Statements

Defendants repeatedly represented to Plaintiffs that they had performed adequate due diligence supporting their FTX investments; that FTX's products and services were safe and reliable; that SBF was a visionary crypto founder whose sole focus was on the greater good rather than profiting at others' expense; that FTX was competently run; and that FTX and SBF had strictly complied with all legal and regulatory requirements to safeguard their customers' assets, including segregating funds deposited by FTX users for safekeeping.  Defendants' competing "argu[ment] that

[Plaintiffs] d[id] not actually plead any specific facts demonstrating misrepresentation" fails because "[Defendants] discuss[] many of the specific facts recited in [Plaintiffs'] complaint, and then attempt[] to attack or rebut the factual basis for [Plaintiffs'] claims." *Ronpak, Inc. v. Elecs. for Imaging, Inc.*, 2015 WL 179560, at *3 (N.D. Cal. Jan. 14, 2015) (declining competing inferences).

Nor do Defendants' statements constitute puffery or opinion.[10] Even Defendants' authority states the distinction, puffing is "'talk which no sensible man takes seriously, and if he does he suffers from his credulity.'" *Id.* And opinion statements are certainly actionable if the speaker does not believe the statement or if the embedded facts are untrue.[11] *Carvelli*, 934 F.3d at 1322; *Stonecreek–AAA, LLC v. Wells Fargo Bank N.A.*, 2013 WL 5416970, at *7-*8 (S.D. Fla. Sept. 26, 2013). Further, "promises of future action" are actionable "where 'the person expressing the opinion is one having superior knowledge of the subject of the statement.'" *Onemata Corp. v. Rahman*, 2021 WL 5175544, at *5 (S.D. Fla. Oct. 12, 2021).

Here, Defendants' due diligence and close relationships with SBF and FTX gave them superior knowledge. And in context, statements about SBF's morals, FTX and its exceptional products, about Defendants' own due diligence, or even FTX's ability to deliver in the future, were all intended to legitimize FTX and induce customers to believe in the safety, viability, and ethical culture of FTX. MTD at 16-18; *see Williams v. Gerber Prods. Co.*, 552 F.3d 934, 939 n.3 (9th Cir. 2008) (a statement "standing on its own, could arguably constitute puffery. . . . [However, g]iven the context of this statement, we decline to give [the defendant] the benefit of the doubt"). Likewise,

---

[10]   Defendants' arguments are an admission that they were inducing customers to use the FTX Platform, because after all "'puffing' is 'seller's or dealer's talk in praise of the virtues of something offered for sale.'" *Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1319 (11th Cir. 2019).

[11]   Defendants fail to inform the Court that they are asserting an Exchange Act fraud statutory safe harbor defense for forward-looking statements (MTD at 18), which is evoked only if statements "are accompanied by meaningful cautionary statements," which Defendants do not even mention. *Hampton v. Aqua Metals, Inc*., 2020 WL 6710096, at *5 (N.D. Cal. Nov. 16, 2020).

Defendants' *ipse dixit* that "touting the safety and stability of FTX are similarly nonactionable" cannot be taken seriously when the Complaint includes, but they ignore, statements discussing the epicenter of the fraud. *Compare, e.g.*, ¶342 ("FTX's margining methodology **will** improve risk management.") *with* ¶¶584-612 (FTX had no risk management function); *United States v. Martinelli*, 454 F.3d 1300, 1317 (11th Cir. 2006) ("factual statements that were verifiably refutable" are not puffery). Clearly, Defendants' statements are not "'so obviously unimportant to an investor that reasonable minds cannot differ'" and so Defendants' puffery and opinion arguments are "'not typically resolved at the motion to dismiss stage.'" *Mascaro Aviation, L.L.C. v. Diamond Aircraft Indus., Inc.*, 2011 WL 13273580, at *4 (S.D. Fla. June 14, 2011). Indeed, Defendants misconstrue the entire Complaint by improperly separating statements into purported "[c]ategories," which is not an inference they are allowed at this stage. *See* ECF 301-5; *Sapssov v. Health Mgmt. Assocs., Inc.*, 608 F. App'x 855, 861 (11th Cir. 2015) (alleged false statements must be "'viewed holistically'"). Defendants' Exhibit 4 should be ignored.

### 2.      Plaintiffs Plead Actionable Omissions

Defendants' omissions are also actionable because Defendants owed a duty arising from their attempts to establish a relationship of trust and confidence with FTX customers and by voluntarily promoting FTX as safe and reliable. "Whether a duty exists can be a fact-intensive question best left for a trier of fact." *Copart, Inc. v. Sparta Consulting, Inc.*, 277 F. Supp. 3d 1127, 1149 (E.D. Cal. 2017). But "even where a person has no duty to speak, 'if he undertakes to do so, either voluntarily or in response to inquiries, he is bound not only to state truly what he tells but also not to suppress or conceal any facts within his knowledge which materially qualify those stated.'" *Id.*; *State Farm Mut. Auto. Ins. Co. v. Performance Orthopaedics & Neurosurgery, LLC*, 2018 WL 2186496, at *11 (S.D. Fla. Feb. 16, 2018) ("A defendant has a duty to disclose '[w]here a defendant's failure to speak

- 17 -

would render the defendant's own prior speech misleading or deceptive.'"); *Ct. Appointed Receiver of Lancer Offshore, Inc. v. Citco Grp. Ltd.*, 2011 WL 1233106, at *6 (S.D. Fla. Mar. 30, 2011) (fund administrator had duty to third party by "voluntarily disseminat[ing]" information about the fund to third party). Indeed, a duty can arise "'when the defendant ha[s] exclusive knowledge of material facts not known to the plaintiff' or 'when the defendant actively conceals a material fact from the plaintiff,'" or "where a party volunteers information, the telling of a half-truth calculated to deceive is fraud." *Cisco Sys., Inc. v. STMicroelectronics, Inc.*, 77 F. Supp. 3d 887, 897 (N.D. Cal. 2014).[12] Here, omissions that FTX was a shoddy, horribly managed business, or what Defendants' due diligence did not entail, were material to making Defendants' unwavering endorsements of FTX, their claims of knowledge of FTX's operations, and their due diligence true. In addition, Defendants' claim of "[t]he lack of any dealings between Plaintiffs and [Defendants]" (MTD at 19) is belied by FTX's use of customer funds to invest in certain Defendants' funds – exactly the "sort of transaction between . . . parties" in "which a [duty] can arise." *LiMandri*, 60 Cal. Rptr. 2d at 543.

### 3.    Plaintiffs Sufficiently Plead Defendants' Knowledge/Intent

"[R]easonable inferences of knowledge and intent that make [Plaintiffs'] claims plausible" suffice. *Noboa*, 2022 WL 2191687, at *4-*5. According to Defendants' own case law, Plaintiffs do not need to allege actual knowledge, as Defendants incorrectly assert. *See Grills v. Philip Morris USA, Inc.*, 645 F. Supp. 2d 1107, 1122-23 (M.D. Fla. 2009) (knowledge of fraud is where "defendant knew or should have known the statement was false, or made the statement without knowledge as to truth or falsity"); *San Diego Gulls Hockey Club, LLC v. ECHL, Inc.*, 2020 WL 2510519, at *3 (C.D. Cal. Jan. 29, 2020) (same). Even when courts do require plaintiffs to plead actual knowledge, such

---

[12]   Defendants' case agrees. *LiMandri v. Judkins*, 60 Cal. Rptr. 2d 539, 543 (Cal. Ct. App. 1997) (discussing "'four circumstances in which nondisclosure or concealment may constitute actionable fraud'").

allegations need only "create the reasonable inference that [defendant] knew the falsity of its

misrepresentation." *State Farm Mut. Auto. Ins. Co. v. Performance Orthopaedics & Neurosurgery,*

*LLC*, 278 F. Supp. 3d 1307, 1318 (S.D. Fla. 2017); *see also Ave. CLO Fund, Ltd. v. Bank of Am.,*

*N.A.*, 723 F.3d 1287, 1297 (11th Cir. 2013) (knowledge "'will be provable (as knowledge must

almost always be proved) by circumstantial evidence'").[13]

      Defendants' due diligence gave them ample access to the inside workings of FTX.  If

Defendants "ran [the] rigorous diligence process" that they claimed to have performed, they knew,

or should have known, that the misrepresentations alleged concerning FTX were materially false and

misleading when made.  ¶543.  *Gavaldon v. StanChart Sec. Int'l, Inc.*, 2019 WL 764031, at *7 (S.D.

Cal. Feb. 20, 2019) ("Representations that SCBI had conducted robust due diligence on the fund, and

that as a result they were confident the fund was safe and secure could, however, support a finding of

fraud.").  In addition, Defendants' claims about their own due diligence raises a significant inference

of fraud because even a "reasonable" or "appropriate" process would have shown a complete lack of

internal controls and competency present at FTX.  ¶¶392, 433; *Schwarz v. ThinkStrategy Cap. Mgmt.*

*LLC*, 797 F. Supp. 2d 439, 444-45 (S.D.N.Y. 2011) ("The issue here is not what the defendants

knew about the . . . fraud, but what they knew about their own due diligence process when they made

allegedly false representations to plaintiffs about that process.");[14] *LeGrand v. Abbott Lab'ys*, 2023

WL 1819159, at *13 n.58 (N.D. Cal. Feb. 8, 2023) ("intent to defraud can be inferred" from

---

[13]  Defendants' citations to multiple Exchange Act fraud cases, where recklessness is the threshold
issue, are inconsistent with their claims that "knowledge of falsity" is required.  MTD at 9 n.7.

[14]  *Wang* is inapposite.  There, plaintiffs were the investors into the scheme, and their funds were
used to pay back the scheme's High Yield loan.  The Court found that the due diligence conducted
did not show that "the High Yield loan could not be repaid with such funds."  *Wang v. Revere Cap.*
*Mgmt., LLC*, 2023 WL 2198570, at *5 (S.D. Fla. Feb. 15, 2023).  Here, the due diligence is not how
FTX was using Defendants' money; Defendants' money was used exactly as agreed.  Rather, it was
whether FTX was safe and viable, and the fraud concerns due diligence.

defendant being a "'large sophisticated company that holds itself out as hav[ing] expert knowledge . . . [and] the intentional and conspicuous placement' of the misrepresentations").

Defendants claimed to have reviewed financial statements, but FTX's financial statements were riddled with red flags, including *numerous "roundtrip and utterly confounding related-party transactions*" and that *FTX was purportedly making over $1 billion in revenue but paying no taxes*.  *Compare* ¶564 ("We looked at balance sheets."), *and* ¶578 ("We saw audited financials") *with* ¶¶554-557, 590; *Cisco Sys.*, 77 F. Supp. 3d at 898 ("it can be inferred that defendant either knew or should have known that the information provided was false or incomplete" from "access to internal reports").  Indeed, "[d]igital asset transactions were tracked in QuickBooks using the generic entry 'investments in cryptocurrency'" (¶588) and "informal, ephemeral messaging systems were used . . . leaving only informal records of such transfers, or no records at all" (¶591).[15]

Defendants admitted that they were suspicious of Alameda's and FTX's relationship, inquired about it, and analyzed the trading records between FTX and Alameda.  ¶564.  These records showed FTX and Alameda were processing "large volumes of data only manually, *a great deal of transaction detail (e.g., the purpose of a transaction) was either populated en masse, or omitted entirely*."  ¶588; *see Gonzales v. Lloyds TSB Bank, PLC*, 532 F. Supp. 2d 1200, 1207 (C.D. Cal. 2006) ("'"[E]xceptional returns" for clients and the commingling of "significant amounts of client monies with both small and large investors involved" are two hallmarks of a Ponzi scheme.'").

---

[15]  Defendants' self-proclaimed robust due diligence differentiates them from those in their citations.  *See In re Enron Corp. Sec., Derivative & ERISA Litig.*, 761 F. Supp. 2d 504, 554, 572 (S.D. Tex. 2011) (no identified due diligence and no false statements); *Meridian Tr. Co. v. Batista*, 2018 WL 4693533, at *9 (S.D. Fla. Sept. 26, 2018) ("'bank was only providing routine banking services'"); *Lynn Finkelstein & Co., Inc. v. Ball*, 2007 WL 9701156, at *15 (S.D. Fla. May 15, 2007) (no due diligence alleged); *In re Autodesk, Inc. Sec. Litig.*, 132 F. Supp. 2d 833, 844 (N.D. Cal. 2000) (executive positions); *Am. United Life Ins. Co. v. Martinez*, 480 F.3d 1043, 1067-68 (11th Cir. 2007) (physical health examination).

Further, that FTX "had difficulty establishing banking relationships" and directed customers to pay funds directly to Alameda bank accounts in order "[t]o evade banks' restrictions" is significant. ¶605.  As sophisticated investors with knowledge of the AML and KYC laws (¶¶620, 622; *see* ¶479 n.144), this blatant red flag would not have gone unnoticed.  *Chang v. JPMorgan Chase Bank, N.A.*, 845 F.3d 1087, 1097 (11th Cir. 2017) ("Even if Chang has no explicit allegation that Padgett-Perdomo knew about Gordon's fraud, such a direct allegation was unnecessary because Chang's allegations support an inference that Padgett-Perdomo knew that Gordon was misappropriating money.").  Indeed, it defies logic to assert that SBF's mere verbal assurance that FTX and Alameda were "independent" was sufficient to assuage Defendants' concerns of commingling.  And even if such assurances were blindly accepted, this only supports an inference that Defendants' purported rigorous due diligence statements were false.  ¶564 ("we were told that they were [independent] . . . so [we invested]").  Knowledge of FTX's and Alameda's comingling is further supported by the account of a prudent investor who asked for "reps and warranties around affiliated transactions and related party transactions" and was told to "go fuck yourself." ¶305.  Defendants either knew assets were being comingled and went along with it for their own beneficial interest, or they lied publically about their "rigorous due diligence." *Compare* ¶564 *with* ¶305 *and* ¶534.  Either one shows fraud.

Further still, Defendants had access to all sides of FTX.  AML and KYC laws required Defendants to understand where funds were coming from before acceptance.  ¶¶620-623.  That Defendants did not know the investments were coming from SBF or Alameda on its face lacks credibility.  MTD at 12-13.  Defendants were required to "identify and verify all customers and, where applicable, beneficial owners, source of funds, and the nature and intended purpose of the business relationship," and they had a strong financial incentives to get this information right. ¶620; *see Chang v. Wells Fargo Bank, N.A.*, 2020 WL 1694360, at *4-*5 (N.D. Cal. Apr. 7, 2020)

- 21 -

(allegations that pursuant to AML/BSA bank had "an opportunity to review, and reviewed [Ponzi company] and its accounts" and "a number of facts in support of their claim" was enough).  Indeed, even a cursory review of the funds sent to them from SBF's entity Clifton Bay would have put Defendants on notice that the money could only be from FTX.  ¶¶613, 621.  Likewise, because Alameda entity Maclaurin Investments Ltd. was a Seychelles entity, AML and KYC required an even higher level of scrutiny.  ¶¶614, 622; *Neilson v. Union Bank of Cal., N.A.*, 290 F. Supp. 2d 1101, 1120 (C.D. Cal. 2003) ("[T]he [defendants] utilized atypical banking procedures to service Slatkin's accounts, raising an inference that they knew of the Ponzi scheme.").

Defendants also claimed in public letters to the CFTC that they ***knew*** FTX's operations protected investors.  *See, e.g.*, ¶408 (claiming to know that FTX has "a method to provide key, legally required protections directly to investors"); ¶446 ("We have deep familiarity with digital asset markets and are knowledgeable about FTX's platform."); ¶482 ("FTX has gone to significant lengths to ensure participant protections.").  In other words, Defendants told regulators and consumers that they ***knew*** FTX was safe, but in fact, there was "no evidence that the FTX Group performed any meaningful reconciliation" of "customers' trading balances against cash and digital assets held by FTX" – it was all comingled, and "the FTX Group made no meaningful distinction between customer funds and Alameda funds."  ¶¶605, 611.

But that is not all.  The basic corporate deficiencies identified in the bankruptcy reports raise a significant inference of Defendants' knowledge that their statements concerning FTX were false. *See supra*, at 10-12; *see* ¶¶319; 369.  Most explicitly, corporate oversight was "effectively non-existent" with FTX controlled instead by individuals with "no experience in risk management or running a business."  ¶586.  There was "a complete absence of trustworthy financial information" (¶553), no "fundamental financial and accounting controls," and no "internal audit function

whatsoever" (¶587).  And "[t]he FTX Group did not observe any discernable corporate formalities when it came to intercompany transactions."  ¶593.

Lastly, the argument that Plaintiffs' theory is "illogical" also fails because Plaintiffs' theory is "not that . . . defendants were convinced [FTX would collapse], it is that they withheld important warning signs from the market."  *In re BioMarin Pharm. Inc. Sec. Litig.*, 2022 WL 164299, at *14 (N.D. Cal. Jan. 6, 2022); *Homyk v. ChemoCentryx, Inc.*, 2023 WL 3579440, at *20 (N.D. Cal. Feb. 23, 2023).  As Judge Posner convincingly opined, "concealing bad news in the hope that it will be overtaken by good news . . . is like embezzling in the hope that winning at the track will enable the embezzled funds to be replaced before they are discovered to be missing." *Makor Issues & Rts., Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008).  Indeed, "[v]enture money is not long-term money.  The idea is to invest in a company's balance sheet and infrastructure until it reaches a sufficient size and credibility."  ¶624.  But at this stage, whether Defendants lost money or were victims are red herring factual arguments.  *See* ¶570 (Scaramucci claiming he "did not lose the money because [SBF] gave me the money"); ¶¶301, 424, 430, 437, 441, 582 (Defendants' investments in FTX's affiliated tokens); *Howard v. Wilkinson*, 305 F. Supp. 3d 1327, 1340 (M.D. Fla. 2018) (At motion to dismiss "self-serving statements by the defendants, are not well-taken.").  Accordingly, even under the actual knowledge standard, Plaintiffs have sufficiently alleged Defendants' general knowledge and intent to commit fraud.

### 4.     Plaintiffs Allege Reliance

"To allege reliance, a plaintiff 'only need[] establish it to be plausible that a "reasonable man would attach importance to [the] existence or nonexistence [of the misrepresentation] in determining his choice of action in the transaction in question."'"  *Moore v. Mars Petcare US, Inc.*, 966 F.3d 1007, 1021 (9th Cir. 2020).  Defendants' deceptive statements misled Plaintiffs into purchasing,

transacting, or depositing fiat currency or crypto assets with FTX.  Plaintiffs "allege[] a sufficient connection between the Defendants' alleged fraudulent conduct and the reliance of Plaintiff[s]." *Brady v. Medtronic, Inc.*, 2015 WL 11181971, at \*5 (S.D. Fla. Mar. 30, 2015).

Contrary to Defendants' contentions (MTD at 21-22), "at the motion to dismiss stage, 'actual reliance . . . is inferred from the misrepresentation of a material fact.'"  *Moore*, 966 F.3d at 1021; *Stonecreek*, 2013 WL 5416970, at \*7 (complaint adequately alleged reliance when it "describe[d] how [defendant] knowingly made [statements at issue] with the understanding that [plaintiffs] would rely on them").  Plaintiffs also allege how they would not have deposited funds into FTX.  ¶¶714-716.  And Defendants' scant contention that the Court must decide at this time whether Plaintiffs' reliance was justifiable "is a matter for summary judgment or trial, not a motion to dismiss." *Point Blank Sols., Inc. v. Toyobo Am., Inc.*, 2010 WL 4624274, at \*5 (S.D. Fla. Nov. 4, 2010); *see In re First All. Mortg. Co.*, 471 F.3d 977, 992 (9th Cir. 2006) ("'a misrepresentation may be the basis of fraud if it was a substantial factor in inducing plaintiff to act and . . . it need not be the sole cause of damage'").

The Court should see through Defendants' attempt to misconstrue the Complaint.  MTD at 22-23, 25.  Defendants' statements are alleged to be about FTX's safety, not "investment advice," and "'[i]t is enough that the maker of the representation intends it to reach and influence either a particular person or persons, known to him, or a group or class of persons.'" *Pruco Life Ins. Co. v. Brasner*, 2011 WL 2669651, at \*8 (S.D. Fla. July 7, 2011); *OCM Principal Opportunities Fund, L.P. v. CIBC World Mkts. Corp.*, 68 Cal. Rptr. 3d 828, 849 (Cal. Ct. App. 2007), *as modified* (Dec. 26, 2007).

### 5.    Plaintiffs Allege Damages

As a result of Defendants' misrepresentations, Plaintiffs suffered damages, including because

they cannot retrieve their fiat currency or digital assets currently in their FTX accounts. ¶¶705, 716, 725, 735, 744. Defendants' cited cases to the contrary are inapplicable.[16] Defendants' conduct caused Plaintiffs to lose money. ¶¶389, 393, 531, 537, 682, 695, 705, 716, 725, 735, 744.[17]

### C. The Complaint States a Claim for Negligent Misrepresentation

The elements for negligent misrepresentation are: "(1) the misrepresentation of a material fact, (2) without reasonable ground for believing the fact is true, (3) with intent to induce another's reliance on the misrepresented fact, (4) justifiable reliance on the misrepresentation, and (5) resulting damage." *Ronpak, Inc.*, 2015 WL 179560, at *4; *Todd Benjamin*, 2023 WL 4457458, at *14 (same). Contrary to Defendants' assertions, in California, Rule 9(b) does not apply to a negligent misrepresentation claim. *See Petersen v. Allstate Indem. Co.*, 281 F.R.D. 413, 415 (C.D. Cal. 2012) ("Rule 9(b) applies only to allegations of fraud and not to allegations of negligent misrepresentation."); *see also Ronpak, Inc.*, 2015 WL 179560, at *4 ("the negligent misrepresentation tort contains an entirely distinct element that distinguishes it from actual fraud").[18]

As the Complaint details, Defendants negligently misrepresented material facts about, *inter alia*, the safety and viability of FTX and their own due diligence to induce confidence in FTX and

---

[16]   Unlike in *Body Jewelz, Inc. v. Valley Forge Ins. Co.*, 241 F. Supp. 3d 1084, 1091 (C.D. Cal. 2017), Plaintiffs have alleged that Defendants' misleading statements helped cause the FTX bubble and collapse, thereby damaging Plaintiffs. Defendants are not bankrupt, so *Harbinger Cap. Partners Master Fund I, Ltd. v. Wachovia Cap. Markets, LLC*, 347 F. App'x 711, 713 (2d Cir. 2009), is also inapt.

[17]   Defendants challenge Plaintiffs' fraudulent inducement claim on the same grounds as their Plaintiffs' misrepresentation claims. MTD at 22-23. Accordingly, if the Court finds Plaintiffs' intentional misrepresentation claim sufficient, the fraudulent inducement claim is as well. *See RxStrategies, Inc. v. CVS Pharmacy, Inc.*, 390 F. Supp. 3d 1341, 1355 (M.D. Fla. 2019).

[18]   If the Court were to apply Rule 9(b) for assessing Plaintiffs' Florida claim, as discussed above, it is "relaxed here where the information supporting [Plaintiffs' misrepresentation] claims would be uniquely within [Defendants'] control, and where the scheme alleged is especially complex." *Todd Benjamin*, 2023 WL 4457458, at *15.

4891-6130-7789.v1

convince consumers to commit and trade fiat currency and digital assets with FTX, thereby increasing the value of Defendants' FTX investments. ¶¶319-321, 325, 329-332, 334-338, 343-346, 354-359, 361-363, 365-366, 368-371, 377-378, 381, 383, 388, 391-392, 405, 410-412, 414-421, 425, 427-430, 440, 442, 445, 449-450, 452-453, 462, 472, 474, 478, 485-487, 496, 498-500.

Defendants only argue they were not negligent in making their misrepresentations by declaring unilaterally that "SBF and FTX engaged in a widespread fraud that they shielded from the world," and so "Plaintiffs do not adequately plead that any Investor Defendant made an alleged misrepresentation without reasonable grounds for believing it to be true. . . ." MTD at 20. But "intent to deceive is not a requirement to plead negligent misrepresentation." *Todd Benjamin*, 2023 WL 4457458, at *14. And evidence "contrary to what [a defendant] represented" is enough, not only to plead but for proof of negligence. *Anderson v. Lumbermens Mut. Cas. Co.*, 220 F. App'x 739, 741 (9th Cir. 2007). For example, Defendants' letters to the CFTC claimed they knew FTX's risk operations. *Supra*, at 7-8, 22. But Defendants also had inside information via the Advisory Board and knew that FTX had no Chief Risk Officer or company-wide controller. *Id.*

### D. Defendants Aided and Abetted FTX and Its Affiliates' Fraud

Aiding and abetting has three elements: (1) an underlying violation, (2) the defendant has knowledge of the underlying violation, and (3) the defendants' substantial assistance. *Todd Benjamin*, 2023 WL 4457458, at *15; *Amparan v. Plaza Home Mortg., Inc.*, 2010 WL 3743953, at *4 (N.D. Cal. Sept. 23, 2010) (same). Defendants cannot, and do not, challenge the substantial assistance they provided to FTX. Instead, they conflate the "knowledge" element of aiding and abetting and claim a "'high' level of intent" is required. MTD at 23. It is not. *See Emess Cap., LLC v. Rothstein*, 2011 WL 13214308, at *7 (S.D. Fla. Dec. 21, 2011) ("'the mental state requirement for fraud (intent) is more culpable than that required for aiding and abetting (knowledge)'"); *Ketayi v.*

*Health Enrollment Grp.*, 2021 WL 2864481, at *6 (S.D. Cal. July 8, 2021) ("The . . . question is whether Plaintiffs have adequately alleged that ACI's assistance to fraud was knowing.  Under Rule 9(b), knowledge can be alleged generally.").[19]   The Supreme Court recently recognized that substantial assistance and knowledge work "in tandem" – "if the assistance were direct and extraordinary, then a court might more readily infer conscious participation in the underlying tort." *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 491-92 (2023) (discussing *Woods*, 765 F.2d at 1010, and *Woodward v. Metro Bank of Dallas*, 522 F.2d 84, 97 (5th Cir. 1975)).  Both Circuits also recognize that inferences of severe recklessness can satisfy an aiding and abetting claim.  *See Woods*, 765 F.2d at 1010 ("Severe recklessness [satisfies] the scienter requirement in an aiding and abetting case, at least where the alleged aider and abettor owes a duty to the defrauded party."); *First All.*, 471 F.3d at 999 ("red flags which were seemingly ignored was enough to establish actual knowledge under the California aiding and abetting standard").

    Here, Defendants' substantial assistance was direct and extraordinary.  Defendants poured over $800 million into FTX.  And Defendants do not dispute that FTX was only able to create "billions of impressions," attracting millions of unsuspecting customers to FTX because of this assistance.  ¶¶13, 293-294; *Neilson*, 290 F. Supp. 2d at 1129 (banks provided "access to large sums of money that kept [Ponzi] scheme afloat for a significant period of time"); *Amparan*, 2010 WL

---

[19]   Defendants' reliance on *Barrett v. Apple Inc.*, 523 F. Supp. 3d 1132, 1148 (N.D. Cal. 2021) is misplaced because unlike here it concerns inaction, which "requires a different analysis of knowledge." *Perlman v. Bank of Am., N.A.*, 2011 WL 13108060, at *7 (S.D. Fla. Dec. 22, 2011). Likewise, *Ct. Appointed Receiver of Lancer Offshore, Inc. v. Citco Grp. Ltd.*, 2008 WL 926513, at *5 (S.D. Fla. Mar. 31, 2008), and *Groom v. Bank of Am.*, 2012 WL 50250, at *2 (M.D. Fla. Jan. 9, 2012), concern a standard for a breach of fiduciary duty claim, which is not raised in here.  And even then, California and Florida courts reject a duty requirement. *Neilson*, 290 F. Supp. 2d at 1133 ("No California case, however, holds that a party must owe the plaintiff a duty before he or she can be held liable as an aider and abettor."); *Perlman*, 2011 WL 13108060, at *9 ("Nowhere in these elements does a requirement that the alleged abettor owe a duty of disclosure appear.").

3743953, at *5 ("Countrywide and WAMU provided Plaza with substantial assistance in marketing the fraudulent loans by providing lines of credit and guarantees . . . ."). FTX also used this money to lobby politicians and paid millions of dollars in political contributions – all "part of a branding campaign designed to make FTX appear trustworthy." ¶347; ¶¶3, 130, 296, 610.

Defendants' own misrepresentations – often coordinated with FTX – substantially assisted FTX in drawing new users. *See* §IV.B-C; *Neilson*, 290 F. Supp. 2d at 1132 ("representations to various members of the class harmed all plaintiffs because the statements allowed Slatkin to retain possession of plaintiffs' funds and continue the Ponzi scheme"); *Benson v. JPMorgan Chase Bank, N.A.*, 2010 WL 1526394, at *4 (N.D. Cal. Apr. 15, 2010) (substantial assistance where bank "gave a false sense of legitimacy to the illicit activities").[20] Indeed, Defendants helped funnel users to FTX by providing links directly to FTX. *See Ray v. BlueHippo Funding, LLC*, 2008 WL 1995113, at *4 (N.D. Cal. May 6, 2008) (direct links gave "'an aura of respectability and further encouraged participation'"). Thoma Bravo, for example, told viewers to only trade bitcoin with FTX. ¶361.

Defendants also provided concrete support and advice to FTX. *EcoHub, LLC, v. Recology Inc.*, 2023 WL 6725632, at *10 (N.D. Cal. Oct. 11, 2023) ("'Advice or encouragement to act operates as a moral support to a tortfeasor and if the act encouraged is known to be tortious it has the same effect upon the liability of the adviser as participation or physical assistance.'"). Paradigm and Ribbit Capital organized the first public financing round for FTX. ¶¶376, 471. Defendants sat on FTX's Advisory Board and directly lobbied for FTX. ¶¶297-298, 339-342, 367, 384-387, 407-408,

---

[20] Defendants' contention that no Plaintiffs "saw or heard" any misleading statements (MTD at 25) is not an element of aiding and abetting. *See Neilson*, 290 F. Supp. 2d at 1133 ("[L]iability attaches because the aider and abettor behaves in a manner that enables the primary violator to commit the underlying tort."). And proximate cause arguments are factual, and thus not appropriate at this stage. *See JP Morgan Chase Bank v. Winnick*, 406 F. Supp. 2d 247, 257 (S.D.N.Y. 2005) ("Whether Armstrong's actual contribution on any given transaction was sufficient to be a proximate cause of the Banks' losses is ultimately a fact issue to be resolved after fuller development of the record[.]").

415, 429, 446-449, 479-483; *SEC v. Spartan Sec. Grp., LTD*, 2019 WL 2372277, at *6 (M.D. Fla. June 5, 2019) ("allegations that Lopez approved responses to FINRA deficiency letters without familiarizing himself with the companies despite numerous red flags are sufficient to establish Lopez's substantial assistance"); *Emess Cap.*, 2011 WL 13214308, at *7 (vouching for legitimacy of transactions, making false statements, and providing misleading documents to third party constituted substantial assistance). SkyBridge, with its roots in Wall Street, played a role as "a bridge to people that are in traditional finance." ¶412.

Certain Defendants participated in FTX's fraud and conversion by taking receipt of at least $814 million of commingled customer funds – surpassing Defendants' entire investment in FTX. ¶¶39, 312, 519, 613-615, 619, 623; *see SEC v. Arbitrade Ltd.*, 2023 WL 2785015, at *10 (S.D. Fla. Apr. 5, 2023) ("The allegation that he converted and redistributed the Defendants' Bitcoin proceeds suffices to support the inference that he played a 'substantial causal factor' in the Defendants' scheme."); *Perlman*, 2011 WL 13108060, at *8 ("[A]llegations of atypical transactions are sufficient to create an inference of knowledge that can withstand a motion to dismiss."); *Neilson*, 290 F. Supp. 2d at 1127-28 ("financial gain [is] evidence that the aider and abettor knew of and substantially assisted the primary violator"); *Cabot E. Broward 2 LLC v. Cabot*, 2016 WL 8739579, at *4 (S.D. Fla. Oct. 25, 2016) ("self-motivated financial reason for the substantial assistance" lends "plausibility to the allegations of substantial assistance").

Defendants do not deny that they "supported [FTX's] business," but argue that this does not amount to aiding conversion and fraud. MTD at 24. This argument contradicts Defendants' own statements. *Compare* MTD at 12 *with* ¶330 ("we're not just passive money"). But most importantly, "[i]n a situation where a company's whole business is built like a house of cards on a fraudulent enterprise, this is a distinction without a difference." *First All.*, 471 F.3d at 995; *SEC v.*

- 29 -

*Quiros*, 2016 WL 11578637, at *15 (S.D. Fla. Nov. 21, 2016) ("'Substantial assistance' can be proved by demonstrating the accused aider and abetter associated himself with the venture, participated in the venture 'as something that he wished to bring about,' and sought to make the venture succeed."). Accordingly, Plaintiffs have adequately alleged Defendants aided and abetted FTX's fraud.

### E.      Conspiracy Is Sufficiently Alleged

Plaintiffs allege multiple overt acts of conspiracy which Defendants do not challenge. Instead, Defendants only claim that there are no specific facts to support that Defendants "agreed to further FTX's fraudulent scheme. . . ." MTD at 25-26.[21] But Defendants concede that conspiracy may be proven by circumstantial evidence (MTD at 23), and "an agreement may be inferred 'from the relationship of the parties, their overt acts and concert of action, and the totality of their conduct.'" *N.R. by Ragan v. Sch. Bd. of Okaloosa Cnty., Fla.*, 418 F. Supp. 3d 957, 999 (N.D. Fla. 2019); *Freeney v. Bank of Am. Corp.*, 2015 WL 12535021, at *29, *32 (C.D. Cal. Nov. 19, 2015) (same). "[A] showing that the alleged conspirators have committed acts that 'are unlikely to have been undertaken without an agreement'" are enough to infer a conspiracy. *Mendocino Env't Ctr. v. Mendocino Cnty.*, 192 F.3d 1283, 1301 (9th Cir. 1999); *Valderrama v. Rousseau*, 2012 WL 12925174, at *7 (S.D. Fla. Sept. 18, 2012) (same).

Here, Defendants' and FTX's coordinated and planned acts could not have occurred without an agreement, including coordinated announcements after their investments, simultaneous

---

[21]   The elements for conspiracy in Florida are "(a) an agreement between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff as a result of the acts done under the conspiracy." *Abbott*, 561 F. App'x at 886. In California they are: "(1) the formation and operation of the conspiracy, (2) wrongful conduct in furtherance of the conspiracy, and (3) damages arising from the wrongful conduct." *United Motors Int'l, Inc. v. Hartwick*, 2017 WL 888304, at *10 (C.D. Cal. Mar. 6, 2017).

appearances on sponsored conferences and podcasts, and coordinated letters to the CFTC.  *See supra* at 5, 7-9, 26-29.  In addition, FTX also owned 30% of SkyBridge.  ¶423.  Multicoin Capital had an intimate relationship with FTX, led FTX investments like SBF's Solana (¶¶437, 547), and received inside information from FTX US's President (¶444).  Such allegations sufficiently allege a conspiracy.  *Freeney*, 2015 WL 12535021, at *29, *32 (close relationship, financial assistance, representation of co-conspirator in legal matters, misrepresentations, showed "'concurrence and knowledge'"); *Hartwick*, 2017 WL 888304, at *10 (finding allegations concerning individuals in the conspiracy, motive, acts directed at Plaintiffs, and intent of defendants were enough to show "formation and operation" of a conspiracy).

**F.**   **Plaintiffs Allege Plausible Violations of California's UCL and FAL**

Plaintiffs adequately plead that Defendants violated both California's Unfair Competition Law ("UCL") and False Advertising Law ("FAL") by engaging in promoting, advertising, and encouraging "investing" with FTX.

**1.**   **Plaintiffs Sufficiently Plead a Basis for Equitable Relief**

Under the UCL, monetary relief is available in the form of restitution specifically because courts can "make such orders or judgments . . . as may be necessary to restore to any person in interest any money or property."  Cal. Bus. & Prof. Code §17203; *see Bank of the W. v. Super. Ct. Contra Cnty.*, 833 P.2d 545 (Cal. 1992).  Here, Plaintiffs "seek an order for the restitution" of money and property (digital assets) lost because such "assets remain missing or unable to be accessed." ¶¶15, 649, 655.  Unlike Defendants' contention, Plaintiffs undoubtedly have standing because the loss is money and property from Defendants' misconduct, not from the decrease in value of their cryptocurrency, as Defendants claim.  *See* Cal. Bus. & Profs. Code §17204; *Kwikset Corp. v. Super. Ct. Orange Cnty.*, 246 P.3d 877, 885 (Cal. 2011) ("There are innumerable ways in which economic

- 31 -

injury from unfair competition may be shown," including "a present or future property interest diminished" and being "deprived of money or property.").

Also as Defendants mistakenly argue, "[a] defendant can be liable for restitution under the UCL even if it is not the direct recipient of a plaintiff's misappropriated funds," since "'[t]he "UCL only requires that the plaintiff must once have had an ownership interest in the money or property acquired by the defendant through unlawful means."'" *City & Cnty. of S.F. v. Purdue Pharma L.P.*, 491 F. Supp. 3d 610, 695 (N.D. Cal. 2020); MTD at 32.  Because Defendants' "financial success necessarily relie[d]" on increased investments and deposits into FTX (¶¶613-615), "the UCL permits restitution as a remedy for indirectly misappropriated funds." *Id.*

Lastly, absent the injunctive relief Plaintiffs seek, the harm from Defendants' public praise of companies Defendants invest in could be repeated and even more disastrous.  Defendants' standing argument is clearly erroneous because "a plaintiff who had been injured would always be deemed to avoid the cause of the injury thereafter . . . and would never have Article III standing." *Larsen v. Trader Joe's Co.*, 2012 WL 5458396, at *3-*4 (N.D. Cal. June 14, 2012).[22]

### 2.  Plaintiffs Sufficiently Plead Reliance and Causation Under the UCL and FAL

As discussed above, and contrary to Defendants' conclusory arguments (MTD at 32-33), Plaintiffs have sufficiently alleged that their reliance on Defendants' misrepresentations were "plausible." *Moore*, 966 F.3d at 1021; *see* §IV.B.4.; *see In re Tobacco II Cases*, 207 P.3d 20, 40 (Cal. 2009) ("the plaintiff is not required to allege that those misrepresentations were the sole or even the decisive cause of the injury-producing conduct").  Likewise, Plaintiffs have satisfied the

---

[22]  Unlike *In re Outlaw Lab'y, LLP*, 463 F. Supp. 3d 1068, 1087 (S.D. Cal. 2020), the relief sought is not against defendants who failed "'to investigate the truth of statements made by others,'" but rather Defendants here are the makers of false and misleading statements.  Even *Outlaw* holds, an injunction "would seem permissible and adequately pled" in such a case.  *Id.* at 1088.

"causation" requirement alleging that their injuries were attributable to Defendants' misconduct. ¶¶16-31, 616-621. Nothing more is required. *Ivie v. Kraft Foods Glob., Inc.*, 961 F. Supp. 2d 1033, 1046 (N.D. Cal. 2013).[23]

### 3.      Defendants Misapply the Elements of a UCL Claim

Under the UCL, fraudulent deception is not required to be "'actually false, known to be false[, or] reasonably relied upon by a victim.'" *In re Tobacco II*, 207 P.3d at 29. Defendants make no argument as to **the UCL's "fraudulent prong"** (*see* MTD at 31-35), which only requires showing "'that members of the public are likely to be deceived by the practice.'" *Friedman v. AARP, Inc.*, 855 F.3d 1047, 1055 (9th Cir. 2017). Accordingly, Plaintiffs' allegations that Defendants' statements were misleading under the UCL are unchallenged and should proceed. ¶651.

**The UCL's "Unlawful" Prong**. Defendants' only argument is that Plaintiffs have failed to allege a predicate violation. MTD at 33-34. Accordingly, if the Court finds that any other violation has been alleged, this prong has been met. *See MacDonald v. Ford Motor Co.*, 37 F. Supp. 3d 1087, 1097 (N.D. Cal. 2014) ("'[V]irtually any state, federal or local law can serve as the predicate for an action under section 17200.'").

**The UCL's "Unfair" Prong**. "'[A] practice may be deemed unfair even if not specifically proscribed by some other law.'" *Blain v. Liberty Mut. Fire Ins. Co.*, 2023 WL 2436003, at *10 (S.D. Cal. Mar. 9, 2023). Defendants, without any authority, insert a knowledge element. MTD at 35. But the "balancing" test "'weigh[s] the utility of the defendant's conduct against the gravity of the harm to the alleged victim'" – it does not look to the knowledge of the defendant. *In re Anthem, Inc.*

---

[23]   Defendants' reference to *Body Jewelz*, 241 F. Supp. 3d at 1091 is incongruous. There, the defendants' statements were made ***after*** the "crash" (data breach) at issue, whereas here, Defendants' statements were made prior to the FTX crash and, in fact, were aimed at inducing Plaintiffs to make deposits in FTX.

- 33 -

*Data Breach Litig.*, 162 F. Supp. 3d 953, 990 (N.D. Cal. 2016) ("None of the three tests for unfairness require plaintiffs to plead that defendants acted in an immoral, unethical, oppressive, or unscrupulous manner."); *Kowalsky v. Hewlett-Packard Co.*, 2011 WL 3501715, at *8 (N.D. Cal. Aug. 10, 2011). Defendants tried to enrich themselves – no public utility – when the harm alleged is worth billions. Further, for example, negligent conduct or the sale of unregistered securities does not require knowing the underlying fraud. Plaintiffs also meet the "tethering test," which "simply requires the allegedly unfair conduct 'be tethered to some legislatively declared policy.'" *Blain*, 2023 WL 2436003, at *12. It is enough for Plaintiffs to allege, as they do in the Complaint, that Defendants violated specific statutes and engaged in conduct that is a public harm. *Ogdon v. Grand Canyon Univ. Inc.*, 2023 WL 5054644, at *7 (D. Ariz. Aug. 8, 2023); *Gonzalez v. Tr.*, 2015 WL 12081028, at *3 (S.D. Cal. Sept. 28, 2015). Lastly, the argument that overlapping claims must fail is entirely unsupported. MTD at 34.[24]

### G.   Plaintiffs' FDUTPA Claims Should Proceed

#### 1.   Plaintiffs' FDUTPA Claims Are Pleaded with Particularity

Under Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA"), to state a claim, Plaintiffs must plead: "(1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." *See Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 983 (11th Cir. 2016). Plaintiffs' allegations with respect to the FDUTPA claim are sufficient for the same reasons that they are sufficient for their common law misrepresentation claims, as discussed above. *See* §IV.B-C.

Defendants' strategy of "see what sticks" does not undermine the facts alleged in the Complaint. Defendants argue that Plaintiffs' FDUTPA claim is not pled with particularity as

---

[24]   Defendants' cases were dismissed simply because they did not meet the "specificity required under Rule 9(b)." *In re Actimmune Mktg. Litig.*, 2009 WL 3740648, at *14 (N.D. Cal. Nov. 6, 2009); *Hadley v. Kellogg Sales Co.*, 243 F. Supp. 3d 1074, 1090 (N.D. Cal. 2017) (same).

required by Rule 9(b) (MTD at 35), but this merely concedes that Plaintiffs' FDUTPA claim rests on the same facts as Plaintiffs' intentional and negligent misrepresentation claims.  Likewise, Defendants' repeating that their statements were not misleading does not make it so.  MTD at 35-36. For example, Defendants cannot credibly argue a statement from Thoma Bravo, one of the world's largest institutional software investors (¶33), to only trade bitcoin on FTX (¶361) and FTX had rigorous operations (¶369) "was [not] likely to mislead consumers" to deposit and transact digital assets with FTX.  MTD at 36.  However, notably, Defendants' arguments that their statements were not misleading are dependent on denial of the knowledge element, when "[a] review of the statute, as interpreted by the Florida Supreme Court, makes clear that knowledge of a deceptive act is not required to state a claim under FDUTPA."  *Lewis v. Mercedes-Benz USA, LLC*, 530 F. Supp. 3d 1183, 1232 (S.D. Fla. 2021).[25]

Defendants' argument that the Complaint alleges no "trade or commerce" is baffling.  MTD at 36-37.  Plaintiffs' decision to deposit currency with FTX in reliance on Defendants' public promotion for FTX falls squarely within the definition of "trade or commerce."  *See Williams v. Nationwide Credit, Inc.*, 890 F. Supp. 2d 1319, 1322 (S.D. Fla. 2012) ("advertisement[s are] explicitly within the definition of trade or commerce under FDUTPA") (citing Fla. Stat. §501.203(8)).  And Defendants' own broad definition of a "'thing of value, wherever situated'" certainly includes FTX and the products they highlighted.  MTD at 36; ¶¶325, 338, 381, 383, 402, 440, 442.

For causation, FDUTPA requires that "'a plaintiff must simply [allege] that "the alleged practice was likely to deceive a consumer acting reasonably in the same circumstances."'"  *Frayman*

---

[25]  Defendants claim that Altimeter did not make statements is incorrect.  *See* ¶¶496-500.  And Tiger Global's consent to be named is actionable, as deception is more broadly defined than just statements.  *Zlotnick v. Premier Sales Grp., Inc.*, 480 F.3d 1281, 1284 (11th Cir. 2007).

*v. Douglas Elliman Realty, LLC*, 515 F. Supp. 3d 1262, 1280 (S.D. Fla. 2021). Plaintiffs' Complaint

alleges that Defendants' conduct was objectively deceptive to a reasonable consumer, as discussed

above. And "it is sufficient to allege that a party directly participated in a violation of the FDUTPA,

even if that violation was initiated by another." *Galstaldi v. Sunvest Cmtys. USA, LLC*, 637 F. Supp.

2d 1045, 1056 (S.D. Fla. 2009); *see Sundance Apartments I, Inc. v. Gen. Elec. Cap. Corp.*, 581 F.

Supp. 2d 1215, 1221 (S.D. Fla. 2008). Even still, it is hard to see how Thoma Bravo's statement

above, for example, is "too remote and speculative to show causation." MTD at 37.[26]

Lastly, "whether the FDUTPA applies to Defendants requires an inquiry into the Court's

personal jurisdiction over them," not whether the transaction in question occurred in Florida or

whether the defrauded consumer resided in Florida. *Barnext Offshore, Ltd. v. Ferretti Grp. USA,*

*Inc.*, 2012 WL 1570057, at *6 (S.D. Fla. May 2, 2012).[27] Plaintiffs plead significant "material ties to

Florida," including that FTX was headquartered in Florida, many promotional campaigns for FTX

took place in Florida, "all offers of the FTX Platform, YBAs, and/or FTT to Plaintiffs . . . were made

by FTX from their principal place of business in Miami, Florida." ¶¶272-292, 632. And multiple

Defendants have offices in Florida. ¶¶35, 37, 40. As such, under FDUTPA, the time to make this

argument is in conjunction with a Rule 12(b)(2) motion, not here. *Id.*

### H.    Plaintiffs Adequately State Claims Under FSIPA

Under Florida Statute §517.211, two categories of persons can be held liable for a sale:

---

[26]   *Fla. Emergency Physicians Kang & Assocs., M.D., Inc. v. United Healthcare of Fla., Inc.*, 526 F. Supp. 3d 1282, 1301 (S.D. Fla. 2021) is inapposite because the injury there was alleged to be from defendants setting reimbursements rates below what was required by Florida law, but the court found that defendants in fact did not set the rates. Where here Defendants are alleged to be the ones making the statements, and Defendants do not argue otherwise.

[27]   Defendants' authority does not stand for the proposition that unfair practices must have occurred in Florida. *Millennium Commc'ns & Fulfillment, Inc. v. Off. of Att'y Gen., Dep't of Legal Affs., State of Fla.*, 761 So. 2d 1256, 1262 (Fla. 3d DCA 2000) ("there are no geographical or residential restrictions contained in the express language of section 501.202").

(1) The person who directly makes the sale of the security; and (2) "[E]very director, officer, partner, or agent of or for the . . . seller, if the director, officer, partner, or agent has personally participated or aided in making the sale." *Id.*  Plaintiffs have adequately alleged that Defendants are liable as "director[s], officer[s], partner[s], or agent[s]" under Florida law. ¶692.  Plaintiffs have pleaded that Defendants worked closely with FTX by forming partnerships, taking positions on FTX's Advisory Board, and engaging in cross-partnerships.  ¶14.  *See generally id.*, ¶¶293-531 (alleging myriad ways in which Defendants worked jointly with FTX to promote the platform, its offerings and further sales).  Further, as agents of FTX, Defendants provided "material assistance" critical to the fraud that FTX perpetrated, including through the sale of the YBAs and FTX's native coin FTT.  ¶¶666, 691, 694; *see* §§IV.D.-E.  Defendants were not the passive investors or third-party service providers like the ones in their cited case law.  *See* MTD at 29-30.

Defendants' own authorities show Plaintiffs need not allege privity with Defendants to establish liability. *J.P. Morgan Sec., LLC v. Geveran Invs. Ltd.*, 224 So. 3d 316, 328 (Fla. 5th DCA 2017) ("Section 517.211, by its plain language, extends liability to '***every*** director, officer, partner ***or agent*** of or for the purchaser or seller.'  ***Such parties would not necessarily be in privity of contract with the buyer or seller in a strict sense***."); *In re Sahlen & Assocs., Inc. Sec. Litig.*, 773 F. Supp. 342, 372 (S.D. Fla. 1991) ("[B]y the express language of the statute itself, it is clear that an officer, director or agent not otherwise in strict contractual privity with the plaintiff-purchaser may be found liable for fraudulent conduct under § 517.301."); *Arthur Young & Co. v. Mariner Corp.*, 630 So. 2d 1199, 1205 (Fla. 4th DCA 1994) (finding "in this section of the statute 'agent' is used in its ordinarily understood sense of representation of a principal, rather than its narrower statutory definition").

Plaintiffs have also adequately alleged that Defendants "personally participated or aided" in

the selling of unregistered securities under the Florida Securities and Investor Protection Act ("FSIPA").[28]  As discussed *supra*, Defendants: (i) invested into FTX's entities; (ii) partnered with FTX; (iii) touted to regulators the purported safety and legitimacy of FTX after conducting due diligence; and (iv) encouraged unsuspecting investors to give their money to FTX.  ¶¶317-347, 352-372, 376-393, 402-434, 439-454, 459-464, 471-488, 494-501, 506-531.  Defendants were not passive investors, but took active roles in providing false and misleading information designed to promote and further the sale of unregistered securities.  These actions distinguish Defendants from those in their cited authority.[29]  Regardless, whether Defendants had "sufficient participation" to be liable under §§517.301 and 517.211, "is a question of fact to be determined at trial or earlier summary proceedings."  *Sahlen & Assocs.*, 773 F. Supp. at 372.

Plaintiffs have also alleged that Defendants participated or aided in the sale of unregistered securities in Florida.  ¶392; ¶¶45, 121, 361.  Defendants' arguments to the contrary are not convincing.

## I.       Plaintiffs Adequately State Claims Under Cal. Corp. Code §25504.1

Plaintiffs allege that Defendants materially assisted FTX in selling unregistered securities and making false and misleading statements in selling securities in violation of California law.  ¶¶663-669.  Defendants challenge three aspects of this claim which all fail.  MTD at 26-28.  ***First***, Defendants incorrectly claim that "actual knowledge" must be plead with "particularity."  MTD at

---

[28]   Although Defendants cite *Dillon v. Axxsys Int'l, Inc.*, for the proposition that liability requires one to "personally participate[] in the sale of unregistered securities," that same case makes clear that one can be liable for "'aid[ing]' in making the sale of . . . unregistered securities."  185 F. App'x 823, 826 (11th Cir. 2006) ("plaintiffs failed to introduce any evidence that demonstrated that [defendant] personally participated ***or aided*** in any of this solicitation"), *id.* at 828.

[29]   *Clement v. Lipson*, 999 So. 2d 1072, 1076 (Fla. 5th DCA 2008) (defendants filed sworn affidavits stating they "did not personally make any statements or representations to any potential investor or customer regarding" and "did not participate in the development, marketing, promotion, advertisement" of the unregistered securities); *Dillon v. Axxsys Int'l, Inc.*, 385 F. Supp. 2d 1307, 1311 (M.D. Fla. 2005), *aff'd*, 185 F. App'x 823 (11th Cir. 2006) (defendant's mere "presence at [a] dinner with [investor]" did not "create[] an 'essential link in the sale'").

27; *Abdo v. Fitzsimmons*, 2018 WL 11220494, at *25 (N.D. Cal. May 22, 2018) (pleading "California securities fraud claims" is the same as "Rule 9(b)'s particularity requirement"); *see* §§IV.A., IV.B.3. **Second**, Defendants contend that they did not materially assist FTX, but ignore the substantial assistance discussed above. *See* §IV.D. Defendants also promoted FTX's products where "yield" was earned (*i.e.*, the sale of unregistered securities). ¶¶210-211, 532; *see also* ¶¶319, 321, 338, 341-342, 378, 381, 383-385, 402, 417-418, 430, 479, 481-482 (promoting FTX's products); *Apollo Cap. Fund, LLC v. Roth Cap. Partners, LLC*, 70 Cal. Rptr. 3d 199, 224 (Cal. Ct. App. 2007) ("Roth materially assisted eNucleus in selling the bridge notes by false or misleading statements"); *Markowitz v. Diversified Lending Grp., Inc.*, 2010 WL 11507662, at *4 (C.D. Cal. Feb. 26, 2010) (false statements and sending the sellers' false statements constituted material assistance). **Third**, an "offer or sale" of a security under California law is "an offer to sell is made in this state, or an offer to buy is accepted in this state, or (if both the seller and the purchaser are domiciled in this state) the security is delivered to the purchaser in this state." Cal. Corp. Code §25008(a). And advertisements on websites and links to FTX constitute offers. *Zakinov v. Ripple Labs, Inc.*, 2020 WL 922815, at *16 (N.D. Cal. Feb. 26, 2020)). Certain Plaintiffs and Defendants are California residents, FTX had addresses in California, FTX had advertisements in California, and FTX and certain Defendants directed consumers to the FTX platform in California. ¶¶17-18, 32, 34, 38, 40, 113, 293, 508, 667.

## V.     PLAINTIFFS' DECLARATORY JUDGMENT CLAIM IS NOT DUPLICATIVE OF PLAINTIFFS' OTHER CLAIMS

Plaintiffs' declaratory judgment claim is not duplicative of Plaintiffs' other claims (MTD at 38) because the Declaratory Judgement Act applies "'***whether or not*** further relief is or could be sought.'" *Rosado v. eBay Inc.*, 53 F. Supp. 3d 1256, 1268 (N.D. Cal. 2014); *I.B. ex rel. Fife v. Facebook, Inc.*, 905 F. Supp 2d 989, 1006 (N.D. Cal. 2012) ("'The existence of another adequate

remedy does not preclude a declaratory judgment that is otherwise appropriate.'"). In addition, the Court has discretion to declare that Defendants' deceptive practices were wrongful to protect consumers from future harm. *In re Adobe Sys., Inc. Priv. Litig.*, 66 F. Supp. 3d 1197, 1222 (N.D. Cal. 2014); *Rosado*, 53 F. Supp. 3d at 1268.

## VI.      CONCLUSION

For the above reasons, the Motion to Dismiss should be denied in its entirety.

## VII.      LEAVE TO AMEND

Contrary to Defendants' one-sided claim, Plaintiffs cannot cure any deficiencies without the Court's input. MTD at 40. Accordingly, if the motion is granted in whole or in part, Plaintiffs respectfully request leave to amend. Fed. R. Civ. P. 15(a)(2); *In re Sunterra Corp. Sec. Litig.*, 199 F. Supp. 2d 1308, 1339 (M.D. Fla. 2002).

## VIII.      REQUEST FOR HEARING

Plaintiffs request a hearing on the Motion to Dismiss in order to provide the Court with additional details and respond to any questions the Court might have.

Respectfully submitted on November 6, 2023

| PLAINTIFFS' CO-LEAD COUNSEL | |
|---|---|
| By:  /s/ *Adam Moskowitz* | By:  /s/ *David Boies* |
| Adam M. Moskowitz (FL Bar No. 984280)<br>Joseph M. Kaye (FL Bar No. 117520)<br>**THE MOSKOWITZ LAW FIRM, PLLC**<br>Continental Plaza<br>3250 Mary Street, Suite 202<br>Coconut Grove, FL  33133<br>Office:  (305) 740-1423<br>adam@moskowitz-law.com<br>joseph@moskowitz-law.com<br>service@moskowitz-law.com | David Boies<br>Alex Boies<br>Brooke Alexander<br>**BOIES SCHILLER FLEXNER LLP**<br>333 Main Street<br>Armonk, NY  10504<br>Office:  (914) 749-8200<br>dboies@bsfllp.com<br>aboies@bsfllp.com<br>balexander@bsfllp.com |

- 40 -

| DOMESTIC VENTURE CAPITAL FUNDS' COMMITTEE MEMBERS | |
|---|---|
| Stuart A. Davidson<br>Anny M. Martin<br>Eric I. Niehaus<br>Brian E. Cochran<br>Patton L. Johnson<br>Kenneth P. Dolitsky<br>Joseph J. Tull<br>Shawn A. Williams<br>Hadiya K. Deshmukh<br>**ROBBINS GELLER RUDMAN & DOWD LLP**<br>225 NE Mizner Boulevard, Suite 720<br>Boca Raton, FL  33432<br>Office:  (561) 750-3000<br>Fax:  (561) 750-3364<br>sdavidson@rgrdlaw.com<br>amartin@rgrdlaw.com<br>ericn@rgrdlaw.com<br>bcochran@rgrdlaw.com<br>pjohnson@rgrdlaw.com<br>kdolitsky@rgrdlaw.com<br>jtull@rgrdlaw.com<br>shawnw@rgrdlaw.com<br>hdeshmukh@rgrdlaw.com | John C. Herman<br>Candace Smith<br>**HERMAN JONES LLP**<br>3424 Peachtree Road NE, Suite 1650<br>Atlanta, GA  30326<br>Office:  (404) 504-6555<br>Fax:  (404) 504-6501<br>jherman@hermanjones.com<br>csmith@hermanjones.com |

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was filed on November 6, 2023, via the Court's CM/ECF system, which will send notification of such filing to all attorneys of record.

By:  /s/ *Adam M. Moskowitz*
ADAM M. MOSKOWITZ

4891-6130-7789.v1