# Exhibit A

2024 WL 1199679
Only the Westlaw citation is currently available.
United States District Court, S.D. California.

Soham BHATIA, on behalf of himself and
all others similarly situated; et al., Plaintiffs,

v.

SILVERGATE BANK, et al., Defendants.

Case No.: 3:23-cv-01406-RBM-BLM
|
Signed March 20, 2024

**Attorneys and Law Firms**

Jason Kellogg, Victoria J. Wilson and Marcelo Diaz-Cortes of Levine Kellogg Lehman Schneider + Grossman LLP in Miami, Florida; Daniel C. Girard, Adam Polk and Tom Watts of Girard Sharp LLP in San Francisco; Jack Fitzgerald, Paul K. Joseph, Melanie Persinger, Trevor M. Flynn and Caroline S. Emhardt of Fitzgerald Joseph LLP in San Diego, California; Timothy G. Blood, Thomas J. O'Reardon and James M. Davis of Blood Hurst & O'Reardon, LLP in San Diego, California; Michael J. Reiser, Matthew Reiser and Isabella Martinez of Reiser Law, p.c. in Walnut Creek, California; and Jason S. Hartley and Jason M. Lindner of Hartley LLP in San Diego, California, represented putative class Plaintiff, Soham Bhatia.

Polly Towill, Heather Lynn Plocky and Madalyn Annabel Macarr of Sheppard Mullin Richter and Hampton LLC in Los Angeles, California, represented Defendants, Silvergate Bank, Silvergate Capital Corporation and Alan J. Lane.

**ORDER DENYING DEFENDANTS'
MOTION TO DISMISS**

RUTH BERMUDEZ MONTENEGRO, UNITED STATES DISTRICT JUDGE

**\*1** On February 14, 2023, Plaintiff Soham Bhatia, on behalf of himself and others similarly situated, filed a Class Action Complaint against Defendants Silvergate Capital Corporation ("Silvergate Capital"), Silvergate Bank, and Alan J. Lane ("Lane") (collectively, "Defendants"). (Doc. 1.) On May 19, 2023, Plaintiffs Joewy Gonzalez, Nicole Keane, Matson Magleby, and Golam Sakline, on behalf of themselves and all others similarly situated, (collectively, "Plaintiffs") filed

this Consolidated First Amended Class Action Complaint ("FAC") against Defendants. [1] (Doc. 14.)

In their FAC, Plaintiffs allege six causes of action: (1) aiding and abetting fraud against all Defendants (Count 1); (2) aiding and abetting breach of fiduciary duty against all Defendants (Count 2); (3) unjust enrichment against the Silvergate Defendants (Count 3); (4) aiding and abetting conversion against all Defendants (Count 4); (5) violations of California's Unfair Competition Law ("UCL"), California Business and Professions Code § 17200, et seq., against all Defendants (Count 5); and (6) negligence against all Defendants (Count 6). (FAC ¶¶ 214–247.)

On June 19, 2023, Defendants filed a Motion to Dismiss Plaintiffs' Consolidated Class Action Complaint, or, in the Alternative, to Transfer Venue ("Motion to Dismiss"). [2] (Doc. 16.) On July 3, 2023, Plaintiffs filed an opposition to Defendants' Motion to Dismiss ("Opposition"). (Doc. 17.) On July 10, 2023, Defendants filed a reply brief ("Reply"). (Doc. 18.)

The Court finds this matter suitable for determination without oral argument pursuant to Civil Local Rule 7.1(d)(1). For the reasons set forth below, Defendants' Motion is **DENIED**.

**I. FACTUAL BACKGROUND** [3]

**A. The Cryptocurrency Industry**
"Cryptocurrency ['crypto'] is a form of digital currency that first came to prominence in 2008.... It is contrasted with fiat currency, which is issued by a government as legal tender." (FAC ¶ 30.) The primary way people buy crypto is through crypto exchanges. (Id. ¶ 35.) Crypto exchanges are companies that accept regular currency in exchange for crypto. (Id.) "In other words, a customer wires an amount of money to a [crypto] exchange, and the [crypto] exchange provides a way to obtain title to a corresponding amount of crypto[ ] (a process known as 'on-ramping')." (Id.) FTX was a crypto exchange. (Id.)

**\*2** "The crypto[ ] market has been a hotbed of crime and scam artists." (Id. ¶ 41.) "On February 24, 2022, the Government Accountability Office reported, '[d]rug and human traffickers use virtual currency and peer-to-peer mobile payments because transactions are somewhat anonymous, making detection more difficult.' " (Id.)

## B. Silvergate Goes "All In" on Crypto

Silvergate was founded in 1988 as a small industrial loan company providing traditional financial services with three branches in Southern California. (*Id.* ¶ 42.) "[Silvergate] 'began exploring the digital currency industry in 2013 based on market dynamics' that it 'believed were highly attractive[.]' " (*Id.*)

Silvergate's CEO, Lane, personally directed Silvergate to move into the burgeoning crypto industry. (*Id.* ¶ 44.) In an interview, "Lane explained that Silvergate's entrance into crypto[ ] was catalyzed by the need to grow deposits in order to fund its lending activities." (*Id.* ¶ 46.) Lane stated, "I was reading that there were companies that were being formed to provide infrastructure to this new thing called Bitcoin .... And so I learned that there were companies that were raising venture money, so they had deposits. They wanted to put them in a bank—Silvergate's a bank—and they were getting kicked out of their banks .... Obviously there was a reason that they were getting kicked out, and it was the perception of risk." (*Id.*) Lane has stated "[w]hat I saw was an opportunity to bank these companies that were essentially being de-risked from other banks." (*Id.* ¶ 44.)

"[T]o this day, the great majority of banks will not service [the crypto industry due to its risks." (*Id.* ¶ 44.) In an interview, Lane explained that one of the reasons that crypto companies were perceived as risky was "because of the whole concern about anti-money laundering, [Bank Secrecy Act]" and the "[b]ig concern that the primary use case for Bitcoin at the time was for nefarious activity[.]" (*Id.* ¶ 47.) "Despite knowing the significant risks associated with providing banking services to crypto firms, Silvergate rapidly became a crypto[ ]-focused bank." (*Id.* ¶ 48.)

According to an analyst report issued shortly before Silvergate went public, "by 2018, '[t]he majority of Silvergate's funding [came] from noninterest-bearing deposits associated with clients in the digital currency industry.' " (*Id.*) After going public, "[f]rom 2020 to 2021, [Silvergate's] deposits from crypto exchanges, miners, custodians, and the like increased fivefold from $2 billion to $10 billion[,]" and "Silvergate's share price rose from $12 per share to $200 per share[.]" (*Id.* ¶ 53.) "By 2022, Silvergate had $11.9 billion in deposits and over 1,600 crypto clients[.]" (*Id.* ¶ 54.) As Lane put it, Silvergate was "all in" on crypto. (*Id.* ¶ 50.)

## C. Silvergate's Banking Obligations

As a bank, Silvergate is obligated to comply with the Bank Secrecy Act ("BSA"), 31 U.S.C. § 5311 *et seq.*, including other regulations broadening the BSA's anti-money laundering provisions. (*Id.* ¶ 16.) Under the BSA and its implementing regulations, Silvergate is required to "develop, implement, and maintain an effective Anti-Money Laundering (AML) program that is reasonably designed to prevent the bank from being used to facilitate money laundering and terrorist activities." (*Id.* ¶ 17 (citing 31 U.S.C. § 5318(h)(1) and 31 C.F.R. § 1020.210(a)).)

**\*3** "The AML program must include: (a) assessing the money laundering risk presented by any foreign financial institution correspondent account (which includes Alameda and FTX accounts ...) based on, among other things, its business and the markets it serves, its anticipated activity, and the nature and duration of its relationship with the bank; and (b) applying risk-based procedures and controls designed to detect money laundering activity, including through a periodic review of account activity sufficient to determine its consistency with expected activity." (*Id.* ¶ 18.) "Silvergate's AML program must also include, among other things: [a]ppropriate risk-based procedures for conducting ongoing customer due diligence, to include, but not be limited to: (A) [u]nderstanding the nature and purpose of customer relationships for the purpose of developing a customer risk profile; and (B) [c]onducting ongoing monitoring to identify and report suspicious transactions and, on a risk basis, to maintain and update customer information[.]" (*Id.* ¶ 21.)

Silvergate must also maintain a due diligence program designed to ensure, at a minimum, Silvergate takes reasonable steps to: "(1) [a]scertain the identity of all nominal and beneficial owners of a private banking account ... (3) [a]scertain the source(s) of funds deposited into a private banking account and the purpose and expected use of the account; and (4) [r]eview the activity of the account to ensure that it is consistent with the information obtained about the client's source of funds, and with the stated purpose and expected use of the account, as needed to guard against money laundering, and to report, in accordance with applicable law and regulation, any known or suspected money laundering or suspicious activity conducted to, from, or through a private banking account." (*Id.* ¶ 19.) Banks also search the internet, databases, press accounts, social media, litigations filings, government enforcement orders, and more for negative information about their customers. (*Id.* ¶ 20.)

"Silvergate must maintain procedures that allow it to 'form a reasonable belief that it knows the true identity of each customer.' ... Customer due diligence programs must be tailored to the risk presented by particular customers, such that the higher the risk presented, the more attention is paid. Where a customer is determined to be high risk, the anti-money laundering guidelines direct federally regulated banks like Silvergate to gather additional information about the customer and its accounts, including determining the: (1) reasons for the account; (2) source of funds; (3) proximity of customer's residence to the bank; and (4) explanations for changes in account activity." (*Id.* ¶ 25.) "Moreover, Silvergate and its personnel must identify and take appropriate action once on notice of any money-laundering 'red flags' set forth in the FFIEC [Federal Financial Institutions Examination Council] Manual." (*Id.* ¶¶ 24, 26.) Among these "red flags" are:

"(1) fund transfers sent in large, round dollar amounts; (2) funds transfers to or from a financial institution located in a higher risk jurisdiction distant from the customer's operations; (3) frequent involvement of multiple jurisdictions or beneficiaries located in higher-risk offshore financial centers; (4) repetitive or unusual funds transfer activity; (5) funds transfers sent or received from the same person to or from different accounts; (6) unusual funds transfers among related accounts or among accounts that involve the same or related principals; (7) transactions inconsistent with the account holder's business; (8) customer use of a personal account for business purposes; (9) multiple accounts established in various corporate names that lack sufficient business purpose to justify the account complexities; and (10) multiple high-value payments or transfers between shell companies without a legitimate business purpose."

(*Id.*) Federal law also requires Silvergate to conduct " 'enhanced' due diligence when establishing or maintaining a correspondent account for a financial institution that operates under an offshore license (as FTX did) or is incorporated in a jurisdiction known for failing to conform with international anti-money laundering principles (as FTX was, having certain entities incorporated in the Bahamas)." (*Id.* ¶ 27.) The FFIEC Manual identifies "lending activities" and "nondeposit account services," including for nondeposit investment products, as "requiring enhanced due diligence and carrying a high risk of money laundering because they facilitate a higher degree of anonymity and involve high volumes of currency." (*Id.* ¶ 28.) When investment trading or lending services are run through a bank, the bank must "[determine]

the purpose of the account, [ascertain] the source and funding of the capital, [identify] account control persons and signatories, [scrutinize] the account holders' business operations, and [obtain] adequate explanations for account activities." (*Id.*)

**\*4** "When a bank detects improper conduct, it must take appropriate actions, up to and including closing the account." (*Id.* ¶ 29.) For example, "Silvergate's Customer Identification Program (CIP) must identify when it should close an account after detecting suspicious activity or after attempts to verify a customer's identity have failed." (*Id.*)

### D. The Silvergate Exchange Network

In 2017, Silvergate introduced the Silvergate Exchange Network ("SEN"), "a proprietary, virtually instantaneous payment network for participants in the digital currency industry" that it described in an SEC filing as instrumental to Silvergate's leadership position and growth strategy. (*Id.* ¶¶ 57, 61.) The SEN only transfers fiat currency but was designed to and did attract new customers to the crypto market by speeding up transactions involving crypto and fiat currency. (*Id.* ¶¶ 57–58.) "Before the SEN, a transaction involving both crypto[ ] and fiat currency typically was slow and burdensome [because] ... banks' traditional ways of transferring fiat currency, such as wires or ACH transfers, took hours or days to complete and closed only within traditional banking hours to allow for banking due diligence." (*Id.* ¶ 58.) "[T]he slowness of crypto/fiat transactions created other problems. For example, crypto assets fluctuate in value frequently. Transactions that made economic sense at the time they were arranged may not make sense days later, when they close." (*Id.* ¶ 59.) "This friction ... was a significant barrier for widespread adoption of crypto[ ] because, by definition, all on-ramping transactions involve both crypto[ ] and fiat currency." (*Id.* ¶ 60.)

The SEN, however, allowed SEN participants to send money instantaneously to other SEN participants at any time, in part by eliminating the due diligence time built into traditional bank transfers. (*Id.* ¶ 61.) One SEN participant could transfer fiat currency from their SEN account to another's SEN account instantaneously, which was used to facilitate the purchase of crypto in exchange for fiat currency. (*Id.* ¶¶ 61, 64.) "Though money was transferred from one SEN account to another through a traditional intrabank funds transfer enabled through Silvergate's online banking data processing system, the SEN facilitated the transfer by using its [cloud-based Application Programming Interface ("API")]

to instantly notify one accountholder when another has sent funds. ... [B]oth parties to the transaction were required to be SEN members and Silvergate bank account holders[.] ... Silvergate thereby acted as a trusted intermediary." [4] (*Id.* ¶ 62.) "[T]hree steps were required to create, authorize, and approve a SEN transfer. First, the sender was authorized as an SEN participant. Second, the receiver was validated as an SEN participant. Third, the transfer amount was confirmed to be available in the originating (sender's) account. SEN transfers were ... settled virtually instantly if all three conditions were met." (*Id.* ¶ 63.) Due in large part to the SEN platform, Silvergate became "the go-to bank for the crypto industry[,]" including "more than a dozen crypto companies that ended up under investigation, shut down, fined, or in bankruptcy ...." (*Id.* ¶¶ 61, 78.)

The SEN grew rapidly after its launch in 2018." (*Id.* ¶ 69.) "Digital currency exchanges, such as FTX, were the SEN's largest customers from the beginning, accounting for $729.9 million of the deposits on the SEN," as described in Silvergate's September 30, 2018 Registration Statement. (*Id.* ¶ 68.) Silvergate's digital currency customers increased from 244 in 2017 to 969 in 2020. (*Id.* ¶ 71.) Much of this growth is attributable to the SEN. (*Id.*) "From the fourth quarter of 2018 to the fourth quarter of 2019, volume on the SEN increased 150% to 14,400 transactions, representing $9.6 billion." (*Id.* ¶ 69.) "Annual SEN transactions grew from $32.7 billion in 2019 to $787.4 billion in 2021, a growth of more than 2,700% in two years." (*Id.*) Silvergate's transaction fee revenue also grew. (*Id.* ¶ 70.)

**\*5** "Silvergate's growth in digital currency customers served Lane's goal of growing the bank's deposits. Deposits from Silvergate's crypto clients were noninterest-bearing, allowing Silvergate to keep all the returns when it invested those deposits." (*Id.* ¶ 72.) Silvergate "generate[d] revenue from a conservative portfolio of investments in cash, short term securities and certain types of loans[.]" (*Id.*) In other words, Silvergate "generate[d] attractive returns on lower risk assets" using its crypto[ ] clients' noninterest-bearing deposits. (*Id.* ¶¶ 72–73.)

"By the end of September 2022, Silvergate's crypto-derived, noninterest bearing deposits were 90% of the bank's overall deposit base, amounting to $11.9 billion." (*Id.* ¶ 75.) "Silvergate's overall revenue also grew, resulting in increasingly greater profits as operating costs stabilized[.]" (*Id.* ¶ 76.)

### E. Alameda

Sam Bankman-Fried ("SBF") founded Alameda Research ("Alameda") in October 2017. (*Id.* ¶ 79.) "Alameda portrayed itself as a quantitative trading firm specializing in crypto[ ] assets." (*Id.*) "Alameda's leadership was young and lacked business experience." (*Id.* ¶ 85.) SBF and the other Alameda insiders (the "Insiders") were in their mid-20s and had only a few years of prior work experience at most. (*Id.*) Despite its name, "Alameda did not focus on research." (*Id.* ¶ 80.) "The purpose of including the word 'Research' in [its] name was to give the company the appearance of legitimacy, particularly with respect to banks." (*Id.*)

"When Alameda eventually opened bank accounts, banks immediately began questioning Alameda's transactions." (*Id.* ¶ 81.) For example, Alameda's international crypto arbitrage involved transferring money between Japanese accounts denominated in yen and American accounts denominated in U.S. dollars, typically via wire transfer, which drew attention from banks. (*Id.*) Yet, Silvergate opened an account for Alameda in 2018 and continued to accept Alameda deposits and process Alameda transactions until it collapsed in November 2022. (*Id.* ¶¶ 79, 82.) In fact, in a 2021 podcast, SBF stated, "[the banks are] like, wait, you're telling me that two days in a row, you're sending an international wire transfer across currency, across continent, in the same direction for the same size with no transfer coming the other way. That's sketchy as s***, right? Where is your money coming from? And we're like, well, it's fake internet money. And they're like, oh, that makes us feel better." (*Id.* ¶¶ 80–81.)

### F. FTX

In 2018, SBF began building a crypto exchange called FTX. (*Id.* ¶¶ 89–90.) FTX began operations in May 2019. (*Id.* ¶ 89.) FTX and its affiliates operated a multi-billion-dollar mobile application crypto investment service that offered trading in various digital commodity derivative products and other services related to crypto trading. (*Id.* ¶ 90.) Customers were able to access the FTX platform either through the FTX website or its popular mobile application. (*Id.* ¶ 91.)

To avoid United States regulatory requirements, oversight, and securities laws, SBF and some other Alameda and FTX insiders moved to Hong Kong in 2019 and 2020. (*Id.* ¶¶ 95–96.) In November 2021, FTX and Alameda relocated to the Bahamas. (*Id.*) Silvergate continued to bank both FTX and Alameda despite the risks associated with their operating in lightly regulated, offshore jurisdictions. (*Id.* ¶¶ 96–97.)

SBF and others speaking at his direction and on his behalf regularly touted the safety of the FTX platform, including its automated risk mitigation procedures, its auto-liquidation program, its technical expertise, and its proprietary, automated, internal "risk engine." (*Id.* ¶¶ 101, 103.) SBF assured investors that their FTX assets were safe, tweeting "[backstopping] customer assets should always be primary ... our users' funds and safety comes first." (*Id.* ¶102.) SBF stated that FTX offered its investors "complete transparency about the positions that are held [and] a robust, consistent, risk framework." (*Id.* ¶ 103.)

**\*6** "Similarly, FTX's Terms of Service assured investors they owned and controlled assets placed on the exchange." (*Id.* ¶ 104.) "Those terms stated unequivocally that '[t]itle to your Digital Assets shall at all times remain with you and shall not transfer to FTX Trading.' " (*Id.*) FTX and its operating entities had fiduciary duties to FTX's customers under FTX's Terms of Service and FTX's User Agreement to ensure that customer funds were segregated and held in trust because the funds did not belong to FTX or its entities. (*Id.* ¶ 105.)

### G. Alameda Misappropriates FTX Investor Funds
SBF individually and through agents and employees maintained "that there were 'circuit breakers' in place to ensure the separation of Alameda and FTX, and to ensure Alameda did not receive preferential treatment on the FTX platform." (*Id.* ¶ 109.) FTX representatives "repeatedly reiterated" publicly as well as to Congress, federal and state regulators, and investors, "that customer assets were properly segregated and custodied by FTX at all times." (*Id.* ¶¶ 110–113.)

"In truth, however, SBF ran FTX and Alameda as a personal fiefdom." (*Id.* ¶ 114.) FTX and Alameda disregarded substantially all pertinent corporate formalities. (*Id.* ¶ 117.) " '[T]ransfers of funds among [FTX] entities were not properly documented[.]' " (*Id.*) " 'Assets and liabilities were routinely shuffled among the FTX Group entities and insiders without proper process or documentation.' " (*Id.*)

FTX and its entities also lacked an appropriate organizational structure as well as independent and experienced finance, accounting, risk, human resources, information security, cybersecurity, or auditing personnel or leadership. (*Id.* ¶ 114.) For example, "[t]he FTX entities had no dedicated financial risk, audit, or treasury departments." (*Id.* ¶ 115.)

Relatedly, board oversight was effectively non-existent, and most major decision-making and authority sat with SBF and the FTX insiders. (*Id.* ¶ 114.) In fact, Citigroup, Inc. had explored the possibility of a partnership with Alameda but "grew skeptical of the firm[,]" particularly its "lack of a risk-management framework that they could articulate in any meaningful way." (*Id.* ¶ 116.)

In other words, "[f]rom its inception, FTX had poor controls and fundamentally deficient risk management procedures. Assets and liabilities of all forms were generally treated as interchangeable, and there were insufficient distinctions between the assignment of debts and credits to Alameda, FTX, and the Insiders." (*Id.* ¶ 120.) "Perhaps the most significant failure of corporate controls involved the use of FTX customer funds. The SEC [ ] alleged, and Alameda and FTX executives later admitted that '[f]rom the inception of FTX ... Alameda diverted FTX customer funds to Alameda, and continued to do so until FTX's collapse in November 2022.' " (*Id.* ¶ 121.) "FTX diverted customer funds to Alameda in at least two ways: (1) by directing FTX customers to deposit fiat currency (e.g., U.S. dollars) into bank accounts controlled by Alameda, often Silvergate accounts; and (2) by enabling Alameda to draw on a virtually limitless 'line of credit' at FTX, which was funded by FTX customer assets." (*Id.* ¶ 122.) "Silvergate banked both FTX and Alameda, and it processed transfers that sent FTX customer money to Alameda." (*Id.*)

"[F]rom the start of FTX's operations in around May 2019 and continuing into 2022, FTX customers wired or otherwise deposited billions of dollars in fiat currency into bank accounts that were controlled by Alameda." (*Id.* ¶ 123.) For example, "on December 17, 2019, SBF formed and registered Alameda Research Ltd., as a British Virgin Islands (BVI) limited corporation [and,] [s]hortly thereafter, Alameda Ltd. opened at least three bank accounts with Silvergate Bank." (*Id.* ¶ 124.) Alameda Ltd. "operated as an alter ego of Alameda and FTX[.]" (*Id.* ¶ 125.) FTX customers also wired money to two accounts at Silvergate in the name of North Dimension Inc. ("North Dimension"), a shell company fully owned by Alameda and operated from the same address. (*Id.* ¶ 126.) North Dimension had no legitimate business of its own. (*Id.*) It had a sham website that purported to sell electronics. (*Id.*) "Moreover, the pattern of North Dimension's wire transfers—which Silvergate processed—was highly irregular. FTX customers also wired money to North Dimension controlled by Alameda, which were not segregated and transferred to FTX." (*Id.* ¶ 127.) Instead, the

money was used to fund Alameda's trading operations and SBF's other ventures. (*Id.*)

**\*7** "Initially, when FTX customer assets were deposited into Alameda bank accounts, Alameda personnel manually credited FTX customer accounts with E-money corresponding amount to the amount of fiat currency on FTX's internal ledger system. Customers accessing their FTX accounts would be able to observe on the exchange's website (and later mobile application) that their deposits had been posted to their FTX accounts, even though the fiat deposits actually remained in Alameda-controlled bank accounts." (*Id.* ¶ 128.) "Even after FTX opened its own FBO, [for the benefit of], bank accounts, previously-transferred FTX customer assets were not moved into FTX's bank accounts .... In addition, FTX customers continued to send their money to Alameda-owned accounts." (*Id.* ¶ 130)

"After Alameda misappropriated FTX customer funds, Alameda used the funds to: (1) subsidize Alameda and FTX's money-losing operations, (2) speculate in crypto[ ] and related enterprises, (3) make political donations, (4) purchase real estate, (5) pay outside lenders, and (6) support lavish lifestyles, and (6) engage in other unauthorized uses." (*Id.* ¶ 132.)

"Alameda was heavily invested across the crypto market and suffered significant losses during [summer 2022]. These losses posed a problem because of Alameda's unusual capital structure: unlike a traditional hedge fund, which pays its investors only if the fund's investments prove profitable, Alameda funded its operations with borrowed money." (*Id.* ¶ 135.) "By 2021, Alameda had borrowed billions of dollars from third-party crypto asset lending firms in order to fund SBF's venture investments and for his personal use. Alameda's creditors began to demand repayment." (*Id.* ¶ 136.) "Because Alameda did not have sufficient assets to cover all of these obligations, SBF directed [Alameda's CEO] to draw on Alameda's 'line of credit' from FTX, which ... allowed Alameda to 'borrow' at will from FTX. Billions of dollars of FTX customer funds were thus intentionally diverted to Alameda and used by Alameda to re-pay its third-party loan obligations." (*Id.* ¶ 137.) By approximately mid-2022, Alameda's liability to FTX totaled approximately $8 billion, exceeding FTX's total lifetime revenue. (*Id.* ¶ 138.)

## H. Alameda, FTX, and Silvergate Mutually Benefit

"FTX was designed to be easy to use even for those who were not experts in crypto[ ]." (*Id.* ¶ 66.) However, "[a]n exchange

that was user-friendly for new users was virtually impossible before the SEN." (*Id.*) "With the underlying infrastructure of the SEN, however, FTX users could trade fiat currency for crypto and vice-versa nearly instantaneously and without friction. The SEN was critical for FTX's rapid growth after its launch." (*Id.* ¶ 67.) In other words, "[t]he SEN's ease of on-ramping was a key part of FTX's growth." (*Id.* ¶ 57.)

Just as Silvergate's SEN drove new deposits to Silvergate, the SEN drove new business to FTX. (*Id.*) "Silvergate profited from dollar deposits by digital-asset customers, and these deposits grew exponentially as FTX's own business expanded." (*Id.* ¶ 97.) Together, Lane and SBF praised the benefits of the SEN. (*Id.* ¶ 2.) Silvergate's website featured SBF's endorsement. (*Id.*)

By the end of September 2022, "FTX alone constituted nearly 10% of the $11.9 billion in deposits, or about $1.2 billion" of Silvergate's overall deposit base. (*Id.* ¶ 75.) Thus, Silvergate had a strong incentive to continue accepting FTX and Alameda customer deposits and executing transfers because Silvergate's business centered around the adoption of the FTX exchange platform and app. (*Id.* ¶ 98.) Silvergate also earned income from transaction fees and interest on money deposited in FTX accounts. (*Id.*) In fact, before Silvergate went public on November 7, 2019, and before Silvergate attracted FTX as a client, Silvergate had an annual net income of only $7.6 million. (*Id.* ¶ 99.) By 2021, Silvergate's annual net income had increased to $75.5 million. (*Id.*)

## I. FTX and Alameda Collapse

**\*8** "FTX collapsed in November 2022." (*Id.* ¶ 3.) Around this time, SBF admitted to diverting billions of customers' money to Silvergate accounts controlled by Alameda, rather than FTX, where it was dissipated and lost. (*Id.*) Silvergate knew about the scheme. (*Id.*) Silvergate "saw FTX customer money being deposited in accounts at Silvergate titled, not in the name of FTX, but in the names of other companies under SBF's control such as Alameda. But Silvergate accepted Plaintiffs' money and executed the transfers by which the money was diverted and dissipated anyway ... even after SBF and his entourage moved offshore to evade U.S. government oversight, and despite numerous unexplained related party transactions and other red flags[.]" (*Id.*)

On November 2, 2022, customers withdrew an estimated $6 billion from FTX over the course of 72 hours. (*Id.* ¶ 141.) "On November 8, 2022, FTX paused all customer withdrawals. At the same time, since Alameda's speculative investments had

been going bad for months, Alameda was unable to repay the loans. FTX's loans to Alameda were unrecoverable." (*Id.* ¶ 142.) "On November 10, 2022, the Securities Commission of The Bahamas froze the assets of FTX Digital Markets, a Bahamian subsidiary of FTX. FTX halted all trading and withdrawals." (*Id.* ¶ 147.) "On the same day, in the midst of FTX's collapse, SBF admitted to culpability in a series of Twitter exchanges with reporters and investors[.]" (*Id.* ¶ 148.) "On November 11, 2022, FTX filed for Chapter 11 bankruptcy and SBF resigned as CEO. The bankruptcy filing includes over 130 companies under the FTX umbrella, as well as the trading firm Alameda." (*Id.* ¶ 150.) "Following the collapse, SBF was asked how FTX customer deposits ended up in Alameda's accounts. [SBF] responded that his exchange platform did not originally have a bank account, so customers were directed to wire money to Alameda's account with Silvergate in exchange for the commodity assets on FTX." (*Id.* ¶ 151.) "According to a presentation released as part of the bankruptcy case on March 2, 2023, $8.9 billion of FTX customer funds remain missing." (*Id.* ¶ 158.)

"On December 12, 2022, SBF was arrested.... The criminal charges against SBF include wire fraud, securities fraud, money laundering, and conspiracy to commit wire fraud and securities fraud." (*Id.* ¶ 191.) "On December 13, 2022, the [SEC] filed a civil action against SBF for securities fraud...." (*Id.* ¶ 192.) "[O]n December 13, 2022, the Commodity Futures Trading Commission [CFTC] filed a complaint against SBF, FTX, and Alameda[.]" (*Id.* ¶ 193.) On December 19, 2022, the U.S. Attorney's Office for the Southern District of New York filed sealed criminal charges against two FTX insiders, who then pled guilty to conspiracy relating to wire fraud, securities and commodities fraud, and money laundering. (*Id.* ¶¶ 195–196.) On December 21, 2022, the SEC and CFTC filed complaints and stipulated judgments against these two insiders, and, as part of their stipulations with the SEC and CFTC, they admitted the truth of the SEC's and CFTC's allegations. (*Id.* ¶ 197.) On February 28, 2023, FTX's co-founder pled guilty to the charges in a superseding criminal information filed by the U.S. Attorney's Office for the Southern District of New York. (*Id.* ¶ 198.) The same day, the CFTC and the SEC filed complaints and consent orders against him. (*Id.* ¶ 199.) As part of the consent orders, he admitted the truth of the allegations in the complaints. (*Id.*) "Collectively, the guilty pleas and consent judgments show that FTX and Alameda employees committed crimes in furtherance of an unlawful scheme to defraud investors, who lost billions of dollars." (*Id.* ¶ 200.)

**J. Silvergate Voluntarily Liquidates**

"The revelation that FTX had diverted customer money in Silvergate prompted a run on Silvergate deposits, leading [Silvergate to] record a $1 billion dollar loss and enter voluntary liquidation. To date, Silvergate has failed to account for its actions and inactions, even in response to a demand from Congress." (*Id.* ¶ 4.)

**\*9** "Concurrently with FTX's collapse, questions about Silvergate's role in the failed FTX crypto enterprise were raised in Congress and on Wall Street. A [Congressional] letter dated December 5, 2022 ... posed a series of questions to Defendant Alan Lane regarding Silvergate's relationship with the FTX entities, after noting the direct funds transfers from FTX's client account at Silvergate to the accounts of Alameda and other entities under SBF's control. Silvergate's 'involvement in the transfer of FTX customer funds to Alameda reveals what appears to be an egregious failure of your bank's responsibility to monitor ... suspicious financial activity,' the letter states." (*Id.* ¶ 201.) In response Lane "wrote that 'Silvergate is fully committed to complying with its Bank Secrecy Act (BSA) and Anti-Money Laundering (AML) obligations. [He] claimed that Silvergate 'conducted significant due diligence on FTX and its related entities, including Alameda....' " (*Id.* ¶ 202.)

"As went FTX, so went Silvergate. Silvergate prospered for years as the FTX fraud gathered momentum. After closing at $12.50 per share on the day of its IPO, the price of Silvergate stock increased to $219.75 per share as of November 15, 2021. As a major Silvergate shareholder, Lane prospered. But by December 9, 2022, following FTX's collapse, Silvergate shares had dropped back down to $21.43." (*Id.* ¶ 159.) "Similarly, at the end of the third quarter of 2022, Silvergate had $11.9 billion in crypto-related deposits. After the FTX collapse, at the end of the following quarter, Silvergate had only $3.8 billion, a 68% drop." (*Id.* ¶ 160.) "On March 3, 2023, Silvergate discontinued the SEN. On March 8, 2023, Silvergate announced that it intended to wind down operations and voluntarily liquidate Silvergate Bank. On March 31, 2023, Silvergate closed all non-CD Silvergate accounts." (*Id.* ¶ 161.)

**K. Silvergate and Lane Knew About the FTX/Alameda Fraud**

"Silvergate was required to develop, implement, and maintain an effective AML program." (*Id.* ¶ 162.) "According to Silvergate's public filings with the [SEC], the company

'invested heavily in [its] risk management and compliance infrastructure,' and 'attracted a talented, dedicated compliance team with substantial experience in regulated financial institutions, including developing, implementing and monitoring systems to detect and prevent financial crimes.' This team 'developed a strong risk management and compliance framework that leverages technology for onboarding and monitoring market participants.' These 'proprietary compliance procedures, developed over five years of serving the digital currency industry,' were 'designed to enable [Silvergate] to prudently and efficiently establish deposit accounts for market participants.' " (*Id.*)

"According to Silvergate, its 'onboarding process ... includes extensive regulatory compliance diligence,' and Silvergate claims it is 'highly selective in [its] customer onboarding process to ensure the integrity of the [SEN] platform.' " (*Id.* ¶ 163.) "More specifically, Silvergate 'comprehensively investigates the customers it proposes to onboard according to the level it deems necessary and appropriate, based on whether the customer is an 'administrator,' an 'exchanger' or a 'user' of virtual currencies' as 'defined in March 2013 guidance by the U.S. Treasury Department....' " (*Id.* ¶ 164.)

"According to Silvergate, 'at a minimum,' its 'due diligence and onboarding processes include ... detailed reviews of each customer's ownership, management team, business activities and geographies in which they operate.' " (*Id.* ¶ 165.) "Moreover, '[f]or customers such as exchanges which pose a higher degree of risk or have a higher degree of regulatory obligations, [Silvergate's] processes are more extensive and incorporate reputational reviews, reviews of applicable licensing requirements, plans, and status, and reviews of customer policies and procedures regarding BSA, consumer compliance, information security, Dodd-Frank Act prohibitions against unfair, deceptive or abusive acts or practices, as well as reviews of transaction monitoring systems and audit results.' " (*Id.* ¶ 166.)

**\*10** "Lane acknowledged Silvergate's duties, stating that '[f]or each and every account, these laws require us to determine the beneficial owner, the source of funds, and the purpose and expected use of funds. Silvergate also monitors transaction activity for every account and identifies activity outside of the expected usage.' " (*Id.* ¶ 167.) "Lane claimed in a December 5, 2022 'Public Letter from Silvergate Capital Corporation Chief Executive Officer Alan Lane' that:

'For each and every account, [applicable] laws require us to determine the beneficial owner, the source of funds,

and the purpose and expected use of funds. Silvergate also monitors transaction activity for every account and identifies activity outside of the expected usage.... This is no small undertaking. We have invested, and will continue to invest, in systems and procedures to help ensure we are conducting effective customer due diligence and monitoring. We have dedicated a substantial number of Silvergate employees to this effort. And, as our customers can attest, the onboarding process can take weeks as a result of the time we spend gathering and reviewing information and documentation from prospective customers. After accounts are open, we continue to monitor account activity as part of our enhanced due diligence process on each of these accounts.... ... Silvergate conducted significant due diligence on FTX and its related entities including Alameda Research, both during the onboarding process and through ongoing monitoring, in accordance with our risk management policies and procedures and the requirements outlined above.'

(*Id.* ¶168.) "Similarly, on December 19, 2022, Mr. Lane affirmed that 'Silvergate has instituted and consistently updates and improves, a robust compliance and risk management program that spans the life cycle of each client.' Mr. Lane, moreover, confirmed that 'we determine the beneficial owner, the source of funds, and the purpose and expected use of funds for each and every account we open.' He also confirmed that the bank 'monitors transaction activity for every account and identifies activity outside of the expected usage.' " (*Id.* ¶ 169.)

Numerous accounts held by SBF's companies—including FTX Ventures Ltd. ("FTX Ventures"), FTX US, Alameda, and North Dimension—were held at Silvergate Bank, including (1) at least eight accounts for Alameda and related entities, (2) at least two accounts for North Dimension, (3) at least one account for FTX Ventures, Ltd., and (4) at least four accounts for FTX Digital Markets. (*Id.* ¶ 170.) "As part of its onboarding due diligence, including through documents such as a Business Account Application, a Certificate of Beneficial Ownership, and a Fund Risk Review Questionnaire, Silvergate obtained or determined relevant information related to each Alameda-or FTX-related entity. This included, among other things, information such as: its beneficial owners, corporate formalities and organization including related entities, locations, licenses and registrations, and number of employees; the nature of its business as it relates to crypto[ ]; assets under management; the anticipated amount and size of transactions within the account (i.e., volume on a monthly basis) and source of funds therefore;

and personal information about the business's principals." (*Id.* ¶ 171.)

"As alleged above, the FFIEC Manual directs banks to watch for 'red flags' indicating possible money laundering or other misconduct." (*Id.* ¶ 172.) "The activity in the FTX/Alameda accounts at Silvergate featured all of the following red flags:

 **\*11**  [1] 'Unusual transfers of funds occur among related accounts or among accounts that involve the same or related principals.' [2] 'Funds transfer activity is unexplained, repetitive, or shows unusual patterns.' [3] 'Many funds transfers are sent in large, round dollar, hundred dollar, or thousand dollar amounts.' [4] 'Frequent involvement of multiple jurisdictions or beneficiaries located in higher-risk offshore financial centers.' [5] 'Funds transfer activity occurs to or from a financial institution located in a higher risk jurisdiction distant from the customer's operations.' [6] 'A foreign correspondent bank exceeds the expected volume in its client profile for funds transfers, or an individual company exhibits a high volume and pattern of funds transfers that is inconsistent with its normal business activity.' [7] 'A business is reluctant, when establishing a new account, to provide complete information about the nature and purpose of its business, anticipated account activity, prior banking relationships, the names of its officers and directors, or information on its business location.' [8] 'A customer is a trust, shell company, or Private Investment Company that is reluctant to provide information on controlling parties and underlying beneficiaries.' [9] 'Purpose of the shell company is unknown or unclear.' [10] 'Payments or receipts with no apparent links to legitimate contracts, goods, or services are received.' "

(*Id.*) "FTX and Alameda's operations and transactions presented additional red flags." (*Id.* ¶ 173.) "A bank like Silvergate ordinarily must ask for and analyze Alameda's and FTX's financial statements as part of routine due diligence. Silvergate and Lane thus knew that Alameda never retained an outside auditor or generated any semblance of audited financial statements." (*Id.* ¶ 174.) "Routine due diligence also ordinarily includes requesting a list of each Alameda and FTX entity's board of directors and a list of the date of every board meeting, as well as board minutes. Silvergate and Lane thus knew that Alameda and FTX did not observe ordinary corporate formalities, such as having a Board of Directors that conducted meaningful oversight." (*Id.* ¶ 175.)

"Silvergate and Lane knew that FTX accepted several billion dollars from FTX customers for use in trading on the FTX exchange, which was deposited not in an FTX account but in an account in the name of or associated with Alameda .... The diversion and commingling of funds, unknown to FTX's customers, was visible to Silvergate and Lane, as Alameda and its affiliated accounts amassed deposits through incremental small dollar deposits from FTX customers as FTX's business expanded, but those accounts did not experience proportional outflows, as would be expected if Alameda was, in fact, transferring money to an FTX bank account, including one external to Silvergate." (*Id.* ¶ 176.)

"Defendants could and did see for themselves that numerous wires earmarked for deposit to FTX for trading on its exchange were ultimately going to Alameda's trading account. Hedge funds do not generate high volumes of relatively small deposits from a large number of distinct individuals, such as Alameda received through its account at Silvergate, particularly when the firm does not have customers or investors (as Alameda did not). There was no legitimate explanation for any of the transfers, much less transfers of the frequency and size that were apparent to Silvergate and Lane. Similarly, Defendants observed Alameda's failure to segregate customer funds on receipt, and the subsequent inexplicable transfers of these funds once within Alameda's control in a manner inconsistent with its business." (*Id.* ¶ 177.)

"Silvergate and Lane nonetheless accepted deposits of unmistakable incoming investor funds, in miscellaneous amounts, with SBF's own investment firm, which were commingled with Alameda's assets." (*Id.* ¶ 178.) "The theft of customer funds from FTX accounts occurred in plain sight of Lane and Silvergate. Silvergate, at Lane's direction, provided the bank's services and his own endorsements to FTX and Alameda, notwithstanding FTX and Alameda's high-risk profile as a crypto[ ] business, and despite numerous unmistakable indicators of suspicious activity. This activity included the diversion of FTX funds to Alameda; unexplained related party transactions between and among FTX, Alameda, and the Insiders, which [FTX's new, independent CEO] reports were common; the absence of internal controls at FTX and Alameda; Alameda's failure to submit to audits or even generate credible financial statements; repetitive, massive and unexplained transfers of funds from FTX and Alameda-related entities to offshore jurisdictions and vice-versa; FTX's and Alameda's move to offshore, lightly regulated jurisdictions; the lack of business experience of key

FTX and Alameda personnel; FTX's and Alameda's failure to staff Chief Financial Officer, Chief Compliance Officer and Chief Risk Control positions; the commingling of funds among unrelated accounts; and a range of other unorthodox business practices and bizarre behavior on the part of the Insiders, including public statements endorsing the use of amphetamines." (*Id.* ¶ 179.)

**\*12** "Defendants' knowledge of the fraud, breaches of fiduciary duty, and conversion of FTX customer funds by FTX, Alameda, and the Insiders is further underscored by the large volume of business they brought to Silvergate. Silvergate's core business was earning income in the form of transaction fees and interest on deposits, and FTX and Alameda were two of Silvergate's most important customers. FTX alone accounted for almost 10% of Silvergate's deposits. Consequently, the loss of FTX and Alameda as clients would have been devastating for Silvergate—as demonstrated by Silvergate's collapse only four months after FTX and Alameda's collapse." (*Id.* ¶ 180.)

### L. Defendants Substantially Assisted the FTX/Alameda Fraud

"Defendants not only knew of the fraud perpetrated through the FTX and Alameda accounts at Silvergate, but also they substantially helped FTX, Alameda, and SBF perpetrate that fraud." (*Id.* ¶ 181.) "Silvergate oversaw the commingling of funds between [FTX and Alameda-related] accounts. It processed billions in transfers from FTX's client accounts to the Alameda accounts. And it accepted deposits from FTX investors—intended to be stored, traded, or cashed out—directly into the bank accounts of Alameda and its shell company, North Dimension. Through its accounts at Silvergate and elsewhere, FTX lent more than half of its $16 billion in customer funds to Alameda, including $4 billion in 2022 alone. According to one analyst report, these transfers were sometimes in the hundreds-of-millions-of-dollar increments and occurred up to several times a day." (*Id.* ¶ 184.)

"Silvergate continued to complete transfers and set up accounts for Alameda and FTX, despite many red flags indicative of an unlawful scheme, such as unusual redirection of customer funds, unusual patterns of transfers, and the lack of any legitimate explanation for FTX's and Alameda's activities." (*Id.* ¶ 185.) "Not only did Defendants continue to allow FTX and Alameda to use Silvergate accounts, but they also continued to allow FTX to use Silvergate's proprietary SEN network. The SEN network enabled FTX and SBF

to continue to on-ramp new customers and allow existing customers to trade crypto[ ]." (*Id.* ¶ 186.) "Allowing FTX to continue to use the SEN also ensured that Silvergate would continue to grow its deposits and generate income from the use of SEN by one of the world's largest crypto[ ] exchanges ... Silvergate and Lane benefitted financially as a result." (*Id.* ¶ 187.)

Silvergate's and Lane's identity of interests with SBF, FTX, and Alameda extended to carrying SBF's endorsements on Silvergate's website. (*Id.* ¶¶ 188–189.) "Defendants' decision to ally with SBF and Alameda to jointly promote the SEN, accept customer deposits, and execute transfers at the direction of FTX and Alameda, and Defendants' other acts and omissions directly in furtherance of the scheme described herein, carried out through Silvergate bank accounts, and other means and facilities, were a substantial cause of the investment losses of Plaintiffs and class members." (*Id.* ¶ 190.)

### M. Agency, Alter Ego, and Co-Conspirator Allegations

"[T]he interests of Silvergate Capital and Silvergate Bank are unified. Silvergate Capital acts as a mere shell to Silvergate Bank. When describing the nature of its business, Silvergate Capital states its 'assets consist primarily of its investment in [Silvergate] Bank and its primary activities are conducted through the Bank.' Silvergate Capital is the 100% shareholder controlling Silvergate Bank and exercises voting control over a majority of the outstanding stock of Silvergate Bank. Silvergate Capital and Silvergate Bank share the same office or business location.... Additionally, Silvergate Capital and Silvergate Bank share employees, counsel, a CEO and President, Alan Lane, and all members of their boards of directors." (*Id.* ¶ 205.)

## II. LEGAL STANDARD

### A. Federal Rule of Civil Procedure 12(b)(6)

**\*13** Pursuant to Federal Rule of Civil Procedure ("Rule")12(b)(6), an action may be dismissed for failure to allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement,

but it asks for more than a sheer possibility that a defendant acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (internal quotation marks and citations omitted). For purposes of ruling on a Rule 12(b)(6) motion, the Court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).

However, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937 (quoting *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955). Nor is the Court "required to accept as true allegations that contradict exhibits attached to the Complaint or matters properly subject to judicial notice, or allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). "In sum, for a complaint to survive a motion to dismiss, the non-conclusory factual content, and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009) (quotation marks omitted).

**B. Federal Rule of Civil Procedure 9(b)**

Federal Rule of Civil Procedure 9(b) states, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Rule 9(b) "requires that, when fraud is alleged, 'a party must state with particularity the circumstances constituting fraud....' " *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009) (quoting Fed. R. Civ. P. 9(b)). A pleading satisfies Rule 9(b) if it identifies "the who, what, when, where, and how" of the misconduct charged." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003). "To comply with Rule 9(b), allegations of fraud must be specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Bly-Magee v. California*, 236 F.3d 1014, 1019 (9th Cir. 2001) (internal quotation marks and citations omitted). "Any averments which do not meet that standard should be 'disregarded,' or 'stripped' from the claim for failure to satisfy Rule 9(b)." *Kearns*, 567 F.3d at 1124. However, " '[m]alice, intent, knowledge, and other conditions of a person's mind may be averred generally.' " *Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 558 (9th Cir. 2010) (quoting *Odom v. Microsoft Corp.*, 486 F.3d 541,

554 (9th Cir. 2007)) (finding that "the only aspects of wire fraud that require particularized allegations are the factual circumstances of the fraud itself.") (quotation marks and citation omitted).

### III. DISCUSSION

The Court will first address two preliminary matters: (1) Defendants' requests for judicial notice and (2) Defendants' argument that Silvergate Capital is not a proper defendant. The Court will then address Defendants' arguments regarding each cause of action in the order of the briefing.

**A. Preliminary Matters**

**1. Defendants' Request for Judicial Notice**

**a) Indictment**

**\*14** Defendants request that the Court take judicial notice of United States' Superseding Indictment filed against SBF in S.D.N.Y Case No. 1:22-cr-00673-LAK, Dkt. No. 113-1 ("Indictment"). (Doc. 16-1 at 2.) Defendants contend that "[t]he contents of filings in other proceedings are matters of public record and are thus properly the subject of judicial notice." (*Id.*) While it is true a court may consider documents properly subject to judicial notice, including the existence of court dockets and filings in related proceedings, like the Indictment, the court cannot take judicial notice of those documents for the truth of any matter asserted therein. *See CB Equities, LLC v. Am. Brokers Conduit Corp.*, No. 12-CV-05449-DMR, 2016 WL 4364320, at *3, n.2 (N.D. Cal. Aug. 16, 2016) (citing *Porter v. Ollison*, 620 F.3d 952, 954–55 (9th Cir. 2010)) (granting request for judicial notice of indictment only as to evidence of the crime charged and not for the truth of any matter asserted therein); *Princeton Strategic Inv. Fund, LLC v. United States*, No. C 04-04310 JW, 2011 WL 6176221, at *6, n.31 (N.D. Cal. Dec. 7, 2011) ("The Court considers the Indictment only as to evidence of the crime charged, and not for the truth of any matter asserted therein."). Here, Defendants argue that FTX and SBF made affirmative misrepresentations to, and succeeded in deceiving, Defendants, undermining Plaintiffs' claim that Defendants knowingly aided and abetted the FTX and Alameda fraud. (Doc. 16 at 9.) In making this argument, Defendants presume the truth of the factual allegations asserted in paragraphs 16 through 19 of the Indictment,

which is not permissible. [5]  (*Id.*) Thus, Defendants' request for judicial notice of the Indictment is **DENIED**.

### b) FTX.US User Agreement

Defendants also request the Court take judicial notice of the FTX.US USER AGREEMENT, dated September 16, 2022, because Plaintiffs refer to or rely upon it in the Complaint and because the authenticity of the document cannot reasonably be contested. (Doc. 16-1 at 2–3.) Defendants explain that "[t]hroughout the Complaint, plaintiffs rely on, refer to, and quote extensively from the FTX Terms of Service." (*Id.* at 3 (citing FAC ¶¶ 92, 104, 105, 133, 245).)

Plaintiffs respond that the version of the user agreement Defendants seek to introduce is dated less than two months before the collapse of FTX and Alameda, so it was operative for only a small fraction of the relevant time period. (Doc. 17 at 25.) Thus, Plaintiffs argue the document is incomplete and not the appropriate subject of judicial notice. (*Id.* at 25–26.) Plaintiffs also argue that "the Court cannot take judicial notice of the truth of its content or any inferences drawn from it." (*Id.* at 26.)

"Generally, the scope of review on a motion to dismiss for failure to state a claim is limited to the contents of the complaint." *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006). However, as Defendants note, "[a] court may consider evidence on which the complaint 'necessarily relies' if: (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion." *Id.* (citations omitted) (finding that the court could consider a release that the plaintiff signed and referenced in one paragraph of her complaint); *see also In re Northpoint Commc'ns Grp., Inc. Sec. Litig.*, 184 F. Supp. 2d 991, 994, n.1 (N.D. Cal. 2001) (taking judicial notice of merger agreement referenced in the complaint); *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001) ("[A] court may consider 'material which is properly submitted as part of the complaint' on a motion to dismiss without converting the motion to dismiss into a motion for summary judgment. If the documents are not physically attached to the complaint, they may be considered if the documents' 'authenticity ... is not contested' and 'the plaintiff's complaint necessarily relies' on them.") (citations omitted). [6]

**\*15**  Plaintiffs do not dispute that their FAC refers to the document or that the document is central to the Plaintiffs' claim for aiding and abetting breach of fiduciary duty. Plaintiffs also do not question the authenticity of the document. However, the Court notes that Defendants' request for judicial notice is misleading. Defendants request that the Court take judicial notice of "Exhibit B: Terms of Service for FTX." (Doc. 16-1 at 2.) Defendants then argue that "the Court should take judicial notice of Exhibit B" because "[t]hroughout the Complaint, [P]laintiffs rely on, refer to, and quote extensively from the FTX Terms of Service." (*Id.* at 3 (citing FAC ¶¶ 92, 104, 105, 133, 245).) However, Exhibit B is not FTX's Terms of Service, it is an FTX.US USER AGREEMENT, dated September 16, 2022. (Doc. 16-3 at 1.) In fact, the specific terms of service quoted in Plaintiffs' FAC do not appear anywhere in the FTX.US USER AGREEMENT. While Plaintiffs do mention "FTX US's User Agreement" once (*see* FAC ¶ 105), the agreement is never quoted. Therefore, the Court cannot find the FTX.US USER AGREEMENT is "central" to Plaintiffs' claim. *Marder*, 450 F.3d at 448.

Additionally, in arguing the FTX.US USER AGREEMENT is incomplete as it only covers a small portion of the relevant time period, Plaintiffs rely on *Yucesoy v. Uber Techs., Inc.*, 109 F. Supp. 3d 1259 (N.D. Cal. 2015). (Doc. 17 at 25.) In *Yucesoy*, the court denied Uber's request for judicial notice of the current passenger contract in part because the current contract had no probative value to the underlying dispute, which arose between 2012 and 2014. 109 F. Supp. 3d at 1263. The Court finds Plaintiffs' reliance on *Yucesoy* persuasive, but not outcome determinative. Here, the FTX.US USER AGREEMENT does pertain to a small portion of the relevant time period, so, while the agreement's probative value may be limited, it is not negligible. However, the Court has identified one case in which the district court declined to take judicial notice of versions of Sony's privacy policy, terms of service, and user agreement not specifically referenced in the complaint. *Rodriguez v. Sony Computer Ent. Am. LLC*, No. C 11-4084 PJH, 2012 WL 12921066, at \*2 (N.D. Cal. Apr. 20, 2012). Here, Plaintiffs reference, but do not quote, "FTX US's User Agreement," but Plaintiffs do not identify which version of the agreement they are referencing. (FAC ¶ 105.) Therefore, the Court cannot know for certain whether the FTX.US USER AGREEMENT attached to Defendants' request for judicial notice is the same agreement referenced in Plaintiffs' FAC.

Finally, Plaintiffs argue "[e]ven if the Court took judicial notice of this document, the Court cannot take judicial notice of the truth of its content or any inferences drawn from it." (Doc. 17 at 25–26.) It is true "courts in the Ninth Circuit routinely take judicial notice of terms of services." *Yuksel v. Twitter, Inc.*, Case No. 22-CV-05415-TSH, 2022 WL 16748612, at *3 (N.D. Cal. Nov. 7, 2022); *see also Matera v. Google Inc.*, Case No. 15-CV-04062-LHK, 2016 WL 5339806, at *7 (N.D. Cal. Sept. 23, 2016); *Noll v. eBay, Inc.*, 282 F.R.D. 462, 463 (N.D. Cal. 2012); *Coffee v. Google, LLC*, Case No. 20-CV-03901-BLF, 2021 WL 493387, at *3–4 (N.D. Cal. Feb. 10, 2021). However, "the Court is not bound by any specific fact findings and legal conclusions set forth in them." *Trudeau v. Google LLC*, 349 F. Supp. 3d 869, 876 (N.D. Cal. 2018). Here, Defendants argue that the paragraphs 21 and 31(m) of the FTX.US USER AGREEMENT "disclaim the existence" of any confidential relationship or investment advisor relationship with its customers, eliminating the possibility of a fiduciary relationship. (Doc. 16 at 27.) However, this argument requires the Court to accept the truth of the facts and legal contentions set forth in paragraphs 21 and 31(m), respectively, namely that "FTX.US does not provide investment, tax, or legal advice" and that "[n]othing in these Terms shall ... cause, you and FTX.US to be treated as ... the agent of the other" (*see* Doc. 16-3 at 9, 14), which is impermissible. Thus, for the reasons set forth above, Defendants' request for judicial notice of the FTX.US USER AGREEMENT is **DENIED**.

### 2. Silvergate Capital is a Proper Defendant

**\*16** In their Motion to Dismiss, Defendants argue Defendant Silvergate Capital is not a proper defendant to this action because it had no role, oversight, or responsibility for the alleged wrongdoing. (Doc. 16 at 30.) Defendants also argue Defendant Silvergate Bank is neither an alter ego nor agent of Defendant Silvergate Capital. (*Id.* at 31–32.) Specifically, Defendants argue Plaintiffs fail to allege facts showing a unity of interest and ownership between Defendant Silvergate Capital and Defendant Silvergate Bank and facts showing that failure to disregard the corporate form would create an inequitable result. (*Id.*)

Plaintiffs, on the other hand, argue Defendant Silvergate Capital is liable for its direct involvement in the fraudulent scheme by making the SEN and other services available to FTX-related entities. (Doc. 17 at 31–32 (citing *Niantic, Inc. v. Global++*, Case No. 19-cv-03425-JST, 2019 WL 8333451,

at *4 (N.D. Cal. Sept. 26, 2019) and *Adobe Sys. Inc. v. Blue Source Group, Inc.*, 125 F. Supp. 3d 945, 965 (N.D. Cal. 2015)).) Plaintiffs also argue they have adequately pled that Defendant Silvergate Bank is Defendant Silvergate Capital's alter ego. (*Id.* at 32–33.) Plaintiffs do not address whether Defendant Silvergate Bank acted as Defendant Silvergate Capital's agent. [7]

#### a) Silvergate Capital's Direct Involvement

The Court notes that throughout their FAC, Plaintiffs collectively refer to both Silvergate Capital and Silvergate Bank as "Silvergate." (FAC at 2.) Thus, throughout the FAC, Plaintiffs make the same allegations as to both defendants. Therefore, as set forth below, Plaintiffs have adequately pled claims for negligence, aiding and abetting fraud, aiding and abetting conversion, aiding and abetting breach of fiduciary duty, unjust enrichment, and violations of California's UCL against Silvergate Capital. (*See* Sections III.B–III.E.) Specifically, Plaintiffs have adequately alleged that Silvergate Capital went "all-in" on crypto (*id.* ¶¶ 42–56); that Silvergate Capital developed the SEN to facilitate crypto transaction (*id.* ¶¶ 57–68); that Silvergate Capital knew about the FTX fraud (*id.* ¶¶ 162–180); that Silvergate Capital substantially assisted the FTX fraud (*id.* ¶¶ 181–190); and more. While Plaintiffs have identified two cases permitting this "grouping" of defendants, Defendants have not identified any case law stating otherwise. *See Niantic, Inc.*, 2019 WL 8333451, at *4 (finding that defendants were not impermissibly lumped together); *Adobe*, 125 F. Supp. 3d at 965 (same). Thus, the Court finds that Plaintiffs have adequately pled Silvergate Capital's direct involvement in the fraudulent scheme.

#### b) Alter Ego

"To satisfy the alter ego test, a plaintiff must make out a prima facie case (1) that there is such unity of interest and ownership that the separate personalities of the two entities no longer exist and (2) that failure to disregard their separate identities would result in fraud or injustice." *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1073 (9th Cir. 2015) (internal citations and quotations omitted). " 'In assessing whether the first prong has been satisfied, courts consider nine factors: [1] the commingling of funds and other assets of the entities, [2] the holding out by one entity that it is liable for the debts of the other, [3] identical equitable ownership of the entities, [4] use

of the same offices and employees, [5] use of one as a mere shell or conduit for the affairs of the other, [6] inadequate capitalization, [7] disregard of corporate formalities, [8] lack of segregation of corporate records, and [9] identical directors and officers.' " *Chubchai v. AbbVie, Inc.*, 599 F. Supp. 3d 866, 875 (N.D. Cal. 2022) (quoting *Corcoran v. CVS Health Corp.*, 169 F. Supp. 3d 970, 983 (N.D. Cal. 2016)). In assessing the second prong, "[t]he alter-ego doctrine is not limited to intentional fraud, nor does it require bad faith. *City & Cnty. of San Francisco v. Purdue Pharma L.P.*, 491 F. Supp. 3d 610, 635 (N.D. Cal. 2020). "So long as there is a unity of interest and ownership, courts will ignore the corporate form and attribute wrongful or inequitable conduct to the organization controlling the corporation." *Id.* Further, "[t]he Court may consider the same variety of factors in making determinations on both prongs of the alter-ego test." *Tam Vu v. Liberty Mut. Ins. Co.*, Case No. 18-cv-03594-SI, 2018 WL 5982867, at *2 (N.D. Cal. Nov. 14, 2018).

 **\*17**  Applying the above factors, the Court finds Plaintiffs have adequately pled that Defendants Silvergate Bank and Silvergate Capital have a unity of interest and ownership. Plaintiffs allege Silvergate Bank is a wholly owned subsidiary of Silvergate Capital, that Silvergate Capital is the 100% controlling shareholder of Silvergate Bank, and that Silvergate Capital has voting control over most of Silvergate Bank's outstanding stock. (FAC ¶¶ 14, 205.) Additionally, Plaintiffs allege that Lane is the President and CEO of both Silvergate Capital and Silvergate Bank, is a member of the board for Silvergate Capital, and manages the day-to-day operations of both companies. (*Id.* ¶¶ 15, 205.) Plaintiffs allege Silvergate Capital and Silvergate Bank share employees, counsel, and all members of their boards of directors. (*Id.* ¶ 205.) Plaintiffs also allege that Silvergate Capital and Silvergate Bank share an office and business location, a website, and a logo. (*Id.*) Finally, Plaintiffs allege that Silvergate Capital has stated its "assets consist primarily of its investment in [Silvergate] Bank *and its primary activities are conducted through the Bank.*" (*Id.* (emphasis added).) Further, Plaintiffs allege that, in January 2022, Silvergate Capital purchased certain intellectual property and other technology assets related to running a blockchain-based payment network, to integrate with Silvergate Bank's SEN. (*Id.*) Therefore, the Plaintiffs have adequately pled at least four of the nine factors—identical equitable ownership of the entities, use of the same offices and employees, use of one as a mere shell or conduit for the affairs of the other, and identical directors and officers—and, on balance, the Court finds Plaintiffs have adequately pled that Defendants

Silvergate Bank is Defendant Silvergate Capital have a unity of interest and ownership.

The Court also finds Plaintiffs have adequately pled that failing to disregard Silvergate Capital and Silvergate Bank's separate identities would result in fraud or injustice. The Court agrees with Plaintiffs that allowing Silvergate Capital to play a "shell game" by using its subsidiary—Silvergate Bank—to facilitate the FTX/Alameda fraud and avoid liability/shield assets would achieve an inequitable result. *See City & Cnty. of San Francisco*, 491 F. Supp. 3d at 638 (finding that treating a parent company and its subsidiaries as separate entities would result in a "substantial injustice"); *Cadence Design Sys., Inc. v. Pounce Consulting, Inc.*, 2019 WL 1768619, at *6 (N.D. Cal. Apr. 1, 2019) (finding that treating two entities separately would lead to "an inequitable result")). Thus, the Court finds that Silvergate Capital is a proper defendant to this action.

## B. Negligence (Count 6)

"The four elements of a negligence claim are well established: (1) duty; (2) breach; (3) proximate causation; and (4) injury." *L. Firm of Fox & Fox v. Chase Bank, N.A.*, 95 Cal. App. 5th 182, 192, 313 Cal.Rptr.3d 244 (2023). "The existence of a duty of care toward an interest of another worthy of legal protection is the essential prerequisite to a negligence cause of action ...." *Software Design & Application v. Hoefer & Arnett*, 49 Cal. App. 4th 472, 478, 56 Cal.Rptr.2d 756 (1996) (citations omitted). "Whether a duty exists is a question of law to be resolved by the court." *L. Firm of Fox & Fox*, 95 Cal. App. 5th at 192, 313 Cal.Rptr.3d 244 (internal quotation marks and citations omitted).

In their Motion to Dismiss, Defendants argue Plaintiffs' negligence claim fails as a matter of law because Defendants did not owe Plaintiffs a duty of care and because Defendants' conduct did not cause Plaintiffs' alleged harm. (Doc. 16 at 15–19.) Specifically, Defendants argue Plaintiffs do not proffer any theory under which Silvergate and Lane would owe a duty of care to Plaintiffs as non-customers. (*Id.* at 16.) Defendants also argue Plaintiffs do not allege that Defendants' conduct was a "substantial factor" in bringing about Plaintiffs' harm. (*Id.* at 18–19.)

Plaintiffs, on the other hand, argue they have adequately pled a negligence claim because Defendants owed Plaintiffs a duty of care for either of two reasons: (1) Plaintiffs had a special relationship with Defendants as intended beneficiaries or (2) Defendants had a duty of care to prevent misappropriation.

*Bhatia v. Silvergate Bank*, --- F.Supp.3d ---- (2024)

(*Id.* at 28–31.) Plaintiffs also argue they adequately pled causation because Defendants' technology was crucial to FTX's existence, Defendants processed transfers that diverted money from FTX accounts to Alameda, and the FTX and Alameda scheme could not have succeeded without Defendants. (*Id.* at 31.) The Court addresses each of these arguments below.

**1. Duty of Care**

As stated above, Defendants argue they do not owe Plaintiffs a duty of care under California law. (Doc. 16 at 15–18.) Defendants cite numerous cases standing for the proposition that banks, "absent extraordinary and specific facts," do not owe a duty of care to non-customers. (*Id.* at 16.) Relatedly, Defendants argue that " 'under California law, a bank owes no duty to nondepositors to investigate or disclose suspicious activities on the part of an account holder.' " (*Id.* at 17 (quoting *Casey v. U.S. Bank Nat'l Ass'n*, 127 Cal. App. 4th 1138, 1149, 26 Cal.Rptr.3d 401 (2005)).) Defendants explain that there is only one "narrow factual circumstance," not applicable here, in which court have found that banks owe a duty of care to non-customers—when banks are presented with checks with objective signs of fraud. (*Id.* at 17, 18 n.9.) Finally, Defendants argue there are sound policy reasons for not extending a bank's duty of care to non-customers: (1) the customer's right to privacy and (2) the importance of facilitating efficient transactions. (*Id.* at 17–18.)

**\*18** Plaintiffs do not dispute their status as non-customers. Instead, Plaintiffs argue Defendants owed them a duty of care based on their "special relationship" as intended beneficiaries of the bank's activities and transactions. (Doc. 17 at 28–31.) Plaintiffs urge the Court to weigh the factors set forth in *Biakanja v. Irving*, 49 Cal. 2d 647, 320 P.2d 16 (1958) and find that Defendants owed Plaintiffs a duty of care despite the lack of privity between the parties. (*Id.* at 29.) In support of their position, Plaintiffs cite *Doe v. Uber Techs., Inc.*, Case No. 19-cv-03310-JSC, 2020 WL 2097599, at *3 (N.D. Cal. May 1, 2020) and *Apex Directional Drilling, LLC v. SHN Consulting Engineers & Geologists*, Inc., 119 F. Supp. 3d 1117, 1124 (N.D. Cal. 2015), which the Court discusses below.[8] (*Id.* at 29–30.) Plaintiffs also argue Defendants had a duty of care to prevent misappropriation. (Doc. 17 at 31 (citing *Sun 'n Sand, Inc. v. United Cal. Bank*, 21 Cal. 3d 671, 148 Cal.Rptr. 329, 582 P.2d 920 (1978)).)

**a) The *Biakanja* Factors**

"*Biakanja* set[s] forth a list of factors that inform whether a duty of care exists between a plaintiff and defendant in the absence of privity[.]" *Beacon Residential Cmty. Ass'n v. Skidmore, Owings & Merrill LLP*, 59 Cal. 4th 568, 578, 173 Cal.Rptr.3d 752, 327 P.3d 850 (2014). In *Biakanja*, a plaintiff sued a notary public for negligently failing to properly attest his brother's will. *Biakanja*, 49 Cal. 2d at 648, 320 P.2d 16. The witnesses did not sign in the presence of each other, and the notary public did not acknowledge his signature in their presence. *Id.* As result, the plaintiff only received one-eighth of his brother's estate via intestate succession. *Id.* The principal questions before the *Biakanja* court were "whether defendant was under a duty to exercise due care to protect plaintiff from injury and was liable for damage caused plaintiff by his negligence even though they were not in privity of contract." *Id.* In finding for the plaintiff, the *Biakanja* court explained:

> The determination whether in a specific case the defendant will be held liable to a third person not in privity ... involves the balancing of various factors, among which are the extent to which the transaction was intended to affect the plaintiff, the foreseeability of harm to him, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, and the policy of preventing future harm.

*Id.* at 650. The court then concluded the defendant "must have been aware from the terms of the will itself that, if faulty solemnization caused the will to be invalid, plaintiff would suffer the very loss which occurred." *Id.* Therefore, the court concluded the "plaintiff should be allowed recovery despite the absence of privity[.]" *Id.* at 651, 320 P.2d 16.

Applying the *Biakanja* factors, Plaintiffs argue Defendants' transactions with SBF and FTX were intended to affect Plaintiffs because one of the principal purposes of Defendants' SEN was to enable FTX's ability to on-ramp

customers like Plaintiffs at a high volume and speed. (Doc. 17 at 29.) Plaintiffs then argue the foreseeability of harm to Plaintiffs was high because Defendants' SEN eliminated the time and due diligence function usually required to implement a transfer. (*Id.*) Finally, Plaintiffs argue their injury is certain because they cannot recover the money they entrusted to FTX and FTX and Alameda are in bankruptcy, (*id.)*; there is a close connection between Defendants' conduct and Plaintiffs' injury because Defendants opened the accounts and processed the transfers misappropriating money from Plaintiffs at the direction of FTX and Alameda, (*id.* at 29–30); Defendants' conduct is morally blameworthy because they knowingly processed transfers misappropriating money from Plaintiffs, (*id.* at 30); and imposing a duty of reasonable care on banks in these unique circumstances will prevent future harm without affecting traditional banking services, (*id.)*. Therefore, Plaintiffs conclude Defendants had a duty of care to FTX's customers.[9] (*Id.* at 30–31.)

**\*19** California courts have applied the *Biakanja* factors in a variety of contexts. *See, e.g., L. Firm of Fox & Fox*, 95 Cal. App. 5th at 192, 313 Cal.Rptr.3d 244 (banking); *Stewart v. Cox*, 55 Cal. 2d 857, 863, 13 Cal.Rptr. 521, 362 P.2d 345 (1961) (construction); *Sabella v. Wisler*, 59 Cal. 2d 21, 28–30, 27 Cal.Rptr. 689, 377 P.2d 889 (1963) (same). The Court has identified one case in which a court applied the *Biakanja* factors and found that a bank owed a duty of care to non-customer, third parties. *See L. Firm of Fox & Fox*, 95 Cal. App. 5th at 200, 313 Cal.Rptr.3d 244 ("The cases limiting a bank's duty to police customer accounts do not foreclose a finding of duty."). In *Law Firm of Fox & Fox*, a probate court ordered the establishment of a blocked account at a bank to hold the proceeds of the sale of real property. 95 Cal. App. 5th at 188. The order specified that the proceeds of the sale could be withdrawn only on court order. *Id.* The bank acknowledged receipt of the blocked account order and certified that no withdrawal would be permitted without a signed court order. *Id.* at 188–89. The probate court later issued the final probate order closing administration of the estate, which indicated that the law firm plaintiff was to receive a total of $66,324.64 in statutory compensation, attorneys' fees, and costs from the blocked account. *Id.* at 189. The bank did not distribute the funds to the law firm. *Id.* at 190. Instead, the bank allowed the administrator of the estate to withdraw all the funds in the blocked account. *Id.* The law firm plaintiff filed suit against the bank, alleging one cause of action for negligence. *Id.*

Applying the *Biakanja* factors, the *Law Firm of Fox & Fox* court found the bank owed the law firm plaintiff a duty of care. *See id.* at 192–203. The court reasoned that the blocked account order, in preventing disbursement of estate funds without a court order authorizing payment, was intended to affect the law firm plaintiff with a priority right to those funds. *See id.* at 197–98. Specifically, the court found that the bank and the law firm had a "special relationship" giving rise to a duty of care because the law firm was the intended beneficiary of the blocked account order. *Id.* at 197–198. The court also found that "[i]t was foreseeable that distributing the entirety of the funds in the blocked account to one beneficiary, without a court order directing disbursement of the funds, would harm the other beneficiaries," including the law firm plaintiff. *Id.* at 198. The court found that it was undisputed that the law firm plaintiff suffered injury as a result of the bank's conduct by depriving the law firm plaintiff of any payment, establishing a "close connection" between the bank's conduct and the law firm plaintiff's injury. *Id.* at 188–199. The court also found that "[h]olding banks accountable to intended beneficiaries for the negligent disbursement of funds from blocked accounts will create an incentive for banks to take steps to ensure estate funds placed in a blocked account are not distributed without clear court authorization, furthering the goal of protecting beneficiaries, who could not otherwise safeguard their interests." *Id.* at 200. The court, however, did not attach moral blame to the bank's conduct. *Id.* at 199.

The present case is a novel one involving the burgeoning crypto industry, and no *Biakanja* precedent squarely addresses circumstances analogous to this case. Nevertheless, given the California appellate court's recent willingness to extend a bank's duty of care to the third parties in *Law Firm of Fox & Fox*, the Court finds that the unique circumstances of this case also warrant finding a duty of care.

### (1) Analysis of Factors

As alleged, the Court finds that Plaintiffs, as FTX customers, were the intended beneficiaries of the Defendants' SEN platform, which was designed to facilitate and speed up crypto transactions. (FAC ¶¶ 57–58, 61.) The SEN specifically enabled FTX and SBF to continue to on-ramp new customers, like Plaintiffs, and allowed existing customers to trade crypto. (*Id.* ¶¶ 66, 186.) Thus, the first *Biakanja* factor—the extent to which the transaction was intended to affect the plaintiff—weighs in favor of finding a duty of care.

Additionally, the Court finds that, as alleged, Plaintiffs' injuries were a foreseeable consequence of Defendants'

conduct. First, Defendants engaged with crypto companies that were being "kicked out of their banks" due to the perception of risk. (*Id.* ¶¶ 44, 46–48.) Second, Defendants developed the SEN, which eliminated the due diligence time built into traditional bank transfers. (*Id.* ¶¶ 57–58, 61.) Finally, Defendants banked both FTX and Alameda and processed transfers and accepted deposits that sent FTX customer money to Alameda. (*Id.* ¶¶ 82, 97, 122, 170, 176–78, 184–85, 190.) FTX did not initially have a bank account, so customers were directed to wire money to Alameda's account with Defendants. (*Id.* ¶ 151.) It was foreseeable that allowing FTX customer funds to be deposited into non-FTX accounts would lead to fraud and harm the owners of those funds. Thus, the second *Biakanja* factor—the foreseeability of harm to plaintiff—weighs in favor of finding a duty of care.

**\*20** The Court also finds that, as alleged, Plaintiffs' injury is certain. "FTX collapsed in November 2022." (*Id.* ¶ 3.) On November 8, 2022, FTX paused all customer withdrawals. (*Id.* ¶ 142.) "On November 11, 2022, FTX filed for Chapter 11 bankruptcy ...." (*Id.* ¶ 150.) "According to a presentation released as part of the bankruptcy case on March 2, 2023, $8.9 billion of FTX customer funds remain missing." (*Id.* ¶ 158.) Thus, the third *Biakanja* factor—the degree of certainty that the plaintiff suffered injury—weighs in favor of finding a duty of care.

Finally, the Court also finds that, as alleged, there is a close connection between Defendants' conduct and Plaintiffs' injury and significant moral blame attached to Defendants' conduct. As set forth below, Plaintiffs have adequately alleged that Defendants knowingly aided and abetted the FTX and Alameda fraudulent scheme. (*See* section III.C.) Specifically, Plaintiffs allege that Defendants banked both FTX and Alameda and processed transfers and accepted deposits that sent FTX customer money to Alameda. (*Id.* ¶¶ 82, 97, 122, 170, 176–78, 184–85, 190.) In fact, FTX did not initially have a bank account, so customers were directed to wire money to Alameda's account with Defendants. (*Id.* ¶ 151.) Silvergate then benefitted from the fraud. "Silvergate profited from dollar deposits by digital-asset customers, and these deposits grew exponentially as FTX's own business expanded." (*Id.* ¶ 97.) By the end of September 2022, "FTX alone constituted nearly 10% of the $11.9 billion in deposits, or about $1.2 billion" of Silvergate's overall deposit base. (*Id.* ¶ 75.) Thus, Silvergate had a strong incentive to continue accepting FTX and Alameda customer deposits and executing transfers because Silvergate's business centered around the adoption of the FTX exchange platform and app. (*Id.* ¶

98.) Silvergate also earned income from transaction fees and interest on money deposited in FTX accounts. (*Id.*) Before Silvergate went public on November 7, 2019, and before Silvergate attracted FTX as a client, Silvergate had an annual net income of only $7.6 million. (*Id.* ¶ 99.) By 2021, Silvergate's annual net income had increased to $75.5 million. (*Id.*) Thus, the fourth and fifth *Biakanja* factors—the closeness of the connection between the defendant's conduct and the injury suffered and the moral blame attached to the defendant's conduct—weigh in favor of finding a duty of care.

The Court does not address the sixth *Biakanja* factor—the policy of preventing future harm. However, on balance, having found that five out of the six *Biakanja* factors weigh in favor of finding a duty of care, the Court finds that Plaintiffs have adequately alleged that Defendants owed Plaintiffs a duty of care under the unique circumstances of the present case.

### (2) Supporting Case Law

The cases cited by Plaintiffs also support finding a duty of care. In *Apex*, a contractor relied on information and reports from the lead engineer and project manager when bidding on a project in Eureka. 119 F. Supp. 3d at 1120. After beginning work, the contractor encountered unforeseen adverse conditions. *Id.* The contractor "[incurred] unforeseen expenses and [lost] valuable equipment[.]" *Id.* The contractor sued the lead engineer/project manager for (1) breach of professional duty; (2) negligent misrepresentation; and (3) tort of another. *Id.* Applying the factors set forth in *Biakanja*, the *Apex* court determined the lead engineer and project manager owed the contractor a duty of care because the contractor was the "intended beneficiary" of the lead engineer and project manager's "specifications and advice," the lead engineer had "positive knowledge ... that its actions were directly responsible for considerable losses," and the lead engineer and project manager's conduct hinted at bad faith. 119 F. Supp. 3d at 1122–26.

**\*21** Here, like in *Apex* where the contractor was the intended beneficiary and recipient of the lead engineer and project manager's report, Plaintiffs were the intended beneficiaries of the SEN and Defendants' interactions with FTX and Alameda. The SEN was designed to speed up crypto transactions by eliminating the due diligence time built into traditional bank transfers. (FAC ¶¶ 57–58, 61.) The SEN then enabled FTX to on-ramp new customers.

(*Id.* ¶¶ 66, 186.) Thus, the SEN drove new customers to FTX and new deposits to Defendants. (*Id.* ¶ 2.) Therefore, as FTX customers, Plaintiffs were intended beneficiaries of Defendants' SEN and interactions with FTX and Alameda, which supports finding a duty of care.

Relatedly, in *Doe*, the plaintiff brought various tort claims against Uber Technologies, Inc. ("Uber") after she was assaulted by a former Uber driver posing as a current Uber driver. *2020 WL 2097599, at \*1*. The *Doe* plaintiff argued Uber's legal duty to her "arose from Uber's affirmative acts because it 'through [its] own action (misfeasance) has made the plaintiff's position worse and has created a foreseeable risk of harm from the third person.' " *Id.* at \*3. The plaintiff argued Uber created the very risk of harm that she suffered by poorly screening drivers, not controlling the distribution of its decals, and representing that it was safe to ride in Uber-marked vehicles. *Id.* The plaintiff also argued "Uber created a seismic shift in the transportation industry through its novel process for matching riders with drivers and that Uber increased the risk to riders as it did so by making stick-on or tape-on paper decals which were the cornerstone of the matching process." *Id.* The *Doe* court found that plaintiff had "plausibly alleged that Uber did something that put her in a worse position—namely, that it changed the transportation industry to encourage people (women in particular) to get into vehicles with strangers based on the presence of a decal in a car window and provided assurances about the safety of riding in these Uber decaled vehicles, but did not control the distribution of the decals." *Id.* In other words, the court concluded that the plaintiff's allegations supported an inference that Uber's actions created a foreseeable risk of harm to the plaintiff. *Id.*

Here, Defendants were one of few banks willing to service the crypto industry. (FAC ¶¶ 41, 45.) Crypto companies, like FTX, were getting kicked out of other banks due to the significant risks. (*Id.* ¶¶ 44, 46–48.) Nevertheless, Defendants became a crypto-focused bank. (*Id.* ¶ 48.) Silvergate introduced the SEN, which was designed to facilitate and speed up crypto transactions by eliminating the due diligence time built into traditional bank transfers. (FAC ¶¶ 57–58, 61.) In fact, a user-friendly exchange on FTX was virtually impossible before the SEN because the SEN network enabled FTX and SBF to continue to on-ramp new customers and allow existing customers to trade crypto. (*Id.* ¶¶ 66, 186.) Due in large part to the SEN, Defendants became the go-to bank for the crypto industry, including more than a dozen crypto companies that ended up under investigation, shut

down, fined, or in bankruptcy. (*Id.* ¶¶ 61, 78.) Thus, as in *Doe*, Defendants created a "seismic shift" in the crypto industry and increased the risk of harm to Plaintiffs by developing the SEN network that allowed crypto companies to quickly on-board new customers and facilitate instantaneous crypto transactions for existing customers. *See 2020 WL 2097599 at \*3*. Therefore, as in *Doe*, Plaintiffs' allegations support the inference that Defendants' actions created a foreseeable risk of harm to Plaintiff, which supports finding a duty of care. *Id.*

#### b) Duty to Prevent Misappropriation

**\*22** In their Opposition, Plaintiffs also argue the present case is analogous to cases in which individuals attempted to deposit checks bearing objective signs of fraud. (Doc. 17 at 31 (citing *Sun 'n Sand, Inc., 21 Cal. 3d at 692–96, 148 Cal.Rptr. 329, 582 P.2d 920*).) In these instances, California courts have found the banks may have a "duty to make reasonable inquiries" when "the circumstances alleged" are "sufficiently suspicious" and the risks are "sufficiently apparent." *Sun 'n Sand, Inc., 21 Cal. 3d at 693, 148 Cal.Rptr. 329, 582 P.2d 920* ("We must decide, however, whether the circumstances alleged were sufficiently suspicious, and the risks thus sufficiently apparent, that a duty to make reasonable inquiries arose."). In *Sun 'n Sand*, the California Supreme Court found "an attempt by a third party to divert the proceeds of a check drawn payable to the order of a bank to the benefit of one other than the drawer or drawee suggests a possible misappropriation" and concluded that the "allegations define circumstances sufficiently suspicious that [the bank] should have been alerted to the risk that [its] employee was perpetrating a fraud." *21 Cal. 3d at 694–95, 148 Cal.Rptr. 329, 582 P.2d 920*. In such instances, a bank has a duty to make reasonable inquiries to discover the fraudulent scheme and prevent its success. [10] *Id.* [11]

"Aside from the narrow *Sun 'n Sand* exception, courts have refrained from imposing on banks a duty to third parties to monitor bank account transactions for suspicious activity." *L. Firm of Fox & Fox, 95 Cal. App. 5th at 202, 313 Cal.Rptr.3d 244; c.f. Kurtz-Ahlers, LLC v. Bank of Am., N.A., 48 Cal. App. 5th 952, 958, 262 Cal.Rptr.3d 420 (2020)* ("The argument fails because the factual circumstances of this case, no matter how 'suspicious,' do not match the very particular factual scenario the Supreme Court addressed in *Sun 'n Sand*.") For example, in *Chazen v. Centennial Bank*, the California appellate court explained that "*Sun 'n Sand* and its progeny have held banks to be subject to a duty of care

toward non-depositors *only in narrow factual circumstances*" involving a "bank's liability for allowing a person to deposit a check, payable to someone else, into a personal account, under circumstances that should have alerted the bank to the possibility of fraud." 61 Cal. App. 4th 532, 545, 71 Cal.Rptr.2d 462 (1998). The *Chazen* court noted that it was "not clear whether the decisions can be applied to other factual circumstances" but that the "decisions appear, at least in part, to reflect policy applying specifically to the negotiation of a check by a person who is not the named payee." *Id.* For this reason, the Court declines to extend the ruling in *Sun 'n Sand* to the present case. However, having already found that Defendants owed Plaintiffs a duty of care based on their "special relationship" as intended beneficiaries, the Court's unwillingness to extend the *Sun 'n Sand* exception to the present case is not fatal to Plaintiffs' negligence claim.

### 2. Causation

Defendants argue their alleged conduct was not a substantial factor in causing Plaintiffs' injury, i.e., their inability to withdraw their deposited funds, because the "primary," "direct," and "proximate" causes of Plaintiffs' injury were the fraudulent actions by FTX and SBF, not Defendants. (Doc. 16 at 19.) Specifically, Defendants argue Plaintiffs' fail to allege that had Defendants not processed the transfers, FTX would not have been able to find another bank that would. (*Id.*) Plaintiffs, on the other hand, argue Defendants' technology was crucial to FTX's existence and that Defendants processed transfers that diverted money from FTX accounts to Alameda. (Doc. 17 at 31.)

**\*23** "To determine causation in fact, California has adopted the substantial factor test set forth in the Restatement Second of Torts, Section 431. "An event will be considered a substantial factor in bringing about harm if it is recognizable as having an appreciable effect in bringing it about." *Kumaraperu v. Feldsted*, 237 Cal. App. 4th 60, 68, 187 Cal.Rptr.3d 583 (2015) (internal citations and quotation marks omitted). An "actor's negligent conduct is not a substantial factor in bringing about harm to another if the harm would have been sustained even if the actor had not been negligent." *Mills v. U.S. Bank*, 166 Cal. App. 4th 871, 899, 83 Cal.Rptr.3d 146 (2008) (internal citations and quotation marks omitted) (emphasis removed) (citing *Viner v. Sweet*, 30 Cal. 4th 1232, 1240, 135 Cal.Rptr.2d 629, 70 P.3d 1046 (2003)).

Plaintiffs have adequately alleged Defendants' conduct was a substantial factor in causing Plaintiffs' injury because it

had an appreciable effect in bringing about their injury. *See Kumaraperu*, 237 Cal. App. 4th at 68, 187 Cal.Rptr.3d 583. Plaintiffs allege Defendants facilitated the FTX and Alameda scheme by developing the SEN, which was a key part of FTX's growth. (*See* FAC ¶¶ 57, 67–68, 182–83, 186, 188–190.) Plaintiffs allege user-friendly crypto exchanges like FTX were virtually impossible before the SEN and that the SEN allowed Defendants to become the go-to bank for more than a dozen crypto companies that ended up under investigation, shut down, fined, or in bankruptcy, including FTX and Alameda. (*See id.* ¶¶ 66, 78.) Plaintiffs also adequately allege that Defendants banked both FTX and Alameda and processed transfers and accepted deposits that sent FTX customer money to Alameda. (*See id.* ¶¶ 82, 97, 122, 170, 176–78, 184–85, 190.) Thus, Defendants' conduct had an appreciable effect in bringing about Plaintiffs' harm.

The Court is also not persuaded by Defendants' argument that Plaintiffs' fail to allege that had Defendants not processed the transfers, FTX would have been able to find another bank that would. (Doc. 16 at 19.) While Defendants are correct their "negligent conduct is not a substantial factor in bringing about harm if the harm would have been sustained even without the [ ] conduct" (Doc. 16 at 19 (citing *Viner*, 30 Cal. 4th at 1240, 135 Cal.Rptr.2d 629, 70 P.3d 1046)), *Viner* was decided on summary judgment. *Viner* does not address the sufficiency of pleadings at the motion to dismiss stage. Additionally, the suggestion by Defendants that FTX and Alameda would have found another bank to create an SEN-like platform that revolutionized crypto transactions is highly speculative. Likewise, the suggestion by Defendants that Plaintiffs would have found another bank to process transfers that diverted FTX customer funds to Alameda is also highly speculative. Plaintiffs allege Defendants were one of few banks willing to service the crypto industry and that crypto companies like FTX were getting kicked out of other banks due to the significant risks servicing these companies posed. (*Id.* ¶¶ 41, 44, 45–48.) Plaintiffs then allege that Defendants created the SEN, which was designed to facilitate and speed up crypto transactions (*id.* ¶¶ 57–58, 61) and enabled FTX to on-ramp new customers, like Plaintiffs, and allowed existing customers to trade crypto instantaneously (*id.* ¶¶ 66, 186). Plaintiffs further allege that Defendants processed transfers and accepted deposits that sent FTX customer money to Alameda. (*See id.* ¶¶ 82, 97, 122, 170, 176–78, 184–85, 190.) At the pleading stage, the Court finds that Plaintiffs have adequately alleged that Defendants' conduct was a "substantial factor" in causing Plaintiffs' harm.

Bhatia v. Silvergate Bank, --- F.Supp.3d ---- (2024)

### 3. Conclusion

**\*24**  For the foregoing reasons, the Court finds Plaintiffs have adequately alleged facts supporting a claim for negligence. Defendants' Motion to Dismiss Plaintiffs' negligence claim is **DENIED**.

### C. Plaintiffs' "Aiding and Abetting" Tort Claims (Counts 1, 2, and 4)

To plead any claim for aiding and abetting a tort under California law, Plaintiffs must allege that Defendants either: "(a) [knew] the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other to so act or (b) gives substantial assistance to the other in accomplishing a tortious result and the person's own conduct, separately considered, constitutes a breach of duty to the third person." *Casey*, 127 Cal. App. 4th at 1144, 26 Cal.Rptr.3d 401 (internal quotation marks and citations omitted). The parties address the first prong only.

"[L]iability for aiding and abetting depends on proof the defendant had *actual knowledge* of the *specific primary wrong* the defendant *substantially assisted*." *Id.* at 1145, 26 Cal.Rptr.3d 401 (emphasis added). "In California state courts, this means that 'on demurrer, a court must carefully scrutinize whether the plaintiff has alleged the bank had actual knowledge of the underlying wrong it purportedly aided and abetted.' " *Chang v. Wells Fargo Bank*, N.A., Case No. 19-cv-01973-HSG, 2020 WL 1694360, at \*3 (N.D. Cal. Apr. 7, 2020) (citation omitted). However, "[w]hether or not that is true as a matter of California civil procedure, in federal court, the Federal Rules of Civil Procedure apply." *In re Woodbridge Invs. Litig.* (*"Woodbridge"*), Case No. CV 18-103-DMG (MRWx), 2020 WL 4529739, at \*5 (C.D. Cal. Aug. 5, 2020) (citing *Aceves v. Allstate Ins. Co.*, 68 F.3d 1160, 1167 (9th Cir. 1995)). Under the Federal Rules of Civil Procedure, "substantial assistance of the underlying fraud 'must be pleaded with particularity,' while actual knowledge of the underlying fraud 'may be averred generally.' " *Lorenz v. E. W. Bancorp, Inc.*, Case No. 2:15-cv-06336-CAS(FFMx), 2016 WL 199392, at \*7 (C.D. Cal. Jan. 14, 2016) (quoting *Allstate Ins. Co. v. Countrywide Fin. Corp.*, 824 F. Supp. 2d 1164, 1188 (C.D. Cal. 2011)) (citing Fed. R. Civ. P. 9(b)); *In re First Alliance Mortgage Co.*, 471 F.3d 977, 993 (9th Cir. 2006)); *see also Su v. Henry Glob. Consulting Grp.*, Case No. 22-cv-02235-ODW (PLAx), 2022 WL 19392, at \*4 (C.D. Cal. Jan. 3, 2022) ("Although actual knowledge of the underlying fraud may be averred generally, the substantial assistance prong of an aiding and abetting claim must be

pleaded with particularity.") (quotation marks and citation omitted).

Defendants argue each of Plaintiffs' aiding and abetting claims fails as a matter of law because "Plaintiffs do not satisfy the 'actual knowledge' or 'substantial assistance' prongs as to any of FTX's alleged torts, and so cannot proceed on any aiding and abetting theory." (Doc. 16 at 19–26.) Additionally, Defendants argue Plaintiffs' aiding and abetting breach of fiduciary claim also fails because FTX and SBF did not owe any fiduciary duties to their customers as a matter of law. (*Id.* at 23–24, 26–28.)

In their Opposition, Plaintiffs argue they have adequately pled that Defendants aided and abetted fraud, conversion, and breach of fiduciary duty because Defendants had actual knowledge of and substantially assisted FTX and Alameda's fraudulent scheme. (Doc. 17 at 17–24.) Additionally, Plaintiffs argue FTX owed fiduciary duties to its customers as custodians of their funds, which were breached by its fraud in misdirecting those funds to Alameda. (*Id.* at 24–26.) The Court addresses each of these arguments below.

### 1. Actual Knowledge

**\*25**  In their Motion to Dismiss, Defendants argue that the Court "cannot reasonably infer that Defendants had actual knowledge of FTX's specific plan to defraud its own customers." (Doc. 16 at 22.) Defendants argue that Plaintiffs infer actual knowledge from the existence of their BSA/AML and due diligence programs, the red flags that such programs would have triggered, and the fact that FTX's transactions were "visible" to Defendants. (*Id.*) Defendants then contend that Plaintiffs "leap to the conclusion" that the fraudulent transactions occurred in "plain sight" of Defendants. (*Id.*) Additionally, Defendants argue that Plaintiffs' FAC compels the opposite inference, that Defendants were not aware of FTX's fraudulent scheme. (*Id.* at 23.)

Plaintiffs argue that they have expressly alleged that Defendants had actual knowledge of the fraudulent scheme and that they have supported this allegation with "detailed facts." (Doc. 17 at 18.) Plaintiffs identify allegations that: (1) Defendants were required to monitor FTX and Alameda's accounts; (2) Defendants actually monitored FTX and Alameda's accounts; (3) Defendants conducted significant due diligence on FTX and Alameda; (4) numerous red flags and atypical banking activities were visible to Defendants; and (5) Alameda then transferred money to its executives for personal use. (*Id.* at 18–19.) Plaintiffs then contend that these

facts are sufficient to plead "actual knowledge" under relevant case law. (*Id.* at 19.) [12]

The Court concludes, at this stage, Plaintiffs have adequately pled actual knowledge, which may be averred generally in federal court. *See Lorenz*, 2016 WL 199392 at *7; *Su*, 2022 WL 19392 at *4. First, Plaintiffs directly allege Defendants knew about FTX's fraudulent scheme. (*See* FAC ¶¶ 3, 176, 181, 216, 230–31, 238–39, 245.) "This sort of direct allegation (really, assertion) of actual knowledge is a *critical threshold* consideration in cases applying California aiding and abetting law in circumstances like these." *Chang*, 2020 WL 1694360 at *4 (emphasis added).

"[T]he next question is whether the complaint pleads sufficient facts to make that allegation plausible as required by *Twombly.*" *Id.* (citing *Evans v. ZB, N.A.*, 779 Fed. Appx. 443, 445 (9th Cir. 2019) and *Benson v. JPMorgan Chase Bank, N.A.*, No. C-09-5272 EMC, 2010 WL 1526394, at *3, 5 (N.D. Cal. Apr. 15, 2010)). Here, the Court finds Plaintiffs have pled sufficient facts to make their allegations regarding actual knowledge plausible.

Plaintiffs allege Defendants are required to comply with the Bank Secrecy Act, which requires Defendants to maintain anti-money laundering and due diligence programs, both of which require Defendants to take reasonable steps to ascertain the source of funds deposited into private banking accounts and the purpose and the expected use of those accounts. (*See* FAC ¶¶ 16–17, 19, 25.) These compliance procedures must also be integrated into any automated data processing system, such as Defendants' SEN. (*See id.* ¶ 23.) In addition, enhanced due diligence procedures are required when establishing or maintaining an account for a financial institution that operates under an offshore license (as FTX did). (*See id.* ¶¶ 27, 95.)

Plaintiffs then allege Defendants followed through and carried out these programs. Defendants' public filings stated they "invested heavily in [their] risk management and compliance infrastructure" and "developed a strong risk management and compliance framework." (*Id.* ¶ 162.) Defendants also stated its "onboarding process ... includes extensive regulatory compliance diligence," that they comprehensively investigated its customers, and that their processes were more extensive for customers posing a higher degree of risk. (*Id.* ¶¶ 163–64, 166.) In fact, Lane himself stated the law required Defendants "to determine the beneficial owner, the source of funds, and the purpose and expected use of the funds." (*Id.* ¶¶ 167–69.) Lane also

stated Defendants monitored transaction activity for every account and identified activity outside of the expected usage. (*Id.* ¶¶ 167–68.) Finally, Lane stated Defendants conducted significant due diligence on FTX and Alameda, specifically:

> **\*26** *Silvergate conducted significant due diligence on FTX and its related entities including Alameda Research*, both during the onboarding process and through *ongoing monitoring*, in accordance with our risk management policies and procedures and the requirements outlined above.

(*Id.* ¶ 168 (emphasis added) (quoting December 5, 2022 Public Letter).)

Plaintiffs' FAC also alleges Defendants held numerous accounts for SBF-related entities, including FTX Ventures, Ltd., FTX US, Alameda, and North Dimension, and that "the FTX/Alameda accounts [with Defendants] featured all of the following red flags:"

Unusual transfers of funds among related accounts or accounts that involve the same or related principals.

Transfer activity that is unexplained, repetitive, or shows unusual patterns.

Fund transfers are sent in large, round-dollar, hundred-dollar, or thousand-dollar amounts.

Frequent involvement of multiple jurisdictions or beneficiaries located in higher-risk offshore financial centers or transfers to or from institutions in higher risk jurisdictions.

An individual company exhibits a high volume and pattern of funds transfers that is inconsistent with its normal business activity.

The purpose of the shell company is unknown or unclear.

Payments or receipts with no apparent links to legitimate contracts, goods, or services are received.

(*Id.* ¶¶ 170–72.) With regards to Alameda and FTX, specifically, Plaintiffs allege Defendants discovered through their compliance and due diligence programs that FTX

and Alameda never retained an outside auditor, never generated audited financial statements, did not observe corporate formalities, accepted several billion dollars from FTX customers which was deposited in trading accounts in the name of or associated with Alameda, and more. (*Id.* ¶¶ 173–79.) Therefore, the Court finds that Plaintiffs have adequately pled "actual knowledge."

**a) Supporting Case Law**

The federal cases cited by Plaintiffs support the Court's finding. In *Chang*, the plaintiffs alleged that non-parties to the litigation "solicited investors by promising them returns generated by investments in a real estate investment program that purchased, renovated, and developed real estate in Chicago." 2020 WL 1694360, at *1. However, the scheme was a "sham." *Id.* According to the plaintiffs, Wells Fargo was the only bank used for the scheme, Wells Fargo processed all the transactions, Wells Fargo knew the accounts held investor money, Wells Fargo knew investor money was being misused, misappropriated, and commingled among the non-parties' various accounts. *Id.* The *Chang* court determined that, "[w]hile [Wells Fargo] repeatedly argues that [the] [p]laintiffs must plead details like who ... when ... or how anyone at Wells Fargo actually discovered anything, that is not the standard at this stage." *Id.* at *5. Therefore, the court found that plaintiffs' claim that Wells Fargo had actual knowledge of the fraud was plausible. *Id.* Here, as in *Chang*, Plaintiffs allege "a number of facts in support of their claim" that Defendants knew FTX was defrauding its customers. *Id.* at *4.

Likewise, in *Woodbridge*, the plaintiffs alleged that the bank knew of its role in a customer's Ponzi scheme. 2020 WL 4529739, at *6. The plaintiffs included extensive allegations regarding the bank's "close business relationship" with the schemers, its awareness of banking activities not consistent with the scheming company's stated business model, and disbursements and personal expenditures from investor funds. *Id.* The court then noted that "[t]he Ninth Circuit ... has suggested that a bank's decision to ignore suspicious activity or red flags is sufficient to demonstrate actual knowledge." *Id.* (citing *In re First All. Mortg. Co.*, 471 F.3d 977, 999 (9th Cir. 2006) ("That [the bank] came upon red flags which were seemingly ignored was enough to establish actual knowledge under the California aiding and abetting standard ...."). For this reason, the court concluded that the bank's ignorance of red flags of which it was aware, especially in conjunction with

allegations of the closeness of the bank and the schemers and the obvious flaws of the schemers' purported business model, were sufficient to plead a claim for aiding and abetting fraud. *Id.* at *7.

*27 Here, as in *Woodbridge*, Plaintiffs allege that numerous red flags were visible to Defendants, which they ignored. (FAC ¶¶ 170, 172.) Under *Woodbridge*, this alone is sufficient to demonstrate actual knowledge. *See* 2020 WL 4529739, at *6 (citing *In re First All. Mortg. Co.*, 471 F.3d at 999). In addition, Plaintiffs allege that Defendants had a "close business relationship" with FTX and Alameda. Plaintiffs allege that FTX and its affiliates, all controlled by SBF, were Defendants' best and most important customers, accounted for almost 10% of Defendants' business, and that FTX and its affiliates' business operations and interests were tightly intertwined with Defendants' business operations and interests. (FAC ¶¶ 2, 68, 97, 180.) Tellingly, Defendants featured SBF's emphatic endorsement on their website. (*Id.* ¶¶ 2, 188–89.) Plaintiffs also allege that a user-friendly exchange like FTX was virtually impossible before Defendants' SEN because it allowed FTX users to trade fiat and crypto nearly instantaneously. (*Id.* ¶¶ 66–67.) Thus, Defendants' SEN allowed Defendant Silvergate Bank to become the go-to bank for FTX (*id.* ¶ 78), and Defendants' core business centered around income from FTX transaction fees and interest on money deposited in FTX and Alameda accounts (*id.* ¶¶ 98, 180). In fact, the loss of FTX and Alameda as clients was devastating for Defendants, as demonstrated by Defendants' collapse only four months after FTX and Alameda's collapse. (*Id.* ¶¶ 4, 180.) Thus, as in *Woodbridge*, Plaintiffs' allegations regarding Defendants "close business relationship" with FTX and Alameda support the Court's finding that Plaintiffs have adequately pled "actual knowledge."

Plaintiffs allege that Defendants were aware of banking activities not consistent with FTX and Alameda's stated business models. Plaintiffs allege that FTX customers wired money to North Dimension, a shell company owned by Alameda, even though North Dimension was purportedly a website that sold electronics, which Defendants would have discovered through "ordinary due diligence," which includes typical internet searches. (*See id.* ¶¶ 20, 126–127.) Plaintiffs also allege Defendants saw small deposits going to Alameda's trading account even though hedge funds do not typically generate high volumes of small deposits from a large number of individuals. (*Id.* ¶ 177.) Thus, as in *Woodbridge*, Plaintiffs' allegations regarding FTX and Alameda transactions inconsistent with their stated business

models support the Court's finding that Plaintiffs' adequately pled "actual knowledge."

Lastly, in *Benson*, the court found that the plaintiffs had sufficiently alleged a bank's actual knowledge of a customer's Ponzi scheme selling fraudulent Certificates of Deposit ("CDs") because the plaintiffs alleged that the bank knew that the schemers were not registered to sell securities, knew the checks deposited into the accounts indicated they were for purchasing CDs, knew that investor deposits were comingled, knew that deposits were being wired to offshore bank accounts, and knew that the deposits were being used to personal expenses. 2010 WL 1526394 at *3. The assertion that the bank had actual knowledge was also supported by additional allegations that the bank maintained a close business relationship with the schemers and that the schemers' accounts were among the largest accounts handled by the branch. *Id.* at *4.

Here, Plaintiffs allege that FTX and Alameda moved offshore to evade United States regulatory requirements, including United States securities laws. (*Id.* ¶¶ 95–96.) Plaintiffs allege that SBF and other FTX and Alameda insiders moved to Hong Kong in 2019 and 2020, that FTX and Alameda relocated to the Bahamas in November 2021, that SBF formed and registered Alameda Research Ltd. as a British Virgin Islands (BVI) limited corporation. (*Id.* ¶¶ 95, 124.) Plaintiffs also allege FTX customer funds were used to make political donations, purchase real estate, and support lavish lifestyles for the FTX and Alameda executives. (*Id.* ¶ 132.) Thus, as in *Benson*, Plaintiffs' allegations regarding the involvement of offshore jurisdictions and the payment of personal expenses also support a finding that Plaintiffs' have adequately pled actual knowledge.

Defendants cite two federal cases deciding the sufficiency of actual knowledge allegations: *Mackintosh v. JPMorgan Chase Bank*, Case No. 18-cv-03348-SK, 2018 WL 3913791, at *3 (N.D. Cal. July 13, 2018) and *Freeney v. Bank of Am. Corp.*, CV 15-2376-JGB-PJWx, 2016 WL 5897773, at *10–11 (C.D. Cal. Aug. 4, 2016). (*See* Doc. 16 at 19–25.) Each case is distinguishable from the present case.

**\*28** In *Mackintosh*, an elderly plaintiff fell victim to a sweepstakes scam. 2018 WL 3913791 at *1. Non-parties told the plaintiff he had won a sweepstakes and that he needed to pay the taxes and fees associated with the prizes to collect his winnings. *Id.* Over the course of eight months, the plaintiff made more than 30 cash withdrawals in sums ranging

from $1,000 to $100,000, totaling more than $1,000,000. *Id.* The plaintiff filed suit against the bank for aiding and abetting fraud, and the bank moved to dismiss the claim. *Id.* The district court found the plaintiff only pled facts to show constructive knowledge, not actual knowledge. *Id.* at *3. The court noted the plaintiff specifically alleged the bank had "actual *and/or* constructive knowledge" and the plaintiff only alleged facts showing constructive knowledge, e.g., that he and his wife almost never withdrew cash from the bank and yet, over an eight-month period, Macintosh made over 30 cash withdrawals. *Id.* at *3 (emphasis added). Here, however, Plaintiffs explicitly stated Defendants had actual, not constructive, knowledge of the FTX and Alameda fraud. (*See* FAC ¶¶ 3, 176, 181, 216, 230–31, 238–39, 245.) Plaintiffs then alleged detailed facts showing Defendants, through their anti-money laundering and due diligence programs, were aware of FTX and Alameda's fraudulent scheme. (*See e.g., id.* ¶¶ 170, 172–79.) Thus, *Mackintosh* is readily distinguishable from the present case. [13]

In *Freeney*, the plaintiffs alleged a bank employee opened a Miami Beach bank account for a Los Angeles restaurant "without questioning" why a Miami Beach bank account was needed, "why millions of dollars were flowing through the account without remaining on deposit for more than a few hours," and did nothing to determine what the fraudulent company was for. 2016 WL 5897773, at *11. The court concluded that the plaintiff's allegations more directly led to the inference that the bank employee did not know funds were being misappropriated due to his negligence, not that the employee (for whom the bank was vicariously liable) had "actual knowledge" of the fraud. *Id.* Here, however, Plaintiffs explicitly allege Plaintiffs had "actual knowledge" of the FTX and Alameda fraud because they monitored the FTX and Alameda accounts that exhibited numerous red flags, including the transfer of FTX customer funds into accounts belonging to Alameda and its affiliates. (*See* FAC ¶¶ 3, 170, 172–79, 181, 216, 230–31, 238–39, 245.) While the *Freeney* defendant may not have known "why millions of dollars were flowing through the account," here Defendants saw and facilitated the transfer of FTX customer funds to accounts owned by Alameda. Thus, unlike in *Freeney*, Plaintiffs' allegations do not compel the conclusion, that Defendants, due to their negligence, were unaware of the FTX/Alameda fraud.

Finally, Defendants' reliance on the California state appellate court's decision in *Casey v. U.S. Bank* ("*Casey*") is also misplaced. As stated above, in federal court, the federal rules

of civil procedure apply, which state that knowledge " 'may be averred generally.' " *Lorenz*, 2016 WL 199392 at *7 (quoting *Allstate Ins. Co.*, 824 F. Supp. 2d at 1188). In *Casey*, the court found liability for aiding and abetting depends on proof the defendant had actual knowledge of the *specific primary wrong* the defendant substantially assisted. *Casey*, 127 Cal. App. 4th at 1145, 26 Cal.Rptr.3d 401 (emphasis added). While the complaint alleged that the bank "knew something fishy was going on" with the accounts opened by the company executives, that the executives were involved in "wrongful or illegal conduct," and that the executives were involved in a criminal or dishonest and wrongful enterprise, e.g., money laundering, the complaint in *Casey* did not allege that the bank was aware that company executives were diverting funds from the company for their own personal use. *See id.* at 1149, 1152–53, 26 Cal.Rptr.3d 401. The court's decision hinged largely on that fact that the bank did not know the source of the funds deposited in the fraudulent accounts. *Id.* at 1152, 26 Cal.Rptr.3d 401. Here, on the other hand, Plaintiffs have alleged that Defendants knew that FTX was diverting customer funds to Alameda accounts, i.e., the specific primary wrong. (*See* FAC ¶¶ 3, 176, 181, 216, 230–31, 238–39, 245.) Plaintiffs then allege detailed facts showing Defendants, through their anti-money laundering and due diligence programs, witnessed FTX/Alameda's fraudulent scheme, and, unlike in *Casey*, were aware of the source of the funds. (*See e.g., Id.* ¶¶ 170, 172–79.)

**\*29** Based on the foregoing, the Court finds Plaintiffs have adequately pled actual knowledge, and the Court proceeds to substantial assistance.

### 2. Substantial Assistance
Defendants argue Plaintiffs have failed to plead Defendants "substantially assisted" FTX and Alameda's fraud, conversion, and breach of fiduciary duty. (Doc. 16 at 25–26.) Specifically, Defendants argue they did not actively and knowingly participate in the wrong and that their conduct was not a "substantial factor" in causing Plaintiffs' injury. (*Id.* at 25.) Defendants also argue that their "ordinary business transactions" cannot constitute "substantial assistance" if they did not know that their banking transactions were assisting FTX and Alameda's scheme, which they argue they did not. (*Id.* at 25–26.) Defendants' arguments regarding "substantial assistance" largely overlap with their arguments regarding "actual knowledge."

Plaintiffs, on the other hand, argue Defendants were key to the entire scheme because their SEN was crucial to FTX's

existence and because Silvergate processed transfers that diverted money from FTX to Alameda. (Doc. 17 at 23.) Plaintiffs argue Defendants' ordinary business transactions are sufficient to find that Defendants substantially assisted the scheme because Defendants had "actual knowledge" of the scheme. (*Id.* at 23–24.) Alternatively, Plaintiffs argue that Defendants did more than conduct "ordinary business transactions" because they defied industry norms by banking FTX, Alameda, and other crypto companies and by establishing the SEN. (*Id.* at 24.) [14]

Both parties agree that " '[s]ubstantial assistance requires a significant and active, as well as a knowing participation in the wrong,' and 'a plaintiff must [also] allege that the defendant's conduct was a substantial factor in bringing about the injury allegedly suffered by the plaintiff.' " *Chang*, 2020 WL 1694360 at *6; *see also Facebook, Inc. v. MaxBounty, Inc.*, 274 F.R.D. 279, 285 (N.D. Cal. 2011) ("Substantial assistance requires that the defendant's actions be a 'substantial factor' in causing the plaintiff's injury.") (internal quotation marks and citation omitted); *Am. Master Lease LLC v. Idanta Partners, Ltd.*, 225 Cal. App. 4th 1451, 1476–78, 171 Cal.Rptr.3d 548 (2014) (finding that the defendants substantially assisted the breach of fiduciary duties). Likewise, both parties agree that "ordinary business transactions" can satisfy the substantial assistance element of an aiding and abetting claim if the defendant actually knew those transactions were assisting the principal in committing a specific tort. *See Chang*, 2020 WL 1694360, at *6; *In re First All. Mortg. Co.*, 471 F.3d at 993–95; *Casey*, 127 Cal. App. 4th at 1145, 26 Cal.Rptr.3d 401.

**\*30** Here, as explained *supra* in Section IV.C.1, Plaintiffs have adequately alleged "actual knowledge," meaning Defendants' "ordinary business transactions" can satisfy the substantial assistance element of an aiding and abetting claim. *See Chang*, 2020 WL 1694360, at *6; *In re First All. Mortg. Co.*, 471 F.3d at 993–95; *Casey*, 127 Cal. App. 4th at 1145, 26 Cal.Rptr.3d 401. Plaintiffs additionally allege Defendants substantially assisted the FTX and Alameda scheme by developing the SEN, which was a key part of FTX's growth. (*See* FAC ¶¶ 57, 67–68, 182–83, 186, 188–190.) Plaintiffs also adequately allege Defendants banked both FTX and Alameda and processed transfers and accepted deposits that sent FTX customer money to Alameda. (*Id.* ¶¶ 82, 97, 122, 170, 176–78, 184–85, 190.) Therefore, the Court finds Defendants substantially assisted the FTX and Alameda scheme through its "ordinary business transactions."

The Court is also persuaded by Plaintiffs' argument that "Defendants did more than conduct ordinary business activities." (Doc. 17 at 24.) Plaintiffs adequately allege Silvergate "defied industry norms" by banking Alameda, FTX, and other crypto companies and by developing the SEN. (*Id.*) Plaintiffs allege Defendants were one of few banks willing to service the crypto industry, a hotbed of crime and scam artists, (FAC ¶¶ 41, 45) and that crypto companies, like FTX, were getting kicked out of other banks due to the significant risks (*id.* ¶¶ 44, 46–48). Plaintiffs also adequately allege that Defendants designed the SEN to facilitate and speed up crypto transactions by eliminating the due diligence time built into traditional bank transfers (FAC ¶¶ 57–58, 61) and that a crypto exchange like FTX was virtually impossible before the SEN. (*Id.* ¶¶ 66, 186.) "The SEN allowed [Defendants] to become the go-to bank for more than a dozen crypto companies that ended up under investigation, shut down, fined, or in bankruptcy, including FTX and Alameda." (*Id.* ¶ 78.) Thus, Defendants' conduct extended beyond "ordinary business transactions" and, even absent knowledge, the Court can find that Defendants substantially assisted the FTX/Alameda scheme. *See Chang,* 2020 WL 1694360, at *6; *In re First All. Mortg. Co.,* 471 F.3d at 993–95; *Casey,* 127 Cal. App. 4th at 1145, 26 Cal.Rptr.3d 401.

### 3. Fiduciary Duty

Defendants argue Plaintiffs' FAC does not allege any facts showing Defendants had actual knowledge that FTX and its customers were in a fiduciary relationship, much less that Defendants knew the types of fiduciary duties that FTX might have owed its customers. (Doc. 16 at 24.) Specifically, Defendants argue FTX did not owe its customers any fiduciary duties, and thus there was no underlying breach of fiduciary duty. (*Id.* at 26.) Defendants argue the FAC does not articulate any theory under which a fiduciary relationship existed between Plaintiffs and FTX. (*Id.* at 27 (citing *In re January 2021 Short Squeeze Trading Litig.,* 584 F. Supp. 3d 1161 (S.D. Fla. 2022) and *Fabian v. LeMahieu,* Case No. 19-cv-00054-YGR, 2019 WL 4918431 (N.D. Cal. Oct. 4, 2019).) Finally, Defendants argue "[e]ven assuming there was a fiduciary relationship between Plaintiffs and FTX or [SBF], the claim still fails for the additional reason that Plaintiffs do not adequately plead facts showing that Defendants had actual knowledge of that relationship, a necessary predicate for their claim." (*Id.* at 28.) Defendants contend that the determination of whether FTX served as a fiduciary to its customers is a complex legal inquiry into which a Bank would have no visibility. (*Id.* at 24.)

Plaintiffs argue a fiduciary relationship may exist where one party voluntarily accepts the trust and confidence of another and enjoys a superior position of influence over the trusting party, as FTX did here. (Doc. 17 at 25 (citing *Lorenz v. E. W. Bancorp, Inc.,* 2016 WL 199392, at *10 (C.D. Cal. Jan. 14, 2016)).) [15] Plaintiffs also argue fiduciary duties have been found in similar circumstances, such as when an escrow holder releases money improperly. (*Id.*) [16]

**\*31** "[I]t is difficult to enunciate the precise elements required to show the existence of a fiduciary relationship." *Oakland Raiders v. Nat'l Football League,* 131 Cal. App. 4th 621, 631, 32 Cal.Rptr.3d 266 (2005). "[B]efore a person can be charged with a fiduciary obligation, he must either knowingly undertake to act on behalf and for the benefit of another, or must enter into a relationship which imposes that undertaking as a matter of law." *Id.* (internal quotation marks and citations omitted). "A fiduciary duty under common law may arise when one person enters into a confidential relationship with another. It is a question of fact whether one is ... a party to a confidential relationship that gives rise to a fiduciary duty under common law." *Hasso v. Hapke,* 227 Cal. App. 4th 107, 140, 173 Cal.Rptr.3d 356 (2014).

At this juncture, the Court finds Plaintiffs have plausibly alleged FTX owed fiduciary duties to its customers and breached those fiduciary duties when it transferred customer funds to Alameda. Plaintiffs have alleged "FTX and its affiliates operated a multi-billion-dollar mobile application crypto[ ] investment service that offered trading in various options, futures, swaps, and other digital commodity derivative products." (FAC ¶ 90.) FTX's Terms of Service provided that "[o]nce we receive fiat currency that you load into your Account, we may issue you with an equivalent amount of electronic money ('E-Money'), denominated in the relevant fiat currency, which represents the fiat currency that you have loaded. This amount will be displayed in your Account.... You may redeem all or part of any E-Money held in your Account at any time ...." (*Id.* ¶ 92.) FTX's Terms of Service also assured investors they owned and controlled assets placed on the exchange:

> Title to your Digital Assets shall at all times remain with you and shall not transfer to FTX Trading. ... None of the Digital Assets in your Account are the property of, or shall or may be loaned to, FTX

> Trading .... You control the Digital Assets held in your account. At any time, subject to outages, downtime, and other applicable policies ... you may withdraw your Digital Assets by sending them to a different blockchain address controlled by you or a third party.

(*Id.* ¶ 104.) Plaintiffs allege FTX and its operating entities thus had fiduciary duties to FTX's customers pursuant to FTX's Terms of Services to ensure that the customers' funds were segregated and held in trust for the customer. (*Id.* ¶ 105.)

Additionally, SBF branded himself and his companies as "honest stewards of crypto" and highlighted publicly the purported safety of the platform and its products, which included risk mitigation procedures and an auto-liquidation program, all designed to keep customer assets safe. (*Id.* ¶¶ 100–03.) FTX also solicited investments that were purportedly loans to be used on the FTX.com exchange to purchase crypto assets that would generate promised returns. (*Id.* ¶ 106.) FTX marketed vaguely described crypto investments as delivering "HIGH RETURNS WITH NO RISK," having "no downside," and guaranteeing "full payment" of the principal and interest. (*Id.* ¶ 107.)

The Court finds that these allegations sufficiently plead several theories under which a fiduciary relationship existed between Plaintiffs and FTX—one based on contract, one based on FTX's representations that they would act for the benefit of its customers, and one based on the confidential relationship between FTX and its customers. At a minimum, there remains a question of fact as to whether FTX and its customers were in a confidential relationship that gives rise to a fiduciary duty under California common law. *Hasso,* 227 Cal. App. 4th at 140, 173 Cal.Rptr.3d 356 ("It is a question of fact whether one is ... a party to a confidential relationship that gives rise to a fiduciary duty....").

**\*32** Plaintiffs' reliance on *Lorenz* is persuasive. In *Lorenz,* the company defendant defrauded the plaintiffs by soliciting investments in CDs. *Id.* Rather than investing the plaintiffs' money, the company defendant wired the money to accounts in "overseas banking secrecy havens." *Id.* The plaintiffs alleged a claim for aiding and abetting breach of fiduciary duty against the bank defendant. *Id.* at \*10. The bank argued plaintiffs failed to sufficiently allege it owed a fiduciary duty

to the plaintiffs. *Id.* The court disagreed. *Id.* It noted the existence of a fiduciary relationship is generally a question of fact that cannot be resolved at the motion to dismiss stage and a fiduciary relationship may exist where one party voluntarily accepts the trust and confidence of another and enjoys a superior position of influence over the trusting party. *Id.* (citations omitted). The court found the plaintiffs' complaint plausibly alleged the company defendant had a fiduciary duty to invest plaintiffs' money as promised. *Id.* The court also found one could reasonably infer that the bank defendant had actual knowledge of the fiduciary relationship between the company defendant and the plaintiffs because the plaintiffs called the bank to confirm that the company had a legitimate bank account. *Id.* at \*11.

Here, as in *Lorenz,* the Court finds Plaintiffs have adequately alleged FTX may have a fiduciary duty to its customers to hold their money as promised. (*See* FAC ¶¶ 92, 104.) The Court also finds Plaintiffs have adequately alleged FTX may have a fiduciary duty to its customers because FTX voluntarily accepted the trust and confidence of its customers. Plaintiffs allege FTX solicited its customers' trust and confidence by touting the safety of the platform. (*See id.* ¶¶ 100–103.) Further, like the company in *Lorenz* that solicited investments in fraudulent CDs, FTX solicited crypto investments described as delivering "high returns with no risk" and "no downside," and guaranteed "full payment" of the principal and interest. (*See id.* ¶¶ 106, 107.) Finally, as in *Lorenz,* Plaintiffs have also alleged facts sufficient to infer that Defendants had "actual knowledge" of the fiduciary relationship between FTX and its customers. Plaintiffs allege as part of onboarding, Defendants obtained or determined relevant information related to each Alameda or FTX-related entity, including the nature of its business as it relates to crypto. (FAC ¶ 172.) Plaintiffs then allege "[t]hrough their knowledge of FTX/Alameda's business model and banking activity, Defendants knew that SBF, FTX, and Alameda owed fiduciary duties to investors[.]" (*Id.* ¶ 220.) Thus, as in *Lorenz,* Plaintiffs have alleged facts sufficient to infer that Defendants had "actual knowledge" of the fiduciary relationship between FTX and its customers.

The Court is also persuaded by Plaintiffs' argument that the present case is akin to cases where an escrow agent improperly releases funds in breach of their fiduciary duties. *See Tung v. Chicago Title Company,* 63 Cal. App. 5th 734, 744, 278 Cal.Rptr.3d 182 (2021); *Benthos Master Fund, Ltd. v. Etra,* 2020 WL 4700901 at \*1–2 (S.D.N.Y.). Here, FTX's terms of service stated, "[o]nce we receive fiat currency

that you load into your Account, we may issue you with an equivalent amount of electronic money ('E-Money'), denominated in the relevant fiat currency, which represents the fiat currency that you have loaded." (FAC ¶ 92.) FTX's Terms of Service then stated that customers could redeem their E-Money or digital assets at any time. (*Id.* ¶¶ 92, 104.) Thus, by releasing customer money to Alameda where it was dissipated away, FTX breach its contractual and fiduciary duties. *See Benthos Master Fund, Ltd.*, 2020 WL 4700901, at *2 (confirming arbitration award where arbitrator concluded that the release of the $4.6 million meant to purchase bitcoin was unauthorized and, therefore, a breach of the escrow agent's contractual and fiduciary duties).

Defendants' reliance on *In re January 2021 Short Squeeze Trading Litigation* ("*Short Squeeze*") is misplaced. *Short Squeeze* explored the bounds of a stockbroker's fiduciary duties to its clients under California law and concluded the brokerage defendant (Robinhood) did not owe a broad fiduciary duty to customers with non-discretionary, self-directed accounts. 584 F. Supp. 3d at 1190–92. In reaching this conclusion, the court relied heavily on the customer agreement, which was attached to the plaintiffs' amended complaint and defined the agency relationship between Robinhood and its customer. *Id.* at 1169, 1191. The customer agreement stated that the accounts were self-directed and that Robinhood did not provide investment advice. *Id.* Therefore, the court concluded that Robinhood's limited role did not warrant imposing a broad fiduciary duty. *Id.*

 **\*33** Defendants suggest that an FTX customer account is akin to non-discretionary, self-directed brokerage account, and the same rules should apply. The Court disagrees. While the court in *Short Squeeze* concluded that a broad, general fiduciary duty does not arise in instances of self-directed, non-discretionary accounts, *see id.* at 1192, the court did not conclude that fiduciary duties could never arise. Rather, the court concluded the scope of the fiduciary relationship could be limited by agreement. *See id.* at 1191. As stated *supra* in Section III.A.1.b, the Court declines to take judicial notice of the FTX.US USER AGREEMENT. Therefore, the Court cannot know whether the FTX.US USER AGREEMENT limited the scope of the fiduciary relationship between FTX and its customers. Further, unlike in *Short Squeeze* where the broker abided by the provisions in its customer agreement, here it is alleged that FTX breached its terms of service when it misappropriated FTX customer funds. Thus, as alleged, even if FTX only had limited fiduciary duties defined by agreement, those duties were

breached when FTX misappropriated FTX customer funds. Finally, the Court is not convinced FTX is akin to a non-discretionary, self-directed brokerage account. Plaintiffs have alleged that, in addition to offering trading, FTX also solicited investments. (*Id.* ¶¶ 90, 106–7.) Thus, it is plausible that the services offered by FTX warrant imposing a broader fiduciary duty. Whether the present circumstances support imposing a broader fiduciary duty cannot be decided at this stage. *See Hasso*, 227 Cal. App. 4th at 140, 173 Cal.Rptr.3d 356.

Defendants' reliance on *Fabian v. LeMahieu*, Case No. 19-cv-00054-YGR, 2019 WL 4918431 (N.D. Cal. Oct. 4, 2019) ("*Fabian*") is also misplaced. In *Fabian*, the plaintiff alleged the defendant crypto exchange had a fiduciary duty to the plaintiff as the custodian of the plaintiff's currency held on the exchange. 2019 WL 4918431, at *11. The court found the plaintiff failed to provide "any authority for his assertion that his allegations of custodianship suffice to state a cause of action for breach of fiduciary duty under California law." *Id.* Here, however, Plaintiffs have alleged multiple bases on which the Court may find that FTX owed fiduciary duties to its customers. Plaintiffs have alleged that FTX and its operating entities had fiduciary duties to FTX's customers pursuant to FTX's Terms of Services (FAC ¶ 105), based on its public representations that the customers assets were safe (*id.* ¶¶ 100–103), and because it solicited investments (*id.* ¶¶ 106–107). Further, unlike the plaintiff in *Fabian*, Plaintiffs have provided authority that custodianship can be a basis for a fiduciary duty in the parallel escrow context. Plaintiffs also found support in *Lorenz.* Thus, the Court finds that Plaintiffs have plausibly alleged that Defendants aided and abetted FTX's breach of their fiduciary duties to Plaintiffs.

### 4. Conclusion

Based on the foregoing, the Court finds Plaintiffs have adequately alleged claims for aiding and abetting fraud, conversion, and breach of fiduciary duty against Defendants. Defendants' Motion to Dismiss these claims is **DENIED**.

### D. Plaintiffs' UCL Claim (Count 5)

California's UCL broadly proscribes unfair competition. *Cappello v. Walmart Inc.*, 394 F. Supp. 3d 1015, 1018 (N.D. Cal. 2019). "[U]nfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice...." Cal. Bus. & Prof. Code § 17200.

### 1. Unlawful Business Acts or Practices

Addressing the "unlawful" prong, Defendants argue Plaintiffs have failed to state a claim under the UCL because the claim is merely derivative of their other claims, which they have failed to state. (Doc. 16 at 28–29.) Defendants cite several cases in which a district court dismissed a derivative UCL claim because the plaintiffs had failed to state a claim for the underlying offenses. *Id.*; *see e.g., BMA LLC v. HDR Glob. Trading Ltd.*, No. 20-CV-03345-WHO, 2021 WL 949371, at *17 (N.D. Cal. Mar. 12, 2021)* ("Because plaintiffs have failed to state a claim as to each of those underlying offenses, their UCL claim necessarily fails."); *Chang v. Interactive Brokers LLC*, No. 21-CV-05967-NC, 2021 WL 5507169, at *5 (N.D. Cal. Nov. 24, 2021)* ("[B]ecause the Court dismisses the aiding and abetting claims, it must dismiss the UCL claim based on unlawful and unfair business practices."). Here, however, Plaintiffs have stated claims for negligence, aiding and abetting fraud, aiding and abetting breach of fiduciary duty, and aiding and abetting conversion. Therefore, Plaintiffs have adequately alleged "unlawful" conduct prohibited by the UCL. *See AngioScore, Inc. v. TriReme Med., LLC*, 70 F. Supp. 3d 951, 962 (N.D. Cal. 2014)* (finding that an adequately pled aiding and abetting claim suffices to plead a UCL claim). The Court need not reach Defendants' alternative argument regarding "unfairness.' (*See* Doc. 16 at 29.)

### 2. Remedies

**\*34** Defendants also argue Plaintiffs' UCL claim fails because Plaintiffs do not seek, and have not shown that they are entitled to, either an injunction or restitution—the only available remedies under the UCL. (*Id.*) Defendants explain restitution is not available where, as here, what Plaintiffs really seek are damages under the guise of restitution. (*Id.*) However, Defendants do not cite authority supporting this position. In response, Plaintiffs argue they expressly seek restitution in paragraph 242 of their FAC. (Doc. 17 at 27.) Plaintiffs also contend privity between the parties is not required for a UCL claim and they only seek to have restored to them money acquired by unfair competition, as expressly permitted by the UCL. (*Id.*)

For the reasons set forth *supra* in Section IV.B.2 regarding causation and Section IV.C.2 regarding substantial assistance, Plaintiffs have adequately alleged that they have "suffered injury in fact and ha[ve] lost money or property as a result of the unfair competition[,]" the only requirement for bringing a UCL claim. Cal. Bus. & Prof. Code § 17204; *see also In re Woodbridge Invs. Litig.*, 2020 WL 4529739, at *8 (declining to dismiss UCL claim when the plaintiff had adequately alleged aiding and abetting claims); *Benson*, 2010

WL 1526394, at *10 (same). Accordingly, the Court finds that Plaintiffs have adequately alleged a UCL claim against Defendants. Defendants' Motion to Dismiss Plaintiffs' UCL claim is **DENIED**.

### E. Plaintiffs' Unjust Enrichment Claim (Count 3)

Defendants argue Plaintiffs' claim for unjust enrichment fails because California does not recognize a cause of action for unjust enrichment and because Plaintiffs have not alleged that restitution is an appropriate form of relief in this case. (Doc. 16 at 29–30.) Defendants also argue a claim for unjust enrichment is a quasi-contract action and Plaintiffs have failed to establish any relationship between Defendants and Plaintiffs whether it be contractual or quasi-contractual. (*Id.* at 30.) Finally, Defendants argue Plaintiffs have not met the basic elements of an unjust enrichment claim. (*Id.*)

Plaintiffs argue unjust enrichment may be pled as an independent claim and they have shown that Defendant received and unjustly retained a benefit at the plaintiff's expense. (Doc. 17 at 28.) Plaintiffs also argue they need not have been in privity with Defendants nor have paid money directly to Defendants to state a claim for unjust enrichment. (*Id.*)

The Ninth Circuit has observed that "[s]ome California courts allow a plaintiff to state a cause of action for unjust enrichment, while others have maintained that California has no such cause of action. While California case law appears unsettled on the availability of such a cause of action, this Circuit has construed the common law to allow an unjust enrichment cause of action through quasi-contract." *ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023, 1038 (9th Cir. 2016)* (internal citations omitted) (allowing a cause of action for unjust enrichment believing that "it states a claim for relief as an independent cause of action or as a quasi-contract claim for restitution").

The Ninth Circuit has held "[t]o allege unjust enrichment as an independent cause of action, a plaintiff must show that the defendant received and unjustly retained a benefit at the plaintiff's expense." *Id.*; *see also Peterson v. Cellco P'ship*, 164 Cal. App. 4th 1583, 1593, 80 Cal.Rptr.3d 316 (2008)* ("The elements of an unjust enrichment claim are the receipt of a benefit and [the] unjust retention of the benefit at the expense of another.") (internal quotation marks and citations omitted); *Hirsch v. Bank of Am.*, 107 Cal. App. 4th 708, 721–22, 132 Cal.Rptr.2d 220 (2003)* ("An individual is required to make restitution when he or she

has been unjustly enriched at the expense of another. A person is enriched if he or she receives a benefit at another's expense. The term 'benefit' connotes any type of advantage.") (citations omitted). Contrary to their assertion, Defendants have not cited any authority supporting their contention that Defendants must have received the benefit directly from Plaintiffs. (Doc. 16 at 30:11–14.)

**\*35** Here, Plaintiffs have adequately alleged Defendants received and unjustly retained a benefit at Plaintiffs' expense. See *ESG Cap. Partners*, LP, 828 F.3d at 1038. As set forth above, Plaintiffs alleged Defendants knowingly aided and abetted FTX and Alameda's fraud and conversion of Plaintiffs' funds. *See supra* at Section IV.C. Defendants had a strong incentive to continue accepting FTX customer deposits and executing the fraudulent transfers because they earned income from transaction fees and interest on money deposited in FTX and Alameda accounts. (*Id.* ¶¶ 97–98.) Before Defendants attracted FTX as a client, Defendants had an annual net income of only $7.6 million; but by 2021,

Defendants had an annual net income of $75.5 million. (*Id.* ¶ 99.) By the end of September of 2022, FTX constituted nearly ten percent of Defendants' $11.9 billion in deposits, or about $1.2 billion. (*Id.* ¶ 75.) Thus, the Court finds that Plaintiffs have adequately pled the elements of an unjust enrichment claim, namely that Defendants received and unjustly retained a benefit at the Plaintiffs' expense. Defendants' Motion to Dismiss Plaintiffs' claim for unjust enrichment is **DENIED**.

### IV. CONCLUSION

For the reasons set forth above, Defendants' Motion to Dismiss is **DENIED** in its entirety.

**IT IS SO ORDERED.**

**All Citations**

--- F.Supp.3d ----, 2024 WL 1199679

## Footnotes

1    Plaintiff Soham Bhatia is not mentioned in Plaintiffs' FAC but has not been terminated from the action.

2    Defendants' "Motion [also] seeks transfer to the District Court for the Southern District of California pursuant to 28 U.S.C. § 1406(a). Alternatively, [Defendants'] Motion seeks to transfer for forum non-conveniens pursuant to 28 U.S.C. § 1404." (Doc. 16 at 8.) This case was transferred to the Southern District of California on August 2, 2023. (Doc. 20.) Thus, Defendants' motion to transfer is **DENIED AS MOOT**. The Court only addresses Defendants' Motion to Dismiss Plaintiffs' substantive claims pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6).

3    The Court's summary of Plaintiffs' allegations throughout Section I reflects Plaintiffs' factual and legal allegations, not conclusions of fact or law by this Court. Additionally, throughout this section, the term "Silvergate" refers to both Defendant Silvergate Bank and Defendant Silvergate Capital, as this is how Plaintiffs used the term in their FAC.

4    "[A]n API is a communication tool between software applications." (*Id.* ¶ 62, n.3.)

5    Additionally, the Court notes that paragraphs 16 through 19 of the indictment, relied upon by Defendants in their Motion to Dismiss, do not specifically name Defendants. Rather, the Indictment references "a bank in California," later referenced throughout the Indictment as "Bank-1." The Court cannot assume that the Indictment is referring to Defendants.

6    Defendants do not cite authority regarding the "incorporation by reference" doctrine, which permits courts "to take into account documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleading." *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) (internal quotation marks and citations omitted). Thus, the "incorporation by reference"

doctrine will not form the basis of the Court's decision. However, the Court notes that, even had Defendants argued the doctrine, Defendants' arguments would still fail because "the mere mention of the existence of a document is insufficient to incorporate the contents of a document." *Coto Settlement v. Eisenberg,* 593 F.3d 1031, 1038 (9th Cir. 2010). Further, "if the document merely creates a defense to the well-pled allegations in the complaint, then that document did not necessarily form the basis of the complaint." *Khoja v. Orexigen Therapeutics, Inc.,* 899 F.3d 988, 1002 (9th Cir. 2018). Finally, "the district court ... is not required to incorporate documents by reference." *Davis v. HSBC Bank Nevada, N.A.,* 691 F.3d 1152, 1159 (9th Cir. 2012).

7   In their Reply, Defendants reassert that the following factors are insufficient to establish an alter ego relationship: Silvergate Capital's total ownership and control over Silvergate Bank; Silvergate Capital and Silvergate Bank's shell company relationship; Silvergate Capital and Silvergate Bank's shared office and business location; Silvergate Capital and Silvergate Bank's shared employees, counsel, executives, and directors; and Silvergate Capital and Silvergate Bank's shared logos and website. (Doc. 18 at 20.) Defendants also contend that Plaintiffs' allegations do not show that Silvergate Capital, as distinct from Silvergate Bank, were involved in the fraud. (*Id.* at 20, n.12.)

8   Plaintiffs also cite *Southern California Gas Leak Cases,* 7 Cal. 5th 391, 247 Cal.Rptr.3d 632, 441 P.3d 881 (2019) and *In re Adobe Systems, Inc. Securities Litigation,* 767 F. Supp. 1023 (N.D. Cal. 1991); however, neither case advances Plaintiffs' position. In *Southern California Gas Leak Cases,* the court found that a utility company "had *no tort duty* to guard against purely economic losses" stemming from a catastrophic gas leak. 7 Cal. 5th at 441, 247 Cal.Rptr.3d 632, 441 P.3d 881 (emphasis added). Likewise, the plaintiffs in *In re Adobe Systems, Inc. Securities Litigation* did not allege a cause of action for negligence requiring a duty-of-care analysis. 767 F. Supp. at 1025.

9   Defendants' Reply reiterates their position that banks do not have a duty of care to non-customers and argues that Plaintiffs' "intended beneficiaries" analysis is not applicable here. (Doc. 18 at 10–11.) Defendants' Reply only briefly addresses the *Biakanja* factors. (*Id.* at 11–12.)

10   The *Sun 'n Sand* court also conducts an analysis of the *Biankja* factors.

11   Subsequent courts have come to the same conclusion. *See, e.g., Joffe v. United Cal. Bank,* 141 Cal. App. 3d 541, 556, 190 Cal.Rptr. 443 (1983) ("We agree ... that the circumstances alleged in their complaint are sufficiently suspicious to come within a rule similar to that imposed in *Sun 'N Sand.*"); *E. F. Hutton & Co. v. City Nat'l Bank,* 149 Cal. App. 3d 60, 68, 196 Cal.Rptr. 614 (1983) (same); *Sehremelis v. Farmers & Merchants Bank,* 6 Cal. App. 4th 767, 775, 7 Cal.Rptr.2d 903 (1992) ("We agree that relevant legal and practical considerations militate in favor of a rather expansive duty of care by collecting banks in dealing with indorsements of checks they negotiate. And on the facts before us, we cannot say that plaintiffs' status and posture precluded [the bank] from owing such a duty to them.")

12   In their Reply, Defendants merely reiterate their assertion that Plaintiffs, at best, allege Defendant "should have known" of the tortious conduct, not that any Defendant actually knew about the FTX and Alameda fraud. (Doc. 18 at 13–15.) Defendants also attempt to distinguish the cases cited by Plaintiffs. (*Id.* at 15–17.)

13   The *Mackintosh* court also misstates the pleading standard. The *Mackintosh* court states, "[a]n allegation of aiding and abetting fraud requires pleading with particularity under [Rule] 9." 2018 WL 3913791 at *3 (citation omitted). However, the *Mackintosh* court does not distinguish between the pleading standard for "actual knowledge" and the pleading standard for "substantial assistance," which are different. Under Rule 9(b), "substantial assistance of the underlying fraud 'must be pleaded with particularity,' while actual knowledge of

the underlying fraud 'may be averred generally.' " *Lorenz*, 2016 WL 199392, at *7 (quoting *Allstate Ins. Co.*, 824 F. Supp. 2d at 1188) (citing *In re First Alliance Mortgage Co.*, 471 F.3d at 993).

14   In their Reply, Defendants reiterate their argument that ordinary business transactions can only satisfy the "substantial assistance" requirement if they actually knew those transactions were assisting the principal in committing a specific tort, which they did not. (Doc. 18 at 17.) Defendants also argue that they did not conduct more than ordinary business activities because the SEN was available to all Defendants' customers, and there is no evidence that Defendants treated FTX or Alameda differently than its other customers. (*Id.* at 17–18.)

15   Plaintiffs also cite to *Takiguchi v. MRI Int'l, Inc.*, 47 F. Supp. 3d 1100 (D. Nev. 2014) and *In re J&J Investment Litigation,* Case No. 2:22-cv-00529-GMN-NJK, 2023 WL 2572300 (D. Nev. Mar. 18, 2023). However, neither case applies California law.

16   In their Reply, Defendants reiterate that Plaintiffs have not alleged a cognizable fiduciary duty and that analogous cases did not find the existence of a fiduciary duty. (Doc. 18 at 18.)

---

**End of Document**                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.