**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| **IN RE FTX CRYPTOCURRENCY EXCHANGE COLLAPSE LITIGATION**<br><br>This document relates to:<br><br>EDWIN GARRISON, *et al.*, on behalf of themselves and all similarly situated,<br><br>                  *Plaintiffs*,<br><br>     v.<br><br>SULLIVAN & CROMWELL LLP,<br><br>                  *Defendant*. | MDL No. 3076<br><br>Case No. 1:23-md-03076<br><br>Hon. K. Michael Moore |

**DEFENDANT SULLIVAN & CROMWELL LLP'S**
**MOTION TO DISMISS AND INCORPORATED MEMORANDUM OF LAW**

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ............................................................................................1

FACTUAL BACKGROUND AND ALLEGATIONS OF THE COMPLAINT ...........................5

    A.    The Parties ...........................................................................................5

    B.    The Rise of FTX ...................................................................................5

    C.    The FTX Fraud .....................................................................................6

    D.    S&C's Prior Representation of FTX .......................................................9

    E.    S&C's Retention as Bankruptcy Counsel to the FTX Debtors............................11

    F.    The FTX Estate Has Announced Anticipated Recoveries that Render the Damages Sought in This Action Duplicative....................................12

STANDARD ON THIS MOTION ......................................................................................13

ARGUMENT .................................................................................................................14

I.    PLAINTIFFS FAIL TO STATE A CLAIM FOR COMMON LAW AIDING-AND-ABETTING OR CONSPIRACY LIABILITY...................................................14

    A.    New York Law Governs Plaintiffs' Common Law Claims.............................14

    B.    Plaintiffs' Tort Claims Must Be Dismissed Because Plaintiffs Have No Contractual Relationship—or Its Functional Equivalent—with S&C.................16

    C.    The Complaint Does Not Adequately Plead Aiding and Abetting Fraud or Breach of Fiduciary Duties. ...................................17

    D.    Plaintiffs' Conspiracy Claims Are Duplicative of Their Aiding-and-Abetting Claims and, In Any Event, Fail Plausibly To Allege that S&C Was Party to any Corrupt Agreement...................................26

II.    PLAINTIFFS' RICO CLAIMS MUST BE DISMISSED .................................................29

    A.    Plaintiffs Fail To State Any RICO Claim. ............................................29

    B.    The International Plaintiffs' RICO Claim Is Impermissibly Extraterritorial.........32

III.    THE COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE ...........................32

CONCLUSION.................................................................................................................33

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Aetna Cas. & Sur. Co.* v. *Aniero Concrete Co.*,
    404 F.3d 566 (2d Cir. 2005).................................................................................26

*Am. Dental Ass'n* v. *Cigna Corp.*,
    605 F.3d 1283 (11th Cir. 2010) .........................................................................29

*Am. United Life Ins. Co.* v. *Martinez*,
    480 F.3d 1043 (11th Cir. 2007) .........................................................................13

*Art Cap. Grp., LLC* v. *Neuhaus*,
    70 A.D.3d 605 (N.Y. App. Div. 1st Dep't 2010).........................................3, 16, 17, 25

*Ashcroft* v. *Iqbal*,
    556 U.S. 662 (2009)..................................................................................13, 22

*In re Bayou Hedge Funds Inv. Litig.*,
    472 F. Supp. 2d 528 (S.D.N.Y. 2007)...........................................................17, 18, 21

*Bell Atl. Corp.* v. *Twombly*,
    550 U.S. 544 (2007)............................................................................... *passim*

*Bishop* v. *Fla. Specialty Paint Co.*,
    389 So.2d 999 (Fla. 1980)..................................................................................15

*Briarpatch Ltd., L.P.* v. *Geisler Roberdeau, Inc.*,
    2007 WL 1040809 (S.D.N.Y. Apr. 4, 2007), *aff'd*, 312 F. App'x 433 (2d Cir.
    2009) .........................................................................................................26

*Brooks* v. *Blue Cross and Blue Shield of Fla., Inc.*,
    116 F.3d 1364 (11th Cir. 1997) .........................................................................14

*Brownstone Inv. Grp., LLC* v. *Levey*,
    468 F. Supp. 2d 654 (S.D.N.Y. 2007)..................................................................28

*In re Capitol Invs., Inc.*,
    473 B.R. 838 (Bankr. S.D. Fla. 2012).................................................................19

*Chance* v. *Cook*,
    50 F.4th 48 (11th Cir. 2022) .............................................................................27

*Cohen* v. *Stevanovich*,
    722 F. Supp. 2d 416 (S.D.N.Y. 2010)..................................................................27

*Cromer Fin. Ltd.* v. *Berger*,
    137 F. Supp. 2d 452 (S.D.N.Y. 2001)....................................................................25

*CRT Invs., Ltd.* v. *BDO Seidman, LLP*,
    85 A.D.3d 470 (N.Y. App. Div. 1st Dep't 2011)....................................................24

*Cunningham* v. *Dist. Attorney's Office for Escambia Cnty.*,
    592 F.3d 1237 (11th Cir. 2010) ...............................................................................1

*DeBoskey* v. *SunTrust Mortgage, Inc.*,
    2017 WL 4083557 (M.D. Fla. Sept. 14, 2017) .......................................................29

*Domanus* v. *Locke Lord LLP*,
    847 F.3d 469 (7th Cir. 2017) ..................................................................................30

*Ellen S.* v. *Fla. Bd. of Bar Examiners*,
    859 F. Supp. 1489 (S.D. Fla. 1994) ........................................................................19

*Ferring B.V.* v. *Allergan, Inc.*,
    4 F. Supp. 3d 612 (S.D.N.Y. 2014) ........................................................................22

*Fittipaldi* v. *Bluegreen Vacations Unlimited, Inc.*,
    2018 WL 11406250 (S.D. Fla. Sept. 18, 2018) .....................................................29

*Fouad* v. *The Milton Hershey Sch. & Sch. Tr.*,
    2024 WL 1425538 (N.Y. Sup. Ct. Mar. 20, 2024) .................................................27

*Funding Metrics, LLC* v. *Decision One Debt Relief LLC*,
    2019 WL 861268 (S.D. Fla. Feb. 22, 2019) ..........................................................23

*Grasso* v. *Donnelly-Schoffstall*,
    2022 WL 728839 (2d Cir. Mar. 11, 2022) .............................................................19

*Grupo Televisa, S.A.* v. *Telemundo Commnc'ns Grp., Inc.*,
    485 F.3d 1233 (11th Cir. 2007) .............................................................................14

*Heinert* v. *Bank of Am. N.A.*,
    835 F. App'x 627 (2d Cir. 2020) ...........................................................................28

*Hongying Zhao* v. *JPMorgan Chase & Co.*,
    2019 WL 1173010 (S.D.N.Y. Mar. 13, 2019) .......................................................24

*ICD Cap., LLC* v. *CodeSmart Holdings, Inc.*,
    842 F. App'x 705 (2d Cir. 2021) .....................................................................20, 21

*In re ICP Strategic Credit Income Fund Ltd.*,
    2015 WL 5404880 (Bankr. S.D.N.Y. Sept. 15, 2015), *aff'd,* 568 B.R. 596
    (S.D.N.Y. 2017), *aff'd,* 730 F. App'x 78 (2d Cir. 2018) .......................................21

*Jackson* v. *BellSouth Telecomms.*,
    372 F.3d 1250 (11th Cir. 2004) ..............................................................................13, 30

*Jacobs* v. *Kay*,
    50 A.D.3d 526 (N.Y. App. Div. 1st Dep't 2008) .................................................17

*In re Jan. 2021 Short Squeeze Trading Litig.*,
    584 F. Supp. 3d 1161 (S.D. Fla. 2022), *aff'd*, 76 F.4th 1335 (11th Cir. 2023) ...................33

*Kaufman* v. *Cohen*,
    307 A.D.2d 113 (N.Y. App. Div. 1st Dep't 2003) .................................................24

*Kirschner* v. *Bennett*,
    648 F. Supp. 2d 525 (S.D.N.Y. 2009) ...................................................................17

*Kolbeck* v. *LIT Am., Inc.*,
    939 F. Supp. 240 (S.D.N.Y. 1996), *aff'd*, 152 F.3d 918 (2d Cir. 1998) .........................24, 25

*Kurlander* v. *Kaplan*,
    2019 WL 6789572 (M.D. Fla. Dec. 12, 2019) ..................................................15, 16

*Lamm* v. *State St. Bank & Tr. Co.*,
    889 F. Supp. 2d 1321 (S.D. Fla. 2012), *aff'd*, 749 F.3d 938 (11th Cir. 2014) ........................18

*Learning Annex, L.P.* v. *Blank Rome LLP*,
    106 A.D.3d 663 (N.Y. App. Div. 1st Dep't 2013) .................................................24

*Lilley* v. *Greene Cent. Sch. Dist.*,
    187 A.D.3d 1384 (N.Y. App. Div. 3d Dep't 2020) ...............................................27

*Marquez* v. *Amazon.com, Inc.*,
    69 F.4th 1262 (11th Cir. 2023) ...............................................................................28

*Martin Hilti Fam. Tr.* v. *Knoedler Gallery, LLC*,
    386 F. Supp. 3d 319 (S.D.N.Y. 2019) ..............................................................26, 27

*McCullough* v. *Finley*,
    907 F.3d 1324 (11th Cir. 2018) ...............................................................................23

*Miccosukee Tribe of Indians of Fla.* v. *Cypress*,
    814 F.3d 1202 (11th Cir. 2015) ...............................................................................13

*Michel* v. *NYP Holdings, Inc.*,
    816 F.3d 686 (11th Cir. 2016) .................................................................................15

*Mixson* v. *C.R. Bard Inc.*,
    628 F. Supp. 3d 1159 (N.D. Fla. 2022) ...................................................................15

*Muskegan Hotels, LLC* v. *Patel*,
    986 F.3d 692 (7th Cir. 2021) ...........................................................................30, 31

*Nat'l Westminster Bank USA* v. *Weksel*,
    124 A.D.2d 144(N.Y. App. Div. 1st Dep't 1987) ...........................................22

*Pension Comm. of Univ. of Montreal Pension Plan* v. *Banc of Am. Sec., LLC*,
    446 F. Supp. 2d 163 (S.D.N.Y. 2006) .......................................................18, 25

*Perkins* v. *Nat'l LGBTQ Task Force, Inc.*,
    580 F. Supp. 3d 1236 (S.D. Fla. 2021) ...........................................................14

*Renner* v. *Chase Manhattan Bank*,
    2000 WL 781081 (S.D.N.Y. June 16, 2000), *aff'd*, 85 F. App'x 782 (2d Cir.
    2004) ..................................................................................................................23

*Republic of Panama* v. *BCCI Holdings (Luxembourg) S.A.*,
    119 F.3d 935 (11th Cir. 1997) .........................................................................30

*RJR Nabisco, Inc.* v. *Eur. Cmty.*,
    579 U.S. 325 (2016)..........................................................................................31

*Roni LLC* v. *Arfa*,
    72 A.D.3d 413 (N.Y. App. Div. 1st Dep't), *aff'd*, 15 N.Y.3d 826 (N.Y. 2010).....................21

*Rosner* v. *Bank of China*,
    2008 WL 5416380 (S.D.N.Y. Dec. 18, 2008) ............................................18, 22

*RSM Prod. Corp.* v. *Freshfields Bruckhaus Deringer U.S. LLP*,
    682 F.3d 1043 (D.C. Cir. 2012).......................................................................30

*Silvercreek Mgmt., Inc.* v. *Citigroup, Inc.*,
    346 F. Supp. 3d 473 (S.D.N.Y. 2018)..............................................................24

*Smith* v. *United States*,
    568 U.S. 106 (2013)..........................................................................................29

*In re Takata Airbag Products Liab. Litig.*,
    396 F. Supp. 3d 1101 (S.D. Fla. 2019) ............................................................29

*Universal Physician Servs., LLC* v. *Del Zotto*,
    2019 WL 6033062 (M.D. Fla. Nov. 14, 2019) .................................................15

*Yegiazaryan* v. *Smagin*,
    599 U.S. 533 (2023)..........................................................................................32

*Yuanxiao Feng v. Walsh*,
    2020 WL 5822420 (S.D. Fla. Sept. 14, 2020) .................................................13

*Zamora* v. *FIT Int'l Grp. Corp.*,
   834 F. App'x 622 (2d Cir. 2020) .............................................................................18

**Statutes and Rules**

11 U.S.C. § 101 ...............................................................................................................2

Fed. R. Civ. P. 9(b) ........................................................................................................13

Fed. R. Civ. P. 12(b)(6) ...................................................................................................1

## REQUEST FOR HEARING

Pursuant to Local Rule 7.1(b)(2), Defendant Sullivan & Cromwell LLP respectfully requests oral argument on its Motion to Dismiss to answer any questions that the Court may have about the legal issues raised in the Motion.  Counsel estimates that one hour would be sufficient for argument.

Defendant Sullivan & Cromwell LLP ("S&C") respectfully moves to dismiss Plaintiffs' Class Action Complaint (No. 24-cv-20630, ECF No. 1) (the "Complaint" or "Compl.") with prejudice under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted.

## PRELIMINARY STATEMENT

Samuel Bankman-Fried, CEO and co-founder of FTX Trading Ltd. and its affiliated companies ("FTX"), used his near-complete control over FTX to perpetrate one of the most brazen frauds in history, secretly commingling and misappropriating billions of dollars' worth of assets to fund speculative investments, purchase lavish personal properties, and buy private jets. Bankman-Fried has been tried and convicted by a jury, and sentenced to 25 years in prison for his crimes.

Over the past year and a half, lawyers at S&C and other professionals supporting the FTX bankruptcy estate have worked around the clock to unwind the fraud perpetrated by Bankman-Fried and his inner circle. These efforts have been extraordinarily successful. Just recently, on May 7, 2024, the FTX bankruptcy estate filed a plan of reorganization providing for payment in full of all customer and non-governmental creditor claims as determined by the Bankruptcy Court, plus additional amounts to compensate creditors for the time value of their money that will increase recoveries to at least 118% of their allowed claims and potentially much more, with 98% of creditors receiving their distributions within 60 days of the plan's effective date.[1]

---

[1] *Disclosure Statement for Debtors' Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and its Affiliated Debtors and Debtors-in-Possession, In re FTX Trading Ltd.*, Case No. 22-11068 (JTD) at 2, 8 (May 7, 2024) (D.I. 14301) (as may be amended, supplemented or modified from time to time, the "Disclosure Statement") (attached as Exhibit 1). S&C requests that the Court take judicial notice of the Disclosure Statement. *See Cunningham* v. *Dist. Attorney's*

Plaintiffs in this action, a handful of alleged FTX customers, purport to bring claims against S&C to recover the same damages for which they are already being compensated through the bankruptcy process, namely, "the loss of their ability to retrieve their fiat currency or digital assets as a result of the insolvency of FTX US and FTX Trading Ltd." (Compl. ¶ 249.)  Plaintiffs' theory is that because S&C provided lawful legal services to FTX while Bankman-Fried was at the helm, before his fraud was uncovered, S&C must have been complicit in that fraud.  One of the Plaintiffs here, Warren Winter, first pursued this dubious theory in another court only to be soundly rebuffed, and this action is nothing more than an attempted do-over in a different forum. A year and a half ago, over the objection of now-Plaintiff Warren Winter, the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") held that S&C was "disinterested" pursuant to Section 327(a) of the Bankruptcy Code, meaning that S&C did not have any interest "materially adverse to the interest of the estate or of any class of creditors . . . by reason of any direct or indirect relationship to, connection with . . . the debtor, or for any other reason." 11 U.S.C. § 101.  The Bankruptcy Court reached this conclusion following a contested evidentiary hearing, expressly finding that there was "no evidence of any actual conflict here," and that the court had "no concerns about any potential conflicts of interests that would require me to disqualify Sullivan & Cromwell in this case."  (Jan. 20, 2023 Hr'g Tr. at 48:18-25, 50:14-16, *In re FTX Trading Ltd.*, No. 22-11068 (Bankr. Del. Jan. 23, 2023), ECF No. 558 ("Jan. 20, 2023 Hr'g Tr.").)

Plaintiffs have failed to provide any allegations that would enable this Court to reach a different conclusion.  That is not for lack of trying.  In pursuing their claims, Plaintiffs have entered into cooperation agreements with the central figures in the FTX fraud, including Gary

---

*Office for Escambia Cnty.*, 592 F.3d 1237, 1255 (11th Cir. 2010) (on a motion to dismiss, courts may take judicial notice of state and federal court proceedings, including criminal proceedings).

Wang (FTX co-founder and Chief Technology Officer), Caroline Ellison (Alameda CEO), Nishad Singh (FTX Head of Technology), Daniel Friedberg (FTX Chief Regulatory Officer) and Bankman-Fried himself.  (*See* ECF Nos. 565-2, 618-2.)  Plaintiffs have publicly, and repeatedly, touted the cooperation they have obtained from these FTX Insiders.  For example, at Bankman-Fried's sentencing, Plaintiffs' counsel remarked that Plaintiffs have been "cooperating with the FTX insiders and with Sam and his team," and that their "cooperation has been incredibly helpful." (March 28, 2024 Sentencing Tr. at 18:12-22, *United States* v. *Bankman-Fried*, No. 22-cr-00673 (S.D.N.Y. Apr. 9, 2024), ECF No. 426.)  Likewise, in seeking preliminary approval of their settlements with the FTX Insiders, Plaintiffs noted that these "Settling Defendants have provided . . . invaluable information, materials, and cooperation."  (ECF No. 565.)  If a claim existed against S&C, Plaintiffs have had every opportunity to find that claim and plead it.  Their failure to do so speaks volumes.

Plaintiffs assert state law claims against S&C for conspiracy to commit fraud, aiding and abetting fraud and breaches of fiduciary duty, and violations of the RICO Act.  All of Plaintiffs' claims suffer from numerous legal defects, and rest on threadbare allegations, unwarranted assumptions, and legal conclusions that the Court need not accept as true even at the pleading stage.  Accordingly, the Court should dismiss Plaintiffs' claims.

*First*, under New York law—which applies because that is where S&C rendered legal advice—"a viable tort claim against a professional requires the underlying relationship between the parties to be one of contract or the bond between them so close as to be the functional equivalent of contractual privity."  *Art Cap. Grp., LLC* v. *Neuhaus*, 70 A.D.3d 605, 607 (N.Y. App. Div. 1st Dep't 2010).  Because Plaintiffs have no relationship whatsoever with S&C—let

alone one arising out of "contract" or the "functional equivalent of contractual privity"—all of Plaintiffs' state law claims must be dismissed.

*Second*, Plaintiffs' aiding and abetting claim fails because Plaintiffs do not allege that S&C had actual knowledge of the fraud, or substantially assisted its commission. All Plaintiffs allege is S&C's provision to FTX of lawful legal services, and New York courts have consistently held that provision of lawful legal services to a fraudster does not impute knowledge of the fraud to the lawyer, nor does it constitute substantial assistance of the fraud. The injury Plaintiffs allege stems from the FTX Insiders' misappropriation of funds, and nowhere does the Complaint allege that S&C knew about or had anything to do with the misconduct that led to that injury.

*Third*, Plaintiffs' conspiracy claims fail because they are duplicative of their aiding and abetting claims, and in any event, are unsupported by any plausible allegation of a corrupt agreement between S&C and FTX. Based on the facts set forth in the Complaint, all that can be inferred is that S&C agreed to perform lawful legal services for FTX. The Complaint pleads no facts suggesting the existence of some other corrupt agreement, let alone one to misappropriate billions of dollars' worth of FTX assets.

*Fourth*, Plaintiffs' RICO claims must be dismissed for the same reasons as their state law claims. Plaintiffs have not alleged any facts showing that S&C entered into an agreement to commit unlawful acts because no such agreement exists. In addition, RICO's private right of action does not apply extraterritorially, and nothing in the Complaint suggests that the international Plaintiffs suffered any injury in the United States.

Despite having had approximately 18 months to build their record, and the benefit of information from "FTX Insiders"—those at the center of the FTX fraud—Plaintiffs have failed to plead anything other than a series of speculative allegations with no factual basis. If the Court

dismisses the Complaint—as it should—there is no reason to waste further time or resources on giving Plaintiffs another bite at the apple.  The Complaint should be dismissed with prejudice.

## FACTUAL BACKGROUND AND ALLEGATIONS OF THE COMPLAINT

### A.  The Parties

Plaintiffs are sixteen individual FTX customers, who each allegedly "purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform."  (Compl. ¶¶ 42-57.)  Twelve plaintiffs live in various U.S. states, while the other four live outside the United States.  (*Id.*)

Defendant S&C is a full-service global law firm organized as a limited liability partnership under New York law.  S&C lawyers have been successfully representing the FTX bankruptcy estate since November 2022, recovering billions of dollars in misappropriated funds for the benefit of FTX customers and other creditors.

### B.  The Rise of FTX

In May 2019, Sam Bankman-Fried and others launched FTX, a cryptocurrency exchange, which allowed users to buy, sell and trade crypto assets.  (*Id.* ¶¶ 65, 106.)

FTX gained international prominence for its popularity with users, high-profile acquisitions and celebrity endorsements, and the public image of Bankman-Fried, its co-founder and CEO, as a philanthropist who supposedly worked to enhance standards, disclosure, oversight and customer protection in the crypto industry.[2]  FTX portrayed itself as the vanguard of providing

---

[2]  Michael Taylor, *Taylor: Sam Bankman-Fried - Billionaire Philosopher at Cutting Edge of Cryptocurrency, Philanthropy*, SAN ANTONIO EXPRESS-NEWS (June 22, 2022), https://www.expressnews.com/business/columnists/michael-taylor/article/Taylor-Sam-Bankman-Fried-billionaire-17255683.php; Eli Tan, *Naomi Osaka Becomes Latest FTX 'Ambassador,' Joining Tom Brady and More*, COINDESK (Mar. 21, 2022), https://www.coindesk.com/business/2022/03/21/tennis-player-naomi-osaka-becomes-latest-ftx-ambassador-joining-tom-brady-and-more; *Crypto Firm FTX Trading's Valuation Rises to $18 bln after $900 mln investment*, REUTERS (Jul. 20, 2021),

customer protection in the crypto industry.[3]  Bankman-Fried claimed to support federal legislation to safeguard consumers' digital assets, and touted FTX's purported procedures to protect fiat currency and crypto deposits, including in testimony he provided to the U.S. Senate.[4]

FTX soon became one of the world's largest cryptocurrency exchanges.  (*Id.* ¶ 81.) By 2022, just three years after FTX's founding, trading volumes on the exchange had reached approximately $21 billion per day, representing more than 10% of all global crypto trading.  (*Id.* ¶¶ 81, 132.)  FTX had grown from its small core to more than 300 employees, and before its collapse, the company was valued at more than $32 billion.  (*Id.* ¶ 81.)

## C.    The FTX Fraud

The Complaint alleges that FTX fraudulently induced customers to deposit money by making false and misleading statements, both publicly and in its customer documentation, including that:

- Customer deposits would be appropriately safeguarded (*Id.* ¶¶ 72-73), and "[FTX's] users' funds and safety come first."  (*Id.* ¶ 78.)

- FTX maintained various automated and manual risk management processes to ensure that customer funds were protected from losses.  (*Id.* ¶ 76.)

---

https://www.reuters.com/technology/crypto-firm-ftx-trading-raises-900-mln-18-bln-valuation-2021-07-20.

[3]    Jesse Hamilton, *FTX's Bankman-Fried Says It's Worth Losing Money to Prop Up Crypto Industry*, COINDESK (Jul. 19, 2022), https://www.coindesk.com/policy/2022/07/19/ftxs-bankman-fried-says-its-worth-losing-money-to-prop-up-crypto-industry; Alexander Osipovich, *The 30-Year-Old Spending $1 Billion To Save Crypto*, WALL ST. J. (Aug. 23, 2022), https://www.wsj.com/articles/crypto-bitcoin-ftx-bankman-fried-11661206532.

[4]    Testimony of Sam Bankman-Fried, Co-Founder and CEO of FTX, "Examining Digital Assets – Risks, Regulation, and Innovation," U.S. Senate Committee on Agriculture, Nutrition and Forestry (Feb. 9, 2022), https://www.agriculture.senate.gov/imo/media/doc/Testimony_Bankman-Fried_0209202211.pdf.

- "[D]irect deposits from employers to FTX US are stored in individually FDIC-insured bank accounts in the users' names," and "stocks are held in FDIC-insured . . . accounts." (*Id.* ¶ 78.)

- Funds deposited by customers would not be "loaned to FTX Trading," and that FTX Trading "does not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading." (*Id.* ¶ 253.)

- Bankman-Fried and the other FTX executives were trustworthy because they were "proponent[s] of the 'effective altruism' social movement which believes in prioritizing donations to projects that will have the largest impact on the most people," and "wanted to get rich, not because [they] like money but because [they] wanted to give that money to charity." (*Id.* ¶ 79.)

The Complaint does not allege that S&C drafted any of these statements or was otherwise responsible for their dissemination.

It is now widely known that these statements made by FTX were false. Instead of segregating funds deposited by customers, FTX commingled those funds with FTX's own funds. (*Id.* ¶ 112.) And then, for years before the fraud was uncovered, Bankman-Fried directed the unlawful misappropriation of billions of dollars of FTX funds, including funds deposited by customers. (*Id.* ¶¶ 17, 119.)

Bankman-Fried and the FTX Insiders used a variety of means to perpetrate this fraud. At Bankman-Fried's direction, FTX told its customers "for many years" to deposit their fiat currency into bank accounts that were actually controlled by Alameda Research, LLC, a crypto hedge fund that was founded and 90% owned by Bankman-Fried. (*Id.* ¶¶ 114, 119.) Bankman-Fried then "loot[ed]" these funds, which were "never delivered to FTX." (*Id.* ¶ 120.) The FTX Insiders also caused a "back door" be written into FTX's code to give Alameda special status on the FTX exchange. (*Id.* ¶¶ 122, 125, 127.) This included an "allow negative" feature in FTX's code, which gave Alameda the ability to operate on the exchange even while it held a large negative balance. (*Id.* ¶ 213.)

Bankman-Fried and others at FTX used billions of dollars of misappropriated funds for various improper purposes, including investments in the crypto market, primarily through Alameda. (*Id.* ¶ 121.)  FTX also used misappropriated funds for "loans" to FTX Insiders, real estate purchases (like a $30 million penthouse in the Bahamas where Bankman-Fried and other FTX executives lived), large political contributions, naming rights to sports arenas, sponsorships, luxury cars, and private jets. (*Id.* ¶ 90, 113.)  To cover up its fraud, FTX created fictitious financial statements and balance sheets that concealed Alameda's borrowing from FTX and loans to FTX executives. (*Id.* ¶ 125.)

In November 2022, the FTX fraud began to unravel. (*Id.* ¶ 138.)  Crypto industry publication CoinDesk revealed that Alameda's balance sheet was being propped up by FTT tokens—a native token created by FTX.  Upon release of this news, prominent industry figures began to sell their holdings of FTT, which caused the token's price to crash and led panicked FTX customers to withdraw billions of dollars from the FTX exchange. (*Id.* ¶¶ 140-141.)  Because FTX had commingled and misused funds deposited by customers, it was unable to cover the withdrawal requests and faced a liquidity crisis, leading the FTX Group entities to file for bankruptcy protection on November 11 and 14, 2022. (*Id.* ¶¶ 143-145.)

In the months following the bankruptcy, three senior FTX executives—Ellison, Wang and Singh—pled guilty to various criminal charges. (*Id.* ¶¶ 91, 94, 103.)  On November 3, 2023, Bankman-Fried was convicted on charges including fraud, conspiracy, and money laundering arising from his theft of billions of dollars of misappropriated assets. (*Id.* ¶ 17.)  Bankman-Fried was sentenced to 25 years in prison for his crimes. (*See* Judgment at 3, *United States* v. *Bankman-Fried*, No. 22-cr-00673 (S.D.N.Y. Mar. 29, 2024), ECF No. 424.)

### D. S&C's Prior Representation of FTX

S&C was first retained by FTX in July 2021, after former S&C partner Ryne Miller became general counsel of FTX US, the FTX cryptocurrency exchange servicing U.S. customers. (Compl. ¶¶ 166, 168.)  Over the following 14 months, until FTX filed for Chapter 11 protection, S&C represented FTX or persons associated with it on around 20 discrete matters.  (*Id.* ¶ 164.)

The Complaint alleges that S&C represented FTX and its principals on the following engagements:

- FTX's acquisition of LedgerX, a cryptocurrency company that held derivatives trading licenses issued by the Commodity Futures Trading Commission ("CFTC") (*id.* ¶¶ 166-172);

- FTX's bid to acquire assets from the bankruptcy estate of Voyager, a competing cryptocurrency exchange (*id.* ¶¶ 173-175);

- unspecified work for an entity called Emergent, which the Complaint alleges was a conduit for misappropriated customer funds (*id.* ¶¶ 176-178);

- FTX's application for certain CFTC licenses, and responses to certain regulatory inquiries (*id.* ¶¶ 179-194);

- a personal representation of FTX executive Singh with regard to certain tax matters and estate planning (*id.* ¶ 196);

- a personal representation of Bankman-Fried concerning his reporting obligations following his purchases of shares in Robinhood (*id.* ¶¶ 197-204); and

- certain "miscellaneous other matters" (*id.* ¶ 205).

Rather than pleading that any of these actions were on their face unlawful, Plaintiffs instead allege that these representations supported FTX's business generally, and by implication, assisted the fraud in some unspecified way by allowing FTX to "expand[] its product offerings" and generate "the appearance of legitimate operations, strict adherence to regulatory obligations, and esteem for legal compliance, which permitted the scheme to grow in scale and persist in duration." (*Id.* ¶ 246.)

-9-

Plaintiffs do not (and cannot) plead any facts suggesting that S&C knew that FTX was commingling and misusing customer funds, instead relying on speculation and innuendo to suggest that S&C somehow must have known of the existence of the fraud.  In essence, Plaintiffs assert that having represented FTX and its executives in the matters referenced above, "S&C was well positioned to uncover through its due diligence the incestuous relationship between and among the FTX Group entities and the FTX Insiders, including the overlapping ownership of Alameda and FTX." (*Id.* ¶ 221; *see also id.* ¶ 211.)  This is just innuendo masquerading as facts; for example, the "overlapping ownership of Alameda and FTX" was publicly known long before FTX's collapse, and could not have put anyone on notice of Bankman-Fried's fraud.  *E.g.*, Alexander Osipovich, *The 30-Year-Old Spending $1 Billion To Save Crypto*, WALL ST. J. (Aug. 23, 2022), https://www.wsj.com/articles/crypto-bitcoin-ftx-bankman-fried-11661206532 (discussing the "trading firm [Bankman-Fried] owns alongside FTX, Alameda Research").

The closest Plaintiffs come to alleging that S&C had knowledge of the FTX fraud are paragraphs 26 and 213, neither of which provides more than unsubstantiated allegations that S&C knew something was amiss at FTX.  Paragraph 26 alleges that "S&C was privy to a software audit of the FTX systems," and that Ryne Miller, the general counsel of FTX US and a former S&C partner, became aware through that software audit of a "back door" in FTX's code that allowed Bankman-Fried and his inner circle to funnel large amounts of FTX customer funds to Alameda.  (Compl. ¶ 26.)  Mr. Miller allegedly then "communicated that fact to his mentors, Messrs. Dietderich and Eitel, and others at S&C." (*Id.*)  Paragraph 213, describing the same events, takes the inconsistent position that "LedgerX had access to view [FTX's] code base," including the "allow negative" feature through which "FTX funneled customer deposits to Alameda," and

that at some unspecified time, this special privilege for Alameda in FTX's code was revealed to "Ryne Miller, Zach Dexter, and **likely** S&C." (*Id.* ¶ 213 (emphasis added).)

Finally, Plaintiffs also allege that "just prior to FTX's collapse"—two days before FTX declared bankruptcy, and after it had already frozen customer withdrawals—one of FTX's main competitors, Binance, backed out of a proposed bailout of FTX after identifying "way too many issues" in due diligence. (*Id.* ¶ 223.) Plaintiffs imply that through this diligence, Binance learned of FTX's fraud, and claim that S&C must have learned of FTX's fraud as well because S&C allegedly had access to the same information as Binance. (*Id.* ¶ 223.)

### E.    S&C's Retention as Bankruptcy Counsel to the FTX Debtors.

On January 20, 2023, the Bankruptcy Court approved the retention of S&C as counsel for the FTX bankruptcy estate. (*Id.* ¶ 16.) S&C's retention faced objections from two individual creditors (including Warren Winter, a Plaintiff here), but no other stakeholders in the bankruptcy objected to the retention, including the United States Trustee and the Official Committee of Unsecured Creditors of FTX. (*See id.* ¶ 15; Jan. 20, 2023 Hr'g Tr. at 10:17-23.)

After considering S&C's prior representations of FTX, the Bankruptcy Court found that S&C was "disinterested" pursuant to Section 327(a) of the Bankruptcy Code. (Jan. 20, 2023 Hr'g Tr. at 47:19-48:4.) The Bankruptcy Court found "no evidence of any actual conflict here" between S&C and the FTX bankruptcy estate, and observed that the FTX bankruptcy estate was being run not by S&C, but by "Mr. [John] Ray and four independent directors appointed by Mr. Ray who are all consummate professionals [and] who were not involved in the company's collapse." (*Id.* at 48:18-25, 50:3-13.) In light of these facts, the Bankruptcy Court stated: "I have no concerns about any potential conflicts of interests that would require me to disqualify Sullivan & Cromwell in this case." (*Id.* at 50:14-16.)

F.      **The FTX Estate Has Announced Anticipated Recoveries that Render the Damages Sought in This Action Duplicative.**

Following FTX's Chapter 11 filing in November 2022, S&C and other professionals supporting the estate's new independent management and board of directors have worked tirelessly to track down and claw back assets that were misappropriated by Bankman-Fried and other FTX Insiders. On January 31, 2024, at a status conference, the FTX bankruptcy estate previewed to the Bankruptcy Court that it could "cautiously predict" that "***customers and general unsecured creditors with allowed claims, will eventually be paid in full.***" (Jan. 31, 2024 Hr'g Tr. at 18:11-25, *In re FTX Trading Ltd.*, No. 22-bk-11068 (Bankr. D. Del. Feb. 2, 2024), ECF No. 6908 (emphasis added).) Notwithstanding that clear indication of the tremendous success experienced by the bankruptcy estate and the substantial forthcoming recoveries for creditors, just two weeks later on February 16, 2024, Plaintiffs filed this action against S&C seeking to recover damages for the very same injury, *i.e.*, their inability to access crypto and fiat that they deposited with FTX, for which they will be compensated in the bankruptcy process.

On May 7, 2024, the FTX bankruptcy estate filed with the Bankruptcy Court a Plan of Reorganization and accompanying Disclosure Statement providing detail on the FTX assets that have been recovered and how they will be distributed to creditors. (*See* Disclosure Statement at 1-3.) Of particular note here, FTX customers with allowed claims will receive 100% of the dollar value of their petition date claims, plus interest at up to 9% from the commencement of the Chapter 11 cases through the date of distribution, as well as the opportunity for certain creditors to receive additional compensation through a supplemental remission fund being discussed with certain governmental agencies. (*Id.* at 2, 9-10.) Contrary to Plaintiffs' speculation that "[t]he FTX Group's bankruptcy proceeding is likely to continue for many years, with no guarantee that any of the victims will be able to see full recovery from those proceedings," (Compl. ¶ 36), the plan

-12-

provides that 98% of creditors will be paid in full at least 118% of their allowed claim amount within 60 days of the plan's effectiveness.  (Disclosure Statement at 8.)

## STANDARD ON THIS MOTION

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)).  It is not enough to plead "labels and conclusions," "naked assertions," or "a statement of facts that merely creates a suspicion of a legally cognizable right of action."  *Twombly*, 550 U.S. at 555, 557 (cleaned up); *see Jackson* v. *BellSouth Telecomms.*, 372 F.3d 1250, 1262 (11th Cir. 2004) ("Conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal." (internal quotation marks omitted)).  Nor is it enough to plead facts that are "merely consistent with" a defendant's liability, when those facts "could just as well" suggest that the defendant was engaged in lawful conduct.  *Twombly,* 550 U.S. at 557.  Instead, a complaint crosses the threshold from possibility to plausibility only through well-pled "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.

For claims that sound in fraud—as is the case with all of Plaintiffs' claims here—a complaint must also "state with particularity the circumstances constituting fraud."  Fed. R. Civ. P. 9(b).[5]  To satisfy this standard, a complaint must "set forth particular allegations about 'the who,

---

[5]    *See Am. United Life Ins. Co.* v. *Martinez*, 480 F.3d 1043, 1064 (11th Cir. 2007) (conspiracy to commit fraud, and aiding and abetting fraud both subject to Rule 9(b)); *Yuanxiao Feng v. Walsh*, 2020 WL 5822420, at *15 (S.D. Fla. Sept. 14, 2020), *report and recommendation adopted,* 2020 WL 5819615 (S.D. Fla. Sept. 30, 2020) (same for breach of fiduciary duty); *Miccosukee Tribe of Indians of Fla.* v. *Cypress*, 814 F.3d 1202, 1212 (11th Cir. 2015) (same for RICO conspiracy).

what, when, where, and how' of the circumstances giving rise to the cause of action." *Perkins* v. *Nat'l LGBTQ Task Force, Inc.*, 580 F. Supp. 3d 1236, 1240 (S.D. Fla. 2021).  The rule that fraud must be pled with particularity "serves an important purpose in fraud actions by alerting defendants to the precise misconduct with which they are charged and protecting defendants against spurious charges of immoral and fraudulent behavior." *Brooks* v. *Blue Cross and Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1370-71 (11th Cir. 1997) (internal quotation marks omitted).

## ARGUMENT

I.   **PLAINTIFFS FAIL TO STATE A CLAIM FOR COMMON LAW AIDING-AND-ABETTING OR CONSPIRACY LIABILITY.**

   A.   **New York Law Governs Plaintiffs' Common Law Claims.**

   Plaintiffs have already taken the position in a similar action in this same MDL against another law firm arising out of the legal services it provided to FTX that the location of the law firm governs the choice-of-law analysis.  (*See* ECF No. 350 at 7 ("[T]he misconduct here—the advice and counsel by Fenwick lawyers—occurred in California, where Fenwick primarily operated.  It is hard to see what, if anything at all, Florida has to do with the claims against Fenwick.").)  Applying Plaintiffs' own reasoning, New York law applies here because that is where the "advice and counsel by [S&C] lawyers" occurred.

   "A federal court sitting in diversity will apply the conflict-of-laws rules of the forum state"—here, Florida.  *Grupo Televisa, S.A.* v. *Telemundo Commnc'ns Grp., Inc.*, 485 F.3d 1233, 1240 (11th Cir. 2007).  In turn, "Florida resolves conflict-of-laws questions according to the 'most significant relationship' test outlined in the Restatement (Second) of Conflict of Laws."  *Id.*  Under that test, "courts consider '(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicil[e], residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any,

between the parties is centered.'" *Michel* v. *NYP Holdings, Inc.*, 816 F.3d 686, 694 (11th Cir. 2016) (quoting *Bishop* v. *Fla. Specialty Paint Co.*, 389 So.2d 999, 1001 (Fla. 1980)).  Here, New York law applies because each factor either favors New York or is neutral.

The first factor, place of injury, does not favor any jurisdiction because the named Plaintiffs are located in numerous jurisdictions and seek to represent both nationwide and international classes.  (Compl. ¶¶ 42-57, 226; *see*, *e.g.*, *Mixson* v. *C.R. Bard Inc.*, 628 F. Supp. 3d 1159, 1163 (N.D. Fla. 2022) (where injury occurred "in part [] in Texas" and "partly [] in Florida," the first factor "does not weigh heavily for Texas law"); *Kurlander* v. *Kaplan*, 2019 WL 6789572, at *5 (M.D. Fla. Dec. 12, 2019) (applying Virginia law despite plaintiffs being located at various times in Florida, Illinois and New York).)

The second factor, place of allegedly injurious conduct, favors the application of New York law.  The Complaint alleges that Plaintiffs were injured as a result of legal advice provided by S&C to FTX (*see*, *e.g.*, Compl. ¶¶ 246, 248), and S&C is a New York law firm (*id.* ¶ 58).  Moreover, where (as here) the alleged injury "occurred in two or more states," the location of the allegedly injurious conduct is entitled to "particular weight."  *Universal Physician Servs., LLC* v. *Del Zotto*, 2019 WL 6033062, at *5 (M.D. Fla. Nov. 14, 2019).

The third factor, the location of the parties, does not favor any particular state.  The only defendant is based in New York, while Plaintiffs are dispersed across several jurisdictions. *Del Zotto*, 2019 WL 6033062, at *6 ("Because the parties' connections are split between two states, the Court finds that the third factor is inconclusive.").

The fourth factor, the place where the parties' relationship is centered, also does not favor any particular jurisdiction, because there is no relationship between the parties.  *See Mixson*, 628 F. Supp. 3d at 1163 (fourth factor does not support any jurisdiction where "[t]here is

-15-

no real 'center' of the parties' 'relationship'").  Plaintiffs do not allege that they were clients or otherwise had any connection to S&C.

While these four factors support the application of New York law, the "policy considerations that underlie the choice-of-law test" militate strongly in favor of applying New York law, given that New York has "an obvious interest in regulating the conduct of its licensed professionals." *Kurlander*, 2019 WL 6789572, at *5 (applying Virginia law to claims based on conduct of Virginia lawyers).[6]

**B.      Plaintiffs' Tort Claims Must Be Dismissed Because Plaintiffs Have No Contractual Relationship—or Its Functional Equivalent—with S&C.**

Under New York law, "a viable tort claim against a professional requires the underlying relationship between the parties to be one of contract or the bond between them so close as to be the functional equivalent of contractual privity." *Art Cap.*, 70 A.D.3d at 607; *see Jacobs* v. *Kay*, 50 A.D.3d 526, 526-27 (N.Y. App. Div. 1st Dep't 2008) (same).  For example, in *Art Capital*, plaintiffs were in the business of providing loans to art galleries, and certain of their former employees set up a competing business that entered into a loan agreement with one of plaintiffs' art gallery clients.  *Art Cap.*, 70 A.D.3d at 609 (Acosta J., dissenting).  Plaintiffs sued the former employees for breach of fiduciary duties and fraud, and then sued the former employees' lawyer for aiding and abetting, including because the lawyer advised on the loan transaction between the former employees and plaintiffs' client.  *Id.* at 608-09.  The court dismissed the claim, noting that New York law requires at least the "functional equivalent of contractual privity" to sustain a tort claim against a professional, and that "[t]he existence of such

---

[6]      Should Plaintiffs change their position and argue that Florida law or some other law should apply, S&C reserves the right to submit briefing on whatever substantive law Plaintiffs advance.  For the avoidance of doubt, Florida law would compel the same result.

a relationship is not alleged here." *Art Cap.*, 70 A.D.3d at 607; *see also*, *e.g.*, *Jacobs*, 50 A.D.3d at 527 (dismissing fraud claim against lawyers where "plaintiffs have not pleaded any facts setting forth the existence of a contractual relationship or the functional equivalent thereof between themselves and defendants").

Plaintiffs here have less of a relationship with S&C than the plaintiff in the *Art Capital* case had with the lawyer who represented the plaintiff's former employees. Plaintiffs allege that they deposited assets with FTX, and that S&C provided legal counsel to FTX on certain discrete matters. In other words, Plaintiffs do not allege that they have any relationship whatsoever with S&C, let alone one approaching "the functional equivalent of contractual privity." *Id.* This absence of a relationship between Plaintiffs and S&C is fatal to their claims.

C.   **The Complaint Does Not Adequately Plead Aiding and Abetting Fraud or Breach of Fiduciary Duties.**

Under New York law, to support a claim for aiding and abetting fraud or a breach of fiduciary duty, "plaintiffs must allege (1) the existence of an underlying tort; (2) defendant's actual knowledge of the underlying tort; and (3) defendant's provision of substantial assistance in the commission of the underlying tort." *In re Bayou Hedge Funds Inv. Litig.*, 472 F. Supp. 2d 528, 532 (S.D.N.Y. 2007); *see Kirschner* v. *Bennett*, 648 F. Supp. 2d 525, 533 (S.D.N.Y. 2009) ("Under New York law, the elements of aiding and abetting a breach of fiduciary duty . . . and aiding and abetting a fraud are substantially similar."). The Complaint fails on two out of three requirements. The crux of the alleged fraud and breach of fiduciary duty is this: FTX told customers it would safeguard assets deposited into accounts controlled by FTX and not commingle and misappropriate them for FTX's own purposes. (Compl. ¶¶ 34, 253-255, 265, 267-269, 275, 277-279, 285.) But the Complaint includes no well-pled facts that even suggest—much less establish for pleading

-17-

purposes—that S&C knew about or substantially assisted this misconduct, so the aiding-and-abetting claims must be dismissed.

> ***Actual Knowledge.***   To sustain their aiding-and-abetting claims, Plaintiffs must plead sufficient facts to show that S&C had "actual knowledge" of FTX's fraud.  *In re Bayou*, 472 F. Supp. 2d at 532.  Allegations that a defendant had "constructive" knowledge, or that it was reckless or willfully blind, are not enough.  *Pension Comm. of Univ. of Montreal Pension Plan* v. *Banc of Am. Sec., LLC*, 446 F. Supp. 2d 163, 201 n.279 (S.D.N.Y. 2006); *see Zamora* v. *FIT Int'l Grp. Corp.*, 834 F. App'x 622, 627 (2d Cir. 2020) ("Mere 'constructive knowledge' of the purported misconduct does not satisfy the 'actual knowledge' inquiry as to [aiding and abetting] claims.").  Indeed, even "ignorance of obvious warning signs of fraud does not suffice to adequately allege the actual knowledge necessary to sustain an aiding and abetting claim." *Pension Comm.*, 446 F. Supp. 2d at 202-03.  Moreover, fraud claims subject to Rule 9(b) face a heightened standard; "while the element of actual knowledge may be alleged generally, the plaintiff still must accompany that general allegation with allegations of specific facts that give rise to a strong inference of actual knowledge regarding the underlying fraud."  *Lamm* v. *State St. Bank & Tr. Co.*, 889 F. Supp. 2d 1321, 1332 (S.D. Fla. 2012), *aff'd*, 749 F.3d 938 (11th Cir. 2014) (quoting *Rosner* v. *Bank of China*, 2008 WL 5416380, at *5 (S.D.N.Y. Dec. 18, 2008)) (cleaned up).

> Despite spanning more than 300 paragraphs, Plaintiffs' Complaint makes just two attempts at alleging that S&C had actual knowledge of FTX's fraud.  Neither passes muster.

> *First*, Plaintiffs allege that at some unidentified time after FTX acquired LedgerX, LedgerX conducted a "software audit" that uncovered the "back door" in FTX's code that "allowed [Bankman-Fried] and his inner circle to embezzle FTX customer funds by funneling them to

Alameda." (Compl. ¶ 26.) The results of this audit, including the "back door" in FTX's code, were allegedly revealed to Ryne Miller, FTX US' general counsel. (*Id.*) The Complaint contains conflicting allegations about what Mr. Miller purportedly did with this information. Paragraph 26 of the Complaint states that "[a]ccording to FTX insiders," Mr. Miller "communicated that fact to his mentors, Messrs. Dietderich and Eitel, and others at S&C." (*Id.*) Paragraph 213 of the Complaint, however, states that "according to FTX Insiders, the LedgerX acquisition revealed key components of the fraud to Ryne Miller, Zach Dexter, and ***likely*** S&C . . . ." (*Id.* ¶ 213.)

The Court need not accept these internally inconsistent allegations as true for purposes of this motion. *See Ellen S.* v. *Fla. Bd. of Bar Examiners*, 859 F. Supp. 1489, 1492 (S.D. Fla. 1994) ("For the purpose of a motion to dismiss, the complaint is construed in the light most favorable to the plaintiff, and all facts alleged by the plaintiff are accepted as true. . . . There are a few exceptions to this rule, such as where the facts alleged are internally inconsistent."); *In re Capitol Invs., Inc.*, 473 B.R. 838, 842 n.5 (Bankr. S.D. Fla. 2012) (courts "need not accept factual claims [in a complaint] that are internally inconsistent"); *see also*, *e.g.*, *Grasso* v. *Donnelly-Schoffstall*, 2022 WL 728839, at *1 (2d Cir. Mar. 11, 2022) (declining to credit inconsistent allegations where "Grasso alleged both that Donnelly-Schoffstall was required to pay Grasso's credit card bills and also that she was required only to 'assist' in paying those bills").

But these allegations also fail for another reason: they are conspicuously silent as to *when* S&C allegedly learned about the "back door" in FTX's code, and whether S&C understood that the "back door" could be used—and was being used—to perpetrate a fraud. According to the Complaint, "S&C was privy to a software audit of the FTX systems" through its "work on the LedgerX acquisition and work in connection with LedgerX (d/b/a/ FTX US Derivatives) thereafter." (Compl. ¶ 26.) Plaintiffs nowhere allege when this "software audit" took place, when

its results were communicated to Ryne Miller, what Mr. Miller allegedly told S&C and when, or what any of them understood the information to mean.

If, for example, Mr. Miller conveyed information about the "back door" in FTX's code on the eve of FTX's bankruptcy, when billions of misappropriated exchange assets were already gone and FTX had frozen withdrawals, then nothing S&C did before that time could have been in furtherance of a fraud that S&C knew nothing about. *See*, *e.g.*, *ICD Cap., LLC* v. *CodeSmart Holdings, Inc.*, 842 F. App'x 705, 706 (2d Cir. 2021) (dismissing aiding and abetting claim against company COO where "nothing in the [complaint] suggests that [COO] knew of the falsity of the [allegedly fraudulent] press release before it was issued"). Likewise, although certain elements of FTX's software code have garnered great attention in the aftermath of FTX's collapse, Plaintiffs do not even attempt to allege that the significance of those elements were apparent to anyone pre-collapse. The suggestion that S&C "likely" became aware of a line of code that affected Alameda's ability to borrow from the FTX exchanges does not come close to establishing that S&C knew that line of code was being used to perpetrate a massive fraud. Plaintiffs' failure to allege what S&C purportedly learned about the "back door" in FTX's code and when S&C supposedly gained that knowledge—despite Plaintiffs' vaunted access to "FTX Insiders" (Compl. ¶ 26)—is telling.

*Second*, Plaintiffs contend that S&C could have figured out that the fraud was occurring in the days leading up to FTX's bankruptcy. (*Id.* ¶ 223.) According to Plaintiffs, after FTX began to experience extreme liquidity issues, on November 8, 2022, Binance made an offer to acquire FTX and inject desperately needed capital. (*Id.* ¶ 140.) But after a 24-hour due diligence period, Binance backed out of the deal, citing "reports of mishandled customer funds, and the possibility of a federal investigation." (*Id.* ¶ 141.) Because S&C was retained on November 7,

-20-

2022 to assist FTX with "potential capital raises," plaintiffs contend that S&C would have seen the same information that caused Binance to back out of the deal.  (*Id.* ¶ 223.)

The Binance allegations do not support Plaintiffs' claims.  First, on Plaintiffs' telling, S&C would have learned about the fraud not only when the damage had already been done, but at a time when public reports were emerging about FTX's mishandling of customer funds. Binance backed away from acquiring FTX on November 8, 2022, after FTX was already in a highly public downward spiral.  (*Id.* ¶ 140-141.)  Indeed, as the Complaint itself acknowledges, Binance had suspicions about a potential fraud at the same time everyone else in the world did— not through "basic diligence," but instead, through public "reports of mishandled customer funds." (*Id.* ¶ 141.)  The inquiry for aiding-and-abetting looks to whether the defendant had actual knowledge of the fraud while it was being committed—not when the fraud was plastered across the front page of newspapers.  *See ICD Cap.*, 842 F. App'x at 706.

With no actual facts to support their claims, Plaintiffs' fall back on the argument that, because S&C represented FTX or its executives in certain M&A and regulatory matters, it was "in a unique position" or "well positioned" to discover FTX's fraud.  (Compl. ¶¶ 211, 221.) That argument, however, runs headlong into the "well-settled principle of New York law that allegations that attorneys represented defrauders in certain transactions do not give rise to any inference that the attorneys were aware of the fraud."  *In re Bayou*, 472 F. Supp. 2d at 533.[7]

---

[7]    *See also In re ICP Strategic Credit Income Fund Ltd.*, 2015 WL 5404880, at *15 (Bankr. S.D.N.Y. Sept. 15, 2015), *aff'd,* 568 B.R. 596 (S.D.N.Y. 2017), *aff'd*, 730 F. App'x 78 (2d Cir. 2018) (To "assert viable claims for [aiding and abetting breach of fiduciary duty], the plaintiff must show that the attorney knew more than the facts generally surrounding the transaction, and that the attorney knew of the various steps in the transaction's execution. The allegations must show that the attorney knew that he or she was assisting *something that was wrong,* and how that assistance facilitated wrongful conduct." (emphasis in original)); *Roni LLC* v. *Arfa*, 72 A.D.3d 413, 413 (N.Y. App. Div. 1st Dep't), *aff'd*, 15 N.Y.3d 826 (N.Y. 2010) ("Plaintiffs' conclusory allegations, and the documentary evidence submitted in support thereof, do not give rise to an

Plaintiffs do not contend—nor could they—that any of the transactions or regulatory applications on which S&C provided legal advice were, in and of themselves, wrongful. To the contrary, the "transactions which plaintiff[s] in hindsight describe[] as 'sham' were, so far as can be gathered from the complaint, completely unobjectionable at the time they were agreed to." *Nat'l Westminster Bank USA* v. *Weksel*, 124 A.D.2d 144, 147 (N.Y. App. Div. 1st Dep't 1987); *see also Twombly*, 550 U.S. at 557 (factual allegations do not plausibly suggest misconduct when they could "just as well" indicate lawful action).

This rule of New York law—that representing a fraudster on lawful transactions does not provide a basis for imputing knowledge of fraud to a lawyer—makes perfect sense in the context of this case. As Plaintiffs allege, S&C was engaged in discrete matters for FTX relating primarily to M&A and regulatory compliance. (Compl. ¶¶ 166-206.) As a matter of "experience and common sense," *Iqbal*, 556 U.S. at 679, it is implausible that S&C in that context would have had any occasion or opportunity to scrutinize FTX's software code, much less that lawyers who are not computer scientists could have detected that something was suspicious about that software code.

Even if one accepts Plaintiffs' conclusory allegation that S&C was "well-positioned" to discover FTX's fraud, that still does not satisfy their burden. Allegations that S&C *could* have ferreted out the truth do not establish that S&C *actually did* so. *See Ferring B.V.* v. *Allergan, Inc.*, 4 F. Supp. 3d 612, 623 (S.D.N.Y. 2014) (allegation that defendant "should have known" not sufficient to plead knowledge necessary for aiding and abetting claim). Plaintiffs have

_____

inference that the attorney defendants had actual knowledge of, or knowingly induced or participated in, the alleged scheme. . . . At most, the documentary evidence indicates that the attorney defendants structured and organized entities that acted as the brokers on the property acquisitions and collected commissions—activities which are part of ordinary real estate lawyering.").

not identified any "obvious 'red flags' or warning signs indicating the fraud's existence," but even had they done so, it would be insufficient to state a claim. *Rosner*, 2008 WL 5416380, at \*6.

        The remainder of Plaintiffs' allegations about S&C's purported knowledge are assertions that S&C was in a position to learn about FTX's fraud.[8]  Such conclusory allegations, based on nothing more than Plaintiffs' say-so (often made on "information and belief") (Compl. ¶ 221), must be disregarded for purposes of this motion.  *See Funding Metrics, LLC* v. *Decision One Debt Relief LLC*, 2019 WL 861268, at \*2 (S.D. Fla. Feb. 22, 2019) ("Conclusory allegations made upon information and belief are not entitled to a presumption of truth, and allegations stated upon information and belief that do not contain any factual support fail to meet the *Twombly* standard."); *McCullough* v. *Finley*, 907 F.3d 1324, 1333 (11th Cir. 2018) ("Conclusory allegations are not entitled to the assumption of truth."); *see also Renner* v. *Chase Manhattan Bank*, 2000 WL 781081, at \*12 (S.D.N.Y. June 16, 2000), *aff'd*, 85 F. App'x 782 (2d Cir. 2004) (conclusory assertion of actual knowledge insufficient where complaint "provides no factual basis for [its] conclusion").

        **Substantial Assistance.**  Even if Plaintiffs had come close to adequately alleging that S&C knew about FTX's fraud (they have not), they must also show that S&C substantially assisted FTX in the commission of that fraud.  On that score, Plaintiffs have nothing.

        "Substantial assistance may only be found where the alleged aider and abettor affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the

---

[8]    *E.g.*, Compl. ¶¶ 32 ("S&C was well positioned to see the collapse coming, via knowledge gleaned from prior engagements."), 211-212 ("S&C, as counsel to FTX Group and to Bankman-Fried and Nishad Singh, personally, on numerous engagements and interactions, placed itself in a unique position to gain deep insight into the FTX entities' convoluted organizational structure, abject lack of internal controls, and dubious business practices."), 216, 220-221, 243-245, 257-260, 263-264, 270-273, 280-282, 299.

breach to occur." *Hongying Zhao* v. *JPMorgan Chase & Co.*, 2019 WL 1173010, at *7 (S.D.N.Y. Mar. 13, 2019) (internal quotation marks omitted). "Also embedded into the substantial assistance element is a proximate cause analysis, which requires a showing that a defendant's participation was the proximate cause of plaintiff's injury." *Silvercreek Mgmt., Inc.* v. *Citigroup, Inc.*, 346 F. Supp. 3d 473, 487 (S.D.N.Y. 2018) (cleaned up). Plaintiffs have not adequately alleged any of these required forms of substantial assistance.

Starting with "failure to act," Plaintiffs do not allege that S&C was required to disclose any supposed knowledge it had about FTX's fraud. Nor could they, since "the mere inaction of an alleged aider and abettor constitutes substantial assistance only if the defendant owes a fiduciary duty directly to the plaintiff." *Kaufman* v. *Cohen*, 307 A.D.2d 113, 126 (N.Y. App. Div. 1st Dep't 2003); *see Kolbeck* v. *LIT Am., Inc.*, 939 F. Supp. 240, 247 (S.D.N.Y. 1996), *aff'd*, 152 F.3d 918 (2d Cir. 1998) ("[I]naction, or a failure to investigate, constitutes actionable participation only when a defendant owes a fiduciary duty directly to the plaintiff; that the primary violator owes a fiduciary duty to the plaintiff is not enough."). Because Plaintiffs do not (and cannot) argue that S&C owed them any fiduciary duty, S&C was under no obligation to disclose anything to them.

Unable to rely on S&C's inaction, Plaintiffs struggle to identify any affirmative actions by S&C that they can characterize as substantially assisting FTX's fraud. Plaintiffs point to various lawful legal services S&C provided to FTX and its executives, relating to M&A, regulatory compliance, personal tax planning and antitrust reporting. *See* pp. 9-10 *supra*. But as New York courts have repeatedly held, a "claim that defendants provided routine legal services to the alleged fraudsters is [] insufficient to establish a claim for aiding and abetting fraud." *Learning Annex, L.P.* v. *Blank Rome LLP*, 106 A.D.3d 663, 663 (N.Y. App. Div. 1st Dep't 2013); *see CRT*

*Invs., Ltd.* v. *BDO Seidman, LLP*, 85 A.D.3d 470, 472 (N.Y. App. Div. 1st Dep't 2011) ("Substantial assistance, a necessary element of aiding and abetting fraud, means more than just performing routine business services for the alleged fraudster." (cleaned up)).  Because all of the legal services S&C provided to FTX "fall completely within the scope of defendant's duties as an attorney," they cannot be the basis for liability.  *Art Cap.*, 70 A.D.3d at 606.

 To establish substantial assistance, Plaintiffs must also plausibly allege that S&C "proximately caused the harm on which the primary liability is predicated." *Pension Comm.*, 446 F. Supp. 2d at 201.  Under this standard, "'[b]ut-for' causation is insufficient; aider and abettor liability requires the injury to be a direct or reasonably foreseeable result of the conduct." *Cromer Fin. Ltd.* v. *Berger*, 137 F. Supp. 2d 452, 470 (S.D.N.Y. 2001).

 S&C's alleged conduct in this case comes nowhere close to meeting that exacting standard because it "had little if anything to do with plaintiffs' losses." *Kolbeck*, 939 F. Supp. at 249.  Plaintiffs' theory of causation appears to be that S&C's legal advice allowed FTX to expand its product offerings and project legitimacy, which improved "confidence in [FTX's] platform and convince[d] consumers to commit fiat currency and digital assets to the FTX platforms." (Compl. ¶¶ 262-263.)  While providing routine legal services to FTX is remote even from Plaintiffs' decision to deposit assets with FTX, that is not the cause of their alleged injury.  Instead, Plaintiffs' injury resulted from the misappropriation of assets by Bankman-Fried and other FTX Insiders. (*Id.* ¶¶ 34, 249 253-255, 265, 267-269, 275, 277-279, 285.)  And Plaintiffs allege no link whatsoever between (i) S&C's provision of M&A and regulatory legal services to FTX, and (ii) the independent decisions of Bankman-Fried and other FTX Insiders to steal billions of dollars of assets from the exchange.  Plaintiffs' theory of causation would impose liability on anyone who

-25-

provided ***any business-related*** services to FTX, but the reach of aiding-and-abetting liability under New York law does not have that breathtaking scope.

> **D.      Plaintiffs' Conspiracy Claims Are Duplicative of Their Aiding-and-Abetting Claims and, In Any Event, Fail Plausibly To Allege that S&C Was Party to any Corrupt Agreement.**

To plead a claim for conspiracy to commit fraud, Plaintiffs must allege "(a) a corrupt agreement between two or more persons, (b) an overt act in furtherance of the agreement, (c) the parties' intentional participation in the furtherance of a plan or purpose, and (d) the resulting damage or injury." *Martin Hilti Fam. Tr.* v. *Knoedler Gallery, LLC*, 386 F. Supp. 3d 319, 349 (S.D.N.Y. 2019). Before even reaching these elements, Plaintiffs claims fail for two independent reasons.

*First*, a plaintiff cannot "reallege a tort asserted elsewhere in the complaint in the guise of a separate conspiracy claim." *Aetna Cas. & Sur. Co.* v. *Aniero Concrete Co.*, 404 F.3d 566, 591 (2d Cir. 2005). But that is precisely what Plaintiffs are trying to do here. Their conspiracy claim relies on the same cursory allegations as their aiding and abetting claims. (*Compare*, *e.g.*, Compl. ¶¶ 243-246, 249 *with* Compl. ¶¶ 258-260, 262, 265.) Plaintiffs' conspiracy claim must be dismissed for that reason alone. *See*, *e.g.*, *Briarpatch Ltd., L.P.* v. *Geisler Roberdeau, Inc.*, 2007 WL 1040809, at *26 (S.D.N.Y. Apr. 4, 2007), *aff'd*, 312 F. App'x 433 (2d Cir. 2009) (Where the alleged overt "acts underlying a claim of conspiracy are the same as those underlying other claims alleged in the complaint, the conspiracy claim is dismissed as duplicative.").

*Second*, Plaintiffs' conspiracy claim fails because they have not alleged a legally viable conspiracy. The only purported conspiracy they have attempted to allege, in entirely conclusory terms, is between, on the one hand, FTX and its agents and, on the other hand, lawyers at S&C who were retained by FTX. (Compl. ¶ 242.) Such a conspiracy claim is barred by the intracorporate conspiracy doctrine, which holds that an entity (including its agents) cannot

conspire with itself.  *See Fouad* v. *The Milton Hershey Sch. & Sch. Tr.*, 2024 WL 1425538, at \*12 (N.Y. Sup. Ct. Mar. 20, 2024) (The "intracorporate conspiracy doctrine . . . posits that officers, agents, and employees of a single entity, each acting within the scope of his or her employment, are legally incapable of conspiring with each other.").  "The doctrine applies in the attorney-client context to preclude conspiracy liability for attorneys alleged to have conspired with clients." *Id.* Because even Plaintiffs acknowledge that S&C's actions described in the Complaint were "committed within the scope of S&C's employment" (Compl. ¶ 264), the conspiracy claim fails. *See*, *e.g.*, *Lilley* v. *Greene Cent. Sch. Dist.*, 187 A.D.3d 1384, 1389–1390 (N.Y. App. Div. 3d Dep't 2020) (dismissing "state civil conspiracy claim" under "intra-corporate or intra-enterprise conspiracy doctrine" where all defendants were "officials, employees or agents of the [defendant] school district"); *accord Chance* v. *Cook*, 50 F.4th 48, 51 (11th Cir. 2022) (conspiracy claims fail when "an attorney's conduct falls within the scope of the representation of his client").

To the extent the Court considers the merits of Plaintiffs' conspiracy allegations, they still fail to state a claim.  The Complaint contains no factual allegations that support the existence of a "corrupt agreement" between S&C and FTX.  *Martin Hilti*, 386 F. Supp. 3d at 349. The most one can infer is that S&C agreed to provide legitimate legal services to FTX, including advice on acquiring other companies, obtaining regulatory licenses and responding to regulatory inquiries.  (*E.g.*, Compl. ¶ 298.)  But that is irrelevant to Plaintiffs' conspiracy claim, which requires allegations of an agreement "to effectuate an *unlawful* purpose."  *Cohen* v. *Stevanovich*, 722 F. Supp. 2d 416, 437 (S.D.N.Y. 2010) (emphasis added; internal quotation marks omitted). Nowhere in the Complaint do Plaintiffs allege an express (or implied) agreement between S&C and FTX to effectuate any unlawful purpose—especially not under the demanding particularity

standard of Rule 9(b). Instead, they rely on "general and conclusory allegations" of an agreement,[9] which are plainly deficient under New York law and Rule 12(b)(6). *Id.*; *see Brownstone Inv. Grp., LLC* v. *Levey*, 468 F. Supp. 2d 654, 661 (S.D.N.Y. 2007) ("[T]o survive a motion to dismiss, a complaint must contain more than general allegations in support of the conspiracy. Rather, it must allege the specific times, facts, and circumstances of the alleged conspiracy."); *see also Marquez* v. *Amazon.com, Inc.*, 69 F.4th 1262, 1269 (11th Cir. 2023) (a viable complaint must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," which necessitates "more than naked assertions devoid of further factual enhancement, mere labels and conclusions, or a formulaic recitation of the elements of a cause of action." (internal quotation marks omitted)).

Plaintiffs also have not adequately alleged S&C's "intentional participation in the furtherance of a plan or purpose," for the same reasons they have failed to plead actual knowledge or substantial assistance in support of their aiding-and-abetting claims. *See* pp. 17-25 *supra*; *Heinert* v. *Bank of Am. N.A.*, 835 F. App'x 627, 632 (2d Cir. 2020) ("[B]ecause the claim for conspiracy requires the same allegations of actual knowledge as those discussed, and found wanting, above, the claim for conspiracy also falls."). Put differently, Plaintiffs nowhere allege that S&C knew FTX was misappropriating customer funds and intentionally participated in that misappropriation.

---

[9]     *E.g.*, Compl. ¶ 242 ("There was an express or implied agreement between, on the one hand, FTX US, FTX Trading Ltd., Alameda, and/or other agents of FTX Group entities and, on the other hand, S&C, to deceive Class Members, and to commit the wrongful conduct described herein, namely FTX Group's fraud and conversion of Class Members' property.")

## II.     PLAINTIFFS' RICO CLAIMS MUST BE DISMISSED

"[C]ourts are wary of civil RICO claims brought in the context of commercial disputes" because plaintiffs are "[e]nticed by the prospect of treble damages" and thus "frequently attempt to mold their claims to the RICO form even though their injuries do not fall within those intended to be addressed by the Act." *Fittipaldi* v. *Bluegreen Vacations Unlimited, Inc.*, 2018 WL 11406250, at *2 (S.D. Fla. Sept. 18, 2018) (internal quotation marks omitted).  Accordingly, "courts have an obligation to scrutinize civil RICO claims early in the litigation–to separate the rare complaint that actually states a claim for civil RICO and should strive to flush out frivolous RICO allegations at an early stage of the litigation." *DeBoskey* v. *SunTrust Mortgage, Inc.*, 2017 WL 4083557, at *7 (M.D. Fla. Sept. 14, 2017) (internal quotation marks omitted).

The Complaint, which tries to portray S&C's provision of lawful legal services into some sort of agreement to join a criminal conspiracy, bears no resemblance to that "rare complaint that actually states a claim for civil RICO." *Id.*  Plaintiffs plead no facts showing that S&C entered into an agreement to commit illegal acts.  Plaintiffs' claims also are impermissibly extraterritorial to the extent they are asserted on behalf of the international Plaintiffs.

### A.     Plaintiffs Fail To State Any RICO Claim.

The touchstone of a RICO conspiracy claim is that the defendant "has agreed to participate in the conduct of an enterprise's illegal activities." *In re Takata Airbag Products Liab. Litig.*, 396 F. Supp. 3d 1101, 1164 (S.D. Fla. 2019) (emphasis omitted).  Such an agreement can be established either "(1) by showing that the defendant agreed to the overall objective of the conspiracy; or (2) by showing that the defendant agreed to commit two predicate acts." *Am. Dental Ass'n* v. *Cigna Corp.*, 605 F.3d 1283, 1293 (11th Cir. 2010).  Plaintiffs nowhere claim that S&C agreed to commit two predicate acts, and so must establish that S&C "knowingly and willfully participated" in an agreement with FTX to steal billions of dollars of assets from the exchange.

*Smith* v. *United States*, 568 U.S. 106, 110 (2013).  To do so, Plaintiffs bear the burden of pleading that S&C joined the alleged conspiracy with "actual knowledge" of or at least "willful blindness" to FTX's massive theft of assets from the exchange.  *Domanus* v. *Locke Lord LLP*, 847 F.3d 469, 479 (7th Cir. 2017); *see Republic of Panama* v. *BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 951 (11th Cir. 1997) (stating a RICO conspiracy required pleading that defendant have knowledge of "essential nature of the plan").  As with Plaintiffs' common law claims, "the fact that someone should have known about a scheme or fraudulent activity is not enough to show that the person actually knew."  *Domanus*, 847 F.3d at 480.  Plaintiffs fail to meet this high standard.

The allegations supporting Plaintiffs' RICO claims are recycled from their faulty common law claims, and fail for the same reasons.  (*See* Part I, *supra*.)  Once again, the best Plaintiffs can come up with is the notion that S&C supposedly "facilitated the scheme to defraud and RICO enterprise by agreeing to provide and providing legal services to FTX."  (Compl. ¶ 296; *see also id.* ¶ 298 (S&C allegedly furthered the conspiracy by "structuring acquisitions and other transactions by which FTX US expanded its product offerings" and "generating for the FTX entities the appearance of legitimate operations").)

But "[a]llegations that a law firm provided legal representation to an enterprise do not, without more, suffice to state a RICO conspiracy."  *Muskegan Hotels, LLC* v. *Patel*, 986 F.3d 692, 699 (7th Cir. 2021).  The legal services that S&C performed for FTX were lawful, and "parties cannot be found guilty of conspiring to commit an act that is not itself against the law."  *Jackson*, 372 F.3d at 1269; *see also Domanus*, 847 F.3d at 482 ("Claims that lawyers have conspired with their clients are insufficient in the absence of allegations that the arrangement involves more than standard legal representation."); *RSM Prod. Corp.* v. *Freshfields Bruckhaus Deringer U.S. LLP*, 682 F.3d 1043, 1051 (D.C. Cir. 2012) (dismissing RICO conspiracy claim against law firm where

"the complaint alleges no conduct by Freshfields beyond the provision of normal legal services in arbitration and so fails to support a reasonable inference that Freshfields agree[d] to assist others in the commission of unlawful acts") (internal quotation marks omitted).

The Seventh Circuit's decision in *Muskegan Hotels, LLC* v. *Patel* is instructive. 986 F.3d 692 (7th Cir. 2021). There, plaintiffs were allegedly tricked into purchasing properties at "about twice their fair values," because the properties had been "appraised at inflated amounts"—allegedly due to "appraisal fraud." *Id.* at 695. Plaintiffs brought RICO conspiracy claims against the seller's law firm, Wolin & Rosen, which had "prepared promissory notes, closing documents, and loan modification agreements" for those transactions. *Id.* at 699. The Seventh Circuit affirmed dismissal of those claims because "[e]ven if Wolin & Rosen knew or should have known that the appraisals for these properties were inflated, alleging mere knowledge is insufficient to state a claim." *Id.* at 700. Rather, the plaintiffs were required to plead "details about the content of any agreement, when and where any agreement arose, or what acts of racketeering were agreed upon," which they failed to do. *Id.* at 700. So too here. Nowhere do Plaintiffs set out—certainly not with the required particularity—the terms of the supposed illegal agreement that they say S&C entered into.

Ultimately, Plaintiffs' RICO claim boils down to the contention that S&C's provision of lawful legal services *could* have been in furtherance of an illegal conspiracy—without alleging any facts establishing that S&C knowingly agreed to join in FTX's illegal behavior. The "obvious alternative explanation" for S&C's conduct is that it provided legitimate legal services for a company whose CEO turned out to be a fraudster and a thief. *Twombly*, 550 U.S. at 567. That does not begin to support a RICO claim.

-31-

### B.      The International Plaintiffs' RICO Claim Is Impermissibly Extraterritorial.

RICO's private right of action does not apply extraterritorially.  Rather, "Section 1964(c) requires a civil RICO plaintiff to allege and prove a domestic injury to business or property and does not allow recovery for foreign injuries." *RJR Nabisco, Inc.* v. *Eur. Cmty.*, 579 U.S. 325, 354 (2016).  An injury is domestic "when the circumstances surrounding the injury indicate it arose in the United States." *Yegiazaryan* v. *Smagin*, 599 U.S. 533, 549 (2023).

Here, nothing in the Complaint suggests that the international Plaintiffs suffered any injury in the United States.[10]  Rather, the Complaint and its exhibits make clear that non-US customers of FTX "resid[e] outside the United States" (Compl. ¶ 226) and used the platform run by FTX Trading, which "operated from [the] Bahamas" on a "server housed in Japan"  (Ex. 1 to Compl. ¶¶ 19, 22), and used "international [bank] accounts" (Compl. ¶ 124.)  Because the international Plaintiffs have alleged no domestic injury, their RICO claims must be dismissed for that reason as well.

### III.    THE COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE

The Court should dismiss Plaintiffs' Complaint with prejudice.  Although this is Plaintiffs' first complaint against S&C, given the context of this case, they should not be permitted to waste S&C's and the Court's resources with another bite at the apple.  When drafting their Complaint, Plaintiffs trumpet the fact that they had access to FTX Insiders (*e.g.*, *id.* ¶¶ 26, 166, 213), and indeed, Plaintiffs' counsel told the court at Bankman-Fried's sentencing that Plaintiffs are "cooperating with the FTX insiders and with Sam and his team," and that their "cooperation has been incredibly helpful" (March 28, 2024 Sentencing Tr. at 18:12-22, *United States* v. *Bankman-Fried*, No. 22-cr-00673 (S.D.N.Y. Apr. 9, 2024), ECF No. 426); *see also*, *e.g.*, ECF No.

---

[10]      The international Plaintiffs are Vozza, Rupprecht, Winter, and Kavuri.  (Compl. ¶ 226).

565 (Plaintiffs asserting in preliminary approval motion that "all Settling Defendants"—including Caroline Ellison, Gary Wang, Nishad Singh and Daniel Friedberg—"have provided . . . invaluable information, materials, and cooperation").  Despite access to those at the center of FTX's fraud, Plaintiffs have not—and cannot—allege facts showing that S&C was complicit in FTX's fraud. *See In re Jan. 2021 Short Squeeze Trading Litig.*, 584 F. Supp. 3d 1161, 1204-05 (S.D. Fla. 2022), *aff'd*, 76 F.4th 1335 (11th Cir. 2023) (dismissing with prejudice where plaintiffs received "voluminous discovery" and had the benefit of "many individual pleadings filed prior to consolidation" before filing the operative complaint).  Accordingly, Plaintiffs' Complaint should be dismissed with prejudice because there is no reasonable possibility of a different result on any second effort.

## CONCLUSION

For the foregoing reasons, this Court should dismiss the Complaint in its entirety with prejudice.

Dated:  May 13, 2024                          Respectfully submitted,

                                              _/s/ Samuel A. Danon_
                                              **HUNTON ANDREWS KURTH LLP**
                                              Samuel A. Danon (FBN 892671)
                                              María Castellanos Alvarado (FBN 116545)
                                              333 S.E. 2 Avenue, Suite 2400
                                              Miami, FL 33131
                                              Telephone: (305) 810-2500
                                              Facsimile: (305) 810-2460
                                              sdanon@huntonak.com
                                              mcastellanos@huntonak.com

                                              Johnathon E. Schronce
                                              (Certificate of Understanding forthcoming)
                                              951 E. Byrd Street
                                              Riverfront Plaza, East Tower
                                              Richmond, VA 23229
                                              Telephone:  (804) 788-8200
                                              Facsimile:  (804) 788-8218
                                              jschronce@huntonak.com

                                              *Counsel for Defendant Sullivan & Cromwell LLP*