Case No.: 1:23-md-03076-KMM

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| IN RE:<br><br>FTX CRYPTOCURRENCY EXCHANGE COLLAPSE LITIGATION | MDL No. 3076<br><br>23-md-03076-KMM |
| THIS DOCUMENT RELATES TO:<br><br>*Lahav et al.* v. *Binance Holdings Limited et al.*, No. 1:24-cv-21421-MOORE (PSLRA Class Action) | |

**FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL: BINANCE DEFENDANTS AND MR. CHANGPENG ZHAO**

**TABLE OF CONTENTS**

NATURE OF THE ACTION AND INTRODUCTION ........................................................... 1

PARTIES ............................................................................................................................ 5

JURISDICTION AND VENUE ......................................................................................... 6

STATEMENT OF FACTS ................................................................................................. 8

    A.    Cryptocurrency, Crypto Exchanges and the SEC ............................................... 8

    B.    Binance Is an FTX Group Competitor, and CZ Had a Rivalry with FTX's CEO ............... 10

    C.    Binance and CZ Made Materially False and Misleading Statements ................................... 12

    E.    Unfairly Hurting the FTX Group Benefitted Binance ........................................ 21

CLASS ALLEGATIONS ................................................................................................. 23

COUNT I: VIOLATION OF §10(b) OF THE EXCHANGE ACT [15 U.S.C. § 78j(b)] AND VIOLATION OF SEC 10(b)(5)[17 C.F.R. § 240.10b-5] ......................................... 26

COUNT II: VIOLATION OF SEC SECTION 17(a)) [15 U.S.C. § 77q] ........................ 27

COUNT III: VIOLATION OF THE CALIFORNIA'S UNFAIR COMPETITION LAW ........................ 28

COUNT IV: VIOLATION OF CAL. CORP. CODE §25504.1. ....................................... 29

COUNT V: NEGLIGENT MISREPRESENTATION ..................................................... 30

COUNT VI: INTENTIONAL MISREPRESENTATION ................................................ 31

COUNT VII: RESTITUTION AND/OR UNJUST ENRICHMENT ................................ 32

PRAYER FOR RELIEF .................................................................................................. 33

DEMAND FOR JURY TRIAL ....................................................................................... 35

## NATURE OF THE ACTION AND INTRODUCTION

In accordance with the parties' agreed motion (ECF No. 681) as subsequently adopted by the Court (ECF No. 687), Lead Plaintiff Nir Lahav ("Lead Plaintiff") on behalf of himself and all others similarly situated (including but not limited to the named plaintiffs in the other actions within this MDL and their classes) hereby files this First Amended Consolidated Class Action Complaint and Demand for Jury Trial pursuant to Fed. R. Civ. P. 42 and Private Securities Litigation Reform Act ("PSLRA") against Binance Holdings Limited, BAM Trading Services Inc. ("BAM Trading"), BAM Management US Holdings Inc. ("BAM Management"), (collectively, "Binance Defendants" or simply "Binance") and Mr. Changpeng Zhao ("CZ"), as named herein, as transferred to this Court from the action styled *Lahav v. Binance Holdings Ltd., et al.,* 1:24-cv-21421-KMM (S.D. Fl.).

1.      In addition to definitions set forth above, Lead Plaintiff uses the following defined terms throughout:

- "Defendants" collectively refers to the Binance Defendants and CZ.
- "Remaining MDL Defendants" collectively refers to all the remaining Defendants named in all the actions consolidated in this MDL.
- "Alameda" or "Alameda Research" refers to Alameda Research, LLC and its subsidiaries.
- "FTX Group" refers to FTX Trading LTD and its subsidiaries d/b/a FTX, West Realm Shires Inc. and its subsidiaries, and includes, without limitation, its subsidiary West Realm Shires Services Inc. d/b/a FTX US and Alameda.
- "FTX Platform(s)" refers to one or more of FTX's mobile application and/or web-based cryptocurrency investment service(s) that place(s) cryptocurrency trade orders on behalf of users.
- "FTX Bankruptcy" refers to bankruptcy proceedings of one or more members of the FTX Group.

- "Binance Platform" refers to Binance Defendants' mobile application and/or web-based cryptocurrency exchange, bitcoin exchange, and cryptocurrency market services that place cryptocurrency trade orders on behalf of users.

2.     CZ and Binance Defendants are not similarly situated with other Remaining MDL Defendants, and differ from other Remaining MDL Defendants in the following material ways:

(i)     There is no allegation of joint liability or conspiracy between CZ and the Binance Defendants on one side and the Remaining MDL Defendants on the other side;

(ii)    CZ and the Binance Defendants were competitors to the FTX Group and the MDL Defendant Samuel Bankman-Fried ("SBF"); (Exhibit 3, JPML-ECF No. 255-1 at 4, 18; 263 at 1, 4-5, 8).  The Binance Platform, controlled by the Binance Defendants, was a competitor platform to the collapsed the FTX Platform.  (JPML-ECF No. 255-1 at 4.)

(iii)   The time of interest for this action is the roughly five- to six-month period before the collapse of the FTX Group.

(iv)    CZ has stepped down as CEO of Binance while continuing to own a majority interest in all the Binance entities.  (Exhibits 13-15.)  CZ is currently sentenced for four months in prison on violations related to the Binance Platform and Binance Services, all of which remain operational. (Exhibit 16.)  On information and belief, CZ is the richest man to go to prison.  (Exhibits 13-15.)  On the other hand, SBF has been sentenced for 25 years in prison and the FTX Group and the FTX Platform(s) are no longer operational.  (Exhibit 17.)

3.     Lead Plaintiff brings this action against CZ and the Binance Defendants for injury under consumer protection laws, unfair competition and violations of securities laws enforced by the Securities and Exchange Commission (SEC) for attempts to monopolize the cryptocurrency

platform market or otherwise limiting competition by damaging the competitor trading platforms operated by the FTX Group.

4.     This Amended Complaint represents claims based on the actions of CZ and Binance Defendants, which separately establish liability for losses caused by the collapse of the FTX Group.  CZ and Binance Defendants' liability in this action is separate and distinct from anyone within the FTX Group or other Remaining MDL Defendants.

5.     CZ is the co-founder of each of the Binance Defendants, all of which are private corporations, and was the CEO of Binance Holdings Ltd. during the relevant period.  While today he is no longer the CEO of Binance Holdings Ltd., on information and belief, CZ continues to own more than 80% of each Binance corporate entity that exists, including the Binance Defendants.  (Exhibits 13-15.)

6.     In 2019, the Binance Defendants invested in competitor the FTX Group and its cryptocurrency FTT, an FTX token.  FTT is a utility token and cryptocurrency that provides, among other things, access to the FTX Platform(s)' features and services.  Binance Defendants' ownership and subsequent sale of FTT tokens at an opportunistic time had a negative impact on FTT value in the market.  (Exhibit 23.)  For example, CZ tweeted, "As part of Binance's exit from FTX equity last year, Binance received roughly $2.1 billion USD equivalent in cash (BUSD and FTT)."  (Exhibit 18; https://twitter.com/cz_binance/status/1589283421704290306?lang=en last accessed May 12, 2024.)  On information and belief, Binance USD, which is also known as BUSD, is a 1:1 U.S. dollar backed stablecoin issued by crypto exchange Binance in partnership with the blockchain company Paxos Trust.  (Exhibit 19-21.)

7.     Since 2020 and through the date of this Complaint, CZ and Binance Defendants have been under SEC investigation for profiteering in a manner in violation of the federal securities laws and the investor and market protections these laws provide.  (Exhibits 1-2.) During at least part of the same time, SBF, the CEO and founder of competitor platform FTX, was known for promoting regulatory efforts for cryptocurrency and crypto exchange in the US.

(Exhibit 3.)  On information and belief, CZ and Binance Defendants were unhappy with SBF's regulatory efforts.

8.      On Sunday November 6, 2022, CZ tweeted, "Due to recent revelations that have came [sic] to light, we have decided to liquidate any remaining FTT on our books."  (Exhibit 18, https://twitter.com/cz_binance/status/1589283421704290306?lang=en.)  Contextually, the phrase "we have decided to liquidate" suggests future action to be taken.  This suggestion was false and misleading because CZ had already liquidated FTT at a higher price before making this announcement, thereby profiting before causing the market to dip.

9.      CZ's calculated move worked and triggered a substantial decline in the value of FTT.  CZ's tweets increased the volume of sellers of FTT in the market by five to six times, causing a bank run.  CZ's tweets caused the price of FTT to decline from US $25.5 to as low as US $22.0 causing a 14% drop over within a day or two.  (Exhibit 22.)

10.     CZ tweeted "We are not against anyone."  But in the same post he added: "***But we won't support people who lobby against other industry players behind their backs***.[1]"

11.     On Saturday November 5, 2022, the day before his tweets, Binance had already sold and moved 23 million FTT (worth approximately $530 million).  (Exhibit 23.)

12.     On Tuesday, November 8, 2022, CZ tweeted, "There is a significant liquidity crunch. To protect users, we signed a non-binding [letter of intent], intending to fully acquire FTX.com."

13.     On Wednesday, November 9, 2022, Binance—now appearing to be armed with confidential information from the FTX Group—suddenly pulled back, with CZ tweeting an emoji putatively expressing regret.  (Exhibit 18.)

---

[1] Unless otherwise noted, emphasis has been added.

Case No.: 1:23-md-03076-KMM



14.     On information and belief, CZ publicly disseminated this information on Twitter and other social media platforms to hurt the FTX Group, which ultimately lead to a rushed and unprecedented collapse of the FTX Group.  The FTX Group and its Board of Directors were unable to avoid this collapse in the market before the FTX Group's bankruptcy filings.

15.     CZ showed no qualms about publicly tweeting to hurt the FTX Group:

16.     Lead Plaintiff thus brings this action for violation of unfair competition laws, consumer protection laws and violations of federal securities laws.

## PARTIES

17.     Lead Plaintiff Nir Lahav, at the time of filing of the original Complaint and during the relevant period at issue, resided in California.  Lead Plaintiff purchased, repurchased, invested, reinvested, deposited and/or transferred additional funds or cryptocurrencies to the

FTX Platform(s).  Lead Plaintiff suffered damages including losing value of his cryptocurrency assets on the FTX Platform(s) triggered by the FTX Group collapse and bankruptcy as set forth in the certification filed in the Transferor Action and incorporated herein by reference. (Transferor Action Civ. No. 3:23-cv-05038-TLT (N.D. Cal.) ECF Nos. 8 and 29-4.)

18.     On information and belief, Defendant Binance Holdings Ltd. is a cryptocurrency company with headquarters in 23 Lime Tree Bay Ave, Cayman Islands and operating out of the Republic of China. Defendants BAM Trading Services, Inc. doing business as Binance.US and BAM Management US Holdings Inc. are cryptocurrency Delaware corporations with headquarters at One Letterman Drive, Building C Suite C3-800, San Francisco, California 94129, US and registered agent for service of process at Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

19.     On information and belief, Defendant CZ is a Canadian citizen who was the Chief Executive Officer of Binance and had direct control of Binance and its subsidiaries at the relevant times.  (Exhibits 13-15, 21, 42.)  On information and belief, CZ continues to retain majority ownership of all the Binance entities including the Binance Defendants.  (Exhibits 13-15, 21.)

## JURISDICTION AND VENUE

20.     This Court (and the transferor Court) has original jurisdiction of this action under the Class Action Fairness Act of 2005.  Pursuant to 28 U.S.C. §§ 1332(d)(2) and (6), this Court (and the transferor Court) has original jurisdiction because the aggregate claims of the putative class members exceed $5 million, exclusive of interest and costs, and at least one of the members of the proposed classes is a citizen of a different state than Defendants.

21.     This Court (and the transferor Court) has personal jurisdiction over Defendant Binance Holdings Limited ("Binance") which has a principal place of business located 23 Lime Tree Bay Ave, Cayman Islands because it conducts substantial business in this District, and a substantial part of the acts and omissions complained of occurred in this District.

22.     This Court (and the transferor Court) has personal jurisdiction over Defendant BAM Trading Services Inc. ("BAM Trading") because it has a principal place of business located at One Letterman Drive, Building C Suite C3-800, San Francisco, California 94129, U.S., it conducts substantial business in this District, and a substantial part of the acts and omissions complained of occurred in this District.

23.     This Court (and the transferor Court) has personal jurisdiction over Defendant BAM Management US Holdings Inc. ("BAM Management") because it has a principal place of business located One Letterman Drive, Building C Suite C3-800, San Francisco, California 94129, U.S., it conducts substantial business in this District, and a substantial part of the acts and omissions complained of occurred in this District.

24.     This Court (and the transferor Court) has personal jurisdiction over Defendant CZ because he conducts substantial business in this District, and a substantial part of the acts and omissions complained of occurred in this District.

25.     CZ and the Binance Defendants can be served using the designated service of process agent at Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808. CZ and Defendants have accepted service through the ECF Filings of the transferor Court and subsequently this MDL action.  (Transferor Action Civ. No. 3:23-cv-05038-TLT (N.D. Cal.) ECF No. 23 ¶ 6, filed October 26, 2023.)

26.     This Court has jurisdiction over CZ and Binance Defendants in this multi-district litigation because this action was transferred to this forum from a transferor court which had personal jurisdiction over them.

27.     Venue is proper in this District under Title 28, United States Code, Section 1391(b) because each Defendants is subject to personal jurisdiction in this District and regularly conducts business in this District, each Defendants has intentionally availed themselves of the laws and markets within this District, each Defendant does substantial business in this District, and because the events giving rise to Lead Plaintiff's claims occurred in this District or the transferor District.

28.     In addition, venue is proper in this District under Title 28, United States Code, Section 1391(b) because Defendants' improper conduct alleged in this complaint was targeted towards this judicial District.

29.     Under 28 U.S.C. § 1407, venue is proper pursuant to a transfer and Fed. R. Civ. P. 42 pre-trial consolidation of this action in this District by the Judicial Panel on Multidistrict Litigation.

## STATEMENT OF FACTS

### A.  Cryptocurrency, Crypto Exchanges and the SEC

30.     While cryptocurrency and crypto exchanges are undergoing regulatory change, the laws are well established when it comes to unfairly hurting competitors that lead to a cascading effect of hurting consumers.

31.     Despite the crypto industry's cries for "regulatory clarity," the SEC's stance on cryptocurrency has been clear and consistent from the beginning.  Critics of the SEC's stance toward cryptocurrency overlook an important aspect of U.S. securities law – securities regulation is not meant to be precise but is instead intentionally drafted to be broad and all-encompassing; specificity is not just uncommon; it is deliberately avoided.  This is why the definitions of "security" in Section 2(a)(1) of the Securities Act of 1933 (Securities Act), 15 U.S.C. 77b(a)(1), and Section 3(a)(10) of the Securities Exchange Act of 1934 (Exchange Act), 15 U.S.C. 78c(a)(10), include not only conventional securities, such as "stock[s]" and "bond[s]," but also the more general term "investment contract."

32.     Along these lines, in *Reves v. Ernst & Young*, the Supreme Court stated that:

> The fundamental purpose undergirding the Securities Acts is 'to eliminate serious abuses in a largely unregulated securities market.' *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 421 U.S. 849 (1975). ***In defining the scope of the market that it wished to regulate, Congress painted with a broad brush. It recognized the virtually limitless scope of human ingenuity, especially in the creation of 'countless and variable schemes devised by those who seek the use of the money of others on the promise of profits***, *SEC v. W.J. Howey Co.*, 328 U.S. 293, 328 U.S. 299 (1946), and determined that the best way to

> achieve its goal of protecting investors was 'to define the term "security"
> in sufficiently broad and general terms so as to include within that
> definition the many types of instruments that in our commercial world
> fall within the ordinary concept of a security.' . . . Congress therefore did
> not attempt precisely to cabin the scope of the Securities Acts . . . Rather,
> it enacted a definition of 'security' sufficiently broad to encompass
> virtually any instrument that might be sold as an investment.

*Reves v. Ernst & Young*, 494 U.S. 56, 60-61, 110 S. Ct. 945, 949 (1990) (emphasis

added).

33.     Crafted to contemplate not only known securities arrangements at the time, but

also any prospective instruments created by those who seek the use of others' money on the

promise of profits, the definition of "security" is broad, sweeping, and designed to be flexible to

capture new instruments that share the common characteristics of stocks and bonds. As Supreme

Court Justice (and former SEC Commissioner (1935) and Chair (1936-37)) William O. Douglas

opined in *Superintendent of Insurance v. Bankers Life and Casualty Co.*:

> We believe that section 10(b) and Rule 10b-5 prohibit **all** fraudulent
> schemes in connection with the purchase or sale of securities, whether
> the artifices employed involve a garden type variety fraud, or present a
> unique form of deception. Novel or atypical methods should not provide
> immunity from the securities laws.

*Superintendent of Ins. V. Bankers Life & Cas. Co.*, 404 U.S. 6, 10 n.7, 92 S.Ct. 165, 168 (1971)

(italics original, internal quotation marks and citation omitted.)

34.     Federal courts have confirmed the SEC's jurisdiction in numerous crypto-related

emergency asset freeze hearings where the issue is always considered and affirmed, as it has

been by hundreds of federal courts across the country since the *Howey* Decision, adopted by the

Supreme Court over 75 years ago.  *SEC v. W. J. Howey Co.*, 328 U.S. 293, 66 S. Ct. 1100

(1946).  That decision resulted in the *Howey* Test, which is used to determine the presence of an

investment contract. The *Howey* Test stipulates that an investment contract exists if there is an

"investment of money in a common enterprise with profits to come solely from the efforts of

others."  *Id.*, 328 U.S. at 301.

35.     The SEC has used multiple distribution channels to share its message and concerns regarding crypto, digital trading platforms, initial coin offerings, and other digital asset products and services over the past decade.  The SEC applied the *Howey Test* to the Decentralized Autonomous Organization ("DAO") crypto tokens and concluded they were securities under the Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act").  *SEC v. Terraform Labs,* No. 23-cv-1346 (JSR), 2023 U.S. Dist. LEXIS 230518, 2023 WL 8944860, at *13-14 (S.D.N.Y. Dec. 28, 2023)*; SEC v. Terraform Labs,* No. 23-cv-1346 (JSR), 2023 U.S. Dist. LEXIS 132046, 2023 WL 4858299, at *10 (S.D.N.Y. July 31, 2023)*.*  Subsequent cases have confirmed this interpretation for other cryptocurrencies as well.

36.     Lead Plaintiff and the class have suffered damages from the collapse of the FTX Group.  Any recovery from the FTX Bankruptcy does not make them whole because the value of different cryptocurrencies that were frozen on the FTX Platform(s) is currently three to four times the value compared to November 2022.  (Exhibit 24 showing cryptocurrency price from November 2022 to current by way of example of Bitcoin price from November 2022 to current.)  Lead Plaintiff and the class were restrained, lost control over their assets and could not sell any cryptocurrency at a value that they desired to profit on.  The FTX Collapse has frustrated the very purpose of making profit from a cryptocurrency investment.

**B.  Binance Is an FTX Group Competitor, and CZ Had a Rivalry with FTX's CEO**

37.     CZ and Binance have openly acknowledged their rivalry and animosity towards the FTX Group and its founders for, among other things, their regulatory efforts.  (Exhibit 3.)  CZ and Binance Defendants do not dispute their position as competitors to the FTX Group and the FTX Platform.  (JPML-ECF No. 255-1 at 4, 18; 263 at 1, 4-5, 8.)

38.     Michael Lewis's book, "Going Infinite, The Rise and Fall of a New Tycoon" gives the background on CZ and SBF's introduction, and how their business relationship turned into a rivalry.  (Exhibit 25.)

39.     In 2019, CZ accused one or more members of the FTX Group of trying to attack Binance Platform via wash trading, which involved the Binance Platform losing money on trades and market manipulation using faster processing of transactions on the FTX Platform.



Case No.: 1:23-md-03076-KMM

40.     When an opportunity to damage the FTX Group arose, CZ did not hesitate.  His actions triggered, in whole or in material part, the collapse of the FTX Group stock in the market. CZ's vendetta has hurt Lead Plaintiff and the Class.  CZ admits that his tweets were the straw that broke the camel's back (even though suggestion that was not his intention).  (Exhibit 18.)



41.     Following the collapse of the FTX Group, Binance's market share increased to 62.1%.  (Exhibits 4, 6-7.)  Before its collapse, the FTX Group was ranked third after Binance and Coinbase.  (Exhibit 5.)

42.     CZ did not regret that his tweets caused the FTX Collapse.  In an interview with Bloomberg TV on November 24, 2022, CZ said, "I actually reflect on the FTX situation and I kind of blame myself for tweeting that too late. As an industry, we let FTX get too big before we started questioning some of those things."  (Exhibit 26.)

**C.  Binance and CZ Made Materially False and Misleading Statements**

43.     On Saturday November 5, 2022, the day before his tweet, Binance had already sold 23 million FTT (worth approximately $530 million).  (Exhibit 23.)  This was "the equivalent of 17% of the circulating supply of FTT, according to CoinGecko."  (Exhibit 27.) The price of FTT at the close of business on November 5 was $24.0593.  (Exhibit 11 at 11.)

Case No.: 1:23-md-03076-KMM

44.     On Sunday November 6, 2022, CZ tweeted, "Due to recent revelations that have came [sic] to light, we have decided to liquidate any remaining FTT on our books."  (Exhibit 18.) While the tweet is phrased in the future tense, the liquidation had already taken place.  This statement was false and misleading because Binance had already sold and moved 23 million FTT (worth approximately $530 million) before making this statement.  This statement was intentionally misleading and intended to cause the price of FTT in the market to decline, *after* CZ and Binance Defendants had profited.



45.     CZ was able to generate the intended effect of triggering the decline of FTT. Specifically, CZ's tweets caused the price of FTT to decline from US $25.47327 on November 5, 2024 (the likely price for Binance's liquidation) to US $22.26374 on November 7, 2024, with the volume of sellers increasing five to six times compared to the previous days.  (Exhibit 11,

Exhibit 43.)  CZ, further tweeted "We are not against anyone." But in the same post he added:

"***But we won't support people who lobby against other industry players behind their backs***."

46.     CZ later confirmed that the transaction had occurred the previous day, on

November 5, 2022:



47.     Out of the $2.2 billion that Binance received for "FTX equity," $1.2 billion came

directly from customer funds on the FTX Platform.  (Exhibit 28, Testimony Excerpts of Peter

Easton.)  On information and belief, the FTX Group was forced to buy back Binance ownership

in the FTX Group because on several previous occasions CZ had refused to comply with

disclosure requirements regarding his ownership.  On information and belief, CZ invested in the

FTX Group early, with the purpose of having the ability to influence the FTX Platform and use

such ownership to his advantage when the right opportunity presented itself.  On information and belief, the FTX Group's payout to CZ was mostly in cash, which eventually damaged the FTX Group and was a significant factor leading to its bankruptcy.

48.     CZ's tweet of selling the remaining FTT around November 6, 2024, after his reference to a Coindesk report published on November 2, 2024 ("recent revelations that came to light," Exhibit 18), destroyed the market confidence in FTT.

49.     CZ did not have an affirmative duty to disclose his liquidation of FTT because he was not an officer, director of the FTX Group or an issuer of FTT.

50.     On information and belief, the discrepancy highlighted by the Coindesk report was not a substantial deficit when viewed in the context of the FTX Group's volume and revenues generated by transactions at that time.  (Exhibit 25, Michael Lewis's Book Excerpts; Exhibit 29, Michael Lewis 60 Minutes, "roughly $15 billion a day in trades-were executed on his new exchange, FTX"; $8 billion in Alameda Research "was a rounding error.")  While the comingling of funds took place between Alameda Research and the FTX Platform, the bankruptcy proceedings to date have shown that there was no hole, missing funds or stolen money from the FTX Group.  (Exhibit 30.)  On information and belief, without the panic generated by CZ, all the FTX Group members would have continued to be solvent and would never have filed for bankruptcy.

51.     On a recent episode of the TV Show "60 minutes," an expert stated, "They had a great real business.  If no one had cast aspersions on the business, if there hadn't been a run-on customers' deposits, they'd still be making tons of money."  (Exhibit 31.)  CZ's response to this episode was, "He's probably wishing everyone else to be that stupid, but…"  (*Id.*)

52.     Realizing his power over the market and the influence his tweets had on the price of FTT, CZ continued by tweeting a proposal to acquire the FTX Group and/or the FTX Platform.

53.     On Tuesday, November 8, 2022, CZ tweeted, "There is a significant liquidity crunch. To protect users, we signed a non-binding [letter of intent], intending to fully acquire

FTX.com." (Exhibit 18.) On information and belief, CZ never had a good faith intention to acquire the FTX Group.

54.     By citing a non-binding letter of intent with the FTX Group, CZ implied to the market that he possessed material, confidential information regarding its internal operations and finances. The nature of the tweet further suggested that CZ was working with the FTX Group's executives.

55.     With the market perception that CZ and Binance were armed with confidential information, CZ flatly stated to the market that "Binance has the discretion to pull out from the deal at any time. We expect FTT to be highly volatile in the coming days as things develop."

56.     CZ's tweets resulted in FTT price declining from US $22.1378 (opening) to US $5.5189 (closing) on November 8, 2022, and further to US $2.3006 on November 9, 2022, and further to $1.2951 on November 28, 2022, after the FTX Group filed for bankruptcy. (Exhibit 11 at 11.)

57.     This rapid price decline plummeted the FTX Group into bankruptcy without its officers or directors having an opportunity to salvage the situation and put in safeguards to protect its clients and end-users.



Case No.: 1:23-md-03076-KMM



58.     CZ publicly disseminated this information on various social media platforms to hurt the FTX Group, leading to its rushed and unprecedented collapse of the FTX Group.  CZ showed no qualms about publicly tweeting to hurt the FTX Group.

59.     As alleged herein, Defendants acted with scienter in that Defendants knew, or recklessly disregarded, that the public statements they disseminated to the public in the name of Binance, or in their own name, were materially false and misleading. Defendants knowingly and substantially participated in, or acquiesced in, the issuance and/or dissemination of such statements as primary violations of the federal securities laws.  Defendants, by virtue of their receipt of material confirmation information reflecting the true facts regarding the FTX Group, and their control over and/or receipt of such material information, were active and culpable participants in the fraudulent scheme alleged herein.

60.     Defendants knew and recklessly disregarded the false and misleading nature of the information they caused to be disseminated to the investing public. The fraudulent scheme

-18-

described herein could not have been perpetuated during the Class Period without the knowledge and complicity of, or at least the reckless disregard by, individuals at the highest levels of Binance, including CZ.

61.     CZ, because of his position with Binance, controlled the contents of Binance's public statements during the Class Period and was intimately involved in negotiating, evaluating, consummating, and ultimately terminating the potential the FTX Group acquisition.  Because of his position and access to material, non-public information, CZ knew or recklessly disregarded the fact that he would cause the downfall of the FTX Group by suggestion a purchase, and then later terminating it, with no intention to acquire the FTX Group in the first place.

62.     CZ had already secured Binance's own profit by selling FTT before manipulating the market.  CZ had openly acknowledged that he did not support the FTX Group and its executives because of their lobbying efforts to regulate cryptocurrency.  Defendants' bait and switch tactics caused the price of FTT to plummet and ultimately was the proximate cause of the FTX Group's hastened bankruptcy.  The FTX Group's board was unable to react in time to protect its clients and end-users.

63.     Binance Defendants' tweets and public statements were aligned with CZ's positions and tweets during the relevant time period of November 2022.  (Exhibit 32; see also Binance Square coverage on Coin Telegraph Exhibit 33.)

64.     Given his majority ownership of all Binance Defendants and direct control of all the Binance Defendants, CZ's knowledge and actions are attributed to the Binance Defendants.  CZ himself was acting in his capacity as spokesperson for the Binance Defendants.  CZ's actions were in furtherance of Binance Defendants' interests.  The Binance Defendants should be held vicariously liable for the actions of its then CEO and owner CZ.  CZ and the Binance Defendants should be held jointly and severally liable for all of the conduct alleged herein.

**D.  There Was Market Reliance on CZ's Tweets**

Case No.: 1:23-md-03076-KMM

65.    CZ and Binance were aware of their position as industry leaders and the market's reliance on any information they disseminated.  (Exhibit 18.)



66.    CZ co-founded Binance in 2017.  Before the time the FTX Group was even founded, Binance was already an industry leader in cryptocurrency.  (Exhibit 34, Binance About Co-Founder Page, Exhibits 13-15, Forbes Profile of CZ.)

67.    CZ was aware of his success and position in the cryptocurrency market.  He acknowledged that he built the world's largest crypto exchange in 180 days.  (Exhibit 35, Business Insider Interview in 2021; Exhibit 38 see his letter to customers stating "active user numbers on Binance have grown 10 times.")

68.    The crypto market tends to react to information disseminated on social media.  In November 2022, the market indeed followed CZ's social media tweets.  As an industry leader in the financial world of cryptocurrencies, CZ knew or reasonably should have known the impact his tweets would have on the market.

69.     The market typically reacts to social media dissemination of information.  The effect has been witnessed on multiple occasions.  For example, the market followed social media in incidents related to the GameStop Robinhood trading platform in 2021, Elon Musk's tweets on taking Tesla private and cryptocurrency Terra Luna's collapse in May 2022.  (Exhibits 36-37.)  As an industry leader in the financial world of cryptocurrencies, CZ knew or reasonably should have known the impact his tweets would have on the market.

70.     In November 2022, the market predictably reacted to CZ's social media tweets.  CZ knew or should reasonably have known that his tweets would cause the market to lose confidence in FTT and the FTX Group.  CZ's knowledge and awareness of the impact of his tweets on the cryptocurrency market should be vicariously imputed to Binance Defendants.

71.     CZ's tweets caused the volume of FTT transactions to increase from 61,710,158 on November 1, 2022, to 3,346,184,382 on November 8, 2022.  (Exhibit 11.)  CZ's tweets are the cause, or at least a material cause, of billions of users selling FTT and attempting to remove assets from the FTX Platform(s).

**E.  Unfairly Hurting the FTX Group Benefitted Binance**

72.     CZ indicated that he originally signed a letter of intent to acquire the FTX Group.  (*Id.*)  Within a day, CZ tweeted that Binance would not be doing so.  (*Id.*)  CZ encouraged market volatility by publicly tweeting information that appeared to be based on the FTX Group's confidential information.  It only later became clear that CZ never had any intention to go through with the deal to save the FTX Group.  (Exhibit 3.)

73.     CZ and the Binance Defendants had a strong financial incentive to trigger the downfall of the FTX Group to remove competition and gain control of lobbying efforts in the U.S..  The rivalry between CZ and SBF is undisputed.  CZ and Binance Defendants stood to gain from the collapse of the FTX Group.  Following the collapse of the FTX Group, CZ and Binance Defendants have gained and solidified their position in the cryptocurrency world.

74.     "Binance makes up more of the crypto derivatives market than ever, thanks to a ***four-month hot streak following the collapse of rival FTX***."

https://blockworks.co/news/binance-crypto-market-share-ftx last visited July 25, 2023.  (Exhibit 7; *see also* Exhibit 6.)

75.     After eliminating the FTX Group and its CEO's influence on the regulatory world, CZ became the most powerful and the most influential person in the crypto world. (Exhibits 6, 10.)

76.     Binance's profit and glory comes at the cost of hurting U.S. consumers who were using the FTX Platform(s).  (Exhibits 9-10.)  CZ and Binance Defendants immediately used the publicity around the collapse of the FTX Group to their advantage to promote their own profiles and the Binance Platform under the attempted guise of creating an industry recovery fund that also fizzled out.  (Exhibits 39-40.)

77.     On information and belief, after seeing his own power in causing the collapse of the FTX Group, CZ tried a similar attack against the other remaining cryptocurrency platform, Coinbase.  (Exhibit 41.)  Coinbase's CEO responded promptly, and CZ backtracked, apologizing for casting unfounded allegations.  (*Id.*)  The FTX Group and SBF were not able to recover, and billions of individual users lost their hard-earned investments.

78.     At all relevant times, the market for FTT was an efficient market for the following reasons, among others: (a) the FTX Platform(s) were among the leading platforms for cryptocurrency exchange with over 1.2 million users (Exhibit 12); (b) the FTX Platform(s) had $10 billion trading volume in June 2021 (*id.*); (c) the FTX Platform(s) had over $1 billion in revenue (*id.*); (d) $388 million in net income the year before (*id.*); (e) its clients and end-users are technologically savvy users who follow cryptocurrency trends and tweets on social-media, as shown by the immediate impact of CZ and Defendants' tweets.

79.     A presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because Lead Plaintiff's claims are based, in significant part, on Defendants' material omissions as to the timing of actual sale of their FTT and truthful intentions as to its acquisition of all or part of the FTX Group.

80.     During the Class Period, as detailed herein, CZ and the Binance Defendants began making statements to cause the market to lose confidence in FTT and the FTX Group.  CZ and Binance Defendants had already profited from their own sale before making such information public and causing the price of FTT to fall.  Such actions caused FTT to artificially deflate. Then, CZ and Binance Defendants made false and misleading statements regarding their intent to acquire the FTX Group, and within a twenty-four-period backed out of that deal, causing further market volatility on the FTX Platform(s).  CZ and the Binance Defendants intentionally caused this market volatility and the resulting bank run that culminated in the FTX Group filing for bankruptcy.  Lead Plaintiff and the Class suffered damages, in part because they could not retrieve their digital assets in accounts with the FTX Platform(s) due to the rapid insolvency of the FTX Group caused by Defendants' actions.  As a result of Defendants' sale of FTT, public disclosure of such alleged "future" sale of FTT when it had already occurred the day before, and its bait and switch acquisition story during the Class Period, Lead Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## CLASS ALLEGATIONS

81.     Lead Plaintiff brings this action pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3), on behalf of himself and the following proposed "Nationwide Class":

> All persons or entities in the United States, who, within the applicable statute of limitations period, had any fiat or cryptocurrency deposited or invested through an FTX Platform during the time period of volatility starting before November 6, 2022 and ending after November 8, 2022.

82.     Lead Plaintiff also seeks to represent the following "California Sub-Class":

> All persons or entities in the state of California, who, within the applicable statute of limitations period, had any fiat or cryptocurrency deposited or invested through an FTX Platform during the time period of volatility starting before November 6, 2022 and ending after November 8, 2022.

83.     The Nationwide Class and the California Sub-Class will be referred to collectively as the "Class."

84.     Excluded from the proposed class are Defendants and their affiliates, their employees, officers, directors, legal representatives, heirs, successors, subsidiaries and affiliates, and the judicial officers and their immediate family members and associated court staff assigned to this case, as well as all persons who make a timely election to be excluded from the proposed class.

85.     Lead Plaintiff reserves the right to modify or amend the definition of the proposed classes, or to include additional classes or subclasses, before or after the Court determines whether such certification is appropriate as discovery progresses.

86.     Certification of Lead Plaintiff's claims for class-wide treatment is appropriate because Lead Plaintiff can prove the elements of his claims on a class-wide basis using the same evidence they would use to prove those elements in individual action alleging the same claims.

87.     This action meets all applicable standards of Fed. R. Civ. P. 23 for class certification, in that Lead Plaintiff can demonstrate the elements delineated below.

88.     <u>Numerosity</u>. The members of the proposed Class are so numerous and geographically dispersed that individual joinder of all proposed class members is impracticable. *See* Fed. R. Civ. P. 23(a)(1).  While Lead Plaintiff believes that there are thousands of members of the proposed class, the precise number of Class members is unknown, but may be ascertained from self-identification with proof of an account on an FTX Platform.

89.     Class members may be notified of the pendency of this action by recognized, court approved notice dissemination methods, which may include U.S. mail, e-mail, internet postings, and/or published notice.

90.     <u>Commonality and Predominance.</u> This action involves common questions of law and fact, which predominate over any questions affecting individual Class members. *See* Fed. R. Civ. P. 23(a)(2) and (b)(3). These include, without limitation:

    a.      Whether previous ownership of competitor's stock allowed Defendants to create volatility that accelerated the FTX Group's bankruptcy;

b.      Whether Defendants and CZ had any good-faith intention to buy the FTX Group, and/or whether they manipulated the market through tweets and press releases around the same;

c.      Whether Lead Plaintiff and members of the Class are injured and harmed directly by Defendants' directly influencing the market through tweets and social media press releases;

d.      Whether Lead Plaintiff and members of the Class are entitled to damages due to Defendants' conduct as alleged in this Complaint, and if so, in what amounts;

91.     Typicality. Lead Plaintiff's claims are typical of the putative class members' claims because, among other things, all such Class members were comparably injured through Defendants' wrongful conduct as described above. *See* Fed. R. Civ. P. 23(a)(3).  Defendants' manipulation and influencing the market and its subsequent impact on the FTX Group is uniform for Lead Plaintiff and all Class Members.

92.     Adequacy. Lead Plaintiff is adequate proposed class representative because his interests do not conflict with the interests of the other members of the proposed Class they seek to represent; because he has retained counsel competent and experienced in complex class action litigation; and because they intend to prosecute this action vigorously. The interests of the proposed class will be fairly and adequately protected by Lead Plaintiff and their counsel. *See* Fed. R. Civ. P. 23(a)(4).  The Court has also approved Lead Plaintiff's selection of Class Counsel pursuant to PSLRA.  (Transferor Action Civ. No. 3:23-cv-05038-TLT (N.D. Cal.) ECF No. 39, March 3, 2025.)

93.     Superiority. A class is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.  The damages or other financial detriment suffered by Lead Plaintiff and putative Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it

would be impracticable for members of the proposed Classes to individually seek redress for Defendants' wrongful conduct.

94.     Applying the principles of equity or balance of equities, expecting an individual Lead Plaintiff who is at a disadvantage with limited resources and spending capacity, and with minimal negotiating power, if any, to litigate claims against Defendants, a billion-dollar corporation that has immense resources and deep pockets would be unfair.  Class actions are a necessary and essential means to provide for public-interest litigations with checks and balances to curtail the growing power of private corporations including Defendants.

95.     In the interest of public policy and recent trends of consumer protection concerns including safeguarding the use of the internet and manipulation of public interests through social media, the Court should recognize the right of Lead Plaintiff and Class Members to compensation due to the actions of Defendants.  Laws protecting securities are equally applicable to cryptocurrency platforms.

96.     Even if Class members could afford individual litigation, the court system cannot. Individualized litigation creates the potential for inconsistent or contradictory judgments, and it increases the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. *See* Fed. R. Civ. P. 23(b)(3).

**VIOLATIONS ALLEGED**
**COUNT I**

**VIOLATION OF §10(b) OF THE EXCHANGE ACT [15 U.S.C. § 78j(b)]**
**AND VIOLATION OF SEC 10(b)(5) [17 C.F.R. § 240.10b-5]**

97.     Lead Plaintiff and Class Members incorporate and reallege all allegations set out in the preceding paragraphs including paragraphs 1 through 96 above.

98.     During the Class Period, Defendants knowingly or recklessly made false and misleading statements and failed to disclose material facts necessary in order to make the

statements made, in light of the circumstances under which they were made, not misleading.  *See* Statement of Facts, Section C-E above.

99.    Defendants violated §10(b) of the Exchange Act and SEC Rule 10b-5 in that they:

(a) employed devices, schemes, and artifices to defraud;

(b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

(c) engaged in acts, practices, and/or a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their sale of FTT, potential acquisition of the FTX Group, and other activities as set forth herein during the Class Period.

100.    Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, their assets in the FTX Platform were artificially frozen with the price of FTT deflating and the FTX Group plummeting into bankruptcy.  As a result, Lead Plaintiff and Class lost all of their assets in the FTX Platform(s).  Lead Plaintiff and the Class would have been able to safeguard their cryptocurrency assets in the FTX Platform(s) if the market would not have plummeted so rapidly due to Defendants' false and misleading statements and fraudulent schemes.

## COUNT II

## VIOLATION OF SEC SECTION 17(a)) [15 U.S.C. § 77q]

101.    Lead Plaintiff and Class Members incorporate and reallege all allegations set out in the preceding paragraphs including paragraphs 1 through 100 above.

102.    By engaging in the conduct described above, Defendants, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails:

(a) with scienter, employed devices, schemes, or artifices to defraud;

(b) obtained money or property by means of untrue statements of material fact or by

omitting to state a material fact necessary in order to make the statements made, in light

of the circumstances under which they were made, not misleading; and/or

(c) engaged in transactions, practices, or courses of business which operated or would

operate as a fraud or deceit upon purchasers.

103.    By reason of the foregoing, Defendants violated Section 17(a) of the Securities

Act [15 U.S.C. § 77q(a)].  *See* Statement of Facts, Section C-E above.

## COUNT III

## VIOLATION OF THE CALIFORNIA'S UNFAIR COMPETITION LAW

### Cal. Bus. & Prof. Code §17200 *et seq.*

104.    Lead Plaintiff and Class Members incorporate and reallege all allegations set out

in the preceding paragraphs including paragraphs 1 through 103 above.

105.    The California Unfair Competition Law ("UCL") prohibits any "unlawful, unfair

or fraudulent business act or practice." Cal. Bus. & Prof. Code §17200.

106.    Defendants' unfair and deceptive practices described herein were likely to

mislead – and in fact did mislead – consumers acting reasonably in the circumstances including

having cryptocurrency assets on the FTX Platform(s) for purchase and sale, depositing, and/or

transacting in digital assets with accounts with the FTX Group.

107.    **Unlawful:** During the Class Period, Defendants publicized and then executed a

scheme of potential acquisition of the FTX Group using false and/or misleading claims as

alleged herein.  Defendants' actions violate at least the following laws: (a) Cal. Corp. Code

§25504.1.

108.    **Fraudulent:** A practice is "fraudulent" under the UCL if members of the general

public were or are likely to be deceived. As detailed herein, Defendants' statements regarding,

*inter alia*, the potential acquisition of the FTX Group, non-viability of the FTX Group and

Defendants' own due diligence activities were deceptive to the public.

109.    **Unfair**: The UCL gives courts wide discretion to address improper business practices that are "unfair." Defendants' conduct with respect to the bait-and-switch on potential acquisition of the FTX Group, while disposing of the their own FTT before making public statements, was unfair because Defendants' conduct was immoral, unethical, unscrupulous, or substantially injurious to consumers in inducing them to purchase, transact, and/or deposit digital assets with accounts with the FTX Group.  The utility of Defendants' conduct, if any, does not remotely outweigh the gravity of the harm to their victims.

110.    Lead Plaintiff and the Class would not have lost their digital assets with accounts with the FTX Group at the prices paid (or at all) had they known Defendants' statements were deceptive.

111.    Defendants' conduct with respect to the potential acquisition of the FTX Group is also unfair because the consumer injury is substantial, not outweighed by benefits to consumers or competition, and not one that consumers could reasonably avoid.

112.    The harm suffered by Lead Plaintiff and the Class was directly and proximately caused by the deceptive and unfair practices of Defendants related to the scheme of potential acquisition of the FTX Group, as described herein.

113.    In accordance with California Business & Professions Code §17203, on behalf of the Class, Lead Plaintiff seeks an order for the restitution of all monies lost, and all monies that could reasonably have been made, from Defendants' investments in or other business dealings with the FTX Group, which were lost or not made due to Defendants' acts as set forth herein.

## COUNT IV

## VIOLATION OF CAL. CORP. CODE §25504.1.

114.    Lead Plaintiff and Class Members incorporate and reallege all allegations set out in the preceding paragraphs including paragraphs 1 through 113 above.

115.    California Corporations Code §25504.1 imposes joint and several liability for "[a]ny person who materially assists in any violation of Section 25110 . . . or 25401 . . . with intent to deceive or defraud."

116.    "Materially assisting" in an alleged securities law violation, as defined under California law, may take the form of misrepresentations made directly to investors, or otherwise playing a material, facilitating role in the alleged securities law violation.

117.    As alleged herein, Defendants made material misrepresentations and omissions to Lead Plaintiff and Class members regarding, *inter alia*, the viability of the FTX Group, Defendants' scheme potential acquisition of the FTX Group, and their own due diligence activities, each with the intent to deceive and/or defraud investors.  *See* Statement of Facts, Section C-E above.

118.    In violation of Cal. Corp. Code §25110, Defendants caused the FTX Platform(s) and the FTX Group to be inaccessible to members of the Class.

119.    In addition, Cal. Corp. Code §25401 makes it "unlawful for any person to offer or sell a security in this state, or to buy or offer to buy a security in this state, by means of any written or oral communication that includes an untrue statement of a material fact or omits to state a material fact necessary to make the statements made, in the light of the circumstances under which the statements were made, not misleading."  Defendants purposefully disseminated false and misleading information on the internet and social media platforms, including Twitter, to cause the loss or failure of the FTX Platform(s), cryptocurrency on the FTX Platform(s), and any assets on the FTX Platform(s).

120.    Defendants violated Cal. Corp. Code §25504.1 and Lead Plaintiff and members of the Class sustained damages as described herein.

## COUNT V

## NEGLIGENT MISREPRESENTATION

121.    Lead Plaintiff and Class Members incorporate and reallege all allegations set out in the preceding paragraphs including paragraphs 1 through 120 above.

122.    As detailed herein, Defendants negligently misrepresented certain material facts, including, *inter alia*, the viability of the FTX Group, Defendants' scheme potential acquisition of the FTX Group, and their own due diligence activities, each with the intent to deceive and/or

defraud investors.  *See* Statement of Facts, Section C-E above.  Defendants made such statements in order to induce lack of confidence in the FTX Platform(s), and to convince consumers to sell and/or move out all digital assets on the FTX Platform(s), thereby decreasing the value of the FTX Group *after* Defendants' own divestment and ultimately increasing users on their own trading platforms.  *See* Statement of Facts, Section C above.

123.    Defendants made these material misrepresentations without reasonable grounds for believing the misrepresented facts to be true.  *See* Statement of Facts, Section D above.

124.    The representations made by Defendants in connection with the FTX Group were material and would have been considered by a reasonable consumer in making decisions to engage in any transactions with the FTX Group or on the FTX Platform(s).  *See* Statement of Facts, Section D above.

125.    The market relied on Defendants' statements in that there was a bank run to withdraw digital assets from the FTX Platform(s).  Lead Plaintiff and members of the Class lost their assets on the FTX Platform(s), which would not have happened absent Defendants' false statements and the resulting predictable market activity.  Lead Plaintiff and the members of the Class transacted, and/or deposited digital assets into accounts with the FTX Group believing that the FTX Platform(s) were stable and secure.  Lead Plaintiff and the Class suffered damages, in part because they could not retrieve their digital assets in accounts with the FTX Platform(s) due to the rapid insolvency of the FTX Group caused by Defendants' actions.  *See* Statement of Facts, Section E above.

126.    As a result, Lead Plaintiff and members of the Class were directly and proximately injured by Defendants' negligence.

## COUNT VI

## INTENTIONAL MISREPRESENTATION

127.    Lead Plaintiff and Class Members incorporate and reallege all allegations set out in the preceding paragraphs including paragraphs 1 through 126 above.

128.    As detailed herein, Defendants knowingly misrepresented certain material facts, including, *inter alia*, the viability of the FTX Group, Defendants' scheme potential acquisition of the FTX Group, and their own due diligence activities, each with the intent to deceive and/or defraud investors.  *See* Statement of Facts, Section C-E above.  Defendants made such statements in order to induce lack of confidence in the FTX Platform(s), and to convince consumers to sell and/or move out all digital assets on the FTX Platform(s), thereby decreasing the value of the FTX Group *after* Defendants' own divestment and ultimately increasing users on their own trading platforms.  *See* Statement of Facts, Section C above.

129.    Defendants made these misrepresentations with the knowledge that their statements were materially misleading.  *See* Statement of Facts, Section D above.

130.    The representations made by Defendants in connection with the FTX Group were material and would have been considered by a reasonable consumer in making decisions to engage in any transactions with the FTX Group.  *See* Statement of Facts, Section D above.

131.    Lead Plaintiff and the Class actually and justifiably relied on Defendants' statements in that they deposited, and/or transacted digital assets, with accounts with the FTX Group, which they would not have done at the prices paid (or at all)—or could have transacted out of—had Defendants not acted as set forth herein. Lead Plaintiff and the members of the Class transacted, and/or deposited digital assets into accounts with the FTX Group believing that the FTX Platform(s) were stable and secure.  Lead Plaintiff and the Class suffered damages, in part because they could not retrieve their digital assets in accounts with the FTX Platform(s) due to the rapid insolvency of the FTX Group caused by Defendants' actions.  *See* Statement of Facts, Section E above.

132.    As a result, Lead Plaintiff and members of the Class were directly and proximately injured by Defendants' actions as set forth herein.

## COUNT VII

## RESTITUTION AND/OR UNJUST ENRICHMENT

133.    Lead Plaintiff and Class Members incorporate and reallege all allegations set out in the preceding paragraphs including paragraphs 1 through 132 above.

134.    Through the conduct described herein, Defendant received and retained tangible benefits at the expense of Lead Plaintiff and the Class; including money and assets resulting from Defendant's divestment from FTX Group.  *See* Statement of Facts, Section C-E above.

135.    Defendants, directly or indirectly, have received and retain an increase in clients and transactions on their own platform(s) because of the demise of the FTX Platform(s) and insolvency of the FTX Group.  Defendants appreciate and/or have knowledge of said benefits.

136.    Defendants should not be permitted to retain the revenue they acquired through their unlawful conduct.  All funds, revenues, and benefits Defendants have unjustly received rightfully belong to Lead Plaintiff and the Class.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff, on behalf of himself and all others similarly situated, prays for judgement against Defendants as follows:

A.    Determining that this action is a proper class action, certifying Lead Plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure and the PSLRA;

B.    Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding rescission or a rescissory measure of damages;

D.    Disgorgement of Defendants' gains resulting from the actions set forth herein;

F.    Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorney fees, expert fees; and costs and disbursements; and

G.    Awarding restitution against Defendants for all money to which Lead Plaintiff and the Classes are entitled in equity;

H.    Holding Defendants jointly and severally liable for all damages, fees and costs;

Case No.: 1:23-md-03076-KMM

I.      Awarding Lead Plaintiff and the Class pre- and post-judgment interest, to the extent allowable;

J.      Awarding Lead Plaintiff and the Class compensatory damages sustained by Lead Plaintiff and all others similarly situated as a result of Defendants' actions as set forth herein;

K.      Awarding Lead Plaintiff and the Class any applicable statutory damages; and

J.      For such other and further relief as this Court may deem just and proper.

Dated: May 21, 2024                          **DEVLIN LAW FIRM, LLC**

                                             By:  */s/ Timothy Devlin*
                                             Timothy Devlin (DE 4241)
                                             tdevlin@devlinlawfirm.com
                                             1526 Gilpin Avenue
                                             Wilmington, DE 19806
                                             Telephone: (302) 449-9010

                                             Deepali A. Brahmbhatt (CA 255646)
                                             dbrahmbhatt@devlinlawfirm.com
                                             3120 Scott Blvd. #13,
                                             Santa Clara, CA 95054
                                             Telephone: (650) 254-9805

                                             *Attorneys for Lead Plaintiff and the Class*
                                             *Nir Lahav on behalf of himself and all others*
                                             *similarly situated*

Case No.: 1:23-md-03076-KMM

## DEMAND FOR JURY TRIAL

Lead Plaintiff and the Class Members hereby demand a trial by jury of all issues so triable.

Dated:  May 21, 2024                          **DEVLIN LAW FIRM, LLC**

By:  */s/ Timothy Devlin*
Timothy Devlin (DE 4241)
tdevlin@devlinlawfirm.com
1526 Gilpin Avenue
Wilmington, DE 19806
Telephone: (302) 449-9010

Deepali A. Brahmbhatt (CA 255646)
dbrahmbhatt@devlinlawfirm.com
3120 Scott Blvd. #13,
Santa Clara, CA 95054
Telephone: (650) 254-9805

*Attorneys for Lead Plaintiff and the Class*
*Nir Lahav on behalf of himself and all others*
*similarly situated*

-35-