**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

IN RE:

**FTX CRYPTOCURRENCY EXCHANGE**
**COLLAPSE LITIGATION**

THIS DOCUMENT RELATES TO:

Bank Defendants

23-md-03076-KMM

**AMENDED ADMINISTRATIVE CLASS ACTION COMPLAINT**
**AND DEMAND FOR JURY TRIAL**
**BANK DEFENDANTS**

**TABLE OF CONTENTS**

**INTRODUCTION**.................................................................................................... 3

**PARTIES** ................................................................................................................ 6

**JURISDICTION AND VENUE** ............................................................................ 11

**FACTUAL ALLEGATIONS** ................................................................................. 12

    **THE UNDERLYING FTX FRAUD** ................................................................. 12

    A.  The Rise of FTX ............................................................................................. 12

    B.  FTX's Key Players......................................................................................... 17

        1.  Defendant Sam Bankman-Fried ............................................................ 17

        2.  Defendant Gary Wang ............................................................................ 17

        3.  Defendant Nishad Singh.......................................................................... 18

        4.  Defendant Caroline Ellison and the Alameda Settlements Team ............ 18

        5.  Ryan Salame .......................................................................................... 20

        6.  Blockfolio and Avi Dabir ...................................................................... 21

    C.  The Mechanics of the Fraudulent Scheme ................................................... 27

    D.  The Fraud's Collapse ................................................................................... 35

    E.  Bankruptcy of FTX Group............................................................................ 37

    F.  The MDL Defendants' Roles in the Fraud ................................................... 41

    **THE BANK DEFENDANTS' ROLE IN THE FTX FRAUD** ........................... 46

    A.  With Mr. Chalopin at the helm, Deltec created a "sandbox for fraud" in the Bahamas for the express benefit of FTX Group. .......................................... 47

    B.  Deltec forged a close bond with FTX and helped to launch FTX's rise; FTX returns the favor in kind. ............................................................................... 50

    C.  Deltec Bank assisted FTX Group with sidestepping, if not outright violating, applicable banking regulations and law. ...................................................... 51

    D.  Deltec Bank assisted FTX Group in siphoning FTX customer funds to Alameda through Deltec Bank Accounts. ..................................................................... 59

        1.  Deltec Bank manually allocated to FTX Group incoming wires of FTX customer funds from FTX customer accounts. ...................................... 59

        2.  Deltec Bank manually allocated to FTX Group incoming wires of FTX customer funds from other FTX Group accounts.................................... 62

        3.  Deltec Bank executed internal transfers of customer funds between FTX Group accounts and FTX customer accounts at Deltec Bank. ................ 64

        4.  Deltec Bank siphoned FTX customer funds to Alameda for the misuse at center of the FTX fraud. ...................................................................... 65

    E.  Alameda, Tether, and Deltec entered into a manipulative scheme............... 70

i

1.  Alameda created and redeemed Tether's stablecoin directly through accounts at Deltec Bank. ........................................................................................................ 70

2.  Alameda purchased billions of dollars in USDT, artificially inflating Tether's market capitalization and Deltec Bank's deposits . ................................... 73

3.  Deltec Bank extended Alameda a secret line of credit to fund the Tether transactions. ........................................................................................................ 81

F.  Mr. Chalopin, through Relm Insurance, insured FTX Group entities and pitched Alameda on a new insurance scheme ........................................................................... 84

G.  Mr. Chalopin extended his assistance to the FTX fraud by way of Moonstone. .............. 85

1.  FTX Group invested in Chalopin's new bank, Moonstone. ...................................... 85

2.  Moonstone gained awareness of FTX's misconduct from its diligence on FTX and Alameda in compliance with its regulatory obligations ......................... 87

3.  Moonstone assisted FTX's misconduct despite knowledge of it. ............................. 90

**CLASS ACTION ALLEGATIONS** ...................................................................................... 92

A.  Class Definitions ............................................................................................................... 92

B.  Numerosity ........................................................................................................................ 93

C.  Commonality/Predominance ............................................................................................. 93

D.  Typicality .......................................................................................................................... 95

E.  Adequacy of Representation .............................................................................................. 95

F.  Requirements of Fed. R. Civ. P. 23(b)(3) ........................................................................ 95

G.  Superiority ......................................................................................................................... 96

H.  Requirements of Fed. R. Civ. P. 23(b)(2) ........................................................................ 97

I.  Requirements of Fed. R. Civ. P. 23(c)(4) ........................................................................ 97

J.  Nature of Notice to the Proposed Class. ........................................................................... 98

**CAUSES OF ACTION** ......................................................................................................... 98

COUNT I ................................................................................................................................. 98

COUNT II ................................................................................................................................ 99

COUNT III ............................................................................................................................ 100

COUNT IV ............................................................................................................................ 102

COUNT V ............................................................................................................................. 102

COUNT VI ............................................................................................................................ 106

**PRAYER FOR RELIEF** ...................................................................................................... 107

**DEMAND FOR JURY TRIAL** ........................................................................................... 108

Plaintiffs hereby file this Amended Administrative Class Action Complaint and Demand for Jury Trial pursuant to Rule 42 of the Federal Rules of Civil Procedure as the controlling document for pre-trial purposes, including Rule 12(b)(6), with regards to the Bank Defendants, as named herein, and as transferred to this Court from the following actions:

- *O'Keefe v. Sequoia Capital Operations, LLC et al.*, Case No. 1:23-cv-20700-KMM (S.D. Fl.)

- *O'Keefe v. Farmington State Bank et al.*, Case No. 2:23-cv-00213-TOR (E.D. Wa.)

Plaintiffs are not otherwise joining or merging these actions, which retain their individual nature for all other purposes, including venue, transferor forum, personal jurisdiction, and subject matter jurisdiction.[1]

Plaintiffs use the following defined terms throughout:

- "Alameda" refers to Alameda Research, LLC and its subsidiaries.

- "Auditor Defendants" refers to Prager Metis CPAs, LLC and Armanino LLP.

- "Bank Defendants" refers to Defendants Deltec Bank & Trust Company Ltd. ("Deltec"), Farmington State Bank d/b/a Moonstone Bank ("Moonstone"), and Jean Chalopin.

- "Domestic VC Defendants" collectively refers to Sequoia Capital Operations, LLC ("Sequoia"), Thoma Bravo, LP ("Thoma Bravo"), Paradigm Operations LP ("Paradigm"), SkyBridge Capital II, LLC ("SkyBridge"), Multicoin Capital Management LLC ("Multicoin Capital"), Tiger Global Management, LLC ("Tiger"), Ribbit Management Company, LLC ("Ribbit Capital"), Altimeter Capital Management, LP ("Altimeter"), and K5 Global Advisor, LLC ("K5 Global").

---

[1] *Gelboim v. Bank of Am. Corp.*, 574 U.S. 405, 413 n.3 (2015).

- "FTT" refers to the native cryptocurrency exchange token of the FTX Platform ecosystem.

- "FTX" refers collectively to FTX Trading LTD and its subsidiaries d/b/a FTX ("FTX Trading") and West Realm Shires Inc. and its subsidiaries ("WRS"). WRS includes, without limitation, its subsidiary West Realm Shires Services Inc. d/b/a FTX US ("FTX US").

- "FTX Group" refers collectively to FTX and Alameda.

- "FTX Insider Defendants" refers to Samuel Bankman-Fried, Caroline Ellison, Gary Wang, and Nishad Singh.

- "FTX Platform" refers to FTX's mobile application and/or web-based cryptocurrency investment service that places cryptocurrency trade orders on behalf of users.

- "Law Firm Defendant" refers to Defendant Fenwick & West LLP.

- "MDL Defendants" collectively refers to all Defendants named in the seven Administrative Class Action Complaints.

- "Multinational VC Defendants" refers to Defendants Sino Global Capital Limited ("Sino Global"), Softbank Group Corp. ("Softbank Group"), and Temasek Holdings (Private) Limited ("Temasek Holdings") together with its wholly owned subsidiary, Temasek International (USA) LLC ("Temasek USA" and, together with Temasek Holdings, "Temasek").

- "Promoter and Digital Creator Defendants" or "Brand Ambassador Defendants" refers to Thomas Brady, Gisele Bündchen, Kevin O'Leary, Udonis Haslem, David Ortiz, Stephen Curry, Golden State Warriors, LLC, Shaquille O'Neal, William Treavor Lawrence, Shohei Ohtani, Noami Osaka, Solomid Corporation d/b/a Team Solomid,

TSM and/or TSM FTX, Graham Stephan, Andrei Jikh, Jaspreet Singh, Brian Jung, Jeremy Lefebvre, Tom Nash, Erika Kullberg and Creators Agency, LLC.

- "YBAs" refers to the Yield-Bearing Accounts offered by FTX on the FTX Platform.

Plaintiffs, on behalf of themselves and all others similarly situated, sue MDL Defendants for their respective actions, as outlined herein,[2] which contributed to the collapse of the FTX Group, including but not limited to 1) aiding and abetting and/or actively participating in the FTX Group's massive, multibillion dollar global fraud, and 2) promoting, offering, or selling unregistered securities such as FTX's yield-bearing accounts ("YBA") and FTX's native cryptocurrency token ("FTT"), which caused Plaintiffs substantial harm. Plaintiffs, on behalf of themselves and all others similarly situated, allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and upon investigation conducted by and through counsel.

## INTRODUCTION

1.      The FTX disaster is the largest financial fraud in US history. For his part, Defendant Sam Bankman-Fried ("SBF"), FTX Group's founder and former CEO, was convicted on seven criminal counts including wire fraud, and his top lieutenants have pleaded guilty to same. . FTX Group's new CEO—who helped wind down Enron—concluded the fraud here was worse than Enron. Billions of dollars have been stolen from investors across the globe.

2.      SBF and his FTX Group caused billions of dollars in losses to Plaintiffs, through at least two separate schemes, both of which contributed to the downfall of the FTX Group.

3.      On one hand, SBF and the FTX Group stole customer deposits and used billions of

---

[2] At the request of the Court at the June 21, 2023 Status Conference, Plaintiffs have separated their complaint into seven versions, each of which contains a similar set of general allegations and the specific allegations as to a single group of MDL Defendants. Because certain claims, such as civil conspiracy, are pled across multiple groups of MDL Defendants, Plaintiffs hereby incorporate by reference the other versions of the complaint.

dollars in customer funds[3] to support the operations and investments of FTX and Alameda, to fund speculative venture investments, to make charitable and political contributions, and to personally enrich SBF himself, all while publicly touting the safety of the investment and the segregation of customer funds. The FTX Platform maintained by the FTX Group was truly a house of cards, a Ponzi scheme where the FTX Group shuffled customer funds between their opaque affiliated entities, using new investor funds obtained through investments in the FTX Platform, the YBAs, FTT, and/or loans to pay interest and investment withdrawals to the old ones and to attempt to maintain the appearance of liquidity.

4.      On the other hand, the FTX Group offered and sold securities without proper registration, thereby depriving Plaintiffs of financial and risk-related disclosures that would have impacted their calculus as to whether to invest in the FTX Group. Rather than heed the myriad warnings from the SEC dating as far back as 2017, the FTX Group chose instead to skirt US regulation through deception.

5.      The FTX Group was originally headquartered in California. FTX Trading later moved to The Bahamas and FTX US ultimately headquartered in Miami, Florida, though even before its official move, FTX US operated substantially from Miami, and many of the steps in furtherance of the FTX fraud were taken in Florida.

6.      This conduct violates numerous laws, including laws related to the sale of unregistered securities, consumer protection, professional malpractice, fraud, and various common law causes of action as detailed herein.

7.      Because of these schemes, the FTX Group imploded, and over $30 billion in value evaporated almost overnight when the FTX Group filed its emergency Chapter 11 bankruptcy

---

[3] As used herein, "customer funds" refers to both fiat and digital assets.

petition in Delaware.

8.      As outlined herein, MDL Defendants directly perpetrated, conspired to perpetrate, and/or aided and abetted the FTX Group's multi-billion-dollar frauds for their own financial and professional gain.

9.      In particular, Bank Defendants provided a suite of non-routine, high risk banking services to FTX Group, when traditional financial institutions would not, including serving as entrées to the U.S. banking system and jurisdictions offshore; manually, and knowingly, transferring FTX customer funds into accounts that were held by entities that SBF separately owned and helping to fence those assets beyond the FTX customers' reach—including *after* the Bank Defendants knew of Alameda's insolvency and FTX Group's inevitable collapse; expediting the transfer of FTX customer funds to Alameda at the expense of other banking customers and FTX customers; brokering a covert manipulation scheme between Tether Limited and Alameda; and extending a *de facto* line of credit to Alameda that at times exceeded *2 billion U.S. dollars*.

10.      Bank Defendants have done their best to elide Plaintiffs' allegations with claims that each is but a tiny rural bank with no ties to this jurisdiction or meaningful presence in the crypto industry, and Bank Defendants have avoided producing discovery contrary to those assertions at all costs. But Bank Defendants can hide no more. With the cooperation of key FTX Insider Defendants, Plaintiffs have uncovered nearly **7000 pages of direct text messages**[4] documenting the allegations herein. It is time for Bank Defendants to account for their material assistance to the FTX fraud and the harm caused to Plaintiffs and Class Members.

---

[4] *See* Ex. A, Declaration of Caroline Ellison, ¶ 28.

## PARTIES

11.     **Plaintiff Brandon Orr** is a citizen and resident of the State of Arizona. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Orr purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the MDL Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Orr has sustained damages for which the MDL Defendants are liable.

12.     **Plaintiff Leandro Cabo** is a citizen and resident of the State of California. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Cabo purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the MDL Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Cabo has sustained damages for which the MDL Defendants are liable.

13.     **Plaintiff Ryan Henderson** is a citizen and resident of the State of California. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Henderson purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the MDL Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Henderson has sustained damages for which the MDL Defendants are liable.

14.     **Plaintiff Michael Livieratos** is a citizen and resident of the State of Connecticut. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Livieratos purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the MDL Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Livieratos has sustained damages for which the MDL Defendants are liable.

15. **Plaintiff Alexander Chernyavsky** is a citizen and resident of the State of Florida. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Chernyavsky purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the MDL Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Chernyavsky has sustained damages for which the MDL Defendants are liable.

16. **Plaintiff Gregg Podalsky** is a citizen and resident of the State of Florida. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Podalsky purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the MDL Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Podalsky has sustained damages for which the MDL Defendants are liable.

17. **Plaintiff Vijeth Shetty** is a citizen and resident of the State of Florida. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Shetty purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the MDL Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Shetty has sustained damages for which the MDL Defendants are liable.

18. **Plaintiff Chukwudozie Ezeokoli** is a citizen and resident of the State of Illinois. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Ezeokoli purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the MDL Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Ezeokoli has sustained damages for which the MDL Defendants are liable.

19. **Plaintiff Michael Norris** is a citizen and resident of the State of New Jersey. He is

a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Norris purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the MDL Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Norris has sustained damages for which the MDL Defendants are liable.

20.     **Plaintiff Edwin Garrison** is a citizen and resident of the State of Oklahoma. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Garrison purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the MDL Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Garrison has sustained damages for which the MDL Defendants are liable.

21.     **Plaintiff Shengyun Huang** is a citizen and resident of the State of Virginia. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Huang purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the MDL Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Huang has sustained damages for which the MDL Defendants are liable.

22.     **Plaintiff Julie Papadakis** is a citizen and resident of the State of Virginia. She is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Papadakis purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the MDL Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Papadakis has sustained damages for which the MDL Defendants are liable.

23.     **Plaintiff Vitor Vozza** is a citizen and resident of the Federal Republic of Brazil. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Vozza purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the MDL Defendants' wrongdoing and the specific

allegations set forth herein, Plaintiff Vozza has sustained damages for which the MDL Defendants are liable.

24.     **Plaintiff Kyle Rupprecht** is a citizen and resident of the Dominion of Canada. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Rupprecht purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the MDL Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Rupprecht has sustained damages for which the MDL Defendants are liable.

25.     **Plaintiff Warren Winter** is a citizen and resident of the Federal Republic of Germany. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Winter purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the MDL Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Winter has sustained damages for which the MDL Defendants are liable.

26.     **Plaintiff Sunil Kavuri** is a citizen and resident of the United Kingdom of Great Britain and Northern Ireland. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Kavuri purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the MDL Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Kavuri has sustained damages for which the MDL Defendants are liable.

27.     **Defendant Deltec Bank and Trust Company Limited** ("Deltec Bank") is an offshore bank licensed and operating in The Bahamas. Deltec Bank is one of the few banks in the world that offers a full suite of digital asset services, including multi-currency banking, digital asset custody, trading, market making, lending and borrowing. Deltec Bank is a subsidiary of Deltec International

Group, which also owns Delchain Limited ("Delchain"), a digital asset financial services provider, whose services include multi-currency banking, digital asset custody, and multi-asset trading.[5] Deltec Bank and Delchain share affiliation with Relm Insurance Ltd. ("Relm Insurance"), one of the few providers offering insurance in the crypto space.[6] Deltec International Group launched Relm Insurance in March 2020 and owned the "captive insurer" at least through December 2022. Deltec International Group has described the relations between Deltec Bank, Delchain, and Relm Insurance as follows:



28.     **Defendant Farmington State Bank d/b/a Moonstone Bank** ("Moonstone") is a state-chartered bank and member of the Federal Reserve based in Farmington, Washington. Moonstone "serve[s] new customers in underserved industries, such as digital assets and hemp/cannabis businesses."

---

[5] TAB 1 - https://deltec.io
[6] https://www.youtube.com/watch?v=5vaW2xDNpgg&t=1438s&ab_channel=HenriArslanianl;
TAB 3 – Internet Archive – Deltec Website
(http://web.archive.org/web/20220228105751/https://www.deltecbank.com/service-insurance/)

29.    **Defendant Jean Chalopin** is a banking executive domiciled in The Bahamas. During the relevant period, Mr. Chalopin served, and continues to serve, as the chairman of Defendant Deltec and the chairman and chief executive officer of Defendant Moonstone. Mr. Chalopin also serves as a director of Delchain, which he part owns.

## JURISDICTION AND VENUE

30.    This Court has subject matter jurisdiction over this action for the reasons set forth in the underlying complaints in actions transferred to this MDL Transferee Court, including pursuant to 28 U.S.C. § 1332(d)(2)(A) because this is a class action for a sum exceeding $1,000,000,000.00 (one billion dollars), exclusive of interest and costs, and in which at least one class member is a citizen of a state different than the MDL Defendants, and also, where applicable, pursuant to 28 U.S.C. § 1331 as the claims against the MDL Defendants include federal questions arising under the laws of the United States.

31.    This Court has jurisdiction over every MDL Defendant in this multi-district litigation because every MDL Defendant was transferred to this forum from a transferor court which had personal jurisdiction over that MDL Defendant.

32.    Under 28 U.S.C. § 1407, venue is proper pursuant to the valid transfer and Fed. R. Civ. P. 42 pre-trial consolidation of these cases in this District by the Judicial Panel on Multidistrict Litigation.

33.    All conditions precedent to the institution and maintenance of this action have been performed, excused, waived, or have otherwise occurred.

## FACTUAL ALLEGATIONS

### THE UNDERLYING FTX FRAUD

**A.     The Rise of FTX**

34.     In May 2019, SBF and his co-founders, Gary Wang and Nishad Singh, launched FTX, which, along with various subsidiaries, affiliates and related entities, operated the FTX Platform, which FTX purported to be a centralized digital asset exchange aimed at "the mass market and first-time users" of cryptocurrencies.

35.     FTX portrayed itself as a trustworthy and law-abiding member of the cryptocurrency industry, focused not only on profits, but also on investor and client protection. In public statements, including in testimony before the United States Senate, SBF stated that FTX had adopted "principles for ensuring investor protections on digital asset-platforms" including "avoiding or managing conflicts of interest," and that "[a]s a general principle[,] FTX segregate[s] customer assets from its own assets across our platforms." SBF spent millions on advertisements to portray FTX as the "safest and easiest way to buy and sell crypto" and "the most trusted way to buy and sell" digital assets.[7]

36.     All the while, however, FTX was doing none of these things. Instead of managing conflicts, the FTX Group actively embraced them, using FTX Trading, FTX US, and Alameda funds interchangeably to prop up the enterprise. Contrary to SBF's statements, FTX had no focus on investor protection and did not segregate customer funds. Rather, FTX used customer assets as an interest-free source of capital for Alameda's and SBF's private ventures.

37.     FTX was conceived in Northern California before transitioning its headquarters to

---

[7] *See United States of America v. Samuel Bankman-Fried a/k/a "SBF"*, S5 Cr. 673 (LAK), ECF No. 115, Superseding Indictment at ¶ 2 (March 28, 2023).

Chicago, Illinois, and ultimately landing its domestic operations in Miami, Florida, where FTX US was headquartered and where, in early 2021, FTX purchased the naming rights to the Miami Heat's waterfront arena for more than $135 million, one of many sports venues on which FTX paid to have its name emblazoned and one of many extravagant purchases made with Class Members' funds.

38.     Beginning no later than early 2019, for FTX Trading, and no later than May 22, 2020, for FTX US, Class Members could open "yield-bearing accounts" ("YBAs") and/or other accounts, and deposit a wide assortment of cryptocurrencies, as well as fiat currency, including U.S. dollars, into the accounts ("Class Member funds") through the FTX website or through FTX's mobile app.

39.     FTX lured Class Members to make such deposits with promises of guaranteed 8% annual percent yield on assets equivalent up to $10,000 USD and guaranteed 5% annual percent yield on amounts between $10,000 USD and $100,000 USD, each of which compounded hourly upon a Class Member's deposit of funds. At no time did FTX register the YBAs pursuant to any federal or state securities law, as discussed more fully below.

40.     By structuring the rates of returns in this way, FTX targeted nascent investors— i.e., those under the age of 30 and/or new to trading, both inexperienced and unsophisticated—by tying higher rates of return to lower deposit amounts with "no fees and no minimum balances."

41.     Unlike a traditional brokerage, FTX took custody of Class Members' assets, which FTX promised to safeguard. In its terms of service, FTX represented to Class Members that "[a]ll cryptocurrency or dollars (or other supported currencies) that are held in your account are held by FTX.US for your benefit;" that "[t]itle to cryptocurrency represented in your FTX.US Account shall at all times remain with you and shall not transfer to FTX.US.;" and that "FTX.US does not

represent or treat assets in your FTX.US Account as belonging to FTX.US." FTX Trading's terms of service similarly represented that no customer funds were "the property of, or shall be loaned to, FTX Trading," and that FTX Trading "does not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading."

42.     FTX assured Class Members that their assets were safe and could be withdrawn at any time, claiming on its website that "FTX does back the principal generating the yield with its own funds and equity." In addition, FTX posted a document on its website entitled "FTX's Key Principles for Ensuring Investor Protections on Digital-Asset Platforms," which stated that FTX "segregates customer assets from its own assets across our platforms."   The document also represented that FTX maintained "liquid assets for customer withdrawals . . . [to] ensure a customer without losses can redeem its assets from the platform on demand."   SBF further promised, on Twitter in August 2021, "[FTX] will always allow withdrawals (except in cases of suspected money laundering/theft/etc.)."

43.     FTX also promised to protect against the risk that any customer would engage in self-dealing on the exchange or otherwise try to manipulate the market. For example, FTX claimed to offer "wash trading protection," representing that it implemented "exchange controls that actively prevent a party trading with themselves." Additionally, FTX represented, in its terms of service, that "FTX.US does not permit self-trades in order to manipulate markets, reported statistics, or cause liquidations."

44.     FTX also purported to protect against the risk that any customer would become overleveraged or undercollateralized on the platform. For this, FTX touted its "risk-engine," an automated monitoring system that required FTX customers to pledge additional collateral to their accounts as trades went bad and, if the customer failed to do so, liquidated that customer's assets.

FTX detailed its auto-liquidating "risk engine" and other purported risk management procedures in a public proposal to the U.S. Commodity Futures Trading Commission ("CFTC"), in which FTX sought permission to trade non-intermediated margin products (i.e., without any intermediary to hold customer funds):

> A participant's margin level is recalculated every 30 seconds as positions are marked to market, and if the collateral on deposit falls below maintenance margin level, FTX's automated system will begin to liquidate the portfolio. The automated system will liquidate 10 percent of a portfolio at a time by placing offsetting orders on the central limit order book. Once the liquidation process results in collateral on deposit that exceeds the margin requirement, the liquidation will stop. Because the liquidation is done automatically and positions are marked to market every 30 seconds, these liquidations can occur at any time, on a "24-7" basis.

45.     FTX claimed that this and other risk management procedures distinguished it from other cryptocurrency exchanges and ensured that Class Member funds were protected from losses by other users. For example, on May 11, 2022, SBF tweeted that "the margin mode is safe and conservative: real time risk engines mean you neither have to preemptively liquidate days early, nor risk positions going underwater for days." The next day, SBF testified before the U.S. House of Representatives Committee on Agriculture that:

> In our risk model the collateral is held directly at the clearinghouses, the collateral for all the positions. There is CFTC oversight of that collateral, and it is guaranteed to be there to not be used for anything else, to be **segregated**, and that is a difference with traditional models. It provides an extra guarantee of the assets backing these positions. (emphasis added).

At that hearing, in response to Chairwoman Jahana Hayes' concern that FTX's risk monitoring system "could create an opening for fraud and abuse, particularly towards new customers that are entering the digital asset market for the first time," SBF assured that in FTX's model, "there is a lot of capital which is held directly with CFTC oversight [and] **segregated** accounts for margin for the customers' positions, which also provides a capital backstop . . . ." (emphasis added).

46.     More generally, in television commercials, in print advertising, through interviews

and spokespeople, on Twitter, TikTok, Instagram, and Facebook, and in other publications, FTX repeatedly peddled itself as "the safest and easiest way to buy and sell crypto," and SBF repeatedly promised that "our users' funds and safety come first." In highlighting FTX's purported safety, SBF and other FTX executives falsely represented that FTX was insured by the Federal Deposit Insurance Corporation ("FDIC")—including in a tweet by FTX US President Brett Harrison that "direct deposits from employers to FTX US are stored in individually FDIC-insured bank accounts in the users' names," and "stocks are held in FDIC-insured . . . accounts"—until the FDIC ordered that FTX cease and desist in a letter dated August 18, 2022.

47.     SBF's carefully curated public persona complemented FTX's veneer of safety and was critical to FTX's meteoric rise. SBF came to be "the best-known proponent of the 'effective altruism' social movement which believes in prioritizing donations to projects that will have the largest impact on the most people." In touting his commitment to the movement, SBF explained on YouTube and to journalists that "I wanted to get rich, not because I like money but because I wanted to give that money to charity," and that "I pretty quickly run out of really effective ways to make yourself happier by spending money . . . . I don't want a yacht."

48.     But in truth, SBF *did* want a yacht, and he wanted Formula One teams, BMWs, beachfront condos, and cocaine-fueled parties. And he got those things—with Class Member funds. SBF's association with altruism and charity, and his public denouncements of greed and excess, generated a false trustworthiness among the public and provided necessary goodwill for FTX, each critical to hide his lavish spending of Class Member funds.

49.     On the basis of these reassurances, along with other representations described herein, FTX grew to become one of the largest cryptocurrency exchanges in the world—at its peak, the exchange's trading volumes reached approximately $21 billion *per day* and its valuation topped

$32 billion within three years of its founding.

**B.      FTX's Key Players**

### 1.      *Defendant Sam Bankman-Fried*

50.      The FTX Group was founded in 2019 and began as an exchange or marketplace for the trading of crypto assets. FTX was established by SBF, Gary Wang and Nishad Singh, with operations commencing in May 2019. FTX was purportedly established to build a digital asset trading platform and exchange for the purpose of a better user experience, customer protection, and innovative products. FTX built the FTX.com exchange to develop a platform robust enough for professional trading firms and intuitive enough for first-time users.

51.      Prior to that, the Silicon Valley-born, MIT-educated SBF launched his quantitative crypto trading firm, Alameda, in November 2017, after stints in the charity world and at trading firm Jane Street. Quantitative trading consists of trading strategies based on quantitative analysis, which rely on mathematical computations and number crunching to identify trading opportunities.

52.      On January 3, 2023, SBF pled not guilty to eight criminal charges during a hearing before the U.S. District Court for the Southern District of California in *USA v. SBF*, 1:22-cr-00673-LAK-1. On February 23, 2023, a superseding indictment was unsealed, adding four more charges, including charges for conspiracy to commit bank fraud and unlicensed money transmitting business, and money laundering. *Id*., Doc. 80. The sets of charges were later bifurcated and, on, November 2, 2023, a jury convicted SBF on the first eight. SBF now faces over 100 years in prison for those crimes predicated on stealing billions of dollars of FTX customer money.

### 2.      *Defendant Gary Wang*

53.      Before co-founding Alameda (and later FTX Group), Wang worked at Google. He claims to have built a system to aggregate prices across public flight data, according to an

introduction on the Future Fund's website. When Bankman-Fried left the Jane Street Hedge Fund to start Alameda in 2017, Wang left the tech giant.

54.     In December 2022, Wang pled guilty to criminal charges stemming from FTX's collapse, including conspiracy to commit wire fraud, conspiracy to commit commodities fraud, and conspiracy to commit securities fraud.

### 3.     *Defendant Nishad Singh*

55.     Nishad Singh joined Alameda in the early days, when the five-person trading firm was based in a Berkeley, California, apartment. After spending one and a half years as a core Alameda engineer, Singh took a role as the head of engineering at the then-newly launched FTX derivative exchange in 2019, where he was allowed to code with "minimal supervision." He provided code to a number of Bankman-Fried-related projects, including the decentralized exchange Serum on Solana. Singh also assisted Wang in building most of FTX's "technological infrastructure" and managed the development team.

56.     On February 28, 2023, Nishad Singh, who was one of SBF's best friends, a core Alameda engineer, and head of FTX's engineering, also pled guilty to criminal counts for conspiracy to commit fraud and conspiracy to commit money laundering. He agreed to cooperate with prosecutors' investigation into Bankman-Fried and apologized for his role in FTX's scheme.

### 4.     *Defendant Caroline Ellison and the Alameda Settlements Team*

57.     Caroline Ellison served as co-CEO, with Sam Trabucco, and then CEO of Alameda from mid-2021 until November 2022, when FTX collapsed. Ellison joined Alameda around March 2018 and worked as a trader until her promotion to co-CEO in the summer of 2021.[8]

58.     In December 2022, Ellison pled guilty to criminal charges stemming from FTX's

---

[8] *See* Ex. A, Declaration of Caroline Ellison, ¶ 2.

collapse, including conspiracy to commit wire fraud, conspiracy to commit commodities fraud, conspiracy to commit securities fraud, and conspiracy to commit money laundering.

59.     In October 2021, Ellison was appointed as co-CEO of Alameda with Sam Trabucco after SBF resigned from the firm in an effort to give the appearance of putting distance between the exchange and trading shop he founded, though in truth, SBF continued to control Alameda after stepping down.

60.     When Ellison joined Alameda in 2018, it was headquartered in Berkeley, California.[9] In or around 2019, Alameda relocated its principal offices to Hong Kong.[10] In or around November 2021, following SBF's decision to move the headquarters of Alameda and FTX Trading to the Bahamas, Ms. Ellison relocated to the Bahamas and lived at The Albany residential development with SBF and other FTX personnel.[11]

61.     From the time she joined Alameda in 2018 through the collapse of FTX, Alameda maintained an office in California and many of its few dozen employees worked from the United States. For example, members of Alameda's Settlements Team, including Lena Ngoy and Carlos Mahomar, principally worked from Alameda's office in Berkeley, California during this period.[12] The Settlements Team moved funds among various Alameda and FTX Group bank accounts and cryptocurrency wallets; communicated with Alameda's banks, lenders, and exchanges; communicated with trading counterparties; and settled trades.[13] This required constant contact between the Settlements Team, including with Ms. Ngoy and Mr. Mahomar in California, and Deltec Bank throughout the time that Deltec Bank serviced Alameda and FTX Group accounts.

---

[9] *See* Ex. A, Declaration of Caroline Ellison, ¶ 7.
[10] *See* Ex. A, Declaration of Caroline Ellison, ¶ 7.
[11] *See* Ex. A, Declaration of Caroline Ellison, ¶ 8.
[12] *See* Ex. A, Declaration of Caroline Ellison, ¶ 8.
[13] *See* Ex. A, Declaration of Caroline Ellison, ¶ 8.

62.    Other Alameda personnel worked principally in other parts of the United States. For instance, Ben Xie, Alameda's Head of Trading, resided in and principally worked from North Carolina and T'Shae Cooper, who served as Alameda's General Counsel from in or around mid-2022 through in or around November 2022, resided in and principally worked from Georgia.[14]

### 5.    *Ryan Salame*

63.    Mr. Salame joined Alameda in or about 2019, and quickly rose the ranks. By 2021, he was named head of Alameda's Settlements Team where he oversaw the processing of customer fiat deposits and withdrawals. Later, he became the co-CEO of FTX's Bahamian affiliate, FTX Digital Markets, Ltd.

64.    Mr. Salame perpetuated the FTX fraud in a number of ways including, by directing FTX customer deposits into and through accounts held by North Dimension, a company under the FTX Group's control and which opened bank accounts at  Silvergate Bank in California.

65. As detailed in Mr. Salame's Superseding Indictment:

> Once the North Dimension bank account was opened, FTX directed customer dollar deposits to the North Dimension account. Thereafter, when FTX customers deposited or withdrew fiat currency, Alameda personnel, who maintained control over the North Dimension account and acted under the direction and supervision of RYAN SALAME, the defendant, Samuel Bankman-Fried, a/k/ "SBF," and their co-conspirators, manually credited or subtracted the customer's FTX account with the customer's FTX account with the corresponding amount to fiat currency on an internal ledger system. Customers could then convert their deposits to a range of cryptocurrencies and traditional currencies, engage in various types of trading, and make withdrawals denominated in various types of cryptocurrencies and traditional currencies. FTX charged fees and generated revenues from many of these activities, using the fraudulently obtained access to a U.S. bank accounts

66.    On September 7, 2023, Salame pleaded guilty to two criminal charges arising from

---

[14] *See* Ex. A, Declaration of Caroline Ellison, ¶ 9.

the FTX fraud.

     **6.**     ***Blockfolio and Avi Dabir***

     67.     FTX maintained an office in Miami, Florida, since early 2021, long before FTX eventually announced the move of its Domestic headquarters to Brickell in late 2022.[15] Since early 2021, FTX's Miami office was run by Mr. Avinash Dabir, FTX's Vice President of Business Development.[16] FTX Group General Counsel Dan Friedberg met with Mr. Dabir often and is very familiar with Mr. Dabir and his activities.[17]

     68.     Mr. Dabir previously worked at Blockfolio LLC ("Blockfolio"), which FTX Group acquired in or around August 2020, reportedly for $150 million. Around the time of the Blockfolio acquisition, FTX Group began storing its cold wallets in servers located in Florida.

     69.     Mr. Dabir joined FTX Group upon the acquisition, which was key to FTX's growth, as Blockfolio, which managed a cryptocurrency application for smartphones, had broader reach to retail customers and would open the door for a more mainstream, mobile user base for FTX.

     70.     FTX thereafter rebranded Blockfolio and its smartphone application as FTX, which users could download from Apple's App Store or Google's Google Play Store. Although FTX rebranded Blockfolio, the application listing in Apple's App Store still shows the application developed by Blockfolio, and many of FTX Group's marketing campaigns directly promoted Blockfolio, including, for example a partnership with William Trevor Lawrence, quarterback for the Jacksonville Jaguars, in April 2021:

---

[15] *See* Ex. A, Declaration of Dan Friedberg, ¶ 20.
[16] *See* Ex. A, Declaration of Dan Friedberg, ¶ 20.
[17] *See* Ex. A, Declaration of Dan Friedberg, ¶ 20.



71.    Upon joining FTX Group, Mr. Dabir, from the Miami office, focused on formulating and executing FTX Group's important celebrity partnerships.[18] Mr. Dabir was the senior FTX executive responsible for creating, consummating, and implementing deals between FTX Group and other partners, such as Major League Baseball, the MLB Umpire's Association, TSM, the Mercedes Formula 1 team, Tom Brady, Stephen Curry, the Golden State Warriors, Naomi Osaka, Larry David, and Shohei Ohtani.[19]

72.    FTX Group's focus on celebrity endorsements and marketing efforts—each, critical to expanding the reach of the FTX fraud—began with a partnership with the Miami Heat and the

---

[18] *See* Ex. B, Declaration of Dan Friedberg, ¶ 21.
[19] *See* Ex. B, Declaration of Dan Friedberg, ¶ 23.

naming rights to the Miami Arena. *Id.* FTX Group announced the partnership in March 2021 and purchased the naming rights of the Miami Heat stadium for 19 years in a deal worth approximately $135 million. *Id.*

73.     Thereafter, FTX Group's many advertisements and marketing campaigns were developed in Miami, under Mr. Dabir's watch.[20] Mr. Dabir detailed FTX Group's Miami roots on the popular cryptocurrency podcast The Joe Pomp Show, released on March 31, 2022. A transcript of the podcast is attached as Exhibit C.

74.     Mr. Dabir begins by introducing himself as "Vice President of Business Development at FTX, so I handle a lot of our sports partnerships as well as doing some of the interesting things in real estate as well." Ex. C at 2. He then explains that "the end goal" is really how does FTX "acquire more users." *Id.,* at 9. After first acknowledging and agreeing with Mr. Pompliano that FTX was at that point the "leaders" in the sports partnership category and that "it started with Miami Heat Arena," Mr. Dabir explained that he led the effort to obtain the FTX Arena deal because he "had previously worked at the NBA" and that he identified Miami because it had "a great market," a "multicultural, great team," and the "Crypto Buzz was like growing here in Miami." *Id.*, at 2–3.

75.     Mr. Dabir also explained that it was crucial "to get approval from a local government, plus the Heat and the NBA who had their own diligence teams looking into" the FTX Arena deal because it "really sort of validated not only just FTX but the cryptocurrency industry in general." *Id.*, at 4.

76.     While the promotional campaigns came from the brain trust of FTX in Miami, many of the promotions also took place in Florida as a cryptocurrency hub.

---

[20] *See* Ex. B, Declaration of Dan Friedberg, ¶ 24.

- FTX served as a title sponsor for the David Ortiz Golf Classic in Florida on or about November 2021 and pledged to make contributions to Ortiz's charity, David Ortiz's Childrens Fund. Ortiz promoted the sponsorship and golf tournament on Twitter and other online pages, including on his personal website.

- In March of 2022, Defendants O'Leary, Haslem, and Ortiz served as judges for the FTX Charity Hackathon at the crypto summit hosted by FTX in Miami.



- On March 11, 2022, Mr. O'Leary appeared on NBC 6 South Florida to explain his involvement with FTX and his role in judging the competition. During that appearance, Mr. O'Leary praised the company saying "I love the company. I like its mission. I like what they're doing in terms of innovating and financial services around crypto." *Id.*

- In March of 2022, Ms. Osaka began her FTX promotion campaign at the 2022 Miami Open tennis tournament. Osaka wore gear with the FTX logo throughout the tournament, including during the presentation and acceptance of her runner-up throw following her loss in the finals.

- On April 18, 2022, Mr. Haslem, a star for and captain of the Miami Heat, shared a

video on Twitter advertising a promotional effort with FTX that promised a giveaway to Miami area small businesses.



77.     FTX's marketing efforts, which emanated from Miami, were underwritten by FTX customer funds and critical to perpetuation of the FTX fraud. "We're the newcomers to the scene," said then-FTX.US President Brett Harrison, referring to the crypto services landscape in the U.S. "The company needs to familiarize consumers with its technology, customer service and offerings, while competing with incumbents like Coinbase Global Inc. or Kraken," Mr. Harrison said. "We know that we had to embark on some kind of mass branding, advertising, sponsorship type work in order to be able to do that," he said. Without its mass marketing campaign, which emanated from Miami and was funded by Class Member deposits, FTX Group would not have reached its massive scale, and Class Members not lost their hard-earned deposits.

**7.     *Zach Dexter and LedgerX***

78.     In October 2021, FTX acquired LedgerX LLC, rebranded as FTX US Derivatives ("LedgerX"). LedgerX was a digital currency futures and options exchange based in Miami and

regulated by the CFTC, which had granted licenses to LedgerX to operate as a Designated Contract Market ("DCM"), a Swap Execution Facility ("SEF"), and a Derivatives Clearing Organization ("DCO"). These licenses provided access to the U.S. commodities derivatives markets as a regulated exchange, and, with its acquisition of LedgerX, FTX acquired that access in one fell swoop.  Upon information and belief, FTX Group paid for the LedgerX acquisition with FTX customer funds.

79.     Zach Dexter, whom FTX installed as CEO of LedgerX once the transaction was finalized, a long-time Miami resident, touted the acquisition as one that would enhance both FTX's regulatory compliance and the safety of the FTX exchange. Mr. Dexter asserted that these were top priorities for the company in announcing the acquisition:

> As the regulatory environment in the crypto ecosystem continues to evolve, we look forward to acting as a resource and an example of how the protections afforded by proper regulatory oversight and licensing can boost consumer confidence and facilitate safe and reliable exchange platforms. The most important facet of this acquisition of LedgerX is that it allows us to do that. FTX US Derivatives will continue to strive to be a part of the regulation conversation and ensure that the operational standards required by the CFTC are maintained.

At other times, Bankman-Fried explained that FTX pursued acquisitions like LedgerX, which were purportedly driven by regulatory and compliance considerations, because what matters most "is transparency and protection against fraud."

80.     Following the LedgerX acquisition, FTX Group promptly applied to the CFTC for amendment of LedgerX's Derivatives Clearing Organization (DCO) license to allow LedgerX to clear margined future contracts. In support of this application, FTX Group created a $250 million fund that SBF referred to as an "Over-Capitalized and Conservative Guaranty Fund" (the "FTX Guaranty Fund"), the purpose of which was to protect depositors by absorbing losses sustained by other users on the FTX Platform. With the FTX Guaranty Fund and other purported risk mechanisms in place, FTX represented to the CFTC that "FTX has gone above and beyond the

regulatory requirements and well above what is necessary or required based on our experience over the past years of operation internationally." That was not true, as S&C knew from its work advising on FTX's application and supporting testimony to the CFTC.

81.     While SBF and FTX touted the $250 million FTX Guaranty Fund to regulators as a fund comprised of $250 million worth of FTX assets, on information and belief these funds were actually comprised, in whole or in part, of FTX customer funds, diverted by SBF and/or FTX Insiders Nishad Singh or Gary Wang, as follows: Alameda diverted the funds from the FTX Platform through the "back door," and transferred the funds to SBF, Mr. Singh, and/or Mr. Wang as unsecured "loans" from Alameda. Indeed, an internal ledger produced in connection with the criminal trial of SBF shows that, in the weeks leading up to FTX's CFTC application, more than $300 million flowed to SBF, Nishad Singh and Gary Wang for "LedgerX" and $250 million flowed to SBF for "insurance fund" in this way. Upon information and belief, SBF, Mr. Singh, and/or Mr. Wang, in turn used those diverted funds to purchase shares of FTX US. FTX US then placed those funds into a LedgerX account to underwrite the FTX Guaranty Fund.

**C. The Mechanics of the Fraudulent Scheme**

82.     The FTX fraud was straightforward, albeit thoroughly concealed from unsuspecting Class Members.

83.     With the promise of higher-than-average returns and leading-edge safeguards, and by way of FTX's material omissions further detailed herein, FTX lured Class Members to deposit U.S. dollars and crypto-based assets into speculative investments, including YBAs, on the FTX exchange.

84.     Contrary to FTX's representations to its customers that "FTX.US does not represent or treat assets in your FTX.US Account as belonging to FTX.US," and unlike many of its

competitors, including Coinbase Global, the largest U.S.-based exchange, FTX did not segregate customer funds or designate them for the customer's benefit, instead commingling those funds in several "omnibus" accounts held by FTX.

85.     Under the cloak of this wide-ranging con game, FTX insiders including SBF facilitated the routing of billions of dollars in purported profits of FTX, which were in reality Class Member funds, to the insiders, and their families, friends, and other acquaintances through purported personal "loans," bonuses, "investments," and all other means of transfer, including real estate purchases and hundreds of millions of dollars in charitable and political contributions. Class Member funds were also used to fuel uncapped spending on parties, naming rights to sports arenas, concert sponsorships, luxury cars, and private jets.

86.     Frequently, SBF routed his fraudulent scheme through Alameda LLC ("Alameda"), a cryptocurrency hedge fund that he independently owned. By no later than fall of 2021, Alameda had no liquid assets other than FTX customer funds.[21] SBF and Mr. Wang formed Alameda two years before launching FTX and split ownership of Alameda 90% and 10%, respectively. SBF led Alameda as CEO until October 2021, from which time he continued to control the company and maintained ultimate authority over its trading, borrowing/lending, and investment activity.

87.     Until his scheme collapsed, SBF, along with a number of his lieutenants, publicly maintained that Alameda and FTX were "wholly separate entitit[ies] . . . at arm's length," and, despite their overlapping ownership by SBF, the companies were kept "separate in terms of day-to-day operations" by way of "a Chinese wall . . . to ensure that [Alameda wouldn't get] any sort of special treatment from FTX."

88.     Contrary to these representations, SBF operated FTX and Alameda as a common

---

[21] *See* Ex. A, Declaration of Caroline Ellison, at 15.

enterprise. The two companies shared offices for some time, as well as key personnel and other resources critical to the companies' operations.

89.     SBF routinely funneled Class Member funds through Alameda and/or other entities that SBF separately owned, sometimes as bogus "related party transactions." For example, financial statements for FTX Trading, now available to the public for the first time, disclose "a related party receivable" valued at $1.2 billion (equivalent to 44% of the company's assets); a $362 million "related party payable"; $250 million in payments (equivalent to 25% of the company's revenues) to a related party for "software royalties;" and a series of related party transactions described only as "currency management" activities. The same financial statements identify that these transactions were for the benefit of SBF, noting that the "primary shareholder [i.e., SBF] is also the primary shareholder of several related entities which do business with the company."

90.     Other times, SBF misappropriated Class Member funds as "loans, including for example, a $1 billion 'loan' to himself; a $543 million 'loan' to Mr. Singh; and a $55 million 'loan' to Ryan Salame, another FTX executive." SBF and other insiders received billions in dollars in purported "loans" from Alameda. None of these "loans" have ever been repaid, nor was there any reason to believe at the time the "loans" were made that they would or could be repaid. The FTX insiders effectively looted the company. Even during the crypto boom, the FTX insiders could not reasonably have repaid these loans, and no reasonable lender would have loaned such large amounts. In fact, none of these loans were ever repaid, nor upon information and belief was any interest ever paid on the loans.

91.     More often, SBF looted Class Member funds directly, without the cover of sham related party transactions or insider loans. For many years, SBF directed that FTX customer funds

be wired to bank accounts held by North Dimension, an entity under Alameda's control.[22]  North Dimension was a fake electronics retailer created by SBF to disguise its ties to FTX. North Dimension shared an address with FTX US in Berkeley, California, and published a website through which customers often "had trouble actually purchasing products" and was "rife with misspellings and bizarre product prices," including "sale prices that were hundreds of dollars above a regular price." For example, North Dimension advertised a $410.00 "Ipad 11 'ich Cell Phone" for the sale price of $899.00:



Once wired to North Dimension's accounts, Class Member funds were commingled with Alameda's and misappropriated by SBF. SBF has admitted to looting Class Member funds in this way, explaining to reporters after the fraud was revealed that "people wired $8b to Alameda and . . . it was never delivered to FTX."

92.     SBF found diverse ends for which to misappropriate Class Members funds, including to pay for Alameda's leveraged trades and investments, which had grown riskier over time. Initially, Alameda primarily traded in high-risk arbitrage, purchasing cryptocurrencies on one exchange and quickly selling them on other exchanges for higher prices. Later, Alameda pivoted to "yield farming," investing in cryptocurrencies that paid interest-like returns. Alameda's

---

[22] *See* Ex. A, Declaration of Caroline Ellison, at 16.

entrée into yield farming was not without internal controversy—in early 2021, Caroline Ellison, Alameda's CEO, expressed concerns about the riskiness of Alameda's yield farming investment strategy to no avail. Ms. Ellison was correct to observe that Alameda's bets had grown dodgier. At the time, Sam Trabucco, another Alameda executive, tweeted that Alameda's investing strategies increasingly relied on "intuition" and other unconventional measures, including "Elon Musk's social media posts." As noted above, Ms. Ellison has since pleaded guilty to misappropriating FTX customer assets to fund Alameda's risky bets and to cover Alameda's colossal losses.

93.    SBF used Class Member funds to underwrite Alameda's risky operations in other ways. Though SBF publicly claimed that Alameda was a "regular user" of FTX, contrary to that representation, FTX exempted Alameda from the automated "risk engine" described above, allowing Alameda to avoid liquidation under the monitoring system. Compounding FTX's—and, though they did not know it, Class Members'—exposure to Alameda, SBF allowed Alameda to maintain a negative balance in its FTX accounts and steadily increased Alameda's negative balance cap over time.  Through these cheats, Alameda was not only able to evade collateralizing its position on the exchange; Alameda also was able to maintain a negative balance on the exchange and utilize the exchange to trade and withdraw assets without limit, giving it an estimated "line of credit" of $65 billion, collateralized by the customer deposits on the exchange. Alameda lacked any ability to repay this line of credit, having spent the money on insider transfers and purported "loans," gifts, and questionable investments.

94.    With these exemptions—exemptions offered to no other customers on the exchange—FTX extended Alameda a de facto limitless line of credit.

95.    Upon information and belief, SBF also employed Alameda to funnel Class Member

funds from FTX US to his other companies. Just days before FTX filed for bankruptcy protection, Alameda withdrew over $200 million from FTX US; Alameda then transferred $142.4 million of those funds to FTX Trading's international accounts, exhibiting, according to industry experts, that Alameda had been serving as a "bridge between FTX US and FTX [Trading]" for some time.

96.     The improper relationship between Alameda and FTX was well known to the companies' insiders, and completely concealed from Class Members. As Ellison, former co-CEO of Alameda, told a federal judge in Manhattan when entering her guilty plea:

> From approximately March 2018 through November 2022, I worked at Alameda Research, a cryptocurrency trading firm principally owned by Sam Bankman-Fried.
>
> From 2019 through 2022, I was aware that Alameda was provided access to a borrowing facility on FTX.com, the cryptocurrency exchange run by Mr. Bankman-Fried. I understood that FTX executives had implemented special settings on Alameda's FTX.com account that permitted Alameda to maintain negative balances in various fiat currencies and crypto currencies. In practical terms, this arrangement permitted Alameda access to an unlimited line of credit without being required to post collateral, without having to pay interest on negative balances and without being subject to margin calls or FTX.com's liquidation protocols. I understood that if Alameda's FTX accounts had significant negative balances in any particular currency, it meant that Alameda was borrowing funds that FTX's customers had deposited onto the exchange.
>
> While I was co-CEO and then CEO, I understood that Alameda had made numerous large illiquid venture investments and had lent money to Mr. Bankman-Fried and other FTX executives. I also understood that Alameda had financed these investments with short-term and open-term loans worth several billion dollars from external lenders in the cryptocurrency industry. When many of those loans were recalled by Alameda's lenders in and around June 2022, I agreed with others to borrow several billion dollars from FTX to repay those loans. I understood that FTX would need to use customer funds to finance its loans to Alameda. I also understood that many FTX customers invested in crypto derivatives and that most FTX customers did not expect that FTX would lend out their digital asset holdings and fiat currency deposits to Alameda in this fashion...…I agreed with Mr. Bankman-Fried and others not to publicly disclose the true nature of the relationship between Alameda and FTX, including Alameda's credit arrangement.
>
> I also understood that Mr. Bankman-Fried and others funded certain investments in amounts more than $10,000 with customer funds that FTX had lent to Alameda. The investments were done in the name of Alameda instead of FTX in order to conceal the source and nature of those funds. I am truly sorry for what I did. I knew

that it was wrong. And I want to apologize for my actions to the affected customers of FTX, lenders to Alameda and investors in FTX. Since FTX and Alameda collapsed in November 2022, I have worked hard to assist with the recovery of assets for the benefit of customers and to cooperate with the government's investigation. I am here today to accept responsibility for my actions by pleading guilty.

97.     Similarly, Nishad Singh, head of FTX's engineering and one of SBF's best friends, has admitted that he knew by mid-2022 that Alameda was borrowing FTX customer funds and that customers were not aware.

98.     FTX co-founder Gary Wang likewise explained his knowledge of the companies' interconnectedness in his guilty plea:

> Between 2019 and 2022, as part of my employment at FTX, I was directed to and agreed to make certain changes to the platform's code. I executed those changes, which I knew would Alameda Research special privileges on the FTX platform. I did so knowing that others were representing to investors and customers that Alameda had no such special privileges and people were likely investing in and using FTX based in part on those misrepresentations. I knew what I was doing was wrong. I also knew that the misrepresentations were being made by telephone and internet, among other means, and that assets traded on FTX included some assets that the U.S. regulators regard as securities and commodities.

99.     FTX had a handful of insiders and employees with virtually limitless power to direct transfers of fiat currency and crypto assets and to hire and fire employees, with no effective oversight, internal controls, or checks on the exercise of these powers. FTX failed to establish or maintain any semblance of fundamental financial and accounting controls. This is particularly shocking given that at its peak, FTX operated in hundreds of jurisdictions, controlled billions of dollars of assets, engaged in as many as 26 million transactions per day, and had millions of users. Board oversight was effectively non-existent. With few exceptions, FTX lacked independent or experienced finance, accounting, human resources, information security, and cybersecurity personnel or leadership. Nor was there any effective internal audit function. Some FTX entities did not produce any financial statements. Some were deemed impossible to audit.

100.    FTX insiders paid out millions of dollars in hush money to keep whistleblowers from exposing the fraud, money laundering, and price manipulation. FTX even hired the attorneys of these whistleblowers to help keep these complaints from the public.

101.    At no time did FTX disclose the foregoing to Class Members, including that:

- SBF was siphoning Class Member funds to his friends and family members or for his own personal use;

- FTX was not segregating Class Member funds, instead commingling those funds in FTX's omnibus accounts and treating those funds as FTX's own;

- FTX directed that Class Member funds be wired directly into accounts held by North Dimension, a subsidiary of Alameda;

- FTX and Alameda were not, in fact, "wholly separate entities at arm's length," and were instead operated as a common enterprise;

- SBF was looting Class Member funds under the guise of non-arm's length "related party transactions" and "loans" often by way of Alameda;

- SBF routinely transferred Class Member funds out of accounts held by FTX to those held by Alameda;

- SBF was using Class Member funds to underwrite his speculative personal investments at Alameda, and his charitable and political contributions;

- Alameda was exempt from the "risk engine" and other FTX protocols in place to prevent a user from becoming undercollateralized or overleveraged on the exchange

- With the foregoing exemption, Alameda engaged in margin trading on the FTX platform, exposing Class Members to the risk of Alameda's loss;

- FTX used Class Member funds to manipulate the price of FTT, which was not "widely distributed," but instead concentrated in the hands of FTX and Alameda; and

- FTX did not have in place fundamental internal controls, including an independent board of director or a CFO.

102.    Had Class Members known of these material omissions, they would not have deposited funds into accounts on the FTX exchange and SBF's fraud would not have succeeded.

34

In late 2022, the fraud finally collapsed, and the misconduct was revealed.

**D.      The Fraud's Collapse**

103.    The FTX.com exchange was extremely successful since its launch in May 2019. In 2022, around $15 billion of assets were traded daily on the platform, which represented approximately 10% of global volume for crypto trading. The FTX Group's team grew to over 300 employees globally. Although the FTX Group's primary international headquarters is in the Bahamas, its domestic US base of operations is located in Miami, Florida.

104.    FTX quickly became one of the most utilized avenues for nascent investors to purchase cryptocurrency. By the time FTX filed for bankruptcy protection, customers had entrusted billions of dollars to it, with estimates ranging from $10 to $50 *billion dollars*.

105.    SBF got rich off FTX and Alameda, with the two companies netting $350 million and $1 billion in profit, respectively, in 2020 alone, according to Bloomberg.

106.    At his peak, SBF was worth $26 billion. At 30, he had become a major political donor, gotten celebrities like the Defendants in this action to vociferously promote FTX, and secured the naming rights to the arena where the NBA's Miami Heat play.

107.    Beginning in mid-2022, the value of cryptocurrencies rapidly declined, and SBF began to bail out troubled crypto firms that, if they were to fail, would bring down FTX with them and reveal SBF's fraud. For example, in the summer of 2022, FTX extended a $400 million revolving credit facility to BlockFi, a crypto lender. At the time, BlockFi held as collateral for loans hundreds of millions of dollars in FTT, the cryptocurrency that FTX had engineered to prop up Alameda. If BlockFi failed, the liquidation of those tokens would crash FTT, and in turn, Alameda, whose assets were primarily backed by the token. FTX's $400 million loan kept BlockFi temporarily afloat, and FTX engaged in a number of similar transactions, propping up failing

crypto companies in order to keep the fraud alive, as 2022 progressed.

108.    Despite SBF's attempts to keep troubled crypto firms afloat, the value of digital currencies continued to decline throughout 2022, and FTX's liquidity crunch tightened. By the end of summer 2022, SBF needed another $1 billion to keep his fraudulent scheme running. He looked to Silicon Valley and to sovereign wealth funds in the Middle East, but he was unable to successfully close any further investments in FTX, despite many solicitations. Without this influx of capital, FTX's exposure to margin calls heightened and, in November 2022, SBF's house of cards finally collapsed.

109.    In early November 2022, crypto publication CoinDesk released a bombshell report that called into question just how stable Bankman-Fried's empire really was. On November 2, 2022, news broke that Alameda's balance sheet was propped up by the FTX-manipulated FTT, revealing the close ties between FTX and Alameda to the public for the first time. FTX had lent billions, including most of its cryptocurrency reserves, to Alameda, first as capital for trading, and eventually to cover Alameda's massive losses.

110.    Prior to the collapse of the FTX Group, Bankman-Fried's cryptocurrency empire was publicly ostensibly broken into two main parts: FTX (his exchange) and Alameda (his trading firm), both giants in their respective industries. But even though they are two separate businesses, the division breaks down in a key place: on Alameda's balance sheet, which was full of FTX – specifically, the FTT token issued by the exchange that grants holders a discount on trading fees on its marketplace. It shows Bankman-Fried's trading giant Alameda rests on a foundation largely made up of a coin that a sister company invented, not an independent asset like a fiat currency or another crypto. The situation adds to evidence that the ties between FTX and Alameda are unusually close.

111.     Days later, on November 6, 2022, Changpeng Zhao, CEO of Binance, the world's largest cryptocurrency exchange and FTX's most powerful competitor, tweeted that he intended to sell Binance's $580 million holding of FTT, which threatened to crash the price of FTX's token and, in turn, Alameda's balance sheet. Mr. Zhao's announcement triggered demand for $5 billion in customer withdrawals, which FTX promptly halted due to a lack of funds. The value of FTT plunged 32%, but rallied once again with Bankman-Fried's surprise announcement on Tuesday, November 8, that Binance would buy FTX, effectively bailing it out.

112.     But, after a 24-hour diligence period, Binance backed out of the deal, denying a critical capital injection to SBF. Mr. Zhao explained his reasons for the about-face: "Sam, I'm sorry. We won't be able to continue this deal. Way too many issues. CZ." Binance cited findings during due diligence, as well as reports of mishandled customer funds and the possibility of a federal investigation. In truth, there were always too many issues—issues with the interconnectedness between Alameda and FTX, issues with FTX's total lack of internal controls, issues with SBF's looting of Class Member funds, the news of which sent FTT plunging even further — SBF saw 94% of his net worth wiped out in a single day. This triggered panic selling of FTT and a run on FTX, thereby ensuring the firm's swift demise.

### E.     Bankruptcy of FTX Group

113.     On November 11th, unable to obtain a bailout and facing an insurmountable liquidity crisis, the FTX Group filed for Chapter 11 bankruptcy and SBF resigned as CEO.

114.     An FTX balance sheet leaked at the time showed that FTX held approximately $900 million in liquid assets against $8.9 billion of liabilities, with a negative $8 billion entry described as a "hidden, poorly internally labeled fiat@ account."

115.     The same source explained that FTX's biggest customer was Alameda, which,

instead of holding money, was borrowing billions from FTX users using FTX's in-house cryptocurrency, FTT token, as collateral, then trading it. When the price of the FTT nosedived 75% in a day, making the collateral insufficient to cover the trade, both FTX and Alameda suffered massive liquidity crises. *Id.*

116.    On December 13, 2022, the SEC filed a civil action against Bankman-Fried for securities fraud in the United States District Court for the Southern District of New York. *SEC v. SBF*, 1:22-cv-10501, Doc. 1 (S.D.N.Y.) In that complaint, the SEC alleged:

> When prices of crypto assets plummeted in May 2022, Alameda's lenders demanded repayment on billions of dollars of loans. Despite the fact that Alameda had, by this point, already taken billions of Bankman-Fried of FTX customer assets, it was unable to satisfy its loan obligations. Bankman-Fried directed FTX to divert billions more in customer assets to Alameda to ensure that Alameda maintained its lending relationships, and that money could continue to flow in from lenders and other investors. *Id.* ¶ 4

> Through the summer of 2022, he directed hundreds of millions more in FTX customer funds to Alameda, which he then used for additional venture investments and for "loans" to himself and other FTX executives.

117.    The bankruptcy court appointed John J. Ray III, a 40-year industry veteran who oversaw the liquidation of Enron, to replace SBF as FTX's CEO. Mr. Ray quickly uncovered fundamental deficiencies in basic accounting, corporate governance, and other controls by FTX. These deficiencies were so startling that Mr. Ray remarked he had never "seen such a complete failure of corporate controls and such a complete absence of trustworthy financial information as occurred here." Moreover, Mr. Ray uncovered that:

> *First*, customer assets from FTX.com were commingled with assets from the Alameda trading platform.

> *Second*, Alameda used client funds to engage in margin trading which exposed customer funds to massive losses.

> *Third*, the FTX Group went on a spending binge in late 2021 through 2022, during which approximately $5 billion was spent buying a myriad of businesses and investments, many of which may be worth only a fraction of what was paid for

them.

***Fourth***, loans and other payments were made to insiders in excess of $1 billion.

***Fifth***, Alameda's business model as a market maker required deploying funds to various third-party exchanges which were inherently unsafe, and further exacerbated by the limited protection offered in certain foreign jurisdictions.

118.    On April 9, 2023, Ray III filed in the FTX Bankruptcy his First Interim Report to the Independent Directors on Control Failures at the FTX Exchanges. *See In re: FTX Trading Ltd.,* No. 1:22-bk-11068-JTD, ECF No. 1242-1 (Bankr. Dist. Del. Apr. 9, 2023) (the "First Interim Rpt.").

119.    Defining the "FTX Group" as a de facto singular entity comprised of FTX Trading, FTX.US, and Alameda, collectively, Mr. Ray explained that: "[t]he FTX Group lacked appropriate management, governance, and organizational structure," and the "management and governance of the FTX Group was largely limited to Bankman-Fried, Singh, and Wang. Among them, Bankman-Fried was viewed as having the final voice in all significant decisions." *Id.,* 11. The trio "controlled nearly every significant aspect of the FTX Group," despite being "not long out of college and with no experience in risk management or running a business," and "[b]oard oversight, moreover, was effectively non-existent." *Id.*

120.    The FTX Group also "lacked an appropriate organizational structure. Rather than having an ultimate parent company able to serve as a central point for decision-making that could also direct and control its subsidiaries, the FTX Group was organized as a web of parallel corporate chains with various owners and interest, all under the ultimate control of Bankman-Fried." *Id.,* 8. The FTX Group dd not even have a comprehensive organizational chart until the end of 2021, lacked any tracking of intercompany relationships and ownership of particular entities, and "did not even have current and complete lists of who its employees were." *Id.,* 8–9.

121.    The FTX Group also suffered from a near complete failure to observe corporate formalities, especially when it came to managing the finances of the FTX Group, for instance:

a.    Recordkeeping was so poor that Bankman-Fried described Alameda as "hilariously beyond any threshold of any auditor being able to even get partially through an audit," adding:

> Alameda is unauditable. I don't mean this in the sense of "a major accounting firm will have reservations about auditing it"; I mean this in the sense of "*we* are only able to ballpark what its balances are, let alone something like a comprehensive transaction history." We sometimes find $50m of assets lying around that we lost track of; such is life.

*Id.,* 14.

b.    "Key accounting reports necessary to understand the FTX Group's assets and liabilities, such as statements of cash flows, statements of equity, intercompany and related party transaction matrices, and schedules of customer entitlements, did not exist or were not prepared regularly," *Id.,* 14–15;

c.    "Copies of key documentation – including executed loan agreements, intercompany agreements, acquisition and investment documents, bank and brokerage account statements, and contract and account information of all types – were incomplete, inaccurate, contradictory, or missing entirely." *Id.,* 15;

d.    The FTX Group "did not maintain reliable lists of bank or trading accounts, cryptocurrency wallets, or authorized signatories," and let "[t]housands of deposit checks . . . collect[] like junk mail," *Id.,* 15;

e.    "Although the FTX Group consisted of many, separate entities, transfers of funds among those entities were not properly documented, rendering tracing of funds extremely challenging," including using Slack, Signal, and Telegram with "disappearing messages" enabled, and often approving expenses and invoices on Slack by "emoji," *Id.*;

f.    "The FTX Group did not observe any discernable corporate formalities when it came to intercompany transactions. Assets and liabilities were routinely shuffled among the FTX Group entities and insiders without proper process or documentation. Alameda routinely provided funding for corporate expenditures (*e.g.*, paying salaries and other business expenses) whether for Alameda, for various other Debtors, or for FTX DM, and for venture investments or acquisitions whether for Alameda or for various

other Debtors. Alameda also transferred funds to insiders to fund personal investments, political contributions, and other expenditures—some of which were nominally 'papered' as personal loans with below-market interest rates and a balloon payment due years in the future." *Id.,* 17;

g.   Often times, intercompany and insider transfers were recorded in a manner "that was inconsistent with the apparent purpose of the transfers," for instance, tens of millions of dollars being transferred from Alameda to Bankman-Fried, personally, but recorded in the general ledger as "Investment in Subsidiaries: Investments-Cryptocurrency," often times recorded in a way that intercompany transactions did not balance across relevant entities, nor were they recorded with specificity regarding which digital assets were involved in the transfer and their value when transferred, *Id.*;

h.   On both FTX International and US exchanges, Alameda was a customer that traded "for its own account as well as engaging in market-making activities, and, in that capacity, it was granted extraordinary privileges by the FTX Group," such as granting Alameda "an effectively limitless ability to trade and withdraw assets from the exchange regardless of the size of Alameda's account balance, and to exempt Alameda from the auto-liquidation process that applied to other customers," effectively allowing it to borrow and/or withdraw up to $65 billion from the FTX Platform, *Id.,* 18–22; and finally

122.   Mr. Ray concluded that "[t]he FTX Group's profound control failures placed its crypto assets and funds at risk from the outset." *Id.,* 39.

**F.   The MDL Defendants' Roles in the Fraud**

123.   Each group of MDL Defendants contributed both to the perpetration of the fraud, and to the sale of unregistered securities, in a vital way.  The roles of each Bank Defendant further detailed herein and the roles of each other MDL Defendant are outlined below, and more fully expounded upon within the individual version of the complaint in which they are named.

124.   SBF stole billions of dollars from FTX clients' deposits and used them to cover costs at FTX's sister company, a crypto hedge fund called alameda Research. He did so with the help of three key people, Caroline Ellison, Gary Wang, and Nishad Singh, who were part of Bankman-Fried's inner circle. Many of them were friends going back years before the creation of

FTX. Together, they were the brain trust of FTX and the architects of the FTX fraud, and are referred to herein as the "FTX Insider Defendants."

125.    The public accounting firms of Prager Metis CPAs, LLC and Armanino LLP (the Auditor Defendants), were the auditors of FTX Trading and FTX US, respectively. In those roles, and in violation of the professional standards to which they were subject,  Prager  Metis and Armanino issued reports in which they opined, respectively, that the financial statements of FTX Trading and FTX US for the years ending 2020 and 2021 were presented in accordance with generally accepted accounting principles (or GAAP) and that they had performed audits of such financial statements in accordance with generally accepted auditing standards (or GAAS). Reports such as the type issued here by the Auditor Defendants are generally referred to as "clean" audit reports. Given the virtual absence of accounting and financial systems and controls, corporate governance structures, and other controls at FTX – things that were so glaring and obvious that Mr. Ray discovered them within just days of being appointed as FTX's CEO in connection with the FTX bankruptcy – the Auditor Defendants never should have issued, and in fact were prohibited by the professional standards to which they were subject, their clean audit reports. Nor should they have allowed, as they did, FTX and SBF to tout that FTX had passed financial statement audits.  Finally, in further violation of the professional rules and standards to which they were subject, the Auditor Defendants issued statements of support on the internet and social media of FTX and SBF. The Auditor Defendants played a significant role in the FTX fiasco in that their actions gave legitimacy and credibility to FTX and SBF, which FTX and SBF used to curry favor with customers and investors and give them the sense that FTX could be entrusted with their money.

126.    FTX's campaign to build public and investor trust relied on significant financial

and public support from certain venture capital fund Defendants.  Sequoia Capital Operations, LLC ("Sequoia"), Thoma Bravo, LP ("Thoma Bravo"), Paradigm Operations LP ("Paradigm"), SkyBridge Capital II, LLC ("SkyBridge"), Multicoin Capital Management LLC ("Multicoin Capital"), Tiger Global Management, LLC ("Tiger"), Ribbit Management Company, LLC ("Ribbit Capital"), Altimeter Capital Management, LP ("Altimeter"), and K5 Global Advisor, LLC ("K5 Global") (collectively, the VC Defendants) poured over $800 million into FTX, both financing and directly participating in FTX's public campaign to create an air of legitimacy for the FTX Platform.  The VC Defendants made numerous deceptive and misleading statements of their own about FTX's business, finances, operations, and prospects for the purpose of inducing customers to invest, trade, and/or deposit assets with FTX.  They also vouched for the safety and stability of the FTX Platform, advertised FTX's purported attempts to become properly regulated, and otherwise promoted the fabricated integrity of the FTX Group and SBF.

127.    Defendants Temasek Holdings (Private) Limited ("Temasek Holdings") is a global commercial investment company owned by the Government of Singapore, with a portfolio valued at nearly $300 billion. Temasek Holdings operates in the United States primarily through its wholly owned subsidiary, Temasek International (USA) LLC ("Temasek USA" and, together with Temasek Holdings, "Temasek"). After undertaking an extensive, 8-month-long due diligence process involving, e.g., FTX's business model, applicable regulations, audited financials, and corporate governance, Temasek invested $275 million in FTX. Temasek "continued to monitor performance and engage management on business strategy, as well as legal, policy and regulatory matters" even post investment, advising FTX with regard to "upgrad[ing] regulatory and legal functions" and to "strengthen [its] leadership." Temasek was in a particularly good position to offer such advice; upon information and belief, its executive, Antony Lewis,

served on FTX's advisory board, which held meetings at least through March 2022.

128.    Defendant Softbank Group Corp. ("Softbank Group") is a Japanese multinational investment company venture capital fund formed as a Delaware limited partnership by Defendant Softbank Group Corp. ("Softbank Group" and, together with Softbank, "Softbank Defendants"), a Japanese holding company. Softbank Group invested in FTX through its Softbank Vision Fund, which is managed by Defendants SoftBank Investment Advisers (UK) Limited ("Softbank Investment Advisers") and Softbank Global Advisers Limited ("Softbank Global Advisers"), and engaged in the misconduct referenced herein in order to increase the value of those investments. SoftBank Vision Fund is one of the largest technology funds in the world, totaling approximately $56 billion, with its U.S. base in Silicon Valley, California. Softbank Group has a worldwide reputation for being a "unicorn company . . . whisperer," and startups such as FTX fortunate enough to count it among its investors gain "a major credibility building moment." SoftBank Group employed its "dedicated review department" to conduct due diligence on FTX's "business, technology, business model, market size, business plan, competitive environment, financial condition, legal compliance, etc." prior to making its reported $100 million dollar investment. Upon information and belief, SoftBank Group continued to enjoy unique influence over and insight into FTX following its investment through its executives—CEO Rajeev Misra and Partner Tom Cheung—who served on FTX's advisory board, which held meetings at least through March 2022. It sought to pave the way for FTX to expand into the derivatives clearinghouse arena by lobbying the CFTC to grant FTX the necessary licenses with claims that FTX's proposal would reduce risks to the consumer.

129.    Defendant Sino Global Capital Limited ("Sino Global") is a venture capital firm based in Hong Kong with hundreds of millions in assets under management. Sino Global

"supported the FTX vision" "[f]rom the very beginning" and "worked with [FTX] to make it a reality," including by investing an undisclosed amount in the "mid-seven figures" in FTX. In conjunction with its investment, Sino Global—in the words of its managing partner Matthew Graham—did "a hell of a lot of due diligence" and eventually embarked on a "deep relationship" with FTX. Sino Global's reputation, due diligence representations, ultimate investment, and ongoing relationship lent an air of legitimacy to FTX, as Mr. Graham recognized following one round of funding: "Today, SBF is no longer merely a titan of crypto. He's now a titan of business . . . ." As FTX's value skyrocketed, Sino Global stood to make an enormous return on its investment, but it benefitted from its ties to FTX in more direct ways: Sino Global accepted a $60 million investment from Alameda and yet another investment of an undisclosed amount from SBF, each of which, upon information and belief, having been comprised of Class Member funds. It further partnered with FTX and Alameda as co-general partners in the $200 million Liquid Value I fund, Sino Global's first ever outside venture fund.  Together, Temasek, Softbank, and Sino Global are referred to as the "Multinational VC Defendants."

130.    Defendant Fenwick was FTX's outside corporate counsel.  Headquartered in Mountain View, California, Fenwick was ideally located in the heart of Silicon Valley, near to FTX's California operations. Fenwick provided services to the FTX Group entities that went well beyond those a law firm should and usually does provide. When asked by FTX Group executives for counsel, Fenwick lawyers were eager to craft not only creative, but illegal strategies.  Fenwick helped set up the shadowy entities through which SBF and the FTX Insiders operated a fraud, structured acquisitions by the FTX US in ways to circumvent regulatory scrutiny, advised on FTX US's regulatory dodge, more generally, and supplied personnel necessary to execute on the strategies that they proposed.  In this manner, Fenwick conspired with and aided and abetted the

fraud, conversion, negligence, and respective breaches of fiduciary duties of the FTX entities.

131.    Defendant Promoters agreed to serve as brand ambassadors, advertised and promoted the sale of the FTX Platform, YBAs and/or FTT, and failed to disclose in any of their marketing campaigns or advertisements that they were paid millions of dollars by FTX. All in clear violation of SEC, FTC, and various federal and state regulations.

132.    Defendant Digital Creators are YouTube and social media financial influencers who promoted FTX as financial advice and promoted the sale of the FTX Platform, YBAs and/or FTT, to their millions of followers.  The Promoter and Digital Creator Defendants include the individuals and entities listed in the paragraphs below.

### THE BANK DEFENDANTS' ROLE IN THE FTX FRAUD

133.    Defendant Deltec Bank, at Mr. Chalopin's direction, provided one-of-a-kind digital asset banking services to FTX Trading, FTX US and Alameda; injected financial capital into FTX Group; manually allocated incoming customer funds to FTX Group accounts; transferred those customer funds to Alameda or for Alameda's use; and extended a secret line of credit to Alameda totaling $2 billion at times

134.    From directly executing these transfers, and from mandatory diligence and monitoring of FTX Group accounts, Deltec Bank uncovered that FTX Group was not in fact safeguarding client assets—which Deltec Bank knew FTX Group promised to do in its terms of services, *see* ¶ 161—but instead that FTX was using customer assets as an interest-free source of capital for Alameda's and SBF's private ventures. Nevertheless, Deltec Bank, at Mr. Chalopin's direction, assisted FTX in moving Class Member funds to Alameda for its misuse.

135.    Though Deltec Bank learned that FTX Group was receiving customer deposits into accounts at Deltec Bank, and though Deltec Bank manually approved and effected transfers of those customer funds to Tether, Bitfinex, and other entities or investments that SBF separately

owned, Deltec Group participated in FTX Trading's Series B fundraising round and injected $1 million of capital into FTX Trading in July 2021.

136.    FTX relied on the provision of these services by Deltec Bank, because FTX could not find them in other banks. In fact, Deltec Group's unique position in that regard apparently motivated Mr. Chalopin to purchase and revolutionize Defendant Moonstone—he saw a "massive gap in the U.S. for digital asset businesses, and [that] is what [Moonstone] think[s] we can solve."

137.    Defendant Moonstone, also at the direction of Mr. Chalopin, provided complementary services, assisting SBF in funneling more than $50 million in Class Member funds to entities SBF separately owned through accounts at the bank and obtaining membership in the Federal Reserve, such that FTX Group could access the U.S. banking system, by deceit, and partnered with SBF by way of an investment in Moonstone by Alameda, with their sights set on developing a bank owned and operated by FTX Group.

**A.    With Mr. Chalopin at the helm, Deltec created a "sandbox for fraud" in the Bahamas for the express benefit of FTX Group.**

138.    Mr. Chalopin is a veteran of the crypto industry. As the chief executive of Deltec, he spent years assisting the Bahamian government in "transform[ing] the country into a sandbox for digital asset startups." Indeed, as Mr. Chalopin tells it, "[i]t would be nothing in The Bahamas if it weren't for us [Deltec Bank] in the beginning."

139.    Transforming The Bahamas into a crypto haven was no easy task—Mr. Chalopin recalls it was like clearing a jungle in which "you have to use your machete and cut the branches." Helpful to Deltec Bank in this regard was the fact that Ryan Pinder, The Bahamas's Attorney General currently in charge of its FTX investigation, was previously employed as the Head of Wealth Management and Chief Legal Officer of Deltec Bank, before he joined The Bahamian Parliament in 2010 .Mr. Pinder notably left Parliament in 2014 to take what he described as a

"mind blowing" deal to serve as Chief Legal Officer at Deltec Bank.

140.     Perhaps with these political connections in mind, in 2018, Mr. Chalopin looked to broaden Deltec Bank's services to crypto clients and companies. He secured the stablecoin Tether as a customer, which held $1.8 billion dollars on deposit at the bank. Tether's deposits accounted for nearly half of the total deposits at Deltec Bank, which had only a few billion dollars under management at the time. Tether had strong connections to FTX, too. As of 2019, Alameda was the second-largest distributor of USDT, Tether's stablecoin. Stated differently, about one-third of USDT minted at any time went to Alameda. Deltec Bank was critical to Alameda's purchase and sale of USDT, which Alameda funded with FTX customer deposits, as further detailed herein.

141.     Notably, Tether and FTX—two of Deltec Bank's largest customers in recent history—share other parallels. Like FTX, Tether represented to its customers that it had sufficient levels of liquidity to protect the value of the customer's investments, claiming "Every Tether is always backed 1-to-1, by traditional currency held in our reserves." In reality, however, just as FTX Group was siphoning funds to cover losses by Alameda, Tether had lent $625 million to its affiliate cryptocurrency exchange Bitfinex, to cover losses that the exchange had incurred. The Attorney General of New York investigated Tether and Bitfinex for fraud in connection with the foregoing misrepresentations and transfers. The parties ultimately settled in early 2021. Deltec Bank banked Tether the throughout the fraud.

142.     Eager to expand Deltec Bank's crypto clientele even further, Mr. Chalopin and his team of executives at Deltec Bank assisted the Bahamian government in drafting crypto-friendly D.A.R.E. Act to attract digital asset startups and other crypto ventures to The Bahamas. With the help of Deltec Bank, that legislation passed in 2020. The D.A.R.E. Act provides few, if any, safeguards to protect consumers and places no obligation on crypto exchanges to back clients'

funds with reserves.

143.    So important was passage of the D.A.R.E. Act to FTX Group that, according to Ryan Salame, it hired an "incredible" outside lobbyist to "help[] on the DARE Act" in the Bahamas, who "assisted a lot with modifications to [the Act]" and who did "more pro bono work" for FTX Group thereafter. Deltec Bank assisted FTX Group's lobbying efforts, too, as Mr. Chalopin has boasted that, with the help of Deltec Bank, the Bahamas "were one of the first regulators to put together something, *and that attracted FTX*."

144.    Mr. Chalopin's assistance in fostering a lax regulatory environment in the Bahamas complemented FTX's strategy for feigning regulatory compliance in the United States. FTX Group repeatedly heralded itself as the most regulatory compliant cryptocurrency exchange on the market. To substantiate those claims, FTX Group touted the CFTC licenses it obtained through acquisition of LedgerX, appeared before Congress and the CFTC, all the while representing that FTX was safe and followed the law.

145.    Contrary to these representations, SBF later admitted to journalists that FTX's public commitment to regulatory compliance was "just PR," to which he added:

> fuck regulators

> they make everything worse

146.    These admissions highlight the FTX entities' need to circumvent the scrutiny of regulators like the CFTC, while fostering "the cleanest brand in crypto" and concealing the fraud that pervaded through their organization. Deltec Bank helped FTX achieve that veneer of regulatory compliance, by helping to pass the D.A.R.E. Act, which Deltec Bank worked to severely weaken and which, in truth, had no teeth. To be sure, while FTX Group registered

pursuant to the Act, Alameda did not, and FTX Group could route its fraudulent activity through Alameda beyond the statute's reach, such that FTX Trading's compliance with the D.A.R.E. Act was but a fig leaf, as Deltec and Chalopin surely knew.

**B.      Deltec forged a close bond with FTX and helped to launch FTX's rise; FTX returns the favor in kind.**

147.    With these efforts, Deltec Bank, through Mr. Chalopin, developed close ties to FTX. Deltec Bank and FTX co-sponsored the Crypto Bahamas summit, where Deltec Bank was a Platinum sponsor, curated "cutting-edge content and entertainment" for the "Trusting Disruption" stage.  Mr. Chalopin and other Deltec Bank executives featured in speeches and panels at the summit, which Deltec Bank described as "an exclusive gathering of the leading investors and builders in the blockchain, digital assets and web3 space." SBF, along with nearly a dozen FTX executives, including Brett Harrison, President of FTX US; Zach Dexter, President of LedgerX were also featured at the conference.

148.    Deltec Bank's sponsorship of Crypto Bahamas helped to amplify SBF's reach. *CoinDesk* described the affair as "a four-day flex of FTX's expanding empire – with a new era of "corporate crypto" firmly on display," and the *New York Times* reported, "Bankman-Fried was presiding over the first edition of the Crypto Bahamas conference, a showcase for FTX and a vivid demonstration of his growing celebrity and influence. Everywhere he went, crypto entrepreneurs offered handshakes and fist bumps, patting him on the back as they pitched projects or presented him with branded swag."

149.    Deltec Bank's hosting Crypto Bahamas also contributed to the normalization of FTX's cryptocurrency exchange "from the early days of 'shadowy super-coders' hearkening the end of banks." Many news outlets reported on the growing acceptance of crypto on display at the Temasek panel and more broadly at Crypto Bahamas.  For example, *Yahoo! Finance* reported how

the story of Crypto Bahamas was "traditional investors and crypto native firms." And *Forbes* reported how the panels "discussed how digital assets fit into modern investment portfolios and the broader maturation of the asset class."

150. Mr. Chalopin, through Deltec, was happy to help FTX in these ways. At the conference, Mr. Chalopin touted that "Deltec has been a long-time friend of FTX, and it is our pleasure to support them." Mr. Chalopin added "Deltec has probably 20 people on the ground here at the conference today. We are here because we embraced [FTX's] vision of the future."

151. FTX, in turn, was a great friend of Deltec. After an extended failure by Deltec to raise debt capital in New York, Mr. Chalopin turned to FTX. In October 2021, Deltec's parent company, Deltec International Group, received a $50 million loan from Norton Hall Ltd., an entity controlled by Ryan Salame, CEO of FTX's Bahamian outfit. This is reportedly the same entity through which Alameda "loaned" $55 million to Mr. Salame, paid for with Class Member funds.

**C.  Deltec Bank assisted FTX Group with sidestepping, if not outright violating, applicable banking regulations and law.**

152. At the time of the FTX collapse, Deltec Bank serviced no fewer than 17 accounts and/or sub-accounts for FTX Group including, specifically, accounts for Alameda, which were opened in 2018,[23] accounts for FTX Trading, which were opened in 2020, and accounts for FTX US, which were opened in 2021.

153. Gregory Pepin, Deltec Bank's Deputy CEO at the time, served as FTX Group's primary contact.[24] Mr. Pepin was often assisted by Michel Giacomotti, one of Deltec Banks' Business Development Managers, in servicing the FTX Group accounts. Mr. Pepin and Mr. Giacomotti frequently communicated with Alameda, FTX Trading and FTX Group on various

---

[23] Ex. A, Declaration of Caroline Ellison, 17.
[24] Ex. A, Declaration of Caroline Ellison, 17.

chat groups through the messaging platform Telegram.[25] The group was close-knit, as the Telegram messages show. The Alameda team, Mr. Pepin, and Mr. Giacomotti would joke about buying private islands together, or that they would "pay money not to own [an NFT] of Mr. Pepin" and share GIF images with one another, such as:



154.     Upon information and belief, like other Deltec International Group officials—including James Schaefer, Deltec Bank's Executive Vice President; Bruno Macchialli, Delchain's Chief Executive Officer, and Joseph Ziolkowski, Relm Insurance's Managing Director—Mr. Pepin traveled to Miami for business, including to service the FTX Group accounts.

155.     Before opening and servicing these accounts, Deltec Bank conducted due diligence on Alameda, FTX Trading and FTX US, just as it did with Tether, Deltec Bank's other major crypto client. In a press release announcing its relationship with Deltec Bank, Tether detailed Deltec Bank's diligence process:

> The acceptance of Tether Limited as a client of Deltec came after [Deltec's] due diligence review of our company. This included, notably, an analysis of our compliance processes, policies and procedures; a full background check of the shareholders, ultimate beneficiaries and officers of our company; and assessments

---

[25] Ex. A Declaration of Caroline Ellison, ¶ 28("Through counsel, I have produced to the Plaintiffs true and correct copies of the Alameda-Tether-Deltec chat messages, along with other Telegram chat messages with Deltec personnel. These copies are Bates-numbered CE-MDL-00000001 through CE-MDL-00006740.").

of our ability to maintain the USD-peg at any moment and our treasury management policies. This process of due diligence was conducted over a period of several months and garnered positive results, which led to the opening of our bank account with this institution. Deltec reviews our company on an ongoing basis.

156.    To be sure, as a Bahamian Supervised Financial Institution ("SFI"), Deltec Bank was required to have in place policies consistent with the Central Bank of the Bahamas' Guidelines for Supervised Financial Institutions on the Prevention of Money Laundering, Countering the Financing of Terrorism & Proliferation Financing (the "Guidelines"), which required diligence and monitoring of the FTX Group accounts at Deltec Bank. All SFIs of the Bahamian Central Bank must use these Guidelines to develop responsible procedures suitable to their business to prevent money laundering and terrorist financing. [26] For example:

  a.   "Every SFI must retain adequate documentation to demonstrate that its [Know Your Customer (KYC)] procedures have been properly implemented, and that it has carried out the necessary verification procedures."

  b.   Likewise, "it is mandatory that organizations conducting banking, trust and money transmission activities covered in these Guidelines introduce comprehensive measures to ensure that staff are fully aware of their responsibilities."

  c.   Specifically, the Guidelines state that when seeking to verify the identity of corporate clients the "source of funds" should be a required disclosure (i.e. customer assets).

  d.   Additionally, the Guidelines required that Deltec Bank, as an SFI, have in place policies to monitor the FTX Group accounts for suspicious activity, including that cross-border wire transfers of $1,000 or more must have contained complete payer and payee information for Deltec Bank to process such wire transfers. The transfers into and out of FTX Group accounts exceeded $1,000, such that Deltec Bank was required to obtain payor and payee information for each transfer. From this information, Deltec Bank was acutely aware of that funds flowing into FTX Group accounts were customer deposits (by way of the "payor" information) and/or that funds

---

[26] Central Bank of the Bahamas' Guidelines for Supervised Financial Institutions on the Prevention of Money Laundering, Countering the Financing of Terrorism & Proliferation Financing (accessed August 3, 2023).

were transferred between FTX Trading or FTX US and Alameda accounts (again, by way of the "payor" and "payee" information).

e.  Moreover, per the Guidelines, "[w]here SFIs observe unusual activity in relation to any client account, they should question the customer concerned, even if it means asking difficult questions. If a customer fails to provide credible answers, this should invite further enquiry about his activities, make the SFI reconsider the wisdom of doing business with him and, potentially lead to a [Suspicious Transaction Report] being filed. SFI should document the results of their enquiries into unusual activity. Under these Guidelines, the large round-dollar transfers that flowed among accounts held by FTX, Alameda, and their affiliates at Deltec Bank and ultimately to other banks were "unusual" by Deltec Bank, who was then obligated under the guidelines to have investigated the transactions. Upon information and belief, Deltec Bank observed such suspicious transfers into, out of, and between FTX Group accounts but did not file requisite Suspicious Transaction Reports for every suspicious transaction.

157.   Telegram messages between Mr. Pepin, Mr. Giacomatti and Alameda show that Deltec Bank did in fact collect the foregoing materials and information as required by the Guidelines, though Deltec Bank often exempted FTX Group from full compliance with those regulations. For example, in one Telegram message, Mr. Giacomotti wrote to an Alameda group including Caroline Ellison and Nishad Singh:

**Good morning friends! Anybody able to help with a KYC request? Need a copy of Gary Wang's passport … ASAP like yesterday :) … Cause our intermediary bank is holding payments**

Though the copy of the passport that FTX Group received was uncertified, contrary to KYC requirements, Deltec Bank offered to sidestep the certification requirement for FTX Group, with Mr. Pepin responding in the Alameda Telegram chat:

**Michel [Giacomatti] will certify [the passport] 😊 … [he] does everything including cooking and cleaning … he is really good :p**

158.   Other times, Mr. Pepin would disregard the Guidelines in servicing FTX Group accounts and he would happily announce the same to the Alameda Telegram chat:

**will see if i can turn it into your dedicated deltec [international bank account**

**number] … given me another day to kind [sic] update ops about it that I'm going to start this (as I did it outside the guideline to rush things lol)**

159.    Deltec Bank was happy to make exceptions to the Guidelines' requirements for its "friends" at FTX Group. Often banks from which FTX customer funds were wired into Alameda's Deltec accounts would ask for KYC information relating to the transfers. Mr. Pepin would request this information directly from Alameda in the Telegram chat. If Alameda could not, or would not, so provide, Mr. Pepin conjured up cover for the missing information. For example, in on Telegram message, Mr. Pepin messaged an Alameda group, including Caroline Ellison and Ryan Salame, seeking KYC information requested by an FTX customer wiring money from Citibank:

**u guys are registered with FinCen? (so i will just add this little detail that often have strong impression to stupid compliance people)**

To which, Mr. Salame responded:

**I don't believe Alameda is registered with FinCen but let me confirm**

To Mr. Pepin's dismay, he replied:

**ok I take away the registration mention it was useless then lol**

**[…]**

**One more dumb question now from Citi lol due to the multiple deposit we receive [from this particular customer] got the KYC?**

Incredibly, Mr. Pepin then *copied and pasted* the KYC questions from Citibank into the Telegram chat, revealing to Alameda the information needed to clear the Guidelines and other regulatory compliance:

**so I have to answer …**

**(1) With respect to the transactions referenced in the enquiry, please confirm that you have reviewed these transactions and are satisfied that these are legitimate transactions and are in line with the profile of your client and expected activity;**

**(2) Please provide business rationale for the transaction(s) including, to the extent you are aware, any details that you think may assist in our inquiries;**

> **a) Please provide who is the Beneficiary of the transaction. Please provide KYC info of the Beneficiary including its line of business (business scope), full address, financial results etc.;**
>
> **b) If possible, please provide details of the Original [FTX customer] including business scope and full address;**

**3) Please provide us with the information regarding:**

> **a) Relation between originator and beneficiary;**
>
> **b) Purpose of the transactions between originator and beneficiary;**

**4) Please explain the reason for repeat payments between originator and benficary;**

**5) Please provide if the activity is expected to be continue[d]**

Such invitation of the fox into the henhouse is obviously impermissible under the Guidelines and contrary to any best anti-money laundering practice. But Deltec Bank was happy to share these "dumb" questions with its friends at FTX Group, and Mr. Pepin followed the message with:



**you guys got the info ? by any chance …**

**could send me the paper kyc [too] is it possible so I just send that along with ur useful answer it makes response even better**

These messages indicate that FTX Group did in fact prepare "useful answer[s]" to Citibank's KYC questions, presumably handcrafted to avoid any scrutiny of the transactions, and that Mr. Pepin provided those answers to Citibank. Apparently, Deltec Bank responded to Citibank's KYC requests in this way on multiple occasion, as Mr. Pepin notes in later Telegram messages:

**Hey guys I'm going to send an email about Compliance of Citi question on transaction they should be basic but if could answer quickly so they are happy lol**

**I'm so fed up of compliance shit** 

160.     Deltec Bank knew that it should not be sharing sensitive compliance information

with the very clients that it is required to monitor, evidenced by the fact that at times, Mr. Pepin

would take these discussions offline. For example, in one Telegram message, Mr. Pepin writes to

the Alameda group:

**Can we do a quick talk?** 

**lol don't want to sound alarmist buy we have a quick issue I was made aware
if I can have your compliance guy or who ever you want so we can handle it**

**[…]**

**kinda urgent … could we hop on a quick call so I check stuff with yoyu
[sic] this as it is pretty important lol and rather explain by phone if possible**

At Mr. Pepin's suggestion, Deltec Bank and Alameda discussed this "pretty important"

compliance matter over the phone. Following that discussion, during which Deltec Bank

apparently shared another client's confidential banking information with FTX Group—which

counsel for Deltec has maintained throughout this litigation is expressly prohibited by Bahamian

law, *see e.g.*, ECF No. 471 at 45—Mr. Pepin reminded FTX Group to keep the conversation

confidential:

**Btw no info or anything to allow this client to be aware he is under scrutiny of
course :)**

161.     Other times, Deltec Bank assisted Alameda in papering over FTX Group's

compliance failures and suspicious activity. The Telegram messages reveal that, often, the

originating banks from which FTX customer funds were wired into FTX Group's Deltec accounts

required an invoice or legal agreement evidencing the purpose of the transaction. For some time,

Deltec Bank alerted FTX Group that such evidence was requested and asked that FTX Group paper

the transaction ad hoc. By early August 2020, this became too tedious for Deltec Bank, and Mr.

Pepin offered to create these sham invoices himself. For example, Mr. Pepin alerted the Alameda chat group:

> **there is 110 000 EUR under PROCESSING at Ibanera from [an FTX customer], will keep an eye on it, hopefully they won't ask question if they do well I'll be ready** 😊

But ask Ibanera (the originating bank) did, as Mr. Pepin reported to the Alameda chat group:

> **[Ibanera] are asking info about [the foregoing FTX customer] do you have the agreement linked to this deposit? so i can get [the wire] release asap?**

Mr. Salame answered:

> **so we don't generally have agreements as people agree to terms when opening the account … I can do an invoice though?**

But Deltec Bank had a better idea, which Mr. Pepin offered in the Alameda chat:

> **Idea :-) Send me a PDF of the term and condition + Invoice and I'll send**
>
> **[…]**
>
> **Now if you send me a XLS sample or whatever of invoice I can populate invoice myself later can do?**

Going forward, that is often how Deltec and FTX Group proceeded, whenever an originating bank required evidence to release a wire from an FTX customer account – Mr. Pepin would populate the template invoice with the FTX customer's name and the amount of the transaction.

162.    Such sham invoices were printed on FTX Group letterhead and lacking any other meaningful detail and were often, in fact, wrong, which Deltec Bank and Alameda would laugh about in their Telegram chat group. For example, Mr. Pepin once noted in the chat:

> **You [Alameda] did an error but I sent the invoice anyhow … you said "USD to be sent to Deltec when it is EUR** 😊 **lol**

163.    Deltec Bank delighted in participating in this scam, with Mr. Pepin joking when a FTX customer's wire was recalled due to an "Investment Scam."

**Look like he is scamming you guys instead**

164.     Upon information and belief, Deltec Bank offered to end run KYC, anti-money laundering, and other banking regulations and compliance for no other customer, save for perhaps its second largest, Tether, with whom FTX Group had close ties through Deltec Bank. Without Deltec Bank's assistance in dodging those regulations, FTX Group could not have achieved its unprecedented fraud.

**D.     Deltec Bank assisted FTX Group in siphoning FTX customer funds to Alameda through Deltec Bank Accounts.**

     **1.     *Deltec Bank manually allocated to FTX Group incoming wires of FTX customer funds from FTX customer accounts.***

165.     Alameda received customer deposits directly in its Deltec Bank accounts by wire transfer from FTX customers' own bank accounts.[27] Upon information and belief, FTX Trading and FTX US received transfers of funds into FTX Group accounts at Deltec Bank in the same way.

166.     To track these incoming deposits, Deltec Bank would send a list of incoming wire transfers to Alameda's settlements team, including Lena Ngoy and Carlos Mahomar in California, who together with Deltec Bank would identify which transfers had come from customers of FTX and into which Alameda or FTX Group account those transfers should go. This manual reconciliation process occurred virtually every business day during the course of Alameda's banking relationship with Deltec Bank.

167.     At first, Deltec Bank identified FTX customer deposits one by one in the Alameda Telegram chat. Mr. Pepin would initiate this process with a call for "money time," including as follows:

**MOOONNNEEEYYY TTTIIIIMMMMEEEE**

---

[27] Ex. A, Declaration of Caroline Ellison, 18.

[…]

**I HEAR A MONEY TIME IS HAPPENING HERE I THINK I NEED TO BE A PART OF IT**

[…]

**Hey Guys Moneyyyy time**

[…]

**Quick MONEYY TIME**

[…]

**I'm on a roll so let's do more MONEY TIME**

[…]

**I think according to rumor … that we have a some money time here did you hear the same rumor?**

[…]

**it is MONEY TIME INDEEDE [sic]**

[…]

**doing my best to hold the wall but such money tsunami is hard to handle dude**

[…]

**MONEY TIME dear friends 😊 thank you for being here 😆 and ready to enjoy money time 😆**

[…]

**MONEY PARTY THE BEST PARTY**

[…]

**MONEY MONEY MONEY TIME**

[…]

**MONEY TIME first let's play "is it yours?"**

[…]

**Money Time is always on time**

168.    Once Mr. Pepin had announced that Money Time was to begin, he would then list out wire amounts and originator names so that Alameda could claim wires as coming from FTX Customers, which Alameda would direct Greg to deposit in Alameda's' Deltec account. Mr. Pepin also often noted any description provided by the originator, including one wire for "investment and securities" and others for "electronics."

169.    In January 2021, going through each wire one by one over the Telegram group chat became too cumbersome, so Deltec Bank and FTX Group began to reconcile the transfers by way of a Google spreadsheet. Certain Alameda team members remarked to Mr. Pepin that the spreadsheet was "beautiful," to which Mr. Pepin replied:

> I won't call it beautiful but the goal is to make your [FTX Group's] life easier and there is tab where you can put [the wires] you are looking for … And I may put some unallocated to myself on one of those tabs  …
>
> And I have put a column (deposit) so you [FTX Group] can mark when processed

170.    Deltec Bank took extra steps to help Alameda track its siphoning of FTX customer funds through its Deltec Bank accounts by way of the Google spreadsheet. According to the Telegram messages, Mr. Pepin would regularly tally up the "exact amount of deposit tickets from [FTX] users" and "highlight[] them in yellow … for Alameda's convenience."

171.    Deltec was indeed at FTX Group's beck and call, and Mr. Pepin would often joke that no other bank was willing to provide FTX Group such hands-on service. For example, Mr. Pepin, while working through reconciliation of the Google spreadsheet, Mr. Pepin remarked:

> what Silvergate [Bank] don't work at 10:38 pm and postpone their evening movie to review wire?

Delaney Orelenas, who worked for FTX Group from California, replied:

> **Lol Silvergate [Bank] wont review our missing wires we have to search all by ourselves**

172.     So devoted was Deltec Bank to servicing FTX Group accounts that, according to his Telegram messages, Mr. Pepin "add[ed] to [his] evening routine" checking that FTX Group did not miss any incoming daily wire of FTX customer deposits. Mr. Pepin would often message the Alameda Telegram group before he went to bed each night, to confirm that the FTX Group needed nothing more from him that day.

> **2.     *Deltec Bank manually allocated to FTX Group incoming wires of FTX customer funds from other FTX Group accounts.***

173.     Just as Deltec Bank knew that FTX customer funds were directly wired from their personal accounts to FTX Group accounts at Deltec Bank, Deltec Bank knew that FTX Group was also transferring FTX customer funds to those accounts by way of other FTX Group accounts.

174.     Alameda, for example, frequently wired funds into its account at Deltec Bank from accounts held or controlled by Alameda in the United States, including from Prime Trust in Nevada, Signature Bank in New York, and Silvergate Bank in California.[28]

175.     Deltec Bank was particularly familiar with Alameda's accounts at Silvergate Bank, as Mr. Pepin processed incoming and outgoing wires to and from those accounts. Routinely, and Mr. Pepin would often comment in the Telegram chat how slow Silvergate Bank took to release outgoing wires from Alameda's account:

> **i think u need to ping silvergate more … 😊 they are slow to release :D**
>
> **[…]**

---

[28] Ex. A, Declaration of Caroline Ellison, ¶ 16.

> **hey guys any update from our belove[d] Silvergate friends?**
>
> **[…]**
>
> **lol don't tell me silvergate is slower than us under hurricane preparation and skeleton team lol**

Mr. Pepin also apparently spoke with Silvergate bankers in processing these wires, as he reported on the Telegram chat:

> **I tried to tell silvergate to be faster on their wire yesterday lol I guess it didn't work 🙂 lol**
>
> **[…]**
>
> **Fun fact I'm talking to the SVP of Digital Solution at silvergate at 1PM ha ha ha … they asked to talk so curious to find out why it is one those weird talk lol I guess**

176.    By 2022, Deltec Bank would process incoming and outgoing wires between Alamada's Silvergate and Deltec Bank accounts on a near daily basis. These wires totaled between 200 million U.S. dollars and $1 billion U.S. dollars on a regular basis.

177.    Deltec Bank was just as familiar with Alameda's North Dimension accounts at Silvergate Bank, and the Telegram messages demonstrate that Deltec Bank knew exactly what Alameda used those accounts for—in June 2021, Mr. Pepin queried the Alameda Telegram group:

> **North Dimension Inc? what is North Dimension Inc?**

Mr. Salame responded only that he and Mr. Pepin should discuss the matter offline and directed Ms. Ngoy to route this particular transaction through Alameda, as Mr. Salame explained:

> **have to run ND through compliance with Deltec first**

Mr. Pepin assured the group that Deltec Bank would have no issue with servicing transfers from Alameda's North Dimension accounts, replying:

> **okidoki … nd we will route it through channel that don't reject … give me the instruction … 😉**

178.   Deltec Bank pulled through on Mr. Pepin's assurances and continued to process incoming wires from North Dimension and allocating those funds to Alameda's Deltec Bank account. For example, in December 2021—more than six months *after* Deltec Bank learned of the North Dimension account—Mr. Pepin notified the Alameda Telegram chat that:

> **we received a woire [sic] of 499 800 usd on the 7th from North Dimension ([w]hich is you guys) can you tell me by any chance who to allocate with as there isn't the precision on the reference field**

Such messages show the Deltec Bank knew that North Dimension was a front for Alameda to siphon FTX customer funds.

**3.   *Deltec Bank executed internal transfers of customer funds between FTX Group accounts and FTX customer accounts at Deltec Bank.***

179.   Over time, certain of FTX Group's larger customers opened their own accounts at Deltec Bank so that those customers could transfer deposits internally to FTX Group accounts. Such transfers were initiated by way of a Telegram group chat between the customer, FTX Group and Deltec. It was clear in these messages that the FTX customer thought he or she was making a deposit into their FTX account, even though the customer instructed Deltec Bank to transfer the funds to Alameda's Deltec Bank account. For example, one customer repeatedly instructed Mr. Pepin as follows:

> **Hi Greg, please pay to Alameda another 2m usd depo ticket created on FTX side**
>
> **[…]**
>
> **Good morning Greg, when u can please pay 7m to Alameda for a new deposit … ticket inserted on FTX platform**
>
> **[…]**
>
> **Hi Greg please pay to Alameda 5m usd deposit ticket inserted on the FTX side**
>
> **[…]**

**Greg can we still send usd directly to Alameda/FTX?**

**[…]**

**Good morning greg, please deposit to FTX 16, 950, 000 usd**

180.     By the same method, customers would withdraw deposits from their FTX accounts.

For example, one such customer messaged its Telegram chat with Deltec Bank and FTX Group:

**Hi how can we withdraw money to deltec from FTX?**

**[…]**

**Greg, how can we withdraw fiat from our FTX account?**

Lena Ngoy, from Alameda's Settlements Team in California replied:

**Can just put up a withdrawal ticket and put in the Deltec Chat in the info then we can move the funds via chat like we do for deposits**

**[…]**

**Post the amount, and request a withdrawal via the [FTX] site … once we approve, [Greg] can move it**

181.     Deltec Bank was necessary to these internal transfers, as the transfers could not be executed without Mr. Pepin's involvement. That was not without some advantage—with Mr. Pepin directly involved in these transfers, the transfers could be executed even when other banks were closed.

**4.     *Deltec Bank siphoned FTX customer funds to Alameda for the misuse at center of the FTX fraud.***

182.     Notwithstanding its knowledge that FTX customer funds were deposited into Alameda's Deltec account, by way of wire from the FTX customer's personal bank account or through FTX Group accounts, such as North Dimension, and by internal transfer between the FTX customer's account and FTX Group accounts at Deltec Bank, Deltec Bank assisted in siphoning

those FTX customer deposits to Alameda anyway.

183.    Sometimes, this would occur by way of the transfers outlined above. Other times, Deltec Bank would transfer funds from FTX Trading and/or FTX US accounts to the Alameda account at Deltec Bank. Mr. Pepin would manually effect such transfers. For example, in May 2022, Mr. Pepin notified the Alameda Telegram chat:

**Hey guys I'm doing an internal of 700m from FTX → Alameda**

Deltec Bank executed these transfers despite knowing that FTX customers were transferring deposits directly into FTX Group accounts, often by way of internal transfers that Mr. Pepin himself would execute.

184.    But Deltec Bank did not stop there. After siphoning billions of dollars from FTX customers to Alameda's Deltec Bank account, Deltec Bank would then promptly wire those accounts out of Deltec Bank to Alameda's other bank accounts or to fund Alameda's speculative investments. For example, immediately after sending the message above to the Alameda Telegram chat, Mr. Pepin followed that:

**And then I'm sending via swift 1bn to your alameda account at silvergate so you should see 1bn coming soon good good**

185.    Though billions of dollars' worth in currencies of all kind flowed into and out of the Alameda Deltec Bank account on a daily basis, Alameda never maintained a balance of more than a few million dollars and never for a substantial period of time. So rapid were these enormous inflows and outflows of these transfers that Alameda employees could not keep up with the balance in the account and repeatedly had to ask Mr. Pepin to update them as to their cash on hand.

186.    Just as frequently, Alameda's Deltec Bank account lacked sufficient funds to cover FTX customer withdrawals and, no later than sometime in 2020, Mr. Pepin would have to message the Alameda Telegram chat to ask that Alameda promptly send over money to prevent any

overdraft. For example, in June 2020, Mr. Pepin messaged the Alameda Telegram chat:

> **we need 200k cash lol as you are short 200k for the 400k … confirm when you guys push it as delchain is annoying me with the settlement 😊 lol**

Less than a month later, Mr. Pepin again messaged the Alameda Telegram chat looking for cash:

> **not enough cash for delchain deal[29]**

At the end of 2020, Alameda still lack sufficient funds to cover FTX customer withdrawals, with Mr. Pepin messaging in December:

> **hey guys for [FTX customer] withdrawal [w]e may need a little bnit [sic] of cahs [sic] for this one**

187.    FTX Group's lack of sufficient funds in its Deltec Bank accounts persisted through 2022 and was not limited to the Alameda account. In February 2022, Mr. Pepin alerted the Alameda Telegram group that both the Alameda and FTX accounts were at risk of overdraft:

> **Helloooooooo … we need some cahs [sic] likely …. at Alameda or FTX … (recently [FTX customer] did a lot of redemption so hard to plan but I would say 100-150m to be on the safe side)**
>
> **[…]**
>
> **Lena [Ngoy] you send today the 300m? or later? As we won't have liquidity**

Again, in March 2022, Deltec Bank was looking for cash in the FTX Group accounts, and Mr. Pepin messaged the Alameda Telegram chat:

> **We may need additional cash to cover all the withdrawal of delchain and [another FTX customer]**

188.    Not once did Deltec Bank stop, much less question, the massive outflows of FTX customer funds from FTX Group accounts at Deltec Bank. Deltec Bank instead routed those funds

---

[29] These Telegram messages show that Delchain, Deltec International Group's digital asset management arm, was counterparty to transactions with Alameda through accounts at Deltec Bank, and knowingly appropriated FTX customer funds to the benefit of Deltec International Group and Mr. Chalopin, its majority owner.

to Alameda's accounts at other banks beyond the FTX customers' reach and it did so even *after* initial reports of Alameda's insolvency that ultimately lead to FTX Group's collapse.

189.    On November 4, 2022, Mr. Pepin expressly acknowledged Deltec Bank's awareness of Alameda's insolvency in a direct message through Telegram to Caroline Ellison, stating:

> **I told Ryan [Salame] … there is people coming to me about alameda insolvency shit. I'm pushing back and say its BS. However seems to grow a bit those FUD. Are you ok if I come ou[t] more publicly (attacking back people on Twitter when I see) and divert [attention] with people ping me?**

190.    Notwithstanding Deltec Bank's knowledge that Alameda was insolvent, and that billions of dollars in FTX customer funds were likely forever gone, on November 8, 2022—four days after he messaged Caroline Ellison "about alameda insolvency shit," Mr. Pepin messaged the Alameda Telegram chat to offer:

> **Hey Guys, trying to get the instruction through … so you guys are ok with me moving 180M usd equivalent from FTX to Alameda**

191.    Without hesitation, and just days before the FTX collapse, Deltec Bank moved those funds from FTX to Alameda through their Deltec Bank accounts, as Mr. Pepin shortly thereafter confirmed:

> **ok It is in the queue, will be done tomorrow probably but consider it done in case you want to use this 180m**

192.    That was not the first time that Deltec Bank prioritized the interests of FTX Group over other customers. In May 2022, when crypto markets abruptly crashed and Alameda's lenders began to demand repayment, Alameda sought to redeem large amounts of its crypto assets quickly and through Deltec Bank; the faster Alameda could redeem the crypto assets, the smaller loss it would suffer, as the value of those assets plummeted. To facilitate those mitigation efforts, Deltec Bank secretly frontloaded Alameda's redemption wires, so that Alameda could outpace everyone

else in redeeming the assets. The crash began on May 9, 2022. On May 11, 2022, Mr. Pepin

messaged the Alameda Telegram group:

> **hey guys based on what i see of people looking to redeem especially if you want funds [to] be transfer[ed] out (and i know how slow my ops team is) friendly advice… line up your redeem early so i can get you in front of everyone line**
>
> **(between us :))**
>
> **[…]**
>
> **what i will do is the following if you post them [when] I'm asleep**
>
> **i'll post yours [a]nd then priorities [sic] when i wake up**
>
> **before acknowledging any other ones**
>
> **so you ae at the front of the row …**
>
> **as i presume that's why you want lol** 😛
>
> **for the round Tether → Deltec → Silvergate**
>
> **[…]**
>
> **(of course stay between us please)**
>
> **Tomorrow i'll pretend i'm not available for 2-3h in the morning so i'll process all yours before everyone else that may have occur overnight. It allows to have it line up first on ops side for release outside … so you guys are first in line up on ops :p**
>
> **gives u a tiny hedge :p**

193.    Deltec Bank's processing (and special treatment) of the "Tether → Deltec → Silvergate" transfers for Alameda was not isolated to the May 2022 crash. For years leading up to the FTX's collapse, Deltec occupied a critical middle ground in a market manipulation scheme by FTX Group and Tether which churned through billions in FTX customer fund and the details which, until now, have yet to come to light.

**E.** **Alameda, Tether, and Deltec entered into a manipulative scheme.**

**1.** ***Alameda created and redeemed Tether's stablecoin directly through accounts at Deltec Bank.***

194.    It was no coincidence that Deltec Bank's two largest clients were FTX Group and Tether. FTX Group opened accounts at Deltec Bank in part because Tether and Bitfinex held accounts at Deltec.[30] Tether is a crypto company which mints the stablecoin Tether ("USDT"). A stablecoin is a cryptocurrency whose value is designed to be equal to the value of a fiat currency. For USDT that fiat currency is the U.S. dollar. Bitfinex is another cryptocurrency exchange platform over which USDT is bought and sold.

195.    USDT was one of the most popular cryptocurrencies at the time, and Alameda often engaged in trades for which it created and redeemed USDT through Tether and/or on the Bitfinex exchange. To create USDT, Alameda sent U.S. dollars to Tether for the purchase of an equivalent amount of USDT.[31] To redeem USDT, Alameda sent USDT to Tether for the exchange of an equivalent amount of U.S. dollars. Alameda also purchased and sold USDT and other cryptocurrencies from or to Bitfinex.[32]

196.    By opening an account at Deltec Bank, Alameda could more easily create and redeem USDT through Tether, and deposit and withdraw cryptocurrencies from Bitfinex.[33] This was in part because Alameda could internally transfer funds from Alameda's Deltec Bank account, in which Alameda commingled FTX customer deposits and Alameda's own funds, to the Tether and Bitfinex accounts at Deltec Bank, and vice versa, without requiring a wire or other external transfer process.[34]

---

[30] Ex. A, Caroline Ellison Declaration, ¶ 20.
[31] Ex. A, Caroline Ellison Declaration, ¶ 21.
[32] Ex. A, Caroline Ellison Declaration, ¶ 21.
[33] Ex. A, Caroline Ellison Declaration, ¶ 20.
[34] Ex. A, Caroline Ellison Declaration, ¶ 22.

197.    For example, when Alameda wanted to create USDT, it would transfer an equivalent amount in U.S. dollars from Alameda's Deltec Bank account to Tether's Deltec Bank account. Alameda would then sell the USDT on other exchanges for U.S. dollars and deposit the proceeds in Alameda's Deltec Bank account.[35]

198.    When Alameda wanted to redeem USDT, it would initiate a redemption transaction on Tether's website, send the USDT to an address controlled by Tether, and Tether would in turn transfer an equivalent amount of U.S. dollars from Tether's Deltec Bank account to Alameda's Deltec Bank account.[36]

199.    Similarly, when Alameda wanted to withdraw U.S. dollars from its Bitfinex account, Bitfinex would internally transfer that amount in U.S. dollars from Bitfinex's Deltec Bank account to Alameda's Deltec Bank account. Alameda, Tether, and Bitfinex regularly engaged in these transfers from the time Alameda opened its Deltec Bank account.[37]

200.    Telegram messages between Deltec and Alameda suggest that often, if not always, when Alameda redeemed USDT or withdrew from Bitfinex, the proceeds would first flow to Deltec Bank's account at Mitsubishi UFJ Trust and Banking Corporation ("MUFG"), located in the Southern District of New York[38] and from which U.S. authorities seized funds belonging to Deltec Bank, in June 2023, amid an investigation into money laundering, wire and bank fraud.

201.    For example, in May 2022, Alameda redeemed $200 million and $1.3 billion USDT in a single day. Mr. Pepin remarked in the Alameda Telegram chat:

**Single largest outgoing wire record that you are about to break here btw …
for deltec history … will have to frame you the swift 😊**

---

[35] Ex. A, Caroline Ellison Declaration, ¶ 23.
[36] Ex. A, Caroline Ellison Declaration, ¶ 24.
[37] Ex. A, Caroline Ellison Declaration, ¶ 25.
[38] The Telegram messages also suggest that Deltec Bank holds accounts at Bank of America, as Mr. Pepin makes several references to a "BofA account."

When the wire was taking some time to hit Alameda's Silvergate account, Mr. Pepin confirmed:

> **All was released… from MUFG per ops … so 1.5 bn (1.3bn + 200m) is on your way and should hit before end of day… 1.3bn will tkae [sic] longer probably size reason…**

202.    The next day, Alameda redeemed $900 million, $500 million, and $600 million USDT in a single day (around the time when crypto suffered a crash and Alameda's lenders began demanding payments on its loans). Mr. Pepin again confirmed in the Alameda Telegram chat:

> **Oki cool … should be release[d] any moment now from MUFG**
>
> **[…]**
>
> **2bn in one day nice**
>
> **3.75 bn in 2 days 🙂 you guys are holding records :p**

203.    Accordingly, Deltec Bank was directly involved with most, if not all, of the transfers between Alameda, Tether, and Bitfinex at Deltec Bank. Every time Alameda wanted to initiate a transfer from Alameda's account to an account held by Tether or Bitfinex, Alameda would first send a Telegram message to a group chat between Alameda, Tether, and Deltec Bank.[39]

204.    Mr. Pepin participated in the Alameda-Tether Deltec Telegram chat, along with Giancarlo Devasini and Paolo Ardoino, Tether's CEO and CTO, respectively, and Caroline Ellison, Ryan Salame and members of Alameda's Settlement Team, including, more often than not, Ms. Ngoy and Mr. Mahomar in California.[40] Mr. Salame seems to have been the mastermind behind the scheme on Alameda's end, as he had a long history of minting USDT on an "institutional scale" and initiated most of the Tether transactions in the Alameda-Tether-Deltec Telegram chat.

---

[39] Ex. A, Caroline Ellison Declaration, ¶ 27.
[40] Ex. A, Caroline Ellison Declaration, ¶ 26.

205.    Neither Alameda nor Tether or Bitfinex could initiate these internal transactions with Tether or Bitfinex without Deltec Bank's material assistance. Deltec Bank's systems were not automated and transfers between Alameda, Tether, and Bitfinex needed to be effected or approved manually. Indeed, the parties often had to wait until Mr. Pepin was awake before any transfers could be made on a given day, because the transactions required Mr. Pepin's direct involvement.[41]

206.    Alameda necessarily used FTX customer funds to create and redeem USDT through its accounts at Deltec Bank, as, for most of the time during which these transactions were made, Alameda did not have any liquid assets other than FTX customer funds. Though Alameda owned large quantities of the FTX-minted cryptocurrencies FTX Token ("FTT") and Serum, neither FTT nor Serum were truly liquid assets. Alameda held most of the total supplies of those tokens, such that if Alameda attempted to sell its holdings in FTT and Serum, the value of the tokens would drop significantly, and the value of those tokens on Alameda's books was only illusory. No later than by the fall of 2021, Alameda's balance of assets and liabilities was negative, excluding Alameda's holdings in FTT and Serum.

**2.    *Alameda purchased billions of dollars in USDT, artificially inflating Tether's market capitalization and Deltec Bank's deposits.***

207.    In total, Alameda minted more than $40 billion USDT through this scheme, encompassing nearly half of USDT in circulation at the time. That was no accident. As the parties to the Alameda-Tether-Deltec Telegram chat freely recognized, the purpose of the scheme was to pump the coffers of Tether and Alameda, and nothing more. In early 2020, Mr. Devasini asked an Alameda trader party to the Alameda-Tether-Deltec Telegram chat:

---

[41] Ex. A, Caroline Ellison Declaration, ¶ 27.

**What's your role in this madhouse?** 😉

To which, the Alameda trader replied:

**Make money for Sam [Bankman-Fried] I suppose.**

Ryan Salame then added:

**money for sam has traditionally = money for Giancarlo [Devasini] so all around good**

Mr. Devasini agreed:

**we are a big family … we will conquer the world**

208.    Upon information and belief, Alameda and Tether profited from the scheme as follows. Alameda would create USDT in amounts and at times that would inflate the market price of the stablecoin. Alameda would promptly sell the USDT in the market, at several basis points above the purchase price. Tether, in turn, would receive U.S. dollars for stablecoins it minted from nothing.

209.    Deltec Bank, too, stood to gain tremendously from the scheme. Banks primarily make money by lending out customer deposits at interest rates higher than paid on the deposits (the "spread"). Tether and FTX Group were Tether's largest clients., and in addition to helping Deltec Bank attract new customers, particularly in the crypto industry, the larger the deposits held by Tether and FTX Group at Deltec Bank, the more money Deltec Bank could make off the deposits. For these reasons, upon information and belief, Deltec Bank was happy to get in on the scheme.

210.    With green in their eyes, Tether, Alameda, and Deltec kept close tabs on the scheme as it progressed.

**[Giancarlo] what are we doing for 10B? Would love an address to ship some gifts if possible :)**

74

Mr. Devasini responded only:

**still a long way to go …**

211.     And a long way they went. More often than not, Alameda's purchases would push the issuances of USDT into the next multiple of billions. Tether, Alameda, and Deltec celebrated whenever such milestones were reached. For example, when Alameda minted the 10 billionth USDT in July 2020, Mr. Devasini messaged the Alameda-Tether-Deltec Telegram group:

**On a positive note your last issuance (15M) took the total number of USDT in circulation to 10 bn, thanks guys!**

212.     Just one month later, in August 2020, Mr. Pepin happily reported to the Alameda:

**Tether is 3m away of 12bn will you be the one crossing 12bn lol**

Lena Ngoy, of Alameda's Settlement Team responded:

**Let's do a 5MM creation!**

Alameda succeeded in crossing the 12 billion USDT threshold to Mr. Devasini's delight in the Alameda-Tether-Deltec Telegram chat, where he offered his congratulations:

**Congrats on always printing the round one, you did 10, 11 and now 12**

213.     Before the end of the month, Alameda purchased the 13 billionth USDT, too, again to Mr. Devasini's delight, which he expressed in the Alameda-Tether-Deltec Telegram chat:

**according to my calculation you guys did make it to 13bn with the above wire, I am pleased to see that the big tradition of Alameda breaking the round number is going on**

Mr. Pepin was particularly impressed with the 13 billionth issuance, noting in the Telegram chat:

**how fun 😊 and with 70M you just did the 2nd biggest single issuance ever and the single biggest single issuance in 2020**

A fact which, Lena Ngoy added:

**Ryan [Salame]'s late birthday present**

214.    Happy as he was with the 13 billionth issuance of USDT, Mr. Devasini focused the group's attention on the future, noting in August 2020 in the Alameda-Tether-Deltec Telegram chat that the group's goal should be:

**20bn by xmas**

To which Mr. Salame dutifully replied:

**we'll do our part :)**

And Mr. Devasini graciously acknowledge:

**you are doing great guys … you guys rock!**

215.    Alameda overdelivered on its promise. By December 31, 2020, USDT in circulation surpassed 21 billion with Alameda's creations. Mr. Devasini expressed his gratitude in the Alameda-Tether-Deltec Telegram chat:

**21bn1 … Alameda made it again! … I love you guys!**

Lena Ngoy, of Alameda, responded:

**Feeling is mutual!**

216.    Alameda was unwavering in its creation of USDT in furtherance of the scheme and each threshold, Mr. Devasini celebrated the achievement in the Alameda-Tether-Deltec Telegram chat:

**you crossed the 25 bn line, thanks for taking us there!**

**[…]**

**with today's issuance you broke the 29th billion btw, the big tradition of Alameda breaking the round number!**

**[…]**

**you just broke the 30th billion**

**[…]**

**38bn, the big tradition of you breaking the round number is being respected**

**[…]**

**yes sir, lets break the 70th bn**

217.    Alameda's creations were unprecedented not only in the number of USDT Alameda put into circulation, but also in the U.S. dollar amount of each creation. Without delay, Alameda began to put up $100 million U.S. dollars per ticket to create USDT, often with the express purpose of manipulating the value of USDT. For example, in December 2020, Mr. Salame notified the Alameda-Tether-Deltec Telegram chat that Alameda would create USDT to outpace the value of Bitcoin at the time:

**ok putting up a 100m creation! Need to beat BTC to 25k**

218.    Mr. Devasini happily welcomed creation and resultant inflation in value of USDT, noting in the Alameda-Tether-Deltec Telegram chat:

**God bless you all Alameda bunch … the world would be a much worse place without you**

219.    Also unprecedented was the frequency with which Alameda created hundreds of millions of U.S. dollars' worth of USDT. Mr. Devasini one time noted that Alameda was "Insatiable" in its creations of USDT, to which Mr. Salame replied "this is your beast" and Mr. Salame in turn joked:

**gotta feed da beast**

220.    Similarly, in November 2020, an Alameda trader commented in the Alameda-Tether-Deltec Group:

**You must feel like a dealer sometimes with how eager we are for the tethers I bet**

Mr. Devasini responded, "I just wish you didn't wait until you have no more before filing up again," evidencing that Alameda immediately dumped the USDT is created at inflated purchase prices on the market.

221.    The Alameda-Tether-Deltec Telegram chat permitted Alameda and Tether to transact when ordinary market participants could not and the parties often joked about Alameda's special advantage in that regard. For example, in July 2021, after Alameda created 100 million USD in USDT, Mr. Salame commented:

> **I'm already preparing the "alameda has a deltec account" tweet for the "How yOu ISssuE oN THe WEekeNd" tweet**

222.    In this way, Alameda routinely emptied its bank accounts to create USDT, a fact of which Tether and Deltec were aware, with Mr. Salame speculating in a Telegram message with Deltec upon learning that Silvergate Bank wanted to discuss Alameda with Deltec Bank in August 2020:

> **[Silvergate Bank wants to ask Deltec Bank] "Why is everyone sending all the money from our bank to your bank?"**

And with Mr. Pepin responding:

> **Let me present you [Tether] Lol**

223.    The round dollar figure amounts with which Alameda created Tether drew some scrutiny to the scheme, as the Mr. Salame joked in the Alameda-Tether-Deltec Telegram chat:

> **Should we do a random number instead of an even number to calm the annoying people on twitter or do we not care about them anymore**

Mr. Devasini concluded the attention was good for the inflation of USDT's market price, noting in the chat:

> **I believe if you do 600 they will call us scammers and that's good, because the more they bad mouth us the more Tether becomes the one and only**

**[…]**

**you know these kids in their parents' basements … they make irrelevant things like tether.co site important … as if anybody but us (and Bitfinex'd) would ever go there ….**

224.    Alameda, Tether and Deltec similarly joked about the many investigations of Tether by government agencies focused primarily on Tether's claim that USDT is backed by USD, one-to-one. To ward off these investigations, in November 2018, Deltec Bank provided an assurance letter stating that USDTs were fully back by cash, one U.S. dollar for every USDT. However, the next day, Tether began to transfer hundreds of millions in funds out of its Deltec Bank account, such that within 24 hours, Deltec Bank's assurance letter was no longer true. This and other activity by Tether prompted an investigation by the New York Attorney General into these and other misrepresentations and Tether's trading activity with New Yorkers.[42] In February 2021, the New York Attorney General and Tether settled these claims, and Tether paid more than $18 million in penalties. In response to this settlement, Mr. Salame joked the Alameda-Tether-Deltec Telegram group:

**Wait Tether was backed the whole time!?**

Mr. Pepin piped in:

**It is just a number on a ledger … 🥴**

And Mr. Devasini replied:

**kind of, but but but**

225.    Later, in October 2021, Tether and the Commodity Futures Trading Commission

---

[42] *See, e.g.*, Press Release, New York State Attorney General, Attorney General James Ends Virtual Currency Trading Platform Bitfinex's Illegal Activities in New York (Feb. 23, 2021), https://ag.ny.gov/press-release/2021/attorney-general-james-ends-virtual-currency-trading-platform-bitfinexs-illegal.

settled similar claims for more than $40 million.[43] Mr. Salame again joked with the Alameda-Tether-Deltec Telegram group:

> **Congrats paolo and [Giancarlo]! I'm sure your adamant haters will come up with new bullshit but happy to see the wins**

Mr. Devasini responded only:

> **no wrongdoing admission, that is all that counts**

226.    But the Alameda-Tether-Deltec group was undeterred by these investigations and media scrutiny, because, as Mr. Devasini explained in the Alameda-Tether-Deltec Telegram chat:

> **they belong to our enemies they are scared of us because wgmi ["We Gonna Make It," the crypto traders' rallying cry]**

Mr. Salme replied:

> **wgmi**

227.    Make it, Tether did. It is now estimated to be worth $9 billion derived exclusively from its issuance of stablecoins like USDT. Mr. Devasini freely admitted in the Alameda-Tether-Deltec Telegram chat that Tether's enormous market capitalization was the result of Alameda's USDT creations (funded by FTX customers). In April 2021, Mr. Devasini shared a GIF image with the Alameda-Tether-Deltec Telegram chat group and captioned the image:

> **It's me and Greg [Pepin] on your back 😊**

Mr. Salame similarly recognized that the relationship was symbiotic, noting:

> **Though it was [me] on your back haha**

228.    For its part, Tether did attempt to carry Alameda on its back in the lead up to the FTX collapse, so that their USDT inflation scheme could continue. In May 2021, when a crypto

---

[43] *See, e.g.*, Press Release, Commodity Futures Trading Commission, CFTC Orders Tether and Bitfinex to Pay Fines Totaling $42.5 Million, (Oct. 15, 2021), https://www.cftc.gov/PressRoom/PressReleases/8450-21.

crash wiped $1 trillion in market value in a single week, Tether did what it could to flush Alameda with short term capital to carry it through the downturn. With his own interests in mind, Mr. Devasini noted in the Alameda-Tether-Deltec Telegram chat:

> **I'm glad today we sent you in one day more money that you ever sent to us in one day, it's a good feeling to be finally revenged 😉 … always a pleasure …"payment instructed to Greg, have a great weekend guys, try to rest a bit as it has been a tiring week**

But Tether was not the only party to the scheme keeping Alameda afloat. Deltec Bank allowed Alameda to borrow up to $2 billion at a time, so that the scheme could continue, and Alameda, Tether, and Deltec Bank could continue to realize enormous cash flows at the expense of FTX customers' deposits.

> **3.      *Deltec Bank extended Alameda a secret line of credit to fund the Tether transactions.***

229.      Beginning no later than January 2021, Deltec Bank began to allow Alameda a three-day grace period to transfer U.S. dollars to settle Alameda's purchase of USDT. Deltec Bank allowed Alameda the *de facto* line of credit for most of 2021 and into 2022, until FTX's collapse.

230.      The grace period appears to have been Deltec Bank's idea. On January 5, 2021, Mr. Pepin messaged the Alameda Telegram chat:

> **any issuance [of USDT] today can be paid [Jan.] 7 or 8 your choice (in case you need capital as we cover the first tranch [sic] today of existing line – FYI :))**

231.      The very next day, on January 6, 2021, Mr. Pepin offered again on the Alameda Telegram chat:

> **Whatever you would push now for Tether would be value tomorrow and payout for you decided between [Jan.] 7-8-11-12 … so when is the settlement date on the one you'll issue now?**

Alameda responded:

**This issuance will be for the 12th if it goes through**

232.     Alameda then took advantage of the three-day grace period so regularly that it served as a *de facto* revolving line of credit totaling hundreds of millions of U.S. dollars. T+3 was not a hard and fast, and Mr. Pepin often asked *Alameda* when they wanted to settle amounts due. For example, on January 27, 2021, after Alameda submitted another ticket for USDT totaling 100 million U.S. dollars, Mr. Pepin asked the Alameda Telegram chat:

**Well what delay you want**

When an Alameda trader opted to "target" February 1, 2021, Mr. Pepin offered:

**well if you want to pay later than feb 1 that's ok**

233.     On January 28, 2021, Alameda created  225 million USD's worth of USDT, and Mr. Pepin asked in the Alameda Telegram chat:

**when do you want to repay anyhow what date works for you guys? … Up to you**

234.     By February 4, 2021—just one week after Mr. Pepin initially offered the *de facto* revolving line—Alameda had "drawn" $1 billion, which Mr. Pepin brought excitedly to Alameda's attention on Telegram:

**So total open 1bn 🙂is it symbolic number or something lol?**

235.     By February 9, 2021—just five days later—Alameda's borrowing doubled, as Mr. Pepin documented in the Alameda Telegram chat:

**And here ladys [sic] and gentlemen … we broke 2bn … (for 24h since we expect 200 000 000 tomorrow)**

236.     Mr. Pepin, who was deputy CEO of Deltec Bank at the time, had not gone rogue in offering the *de facto* line of credit to Alameda; he cleared the arrangement with Deltec Bank's other chief officers and routinely ran the transactions by his "treasury team." On January 27, 2021,

Mr. Pepin explained in the Alameda Telegram chat that, after toying with the structure of the deal for a few days:

> **I found a solution it seems that the CFO told me over the phone doesn't seem to create a challenge (She will double check but it seems that on top of her head it works) … Now I assume the CFO that agreed with my loophole (from the top of her head) will confirm later but she is pretty confident it works.**

Together, Mr. Pepin and Deltec Bank's CFO determined that the "new solution" would be as follows:  while any "line" opened in the last four business days of any month need to not be closed until the end of the following month, all "lines" opened must be closed by the end of each quarter and the end of each fiscal year. Mr. Pepin would frequently follow up in the Telegram group chat to remind Alameda to settle these transactions, typically by the end of each of quarter.

237.    Upon information and belief, the three-day grace period was not offered to Deltec's other clients, and Mr. Pepin repeatedly requested that Alameda not tell anyone about the arrangement. Upon information and belief, Deltec never provided official terms or documentation for the three-day grace period.

238.    This *de facto* line of credit greatly enabled Alameda's operations and expanded its reach. Often, Alameda purchased hundreds of millions of U.S. dollars' worth of USDT—often exceeding $1 billion at a time—and Deltec's *de facto* line of credit tremendously increased Alameda's capital base by allowing Alameda to execute those transactions, receive the USDT, and then not pay for the USDT until three days later. USDT tended to trade at a premium, such that Alameda could sell the USDT for a few basis points above its purchase price within the three-day grace period and before having to fund the purchase in Tether's Deltec Bank account. Alameda used the proceeds from those trades to pay third-party lenders and other debts.

239.    The line of credit served Deltec Bank's interests, too, as it enabled Alameda to route enormous caches of money through Deltec Bank accounts, which were used to purchase USDT

from Tether and further pack the Tether Deltec Bank account with huge deposits of U.S. dollars.

**F.      Mr. Chalopin, through Relm Insurance, insured FTX Group entities and pitched Alameda on a new insurance scheme**

240.    In April, 2020, Deltec International Group, Deltec Bank's parent company, launched Realm Insurance, and supplied its underwriting capacity. Reportedly, Relm Insurance was Mr. Chalopin's brainchild, which he created to offer insurance coverage to digital assets and the cannabis and hemp industries.

241.    Relm Insurance moved quickly to insure "the vast majority of the crypto industry," FTX Group included, as Mr. Chalopin acknowledged on an episode of "The Future of Money" podcast hosted by Henri Arslanian and released on June 29, 2022. Specifically, Relm Insurance extended policies to FTX US and FTX Australia Pty Ltd. totaling more than $15 million. Upon information and belief, premiums and other payments for these policies were made with FTX customer funds.

242.    Obtaining insurance coverage was important to the FTX Group's rise for a number of reasons, including enhancing its credibility and reputation, and instilling confidence in business partners and clients. FTX Group certainly appreciated the benefits of insurance coverage—in television commercials, through interviews, on Twitter, and in other publications, FTX Group repeatedly peddled itself as "the safest and easiest way to buy and sell crypto" and SBF repeatedly promised that "our users' funds and safety come first." In highlighting FTX Group's purported safety, SBF and other FTX Group executives represented that it had insurance. For example, FTX US President once tweeted "direct deposits from employers to FTS US are stored in individually FDIC-insured bank accounts in the users' names" and "stocks are held in FDIC-insured accounts." While that was untrue, and the FDIC issued a cease-and-desist letter to FTX Group in August 2022—FTX Group's coverage from Relm Insurance allowed it to tout such a veneer of safety.

243.    By the time Deltec International Group launched Relm Insurance in April 2020, and while it extended coverage to FTX US and other FTX Group entities thereafter, it had learned of Alameda's siphoning of FTX customer deposits and its manipulation of USDT with Tether, as Deltec Bank was a critical player in both schemes. Moreover, upon information and belief, Relm Insurance did even more thorough diligence in addition to what it gleaned from its affiliate, Deltec Bank because, as Mr. Chalopin has explained, "Risk in insurance you cannot go blindly, in banking you can, but insurance you can't," and Relm Insurance learned of FTX Group's misconduct, outlined herein. Nevertheless, Relm Insurance, at the direction of Mr. Chalopin, extended coverage to FTX US and other FTX Group entities to the detriment of FTX customers, Class Members included.

244.    Ever the entrepreneur, Mr. Chalopin sought to cash in on insuring more than just the FTX Group entities. He wanted to extract profit from coverage on customer deposits, too. In 2022, Mr. Chalopin contacted Alameda to propose that Relm Insurance, or some other subsidiary of Deltec International Group, sell a form of deposit insurance to FTX Group customers to insure funds held in their FTX accounts. However, Mr. Chalopin did not want for Deltec International Group to bear the economic risk in those transactions—demonstrating his knowledge that FTX Group had put those deposits at risk—and proposed that Alameda would fund Deltec's sale of the insurance, with Deltec taking some cut of the profits derived therefrom for luring in unsuspecting FTX customer clients.

## G.    Mr. Chalopin extended his assistance to the FTX fraud by way of Moonstone.

### 1.    *FTX Group invested in Chalopin's new bank, Moonstone.*

245.    By way of his close ties with SBF, Mr. Chalopin sought funding from FTX for his other bank, Defendant Moonstone. Janvier Chalopin, Moonstone's chief digital officer and Mr.

Chalopin's son, reports that they "pitched [Alameda Research] the whole roadmap" to invest in Moonstone, which he claimed would fill "the massive gap in banking in the U.S. for digital assets businesses." The Chalopins succeeded. In January 2022, Alameda invested $11.5 million in Moonstone—nearly double the bank's net worth at the time. In a press release dispatched from Bellevue, Washington, Mr. Chalopin boasted at that time "Alameda Research's investment into … Moonstone Bank signifies the recognition, by one of the world's most innovative financial leaders, of the value of what we are aiming to achieve. This marks a new step into building the future of banking."

246.    Moonstone was not always flush with such large inflows of capital. Until recently, Moonstone was the 26th smallest of 4,800 banks in the United States with roughly no more than 25 employees and a single branch in Farmington, Washington, a town of only 150 residents. In 2010, the bank's president bragged that it did not offer credit cards and held more deposits than loans outstanding. That changed in 2020, when Mr. Chalopin purchased Moonstone, purportedly to target digital assets and to support the "underserved cannabis industry," and now serves as its chairman and CEO.

247.    With its $11.5 million investment, Alameda was Moonstone's largest investor, and Mr. Chalopin secured the investment in part through his close personal bond to Dan Friedberg, FTX's general counsel and chief compliance officer, licensed in Washington state and worked for FTX from the Seattle area. Mr. Friedberg regularly met with Mr. Chalopin, often over dinner and, in or around August 2021, the two began to discuss Alameda's potential investment in Moonstone. Over the course of the negotiations, FTX and Deltec employees report, the two men "spoke highly of one another."

248.    Mr. Friedberg was considered one of the key decisionmakers within the FTX Group

and was routinely identified as a member of the senior executive team. Mr. Freiberg served simultaneously as FTX US's Chief Compliance Officer and Alameda's General Counsel, an overlap that Mr. Chalopin must have appreciated. As time passed, Friedberg would also hold other titles at the FTX Group, including Executive Vice President and Chief Regulatory/Compliance Officer of FTX US, General Counsel of Alameda and Chief Regulatory Officer and General Counsel of FTX Trading Ltd. Friedberg also served as the Secretary for the Board of Directors at several FTX Group entities including FTX Digital Markets Ltd., FTX Property Holdings Ltd., and FTX US. Friedberg was also an officer of FTX Digital Markets Ltd., and FTX US, and served on the Risk and Compliance Committee of FTX US's Board of Directors. Mr. Chalopin also likely understood that Mr. Friedberg had only recently been associated with another fraud arising from a cheating scheme facilitated by the online poker site Ultimate Bet. For years prior, Ultimate Bet allowed certain players to employ "God-mode," which allowed them to see the hands held by their unsuspecting competitors. Victims of the scandal lost an estimated $40 million to the players employing "God-mode" to cheat others. At the time, Friedberg was an executive at the software company that managed Ultimate Bet. Rather than report the scandal to the public, Mr. Friedberg sought to cover it up, suggesting that Ultimate Bet tell the public that an outside consultant "took advantage of a server flaw by hacking into the client," and that Ultimate Bet was "unable to identify exactly when" the hacking occurred. In 2013, just one year before Friedberg joined Fenwick, news broke of Mr. Friedberg's attempts to suppress the truth about Ultimate Bet.

**2.      *Moonstone gained awareness of FTX's misconduct from its diligence on FTX and Alameda in compliance with its regulatory obligations*  .**

249.    Moonstone, as a bank in the United States, must adhere to certain anti-money laundering ("AML") and know your customer ("KYC") laws and regulations, such as the Bank Secrecy Act ("BSA"), Patriot Act, and Anti-Money Laundering Act,  including "Know Your

Customer standards including a Customer Identification Program and Customer Due Diligence procedures reasonably designed to identify and verify all customers and, where applicable, beneficial owners, source of funds, and the nature and intended purpose of the business relationship, to the extent warranted by the risk of money laundering or terrorist financing or as required by regulation." Moonstone represented to the public that it offered to its customers "first-in-class regulatory, compliance and risk expertise," and so certainly must have satisfied its diligence and monitoring regulatory obligations in keeping with that representation.

250.   For example, FTX Trading was an offshore money service business ("MSB") incorporated in Antigua, which the Financial Crimes Enforcement Network ("FinCEN"), classifies as a "high risk" customer, requiring enhanced due diligence under the U.S. banking regulations. The Federal Financial Institutions Examination Council Manual, which sets forth guidelines for compliance with the U.S. banking laws, called for enhanced due diligence and ongoing monitoring of the MSBs, and Moonstone would have obtained knowledge of SBF's fraud by conducting that diligence and monitoring on FTX. Specifically, with respect to FTX Trading and other of FTX's offshore MSBs, the FFEIC Manual required Moonstone to (1) understand the intended use and purposes of the accounts and anticipated account activity (both type and volume); (2) understand the types of products and services offered, as well as the location and markets served; and (3) conduct ongoing diligence and monitoring for suspicious activity, in each case in accordance with the BSA. This diligence and monitoring encompassed, for example:

- A review the MSB's BSA/AML program.

- A review results of the MSB's independent testing of its AML program.

- A review written procedures for the operation of the MSB.

- On-site visits,

- A review list of agents, including locations, within or outside the United States, which will be receiving services directly or indirectly through the MSB account.

- A determination whether the MSB has performed due diligence on any third-party servicers or paying agents.

- A review written agent management and termination practices for the MSB.

- A review written employee screening practices for the MSB.

251.    Additionally, relevant regulations, including those promulgated by the U.S. Financial Crimes Enforcement Network ("FinCEN"), the financial intelligence unit within the Department of Treasury,  requires Moonstone to (1) monitor for and report suspicious transactions of $5,000 or more; (2) monitor and report currency transactions in excess of $10,000; (3) implement a customer identification program; and (4) conduct due diligence on its customers, including enhanced due diligence for MSB accounts. Moonstone held at least $50 million in FTX accounts and, under information and belief, effected numerous transfers that qualify as suspicious under the regulations and required additional monitoring and reporting by Moonstone.

252.    From this regulatory-mandated diligence, as well as from Mr. Chalopin's close relationship and frequent visits with Mr. Freidberg, Moonstone would have gained awareness of the deficiencies that Mr. Ray so quickly uncovered in FTX's bankruptcy, including (1) that FTX lacked the most basic internal controls, including for example, management and governance controls, financial and accounting controls; and lack of digital asset management, information security and cybersecurity controls; and (2) that SBF was siphoning customer assets Mr. Chalopin would have gained awareness of the deficiencies that Mr. Ray so quickly uncovered in FTX's bankruptcy, including (1) that FTX lacked the most basic internal controls, including for example, management and governance controls, financial and accounting controls; and lack of digital asset

management, information security and cybersecurity controls; and (2) that SBF was siphoning customer assets to enrich himself through transfers to Alameda and through other related party transactions.

### 3.    Moonstone assisted FTX's misconduct despite knowledge of it.

253.    Upon Alameda's investment in Moonstone, Moonstone promptly applied, and was approved, to become a member of the Federal Reserve. According to a former president of the Independent Community Bankers of America,  Moonstone's close relationship to Alameda was concerning, and the approval of its application to the Federal Reserve, a cause for alarm:  "The fact that an offshore hedge fund that was basically a crypto firm was buying a stake in a tiny bank for multiples of its stated book value should have raised massive red flags for the F.D.I.C., state regulators and the Federal Reserve…It's just astonishing that all of this got approved."

254.    With membership in the Federal Reserve, FTX gained access to a third point of entry to the US banking system, and FTX swiftly took advantage of these services, depositing $50 million in Class Member funds across two accounts.

255.    On August 17, 2023, the Federal Reserve announced an enforcement action against Moonstone, because, upon information and belief, at Chalopin's direction, Moonstone did not inform the Federal Reserve, in applying for membership, that Moonstone intended "to pursue a strategy focused on digital banking services or digital assets" (i.e., banking FTX and Alameda), and Moonstone "improperly chang[ed] its business plan" to provide such services (i.e., to FTX and Alameda) without prior notification or approval from the Federal Reserve.

256.    With access to the U.S. banking system by way of Moonstone's membership in the Federal Reserve fraudulently obtained, FTX quickly began to route the fraud through it, depositing

$50 million in customer assets, including Class Member funds, across two accounts at the bank.[44] FTX was Moonstone's largest customer, and Moonstone, for its part, benefited tremendously from this quid pro quo.[45]

257.    At the time of the fraud's collapse, FTX was Moonstone's largest customer, and Moonstone, for its part, benefited tremendously from this quid pro quo. With FTX's accounts, Moonstone's deposits jumped to $71 million in the third quarter of 2020, a 600% increase from Moonstone's historical average. In pursuit of continued growth and unprecedent profits, Moonstone, at the direction of Mr. Chalopin, gladly took action in furtherance of SBF's fraud.

258.    To be sure, the assistance provided by Deltec, Moonstone, and Mr. Chalopin goes beyond ordinary or routine banking services, and the irregular nature of their relationship to FTX has captured the attention of John J. Ray, who is overseeing FTX's bankruptcy. In testimony before Congress, Mr. Ray noted that he was "looking at what dollars were that went from the FTX group to [Moonstone] and looking at the connections of that bank to the Bahamas [i.e., Deltec]….There's a lot more questions than answers. It's certainly highly irregular and has got our attention."

259.    Deltec and Moonstone provided these services despite their awareness of SBF's fraud. From their close ties with SBF by way of Mr. Chalopin, from working closely with FTX in proselytizing on behalf of the crypto industry, and from pitching Alameda "the whole roadmap" for investments, Deltec and Moonstone knew, for example, that Alameda was owned by SBF— separately from FTX—and that FTX was misappropriating Class Member funds by funneling them through accounts under SBF's control at Deltec and Moonstone. Nevertheless, Deltec and

---

[44] R. Doc. 155, ¶ 313.
[45] R. Doc. 155, ¶ 314.

Moonstone took overt acts in furtherance of the FTX fraud, with Moonstone providing FTX access to the U.S. banking system, and effecting transfers of Class Member funds into accounts under SBF's control; and Deltec, in turn, helping SBF fence Class Member funds, including those held in accounts at Silvergate Bank, Signature Bank Prime Trust, and Moonstone, across the U.S. border and beyond the reach of U.S. law enforcement. SBF could not have perpetuated the fraud without these services.

260.    As detailed below in the individual counts, Plaintiffs bring this lawsuit on behalf of themselves and all others similarly situated, pursuant to Rule 23(a), (b)(2), (b)(3), and/or (c)(4) of the Federal Rules of Civil Procedure.

## CLASS ACTION ALLEGATIONS

### A.    Class Definitions

261.    Plaintiffs Vozza, Rupprecht, Winter, and Kavuri seek to represent the following International Classes and Plaintiffs Orr, Cabo, Henderson, Livieratos, Chernyavsky, Podalsky, Shetty, Ezeokoli, Norris, Garrison, Huang, and Papadakis seek to represent the following Nationwide Classes:

> **(1)** **International Class:** All persons or entities residing outside the United States who, within the applicable limitations period, purchased or held legal title and/or beneficial interest in any fiat or cryptocurrency deposited or invested through FTX Platform, purchased or enrolled in a YBA, or purchased FTT.

> **(2)** **Nationwide Class:** All persons or entities in the United States who, within the applicable limitations period, purchased or held legal title and/or beneficial interest in any fiat or cryptocurrency

deposited or invested through an FTX Platform, purchased or

enrolled in a YBA or purchased FTT.

Excluded from the Classes are Defendants and their officers, directors, affiliates, legal representatives, and employees, the FTX Group and their officers, directors, affiliates, legal representatives, and employees, any governmental entities, any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

262.   Plaintiffs reserve the right to modify or amend the definition of the proposed Classes, or to include additional classes or subclasses, before or after the Court determines whether such certification is appropriate as discovery progresses. Plaintiffs seek certification of the Classes in part because all offers of the FTX Platform, YBAs and/or FTT to Plaintiffs and the Class Members (in which MDL Defendants each materially assisted, substantially participated, and/or personally participated) were made by FTX from their principal place of business in Miami, Florida, and thus every single offer to sell cryptocurrency, the FTX Platform, YBAs and/or FTT stems from a transactional occurrence that emanated from the State of Florida.

**B.     Numerosity**

263.   The Classes are comprised of thousands, if not millions, of consumers globally, to whom FTX offered and/or sold cryptocurrency, the FTX Platform, YBAs and/or FTT. Moreover, thousands, if not millions, of consumers worldwide have executed trades on the FTX Platform within the applicable limitations period. Membership in the Classes are thus so numerous that joinder of all members is impracticable. The precise number of class members is currently unknown to Plaintiffs but is easily identifiable through other means, such as through FTX's corporate records or self-identification.

**C.     Commonality/Predominance**

264.     This action involves common questions of law and fact, which predominate over any questions affecting individual class members. These common legal and factual questions include, but are not limited to, the following:

(a)  whether Bankman-Fried, the FTX Insiders, and/or FTX committed fraud;

(b)  whether the MDL Defendants agreed with Bankman-Fried, the FTX Insiders, and/or FTX to commit fraud;

(c)  whether the MDL Defendants had the requisite degree of knowledge of Bankman-Fried's, the FTX Insiders', and/or FTX's fraud;

(d)  whether the FTX Platform, YBAs and/or FTT were unregistered securities under federal,  Florida, California, or other law;

(e)  whether the MDL Defendants' participation and/or actions in FTX's offerings and sales of the FTX Platform, YBAs and/or FTT violate the provisions of applicable securities law;

(f)  the type and measure of damages suffered by Plaintiffs and the Class;

(g)  whether the MDL Defendants' practices violate the FDUTPA, the California Unfair Competition Law, or other state consumer-protection statutes;

(h)  whether Plaintiffs and Class members have sustained monetary loss and the proper measure of that loss;

(i)  whether Plaintiffs and Class members are entitled to injunctive relief;

(j)  whether Plaintiffs and Class members are entitled to declaratory relief; and

(k)  whether Plaintiffs and Class members are entitled to consequential damages, punitive damages, statutory damages, disgorgement, and/or other legal or equitable appropriate remedies as a result of Defendants' conduct.

**D.      Typicality**

265.    Plaintiffs' claims are typical of the claims of the members of the Classes because all members were injured through the uniform misconduct described above, namely that Plaintiffs and all class members were offered and/or sold FTX's FTX Platform, YBAs and/or FTT because of MDL Defendants' actions and/or participation in the offering and sale of these unregistered securities, that MDL Defendants aided and abetted the fraud and conversion perpetrated by Bankman-Fried, the FTX Insiders, and/or FTX, or that MDL Defendants agreed with Bankman-Fried, the FTX Insiders, and/or FTX to commit fraud. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all such members. Further, there are no defenses available to any MDL Defendant that are unique to Plaintiffs.

**E.      Adequacy of Representation**

266.    Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs have retained counsel experienced in complex consumer and securities class action litigation, and Plaintiffs intend to prosecute this action vigorously. Plaintiffs have no adverse or antagonistic interests to those of the Classes. Plaintiffs anticipate no difficulty in the management of this litigation as a class action. To prosecute this case, Plaintiffs have chosen the undersigned law firms, which have the financial and legal resources to meet the substantial costs and legal issues associated with this type of consumer class litigation.

**F.      Requirements of Fed. R. Civ. P. 23(b)(3)**

267.    The questions of law or fact common to Plaintiffs' and each Class member's claims predominate over any questions of law or fact affecting only individual members of the Classes. All claims by Plaintiffs and the unnamed members of the Classes are based on the common course of conduct by the MDL Defendants (1) in marketing, offering, and/or selling the FTX Platform,

YBAs and/or FTT, which are unregistered securities, (2) in receiving secret undisclosed compensation for their promotion of the FTX Platform, (3) in aiding and abetting fraud and/or conversion by Bankman-Fried, FTX and the FTX Insiders, and/or (4) in agreeing with Bankman-Fried, the FTX Insiders, and/or FTX to commit fraud.

268.    The common course of conduct by the MDL Defendants includes, but is not limited to their promotion, offer, sale, solicitation, material assistance, substantial participation in, and/or personal participation in the offer or sale of the FTX Platform, YBAs, and/or FTT, and/or their aiding and abetting of the FTX Group's Ponzi scheme, fraud, and/or conversion of billions of dollars of customer assets.

269.    Common issues predominate when, as here, liability can be determined on a class-wide basis, even when there will be some individualized damages determinations.

270.    As a result, when determining whether common questions predominate, courts focus on the liability issue, and if the liability issue is common to the Classes as is in the case at bar, common questions will be held to predominate over individual questions.

**G.      Superiority**

271.    A class action is superior to individual actions for the proposed Classes, in part because of the non-exhaustive factors listed below:

(a) Joinder of all Class members would create extreme hardship and inconvenience for the affected customers as they reside nationwide and throughout the state;

(b) Individual claims by Class members are impracticable because the costs to pursue individual claims exceed the value of what any one Class member has at stake. As a result, individual Class members have no interest in prosecuting and controlling separate actions;

(c) There are no known individual Class members who are interested in individually controlling the prosecution of separate actions;

(d) The interests of justice will be well served by resolving the common disputes of potential Class members in one forum;

(e) Individual suits would not be cost effective or economically maintainable as individual actions; and

(f) The action is manageable as a class action.

## H.     Requirements of Fed. R. Civ. P. 23(b)(2)

272.     The MDL Defendants have acted and refused to act on grounds generally applicable to the Classes by engaging in a common course of conduct of aiding and abetting the offering and/or selling of the FTX Platform, YBAs and/or FTT, which are unregistered securities, and violating state consumer-protection laws, thereby making appropriate final injunctive relief or declaratory relief with respect to the classes as a whole.

273.     The MDL Defendants have acted and refused to act on grounds generally applicable to the Classes by engaging in a common course of conduct of uniformly identical and uniform misrepresentations and omissions in receiving secret undisclosed compensation for their promotion of the FTX Platform, thereby making appropriate final injunctive relief or declaratory relief with respect to the classes as a whole.

## I.     Requirements of Fed. R. Civ. P. 23(c)(4)

274.     As it is clear that one of the predominant issues regarding the MDL Defendants' liability is whether the FTX Platform, YBAs and/or FTT that FTX offered and/or sold are unregistered securities, utilizing Rule 23(c)(4) to certify the Class for a class wide adjudication on this issue would materially advance the disposition of the litigation as a whole.

275.    As it is clear that another predominant issue regarding the MDL Defendants' liability is whether they have violated the consumer protection and securities laws of Florida in making identical and uniform misrepresentations and omissions regarding the functionality of the FTX Platform, and/or in receiving secret undisclosed compensation for their promotion of the FTX Platform, utilizing Rule 23(c)(4) to certify the Classes for a class wide adjudication on this issue would materially advance the disposition of the litigation as a whole.

**J.    Nature of Notice to the Proposed Class.**

276.    The names and addresses of all Class Members are contained in the business records maintained by FTX and are readily available to FTX. The Class Members are readily and objectively identifiable. Plaintiffs contemplate that notice will be provided to Class Members by e-mail, mail, and published notice.

<strong><u>CAUSES OF ACTION</u></strong>

<strong>COUNT I</strong><br><strong>Civil Conspiracy (All Defendants)</strong>

277.    Plaintiff hereby incorporates the allegations in all paragraphs preceding Count I as if fully set forth herein.

278.    There was an express or implied agreement between at least one of SBF and/or other agents of FTX and each of the Defendants to deceive Class Members, and to commit the wrongful conduct described herein, including FTX's fraud, breach of fiduciary duty to Class Members, and conversion of Class Members property.

279.    Through the course of their due diligence and ongoing monitoring, and in providing high-risk, non-routine banking services to FTX and its founder, SBF, Defendants acquired knowledge of FTX's omissions and untruthful conduct and misappropriation of Class Members' funds. Despite this knowledge, each Defendant stood to gain financially from FTX's

misconduct, and each Defendant agreed, at least impliedly, to assist that unlawful conduct.

280.    Defendants agreed, at least impliedly, with SBF and/or one or more of his co-conspirators to commit the overt acts alleged herein, each in furtherance of SBF's fraud, breach of fiduciary duty, and conversion of Class Members' property, including:  (1) accepting deposits of Class Member funds into accounts held by Alameda or other entities that SBF separately owned, notwithstanding knowledge that the funds belonged to Class Members; (2) transferring Class Member funds from accounts held by FTX first into stopover accounts held by Alameda, and then to SBF, his friends, and his family members, often labeled as large hundred-million dollar "loans;" (3) providing FTX and its affiliates access to the U.S. banking system, a service that other U.S. banks refused to provide; and (3) supplying other infrastructure critical to SBF's fraud—and unique to Defendants—including the SEN and Signet proprietary platforms.

## COUNT II
## Common Law Aiding and Abetting Fraud (All Defendants)

281.    Plaintiffs hereby incorporate the allegations in all paragraphs preceding Count I as if fully set forth herein.

282.    FTX, and its founder SBF, defrauded Class Members by, among other things, making the following material omissions in soliciting their deposits:

- FTX was not segregating Class Member funds, instead commingling those funds in FTX's omnibus accounts and treating those funds as FTX's own;

- SBF was siphoning Class Member funds to his friends and family members or for his own personal use;

- FTX and Alameda were not, in fact, "wholly separate entities at arm's length," and were instead operated as a common enterprise;

- FTX directed that Class Member funds be wired directly into accounts held by Northern Dimension, a subsidiary of Alameda;

- SBF was looting Class Member funds under the guise of non-arm's length "related party transactions" and "loans" often by way of Alameda;

- SBF routinely transferred Class Member funds out of accounts held by FTX to those held by Alameda;

- SBF was using Class Member funds to underwrite his speculative personal investments at Alameda;

- Alameda was exempt from the "risk engine" and other FTX protocols in place to prevent a user from becoming undercollateralized or overleveraged on the exchange;

- With the foregoing exemption, Alameda engaged in margin trading on the FTX platform, exposing Class Members to the risk of Alameda's loss;

- FTX used Class Member funds to manipulate the price of FTT, which was not "widely distributed," but instead concentrated in the hands of FTX and Alameda; and

- FTX did not have in place fundamental internal controls, including an independent board of director or a CFO.

283.    Based on their knowledge of the financial industry, with a focus on serving crypto clients, and their understanding of FTX's operations obtained through diligence, ongoing monitoring and/or hands-on partnership, Defendants acquired knowledge of FTX's omissions and untruthful conduct and misappropriation of Class Member funds.

284.    Notwithstanding this knowledge, and by reason of the conduct described above, Defendants substantially aided, abetted, and/or participated with SBF and his co-conspirators in a fraudulent scheme against Class Members, including by the actions set forth above.

285.    Defendants' actions, in combination with the actions of SBF and his co-conspirators, are a proximate cause of actual damages to Class Members. As a result of this conduct, Defendants are jointly and severally liable for aiding and abetting his fraudulent scheme.

## COUNT III
**Common Law Aiding and Abetting Fiduciary Breach (All Defendants)**

286.    Plaintiffs hereby incorporate the allegations in all paragraphs preceding Count I as if fully set forth herein.

287.     FTX took custody of the Class Member funds. As alleged herein, FTX promised Class Members funds were safe in its hands, and that FTX customer funds were "held by FTX for [their] benefit." As a custodian of Class Member funds, and by virtue of the promises FTX made to safeguard their funds, FTX owed a fiduciary duty to Class Members, and FTX was obligated to discharge that duty in good faith, with the care that a fiduciary in a similar position would exercise and in a manner reasonably believed to be in the best financial interests of Class Members.

288.     Rather than safeguarding Class Member funds, FTX misappropriated their funds in breach of the fiduciary duty owed to Class Members. These breaches include, but are not limited to: (1) transferring funds belonging to Class Members to Alameda and other of SBF's separately owned entities; (2) transferring funds belonging to Class Members to SBF and his co-conspirators; (3) using funds belonging to Class Members to engage in self-dealing, including non-arms' length transactions among SBF's affiliated entities.

289.     Based on their knowledge of the financial industry, with a focus on serving crypto clients, and their understanding of FTX's operations obtained through diligence, ongoing monitoring and/or hands-on partnership, Defendants had Defendants acquired knowledge of FTX's fiduciary duty to Class Members and breaches thereof.

290.     Notwithstanding this knowledge, and by reason of the conduct described above, Defendants substantially aided, abetted, and/or participated with SBF and his co-conspirators in a fraudulent scheme against Class Members, including by the actions set forth above.

291.     Defendants' actions, in combination with the actions of SBF and his co-conspirators, are a proximate cause of actual damages to Class Members. As a result of this conduct, Defendants are jointly and severally liable for participating in the breach of FTX's fiduciary duty.

## COUNT IV
## Aiding and Abetting Conversion (All Defendants)

292.    Plaintiffs hereby incorporate the allegations in all paragraphs preceding Count I as if fully set forth herein.

293.    The funds deposited by Class Members into YBAs on the FTX exchange were personal property of Class Members. SBF and his co-conspirators wrongfully exercised dominion or control over such property, misappropriating Class Member funds entrusted to FTX.

294.    Based on their knowledge of the financial industry, with a focus on serving crypto clients, and their understanding of FTX's operations obtained through diligence, ongoing monitoring and/or hands-on partnership, Defendants had acquired knowledge of FTX's conversion of Class Member funds.

295.    Notwithstanding this knowledge, and by reason of the conduct described above, Defendants substantially aided, abetted, and/or participated with SBF and his co-conspirators in conversion of funds belonging to Class Members, including by the actions set forth above.

296.    Defendants' actions, in combination with the actions of SBF and his co-conspirators, are a proximate cause of actual damages to Class Members. As a result of this conduct, Defendants are jointly and severally liable for participating in the breach of FTX's conversion of Class Member funds.

## COUNT V
## Federal R.I.C.O., 18 U.S.C. § 1962(d) (All Defendants)

297.    Plaintiffs hereby incorporate the allegations in all paragraphs preceding Count I as if fully set forth herein.

298.    At all relevant times, and as described below, Defendants agreed and conspired with SBF, Ryan Salame, Caroline Ellison, FTX Group entities, and others to violate 18 U.S.C. §

1962(c)

299.    SBF directed and controlled a RICO enterprise through a pattern of racketeering activity consisting of numerous and repeated uses of the interstate mail and wire facilities and other aspects of illegal activity alleged below to execute a scheme to defraud, all in violation of RICO, 18 U.S.C. § 1962(c).

300.    The RICO enterprise, the activities of which affected interstate and foreign commerce, was comprised of an association-in-fact of entities and individuals that included SBF, Ryan Salame, Caroline Ellison, FTX Group, the FTX Group, and other unnamed co-conspirators. Their association was structured by contracts and agreements between and among them.

301.    The RICO enterprise shared a common purpose, which was to (i) convince and assuage potential and existing customers to entrust FTX US and FTX Trading Ltd. with their assets, (ii) conceal their misappropriate of customers' funds and conflict-of-interest activities, and (iii) make their ill-gotten gains available for the co-conspirators personal use in interstate and foreign commerce.

302.    The RICO enterprise had a continuity of structure and personnel and operated as an ascertainable, separate structure. SBF was at all times the leader, assisted by Salame, Ellison, and others, who reported to Bankman-Fried as co-owners and/or as part of his inner circle.  Defendants served as the primary bank for the RICO enterprise, assisting in the structuring of the enterprise operations and the flow of FTX customer funds from FTX Trading Ltd. and FTX US to Alameda.

303.    Together, these co-conspirators agreed to and did conduct and participate in the enterprise's affairs through a pattern of racketeering activity for the unlawful purpose of intentionally defrauding depositors and customers of FTX US and FTX Trading Ltd.  Specifically, they committed multiple related acts of racketeering activity as follows:

a) SBF committed multiple acts of wire fraud under 18 U.S.C. § 1343. Specifically, SBF devised and perpetrated a scheme to defraud customers and potential customers of FTX cryptocurrency exchanges for the purpose of obtaining money or property by means of false or fraudulent pretenses, representations, or promises and transmitted or caused to be transmitted by means of wire, radio, or television communication in intrastate or foreign commerce various writings, signals, pictures, and sounds for the purpose of executing their scheme;

b) SBF committed multiple violations of 18 U.S.C. § 1952, prohibiting intrastate state or foreign travel in aid of racketeering enterprise. Specifically, SBF traveled in interstate or foreign commerce with the intent to distribute the proceeds of his unlawful activity and otherwise promote, manage, establish, carry on, and facilitate the promotion, management, establishing, and carrying out of his unlawful acidity. This unlawful activity for purposes of this violation includes money laundering in violation of 18 U.S.C. § 1956 and indictable violations of the U.S. Code, Chapter 31, Subchapter II, prohibiting false reporting of monetary transactions.

c) SBF committed numerous acts of money laundering in violation of 18 U.S.C. § 1956. Specifically, SBF, with the knowledge that the property involved in financial transactions as to which he and/or the FTX entities were parties represented proceeds of unlawful activity, did, in fact, conduct and attempt to conduct financial transactions that involved the proceeds of that unlawful activity and were intended to promote the carrying on of that unlawful activity.

d) SBF engaged in numerous transactions in property derived from unlawful activity in violation of 18 U.S.C. § 1957. Specifically, SBF repeatedly deposited funds derived from their unlawful RICO enterprise by and through financial institutions in the United States and abroad and thereby affected interstate and foreign commerce.

e) SBF, Salame, Ellison, and Friedberg operated an unlicensed money-transmitting business in violation of 18 U.S.C. § 1960. Specifically, Bankman-Fried, Ellison, and Friedberg operated Alameda as a money-transmitting business by directing wire transfers to that entity and proceeding to distribute those funds at their discretion. Alameda is not a licensed money-transmitting business in any jurisdiction, and its activities involved the transportation of funds that were intended to be used to promote or support unlawful activity.

f) SBF, Salame, Ellison, and Friedberg engaged in access device fraud in violation of 18 U.S.C. § 1029(a). Specifically, SBF, Salame, and Ellison knowingly and with intent to defraud trafficked in and/or use one or more unauthorized access devices during any one-year period and, by such conduct, obtained anything of value during the period.

304.    As a part of and in furtherance of the above violations and coordinated scheme to

defraud, SBF, FTX US, and FTX Trading Ltd. made numerous material omissions to the Plaintiffs and Class Members with the intent to defraud and deceive the Plaintiffs and Class members, as alleged above.

305.     Additionally, SBF, Salame and Ellison and invested the income received through the pattern of racketeering activity to operate the RICO enterprise the FTX Group operations, and to enrich himself and his friends, which caused the Plaintiffs and Class Members to suffer damages.  This income further allowed SBF and his inner circle to perpetuate the operation of the enterprise and to continue to defraud the Plaintiffs and the Class members.

306.     These related criminal acts had the same or similar purpose, results, participants, victims, and methods of commission and are otherwise related, which are not isolated events, such that they constituted a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

307.     For its part, Defendants facilitated the scheme to defraud and RICO enterprise by agreeing to provide and providing banking services to Alameda, FTX US and FTX Trading Ltd., including executing wire transfers and other transactions of FTX customer funds into and out of FTX Group accounts, and officers of the FTX entities.  Defendants did so knowingly, recklessly, or with willful blindness to the nature of the RICO enterprise but within the scope of Defendants' employment and in furtherance of the firm's business.  In fact, in exchange for Defendants' services in these matters, FTX Group, at the direction of SBF and with the assistance of Salame, paid more than $50 million in the form of a sham "loan" to Deltec Group, Deltec Bank's parent company, in which Mr. Chalopin holds a controlling interest, and invested more than $11 million in the holding company for Moonstone, which Mr. Chalopin also owns.

308.     Defendants had the specific intent to participate in the overall RICO enterprise, which is evidenced by its words and conduct in providing substantial assistance in facilitating the

misappropriation of customer funds and the concealment of that misappropriation.  Further, Defendants reasonably calculated this assistance to shield the comingling and misappropriation of customer funds and to generally obfuscate the scheme to defraud Plaintiffs and members of the Class.

309.     Defendants agreed, at least impliedly, with Salame, Ellison, Friedberg and/or one or more of his co-conspirators to commit overt acts in furtherance of these activities, including (1) violating anti-money laundering laws and other banking regulations (all Defendants); (2) siphoning FTX customer funds into Alameda's bank accounts (all Defendants); (3) effecting purchases by Alameda of USDT with FTX customer funds (Deltec Bank); and (4) propping up the FTX Group's fraudulent enterprise with a *de facto* line of credit totaling up to $2 billion, which permitted the scheme to grow in scale and persist in duration (Deltec Bank).

310.     Notwithstanding Defendants' knowledge, and by reason of the conduct described above, Defendant participated with the FTX Group entities, SBF, Salame, Ellison, and Friedberg in a fraudulent scheme against Class Members, including by the actions set forth above, which were committed within the scope of the Defendants' employment with FTX and in furtherance of the firm's business.

311.     In this manner, the Defendants formed an illegal agreement to violate the substantive provisions of the RICO statute set forth above and thus are jointly and severally liable for the acts of their co-conspirators, including SBF, Salame, Ellison, and Friedberg.

312.     By reason, and as a result thereof, Defendants' conduct and participation in the racketeering activity described herein has caused Plaintiffs and the Class Members to incur significant damages directly.

## COUNT VI
## Unjust Enrichment (Deltec & Moonstone)

313.     Plaintiffs hereby incorporate the allegations in all paragraphs preceding Count I as if fully set forth herein.

314.     Plaintiffs lack an adequate remedy at law.

315.     Plaintiffs and other class members conferred benefits on Deltec and Moonstone by depositing funds into and using the FTX Platform.

316.     Deltec and Moonstone acquired ill-gotten gains, including in the form of revenues derived from Plaintiffs' and other class members' funding and use of the FTX Platform.

317.     Deltec and Moonstone condoned and furthered the wrongful conduct from which they benefited. Their retention of these sums is therefore inequitable.

318.     Deltec and Moonstone's wrongful gains should be restored to Plaintiffs' and the class.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray for a judgment on behalf of themselves and the Classes:

a.  Certifying the Class as requested herein;

b.  Awarding actual, direct and compensatory damages;

c.  Awarding restitution and disgorgement of revenues;

d.  Awarding declaratory relief as permitted by law or equity, including declaring the MDL Defendants' practices as set forth herein to be unlawful;

e.  Awarding injunctive relief as permitted by law or equity, including enjoining the MDL Defendants from continuing those unlawful practices as set forth herein, and directing the MDL Defendants to identify, with Court supervision, victims of their conduct and pay them all money they are required to pay;

f.  Awarding statutory, punitive, and multiple damages, as appropriate;

g.  Awarding attorneys' fees and costs; and

h.  Providing such further relief as may be just and proper.

### DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial as to all claims so

triable. Respectfully submitted on November 15, 2024,

| **Plaintiffs' Co-Lead Counsel** | |
|---|---|
| By: */s/ Adam Moskowitz*<br>Adam M. Moskowitz<br>Florida Bar No. 984280<br>Joseph M. Kaye<br>Florida Bar No. 117520<br>**THE MOSKOWITZ LAW FIRM, PLLC**<br>Continental Plaza<br>3250 Mary Street, Suite 202<br>Coconut Grove, FL 33133<br>Office: (305) 740-1423<br>adam@moskowitz-law.com<br>joseph@moskowitz-law.com<br>service@moskowitz-law.com | By: */s/ David Boies*<br>David Boies<br>Alex Boies<br>Brooke Alexander<br>**BOIES SCHILLER FLEXNER LLP**<br>333 Main Street<br>Armonk, NY 10504<br>Office: (914) 749-8200<br>dboies@bsfllp.com<br>aboies@bsfllp.com<br>balexander@bsfllp.com |
| **Committee Members** | |
| Barbara C. Lewis<br>Florida Bar No. 118114<br>**The Moskowitz Law Firm, PLLC**<br>Continental Plaza<br>3250 Mary Street, Suite 202<br>Coconut Grove, FL 33133 Office:<br>(305) 740-1423<br>barbara@moskowitz-law.com<br>service@moskowitz-law.com | Kerry J. Miller<br>Molly L. Wells<br>C. Hogan Paschal<br>**FISHMAN HAYGOOD L.L.P.**<br>201 St. Charles Avenue, 46th Floor<br>New Orleans, LA 70170<br>Telephone: (504) 586-5252<br>hpaschal@fishmanhaygood.com |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the forgoing was filed on November 15, 2024, via the Court's CM/ECF system, which will send notification of such filing to all attorneys of record.

By: <u>*/s/ Adam M. Moskowitz*</u>
ADAM M. MOSKOWITZ