# Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MDL No. 3076
CASE NO. 1:23-md-03076-KMM

IN RE:

FTX Cryptocurrency Exchange Collapse MDL Litigation
_____

THIS DOCUMENT RELATES TO:

All Cases
_____/

### DECLARATION OF CAROLINE ELLISON REGARDING DELTEC BANK AND TRUST

I, Caroline Ellison, under penalty of perjury, declare as follows:

1. I am a citizen and permanent resident of the United States. I am over 18 and competent to make this Declaration. I am personally knowledgeable of the matters set forth in this Declaration and, if called upon to do so, I could and would competently testify to the following facts set forth below.

2. I served as co-CEO and then CEO of Alameda Research, Ltd. ("Alameda") from mid-2021 until November 2022. I joined Alameda in 2018 and worked as a trader until my promotion to Co-CEO, along with Sam Trabucco, in Summer 2021. Sam Bankman-Fried ("SBF") founded Alameda and served as its CEO until Mr. Trabucco and I replaced him. However, as I testified at the October 2023 criminal trial of SBF, SBF continued to control Alameda after stepping down. For instance, SBF was the majority owner, he was "the person I officially reported to," and he was "who set my compensation and had the ability to fire me[.]" Oct. 10 Trial Tr. 687:12-14. At the same time, SBF served as CEO of FTX Trading Ltd. ("FTX Trading"), which he controlled along with its domestic counterpart, West Realm Shires, Inc. ("FTX US") and other affiliates (collectively, "FTX Group").

3. As I testified at trial, throughout my tenure as Co-CEO and then CEO of Alameda,

DocuSign Envelope ID: 3312BF19-53D4-4B7C-9C4E-74EAE673C7C2

and at SBF's direction, Alameda used funds from FTX Trading to finance investments made through Alameda subsidiaries, to satisfy Alameda's debts, to support Alameda's operations, and for other uses that were not at the time disclosed to FTX customers. By late 2022, Alameda had spent at least $8 billion in FTX customer funds, and it was unable to repay those funds. In November 2022, FTX Group's misappropriation of customer funds, including to and through Alameda, was revealed, and the FTX Trading cryptocurrency exchange ("FTX.com") collapsed.

4. On December 19, 2022, I waived indictment by the U.S. Attorney, consented to the filing of a Superseding Information, and pled guilty to seven criminal offenses arising from the collapse of FTX, including wire fraud, securities fraud conspiracy, and money laundering conspiracy, all arising from a scheme to defraud customers of FTX.com.

5. In connection with my plea, I entered into an agreement with the United States Attorney for the Southern District of New York (the "U.S. Attorney") pursuant to which I agreed to cooperate with the U.S. Attorney's investigation and prosecution of crimes arising from the FTX Group's collapse.

6. After testifying at the October 2023 criminal trial of SBF, my attorneys finalized the terms of a class action settlement agreement ("Settlement") with attorneys representing Plaintiffs and members of the proposed classes defined in that Settlement. On January 31, 2023, pursuant to my commitments in the Settlement, I met with attorneys representing Plaintiffs and class members to provide truthful information concerning certain matters at issue in this litigation. Under the Settlement, I have agreed to sit for additional interviews.

**Alameda's Operations in the United States**

7. When I joined Alameda in or around March 2018, it was headquartered in Berkeley, California. In or around 2019, Alameda moved its principal offices to Hong Kong, but Alameda maintained an office in California at all times through the collapse of FTX in November 2022. In or around November 2021, following SBF's decision to move the headquarters of Alameda and the FTX Group to the Bahamas, I relocated to the Bahamas. After that relocation, I lived at The Albany residential development and regularly worked from Alameda's offices in the Bahamas.

8. During my employment at Alameda, Alameda never had more than a few dozen employees. Throughout my time at Alameda, Alameda employed key personnel who principally worked from the United States. For example, members of Alameda's Settlements Team, including Lena Ngoy, and Carlos Mahomar, principally worked in Alameda's Berkeley office during this period. The responsibilities of the Settlements Team included moving funds among various Alameda and FTX Group bank accounts and cryptocurrency wallets; communicating with Alameda's banks, lenders, and exchanges; communicating with trading counterparties; and settling trades. Although I never worked as a member of the Settlements Team, the Settlements Team ultimately reported to me after I became Co-CEO and then CEO of Alameda. Among the accounts the Settlements Team used were accounts held in the name of entities under Alameda's control named "North Dimension" and variants thereof. As I testified at trial, "Alameda would receive money in its [North Dimension] bank accounts for FTX customer [fiat currency] deposits." Oct. 10 Trial Tr. 654:12-25, 655:1-3. These accounts were also used to provide outgoing wire transfers when those users made withdrawals from their FTX.com accounts. *Id*. 655:22-25, 656:5-6.

9. In or around the summer of 2022, FTX US opened an office in San Francisco, California, and the employees working in Alameda's Berkeley office, including Ms. Ngoy, and Mr. Mahomar, began working from the FTX US office in San Francisco.

10. Other Alameda personnel worked principally in other parts of the United States. For instance, Ben Xie, Alameda's Head of Trading, resided in and principally worked from North Carolina. And T'Shae Cooper, who served as Alameda's General Counsel from in or around mid-2022 through in or around November 2022, resided in and principally worked from Georgia.

**Alameda's Use of FTX Customer Funds**

11. As I testified at trial, during my employment at Alameda, Alameda withdrew several billion dollars in fiat currency and various cryptocurrencies that had been deposited by FTX.com customers ("FTX.com Customer Funds"). Alameda spent those FTX.com Customer Funds for various purposes, including to "repay our lenders," pay the company's expenses, facilitate "stablecoin conversion," and "make our own investments." Oct. 10 Trial Tr. 646:4-5,

3

656:7-25, 657:7-11.

12. As I testified at trial, Alameda was able to access FTX.com Customer Funds in two principal ways. First, I recall that "as early as 2020," FTX.com instructed its customers to deposit their FTX.com Customer Funds in the form of fiat currencies into bank accounts owned by Alameda or by Alameda affiliates, such as North Dimension. Oct. 10 Trial Tr. 654:22. I understand that while this fiat currency deposit system was active, bank accounts controlled by Alameda and its affiliates received "[$]10 to $20 billion" in FTX.com Customer Funds in this manner. *Id*. 655:8-14.

13. As a general matter, Alameda did not segregate its own funds from FTX Customer Funds that were received in bank accounts owned by Alameda or its affiliates, including North Dimension. As I testified at trial, I understood this to be true from around the time "when FTX was getting started"—at which time "[SBF] was the CEO" of Alameda—through FTX's collapse in or around November 2022. Oct. 10 Trial Tr. 654:14, 22-25; 657:10-14.

14. Second, as I testified at trial, Alameda had access to a "line of credit" drawn on FTX Trading that was limited only by the total amount of available FTX.com Customer Funds. I understood from SBF that Alameda's trading accounts on FTX.com were configured to give Alameda "access to an essentially unlimited line of credit on FTX." Oct. 10 Trial Tr. 644:21-22. This allowed Alameda to withdraw funds from its FTX.com trading accounts "even if we didn't have them in our balances" and without having to post collateral. *Id* 658:15-21, 659:9-12, 660:19-25, 661:1. Moreover, I understood that Alameda's FTX.com trading accounts had a "special setting" that allowed Alameda to withdraw FTX.com Customer Funds and to use those FTX.com Customer Funds for Alameda's own purposes without Alameda's FTX.com trading accounts being liquidated by the FTX.com risk engine. *Id*. 660:2-7.

15. For much of 2022, the only liquid assets that Alameda had access to were FTX.com Customer Funds, because Alameda's other liquid assets had been transferred to SBF and entities that he controlled or invested in various illiquid "ventures." Although Alameda and its affiliates owned large quantities of certain cryptocurrency tokens such as FTT and Serum ("SRM")

(collectively "SamCoins"), these tokens were primarily held by entities under the de facto control of SBF and by "other people at the company." Oct. 10 Trial Tr. 682:18-22. Therefore, although Alameda carried its FTT and SRM holdings on its balance sheets at values worth billions of dollars, I knew that Alameda could not realize this value because there was not "a market for the amount of [SamCoins] that Alameda owned[.]" *Id*. 680:5-11. I therefore understood that if Alameda attempted to sell any significant portion of its FTT and SRM positions, the price of those tokens "would drop significantly." *Id*. 679:13-15. In or around the fall of 2021, I understood that Alameda's "net asset value minus Sam[C]oins to be about negative [$]2.7 billion." *Id*. 709:25, 710:7-10. I discussed this fact with SBF in or around fall 2021. *Id*. 711:3-4.

**Alameda's Bank Accounts**

16. Alameda and its affiliated entities held bank accounts at Prime Trust, Signature Bank, and Silvergate Bank. Alameda opened these accounts in its own name and in the name of entities under Alameda's control, including North Dimension. The North Dimension account was principally used to send and receive FTX.com Customer Funds via wire transfers with the customers' own banks. I am not aware of any other significant source of funds for the North Dimension accounts.

17. I understand that in 2018, Alameda opened one or more accounts at Deltec Bank and Trust ("Deltec") in the Bahamas (the "Alameda Deltec Account"). Gregory Pepin was Alameda's primary contact at Deltec.

18. Alameda generally maintained a significant balance in the Alameda Deltec Account. Among the sources of funds for Alameda's Deltec account were wire transfers from accounts held or controlled by Alameda or its affiliates in the United States, including accounts held at Prime Trust, Signature Bank and Silvergate Bank. Alameda also received deposits of FTX.com Customer Funds directly in the Alameda Deltec Account by wire transfer from FTX.com customers' own bank accounts.

19. Among the ways these incoming deposits were tracked was that Deltec would periodically send via Telegram chat to Alameda's settlements team, including to Ms. Ngoy and

Mr. Mahomar in California, a list of wire transfers received by Deltec that day. I understood this list would include deposits to accounts held at Deltec by customers other than Alameda or its affiliates, so Alameda personnel would have access to banking information of people whom I understood to have no connection to FTX.com. The Alameda Settlements Team would then help Deltec identify which transfers had come from customers of FTX.com and into which Alameda or FTX Group account those transfers should go. This manual reconciliation process occurred regularly during the course of Alameda's banking relationship with Deltec.

**Alameda's Transfers to and from Tether and Bitfinex Accounts at Deltec**

20. One reason for opening the Alameda and FTX accounts at Deltec was that the cryptocurrency firm Tether Ltd. ("Tether") and the cryptocurrency exchange Bitfinex held accounts at Deltec. Tether "mints" the stablecoin Tether ("USDT"). A stablecoin is a cryptocurrency whose value is designed not to fluctuate and to maintain a value equal to a fiat currency. USDT was designed to maintain parity with the value of the U.S. dollar. Bitfinex is a cryptocurrency exchange platform.

21. During the period FTX.com was operational, USDT was a popular cryptocurrency, and Alameda often engaged in trades for which it created and redeemed USDT through Tether and/or on the Bitfinex exchange. To "create" USDT, Alameda typically sent U.S. dollars to Tether's bank account at Deltec, and Tether would transfer to Alameda an equivalent amount of USDT. To redeem USDT, Alameda typically sent USDT to cryptocurrency wallets controlled by Tether, which would transfer to Alameda an equivalent value of U.S. dollars.

22. By opening an account at Deltec, Alameda could more easily create and redeem USDT through Tether, and deposit and withdraw U.S. Dollars from Bitfinex. This was in part because Alameda could internally transfer funds from the Alameda Deltec Account (in which Alameda commingled FTX.com Customer Funds and Alameda's own funds) to the Tether and Bitfinex accounts held at Deltec without a wire transfer.

23. For example, when Alameda wanted to create USDT, it would instruct Deltec to transfer an equivalent amount in U.S. dollars from Alameda's Deltec account to Tether's Deltec

account. Alameda would then sell the USDT on other exchanges or to OTC counterparties, ultimately generating U.S. dollars and deposit the proceeds in Alameda's Deltec account.

24. When Alameda wanted to redeem USDT, it would initiate a redemption transaction on Tether's website, send the USDT to an address controlled by Tether, and Tether would in turn transfer an equivalent amount of U.S. dollars from Tether's Deltec account to Alameda's Deltec account.

25. Similarly, when Alameda wanted to withdraw U.S. dollars from its Bitfinex account, Bitfinex would internally transfer that amount in U.S. dollars from Bitfinex's Deltec account to Alameda's Deltec account. Alameda, Tether, and Bitfinex regularly engaged in these transfers from the time Alameda opened its Deltec account.

26. Mr. Pepin was involved with most of the transfers between Alameda and either Tether's or Bitfinex's accounts held at Deltec. The general process for when Alameda wanted to initiate a transfer from an account held by Alameda or one of its affiliates to an account held by Tether or Bitfinex was that Alameda personnel would send a message on the messaging platform Telegram to a group chat that included representatives from Alameda, Tether, and Deltec (the "Alameda-Tether-Deltec Chat"). Mr. Pepin participated in Alameda-Tether-Deltec Chat on behalf of Deltec (under the name "Greg"). Giancarlo Devasini participated in the Alameda-Tether-Deltec Chat on behalf of Tether (under the name "Merlin"). And Paolo Ardoino participated in the Alameda-Tether-Deltec Chat on behalf of Bitfinex (under the name "Paolo"). Members of Alameda's settlement team and I participated in the Alameda-Tether-Deltec Chat on behalf of Alameda. Ms. Ngoy, and Mr. Mahomar were among those who participated in the Alameda-Tether-Deltec Chat on Alameda's behalf, and they would repeatedly initiate transactions with Tether and Deltec through the Alameda-Tether-Deltec Chat. SBF, along with other FTX personnel, and Ryan Salame, then head of the Alameda Operations Team, were also involved in these and other transactions with Deltec. Mr. Salame also repeatedly initiated transactions with Tether and Deltec through the Alameda-Tether-Deltec Chat.

27. I understood from SBF that Alameda could not initiate these internal transactions

with Tether or Bitfinex without Deltec's material assistance. Many of Deltec's processes were not automated, and I understood that many of Alameda's transfers needed to be effected or approved manually by Mr. Pepin. Alameda therefore often had to wait until Mr. Pepin was awake before a required transfer could be made.

28. Through counsel, I have produced to the Plaintiffs true and correct copies of the Alameda-Tether-Deltec chat messages, along with other Telegram chat messages with Deltec personnel. These copies are Bates-numbered CE-MDL-00000001 through CE-MDL-00006740.

**Deltec's "Unofficial" Line of Credit to Alameda**

29. Another service offered by Deltec to Alameda was that Deltec allowed Alameda a three-day grace period to transfer U.S. dollars to settle Alameda's creation of USDT (the "Unofficial Deltec Line of Credit"). Alameda regularly used the Unofficial Deltec Line of Credit as a *de facto* revolving line of credit that provided Alameda access to, at times, hundreds of millions of dollars in value. I do not recall specifically when Deltec began to offer Alameda the Unofficial Deltec Line of Credit, but my best recollection is that Deltec allowed Alameda to access the Unofficial Deltec Line of Credit in 2020 and 2021.

30. I do not know if any similar service was offered to Deltec's other clients. I recall that Mr. Pepin repeatedly asked that Alameda keep the arrangement secret.

31. I am not aware of any documentation or terms under which the Unofficial Deltec Line of Credit was offered. I suspected from Mr. Pepin's statements and conduct that the Unofficial Deltec Line of Credit may not have been accurately reflected on Deltec's books. For instance, Mr. Pepin would not permit Alameda to maintain a balance through the Unofficial Deltec Line of Credit over the end of a month. Mr. Pepin would also occasionally shorten the settlement time for the Unofficial Deltec Line of Credit from three to two days or less. Mr. Pepin would also occasionally restrict Alameda's use of the Unofficial Deltec Line of Credit. Eventually, Mr. Pepin eliminated Alameda's access to the Unofficial Deltec Line of Credit.

32. This Unofficial Deltec Line of Credit was helpful for Alameda's operations and trading, because it served as an additional source of capital. Because USDT often traded at a

premium to the U.S. Dollar during this time period, Alameda could create USDT on credit through the Unofficial Deltec Line of Credit and sell that USDT for a gain before having to fund the purchase by depositing U.S. Dollars in Tether's Deltec account. These transactions generated proceeds for Alameda.

**Contact with Jean Chalopin**

33.     In or around August 2022, Jean Chalopin, whom I understood to be the Chairman of Deltec Bank, contacted me seeking to discuss a potential business venture. Mr. Chalopin invited me to Deltec's office. When I met with Mr. Chalopin, he proposed that Deltec sell a form of deposit insurance to FTX.com customers to insure the funds held in their FTX.com customer accounts. I understood Mr. Chalopin to propose that Alameda would fund Deltec's sale of this insurance, so that Alameda, not Deltec, would bear the economic risk in these transactions. I understood the purpose of Mr. Chalopin's proposal to be that this insurance product would incentivize FTX.com customers to hold fiat currency and cryptocurrency deposits on the FTX.com platform, and that Deltec's role as an intermediary would conceal the fact that the deposit insurance was actually provided by Alameda. I did not pursue Mr. Chalopin's proposed insurance scheme.

I, Caroline Ellison, declare under the penalty of perjury that the foregoing is true and correct.

Executed on  2/13/2024                                  *Caroline Ellison*
                                                        Caroline Ellison

9