**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| **IN RE:**<br><br>**FTX CRYPTOCURRENCY EXCHANGE COLLAPSE LITIGATION** | MDL No. 3076<br>23-md-03076-KMM |
| THIS DOCUMENT RELATES TO:<br><br>Multinational VC Defendants | |

<u>**AMENDED ADMINISTRATIVE CLASS ACTION COMPLAINT**</u>
<u>**AND DEMAND FOR JURY TRIAL:**</u>
<u>**Multinational VC Defendants**</u>

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 4

PARTIES .................................................................................................................... 7

JURISDICTION AND VENUE ................................................................................ 23

FACTUAL ALLEGATIONS ..................................................................................... 24

    A.   The Rise of FTX ............................................................................................. 24

    B.   FTX's Key Players ......................................................................................... 30

       I.   Defendant Sam Bankman-Fried ................................................................. 30

       II.  Defendant Caroline Ellison ....................................................................... 31

       III. Defendant Gary Wang ............................................................................... 33

       IV. Defendant Nishad Singh ........................................................................... 34

    C.   The Basics of a Cryptocurrency Exchange .................................................... 44

    D.   The Mechanics of the Fraudulent Scheme ..................................................... 47

    E.   The Fraud's Collapse ...................................................................................... 54

    F.   FTX Files for Bankruptcy .............................................................................. 64

    G.   The Crypto Sector is a Hotbed for Illicit Activity and Fraudulent Conduct.................... 71

    H.   The SEC's Approach to Cryptocurrency. ....................................................... 76

       I.   Overview ................................................................................................... 76

       II.  SEC v. KIK ............................................................................................... 81

       III. SEC v. Telegram ...................................................................................... 81

       IV. SEC v. BlockFi ......................................................................................... 83

       V.   SEC Wells Notice to Coinbase ................................................................. 83

       VI. SEC v. Binance ......................................................................................... 86

       VII. SEC v. Coinbase ...................................................................................... 86

       VIII. SEC v. Terraform Labs Pte. Ltd. .......................................................... 87

    I.    FTX's offer and sale of YBAs, which are unregistered securities. ................................. 91

    J.    FTX's offer and sale of FTT Tokens, which are unregistered securities....................... 101

    K.   Using the FTX Platform itself necessarily required transacting
        in unregistered securities ............................................................................ 102

    L.    FTX Aggressively and Deceptively Marketed its Platform............ **Error! Bookmark not defined.**

    M.  The MDL Defendants' Roles in the Fraud ................................................... 106

    N.   Material Ties to Florida ....................................................**Error! Bookmark not defined.**

O.   The Defendants' Roles in the Fraud ............................................................ 117

CLASS ACTION ALLEGATIONS ........................................................................... 157

A.   Class Definitions ........................................................................................ 158

B.   Numerosity ................................................................................................. 159

C.   Commonality/Predominance ...................................................................... 159

D.   Typicality .................................................................................................... 160

E.   Adequacy of Representation ....................................................................... 161

F.   Requirements of Fed. R. Civ. P. 23(b)(3) ................................................. 161

G.   Superiority .................................................................................................. 162

H.   Requirements of Fed. R. Civ. P. 23(b)(2) ................................................. 163

I.   Requirements of Fed. R. Civ. P. 23(c)(4) ................................................. 163

J.   Nature of Notice to the Proposed Class. .................................................... 164

CAUSES OF ACTION ............................................................................................. 164

COUNT ONE ................................................................................... 164

COUNT TWO .................................................................................. 165

COUNT THREE .............................................................................. 167

COUNT FOUR ................................................................................ 169

COUNT FIVE .................................................................................. 172

COUNT SIX .................................................................................... 174

COUNT SEVEN .............................................................................. 175

COUNT EIGHT ............................................................................... 176

COUNT NINE .................................................................................. 178

COUNT TEN .................................................................................... 179

COUNT ELEVEN ............................................................................ 182

COUNT TWELVE ........................................................................... 184

COUNT THIRTEEN ........................................................................ 186

COUNT FOURTEEN ...................................................................... 188

COUNT FIFTEEN ........................................................................... 190

COUNT SIXTEEN ........................................................................... 191

COUNT SEVENTEEN .................................................................... 192

COUNT EIGHTEEN ....................................................................... 194

COUNT NINETEEN ........................................................................ 195

PRAYER FOR RELIEF ........................................................................................... 196

In accordance with this Court's Order (EFC No. 61 at 1), Plaintiffs hereby file this Administrative Class Action Complaint and Demand for Jury Trial pursuant to Rule 42 of the Federal Rules of Civil Procedure as the controlling document for pre-trial purposes, including Rule 12(b)(6), with regards to the Multinational VC Defendants, as named herein, and as transferred to this Court from the following actions:

- *O'Keefe et al v. Sequoia Capital Operations, LLC at al, No. 1:23-cv-20700 (S.D. Fla.)*
- *O'Keefe v. Temasek Holdings (Private) Limited, et al., No. 3:23-cv-03655 (N.D. Cal.)*
- *Chernyavsky et al v. Temasek Holdings (Private) Limited, et al., No. 1:23-cv-22960 (S.D. Fla.)*
- *Cabo et al v. Temasek Holdings (Private) Limited, et al., No. 3:23-cv-03974 (N.D. Cal.)*
- *To be filed action(s) once leave to file the instant amendment is granted.*
- *To be filed action(s) once leave to file the instant amendment is granted.*

Plaintiffs are not otherwise joining or merging these actions, which retain their individual nature for all other purposes, including venue, transferor forum, personal jurisdiction, and subject matter jurisdiction.

Plaintiffs use the following defined terms throughout:

- "MDL Defendants" collectively refers to all Defendants named in the seven Administrative Class Action Complaints.

- "FTX Insider Defendants" refers to Samuel Bankman-Fried, Caroline Ellison, Gary Wang, and Nishad Singh.

- "Auditor Defendants" refers to Prager Metis CPAs, LLC and Armanino LLP.

- "VC Defendants" collectively refers to Sequoia Capital Operations, LLC ("Sequoia"), Thoma Bravo, LP ("Thoma Bravo"), Paradigm Operations LP

("Paradigm"), SkyBridge Capital II, LLC ("SkyBridge"), Multicoin Capital Management LLC ("Multicoin Capital"), Tiger Global Management, LLC ("Tiger"), Ribbit Management Company, LLC ("Ribbit Capital"), Altimeter Capital Management, LP ("Altimeter"), and K5 Global Advisor, LLC ("K5 Global").

- "Multinational VC Defendants" refers to Defendants Sino Global Capital Limited ("Sino Global") and its affiliates Sino Global Capital Holdings, LLC, Sino Global Capital Management LLC, Liquid Value Offshore Feeder Fund I LLP, Liquid Value GP Limited, Liquid Value Fund GP Ltd.; Softbank Group Corp. ("Softbank Group"), together with its wholly owned subsidiaries SB Group US, Inc., SoftBank Investment Advisers (UK) Limited, and SoftBank Global Advisers Limited and affiliates SoftBank II Tempest (DE) LLC (collectively, "SoftBank"); and Temasek Holdings (Private) Limited ("Temasek Holdings") together with its wholly owned subsidiaries, Temasek International (USA) LLC ("Temasek USA"), Temasek International Private Limited ("Temasek International"), Artz Fund Investments Private Limited ("Artz" or "Artz Fund"), and Blakiston Investments Pte. Ltd. ("Blakiston") (collectively, "Temasek").

- "Law Firm Defendant" refers to Defendant Fenwick & West LLP.

- "Promoter and Digital Creator Defendants" or "Brand Ambassador Defendants" refers to Thomas Brady, Gisele Bündchen, Kevin O'Leary, Udonis Haslem, David Ortiz, Stephen Curry, Golden State Warriors, LLC, Shaquille O'Neal, William Treavor Lawrence, Shohei Ohtani, Noami Osaka, Solomid Corporation d/b/a Team Solomid, TSM and/or TSM FTX, Graham Stephan, Andrei Jikh, Jaspreet Singh,

Brian Jung, Jeremy Lefebvre, Tom Nash, Erika Kullberg and Creators Agency, LLC.

- "Bank Defendants" refers to Defendants Deltec Bank & Trust Company Ltd. ("Deltec"), Farmington State Bank d/b/a Moonstone Bank ("Moonstone"), and Jean Chalopin.

- FTX Trading LTD and its subsidiaries d/b/a FTX ("FTX Trading") and West Realm Shires Inc. and its subsidiaries ("WRS"), are together referred to herein as "FTX." WRS includes, without limitation, its subsidiary West Realm Shires Services Inc. d/b/a FTX US ("FTX US"). FTX and Alameda Research, LLC and its subsidiaries ("Alameda") collectively make up the "FTX Group."

Plaintiffs, on behalf of themselves and all others similarly situated, sue the MDL Defendants for their respective actions, as outlined herein,[1] which contributed to the collapse of the FTX Group, including but not limited to 1) aiding and abetting and/or actively participating in the FTX Group's massive, multibillion dollar global fraud, and 2) promoting, offering, or selling unregistered securities such as FTX's yield-bearing accounts ("YBA") and FTX's native cryptocurrency token ("FTT"), which caused Plaintiffs substantial harm. Plaintiffs, on behalf of themselves and all others similarly situated, allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and upon an investigation conducted by and through counsel.

---

[1] At the request of the Court at the June 21, 2023, Status Conference, Plaintiffs have separated their complaint into seven versions, each of which contains a similar set of general allegations and the specific allegations as to a single group of MDL Defendants. Because certain claims, such as civil conspiracy, are pled across multiple groups of MDL Defendants, Plaintiffs hereby incorporate by reference the other versions of the complaint.

## INTRODUCTION

1.      The FTX disaster is the largest financial fraud in US history. Defendant Sam Bankman-Fried ("SBF" or "Bankman-Fried"), FTX Group's founder and former CEO, is on house arrest awaiting his criminal trial scheduled for October of this year. FTX Group's new CEO—who helped wind down Enron—concluded the fraud here was worse than Enron. Billions of dollars have been stolen from investors across the globe.

2.      SBF and his FTX Group caused billions of dollars in losses to Plaintiffs, through at least two separate schemes, both of which contributed to the downfall of the FTX Group.

3.      On one hand, SBF and the FTX Group stole customer deposits and used billions of dollars in customer funds to support the operations and investments of FTX and Alameda, to fund speculative venture investments, to make charitable and political contributions, and to personally enrich SBF himself, all while publicly touting the safety of the investment and the segregation of customer funds. The FTX Platform[2] maintained by the FTX Group was truly a house of cards, a Ponzi scheme where the FTX Group shuffled customer funds between their opaque affiliated entities, using new investor funds obtained through investments in the FTX Platform, the YBAs, FTT, and/or loans to pay interest and investment withdrawals to the old ones and to attempt to maintain the appearance of liquidity.

4.      On the other hand, the FTX Group offered and sold securities without proper registration, thereby depriving Plaintiffs of financial and risk-related disclosures that would have

---

[2] "Deceptive FTX Platform" refers to the various platforms FTX created for investors to access crypto and related markets.  It provided an easy way for investors to access an otherwise tech-heavy dominant world of cryptocurrencies, as *The New York Times* described it: "FTX serves as a portal to the crypto world.  With the click of a button, a curious investor can turn dollars into Bitcoin, Dogecoin or Ether.  It's as simple as buying paper towels from Target."  In addition to YBAs and FTT, the Deceptive FTX Platform offered a range of trading products to cryptocurrency investors, including derivatives, options, volatility products, coins, tokens and leveraged tokens.

impacted their calculus as to whether to invest in the FTX Group. Rather than heed the myriad warnings from the SEC dating as far back as 2017, the FTX Group chose instead to skirt US regulation through deception.

5.    This conduct violates numerous laws, including laws related to the sale of unregistered securities, consumer protection, professional malpractice, the California Unfair Competition Law, the California False Advertising Law, the California Corporations Code, the Florida Deceptive and Unfair Trade Practices Act, the Florida Securities and Investor Protection Act, and various common law causes of action as detailed herein.

6.    As outlined herein, MDL Defendants directly perpetrated, conspired to perpetrate, and/or aided and abetted the FTX Group's multi-billion-dollar frauds for their own financial and professional gain.

7.    Because of these schemes, the FTX Group imploded, and over $30 billion in value evaporated almost overnight when the FTX Group filed its emergency Chapter 11 bankruptcy petition in Delaware.

8.    The first filed action transferred into this MDL was filed in Florida against the Brand Ambassador Defendants and resulted from the FTX Group's multi-billion-dollar frauds.[3] It was revealed how these famous celebrities and influencers were paid hundreds of millions of dollars through bribes to promote FTX under the now admittedly false narrative that investors and consumers could "trust" FTX because the Brand Ambassador Defendants "knew FTX" and "were all in" and therefore investors should invest their money too. These defendants never denied these allegations outright in the multiple motions to dismiss that they filed; instead, their primary defense was that they were not subject to personal jurisdiction in Florida.

---

[3] *Garrison v. Bankman-Fried*, S.D. Fla. Case No. 1:22-cv-23753-KMM.

9.      The *Garrison* plaintiffs sought to create this MDL, arguing that Defendants' jurisdictional arguments would fall by the wayside when all the actions were consolidated. Subsequently, the *Garrison* plaintiffs amended their complaint to add the Declaration of Dan Friedberg, making it clear that Miami was the epicenter of the FTX fraud.  With those developments, Defendants must now face the merits.

10.      Since the initial complaints in this MDL were filed, it has become even more clear that Florida law applies to all Class Members on the securities-related claims. Judge Rakoff's recent Terraform opinion, discussed further below, demonstrates that the FTX Platform, YBAs, and FTT are all securities. This leaves the MDL Defendants with no defense regarding whether the violations occurred; they can only argue that they, personally, did not aid and abet any violations.

11.      The MDL Defendants will surely point to one another in an attempt to minimize their involvement and absolve their liability in this lawsuit. But to be sure, every single MDL Defendant is responsible for the damages that Class Members have sustained. As further detailed herein, every MDL Defendant was a necessary player in pushing the FTX fraud to the unprecedented extent it reached, and all made exorbitant amounts of money in the process of doing so. For instance, the Law Firm Defendants suggested and implemented the plans.  Just the same, the Bank Defendants helped move the money, the advertising agencies help create the false narratives, the Brand Ambassador Defendants gave them instant credibility and the Domestic and Multinational VC Defendants, unfortunately, stamped it with their approval.

12.      FTX will be involved in federal bankruptcy proceedings for many years and there is no guarantee that any of the victims will be able to see any recovery from those proceedings.

This class action, pending in the Southern District of Florida as a Multi-District Litigation, may be the only avenue for any of the victims to recover any of their damages.

## PARTIES

13.     **Plaintiff Brandon Orr** is a citizen and resident of the State of Arizona. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Orr purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the MDL Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Orr has sustained damages for which the MDL Defendants are liable.

14.     **Plaintiff Leandro Cabo** is a citizen and resident of the State of California. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Cabo purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the MDL Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Cabo has sustained damages for which the MDL Defendants are liable.

15.     **Plaintiff Ryan Henderson** is a citizen and resident of the State of California. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Henderson purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the MDL Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Henderson has sustained damages for which the MDL Defendants are liable.

16.     **Plaintiff Michael Livieratos** is a citizen and resident of the State of Connecticut. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Livieratos purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the MDL Defendants' wrongdoing and the specific

allegations set forth herein, Plaintiff Livieratos has sustained damages for which the MDL Defendants are liable.

17.     **Plaintiff Alexander Chernyavsky** is a citizen and resident of the State of Florida. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Chernyavsky purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the MDL Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Chernyavsky has sustained damages for which the MDL Defendants are liable.

18.     **Plaintiff Gregg Podalsky** is a citizen and resident of the State of Florida. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Podalsky purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the MDL Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Podalsky has sustained damages for which the MDL Defendants are liable.

19.     **Plaintiff Vijeth Shetty** is a citizen and resident of the State of Florida. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Shetty purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the MDL Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Shetty has sustained damages for which the MDL Defendants are liable.

20.     **Plaintiff Chukwudozie Ezeokoli** is a citizen and resident of the State of Illinois. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Ezeokoli purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the MDL Defendants' wrongdoing and the specific

allegations set forth herein, Plaintiff Ezeokoli has sustained damages for which the MDL Defendants are liable.

21.     **Plaintiff Michael Norris** is a citizen and resident of the State of New Jersey. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Norris purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the MDL Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Norris has sustained damages for which the MDL Defendants are liable.

22.     **Plaintiff Edwin Garrison** is a citizen and resident of the State of Oklahoma. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Garrison purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the MDL Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Garrison has sustained damages for which the MDL Defendants are liable.

23.     **Plaintiff Shengyun Huang** is a citizen and resident of the State of Virginia. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Huang purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the MDL Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Huang has sustained damages for which the MDL Defendants are liable.

24.     **Plaintiff Julie Papadakis** is a citizen and resident of the State of Virginia. She is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Papadakis purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the MDL Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Papadakis has sustained damages for which the MDL Defendants are liable.

25.     **Plaintiff Vitor Vozza** is a citizen and resident of the Federal Republic of Brazil. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Vozza purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the MDL Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Vozza has sustained damages for which the MDL Defendants are liable.

26.     **Plaintiff Kyle Rupprecht** is a citizen and resident of the Dominion of Canada. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Rupprecht purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the MDL Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Rupprecht has sustained damages for which the MDL Defendants are liable.

27.     **Plaintiff Warren Winter** is a citizen and resident of the Federal Republic of Germany. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Winter purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the MDL Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Winter has sustained damages for which the MDL Defendants are liable.

28.     **Plaintiff Sunil Kavuri** is a citizen and resident of the United Kingdom of Great Britain and Northern Ireland. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Kavuri purchased or held legal title to any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the MDL Defendants' wrongdoing and the specific

allegations set forth herein, Plaintiff Kavuri has sustained damages for which MDL Defendants are liable.

29.     **Defendant Temasek Holdings (Private) Limited ("Temasek Holdings")** is a global commercial investment company owned by the Government of Singapore, with a portfolio valued at more than $280 billion. Temasek Holdings has only one employee, its CEO, and otherwise relies entirely upon its subsidiaries to carry out business. Temasek Holdings operates through subsidiaries, including **Defendant Temasek International Private Limited ("Temasek International")**, which shares the same CEO as Temasek Holdings, and **Defendant Temasek International (USA) LLC ("Temasek USA"),** a Delaware corporation with a registered California corporate branch in San Francisco, California., and **Defendants Artz Fund Investments Private Limited ("Artz") and Blakiston Investments Pte. Ltd. ("Blakiston")**, [4] investment vehicles through which Temasek invested in FTX, and otherwise aided, abetted, assisted, and facilitated the misconduct alleged herein, including FTX's illegal sale of fraudulent unregistered securities. Temasek's other U.S. investments include PayPal, SoFi, and Airbnb.

30.     Temasek Holdings has no employees except the Temasek CEO, such that all acts of Temasek Holdings are necessarily done by agents who work for other Temasek entities. Upon information and belief, Temasek Holdings ultimately funds the acquisition price of investments such as FTX, which it owns though investment arms such as Artz. Temasek Holdings sets investment "objectives and strategies" of the investments made through and/or managed by Temasek, the proceeds of which, upon information and belief, are rolled into Temasek Holdings' financial results and are for the benefit of the citizens of Singapore.

---

[4] Collectively, Temasek Holdings, Temasek International, Temasek USA, Artz, and Blakiston are referred to as "Temasek" herein.

31.     Temasek's leadership holds itself out as "OneTemasek."[5] Jane Atherton, Temasek USA's corporate representative, attests that she is the Managing Director of Temasek USA,[6] but the Temasek website states only that she has been with "Temasek" since 2017 and currently serves as "Joint Head, North America."[7] Similarly, although Temasek maintains that Pradyumna Agrawal is strictly an employee of Temasek International,[8] Temasek holds him (and Ms. Atherton) out as "Senior Management," a group apparently charged with "set[ting] the tone and culture of the team" and "leading the delivery of Temasek's vision and mission."[9] These facts indicate that Temasek USA, Temasek International, and Artz Fund were maintained and operated as Temasek Holdings' agent, created for the express purpose of facilitating access to the U.S. market.[10] The entities have interlocking directorates and leadership, and employees of one entity frequently serve as authorized representatives of other entities in order to carry out common goals or objectives of Temasek as set by Temasek Holdings.

32.     Upon information and belief, Temasek employs nearly 200 people in the United States and has offices in New York, New York, San Francisco, California, and Washington, D.C.,

---

[5] *Id.* ("Operating as *OneTemasek*, our management team implements the strategy and policy directions set by the Temasek Board to fulfill our three roles as investor, institution, and steward."). E.g., Temasek International's Chairman concurrently serves as Executive Director of Temasek Holdings, to "oversee[] the development of Temasek" and "work closely with [Temasek International's CEO] on commercial strategies and portfolio matters." *See supra* note 42 "Leadership Succession at Temasek International."

[6] *See* R. Doc. 300-3, ¶ 1.

[7] "Our Leadership," https://www.temasek.com.sg/en/about-us/our-leadership#content-temasek-corporate-en-about-us-our-leadership-jcr:content-par-tabbed_content_copy-tabbed_content_item0-tabpar-gridtabs_1827184518_-item (last accessed Nov. 3, 2023).

[8] *See* R. Doc. 300-2, ¶ 8.

[9] "Our Leadership," https://www.temasek.com.sg/en/about-us/our-leadership#senior-management (last accessed Nov. 3, 2023).

[10] *See Bowoto v. Chevron Texaco Corp.*, 312 F. Supp. 2d 1229, 1244 (N.D. Cal. 2004) (recognizing that "overlap between officers and directors, coupled with other factors tending to show agency, is probative of whether an agency finding is warranted").

which it opened in 2014, 2017, and 2018, respectively. Employees of Temasek International frequent Temasek USA's offices when needed for business meetings, etc. For example, Temasek International employees Pradyumna Agrawal and Antony Lewis held a meeting with SBF and Mr. Ramnik Arora at Temasek USA's New York, New York office regarding the FTX investments at issue in this case.

33.     Temasek International and Temasek USA constitute Temasek Holdings's investment arm. More specifically, Temasek International and Temasek USA are separate service entities, which source, monitor, and manage Temasek's various investments. Each of Temasek International and Temasek USA provides research-based investment consulting to Temasek Pte. Ltd., which passes along those recommendations to Temasek Holdings. Temasek International and Temasek USA make these investment recommendations based on Temasek's "objectives and strategies." Neither Temasek International nor Temasek USA provides any service—investment or otherwise—to any non-Temasek entities. Instead, Temasek International and Temasek USA service only those entities that fall under, and roll up to, Temasek Holdings.

34.     Temasek Holdings and Temasek International maintain interlocking directorates and loci of control. Indeed, "[Temasek International] houses all our management and staff, except the Temasek CEO who continues to be employed under Temasek Holdings (TH)."[11]

35.     The agency relationships among the Temasek Defendants is reflected in signed agreements with FTX or Alameda, Temasek itself agreed to the application of agency principles as to all of its subsidiaries, including the named Temasek Defendants.

36.     ███████████████████████████████████████████

███████████████████████████████████████████████

---

[11] *Id.* at 112.



37.

38.

---

[12] *See*, *e.g.*, "Temasek Review 2023," https://www.temasekreview.com.sg/downloads/Temasek-Review-2023-full-version.pdf (last accessed Nov. 3, 2023).

39.     Notably, Temasek has even held itself out in public documents as one unit with respect to its investment in FTX. In early 2022, Mr. Agrawal posted on Twitter regarding "Temasek"'s—*not* Artz Funds' or Temasek International's—partnership with and investment in FTX.[13] Moreover, although Belinda Wun testified on behalf of Temasek Holdings that "Temasek Holdings did not invest in FTX," Temasek Holdings represents otherwise in its "Temasek Review 2023" when it states, "*we* are disappointed with the outcome of *our* [FTX] investment, and the negative impact on *our* reputation."[14] On its website, Temasek states, "*We* invested" $210 million in FTX International, and US$65 million in FTX US.[15]

40.     In February 2017, Temasek officially opened its San Francisco office and, notably, Temasek's American work population is its third largest nationality group. Temasek's then Joint Head of North America, John Vaske, stated in a press release, which remains on Temasek's website[16] that: "We recognize that opportunities arising from the East Coast and the West Coast are diverse and unique, and have always intended to have an office in San Francisco alongside our New York office. We have been stepping up our US investments, and our exposure to North America has grown to 10% of our portfolio as of March 31, 2016. The opening of our San Francisco office comes at a time where we see increasing opportunities in areas such as technology, healthcare, life sciences and agriculture, as well as early-stage investments."

41.     The Temasek press release describes and promotes Temasek's deep ties with tech investing in California: "Over the years, we have been constantly engaging our friends in the US,

---

[13] R. Doc. 300-2, ¶¶ 313, 346.

[14] *See supra* note 43 "Temasek Review 2023," at p. 11.

[15] "FTX Statement and FAQs," https://www.temasek.com.sg/en/news-and-resources/news-room/statements/2022/statement-FTX#how-did-Temasek-engage-FTX-management (last accessed Nov. 3, 2023).

[16] https://www.temasek.com.sg/en/news-and-resources/news-room/news/2017/temasek-expands-footprint-in-north-america-with-san-francisco-office

and have gained valuable experiences and insights. Having our feet on the ground now allows us to broaden and strengthen these valued relationships, especially those in the Valley. It enables us to deepen our engagement, not just with the vibrant ecosystem of startups, technology companies and the business community, but also the wider community, here in the US." Temasek reported that its "expanded presence in North America reflects the growing investment opportunities in the region" and that the San Francisco office, in particular "serve[s] as a gateway to investment opportunities and facilitate[s] the deepening of relationships within the Bay area and beyond."

42. The same press release notes that "[t]he opening of Temasek's San Francisco office was also marked by the second meeting of its Temasek Americas Advisory Panel, which was launched in June 2016" and "[t]he Panel comprises pre-eminent business leaders with deep experience, insights and perspectives on significant industry, economic, social and political trends, with a focus on the Americas."

43. The Temasek press release also included a statement from Lee Theng Kiat, then-CEO of Defendant Temasek International Pte. Ltd. that: "[t]he opening of our San Francisco office underscores the importance of North America as an investment destination for us. It will work closely with our offices in New York, Mexico City and São Paulo in Brazil to cover both North and Latin America. As a global investor, we will look to these offices, including our London office for Europe and Africa, to provide a lift for our portfolio beyond Asia."

44. Temasek's many investment vehicles include **Defendant Artz Fund Investments Pte. Ltd.**, through which it invested in FTX and otherwise aided, abetted, assisted, and facilitated the misconduct alleged herein, including FTX's illegal sale of fraudulent unregistered securities. Temasek's other U.S. investments include PayPal, SoFi, and Airbnb.

45.    **Defendant SoftBank Group Corp. ("SoftBank Group")** is a Japanese multinational investment corporation located at 1-7-1, Kaigan, Minato-Ku, Tokyo, 105-7537, Japan. SoftBank Group Corp. is the corporate parent of, and operates **Defendant SB Group US, Inc. ("SoftBank US")**, its subsidiary entity through which it runs its U.S. operations. SoftBank US is a Delaware Corporation with a registered California branch office in Silicon Valley, located at 1 Circle Star Way, 4th Floor, San Carlos CA, 94070.

46.    SoftBank Group invested in FTX through its SoftBank Vision Fund. SoftBank Vision Fund is the largest global technology investing platform with over $150 billion in assets across over 500 portfolio companies   Softbank Vision Fund includes **Defendant SoftBank II Tempest (DE) LLC**, the Delaware corporation that served as the investment vehicle to fund and otherwise aid, abet, assist and facilitate the misconduct alleged herein, including FTX's illegal sale of fraudulent unregistered securities (together "SoftBank Vision Fund"). Through the SoftBank Vision Fund, SoftBank Group seeks to invest in "market-leading, tech enabled growth companies, particularly in private companies valued at over $1 billion at the time of investment, colloquially known as 'unicorns.'" Upon information and belief, SoftBank employes more than 300 people in the United States and maintains offices in Menlo Park, California, Miami, Florida, New York, New York, and Washington, D.C. SoftBank has invested billions in dozens of U.S. companies, many based in Silicon Valley, including WeWork, Uber, DoorDash, Nvidia, Fanatics, and Slack.

47.    The SoftBank Vision Fund is managed by **Defendant SoftBank Investment Advisers (UK) Limited** ("SoftBank Investment Advisers") and **Defendant SoftBank Global Advisers Limited** ("SoftBank Global Advisers" and, together with Softbank Investment Advisers,

"Softbank Advisers"), direct subsidiaries of SoftBank Group.[17] The SoftBank Advisers both list their main office as 69 Grosvenor Street, Mayfair, London, W1K 3JP, England, United Kingdom. The SoftBank Advisers also have offices and conduct business in California at 1 Circle Star Way, 4th Floor, San Carlos, CA 94070. SoftBank's decision to materially assist and facilitate FTX's fraud was made in part in its California offices.

48. **Defendant Sino Global Capital Limited ("Sino Global")** is a venture capital firm founded and run by Mathhew Graham. Its headquarters are located at 12/F, Tsim Sha Tsui Centre, Salisbury Rd, Tsim Sha Tsui, Hong Kong and it also maintains employees and offices in California, Kentucky and the Bahamas, at a minimum. Sino Global has hundreds of millions of dollars of assets under management including a large equity presence in several California technology companies. Sino Global invested in the FTX Group and otherwise aided, abetted, assisted and facilitated the FTX Group's fraud and other misconduct. Sino Global has hundreds of millions of dollars of assets under management and, in addition to its stake in FTX US, maintains a large equity presence in a number of U.S.-based technology companies. Sino Global invests in California tech startups and has numerous investments in California, including: Evertas (a cryptocurrency insurance company); Impossible Finance; MetaPlex; and Portals. Sino Global's Founder and chief executive, Matthew Graham, extensively touted his relationship with and trust in FTX, including on podcast hosted by Apple in Cupertino, CA. Sino Global has co-invested with Alameda Research in at least 14 separate early-stage investments. Sino Global operates in the United States through, among other related entities referenced herein, a wholly owned Delaware subsidiary, **Defendant Sino Global Capital Holdings, LLC**, which Matthew Graham also admits

---

[17] Collectively, Softbank Group, SoftBank US, SoftBank Vision Fund, SoftBank Investment Advisers, and SoftBank Global Advisers are referred to as "SoftBank" herein.

"has utilized a co-working space" in Florida as its "mailing address." Matthew Graham enjoys

ultimate control over the Sino Global Capital-related entities named herein. Upon information and

belief, the entities are small, and their members, officers, executives, directors, and/or employees

work in various capacities across multiple such entities.

49.    Sino Global started a $200 million crypto investment fund, **Defendant Liquid**

**Value Offshore Feeder Fund I LLP**, in October 2021 with the "substantial" financial backing of

the FTX Group after investing in FTX. called the "Liquid Value Fund I" that engaged in crypto

trading and investment, including in the unregistered FTX securities alleged herein. The mutual

aid and assistance provided between Sino Global and FTX could not be clearer when SBF touted,

"We are excited to support the launch of Sino Global Capital's institutional fund," and stated that

"from the very beginning, Matthew [Graham, Sino Global's founder and CEO] and the Sino Global

Capital team supported the FTX vision and then worked with us to help make it a reality. The Fund

will now provide more opportunities to projects that are pushing crypto and blockchain

technologies to the next level." Sino Global traded in and helped churn and prop up FTX's

unregistered, unqualified securities with money FTX provided it.  FTX's illiquid securities can be

found on the balance sheet of Sino Global. Sino Global Capital's promotional slide deck for the

joint fund with FTX reveals that Sino Global Capital maintained a team member in Miami, as well

as one in Utah and another in "USA." The full deck is attached hereto as Exhibit E.

50.    **Defendant Sino Global Capital Management LLC** is a United States-based

registered Investment Adviser that raised money for **Defendant Liquid Value Offshore Feeder**

**Fund I LP**, which was the fund created by Matthew Graham and Sam Bankman-Fried. The seed

money Matthew Graham raised for this fund was primarily from Sam Bankman-Fried and

Alameda, and was raised through an entity named "Maclaurin Investments Ltd.," an entity formerly known as "Alameda Ventures Ltd."

51.     **Defendant Sino Global Capital Management LLC** lists its principal office and place of business at a Florida address, at 1111 Brickell Avenue, 10 Floor, Miami, FL 33131 with a telephone number with a (206) area code, on an investment adviser application (available at https://reports.adviserinfo.sec.gov/reports/ADV/326303/PDF/326303.pdf). FTX maintained an office in the same building, which online touts online its environment or design which are intended to facilitate "meaningful connections" among tenants. On the form ADV, **Defendant Sino Global Capital Management LLC** stated it was organized as a limited partnership (LP) and not an LLC (contrary to its corporate name). **Defendant Liquid Value GP Limited** is listed as a related person. The form also identifies **Defendant Liquid Value Offshore Feeder Fund I LP** as a private fund (with reported assets of $111,351,942) with the general partner of that fund as **Defendant Liquid Value GP Limited**. Matthew Graham is listed as the managing member. The Investment Adviser Application is signed by Patrick Loney, as General Counsel, with an email address that includes a sinoglobalcapital email prefix (@sinoglobalcapital.com).

52.     **Defendant Liquid Value Fund GP Ltd.** lists the Sino Global Capital Ltd. website as its website (https://www.sinoglobalcapital.com/) in its filings (i.e. a form ADV at https://reports.adviserinfo.sec.gov/reports/ADV/317744/PDF/317744.pdf), supporting the conclusion that **Defendant Liquid Value Fund GP Ltd**. and the other named Sino Global entities are all agents and alter egos of **Defendant Sino Global Capital Ltd**.

53.     **Defendant Liquid Value GP Ltd.** lists its address as a Hong Kong address on a Form ADV filed with the SEC.[18] It is now not currently registered and not filing reports with the SEC.[19]

54.     The Sino Global Defendants therefore relied upon FTX funds to fund their own venture capital funds, and therefore the Sino Defendants relied upon investment funds traceable directly to FTX customer accounts, through Alameda.  These funds were directly derived from activity in California and Florida, including: (1) the settlement of Alameda's trades by Alameda employees in California; (2) the improperly obtained regulatory approval of the Florida-based LedgerX platform to serve as FTX's derivative trading platform by Florida FTX employees, (3) multiple other FTX US employees based in California and Florida, involved with future plans for FTX such as a plan to construct "cold wallets" for FTX customers; (4) travel by FTX executives between Florida and the United States; and (5) promotional activities in Miami including seats in FTX arena for the Miami Heat.

55.     The Multinational VC Defendants were more than passive investors with respect to FTX. In addition to supplying FTX with hundreds of millions of dollars in critical capital infusions, they lent their reputation and expertise to aid and assist SBF's scheme. After conducting supposedly significant due diligence on the FTX Group and gaining awareness of the misconduct, omissions related parties and fraud highlighted herein, the Multinational VC Defendants injected hundreds of millions of dollars into the FTX Platform, all the while touting the safety and legitimacy of the exchange to the public. Even more, the Multinational VC Defendants advised and monitored FTX's growth, including, in the case of Temasek and Softbank, by serving on

---

[18] https://reports.adviserinfo.sec.gov/reports/ADV/317744/PDF/317744.pdf
[19] https://adviserinfo.sec.gov/firm/ summary/317744.

FTX's Advisory Board. The FTX Group returned the favor by investing money in return with some of the Multinational VC Defendants.

56.     In addition, FTX executives provided auditors and investors with information which clearly indicated the scale of the improper transfer of customer funds to Alameda – in particular, FTX insisted on an interest payment from the line of credit to Alameda, and disclosed that interest to auditors and investors.

57.     Caroline Ellison, Nishad Singh and Gary Wang were able to tally up exactly how much Alameda had borrowed under its line of credit with FTX from information from FTX databases and the Alameda databases.  The line of credit didn't start out as $65 billion but instead started as just a few million dollars.  Managers discovered multiple times that they had run over the line of credit, beginning in 2019.

58.     Other customers on the FTX exchange also had lines of credit. In particular, market makers such as Jump Trading had lines of credit memorialized with written agreements.  These lines of credit were typically in the single to double-digit millions of dollar range and, upon information and belief, known to FTX's equity investors.

59.     With respect to the lines of credit, FTX imposed no direct restrictions, but typically Alameda and other borrowers could not use the lines of credit to directly withdraw assets from the platform - only to put positions on the platform (i.e. buy assets).

60.     The approximate value of the Alameda line of credit was about one or two billion dollars and FTX was charging a one or two percent interest rate. The value of the interest was in the tens of millions of dollars. These amounts were about an order of magnitude higher than the interest for any other market maker and, upon information and belief, known to FTX's equity investors.

61.     The lines of credit were not disclosed to people outside FTX, but the interest paid on the lines of credit showed up in FTX's revenue and were disclosed to investors. Alameda was also charged interest for a portion of their line of credit and this was reflected in the revenue breakdown.

62.     FTX's internal systems had a page which could generate the breakdowns of the revenue and which could be printed out and posted on Slack. Sam Bankman-Fried gave this information to the auditors and he gave the financials to the investors.  The auditors had access to this breakdown of fees by category. Along with Sam Bankman-Fried, Ramnik Arora was involved with the audits.

63.     Each of the Multinational VC Defendants is liable for making deceptive and/or misleading statements, willfully participating in acts that damaged Class Members in violation of the law, and/or aiding, abetting or otherwise materially assisting violations of law as described herein.  In committing the wrongful acts alleged herein, each of the Multinational VC Defendants willfully participated in acts and transactions and/or aided and abetted such unlawful acts and transactions, which promoted the purported trustworthiness, favorable risk profile, and financial stability of the FTX Platform and of the FTX Group, thereby deceiving and injuring the investing public.

**<u>JURISDICTION AND VENUE</u>**

64.     This Court has subject matter jurisdiction over this action for the reasons set forth in the underlying complaints in actions transferred to this MDL Transferee Court, including pursuant to 28 U.S.C. § 1332(d)(2)(A) because this is a class action for a sum exceeding $1,000,000,000.00 (one billion dollars), exclusive of interest and costs, and in which at least one class member is a citizen of a state different than the MDL Defendants, and also, where applicable,

pursuant to 28 U.S.C. § 1331 as the claims against the MDL Defendants include federal questions arising under the laws of the United States.

65.     This Court has jurisdiction over every MDL Defendant in this multi-district litigation because every MDL Defendant was transferred to this forum from a transferor court which had personal jurisdiction over that MDL Defendant.

66.     Under 28 U.S.C. § 1407, venue is proper pursuant to the valid transfer and Fed. R. Civ. P. 42 pre-trial consolidation of these cases in this District by the Judicial Panel on Multidistrict Litigation.

67.     All conditions precedent to the institution and maintenance of this action have been performed, excused, waived, or have otherwise occurred.

## FACTUAL ALLEGATIONS

### A.  The Rise of FTX

68.     In May 2019, SBF and his co-founders, Gary Wang and Nishad Singh, launched FTX, which, along with various subsidiaries, affiliates and related entities, operated the FTX Platform, which FTX purported to be a centralized digital asset exchange aimed at "the mass market and first-time users" of cryptocurrencies.

69.     FTX portrayed itself as a trustworthy and law-abiding member of the cryptocurrency industry, focused not only on profits, but also on investor and client protection. In public statements, including in testimony before the United States Senate, SBF stated that FTX had adopted "principles for ensuring investor protections on digital asset-platforms" including "avoiding or managing conflicts of interest," and that "[a]s a general principle[,] FTX segregate[s] customer assets from its own assets across our platforms." SBF spent millions on advertisements

to portray FTX as the "safest and easiest way to buy and sell crypto" and "the most trusted way to buy and sell" digital assets.[20]

70.     All the while, however, FTX was doing none of these things. Instead of managing conflicts, the FTX Group actively embraced them, using FTX Trading, FTX.US, and Alameda funds interchangeably to prop up the enterprise. Contrary to SBF's statements, FTX had no focus on investor protection and did not segregate customer funds. Rather, FTX used customer assets as an interest-free source of capital for Alameda's and SBF's private ventures.

71.     FTX was conceived in Northern California before transitioning its headquarters to Chicago, Illinois, and ultimately landing its domestic operations in Miami, Florida, where FTX US was headquartered and where, in early 2021, FTX purchased the naming rights to the Miami Heat's waterfront arena for more than $135 million, one of many sports venues on which FTX paid to have its name emblazoned and one of many extravagant purchases made with Class Members' funds. Theselection of Miami occurred for many reasons, including a desire to consolidate operations in the United States, FTX US employees' preference for Miami for such consolidation, Miami's close proximity to the Bahamas and ease of travel between the two locales, Mr. Dexter's stature within FTX US, SBF's relationship with Miami mayor Francis Suarez, Miami's status as an informal "crypto hub," and the rebranding of the Miami Heat arena as FTX Arena. In the following days, at least twenty-one employees not already located in Miami indicated they would move to Miami soon. Others indicated they would spend the majority of their time in Miami. FTX US selected a new, bigger office space in Miami to expand into as part of the relocation of its official headquarters.

---

[20] *See United States of America v. Samuel Bankman-Fried a/k/a "SBF"*, S5 Cr. 673 (LAK), Dkt. 115, Superseding Indictment at ¶ 2 (March 28, 2023).

72.     Beginning no later than early 2019, for FTX Trading, and no later than May 22, 2020, for FTX US, Class Members could open "yield-bearing accounts" ("YBAs") and/or other accounts, and deposit a wide assortment of cryptocurrencies, as well fiat currency, including U.S. dollars, into the accounts ("Class Member funds") through the FTX website or through FTX's mobile app.

73.     FTX lured Class Members to make such deposits with promises of guaranteed 8% annual percent yield on assets equivalent up to $10,000 USD and guaranteed 5% annual percent yield on amounts between $10,000 USD and $100,000 USD, each of which compounded hourly upon a Class Member's deposit of funds. At no time did FTX register the YBAs pursuant to any federal or state securities law, as discussed more fully below.

74.     By structuring the rates of returns in this way, FTX targeted nascent investors— i.e., those under the age of 30 and/or new to trading, both inexperienced and unsophisticated—by tying higher rates of return to lower deposit amounts with "no fees and no minimum balances."

75.     Unlike a traditional brokerage, FTX took custody of Class Members' assets, which FTX promised to safeguard. In its terms of service, FTX represented to Class Members that "[a]ll cryptocurrency or dollars (or other supported currencies) that are held in your account are held by FTX.US for your benefit;" that "[t]itle to cryptocurrency represented in your FTX.US Account shall at all times remain with you and shall not transfer to FTX.US.;" and that "FTX.US does not represent or treat assets in your FTX.US Account as belonging to FTX.US." FTX Trading's terms of service similarly represented that no customer funds were "the property of, or shall be loaned to, FTX Trading," and that FTX Trading "does not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading."

76.     FTX assured Class Members that their assets were safe and could be withdrawn at any time, claiming on its website that "FTX does back the principal generating the yield with its own funds and equity." In addition, FTX posted a document on its website entitled "FTX's Key Principles for Ensuring Investor Protections on Digital-Asset Platforms," which stated that FTX "segregates customer assets from its own assets across our platforms."  The document also represented that FTX maintained "liquid assets for customer withdrawals . . . [to] ensure a customer without losses can redeem its assets from the platform on demand." SBF further promised, on Twitter in August 2021, "[FTX] will always allow withdrawals (except in cases of suspected money laundering/theft/etc.)."

77.     FTX also promised to protect against the risk that any customer would engage in self-dealing on the exchange or otherwise try to manipulate the market. For example, FTX claimed to offer "wash trading protection," representing that it implemented "exchange controls that actively prevent a party trading with themselves." Additionally, FTX represented, in its terms of service, that "FTX.US does not permit self-trades in order to manipulate markets, reported statistics, or cause liquidations."

78.     FTX also purported to protect against the risk that any customer would become overleveraged or undercollateralized on the platform. For this, FTX touted its "risk-engine," an automated monitoring system that required FTX customers to pledge additional collateral to their accounts as trades went bad and, if the customer failed to do so, liquidated that customer's assets. FTX detailed its auto-liquidating "risk engine" and other purported risk management procedures in a public proposal to the U.S. Commodity Futures Trading Commission ("CFTC"), in which FTX sought permission to trade non-intermediated margin products (i.e., without any intermediary to hold customer funds):

A participant's margin level is recalculated every 30 seconds as positions are marked to market, and if the collateral on deposit falls below maintenance margin level, FTX's automated system will begin to liquidate the portfolio. The automated system will liquidate 10 percent of a portfolio at a time by placing offsetting orders on the central limit order book. Once the liquidation process results in collateral on deposit that exceeds the margin requirement, the liquidation will stop. Because the liquidation is done automatically and positions are marked to market every 30 seconds, these liquidations can occur at any time, on a "24-7" basis.

79.     FTX claimed that this and other risk management procedures distinguished it from other cryptocurrency exchanges and ensured that Class Member funds were protected from losses by other users. For example, on May 11, 2022, SBF tweeted that "the margin mode is safe and conservative: real time risk engines mean you neither have to preemptively liquidate days early, nor risk positions going underwater for days." The next day, SBF testified before the U.S. House of Representatives Committee on Agriculture that:

> In our risk model the collateral is held directly at the clearinghouses, the collateral for all the positions. There is CFTC oversight of that collateral, and it is guaranteed to be there to not be used for anything else, to be **segregated**, and that is a difference with traditional models. It provides an extra guarantee of the assets backing these positions. (emphasis added).

At that hearing, in response to Chairwoman Jahana Hayes' concern that FTX's risk monitoring system "could create an opening for fraud and abuse, particularly towards new customers that are entering the digital asset market for the first time," SBF assured that in FTX's model, "there is a lot of capital which is held directly with CFTC oversight [and] **segregated** accounts for margin for the customers' positions, which also provides a capital backstop . . . ." (emphasis added).

80.     More generally, in television commercials, in print advertising, through interviews and spokespeople, on Twitter, TikTok, Instagram, and Facebook, and in other publications, FTX repeatedly peddled itself as "the safest and easiest way to buy and sell crypto," and SBF repeatedly promised that "our users' funds and safety come first." In highlighting FTX's purported safety,

SBF and other FTX executives falsely represented that FTX was insured by the Federal Deposit Insurance Corporation ("FDIC")—including in a tweet by FTX US President Brett Harrison that "direct deposits from employers to FTX US are stored in individually FDIC-insured bank accounts in the users' names," and "stocks are held in FDIC-insured . . . accounts"—until the FDIC ordered that FTX cease and desist in a letter dated August 18, 2022.

81.     SBF's carefully curated public persona complemented FTX's veneer of safety and was critical to FTX's meteoric rise. SBF came to be "the best-known proponent of the 'effective altruism' social movement which believes in prioritizing donations to projects that will have the largest impact on the most people." In touting his commitment to the movement, SBF explained on YouTube and to journalists that "I wanted to get rich, not because I like money but because I wanted to give that money to charity," and that "I pretty quickly run out of really effective ways to make yourself happier by spending money . . . . I don't want a yacht."

82.     But in truth, SBF did want a yacht, and he wanted Formula One teams, BMWs, beachfront condos, and cocaine-fueled parties. And he got those things—with Class Member funds. SBF's association with altruism and charity, and his public denouncements of greed and excess, generated a false trustworthiness among the public and provided necessary goodwill for FTX, each critical to hide his lavish spending of Class Member funds.

83.     On the basis of these reassurances, along with other representations described herein, FTX grew to become one of the largest cryptocurrency exchanges in the world—at its peak, the exchange's trading volumes reached approximately $21 billion per day and its valuation topped $32 billion within three years of its founding.

**B.  FTX's Key Players**

     *I.    Defendant Sam Bankman-Fried*

84.     FTX was founded in 2019 and began as an exchange or marketplace for the trading of crypto assets. FTX was established by SBF, Gary (Zixiao) Wang and Nishad Singh, with operations commencing in May 2019. FTX was purportedly established to build a digital asset trading platform and exchange for the purpose of a better user experience, customer protection, and innovative products. FTX built the FTX.com exchange to develop a platform robust enough for professional trading firms and intuitive enough for first-time users.

85.     Prior to that, the Silicon Valley-born, MIT-educated SBF launched his quantitative crypto trading firm, Alameda, in November 2017,[21] after stints in the charity world and at trading firm Jane Street.[22] Quantitative trading consists of trading strategies based on quantitative analysis, which rely on mathematical computations and number crunching to identify trading opportunities.

86.     On January 3, 2023, Bankman-Fried pled not guilty to eight criminal charges during a hearing before the U.S. District Court for the Southern District of California in USA v. SBF, 1:22-cr-00673-LAK-1. On February 23, 2023, a superseding indictment was unsealed. It added four more charges, including charges for conspiracy to commit bank fraud and unlicensed money transmitting business, and money laundering. Id., Doc. 80. With his trial scheduled for October 2023, Bankman-Fried faces over 100 years in prison for crimes predicated on his lying to investors and stealing billions of dollars of his customers' money.

---

[21] https://www.businessinsider.com/ftx-crypto-king-sam-bankman-fried-rise-and-fall-2022-11 (accessed May 11, 2023).

[22]     https://www.businessinsider.com/ftx-sbf-crypto-saga-explained-what-happened-what-it-means-2022-11?inline-endstory-related-recommendations= (accessed May 11, 2023).

## II.   *Defendant Caroline Ellison and the Alameda Settlements Team*

87.     By 2018, Defendant Bankman-Fried had persuaded Defendant Ellison to join him at Alameda. Defendant Ellison described the recruitment as follows: "This was very much like, 'oh, yeah, we don't really know what we're doing,'" Ellison told *Forbes* magazine in an interview regarding her initial impressions of Alameda.

88.     In late 2018, the headquarters of Alameda was relocated to Hong Kong. The team at Alameda included Defendant Bankman-Fried's close friends (and later co-founders for FTX) Nishad Singh and Gary Wang. Defendant Caroline Ellison was also part of the group and, upon moving to Hong Kong, the group lived like college students and fiercely traded crypto.

89.     Before 2019, Alameda was headquartered in Berkeley, California. In 2019, Alameda moved its headquarters to Hong Kong but maintained an office in California through the collapse of FTX in November 2022.

90.     Members of Alameda's settlement team worked in Alameda's Berkeley office.

91.     In the summer of 2022 FTX US opened an office in San Franciso, California, and the employees working in Alameda's Berkeley office moved to the FTX US office in San Francisco.

92.     The settlements team performed important functions for Alameda, including communicating with Alameda's banks and exchanges, sending wire transfers and cryptocurrency transfers, communicating with trading counterparties and settling trades.

93.     In the United States, Alameda held bank accounts at Prime Trust, Signature Bank, and Silvergate Bank. Alameda opened these accounts in its own name and in the name of entities under Alameda's control, including North Dimension Inc. ("North Dimension"). The North Dimension account was one of the primary accounts into which FTX customer funds were directly

deposited by wire transfer from the customers' own banks. FTX customer funds may have been the only source of funds for the North Dimension accounts. The North Dimension entity has a Berkeley, California address.

94.     FTX executive Nishad Singh visited California, including a trip to FTX US's San Francisco office, where he spent time working with other FTX software engineers.

95.     After Defendant Bankman-Fried established FTX in 2019, Defendant Ellison began taking more responsibility at Alameda.

96.     In October 2021, Ellison was appointed as co-CEO of Alameda with Sam Trabucco after Bankman-Fried resigned from the firm in an effort to give the appearance of putting distance between the exchange and trading shop he founded. As co-CEO, Ellison helped oversee Alameda's expansion beyond its initial market-neutral, but relatively low-profit business as a market maker for low-volume cryptocurrencies into riskier trading strategies, according to a Twitter thread detailing that shift. For instance, Alameda traders began exploring yield farming in decentralized finance (DeFi). Ellison became sole CEO in August 2022, following Trabucco's sudden and unexpected departure from the firm, when he shifted his role from Co-CEO to adviser of the company.[23]

97.     Leading up to the collapse of FTX, Ellison lived with nine other FTX or Alameda colleagues in Bankman-Fried's $30 million penthouse in the Bahamas. She reportedly paid SBF rent and was occasionally in a romantic relationship with him. In 2021, Ellison tweeted about recreational stimulant use. Upon information and belief, Ellison left the Bahamas and moved back to Hong Kong.

---

[23] https://www.coindesk.com/business/2022/08/24/co-ceo-of-crypto-trading-firm-alameda-research-sam-trabucco-steps-down/ (accessed May 11, 2023).

98.    "Young people tend to be to risk averse," Ellison said in a more recent Alameda podcast episode.[24]

99.    In December 2022, Ellison pled guilty to criminal charges stemming from FTX's collapse, including conspiracy to commit wire fraud, conspiracy to commit commodities fraud, conspiracy to commit securities fraud, and conspiracy to commit money laundering.

### III.   *Defendant Gary Wang*

100.   Wang is not like his co-founder Sam Bankman-Fried, who loves fame and putting himself at the center of public attention. In fact, there's little public information about Wang, who has been described as a shady but critical player in the rise and fall of FTX.

101.   Wang met Bankman-Fried at a math camp in high school. Later, they became college roommates at the Massachusetts Institute of Technology, where Wang got degrees in mathematics and computer science and Bankman-Fried received a bachelor's in physics.[25]

102.   Before co-founding Alameda (and later FTX), Wang worked at Google. He claims to have built a system to aggregate prices across public flight data, according to an introduction on the Future Fund's website.[26] When Bankman-Fried left the Jane Street Hedge Fund to start Alameda in 2017, Wang left the tech giant.

103.   The startup has its beginnings in a three-bedroom Berkeley apartment – the downstairs served as its office. The firm shifted to Hong Kong, in part to take advantage of arbitrage opportunities in Asian bitcoin markets – including the price discrepancy between BTC in Japan and BTC everywhere else.

---

[24] https://www.youtube.com/watch?v=zfcb9JAgWBs (accessed May 11, 2023).

[25] https://blog.ftx.com/blog/raising-the-bar/ (accessed May 11, 2023)

[26] https://ftxfuturefund.org/about/ (accessed May 11, 2023).

104.    It's there that Wang and Bankman-Fried funneled funds from Alameda to build its bespoke derivatives exchange. Bankman-Fried told Insider that he is not a good coder: "I don't code. I'm trash. I have not written any of FTX's code base. That's all a lot of other really impressive people at FTX. That's not me at all."[27]

105.    At the age of 28, Wang topped *Forbes*' 2022 list of the world's billionaires under 30 with a net worth of $5.9 billion in April. SBF sent his congratulations to Wang in public, tweeting that "I couldn't be prouder" when the list came out.[28]

106.    In December 2022, Wang pled guilty to criminal charges stemming from FTX's collapse, including conspiracy to commit wire fraud, conspiracy to commit commodities fraud, and conspiracy to commit securities fraud.

### IV.    Defendant Nishad Singh

107.    Nishad Singh joined Alameda in the early days, when the five-person trading firm was based in a Berkeley, California, apartment. He went from finding and exploiting arbitrage opportunities in crypto markets to being appointed director of engineering at FTX.

108.    Singh is and was a close confidant of Bankman-Fried, having shared multiple apartments with the FTX founder over the years, including most recently a ten-person luxury penthouse in Nassau, the Bahamas.

---

[27]    https://www.businessinsider.com/crypto-trading-billionaire-sam-bankman-fried-ftx-alameda-surprising-facts-2021-12#5-people-often-think-hes-a-programmer-but-hes-not-5  (accessed May 11, 2023).

[28]    https://twitter.com/SBF_FTX/status/1511324242612297738?ref_src=twsrc%5Etfw%7Ctwcamp%5Etweetembed%7Ctwterm%5E1511324242612297738%7Ctwgr%5E8e0ce65ea02f827b72be96dde8f9484a3ba3e41c%7Ctwcon%5Es1_&ref_url=https%3A%2F%2Fwww.usatoday.com%2Fstory%2Fmoney%2F2022%2F04%2F05%2Fcryptocurrency-ceo-donate-charity%2F7272175001%2F (accessed May 11, 2023).

109.    He is rumored to be just one of three people who controlled the keys to the exchange's matching engine, and admittedly was informed of a plan to backstop losses at Alameda with FTX customer funds.[29]

110.    Although Singh's LinkedIn profile is down and his Twitter account is locked, the University of California, at Berkeley graduate talked about why he left his dream job at Facebook to join Alameda in a FTX podcast.[30]

111.    "I spent maybe about a month doing weekends and nights at Alameda," he said, discussing a period of time when his "day job" was as a software engineer working on applied machine learning at Facebook. "At some point, it became obvious that was kind of stupid … so I took some time off and really gave my 100% working at Alameda," Singh said.

112.    Singh visited Alameda in the first month of its existence, where he witnessed Bankman-Fried execute a sequence of trades that he described as "super profitable, easy to understand and there were lots available." Feeling inspired, he took a job.

113.    After spending one and a half years as a core Alameda engineer, Singh took a role as the head of engineering at the then-newly launched FTX derivative exchange in 2019, where he was allowed to code with "minimal supervision." He has provided code to a number of Bankman-Fried-related projects, including the decentralized exchange Serum on Solana.

114.    "Nishad was one of my brother's best friends in high school. He's shown the fastest and most sustained professional growth I've ever witnessed," Bankman-Fried wrote in a company

---

[29]   https://www.wsj.com/articles/alameda-ftx-executives-are-said-to-have-known-ftx-was-using-customer-funds-11668264238?mod=latest_headlines (accessed May 11, 2023).

[30]   https://www.youtube.com/watch?v=rl0Rq2cUSIQ (accessed May 11, 2023).

blog.[31] Singh also assisted Wang in building most of FTX's "technological infrastructure" and managed the development team.

115.    Although pitched as a community-run and- organized exchange, people familiar with the matter told CoinDesk the true power over Serum rested with FTX Group, which then held the program's access keys.[32] A similar relationship may be in place at FTX's core properties.[33]

116.    In furtherance of the fraud, Nishad Singh allowed FTX Group to use his bank account to make political donations to candidates and organizations in the United States, including in Florida and California. Upon information and belief, these political donations, which flowed into Florida and California, were made with FTX customer funds.

117.    On February 28, 2023, Nishad Singh, who was one of SBF's best friends, a core Alameda engineer, and head of FTX's engineering, also pled guilty to criminal counts for conspiracy to commit fraud and conspiracy to commit money laundering. He agreed to cooperate with prosecutors' investigation into Bankman-Fried and apologized for his role in FTX's scheme.

### V.    *Blockfolio and Avi Dabir*

118.    FTX maintained an office in Miami, Florida, since early 2021, long before FTX eventually announced the move of its Domestic headquarters to Brickell in late 2022.[34] Since early 2021, FTX's Miami office was run by Mr. Avinash Dabir, FTX's Vice President of Business Development.[35] FTX Group General Counsel Dan Friedberg met with Mr. Dabir often and is very

---

[31] https://blog.ftx.com/blog/raising-the-bar/ (accessed May 11, 2023).

[32]    https://www.coindesk.com/business/2022/11/12/ftx-hack-spooks-solana-defi-community-igniting-revolution-at-alameda-controlled-serum-dex/ (accessed May 11, 2023).

[33]    https://www.wsj.com/articles/alameda-ftx-executives-are-said-to-have-known-ftx-was-using-customer-funds-11668264238?mod=latest_headlines (accessed May 11, 2023).

[34] *See* Ex. A, Declaration of Dan Friedberg, ¶ 20.

[35] *See* Ex. A, Declaration of Dan Friedberg, ¶ 20.

familiar with Mr. Dabir and his activities.[36]

119.    Mr. Dabir previously worked at Blockfolio LLC ("Blockfolio"), which FTX Group acquired in or around August 2020, reportedly for $150 million. Around the time of the Blockfolio acquisition, FTX Group began storing its cold wallets in servers located in Florida.

120.    Mr. Dabir joined FTX Group upon the acquisition, which was key to FTX's growth, as Blockfolio, which managed a cryptocurrency application for smartphones, had broader reach to retail customers and would open the door for a more mainstream, mobile user base for FTX.

121.    FTX thereafter rebranded Blockfolio and its smartphone application as FTX, which users could download from Apple's App Store or Google's Google Play Store. Although FTX rebranded Blockfolio, the application listing in Apple's App Store still shows the application developed by Blockfolio, and many of FTX Group's marketing campaigns directly promoted Blockfolio, including, for example a partnership with William Trevor Lawrence, quarterback for the Jacksonville Jaguars, in April 2021:

---

[36] *See* Ex. A, Declaration of Dan Friedberg, ¶ 20.



122.    Upon joining FTX Group, Mr. Dabir, from the Miami office, focused on formulating and executing FTX Group's important celebrity partnerships.[37] Mr. Dabir was the senior FTX executive responsible for creating, consummating, and implementing deals between FTX Group and other partners, such as Major League Baseball, the MLB Umpire's Association, TSM, the Mercedes Formula 1 team, Tom Brady, Stephen Curry, the Golden State Warriors, Naomi Osaka, Larry David, and Shohei Ohtani.[38]

123.    FTX Group's focus on celebrity endorsements and marketing efforts—each, critical to expanding the reach of the FTX fraud—began with a partnership with the Miami Heat and the naming rights to the Miami Arena. *Id.* FTX Group announced the partnership in March 2021 and purchased the naming rights of the Miami Heat stadium for 19 years in a deal worth approximately

---

[37] *See* Ex. A, Declaration of Dan Friedberg, ¶ 21.
[38] *See* Ex. A, Declaration of Dan Friedberg, ¶ 23.

$135 million. *Id.*

124.     Thereafter, FTX Group's many advertisements and marketing campaigns were developed in Miami, under Mr. Dabir's watch.[39] Mr. Dabir detailed FTX Group's Miami roots on the popular cryptocurrency podcast The Joe Pomp Show, released on March 31, 2022. A transcript of the podcast is attached as Exhibit C.

125.     Mr. Dabir begins by introducing himself as "Vice President of Business Development at FTX, so I handle a lot of our sports partnerships as well as doing some of the interesting things in real estate as well." Ex. C at 2. He then explains that "the end goal" is really how does FTX "acquire more users." *Id.,* at 9. After first acknowledging and agreeing with Mr. Pompliano that FTX was at that point the "leaders" in the sports partnership category and that "it started with Miami Heat Arena," Mr. Dabir explained that he led the effort to obtain the FTX Arena deal because he "had previously worked at the NBA" and that he identified Miami because it had "a great market," a "multicultural, great team," and the "Crypto Buzz was like growing here in Miami." *Id.*, at 2–3.

126.     Mr. Dabir also explained that it was crucial "to get approval from a local government, plus the Heat and the NBA who had their own diligence teams looking into" the FTX Arena deal because it "really sort of validated not only just FTX but the cryptocurrency industry in general." *Id.*, at 4.

127.     While the promotional campaigns came from the brain trust of FTX in Miami, many of the promotions also took place in Florida as a cryptocurrency hub.

- FTX served as a title sponsor for the David Ortiz Golf Classic in Florida on or about November 2021 and pledged to make contributions to Ortiz's charity, David Ortiz's

---

[39] *See* Ex. A, Declaration of Dan Friedberg, ¶ 24.

Childrens Fund. Ortiz promoted the sponsorship and golf tournament on Twitter and other online pages, including on his personal website.

- In March of 2022, Defendants O'Leary, Haslem, and Ortiz served as judges for the FTX Charity Hackathon at the crypto summit hosted by FTX in Miami.



- On March 11, 2022, Mr. O'Leary appeared on NBC 6 South Florida to explain his involvement with FTX and his role in judging the competition. During that appearance, Mr. O'Leary praised the company saying "I love the company. I like its mission. I like what they're doing in terms of innovating and financial services around crypto." *Id.*

- In March of 2022, Ms. Osaka began her FTX promotion campaign at the 2022 Miami Open tennis tournament. Osaka wore gear with the FTX logo throughout the tournament, including during the presentation and acceptance of her runner-up throw following her loss in the finals.

- On April 18, 2022, Mr. Haslem, a star for and captain of the Miami Heat, shared a video on Twitter advertising a promotional effort with FTX that promised a giveaway to Miami area small businesses.



128.     FTX's marketing efforts, which emanated from Miami, were underwritten by FTX

customer funds and critical to perpetuation of the FTX fraud. "We're the newcomers to the scene,"

said then-FTX.US President Brett Harrison, referring to the crypto services landscape in the U.S.

"The company needs to familiarize consumers with its technology, customer service and offerings,

while competing with incumbents like Coinbase Global Inc. or Kraken," Mr. Harrison said. "We

know that we had to embark on some kind of mass branding, advertising, sponsorship type work

in order to be able to do that," he said. Without its mass marketing campaign, which emanated

from Miami and was funded by Class Member deposits, FTX Group would not have reached its

massive scale, and Class Members not lost their hard-earned deposits.

**VI.     *Zach Dexter and LedgerX***

129.     In October 2021, FTX acquired LedgerX LLC, rebranded as FTX US Derivatives

("LedgerX"). LedgerX was a digital currency futures and options exchange based in Miami and

regulated by the CFTC, which had granted licenses to LedgerX to operate as a Designated Contract

Market ("DCM"), a Swap Execution Facility ("SEF"), and a Derivatives Clearing Organization

("DCO"). These licenses provided access to the U.S. commodities derivatives markets as a regulated exchange, and, with its acquisition of LedgerX, FTX acquired that access in one fell swoop.  Upon information and belief, FTX Group paid for the LedgerX acquisition with FTX customer funds.

130.    Zach Dexter, whom FTX installed as CEO of LedgerX (d/b/a "FTX US Derivatives") directed the efforts to start up the platform's futures trading. He worked frequently with SBF on his political efforts with elected officials and/or regulators, and he often traveled to Washington, D.C. as a result. It was apparent to me that one of the most promising or valuable pieces of FTX US was LedgerX (d/b/a "FTX US Derivatives") and, more specifically, its ability to engage in futures trading. Mr. Singh believes the advantages that such licenses and technology lent to LedgerX (d/b/a "FTX US Derivatives")  (and, by extension, FTX US) were notable, and they would have added value to any investment in FTX US. LedgerX and the advantages it could provide were frequent topics of discussion for the FTX Advisory Board, as evidenced by the minutes of the March 2022 meeting attached hereto as Exhibit F which Plaintiffs obtained via SBF's criminal trial.

131.    Mr. Dexter, a Miami resident, touted the acquisition as one that would enhance both FTX's regulatory compliance and the safety of the FTX exchange. Mr. Dexter asserted that these were top priorities for the company in announcing the acquisition:

> 132.   As the regulatory environment in the crypto ecosystem continues to evolve, we look forward to acting as a resource and an example of how the protections afforded by proper regulatory oversight and licensing can boost consumer confidence and facilitate safe and reliable exchange platforms. The most important facet of this acquisition of LedgerX is that it allows us to do that. FTX US Derivatives will continue to strive to be a part of the regulation conversation and ensure that the operational standards required by the CFTC are maintained.

At other times, Bankman-Fried explained that FTX pursued acquisitions like LedgerX, which were

purportedly driven by regulatory and compliance considerations, because what matters most "is transparency and protection against fraud."

133.    Following the LedgerX acquisition, FTX Group promptly applied to the CFTC for amendment of LedgerX's Derivatives Clearing Organization (DCO) license to allow LedgerX to clear margined future contracts. In support of this application, FTX Group created a $250 million fund that SBF referred to as an "Over-Capitalized and Conservative Guaranty Fund" (the "FTX Guaranty Fund"), the purpose of which was to protect depositors by absorbing losses sustained by other users on the FTX Platform. With the FTX Guaranty Fund and other purported risk mechanisms in place, FTX represented to the CFTC that "FTX has gone above and beyond the regulatory requirements and well above what is necessary or required based on our experience over the past years of operation internationally."  That was not true, as S&C knew from its work advising on FTX's application and supporting testimony to the CFTC.

134.    While SBF and FTX touted the $250 million FTX Guaranty Fund to regulators as a fund comprised of $250 million worth of FTX assets, on information and belief these funds were actually comprised, in whole or in part, of FTX customer funds, diverted by SBF and/or FTX Insiders Nishad Singh or Gary Wang, as follows: Alameda diverted the funds from the FTX Platform through the "back door," and transferred the funds to SBF, Mr. Singh, and/or Mr. Wang as unsecured "loans" from Alameda. Indeed, an internal ledger produced in connection with the criminal trial of SBF shows that, in the weeks leading up to FTX's CFTC application, more than $300 million flowed to SBF, Nishad Singh and Gary Wang for "LedgerX" and $250 million flowed to SBF for "insurance fund" in this way. Upon information and belief, SBF, Mr. Singh, and/or Mr. Wang, in turn used those diverted funds to purchase shares of FTX US. FTX US then placed those funds into a LedgerX account to underwrite the FTX Guaranty Fund.

## C. The Basics of a Cryptocurrency Exchange

135.    Cryptocurrency exchanges accept deposits of cryptocurrency, and often fiat currency on behalf of their customers. Once that cryptocurrency is received by the exchange then it has dominion and control over those assets.

136.    The exchange then credits the applicable customer account with the appropriate amount of cryptocurrency or fiat assets the exchange received. This credit can be regarded as a liability of the exchange to its customer.

137.    If, for example, cryptocurrency was deposited to the customer's exchange account, the customer could then take that credit received from the exchange, and:

    a)  Trade it for another cryptocurrency

    b)  Trade it for fiat currency

    c)  Leave it as a balance on the exchange account (leaving an open liability of the exchange to the customer)

    d)  Withdraw it (withdrawal could be done prior to or after a trade or conversion)

These things could be done in whole or in part. Ledger entries would (and should) be made internally by the exchange to account for changes in positions and applicable balances.

138.    The exchange accounts should very much be regarded as being custodial in nature; FTX certainly professed to do so. This means that the customer does not *control* access to the assets "in" their account. The customer needs to make a request to the exchange to be able to access and send those balances. The exchange then debits the user account and sends the assets. Whether or not such requests are processed are dependent on the willingness, ability, and approval of the exchange.

139.    One major factor the affects the exchange's ability to process such requests is whether or not they have the assets and/or capital necessary to do so.

140.     For any non-yield-bearing account, this *shouldn't* be a problem, since exchanges *should* have enough assets in custody for the benefit of their customers to cover their liabilities to their customers, and on a 1:1 basis. FTX's terms of service purport to guarantee this, although FTX clearly violated their own terms of service:

**<u>FTX Trading</u>**

Title to your Digital Assets shall at all times remain with you and shall not transfer to FTX Trading. As the owner of Digital Assets in your Account, you shall bear all risk of loss of such Digital Assets. FTX Trading shall have no liability for fluctuations in the fiat currency value of Digital Assets held in your Account.

None of the Digital Assets in your Account are the property of, or shall or may be loaned to FTX Trading; FTX Trading does not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading.

You control the Digital Assets held in your Account. At any time, subject to outages, downtime, and other applicable policies (including the Terms), you may withdraw your Digital Assets by sending them to a different blockchain address controlled by you or a third party.[40]

**FTX US**

All cryptocurrencies or dollars (or other supported currencies) that are held in your account are held by FTX.US for your benefit.

Title to cryptocurrency represented in your FTX.US Account shall at all times remain with you and shall not transfer to FTX.US.

FTX.US does not represent or treat assets in your FTX.US Account as belonging to FTX.US.

141.     Consistent with these terms, which FTX violated, FTX exchange accounts (or any exchange account with any centralized custodial exchange, including Coinbase for example) are

---

[40]     https://help.ftx.com/hc/article_attachments/9719619779348/FTX_Terms_of_Service.pdf (accessed May 11, 2023).

custodial in nature. *Id.* This means that the customer does not control access to the assets 'in' their account. The customer needs to make a request to the exchange to be able to access and send those balances. It is very much the exchange that controls the assets, not their customer.

142.     With any yield-bearing account, it could generally be expected for an exchange to take those customers and leverage, loan or invest them in some way, and hopefully receive enough assets back to be able to pay out their customers back their principal, in addition to yield or interest earned, when applicable customers attempt to redeem or withdraw those funds.

143.     While the existence of such loans associated with assets deposited to yield-bearing accounts was known, the substantial risks associated with such loans, and by extension the yield-bearing accounts in general, was not adequately represented.

144.     The main functional differences between banks and cryptocurrency exchanges are such that exchanges are largely unregulated, and that exchanges (and by extension exchange accounts and the users who use them) are subject to a lot of additional risks compared to that of a bank account.

145.     Banks are, of course, subject to a variety of capital control requirements to ensure protection of consumer assets. Banks are regulated with regard to the type of assets in which they can invest customer assets in. Banks are subject to regular financial audits. Banks have regulatory oversight to ensure the protection of consumer assets. And of course, bank accounts have FDIC insurance so that bank account holders have coverage in case a bank, despite such measures, becomes insolvent. *Id.*

146.     Exchanges, on the other hand, are not subject to capital control requirements. While almost all exchanges will indicate that they 'securely' store all customer assets 1:1 in 'cold storage,' there is no regulatory requirement in most jurisdictions (including the US) for exchanges

to do so, nor is there any requirement for exchanges to offer any transparency regarding their solvency or use of customer assets to regulators or to the general public.

### D.  The Mechanics of the Fraudulent Scheme

147.    The FTX fraud was straightforward, albeit thoroughly concealed from unsuspecting Class Members.

148.    With the promise of higher-than-average returns and leading-edge safeguards, and by way of FTX's material omissions further detailed herein, FTX lured Class Members to deposit U.S. dollars and crypto-based assets into accounts, including YBAs, on the FTX exchange.

149.    Contrary to FTX's representations to its customers that "FTX.US does not represent or treat assets in your FTX.US Account as belonging to FTX.US," and unlike many of its competitors, including Coinbase Global, the largest U.S.-based exchange, FTX did not segregate customer funds or designate them for the customer's benefit, instead commingling those funds in several "omnibus" accounts held by FTX.

150.    Under the cloak of this wide-ranging con game, FTX insiders including SBF facilitated the routing of billions of dollars in purported profits of FTX, which were in reality Class Member funds, to the insiders, and their families, friends, and other acquaintances through purported personal "loans," bonuses, "investments," and all other means of transfer, including real estate purchases and hundreds of millions of dollars in charitable and political contributions. Class Member funds were also used to fuel uncapped spending on illicit drugs, naming rights to sports arenas, concert sponsorships, luxury cars, and private jets.

151.    Frequently, SBF routed his fraudulent scheme through Alameda, the cryptocurrency hedge that he and Mr. Wang formed two years before launching FTX and owned 90% and 10%, respectively. SBF led Alameda as CEO until October 2021, from which time he

continued to control the company and maintained ultimate authority over its trading, borrowing/lending, and investment activity.

152.    Until his scheme collapsed, SBF, along with a number of his lieutenants, publicly maintained that Alameda and FTX were "wholly separate entitit[ies] . . . at arm's length," and, despite their overlapping ownership by SBF, the companies were kept "separate in terms of day-to-day operations" by way of "a Chinese wall . . . to ensure that [Alameda wouldn't get] any sort of special treatment from FTX."

153.    Contrary to these representations, SBF operated FTX and Alameda as a common enterprise. The two companies shared offices for some time, as well as key personnel and other resources critical to the companies' operations.

154.    SBF routinely funneled Class Member funds through Alameda and/or other entities that SBF separately owned, sometimes as bogus "related party transactions." For example, financial statements for FTX Trading, now available to the public for the first time, disclose "a related party receivable" valued at $1.2 billion (equivalent to 44% of the company's assets); a $362 million "related party payable"; $250 million in payments (equivalent to 25% of the company's revenues) to a related party for "software royalties;" and a series of related party transactions described only as "currency management" activities. The same financial statements identify that these transactions were for the benefit of SBF, noting that the "primary shareholder [i.e., SBF] is also the primary shareholder of several related entities which do business with the company."

155.    Other times, SBF misappropriated Class Member funds as "loans, including for example, a $1 billion 'loan' to himself; a $543 million 'loan' to Mr. Singh; and a $55 million 'loan' to Ryan Salame, another FTX executive." SBF and other insiders received billions in dollars in purported "loans" from Alameda. None of these "loans" have ever been repaid, nor was there any

reason to believe at the time the "loans" were made that they would or could be repaid. The FTX insiders effectively looted the company. Even during the crypto boom, the FTX insiders could not reasonably have repaid these loans, and no reasonable lender would have loaned such large amounts. In fact, none of these loans were ever repaid, nor upon information and belief was any interest ever paid on the loans.

156.    More often, SBF looted Class Member funds directly, without the cover of sham related party transactions or insider loans. For many years, SBF directed that FTX customer funds be wired to bank accounts held by North Dimension, a wholly owned subsidiary of Alameda. North Dimension was a fake electronics retailer created by SBF to disguise its ties to FTX. North Dimension shared an address with FTX US in Berkeley, California, and published a website through which customers often "had trouble actually purchasing products" and was "rife with misspellings and bizarre product prices," including "sale prices that were hundreds of dollars above a regular price." For example, North Dimension advertised a $410.00 "Ipad 11 'ich Cell Phone" for the sale price of $899.00:



Once wired to North Dimension's accounts, Class Member funds were commingled with Alameda's and misappropriated by SBF. SBF has admitted to looting Class Member funds in this way, explaining to reporters after the fraud was revealed that "people wired $8b to Alameda and . . . it was never delivered to FTX."

157.    SBF found diverse ends for which to misappropriate Class Members funds, including to pay for Alameda's leveraged trades and investments, which had grown riskier over time. Initially, Alameda primarily traded in high-risk arbitrage, purchasing cryptocurrencies on one exchange and quickly selling them on other exchanges for higher prices. Later, Alameda pivoted to "yield farming," investing in cryptocurrencies that paid interest-like returns. Alameda's entrée into yield farming was not without internal controversy—in early 2021, Caroline Ellison, Alameda's CEO, expressed concerns about the riskiness of Alameda's yield farming investment strategy to no avail. Ms. Ellison was correct to observe that Alameda's bets had grown dodgier. At the time, Sam Trabucco, another Alameda executive, tweeted that Alameda's investing strategies increasingly relied on "intuition" and other unconventional measures, including "Elon Musk's social media posts." As noted above, Ms. Ellison has since pleaded guilty to misappropriating FTX customer assets to fund Alameda's risky bets and to cover Alameda's colossal losses.

158.    SBF used Class Member funds to underwrite Alameda's risky operations in other ways. Though SBF publicly claimed that Alameda was a "regular user" of FTX, contrary to that representation, FTX exempted Alameda from the automated "risk engine" described above, allowing Alameda to avoid liquidation under the monitoring system. Compounding FTX's—and, though they did not know it, Class Members'—exposure to Alameda, SBF allowed Alameda to maintain a negative balance in its FTX accounts and steadily increased Alameda's negative balance cap over time. Through these cheats, Alameda was not only able to evade collateralizing its position on the exchange; Alameda also was able to maintain a negative balance on the exchange and utilize the exchange to trade and withdraw assets without limit, giving it an estimated "line of credit" of $65 billion, collateralized by the customer deposits on the exchange. Alameda

lacked any ability to repay this line of credit, having spent the money on insider transfers and purported "loans," gifts, and questionable investments.

159.    With these exemptions—exemptions offered to no other customers on the exchange—FTX extended Alameda a de facto limitless line of credit.

160.    Upon information and belief, SBF also employed Alameda to funnel Class Member funds from FTX US to his other companies. Just days before FTX filed for bankruptcy protection, Alameda withdrew over $200 million from FTX US; Alameda then transferred $142.4 million of those funds to FTX Trading's international accounts, exhibiting, according to industry experts, that Alameda had been serving as a "bridge between FTX US and FTX [Trading]" for some time.

161.    The improper relationship between Alameda and FTX was well known to the companies' insiders, and completely concealed from Class Members. As Ellison, former co-CEO of Alameda, told a federal judge in Manhattan when entering her guilty plea:

> From approximately March 2018 through November 2022, I worked at Alameda Research, a cryptocurrency trading firm principally owned by Sam Bankman-Fried.
>
> From 2019 through 2022, I was aware that Alameda was provided access to a borrowing facility on FTX.com, the cryptocurrency exchange run by Mr. Bankman-Fried. I understood that FTX executives had implemented special settings on Alameda's FTX.com account that permitted Alameda to maintain negative balances in various fiat currencies and crypto currencies. In practical terms, this arrangement permitted Alameda access to an unlimited line of credit without being required to post collateral, without having to pay interest on negative balances and without being subject to margin calls or FTX.com's liquidation protocols. I understood that if Alameda's FTX accounts had significant negative balances in any particular currency, it meant that Alameda was borrowing funds that FTX's customers had deposited onto the exchange.
>
> While I was co-CEO and then CEO, I understood that Alameda had made numerous large illiquid venture investments and had lent money to Mr. Bankman-Fried and other FTX executives. I also understood that Alameda had financed these investments with short-term and open-term loans worth several billion dollars from external lenders in the cryptocurrency industry. When many of those loans were recalled by Alameda's lenders in and around June 2022, I agreed with others to borrow several billion dollars from FTX to repay those loans. I understood that FTX would need to use customer funds to finance its loans to Alameda. I also

understood that many FTX customers invested in crypto derivatives and that most FTX customers did not expect that FTX would lend out their digital asset holdings and fiat currency deposits to Alameda in this fashion. From in and around July 2022 through at least October 2022, I agreed with Mr. Bankman-Fried and others to provide materially misleading financial statements to Alameda's lenders. In furtherance of this agreement, for example, we prepared certain quarterly balance sheets that concealed the extent of Alameda's borrowing and the billions of dollars in loans that Alameda had made to FTX executives and to related parties…I agreed with Mr. Bankman-Fried and others not to publicly disclose the true nature of the relationship between Alameda and FTX, including Alameda's credit arrangement.

I also understood that Mr. Bankman-Fried and others funded certain investments in amounts more than $10,000 with customer funds that FTX had lent to Alameda. The investments were done in the name of Alameda instead of FTX in order to conceal the source and nature of those funds. I am truly sorry for what I did. I knew that it was wrong.… Since FTX and Alameda collapsed in November 2022, I have worked hard to assist with the recovery of assets for the benefit of customers and to cooperate with the government's investigation. I am here today to accept responsibility for my actions by pleading guilty.[41]

162.    *The Wall Street Journal* recently reported that Ellison told Alameda staffers in a video call that she, along with Sam Bankman-Fried, Gary Wang, and Nishad Singh, was aware of the decision to send FTX customer funds to Alameda, to help the fund meet its liabilities.[42]

163.    Similarly, Nishad Singh, head of FTX's engineering and one of SBF's best friends, has admitted that he knew by mid-2022 that Alameda was borrowing FTX customer funds and that customers were not aware.[43]

164.    FTX co-founder Gary Wang likewise explained his knowledge of the companies' interconnectedness in his guilty plea:

Between 2019 and 2022, as part of my employment at FTX, I was directed to and agreed to make certain changes to the platform's code. I executed those changes,

---

[41]    https://www.johnreedstark.com/wp-content/uploads/sites/180/2022/12/Ellison-Hearing-Transcript.pdf (accessed May 11, 2023)

[42]    https://www.wsj.com/articles/alameda-ftx-executives-are-said-to-have-known-ftx-was-using-customer-funds-11668264238 (accessed May 11, 2023).

[43]    https://www.reuters.com/legal/ftxs-singh-agrees-plead-guilty-us-criminal-charges-lawyer-says-2023-02-28/ (accessed May 11, 2023).

which I knew would Alameda Research special privileges on the FTX platform. I did so knowing that others were representing to investors and customers that Alameda had no such special privileges and people were likely investing in and using FTX based in part on those misrepresentations. I knew what I was doing was wrong. I also knew that the misrepresentations were being made by telephone and internet, among other means, and that assets traded on FTX included some assets that the U.S. regulators regard as securities and commodities.

165.    FTX had a handful of insiders and employees with virtually limitless power to direct transfers of fiat currency and crypto assets and to hire and fire employees, with no effective oversight, internal controls, or checks on the exercise of these powers. FTX failed to establish or maintain any semblance of fundamental financial and accounting controls. This is particularly shocking given that at its peak, FTX operated in hundreds of jurisdictions, controlled billions of dollars of assets, engaged in as many as 26 million transactions per day, and had millions of users. Board oversight was effectively non-existent. With few exceptions, FTX lacked independent or experienced finance, accounting, human resources, information security, and cybersecurity personnel or leadership. Nor was there any effective internal audit function. Some FTX entities did not produce any financial statements. Some were deemed impossible to audit.

166.    FTX insiders paid out millions of dollars in hush money to keep whistleblowers from exposing the fraud, money laundering, and price manipulation. FTX even hired the attorneys of these whistleblowers to help keep these complaints from the public.

167.    At no time did FTX disclose the foregoing to Class Members, including that:

- SBF was siphoning Class Member funds to his friends and family members or for his own personal use.

- FTX was not segregating Class Member funds, instead commingling those funds in FTX's omnibus accounts and treating those funds as FTX's own.

- FTX directed that Class Member funds be wired directly into accounts held by North Dimension, a subsidiary of Alameda.

- FTX and Alameda were not, in fact, "wholly separate entities at arm's length," and were instead operated as a common enterprise.

- SBF was looting Class Member funds under the guise of non-arm's length "related party transactions" and "loans" often by way of Alameda.

- SBF routinely transferred Class Member funds out of accounts held by FTX to those held by Alameda.

- SBF was using Class Member funds to underwrite his speculative personal investments at Alameda, and his charitable and political contributions.

- Alameda was exempt from the "risk engine" and other FTX protocols in place to prevent a user from becoming undercollateralized or overleveraged on the exchange.

- With the foregoing exemption, Alameda engaged in margin trading on the FTX platform, exposing Class Members to the risk of Alameda's loss.

- FTX used Class Member funds to manipulate the price of FTT, which was not "widely distributed," but instead concentrated in the hands of FTX and Alameda; and

- FTX did not have in place fundamental internal controls, including an independent board of directors or a CFO.

168.    Had Class Members known of these material omissions, they would not have deposited funds into accounts on the FTX exchange and SBF's fraud would not have succeeded. In late 2022, the fraud finally collapsed, and the misconduct was revealed.

**E.  The Fraud's Collapse**

169.    The FTX exchange was extremely successful since its launch in May 2019. In 2022, around $15 billion of assets were traded daily on the platform, which represented approximately 10% of global volume for crypto trading. The FTX Group's team grew to over 300 employees globally. Although the FTX Group's primary international headquarters is in the Bahamas, its domestic US base of operations is located in Miami, Florida.[44]

---

[44]     https://www.coindesk.com/business/2022/09/27/crypto-exchange-ftx-is-moving-its-us-headquarters-from-chicago-to-miami/ (accessed May 11, 2023).

170.    FTX quickly became one of the most utilized avenues for nascent investors to purchase cryptocurrency. By the time FTX filed for bankruptcy protection, customers had entrusted billions of dollars to it, with estimates ranging from $10-to-$50 **billion dollars**.

171.    Bankman-Fried got rich off FTX and Alameda, with the two companies netting $350 million and $1 billion in profit, respectively, in 2020 alone, according to Bloomberg.

172.    At his peak, Bankman-Fried was worth $26 billion. At 30, he had become a major political donor, gotten celebrities and industry power players like the Co-Defendants in this action to vociferously promote FTX, and secured the naming rights to the arena where the NBA's Miami Heat play.[45]

173.    Beginning in mid-2022, the value of cryptocurrencies rapidly declined, and SBF began to bail out troubled crypto firms that, if they were to fail, would bring down FTX with them and reveal SBF's fraud. For example, in the summer of 2022, FTX extended a $400 million revolving credit facility to BlockFi, a crypto lender. At the time, BlockFi held as collateral for loans hundreds of millions of dollars in FTT, the cryptocurrency that FTX had engineered to prop up Alameda. If BlockFi failed, the liquidation of those tokens would crash FTT, and in turn, Alameda, whose assets were primarily backed by the token. FTX's $400 million loan kept BlockFi temporarily afloat, and FTX engaged in a number of similar transactions, propping up failing crypto companies in order to keep the fraud alive, as 2022 progressed.

174.    Despite SBF's attempts to keep troubled crypto firms afloat, the value of digital currencies continued to decline throughout 2022, and FTX's liquidity crunch tightened. By the end of summer 2022, SBF needed another $1 billion to keep his fraudulent scheme running. He looked

---

[45]       https://www.businessinsider.com/ftx-sbf-crypto-saga-explained-what-happened-what-it-means-2022-11?inline-endstory-related-recommendations= (accessed May 11, 2023).

to Silicon Valley and to sovereign wealth funds in the Middle East, but he was unable to successfully close any further investments in FTX, despite many solicitations. Without this influx of capital, FTX's exposure to margin calls heightened and, in November 2022, SBF's house of cards finally collapsed.

175.    In early November 2022, crypto publication CoinDesk released a bombshell report that called into question just how stable Bankman-Fried's empire really was.[46] On November 2, 2022, news broke that Alameda's balance sheet was propped up by the FTX-manipulated FTT, revealing the close ties between FTX and Alameda to the public for the first time. FTX had lent billions, including most of its cryptocurrency reserves, to Alameda, first as capital for trading, and eventually to cover Alameda's massive losses.

176.    Prior to the collapse of the FTX Group, Bankman-Fried's cryptocurrency empire was publicly ostensibly broken into two main parts: FTX (his exchange) and Alameda (his trading firm), both giants in their respective industries. But even though they are two separate businesses, the division breaks down in a key place: on Alameda's balance sheet, which was full of FTX – specifically, the FTT token issued by the exchange that grants holders a discount on trading fees on its marketplace. It shows Bankman-Fried's trading giant Alameda rests on a foundation largely made up of a coin that a sister company invented, not an independent asset like a fiat currency or another crypto. The situation adds to evidence that the ties between FTX and Alameda are unusually close.[47]

---

[46]    https://www.businessinsider.com/ftx-sbf-crypto-saga-explained-what-happened-what-it-means-2022-11?inline-endstory-related-recommendations= (accessed May 11, 2023).

[47]    https://www.coindesk.com/business/2022/11/02/divisions-in-sam-bankman-frieds-crypto-empire-blur-on-his-trading-titan-alamedas-balance-sheet/ (accessed May 11, 2023).

177.     Days later, on November 6, 2022, Changpeng Zhao, CEO of Binance, the world's largest cryptocurrency exchange and FTX's most powerful competitor, tweeted that he intended to sell Binance's $580 million holding of FTT, which threatened to crash the price of FTX's token and, in turn, Alameda's balance sheet. Mr. Zhao's announcement triggered demand for $5 billion in customer withdrawals, which FTX promptly halted due to a lack of funds. The value of FTT plunged 32% but rallied once again with Bankman-Fried's surprise announcement on Tuesday, November 8, that Binance would buy FTX, effectively bailing it out.[48]

178.     But, after a 24-hour diligence period, Binance backed out of the deal, denying a critical capital injection to SBF. Mr. Zhao explained his reasons for the about-face: "Sam, I'm sorry. We won't be able to continue this deal. Way too many issues. CZ." Binance cited findings during due diligence, as well as reports of mishandled customer funds and the possibility of a federal investigation.[49]  In truth, there were always too many issues—issues with the interconnectedness between Alameda and FTX, issues with FTX's total lack of internal controls, issues with SBF's looting of Class Member funds, the news of which sent FTT plunging even further — Bankman-Fried saw 94% of his net worth wiped out in a single day.[50] This triggered panic selling of FTT and a run on FTX, thereby ensuring the firm's swift demise.

179.     Bankman-Fried issued a 22-tweet-long explanation of where he believed he and the FTX Group went wrong:[51]

---

[48]   https://markets.businessinsider.com/news/currencies/ftx-6-billion-withdrawals-72-hours-sam-bankman-fried-binance-2022-11 (accessed May 11, 2023).

[49]   https://markets.businessinsider.com/news/currencies/ftx-crash-sec-cftc-probes-asset-liability-shortfall-6-billion-2022-11 (accessed May 11, 2023).

[50]   https://www.businessinsider.com/ftx-ceo-crypto-binance-sam-bankman-fried-wealth-wiped-out-2022-11 (accessed May 11, 2023).

[51]   https://twitter.com/SBF_FTX/status/1590709189370081280 (accessed May 11, 2023).

Case No. 1:23-md-03076-KMM



**SBF** ✔ @SBF_FTX · Nov 10
1) I'm sorry.  That's the biggest thing.

I fucked up, and should have done better.

💬 11K      🔁 21.4K      ♡ 59.3K      ⬆

**SBF** ✔ @SBF_FTX · Nov 10
2) I also should have been communicating more very recently.

Transparently--my hands were tied during the duration of the possible Binance deal; I wasn't particularly allowed to say much publicly.  But of course it's on me that we ended up there in the first place.

💬 218      🔁 391      ♡ 4,939      ⬆

**SBF** ✔ @SBF_FTX · Nov 10
3) So here's an update on where things are.

[THIS IS ALL ABOUT FTX INTERNATIONAL, THE NON-US EXCHANGE.  FTX US USERS ARE FINE!]

[TREAT ALL OF THESE NUMBERS AS ROUGH.  THERE ARE APPROXIMATIONS HERE.]

💬 259      🔁 639      ♡ 3,873      ⬆

**SBF** ✔ @SBF_FTX · Nov 10
4) FTX International currently has a total market value of assets/collateral higher than client deposits (moves with prices!).

But that's different from liquidity for delivery--as you can tell from the state of withdrawals.  The liquidity varies widely, from very to very little.

💬 174      🔁 636      ♡ 3,592      ⬆

Case No. 1:23-md-03076-KMM



**SBF** ✔ @SBF_FTX · Nov 10

5) The full story here is one I'm still fleshing out every detail of, but as a very high level, I fucked up twice.

The first time, a poor internal labeling of bank-related accounts meant that I was substantially off on my sense of users' margin.  I thought it was way lower.

💬 251          ⇄ 749          ♡ 3,407          ⬆



**SBF** ✔ @SBF_FTX · Nov 10

6) My sense before:

Leverage: 0x
USD liquidity ready to deliver: 24x average daily withdrawals

Actual:

Leverage: 1.7x
Liquidity: 0.8x Sunday's withdrawals

Because, of course, when it rains, it pours.  We saw roughly $5b of withdrawals on Sunday--the largest by a huge margin.

💬 241          ⇄ 907          ♡ 3,823          ⬆



**SBF** ✔ @SBF_FTX · Nov 10

7) And so I was off twice.

Which tells me a lot of things, both specifically and generally, that I was shit at.

And a third time, in not communicating enough.  I should have said more. I'm sorry--I was slammed with things to do and didn't give updates to you all.

💬 116          ⇄ 278          ♡ 2,882          ⬆

Case No. 1:23-md-03076-KMM



**SBF** ✔ @SBF_FTX · Nov 10

8) And so we are where we are.  Which sucks, and that's on me.

I'm sorry.

💬 155          ⟲ 357          ♡ 3,122          ⬆

**SBF** ✔ @SBF_FTX · Nov 10

9) Anyway: right now, my #1 priority--by far--is doing right by users.

And I'm going to do everything I can to do that.  To take responsibility, and do what I can.

💬 162          ⟲ 357          ♡ 3,715          ⬆

**SBF** ✔ @SBF_FTX · Nov 10

10) So, right now, we're spending the week doing everything we can to raise liquidity.

I can't make any promises about that.  But I'm going to try.  And give anything I have to if that will make it work.

💬 164          ⟲ 394          ♡ 3,377          ⬆

**SBF** ✔ @SBF_FTX · Nov 10

11) There are a number of players who we are in talks with, LOIs, term sheets, etc.

We'll see how that ends up.

💬 87          ⟲ 234          ♡ 2,625          ⬆

Case No. 1:23-md-03076-KMM













Case No. 1:23-md-03076-KMM



**SBF** ✔ @SBF_FTX · Nov 10

18) But all of that isn't what matters right now--what matters right now is trying to do right by customers.  That's it.

💬 144          ⟲ 158          ♡ 1,970          ⬆



**SBF** ✔ @SBF_FTX · Nov 10

19) A few other assorted comments:

This was about FTX International.  FTX US, the US based exchange that accepts Americans, was not financially impacted by this shitshow.

It's 100% liquid.  Every user could fully withdraw (modulo gas fees etc).

Updates on its future coming.

💬 406          ⟲ 760          ♡ 2,776          ⬆



**SBF** ✔ @SBF_FTX · Nov 10

20) At some point I might have more to say about a particular sparring partner, so to speak.

But you know, glass houses.  So for now, all I'll say is:

well played; you won.

💬 1,532          ⟲ 3,303          ♡ 8,047          ⬆



**SBF** ✔ @SBF_FTX · Nov 10

21) NOT ADVICE, OF ANY KIND, IN ANY WAY

I WAS NOT VERY CAREFUL WITH MY WORDS HERE, AND DO NOT MEAN ANY OF THEM IN A TECHNICAL OR LEGAL SENSE; I MAY WELL HAVE NOT DESCRIBED THINGS RIGHT though I'm trying to be transparent.  I'M NOT A GOOD DEV AND PROBABLY MISDESCRIBED SOMETHING.

💬 908          ⟲ 1,055          ♡ 3,463          ⬆



### F.  FTX Files for Bankruptcy

180.    On November 11th, unable to obtain a bailout, and facing an insurmountable liquidity crisis, the FTX Group filed for Chapter 11 bankruptcy and Bankman-Fried resigned as CEO.[52]

181.    At or around the same time as Bankman-Fried's *mea culpa* tweets and discussions with reporters, an FTX balance sheet was leaked which shows that FTX held approximately $900 million in liquid assets against $8.9 billion of liabilities, with a negative $8 billion entry described as a "hidden, poorly internally labeled fiat@ account."[53]

182.    Later, *The Wall Street Journal* reported that in a video meeting with Alameda employees on November 9, 2022 (the day prior to Bankman-Fried's November 10, 2022, litany of tweets), Alameda CEO Caroline Ellison said that she, Bankman-Fried, and two other FTX executives, Singh and Wang, were aware of the decision to send customer funds directly to Alameda. Ellison even admitted that "FTX used customer money to help Alameda meet its liabilities."[54] Ellison elaborated on these statements on the record when pleading guilty to eight

---

[52]    https://markets.businessinsider.com/news/currencies/ftx-bankruptcy-sam-bankman-fried-ceo-crypto-binance-alameda-markets-2022-11 (accessed May 11, 2023).

[53]    https://www.bloomberg.com/opinion/articles/2022-11-14/ftx-s-balance-sheet-was-bad#xj4y7vzkg (last accessed February 22, 2023)

[54]    https://www.wsj.com/articles/alameda-ftx-executives-are-said-to-have-known-ftx-was-using-customer-funds-11668264238 (last accessed February 22, 2023)

counts of conspiracy to commit wire fraud, securities fraud, and money laundering, among other conspiracies.[55]

183.    The same source explained that FTX's biggest customer was Alameda, which, instead of holding money, was borrowing billions from FTX users using FTX's in-house cryptocurrency, FTT token, as collateral, then trading it. When the price of the FTT nosedived 75% in a day, making the collateral insufficient to cover the trade, both FTX and Alameda suffered massive liquidity crises. *Id.*

184.    The bankruptcy court appointed John J. Ray III, a 40-year industry veteran who oversaw the liquidation of Enron, to replace SBF as FTX's CEO. Mr. Ray quickly uncovered fundamental deficiencies in basic accounting, corporate governance, and other controls by FTX. These deficiencies were so startling that Mr. Ray remarked he had never "seen such a complete failure of corporate controls and such a complete absence of trustworthy financial information as occurred here." Moreover, Mr. Ray uncovered that:

185.    ***First***, customer assets from FTX.com were commingled with assets from the Alameda trading platform.

186.    ***Second***, Alameda used client funds to engage in margin trading which exposed customer funds to massive losses.

187.    ***Third***, the FTX Group went on a spending binge in late 2021 through 2022, during which approximately $5 billion was spent buying a myriad of businesses and investments, many of which may be worth only a fraction of what was paid for them.

188.    ***Fourth***, loans and other payments were made to insiders in excess of $1 billion.

---

[55]    https://www.wsj.com/articles/alameda-ftx-executives-are-said-to-have-known-ftx-was-using-customer-funds-11668264238 (last accessed December 16, 2022).

189.    *Fifth*, Alameda's business model as a market maker required deploying funds to various third-party exchanges which were inherently unsafe, and further exacerbated by the limited protection offered in certain foreign jurisdictions.

190.    On April 9, 2023, Ray III filed in the FTX Bankruptcy his First Interim Report to the Independent Directors on Control Failures at the FTX Exchanges. *See In re: FTX Trading Ltd.,* No. 1:22-bk-11068-JTD, ECF No. 1242-1 (Bankr. Dist. Del. Apr. 9, 2023), attached as Exhibit D (the "First Interim Rpt.").

191.    Defining the "FTX Group" as a de facto singular entity comprised of FTX Trading, FTX.US, and Alameda, collectively, Mr. Ray begins by explaining that:

192.    the Debtors have had to overcome unusual obstacles due to the FTX Group's lack of appropriate record keeping and controls in critical areas, including, among others, management and governance, finance and accounting, as well as digital asset management, information security and cybersecurity. Normally, in a bankruptcy involving a business of the size and complexity of the FTX Group, particularly a business that handles customer and investor funds, there are readily identifiable records, data sources, and processes that can be used to identify and safeguard assets of the estate. Not so with the FTX Group.

193.    Upon assuming control, the Debtors found a pervasive lack of records and other evidence at the FTX Group of where or how fiat currency and digital assets could be found or accessed, and extensive commingling of assets. This required the Debtors to start from scratch, in many cases, simply to identify the assets and liabilities of the estate, much less to protect and recover the assets to maximize the estate's value. This challenge was magnified by the fact that the Debtors took over amidst a massive cyberattack, itself a product of the FTX Group's lack of controls, that drained approximately $432 million worth of assets on [November 11, 2022,] the

date of the bankruptcy petition (the "November 2022 Breach") and threatened far larger losses absent measures the Debtors immediately implemented to secure the computing environment.

194.    Despite the public image it sought to create of a responsible business, the FTX Group was tightly controlled by a small group of individuals who showed little interest in instituting an appropriate oversight or control framework. These individuals stifled dissent, commingled and misused corporate and customer funds, lied to third parties about their business, joked internally about their tendency to lose track of millions of dollars in assets, and thereby caused the FTX Group to collapse as swiftly as it had grown. In this regard, while the FTX Group's failure is novel in the unprecedented scale of harm it caused in a nascent industry, many of its root causes are familiar: hubris, incompetence, and greed.

First Interim Rpt., 2-3.

195.    After summarizing the history of the three main FTX Group entities, the current efforts to retain advisors to assist in investigating the FTX Group's available financial records and interview witnesses, Mr. Ray provides a comprehensive review of the FTX Group's control failures that led to its eventual collapse, including (1) lack of management and governance controls; (2) lack of financial and accounting controls; and (3) lack of digital asset management, information security and cybersecurity controls. *Id.*, 11–37.

196.    According to Mr. Ray, "[t]he FTX Group lacked appropriate management, governance, and organizational structure," and the "management and governance of the FTX Group was largely limited to Bankman-Fried, Singh, and Wang. Among them, Bankman-Fried was viewed as having the final voice in all significant decisions." *Id.,* 11. The trio "controlled nearly every significant aspect of the FTX Group," despite being "not long out of college and with

no experience in risk management or running a business," and "[b]oard oversight, moreover, was effectively non-existent." *Id.*

197.    The FTX Group also "lacked an appropriate organizational structure. Rather than having an ultimate parent company able to serve as a central point for decision-making that could also direct and control its subsidiaries, the FTX Group was organized as a web of parallel corporate chains with various owners and interest, all under the ultimate control of Bankman-Fried." *Id.,* 8. The FTX Group dd not even have a comprehensive organizational chart until the end of 2021, lacked any tracking of intercompany relationships and ownership of particular entities, and "did not even have current and complete lists of who its employees were." *Id.,* 8–9.

198.    The FTX Group also suffered from a near complete failure to observe corporate formalities, especially when it came to managing the finances of the FTX Group, for instance:

a.    Failure to maintain "personnel who were experienced and knowledgeable enough to account accurately for assets and liabilities, understand and hedge against risk, or compile and validate financial reports," *Id.,* 11;

b.    Failure to maintain adequate "policies and procedures relating to accounting, financial reporting, treasury management, and risk management," *Id.*

c.    Failure to maintain an accurate and appropriate accounting system, in that 56 FTX Group entities did not produce financial statements of *any* kind, 35 used QuickBooks in conjunction with Google documents, Slack communications, shared drives, and Excel spreadsheets, *Id.,* 12–13.

d.    Recordkeeping was so poor that Bankman-Fried described Alameda as "hilariously beyond any threshold of any auditor being able to even get partially through an audit," adding:

> Alameda is unauditable. I don't mean this in the sense of "a major accounting firm will have reservations about auditing it"; I mean this in the sense of "*we* are only able to ballpark what its balances are, let alone something like a comprehensive transaction history." We sometimes find $50m of assets lying around that we lost track of; such is life.

Id., 14.

e.   "Key accounting reports necessary to understand the FTX Group's assets and liabilities, such as statements of cash flows, statements of equity, intercompany and related party transaction matrices, and schedules of customer entitlements, did not exist or were not prepared regularly," *Id.,* 14–15.

f.   "Copies of key documentation – including executed loan agreements, intercompany agreements, acquisition and investment documents, bank and brokerage account statements, and contract and account information of all types – were incomplete, inaccurate, contradictory, or missing entirely." *Id.,* 15.

g.   the FTX Group "did not maintain reliable lists of bank or trading accounts, cryptocurrency wallets, or authorized signatories," and let "[t]housands of deposit checks . . . collect[] like junk mail," *Id.,* 15.

h.   "Although the FTX Group consisted of many, separate entities, transfers of funds among those entities were not properly documented, rendering tracing of funds extremely challenging," including using Slack, Signal, and Telegram with "disappearing messages" enabled, and often approving expenses and invoices on Slack by "emoji," *Id.*

i.   "The FTX Group did not observe any discernable corporate formalities when it came to intercompany transactions. Assets and liabilities were routinely shuffled among the FTX Group entities and insiders without proper process or

69

documentation. Alameda routinely provided funding for corporate expenditures (*e.g.*, paying salaries and other business expenses) whether for Alameda, for various other Debtors, or for FTX DM, and for venture investments or acquisitions whether for Alameda or for various other Debtors. Alameda also transferred funds to insiders to fund personal investments, political contributions, and other expenditures—some of which were nominally 'papered' as personal loans with below-market interest rates and a balloon payment due years in the future." *Id.,* 17.

j.  Often times, intercompany and insider transfers were recorded in a manner "that was inconsistent with the apparent purpose of the transfers," for instance, tens of millions of dollars being transferred from Alameda to Bankman-Fried, personally, but recorded in the general ledger as "Investment in Subsidiaries: Investments-Cryptocurrency," often times recorded in a way that intercompany transactions did not balance across relevant entities, nor were they recorded with specificity regarding which digital assets were involved in the transfer and their value when transferred, *Id.*;

k.  On both FTX International and US exchanges, Alameda was a customer that traded "for its own account as well as engaging in market-making activities, and, in that capacity, it was granted extraordinary privileges by the FTX Group," such as granting Alameda "an effectively limitless ability to trade and withdraw assets from the exchange regardless of the size of Alameda's account balance, and to exempt Alameda from the auto-liquidation process that applied to other customers," effectively allowing it to borrow and/or withdraw up to $65 billion from the FTX Platform, *Id.,* 18–22; and finally

l.   There were "extensive deficiencies in the FTX Group's controls with respect to
digital asset management, information security, and cybersecurity," which was
"particularly surprising given that the FTX Group's business and reputation
depended on safeguarding crypto assets," and "[a]s a result of these control
failures," which included (i) maintaining the majority of customer assets in "hot"
wallets that are easily hacked, (ii) failing to safeguard private keys but storing them
in an Amazon Web Services account, (iii) failing to employ multi-signature
capabilities or Multi-Party Computation, (iv) failing to restrict FTX Group
employee user access to sensitive infrastructure, such as omnibus wallets holding
billions of dollars in assets, and (v) failing to enforce multi-factor authentication
for employees and other commonsense safeguards to protect customer assets and
sensitive data—all of which leads to the irrefutable conclusion that "the FTX Group
exposed crypto assets under its control to a grave risk of loss, misuse, and
compromise, and lacked a reasonable ability to prevent, detect, respond to, or
recover from a significant cybersecurity incident, including the November 2022
Breach." *Id.,* 22–37.

199.   Mr. Ray concludes that "[t]he FTX Group's profound control failures placed its
crypto assets and funds at risk from the outset." *Id.,* 39.

## G.  The Crypto Sector is a Hotbed for Illicit Activity and Fraudulent Conduct

200.   From its inception, cryptocurrency has been fueled by illicit activity and the crypto
sector continues to be rife with frauds and scams. For a detailed breakdown on the illicit use of
cryptocurrency, see the U.S. Department of Justice's report from September 2022 titled: "The Role
of Law Enforcement In Detecting, Investigation, And Prosecuting Criminal Activity Related to

Digital Assets." The report was issued pursuant to the March 9, 2022, Executive Order on Ensuring Responsible Development of Digital Assets and is the latest report on cryptocurrency released by [56] dating back to 2018, all of which detail the dire harms caused by cryptocurrency. DoJ notes that "[t]he rise of the Bitcoin network paralleled the development of Silk Road, AlphaBay, and other illegal online marketplaces…" and the department classified digital asset crime into three categories: "(1) cryptocurrency as a means of payment for, or manner of facilitating, criminal activity; (2) the use of digital assets as a means of concealing illicit financial activity; and (3) crimes involving or affecting the digital assets ecosystem." The September report details several high-profile cases involving the illicit use of cryptocurrency. One case is the darknet marketplace Silk Road, which accepted payment only in Bitcoin, and was shut down by the FBI in 2013 after having facilitated sales revenue totaling over 9.5 million Bitcoin, equivalent to roughly $1.2 billion at the time.

201.    Cryptocurrency is increasingly being used by organized crime syndicates and nation states for illicit purposes. In January 2022, the Government Accountability Office (GAO) issued a report finding that "[v]irtual currency is increasingly used illicitly to facilitate human and drug trafficking."[57] Cryptocurrency is also being used by Iran, Russia, and North Korea to bypass U.S. economic and financial sanctions.[58] According to the United Nations, "money raised by North

---

[56]    https://www.justice.gov/opa/pr/justice-department-announces-report-digital-assets-and-launches-nationwide-network (accessed May 11, 2023).

[57] Virtual Currencies: Additional Information Could Improve Federal Agency Efforts to Counter Human and Drug Trafficking [Reissued with Revisions Feb. 7, 2022] | U.S. GAO (accessed May 11, 2023).

[58] Russia Could Use Cryptocurrency to Mitigate U.S. Sanctions - The New York Times (nytimes.com) (accessed May 11, 2023), Iran Plans Uses Crypto for Imports to Get Around Sanctions (gizmodo.com) (accessed May 11, 2023), This is how North Korea uses cutting-edge crypto money laundering to steal millions | MIT Technology Review(accessed May 11, 2023).

Korea's criminal cyber operations are helping to fund the country's illicit ballistic missile and nuclear programs."[59] North Korea's brazenness was revealed to the public earlier this year when a well-known "Web 3" video game, Axie Infinity, was hacked and $620 million in the cryptocurrency ether was stolen. "Chainalysis estimates that North Korea stole approximately $1 billion in the first nine months of 2022 from decentralized crypto exchanges alone," one of the reasons why Anne Neuberger, US deputy national security adviser for cyber security, said in July 2022 that North Korea "uses cyber to gain …. up to a third of their funds for their missile program."[60]

202.    Cryptocurrency has also fueled a surge in ransomware that has victimized American businesses, health care systems, and state and local governments. In May of 2022, the majority staff on the Homeland Security & Governmental Affairs Committee released a startling report on ransomware.[61] The report notes that in 2021, "ransomware attacks impacted at least 2,323 local governments, schools, and healthcare providers in the United States" and that the FBI "received 3,729 ransomware complaints with adjusted losses of more than $49.2 million." The report acknowledges that these numbers underestimate the true scale of the problem because many ransomware victims do not report to authorities. As evidence, they cite data from blockchain analytics company Chainalysis that found "malign actors received at least $692 million in cryptocurrency extorted as part of ransomware attacks" in 2020. The report notes that "cryptocurrency, typically Bitcoin, has become a near universal form of ransom payment in

---

[59] How North Korea became a mastermind of crypto cybercrime | Ars Technica (accessed May 11, 2023).

[60] Id.

[61] HSGAC Majority Cryptocurrency Ransomware Report.pdf (senate.gov) (accessed May 11, 2023).

ransomware attacks, in part, because cryptocurrency enables criminals to extort huge sums of money from victims across diverse sectors with incredible speed." The link between cryptocurrency and ransomware became clear to the public in the wake of the Colonial Pipeline hack in May 2021, which disrupted gasoline supplies in the southeastern U.S. In the wake of that breach, several commentators argued for a ban, or heavy regulation, of cryptocurrency.[62]

203.    Everyday consumers have also fallen victim to various cryptocurrency-related scams. The Consumer Financial Protection Bureau (CFPB) published 2,404 cryptocurrency related consumer complaints in its Consumer Complaint Database during 2021, and more than 1,000 cryptocurrency-related complaints during 2022 year-to-date.[63] According to the September DoJ report: "The CFPB has also received hundreds of servicemember complaints involving cryptocurrency assets or exchanges in the last 12 months, approximately one-third of which concerned frauds or scams."[64] In June 2022, the Federal Trade Commission issued a report finding that "since the start of 2021 more than 46,000 people have reported losing over $1 billion in crypto to scams – that's about one out of every four dollars reported lost, more than *any* other payment method."[65] The median individual loss was a staggering $2,600.

204.    Another September 2022 report from the Treasury Department, issued pursuant to the Executive Order, also called out the risks and harms to consumers from cryptocurrency:

---

[62] Ban Cryptocurrency to Fight Ransomware - WSJ (accessed May 11, 2023).

[63] Justice Department Announces Report on Digital Assets and Launches Nationwide Network | OPA | Department of Justice (accessed May 11, 2023).

[64] *Id.*

[65] Reports show scammers cashing in on crypto craze | Federal Trade Commission (ftc.gov) (accessed May 11, 2023).

205.    Consumers and investors are exposed to improper conduct in the crypto-asset ecosystem for a variety of reasons, including a lack of transparency as well as the fact that crypto-assets have relatively novel and rapidly developing applications. This leads to frequent instances of operational failures, market manipulation, frauds, thefts, and scams. While the data for populations vulnerable to disparate impacts remains limited, available evidence suggests that crypto-asset products may present heightened risks to these groups, and the potential financial inclusion benefits of crypto-assets largely have yet to materialize.[66]

206.    There is also a long history of consumer losses associated with centralized exchanges, FTX being the latest. One of the first cryptocurrency exchange failures was Japan-based Mt. Gox in 2014. Mt. Gox was handling over 70% of bitcoin transactions worldwide by the time it ceased operations after the exchange was hacked and the majority of cryptocurrency held by the exchange on behalf of customers was stolen. Creditors to Mt. Gox are still waiting for their funds, a sign that does not bode well for FTX creditors, to the extent they seek recovery directly from the FTX Group through the bankruptcy proceedings.[67]

207.    All of the above-mentioned problems with cryptocurrency are well known and one of the big reasons why consumers are often hesitant to purchase or use cryptocurrency. According to Pew Research, 16% of Americans have invested in cryptocurrency while another 71% are not invested although they have heard at least a little about cryptocurrency.[68] For those in the latter group, concerns around fraud and scams are likely playing a role in their resistance to crypto investing. FTX capitalized on these concerns, and on the checkered history of crypto, more

---

[66] Crypto-Assets: Implications for Consumers, Investors, and Businesses (treasury.gov) (accessed May 11, 2023).

[67] What to Watch in the FTX Bankruptcy as Details Remain Scarce - WSJ

[68] 46% of cryptocurrency investors in US say it did worse than expected | Pew Research Center

generally, in promoting the FTX Platform as one that customers could trust, unlike any other exchange in the industry.

208.   For those who choose to invest in cryptocurrency, the damages can be overwhelming, as with the FTX fraud. The losses sustained by SBF's victims are staggering. FTX stole more than $8 billion in Class Member funds, the bulk of which has now vanished. Many Class Members came of working age in the recession and, later, the COVID-19 pandemic, and as a result have spent their lives working long hours for low wages, often across multiple jobs or in the gig economy. Unlike MDL Defendants, these Class Members do not have money to burn. They are not "crypto-bros." They are financially vulnerable, and SBF, with the help of his co-conspiring MDL Defendants, exploited their vulnerability for tremendous financial gain. Now, while SBF rests comfortably at his parents' home in Palo Alto, flush with the resources to post $250 million bail, SBF's victims are left with nothing.

## H.  The SEC's Approach to Cryptocurrency.

### I.      Overview

209.   Despite the crypto industry's cries for "regulatory clarity," the SEC's stance on cryptocurrency has been clear and consistent from the beginning. Critics of the SEC's stance toward cryptocurrency overlook an important aspect of U.S. securities law – securities regulation is not meant to be precise but is instead intentionally drafted to be broad and all-encompassing; clarity is not just uncommon; it is deliberately avoided. This is why the definitions of "security" in Section 2(a)(1) of the Securities Act of 1933 (Securities Act), 15 U.S.C. 77b(a)(1), and Section 3(a)(10) of the Securities Exchange Act of 1934 (Exchange Act), 15 U.S.C. 78c(a)(10), include not only conventional securities, such as "stock[s]" and "bond[s]," but also the more general term "investment contract."

210.    Along these lines, in *Reves v. Ernst & Young*, the Supreme Court stated that:

The fundamental purpose undergirding the Securities Acts is 'to eliminate serious abuses in a largely unregulated securities market.' *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 421 U.S. 849 (1975). **In defining the scope of the market that it wished to regulate, Congress painted with a broad brush. It recognized the virtually limitless scope of human ingenuity, especially in the creation of 'countless and variable schemes devised by those who seek the use of the money of others on the promise of profits**, *SEC v. W.J. Howey Co.*, 328 U.S. 293, 328 U.S. 299 (1946), and determined that the best way to achieve its goal of protecting investors was 'to define the term "security" in sufficiently broad and general terms so as to include within that definition the many types of instruments that in our commercial world fall within the ordinary concept of a security.' . . . Congress therefore did not attempt precisely to cabin the scope of the Securities Acts . . . Rather, it enacted a definition of 'security' sufficiently broad to encompass virtually any instrument that might be sold as an investment." (emphasis added)[69]

211.    Crafted to contemplate not only known securities arrangements at the time, but also any prospective instruments created by those who seek the use of others' money on the promise of profits, the definition of "security" is broad, sweeping, and designed to be flexible to capture new instruments that share the common characteristics of stocks and bonds. As Supreme Court Justice (and former SEC Commissioner (1935) and Chair (1936-37)) William O. Douglas opined in Superintendent of Insurance v. Bankers Life and Casualty Co.:

We believe that section 10(b) and Rule 10b-5 prohibit all fraudulent schemes in connection with the purchase or sale of securities, whether the artifices employed involve a garden type variety fraud or present a unique form of deception. Novel or atypical methods should not provide immunity from the securities laws.

212.    Federal courts have already confirmed the SEC's jurisdiction in numerous crypto-related emergency asset freeze hearings where the issue is always considered and affirmed, same as it has been by hundreds of federal courts across the country since the *Howey* decision, which

---

[69]https://scholar.google.com/scholar_case?case=18068523124125938239&q=Reves+v.+Ernst+%26+Young&hl=en&as_sdt=400006&as_vis=1 (accessed May 11, 2023).

the Supreme Court adopted over 75 years ago.[70] That decision resulted in the *Howey* Test, which is used to determine the presence of an investment contract. The *Howey* Test stipulates that an investment contract exists if there is an "investment of money in a common enterprise with a reasonable expectation of profits to be derived from the efforts of others."[71] The *Howey* Test is the principal method used by the SEC to determine if a given cryptocurrency is a security.

213.    The SEC has used multiple distribution channels to share its message and concerns regarding crypto, digital trading platforms, initial coin offerings, and other digital asset products and services over the past decade. The SEC first made investors aware of the dangers of investing in cryptocurrency in 2013 when the Office of Investor Education and Advocacy issued an Investor Alert on "Ponzi Schemes Using Virtual Currencies."[72]

214.    A year later, the same office issued an Investor Alert on "Bitcoin and Other Virtual Currency-Related Investments."[73] In 2017, the Commission took the rare step of releasing a Section 21(a) Report of Investigation that looked at the facts and circumstances of The DAO, which offered and sold approximately 1.15 billion DAO Tokens in exchange for a total of approximately 12 million Ether ("ETH") over a one-month period in 2016.[74] The SEC applied the *Howey* Test to the DAO tokens and concluded they were securities under the Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act"). While The DAO, and DAO tokens, were no longer operational at the time due to a high-profile hack that

---

[70] https://supreme.justia.com/cases/federal/us/328/293/ (accessed May 11, 2023).

[71] Id.

[72] ia_virtualcurrencies.pdf (sec.gov) (accessed May 11, 2023).

[73] Investor Alert: Bitcoin and Other Virtual Currency-Related Investments | Investor.gov (accessed May 11, 2023).

[74] https://www.sec.gov/litigation/investreport/34-81207.pdf (accessed May 11, 2023).

resulted in the theft of most DAO tokens, the Commission chose to release the report so as "to advise those who would use a Decentralized Autonomous Organization ("DAO Entity"), or other distributed ledger or blockchain-enabled means for capital raising, to take appropriate steps to ensure compliance with the U.S. federal securities laws."[75]

215.   In 2019, the SEC released a "Framework for "Investment Contract" Analysis of Digital Assets" which provided additional details on when a digital asset has the characteristics of an investment contract and "whether offers and sales of a digital asset are securities transactions."[76]

216.   In addition, the SEC has publicized its position on cryptocurrency in countless enforcement actions,[77] multiple speeches,[78] Congressional testimony,[79] and several official SEC statements[80] and proclamations.[81] Current SEC Chairman, Gary Gensler, has spoken frequently about the perils and illegality of crypto lending platforms and decentralized

---

[75] Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO (accessed May 11, 2023).

[76] SEC.gov | Framework for "Investment Contract" Analysis of Digital Assets (accessed May 11, 2023).

[77] SEC.gov | Crypto Assets and Cyber Enforcement Actions (accessed May 11, 2023).

[78] https://www.sec.gov/news/speech/gensler-aspen-security-forum-2021-08-03 (accessed May 11, 2023).

[79] https://www.sec.gov/news/testimony/gensler-2021-05-26 (accessed May 11, 2023).

[80] https://www.sec.gov/news/public-statement/statement-clayton-2017-12-11 (accessed May 11, 2023).

[81] https://www.sec.gov/news/public-statement/enforcement-tm-statement-potentially-unlawful-online-platforms-trading (accessed May 11, 2023).

finance,[82] warning that their failure to register with the SEC may violate U.S. securities laws.[83] In one interview, Gensler said:

> "The law is clear; it's not about waving a wand. Congress spoke about this in 1934 . . . When a [digital] platform has securities on it, it is an exchange, and it's a question of whether they're registered or they're operating outside of the law, and I'll leave it at that."[84]

217.    On September 8, 2022, Chair Gensler gave a speech reflecting on the flexibility of the securities laws and the SEC's consistency in applying these laws to cryptocurrency.[85] Gensler noted that of the 10,000 different cryptocurrencies in the market, "the vast majority are securities," a position that was also held by his predecessor, Jay Clayton.[86] Gensler went on to note that the SEC has spoken with a "pretty clear voice" when it comes to cryptocurrency "through the DAO Report, the Munchee Order, and dozens of Enforcement actions, all voted on by the Commission" and that "[n]ot liking the message isn't the same thing as not receiving it."[87]

218.    The judicial record supports Chair Gensler's assertions. The SEC has taken over 100 crypto-related enforcement actions and has not lost a single case.[88]

219.    What follows are summaries of five cases that will help inform this litigation.

---

[82]   https://www.theblock.co/post/113416/gensler-speech-crypto-defi-lending-sec  (accessed  May 11, 2023).

[83]   https://ca.finance.yahoo.com/news/crypto-platforms-dont-register-with-sec-outside-the-law-gensler- 164215740.html (accessed May 11, 2023).

[84]   https://www.theblock.co/post/113416/gensler-speech-crypto-defi-lending-sec  (accessed  May 11, 2023).

[85] SEC.gov | Kennedy and Crypto (accessed May 11, 2023).

[86] Id.

[87] Id.

[88] SEC Cryptocurrency Enforcement: 2021 Update (cornerstone.com) (accessed May 11, 2023).

## II.      SEC v. KIK

220.     In Kik[89], the SEC's complaint[90], filed in the U.S. District Court for the Southern District of New York on June 4, 2019, alleged that Kik sold digital asset securities to U.S. investors without registering their offer and sale as required by the U.S. securities laws. Kik argued that the SEC's lawsuit against it should be considered "void for vagueness."[91]

221.     The court granted the SEC's motion for summary judgment on September 30, 2020, finding that undisputed facts established that Kik's sales of "Kin" tokens were sales of investment contracts (and therefore of securities) and that Kik violated the federal securities laws when it conducted an unregistered offering of securities that did not qualify for any exemption from registration requirements. The court further found that Kik's private and public token sales were a single integrated offering.

## III.      SEC v. Telegram

222.     In Telegram,[92] the SEC filed a complaint[93] on October 11, 2019, alleging that the company had raised capital to finance its business by selling approximately 2.9 billion "Grams" to 171 initial purchasers worldwide. The SEC sought to preliminarily enjoin Telegram from delivering the Grams it sold, which the SEC alleged were securities that had been offered and sold in violation of the registration requirements of the federal securities laws.

---

[89] https://www.sec.gov/news/press-release/2020-262 (accessed May 11, 2023).

[90] https://www.sec.gov/news/press-release/2019-87 (accessed May 11, 2023).

[91]      https://www.financemagnates.com/cryptocurrency/news/sec-seeks-to-block-kik-subpoenas-refutes-void-for-vagueness-claim/ (accessed May 11, 2023).

[92] https://www.sec.gov/news/press-release/2020-146 (accessed May 11, 2023).

[93] https://www.sec.gov/news/press-release/2019-212 (accessed May 11, 2023).

223.    Telegram argued[94] that the SEC has "engaged in improper 'regulation by enforcement' in this nascent area of the law, failed to provide clear guidance and fair notice of its views as to what conduct constitutes a violation of the federal securities laws, and has now adopted an ad hoc legal position that is contrary to judicial precedent and the publicly expressed views of its own high-ranking officials."

224.    On March 24, 2020, the U.S. District Court for the Southern District of New York issued a preliminary injunction[95] barring the delivery of Grams and finding that the SEC had shown a substantial likelihood of proving that Telegram's sales were part of a larger scheme to distribute the Grams to the secondary public market unlawfully.

225.    Without admitting or denying the allegations in the SEC's complaint, the defendants consented to the entry of a final judgment enjoining them from violating the registration provisions of Sections 5(a) and 5(c) of the Securities Act of 1933. The judgment ordered the defendants to disgorge, on a joint and several basis, $1,224,000,000.00 in ill-gotten gains from the sale of Grams, with credit for the amounts Telegram pays back to initial purchasers of Grams. It also ordered Telegram Group Inc. to pay a civil penalty of $18,500,000. For the next three years, Telegram is further required to give notice to the SEC staff before participating in the issuance of any digital assets.

---

[94]    https://www.financemagnates.com/cryptocurrency/news/sec-vs-telegram-will-gram-tokens-ever-be-distributed/ (accessed May 11, 2023).

[95]    SEC v. Telegram: A Groundbreaking Decision in Cryptocurrency Enforcement? | Insights | Greenberg Traurig LLP (gtlaw.com) (accessed May 11, 2023).

### IV.    SEC v. BlockFi

226.    In BlockFi Lending LLC, the first SEC case ever involving a crypto-lending program, on February 22, 2022, the SEC charged BlockFi [96] with failing to register the offers and sales of its retail crypto-lending product and also charged BlockFi with violating the registration provisions of the Investment Company Act of 1940.

227.    BlockFi argued for "increased regulatory clarity" but lost. [97]

228.    To settle the SEC's charges, BlockFi agreed to pay a $50 million penalty, cease its unregistered offers and sales of the lending product, BlockFi Interest Accounts (BIAs), and bring its business within the provisions of the Investment Company Act within 60 days. BlockFi's parent company also announced that it intends to register under the Securities Act of 1933 the offer and sale of a new lending product. In parallel actions, BlockFi agreed to pay an additional $50 million in fines to 32 states to settle similar charges.

### V.    SEC Wells Notice to Coinbase

229.    In 2021, Coinbase began marketing a cryptocurrency lending product called Lend. The Lend program purported to allow some Coinbase customers to "earn interest on select assets on Coinbase, starting with 4% APY on USD Coin (USDC)." [98] According to Coinbase, its lawyers reached out to the SEC to discuss its Lend product, at which point SEC staff instead served Coinbase with a *Wells Notice,* informing Coinbase of their intention to seek approval from the SEC Commissioners to file a civil enforcement action against Coinbase for violating the federal securities laws.

---

[96] https://lnkd.in/d-Xy45ec (accessed May 11, 2023).

[97] https://blockfi.com/pioneering-regulatory-clarity (accessed May 11, 2023).

[98] The SEC has told us it wants to sue us over Lend. We don't know why. - Blog (coinbase.com) (accessed May 11, 2023).

230.    According to Coinbase, the SEC issued the Wells Notice because of Coinbase's failure to file a registration statement with the SEC for the offering of its Lend product, which the SEC believed was a security.[99]

231.    The two cases that Coinbase claims the SEC cites as support for its *Wells* Notice are *SEC v. Howey* and *Reves v. Ernst & Young*. *Reves* addressed the question of whether a product is a "note" and hence a security (applying the so-called "Familial Resemblance Test").

232.    Under the Lend program, Coinbase customers were clearly investing "money" at Coinbase and placing their faith in Coinbase to generate a profit for them. Lend investors would have no say in how Coinbase runs the Lend program and Coinbase was not going to permit Lend investors to participate in Lend-related decisions. Given these facts, Lend was clearly an investment contract.

233.    Under *Reves*, Lend may have also been a "note" and hence a security. Although the term "note" is included in the statutory definition of a security, case law has determined that not every "note" is a security. The definition specifically excludes notes with a term of less than nine months and courts have carved out a range of exemptions over the years for commercial paper type notes such as purchase money loans and privately negotiated bank loans. To reconcile these varying cases, the U.S. Supreme Court in *Reves* established the "family resemblance test," to determine whether a note is a security.

234.    Per the "family resemblance test," a presumption that a note is a security can only be rebutted if the note bears a resemblance to one of the enumerated categories on a judicially developed list of exceptions, as follows: 1) a note delivered in consumer financing; 2) a note secured by a mortgage on a home; 3) a short-term note secured by a lien on a small business or

---

[99] *Id.*

some of its assets; 4) a note evidencing a character loan to a bank customer; 5) a short-term note secured by an assignment of accounts receivable; and 6) a note which simply formalizes an open-account debt incurred in the ordinary course of business (such as a trade payable for office supplies); and vii) a note evidencing loans by commercial banks for current operations.

235.    The "family resemblance" analysis requires:

- A consideration of the motivation of the seller and buyer (e.g., is the seller looking for investment and the buyer looking for profit?);

- The plan of distribution of the note (e.g., is the product being marketed as an investment?);

- The expectation of the creditor/investor (e.g., would the investing public reasonably expect the application of the securities laws to the product); and

- The presence of an alternative regulation (e.g., will the product be registered as a banking product and the offered registered as a bank?).

236.    Applying the family resemblance test to Lend reveals the presence of a note. First, Coinbase likened the Lend program to that of a savings account, where the Lend customer is looking for a profitable investment and Coinbase is looking for investors. Second, Coinbase marketed the Lend program as an investment. Third, investors would expect that securities regulation applies. Fourth, Coinbase is not a bank, so their so-called savings account falls under no other regulatory jurisdiction and protection.

237.    Given the clear facts of the case, Coinbase decided to cancel the Lend program.[100]

---

[100]https://www.theverge.com/2021/9/20/22684169/coinbase-crypto-lend-feature-discontinued-sec-lawsuit-threats (accessed June 27, 2023).

## VI.    SEC v. Binance

238.    In Binance, the SEC filed a complaint[101] on June 5, 2023, in the United States District Court for the District of Columbia against several of the Binance entities including Binance.com, U.S.-based affiliates, and the founder Changpeng Zhao. The SEC alleges that Binance.com and the other defendants violated thirteen securities laws, including selling various unregistered securities and a staking-as-a-service program; operating an unregistered exchange, broker-dealer, and clearing agency across interstate lines; covertly controlling Binance.US to evade U.S. securities laws; secretly allowing U.S. high-value traders to remain on the international platform; and commingling billions of U.S. assets with Zhao-owned entities. The SEC seeks a preliminary injunction to, among other relief, freeze and repatriate defendants' U.S. assets. The SEC also seeks to permanently enjoin defendants from directly or indirectly violating the Exchange and Securities Acts, disgorge illegal gains, and award civil damages.

## VII.    SEC v. Coinbase

239.    In Coinbase, the SEC filed a complaint[102] on June 6, 2023, in the United States District Court for the Southern District of New York against Coinbase and Coinbase Global. The SEC alleges that the Coinbase entities have violated multiple securities laws, including making billions of dollars from selling various unregistered securities and a staking-as-a-service program; and operating an unregistered exchange, broker-dealer, and clearing agency across interstate lines. The SEC seeks to permanently enjoin defendants from directly or indirectly violating the Exchange and Securities Acts, disgorge illegal gains, and award civil damages. "Coinbase was fully aware

---

[101]https://www.sec.gov/files/litigation/complaints/2023/comp-pr2023-101.pdf.
[102] https://www.sec.gov/litigation/complaints/2023/comp-pr2023-102.pdf.

of the applicability of the federal securities laws to its business activities, but deliberately refused to follow them," stated Gurbir S. Grewal, Director of the SEC's Division of Enforcement.[103]

## VIII.   SEC v. Terraform Labs Pte. Ltd.

240.   In one of the most recent developments in the crypto space, on July 31, 2023, Judge Jed Rakoff in the Southern District of New York entered an order denying a motion to dismiss claims that defendants, a crypto-assets company and its founder, were responsible for a multibillion-dollar fraud that involved the development, marketing, offer and sale of crypto-assets that the SEC alleged were unregistered securities. *SEC v. Terraform Labs Pte. Ltd., et al.*, No 1:23-cv-01346-JSR, ECF No. 51 (S.D.N.Y. July 31, 2023).[104]

241.   This is a significant ruling for several reasons.

242.   First, it supports the fact that YBAs and FTT are unregistered securities.

243.   Second, Judge Rakoff explicitly rejects a key component of his colleague, Judge Analisa Torres' reasoning in her order on cross-motions for summary judgment in *SEC v. Ripple Labs, Inc., et al.*, No. 1:20-cv-10832, ECF No. 874 (S.D.N.Y. July 13, 2023), which drew a distinction between crypto-assets sold directly by the issuer and on the secondary market.[105]

244.   Third, Judge Jed Rakoff is a highly regarded jurist who is considered an expert in securities law and business law. In fact, Todd Baker, an attorney and Senior Fellow at the Richman Center for Business, Law & Public Policy at Columbia Business and Law Schools called Judge

---

[103] https://www.sec.gov/news/press-release/2023-102.

[104] https://storage.courtlistener.com/recap/gov.uscourts.nysd.594150/gov.uscourts.nysd.594150.51.0_1.pdf (accessed August 6, 2023).

[105] https://assets.bwbx.io/documents/users/iqjWHBFdfxIU/rVqyLFyEZnz8/v0

Rakoff, in a *Financial Times* article, the "[T]he most respected securities authority in the federal judiciary."[106]

245.    The relevant points of comparison in Judge Rakoff's decision to the FTX MDL are his analysis around the Luna token and UST stablecoin, which bear similarities to the FTT token and YBAs, respectively.

246.    With respect to the Luna token, Judge Rakoff found that a common enterprise and expectation of profit existed because Terraform labs used proceeds from LUNA coin sales to develop the Terraform blockchain and represented that that these improvements would increase the value of the Luna tokens. This is similar to the FTT token, which was an exchange token. Given FTT's features, it was clearly designed to go up in value as the FTX platform grew and became more popular with crypto traders. In fact, in their complaint alleging, amongst other things, that FTT is an unregistered security, the SEC states:

> FTX used the pooled proceeds from FTT sales to fund the development, marketing, business operations, and growth of FTX, depending on the success of FTX and its management team in developing, operating, and marketing the trading platform. If demand for trading on the FTX platform increased, demand for the FTT token could increase, such that any price increase in FTT would benefit holders of FTT equally and in direct proportion to their FTT holdings. The large allocation of tokens to FTX incentivized the FTX management team to take steps to attract more users onto the trading platform and, therefore, increase demand for, and increase the trading price of, the FTT token.[107]

The SEC makes a similar allegation with respect to Luna in the Terraform Labs action and

Judge Rakoff sides with the SEC. From his decision:

> The SEC's theory for horizontal commonality as to these other coins, however, rests on a different but equally plausible theory. As to the LUNA tokens, for instance, the SEC has demonstrated horizontal commonality by alleging that the defendants' used proceeds from LUNA coin sales to develop the Terraform blockchain and represented that these improvements would increase the value of

---

[106] https://www.ft.com/content/5e5a3c4a-7508-4db8-ab23-1ff17c87c880

[107] comp-pr2022-234.pdf (sec.gov)

the LUNA tokens themselves. See Amended Complaint ¶¶ 46-47, 49-51. In other words, by alleging that the defendants "pooled" the proceeds of LUNA purchases together and promised that further investment through these purchases would benefit all LUNA holders, the SEC has adequately pled that the defendants and the investors were joined in a common, profit-seeking enterprise.[108]

Also, of relevance to the FTX MDL is Judge Rakoff's conclusion that the algorithmic stablecoin, UST, also met the *Howey* standard for investment contracts. Note that this is the first time the SEC has alleged that a stablecoin is an investment contract, and the SEC's reasons for making this allegation also support the assertion that YBAs are securities.

While UST, like most stablecoins, was supposed to be tied one-for-one to the US dollar, Terraform and Kwon marketed "UST coins as profitable investment opportunities—as opposed to just stable stores of value—in meetings with U.S. investors, investment conferences in major U.S. cities, and on social media platforms."[109]

247.    Then, in 2021, Terraform launched the "Anchor Protocol" which was an "investment pool into which owners of UST coins could deposit their coins and earn a share of whatever profits the pool generated."

Judge Rakoff found that "the fact that most of the UST coins were deposited in the Anchor Protocol independently rendered these tokens investment contracts, indeed investments that were touted as being capable of being able to generate future profits of as much as 20%."[110] Judge Rakoff goes on to say:

> In essence, the UST tokens were allegedly "pooled" together in the Anchor Protocol and, through the managerial efforts of the defendants, were expected to generate

---

[108] https://assets.bwbx.io/documents/users/iqjWHBFdfxIU/rwwEEo0YbENc/v0 at 36

[109] *Id.* at Page 4

[110] *Id.* at Page 34

profits that would then be re-distributed to all those who deposited their coins into the Anchor Protocol—in other words, on a pro-rata basis."[111]

This closely resembles the facts surrounding YBAs and Judge Rakoff's finding that UST met the requirements for an investment contract supports the conclusion that YBAs are also unregistered securities.

Judge Rakoff also explicitly rejects a key element of Judge Torres' analysis in the *Ripple* decision, stating:

> It may also be mentioned that the Court declines to draw a distinction between these coins based on their manner of sale, such that coins sold directly to institutional investors are considered securities and those sold through secondary market transactions to retail investors are not. In doing so, the Court rejects the approach recently adopted by another judge of this District in a similar case, *SEC v. Ripple Labs Inc.*, 2023 WL 4507900 (S.D.N.Y. July 13, 2023).[112]

Judge Rakoff goes on to explain that *Howey* and its progeny never made such a distinction, nor does it matter, for purposes of *Howey* analysis, whether a purchaser "bought the coins directly from the defendants or, instead, in a secondary resale transaction."[113]

After noting that "in theory, the tokens, if taken by themselves, might not qualify as investment contracts," Judge Rakoff evaluated—"as the Supreme Court did in *Howey*"—"whether the crypto-assets and the 'full set of contracts, expectations, and understandings centered on the sales and distribution of [these tokens]' amounted to an 'investment contract' under federal securities laws."[114]

Judge Rakoff's rejection of the *Ripple* decision's secondary market distinction and fulsome *Howey* analysis support Plaintiffs' assertion that FTT and YBAs are unregistered securities. FTT

---

[111] *Id.* at Page 36

[112] *Id.* at 40

[113] *Id.* at 41

[114] *Id.* at 32–33.

purchasers, on the FTX Platform or elsewhere, did not necessarily know who the seller was. But, as Judge Rakoff explains, knowledge of the seller's identity is not necessary to prove that purchasers expected profits based on the efforts of FTX, who is the ***issuer*** of these assets, and not simply a platform where the assets traded.

**I.  FTX's offer and sale of YBAs, which are unregistered securities.**

248.     Beginning in 2019, the FTX Group began offering the YBAs to public investors through its Earn program. Plaintiffs and other similarly situated individuals invested in FTX's YBAs.

249.     The details of the Earn program are still listed on the FTX website,[115] and additional information on Earn is described in a declaration submitted in the Voyager Chapter 11 proceedings by Joseph Rotunda, Director of Enforcement of the Texas State Securities Board, on October 14, 2022.[116]

250.     Under the section titled "How can I earn yield on my FTX deposits?" on the FTX website, the company describes the Earn program thusly:

251.     "You can now earn yield on your crypto purchases and deposits, as well as your fiat balances, in your FTX app! By opting in and participating in staking your supported assets in your FTX account, you'll be eligible to earn up to 8% APY on your assets."[117]

252.     On the same webpage, the company also states:

---

[115] FTX App Earn – FTX Exchange (accessed May 11, 2023).

[116] 1175310142280000000134.pdf (stretto.com) (accessed May 11, 2023).

[117] FTX App Earn – FTX Exchange (accessed May 11, 2023).

253.    The **first $10,000** USD value in your deposit wallets will earn **8%** APY. Amounts held **above $10,000 up to $100,000** USD in value (subject to market fluctuations) will earn **5%** APY.[118]

254.    Nowhere on the website does FTX describe how this yield will be generated; other than that the yield will come from "staking your supported assets in your FTX account" although nowhere does the company describe what staking actually is.

255.    Staking is a technical concept that applies to the blockchain consensus mechanism called Proof of Stake, which some cryptocurrencies utilize.[119] Staking serves a similar function to cryptocurrency mining, in that it is the process by which a network participant gets selected to add the latest batch of transactions to the blockchain and earn some crypto in exchange. While the exact mechanism will vary from project to project, in general, users will put their token on the line (i.e., "stake") for a chance to add a new block onto the blockchain in exchange for a reward. Their staked tokens act as a guarantee of the legitimacy of any new transaction they add to the blockchain. The network chooses validators based on the size of their stake and the length of time they've held it. Thus, the most invested participants are rewarded. If transactions in a new block are discovered to be invalid, users can have a certain amount of their stake burned by the network, in what is known as a slashing event.[120]

256.    Some within the crypto community argue that staking is not a security because it is simply part of the code by which specific cryptocurrencies operate. In other words, some argue that staking programs are different from lending programs because user assets are not actually

---

[118] *Id.*

[119] For example, Ethereum, Tezos, Cosmos, Solana, and Cardano all use Proof of Stake.

[120] The staking definition comes from the Coinbase website: <u>What is staking? | Coinbase</u> (accessed May 11, 2023).

being "lent" out to third parties. But in September 2022, SEC Chairman Gary Gensler told reporters that "cryptocurrencies and intermediaries that allow holders to 'stake' their coins might pass" the *Howey* Test.[121] According to Gensler, "From the coin's perspective…that's another indicia that under the *Howey* test, the investing public is anticipating profits based on the efforts of others." The *Wall Street Journal* noted that if an intermediary such as a crypto exchange offers staking services to its customers, Mr. Gensler said, it "looks very similar—with some changes of labeling—to lending."[122]

257.    Based upon information – included and not included – on the FTX website, it does not appear that the company is adhering to the technical, commonly understood, definition of staking. *See* Ex. A ¶¶ 36–42. The most telling indicator is that the company permits any cryptocurrency listed on their platform to be eligible for staking, even coins that do not use Proof of Stake. *Id.* ¶ 39. The FTX website specifically states that Bitcoin and Dogecoin can generate yield under the Earn program, even though these coins use the Proof of Work consensus mechanism (meaning you CANNOT technically stake Bitcoin or Dogecoin). Therefore, it is not at all clear where the promised yield is coming from.

258.    Applying *Howey* to the FTX Earn program reveals that Earn is an investment contract. An investment contract is present because users are clearly entrusting their funds to FTX. Users have to "opt-in" so that FTX may take possession over user assets and deploy them in a manner that will generate yield. As noted above, it is not clear how that yield is generated, but it is clear that FTX is deploying customer assets in a discretionary manner. Therefore, the efforts of

---

[121] Ether's New 'Staking' Model Could Draw SEC Attention - WSJ (accessed May 11, 2023).

[122] Id.

FTX are instrumental in generating the users' yield and of course users have an expectation of profit because FTX is advertising yields of up to 8% APY:

From a securities perspective, the *Howey* Test defines an investment contract as:

a. An investment of money

  i. Cryptocurrency is a medium of exchange and way of transferring value in a measurable and quantifiable way. It is increasingly used as a means of payment, although it is more commonly used as a speculative investment at this point in time. Whether or not cryptocurrency can be defined as 'money' is in part a matter of semantics that can vary based on considers the fundamental features of money to be, and what criteria needs to be achieved in order for something to be considered money. Suffice to say, when examining aspects such as fungibility, durability, portability, divisibility, scarcity, transferability, acting as a medium of exchange, acting as a unit of account, and acting as a store of value, it could be argued that some cryptocurrencies fulfill many of these criterions as good as or even better than fiat currencies.

b. In a common enterprise

  i. FTX customer assets are almost always consolidated in wallets operated and controlled by FTX at least initially. These wallets are typically referred to as 'hot wallets' or 'consolidation wallets.' From these wallets, cryptocurrency can be move to other FTX-controlled wallets, or it can be used to pay back other customers performing withdrawals, but FTX can and did send (and loan) out such assets to other entities, including Alameda 'Alameda.' The blockchains data contains an immutable and verifiable record of data that shows that FTX customer deposits went into accounts operated by a common enterprise, namely, FTX.

c. With the expectation of profit

  i. FTX customers are promised yield when they participate in the Earn program. And at up to 8% yield, that is a considerable amount that would be considerably in excess to that of a savings account at a bank. But it was also far riskier than investing money in a savings account at a bank. FTX goes out of their way to advertise this yield,

and indicate that such earnings are to be calculated on the "investment portfolio" that is stored 'in' the FTX app.[123]

d.   To be derived from the efforts of others

      i.   The FTX Yield-bearing account was portrayed as passive income stream. A customer needs to do nothing more than ensure they are subscribed to the yield program, and that they have deposited assets (of crypto or even fiat) in order to earn the 5% or 8% yield, which they clearly indicate is counted hourly. There is no further work or action needed on the part of the user.

      ii.   The work that 'others' (namely FTX) would need to do would including, at a baseline, sending transactions. But it would also require FTX to make an effort by leveraging and investing the money elsewhere which could theoretically come about either via giving out loans, employing trading strategies, 'staking,' making other investments, or giving out loans to entities (such as Alameda) that would employ such strategies.

259.   The FTX Earn program was most likely a note per *Reves* as well. First, FTX offered Earn to obtain crypto assets for the general use of its business, namely, to run its activities to pay interest to Earn investors, and users purchased YBAs and were automatically opted-in to Earn to receive interest on their crypto assets. Second, Earn was offered and sold to a broad segment of the general public. Third, FTX promoted Earn as an investment; on their website, FTX notes that Earn users will receive "yield earnings" on their "investment portfolio."[124] Fourth, no alternative regulatory scheme or other risk reducing factors exist with respect to Earn. Note that the above analysis mirrors that provided by the SEC in their BlockFi order.[125]

---

[123]   https://help.ftx.com/hc/en-us/articles/10573545824532-FTX-App-Earn   (accessed May 11, 2023).

[124]   FTX App Earn – FTX Exchange (accessed May 11, 2023).

[125]   https://www.sec.gov/news/press-release/2022-26 (accessed May 11, 2023).

260.    FTX maintains that it does not offer for sale any product that constitutes a "security" under federal or state law. Under federal securities laws as construed by the United States Supreme Court in its decision *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946) and by the SEC, an investment contract is a form of security under United States securities laws when (1) the purchaser makes an investment of money or exchanges another item of value (2) in a common enterprise (3) with the reasonable expectation of profits to be derived from the efforts of others.

261.    The YBAs were "securities" as defined by the United States securities laws and as interpreted by the Supreme Court, the federal courts, and the SEC. The FTX Group offered variable interest rewards on crypto assets held in the YBAs on the FTX Platform, which rates were determined by the FTX Group in their sole discretion. In order to generate revenue to fund the promised interest, the FTX Group pooled the YBA assets to engage in lending and staking activities from which they derived revenue to pay interest on the YBAs. These activities make the YBAs a "security" under state and federal law.

262.    On October 14, 2022, Director of Enforcement of the Texas State Securities Board, Joseph Rotunda, filed a declaration in the Chapter 11 bankruptcy proceedings pending in connection with the collapse of the Voyager Digital cryptocurrency exchange, *In re: Voyager Digital Holdings, Inc., et al.*, Case No. 22-10943 (MEW), ECF No. 536 (Bankr. S.D.N.Y. Oct. 14, 2022), in which he explained how the YBAs are in fact "an offering of unregistered securities in the form of yield-bearing accounts to the residents of the United States." *Id.*, at 6. In his declaration, the pertinent portions of which are reproduced in full for ease of reference, Rotunda explains:

I am also familiar with FTX Trading LTD ("FTX Trading") dba FTX as described herein. As more fully explained throughout this declaration, I am aware that FTX Trading, along with West Realm Shires Services Inc. dba FTX US ("FTX US"), may be offering unregistered securities in the form of yield-bearing accounts

to residents of the United States. These products appear similar to the yield-bearing depository accounts offered by Voyager Digital LTD et al., and the Enforcement Division is now investigating FTX Trading, FTX US, and their principals, including Sam Bankman-Fried.

I understand that FTX Trading is incorporated in Antigua and Barbuda and headquartered in the Bahamas. It was organized and founded in part by Mr. Bankman-Fried, and FTX Trading appears to be restricting operations in the United States. For example, domestic users accessing the webpage for FTX Trading at ftx.com are presented with a pop-up window that contains a disclaimer that reads in part as follows:

> Did you mean to go to FTX US? FTX US is a US licensed cryptocurrency exchange that welcomes American users.

> You're accessing FTX from the United States. You won't be able to use any of FTX.com's services, though you're welcome to look around the site.

FTX US claims to be regulated as a Money Services Business with FinCEN (No. 31000195443783) and as a money transmitter, a seller of payment instruments and in other non-securities capacities in many different states. It is not, however, registered as a money transmitter or in any other capacity with the Texas Department of Banking and it is not registered as a securities dealer with the Texas State Securities Board.

FTX US owns 75 percent or more of the outstanding equity of FTX Capital Markets (CRD No. 158816) ("FTX Capital"), a firm registered as a broker-dealer with the United States Securities and Exchange Commission, the Financial Industry Regulatory Authority Inc., and 53 state and territorial securities regulators. FTX Capital's registration as a dealer in Texas became effective on May 7, 2012, and the registration continues to remain in force and effect.

FTX US maintains a website at https://ftx.us that contains a webpage for smartphone applications for FTX (formerly Blockfolio)[126] (the "FTX Trading

---

[126] FTX acquired Blockfolio LLC ("Blockfolio") in or around August 2020. At the time, Blockfolio managed a cryptocurrency application. FTX thereafter rebranded Blockfolio and its smartphone application as FTX. Now, users can download the FTX Trading App from Apple's

App") and FTX US Pro. Users appear able to click a link in this webpage to download the FTX Trading App even when they reside in the United States.

On October 14, 2022, I downloaded and installed the FTX Trading App on my smartphone. I created an account with FTX Trading through the FTX Trading App and linked the FTX account to an existing personal bank account. During the process, I provided my full first and last name and entered my residential address in Austin, Texas. I also accessed hyperlinks in the FTX Trading App that redirected to the Privacy Policy and Terms of Service. Although I was from the United States and was using the application tied to FTX Trading, the Privacy Policy and Terms of Service were from FTX US - not FTX Trading.

I thereafter used the FTX Trading App to initiate the transfer of $50.00 from my bank account to the FTX account and then transferred .1 ETH from a 3.0 wallet to the FTX account. The transfer of funds from my bank account to the FTX account will take up to six days to complete but the transfer of ETH was processed within a few minutes.

The FTX Trading App showed that I was eligible to earn a yield on my deposits. It also explained the "Earn program is provided by FTX.US" – not FTX Trading. It also represented that "FTX Earn rewards are available for US users on a promotional basis."

I recall the FTX Trading App's default settings were automatically configured to enable the earning of yield. The application also contained a link for additional information about yield. I accessed the link and was redirected to a recent article published by "Blockfolio Rebecca" under help.blockfolio.com. The article began as follows:

> You can now earn yield on your crypto purchases and deposits, as well as your fiat balances, in your FTX Trading App! By opting in and participating in staking your supported assets in your FTX account, you'll be eligible to earn up to 8% APY on your staked assets. THIS APY IS ESTIMATED AND NOT GUARANTEED AS DESCRIBED BELOW.

---

App Store or Google's Google Play Store. Although FTX rebranded Blockfolio, the application listing in Apple's App Store still shows the application developed by Blockfolio.

The article also described the payment of yield. It contained a section titled How do you calculate APY? Does my balance compound daily? that read, in part, as follows:

> FTX will deposit yield earnings from the staked coins, calculated hourly, on the investment portfolio that is stored in your FTX Trading App. Yield will be compounded on principle and yield you have already earned. Any cryptocurrency that you have deposited on FTX as well as any fiat balance you may have on your account, will earn yield immediately after you have opted into the program.
>
> The first $10,000 USD value in your deposit wallets will earn 8% APY. Amounts held above $10,000 up to $10MM USD in value (subject to market fluctuations) will earn 5% APY. In this scenario, your yield earned on the coins will look something like the examples below the table.

The article also contained a section titled Is this available in my country? This section explained that "FTX Trading App Earn is available to FTX Trading App customers that are in one of the FTX permitted jurisdictions." It contained a hyperlink to an article titled Location Restrictions published by FTX Crypto Derivatives Exchange under help.ftx.com. This article described various restrictions on operations in certain countries and locations and read in part as follows:

> **FTX** does not onboard or provide services to corporate accounts of entities located in, established in, or a resident of the **United States of America, Cuba, Crimea and Sevastopol, Luhansk People's Republic, Donetsk People's Republic, Iran, Afghanistan, Syria, or North Korea**. FTX also does not onboard corporate accounts located in or a resident of Antigua or Barbuda. FTX also does not onboard any users from Ontario, and FTX does not permit non-professional investors from Hong Kong purchasing certain products.
>
> **FTX does not onboard or provide services to personal accounts of current residents of the United States of America, Cuba, Crimea and Sevastopol, Luhansk People's Republic, Donetsk People's Republic, Iran, Afghanistan, Syria, North Korea, or Antigua and Barbuda**. There may be partial restrictions in other jurisdictions, potentially including Hong Kong, Thailand, Malaysia, India and Canada. In addition, FTX does not onboard any users from Ontario, does not permit non-professional investors from

Hong Kong purchasing certain products, and does not offer derivatives products to users from Brazil.

FTX serves all Japanese residents via FTX Japan.
(emphasis in original)

Despite the fact I identified myself by name and address, the FTX Trading App now shows that I am earning yield on the ETH. The yield is valued at 8 percent APR.

Based upon my earning of yield and an ongoing investigation by the Enforcement Division of the Texas State Securities Board, the yield program appears to be an investment contract, evidence of indebtedness and note, and as such appears to be regulated as a security in Texas as provided by Section 4001.068 of the Texas Securities Act. At all times material to the opening of this FTX account, FTX Trading and FTX US have not been registered to offer or sell securities in Texas. FTX Trading and FTX US may therefore be violating Section 4004.051 of the Texas Securities Act. Moreover, the yield program described herein has not been registered or permitted for sale in Texas as generally required by Section 4003.001 of the Securities Act, and as such FTX Trading and FTX US may be violation Section 4003.001 by offering unregistered or unpermitted securities for sale in Texas. Finally, FTX Trading and FTX US may not be fully disclosing all known material facts to clients prior to opening accounts and earning yield, thereby possibly engaging in fraud and/or making offers containing statements that are materially misleading or otherwise likely to deceive the public. Certain principals of FTX Trading and FTX US may also be violating these statutes and disclosure requirements. Further investigation is necessary to conclude whether FTX Trading, FTX US and others are violating the Securities Act through the acts and practices described in this declaration.

The Enforcement Division of the Texas State Securities Board understands that FTX US placed the highest bid for assets of Voyager Digital LTD et al., a family of companies variously accused of misconduct in connection with the sale of securities similar to the yield program promoted by FTX Trading and FTX US. FTX US is managed by Sam Bankman-Fried (CEO and Founder), Gary Wang (CTO and Founder) and Nishad Singh (Head of Engineering). The same principals

hold the same positions at FTX Trading, and I was able to access the yield-earning product after following a link to the FTX Trading App from FTX US's website. The FTX Trading App also indicated the Earn program is provided by FTX US. As such, FTX US should not be permitted to purchase the assets of the debtor unless or until the Securities Commissioner has an opportunity to determine whether FTX US is complying with the law and related and/or affiliated companies, including companies commonly controlled by the same management, are complying with the law.

  I hereby authorize the Texas Attorney General's Office and any of its representatives to use this declaration in this bankruptcy proceeding.

  I declare under penalty of perjury that the foregoing is true and correct.

  Executed on October 14, 2022, in Austin, Texas.

/s Joseph Jason Rotunda

By: Joseph Jason Rotunda

**J. FTX's offer and sale of FTT Tokens, which are unregistered securities.**

  263. The FTT token that contributed to FTX's demise is also an investment contract per the *Howey* Test. FTT is an exchange token created by FTX that entitles holders to benefits on the FTX exchange. According to crypto news site CoinDesk, "such benefits often include trading fee discounts, rebates and early access to token sales held on the platform."[127] Exchange tokens can be very profitable for their issuers because the exchanges that issue them tend to keep a significant number of tokens for themselves, which they can pump in price through speeches, social media posts, and other announcements. Economically, exchange tokes are akin to equity, although the holders of exchange tokens have no legal rights or interests in the issuer. As the exchange issuer grows in size and prominence, and trading volume increases on the exchange, the value of the

---

[127] https://www.coindesk.com/learn/what-is-an-exchange-token/ (accessed May 11, 2023).

exchange token will likely increase. Thus, the value of FTT increased as the FTX exchange became more well-known and utilized.[128]

264.    FTT passes the *Howey* Test because the token was controlled by FTX; the company could create or destroy FTT at will. And the value of FTT was based upon the success of FTX, therefore the "efforts" of others prong of the Howey Test is implicated. It is also clear that investors bought FTT because they thought it would go up in price; this is the same reason why most, if not all, investors buy any given cryptocurrency. In fact, Binance CEO Changpeng "CZ" Zhao agreed to accept FTT tokens as part of FTX's buyout of Binance's equity stake in FTX.[129]

**K.  Using the FTX Platform itself necessarily required transacting in unregistered securities.**

265.    Another avenue through which FTX users may have been exposed to a securities transaction was through the basic structure of the FTX Platform.

266.    Despite cryptocurrency and blockchain's foundational premise being the ability to transmit value peer-to-peer using a trustless and decentralized database that cannot be censured by any third party, cryptocurrency exchanges operate more like traditional banks.

267.    When you buy Bitcoin through a centralized cryptocurrency exchange, there is no corresponding transaction to the Bitcoin blockchain. Rather, the exchange simply maintains its own database that indicates which cryptocurrencies it owes to its customers.

268.    Cryptocurrency exchanges should then be in custody of enough cryptocurrency on the blockchain to cover what it owes customers. Custody can be done using hot or cold digital wallets (hot wallets are connected to the internet, cold wallets are not) with best practice being for

---

[128] See FTT price history here: https://coinmarketcap.com/currencies/ftx-token/ (accessed May 11, 2023).

[129]    https://www.investors.com/news/binance-to-buy-ftx-international-operations-as-liquidity-crunch-sparks-crypto-selloff/ (accessed May 11, 2023).

exchanges to hold the majority of cryptocurrency (crypto which they are holding on behalf of customers) in multiple cold wallets. Best practice would also dictate that exchanges hold customer assets in separate wallets from exchange assets, and that each customer's assets would be held in a distinct wallet.

269.    According to the first day declaration by John Ray, FTX kept its crypto in a common pool used to fund undisclosed and unreasonably risky investments:

> The FTX Group did not keep appropriate books and records, or security controls, with respect to its digital assets. Mr. Bankman-Fried and [Alameda co-founder Gary] Wang controlled access to digital assets of the main businesses in the FTX Group (with the exception of LedgerX, regulated by the CFTC, and certain other regulated and/or licensed subsidiaries). Unacceptable management practices included the use of an unsecured group email account as the root user to access confidential private keys and critically sensitive data for the FTX Group companies around the world, the absence of daily reconciliation of positions on the blockchain, the use of software to conceal the misuse of customer funds, the secret exemption of Alameda from certain aspects of FTX.com's auto-liquidation protocol, and the absence of independent governance as between Alameda (owned 90% by Mr. Bankman-Fried and 10% by Mr. Wang) and the Dotcom Silo (in which third parties had invested).
>
> The Debtors have located and secured only a fraction of the digital assets of the FTX Group that they hope to recover in these Chapter 11 Cases. The Debtors have secured in new cold wallets approximately $740 million of cryptocurrency that the Debtors believe is attributable to either the WRS, Alameda and/or Dotcom Silos. The Debtors have not yet been able to determine how much of this cryptocurrency is allocable to each Silo, or even if such an allocation can be determined. These balances exclude cryptocurrency not currently under the Debtors' control as a result of (a) at least $372 million of unauthorized transfers initiated on the Petition Date, during which time the Debtors immediately began moving cryptocurrency into cold storage to mitigate the risk to the remaining cryptocurrency that was accessible at the time, (b) the dilutive 'minting' of approximately $300 million in FTT tokens by an unauthorized source after the Petition Date and (c) the failure of the co-founders and potentially others to identify additional wallets believed to contain Debtor assets.[130]

---

[130] 042020648197.pdf (pacer-documents.s3.amazonaws.com) (accessed May 11, 2023).

270.     In the declaration, Mr. Ray presents several rough balance sheets for the various FTX silos, while noting that he does not have confidence in them, and that "the information therein may not be correct as of the date stated."[131] Most telling is a footnote that appears on the balance sheets for the exchange businesses: "Customer custodial fund assets are comprised of fiat customer deposit balances. Balances of customer crypto assets deposited are not presented."[132] Ray notes that U.S. and overseas exchanges "may have significant liabilities" but that "such liabilities are not reflected in the financial statements prepared while these companies were under the control of Mr. Bankman-Fried."[133]

271.     To further complicate matters, recent statements given by Sam Bankman-Fried to the *Wall Street Journal* (WSJ) suggest that about half of the balance owed by Alameda to FTX was from wire transfers that customers made to FTX via Alameda in the early days before FTX had a bank account.[134] This money was intended to fund customers' accounts at FTX. Bankman-Fried claims some customers continued to use that route after FTX had a bank account and that over time, "FTX customers deposited more than $5 billion in those Alameda accounts."[135] The WSJ acknowledged that these funds "could have been recorded in two places—both as FTX customer funds and as part of Alameda's trading positions" and that "such double-counting would

---

[131] *Id.*

[132] *Id.*

[133] *Id.*

[134]     https://www.wsj.com/articles/ftx-founder-sam-bankman-fried-says-he-cant-account-for-billions-sent-to-alameda-11670107659?st=g35ia0eu0bjwqzn&reflink=desktopwebshare_permalink (accessed May 11, 2023).

[135] FTX customers deposited more than $5 billion in those Alameda accounts.

have created a huge hole in FTX's and Alameda's balance sheets, with assets that weren't really there."[136]

272.     The relationship between FTX and Alameda was critical to the exchange's eventual collapse. After suffering large losses in the wake of several high profile crypto-firm failures in the spring and summer of 2022 (Alameda most likely was exposed to crypto hedge fund Three Arrows Capital), FTX lent out some of its customer assets that it did control to Alameda.[137] Presumably, the exchange benefitted from the interest paid by Alameda for the loaned cryptoassets – although some have suggested that the loans were made for free.[138] Alameda could then use the customer assets as cheap collateral for margined trades with other parties (obtaining collateral from other sources would have been much more expensive).[139]

273.     It appears that Alameda did post collateral to secure the loans of customer cryptoassets that it received, but that collateral took the form of FTT tokens. FTT tokens were the so-called "native token" of the FTX exchange: FTX created FTT and issued it to both institutional and retail investors without registering with any regulator or undergoing any audit or other external due diligence. FTX could create unlimited amounts of FTT if it wished.

274.     In short, there appear to have been two sets of leveraged transactions involved. First, Alameda borrowed assets from FTX's customers, providing FTT tokens as collateral for

---

[136] *Id.*

[137] https://newsletter.mollywhite.net/p/the-ftx-collapse-the-latest-revelations (accessed May 11, 2023).

[138] https://www.cnbc.com/2022/11/13/sam-bankman-frieds-alameda-quietly-used-ftx-customer-funds-without-raising-alarm-bells-say-sources.html (accessed May 11, 2023).

[139] For a more general discussion of the conflicts of interest inherent in these relationships, see https://www.coppolacomment.com/2022/11/the-ftx-alameda-nexus.html (accessed May 11, 2023).

those loans. Second, Alameda engaged in margin trading, essentially borrowing money to execute risky trading strategies: these trades were secured by the assets Alameda had borrowed from FTX customers' accounts. Leverage makes trades potentially more lucrative, but also makes them more vulnerable to adverse market movements. In an Alameda balance sheet linked to CoinDesk in early November, Alameda's largest asset holdings were listed as being FTT tokens (it is possible that it received these in a kind of bailout from FTX). Other assets listed on that balance sheet included SOL tokens (issued by the Solana blockchain, in which Sam Bankman-Fried was an early investor) and SRM tokens (issued by the Serum exchange that Sam Bankman-Fried co-founded).[140] Alameda had few assets that hadn't been created out of thin air by FTX or FTX-related entities.

## L. The MDL Defendants' Roles in the Fraud

275. Each group of MDL Defendants contributed both to the perpetration of the fraud, and to the sale of unregistered securities, in a vital way. The individual role of each MDL Defendant is outlined below, and more fully expounded upon within the individual version of the complaint in which they are named.

276. Samuel Bankman-Fried stole billions of dollars from FTX clients' deposits and used them to cover costs at FTX's sister company, a crypto hedge fund called alameda Research. He did so with the help of three key people, Caroline Ellison, Gary Wang, and Nishad Singh, who were part of Bankman-Fried's inner circle. Many of them were friends going back years before the creation of FTX. Together, they were the brain trust of FTX and the architects of the FTX fraud, and are referred to herein as the "FTX Insider Defendants."

---

[140] https://www.coindesk.com/business/2022/11/02/divisions-in-sam-bankman-frieds-crypto-empire-blur-on-his-trading-titan-alamedas-balance-sheet/ (accessed May 11, 2023).

277.     The public accounting firms of Prager Metis CPAs, LLC and Armanino LLP (the Auditor Defendants), were the auditors of FTX Trading and FTX US, respectively. In those roles, and in violation of the professional standards to which they were subject,  Prager  Metis and Armanino issued reports in which they opined, respectively, that the financial statements of FTX Trading and FTX US for the years ending 2020 and 2021 were presented in accordance with generally accepted accounting principles (or GAAP) and that they had performed audits of such financial statements in accordance with generally accepted auditing standards (or GAAS). Reports such as the type issued here by the Auditor Defendants are generally referred to as "clean" audit reports. Given the virtual absence of accounting and financial systems and controls, corporate governance structures, and other controls at FTX – things that were so glaring and obvious that Mr. Ray discovered them within just days of being appointed as FTX's CEO in connection with the FTX bankruptcy – the Auditor Defendants never should have issued, and in fact were prohibited by the professional standards to which they were subject, their clean audit reports. Nor should they have allowed, as they did, FTX and SBF to tout that FTX had passed financial statement audits.  Finally, in further violation of the professional rules and standards to which they were subject, the Auditor Defendants issued statements of support on the internet and social media of FTX and SBF. The Auditor Defendants played a significant role in the FTX fiasco in that their actions gave legitimacy and credibility to FTX and SBF, which FTX and SBF used to curry favor with customers and investors and give them the sense that FTX could be entrusted with their money.

278.     FTX's campaign to build public and investor trust relied on significant financial and public support from certain venture capital fund Defendants, who primarily interfaced with FTX Insiders Ryan Salame and Ramnik Arora.  Sequoia Capital Operations, LLC ("Sequoia"),

Thoma Bravo, LP ("Thoma Bravo"), Paradigm Operations LP ("Paradigm"), SkyBridge Capital II, LLC ("SkyBridge"), Multicoin Capital Management LLC ("Multicoin Capital"), Tiger Global Management, LLC ("Tiger"), Ribbit Management Company, LLC ("Ribbit Capital"), Altimeter Capital Management, LP ("Altimeter"), and K5 Global Advisor, LLC ("K5 Global") (collectively, the VC Defendants) poured over $800 million into FTX, both financing and directly participating in FTX's public campaign to create an air of legitimacy for the FTX Platform.  The VC Defendants made numerous deceptive and misleading statements of their own about FTX's business, finances, operations, and prospects for the purpose of inducing customers to invest, trade, and/or deposit assets with FTX.  They also vouched for the safety and stability of the FTX Platform, advertised FTX's purported attempts to become properly regulated, and otherwise promoted the fabricated integrity of the FTX Group and SBF.

279.    Defendants Temasek Holdings (Private) Limited ("Temasek Holdings") is a global commercial investment company owned by the Government of Singapore, with a portfolio valued at nearly $300 billion. Temasek Holdings operates in the United States primarily through its wholly owned subsidiary, Temasek International (USA) LLC ("Temasek USA" and, together with Temasek Holdings, "Temasek"). After undertaking an extensive, 8-month-long due diligence process involving, e.g., FTX's business model, applicable regulations, audited financials, and corporate governance, Temasek invested $275 million in FTX. Temasek "continued to monitor performance and engage management on business strategy, as well as legal, policy and regulatory matters" even post investment, advising FTX with regard to "upgrad[ing] regulatory and legal functions" and to "strengthen [its] leadership." Temasek was in a particularly good position to offer such advice; upon information and belief, its executives, Pradyumna Agrawal and Antony Lewis, served on FTX's advisory board, which held meetings at least through March 2022.

Reportedly, Temasek was one of the "most demanding" investors for due diligence, despite being offered the best terms from FTX for its investment, which drew frustration from several members of the Temasek team.[141]

280.



281.

282.    Defendant Softbank Group Corp. ("Softbank Group") is a Japanese multinational investment company venture capital fund. Softbank Group invested in FTX through its Softbank Vision Fund, which is managed by Defendants SoftBank Investment Advisers (UK) Limited ("Softbank Investment Advisers") and Softbank Global Advisers Limited ("Softbank Global

---

[141] *See* Ex. B, Declaration of Nishad Singh, ¶ 19.

Advisers") and engaged in the misconduct referenced herein in order to increase the value of those investments. SoftBank Vision Fund is one of the largest technology funds in the world, totaling approximately $56 billion, with its U.S. base in Silicon Valley, California. Softbank Group has a worldwide reputation for being a "unicorn company . . . whisperer," and startups such as FTX fortunate enough to count it among its investors gain "a major credibility building moment." SoftBank Group employed its "dedicated review department" to conduct due diligence on FTX's "business, technology, business model, market size, business plan, competitive environment, financial condition, legal compliance, etc." prior to making its reported $100 million dollar investment. Upon information and belief, SoftBank Group continued to enjoy unique influence over and insight into FTX following its investment through its executives—CEO Rajeev Misra and Partner Tom Cheung—who served on FTX's advisory board, which held meetings at least through March 2022. It sought to pave the way for FTX to expand into the derivatives clearinghouse arena by lobbying the CFTC to grant FTX the necessary licenses with claims that FTX's proposal would reduce risks to the consumer.

283.    Defendant Sino Global Capital Limited ("Sino Global") is a venture capital firm based in Hong Kong with hundreds of millions in assets under management. Sino Global "supported the FTX vision" "[f]rom the very beginning" and "worked with [FTX] to make it a reality," including by investing an undisclosed amount in the "mid-seven figures" in FTX. In conjunction with its investment, Sino Global—in the words of its managing partner Matthew Graham—did "a hell of a lot of due diligence" and eventually embarked on a "deep relationship" with FTX. Sino Global's reputation, due diligence representations, ultimate investment, and ongoing relationship lent an air of legitimacy to FTX, as Mr. Graham recognized following one round of funding: "Today, SBF is no longer merely a titan of crypto. He's now a titan of business

. . . ." As FTX's value skyrocketed, Sino Global stood to make an enormous return on its investment, but it benefitted from its ties to FTX in more direct ways: Sino Global accepted a $60 million investment from Alameda and yet another investment of an undisclosed amount from SBF, each of which, upon information and belief, having been comprised of Class Member funds. It further partnered with FTX and Alameda as co-general partners in the $200 million Liquid Value I fund, Sino Global's first ever outside venture fund.  Together, Temasek, Softbank, and Sino Global are referred to as the "Multinational VC Defendants."

284.    Defendant Fenwick was FTX's principal outside law firm.  Headquartered in Mountain View, California, Fenwick was ideally located in the heart of Silicon Valley, near to FTX's California operations. Fenwick provided services to the FTX Group entities that went well beyond those a law firm should and usually does provide. When asked by FTX Group executives for counsel, Fenwick lawyers were eager to craft not only creative, but illegal strategies.  Fenwick helped set up the shadowy entities through which Bankman-Fried and the FTX Insiders operated a fraud, structured acquisitions by the FTX US in ways to circumvent regulatory scrutiny, advised on FTX US's regulatory dodge, more generally, and supplied personnel necessary to execute on the strategies that they proposed.  In this manner, Fenwick conspired with and aided and abetted the fraud, conversion, negligence, and respective breaches of fiduciary duties of the FTX entities.

285.    Defendants Deltec, Moonstone, and Jean Chalopin (together, the Bank Defendants) primarily assisted SBF in trafficking Class Member funds across the U.S. border. Defendant Deltec, at Mr. Chalopin's direction, provided one-of-a-kind digital asset banking services to FTX and, upon information and belief, served as a primary vehicle through which SBF routed Class Member funds offshore, beyond the reach of U.S. regulators and law enforcement. Defendant Moonstone, also at the direction of Mr. Chalopin, provided complementary services, assisting SBF

in funneling more than $50 million in Class Member funds to entities he separately owned through accounts at the bank.

286. Promoters are Defendants who agreed to serve as brand ambassadors, advertised and promoted the sale of the FTX Platform, YBAs and/or FTT, and failed to disclose in any of their marketing campaigns or advertisements that they were paid millions of dollars by FTX. All in clear violation of SEC, FTC, and various federal and state regulations.

287. Digital Creators are YouTube and social media financial influencers who promoted FTX as financial advice and promoted the sale of the FTX Platform, YBAs and/or FTT, to their millions of followers. The Promoter and Digital Creator Defendants include the individuals and entities listed in the paragraphs below.

288. The individual role of each MDL Defendant is outlined below, and more fully expounded upon within the individual chapter of the complaint in which they are named.

289. Samuel Bankman-Fried stole billions of dollars from FTX clients' deposits and used them to cover costs at FTX's sister company, a crypto hedge fund called alameda Research. He did so with the help of three key people, Caroline Ellison, Gary Wang, and Nishad Singh, who were part of Bankman-Fried's inner circle. Many of them were friends going back years before the creation of FTX. Together, they were the brain trust of FTX and the architects of the FTX fraud and are referred to herein as the "FTX Insider Defendants."

290. The public accounting firms of Prager Metis CPAs, LLC and Armanino LLP (the Auditor Defendants), were the auditors of FTX Trading and FTX US, respectively. In those roles, and in violation of the professional standards to which they were subject, Prager Metis and Armanino issued reports in which they opined, respectively, that the financial statements of FTX Trading and FTX US for the years ending 2020 and 2021 were presented in accordance with

generally accepted accounting principles (or GAAP) and that they had performed audits of such financial statements in accordance with generally accepted auditing standards (or GAAS). Reports such as the type issued here by the Auditor Defendants are generally referred to as "clean" audit reports. Given the virtual absence of accounting and financial systems and controls, corporate governance structures, and other controls at FTX – things that were so glaring and obvious that Mr. Ray discovered them within just days of being appointed as FTX's CEO in connection with the FTX bankruptcy – the Auditor Defendants never should have issued, and in fact were prohibited by the professional standards to which they were subject, their clean audit reports. Nor should they have allowed, as they did, FTX and SBF to tout that FTX had passed financial statement audits.  Finally, in further violation of the professional rules and standards to which they were subject, the Auditor Defendants issued statements of support on the internet and social media of FTX and SBF. The Auditor Defendants played a significant role in the FTX fiasco in that their actions gave legitimacy and credibility to FTX and SBF, which FTX and SBF used to curry favor with customers and investors and give them the sense that FTX could be entrusted with their money.

291.    FTX's campaign to build public and investor trust relied on significant financial and public support from certain venture capital fund Defendants.  Sequoia Capital Operations, LLC ("Sequoia"), Thoma Bravo, LP ("Thoma Bravo"), Paradigm Operations LP ("Paradigm"), SkyBridge Capital II, LLC ("SkyBridge"), Multicoin Capital Management LLC ("Multicoin Capital"), Tiger Global Management, LLC ("Tiger"), Ribbit Management Company, LLC ("Ribbit Capital"), Altimeter Capital Management, LP ("Altimeter"), and K5 Global Advisor, LLC ("K5 Global") (collectively, the VC Defendants) poured over $800 million into FTX, both financing and directly participating in FTX's public campaign to create an air of legitimacy for the

FTX Platform.  The VC Defendants made numerous deceptive and misleading statements of their own about FTX's business, finances, operations, and prospects for the purpose of inducing customers to invest, trade, and/or deposit assets with FTX.  They also vouched for the safety and stability of the FTX Platform, advertised FTX's purported attempts to become properly regulated, and otherwise promoted the fabricated integrity of the FTX Group and SBF.

292.    Defendants Temasek Holdings (Private) Limited ("Temasek Holdings") is a global commercial investment company owned by the Government of Singapore, with a portfolio valued at nearly $300 billion. Temasek Holdings operates in the United States primarily through subsidiaries, such as Defendant Temasek International Ltd. Ptd. And Temasek International (USA) LLC ("Temasek USA") together with Temasek Holdings, "Temasek"). After undertaking an extensive, 8-month-long due diligence process involving, e.g., FTX's business model, applicable regulations, audited financials, and corporate governance, Temasek invested $275 million in FTX. Temasek "continued to monitor performance and engage management on business strategy, as well as legal, policy and regulatory matters" even post investment, advising FTX with regard to "upgrad[ing] regulatory and legal functions" and to "strengthen [its] leadership." Temasek was in a particularly good position to offer such advice; upon information and belief, its executives, Pradyumna Agrawal and Antony Lewis, served on FTX's advisory board, which held meetings at least through March 2022.

293.    Defendant SoftBank Group Corp. ("Softbank Group") is a Japanese multinational investment firm that operates in the United States through its subsidiary Defendant SB Group US, Inc., ("Softbank US") a Delaware corporation. Softbank Group invested in FTX through its Softbank Vision Fund, which is managed by Defendants SoftBank Investment Advisers (UK) Limited ("Softbank Investment Advisers") and Softbank Global Advisers Limited ("Softbank

Global Advisers") and engaged in the misconduct referenced herein in order to increase the value of those investments. SoftBank Vision Fund is one of the largest technology funds in the world, totaling approximately $56 billion, with its U.S. base in Silicon Valley, California. SoftBank Group has a worldwide reputation for being a "unicorn company . . . whisperer," and startups such as FTX fortunate enough to count it among its investors gain "a major credibility building moment." SoftBank Group employed its "dedicated review department" to conduct due diligence on FTX's "business, technology, business model, market size, business plan, competitive environment, financial condition, legal compliance, etc." prior to making its reported $100 million dollar investment. Upon information and belief, SoftBank Group continued to enjoy unique influence over and insight into FTX following its investment through its executives—CEO Rajeev Misra and Partner Tom Cheung—who served on FTX's advisory board, which held meetings at least through March 2022. It sought to pave the way for FTX to expand into the derivatives clearinghouse arena by lobbying the CFTC to grant FTX the necessary licenses with claims that FTX's proposal would reduce risks to the consumer.

294.    Defendant Sino Global Capital Limited ("Sino Global") is a venture capital firm based in Hong Kong, Kentucky and The Bahamas with hundreds of millions in assets under management. Sino Global "supported the FTX vision" "[f]rom the very beginning" and "worked with [FTX] to make it a reality," including by investing an undisclosed amount in the "mid-seven figures" in FTX. In conjunction with its investment, Sino Global—in the words of its managing partner Matthew Graham—did "a hell of a lot of due diligence" and eventually embarked on a "deep relationship" with FTX. Sino Global's reputation, due diligence representations, ultimate investment, and ongoing relationship lent an air of legitimacy to FTX, as Mr. Graham recognized following one round of funding: "Today, SBF is no longer merely a titan of crypto. He's now a

titan of business . . . ." As FTX's value skyrocketed, Sino Global stood to make an enormous return

on its investment, but it benefitted from its ties to FTX in more direct ways: Sino Global accepted

a $60 million investment from Alameda and yet another investment of an undisclosed amount

from SBF, each of which, upon information and belief, having been comprised of Class Member

funds. It further partnered with FTX and Alameda as co-general partners in the $200 million Liquid

Value I fund, Sino Global's first ever outside venture fund.  Together, Temasek, Softbank, and

Sino Global are referred to as the "Multinational VC Defendants."

294.   Defendant Fenwick was FTX's principal outside law firm.  Headquartered in

Mountain View, California, Fenwick was ideally located in the heart of Silicon Valley, near to

FTX's California operations. Fenwick provided services to the FTX Group entities that went well

beyond those a law firm should and usually does provide. When asked by FTX Group executives

for counsel, Fenwick lawyers were eager to craft not only creative, but illegal strategies.  Fenwick

helped set up the shadowy entities through which Bankman-Fried and the FTX Insiders operated

a fraud, structured acquisitions by the FTX US in ways to circumvent regulatory scrutiny, advised

on FTX US's regulatory dodge, more generally, and supplied personnel necessary to execute on

the strategies that they proposed.  In this manner, Fenwick conspired with and aided and abetted

the fraud, conversion, negligence, and respective breaches of fiduciary duties of the FTX entities.

296.   Defendants Deltec, Moonstone, and Jean Chalopin (together, the Bank Defendants)

primarily assisted SBF in trafficking Class Member funds across the U.S. border. Defendant

Deltec, at Mr. Chalopin's direction, provided one-of-a-kind digital asset banking services to FTX

and, upon information and belief, served as a primary vehicle through which SBF routed Class

Member funds offshore, beyond the reach of U.S. regulators and law enforcement. Defendant

Moonstone, also at the direction of Mr. Chalopin, provided complementary services, assisting SBF

in funneling more than $50 million in Class Member funds to entities he separately owned through accounts at the bank.

297. Promoters are Defendants who agreed to serve as brand ambassadors, advertised and promoted the sale of the FTX Platform, YBAs and/or FTT, and failed to disclose in any of their marketing campaigns or advertisements that they were paid millions of dollars by FTX. All in clear violation of SEC, FTC, and various federal and state regulations.

298. Digital Creators are YouTube and social media financial influencers who promoted FTX as financial advice and promoted the sale of the FTX Platform, YBAs and/or FTT, to their millions of followersThe Defendants' Roles in the Fraud

299. Multinational VCs Defendants contributed both to the perpetration of the fraud, and to the sale of unregistered securities, in a vital way.

300. Multinational VC Defendants are some of the largest venture capitalists in the world and wield enormous influence in spurring the development of emerging industries, like crypto, and persuading others to invest in the portfolio companies that they advise and nurture. From these positions of power, Multinational VC Defendants provided critical funding for SBF's fraudulent scheme, pumping billions into FTX's coffers, without which SBF could not have launched the venture nor so extensively expanded its reach through aggressive promotional and marketing campaigns legitimizing its brand to the public, as FTX itself acknowledged in its "End of Year 2021" blog post:

> 2021 was a transformative year for FTX. Going into it we were valued at $1bn with no VC investment, had yet to hit the million-user mark, and had never done any marketing or a single advertisement; all of which is somewhat understandable for a company that hadn't even existed for 2 years.
>
> As we move into 2022, we're valued at $25bn after raising the largest round in the history of crypto from some of the best firms in the world. In addition, we not only cruised past the 1mm user mark, but also 2mm, 3mm, 4mm, and 5mm users; have partnered with many of the biggest names in sports and launched an

ad campaign resulting in FTX being named one of the top 10 marketers of the year; became the first crypto-native firm to obtain licensing for crypto derivatives; and we had our second birthday!

We are extremely thankful for the support we have received from the crypto community and our partners which has allowed us to grow to where we are today.

A key component of these promotional efforts was the legitimacy lent by the Multinational VC Defendants as well-known and respected venture capital and private equity firms. The Multinational VC Defendants not only invested in FTX knowing that these funds would be spent on FTX's and SBF's promotional activities described above, which were all false and misleading, the Multinational VC Defendants often directly touted the purported safety, trustworthiness, and favorable risk profile of the FTX Platforms.

301.     The Multinational VC Defendants' investments were not passive investments, and their assistance went much further than underwriting FTX's launch, in part because FTX was soliciting more than just capital from them. As SBF explained at a crypto conference in 2021, FTX was looking for true "partners":

> [Y]ou know we could buy tens of millions of Facebook ads – and I don't know maybe we should at some point, we'll hire a team to look into to whether that is worth doing – but that's not a thing which is going to really make it the same sort of impact on people, anyone can sort of you know potentially do that, and instead *what we've really been looking for like who are partners that we're really excited about and are really excited about us, and you know, who can help represent us and who we can really work with in a way to build something kind of stronger and more powerful than what we had*.

302.     FTX found those partners in the Multinational VC Defendants, who supplied FTX with hands-on support, partnership, guidance, infrastructure, networks, endorsements, promotion, publicity, cover and other assistance vital to the fraud. Each Multinational VC Defendant worked closely with FTX in providing these services and, in turn, driving up FTX's valuation to the

Multinational VC Defendants' direct benefit, all by way of FTX's fraudulent scheme and expanding SBF's reach to victims.

### a. The Multinational VC Defendants pumped billions of dollars into FTX, and FTX returned the favor

303.    In mid-2021, FTX raised more than $1 billion across to rounds of fundraising from a handful of VC firms, including the Multinational VC Defendants, and Temasek's, Softbank's, and Sino Global's names were advertised prominently in FTX's press releases announcing the closings of each fundraiser.  It was widely reported at this time that FTX was preparing itself to go public, and the endorsements of the Multinational VC Defendants added weight to this narrative.

304.    On July 20, 2021, Defendants Temasek, SoftBank, and Sino Global, along with other venture capitalists, put up nearly $1 billion in Series B funding for FTX Trading. SBF underscored the tremendous value that the Multinational VC Defendants brought to FTX, remarking that through this round of fundraising, "we've formed a hugely valuable set of partners" in these Multinational VC Defendants. SBF explained after the Series B funding closed that "[t]he primary goal of the raise was to [find] strategic allies who can help FTX grow its brand."

305.    Shortly thereafter, on October 21, 2021, Defendant Temasek, along with other venture capitalists, put up $420.69 million in FTX Trading's Series B-1 funding. In the press release announcing the fundraising, SBF repeated a common refrain, underscoring FTX's safety:

> We are focused on establishing FTX as a trustworthy and innovative exchange by regularly engaging regulators around the world, and constantly seeking opportunities to enhance our offerings to digital asset investors. For this round, we capitalized on those strides and were able to partner with investors that prioritize positioning FTX as the world's most transparent and compliant cryptocurrency exchange.

306.    FTX reportedly referred to the Series B-1 fundraising as a "meme-round," referencing the allusions to oral sex and marijuana embedded within the amount raised. This was

one of many juvenile references made by FTX regarding core components of its business model. For example, FTX advertised to investors that one of the products unique to the exchange was its "Shitcoin Index Futures," a "funny named" futures product built on "shit" cryptocurrencies.

307.    Though FTX Trading claimed that the Series B-1 funding would help it "make strategic investments designed to grow the business and expand [its] regulatory coverage," in October 2021, during the height of its Series B-1 fundraising, FTX instead diverted $300 million— equivalent to nearly 75% of the Series B-1 funding—to SBF in exchange for shares he owned in the company. Pay days of this kind are unusual and indicative that something is amiss. As industry experts explain:

> Generally, venture investors frown on large sales of stock by founders before a company goes public, in part because they dislike the idea of a founder who puts little or no money into a business getting rich before investors can cash out. . . . It shows the company's founder thinks there's a better place to invest. . . . Anytime you see a founder selling shares in a secondary offering, you have to really ask them pretty tough questions.

To be sure, not only was SBF's cash out "large by startup-world standards," it also directly contradicted FTX Trading's purported use for the funds. Moreover, it was money that could have—and should have—been paid to satisfy the claims of SBF's victims.

308.    Unphased by SBF's $300 million payday, the Multinational VC Defendants put up more money. On January 31, 2022, FTX Trading announced that it had raised $400 million in Series C Funding from investors, many of whom had participated in its Series B and B-1 rounds of fundraising, including Temasek and SoftBank, "demonstrating [their] belief in the Company's vision and their continued support of FTX's explosive growth."

309.    Just days earlier, on January 26, 2022, FTX US closed on its $400 million Series A fundraising, securing yet more money from certain Multinational VC Defendants, including Temasek and SoftBank. In publicizing the deal, Brett Harrison, President of FTX US, affirmed

FTX's commitment to regulatory compliance, stating that "[w]e're excited to continue working cooperatively with [lawmakers and regulators], and feel confident that FTX US will emerge as the leading US-regulated crypto spot and derivatives exchange."

310.    In announcing each round of funding, the Multinational VC Defendants publicly endorsed FTX and its founder. After fundraising closed, the Multinational VC Defendants continued to valorize SBF and promote FTX to the public, and they did so because the Multinational VC Defendants would directly benefit from the rise in popularity of FTX and the polishing of its brand. As another VC Defendant put it, crypto was once like the "wild west" and "over the years, decades and centuries, **what has mattered the most is what is the value of the brand that people trust**."  (emphasis added). Comparing banks with identical balance sheets, same assets, same liabilities, same net worth, more or less same profitability, this VC Defendant explained that "one bank could be worth three times more than the other, why?  **Because of the brand.  They trust the brand more**." (emphasis added).

311.    In total, the Multinational VC Defendants, along with other venture capitalists put up a combined $2 billion to expand FTX's reach to SBF's victims. SBF returned the favor in kind, investing in his VC-backers, as they had in him. Sino Global, for example, took in $60 million from Alameda and an amount still unknown from SBF, himself. Upon information and belief, some or all of these investments were paid for with, or collateralized by, Class Member funds.

312.    In garnering investments into their own funds, the Multinational VC Defendants worked closely with SBF. For example, in 2021, Sino Global partnered with FTX as a co-general partner and "anchor" investor in building Sino Global's $200 million Liquid Value I fund.



This was the first time that Sino Global had ever accepted outside capital for its funds, and the first time that FTX had "allocated capital to an outside VC manager."

313.    SBF lauded the partnership, telling the press at the time that "We [FTX] are excited to support the launch of Sino Global Capital's institutional fund. From the very beginning, [CEO] Matthew [Graham] and the Sino Global Capital team supported the FTX vision and then worked with us to make it a reality."

314.    SEC filings reveal that Alameda, too, invested in the Liquid Value I fund. Indeed, Sino Global lists SBF and Alameda as general partners and co-owners of the Liquid Value I fund in filings with the SEC. Through that partnership, Sino Global's managing partner Matthew Graham and SBF worked hand-in-hand to pitch the fund, and touted FTX—including its growing brand recognition through "high profile sponsorships of Miami Heat Areana and star athletes, including Tom Brady, Steph Curry and Lewis Hamilton, as well as funding from Defendant SoftBank and other VC firms—as "Key Advantages" to the fund.



**b. The Multinational VC Defendant gained awareness of SBF's fraud in the course of investing in, advising, and promoting FTX.**

315.    The Multinational VC Defendants had knowledge of FTX's misconduct, because, in addition to their close ties to SBF and his affiliates, prior to investing, each Multinational VC Defendant undertook a diligence process to evaluate FTX's offerings and understand its business model and operations. The Multinational VC Defendants were obligated to conduct this diligence, as fiduciaries to their investors. Diligence of this kind occurs in multiple stages, and industry standards require a review of the target's financial statements and projections, identification of the target's basic corporate governance structures, including formation documents and information concerning the target's directors, officers and internal controls, an understanding of the target's business model (as confirmed by the target's financial statements), in addition to information concerning related party transactions, intercompany agreements, loans, debt instruments and other credit agreements. Venture capital firms also typically conduct an evaluation of the founders' track records and relevant experience. Venture capital firms conduct diligence for a living, and the Multinational VC Defendants are the largest and foremost of those firms. Firms of such stature

undertake state-of-the-art diligence on the investments they make, and the Multinational VC Defendants conducted the same top-notch, rigorous diligence on FTX.

316.    Temasek, for example, reports that it conducted eight months of diligence, including "significant regulatory and licensing due diligence on the business model of FTX, particularly on financial regulations, licensing, anti-money laundering (AML) / Know Your Customer (KYC) and sanctions across multiple jurisdictions[,] a review of [FTX's] audited financial statements and a cybersecurity review."

317.    Moreover, Temasek further reports that "[t]hroughout the multiple rounds of due diligence," Temasek specifically "enquired about the relationship, preferential treatment, and separation between Alameda and FTX," and "gathered qualitative feedback on FTX and [its] management team based on interviews with people familiar with the company, including employees, industry participants, and other investors."  Temasek reports that these meetings included face-to-face contact with SBF, himself.

318.    Temasek's diligence was ongoing after fundraising closed, and "[p]ost investment, Temasek continued to engage management on business strategy and monitor performance." More specifically, Temasek explained in a series of FAQs regarding FTX's collapse posted to its website:

> As an active investor, we engage the companies in our portfolio and conduct regular internal reviews of our investments. For each investment, the relevant investment team monitors the performance of the company and engages its management team. We have a formal review each quarter to assess all investments individually, and therefore, the performance of our portfolio.

319.    SoftBank conducted thorough due diligence, too. At the time it invested in FTX, SoftBank Group reported to its investors that it conducted the following diligence on its investments:

> In the investment decision-making process, SoftBank seeks to appropriately estimate the investment target's equity value and to assess risks related to the target's businesses, finances, corporate governance, compliance, and internal controls, by conducting due diligence on the target's business, technology, business model, market size, business plan, competitive environment, financial condition, legal compliance, etc. For this purpose, SoftBank ensures the involvement of, for example, outside financial, legal, and tax advisors, in addition to the relevant internal departments. In addition, an objective review of the adequacy of the due diligence findings is carried out by a dedicated review department.

Upon information and belief, SoftBank Group subjected FTX to this same rigorous diligence process before investing hundreds of millions of dollars in FTX.

320.    Moreover, SoftBank knew that FTX's underlying business—at least it represented to the public—was fraught with risk and amenable to manipulation. For that reason, SoftBank would not, itself, invest in crypto currencies: "We have stayed away from coins," Rajeev Misra told delegates at an October 2021 investment forum in India, "We can't quantify it, we can't put a mathematical model to it." Presumably, with that understanding, SoftBank conducted heightened diligence on FTX, whose primary business was, at least purportedly, to operate as a cryptocurrency exchange.

321.    Like the other VC Defendants, Multinational VC Defendants included, Sino Global also engages in "quality due diligence" before partnering with the companies in which it invests, including FTX. Managing partner Matthew Graham reports that Sino Global "do[es] a hell of a lot of due diligence. People know that if [Sino Global is] going to invest in them, I'm definitely going to be asking around about them. We'll ask people they used to work with what it's like being on the same team with them. . . . I've got to get to know you. It's like we're buying a vacation house together, we're not just going for a quick dinner." Upon information and belief, Sino Global was as rigorous in conducting diligence on FTX and indeed publicly reported that, when it comes to investments through its Liquid Value Fund I, including FTX, Sino Global would be "using our

same approach of betting on them and then working with the and supporting entrepreneurs that have similar values of high-trust and long-term approach to the ecosystem."

322.    Moreover, Sino Global would have undertaken some diligence of SBF, FTX, and Alameda, because of the FTX Group's investments and participation in Sino Global's Liquid Value Fund 1. As is standard in the industry, private funds employ "Know Your Customer/Client" (KYC) and anti-money laundering programs to detect fraud or other illicit activity among the fund's investors. This includes basic diligence to identify the risks associated with any money flowing into the fund, related party transactions, executive overlap and relationships, as well as monitoring thereafter to identify suspicious activity among its investors.

323.    To be sure, the slide deck that Sino Global prepared to pitch its Liquid Value Fund 1—the fund for which FTX served as Sino Global's co-general partner and anchor investor— highlight the knowledge that Sino Global acquired in the course of its relationship with SBF and his companies. For example, the slide deck demonstrates that Sino Global knew that SBF owned and controlled both FTX and Alameda:



And the slide decks demonstrate that Sino Global knew what each of FTX Trading, FTX.US, and Alameda purported to do:



From employing in-depth diligence standards in the industry, the Multinational VC Defendants knew that SBF was misappropriating Class Member funds, contrary to FTX's public representations and by way of the omissions set forth in this complaint. In particular, the Multinational VC Defendants could see that (1) FTX was closely interconnected with Alameda, though SBF separately owned each entity, and SBF engaged in self-dealing by way of FTX and Alameda; (2) FTX granted Alameda exemptions and other special treatment that allowed Alameda to engage in margin trading and other risky activity on the FTX platform, exposing Class Members to Alameda's risk of loss; (3) FTX's projections were unsubstantiated and its financial statements, nothing more than "homespun excel files;" and (4) FTX lacked critical internal controls, such as separate accounts for Class Member funds, an independent board of directors, or even a chief financial officer.

324.    These issues were readily apparent to other investors solicited by FTX. For example, a November 15, 2022, article published by *Insider*, describes how Bankman-Fried pitched investing in FTX to CEO and founder of venture capital company Social Capital, Chamath Palihapitiya, during the same investment round in which many of the Multinational VC Defendants participated. But "[a]fter a Zoom meeting with Bankman-Fried, Palihapitiya said [Bankman-Fried]

didn't 'make much sense,' so his team at Social Capital worked on a two-page deck of recommendations for next steps for FTX if the investment talks were to proceed." Social Capital made three recommendations to FTX: (1) form a board; (2) create a dual-class stock; and (3) provide investors with "'some reps and warranties around affiliated transactions and related party transactions'" and, in doing so, quickly identified many of the glaring deficiencies in governance and controls that Mr. Ray uncovered days after FTX's bankruptcy. Palihapitiya explained that after making these recommendations "'[t]he person that worked there called us back and literally, I'm not kidding you, said, 'go fuck yourself.'" The Multinational VCs profess to have undertaken even more rigorous diligence of FTX and from that diligence would have seen the same issues that immediately gave Social Capital pause.

325.    The questionable entanglement of FTX and Alameda was likewise readily apparent to those investors considering a stake in FTX. Investor presentations (now available to the public for the first time, but available to the Multinational VC Defendants years ago)highlighted financial statements in which "some of the same assets appeared simultaneously on the balance sheets of FTX and of [SBF's] trading firm, Alameda Research[,] despite claims by FTX that Alameda operated independently." Specifically, for example, "each time FTX was seeking to raise funding, [SBF] sent a spreadsheet to potential investors displaying items like revenue, profit and losses, daily users, and expenses for FTX," and these spreadsheets showed overlap between FTX and Alameda. Other investor materials note that "FTX is a spinout of Alameda Research" and that one of the risk factors presented by FTX was its relationship with Alameda, and specifically that FTX and Alameda would engage in self-dealing by "[t]rading on their own exchange," elaborating that:

> An exchange needs a market maker to get it off the ground and Alameda will be the initial market [maker] for FTX itself. The team intends to bring on more market makers over time, however this is a major risk. We have talked to other quantitative hedge funds who are hesitant to trade on FTX for this reason"

326.    The incestuous relationship between FTX and Alameda was certainly apparent to other investors conducting diligence on the companies. Alex Pack, a venture capitalist focused on cryptocurrency investments, reported after FTX's collapse that in December 2018, he considered investing in Alameda and, after a month-long due diligence period (i.e., $1/8^{th}$ of the diligence conducted by Temasek), discovered that "Alameda and FTX were tied at the hip," and that SBF planned to use Mr. Pack's investment in Alameda to fund the operations of FTX. For those reasons, Mr. Pack declined to invest in SBF's enterprise. After conducting the rigorous diligence that the Multinational VC Defendants claim to have completed on FTX, the Multinational VC Defendants would have likewise identified the concerning overlap between FTX and Alameda, just as Mr. Pack so quickly discerned.

327.    In addition to exposing the overlap between Alameda and FTX, the pitchbooks that FTX used to solicit funds from the Multinational VC Defendants reportedly featured projections that FTX could not substantiate with viable assumptions or calculations. For example, in financials that FTX provided to investors, FTX's projected revenue figures for fiscal years 2021 and 2022 did not reconcile with projected volumes or fees. More generally, these financials were not of the caliber expected of a $32 billion multinational corporation and instead, where "homespun Excel files," which were "very unorganized," at times "inaccurate" and "confusing." In piecing FTX together after the fraud's collapse, Mr. Ray quickly discovered that FTX used Quickbooks for its financials, which he found obviously incongruous: "[A] multi-billion-dollar company using Quickbooks. Nothing against Quickbooks, very nice tool, just not for a multi-billion-dollar company."

328.    Even FTX's audited financials, which Temasek claims to have reviewed and which would have been standard for Softbank and Sino Global to review, immediately highlight suspicious activity at FTX.

329.    First, the audited financials for FTX Trading and FTX US were commissioned by two different audit firms:  Defendant Prager Metis LLP signed the audit report for FTX Trading and Defendant Armanino LLP signed the audit report for FTX US. As *Coindesk* reported, "[A]nyone receiving these reports should have seen is that there were two different audit firms producing them.  Why hire two different firms rather than one to produce an opinion on consolidated results?"  And then further both Prager Metis and Armanino had "a poor recent track record with the PCAOB."

330.    Moreover, neither the Armanino nor the Prager Metis audit reports for 2021 provides an opinion on internal controls by FTX Trading or FTX US over accounting and financial reporting. According to *Coindesk* "the year-end 2021 financial statements should have screamed to any auditor or reader of the reports: There were no controls."

331.    Further, *Coindesk* reported "despite a combination of enormous siphoning off of firm assets by related parties and favorable tax planning, neither FTX Trading nor FTX US paid any federal income taxes, although they both appeared to be profitable."

332.    Lastly, *CoinDesk* reported, the audited financials contained a "number of complex, roundtrip and utterly confounding related-party transactions documented in just these two years. The related-party transactions at FTX Trading are so numerous that it is difficult to know where to begin to analyze them." *CoinDesk* went on to list several key issues it notices, including numerous related-party transactions, the use of FTT on balance sheets, FTT being used as currency for acquisitions, and questionable loans to related parties.

333.     Additionally, basic due diligence, including a cursory review of FTX's balance sheets, would have shown that those balance sheets were largely backed by FTT, a cryptocurrency that FTX contrived from thin air and issued to Alameda at no cost. FTX represented that, as "the backbone of the FTX ecosystem," FTT was widely distributed, but contrary to that representation, most FTT tokens issued were held by FTX or Alameda.  As of June 30, 2022, Alameda's largest assets were tied to FTT, including "unlocked FTT" totaling $3.66 billion, and "FTT collateral" totaling $2.16 billion.  Using customer funds and to the benefit of Alameda, SBF and his cohorts manipulated the value of FTT by implementing a "rolling program of buying back and burning [FTT] tokens," a process which consumed a third of FTX's revenue.

334.     Finally, with even the most basic diligence the Multinational VC Defendants would have uncovered that FTX was commingling and misappropriating Class Member assets in violation of FTX's fiduciary duty to its depositors, Class Members included. As sophisticated players in the crypto industry, the Multinational VC Defendants would have appreciated that FTX held customer deposits as a custodian in trust. To be sure, a quick review of FTX's terms of service would have confirmed the custodial nature of FTX's role. FTX US represented to customers in its terms of service that:

a. "[a]ll cryptocurrency or dollars (or other supported currencies) that are held in your account are held by FTX.US for your benefit".

a. "[t]itle to cryptocurrency represented in your FTX.US Account shall at all times remain with you and shall not transfer to FTX.US"; and

b. that "FTX.US does not represent or treat assets in your FTX.US Account as belonging to FTX.US."

335.     Similarly, FTX Trading represented to its customers in its terms of service that:

a. "[t]itle to your Digital Assets shall at all times remain with you and shall not transfer to FTX Trading".

b. "[n]one of the Digital Assets in your Account are the property of, or shall or

may be loaned to, FTX Trading"; and

c. "FTX Trading does not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading."

Upon conducting the diligence outlined above, the Multinational VC Defendants could see that FTX was violating these terms of service in breach of FTX"s fiduciary obligation to hold those assets as a custodian in trust.

336.    In short, the Multinational VC Defendants could see, *years* before Mr. Ray could see (and was able to uncover in a matter of days), that the information presented in FTX's financial statements presented "substantial concerns;" that FTX lacked fundamental internal controls, including a chief financial officer or a board of independent directors; that FTX did not segregate Class Member funds from operations; that FTX was hemorrhaging money to Alameda and other of affiliates of SBF or entities under his control; and that control of FTX was concentrated in the hands of unsophisticated twenty-somethings who played League of Legends throughout meetings at which billions of dollars in venture capital were at stake. None of this material information was disclosed to Class Members, due primarily to the public image fostered by the Multinational VC Defendants, and SBF's fraud relied on the Multinational VC Defendants assistance in keeping the fraud in motion, and these critical omissions concealed.

337.    In fact, at least one VC investor (perhaps even one of the Multinational VC Defendants) *did* see, years before Mr. Ray could see, that any investment in FTX should be declined. In a story following FTX's collapse, the *Financial Times* quoted one "top investor" of FTX, on the basis of anonymity, explaining that he advised his firm *against* the investment, following the firm's diligence, but the firm invested anyway:

> We were seduced," said a top investor that piled large sums into FTX.… The investor said he had some reservations during initial calls with Bankman-Fried, including the way the entrepreneur "comported himself" and a sense that he believed everyone else in the financial world "were idiots". "**I wouldn't have**

**touched him,**" he added, but it was not his ultimate decision [to go ahead and invest]. (emphasis added).

338.     Regulatory action taken in the wake of FTX's collapse further confirm that the most basic diligence—available to the Multinational VC Defendants, but not to Class Members—would have revealed the FTX fraud. On December 13, 2022, after FTX filed for bankruptcy, CFTC Chair Rostin Benham lambasted the fact that "FTX customer assets were routinely accepted and held by Alameda and commingled with Alameda's funds," after the CFTC filed its own complaint related to the collapse of FTX, stating in pertinent part as follows:

> **FTX held itself out as 'the safest and easiest way to buy and sell crypto' and represented that customers' assets, including both fiat and digital assets including bitcoin and ether, were held in 'custody' by FTX and segregated from FTX's own assets.  To the contrary, FTX customer assets were routinely accepted and held by Alameda and commingled with Alameda's funds.**  Alameda, Bankman-Fried, and others also appropriated customer funds for their own operations and activities, including luxury real estate purchases, political contributions, and high-risk, illiquid digital asset industry investments.  The complaint further alleges that, at Bankman-Fried's direction, FTX employees created features in the FTX code that favored Alameda and allowed it to execute transactions even when it did not have sufficient funds available, including an 'allow negative flag' and effectively limitless line of credit that allowed Alameda to withdraw billions of dollars in customer assets from FTX.  These features were not disclosed to the public. (emphasis added).

*c.*     ***The Multinational VC Defendants provided critical assistance in furtherance of the FTX fraud, despite knowing that SBF was misappropriating Class Member funds.***

339.     Still, the Multinational VC Defendants jumped at the opportunity to pour hundreds of millions each into FTX's repositories, without which FTX could not have gotten off the ground, much less enjoyed such expansive reach. Reportedly, FTX raised:

- $275 million from Defendant Temasek;

- $100 million from Defendant SoftBank; and

- an amount in the "mid-seven figures" from Sino Global.

340.    This funding, along with funding from other venture capitalists, was critical to FTX's growth. FTX needed money, and it needed money from the Multinational VC Defendants, specifically, for reasons laid bare by another venture capitalist in a glowing profile of SBF:

> FTX did need money, after all. **And it needed that money from credible sources so it could continue to distinguish itself from the bottom-feeders who came to crypto to fleece the suckers.**

Without the credibility and influence attached to the enormous sums of money that the Multinational VC Defendants put into FTX, SBF could never have crafted the veneer of legitimacy, trustworthiness, and safety critical to FTX's meteoric growth.

341.    To that end, each Multinational VC Defendant widely, vociferously, and repeatedly, promoted the legitimacy of FTX and endorsed SBF's integrity and character. Sino Global, for example, heaped on the praise for FTX and its founder. Upon closing FTX Trading's Series B funding, Sino Global managing partner Matthew Graham tweeted:



342.    Temasek, too, publicly promoted its investments and partnership with FTX *and LedgerX (d/b/a FTX US Derivatives)*, which was always based in Miami:



343.    Endorsements from the Multinational VC Defendants carry monumental weight, as the Multinational VC Defendants were considered "powerful and well-known" by members of the public.



344.    Temasek, for example, is Singapore's state-owned investment company with a net portfolio of $287 billion and is one of the most reputable investment funds in the world. In a podcast hosted by McKinsey & Company, the high-powered consulting group described Temasek as  "one of the world's leading investment firms dedicated to bringing sustainability and accessibility of new technologies to the entire world." At the time of its investments in FTX, the *Financial Times* described Temasek as one of FTX's "blue chip investors" who "prioritise[s] positioning FTX as the world's most transparent and compliant cryptocurrency exchange" and whose investment "shows the increasing appetite from traditional investors to back crypto companies despite intensifying regulatory scrutiny into the sector."  FTX posted a link to the story

on its website, channeling potential customers to read the story reporting Temasek's investment in FTX:



345.    On information and belief, Temasek and its executives would frequently meet with SBF and other high-level personnel to discuss Temasek's investment in FTX and their partnership. Indeed, Temasek admitted in statements after FTX's collapse that Temasek had numerous "interactions" with SBF and others in the FTX ecosphere.

346.    SoftBank, for its part, is "well-known for being in the spotlight," and investments by the SoftBank Vision Fund make headlines. As one veteran of the tech start-up industry observed:

> SoftBank is a little bit like working with the Kardashians. They're famous for being famous….They're in the news all the time, even for minor stuff. An investment goes up, they're in the news. An investment goes down, they're in

137

the news. They get a disproportionate share of attention, **which I think they love**, to be frank. (emphasis added).

Funding from SoftBank—a so-called "unicorn company [i.e., start-ups valued at $1 billion or more] whisperer"--provides more than notoriety. "SoftBank's backing can elevate the media profiles of startups and help pave the way for expansion abroad, particularly in Asia where SoftBank has its roots." As the CEO of one of SoftBank's portfolio companies recognized, "It's one thing to be a unicorn, it's another thing to be backed by a firm with the global footprint and wherewithal of SoftBank…. On a global basis, it's a major credibility building moment for a company [starting up]."

347.    Sino Global, too, recognizes the influence that its reputation carries, and the impact endorsements by Sino Global can have on any potential investment; in fact, Sino Global touts that influence in pitching fund investors:



Sino Global is right that its reputation was important to legitimizing FTX not only to customers, but to other investors, whose investments FTX would need to continue its fraudulent scheme. Anthony Scaramucci, the founder and managing partner of Defendant Skybridge, claims that, at the time Skybridge invested in FTX (which investment occurred *after* the investments by

Multinational VC Defendants), it relied on the endorsements by other VC firms, such as the Multinational VC Defendants, in deciding to invest in FTX:

> I guess I was naïve to it because of what we saw. **We saw a very pristine data room. We saw audited financials. We saw, and again I won't mention the names, but there were 25 other luminary venture capital investors, hedge fund billionaires, all of which were investors in Sam's company – remember he was giving me the money.**

348.    In this way, the Multinational VC Defendants' commendations and endorsements were critical to the perpetuation of SBF's fraud. In summarizing FTX's success to *The New York Times*, FTX's president, Brett Harrison, explained:

> We're the newcomers to the [cryptocurrency] scene…The company needs to familiarize consumers with its technology, customer service and offerings, while competing with incumbents like Coinbase Global Inc. or Kraken….We know that we had to embark on some kind of mass branding, advertising, sponsorship type work in order to be able to do that.

349.    Multinational VC Defendants readily stepped in, lending their credibility to launder FTX's reputation.  FTX flouted its "End of Year 2021" blog post, FTX flouted its fundraising from "notable investors" and "illustrious partners" "like Temasek [and] Softbank," and in every press release following the Series B, B-1 and C fundraising rounds for FTX Trading and the Series A fundraising round for FTX US, FTX highlighted the participation of, and featured statements endorsing FTX by, the Multinational VC Defendants:



350.    Regulators have taken note of the assistance provided to the FTX fraud by venture capitalists, including Multinational VC Defendants, in pumping FTX with cash and repeatedly endorsing the exchange and its founder. In a keynote address to The Warton School and the University of Pennsylvania Carey Law School on January 18, 2023, Christy Goldsmith Romero, Commissioner of the CFTC, remarked:

> FTX had financial support for its campaign to build trust. Some venture capital firms (and other investors) knowingly funded this trust campaign. . . . **FTX appears to have used [venture capital firms, for example,] as a credibility**

**and trust enhancer, and it used Sequoia's money to embark on a campaign
to gain public trust and distinguish itself as the most trusted brand in
crypto.….**

However, there are serious questions and allegations about whether this public
relations "war chest" was funded not only by venture capital money but also
customer property. If those allegations prove to be true, this could be one of the
most significant breaches of trust in financial history.

**The multi-dimensional public relations campaign was meant to build the
public's trust in FTX.** And I have not discussed all elements of that campaign.
There were rumored efforts to influence charities and policy advocacy groups.
There were efforts relating to FTX's extensive legal and political spending, and
even an alleged investment in a crypto news site. All of this appears to be part
of a branding campaign designed to make FTX appear trustworthy.

351. In short, FTX told customers that what set it apart was its safety and its
trustworthiness, and the Multinational VC Defendants hawked these purported features of the
exchange again and again, despite knowing that what they were telling the public about FTX and
about SBF was unsubstantiated. The Multinational VC Defendants succeeded in generating the
illusion of FTX's credibility as a legitimate exchange. As commentators in the industry describe,
"[w]ith the help of a marquee investor roster, SBF was able to build FTX into a massively popular
exchange…and successfully promote himself as one of the most trusted founders in all of crypto."

352. The Multinational VC Defendants' enthusiastic endorsements of FTX paid off.
Between the Series B and B-1 fundraising rounds, FTX's user base increased 48%, its average
daily trade volume surpassed $14 billion, and its valuation jumped from $18 billion to $25 billion.
At the close of the Series C fundraising round, FTX's user base grew another 60% and its valuation
ballooned to $32 billion. The Multinational VC Defendants who put up money in the Series B
round therefore saw the value of their stakes in FTX grow by 40% in the three months intervening
the Series B and Series B-1 fundraising rounds and nearly 90% in the six months intervening the
Series B and Series C rounds.

353.    The Multinational VC Defendants' assistance in furtherance of the FTX fraud extended beyond their fundraising for and promotion of FTX, in line with SBF's "two main goals" in fundraising from the Multinational VC Defendants. In addition to raising necessary capital, SBF also sought to "form[] a lot of partnerships with people who are really excited about and who we think can help grow our business and make a lot of connections for us." These "partnerships" were critical to FTX's rise, as SBF himself recognized, telling the Financial Times on July 4, 2021, just prior to the close of FTX's $900 million Series B: "The biggest thing is not the funds themselves," he said, "[t]he biggest thing is the partnerships."   Again, the Multinational VC Defendants pulled through.

354.    Each Multinational VC Defendant provided to FTX a self-professed "hands-on" investment strategy, which involved "partnering" with FTX and offering it guidance, infrastructure and expertise. For example, Defendant Sino Global is led by managing partner Matthew Graham, a veritable "kingmaker" in the digital assets space, whom "[m]any founders … swear by" and whose "vision and drive … helps companies and products grow" brings  "same long-term, roll-up-your-sleeves, and deep relationship approach that [Sino Global] bring[s] to portfolio companies like FTX."  Sino Global worked particularly close with FTX, and the two shared "a great working relationship" in part because FTX's "processes, values and agency aligned with [Sino Global's]." Indeed, "From the very beginning, Matthew and the Sino Global Capital team supported the FTX vision and then worked with us to help make it a reality." In turn, from its partnership with FTX, Sino Global reports that it derived "enormous strategic value."

355.    Similarly, SoftBank explains that, in investing in startups like FTX, its "role is to provide the operational expertise, global network, and patient capital" and recognizes that "[t]here are few organizations with the vision and resources to back difficult and ambitious global

projects." SoftBank Group is careful to note that it is more than a passive investor, explaining that "[a]s important as capital is, [SoftBank] enables something even more powerful[:]  building a unique network of portfolio companies that will collaborate and learn from each other to unlock further opportunities." Moreover, once SoftBank invests in a company, SoftBank has available to it immense influence over its investments, as commentators rightly note:

> SoftBank can also shift how these businesses are run and upend entire markets. Nowhere is this more evident than with Uber. After a year full of internal chaos and PR crises, Uber agreed to make a series of corporate governance changes in part to pave the way for the SoftBank deal. Call it the allure of SoftBank cutting a big check -- or the threat of that check going to a competitor. SoftBank had said it might invest in either Uber or Lyft.

356.    Temasek also is an "active investor and shareholder" in the companies in which it invests and prides itself "[a]s an engaged shareholder in "promot[ing] sound corporate governance in [its] portfolio companies, including FTX. Specifically, "[p]ost investment, [Temasek] continued to monitor performance and engage management on business strategy, as well as legal, policy and regulatory matters. [Temasek] also encouraged FTX to improve and upgrade their regulatory and legal functions, as well as to appoint experienced executives to strengthen their leadership team in these areas…. This is similar to how [Temasek] engage[s] other early-stage investments as an active investor and shareholder."

357.    The Multinational VC Defendants did not deviate from their standard "hands on" approach when partnering with FTX. Indeed, upon information and belief, executives of Defendants Temasek and SoftBank served on FTX's Advisory Board, which held meetings at least through March 2022. The Advisory Board was comprised of several other Co-Defendants and FTX executives from across the United States and The Bahamas, including, upon information and belief:

- Co-Defendant VC Sequoia, based in Menlo Park, California.

- Co-Defendant VC Paradigm, based in San Francisco, California.

- Co-Defendant VC Thoma Bravo, based in San Francisco, California, Miami, Florida, and Chicago, Illinois.

- Co-Defendant VC Altimeter, based in Menlo Park, California and Boston, Massachusetts.

- Co-Defendant VC Ribbit Capital, based in Palo Alto, California.

- Co-Defendant VC Multicoin, based in Austin, Texas.

- Co-Defendant VC K5 Global, based in Miami, Florida.

- Brett Harrison, CEO of FTX US, based in Chicago, Illinois.

- Dan Friedberg, General Counsel and Chief Compliance Officer of FTX Trading *and* General Counsel to Alameda, based in Seattle, Washington.

- Zach Dexter, CEO of FTX Derivatives US and, later, President of FTX US, based in Miami, Florida; and

- Constance Wang, who held multiple executive roles at FTX, including Chief Operating Officer of FTX Trading and Chief Executive Officer of FTX Digital Markets, FTX's Bahamian subsidiary, based in The Bahamas.

358. FTX's Advisory Board met quarterly and had unique inside information and access into FTX, holding regularly scheduled virtual meetings with PowerPoint presentations at each. Their participation in FTX's business was in a contract titled "Letter Agreement Re: FTX Advisory Board" dated August 24, 2021, with Sequoia's being titled "Advisory Board Letter" and dated the same. These Advisory Board members specifically discussed issues such as the CFTC's potential request to increase FTX's default insurance fund in connection with its application to clear derivatives in the U.S., FTX's correspondence with the SEC, the celebrity-fueled marketing campaign engineered by K5 Global (detailed in the Domestic VC Administrative Complaint) and various other executive-level board issues until at least September 2022.

359. Temasek was represented on the Advisory Board by Pradyumna Agrawal, Temasek's Managing Director for Blockchain Investments and Antony Lewis, a director in the

firm's Crypto & Blockchain Venture Building & Investing group. Mr. Lewis was a featured speaker at the Crypto Bahamas April 2022 conference, "[a]n exclusive gathering of the leading investors and buildings in the blockchain, digital assets and web3 space. SBF, along with nearly a dozen FTX executives, including Brett Harrison and Zach Dexter were featured at the conference.

360.    Temasek's participation in the FTX-sponsored Crypto Bahamas event helped to amplify SBF's reach. *CoinDesk* described the affair as "a four-day flex of FTX's expanding empire – with a new era of "corporate crypto" firmly on display," and the *New York Times* reported, "Bankman-Fried was presiding over the first edition of the Crypto Bahamas conference, a showcase for FTX and a vivid demonstration of his growing celebrity and influence.  Everywhere he went, crypto entrepreneurs offered handshakes and fist bumps, patting him on the back as they pitched projects or presented him with branded swag."

361.    Temasek's contributions at Crypto Bahamas also fueled the normalization of FTX's cryptocurrency exchange "from the early days of 'shadowy super-coders' hearkening the end of banks." On the FTX Stage, Mr. Lewis presented on behalf of Temasek in a panel discussion on "Institutional Crypto Adoption: From FAAMG to Sovereign Wealth." Many news outlets reported on the growing acceptance of crypto on display at the Temasek panel and more broadly at Crypto Bahamas.  For example, *Yahoo! Finance* reported how the story of Crypto Bahamas was "traditional investors and crypto native firms."  And *Forbes* reported how the panels "discussed how digital assets fit into modern investment portfolios and the broader maturation of the asset class."

362.    SoftBank also held two seats on the FTX Advisory Board, and it filled those seats with its most senior executives: Rajeev Misra, CEO of both SoftBank Investment Advisers, which manages SoftBank's Visions Fund 1, and SoftBank Global Advisers, which manages SoftBank's

Vision Fund 2; and Tom Cheung, a San Francisco-based Partner of SoftBank Investment Advisers. Mr. Misra is not without a checkered history of questionable professional conduct. *The Wall Street Journal* reports that Mr. Misra "used [a] campaign of sabotage to hobble [his] internal rivals," invoking tactics such as "planting negative news stories about them concocting a shareholder campaign to pressure SoftBank to fire them and even attempting to lure them into a 'honey trap' of sexual blackmail," all so that Mr. Misra could become the "right hand of [SoftBank CEO] Japanese billionaire Masayoshi Son."[142] Notably, Mr. Misra was demoted in July 2022, and Mr. Cheung laid off in late September 2022, mere weeks before the FTX fraud was revealed and the exchange collapsed.

363.    SoftBank assisted in other ways, too, including by submitting a letter in support of FTX Derivatives' application to the CFTC for a license to operate as a derivatives clearinghouse. Under the proposal, FTX Derivatives would trade directly with investors using algorithms rather than traditional financial intermediaries such as brokers. Brett Harrison, President of FTX.US acknowledged that this application was "unprecedented, not just for crypto derivatives, but for traditional exchange-traded derivatives more generally," and the proposal was not without controversy, with opponents asserting that the application would "come at the expense of risk management best practices, market integrity and ultimately, financial stability." Still, SoftBank threw in its support, by way of a formal comment that:

> Given our knowledge of the digital asset ecosystem, we are uniquely positioned to comment on the nascent but rapidly growing digital asset market as the U.S. government seeks to calibrate its regulatory framework for digital assets…. We believe the FTX proposal will provide broader access to commodity products and increased financial participation in digital markets by retail investors, while

---

[142]   https://www.wsj.com/articles/softbanks-rajeev-misra-used-campaign-of-sabotage-to-hobble-internal-rivals-11582743294 (last accessed July 31, 2023).

protecting and reducing risk for the users of digital assets, financial intermediaries, and the financial system.

In the letter, SoftBank again touted the safety of the FTX exchange, this time to the U.S. federal government:

> Risk mitigation in the digital asset marketplace is a key pillar of the FTX proposal. The digital asset marketplace is fundamentally different from traditional securities and commodities markets. Because digital asset marketplaces do not close, traditional ways of clearing, including end of day clearing, do not fully mitigate risks associated with a 24/7 marketplace. FTX's proposal for 24/7 clearing allows for margin calculation in real time rather than at the end of day, removing gap risk from the system.
>
> Furthermore, FTX's automated system for liquidating collateral when it falls below the maintenance margin level, calculated every 30 seconds, is an important innovation that enables FTX to safely offer margin without the imposition of futures commission merchants into the payment flow. The frequent collateral assessments and ability to rapidly liquidate collateral safely eliminate the need for intermediation and mutualization of losses. In unusual circumstances in which the liquidation of collateral is not sufficient to cover position losses, FTX will have arrangements with backstop liquidity providers who will assume positions needing to be liquidated along with the remaining margin. As an additional layer of protection, FTX will fund a guaranty fund of $250 million.

In "strongly support[ing] FTX's application" to the CFTC and in "urg[ing] the Commission to grant its approval," SoftBank provided to FTX much needed credibility and assistance in expanding FTX's reach, by allowing FTX to portray itself as at the forefront of investor protection and as the only regulatory-compliant cryptocurrency exchange. In 2021, FTX released a press release with "FTX's Key Principles for Ensuring Investor Protections on Digital-Asset Platforms," claiming "the protection of investors and the public as a top priority." SoftBank's lobbying efforts with the CFTC heavily helped shape FTX's regulatory narrative and helped present FTX as a legitimate exchange to customers.

364.    Meanwhile, Matthew Graham, CEO of Defendant Sino Global, pictured below with SBF, remained a "close confidante" of SBF throughout perpetuation of the FTX scheme:



365.    Further, Matthew Graham praised FTX and touted the rigorous due diligence that

Sino Global undertakes. For example, Graham appeared on an episode of the FTX Podcast, where

Graham said "where we don't compromise is on the type of people we invest in." He also said,

"we spend a lot of time doing dd [i.e., due diligence] such that we feel comfortable that it's an

extremely high trust relationship where we really ask ourselves if this is someone we want to be

hanging out with literally for years." Graham described Sino Global's internal "thesis" for

investment which is to look for what Sino Global refers to internally "superfans," and SBF was a

"superfan."

366.    Upon information and belief, Mr. Graham met with SBF frequently, including at SALT New York 2022, a crypto conference hosted by VC Defendant SkyBridge in New York City. Sino Global was also a sponsor of the Crypto Bahamas event that launched FTX and SBF into notoriety for their purported commitment to building a crypto exchange with unmatched safety and a commitment to serving their customers' best interests.

367.    Mr. Graham touted his and Sino Global's relationship with SBF and FTX publicly. For instance, Mr. Graham appeared on "The Pomp Podcast," a podcast disseminated by Apple from California,[143] in which he touted his relationship with SBF, claiming, among other things:

- He had a "deep relationship, particularly with Sam."

- He and SBF "made the decision to work together after 5 minutes."

- He cold called SBF when they had 3 people at FTX.

- He believed SBF was "the smartest person in the world."

- He wanted to go "down the path" with FTX.

- He thought SBF was smarter than competition and outhustling them.

- that FTX was "all fucking studs"

- He knew FTX only had 5 engineers but claimed they were smart, not that they were understaffed.

- Sino Global had two employees in the United States.

368.    The close ties between Sino Global and FTX extend to Constance Wang, who joined FTX in 2019 and held multiple executive roles included Chief Operating Officer of FTX Trading and Chief Executive Officer of FTX Digital Markets, FTX's Bahamian subsidiary. Often described as SBF's "right-hand man," Ms. Wang reportedly lived in SBF's luxury "10-person

---

[143] https://podcasts.apple.com/in/podcast/707-launching-a-%24200m-fund-backed-by-ftx-w-matthew-graham/id1434060078?i=1000540269403

crash-pad" in The Bahamas, from where she led FTX's global business expansion and oversight of its token listings, as well as its public relations and marketing. Upon information and belief, Ms. Wang regularly attended meetings of the advisory board, on which Temasek and SoftBank sat.  In addition, she reportedly oversaw "much of the company's star-studded marketing and hosted almost-weekly parties at her Nassau villa."

369.    Like many of FTX's executives, Ms. Wang was significantly lacking in experience necessary to run a multi-billion-dollar company. She graduated from college in 2015, and in the short time leading up to her taking the helm at FTX in 2019, she acquired just over two years of experience in risk management and business development. Despite her inexperience, and though presiding as a chief executive over the largest frauds in recent history is her most prominent professional accomplishment to date, Sino Global recently hired Ms. Wang, one of only "a half dozen" remaining SBF-loyalists, as its head of investments in gaming, a move that seemingly conflicts with Sino Global's public apologies following the FTX collapse and subsequent attempts at distancing itself from FTX. To be sure, it is a move that Sino Global did not take lightly, as Sino Global is, apparently, a closely knit group and is very careful in expanding its personnel. With Ms. Wang, Sino Global will comprise only 11 people.

370.    Ms. Wang's move to Sino Global in the wake of the FTX fraud's collapse is not surprising given that she would have had many opportunities to become familiar with Sino Global and its affiliates' employees. Approximately five employees of Sino Global and/or its related entities employees worked out of the FTX offices in the Bahamas. These Sino Global employees did not have their own separate walled-off space within the FTX offices, but were working

amongst FTX employees and shared with those employees common spaces such as the office kitchen, restrooms, etc, and lived or frequently visited the Albany while working there.[144]

### d. The Multinational VC Defendants sought to keep the fraud concealed, and therefore afloat, until FTX could affect an IPO or a private sale.

371.     In performing extensive due diligence before investing in FTX and then working with SBF to grow the FTX Platform to its exponential scale, the Multinational VC Defendants obtained knowledge of SBF's misappropriation of Class Member funds, the undisclosed relationship between Alameda and FTX, along with FTX's attendant misrepresentations and omissions. But despite this knowledge, the Multinational VC Defendants continued to provide capital, infrastructure for and guidance on the company's trajectory, with any eye towards an IPO or private sale, the end game for venture capitalists like the Multinational VC Defendants:

> Venture money is not long-term money. The idea is to invest in a company's balance sheet and infrastructure until it reaches a sufficient size and credibility so that it can be sold to a corporation or so that the institutional public-equity markets can step in and provide liquidity. In essence, the venture capitalist buys a stake in an entrepreneur's idea, nurtures it for a short period of time, and then exits with the help of an investment banker.

For the Multinational VC Defendants, FTX was no different. In fact, in closing FTX Trading's Series B funding, SBF announced that FTX was "trying to get [itself] in a position where we could go public relatively quickly if we wanted to." Multinational VC Defendants stood to profit enormously from FTX's public or private sale, as long as Multinational VC Defendants could help keep the fraud afloat until FTX went on the selling block.

372.     By January 2022, an IPO or private sale was increasingly imminent. FTX Trading's valuation reached $32 billion—one of the largest valuations in recent history, greater than the market cap of both Nasdaq and Twitter—while FTX US's valuation topped $8 billion. The

---

[144] *See* Ex. B, Declaration of Nishad Singh, ¶ 22.

Multinational VC Defendants' relentless efforts to promote the FTX exchange as reliable and trustworthy predominantly drove FTX's unprecedented valuations, all to increase the returns on the Multinational VC Defendants' respective investments. In announcing the valuations, SBF stated that he and others at FTX "look forward to working alongside our investors [*i.e.*, the Multinational VC Defendants] to achieve our mission and continue our tremendous growth throughout 2022 and beyond." These multi-billion dollars valuations arose directly from the fundraising by venture capitalists, including Multinational VC Defendants; FTX could not have achieved these appraisals without the nearly $2 billion in fundraising from Multinational VC Defendants and other investors.

373.    Just two months later, in March 2022, SBF met with David Solomon, CEO of Goldman Sachs, to discuss, among other things, FTX's IPO. With the prospect of an IPO imminent, Multinational VC Defendants could cash out with massive returns on their equity stakes and leave Class Members to bear the losses resulting from SBF's fraud, if they could help keep customer deposits flowing into FTX accounts, and SBF's fraud concealed, until after the sale.

374.    But at this time, cryptocurrencies had entered into a period of prolonged pricing declines, which has become known as the "Crypto Winter." Just a few months later, in May 2022, a series of highly publicized cryptocurrency collapses occurred, including Luna and Terra USD, which had the effect of wiping out Three Arrows Capital, then Voyager Digital and Celsius Network collapsed in July 2022. With the crypto industry beginning to falter, SBF's spree to buy up failing crypto companies (so to keep his fraud concealed from Class Members) took off, and for as long as FTX could shore of the crypto industry, FTX's fraudulent scheme would remain concealed, and the Multinational VC Defendants' investments, protected.

375.    Thus, by now, Multinational Defendants' interest in keeping SBF's fraud concealed—and, in turn, FTX afloat—had broadened, as Multinational Defendants had stakes not only in FTX, but in crypto currencies and companies throughout the industry. For example, Sino Global held a portfolio of digital tokens totaling in excess of $129 million, many of which were directly associated with SBF or FTX, including, for example, Solana's native SOL tokens, in addition to serum (SRM), maps (MAPS), oxygen (OXY) and jet protocol (JET). The collapse of FTX led to price decreases of 80% or more for each of these tokens.

376.    For as long as Multinational VC Defendants could keep FTX's fraud hidden from public eye, FTX could in turn shore up vulnerable stakes in crypto coins and tokens, as well as struggling players in the crypto industry (like it did BlockFi), including those in which Multinational VC Defendants had an interest. In the alternative, the collapse of FTX—then the second-largest cryptocurrency exchange on the market—could potentially result in a total crash of the cryptocurrency market. Despite that turmoil, at a time when investors were worried about the stability of players in the crypto markets, the Multinational VC Defendants continued to promote FTX as stable and fostered the narrative that SBF was the "savior" of crypto.

377.    By mid-summer 2022, SBF had burned through the assets accessible to FTX (including Class Member funds) and was in need of an immediate capital injection of $1 billion. Multinational VC Defendants declined to invest again yet made no mention of FTX's flatlining to the public. So SBF traveled to the Middle East in a desperate effort to get his hands on more cash. This was not known publicly at the time as FTX's public image fostered by the VC Defendants was that it held ample cash having raised over $2.2 billion within the prior year and customer assets were fully covered dollar per dollar.

378.     Throughout the summer of 2022, with FTX spiraling into a liquidity crisis  and the crypto industry faltering writ large, the Multinational VC Defendants disclosed none of it with their eyes on an IPO or private sale, and determined to extricate crypto industry-wide, the Multinational VC Defendants conspired with FTX to keep Class Member funds flowing in and the fraud hidden. For as long as Multinational VC Defendants could lure users to the FTX exchanges, their stakes in FTX would continue to skyrocket in value, and Defendants' fees in managing the investments, would continue to grow.[145]

### e. Multinational VC Defendants emerged from the fraud relatively unscathed, while Class Members lost everything.

379.     Multinational VC Defendants nearly succeeded in cashing out on SBF's fraudulent crypto exchange and they reaped substantial management fees and carried interest in their respective funds throughout the duration of the fraud. However, journalists broke the news of the fraud in early November, and SBF's fraud swiftly imploded. Though many Class Members lost their entire savings to SBF's fraud, Multinational VC Defendants emerged largely unscathed. For example:

- SoftBank reported that, though they marked down their projections of returns from its stake in FTX, FTX's collapse "is very not material for us."

- Sino Global was similarly unphased by the fraud. Sino Global described the minimal impact of FTX's collapse, explaining that Sino Global "is functioning as normal and continues to invest as a fund," in part because "fund investments have been balanced across ecosystems."

- Temasek reported that the total cost of its investment in FTX was 0.09% of its net portfolio value of $403 billion SGD (about $293 billion USD) and, like the other Multinational VC Defendants, wrote the investment off following the fraud's collapse.

---

[145] A typical fee structure for these types of funds is "2 and 20," or an annual 2% management fee and 20% of any profits (*i.e.*, carried interest). The Multinational VC Defendants' management fees would therefore be based on the invested amount and the committed amount. On top of these guaranteed fees, these Multinational VC Defendants would reap 20% of any profits from the investments in FTX.

380.     These relatively minimal losses underscore the win/win scenario that the Multinational VC Defendants enjoyed at the expense of Class Members, including Plaintiffs. Provided the Multinational VC Defendants could keep SBF's merry-go-round running until FTX went on the selling block or the volatile crypto market returned to ascendancy, the Multinational VC Defendants would go down in history as some of the largest rainmakers in the tech industry. Conversely, as they now admit, if the fraud collapsed before FTX reached a sale, the Multinational VC Defendants would suffer only non-material losses, losses which the Multinational VC Defendants could in fact harvest for hefty tax deductions. All told, the Multinational VC Defendants had nothing to lose in propping up SBF's fraud; they instead had everything to gain. And so, the Multinational VC Defendants assisted the FTX fraud; they did so knowingly; and they did so at Class Members' expense.

381.     As detailed herein, the Multinational VC Defendants represented to Plaintiffs and the Classes that they had performed adequate due diligence supporting their substantial FTX investments; that FTX's products and services were safe, trustworthy, and reliable; that SBF was a visionary crypto founder whose sole focus was on the greater good rather than profiting at the expense of others; that FTX was being competently run with extraordinary execution; and that FTX and SBF had strictly complied with all legal and regulatory requirements to safeguard their customers' assets, which included ensuring that funds deposited by FTX platform users would be segregated for safekeeping.

382.     The Multinational VC Defendants knew, or should have known, that these representations were materially false and misleading when made.  The due diligence activities that the Multinational VC Defendants claimed to have performed with respect to FTX would have revealed the wanton fraud and self-dealing, the related party transactions and relationships with

Alameda, and the total lack of internal controls and competency present at FTX. The Multinational VC Defendants had knowledge that FTX was not operating in the manner that VC Defendants had represented to consumers and the market as a result of their experience and relationship with FTX, and their statements to the contrary during the relevant period omitted material facts regarding FTX and Alameda and made other statements did not have a reasonable factual basis given this insider knowledge.

383.    Still, the Multinational VC Defendants tirelessly promoted FTX through both financial funding and issuing promotional statements that would reach investors and provided FTX with platforms – through the conferences and online shows – to present itself amongst other key players in the cryptocurrency industry. The Multinational VC Defendants' unfair and deceptive statements described herein are likely to mislead – and clearly have misled – consumers and investors acting reasonably in the circumstances into depositing funds and/or cryptocurrency into FTX.

384.    The Multinational VC Defendants' unfair and deceptive statements described herein were likely to have misled – and indeed did mislead – consumers acting reasonably under the circumstances in purchasing, transacting, or depositing fiat current or crypto assets in accounts with FTX during the relevant period.

385.    In addition, the Multinational VC Defendants gave hundreds of millions of dollars in funding to FTX knowing, or reckless in not knowing, that those funds would be used to promote FTX to more customers, inducing them to trade and keep their assets with FTX.  Immediately after funds were provided, FTX plowed those funds into expensive advertising campaigns, hiring celebrities, naming stadiums, and conducting many other public promotional activities.  The due diligence activities that the Multinational VC Defendants claimed to have performed with respect

to FTX would have revealed that FTX was not safeguarding, not segregating, not properly accounting for, and simply not protecting customer assets, again evidenced by the fact that other investors (*e.g.*, Social Capital and Alexander Pack, and the anonymous employee of one of the VC firm that did invest in FTX) so quickly identified these deficiencies. The Multinational VC Defendants also knew that FTX was comingling and misusing assets, yet turned a blind eye, did not warn customers, conspired with FTX and in fact gave hundreds of millions of dollars more to aid and abet, and materially assists in the fraud.

386.   FTX would not have been able to deceive customers to purchase, deposit, or transact in fiat currency or digital assets on its exchange if it were not for VC Defendants' public platforms, promotion, and active participation in the wrongful acts described herein. The Multinational VC Defendants' conduct has caused Class Members to suffer billions of dollars in losses, as SBF burned through Class Member funds for his own enrichment, leading FTX to collapse. .FTX and Alameda remain embroiled in bankruptcy proceedings, where their assets continue to be consumed by a variety of costs.  Billions of dollars' worth of assets have yet to be returned to customers, while each of the Multinational VC Defendants has escaped the collapse of FTX relatively unscathed and continues to operate without any major disruptions to their respective investment portfolios.

## CLASS ACTION ALLEGATIONS

387.   As detailed below in the individual counts, Plaintiffs bring this lawsuit on behalf of themselves and all others similarly situated, pursuant to Rule 23(a), (b)(2), (b)(3), and/or (c)(4) of the Federal Rules of Civil Procedure.

## A. Class Definitions

388. Plaintiffs Vozza, Rupprecht, Winter, and Kavuri seek to represent the following International Classes and Plaintiffs Orr, Cabo, Henderson, Livieratos, Chernyavsky, Podalsky, Shetty, Ezeokoli, Norris, Garrison, Huang, and Papadakis seek to represent the following Classes:

> (1) **<u>International Class</u>:** All persons or entities residing outside the United States who, within the applicable limitations period, purchased or held legal title and/or any beneficial interest in fiat or cryptocurrency deposited or invested through an FTX Platform, purchased or enrolled in a YBA, or purchased FTT.

> (2) **<u>Nationwide Class</u>:** All persons or entities residing in the United States who, within the applicable limitations period, purchased or held legal title and/or any beneficial interest in fiat or cryptocurrency deposited or invested through an FTX Platform, purchased or enrolled in a YBA, or purchased FTT.

Excluded from the Classes are MDL Defendants and their officers, directors, affiliates, legal representatives, and employees, the FTX Group and their officers, directors, affiliates, legal representatives, and employees, any governmental entities, any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

389. Plaintiffs reserve the right to modify or amend the definition of the proposed Classes, or to include additional classes or subclasses, before or after the Court determines whether such certification is appropriate as discovery progresses. Plaintiffs seek certification of the Classes in part because all offers of the FTX Platform, YBAs and/or FTT to Plaintiffs and the Class Members (in which MDL Defendants each materially assisted, substantially participated, and/or

personally participated) were made by FTX from their principal place of business in Miami, Florida, and thus every single offer to sell cryptocurrency, the FTX Platform, YBAs and/or FTT stems from a transactional occurrence that emanated from the State of Florida.

**B.  Numerosity**

390.    The Classes are comprised of thousands, if not millions, of consumers globally, to whom FTX offered and/or sold cryptocurrency, the FTX Platform, YBAs and/or FTT. Moreover, thousands, if not millions, of consumers worldwide have executed trades on the FTX Platform within the applicable limitations period. Membership in the Classes are thus so numerous that joinder of all members is impracticable. The precise number of Class Members is currently unknown to Plaintiffs but is easily identifiable through other means, such as through FTX's corporate records or self-identification.

**C.  Commonality/Predominance**

391.    This action involves common questions of law and fact, which predominate over any questions affecting individual Class Members. These common legal and factual questions include, but are not limited to, the following:

(a)  whether Bankman-Fried, the FTX Insiders, and/or FTX committed fraud.

(b)  whether the MDL Defendants agreed with Bankman-Fried, the FTX Insiders, and/or FTX to commit fraud.

(c)  whether the MDL Defendants had the requisite degree of knowledge of Bankman-Fried's, the FTX Insiders', and/or FTX's fraud.

(d)  whether the FTX Platform, YBAs and/or FTT were unregistered securities under federal, Florida, California, or other law.

(e) whether the MDL Defendants' participation and/or actions in FTX's offerings and sales of the FTX Platform, YBAs and/or FTT violate the provisions of applicable securities law.

(f) the type and measure of damages suffered by Plaintiffs and the Class.

(g) whether the MDL Defendants' practices violate the FDUTPA, the California Unfair Competition Law, or other state consumer-protection statutes.

(h) whether Plaintiffs and Class Members have sustained monetary loss and the proper measure of that loss.

(i) whether Plaintiffs and Class Members are entitled to injunctive relief.

(j) whether Plaintiffs and Class Members are entitled to declaratory relief; and

(k) whether Plaintiffs and Class Members are entitled to consequential damages, punitive damages, statutory damages, disgorgement, and/or other legal or equitable appropriate remedies as a result of the MDL Defendants' conduct.

## D.  Typicality

392.    Plaintiffs' claims are typical of the claims of the members of the Classes because all members were injured through the uniform misconduct described above, namely that Plaintiffs and all Class Members were offered and/or sold FTX's FTX Platform, YBAs and/or FTT because of the MDL Defendants' actions and/or participation in the offering and sale of these unregistered securities, that the MDL Defendants aided and abetted the fraud and conversion perpetrated by Bankman-Fried, the FTX Insiders, and/or FTX, or that the MDL Defendants agreed with Bankman-Fried, the FTX Insiders, and/or FTX to commit fraud. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all such members. Further, there are no defenses available to any MDL Defendant that are unique to Plaintiffs.

### E.  Adequacy of Representation

393.    Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs have retained counsel experienced in complex consumer and securities class action litigation, and Plaintiffs intend to prosecute this action vigorously. Plaintiffs have no adverse or antagonistic interests to those of the Classes. Plaintiffs anticipate no difficulty in the management of this litigation as a class action. To prosecute this case, Plaintiffs have chosen the undersigned law firms, which have the financial and legal resources to meet the substantial costs and legal issues associated with this type of consumer class litigation.

### F.  Requirements of Fed. R. Civ. P. 23(b)(3)

394.    The questions of law or fact common to Plaintiffs' and each Class Member's claims predominate over any questions of law or fact affecting only individual members of the Classes. All claims by Plaintiffs and the unnamed members of the Classes are based on the common course of conduct by the MDL Defendants (1) in marketing, offering, and/or selling the FTX Platform, YBAs and/or FTT, which are unregistered securities, (2) in receiving secret undisclosed compensation for their promotion of the FTX Platform, (3) in aiding and abetting fraud and/or conversion by Bankman-Fried, FTX and the FTX Insiders, and/or (4) in agreeing with Bankman-Fried, the FTX Insiders, and/or FTX to commit fraud.

395.    The common course of conduct by the MDL Defendants includes, but is not limited to their promotion, offer, sale, solicitation, material assistance, substantial participation in, and/or personal participation in the offer or sale of the FTX Platform, YBAs, and/or FTT, and/or their aiding and abetting of the FTX Group's Ponzi scheme, fraud, and/or conversion of billions of dollars of customer assets.

396.    Common issues predominate when, as here, liability can be determined on a class-wide basis, even when there will be some individualized damages determinations.

397.    As a result, when determining whether common questions predominate, courts focus on the liability issue, and if the liability issue is common to the Classes as is in the case at bar, common questions will be held to predominate over individual questions.

## G. Superiority

398.    A class action is superior to individual actions for the proposed Classes, in part because of the non-exhaustive factors listed below:

(a) Joinder of all Class members would create extreme hardship and inconvenience for the affected customers as they reside nationwide and throughout the state.

(b) Individual claims by Class members are impracticable because the costs to pursue individual claims exceed the value of what any one Class member has at stake. As a result, individual Class members have no interest in prosecuting and controlling separate actions.

(c) There are no known individual Class members who are interested in individually controlling the prosecution of separate actions.

(d) The interests of justice will be well served by resolving the common disputes of potential Class members in one forum.

(e) Individual suits would not be cost effective or economically maintainable as individual actions; and

(f) The action is manageable as a class action.

## H. Requirements of Fed. R. Civ. P. 23(b)(2)

399.    The MDL Defendants have acted and refused to act on grounds generally applicable to the Classes by engaging in a common course of conduct of aiding and abetting the offering and/or selling of the FTX Platform, YBAs and/or FTT, which are unregistered securities, and violating state consumer-protection laws, thereby making appropriate final injunctive relief or declaratory relief with respect to the classes as a whole.

400.    The MDL Defendants have acted and refused to act on grounds generally applicable to the Classes by engaging in a common course of conduct of uniformly identical and uniform misrepresentations and omissions in receiving secret undisclosed compensation for their promotion of the FTX Platform, thereby making appropriate final injunctive relief or declaratory relief with respect to the classes as a whole.

## I. Requirements of Fed. R. Civ. P. 23(c)(4)

401.    As it is clear that one of the predominant issues regarding the MDL Defendants' liability is whether the FTX Platform, YBAs and/or FTT that FTX offered and/or sold are unregistered securities, utilizing Rule 23(c)(4) to certify the Class for a class wide adjudication on this issue would materially advance the disposition of the litigation as a whole.

402.    As it is clear that another predominant issue regarding the MDL Defendants' liability is whether they have violated the consumer protection and securities laws of Florida in making identical and uniform misrepresentations and omissions regarding the functionality of the FTX Platform, and/or in receiving secret undisclosed compensation for their promotion of the FTX Platform, utilizing Rule 23(c)(4) to certify the Classes for a class wide adjudication on this issue would materially advance the disposition of the litigation as a whole.

**J.  Nature of Notice to the Proposed Class.**

403.    The names and addresses of all Class Members are contained in the business records maintained by FTX and are readily available to FTX. The Class Members are readily and objectively identifiable. Plaintiffs contemplate that notice will be provided to Class Members by e-mail, mail, and published notice.

## CAUSES OF ACTION

**COUNT ONE (All Defendants)**
**Sale of Unregistered Securities in Violation of Florida Law**

404.    Plaintiffs repeat and re-allege the allegations contained in all preceding paragraphs as if fully set forth herein.

405.    Section 517.07(1), Fla. Stat., provides that it is unlawful and a violation for any person to sell or offer to sell a security within the State of Florida unless the security is exempt under Fla. Stat. § 517.051, is sold in a transaction exempt under Fla. Stat. § 517.061, is a federally covered security, or is registered pursuant to Ch. 517, Fla. Stat.

406.    Section 517.211 extends liability to any "director, officer, partner, or agent of or for the seller, if the director, officer, partner, or agent has personally participated or aided in making the sale, is jointly and severally liable to the purchaser in an action for rescission, if the purchaser still owns the security, or for damages, if the purchaser has sold the security."

407.    The FTX Platform, YBAs and/or FTT are each a security pursuant to Fla. Stat. § 517.021(22)(a).

408.    The FTX Platform, YBAs and/or FTT sold and offered for sale to Plaintiffs and Class members were not:

a. exempt from registration under Fla. Stat. § 517.051.

b. a federal covered security.

c. registered with the Office of Financial Regulations (OFR); or

d. sold in a transaction exempt under Fla. Stat. § 517.061.

409.     The FTX Group sold and offered to sell the unregistered FTX Platform, YBAs and/or FTT to Plaintiffs and the members of the Class.

410.     The Multinational VC Defendants are directors, officers, partners and/or agents of or for the FTX Group pursuant to Fla. Stat. § 517.211.

411.     The FTX Group, with the Multinational VC Defendants' material assistance and personal participation, offered and sold the unregistered FTX Platform, YBAs and/or FTT to Plaintiffs and the members of the Class. As a result of this assistance, the Multinational VC Defendants violated Fla. Stat. § 517.07 et seq. and Plaintiffs and members of the Class sustained damages as herein described.

**COUNT TWO (All Defendants)**
**Securities Fraud in Violation of Florida Law**

412.     Plaintiffs repeat and re-allege the allegations contained in all preceding paragraphs as if fully set forth herein.

413.     Fla. Stat. Ann. § 517.301 prohibits any person "in connection with the offer, sale, or purchase of any investment or security" from "directly or indirectly" (1) employing "any device, scheme, or artifice to defraud"; (2) obtaining "money or property by means of an untrue statement or a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading"; or (3) engaging in "any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a person."

414.     Section 517.211 extends liability to any "director, officer, partner, or agent of or for the seller, if the director, officer, partner, or agent has personally participated or aided in making

the sale, is jointly and severally liable to the purchaser in an action for rescission, if the purchaser still owns the security, or for damages, if the purchaser has sold the security."

415.    The FTX Platform, the YBAs and/or FTT Tokens are securities under Florida law.

416.    In offering or selling the FTX Platform, the YBAs and/or FTT Tokens Securities to Plaintiffs and Class Members, FTX and/or SBF made the following material omissions:

- FTX was not segregating Class Member funds, instead commingling those funds in FTX's omnibus accounts and treating those funds as FTX's own.

- SBF was siphoning Class Member funds to his friends and family members or for his own personal use.

- FTX and Alameda were not, in fact, "wholly separate entities at arm's length," and were instead operated as a common enterprise.

- FTX directed that Class Member funds be wired directly into accounts held by North Dimension, a subsidiary of Alameda.

- SBF was looting Class Member funds under the guise of non-arm's length "related party transactions" and "loans" often by way of Alameda.

- SBF routinely transferred Class Member funds out of accounts held by FTX to those held by Alameda.

- SBF was using Class Member funds to underwrite his speculative personal investments at Alameda.

- Alameda was exempt from the "risk engine" and other FTX protocols in place to prevent a user from becoming undercollateralized or overleveraged on the exchange.

- With the foregoing exemption, Alameda engaged in margin trading on the FTX platform, exposing Class Members to the risk of Alameda's loss.

- FTX used Class Member funds to manipulate the price of FTT, which was not "widely distributed," but instead concentrated in the hands of FTX and Alameda; and

- FTX did not have in place fundamental internal controls, including an independent board of directors or a CFO.

417.    Plaintiffs and Class Members were in strict privity with FTX.

418.    The Multinational VC Defendants are directors, officers, partners and/or agents of or for the FTX Group pursuant to Fla. Stat. § 517.211.

419.    Based on their knowledge of the financial industry, with a focus on serving crypto clients, and their understanding of FTX's operations obtained through diligence, ongoing monitoring and/or hands-on partnership, the Multinational VC Defendants acquired knowledge of FTX's omissions and untruthful conduct and misappropriation of Class Member funds.

420.    Nevertheless, by way of the conduct described above, the Multinational VC Defendants directly participated in the FTX Group's offer and sale of the FTX Platform, the YBAs and/or FTT Tokens Securities in Florida while perpetuating the above-listed omissions in violation of section 517.301.

421.    The Multinational VC Defendants are accordingly joint and severally liable to Plaintiffs for rescissionary damages under section 517.211.

422.    Plaintiffs hereby conditionally tender their FTX Group Securities in accordance with section § 517.211.

**COUNT THREE (All Defendants)**
**Sale of Unqualified Securities in Violation of California Law**

423.    Plaintiffs repeat and re-allege the allegations contained in all preceding paragraphs as if fully set forth herein.

424.    Section 25110 of the California Securities Law ("CSL") prohibits the offer or sale by any person in California of securities that are not qualified through registration. CSL section 25503 affords a statutory cause of action to victimize investors for violations of section 25110. Additionally, section 25504.1 extends liability under Section 25503 to any person who materially assists in a violation of section 25110 and makes them jointly and severally liable with any other person liable under section 25503.

425.    By way of the conduct described above, the Multinational VC Defendants materially assisted and/or personally participated with the FTX Group in the offering and selling of the FTX Platform, the YBAs and/or FTT Token securities in California without being properly registered or qualified for offer or sale either with any federal or California regulator in violation of section 25503.[146]

426.    Based on their knowledge of securities laws and regulations, the financial industry, with a focus on serving crypto clients, and their understanding of FTX's operations and intentions obtained through diligence, ongoing monitoring and/or their hands-on partnership with FTX and/or SBF, the Multinational VC Defendants understood that the FTX Platform, the YBAs and/or FTT Tokens were securities not properly qualified or registered under California law, and materially assisted in their issuance and sale.

427.    Moreover, CSL section 25210(b) provides: No person shall, … on behalf of an issuer, effect any transaction in, or induce or attempt to induce the purchase or sale of, any security in this state unless [a licensed] broker-dealer and agent have complied with any rules as the commissioner may adopt for the qualification and employment of those agents. To the extent the Multinational VCs in addition to providing capital for the scheme to sell unregistered, unqualified securities, also promoted and invested in these unregistered, unqualified securities to induce their

---

[146] Plaintiffs contend that secondary liability for materially assisting a strict liability violation of the qualification requirements of a violation pursuant to section 25503 does not require proof that The Multinational VC Defendants intended "to deceive or defraud." They had to know they were assisting in the sale of unqualified securities. However, Plaintiffs in the alternative contend that even if so, The Multinational VC Defendants' allegations demonstrate knowledge of and participation in FTX Group's non-compliance with the CSL establishes their intent to deceive investors regarding the Deceptive FTX Platform, the YBAs and/or FTT Tokens.

purchase by Plaintiffs, the Multinational VC Defendants are liable under CSL sections 25504.1 and 25210.

428.    The Multinational VC Defendants breached section 25210(b) by, on behalf of FTX, inducing or attempting to induce the purchase and sale of unregistered securities in the State of California and by facilitating and encouraging the FTX Group to offer and sell the FTX Platform, YBAs and/or FTT Tokens securities despite those securities not being registered or qualified under the California securities law.

429.    Additionally, CSL section 25501.5 affords a statutory cause of action to victimize investors for violations of section 25210(b).

430.    The Multinational VC Defendants are accordingly joint and severally liable to Plaintiffs for recessionary damages under section 25504.1.

431.    Plaintiffs hereby conditionally tender their FTX Group Securities in accordance with section 25503.

**COUNT FOUR (All Defendants)**
**Securities Fraud in Violation of California Law**

432.    Plaintiffs repeat and re-allege the allegations contained in all preceding paragraphs as if fully set forth herein.

433.    Section 25401 of the California Securities Law ("CSL") makes it "unlawful for any person to offer or sell a security in this state, or to buy or offer to buy a security in this state, by means of any written or oral communication that includes an untrue statement of a material fact or omits to state a material fact necessary to make the statements made, in the light of the circumstances under which the statements were made, not misleading." Section 25501 provides a private right of action to purchasers of securities injured by violation of section 25401.

434.     Additionally, section 25504.1 extends liability under Section 25501 to any person who materially assists in a violation of section 25401 and makes them jointly and severally liable with any other person liable under section 25501.

435.     The FTX Platform, the YBAs and/or FTT Tokens are securities under California law. The Multinational VC Defendants materially assisted FTX and SBF's scheme to sell securities through utilizing material omissions.

436.     In offering or selling the FTX Platform, the YBAs and/or FTT Tokens Securities to Plaintiffs and Class Members, FTX and/or SBF made the following material omissions:

- FTX was not segregating Class Member funds, instead commingling those funds in FTX's omnibus accounts and treating those funds as FTX's own;

- SBF was siphoning Class Member funds to his friends and family members or for his own personal use.

- FTX and Alameda were not, in fact, "wholly separate entities at arm's length," and were instead operated as a common enterprise that engaged in a material, undisclosed related party transactions.

- FTX directed that Class Member funds be wired directly into accounts held by North Dimension, a subsidiary of Alameda.

- SBF was looting Class Member funds under the guise of non-arm's length "related party transactions" and "loans" often by way of Alameda.

- SBF routinely transferred Class Member funds out of accounts held by FTX to those held by Alameda.

- SBF was using Class Member funds to underwrite his speculative personal investments at Alameda.

- Alameda was exempt from the "risk engine" and other FTX protocols in place to prevent a user from becoming undercollateralized or overleveraged on the exchange.

- With the foregoing exemption, Alameda engaged in margin trading on the FTX platform, exposing Class Members to the risk of Alameda's loss.

- FTX used Class Member funds to manipulate the price of FTT, which was not "widely distributed," but instead concentrated in the hands of FTX and Alameda; and

- FTX did not have in place fundamental internal controls, including an independent board of directors or a CFO.

437.   Plaintiffs and Class Members were in strict privity with FTX and purchased securities issued by FTX.

438.   Based on their knowledge of the financial industry, with a focus on serving crypto clients, and their understanding of FTX's operations obtained through diligence, ongoing monitoring and/or hands-on partnership, the Multinational VC Defendants acquired knowledge of FTX's omissions, related party transactions and relationships, and other untruthful conduct and misappropriation of Class Member funds.

439.   Nevertheless, by way of the conduct described above, the Multinational VC Defendants materially assisted with the FTX Group in the offering and selling of the FTX Platform, the YBAs and/or FTT Tokens Securities in California while perpetuating the above-listed omissions in violation of section 25501. The Multinational VC Defendants so assisted or participated with the intent to deceive or defraud Plaintiffs and Class Members; Plaintiff sand Class Members' deposits increased the value of FTX and, by extension, the Multinational VC Defendants' investments.

440.   The Multinational VC Defendants materially assisted the scheme to sell unregistered securities via material omissions to citizens of California. All of the Multinational VC defendants had knowledge of the omitted related party transactions and relationship  between FTX and Alameda orchestrated by SBF, including, as alleged, through providing SBF the capital for the fraudulent scheme, providing their reputations and false assurances of due diligence to garner trust in SBF, FTX and these securities, and by even partnering with SBF and both FTX and Alameda in investment entities that churned these fraudulent, unregistered securities while SBF looted FTX.

441.    The Multinational VC Defendants are accordingly joint and severally liable to Plaintiffs for rescissionary damages under section 25504.1.

442.    Plaintiffs hereby conditionally tender their FTX Group Securities in accordance with section 25503.

## COUNT FIVE (All Defendants)
## Securities Market Manipulation in Violation of California Law

443.    Plaintiffs repeat and re-allege the allegations contained in all preceding paragraphs as if fully set forth herein.

444.    Section 25400 of the CSL makes it unlawful for any person, directly or indirectly, to make any statement in the offer or sale of a security, "which was, at the time and in the light of the circumstances under which it was made, false or misleading with respect to any material fact, or which omitted to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, and which he knew or had reasonable ground to believe was so false or misleading" in order to "induce the purchase or sale of such security." Under Section 25500, "[a]ny person who willfully participates in any act or transaction in violation of Section 25400 [i.e., market manipulation] shall be liable to any person who purchases or sells any security at a price which was affected by such act or transaction for the damages sustained by the latter."

445.    The FTX Platform, the YBAs and/or FTT Tokens are securities under California law.

446.    In offering or selling the FTX Platform, the YBAs and/or FTT Tokens Securities to Plaintiffs and Class Members, FTX and/or SBF made the following material omissions:

- FTX was not segregating Class Member funds, instead commingling those funds in FTX's omnibus accounts and treating those funds as FTX's own.

- SBF was siphoning Class Member funds to his friends and family members or for his own personal use.

- FTX and Alameda were not, in fact, "wholly separate entities at arm's length," and were instead operated as a common enterprise.

- FTX directed that Class Member funds be wired directly into accounts held by North Dimension, a subsidiary of Alameda.

- SBF was looting Class Member funds under the guise of non-arm's length "related party transactions" and "loans" often by way of Alameda.

- SBF routinely transferred Class Member funds out of accounts held by FTX to those held by Alameda.

- SBF was using Class Member funds to underwrite his speculative personal investments at Alameda.

- Alameda was exempt from the "risk engine" and other FTX protocols in place to prevent a user from becoming undercollateralized or overleveraged on the exchange.

- With the foregoing exemption, Alameda engaged in margin trading on the FTX platform, exposing Class Members to the risk of Alameda's loss.

- FTX used Class Member funds to manipulate the price of FTT, which was not "widely distributed," but instead concentrated in the hands of FTX and Alameda; and

- FTX did not have in place fundamental internal controls, including an independent board of directors or a CFO.

447.   FTX made these omissions of material fact despite having represented that it would hold its customers' funds for their benefit after taking custody of such funds.

448.   FTX made the foregoing omissions in order to induce the purchase or sale of the FTX Platform, the YBAs and/or FTT Tokens Securities. Such omissions affected the value of the FTX Platform, the YBAs and/or FTT Tokens Securities.

449.   Based on their knowledge of the financial industry, with a focus on serving crypto clients, and their understanding of FTX's operations obtained through diligence, ongoing monitoring, control, their positions on advisory committees and/or hands-on partnership, The

Multinational VC Defendants acquired knowledge of FTX's omissions and untruthful conduct and misappropriation of Class Member funds.

450.    Nevertheless, by way of the conduct described above, the Multinational VC Defendants willfully participated in the FTX Group's offers and sales of the FTX Platform, the YBAs and/or FTT Tokens Securities in California while perpetuating the above-listed omissions in violation of section 25500.

451.    The Multinational VC Defendants are accordingly joint and severally liable to Plaintiffs for damages under section § 25500.

**COUNT SIX (All Defendants)**
**Control Person Liability for Violation of California Securities Law**

452.    Plaintiffs repeat and re-allege the allegations contained in all preceding paragraphs as if fully set forth herein.

453.    Section 25504 of the CSL extends liability under Section 25501 (which provides a private right of action for violations of section 25401) to control persons of any person or entity liable under section 25501, including "every broker-dealer or agent who materially aids in the act or transaction constituting the violation, are also liable jointly and severally with and to the same extent as such person[s] liable under section 25501.

454.    Here Defendants Temasek and SoftBank were control persons of FTX and FTX US as significant equity owners of FTX and FTX US who had representatives who sat on an advisory board committee at FTX. Those Defendants wielded their power, control, and deep pockets, to launch FTX's house of cards to its multi-billion-dollar scale. Along with the other Defendant VCs, Temasek and SoftBank invested nearly $2 billion in FTX. Temasek and SoftBank were more well than passive investors in the control positions. Indeed, Temasek and SoftBank provided critical groundwork for the FTX fraud, when serving on FTX's advisory board and providing guidance to

the fraud and promoting FTX despite knowing that SBF was misappropriating Class Member funds.

**COUNT SEVEN (All Defendants)**
**Civil Conspiracy**

455.    Plaintiffs repeat and re-allege the allegations contained in all preceding paragraphs as if fully set forth herein.

456.    There was an express or implied agreement between at least one of SBF and/or other agents of FTX and each of the Multinational VC Defendants to deceive Class Members, and to commit the wrongful conduct described herein, including FTX's fraud, breach of fiduciary duty to Class Members, and conversion of Class Members' property, which wrongful conduct is described more fully above.

457.    Moreover, Temasek Holdings and Temasek USA expressly or impliedly agreed to act in furtherance of the wrongful conduct described herein, including FTX's fraud, breach of fiduciary duty to Class Members, and conversion of Class Members' property, which wrongful conduct is described more fully above.

458.    SoftBank Group, SoftBank US, and SoftBank Advisers likewise expressly or impliedly agreed to act in furtherance of the wrongful conduct described herein, including FTX's fraud, breach of fiduciary duty to Class Members, and conversion of Class Members' property, which wrongful conduct is described more fully above.

459.    Through the course of their due diligence and hands-on partnerships with FTX, and in providing guidance to FTX and its founder, SBF, the Multinational VC Defendants acquired knowledge of FTX's omissions and untruthful conduct and misappropriation of Class Members' funds. Despite this knowledge, each Multinational VC Defendant stood to gain financially from

FTX's misconduct, and each Multinational VC Defendant agreed, at least impliedly, to assist that unlawful conduct.

460.    The Multinational VC Defendants agreed, at least impliedly, with SBF and/or one or more of his co-conspirators to commit the overt acts alleged herein, each in furtherance of SBF's fraud, breach of fiduciary duty, and conversion of Class Members' property, including (1) propping up SBF's fraud—and expanding its reach—by injecting more than $500 million of necessary capital into the scheme; (2) generating for FTX the appearance of legitimate operations, strong financial condition, and other credibility, which permitted the scheme to grow in scale and persist in duration; (3) advising FTX on ways to continue its growth, thereby attracting new victims and thrusting the scheme forward; and (4) concealing the fraud when the cryptocurrency industry began to falter, with the purpose of keeping the fraud afloat until Defendants could cash out in a public or private sale or once the crypto market recovered.

### COUNT EIGHT (All Defendants)
### Common Law Aiding and Abetting Fraud

461.    Plaintiffs repeat and re-allege the allegations contained in all preceding paragraphs as if fully set forth herein.

462.    FTX, and its founder SBF, defrauded Class Members by, among other things, making the following material omissions in soliciting their deposits:

- FTX was not segregating Class Member funds, instead commingling those funds in FTX's omnibus accounts and treating those funds as FTX's own.

- SBF was siphoning Class Member funds to his friends and family members or for his own personal use.

- FTX and Alameda were not, in fact, "wholly separate entities at arm's length," and were instead operated as a common enterprise.

- FTX directed that Class Member funds be wired directly into accounts held by North Dimension, a subsidiary of Alameda.

- SBF was looting Class Member funds under the guise of non-arm's length "related party transactions" and "loans" often by way of Alameda.

- SBF routinely transferred Class Member funds out of accounts held by FTX to those held by Alameda.

- SBF was using Class Member funds to underwrite his speculative personal investments at Alameda.

- Alameda was exempt from the "risk engine" and other FTX protocols in place to prevent a user from becoming undercollateralized or overleveraged on the exchange.

- With the foregoing exemption, Alameda engaged in margin trading on the FTX platform, exposing Class Members to the risk of Alameda's loss.

- FTX used Class Member funds to manipulate the price of FTT, which was not "widely distributed," but instead concentrated in the hands of FTX and Alameda; and

- FTX did not have in place fundamental internal controls, including an independent board of directors or a CFO.

463.    Based on their knowledge of the financial industry, with a focus on serving crypto clients, and their understanding of FTX's operations obtained through diligence, ongoing monitoring and/or hands-on partnership, the Multinational VC Defendants acquired knowledge of FTX's omissions and untruthful conduct and misappropriation of Class Member funds.

464.    Notwithstanding this knowledge, and by reason of the conduct described above, the Multinational VC Defendants substantially aided, abetted, and/or participated with SBF and his co-conspirators in a fraudulent scheme against Class Members, including by the actions set forth above.

465.    The Multinational VC Defendants' actions, in combination with the actions of SBF and his co-conspirators, are a proximate cause of actual damages to Class Members. As a result of this conduct, the Multinational VC Defendants are jointly and severally liable with the FTX Group and the FTX Insiders for aiding and abetting his fraudulent scheme.

## COUNT NINE (All Defendants)
### Common Law Aiding and Abetting Fiduciary Breach

466.    Plaintiffs repeat and re-allege the allegations contained in all preceding paragraphs as if fully set forth herein.

467.    FTX took custody of the Class Member funds. As alleged herein, FTX promised Class Members funds were safe in its hands, and that FTX customer funds were "held by FTX for [their] benefit." As a custodian of Class Member funds, and by virtue of the promises FTX made to safeguard their funds, FTX owed a fiduciary duty to Class Members, and FTX was obligated to discharge that duty in good faith, with the care that a fiduciary in a similar position would exercise and, in a manner, reasonably believed to be in the best financial interests of Class Members.

468.    Rather than safeguarding Class Member funds, FTX misappropriated their funds in breach of the fiduciary duty owed to Class Members. These breaches include but are not limited to:  (1) transferring funds belonging to Class Members to Alameda and other of SBF's separately owned entities; (2) transferring funds belonging to Class Members to SBF and his co-conspirators; (3) using funds belonging to Class Members to engage in self-dealing, including non-arms' length transactions among SBF's affiliated entities.

469.    Based on their knowledge of the financial industry, with a focus on serving crypto clients, and their understanding of FTX's operations obtained through diligence, ongoing monitoring and/or hands-on partnership, the Multinational VC Defendants acquired knowledge of FTX's fiduciary duty to Class Members and breaches thereof.

470.     Notwithstanding this knowledge, and by reason of the conduct described above, the Multinational VC Defendants substantially aided, abetted, and/or participated with SBF and his co-conspirators in a fraudulent scheme against Class Members, including by the actions set forth above.

471.    The Multinational VC Defendants' actions, in combination with the actions of SBF and his co-conspirators, are a proximate cause of actual damages to Class Members. As a result of this conduct, the Multinational VC Defendants are jointly and severally liable with the FTX Group and the FTX Insiders for participating in the breach of FTX's fiduciary duty.

**COUNT TEN (All Defendants)**
**Common Law Aiding and Abetting Conversion**

472.    Plaintiffs repeat and re-allege the allegations contained in all preceding paragraphs as if fully set forth herein.

473.    The funds deposited by Class Members into YBAs on the FTX exchange were personal property of Class Members. SBF and his co-conspirators wrongfully exercised dominion or control over such property, misappropriating Class Member funds entrusted to FTX.

474.    Based on their knowledge of the financial industry, with a focus on serving crypto clients, and their understanding of FTX's operations obtained through diligence, ongoing monitoring and/or hands-on partnership, the Multinational VC Defendants acquired knowledge of FTX's conversion of Class Member funds.

475.    Notwithstanding this knowledge, and by reason of the conduct described above, the Multinational VC Defendants substantially aided, abetted, and/or participated with SBF and his co-conspirators in conversion of funds belonging to Class Members, including by the actions set forth above.

476.    The Multinational VC Defendants' actions, in combination with the actions of SBF and his co-conspirators, are a proximate cause of actual damages to Class Members. As a result of this conduct, Defendants are jointly and severally liable with the FTX Group and the FTX Insiders for participating in the breach of FTX's conversion of Class Member funds.

**COUNT ELEVEN (The Sino Global Defendants)**
**Conversion**

337.     Plaintiffs reallege and incorporate by reference the allegations contained in all preceding paragraphs as if fully set forth herein.

338.     The Sino Global Defendants accepted a $60 million investment from Alameda and yet another investment of an undisclosed amount from Sam Bankman-Fried, each of which, upon information and belief, was comprised of Class Member funds. It further partnered with FTX and Alameda as co-general partners in the $200 million Liquid Value I fund, Sino Global's first ever outside venture fund.

338. The funds deposited by Class Members into the FTX Platform were personal property of the Plaintiffs and Class Members. The Sino Global Defendants wrongfully interfered with Plaintiffs' possessory interest in a specific, identifiable sum of money: the amount that the Sino Global Defendants took from FTX in the form of investments in Sino Global.

339. Plaintiffs' funds were their own. They each had a possessory interest in the sum of money they invested in the FTX Platform.

340. Nevertheless, the Sino Global Defendants misappropriated those funds for their own benefit by taking funds from FTX (in the form of an investment in Sino Global entities) which were owned by FTX customers, given FTX's general practice of unlawfully converting funds that belonged to Plaintiffs.

341. The Sino Global Defendants' actions are a proximate cause of actual damages to Plaintiffs and class members and the Sino Global Defendants are jointly and severally liable for the conversion of Plaintiffs' funds in an amount to be proven at trial.

**COUNT TWELVE (Sino Global Defendants)**
**Aiding and Abetting Conversion**

342. Plaintiffs reallege and incorporate by reference the allegations contained in all preceding paragraphs as if fully set forth herein.

343. The funds deposited by Class Members into the FTX Platform were personal property of the Plaintiffs and Class Members. The Sino Global Defendants wrongfully interfered with Plaintiffs' possessory interest in a specific, identifiable sum of money: the amount that each plaintiff had in their FTX account that they could not withdraw.

344. Plaintiffs' funds were their own. They each had a possessory interest in the sum of money they invested in the FTX Platform.

345.  The Sino Global Defendants, based on their knowledge of the FTX Group's operations obtained through due diligence, ongoing monitoring, and partnership, acquired knowledge of FTX's conversion of Plaintiffs' funds.

345. Notwithstanding this knowledge, and by reason of the conduct described herein, the Sino Global Defendants took money from FTX anyways in the form of investments in Sino Global entities and substantially aided, abetted, and/or participated with FTX in the conversion of funds that belonged to Plaintiffs.

347. The Sino Global Defendants' actions, in combination with the actions of FTX, are a proximate cause of actual damages to Plaintiffs and class members. The Sino Global Defendants are jointly and severally liable for participating in the conversion of Plaintiffs' funds in an amount to be proven at trial.

## COUNT THIRTEEN (Sino Global Defendants)
### Unjust Enrichment

363. Plaintiffs reallege and incorporate by reference the allegations contained in all preceding paragraphs above as if fully set forth herein.

364. Plaintiffs directly conferred a monetary benefit on the Sino Global Defendants in

the form of investment funds provided to the Sino Global Defendants from FTX customer funds.

365. Plaintiffs also conferred a monetary benefit on the Sino Global Defendants because they accepted funds that they knew, or should have known, were FTX consumer deposits.

366. With Plaintiffs' money, the Sino Global Defendants enriched themselves.

367. The Sino Global Defendants have knowledge of the benefits that Plaintiffs conferred on them.

368. Under principles of equity and good conscience, the Sino Global Defendants should not be permitted to retain the funds and assets they received as a result of their misappropriation of Plaintiffs' assets, because they knowingly concealed material information from Plaintiffs regarding FTX's conversion of the funds, which directly resulted in the loss of Plaintiffs' funds and assets that were supposed to have been stored on the exchange.

369. As a result of the Sino Global Defendants' conduct, Plaintiffs have suffered damages in an amount to be determined at trial.

370. To the extent that Plaintiffs have no other adequate remedy at law, Plaintiffs seek restitution of all funds and assets that the Sino Global Defendants have unjustly received as a result of their conduct alleged herein, as well as interest, reasonable attorneys' fees, expenses, and costs to the extent allowable, as well as all other relief the Court deems necessary to make them whole.

### COUNT FOURTEEN  (All Defendants)
### Violation of California's Unfair Competition Law
### (Cal. Bus. & Prof. Code §17200, *et seq.*)

477.    Plaintiffs repeat and re-allege the allegations contained in all preceding paragraphs as if fully set forth herein.

478.    The California Unfair Competition Law ("UCL") prohibits any "unlawful, unfair or fraudulent business act or practice."  Cal. Bus. & Prof. Code §17200.

479.     The Multinational VC Defendants' unfair and deceptive practices described herein were likely to mislead – and in fact did mislead – consumers acting reasonably in the circumstances into purchasing, depositing, and/or transacting in fiat currency and digital assets with accounts with FTX.

480.     **Unlawful**: During the relevant period, the Multinational VC Defendants advertised and otherwise promoted FTX using false and/or misleading claims, such that the Multinational VC Defendants' actions as alleged herein violate at least the following laws:

(a)  The False Advertising Law, Cal. Bus. & Prof. Code §17500, *et seq*.; and

(b)  Cal. Corp. Code §25504.1.

481.     **Fraudulent**: A practice is "fraudulent" under the UCL if members of the general public were or are likely to be deceived.  As detailed herein, the Multinational VC Defendants' statements regarding, *inter alia*, the safety and viability of FTX and their due diligence activities having confirmed such safety and viability were deceptive to or likely to deceive the public. In the alternative, the Multinational VC Defendants deceived the public in suggesting that they conducted extensive due diligence regarding FTX when they in fact did not and nevertheless touted FTX's safety and viability.

482.     **Unfair**: The UCL gives courts maximum discretion to address improper business practices that are "unfair."  The Multinational VC Defendants' collective conduct with respect to the marketing and promotion of FTX is unfair because Defendants' conduct was immoral, unethical, unscrupulous, or substantially injurious to consumers in inducing them to purchase, transact, and/or deposit fiat currency and digital assets with accounts with FTX and the utility of the Multinational VC Defendants' conduct, if any, does not remotely outweigh the gravity of the harm to their victims.  Plaintiffs and the Class would not have purchased, transacted, and/or

deposited fiat currency and digital assets with accounts with FTX at the prices paid or at all had they known that the statements were misrepresentations and deceptive.

483.    The Multinational VC Defendants' conduct with respect to the promotion of FTX is also unfair because the consumer injury is substantial, not outweighed by benefits to consumers or competition, and not one that consumers can reasonably avoid.

484.    The harm suffered by Plaintiffs and the Class was directly and proximately caused by the deceptive and unfair practices of Defendants related to the promotion and marketing of FTX, as described herein.

485.    In accordance with Cal. Bus. & Prof. Code §17203, Plaintiffs seek an order enjoining the Multinational VC Defendants from continuing to conduct business through fraudulent or unlawful acts and practices and to commence a corrective advertising campaign.  On behalf of the Class, Plaintiffs also seek an order for the restitution of all monies made from the Multinational VC Defendants' investments in or other business dealings with FTX, which were made resulting from acts of fraudulent, unfair, or unlawful competition as detailed herein.

**COUNT FIFTEEN (All Defendants)**
**Violation of California's False Advertising Law**
**(Cal. Bus. & Prof. Code §17500, *et seq*.)**

486.    Plaintiffs repeat and re-allege the allegations contained in all preceding paragraphs as if fully set forth herein.

487.    California's False Advertising Law prohibits any statement in connection with the sale of goods or services "which is untrue or misleading."  Cal. Bus. & Prof. Code §17500.

488.    As set forth herein, the Multinational VC Defendants made statements regarding FTX and their own due diligence activities that were untrue or misleading.  They publicly represented, *inter alia*, that FTX was a viable and safe way to invest in crypto and that their due diligence efforts had confirmed such representations, statements designed to deceive consumers

into investing with FTX. In the alternative, the Multinational VC Defendants deceived the public in suggesting that they conducted extensive due diligence regarding FTX when they in fact did not and nevertheless touted FTX's safety and viability.

489.    The Multinational VC Defendants' claims that FTX was, *inter alia*, viable and safe for investing in crypto and that their robust due diligence efforts had verified these representations were untrue and manifestly false and misleading for the reasons detailed herein.  For example, when FTX imploded in late 2022, it was revealed that FTX had failed to employ the most basic safeguards and siphoned billions of dollars' worth of customer assets for their own nefarious purposes during the relevant period.

490.    The Multinational VC Defendants knew, or reasonably should have known, that their claims relating to, inter alia, the viability and safety of FTX and the results of their own due diligence activities were untrue or misleading.  In the alternative, if the Multinational VC Defendants did not carry out the robust due diligence efforts they advertised, then the Multinational VC Defendants knew, or reasonably should have known, that their claims relating to their due diligence were untrue or misleading. The Multinational VC Defendants failed to adequately inform Plaintiffs and the Class of the true nature of FTX.

491.    When the true nature of FTX became publicly known at the end of the relevant period, the immediate public outrage, bankruptcy proceedings, and government investigation reflected the degree to which consumers and the public at large felt they were deceived by the Multinational VC Defendants and FTX's business practices.

492.    By reason of the above conduct, the Multinational VCs Defendants are liable pursuant to Cal. Bus. & Prof. Code §17500.

**COUNT SIXTEEN (All Defendants)**
**Violation of Florida's Deceptive and Unfair Trade Practices Act**
**(§501.201, Florida Statutes, et seq.)**

493.     Plaintiffs repeat and re-allege the allegations contained in all preceding paragraphs as if fully set forth herein.

494.     The Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §501.201 et seq. ("FDUPTA") "protect[s] the consuming public . . . from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce."  §501.202(2) Fla. Stat.

495.     Plaintiffs and Class Members are consumers as defined by §501.203, Fla. Stat.  The Multinational VC Defendants' actions as described herein occurred while engaging in "[t]ride or commerce" as defined by the FDUTPA.  Fla. Stat. §501.203(8).

496.     The Multinational VC Defendants' conduct, as described herein, constitutes "[u]nfair methods of competition, unconscionable acts or practices, or unfair or deceptive acts or practices in the conduct of any trade or commerce" and is unlawful under the FDUTPA. §501.204(1) Fla. Stat.

497.     The Multinational VC Defendants' unfair and deceptive practices, as described herein were objectively likely to mislead – and in fact did mislead – consumers acting reasonably in the circumstances into purchasing, depositing, and/or transacting in fiat currency and digital assets with accounts with FTX.

498.     The Multinational VC Defendants violated FDUPTA by engaging in such unfair and deceptive practices, as described herein, which offend public policies, are immoral, unethical, unscrupulous and injurious to consumers.

499.     During the relevant period, the Multinational VC Defendants engaged in unfair and deceptive practices by advertising and otherwise promoting FTX using false and/or misleading claims to attract and lure Plaintiffs and Class Members into paying into the FTX Platform.

500.     A practice is deceptive or "deception occurs if there is a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment."   As detailed herein, the Multinational VC Defendants' statements regarding, *inter alia*, the safety, and viability of FTX and the results of their own due diligence activities were deceptive to the public. In the alternative, the Multinational VC Defendants deceived the public in suggesting that they conducted extensive due diligence regarding FTX when they in fact did not and nevertheless touted FTX's safety and viability.

501.     In interpreting unfair or deceptive acts or practices FDUTPA gives deference to the interpretations of the Federal Trade Commission and the federal courts relating to §5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. §45(a)(1), §501.204(2) Fla. Stat.  The Multinational VC Defendants' collective conduct with respect to the marketing and promotion of FTX is unfair because the Multinational VC Defendants' induced Plaintiffs and consumers to purchase, transact, and/or deposit fiat currency and digital assets with accounts with FTX which resulted in injuries that (1) were substantial to the consumers; (2) were not outweighed by benefits to the consumers, and (3) could not have reasonably been avoided by the consumers.

502.     Plaintiffs and the Class would not have purchased, transacted, and/or deposited fiat currency and digital assets with accounts with FTX at the prices paid or even at all had they known that the Multinational VC Defendants' statements were misrepresentations and deceptive.

503.     The Multinational VC Defendants' deceptive promotion and misleading marketing of FTX, as described herein, directly, and proximately caused the harm suffered by Plaintiffs and the Class.

504.     The Multinational VC Defendants still utilize many of the deceptive acts and practices described herein. Plaintiffs and the other members of the Classes have suffered and will continue to suffer irreparable harm if the Multinational VC Defendants continue to engage in such deceptive, unfair, and unconscionable practices.

505.     As a direct and proximate cause of Defendants' unfair and deceptive acts, Plaintiffs and Class Members paid into the FTX Platform and were aggrieved and damaged by the Multinational VC Defendants in the amount of their lost investments.

506.     Further to the amounts of their lost investments, Plaintiffs and consumers in the Classes make claims for actual damages, attorneys' fees and costs pursuant to §§501.211(2) and 501.2105, Fla. Stat.

507.     Section 501.211(1), Fla. Stat., also entitles Plaintiffs and the Classes to obtain both declaratory and injunctive relief . §501.211(1) Fla. Stat.  As such, Plaintiffs seek an order enjoining these the Multinational VC Defendants from continuing to conduct business through fraudulent or unlawful acts and practices and providing declaratory relief requiring Defendants to commence a corrective advertising campaign.

### COUNT SEVENTEEN (All Defendants)
### Negligent Misrepresentation

508.     Plaintiffs repeat and re-allege the allegations contained in all preceding paragraphs as if fully set forth herein.

509.     Plaintiffs allege this cause of action in the alternative in the event that the Multinational VC Defendants did not conduct the robust due diligence that they advertised.

510.    As detailed herein, the Multinational VC Defendants negligently misrepresented certain material facts, including, inter alia, regarding the safety and viability of FTX and their own due diligence activities in order to induce confidence in the FTX platforms and convince consumers to commit fiat currency and digital assets to the FTX platforms, thereby increasing the value of the Multinational VC Defendants' investments in FTX.

511.    The Multinational VC Defendants made these material misrepresentations without reasonable grounds for believing the misrepresented facts to be true.

512.    The representations made by the Multinational VC Defendants in connection with FTX were material and would have been considered by a reasonable consumer in making decisions to engage in any transactions with FTX.

513.    Plaintiffs and the Class justifiably relied on the Multinational VC Defendants' statements in that they purchased, deposited, and/or transacted in fiat currency and digital assets with accounts with FTX, which they would not have done at the prices paid or at all had they known the true nature of the FTX platforms.  Plaintiffs and the members of the Class opened accounts and purchased, transacted, and/or deposited fiat currency and digital assets into accounts with the FTX entities believing that the FTX platforms would be operated in accordance with the representations made by the Multinational VC Defendants.

514.    As a result, Plaintiffs and members of the Class were directly and proximately injured by the Multinational Defendants' negligence in failing to inform Plaintiffs and members of the Class of the true nature of the operations of the FTX platforms.

515.    As a result of the Multinational Defendants' negligent misrepresentation during the relevant period, Plaintiffs and the Class suffered damages, including because they cannot retrieve

their fiat currency or digital assets currently in accounts with the FTX platforms as a result of the insolvency of FTX.

**COUNT EIGHTEEN  (All Defendants)**
**Intentional Misrepresentation**

516.    Plaintiffs repeat and re-allege the allegations contained in all preceding paragraphs as if fully set forth herein.

517.    As detailed herein, the Multinational VC Defendants knowingly misrepresented certain material facts, including, inter alia, regarding the safety and viability of FTX and that their own due diligence confirmed such safety and viability in order to induce confidence in the FTX platforms and convince consumers to commit fiat currency and digital assets to the FTX platforms, thereby increasing the value of these Defendants' investments in FTX.

518.    The Multinational VC Defendants made these misrepresentations with the knowledge that their statements were materially misleading.

519.    The Multinational VC Defendants' misrepresentations in connection with FTX were material and would have been considered by a reasonable consumer in making decisions to engage in any transactions with FTX.

520.    Plaintiffs and the Class actually and justifiably relied on Defendants' statements in that they purchased, deposited, and/or transacted in fiat currency and digital assets with accounts with FTX, which they would not have done at the prices paid or at all had they known the true nature of the FTX platforms.  Plaintiffs and the members of the Class opened accounts and purchased, transacted, and/or deposited fiat currency and digital assets into accounts with the FTX entities believing that the FTX platforms would be operated in accordance with the representations made by the Multinational VC Defendants.

521.    As a result, Plaintiffs and members of the Class were directly and proximately injured by Defendants' intentional misrepresentations in failing to inform Plaintiffs and members of the Class of the true nature of the operations of the FTX platforms.

522.    As a result of the Multinational VC Defendants' intentional misrepresentations during the relevant period, Plaintiffs and the Class suffered damages, including because they cannot retrieve their fiat currency or digital assets currently in accounts with the FTX platforms as a result of the insolvency of FTX.

### COUNT NINETEEN  (All Defendants)
### Fraudulent Inducement

523.    Plaintiffs repeat and re-allege the allegations contained in all preceding paragraphs as if fully set forth herein.

524.    As detailed herein, the Multinational VC Defendants materially misrepresented and omitted existing facts about the FTX entities when they failed to disclose information regarding the true nature of FTX and the results of their own due diligence efforts that were known to them. In the alternative, Defendants materially misrepresented and omitted existing facts about the extent of their own due diligence efforts that were known to them.

525.    The omission is material because Plaintiffs and the Class would not have transacted with FTX had they known the true nature of FTX.

526.    The Multinational VC Defendants marketed and promoted FTX to Plaintiffs and the Class despite having knowledge of the true nature of FTX that were contrary to their public misrepresentations.

527.    The Multinational VC Defendants intended that consumers and purchasers would rely on these Defendants' statements regarding, inter alia, the safety and viability of FTX and the results of their own due diligence activities so as to increase the user base for FTX and thereby

increase the value of their investments in FTX. In the alternative, the Multinational VC Defendants intended that their statements regarding the extent of their due diligence activities would lend an air of legitimacy to FTX that would increase the user base for FTX and thereby increase the value of their investments in FTX.

528.    Plaintiffs and the Class were not aware of the true nature and safety of FTX's platform and could not reasonably have discovered those true characteristics. Plaintiffs and the Class were not aware of the results of or the extent of the Multinational VC Defendants' due diligence efforts and could not reasonably have discovered those true characteristics.

529.    Plaintiffs and the Class justifiably relied on the Multinational VC Defendants' statements in that they purchased, deposited, and/or transacted in fiat currency and digital assets with accounts with FTX, which they would not have done at the prices paid or at all had they known the true nature of the FTX platforms.

530.    As a result of the Multinational VC Defendants' fraudulent inducement of Plaintiffs and the Class onto the FTX platforms, Plaintiffs and the Class suffered damages, including because they cannot retrieve their fiat currency or digital assets currently in accounts with the FTX platforms as a result of the insolvency of FTX.

**COUNT TWENTY (All Defendants)**
**Declaratory Judgment (28 U.S.C. §2201)**

531.    Plaintiffs repeat and re-allege the allegations contained in all preceding paragraphs as if fully set forth herein.

532.    Plaintiffs seek declaratory relief based upon the violations of the UCL and the California False Advertising Law as alleged herein.

533.    There is a bona fide, actual, and present need for the declaratory relief requested herein; the declaratory relief prayed for herein deals with a present, ascertained, or ascertainable

state of facts and a present controversy as to the state of facts; contractual and statutory duties and rights are dependent on those facts and law applicable to the facts; the parties have an actual, present, adverse, and directly antagonistic interest in the subject matter; and the antagonistic and adverse interests are all before this Court by proper process for final resolution.

534.     Plaintiffs and the Class have an obvious and significant interest in the outcome of this lawsuit.

535.     Plaintiffs and the Class purchased, transacted, and/or deposited fiat currency and digital assets with accounts with FTX in reliance on the Multinational VC Defendants' false and misleading statements.

536.     If Plaintiffs and the Class knew the true facts surrounding FTX, Plaintiffs and the Class would not have purchased, transacted, or deposited fiat currency and digital assets with FTX at the prices paid or at all.

537.     Thus, there is a justiciable controversy over whether the Multinational VC Defendants illegally solicited their purchases, deposits, and other transactions from Plaintiffs and the Class.

538.     Plaintiffs and the Class seek an order declaring that the Multinational VC Defendants committed the violations of law alleged herein; enjoining Defendants from continuing such legal violations; ordering that the Multinational VC Defendants engage in appropriate and equitable remedial measures, such as issuing public announcements to correct their misrepresentations of material fact regarding FTX and their own due diligence activities; and ordering that each of these Multinational VC Defendants that received financial benefits from their wrongful acts detailed herein provide appropriate and equitable restitution to Plaintiffs and members of the Class.

## COUNT TWENTY-ONE (All Defendants)
### Declaratory Judgment (28 U.S.C. §2201)

539.     Plaintiffs repeat and re-allege the allegations contained in all preceding paragraphs as if fully set forth herein.

540.     Plaintiffs seek declaratory relief based upon the Multinational VC Defendants' role in the selling or offering of the YBAs, Deceptive FTX Network, and FTT, which are unregistered securities under applicable law, as well as the Multinational VC Defendants' misrepresentations regarding FTX and the results of their due diligence or due diligence more generally.

541.     There is a bona fide, actual, and present need for the declaratory relief requested herein; the declaratory relief prayed for herein deals with a present, ascertained, or ascertainable state of facts and a present controversy as to the state of facts; contractual and statutory duties and rights are dependent on those facts and law applicable to the facts; the parties have an actual, present, adverse, and directly antagonistic interest in the subject matter; and the antagonistic and adverse interests are all before this Court by proper process for final resolution.

542.     Plaintiffs and the Class have an obvious and significant interest in the outcome of this lawsuit.

543.     Plaintiffs and the Class purchased, transacted, and/or deposited fiat currency and digital assets with accounts with FTX in justifiable reliance on the Multinational VC Defendants' misrepresentations and omissions as described hereinabove.

544.     If Plaintiffs and the Class had known the true facts surrounding FTX, including but not limited to the fact that YBAs are unregistered securities and that the Multinational VC Defendants' representations to Plaintiffs and consumers regarding FTX and Bankman-Fried were false, then Plaintiffs and the Class would not have purchased, transacted, or deposited fiat currency and digital assets with FTX at the prices paid or at all.

545.    Thus, there is a justiciable controversy over whether the YBAs were sold illegally and whether the Multinational VC Defendants illegally solicited the purchases, deposits, and other transactions made by Plaintiffs and the Class.

546.    Plaintiffs and the Class seek an order declaring that Defendants committed the violations of law alleged herein; enjoining Defendants from continuing such legal violations; ordering that the Multinational VC Defendants engage in appropriate and equitable remedial measures, such as issuing public announcements to correct their misrepresentations of material fact regarding FTX and Bankman-Fried and the results of their own due diligence activities; and ordering that each of these Defendants that received financial benefits from its wrongful acts as detailed herein provide appropriate and equitable restitution to Plaintiffs and the Class.

## COUNT TWENTY-TWO (All Defendants)
### Punitive Damages

547.    Plaintiffs repeat and re-allege the allegations contained in all preceding paragraphs as if fully set forth herein.

548.    When the Multinational VC Defendants conspired with and aided and abetted FTX and its founder, SBF, in their violations of applicable securities laws, fraud, breaches of fiduciary duty, and conversion, the Multinational VC Defendants acted with oppression, fraud, malice, and/or gross negligence.

549.    The Multinational VC Defendants knew of FTX and SBF's omissions and untruthful conduct and misappropriation of Class Members' funds and nevertheless perpetuated their fraud, breaches of fiduciary duty, and conversion by propping up FTX and SBF with funding and encouraging Class Members' investments by bolstering the reputations of FTX and SBF while concealing FTX and SBF's underlying misconduct.

550.    The Multinational VC Defendants' conduct reflects a willful and conscious disregard or total indifference to Class Members' rights and property.

551.    As a result of this conduct, the Multinational VC Defendants are jointly and severally liable for punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray for a judgment on behalf of themselves and the Classes:

a.  Certifying the Class as requested herein.

b.  Awarding actual, direct and compensatory damages.

c.  Awarding restitution and disgorgement of revenues.

d.  Awarding declaratory relief as permitted by law or equity, including declaring the MDL Defendants' practices as set forth herein to be unlawful.

e.  Awarding injunctive relief as permitted by law or equity, including enjoining the MDL Defendants from continuing those unlawful practices as set forth herein, and directing the MDL Defendants to identify, with Court supervision, victims of their conduct and pay them all money they are required to pay.

f.  Awarding statutory, punitive, and multiple damages, as appropriate.

g.  Awarding attorneys' fees and costs; and

h.  Providing such further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial as to all claims so triable.

Case No. 1:23-md-03076-KMM

Respectfully submitted on November 13, 2024,

| Plaintiffs' Co-Lead Counsel | |
|---|---|
| By: /s/ Adam Moskowitz<br>Adam M. Moskowitz<br>Florida Bar No. 984280<br>Joseph M. Kaye<br>Florida Bar No. 117520<br>**THE MOSKOWITZ LAW FIRM, PLLC**<br>Continental Plaza<br>3250 Mary Street, Suite 202<br>Coconut Grove, FL 33133<br>Office: (305) 740-1423<br>adam@moskowitz-law.com<br>joseph@moskowitz-law.com<br>service@moskowitz-law.com | By: /s/ David Boies<br>David Boies<br>Alex Boies<br>Brooke Alexander<br>**BOIES SCHILLER FLEXNER LLP**<br>333 Main Street<br>Armonk, NY 10504<br>Office: (914) 749-8200<br>dboies@bsfllp.com<br>aboies@bsfllp.com<br>balexander@bsfllp.com |
| **Domestic Venture Capital Funds Committee Member** | |
| Joseph R. Saveri<br><br>Christopher K.L. Young<br>Louis A. Kessler<br>Joseph Saveri Law Firm, LLP<br>601 California Street, Suite 1000 San<br>Francisco, California 94108 (415) 500-6800<br>Fax (415) 395-9940<br>jsaveri@saverilawfirm.com<br>cyoung@saverilawfirm.com<br>lkessler@saverilawfirm.com | |

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the forgoing was filed on November 13, 2024, via the Court's CM/ECF system, which will send notification of such filing to all attorneys of record.

/s/ Adam M. Moskowitz
Adam M. Moskowitz

# Exhibit A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.: 1:22-CV-23753-KMM**

EDWIN GARRISON, et al. on behalf of
themselves and all others similarly
situated,

      Plaintiff,

v.

SAM BANKMAN-FRIED, et al.,

      Defendants.

_____/

**<u>DECLARATION OF DAN FRIEDBERG</u>**

I, <u>Dan Friedberg</u>, declare as follows:

1.      I am a citizen and permanent resident of the United States. I am over 18 and am competent to make this Declaration.

2.      I am admitted to practice law in the State of Washington. I served as chief compliance officer of West Realm Shires Services, Inc. ("FTX.US") and chief regulatory officer of FTX Trading Ltd. ("FTX International") until I resigned as described below. I have personal knowledge of the facts stated herein.

3.      I am providing non-privileged information about aspects of the business of the FTX Entities and certain celebrities that served as what we called FTX Brand Ambassadors.  As set forth below, many of these activities occurred in, and/or were emanated, from our FTX offices in Miami, Florida.

## I.      My Role with FTX International, FTX US, and Alameda Research

4.      I was introduced to Samuel Bankman-Fried ("Sam") by his father who is a prominent tax professor at Stanford. I represented Alameda Research LLC ("Alameda") and then FTX International as outside counsel when I served as Chair of the Fintech group at an outside law firm since about the time that Sam left Jane Street to form his own trading firm.

5.      In early 2020, when Sam decided to form FTX.US, I left my law firm to work full time for him. Ultimately, there were over a dozen lawyers retained, including the General Counsel for FTX.US (Ryne Miller), the General Counsel for FTX International (Can Sun), and the General Counsel for FTX Ventures (Tim Wilson) (Alameda, FTX International and FTX US shall hereafter be referred to as "the Organization").

6.      The goal was for the General Counsels to report directly to Sam where possible in the case of FTX International, the President of FTX.US in the case of FTX.US, and to the CEO of Alameda in the case of FTX Ventures.  I oversaw all lawyers -- as needed -- to efficiently deliver legal services to the Organization.

## II.      Events Leading Up to My Resignation From the Organization

7.      On November 7, 2022, certain FTX personnel including Defendant Sam Bankman-Fried informed certain executives in the Bahamas of the existence of an $8 billion customer deficit with respect to FTX International.

8.      The FTX International general counsel contacted me by zoom to inform me of this shocking development.

9.      Prior to this disclosure, I had no idea of any customer deficit. I believed that the customer assets were fully funded on a 1:1 basis as represented to customers.

*Declaration of Dan Friedberg*
*CASE NO.: 1:22-CV-23753-KMM*

10.     I reviewed my ethical obligations and felt that there was substantial risk that I would
be used to further additional fraud in connection with the additional investment efforts if I stayed
on. In addition, I no longer trusted Sam, Gary, or Nishad, and did not think that I could proceed
under such circumstances.

11.     I therefore tendered my resignation the following day.

## III.     Events Leading Up to My Cooperation With Plaintiffs

12.     I was named as a Defendant in this action, in the current operative complaint filed
on December 16, 2022. ECF No. 16.

13.     After I was served with the Complaint, I called Plaintiffs' Counsel on March 3,
2023, to discuss an extension of time to file and serve my Response to the Complaint. I left a
telephone message and was called back by Plaintiffs' Counsel. They asked me if I was represented
in this matter, and I told him that I am a lawyer and that I was proceeding *pro se*.

14.     I told Plaintiffs' Counsel that I did not have any personal knowledge of the issues
that the Organization was facing, until shortly before my resignation.  I also told Plaintiffs' Counsel
that I wanted to cooperate and assist for the benefit of the FTX customers.

15.     I explained to Plaintiffs' Counsel that at that point in time, I had already spent much
money paying for counsel and that I had spent significant time disclosing everything I knew about
these events to various federal officials and parties to the "Bankruptcy Action," pending in the
United States Bankruptcy Court for the District of Delaware and styled *In re: FTX Trading Ltd.,
et al.*, No. 22-11068-JTD.

16.     Plaintiffs' Counsel informed me to make sure to not reveal any information that
could be covered by attorney-client privilege and/or any other potentially applicable privilege or
confidentiality protections. I certainly agreed and have not disclosed any such information.

*Declaration of Dan Friedberg*
*CASE NO.: 1:22-CV-23753-KMM*

17.     Plaintiffs' Counsel further asked me to make sure that any cooperation I provided to Plaintiffs, and the proposed Class, would not in any manner interfere with, and/or run contrary to any state or federal investigations. I agreed and reaffirmed to them that I had met extensively with federal authorities to assist with their investigation against the perpetrators.

18.     Against this backdrop, I represented to Plaintiffs' Counsel that I was more than willing to help the injured FTX customers, and we agreed that we would explore a possible resolution, whereby I would: (a) provide proof that I did not have significant, non-exempt assets in light of the quantum of damages sought, available to provide monetary relief to Plaintiffs or the Class, in the event they obtained a judgment against me in this Action, and (b) provide non-privileged information and assistance that could benefit the harmed customers in terms of seeking out and obtaining possible recoveries. After reviewing all the applicable facts and evidence, Plaintiff's Counsel confirmed that Plaintiffs and the Class would seek preliminary (and then final) approval by the Court, of a proposed class-wide settlement and resolution of the claims against me.

19.     I have been very careful not to provide Plaintiffs, and the Class, with any information that could ever be considered as covered by the attorney-client privilege and/or any other potentially applicable privilege or protection.

## IV.     FTX's Miami Office and Miami-Based Business Activities

20.     FTX maintained an office in Miami, Florida, since early 2021, long before we eventually moved FTX's Domestic headquarters to Brickell in late 2022.  Since early 2021, our Miami office was run by Mr. Avinash Dabir, who originally worked for Blockfolio, which FTX later acquired, and eventually became FTX's Vice President of Business Development. I met with Mr. Dabir often and I am very familiar with him and his activities.

21.     Mr. Dabir, operated from our Miami office, and he was focused on formulating and executing our important FTX celebrity partnerships. Mr. Dabir had a lot of prior experience working with some of the major sports industries, including the NBA.

22.     It is my opinion that Mr. Dabir was very good at his job, and it was his idea to expend significant resources on FTX's sports and celebrity-based partnerships.  Mr. Dabir specifically started by suggesting FTX form a Partnership with the Miami Heat and the naming rights to the Miami Arena.  FTX announced the Partnership in March 2021, and included FTX purchasing the naming rights of the Miami Heat stadium for 19 years in a deal worth approximately $135 million.

23.     The naming of the "FTX Arena" served an important centerpiece for our efforts to reach other FTX partnerships with celebrities and other well-known partners. Mr. Dabir was the senior FTX executive responsible for creating, consummating, and implementing deals between FTX and other Partners, such as Major League Baseball, the MLB Umpire's Association, TSM, the Mercedes Formula 1 team, Tom Brady, Stephen Curry, the Golden State Warriors, Naomi Osaka, Larry David, and Shohei Ohtani.

24.     Having Larry David agree to conduct a commercial for FTX during the 2022 Super Bowl was a very big event for FTX because, to my knowledge, it was the first time that he had ever agreed to serve as a spokesperson for any product.  Mr. Dabir deserves much of the credit for creating that idea and concept and collaborating with Mr. David and his team, resulting in the award-winning Super Bowl FTX commercial that aired with the Super Bowl in 2022.

*Declaration of Dan Friedberg*
*CASE NO.: 1:22-CV-23753-KMM*

25.    If called upon to testify, I would testify competently to the facts set out in this Declaration.  I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: May 7, 2023

_____
**Daniel Friedberg**

# Exhibit B

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MDL No. 3076**
**CASE NO. 1:23-md-03076-KMM**

**IN RE:**

**FTX Cryptocurrency Exchange Collapse MDL Litigation**
_____

THIS DOCUMENT RELATES TO:

All Cases

_____/

## DECLARATION OF NISHAD SINGH

I, Nishad Singh, under penalty of perjury, declares as follows:

1.      I am a citizen and permanent resident of the United States. I am over 18 and competent to make this Declaration. I am personally knowledgeable of the matters set forth in this Declaration and, if called upon to do so, I could and would competently testify to the following facts set forth below.

2.      In or around December 2017, I began working at Alameda Research, LLC ("Alameda") as a software engineer writing code to build out or improve Alameda's trading systems for its internal traders' usage. In or around April 2019, at the request of Sam Bankman-Fried ("SBF") and Gary Wang, I also began contributing as a software engineer to the FTX Trading Ltd. ("FTX Trading") platform. There, I was writing code not to build out internal trading systems but, instead, to build out the FTX Trading website to allow its customers to trade on the platform or exchange.  SBF and Mr. Wang co-founded and co-owned both Alameda and FTX Trading, and SBF served as CEO of both entities at that time.[1] As of late 2021 and until its collapse, I owned a roughly 6 or 7 percent equity stake in FTX Trading. Throughout my tenure at Alameda and FTX

---

[1] SBF separately founded and owned West Realm Shires, Inc. ("FTX US") and other affiliates (collectively, along with FTX Trading, "FTX").

1

Trading, I worked under SBF and Mr. Wang's direction or instruction.

3.      In early to mid-2020, I ceased working for Alameda and instead worked only at FTX Trading. I eventually became the head of engineering at FTX Trading, at which time I was responsible for coding, other aspects of FTX's platform, and managing junior members of the engineering team. Mr. Wang served as FTX Trading's chief technology officer; his role was similar to mine in that we both wrote code, but Mr. Wang served as my supervisor.

4.      Although, unlike Mr. Wang and I, SBF did not actually write code for FTX Trading, he was the main architect or visionary in designing how the systems—and therefore the coding underlying such systems—would work. One example of a system that SBF designed is the FTX Trading margin and liquidation system, which considered each customer's balances and decided based on such balance the extent to which the customer could trade or whether instead they should be foreclosed from trading in order to prevent losses. SBF generally supervised and instructed Mr. Wang at FTX Trading, but SBF would frequently defer to Mr. Wang on the more technical aspects of FTX Trading's coding. In his role as CEO of FTX Trading, SBF was in charge of all other business decisions, including but not limited to fundraising from investors, marketing and publicity, and management of other departments. For the most part, I was not involved in these areas of the business.

5.      When I joined Alameda in 2017, it was headquartered in Berkeley, California, and I worked out of the Berkeley office. In 2019, Alameda moved its headquarters to Hong Kong. SBF and Mr. Wang started developing FTX in late 2018, also based out of Hong Kong. I visited Hong Kong to work a few times in 2019, and I relocated there permanently in early 2020. In late 2021, at SBF's request and as FTX Trading and Alameda moved their headquarters to the Bahamas, I relocated to the Bahamas. While in the Bahamas, I lived with SBF and a group of other FTX employees in the penthouse at The Albany ("Albany").

6.      During the period in which I was living abroad—first in Hong Kong and then in the Bahamas—I made a handful of trips to the United States. I visited California at least once to work from FTX US's San Francisco office, where I spent time with other FTX software engineers.

I also visited the Chicago office at least twice, where I also worked with other FTX software engineers. Finally, I visited Miami at least once, where I worked with other FTX software engineers and looked at office space that FTX US's Miami headquarters would expand into.

7.      On February 28, 2023, I waived Indictment by the U.S. Attorney, consented to the filing of a Superseding Information, and pleaded guilty to six criminal offenses arising from the collapse of FTX, including wire fraud, conspiracy to commit wire fraud, conspiracy to commit securities fraud and commodities fraud, conspiracy to commit money laundering, and violations of campaign finance laws, arising from a scheme to defraud customers of FTX.

8.      In connection with my plea, I entered into an agreement with the United States Attorney for the Southern District of New York (the "US Attorney") pursuant to which I agreed to cooperate with, and provide information to, the US Attorney, which had by that point initiated a prosecution of SBF on twelve criminal counts, including fraud, conspiracy, and other crimes relating to FTX's collapse.

9.      On June 15, 2022, Judge Lewis Kaplan bifurcated the criminal charges against SBF, with the securities fraud, wire fraud, and money laundering-related charges to be tried in October 2023, and the other charges to be tried in March 2024 (the "March 2024 Trial"). On December 29, 2023, the U.S. Attorney informed Judge Kaplan that he did not plan to proceed with the March 2024 trial.

10.     After the dismissal of the charges to be tried at the March 2024 trial, my attorneys promptly finalized the terms of a settlement stipulation with attorneys for Plaintiffs and class members, and on February 2, 2024, I sat for an initial proffer session with attorneys representing Plaintiffs and class members in this multidistrict litigation. I have agreed to sit for additional proffer sessions and to provide other information to Plaintiffs and class members in this case.

*FTX's and Alameda's Operations in the United States*

11.     When I joined Alameda, it was headquartered in Berkeley, California. Although Alameda moved its headquarters to Hong Kong in 2019, it maintained at least one office in California through the collapse of FTX in November 2022 (whether a standalone office, or within

FTX's office).

12.     FTX US maintained multiple offices in the United States, including but not limited to locations in Miami, San Francisco, Chicago, and New York. Certain FTX US employees also occasionally worked out of Alameda's Berkeley office.

13.     At the time of FTX US's acquisition of Blockfolio in mid-to-late 2020, it gained employee Mr. Avinash Dabir, along with other then-Blockfolio employees. Mr. Dabir and certain other Blockfolio employees became based at least in part in Miami. From 2021 until FTX's collapse, Mr. Dabir executed some of FTX's various publicity campaigns from a Miami office. Mr. Dabir worked with other FTX and FTX US employees that did the same, some also based out of Miami. These campaigns included FTX's many celebrity partnerships, as well as its partnership with the Miami Heat and correlative purchase of the naming rights to the Miami Heat stadium, which became FTX Arena. FTX US had at least two front-row seats and a suite for Miami Heat games at the FTX Arena, which I was informed FTX US took efforts to fill with business partners.

14.     In mid-to-late 2021, FTX US acquired LedgerX and subsequently rebranded it as FTX US Derivatives.  Mr. Dexter, previously the Chief Executive Officer of LedgerX, continued as the CEO of FTX US Derivatives after the LedgerX acquisition and rename. In 2022,  Mr. Dexter and FTX US Derivatives Chief Technology Officer Brandon Kotara were living in Miami.

15.     Mr. Dexter directed the efforts to start up FTX US Derivatives' futures trading. He worked frequently with SBF on his political efforts with elected officials and/or regulators, and he often traveled to Washington, D.C. as a result. It was apparent to me that one of the most promising or valuable pieces of FTX US was FTX US Derivatives and, more specifically, its ability to engage in futures trading. I believe the advantages that such licenses and technology lent to FTX US Derivatives (and, by extension, FTX US) were notable, and they would have added value to any investment in FTX US.

16.     Several of FTX's payments team members were likewise based in the greater Miami area, including Jessica Moser, Balaji Mudaliyar, and Oscar Messina Jr. These employees worked in their capacity as members of the payments team for the benefit of both FTX Trading

4

and FTX US. This payments team was working towards providing multiple deposit and withdrawal options for FTX and FTX US customers to manage their fiat currency. Among other means, it achieved this by partnering with Visa to issue credit cards that allowed FTX US customers to effectively withdraw funds on the platform.

17.     In September 2022, SBF announced to the company over video conference that the Miami office would become the official FTX US headquarters, and that it would close its other offices in favor of the Miami location. This selection of Miami occurred for many reasons, including a desire to consolidate operations in the United States, FTX US employees' preference for Miami for such consolidation, Miami's close proximity to the Bahamas and ease of travel between the two locales, Mr. Dexter's stature within FTX US, SBF's relationship with Miami mayor Francis Suarez, Miami's status as an informal "crypto hub," and the rebranding of the Miami Heat arena as FTX Arena. In the following days, at least twenty-one employees not already located in Miami indicated they would move to Miami soon. Others indicated they would spend the majority of their time in Miami. FTX US selected a new, bigger office space in Miami to expand into as part of the relocation of its official headquarters.

18.     Even though FTX Trading was not based in the United States, at least one of SBF and Ramnik Arora, FTX Trading's head of product, traveled to the United States, on average, roughly every other week to meet with business partners, including investors. I specifically recall that these trips often took them to, at a minimum, Washington, D.C., New York, and Miami.

19.     Despite Mr. Arora's title, he often focused on FTX's fundraising efforts from venture capitalist investors, which alone could have constituted a full-time job for him. I generally understood that the due diligence process investors undertook in connection with any investment in FTX was arduous. I recall learning from Mr. Arora that Temasek, in particular, engaged in an especially long due diligence investigation of FTX prior to its investment: one that lasted for several months. I recall once discussing with Mr. Arora how Temasek was among the most demanding investors for due diligence despite being set up to receive the best terms from FTX for its investment that round. Mr. Arora informed me that his counterpart at the Temasek team had at

times grown frustrated with the extent of the due diligence that his firm demanded prior to the FTX investment.

20.     Other senior FTX employees, such as Ryan Salame and Dan Friedberg, traveled back and forth between the U.S. and the Bahamas, though not quite as often as SBF or Mr. Arora. Both FTX Trading and Alameda, even after its headquarters moved away from its Berkeley roots, maintained employees throughout the U.S. in Chicago, Miami, California, Washington D.C., and New York.

***Venture Capitalist Investors Visited the Bahamas***

21.     From time to time, FTX investors would visit the FTX offices and socialize with FTX employees at FTX's office and Albany. For example, I recall Michelle Fradin of Sequoia Capital visiting FTX in the Bahamas on a number of occasions. From my observations, she spoke primarily with SBF, and she also socialized with SBF and other FTX employees at Albany.

22.     I also recall that approximately five Sino Global Capital employees worked out of the FTX offices in the Bahamas. They did not have their own separate walled-off space within the FTX offices, but were working amongst FTX employees and shared with those employees common spaces such as the office kitchen, restrooms, etc. They, like I and several other FTX employees, also lived at or frequently visited Albany while they were working from the FTX offices.

***Alameda-Funded Political Contributions in the United Sates***

23.     I allowed other staff at Alameda/FTX to use my bank account to make political donations to candidates and organizations in the United States. Some of these donations were made to recipients in Florida, including to Moving Broward Forward PAC, Lois Frankel for Congress, Castor for Congress, and Athena PAC, and some were made to recipients in California, including Matsui for Congress and Anna Eshoo for Congress. *See* GX-1090.

24.     The funds for many of these donations originated from Alameda. I now understand that one of the accounts Alameda sent these funds from was its account at Silvergate Bank, located in California.  In these instances, the funds flowed from Alameda's Silvergate account, through

my personal bank account at Prime Trust Bank in Nevada, before transfer to the candidates, their campaigns, and/or political action committees.

I, Nishad Singh, declare under the penalty of perjury that the foregoing is true and correct.

      Executed on February 16, 2024.

Nishad Singh

# Exhibit C



**Joe:** What's up, everyone? I'm Joe Pompliano, and this is *The Joe Pomp Show*. Today's episode is with Avi Dabir, Vice President of Business Development at FTX. Avi has spent the last few years working on sports partnerships with organizations all around the world. FTX has spent more than $500 million on partnerships with the Miami Heat, Major League Baseball, and Mercedes Formula One team, as well as equity-based partnerships with athletes like Tom Brady, Stephen Curry, Naomi Osaka, and Shohei Otani.

Avi joined us in the studio this week, so my brothers and I had some **[00:00:30]** fun asking him exactly how these deals are negotiated, what it's like working with Tom Brady, how their Super Bowl commercial with Larry David came together, and what might be next for FTX. This was an awesome conversation and I hope you guys enjoy it. But before we get into it, let's quickly run through today's sponsors.

This episode is brought to you by Whoop. Whoop is a 24/7 personalized fitness wearable that's here to help you improve your recovery, sleep, fitness, and health. It's the one tech product that I wear 24/7. Here's how it works. Each day when you get up, **[00:01:00]** Whoop gives you a recovery score based on your sleep, resting heart rate, respiratory rate, and heart rate variability.

Your score lets you know how to approach your day, whether you should push yourself during your workout or activity, or if you should skip the gym and take a rest day. You wear your Whoop on your wrist, bicep, or now within one of their new smart clothing garments called Whoop Body. The band connects with an app on your phone and it automatically measures your heart rate, calories, and activity levels throughout the day.

The band also automatically detects and classifies your workouts, so there's never **[00:01:30]** an issue in forgetting to press go on a run anymore. You can then analyze your activity level in the app. There's also a ton of coaching features within it like Strain Coach, which gives you target workout exertion goals tailored to your body's recovery level for that day. Those goals change over the course of the day depending on how active you've been.

That coaching is where Whoop really shines. Whether you're interested in how CBD or alcohol impacts your sleep and recovery, where you're just wondering how long of a run you should go on. Whoop is there to provide you with personalized data to make sure you're aware of the impact **[00:02:00]** these decisions have on your body. And Whoop is now offering 15% off their new Whoop 4.0 right now with the code Joe at Checkout.

Go to Whoop W-H-O-O-P.com. Enter Joe, J-O-E at Checkout to save 15%. Sleep better, recover faster, train smarter, and now feel healthier with Whoop. Next up is Athletic Brewing. When it comes to non-alcoholic beers, Athletic Brewing change the game. Their beer tastes amazing. **[00:02:30]** And since each can is only 25 calories, 5 carbs, and made with organic grains, I can now enjoy the taste of a great beer without compromising my sleep or performance.

File name: 40 The Crypto Company Spending 500 Million On Sports Partnerships With Avinash Dabir.mp3



But here's the best part, Athletic Brewing is now offering my listeners 20% off their first order with code Joe 20. That's J-O-E 2-0. So as you prepare to stock the fridge from Arch Madness, now's the perfect time to buy a refreshing, great-tasting beer without the consequences. Next up is Underdog Fantasy. **[00:03:00]** My friends at Underdog Fantasy have a contest on their app right now that no one else is doing. It's called the Dance and it's open from now until April 16th, right before the NBA playoffs start. With $200,000 in total prizes and $30,000 awarded to first place, now is the time to draft your perfect team for the NBA playoffs. Pick players from teams you think will make the Conference finals and NBA finals and you'll have a shot at winning big money by the time the playoffs wrap up. Just go to underdogfantasy.com or download their app in the app store. Sign up with promo code POMP, P-O-M-P, and **[00:03:30]** Underdog will double your first deposit up to $100. The Dance is only $10 to enter, so download the app, try it out. Take your shot at $30,000 in the Dance on Underdog Fantasy today. All right, let's get into this episode.

**Avinash:** Joe Pompliano runs Pomp Investments. All views of Joe Pompliano and his guests are solely their opinions and do not reflect the opinions of Pomp Investments. You should not treat any opinion by Joe or his guests as a specific inducement to make a particular investment or follow a particular strategy, but only as an expression of his personal opinion. This **[00:04:00]** podcast is for informational purposes only.

**Joe:** We got a special treat today. Avi from FTX has joined us. Avi, how are you?

**Avinash:** Doing well, guys. Thanks for having me here. Nice to meet you, Anthony, Joe, John, right? I got that right?

**Joe:** [crosstalk] Yeah, that was pretty good. [laughs] You're good to go, you're good to go. So what-what is your exact role at FTX?

**Avinash:** So I'm Vice President of Business Development at FTX, so I handle a lot of our sports partnerships as well as doing some of the interesting things in real estate as well. But the end goal is really just how do we take this great platform we have at FTX and **[00:04:30]** acquire more users and also provide more benefits to-to businesses, whoever that might be.

**Joe:** All right. So the real estate part sounds interesting. So let's-

[laughter]

-let's-let-let's start with sports maybe first.

**Avinash:** Sure, sure.

**Joe:** So in my mind, you guys have been like the leaders in this category, right? Everyone laughs now. Crypto is all over the sports industry, whether it's leagues, teams, individuals, whatever. But you guys really started this. It started with Miami Heat Arena here, and you've done a bunch of other deals since. What is the thought process originally behind your involvement within sports specifically?

File name: 40 The Crypto Company Spending 500 Million On Sports Partnerships With Avinash Dabir.mp3

2



**Avinash:** Yeah, I-I mean, **[00:05:00]** so much of what happens at FTX is just, you know, Sam creates like such an op-- and Brett, the president of our US business, just creates such an open environment for people to just throw out like crazy ideas, right? And-and I think you want that at any company, especially when it's young and it's growing. And, you know, the-the way it-it really started for us is we were on a company all-hands call and a bunch of people were just throwing out ideas and someone threw out the idea of, "Oh, we should do like an arena."

And-and, you know, I had previously worked at the NBA, and so I was-- kind of like raised my hand. I **[00:05:30]** was like, "Okay, cool. Like I can-- I can look into this." This was in January, 2020. And then like, you know, I started looking into it, starting getting some more momentum just internally as well. People are like, "Oh, okay, this is cool. Let's do this." Talking to a handful of teams and cities, right? Because the governments-- local governments are involved as well.

And we kind of identified Miami as like, "Oh, this is really interesting," you know, great market, super like-like multicultural, great team. And this **[00:06:00]** was also around the time where like Crypto Buzz was like growing here in Miami. And then, you know, honestly, three months later things just kind of snowballed. And we had this arena like it happened so fast. Tons of credit to Miami-Dade County and Mayor Cava and her staff like to get comfortable with crypto. Like it wasn't easy. No one had really done crypto deals. So--

**Joel:** So how-- so let's stop there for a second. Like, how does this deal actually work? Miami, the-the Heat deal specifically, right?

**Avinash:** Yeah.

**Joel:** Because I think that the arena, I don't know if it had been like a vacant name sponsor for a couple years, I believe, **[00:06:30]** right?

**Avinash:** Yep.

**Joel:** But like how does this work? How do you approach them? How does it get negotiated? All that type of stuff.

**Avinash:** Yeah. You know- you know your history. So American Airlines I think was a vacant partner for the last two years. Right. And-and--

**Joel:** What does that mean? Vacant partner?

**Avinash:** So-so-so their deal ended and for two years, they technically didn't have a naming rights partner, but they left the signage up, right? Because-

**Joel:** It costs money.

**Avinash:** - **[unintelligible 00:06:49]** costs money to take it all down too, right? So there's--

File name: 40 The Crypto Company Spending 500 Million On Sports Partnerships With Avinash Dabir.mp3

3



**Joel:** And they hadn't sold the name yet. [crosstalk]

**Avinash:** They hadn't sold the name. So they didn't have a new partner. And I think this is public, but I think there's the-the county also, there's **[00:07:00]** some stipulation in their agreement with the Heat where they may owe some funds or some services in exchange if there's no naming rights partner, right? So they really wanted to get a new partner. And-and we kind of came in at the right time.

And, you know, you kind of add on the fact that this was during COVID where, you know, a decent amount of live event businesses were-were short on revenue. I think kind of opened up the door, right? And that sort of opened up the door where we could have the conversation with-with Mayor Cava and Miami-Dade County as well as **[00:07:30]** the Heat. And then they spent a lot of time getting comfortable with our business.

It required a lot of just financial due diligence, a lot of education, and they took the time to learn. Honestly, that's why I give 'em a ton of credit for that. And to get approval from a local government, plus the Heat and the NBA who had their own diligence teams looking into this really sort of validated not only just FTX but the cryptocurrency industry in general. And-and things kind of just snowballed from there, right.

**Joe:** And on the due **[00:08:00]** diligence piece, I think, I remember seeing a quote from Sam that was like, you know, they questioned if Crypto was gonna be around in years and if he was gonna be able to pay for these things. And he was like, not to sound completely absurd, but we could pay for it today if we needed to. Is that part of the process? You're like, just look how much money we have on our balance sheet, like it's not a problem.

**Avinash:** I mean- I mean they-they have our financials, right?

**Joel:** Yeah.

**Avinash:** And we did disclose that and share that and confidentially, you know, and there are ways to structure these deals in a way where, you know, you can front load some of the funds, right, to-to provide some more comfort and the **[00:08:30]** deal is public, right? So anyone can really go and look up what the deal terms are with the county.

**Joel:** And why do you think that they sat for two years without a sponsor?

**Avinash:** That's a good question. You know, sort of all that predates really my involvement and-and really, I don't even know if FTX was really in a position where we could acquire an arena at that point. But I think it could be a multitude of reasons. You know, American Airlines, airline businesses probably took a little bit of a hit during-during COVID. That could be one reason. I'm just purely **[00:09:00]** speculating here. I have no--

File name: 40 The Crypto Company Spending 500 Million On Sports Partnerships With Avinash Dabir.mp3

4



**Joe:** What-what is the, like, once you go ahead and you get the naming rights, what else comes with it? Cause I- I see that there's usually people FTX-related courtside. I see, "I went to the game on Monday night" and all of a sudden, they have like 16 kids basically like run out. They're doing the half-court shot of kids--

**Avinash:** Crypto chaos.

**Joe:** Yeah. Kid hits. It goes wild. I'm like, "What just happened?" And all of a sudden it pops up like $5,000 in crypto. Like, oh, that kid about to go party his face off.

**Participant:** Well, we went to the season opener too, and I think you guys gave, uh, it was like $500 to every person in a specific **[00:09:30]** section if they downloaded the app, right?

**Joe:** Yep.

**Participant:** I'm assuming there's a bunch of apps--

**Joe:** Yes, like how does this work? Or like what are some of the things you guys are doing inside of the state other than just the naming rights?

**Avinash:** Yeah. Uh, great question. So-so there's really- there's really two deals. Like, there's one with the county, which is the naming rights, and then there's a- a marketing partnership with the Heat who help activate the arena space.

**Joe:** Got it. So the Heat are responsible for what happens in the game?

**Avinash:** Related to the Miami Heat? Yes, correct. Yeah, I mean part of it is hospitality, right? Where you entertain gas, you know, we could do giveaways and whatnot for, uh, win a ticket to a Heat game, uh, things of that nature. Every game we have a lucky seat and lucky row where we give away cryptocurrency, uh, for downloading the app to the people in those spaces. And now, we've recently added crypto chaos, which is like, I dunno if you guys are, remember that game, like Knockout. It's kind of a knockout-ish.

**Joe:** Yes. They're playing.

**Avinash:** Yeah. Like everyone was just, he even half shots.

**Joe:** It was- it was chaos.

[laughter]

It's good. $5,000, $5,000, $5,000. [laughs]

**Avinash:** It's so- it's so fun. I mean, it's one of the most, like, I-I love that part of the game, right? Because the whole arena is cheering for these people to-to make this shot. So we've added that element to it. You know, we also have a partnership where we're able to sort of leverage Heat assets and whether that be like in social

File name: 40 The Crypto Company Spending 500 Million On Sports Partnerships With Avinash Dabir.mp3



media promotions. We did an NFT drop recently with-with the Miami Heat around the mashup jersey.

So really excited about that. There's a space called the FTX Token Lounge, which we've actually created and turned it into an NFT gallery. It's a way for people to enter into the arena. We just launched that like a week ago. We'd love to have you guys come by at some point. We got LED screens, you know, we got some printouts on the- on the hallway entering in. But really just trying to meet the fans where they're kind of already at through cryptocurrency, NFTs, and blockchain technology rather than try and like force it on them.

**Joe:** How do you measure success? Like, all right, so you guys go spend this money, it's obviously cool, people see it, you know, on the screens, whatever. Do you guys measure like, "Hey, how much do we get from downloads or volume?" Or is it just like, we think it works and let's figure it out? Like what-what do you do?

**Avinash:** Yeah, I think there's- there's multiple pieces to like how you measure success here. You know, one, like the obvious one is straight-up conversion, right? How many people in Florida download the app or around the Miami area, download the app, register, deposit, trade, you know, it's that standard sort of funnel that's very easily to track. But there's this intangible element that's a little bit harder to- to quantify and right. And that's just generally like when I go have a conversation with-with a real estate **[00:12:00]** developer and they're like, that conversation's just easier because they've seen FTX at the arena.

**Joe:** It's Legitimacy as well.

**Avinash:** Yeah. It's trust. It-it's-it's, you know, legitimacy, same thing when it comes to any of our-our team's business development endeavors, right? If you're a trader that's at an institution and like, oh, cool, like I've already heard of FTX because of FTX Arena, or I saw your Super Bowl spot with-with Larry David or the MLB umpire patch. Like it's just building trust and value through brand association, but we have **[00:12:30]** to deliver on that trust and value. Like that opens up the door, but you know, we need to help them step through that door and then make sure they have a good time when they're in the room with it.

**Joe:** I'm assuming that's more off of feel than it is actual numbers, right? That's probably pretty difficult to quantify.

**Avinash:** Totally. It-it's, and you know, we see it because, you know, we hear people be like, "Oh, I love your Super Bowl commercial, or, you know, I had a great time at the Heat game, you know, last night, or I can't help but see the FTX on the MLB patch, like every ti-- every **[00:13:00]** pitch." All the staff.

**Joe:** How did the Larry David commercial come together? Like, obviously I have a theory, but I want to hear kind of how you guys came up with that and how that came together.

File name: 40 The Crypto Company Spending 500 Million On Sports Partnerships With Avinash Dabir.mp3



**Avinash:** Yeah, I mean, so-so there's a really good article written. I-I can't remember the publication. It might be the Times, but I-I don't--

**Joe:** It's probably the best business show.

**Avinash:** Yeah.

[laughter]

That's right. Uh, the best business show. I think-I think they had the best theory on it.

[laughter]

But, you know, we-we have some really good agency partners that are super creative, and we also have some great folks **[00:13:30]** internally on the marketing side. They're just great at like, explaining what FTX wants and what FTX really wants is like, we're trying to just be playful, inviting, and just like, "Hey, like, we're here when you're ready." Like, that is our very much, our approach to sort of doing our marketing and advertising. And Daniel on our marketing team is-is a super key component of our brand messaging. And, you know, another, uh, colleague of mine, Cena--

**Joe:** Both Fantastic.

**Avinash:** Yeah, both-both great guys, super smart **[00:14:00]** and just really get our brand, and, you know, they really spearheaded that and pulling the right people and teams together, you know, and then when we- when we saw the script, we were like, this script is awesome. And then-then we're like, "We have to get Larry David, right?" And then, you know, the teams went to work to try, and I don't know if that commercial works, if it's not Larry David, right?

**Joe:** Yeah, yeah, yeah.

**Avinash:** And-and just small sort of teaser, Sam's dad is-is also in that commercial. Uh--

**Joe:** Really?

**Avinash:** Yeah-yeah. It's a little-little **[unintelligible 00:14:24]**

**Joe:** That's amazing. I didn't know that. [chuckles] Yeah. Well, Sam's dad is very involved with-- I think it's a foundation? **[00:14:30]**

**Avinash:** Yep.

**Joe:** There's a pretty big philanthropic effort that's going on.

**Avinash:** A 100% We recently had just had a FTX foundation hackathon at the FTX Arena where we-we gave away-- well we awarded a million dollars in pricing for high school students that were building businesses in sort of like the-the tech space. So



we're really excited about that and Joe Bankman leads a lot of that for us, uh, as well as we have a lot of other initiatives around climate and that the foundation is super focused on-on just the whole idea of effective altruism and, **[00:15:00]** you know, making the world a better place.

**Joe:** What's going on with F1 Mercedes? You guys I know sponsored the team.

**Avinash:** Oh, man, uh, I-I love F1, right? Like, you know, drive to survive has gotten so many of-of us Americans like pulled into the sport and-and it really is a team sport all the way from like engineering these cars to executing on-on race day. So we are a Mercedes Formula One partner, they've been awesome. This year has been pretty interesting so far. Last year was, you know, I'm biased, but you know, I didn't agree with the results. **[00:15:30]**

**Joe:** Lewis Hamilton didn't either.

[laughter]

**Avinash:** But the guy's a true professional man.

**Joe:** Yeah.

**Avinash:** Like the fact that he's back in-in that seat and ready to go again is super impressive but we're planning to have a pretty big event here in Miami for the Miami Grand Prix, that's May 6th through 8th. We'll be announcing that pretty shortly, but expecting a lot of people to come through, doing a lot of activations around just other Mercedes partners, our partners involved like just try to bring together a whole community of people **[00:16:00]** building cool things together to celebrate that all and it's gonna be big. I-I wish I could share more details.

**Joe:** How much money have you guys spent on marketing?

**Avinash:** Oh, that's a good question.

**Joe:** Um, like just ballpark. Are we talking 500 million, a billion?

**Avinash:** Well-well, some of these deal-- like--

**Joe:** Let's do committed, right? Yeah, they-they're multi-year deals, right?

**Avinash:** Right-right.

**Joe:** Committed.

**Avinash:** I'd say, I'd say over 500.

**Joe:** Yeah. Over 500 million, you-you-- have you crossed over a billion you think?

**Avinash:** I-I don't know. I-I-I don't think so.

File name: 40 The Crypto Company Spending 500 Million On Sports Partnerships With Avinash Dabir.mp3



**Joe:** Yeah, because what the-the arena deal **[00:16:30]** is how much?

**Avinash:** In total, like if you consider the Heat and the arena portion of it, like close to 200.

**Joe:** Yeah.

**Avinash:** So that's 200 of-- at least 500.

**Joe:** And-and that's a 19-year deal, you know, so we're committed.

**Avinash:** Yeah-yeah, part-part of this is when you do the committed, you could look at this, it could be over 20 years, literally.

**Joe:** Right. But, so $500 million is a huge commitment. What was the major league baseball? Is the umms a one-off or is it part of a bigger deal?

**Avinash:** It's part of a bigger deal. So we have a lot of other components that, you know, the-the patch **[00:17:00]** is so visible, right which we love, but there's so many other components to it. Last season we had this campaign called Moon Blasts, so every time someone hit a home run over certain, I think it was 400 or 425 feet, then it was considered a moon blast and so that was branded on social media, FTX Moon Blast like so there's that entire element of it, we have some additional--

**Joe:** That's a very FTX-type thing to do.

[laughter]

And you had the guy at the playoff?

**Avinash:** Yeah, we had the-the moon, uh, the Moonman.

**Joe:** They literally had someone show up with like a costume at the games **[00:17:30]** and he was the Moonman.

**Avinash:** And we planted him behind the umpire in the stands with this giant head, it was **[inaudible 00:17:35]**

**Joe:** You can see 'em right in the screen every game, it was amazing. There's moon Boys on Twitter and then there's moon blasts on-in baseball.

[laughter]

So how did the individual deals work, right? Because you've done a bunch of those also with Tom Br-- someone in the chat asked if you personally know Tom Brady? [laughter]

**Avinash:** I-I personally do not. I've met him, great guy, like excellent smile, um-

**Joe:** Like great hair, great face.



**Avinash:** Yeah, some of these **[00:18:00]** people we meet and they just have this like-like gravitas to them, right? Just--

**Joe:** Yeah.

**Avinash:** And-and he is that, he's a su-- bonafide superstar, you know, that really came through. So, you know, Cena's a-- he works on a lot of our-our-our partnerships with-with the athletes. He's done a great job with-with really, not just, you know, working with Tom, but Giselle too is also a partner of ours. And so we're looking to do more things with her.

**Joe:** If you're gonna work with the family, you better work with the richer of the two.

[laughter]

**Avinash:** Totally. And like, you know, you keep them both involved together, right? And I think that makes the partnership **[00:18:30]** stronger. And, you know, again, credit to them, they're open about learning. Like-like they-they will say, "Hey, I'm comfortable with this. I'm not comfortable with this. Help me learn about this." And-and our team who-who handles those relationships have done a great job with--

**Joe:** Is Brady a Bitcoiner?

**Avinash:** He is. Yeah. I mean, you've seen like those videos he's throwing, like there's-there's one video that he made on his own, I mean, his teammate, but he throws a football like into the sky, and he's got like laser eyes on it, and the Bitcoin like comes down. So he's--he's--

**Joe:** But it's amazing **[00:19:00]** you guys had nothing to do with that video. [laughs]

**Avinash:** Because I-I think that that's what-- those are the partnerships we love, where like, you get them excited about crypto, and then they kind of authentically take it in the direction that they want to take it has been the most successful stuff that we've done.

**Joe:** How do you guys think about, like, you added, I believe, equity part of Tom Brady's deal. Like how important is that to align incentives with these individual athletes for these marketing deals?

**Avinash:** Great question. Like-like, these guys have money, right? Like-like-like you kind of kind of figure out like what gets **[00:19:30]** them excited about partnering with you, and he doesn't need another X millions of dollars more, but if he's got an investment in-in something, and they're competitors, right? So like-like in a way, business is competition, right? And he's kind of aligning himself with FTX, which we love, right? And he-he thinks, and-and backs us that-that we're strong competitor. So I think that validates FTX, but also gives him some access to be competitive in the-- in this world that he wants to learn more about and compete in.



**Joe: [00:20:00]** What-what about the Stephen Curry? I-I saw that there's a brand new, I guess, commercial or-

**Avinash:** Yeah.

**Joe:** -video that you guys put out, and he's like chiseling the ice and-

**Avinash:** Yeah.

**Joe:** -uh, I think Shaq does the voiceover-

**Avinash:** Yeah.

**Joe:** -and he's like, "Tell Shaq stop playing." Right? Uh, but like when you guys do that type of stuff, how much of that is like they have ideas for the creative versus you guys are like, "Okay, we're gonna do, you know, A, B, C, here's the scenes, you know, you just-

**Avinash:** Yeah.

**Joe:** -gotta do your kind of acting role.

**Avinash:** Yeah, I mean, they're generally so busy, so when it's hard to get their time. So when you have it, like you wanna have a plan as to what you wanna do. **[00:20:30]** So-so we-we have a plan, right? We have a script. We're like, "Hey, here's the theme." You know, we keep them, Steph and his team involved throughout the entire process, because they gotta be comfortable doing it. If it's not authentic to your brand, like they're not gonna do it. I think this last spot, the not a expert spot is-is really authentic to him, 'cause like he's interested in crypto, but doesn't know a ton about it-

**Joe:** Mm-hmm.

**Avinash:** -but wants to, right? And that makes it approachable. And I think that aligns with what FTX's sort of ethos. Is it's like, "Hey, **[00:21:00] [00:21:00]** like, we're here when you're ready, or like, come to us to like learn and, you know, you're not alone in this process." Right? Like, you know, Steph, like arguably, you know, the best basketball player on the planet is successful at so many things, but here's something that he is not the best at. But he's willing to admit that and say he wants to learn.

**Joe:** Try to learn.

**Avinash:** And come with us on that journey is really important.

**Joe:** David Schwab did that deal?

**Participant:** I'm not sure he works at Octagon. So maybe, yeah.

**Joe:** Yeah, he did.



**Participant:** All right. Yeah. Look, he-he'll be happy we gave him a little shout-out.

**Joe:** Here we go.

**Participant:** David Schwab [laughs]. What else?

**Joe: [00:21:30]** I was just gonna ask about the real estate stuff. What do you do on the real estate side?

**Avinash:** Oh, yeah. This-this is my- this is my new sort of like excitement and passion right now.

**Joe:** We're in.

[laughter]

If you- if you need partners, we're in.

**Avinash:** Let's-let's talk about this. So we're helping a lot of, um, condo developments specifically here in Miami except cryptocurrency payments for purchases. The first couple that we did is with 11 eleven Residences, which is a PMG property. [crosstalk] Uh, and then also, uh, with the Waldorf Astoria. I'm actually going to a real estate **[00:22:00]** event tonight with the Diesel Wynwood Condominiums in Wynwood. So they're now a partner and we've done a partnership with Paramount as well. And I got off the call before here with another big, uh, real estate firm. Does, like, people just want, like, the interesting thing about right now, it's like, "Hey, let's accept payments for real estate."

And what that really does is, one, you guys know. If you transact in crypto, you're in control. You could do it anytime. You don't have to wait for a wire transfer cutoff, you're in control. And it's just infinitely **[00:22:30]** more seamless. And then plus a lot of people in crypto have made money. So if you give them a way to sort of diversify their assets into a asset class, like real estate, there's value there. And then sort of the third point is like a lot of international buyers really prefer it. It's just easier to move the money.

**Joe:** Do-do you wear a, uh, a suit and tie when you go to these events? Or you show up in the FTX t-shirt?

**Avinash:** Uh, I'm a t-shirt guy. I did bring a blazer. I'm not sure if I'm gonna wear, uh, to be honest, like I brought a blazer to work. I'm not sure if I'm gonna wear it or not, but, uh, I just brought it just in case. Like--

**Joe:** I feel like that's an insurance **[00:23:00]** policy.

**Avinash:** Yeah.

**Joe:** Like that may be one of the industries that, and like lawyers.



**Avinash:** Yeah.

**Joe:** Those two together.

**Avinash:** So I'm-I'm feeling it out like, uh, I'm definitely wearing sneakers [laughs], like forget the dress shoes.

**Joe:** What's the process like when a company, a traditional like mortgage company or whatever for loans is like, "Hey, we want to start accepting payments in crypto." Like, do you guys just go in and help them set it all up? Like what's the process like?

**Avinash:** Yeah, totally. It's actually fairly easy. Like we have an agreement, you know, we've sort of templatized at this point. We're just essentially accepting funds crypto **[00:23:30]** and then converting it in real-time to dollars and putting those dollars wherever it needs to go. Whether that's to the seller or to the title company, right?

**Joe:** Mm-hmm.

**Avinash:** Like they don't really wanna hold crypto. So it's really the benefit is more so for the buyer, ease of transaction for the buyer.

**Joe:** How many people actually wanna buy using crypto versus the buildings or the building Managers want to say they accept it, but they don't actually have any anticipation of people actually buying? Like, it's like a-- I've seen them, cool 'cause I accept it, but no one's gonna do it 'cause of the tax ramifications, et cetera.

**Avinash:** Well, the tax, you have to pay taxes **[00:24:00]** regardless. Right. So I-I don't think that's really a deterrent.

**Joe:** Well, right now if I buy the building, if I-- let's say I buy a condo and I buy it in cash, I just pay the sales tax or-or whatever.

**Avinash:** Yeah.

**Joe:** But if I buy it in crypto, I have to pay the capital gains on top of the sales tax, except like--

**Avinash:** Correct.

**Joe:** That's why I always wonder, I've seen a couple of announcements in Miami, which I'm assuming you guys were involved in, where people bought, you know, some are $5 million, some are $20 million type condo purchases in crypto.

**Avinash:** Yep.

**Joe:** I'm like, man, are they really paying capital gains tax on doing **[00:24:30]** it? But I guess like if you have a 100% of your assets in crypto, like you have no other choice.

File name: 40 The Crypto Company Spending 500 Million On Sports Partnerships With Avinash Dabir.mp3



**Avinash:** Th-th-that's what I'm saying, like a lot of, like most of them, some are international buyers, so it's just easier to transfer. Some are I, some people would just be YOLO buying condos, right?

**Joe:** Mm-hmm.

**Avinash:** Because they-they can, you know, I think today it just starts with-with cryptocurrency payments, but to your point, right? Like, you know, would love to get to a point where, okay, you know, if I have a-a million dollars in-in Bitcoin, like can I take out a mortgage against that, right? So then I don't have to sell my Bitcoin or can I borrow against it in some particular **[00:25:00]** way and, you know, tie that closer to real estate.

I-I think we're gonna get there, it's just a matter of when. Like technically, I think we can get there like tomorrow, but like- but like-like regulatory-wise and just like, you know, smoothing all that stuff over. I think that's-that's really sort of where the hurdle is. And that's a big thing that we're-we're doing at FTX, right? Like Sam and Brett spend a ton of time in DC working with the regulators, like educating them. Like we make sure we have all of our licenses.

So it's just super important for **[00:25:30]** us to-to be up to speed and-and do things the right way. So when we wanna offer these cool, fun products that people are kind of used to already, but now put a crypto spin on it, I think is gonna be really interesting.

**Joe:** How have those conversations with DC and everything changed over the last year?

**Avinash:** You know, I'm not personally involved in them, but like, just from like the outside, I-I think they've gone really, really well. And so much of that is just cause like you guys know, right? Like one, okay, you hear about Bitcoin or you hear about any cryptocurrency, but then you like, put a **[00:26:00]** little skin in the game, whether it's like a $100, $1,000 or whatever, then you start like paying attention to it more and you learn more and you see the use cases. And I think it's just, uh, the time and the effort that's been spent has really moved things forward. And I only see like, it's just gonna trend upward.

**Joe:** Well, it sounds too like when you guys first started doing these partnerships, take the Miami Heat for example, they were questioning maybe is not the right word, but interested to see if this industry was gonna be here in a decade, right?

**Avinash:** Yeah.

**Joe:** And asking the right questions and now it's, people are coming to you guys to do partnerships, I'm sure, right? **[00:26:30]**

**Avinash:** Yeah, 100%. Like, you know, our inboxes are flooded, like, you know, people know we've spent a-a little bit of money on-on some sponsorships, so, you know, we see a lot of interesting things.

File name: 40 The Crypto Company Spending 500 Million On Sports Partnerships With Avinash Dabir.mp3

14



**Joe:** What's the- what's the craziest thing someone's asked you guys to do?

**Avinash:** I saw like-like a Canadian, like, curling team was like super, just like wacky and just like out there, one of my favorite ones that we've done is, uh, we wrote the Fortunes for Fortune Cookies. So a few-- and-and I-I forget how many we, but they're all over the US. So if you, **[00:27:00]** like, you know, you get a fortune cookie from one of these restaurants, it'll say FTX on the back, and Alec, the guy who runs-

**Joe:** Who runs our Fortune cookie business?

[laughter]

How much is a fortune cookie?

**Avinash:** He-he's our-he's our-he runs our Twitter handles, he wrote most of the fortunes.

**Joe:** No way.

**Avinash:** Um, so like you-

**Joe:** Shout on Alec.

[laughter]

That's amazing.

**Avinash:** And they're really-they're really witty, he did-he did a great job.

**Joe:** Like what- so like, take that for example, right?

**Avinash:** Yeah.

**Joe:** Because I think a lot of people like, what do you mean, whatever, is it just a branding exercise or like, is there like a QR code that people can scan and then--

**Avinash:** Yeah, it's just a branding, **[00:27:30]** you know, you, you know, you-you ordered like an Asian meal and, you know, you're done with a meal, you-you crack open the fortune cookie and, you know, you see an FTX logo and it's like some witty, just like fortune around, it's-it's all crypto related fortunes.

**Joe:** Got it. Got it.

**Avinash:** Like blockchain and crypto-related fortunes.

**Joe:** And so when you do that, I'm assuming that there's some kind of analysis on like, "Hey, we're arbing the potential eyeballs that are gonna look at this versus like what it costs", and I always wonder if you were to unleash, you know, like intelligent **[00:28:00]** quantitative people on marketing, which I'll put FTXs as, you know, a leader here, it seems like that's really what you guys are doing, right? You're trying to



figure out like what are all the mispriced marketing opportunities in the market and then you go and you just attack those and you're not scared to kind of do it with conviction.

**Avinash:** For sure, that's like, at a high level, that is what it is like what's sort of like mispriced, I mean maybe things, I think sports partnerships now are less mispriced for crypto. Like, 'cause like everything's been bid up, but when we got into it, I think it was mispriced-- not mispriced, that's like a-- **[00:28:30]** it was just like, there was an opportunity, like there was value there.

**Joe:** Yeah. I just got a text from someone. They said, "Hey, man, I'm watching this show and I can say that I've had a few of those FTX fortune

Cookies from our favorite Chinese place in Chicago.

[laughter]

The branding Chicago.

**Avinash:** Exactly right. And-and people-people tweet them out. So there's like this just natural like good vibe feeling that comes with that, right?

**Joe:** Yeah.

**Avinash:** And-and you, some of that's not quantifiable, right? But someone cracks that open, sees FTX, feels good about it like maybe they think differently **[00:29:00]** about the--

**Joe:** If I got that, you know what I would think? I'm like, these guys are everywhere. They're literally infiltrating the fortune cookie industry. I saw Sam at one point was like, I think he was joking, but he was like, ah, maybe at some point we should like start doing things 'cause like the rest of the industry will do it as well and like throw 'em off our scent. Yeah, he's like, "I'm gonna lose money on purpose", I think is what he said.

[crosstalk]

**Participant:** They're one of the fortune cookies up right now, it says, in retrospect it was inevitable.

[laughter]

**Joe:** When-when you guys think about-- like have you guys ever actually considered like trying to fake out everyone else and like do something that would, **[00:29:30]** you guys put a little bit of money lose on purpose and then let everyone else go spend all their money?

**Avinash:** I mean, there's definitely some-some games-gamesmanship.

File name: 40 The Crypto Company Spending 500 Million On Sports Partnerships With Avinash Dabir.mp3



[crosstalk]

There's some gamesmanship that goes along with-with, you know, anytime there's a counterparty involved.

**Joe:** Yeah.

**Avinash:** Right. So--

**Joe:** So the fortune cookies or the money-losing one?

**Avinash:** No, I mean, it's-it's-it's hard to, like I wouldn't, honestly, I think that's-that one's been like, you know-

**Participant:** I actually think that was really smart. I actually, that was really smart.

**Joe:** So like what-what would be, I wanna like just sit here and brainstorm for a second, what would be **[00:30:00]** something that you guys could do, that would throw everyone else off. Like, I feel like the sports stuff--

**Avinash:** We can't reveal it on air. [laughs]

**Joe:** Trust me. You could definitely say a lot of stuff-

**Avinash:** People will steal it.

**Joe: [unintelligible 00:30:08]** [crosstalk] Follow. No, they're-they're trying to trick us into thinking that it wouldn't work, but it really would work. [laughter] But it feels like, like I saw in Miami, right? There was just ultra, there was a whole bunch of stuff.

**Avinash:** Yeah.

**Joe:** And one day I, I was walking and I just saw like 17 planes all pulling like the banners behind them.

**Avinash:** Yeah.

**Joe:** And I was like, what are the odds that I can-- won't even see any of those? **[00:30:30]** But also too, like I understand what it means, I remember it and I go and it converts and it's like, it's probably not that much. There's also like those screen that floats-

**Avinash:** Yep.

**Joe:** -in-in the water.

**Avinash:** I see those all the time from my farm.



**Joe:** Yeah. And it's like, I've seen it over and over and over again. I probably could remember maybe two of the ads I've seen. But then I went and I looked, how much does this cost? It's like nothing.

**Avinash:** Yeah.

**Joe:** Right? It-- it's-it's so inexpensive that I feel like some teams are just like, we might as well do it. And it's just a pure branding exercise that has nothing to do with conversion.

**Avinash:** Yeah.

**Joe:** But the cost to the impression number is so **[00:31:00]** skewed that you're just like, screw it, whatever. And for those people, they're making money and so they keep the cost low without, you know, really worrying about trying to price it at the-the high price point.

**Avinash:** Totally, and it's that-- that's an awareness play, right? Like you're just trying to get people aware of FTX. So then okay, they see, you know, that boat go by and it's an FTX logo or some quick hit about it. They see the plane go by. Oh, FTX. But then when they get to FTX Arena and there's an opportunity to, I don't know, check out with FTX pay or something of that nature, I think, oh cool. Like I've seen that **[00:31:30]** brand twice already. Here's for the third time and this is kind of what they do. Let me now convert, right? So--

**Joe:** You wanna know what I think you guys should do?

**Avinash:** Yeah.

**Joe:** I think you guys should open a bar. If you open a bar in Miami. Cause there's a ton of young people who have started to move here.

**Avinash:** Yep.

**Joe:** Right? There's a lot of crypto folks who have moved here, et cetera. But if you make it a fun bar, it then infiltrates into the conversations and what ends up happening is, it's kinda like a club or-or some of this other stuff. Right? It becomes the center of people's social life.

**Avinash:** Right.

**Joe: [00:32:00]** And once you do that, like you win.

**Participant:** Well, you could probably make money doing it too.

[laughter]

[crosstalk]

File name: 40 The Crypto Company Spending 500 Million On Sports Partnerships With Avinash Dabir.mp3



**Participant:** It's like I **[unintelligible 00:32:08]** $500 million **[unintelligible 00:32:09]**.

**Joe:** Even if you did things like, you know, hey, if, uh, certain times there's like FTX, you know, specific events, but if it literally was just like the FTX bar and it was just fun. It was like genuinely fun to go to and people would go there regardless of what the name was.

**Avinash:** Right.

**Joe:** You just infiltrate into the social life and like a bunch of 25-year-old kids, like, where are we gonna go tonight? Like, oh, every Friday we go to FTX bar.

**Avinash:** Yeah.

**Joe:** You just immediately **[00:32:30]** become part of the conversation. And it feels like those are the types of things where like the arena when people, they're not thinking, "Hey, I'm marketing FTX, but like, hey, I'm going to FTX Arena."

**Avinash:** Correct.

**Joe:** "I'm going to the game." There's other things that you could do that are like that. And I don't know what the legal risks are of, uh--

**Avinash:** Yeah. Well, you guys wanna open that bar up with us?

**Joe:** Sure.

**Avinash:** Like let's-let's do it.

**Joe:** Sure. [laughs] I-I'm being dead serious.

**Avinash:** [laughs] No, I'm not saying--

**Participant:** I've been com-- [crosstalk]

**Joe:** I'm not gonna run it?

**Avinash:** I have been complaining too. [laughs]

**Joe:** Yeah. Well, we'll find someone to operate it. But-- I've been complaining about the bars in Miami too. [laughs]

**Avinash:** Perfect.

[crosstalk]

**Joe:** We are not-- We have, uh,-- **[unintelligible 00:32:58]**

File name: 40 The Crypto Company Spending 500 Million On Sports Partnerships With Avinash Dabir.mp3



**Avinash:** If we got to **[unintelligible 00:32:59]** street research? **[00:33:00]** [crosstalk]

**Avinash:** No, my brother cannot **[unintelligible 00:33:03]** I am out.

**Participant:** We're not-we're not-we're not interviewing if you're running.

[laughter]

**Avinash:** If John's the general manager, [crosstalk] I'm out.

**Participant:** You guys aren't making money.

**Avinash:** Well, that's the problem.

[laughter]

**Joe:** Yeah, yeah. I think we may not make money.

**Avinash:** I know you. You and all your friends will be there all the time.

**Joe:** Nah.

**Avinash:** We won't make any money.

**Joe:** Yeah. My friends will be paying covers to get it.

[laughter] And-and they'll be downloading the FTX. [laughter]

**Participant:** I love it. I love it.

**Joe:** Have you guys sponsored college athletes?

**Avinash:** We have, yes. We've done a couple of teams and a couple of players. Uh, I think we've done the **[00:33:30]** UCLA women's basketball team, a softball team in Florida, Kentucky men's basketball team.

**Joe:** Yeah.

**Avinash:** So we experimented in the NIL space. Like, I think it's interesting and there's definitely value in there, especially because so many of these athletes want to build their brand and like they also learn about it, and they're also really good at it, right? They're-they're natively just good at social media. But there are some challenges. And those challenges are just like, you know, they're still- they're still college students, right? Their-their main focus is, **[00:34:00]** you know, going to **[unintelligible 00:34:01]** playing bask-- like playing sports.

[laughter]

Going to class.

File name: 40 The Crypto Company Spending 500 Million On Sports Partnerships With Avinash Dabir.mp3



[laughter]

**Joe:** Let's just call a speed, a spade.

[laughter]

**Participant:** Play sports and they wanna party. That's what they're trying to do.

**Avinash:** Yeah. It's like still hard. Like I remember when I was like, you know, 19, 20 when it's, this hard-hard to get people to do things, but some of them are great and-and totally get it. It-- I think there needs to be a little bit more structure in that space and it's gonna come. Uh, and these-- there's some platforms out there that have been really helpful in-in helping sort of put the plan out there. But I think there's a lot of value there once that gets sorted out and figured out.

**Joe:** Yeah. I-- if you **[00:34:30]** really think about it, if you're like an enterprising, you know, 18 to 22 year old and you're good at your sport, you could make an absolute bag right now. Because there's so much capital that everyone-- it feels like everyone's like, that market's going to be big and I need to get there early.

**Participant:** Yep.

**Joe:** And they don't know really kinda what the cost should be. They don't know how effective it is. Like there's a lot of kind of fragmentation. And so if you actually have a big following and you understand business, like you-you probably **[unintelligible 00:34:55]**

**Participant:** Most people don't have agents either, right? Which is one piece of it. So they're-- [crosstalk]

**Joe:** Yeah. But they have **[00:35:00]** like somebody looking after their life.

**Avinash:** Yeah, they got their brother or their mom [laughs] or their--

**Participant:** But the deal is my point. Is there much less structured, right? They're not-- they're not nearly as.

**Joe:** Is it worse to call up a college athlete and him be like, okay, I've got an agent that works at, you know, CAA or whatever, or to be like, yeah, my mom handles my deals. Which one- which-which one are you like, Dave? [laughs]

**Participant:** I-I-I feel like I'd rather deal with the agent.

[laughter]

Right? Yeah. Like, even if I gotta pay extra, its like, [laughs] let's just deal with the agent.

**Joe:** Like, imagine if our mom was like our agent **[00:35:30]** and she'd be like, "My boys are worth so much more." [laughter]

File name: 40 The Crypto Company Spending 500 Million On Sports Partnerships With Avinash Dabir.mp3



**Participant:** Right?

**Joe:** Like every mom would be that 100%--

**Participant:** Jonny need to post this yesterday. Why didn't he post? He'll post it when he wants.

[laughter]

That's literally what would happen.

**Avinash:** That's great.

**Joe:** Yeah. It's like, I-I-I don't know, it just feels like when there is fragmentation, sometimes actually the fragmentation's bad. We talk all time about the Miami apartment scene.

**Avinash:** Yep.

**Joe:** Is completely different than New York. Like in New York, the landlords are on it. They know exactly what the deal is. There's laws, there's regulations. You can't raise rent too much, like all this stuff. In Miami, multiple friends, we know **[00:36:00]** where they're like, "We're raising rent 30%." And you're like, you can't do this. Like, we can do whatever we want. And you're like, "I wanna go back to the structure."

**Avinash:** It's free. It's a free for all.

**Joe:** Yeah. They show you comps. You're like, that's from two towns over.

[laughter]

**Avinash:** Like, that has nothing to do with my apartment.

**Joe:** The, uh, the-the one that, uh, I keep seeing on Instagram, there's an apartment in one of the buildings on I-I guess what it is, Brooklyn Avenue.

**Avinash:** Mm-hmm.

**Joe:** And it's like a $50 million apartment.

**Avinash:** Jeez.

**Joe:** And all these like real estate Instagram accounts, went and took a tour. There's a video that they all **[00:36:30]** keep using and it's got indoor pool, it's got all this stuff and everything. And I always just think of like, the landlords sitting there be like, well, if they're selling $50 million apartment down the street, then my thing is worth, you know, at least a million. [laughs] You're like, that's not how this works. They have an indoor pool. You have a pool on the roof that sometimes is open.

File name: 40 The Crypto Company Spending 500 Million On Sports Partnerships With Avinash Dabir.mp3

22



**Participant:** 100%. Uh, it's-it's-it's a little wacky out there for sure in the real estate market here. And you know, I think doing stuff with crypto and maybe bringing a little bit more transparency through that can be really beneficial. How long have you lived in Miami? Eight months?

**Avinash:** Eight months.

**Participant:** [00:37:00] Yeah. Okay, cool.

**Avinash:** Yeah.

**Participant:** Where did you come from?

**Avinash:** So, I'm kind of all around from upstate New York, school in Boston, then San Francisco, Los Angeles, and then now here.

**Participant:** Oh, smart move.

**Avinash:** Yeah.

**Participant:** Yeah

**Participant:** Yeah. You like it? Are you staying?

**Avinash:** Yeah-yeah. We love- we love it in Miami. We just bought a house, so.

**Participant:** Yeah. Smart.

**Avinash:** It's-it's the, uh, it's a good place. [laughs]

**Participant:** Things are- things are- things are happening.

**Avinash:** We went to, uh, we went to LA for the Super Bowl and we were trying to figure out where the 52% of your income was going.

[laughter]

**Joe:** We thought they'd be flying cars. We thought, you know, the weather's great, **[00:37:30]** don't get me wrong.

**Avinash:** Yeah.

**Joe:** But--

**Avinash:** For sure.

**Joe:** It's a nice place to visit now.

**Avinash:** Yeah.

File name: 40 The Crypto Company Spending 500 Million On Sports Partnerships With Avinash Dabir.mp3



**Joe:** The part that cracks me up-up when people come to, uh, Miami is like, it's one thing when people from Miami go somewhere else, like, oh, this is like a little off for whatever reason. But when people come here now, I feel like they're just like, damn this is what freedom looks like.

**Avinash:** Yeah.

**Joe:** Right. And like, they're talking about everything from, you know, pandemic-related stuff to the economy, to the, just the way that the local government feels to be encouraging local business, like all this stuff. And it makes you actually thankful, like grateful. Like, you know, most people didn't **[00:38:00]** move here with their eyes wide open. Like that's why they were moving. But once you get here and you get into it and you're like, oh, okay. Like this is where I want to be.

**Avinash:** Totally. I-I feel like in-in Miami, there's not really rules. They're like guidelines.

[laughter]

**Joe:** Yeah.

**Participant:** You know- you know, you can follow them.

**Avinash:** The Mayor's like, shit.

[laughter]

**Participant:** You like, follow them or-or-or not. But like, I feel like most people, you know, if you treat them like adults, they'll behave like adults.

**Joe:** Yeah-yeah-yeah.

**Participant:** You know, like, and-and that's, there's like this general mutual respect. So yeah, I think that's been really referring.

**Joe:** I completely agree with that. Before we let you go, where can **[00:38:30]** people go? Like what-what would be helpful to FTX or like, how do you guys wanna help people that are watching this?

**Avinash:** Thanks for that. I-I-I would say, you know, follow us on Twitter, on Instagram, ftx.us if you wanna open an account. If you're in Miami, you know, come to our event, which we'll-we'll be announcing for the Miami Grand Prix. I think we'll be announcing next week. But, you know, excited to, and opening that up to-to anyone and everyone.

**Joe:** Somebody suggested also you should do FTX barf bags on the- on the airplanes. I don't know if that's good or bad. **[00:39:00]** It's probably cheap relative impressions.

File name: 40 The Crypto Company Spending 500 Million On Sports Partnerships With Avinash Dabir.mp3



[laughter]

[crosstalk]

**Avinash:** I don't think I've ever thrown up on a plane. Like, yeah. I don't think those **[unintelligible 00:39:10]** that much.

**Joe:** Uh, to-to be honest, actually, uh, now that I'm thinking about it is, I bet you no one's ever done an advertising deal inside of the plane but like, you're just sitting there staring.

**Avinash:** Right. Right.

**Participant:** Well, you can do the airbag comes down and you're like, "Oh, let me check out the **[unintelligible 00:39:24]** first. Well, if I go sell or did say Bitcoin was oxygen, so like--

**Avinash:** Y-you know what, I always see the Marriott Bonvoy **[00:39:30]** commercial play before, like every movie that I try and watch [crosstalk] and credit card ads. I mean, they literally go down the aisle trying to sell you--

[laughter]

[crosstalk]

And it's only rewards they talking about. It's not like what the APR or any of that stuff.

**Participant:** We've been 27% APR but don't listen to that. You get 500 airline points.

**Joe:** You can go to **[unintelligible 00:39:50]** for one night.

[laughter]

**Avinash:** Yeah. That's crazy.

**Joe:** Thank you so much for coming on.

**Avinash:** Hey, thank you guys so much for having me. This is- this is fun. This is really fun.

**Joe:** We're gonna bring back after you guys do something **[00:40:00]** else crazy.

**Avinash:** Sure when we open that bar, like let's-let's, uh, what we could do is **[unintelligible 00:40:03]**

**Joe:** We're gonna message you afterwards. [crosstalk] John is gonna find the GM and we'll mean business.

**Avinash:** Sounds great, guys. Thank you. Thanks so much.

File name: 40 The Crypto Company Spending 500 Million On Sports Partnerships With Avinash Dabir.mp3



**Joe:** Alright. Thank you, buddy. All right, everyone. That's it for today. I hope you enjoyed this episode. And as always, I appreciate you listening to the Joe Pomp Show. Make sure you subscribe to the podcast on Apple or Spotify so that you don't miss any episodes going forward. And if you are looking for additional content, check out my daily newsletter at readhuddleup.com **[00:40:30]** or follow me on Twitter @JoePompliano. I hope you have a great day and I'll see you next time.

**[00:40:38] [END OF AUDIO]**



# Certificate of Accuracy

Transcription of **40 The Crypto Company Spending 500 Million On Sports Partnerships With Avinash Dabir.mp3** in **English**

As an authorized representative of GoTranscript LTD, a professional transcription services agency, I, Mindaugas Caplinskas hereby certify that the above-mentioned document has been transcribed by an experienced, qualified and competent professional transcriber, fluent in the above-mentioned language and that, in my best judgement, the transcribed text truly reflects the content, meaning, and style of the original audio file and constitutes in every respect a complete and accurate transcription of the original audio. This audio file has not been transcribed for a family member, friend, or business associate.

This is to certify the correctness of the transcription only. I do not make any claims or guarantees about the authenticity of the content of the original audio file. Further, GoTranscript LTD assumes no liability for the way in which the transcription is used by the customer or any third party, including end-users of the transcription.

A copy of this transcription is attached to this certification.

Signed on **10 May 2023**

Signed _MindCaplin_

Name Mindaugas Caplinskas

Position CEO

Mindaugas Caplinskas, CEO of GoTranscript LTD

**Address:** 166, College Road, Harrow, Middlesex, HA11BH, United Kingdom
**Phone number:** +1 (831) 222-8398 **Email:** support@gotranscript.com **Website:** www.gotranscript.com

# Exhibit D

# **Exhibit A**

**FIRST INTERIM REPORT OF JOHN J. RAY III TO THE INDEPENDENT
DIRECTORS ON CONTROL FAILURES AT THE FTX EXCHANGES**

April 9, 2023

**TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION ................................................................................ 1

II.    BACKGROUND ............................................................................... 3

     A.     Alameda ............................................................................. 3

     B.     FTX.com ............................................................................ 4

     C.     FTX.US .............................................................................. 4

III.    SCOPE OF REVIEW ....................................................................... 4

     A.     Retention of Advisers ....................................................... 4

     B.     Data Collection ................................................................. 5

     C.     Witnesses ......................................................................... 6

IV.    REVIEW OF CONTROL FAILURES ............................................. 7

     A.     Lack of Management and Governance Controls .................. 7

           1.     FTX Group Management and Governance ...................... 7

           2.     Debtors' Management and Governance ........................... 9

     B.     Lack of Financial and Accounting Controls ......................... 10

           1.     Lack of Key Personnel, Departments, and Policies ........ 11

           2.     Lack of Appropriate Accounting Systems ..................... 12

           3.     Inadequate Reporting and Documentation ..................... 14

           4.     Trading Records from Other Exchanges ........................ 16

           5.     Intercompany Transactions ............................................ 17

           6.     Extraordinary Privileges Granted to Alameda ............... 18

     C.     Lack of Digital Asset Management, Information Security &
           Cybersecurity Controls ............................................................ 22

           1.     Lack of Key Personnel, Departments, and Policies ........ 22

|   | 2. | Crypto Asset Management and Security | 23 |
|---|----|-------------------------------------|----|
|   | 3. | Identity and Access Management | 30 |
|   | 4. | Cloud and Infrastructure Security | 32 |
|   | 5. | Application and Code Security | 35 |
|   | 6. | Debtors' Work to Identify and Secure Crypto Assets in the Computing Environment | 37 |
| V. | CONCLUSION | | 39 |

## I.    Introduction

FTX Trading Ltd. ("FTX.com" and, together with its U.S. counterpart, FTX.US, the "FTX exchanges") was among the world's largest cryptocurrency exchanges, where millions of customers bought, sold and traded crypto assets.  The FTX exchanges gained international prominence for their popularity among users, their high-profile acquisitions and celebrity endorsements, and the public image of Sam Bankman-Fried, their co-founder and CEO, as a philanthropist who worked to enhance standards, disclosure, oversight, and customer protection in the crypto industry.[1]  On November 11, 2022, however, capping a stunning collapse that began just nine days earlier with the revelation of financial weakness at their affiliated trading firm, Alameda Research LLC ("Alameda"), the FTX exchanges and certain entities under common ownership (the "FTX Group")[2] filed for bankruptcy (the "Chapter 11 Cases").  Within weeks, Bankman-Fried was charged with perpetrating a multibillion-dollar fraud through the FTX Group with at least three senior insiders, who have pleaded guilty in connection with the scheme.

When the Chapter 11 Cases were first filed, the Debtors[3] identified five core objectives:  (1) implementation of controls, (2) asset protection and recovery, (3) transparency and investigation, (4) efficiency and coordination with any non-U.S. proceedings and

---

[1]    See David Yaffe-Bellany, A Crypto Emperor's Vision: No Pants, His Rules, N.Y. TIMES, May 14, 2022, https://www.nytimes.com/2022/05/14/business/sam-bankman-fried-ftx-crypto.html?.

[2]    The "FTX Group" refers to FTX Trading Ltd., West Realm Shires Services Inc., d/b/a FTX.US, Alameda Research LLC, and their directly and indirectly owned subsidiaries.

[3]    The Debtors comprise the approximately one hundred entities associated with the FTX Group listed at https://restructuring.ra.kroll.com/FTX.

(5) maximization of value.[4] It is in furtherance of these core objectives, particularly transparency, that this first interim report is issued. The Debtors plan to issue supplemental reports which describe the cause and effect of the pre-petition events which lead up to the Chapter 11 Cases.

In working to achieve their objectives, the Debtors have had to overcome unusual obstacles due to the FTX Group's lack of appropriate record keeping and controls in critical areas, including, among others, management and governance, finance and accounting, as well as digital asset management, information security and cybersecurity. Normally, in a bankruptcy involving a business of the size and complexity of the FTX Group, particularly a business that handles customer and investor funds, there are readily identifiable records, data sources, and processes that can be used to identify and safeguard assets of the estate. Not so with the FTX Group.

Upon assuming control, the Debtors found a pervasive lack of records and other evidence at the FTX Group of where or how fiat currency and digital assets could be found or accessed, and extensive commingling of assets. This required the Debtors to start from scratch, in many cases, simply to identify the assets and liabilities of the estate, much less to protect and recover the assets to maximize the estate's value. This challenge was magnified by the fact that the Debtors took over amidst a massive cyberattack, itself a product of the FTX Group's lack of controls, that drained approximately $432 million worth of assets on the date of the bankruptcy

---

[4]     First Day Declaration of John Ray III, Dkt 24 ("First Day Declaration") ¶ 6. *See also* Presentation to the Official Committee of Unsecured Creditors, Dkt 507 at 7; Presentation to the Official Committee of Unsecured Creditors, Dkt 792 (describing efforts to assess exchange shortfalls); Presentation to the Official Committee of Unsecured Creditors, Dkt 1101 (describing statement of financial affairs).

petition (the "<u>November 2022 Breach</u>"),[5] and threatened far larger losses absent measures the Debtors immediately implemented to secure the computing environment.

        Despite the public image it sought to create of a responsible business, the FTX Group was tightly controlled by a small group of individuals who showed little interest in instituting an appropriate oversight or control framework. These individuals stifled dissent, commingled and misused corporate and customer funds, lied to third parties about their business, joked internally about their tendency to lose track of millions of dollars in assets, and thereby caused the FTX Group to collapse as swiftly as it had grown. In this regard, while the FTX Group's failure is novel in the unprecedented scale of harm it caused in a nascent industry, many of its root causes are familiar: hubris, incompetence, and greed.

        This first interim report provides a high-level overview of certain of the FTX Group's control failures in the areas of (i) management and governance, (ii) finance and accounting, and (iii) digital asset management, information security and cybersecurity. The report does not address all control failures in these or other areas. The Debtors continue to learn new information daily as their work progresses and expect to report additional findings in due course.

## II.    Background

        The following is a brief description of the FTX Group entities most relevant to this interim report.

### A.    Alameda

        Founded in 2017 by Bankman-Fried and Gary Wang, Alameda operated as a "crypto hedge fund" that traded and speculated in crypto assets and related loans and securities

---

[5]        All crypto asset values set forth in this report are as of the petition date, November 11, 2022.

for the account of its owners, Bankman-Fried (90%) and Wang (10%).[6]  Alameda also offered over-the-counter trading services and made and managed other debt and equity investments. Beginning in October 2021, Caroline Ellison acted variously as CEO and co-CEO of Alameda, which was organized in the State of Delaware.

### B.   FTX.com

Founded in 2019 by Bankman-Fried and Wang, FTX.com was a digital asset trading platform and exchange that was organized in Antigua and represented as being off-limits to U.S. users.[7]  FTX.com was operated, at the most senior level, by Bankman-Fried, Wang, and Nishad Singh, who had worked at Alameda and joined FTX.com soon after it was launched.  By November 2022, FTX.com had more than seven million registered users around the world.

### C.   FTX.US

Founded in January 2020 by Bankman-Fried, Wang, and Singh, FTX.US was an exchange for spot trading in digital assets and tokens in the United States.  The FTX.US platform was organized in the State of Delaware.  By November 2022, FTX.US had over one million U.S. users.[8]

## III.   Scope of Review

### A.   Retention of Advisers

In connection with the Chapter 11 Cases and related matters, the Debtors have retained a number of advisers, including:[9]

---

[6]     First Day Declaration ¶ 22.

[7]     *See id.* ¶ 33.

[8]     *Id.* ¶ 21.

[9]     This summary is limited to the advisers, and the work these advisers are performing, on the control failures that are relevant to this interim report.  As noted in the Debtors' Chapter 11 filings, some of these advisers have additional responsibilities, and the Debtors have retained additional advisers beyond those listed here to assist with other important matters of the estate.

- **Legal:** The Debtors retained Sullivan & Cromwell LLP as lead counsel to assist in the filing and prosecution of the Chapter 11 Cases, investigating potential causes of action and avenues of recovery for the Debtors' estate, and responding to requests from government authorities, among other matters. The Debtors also retained Quinn Emanuel Urquhart & Sullivan LLP as Special Counsel to assist the Debtors and the Board in litigating bankruptcy-related matters against third parties, and investigating and prosecuting certain claims, including asset recovery actions.

- **Restructuring, asset identification and forensic accounting:** The Debtors retained Alvarez & Marsal North America, LLC ("A&M") as their restructuring adviser to assist in identifying, quantifying, and securing liquid and crypto assets, investments, and other property of the Debtors' estate, as well as development of ongoing business plans and supporting the overall restructuring process. The Debtors also retained AlixPartners LLP ("AlixPartners") to assist in tracing and analyzing financial and accounting data, including trading activity and FTX Group internal transfers, and re-constructing historical financial statements for each Debtor entity.

- **Cybersecurity, computer engineering, and cryptography:** The Debtors retained Sygnia, Inc. ("Sygnia") to secure their computing environment following the November 2022 Breach; to identify and secure the Debtors' remaining digital assets; to investigate the November 2022 Breach; and to perform technical and forensic analysis in support of the Debtors' other ongoing work to recover assets.

- **Blockchain analytics:** The Debtors retained TRM Labs, Inc. ("TRM") and Chainalysis Inc. ("Chainalysis") to engage in blockchain analysis to assist A&M and Sygnia in identifying crypto assets of the Debtors, and to monitor crypto assets stolen in the November 2022 Breach, including in order to work with law enforcement and other third parties to attempt to freeze and recover the stolen assets.

Identifying and recovering assets of the Debtors' estate, and identifying potential claims of the estate, requires extensive coordination among these advisers, particularly given the FTX Group's lack of adequate record keeping and extensive commingling of assets.

### B. Data Collection

To date, the Debtors have reviewed over one million documents collected from Debtor entities around the world, including communications (*e.g.*, Slack, Signal, email) and other documents (*e.g.*, Excel spreadsheets, Google Drive documents). The Debtors have also been engaged in substantial analysis of FTX Group customer transaction data, which is housed in databases that are over one petabyte (*i.e.*, 1000 terabytes) in size. The Debtors' review of relevant documents and customer transaction data remains ongoing.

The Debtors have also reviewed and analyzed the FTX Group's available financial records. These include QuickBooks, which certain entities in the FTX Group used as their general ledgers; certain bank statements; financial statements; tax returns; promissory notes evidencing intercompany loans; spreadsheets recording real estate transactions, political and charitable contributions, and venture investments; and Slack channels devoted to expense reimbursements and related matters.

Finally, the Debtors have analyzed a small set of laptops and other electronic devices of certain employees of the FTX Group, and continue to collect such devices. The set of electronic devices in the Debtors' possession does not include those known to have belonged to Bankman-Fried and other key insiders that are currently in the possession of the Bahamian Joint Provisional Liquidators ("JPLs") and are the subject of ongoing discussion between the Debtors and the JPLs.

## C. Witnesses

To date, the Debtors have conducted interviews of 19 employees of the FTX Group, and received substantial information through counsel for five others. These include interviews of employees who worked in Policy and Regulatory Strategy, Information Technology, Controllers, Administration, Legal, Compliance, and Data Science and Engineering, among others. The Debtors continue to identify, interview, and collect information from potentially relevant witnesses.

While Singh, Wang, and Ellison have pleaded guilty pursuant to cooperation agreements with the Justice Department, it is generally not feasible for the Debtors to interview them on key subjects until after the ongoing criminal prosecution of Bankman-Fried has concluded. Wang has provided discrete assistance to the Debtors' financial and technical advisors.

## IV.     Review of Control Failures

The FTX Group's control failures created an environment in which a handful of employees had, among them, virtually limitless power to direct transfers of fiat currency and crypto assets and to hire and fire employees, with no effective oversight or controls to act as checks on how they exercised those powers. These employees, particularly Bankman-Fried, deprioritized or rejected advice to improve the FTX Group's control framework, exposing the exchanges to grave harm from both external bad actors and their own misconduct.

### A.     Lack of Management and Governance Controls

The FTX Group lacked appropriate management, governance, and organizational structure. As a result, a primary objective of the Debtors has been to institute an appropriate governance framework from the outset of the bankruptcy.

#### 1.     FTX Group Management and Governance

The management and governance of the FTX Group was largely limited to Bankman-Fried, Singh, and Wang. Among them, Bankman-Fried was viewed as having the final voice in all significant decisions, and Singh and Wang largely deferred to him.[10] These three individuals, not long out of college and with no experience in risk management or running a business, controlled nearly every significant aspect of the FTX Group. With isolated exceptions, including for FTX.US Derivatives ("LedgerX"), a non-Debtor entity it acquired in late 2021, FTX Japan, a Debtor acquired in 2022, and Embed Clearing LLC, a non-Debtor acquired in 2022, the FTX Group lacked independent or experienced finance, accounting, human resources, information security, or cybersecurity personnel or leadership, and lacked any internal audit function whatsoever. Board oversight, moreover, was also effectively non-existent.

---

[10]     *See, e.g.*, *SEC* v. *Caroline Ellison et al.*, 22-cv-10794 (S.D.N.Y. Dec. 21, 2022), Compl. ¶¶ 21, 25, 45(b), 45(c), 46, 67, 96, Dkt 1; *SEC* v. *Nishad Singh*, 23-cv-01691 (S.D.N.Y. Feb. 28, 2023), Compl. ¶¶ 8, 9, 32, 34, 40, 50-51, 67, 90, 100, Dkt 1.

Most major decision-making and authority sat with Bankman-Fried, Singh, and Wang, and numerous significant responsibilities were not delegated to other executives or managers even where such individuals had been hired. Commenting on Wang's and Singh's control over the FTX Group's technology development and architecture, an FTX Group executive stated that "if Nishad [Singh] got hit by a bus, the whole company would be done. Same issue with Gary [Wang]."

Efforts to clarify corporate responsibilities and enhance compliance were not welcome and resulted in backlash. For example, the President of FTX.US resigned following a protracted disagreement with Bankman-Fried and Singh over the lack of appropriate delegation of authority, formal management structure, and key hires at FTX.US; after raising these issues directly with them, his bonus was drastically reduced and senior internal counsel instructed him to apologize to Bankman-Fried for raising the concerns, which he refused to do. Similarly, less than three months after being hired, and shortly after learning about Alameda's use of a North Dimension bank account to send money to customers of the FTX exchanges, a lawyer within the FTX Group was summarily terminated after expressing concerns about Alameda's lack of corporate controls, capable leadership, and risk management.

Echoing its lack of appropriate management and governance structure, the FTX Group lacked an appropriate organizational structure. Rather than having an ultimate parent company able to serve as a central point for decision-making that could also direct and control its subsidiaries, the FTX Group was organized as a web of parallel corporate chains with various owners and interests, all under the ultimate control of Bankman-Fried.

The FTX Group's lack of management and governance controls also manifested in the absence of any comprehensive organizational chart of the FTX Group entities prior to the end of 2021, and the lack of any tracking of intercompany relationships and ownership of

particular entities.  At the time of the bankruptcy filing, the FTX Group did not even have current and complete lists of who its employees were.

### 2.  Debtors' Management and Governance

A primary objective of the Debtors was to institute an appropriate management, governance, and structural framework at the outset of the bankruptcy.  To do so, the Debtors arranged the conduct of the Chapter 11 Cases into four groups of businesses, or "Silos," for organizational purposes:  (a) Debtor West Realm Shires Inc. and its Debtor and non-Debtor subsidiaries (the "WRS Silo"), which includes the businesses known as FTX.US, LedgerX, FTX.US Derivatives, FTX.US Capital Markets, and Embed Clearing, among other businesses; (b) Debtor Alameda Research LLC and its Debtor subsidiaries (the "Alameda Silo"); (c) Debtor Clifton Bay Investments LLC, Debtor Clifton Bay Investments Ltd., Debtor Island Bay Ventures Inc. and Debtor FTX Ventures Ltd. (the "Ventures Silo"); and (d) Debtor FTX Trading Ltd. and its Debtor and non-Debtor subsidiaries (the "Dotcom Silo"), including the exchanges doing business as "FTX.com" and similar exchanges in non-U.S. jurisdictions.  The Debtors then moved expeditiously to build a Board of Directors that, for the first time, would provide independent oversight of the disparate corporate chains that constituted the FTX Group.

As previously set forth in filings in the Chapter 11 Cases, the Debtors appointed a board of directors (the "Board") consisting of five directors with respective silo responsibilities.[11]  These directors were wholly independent from the FTX Group, and have a wealth of experience in complicated restructuring matters well suited to the Debtors' present

---

[11]  First Day Declaration ¶¶ 46-47.

circumstances.[12]  The Board meets effectively on a weekly or more frequent basis on matters of common interest of the Silo directors, including the objectives set forth above.[13]

The Debtors appointed John J. Ray III as their Chief Executive Officer, Mary Cilia as their Chief Financial Officer, Kathryn Schultea as their Chief Administrative Officer, and Raj Perubhatla as their Chief Information Officer.  These officers each have extensive experience in providing crisis management services, including work relating to complex financial and operational restructurings, to distressed and under-performing companies. Collectively, these executives have over 125 years of experience, including at senior management levels of public companies.

### B.     Lack of Financial and Accounting Controls

At its peak, the FTX Group operated in 250 jurisdictions, controlled tens of billions of dollars of assets across its various companies, engaged in as many as 26 million transactions per day, and had millions of users.  Despite these asset levels and transaction volumes, the FTX Group lacked fundamental financial and accounting controls.  Reconstruction of the Debtors' balance sheets is an ongoing, bottom-up exercise that continues to require significant effort by professionals.

---

[12]     *Id.*  The Director of the WRS Silo is Mitchell I. Sonkin, a Senior Advisor to MBIA Insurance Corporation. The Director of the Alameda Silo is Matthew R. Rosenberg, a Partner at Lincoln Park Advisors.  The Director of the Ventures Silo is Rishi Jain, a Managing Director and Co-Head of the Western Region of Accordion.  The Director of the Dotcom Silo, and the Lead Independent Director, is the Honorable Joseph J. Farnan, who served for almost three decades as a United States District Judge for the District of Delaware.

[13]     At this phase in the Chapter 11 Cases, the Debtors are focused on asset recovery and maximization of value for all stakeholders through the eventual reorganization or sale of the Debtors' complex array of businesses, investments and property around the world.  The Debtors believe that all Silos benefit from this central administration process and full visibility of the assets being obtained, and the various sales processes being run, with all Silo Directors participating in the relevant decision-making processes in order to flag any inter-Silo issues early. At a later stage in the Chapter 11 Cases, when the Debtors' assets have been appropriately marshaled and secured, the Board and Debtors will turn their focus to distributional matters. The Board has also implemented appropriate procedures for the resolution of any conflicts of interest among the Silos and if necessary as the case progresses, any Silo may engage independent counsel in connection with the resolution of intercompany claims which, as the Debtors have previously noted, are likely to be complex but are still in the process of being assessed.

### 1. Lack of Key Personnel, Departments and Policies

The FTX Group did not have personnel who were experienced and knowledgeable enough to account accurately for assets and liabilities, understand and hedge against risk, or compile and validate financial reports. Key executive functions, including those of Chief Financial Officer, Chief Risk Officer, Global Controller and Chief Internal Auditor, were missing at some or all critical entities. Nor did the FTX Group have any dedicated financial risk, audit, or treasury departments. Although certain of the FTX Group entities nominally employed individuals responsible for accounting at those entities, in many instances, those individuals lacked the requisite expertise and had little or no internal staff. As a general matter, policies and procedures relating to accounting, financial reporting, treasury management, and risk management did not exist, were incomplete, or were highly generic and not appropriate for a firm handling substantial financial assets.

Indeed, in late December 2020, when the FTX Group learned, in connection with exploring a potential direct listing on NASDAQ, that FTX.US would have to be audited, and that this audit would include a review of policies and procedures, senior FTX Group personnel scrambled to cobble together purported policies that could be shown to auditors. In requesting the assistance of certain employees in quickly writing policies, FTX Group management informed them that because the "auditors [would] spend time in understanding and reviewing [FTX] internal processes," internal controls would have to be documented. FTX Group management asked employees "well-versed with" "parts of the [work]flow" to provide first drafts of policies and procedures in a mere 24 hours. It is unclear to what extent the resulting policies—which were prepared by editing off-the-shelf precedents provided by the FTX Group's outside accountants—reflected the reality of the FTX Group's business, but they were never formally promulgated, and no employees were ever trained on them.

-11-

The FTX Group principally relied on a small outside accounting firm to perform almost all of its basic accounting functions. Although the outside accountants' public profile is limited, it appears to have a small number of employees and no specialized knowledge relating to cryptocurrencies or international financial markets. There is no evidence that the FTX Group ever performed an evaluation of whether its outside accountants were appropriate for their role given the scale and complexity of the FTX Group's business, or whether they possessed sufficient expertise to account for the wide array of products in which the FTX Group transacted.

## 2. Lack of Appropriate Accounting Systems

Companies with operations as large and complex as those of the FTX Group normally employ either an advanced off-the-shelf Enterprise Resource Planning ("ERP")[14] system (*e.g.*, Oracle Fusion Cloud ERP, SAP S/4HANA Cloud) or a sophisticated proprietary system tailored to the accounting needs of the business such as, for a crypto exchange or trading business, a system tailored to the crypto assets in which the business transacted. Any appropriate accounting system should be capable of handling large volumes of data to accurately record, process, and report financial statement information (balance sheet/income statement) as well as operational information (actual versus budgeted spending), and to store key supporting materials. To minimize the risk of data integrity errors and the need for manual processing of transactions, data should flow automatically into the accounting system from core systems of the business, with transactions recorded based on appropriate accounting criteria and logic. None of the FTX Group companies employed such an accounting system.

Fifty-six entities within the FTX Group did not produce financial statements of any kind. Thirty-five FTX Group entities used QuickBooks as their accounting system and

---

[14] An ERP system is a type of software system that helps an organization automate and manage core business processes for optimal performance. ERP software coordinates the flow of data among a company's business processes, streamlining operations across the enterprise.

relied on a hodgepodge of Google documents, Slack communications, shared drives, and Excel spreadsheets and other non-enterprise solutions to manage their assets and liabilities. QuickBooks is an accounting software package designed for small and mid-sized businesses, new businesses, and freelancers.[15]  QuickBooks was not designed to address the needs of a large and complex business like that of the FTX Group, which handled billions of dollars of securities, fiat currency, and cryptocurrency transactions across multiple continents and platforms.

As a result of the FTX Group's poor controls, and the inherent limitations of QuickBooks software for use in a large and complex business, the FTX Group did not employ QuickBooks in a manner that would allow it to maintain accurate financial records.  For example, QuickBooks did not interface directly with the FTX Group's core systems.  Data had to be transported from the FTX Group systems into QuickBooks manually, generally by outside accountants who did not have access to the source data to validate that they had completely and accurately transferred the data into QuickBooks.  Furthermore, because they processed large volumes of data only manually, a great deal of transaction detail (*e.g.*, the purpose of a transaction) was either populated *en masse*, or omitted entirely.  Substantial accounts and positions went untracked in QuickBooks.  Digital asset transactions were tracked in QuickBooks using the generic entry "investments in cryptocurrency," but detailed recordkeeping reflecting what those cryptocurrency investments actually consisted of did not exist in QuickBooks, making reconciliation with other data sources extremely challenging or impossible. Approximately 80,000 transactions were simply left as unprocessed accounting entries in catch-all QuickBooks accounts titled "Ask My Accountant."  Further complicating matters,

---

[15]     *See* INTUIT QUICKBOOKS, https://quickbooks.intuit.com/ (last visited Apr. 4, 2023).

QuickBooks entries were often made months after transactions occurred, rendering impossible real-time financial reporting and risk management.

Alameda often had difficulty understanding what its positions were, let alone hedging or accounting for them. For the vast majority of assets, Alameda's recordkeeping was so poor that it is difficult to determine how positions were marked. A June 2022 "Portfolio summary" purporting to model cryptocurrency positions held by Alameda stated, with respect to valuation inputs for certain tokens, that Alameda personnel should "come up with some numbers? idk." In an internal communication, Bankman-Fried described Alameda as "hilariously beyond any threshold of any auditor being able to even get partially through an audit," adding:

> Alameda is unauditable. I don't mean this in the sense of "a major accounting firm will have reservations about auditing it"; I mean this in the sense of "*we* are only able to ballpark what its balances are, let alone something like a comprehensive transaction history." We sometimes find $50m of assets lying around that we lost track of; such is life.

Bankman-Fried's statements evidence the challenges a competent audit firm would have had to overcome to audit Alameda's business.

### 3. Inadequate Reporting and Documentation

A large number of FTX Group entities did not close financial reporting periods on a timely basis, and back-end checks to identify and correct material errors (*e.g.*, secondary review of transactions over a certain size, reconciliations of bank accounts, cryptocurrency wallets transactions, and other off-exchange positions) did not occur. These and other deficiencies resulted in numerous, often substantial, positions either not being recorded or being recorded in vague or inaccurate ways.

Key accounting reports necessary to understand the FTX Group's assets and liabilities, such as statements of cash flows, statements of equity, intercompany and related party

transaction matrices, and schedules of customer entitlements, did not exist or were not prepared regularly. Important treasury reports, such as reports on daily liquidity, daily settlement, funding mismatches, concentration risk, and liability profiles, did not exist or were not prepared regularly. Copies of key documentation—including executed loan agreements, intercompany agreements, acquisition and investment documents, bank and brokerage account statements, and contract and account information of all types—were incomplete, inaccurate, contradictory, or missing entirely. Thousands of deposit checks were collected from the FTX Group's offices, some stale-dated for months, due to the failure of personnel to deposit checks in the ordinary course; instead, deposit checks collected like junk mail. As discussed in greater detail below, the FTX Group did not maintain reliable lists of bank or trading accounts, cryptocurrency wallets, or authorized signatories. The Debtors have had to construct this historical data from scratch and make sense of the numerous resulting discrepancies, anomalies, and undocumented positions.

Although the FTX Group consisted of many, separate entities, transfers of funds among those entities were not properly documented, rendering tracing of funds extremely challenging. To make matters worse, Slack, Signal, and other informal methods of communication were frequently used to document approvals. Signal and Telegram were at times utilized in communications with both internal and external parties with "disappearing messages" enabled, rendering any historical review impossible. Expenses and invoices of the FTX Group were submitted on Slack and were approved by "emoji." These informal, ephemeral messaging systems were used to procure approvals for transfers in the tens of millions of dollars, leaving only informal records of such transfers, or no records at all.

Numerous loans were executed between former insiders and Alameda without contemporaneous documentation, and funds were disbursed pursuant to those purported loans with no clear record of their purpose. In one instance, an insider entered into an agreement to

purchase a piece of real estate.  The funds used to purchase that property, however, were wired directly from Alameda and FTX Digital Markets Ltd. ("FTX DM"), a Bahamas-based entity which was owned by, and had obtained the funds from, FTX Trading Ltd.  Only four months after the real estate purchase had closed did the employee enter into a promissory note with Alameda in which he undertook to repay the funds used to purchase the property.  Other insiders received purported loans from Alameda for which no promissory notes exist.

### 4. Trading Records from Other Exchanges

While the FTX Group maintained over a thousand accounts on external digital asset trading platforms in jurisdictions around the world, many of which held significant assets at various points in time, it had no comprehensive, centralized source of information reflecting the purpose of these accounts, or the credentials to access them.  Many of these accounts were opened using names and email addresses that were not obviously linked to any of the FTX Group entities.  Other accounts were opened using pseudonymous email addresses, in the names of shell companies created for these purposes, or in the names of individuals (including individuals with no direct connection to the FTX Group).

The Debtors have been working to identify and access these external accounts in order to secure the Debtors' assets and extract historical trading data.  Obtaining such access has required significant document review, interviews with current and former employees, and engagement with the external platforms.  In many instances, accounts belonging to the Debtors have been seized, locked, or frozen, requiring further coordination with the platforms and foreign government agencies to provide adequate proof of ownership and authorization to access the accounts.

### 5. Intercompany Transactions

The FTX Group did not observe any discernable corporate formalities when it came to intercompany transactions. Assets and liabilities were routinely shuffled among the FTX Group entities and insiders without proper process or documentation. Alameda routinely provided funding for corporate expenditures (*e.g.*, paying salaries and other business expenses) whether for Alameda, for various other Debtors, or for FTX DM, and for venture investments or acquisitions whether for Alameda or for various other Debtors. Alameda also transferred funds to insiders to fund personal investments, political contributions, and other expenditures—some of which were nominally "papered" as personal loans with below-market interest rates and a balloon payment due years in the future.

Intercompany and insider transfers were often recorded on the QuickBooks general ledgers in a manner that was inconsistent with the apparent purpose of the transfers. For example, an Alameda bank account transferred tens of millions of dollars to a personal bank account of Bankman-Fried in 2021 and 2022. Although the transfers were documented in promissory notes as loans from Alameda to Bankman-Fried, they were recorded on the general ledger as "Investment in Subsidiaries: Investments-Cryptocurrency." The Debtors have identified examples of intercompany transactions that do not balance to each other (*i.e.*, where the amounts "due to" and "due from" do not balance across the relevant entities). North Dimension, a shell company owned by Alameda, frequently recorded cash transfers to Alameda accounts in the general ledger with the description "interco transfer reflecting bank wire," without otherwise stating the purpose or substance of the transaction.

In addition to these inconsistencies, many intercompany transactions recorded in the QuickBooks general ledgers involved digital assets, but critical records regarding which digital assets were transferred, and at what values they were transferred, were not maintained in

QuickBooks.  Multiple intercompany transactions were recorded in QuickBooks by grouping many transactions together in summary batch entries without sufficient information to identify or properly account for the underlying transactions.  Compounding the issue, these batch entries were then recorded under generalized account names in QuickBooks such as "investments in cryptocurrency," as described above.  The cumulative impact is that these intercompany transactions as recorded in QuickBooks are difficult to reconcile with underlying documentation, and have required substantial additional investigation to understand and properly account for.

### 6.  Extraordinary Privileges Granted to Alameda

Alameda was a customer of FTX.com, trading for its own account as well as engaging in market-making activities, and, in that capacity, it was granted extraordinary privileges by the FTX Group.[16]  As detailed below, the FTX Group configured the codebase of FTX.com and associated customer databases to grant Alameda an effectively limitless ability to trade and withdraw assets from the exchange regardless of the size of Alameda's account balance, and to exempt Alameda from the auto-liquidation process that applied to other customers.  Any number of different controls routinely implemented by financial institutions and exchanges in established financial markets would be expected to have prevented, detected, and escalated these secret privileges to personnel in control functions with sufficient independence and authority to address the issue.[17]

---

[16]    FTX Group granted the same privileges to Alameda on FTX.US.  Because the Debtors' investigation is ongoing as to whether or to what extent Alameda made use of these privileges on FTX.US, this discussion focuses on FTX.com.

[17]    For instance, at a financial institution, these privileges would be expected to be identified by the finance department, as part of balance activity reports and margin balance monitoring; the market risk department, via VAR calculations and funding risk metrics; and the accounting department, through reconciliations of account-level balances against independently calculated aggregate exchange balances; and by having compliance, information technology, risk management, and finance departments that are segregated and independent from traders and other front-line business personnel.

The FTX Group not only failed to disclose these privileges to its customers or the public, but affirmatively misrepresented Alameda's privileged status relative to that of other customers. On July 31, 2019—the same day Singh altered the codebase to allow Alameda to withdraw apparently unlimited amounts of crypto assets from FTX.com, and a week after he altered it to effectively exempt Alameda from auto-liquidation—Bankman-Fried claimed on Twitter that Alameda's account was "just like everyone else's and "Alameda's incentive is just for FTX to do as well as possible."[18]  As recently as September 2022, in interviews with reporters, Bankman-Fried claimed that Alameda was a "wholly separate entity" and Ellison claimed that Alameda was "arm's-length and [did not] get any different treatment from other market makers."[19]

### a.    FTX customers and auto-liquidation processes

In general, there were two types of customers on FTX.com:  retail customers and market makers (*i.e.*, liquidity providers that stand ready to buy or sell to satisfy market demand). As to both types of customers, the exchange implemented automatic liquidation processes such that if the customer's account balance fell below a certain threshold, then the customer's existing positions on the exchange would be liquidated (*i.e.*, sold off) until the account balance became net-positive again.

For retail customers, the auto-liquidation process was triggered if the customer's account balance approached zero.  Market-makers and certain other preferred customers were

---

[18]    Sam Bankman-Fried, Twitter (July 31, 2019), *at* https://twitter.com/bitshine_/status/1156665108174651392?ref_src=twsrc%5Etfw%7Ctwcamp%5Etweetembed%7Ctwterm%5E1156696100729806849%7Ctwgr%5E4bccfdc775938ec4496be7f2a64f95301cbc3e7b%7Ctwcon%5Es2_&ref_url=https%3A%2F%2Fwww.forbes.com%2Fadvisor%2Finvesting%2Fcryptocurrency%2Fwhat-happened-to-ftx%2F (responding to a Twitter user's question about how Bankman-Fried would "resolve the conflict of interest of running [his] own derivative exchange, AND actively trading against the market at the same time").

[19]    Annie Massa, Anna Irrera, and Hannah Miller, *Quant Shop with Ties to FTX Powers Bankman-Fried's Crypto Empire*, BLOOMBERG NEWS (Sept. 14, 2022).

provided lines of credit in amounts that varied by customer up to a maximum of $150 million; for those customers, the auto-liquidation process would be triggered if the account became negative and approached the pre-set borrowing limit.

Apart from auto-liquidation processes that prevented customers from trading on the exchange if their balance went below a given threshold, through the operation of its code, FTX.com did not allow customers—except, as set forth below, Alameda—to withdraw assets from the exchange in excess of the amount of their net-positive account balance.

### b.    Alameda's privileges

Contrary to the public claims of FTX Group management, the FTX Group exempted Alameda from the automatic processes set forth above in multiple ways.  Specifically, one of the privileges secretly granted to Alameda, executed through a setting known as "*borrow*," permitted Alameda alone to trade on FTX.com effectively without regard to the size of its overall negative position.  *Borrow* was a field in the customer account settings within the FTX.com exchange's customer databases that contained a value for each customer representing how much the customer could "borrow"—*i.e.*, whether and to what extent the customer's account balance could become net-negative without triggering trade restrictions or the FTX.com exchange's auto-liquidation processes.  As of the petition date, on FTX.com:

- Most retail customers had a *borrow* value of zero;

- Certain preferred customers and market makers had a *borrow* value greater than zero and in amounts up to $150 million;

-20-

- Alameda alone had a *borrow* value set to $65 billion.[20]

The second and third privileges secretly granted to Alameda, known as "*can_withdraw_below_borrow*," and "*allow_negative*," provided Alameda the unique ability to withdraw an unlimited amount of crypto assets from FTX.com even when its account balance was net-negative. Singh added these features to the codebase of the FTX.com exchange on July 23, 2019 and July 31, 2019, respectively. It appears that Alameda's *can_withdraw_below_borrow* privilege was quickly supplanted by the addition to the codebase of *allow_negative*, which operated in essentially the same manner and controlled in the event of conflict with the settings for *can_withdraw_below_borrow*.[21]

*Allow_negative* referred to a field in the FTX.com exchange's customer databases that, if set to "true" for a particular customer, (i) allowed the customer to *withdraw* an unlimited amount of crypto assets from the FTX.com exchange while having a net-negative account balance (as opposed to merely "borrow") and (ii) exempted the customer from the FTX.com exchange's automatic liquidation processes. As of the petition date, Alameda was the only customer on FTX.com for which *allow_negative* was set to "true." When taken together, Alameda's $65 billion *borrow* and *allow_negative* settings gave it the unique ability to trade and

---

[20]     Due to the FTX Group's failure to maintain appropriate database logs, it is not possible to determine precisely when these particular *borrow* values for Alameda were configured, or by whom. In interviews, one FTX Group employee recalled that, in approximately the summer of 2022, he discovered a configuration that gave Alameda a line of credit in a very large amount, and raised the issue with Singh, who responded that he would reduce the amount to $1 billion (an amount that would still be approximately seven times larger than that of any customer or market maker on the exchange). Due to the lack of database logs, it is unclear what Alameda's *borrow* value was set to at the time, or to what extent Singh made any change to reduce it. Nonetheless, database records reflect that as of the petition date, Alameda's *borrow* limit was set to $65 billion.

[21]     While it appears that *can_withdraw_below_borrow* was thus rendered obsolete by Singh's addition of *allow_negative*, the Debtors currently understand that the *borrow* privilege granted to Alameda continued to remain relevant because Alameda would still need a net-positive account balance (after accounting for the specified *borrow* value) in order to actually trade on the exchange.

withdraw virtually unlimited assets, regardless of the size of its account balance and without risk of its positions being liquidated.

The Debtors' investigation of extraordinary privileges granted to Alameda remains ongoing.

### C. Lack of Digital Asset Management, Information Security & Cybersecurity Controls

The Debtors identified extensive deficiencies in the FTX Group's controls with respect to digital asset management, information security, and cybersecurity. These deficiencies were particularly surprising given that the FTX Group's business and reputation depended on safeguarding crypto assets. As a result of these control failures, the FTX Group exposed crypto assets under its control to a grave risk of loss, misuse, and compromise, and lacked a reasonable ability to prevent, detect, respond to, or recover from a significant cybersecurity incident, including the November 2022 Breach.

### 1. Lack of Key Personnel, Departments, and Policies

While the FTX Group employed software developers and a single dedicated IT professional, it had no dedicated personnel in cybersecurity, a specialized discipline that generally acts as a "check" to mitigate risks posed by business pressure for technology to operate as fast and easily as possible. The FTX Group had no independent Chief Information Security Officer, no employee with appropriate training or experience tasked with fulfilling the responsibilities of such a role, and no established processes for assessing cyber risk, implementing security controls, or responding to cyber incidents in real time. Instead, its security was largely managed by Singh and Wang, neither of whom had the training or experience to handle the FTX Group's cybersecurity needs, and both of whom had responsibilities for the speed, efficiency, and continuing development of the FTX Group's technology, which are business needs that generally run counter to those of security and thus are

not appropriately managed by the same personnel.  In short, as with critical controls in other areas, the FTX Group grossly deprioritized and ignored cybersecurity controls, a remarkable fact given that, in essence, the FTX Group's entire business—its assets, infrastructure, and intellectual property—consisted of computer code and technology.

### 2.     Crypto Asset Management and Security

A critical responsibility of a crypto exchange, as with any business that holds funds provided by others, is to safeguard crypto assets from loss, misuse, misappropriation, or theft by insiders or unauthorized third parties.  Crypto exchanges face unique security challenges in this regard, which only heightens their need to focus adequate time, resources, and expertise on fulfilling this core responsibility.

#### a.     Crypto wallets and storage

Crypto assets are held in a crypto wallet, which consists of (i) a public key that serves as the asset owner's identifier on the blockchain ledger, and (ii) a private key that is required to access the user's crypto holdings, authorize transactions, and exercise ownership over a blockchain asset.  A crypto wallet can either be a "cold" wallet (*i.e.*, an offline storage unit[22]) or a "hot" wallet (*i.e.*, a storage unit that is connected to the internet).  Crypto assets held in hot wallets are at a higher risk of compromise because hot wallets are internet-connected, rendering their private keys vulnerable to hacking, malware, and other cybersecurity threats. Compounding the risk, blockchain transactions are generally irreversible and anonymous, making unauthorized transfers particularly challenging, if not impossible, to recover.  For these reasons, it is axiomatic in the crypto industry that a private key should be kept confidential,

---

[22]     Assets maintained in cold wallets are typically kept in a physically secured location and accessed only by authorized personnel on a need-to-access basis, a method known as "cold storage."

including by being generated and stored in a secure and encrypted manner,[23] and used exclusively by the owner.  Relatedly, businesses that control private keys need detailed access control policies such that the keys may only be accessed by authorized parties or systems.

        The FTX Group stored the private keys to its crypto assets in its cloud computing environment, which included over one thousand servers and related system architecture, services, and databases that it leased from Amazon Web Services (the "AWS account").  AWS's cloud computing platform offers businesses a range of infrastructure-as-a-service (IaaS), platform-as-a-service (PaaS), and software-as-a-service (SaaS) capabilities, and through it, like other businesses, the FTX Group customized, configured, and controlled its own cloud environment.

### b. Lack of security controls to protect crypto assets

        The FTX Group failed to implement basic, widely accepted security controls to protect crypto assets.  Each failure was egregious in the context of a business entrusted with customer transactions, and any one of the controls may have prevented the loss in the November 2022 Breach.  Taken together, the failures were further magnified, since each control failure exacerbated the risk posed by the others.

        *First*, the FTX Group kept virtually all crypto assets in hot wallets, which are far more susceptible to hacking, theft, misappropriation, and inadvertent loss than cold wallets because hot wallets are internet-connected.  Prudently-operated crypto exchanges keep the vast majority of crypto assets in cold wallets, which are not connected to the internet, and maintain in hot wallets only the limited amount necessary for daily operation, trading, and anticipated

---

[23]     Encryption is the process by which readable data is converted to an unreadable form to prevent unauthorized parties from viewing or using it.  Plaintext, by contrast, refers to data that is unencrypted and, therefore, can be viewed or used without requiring a key or other decryption device.

customer withdrawals.[24]  Relatedly, prudently-operated crypto exchanges implement strict

processes and controls to minimize the security risks (for example, the risk of hacking, theft or

loss) inherent in the transfer of crypto assets between hot and cold wallets.

The FTX Group undoubtedly recognized how a prudent crypto exchange should

operate, because when asked by third parties to describe the extent to which it used cold storage,

it lied.  For example, in 2019, Bankman-Fried falsely responded to a customer question on

Twitter by providing assurance that "[we use the] standard hot wallet/cold wallet setup."[25]  In

2022, the FTX Group responded to questions posed by certain advisers and counterparties about

its use of cold storage as follows:

> FTX uses a best practice hot wallet and cold wallet standard solution for the
> custody of virtual assets. The firm aims to maintain sufficient virtual assets in
> the hot wallet to cover two days of trading activities, which means only a
> small proportion of assets held are exposed to the internet, the remaining
> assets are stored offline in air gapped encrypted laptops, which are
> geographically distributed. The 2-day trading figure is continuously
> monitored and if the hot wallet exceeds this amount, it will overflow into the
> cold wallet. If the figure drops below the 2-day trading figure, the hot wallet
> will be topped up from the cold wallet.

These representations were false.  None of FTX.com, FTX.US, or Alameda had a system in

place to monitor or move to cold wallets crypto assets in excess of the amount needed to cover

two days of trading activity, and they did not use offline, air-gapped, encrypted, and

geographically distributed laptops to secure crypto assets.

---

[24]    Although there is currently no regulation in the United States that requires exchanges to use cold wallets to
store customer assets, other regulatory authorities have imposed such requirements.  For instance, regulation in
Japan mandates that "Crypto Asset Exchange Service Providers" keep at least 95% of users' crypto assets in a
device that is always disconnected from the internet.  *See* Article 63-11(2) Payment Services Act in connection with
Article 27(2) Cabinet Order on Crypto Asset Exchanges.  Offline storage of information is also a standard security
practice and control for organizations outlined in the U.S. National Institute of Standards and Technology
("NIST")'s Special Publication 800-53 under System and Communications Protection SC-28(2).

[25]    Sam Bankman-Fried, (@SBF_FTX), Twitter (Aug. 16, 2019, 5:00 AM),
https://twitter.com/SBF_FTX/status/1162288084634836993.

FTX Group employees openly acknowledged uncertainty about FTX Group's use of cold storage, and that regulators and users appeared to receive different information on the subject. In Slack communications in October 2022, an FTX Group employee relayed an internal communication that "it's ab[ou]t 70% cold and 30% hot," and that he had been instructed that this information was not to be shared with regulators unless it was specifically requested. Another FTX Group employee responded that if the question was being posed by "non-regulators," then "we say 10% in hot wallet, and 90% in cold wallet."

In fact, neither of these assertions about cold storage use was true. Outside of Japan, where required by regulation to use cold storage, the FTX Group made little use of cold storage. The Debtors have identified evidence that an individual associated with LedgerX, a non-Debtor entity, recommended to FTX Group management that FTX.US secure crypto assets in cold storage using a system similar to that employed by LedgerX, but no such system was put in place prior to the bankruptcy.

*Second*, the FTX Group failed to employ multi-signature capabilities or Multi-Party Computation ("MPC") controls (together, "multi-signature/MPC controls") that are widely used throughout the crypto industry to protect crypto assets. These controls require the cooperation of multiple individuals using unique keys or key fragments to effectuate a transaction.[26] As a result, the controls significantly reduce the risk of fraud, theft, misuse, or errors either by any single individual or in the event any single individual's key or key fragment is compromised. These controls are widely understood to be crucial for crypto exchanges to ensure that unauthorized transactions do not occur, for many reasons: exchanges are regularly

---

[26] "Multi-signature" refers to the requirement that two or more authorized individuals provide unique keys or credentials to perform sensitive or critical operations, such as engaging in a high-value transfer of crypto assets. MPC controls generate multiple private keys required to digitally sign transactions, thus providing multi-signature capabilities to crypto assets that do not natively support multi-signature. Because MPCs utilize cryptographic methods, multiple parties can act to effect a single transaction without revealing their private keys to each other.

targeted by hackers; exchanges custody assets provided by others, heightening the need for security; exchanges engage in a high volume of transactions, increasing the likelihood that errors will occur; and, as noted above, compounding all of these issues, crypto assets may be difficult or impossible to recover once they have been transferred.

While a single-key mechanism may not be inappropriate for wallets holding a relatively small amount of assets, such as those held by many retail customers, there is no question that a crypto exchange should employ multi-signature/MPC controls and cold storage solutions for—at a minimum—the central wallets that hold the majority of the crypto assets of the exchange. Nonetheless, neither the FTX exchanges nor Alameda utilized them to protect crypto assets. In the few instances in which the FTX Group even attempted to employ these controls, it misapplied them: for each wallet, the FTX Group stored together, in one place, all three private keys required to authorize a transfer such that any individual who had access to one had access to all the keys required to transfer the contents of the wallet, thus defeating the purpose of the controls.

*Third*, the FTX Group failed to manage or implement any appropriate system to attempt to manage private keys. As noted above, because crypto assets in a hot wallet may be misappropriated by anyone with access to the private key for that wallet, private keys must be maintained in a highly-secure manner. For crypto exchanges, controls to protect and manage keys are of paramount importance because customers who transfer crypto assets from their own wallets to the exchange's wallet must relinquish control over the security of their assets to the exchange. Exchanges and other crypto businesses rely on a variety of methods of secure key storage and management that are generally not difficult to implement, and they rely on detailed access control and management policies such that the keys may only be accessed by authorized

parties or systems critical to the operation of the associated wallets.[27]  Businesses also regularly retain the services of third-party crypto custodians to secure their crypto assets and minimize the risk of maintaining their own private keys.

Despite the well-understood risks, private keys and seed phrases[28] used by FTX.com, FTX.US, and Alameda were stored in various locations throughout the FTX Group's computing environment in a disorganized fashion, using a variety of insecure methods and without any uniform or documented procedure.  Among other examples:

- The Debtors identified private keys to over $100 million in Ethereum assets stored in plain text and without encryption on an FTX Group server.

- The Debtors identified private keys, as well as credentials to third-party exchanges, that enabled access to tens of millions of dollars in crypto assets that were stored in plain text and without encryption across multiple servers from which they could be accessed by many other servers and users in many locations.

- Single-signature-based private keys to billions of dollars in crypto assets were stored in AWS Secrets Manager (a cloud-based tool used to manage sensitive information), and/or a password vault (a tool for secure storage of passwords), neither of which is designed to meet the needs of secure-key storage; any of the many FTX Group employees who had access to AWS Secrets Manager or the password vault could access certain of the keys and unilaterally transfer the corresponding assets.[29]

- Alameda also lacked appropriate documentation as to the description or usage of private keys.  For example, a key for $600 million dollars' worth of crypto assets was titled with four non-descriptive words, and stored with no information about what the key was for, or who might have relevant information about it.  The Debtors identified other keys to millions of dollars in crypto assets that were simply titled "use this" or "do not use," with no further context.

---

[27]     Examples of these methods include encryption, as well as the use of commercially available products such as hardware wallets, hardware security modules ("HSMs"), and MPC protocols.  A hardware wallet stores a user's private keys in a secure hardware device that resembles a USB drive.  Crypto transactions can be made by plugging the hardware wallet into a computer or other device. An HSM is a physical computing device that protects, manages, and stores secrets, such as cryptographic keys.

[28]     A seed phrase (also known as a recovery phrase or mnemonic seed) is a series of words generated by a crypto wallet that allows a user to recover all the crypto assets associated with that wallet.

[29]     In the infrequent instances in which the FTX Group stored private keys in encrypted form, it stored the decryption key in AWS Secrets Manager and not in a protected form, such as HSM.  As a result, the decryption keys could easily be retrieved by an unauthorized actor, thereby dramatically reducing the value of encryption.

- Many FTX Group private keys were stored without appropriate backup procedures such that if the key was lost, the associated crypto assets would likely be permanently lost.

- Because the FTX Group lacked adequate records of private keys, there was a significant risk that crypto assets would be lost simply because no one knew how to locate or access them. As described below, through painstaking analysis by experts, the Debtors have recovered to date over a billion dollars' worth of crypto assets as to which few or no records existed.

- Because the FTX Group failed to maintain appropriate records of access to private keys, employees or others could potentially copy those keys to their own electronic devices and transfer the associated crypto assets without detection.

*Fourth*, the FTX Group failed to appropriately implement controls to manage "wallet nodes," which are software programs that operate on servers running the software of the blockchain network and help to implement and propagate transactions and maintain the security and integrity of the blockchain. A wallet node that holds private keys for a specific wallet is responsible for managing that wallet's assets and communicating with the blockchain network to process transactions. As a result, the security of the associated wallet's assets depends in large part on the security of the server on which the node is running.

Crypto exchanges typically use trusted wallet nodes to broadcast transactions and query the blockchain to reconcile exchange ledger data with blockchain data. The FTX exchanges and Alameda maintained servers that ran wallet nodes for blockchains, including Bitcoin, Litecoin, and Dogecoin, among others; these nodes acted as hot wallets that held hundreds of millions of dollars' worth of assets. Virtually all FTX.com Bitcoin assets, for example, were held in a single Bitcoin Core wallet node.

Despite the obvious importance of securing its wallet nodes, the FTX Group's security controls for its wallet nodes were grossly deficient. For example, the passwords for encrypting the private keys of wallet nodes were stored in plain text, committed to the code repository (where they could be viewed by many and were vulnerable to compromise), and

reused across different wallet nodes such that if one were compromised, every other node with the same password could be compromised as well.  Furthermore, wallet node servers were not securely segregated from connected servers such that anyone who compromised the FTX Group's computing environment could potentially compromise its wallet nodes.

### 3.    Identity and Access Management

The FTX Group failed to implement in an appropriate fashion even the most widely accepted controls relating to Identity and Access Management ("IAM")—often the first line of defense in preventing an unauthorized system compromise.  IAM refers to the policies, technologies, and procedures used to manage digital identities and control access to computer systems.  Typically, IAM controls involve user authentication, authorization, and permissions management to ensure that only authorized individuals or systems are granted access to resources, while preventing unauthorized access and enforcing security policies.  In the context of a cryptocurrency exchange, IAM controls are essential for protecting the confidentiality, integrity, and availability of crypto assets.

The FTX Group's IAM controls were insufficient in at least three respects:

*First*, the FTX Group failed to adhere to the basic security principle of "least privilege," by which users and systems are given access to the minimum needed to perform their duties or functions and nothing more.[30]  By limiting access in this way, the impact of a security breach or an unintentional action involving any particular user or system is also necessarily limited.  Among notable examples of the FTX Group's failures in this respect, over a dozen people had direct or indirect access to the FTX.com and FTX.US central omnibus wallets, which

---

[30]    The Committee on National Security Systems defines "least privilege" as "[t]he principle that a security architecture should be designed so that each entity is granted the minimum system resources and authorizations that the entity needs to perform its function."  Committee on National Security Systems (CNSS) Glossary, CNSSI No. 4009-2015, (Apr. 6, 2015).

held billions of dollars in crypto assets, and dozens of other users were granted access to other types of FTX exchange and Alameda wallets.  Only a small number of these individuals needed access to these wallets to perform their duties.

*Second*, the FTX Group failed to effectively enforce the use of multi-factor authentication ("MFA") among its own personnel and corporate infrastructure, increasing the risk that key account credentials would be compromised and critical assets would thereby be vulnerable to unauthorized access.  MFA is a basic security mechanism that requires users to provide two or more methods of authentication (for example, a password and one-time passcode sent to a cell phone or email previously associated with the user) to verify their identity and gain access to a system or account.  MFA is a widely used and simple technique to mitigate the risks created by password weaknesses and theft, and businesses commonly require MFA to access any corporate systems, and particularly systems holding sensitive data.

The FTX Group did not enforce the use of MFA in connection with two of its most critical corporate services—Google Workspace, its primary tool for email and document storage and collaboration, and 1Password, its password-management program.   The deficiency is ironic given that the FTX Group recommended that customers use MFA on their own accounts,[31] and Bankman-Fried, via Twitter, publicly stressed the importance of "2FA [Two-factor authentication]," a form of MFA, for crypto security:

---

[31]      *See* FTX.US Security Features, (Sept. 25, 2021) [http://web.archive.org/web/20210925211745/https:/help.ftx.us/hc/en-us/articles/4408447825815-FTX-US-Security-Features]; FTX.US Security Features, (Aug. 14, 2022) [http://web.archive.org/web/20220814000906/https:/help.ftx.us/hc/en-us/articles/4408447825815-FTX-US-Security-Features]; FTX Security Features, (Sept. 21, 2021) [http://web.archive.org/web/20210921181611/https:/help.ftx.com/hc/en-us/articles/360044838051-FTX-Security-Features-]; FTX Security Features, (July 1, 2022) [http://web.archive.org/web/20220701085013/https:/help.ftx.com/hc/en-us/articles/360044838051-FTX-Security-Features-].

> Daily reminder: use 2FA! 90% of crypto security is making sure you've done the basics.[32]

While he correctly characterized MFA as one of "the basics" in securing crypto assets, the FTX Group did not enforce it in the essential areas described above. And in an important instance in which FTX Group did use MFA—for a corporate email account that handled significant administrative matters—FTX Group management arranged to bypass the MFA requirement.

*Third*, the FTX Group generally did not use Single Sign-On ("SSO"),[33] an authentication scheme used by companies worldwide to manage user access centrally, enabling users to adopt a single strong password to use across multiple applications, thus reducing the risk of unauthorized access and other harms. Without SSO, among other problems, the FTX Group could not effectively manage or revoke user access, enforce MFA, revoke user access, or prevent users from having many user accounts for different services with separate passwords, which increased the likelihood of compromise.

### 4. Cloud and Infrastructure Security

The FTX Group also failed to implement appropriate controls with respect to cloud and infrastructure security—that is, controls to protect its cloud services, networks, servers, and "user endpoints" such as desktops and laptops. These controls were crucial for the FTX Group, which essentially "lived" in the cloud, where the exchanges operated and the FTX

---

[32] Sam Bankman-Fried, (@SBF_FTX), TWITTER (Sept. 12, 2019, 4:11 AM), https://twitter.com/SBF_FTX/status/1172060173604515840.

[33] SSO enables users to authenticate their identity once in order to continually gain access to multiple applications and services without having to re-enter login credentials.

Group stored the majority of its assets. The FTX Group's management of its cloud and infrastructure security deviated from standard corporate practices in several respects.

*First*, the FTX Group generally shared computer infrastructure and IT services among FTX.com, FTX.US, and Alameda, and in doing so, departed from the fundamental security principle of segmentation, whereby business entities and computing environments are separated to minimize the impact of a breach, and exercise greater control over who can access particular systems. Among many examples, the FTX exchanges and Alameda used a single, shared AWS account, meaning that a compromise of that AWS account would expose all three entities' assets to misuse or theft.[34]

*Second*, while crypto exchanges are notoriously targeted by hackers, the FTX Group had poor or, in some cases, no "visibility" controls to detect and respond to cybersecurity threats. As widely understood across industries, and emphasized by the U.S. government in public advisories, appropriate visibility controls generally include the creation and collection of logs that record and reflect activity within the computing environment, and systems to alert

---

[34] Other significant examples of the FTX Group's segmentation failures that increased the risk of harm from an information security problem or compromise include hosting FTX.com and Alameda in the same collaboration platform, Google Workspace, and employing the same password vault tenant, 1Password, for both FTX.com and FTX.US. The FTX Group appears to have recognized the deficiency, because as of the petition date, FTX.US had begun a process of migrating to its own dedicated AWS account; because it did not complete that work, its assets remained within the shared account such that FTX.US lost approximately $139 million of its crypto assets during the November 2022 Breach. In these ways, the FTX Group departed from best practices, which call for segregation and separation of an organization's infrastructure and networks in order to effectively mitigate the risk of, and impact from, unauthorized access to the organization's environment. *See, e.g.*, U.S. CYBERSECURITY & INFRASTRUCTURE SECURITY AGENCY, *Securing Network Infrastructure Devices*, at https://www.cisa.gov/news-events/news/securing-network-infrastructure-devices (noting that "[s]ecurity architects must consider the overall infrastructure layout, including segmentation and segregation" because "[a] securely segregated network can contain malicious occurrences, reducing the impact from intruders in the event that they have gained a foothold somewhere inside the network").

designated personnel to suspicious activity.[35]  The FTX Group failed by any measure to maintain such appropriate controls.

Among many examples of its control deficiencies in this area, the FTX Group did not have any mechanism to identify promptly if someone accessed the private keys of central exchange wallets holding hundreds of millions or billions of dollars in crypto assets, and it did not fully enable even the basic features offered by AWS to assist with cyber threat detection and response.[36]  In fact, due to the lack of such controls, the FTX Group did not learn of the November 2022 Breach until the Debtors' restructuring advisor alerted employees after observing, via Twitter and other public sources, that suspicious transfers appeared to have occurred from FTX Group crypto wallets.  The FTX Group similarly failed to institute any basic mechanism to be alerted to any "root" login to its AWS account, the cloud computing environment where it operated the FTX exchanges and stored keys to billions of dollars in crypto assets, even though such access would provide virtually complete access to the environment.

*Third*, the FTX Group did not implement controls sufficient to protect its network endpoints, such as laptops and desktops, from potential security threats.  The FTX Group had no commonly used technical controls to ensure that employees used their corporate laptops, leaving employees free to use personal devices devoid of corporate security controls.  The FTX Group also lacked any endpoint protection tool to monitor cloud-hosted servers for threats, and several

---

[35]  *See, e.g.*, U.S. CYBERSECURITY & INFRASTRUCTURE SECURITY AGENCY, *Weak Security Controls and Practices Routinely Exploited for Initial Access* (last revised Dec. 8, 2022), at https://www.cisa.gov/news-events/cybersecurity-advisories/aa22-137a (noting that "[l]og files play a key role in detecting attacks and dealing with incidents[,]" that "implementing robust log collection and retention" provides organizations with "sufficient information to investigate incidents and detect threat actor behavior," and that effective log management calls for setting up "notifications of suspicious login attempts based on an analysis of log files").

[36]  For example, Amazon GuardDuty, an AWS feature that supports threat detection, was not enabled at all on FTX.com, and across the entities, VPC flow logs that can capture IP traffic information were only enabled to log the rejected traffic (and only in some networks)—they were not enabled to log the permitted traffic at all.  The lack of these and other logs complicated the Debtors' investigation of the November 2022 Breach.

of its critical services did not have the latest security updates installed.  For example, to manage inbound internet traffic on a key server, the FTX Group used a version of software that was nearly four years out of date, leaving the server exposed to known vulnerabilities that had been addressed in updated versions of the software.  This practice flouted industry standards by which software flaws and vulnerabilities should be remediated in a timely manner.[37]

*Fourth*, the FTX Group had no comprehensive record from which it could even identify critical assets and services, including employee workstations, software application servers, business data, and third-party cloud and other services it relied upon, leaving it with little to no visibility into what it needed to secure, let alone how to best secure it.[38]  Indeed, to understand and gain necessary access to the full scope of services that the FTX Group used, the Debtors had to analyze financial records such as bills paid to vendors, and search through employees' email and chat messages.  Although the FTX Group's designated IT professional began creating an inventory of electronic devices issued to employees, and stressed to Singh (who was supposedly in charge of the FTX's Group's cybersecurity) the importance for security purposes of having Singh and other FTX Group senior management identify in the inventory the electronic devices they were using, neither Singh nor other senior management provided the requested information.

### 5. Application and Code Security

The FTX Group did not implement controls sufficient to protect sensitive data relating to its applications, including its application code, from vulnerabilities and attacks.  While essential in any context, securing such data was particularly critical for the FTX Group, which

---

[37]      *See* NIST Special Publication 800-53 Revision 5: SI-2: Flaw Remediation.

[38]      The NIST identifies the development and maintenance of an inventory of information systems (including hardware, software, and firmware) that are owned, leased, or operated by an organization as a standard security practice and control.  *See* NIST Special Publication 800-53 Revision 5:  PM-5:  Information System Inventory.

used multiple applications with access to sensitive data and assets, including customer data, financial data, and crypto wallets.  In managing its application and code security, the FTX Group departed from standard practices in several ways.

    *First*, while it is widely recognized that sensitive data should be protected through encryption and appropriate access controls,[39] the FTX Group failed to adopt these basic controls to secure its "application secrets," that is, the highly sensitive data such as passwords, API keys,[40] and private keys used by its applications.  Protecting these secrets is paramount because they are frequently the target of malicious actors who may use them to gain access to additional data and assets.  With respect to the FTX Group, access to such secrets could enable someone to make transfers of billions of dollars' worth of crypto assets from hot wallets or third-party crypto exchanges.  Nonetheless, among many examples of its deficient controls in this area, the FTX Group simply stored certain secrets—including the private keys and seeds to Alameda's crypto wallets—in unencrypted files to which numerous employees had access, and kept hundreds of other secrets—including passwords for crypto wallet nodes, API keys for crypto exchanges, and credentials for sensitive email accounts—in source code repositories from which they were widely accessible.[41]

---

[39]   *See* NIST Special Publication 800-53 Revision 5: SC-28:  Protection of Information at Rest.

[40]   Application Programming Interface, or "API," keys are credentials used to authenticate to third-party services, including, for example, other crypto exchanges.

[41]   While a senior developer subsequently deleted a file containing these secrets from the repository, the developer did not remove the file from the code history in the repository, contrary to the recommended practice of GitHub, where the repository was maintained.  As a result, the file continued to remain exposed to anyone who accessed the code repository.

*Second*, the FTX Group failed to adopt certain standard controls in order to ensure the integrity of its code.[42]  For example, there was no effective process for securely introducing, updating, or patching software, and no procedures, such as scanning, to continually ensure the integrity of the code running on FTX Group servers.  Thus, among many other harms, the FTX Group was highly vulnerable to software "supply chain" attacks in which malicious actors insert vulnerabilities into third-party software in order to compromise any organization that uses the software.[43]  Furthermore, with only minimal code review and testing procedures in place, and no focus on continuous security testing, the FTX Group did not review, test, or otherwise deploy its code in a manner that sufficiently ensured that it was functioning as expected and free of vulnerabilities that might be leveraged by malicious actors.

### 6. Debtors' Work to Identify and Secure Crypto Assets in the Computing Environment

As a result of FTX Group's lack of appropriate documentation and recordkeeping, the Debtors had to undertake significant efforts to identify, access, and secure crypto assets from the FTX Group's computing environment.  The lack of records was particularly challenging because cryptocurrency keys are simply strings of alphanumeric characters that may otherwise be indiscernible in a computing environment.  The Debtors' challenge was compounded by the

---

[42]     *See, e.g.,* NIST Special Publication 800-53 Revision 5: SA-12: Supply Chain Protection ("Verify the integrity of code obtained from external sources before it is deployed on the system"); NIST Special Publication 800-53 Revision 5: SA-11:  Developer Security Testing and Evaluation ("Require developers to test their code for security vulnerabilities before it is deployed into production"); NIST Special Publication 800-53 Revision 5: SA-3: System Development Life Cycle ("Incorporate security requirements into the system development life cycle and ensure that security is addressed in all stages of the life cycle").

[43]     The most prominent example of a software supply chain attack is the 2020 SolarWinds attack, in which Russian state-sponsored actors compromised SolarWinds software, used widely throughout the U.S. public and private sectors, in order to gain access to the networks of government agencies and companies that downloaded the software.

enormous time pressure that they faced due to a confluence of circumstances that resulted from

other FTX Group control failures described above:

- The Debtors took over responsibility for a computing environment that had been compromised. A malicious actor had just drained approximately $432 million worth of crypto assets in hours; the FTX Group did not have the controls to detect the compromise, much less to stop it; and due to the FTX Group's deficient controls to secure crypto assets, the Debtors faced the threat that billions of dollars of additional assets could be lost at any moment.

- Compounding the challenge, and reflecting additional FTX Group control deficiencies, the Debtors' cybersecurity experts found that the FTX Group had no written plans, processes, or procedures that explained the architecture or operation of its computing environment or storage of crypto assets.

- Even as they raced to secure the environment in these challenging circumstances, the Debtors separately faced the risk that individuals in possession of private keys to crypto assets could unilaterally transfer those assets. In other words, securing the environment would not be enough: until the crypto assets were transferred to cold storage, they could be taken by anyone who had the private keys. Indeed, the day after the November 2022 Breach, without the Debtors' authorization, and at the direction of Bahamian authorities, Bankman-Fried and/or Wang used private keys they had in their possession to transfer hundreds of millions of dollars' worth of FTT, SRM, MAPS and other tokens out of Debtor wallets and into cold wallets in Bahamian custody.[44]

- Compounding all of these challenges, and as the Debtors worked to identify and access crypto assets with no "map" to guide them, the Debtors had to engineer technological pathways to transfer many types of assets they identified to cold storage because the FTX Group had never engaged in the computer engineering necessary to make those transfers possible.

The Debtors' work to identify and secure these crypto assets required the

combined efforts of experts in computer engineering, cryptography, blockchain technology,

cybersecurity, IT architecture, and cloud computing. Examples of the work that was undertaken

to identify crypto assets in the environment—ultimately, to date, over a billion dollars' worth of

crypto assets as to which few or no records existed—include the following:

---

[44]     Due to price declines, illiquidity, and other issues, these tokens are currently worth a small fraction of the amount of their estimated worth at the time of transfer.

- Experts developed novel code to identify crypto assets and keys that were stored in over a thousand servers and IT resources that constituted the FTX Group computing environment. Millions of these keys had no labelling or description that reflected their nature or use, requiring further analysis and blockchain analytics. Through this work, the Debtors recovered hundreds of millions of dollars' worth of crypto assets not reflected in any recordkeeping system of the FTX Group.

- Experts identified and recovered crypto wallets used for the FTX Group's extensive trading operations, and developed scanning tools and dedicated software to identify Alameda's DeFi portfolio[45] as to which few centralized records have been identified. Using these tools, the Debtors have identified tens of millions of dollars' worth of crypto assets that are in the process of being recovered.

- Experts learned that the FTX exchanges had experienced difficulty with the accuracy of code that the FTX Group had engineered to identify and transfer assets from over 10 million wallets of exchange customers into omnibus accounts. Surmising that crypto assets could still remain scattered among the wallets due to the inaccuracy of that code, experts developed code that would automatically both identify any crypto assets across blockchains that remained among the more than 10 million wallets, and then automatically transfer those assets to cold storage. Through the operation of this code alone, the Debtors have identified and secured over $140 million in crypto assets of the estate.

## V.  Conclusion

The FTX Group's profound control failures placed its crypto assets and funds at risk from the outset. They also complicated the Debtors' recovery efforts, although the Debtors have made and continue to make substantial progress in that regard. To date, through the work described above, the Debtors have recovered and secured in cold storage over $1.4 billion in digital assets, and have identified an additional $1.7 billion in digital assets that they are in the process of recovering. The Debtors will continue to provide updates on their ongoing recovery efforts and investigation.

---

[45]     A Decentralized Finance (DeFi) portfolio encompasses a range of investments, holdings, and trading positions in blockchain-based financial applications that operate in a decentralized, peer-to-peer manner, rather than relying on centralized exchanges, brokerage firms, or banks.

# Exhibit E

# Liquid Value Fund I, LP

**Sino Global Capital** *in partnership with* **FTX**

 

Information Current as of January 5, 2022

Private & Confidential - Not for Distribution



# Executive Summary

➢ **Liquid Value Fund I** is a stage agnostic closed-ended VC fund that invests in blockchain technology, cryptocurrencies and adjacent infrastructure.



**Sino Global Capital** is an Asia-based VC that has an **unrealized multiple of 31.8x** on mark-to-market investments that were made with prop capital over the last 15 months.

SGC is the **GP responsible for all fund discretionary decisions** of Liquid Value Fund I.



FTX is a cryptocurrency derivatives exchange that handles over $10B in daily volume.

**FTX** will serve as **Co-GP** and **anchor LP** of Liquid Value Fund I, providing significant strategic advantage. FTX will provide up to $60m in capital contributions.

➢ Fund I has a current portfolio of 22 investments, including an investment with a **14x markup and one with a 31x markup.**

➢ GP will return 100% of LP capital before taking carried interest.

➢ Substantial investment weight given to **FTX, Solana, and Serum** ecosystems.

 

# 1. Sino Global Capital

## 2. Liquid Value Fund I ("LV I")

## 3. Case Studies

## 4. Offering Overview

## 5. Contact & Data Room

## 6. Appendix

Sino Global Capital 

# Key Facts

**Sino Global Capital – Key Facts:**

➢ Founded in 2015 and exclusively crypto-focused since early 2017.

➢ Writes strategic checks to best-in-class blockchain and digital asset projects.

➢ Known for strong Asia-based networks and ability to bridge East-West gaps.

➢ Prop AUM of more than $300M.

**Sino Global Capital – Team Member Distribution:**



Note: Beijing (1), Shanghai (1), Kunming (2), Hong Kong (1), Kuala Lumpur (1), Singapore (1), The Hague (1), Miami (1), Utah (1), USA (1), Bengaluru (2).

Private & Confidential - Not for Distribution

## Sino Global Capital

 

# Team



**Managing Partner & CEO**
**Matthew Graham**

Matthew has seven years of mainland China investment banking experience with a focus on representing international technology companies in China for strategic partnership and investment. Previously Matthew working in financial services as trader.
@mattysino



**Partner**
**Haru Chen**

Haru is a serial entrepreneur and investor from China's Yunnan Province. She has been focused on blockchain since 2015, and has invested in numerous successful projects including Ethereum, Neo, Ontology, EOS, Ada, RSK, and AE.



**Chief of Staff**
**Dermot McGrath**

Dermot has over 5 years of China experience focusing on corporate finance, investment analysis, deal making and technology commercialization. Before joining Sino Global Capital, he worked as a Finance Manager for a blue-chip Chinese Fortune 500 company. @dermotmcg



**COO & Head of Investment**
**Ian Wittkopp**

Ian has 6 years of experience working at the Bureau of Labor Statistics in Washington, D.C. in both the Budget and Economic Indicators Offices. Before joining SGC, Ian also consulted for numerous MNCs including Volkswagen-China and was a Product Manager at an InsurTech. @ianw888



**General Counsel & Head of IR**
**Patrick Loney**

Over seven years experience as a lawyer, merchant banker and entrepreneur in mainland China. Serving as General Counsel and fundraiser for SGC. Fluent in English and proficient in Mandarin. @PatrickLoneyo



**Senior Investment Associate**
**Hans Xiang**

Hans has over 3 years' experience in the blockchain industry. He completed his BSc in Finance & Control at The Hague University of Applied Sciences and has recently finished his MSc in Financial Technology at The University of Glasgow. He has a multilingual background in English, Chinese and Dutch. @OmniscientAsian



**Vice President - Communications**
**Sally Wang**

Sally has 6+ years combined experience in communications and crypto. Started as a Journalist in China state-owned media CGTN and found her passion for crypto. She has guided multiple crypto brands including TokenInsight, Velo Labs, DCG's Foundry etc. @sallywang666



**Investment Associate**
**Thomas Tang**

Thomas has 2+ years of experience in traditional finance, previously working at Citibank across multiple verticals including equities, credit & risk, portfolio & asset management. Thomas graduated from the London School of Economics in 2019, majoring in Accounting and Finance. @TTxox



**Investment Associate**
**Wei Han**

Wei Han has over 6 years of product development experience in the Fintech industry. An early participant to the DeFi space, he was top 100 in the Degen Score leaderboard. Now, as a full-time investment associate at SGC he helps contribute to deal sourcing and research. @cweihan



**Investment Analyst**
**Ben Poynor**

Ben has four years of crypto experience, three years in backend web development, and two years in venture capital. @0xPemulis

5



# We invest early and with conviction



Private & Confidential - Not for Distribution

Sino Global Capital  

# Return Performance



**31.8x*** on invested capital

Mark-to-market investments

**1.0x*** on invested capital
(valued at cost)

Investments with no market price

*Note: See Appendix I for details

 

1. Sino Global Capital

## 2. Liquid Value Fund I ("LV I")

3. Case Studies

4. Offering Overview

5. Contact & Data Room

6. Appendix

Liquid Value Fund I  

# Fund & Manager

➤ Liquid Value Fund I, LP (the "Fund") is **managed by Sino Global Capital ("SGC") in partnership with FTX**.

➤ SGC will make **all discretionary decisions** regarding the management of the Fund.

➤ FTX will be **co-GP and anchor LP**. The fund represents the first time that FTX has allocated capital to an outside VC manager.

➤ SGC's mark-to market prop capital investments have a **31.8x unrealized multiple**.

➤ SGC has **22 deals** (and counting) in the Liquid Value Fund I portfolio.



**SINO** GLOBAL CAPITAL

Matthew Graham
**CEO | @mattysino**

SGC is an established crypto investor with deep roots in Asia and within the rapidly expanding Solana ecosystem. Founded by Matthew Graham, SGC invests in leading crypto teams around the world.



**FTX**

Sam Bankman-Fried
**CEO | @sbf_ftx**

FTX is a crypto finance empire built by Sam Bankman-Fried ("SBF") & includes FTX Int'l ($25B crypto exchange), FTX.US (crypto exchange), Alameda Research (prop trading) & Alameda Ventures (prop VC).

Liquid Value Fund I  

# Key Advantages

*Competition for the best deals has increased; LV Fund I has significant advantages to access the best deal flow*



**Partnership with FTX**

➢ FTX as a co-GP and anchor LP unlocks significant strategic advantage.

➢ Rapidly growing brand recognition in US through high profile sponsorships of Miami Heat Arena, MLB and star athletes including Tom Brady, Steph Curry and Lewis Hamilton



**Best-in-class reputation and expertise**

➢ Crypto is an industry with large amounts of "vaporware."

➢ SGC investment signals trustworthiness and quality

➢ SGC provides key strategic relationships and post-investment support to portfolio.



**Significant mindshare in Solana ecosystem**

➢ SGC has invested broadly in Solana infrastructure

➢ Co-hosted a product demo day with Solana team to showcase best-in-class teams.

➢ Solana Ecosystem Outlook with SBF (FTX founder), Anatoly Yakovenko (Solana founder) and Matt (SGC founder)



**Strong Asia-based network and geographic diversity**

➢ SGC provides a strong Asia network and expertise, while also bridging Western networks.

➢ Being an Asia-based VC provides a significant advantage in winning deals.

Private & Confidential - Not for Distribution

11

Liquid Value Fund I 

# Key Advantages: FTX



THE WALL STREET JOURNAL.

**MARKETS | DEALS**

## Crypto Exchange FTX Valued at $18 Billion in Funding Round

Investors include SoftBank, Sequoia Capital and Daniel Loeb's Third Point hedge fund







**Cryptocurrencies**

## Tom Brady and Gisele Bündchen Take Equity Stake in Crypto Firm FTX

By Vildana Hajric • Follow
June 29, 2021, 8:00 PM GMT+8
*Updated on June 30, 2021, 3:10 AM GMT+8*

▶ 'They were both really into it,' says FTX's Sam Bankman-Fried

▶ Tampa quarterback tweets Monday that 'laser eyes didn't work'

Liquid Value Fund I  

# Key Advantages: FTX

*FTX as a Co-GP and anchor LP unlocks significant strategic value through FTX ecosystem collaboration*

Sam Bankman-Fried is the CEO or founding member of the below entities



➢ Raised $1.32B in 2021; valued at $25B.

➢ Lists over 250 futures and 100 spot markets.

➢ Avg daily volume of $12–15B.

➢ Official sponsor of Major League baseball and Miami Heat.



➢ Subsidiary of FTX, focused on the U.S. market.

➢ Acquired LedgerX to expand offerings.

➢ Controls a CFTC derivatives clearing organization license letting it host complex contracts on the platform.

➢ Avg daily volume of $200–250M.



ALAMEDA RESEARCH

➢ Best-in-class OTC desk & market making services

➢ Manages over $1B in digital assets

➢ Trades between $1-$10 billion per day across thousands of products



➢ First decentralized, on-chain, central limit order book.

➢ Recently launched permissioned markets setting.

➢ $40M+ in daily volume (trailing 7 days)

Liquid Value Fund I  

# Key Advantages: Solana Mindshare

*SGC has gained significant mindshare in the Solana ecosystem investing in key projects and infrastructure*



See Solana Demo Day hosted and organized by SGC

Private & Confidential - Not for Distribution

14

Liquid Value Fund I 

# Key Advantages: Reputation

*SGC has spent years cultivating deep ecosystem relationships; SGC on a cap table is signal that a project is high quality*

**Reputation among crypto users and other investors:**
View SGC as long-term, high trust, community member







**Reputation among builders and portfolio companies:**
View SGC as taking extra effort post-investment





Liquid Value Fund I  

# Portfolio Investments (Page 1 of 2)

| Project | Category | Description |
|---|---|---|
| ORCA | Decentralized Exchange | **Orca** is the easiest, fastest, and most user-friendly automated market marker on Solana, a human-centred DEX built to optimise for simplicity and composability. |
| LayerZero. | Cross-Chain Architecture | **LayerZero** is an omnichain interoperability protocol that unites decentralized applications across disparate blockchains. |
| Clearpool | Institutional Liquidity | **Clearpool** is a decentralized capital markets ecosystem, where institutions can borrow uncollateralized liquidity, and LPs get attractive rewards. |
| ZETA | Decentralized Derivatives | **Zeta** is the premier under-collateralized DeFi options platform, providing liquid derivatives trading to individuals and institutions alike. |
| VYBE NETWORK | Blockchain Infrastructure | **Vybe Network** is the premier data-processing & analytics protocol for the Solana & Serum community. |
| SOLCERY | Gaming Infrastructure | **Solcery** is a decentralized games hub on Solana, connecting players, developers and creators in one place. |
| PHANTASIA | Sports Gaming | **Phantasia** is the first of its kind Fantasy Sports Platform made for players and powered by Blockchain technology. |

| Liquid Value Fund I | |   |
|---|---|---|

# Portfolio Investments (Page 2 of 2)

| Project | Category | Description |
|---|---|---|
| paraswap | DeFi Aggregator | **ParaSwap** aggregates decentralized exchanges and other DeFi services in one comprehensive interface to streamline and facilitate users' interactions with DeFi. |
| STAKE | Liquid Staking | **pSTAKE** is a liquid staking protocol unlocking the liquidity of staked assets which can be used in DeFi to generate additional yield. |
| Atomic Form | NFT Hardware | **Atomic Form** builds hardware and software for NFTs and Web3 media, bridging physical and digital worlds through on-chain verification, participation and display. |
| NYAN | Decentralised Gaming | **Nyan Heroes** is a NFT play-and-earn metaverse built on Solana featuring a third-person shooter battle royale game. |
| BETDEX | Sports Betting | **BetDex** is a global decentralized sports betting protocol that is permissionless, allowing anyone to build applications on top. |
| XDEFI WALLET | Wallet Infrastructure | **XDEFI Wallet** is a multi-chain wallet built for DeFi users and NFT lovers with native integrations on THORChain, Ethereum, several EVM networks and Terra. |
| cypher | Decentralized Exchange | **Cypher** is a decentralized synthetic asset protocol on the Solana blockchain that facilitates price and demand discovery in nascent markets. |
| marginfi | Trading Protocol | **MarginFi** allows traders to seamlessly trade across Solana protocols through one global margin account. |

 

1. Sino Global Capital

2. Liquid Value Fund I ("LV I")

3. **Case Studies**

4. Offering Overview

5. Contact & Data Room

6. Appendix

Case Study  

# Solana

Solana is a built to **optimize speed, volume, cost efficiency and composability**, which we believe will drive mass adoption of Solana-based crypto services.

**Speed/Volume.**
Currently can process ~50,000 tps
Theoretically scalable to ~710,000 tps

**Cost efficiency.**
Ultra-low fees ($0.0008/tx).

**Composability.**
Highly composable infrastructure and developer tools accelerates innovation



Source: DeFi Llama

_Watch_: Matthew Graham, SBF and Solana founder Anatoly Yakovenko discuss upcoming trends in the Solana ecosystem. (September 10, 2021)
_Read_: Solana's roadmap for increased decentralization and scaling.

Case Study                                                          

# Solana

*Solana is a highly performant chain with the ability to scale transactions*



| | Solana | Polkadot | Cardano | Cosmos | Avalanche | Algorand | Binance Smart Chain | Ethereum | Ethereum 2' | Arbitrum | Optimism |
|---|---|---|---|---|---|---|---|---|---|---|---|
| TPS | 50,000 | 400 | 250 | 1,400 | 4,500 | 1,000 | 100 | 30 | 100,000* | 2,000 | 2,000 |
| Finality time | 0.4 seconds | 12-60 seconds | ~20 seconds | 1-3 seconds | 1-5 seconds | 4.5 seconds | 75 seconds | 5 minutes | 20 - 60 seconds | Up to 1 week | Up to 1 week |
| Avg tx fee | $0.0008 | $0.46 | $0.38 | $0.03 | $0.03 | $0.001 | $0.01 | $20-200+ | | $3-12 | $1-5 |
| # of Validators | 1,083 | 297 | 2,076 | 125 | 1,025 | 1,254 | 21 | 3,023 | 242,772 | N/A | N.A |
| Type | Layer 1 | Sharding | Layer 1 | Layer 1 | Layer 1 | Layer 1 | Layer 1 | Layer 1 | Sharding | Layer 2 (Optimistic rollup) | Layer 2 (Optimistic rollup) |

* ETH2.0 stats are theoretical

**Note on Decentralization:** At ~1,000 nodes, Solana is often criticized for being "centralized." We agree Solana needs more independent nodes and believe it will as it grows. However, mass adoption (among devs, consumers and institutions) will not hinge on decentralization but rather on speed, volume, cost and composability.

Case Study  

# Serum

In August 2020, FTX launched Serum, the first DEX using a fully decentralized central limit orderbook (CLOB). Serum enables transaction bundling and potential for advanced, automated investment strategies.

### Serum and its ecosystem are highly composable



**Applications use Serum as an economic clearing mechanism, share Serum's common liquidity pool and access services offered by one another.**

**Key Benefit**

This allows projects to focus their efforts on refining their own product (i.e. risk engine, margin engine, front end) and business model, and to launch, pivot and iterate as needed.

\* Serum Ecosystem project examples in Appendix

Case Study  

# Adjacent Investment Opportunities

We continue to invest in projects that are adjacent to our core focus of DeFi and the Solana ecosystem. Typically, these decisions are made based on the quality of the founders and teams at these companies.



**Cryptocurrency derivatives exchange built by traders, for traders**

➢ Offers innovative products including industry-first derivatives, options, volatility products and leveraged tokens

➢ Strives to be robust enough for professional trading firms and intuitive enough for first-time users



**Global NFT platform and marketplace**

➢ "Shopify for NFTs": allows anyone to create their own NFTs and market*place while* abstracting away all complexity

➢ Innovative auction types and token features such as spawning, self-destructing and embedded value tokens

WINTERMUTE

**Leading Crypto market maker and proprietary trading firm**

➢ Crypto-native market maker focused on creating efficient, liquid, transparent markets

➢ Provides liquidity algorithmically more than $5B+/day across most cryptocurrency exchanges and trading platforms

 

1. **Sino Global Capital**

2. **Liquid Value Fund I ("LV I")**

3. **Case Studies**

4. **Offering Overview**

5. **Contact & Data Room**

6. **Appendix**

Liquid Value Fund I  

# Offering Overview

## Liquid Value Fund I

The investments we make out of **Liquid Value Fund I** will leverage SGC's strong reputation, experience, and network while adding the immense strategic benefits of a best-in-class partner like FTX.

We plan to continue to cultivate high ROI opportunities in the FTX, Solana, and Serum ecosystems while broadening into other areas of innovation.

| General Partners | SINO GLOBAL CAPITAL   FTX |
|---|---|
| Size | $175M Target; $200M Hard Cap |
| Minimum Ticket | $1 million |
| Term | Close-ended: 10 (+1) years |
| Investment Period | 4 years (ideal is 18–30 months) |
| Distribution | 100% of LP capital returned before GP carry |
| Mgmt Fee / Carry | 2% / 20% |
| Initial Closing | December 15, 2021 ($10m; FTX) |
| Investment Stage | Early-stage; Follow-on; Private "treasury rounds"; Select big tickets |

**Service Providers**

| | |
|---|---|
| Cayman Counsel: | WALKERS |
| LPA/PPM: | Cole-Frieman & Mallon llp |
| Tax: | BPM |
| Administrator: | STOVER |

 

1. Sino Global Capital

2. Liquid Value Fund I ("LV I")

3. Case Studies

4. Offering Overview

**5. Contact & Data Room**

6. Appendix

Next Steps  

# Contact & Data Room

**Data Room Contents:**

- PPM
- LPA
- Subscription Agreement
- Team Track Record
- Warehouse/Portfolio Materials
- Organizational Documents

**Contact and Data Room Access:**

Detailed descriptions of the offering, our investment track record, warehoused and portfolio investments, and subscription documents can be found in the Fund's data room.

Please email investors@sinoglobalcapital.com to request access.

Private & Confidential - Not for Distribution

 

# Legal Disclosure

The information contained in this presentation (the "Presentation") is highly confidential and is being provided for information purposes only to a limited number of financially sophisticated persons who have expressed an interest in the matters described herein.

The Presentation does not constitute an offer to sell, or a solicitation of an offer to purchase, any securities.  Any such offer or solicitation will be made in accordance with applicable securities laws.

The Presentation is being provided on a confidential basis solely to those persons to whom this Presentation may be lawfully provided.  It is not to be reproduced or distributed to any other persons (other than professional advisors of the persons receiving these materials).  It is intended solely for the use of the persons to whom it has been delivered and may not be used for any other purpose.  Any reproduction of the Presentation in whole or in part, or the disclosure of its contents, without the express prior consent of Liquid Value GP Limited is prohibited.

No representation or warranty (express or implied) is made or can be given with respect to the accuracy or completeness of the information in the Presentation.  Certain information in the Presentation constitute "forward-looking statements" about potential future results.  Those results may not be achieved, due to implementation lag, other timing factors, portfolio management decision-making, economic or market conditions or other unanticipated factors. Nothing contained herein shall be relied upon as a promise or representation whether as to past or future performance or otherwise.

In considering the performance information contained herein, past performance is not necessarily indicative of future results, and there can be no assurance that comparable results will be achieved.

The views, opinions, and assumptions expressed in this presentation are as of the date listed on the cover, are subject to change without notice, may not come to pass and do not represent a recommendation or offer of any particular security, strategy or investment.

The Presentation does not purport to contain all of the information that may be required to evaluate the matters discussed therein.  It is not intended to be a risk disclosure document.  Further, the Presentation is not intended to provide recommendations, and should not be relied upon for tax, accounting, legal or business advice.  The persons to whom this document has been delivered are encouraged to ask questions of and receive answers from the general partner of the Company and to obtain any additional information they deem necessary concerning the matters described herein.

None of the information contained herein has been filed or will be filed with the Securities and Exchange Commission, any regulator under any state securities laws or any other governmental or self-regulatory authority. No governmental authority has passed or will pass on the merits of this offering or the adequacy of this document. Any representation to the contrary is unlawful.

 

1. **Sino Global Capital**

2. **Liquid Value Fund I ("LV I")**

3. **Case Studies**

4. **Offering Overview**

5. **Contact & Data Room**

6. **Appendix**

Private & Confidential - Not for Distribution

28

 

# SGC Prop Track Record

**Mark-to-Market Investments**

| Company | Token ticker | Investment Amount ($000s) | % of prop cap | Mark-to-Market ($000s) | MOIC |
|---|---|---|---|---|---|
| Serum | SRM | | | | 114.7x |
| Mask Network | MASK | | | | 42.9x |
| Bonfida | FIDA | | | | 35.5x |
| Delta Exchange | DETO | | | | 5.4x |
| MAPS | MAPS | | | | 11.5x |
| Oxygen | OXY | *Redacted – See Data Room* | | | 7.6x |
| Solana | SOL | | | | 15x |
| Zignaly | ZIG | | | | 8.6x |
| Mercurial Finance | MER | | | | 3.2x |
| Impossible Finance | IF | | | | 28.7x |
| Jet Protocol | JET | | | | 19x |
| Party Parrot | PRT | | | | 4.3x |
| **Total** | | **$4,080,000** | **38%** | **$129,705,997** | **31.8x** |

**Investments with no public market price**

| Company | Token ticker | Investment Amount ($000s) | % of prop cap | Mark-to-Market ($000s) | MOIC |
|---|---|---|---|---|---|
| Mintbase | - | | | | 1x |
| Wintermute | - | | | | 1x |
| Zapper.fi | - | *Redacted – See Data Room* | | | 1x |
| Pyth | - | | | | 1x |
| FTX | - | | | | 1x |
| FTX.US | - | | | | 1x |
| **Total** | | **$6,772,842** | **62%** | **$6,772,842** | **1x** |

**Note:** The multiple of 31.8X was calculated based on 12 investments using the following formula: [Current market price of all SGC primary or private deals which are actively traded with a quoted market price] / [Total invested capital on such deals]. The 6 primary or private deals for which there is not a current public market price are excluded from the calculation, although, if comps were used, many of these investments would show significant gains.

Finally, secondary market purchases of Solana (at a blended price below $2) and FTX's exchange token FTT (at a blended price below $1) are not included in the above estimates. As of January 5, 2022, Solana was traded at $149.31 and FTT at $37.23.

 Back to "Return Performance"

Appendix 2  

# Solana Advantage Visual

*High performance next generation blockchains unlock a virtuous cycle leading to mass adoption*



Appendix 3  

# Interesting Solana Ecosystem Projects

| Product | Industry | Description |
|---------|----------|-------------|
| PYTH | Data Oracle | To compete with NASDAQ as a provider of real time data to financial firms, Jump Capital identified Solana as the only viable blockchain on which to launch Pyth, an oracle that feeds real-time data from around the world directly into Serum and registered on the Solana blockchain. |
| Serum | Infrastructure | FTX chose Solana on which to build Serum, the first ever decentralized central limit order book (CLOB) on which other financial apps are built. We discuss Serum in more detail in the following slides. |
| jet | DeFi | Taking advantage of Solana's highly composable blockchain, Jet Protocol built out a borrow-lending protocol available for its own users and also other projects within the Serum ecosystem. Jet will even allow for cross chain rate arbitrage powered by Solana and Serum. |
| Parrot | DeFi | Parrot Protocol is a liquidity and lending network that uses their own stablecoin, PAI, to centralize exposure taken across multiple collateral types. The team chose Solana because allows multiple processing steps to be combined into a single transaction, enabling complex collateral types to be efficiently liquidated. |
| AUDIUS | Music Streaming | Audius is a blockchain-powered, decentralized music streaming service with social media features. It is owned and run by an open-source community of artists, fans, and developers. The founders of Audius chose Solana for its high-performance and ability to house a platform with the potential need to scale rapidly. |
| STAR ATLAS | Gaming | Star Atlas is a next-generation video game involving space exploration, territorial conquest, political domination, and more. It features a decentralized economy and plans to evolve into a metaverse. ([Watch trailer](#)). The team chose Solana because it is the only blockchain with the computational bandwidth akin to the modern internet. |

Appendix 4                                                           

# Portfolio Construction

In our prop capital investments, we were capital constrained and not able to "size up" and lead as many investment rounds as desired.

➢ In Liquid Value Fund I, we will continue to invest heavily in early-stage (Seed/Series A) projects. Check sizes are under $1.5M with 30% capital allocated. These early-stage investments will start a relationship with the founders and allow for value to be built post investment.

➢ Roughly 40% of the fund will be invested in deals between $1.5M-$5M. With this check size we will lead follow-ons for Seed/Series A projects. Additionally, we will participate in private placements.

➢ Finally, roughly 30% of the fund will be invested in deals over $5M. These are unique opportunities where ability to size up meets conviction.





# Portfolio Construction

The investment breakdown of our prop capital could reflect thinking on future investment allocations.

➢ Solana projects (42%): We continue to see strong deal flow in the Solana ecosystem due to our strong reputation and mindshare.  These projects span DeFi, NFTs/gaming, sports betting, and developer infrastructure.

➢ Chain-agnostic infrastructure (42%): We view crypto-adjacent or supporting infrastructure like centralized exchanges, wallets, market makers, and agnostic aggregators as superior investment opportunities in a multi-chain world.

➢ Non-Solana projects (16%):  We continue to believe in a multi-chain world where different use cases are more suited or less suited for different chains.  We have also made investments on Ethereum, NEAR, and Binance Smart Chain.

***Potential* Investment Breakdown**



**Note:** The above percentages reflect the breakdown of our previous prop capital portfolio (19 investments); Liquid Value Fund I *could* exhibit a similar breakdown.

# Exhibit F

# FTX Advisory Board Meeting for Mar 21th 2022

Link to previous advisory board meetings: Q4 2021

# Metrics

## Market Share / Growth and Revenue

**Data for 2021**
- Ended 2021 with $1.004B of revenues for FTX.com and $40.9M of revenues for FTX.us
- Ended 2021 at 10.5% of global volume (FTX.com) and 3.3% of US volumes (FTX.us)

| FTX Intl | FTX US |
|---|---|
| Start: 12/31/2020, 7:00:00 PM<br>End: 12/31/2021, 7:00:00 PM<br><br>**Revenue**<br>Future fill fees: $674,032,441.51<br>Spot fill fees: $146,031,877.64<br>LT creation fees: $2,431,339.95<br>LT redemption fees: $2,203,742.60<br>LT management fees: $32,952,343.90<br>Options fees: $682,838.87<br>Interest payments: $12,493,765.07<br>Unstake fees: $15,438,665.71<br>Loc interest: $10,620,738.94<br>Withdrawal fees: $10,655,651.65<br>OTC portal fees: $2,238,073.38<br>Spot margin fees: $22,731,583.04<br>TW options fees: $258,235.62<br>Blockfolio interest fees: $1,857,934.73<br>Staking fees: $56,801,035.38<br>Nft fees: $225,984.51<br>FTX Blockfolio fees: $3,618,748.61<br>FTX Blockfolio fees ext: $9,344,270.83<br>**Total revenue:** $1,004,619,271.94 | Start: 12/31/2020, 7:00:00 PM<br>End: 12/31/2021, 7:00:00 PM<br><br>**Revenue**<br>Future fill fees: $0.00<br>Spot fill fees: $32,386,868.33<br>LT creation fees: $0.00<br>LT redemption fees: $0.00<br>LT management fees: $0.00<br>Options fees: $0.00<br>Interest payments: $0.00<br>Unstake fees: $0.00<br>Loc interest: $0.00<br>Withdrawal fees: $719,720.99<br>OTC portal fees: $99,049.15<br>Spot margin fees: $6,496,364.10<br>TW options fees: $0.00<br>Blockfolio interest fees: $0.00<br>Staking fees: $0.00<br>Nft fees: $213,228.01<br>Blockfolio platform fees: $1,063,715.07<br>**Total revenue:** $40,978,945.65 |
| Does not include FTT Buy-and-burn. | |
| Market share as of 12/31/2021 = 10.5% | Market share as of 12/31/2021 = 3.3% |



GOVERNMENT EXHIBIT 294

22 Cr. 673 (LAK)

**YTD Data for 2022**

| FTX Intl | FTX US |
|---|---|
| Start: 12/31/2021, 7:00:00 PM<br>End: 3/19/2022, 8:00:00 PM<br><br>**Revenue**<br>Future fill fees: $140,663,954.68<br>Spot fill fees: $38,395,905.20<br>LT creation fees: $234,068.44<br>LT redemption fees: $182,727.62<br>LT management fees: $3,054,568.18<br>Options fees: $504.59<br>Interest payments: $1,417,494.38<br>Unstake fees: $2,076,828.41<br>Loc interest: $16,058,951.82<br>Withdrawal fees: $3,466,272.35<br>OTC portal fees: $415,591.74<br>Spot margin fees: $4,722,563.86<br>TW options fees: $20,968.25<br>Blockfolio interest fees: $1,378,547.87<br>Staking fees: $0.00<br>Nft fees: $3,803.70<br>FTX Blockfolio fees: $928,405.07<br>FTX Blockfolio fees ext: $1,393,572.82<br>**Total revenue:** $214,414,729.01 | Start: 12/31/2021, 7:00:00 PM<br>End: 3/19/2022, 8:00:00 PM<br><br>**Revenue**<br>Future fill fees: $0.00<br>Spot fill fees: $8,890,397.10<br>LT creation fees: $0.00<br>LT redemption fees: $0.00<br>LT management fees: $0.00<br>Options fees: $0.00<br>Interest payments: $0.00<br>Unstake fees: $0.00<br>Loc interest: $0.00<br>Withdrawal fees: $215,827.67<br>OTC portal fees: $5,702.98<br>Spot margin fees: $323,272.54<br>TW options fees: $0.00<br>Blockfolio interest fees: $0.00<br>Staking fees: $0.00<br>Nft fees: $233,867.31<br>Blockfolio platform fees: $1,284,786.50<br>**Total revenue:** $10,953,854.10 |
| Does not include FTT Buy-and-burn. | |
| Market share as of 03/20/2022 = 10.09% | Market share as of 03/20/2022 = 4.53% |



The updated FTX Stats can be [found here (until 03/20)](#).

{{date}} quinn@ftx.com

## Highlights

1. Regulatory and licenses:
   a. Our application to the CFTC for real-time 24x7 margin system for retail customers is live for public comments
   b. Since the last advisory board meeting we've received licenses for crypto spot and derivatives in Europe (EU), Switzerland, Dubai, Japan, Australia, Gibraltar, Bahamas. In addition, we have pending license applications / acquisitions for the UK, Canada, Singapore (Spot), Bahrain, Philippines and Indonesia.
   c. 30 MTL applications have been accepted. Also, a NY Trust application license was submitted recently
2. Launch of new product lines including:
   a. Gaming and associated partnerships
   b. Whitelabels partnerships
   c. Access
   d. Ventures


## Lowlights

1. The overall crypto volumes have come down substantially over Q1. Our market share has flattened because of two reasons:
   a. For the last 8 months, a majority of the company is focussed on building regulatory moats
   b. Rate limits and exchange throughput can be a huge unlock
      i. We just rolled out a 50% increase, expecting another 2-5x increase this year
   c. The benefits of being regulatory compliant (e.g. banking relationships, on/off ramps, ability to market) haven't come online as yet
      i. Banking relationships coming online over the next 3 months
      ii. US futures sometime in 2022
      iii. Absence of enforcement actions: the *only* major crypto exchange *anywhere* in the world without any enforcements, etc.
2. NFT volumes are quite small relative to our dominance in fungible tokens


## Asks

1. CFTC license application:
   a. Please provide comments to our CFTC license application
   b. Brief notes here: https://docsend.com/view/ta36fnu4rg49gk8q (password: FTXBAHAMAS)
   c. The deadline for the comments is **April 11, 2022.**
2. Crypto Bahamas - Please visit us for Crypto Bahamas. We will host the next meeting in-person (with virtual attendance for those that cannot attend)

3. Fundraising (Series D for FTX Trading and Series A for FTX US) - <u>See below</u>

## Product and recent launches

1. Continuation of a number of matching engine improvements to support the volume, increase reliability etc. We now have a little head room (~ 2 months) before this becomes a blocker
2. Large amount of developer capacity has been spent on regulatory approvals, and launch of FTX in Europe, Japan and Australia and integration of FTX US Derivatives to FTX US.
3. Large number of localized on/off-ramps and KYC / AML improvements including move to Stripe Identity
4. Support for whitelabel partners to bring them online. In the next few months, Ledger (hardware wallet), TradingView (trading charts software), DraftKings (sportsbetting) and Dave.com (neobank) might go online with crypto trading enabled by FTX
5. We are likely to launch Stocks in the US on the FTX App for internal testing in the next month. As we file state by state notices, we'll be able to launch over the next few months
6. Improved onboarding flow and telemetry for FTX App.  Huge improvement from six months ago; some upgrades still coming.

## FTX US

1. FTX US Derivatives and readiness for launch of derivatives in the US: sometime in 2022
2. Regulatory license applications including NY Trust license and MTLs (at 30 MTLs now)
3. Details about US derivatives:
   a. Direct to customer, including both retail and institutional
   b. Real-time margining
   c. Collateral posted directly with clearinghouse
   d. There is *some* precedent for some of this (e.g. ICE-NGX) but no US exchange has put these together before
   e. Would have prevented the LME/Nickel implosion
   f. Unlocks the US futures market for non-institutional participants

## Fund raising

1. We are likely to pursue another fund raise for FTX and FTX US. This is for a few reasons:
   a. Acquisitions:
      i. We expect consolidation in the crypto exchange market. In particular, local exchanges with large user bases are particularly attractive at this time.  We are in conversations with multiple large regional crypto exchanges.
      ii. In the last year, we have done roughly $1b of acquisitions, which have resulted in us getting: US futures license; European licensing; Japanese

{{date}}

licensing; an in-house video game; Australian licensing; in-house qualified custodian; blockchain/RPC server dev support; etc.  There is some more on the horizon: mostly licensing and user acquisition.

    b. Regulatory moats:

        i. FTX US Derivatives and a new real-time margin, direct to retail approach is likely to come online soon. This would be a huge regulatory moat and the captive opportunity is over 2x our current business.  We would likely be the only exchange (crypto or otherwise) authorized to directly offer crypto futures to all clients in the US.

        ii. We're the most regulated exchange with 17 licenses and licenses to serve over 50% of the world's GDP (large parts of the world currently don't have a licensing regime). These are long-term compounding moats and advantages with better payment rails and ability to market.

    c. More capacity for insurance fund for FTX US Derivatives.  This hasn't been requested yet but there is a nontrivial chance that the CFTC requests us to post up to $1b for the risk waterfall.  We posted $250m from a previous raise, and the CFTC was *very* happy; it probably sped up our futures application by 3-6 months and removed the remaining significant possibility of rejection.

## Others

1. Recent acquisitions:
   a. Liquid - Japanese crypto exchange
   b. Storybook Brawl - A small TCG game to understand NFTs for gaming
   c. [Confidential and hasn't closed] Aza Finance - FX OTC desk for on and off ramps in Africa, together with licensing
2. Endorsements and marketing:
   a. FTX Super bowl ad in case you missed it
   b. Considering soccer, music, and fashion right now
3. FIA in Boca Raton:
   a. The Futures Industry Association conference was held in Boca Raton, Florida where crypto was an important topic of conversation. Here is a JPM report on the FIA (h/t to Oliver from Standard Investments); "FTX dominated the dialogue with its proposal to offer a non-intermediated, direct to customer clearing model".

–

**Attendees:**
Alfred Lin (Sequoia)
Matt Huang (Paradigm)
Robert Sayle (Orlando Bravo)
Jan Koum (Newlands)
Michael Abramson (Newlands)
Prady Agarwal (Temasek)

Rick Prostko (OTPP)
Tom Loverro (IVP)
Rajeev Misra (SoftBank)
Neil Mehta (Greenoaks)
Nick Shalek (Ribbit)
Daniel Loeb (ThirdPoint)
Ravi Mhatre (LSVP)
Michael Kives (K5)
Bryan Baum (K5)
Nikhil Sachdev (Insight Partners)
Daniel Och (Willoughby)
Daegwon Chae (Bond Capital)
Oliver Weiner (40North)
Kyle Samani (Multicoin Capital)
Eileen Aptman (Belfer Management)
Dan Matuszewski (CMS Holdings)
Yoonkee Sull (ICONIQ)
Sam Bankman-Fried (FTX)
Brett Harrison (FTX US)
Zach Dexter (FTX US Derivatives)
Gary Wang (FTX)
Nishad Singh (FTX)
Amy Wu (FTX)
Dan Friedberg (FTX)
Ramnik Arora (FTX)