# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA
## MDL No. 3076
### CASE NO. 1:23-md-03076-KMM

**IN RE:**

**FTX Cryptocurrency Exchange Collapse MDL Litigation**

THIS DOCUMENT RELATES TO:

Multinational VC Defendants

*O'Keefe v. Sequoia Capital Operations, LLC,*
No. 1:23-cv-20700 (S.D. Fla.)

*O'Keefe v. Temasek Holdings (Private) Limited,*
No. 1:23-cv-23065 (S.D. Fla.)

*Chernyavsky v. Temasek Holdings (Private) Limited,*
No. 1:23-cv-22960 (S.D. Fla.)

*Cabo v. Temasek Holdings (Private) Limited,*
No. 1:23-cv-23212 (S.D. Fla.)

## OPPOSITION TO MULTINATIONAL VC DEFENDANTS'[1] MOTION TO DISMISS THE AMENDED ADMINISTRATIVE CLASS ACTION COMPLAINT (ECF NO. 783 OR "FAC")[2] FOR FAILURE TO STATE A CLAIM (MDL ECF NO. 818)

### ORAL ARGUMENT REQUESTED

---

[1] (1) Temasek Holdings (Private) Limited; Temasek International Private Limited; Temasek International (USA) LLC; Artz Fund Investments Private Limited; Blackiston Investments Ptd. Ltd ("Temasek").

(2) SoftBank Group Corp.; SB Group US, Inc.; SoftBank Investment Advisers (UK) Limited, and SoftBank Global Advisers Limited (SoftBank); and SoftBank II Tempest (DE) LLC // SVF II Tempest (DE) LLC.

(3) Sino Global Capital Limited; Sino Global Capital Holdings; Sino Global Capital Management; Liquid Value Offshore; Liquid Value GP Limited; and Liquid Value Fund GP Limited.

[2] ECF No. 783 is Plaintiffs' First Amended Complaint; Defendants erroneously call it the Second Amended Complaint. *See* Mot. at fn. 1.

## TABLE OF CONTENTS

I.     INTRODUCTION ...................................................................................................... 1

II.    RELEVANT FACTUAL BACKGROUND ................................................................ 2

    A.    Defendants infused SBF with hundreds of millions of dollars in exchange for ownership in FTX. ........................................................................................ 2

    B.    Defendants provided FTX with vital non-monetary assistance and developed close ties with SBF. .................................................................................................. 3

    C.    Defendants gained awareness of FTX's misconduct through extensive due diligence and monitoring of FTX. ...................................................................... 4

    D.    Plaintiffs were injured by Defendants' conduct .................................................. 8

III.    ARGUMENT ............................................................................................................. 8

    A.    Standard of Review. ........................................................................................... 8

    B.    Plaintiffs' Allegations Are Sufficiently Pled ....................................................... 9

        i.    Defendants' argument that Plaintiffs' claims are implausible is a veiled demand for a level of detail not required at the pleadings stage. ................ 9

        ii.    Shotgun pleadings are stricken to ensure parties know of the claims against them, which Defendants clearly do. ............................................ 10

    C.    Plaintiffs Sufficiently Pled That Defendants Aided and Abetted the Sale of Unregistered Securities (Counts 1 and 3)............................................................ 12

        i.    Plaintiffs have sufficiently pled their claims against Defendants for aiding and abetting FTX's sale of unregistered securities under both Florida and California law. .................................................................... 12

        ii.    Defendants provided "material assistance" to FTX, which sold unregistered securities in violation of California law. ............................ 13

        iii.    Defendants "personally participated or aided" FTX in the sale of unregistered securities in violation of Florida law. ................................ 14

        iv.    Defendants are partners and agents of FTX. ............................................ 15

        v.    Plaintiffs have pled the requisite intent. .................................................. 15

        vi.    Privity between Defendants and Plaintiffs is not required because they are in privity with FTX. ........................................................................ 16

        vii.    Defendants misstate the standard for Plaintiffs' unregistered broker-dealer claim for Count 3. ............................................................ 17

    D.    Plaintiffs Sufficiently Pled That Defendants Aided and Abetted Securities Fraud and (Counts 2 and 4). ....................................................................... 17

        i.    Defendants participated and materially assisted in securities fraud. ......... 19

       ii.     Plaintiffs allege scienter. ........................................................................20

E.     Plaintiffs Sufficiently Pled Control Person Liability for FTX's Primary
Violations Under California Law (Count 6). .......................................................20

F.     Market Manipulation Under California Law is Sufficiently Pled (Count 5).........21

G.     Plaintiffs Sufficiently Pled Defendants Engaged in a Conspiracy (Count 7).........21

H.     Plaintiffs Sufficiently Pled Defendants Aiding and Abetted the Common Law
Claims of Fraud, Fiduciary Breach, and Conversion (Count 8, 9, 10). ...............23

I.      Plaintiffs Sufficiently Pled Claims for Conversion and Aiding and Abetting
Conversion against the Sino Global Defendants (Counts 11 and 12)....................26

J.      Plaintiffs have Sufficiently Pled an Unjust Enrichment claim against the Sino
Global Defendants. ............................................................................................27

K.     Plaintiffs Sufficiently Pled Their Claims Under the California Unfair
Competition Law ("UCL") (Count 14). .............................................................27

       i.      Plaintiffs state a UCL claim under the "unlawful prong." ........................28

       ii.     Plaintiffs state claims under the "unfair" and "fraudulent" prongs...........29

L.      Plaintiffs Sufficiently Pled a False Advertising Law Claim (Count 15). ..............29

M.    Plaintiffs Sufficiently Pled Their Claim under Florida's Deceptive and Unfair
Trade Practices Act (Count 16)..........................................................................30

       i.      Plaintiffs sufficiently pled a claim under the FDUTPA............................31

N.     Plaintiffs Sufficiently Pled Negligent Misrepresentation.....................................32

O.     Plaintiffs Sufficiently Pled Intentional Misrepresentation and Fraudulent
Inducement. ......................................................................................................33

P.      Plaintiffs' Declaratory Judgment Claims Stand Because There is a Justiciable
Controversy.......................................................................................................35

Q.     Plaintiffs' Request for Punitive Damages Stand..................................................36

IV.    CONCLUSION .............................................................................................................37

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Acadia Partners, L.P. v. Tompkins*,
    759 So. 2d 732 (Fla. 5th Dist. Ct. App. 2000) ........................................................................ 23

*Affiliated Ute Citizens of Utah v. United States*,
    406 U.S. 128 (1972) .................................................................................................................. 29

*AREI II Cases*,
    216 Cal. App. 4th 1004 (2013) ........................................................................................... 19, 22

*Arnold v. McFall*,
    839 F. Supp. 2d 1281 (S.D. Fla. 2011) ....................................................................... 15, 18, 20

*Arthur Young & Co. v. Mariner Corp.*,
    630 So. 2d 1199 (Fla. Dist. Ct. App. 1994) ............................................................................ 15

*Baptist Hosp., Inc. v. Baker*,
    84 So. 3d 1200 (Fla. Dist. Ct. App. 2012) .............................................................................. 31

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ............................................................................................................. 9, 10

*Benson v. JPMorgan Chase Bank, N.A.*
    No. 09-5272, 2010 WL 1526394 (N.D. Cal. Apr. 15, 2010) .................................................. 28

*Blair v. Wachovia Mortg. Corp.*,
    No. 5:11-CV-566-OC-37TBS, 2012 WL 868878 (M.D. Fla. Mar. 14, 2012) ....................... 31

*Bowden v. City of Franklin, KY*
    13 F. App'x 266 (6th Cir.2001) ............................................................................................... 37

*Bowen v. Ziasun Techs., Inc.*,
    116 Cal. App. 4th 777 (2004) ...................................................................................... 28, 30, 31

*Butler v. Yusem*,
    44 So. 3d 102 (2010) ................................................................................................................ 33

*Cabrales v. Castle & Cooke Mortg., LLC*,
    No. 1:14-CV-01138-MCE, 2015 WL 3731552 (E.D. Cal. June 12, 2015) ............................ 28

*Chang v. JPMorgan Chase Bank, N.A.*,
    845 F.3d 1087 (11th Cir. 2017) ............................................................................................... 24

*In re Checkers Sec. Litig.*,
  858 F. Supp. 1168 (M.D. Fla. 1994) ............................................................... 11

*City of L.A. v. Lyons*,
  461 U.S. 95 (1983) ........................................................................................ 37

*City Pension Fund for Firefighters & Police Officers in City of Miami Beach v.*
  *Aracruz Cellulose S.A.*,
  41 F. Supp. 3d 1369 (S.D. Fla. 2011) ............................................................. 11

*Cohen v. Office Depot, Inc.*,
  184 F.3d 1292 (11th Cir.1999) ....................................................................... 37

*Commodity Futures Trading Comm'n v. Gibraltar Monetary Grp., Inc.*,
  No. 04-80132-CIV, 2004 WL 7334350 (S.D. Fla. July 23, 2004) ....................... 11

*Conley v. Gibson*,
  335 U.S. 41 (1957) .......................................................................................... 9

*Cordell Consultant, Inc. Money Purchase Plan & Tr. v. Abbott*,
  561 F. App'x. 882 (11th Cir. 2014) .................................................................. 24

*Cox v. Adm'r U.S. Steel & Carnegie*,
  17 F.3d 1386 (11th Cir.) ................................................................................ 11

*Davis v. Powertel, Inc.*,
  776 So. 2d 971 (Fla. Dist. Ct. App. 2000) ....................................................... 31

*Dillon v. Axxsys Int'l, Inc.*,
  385 F. Supp. 2d 1307 (M.D. Fla. 2005), aff'd, 185 F. App'x 823 (11th Cir. 2006) .............. 15

*Drummond Co., Inc. v. Conrad & Scherer, LLP*,
  885 F.3d 1324 (11th Cir. 2018) ...................................................................... 27

*Eidmann v. Walgreen Co.*,
  522 F. Supp. 3d 634 (N.D. Cal. 2021) ............................................................. 29

*Escalante v. Villanueva*,
  No. CV 22-2590-MWF, 2023 WL 2344208 (C.D. Cal. Feb. 16, 2023) ................. 21

*Fitzpatrick v. Gen. Mills, Inc.*,
  635 F.3d 1279 (11th Cir. 2011) ...................................................................... 31

*Flying Dutchman Park, Inc. v. City and Cnty. of San Francisco*,
  93 Cal. App. 4th 1129 (2001) ........................................................................ 36

*Freeman v. Sharpe Res. Corp.*,
  No. 6:12-CV-1584-ORL-22T, 2013 WL 2151723 (M.D. Fla. May 16, 2013) ............. 9, 22

*Freeney v. Bank of Am. Corp.*,
   No. CV 15-02376 MMM, 2015 WL 12535021 (C.D. Cal. Nov. 19, 2015) ..................... 21, 23

*Garcia v. Kashi Co.*,
   43 F. Supp. 3d (S.D. Fla. 2014) ..................................................................... 35

*Gilchrist Timber Co. v. ITT Rayonier, Inc.*,
   696 So. 2d 334 (Fla.1997) ............................................................................ 34

*Gilison v. Flagler Bank*,
   303 So. 3d 999 (Fla. Dist. Ct. App. 2020) ....................................................... 24

*Glynn v. Basil St. Partners, LLC*,
   No. 2:09-CV-585-FtM-36SPC, 2010 WL 11623025 (M.D. Fla. Sept. 21,
   2010) ...................................................................................................... 31

*Haas v. Travelex Ins. Servs. Inc.*,
   555 F. Supp. 3d 970 (C.D. Cal. 2021) ............................................................ 28

*Hadley v. Kellogg Sales Co.*,
   243 F. Supp. 3d 1074 (N.D. Cal. 2017) .......................................................... 28

*Hellum v. Breyer*,
   194 Cal. App. 4th 1300 (2011) ..................................................................... 21

*In re Initial Pub. Offering Sec. Litig.*,
   241 F. Supp. 2d 281 (S.D.N.Y. 2003) ............................................................ 10

*Intel Corp. Inv. Pol'y Comm. v. Sulyma*,
   140 S. Ct. 768, 206 L. Ed. 2d 103 (2020) ....................................................... 34

*J.P. Morgan Sec., LLC v. Geveran Invs. Ltd.*,
   224 So. 3d 316 (Fla. Dist. Ct. App. 2017) ....................................................... 15

*Jackson v. Fischer*,
   931 F. Supp. 2d 1049 (N.D. Cal. 2013) .......................................................... 20

*Janis v. Nelson*,
   No. CR. 09-5019-KES, 2009 WL 4505935 (D.S.D. Nov. 24, 2009) ......................... 37

*Johnson v. Davis*,
   480 So.2d 625 (Fla.1985) ............................................................................ 33

*Kainos Lab'ys, Inc. v. Beacon Diagnostics, Inc.*,
   No. C-97-4618 MHP, 1998 WL 2016634 (N.D. Cal. Sept. 14, 1998) ....................... 30

*Kelly v. State, Dep't of Ins.*,
   597 So. 2d 900 (Fla. Dist. Ct. App. 1992) ....................................................... 26

*Kerruish v. Essex Holdings, Inc.*,
   No. 16-60877-CIV, 2017 WL 10457076 (S.D. Fla. Aug. 9, 2017) ......................................34

*Lesti v. Wells Fargo Bank, N.A.*,
   960 F. Supp. 2d 1311 (M.D. Fla. 2013) ...............................................................................23

*Livingston v. H.I. Fam. Suites, Inc.*,
   No. 6:05-CV-860-ORL19KRS, 2005 WL 2077315 (M.D. Fla. Aug. 29, 2005)....................9

*Logan v. Morgan, Lewis & Bockius LLP*,
   350 So. 3d 404 (Fla. Dist. Ct. App. 2022)............................................................................16

*Lozano v. AT & T Wireless Servs., Inc.*,
   504 F.3d 718 (9th Cir. 2007) ................................................................................................28

*Maison v. Ford Motor Co.*,
   No. 1:04-CV-041-SPM, 2005 WL 1684159 (N.D. Fla., July 7, 2005)....................................9

*Mendocino Env't Ctr. v. Mendocino Cnty.*,
   192 F.3d 1283 (9th Cir. 1999) ..............................................................................................22

*Miller Fam. Tr. v. Nielson*,
   No. 2:12-CV-00913-SVW-SH, 2013 WL 12474637 (C.D. Cal. Mar. 11, 2013)..................28

*Moss v. Kroner*,
   197 Cal. App. 4th 860 (2011) ......................................................................................*passim*

*MSP Recovery Claims, Series LLC v. Metro. Gen. Ins. Co.*,
   40 F.4th 1295 (11th Cir. 2022) ..............................................................................................9

*N.R. by Ragan v. Sch. Bd. of Okaloosa Cnty., Fla.*,
   418 F. Supp. 3d 957 (N.D. Fla. 2019) ..................................................................................21

*Nagrampa v. MailCoups Inc.*,
   No. C03-00208 MJJ, 2007 WL 2221028 (N.D. Cal. July 30, 2007) .....................................29

*Neilson v. Union Bank of Cal., N.A.*,
   290 F. Supp. 2d. 1101 (C.D. Cal. Oct. 20, 2003)...........................................................24, 26

*People v. Salas*,
   37 Cal.4th 967 (2006).............................................................................................................16

*People v. Simon*,
   9 Cal. 4th 493, 886 P.2d 1271 (1995) ...................................................................................19

*People's Tr. Ins. Co. v. Alonzo-Pombo*,
   307 So.3d 840 (Fla. Dist. Ct. App. 2020)..............................................................................35

*People's Tr. Ins. Co. v. Franco*,
  305 So. 3d 579 (Fla. Dist. Ct. App. 2020) ...........................................................................35

*Peters v. Amoco Oil Co.*,
  57 F.Supp.2d 1268 (M.D.Ala.1999)...................................................................................22

*Pilliod v. Monsanto Co.*,
  67 Cal. App. 5th 591 (2021) .............................................................................................37

*Pirozzi v. Apple, Inc.*,
  966 F. Supp. 2d 909 (N.D. Cal. 2013)...............................................................................29

*Primerica Fin. Servs., Inc. v. Mitchell*,
  48 F. Supp. 2d 1363 (S.D. Fla. 1999)................................................................................22

*Quality Foods de Centro Am., S.A. v. Latin Am. Agribusiness Dev. Corp., S.A.*,
  711 F.2d 989 (11th Cir.1983) ...........................................................................................22

*Randall v. Ditech Fin., LLC*,
  23 Cal. App. 5th 804 (2018) .............................................................................................28

*Rhea v. Dist. Bd. of Trs. of Santa Fe Coll.*,
  109 So. 3d 851 (Fla. Dist. Ct. App. 2013) .........................................................................35

*Ronpak, Inc. v. Elecs. for Imaging, Inc.*,
  No. 14-CV-04058-JST, 2015 WL 179560 (N.D. Cal. Jan. 14, 2015)............................32, 35

*Rousseff v. E.F. Hutton Co.*,
  867 F.2d 1281 (11th Cir. 1989)........................................................................................15

*Rusty115 Corp v. Bank of Am., N.A.*,
  No. 22-CV-22541-BER, 2023 WL 6064518 (S.D. Fla. Sept. 18, 2023)...............................34

*Saunders v. Superior Ct.*,
  27 Cal. App. 4th 832 (1994) .............................................................................................23

*Schaffer Fam. Invs., LLC v. Sonnier*,
  120 F. Supp. 3d 1028 (C.D. Cal. 2015)..............................................................................14

*Scheck Invs., L.P. v. Kensington Mgmt., Inc.*,
  No. 04-21160-CIV, 2009 WL 10668565 (S.D. Fla. June 17, 2009)...............................14, 15

*Sierra Equity Group, Inc. v. White Oak Equity Partners, LLC*,
  650 F.Supp. 2d 1213 (S.D. Fla. 2009)...............................................................................36

*Smith v. Network Equip. Techs., Inc.*,
  No. C-90-1138 DLJ, 1990 WL 263846 (N.D. Cal. Oct.19, 1990)........................................24

*Souran v. Travelers Ins. Co.*,
    982 F.2d 1497 (11th Cir. 1993)...........................................................................................32

*Specialty Marine & Indus. Supplies, Inc. v. Venus*,
    66 So. 3d 306 (Fla. Dist. Ct. App. 2011).............................................................................33

*State Office of Attorney Gen., Dep't of Legal Affairs v. Commerce Commercial
    Leasing, LLC*,
    946 So. 2d 1253 (Fla. Dist. Ct. App. 2007) ........................................................................31

*Stewart Agency, Inc. v. Arrigo Enters., Inc.*,
    266 So. 3d 207 (Fla. Dist. Ct. App. 2019) ..........................................................................31

*Stonecreek--AAA, LLC v. Wells Fargo Bank N.A.*,
    No. 1:12-CV-23850-MGC, 2013 WL 5416970 (S.D. Fla. Sept. 26, 2013) ..........................34

*Stowell v. Ted S. Finkel Inv. Servs., Inc.*
    489 F. Supp. 1209 (S.D. Fla. 1980).....................................................................................37

*Sud v. Costco Wholesale Corp.*,
    229 F. Supp. 3d 1075 (N.D. Cal. 2017), aff'd, 731 F. App'x 719 (9th Cir.
    2018) ....................................................................................................................................30

*Tellabs, Inc. v. Makor Issues and Rights, Ltd*,
    551 U.S. 308 (2007) .............................................................................................................25

*Turk v. Pershing LLC*,
    No. 3:09-CV-2199-N, 2014 WL 12572906 (N.D. Tex. Dec. 8, 2014) ..................................20

*United Motors Int'l, Inc. v. Hartwick*,
    No. CV 17-00243 BRO (EX), 2017 WL 888304 (C.D. Cal. Mar. 6, 2017)....................22, 23

*United States v. Baxter Int'l, Inc.*,
    345 F.3d 866 (11th Cir. 2003) ..........................................................................................9, 22

*Valderrama v. Rousseau*,
    No. 11-CIV-24637, 2012 WL 12925174 (S.D. Fla. Sept. 18, 2012) ....................................22

*Vechten v. Elenson*,
    No. 12-80668-CIV, 2013 WL 12080759 (S.D. Fla. Nov. 12, 2013) ....................................27

*Viterbi v. Wasserman*,
    191 Cal. App. 4th 927 (2011) ..............................................................................................16

*Weiland v. Palm Beach Cnty. Sheriff's Off.*,
    792 F.3d 1313 (11th Cir. 2015).............................................................................................10

*In re Westwood Plaza N.*,
No. CV 13-00318-BRO, 2016 WL 11697903 (C.D. Cal. Sept. 26, 2016) ............................26

*Wilson & Wilson v. City Council of Redwood City*,
191 Cal. App. 4th 1559 (2011) ..............................................................................................35

*Woodward v. Metro Bank of Dallas*,
522 F.2d 84 (5th Cir.1975) ....................................................................................................26

*X Corp. v. Y Person*,
622 So. 2d 1098 (Fla. Dist. Ct. App. 1993) ..........................................................................35

**Statutes**

Cal. Bus. & Prof. Code § 17200 ...............................................................................................28

Cal. Bus. & Prof. Code §17500 ................................................................................................29

Cal. Corp. Code § 25110 ............................................................................................... 13, 16, 17

Cal. Corp. Code § 25400 ...........................................................................................................21

Cal. Corp. Code § 25503 ...........................................................................................................13

Cal. Corp. Code § 25504 .....................................................................................................*passim*

California's False Advertising Law ...................................................................................... 28, 29

California Unfair Competition Law ......................................................................................*passim*

Fla. Stat. § 501 ..........................................................................................................................31

Fla. Stat. § 517 ....................................................................................................................*passim*

Florida Securities and Investor Protection Act Section 517.07 .................................................14

**Other Authorities**

17 C.F.R. § 240.10b-5 ...............................................................................................................18

Fed. R. Civ. P. 8 ................................................................................................................... 2, 37

Fed. R. Civ. P. 9 ................................................................................................... 2, 9, 22, 24

Fed. R. Civ. P. 12 ......................................................................................................... 8, 9, 10, 37

*Financial Times* ....................................................................................................... 3, 4, 7, 8

L.R. 7.1(b) .................................................................................................................................38

## I.    <u>INTRODUCTION</u>

FTX, through its CEO Sam Bankman-Fried and others, preyed on Plaintiffs and class members by bringing the FTX exchange and the unregistered securities by which it operated to market in the United States based on numerous false assurances, including that FTX was the safest place to trade crypto.

Plaintiffs did not, could not, and frankly would never have known but for the collapse, that SBF was plundering their accounts from the start. They did not know FTX lacked asset management, governance, and cybersecurity controls. They did not know FTX contradicted its own terms of service and was commingling depositor funds. They did not know SBF structured his companies as one common enterprise, such that giant sums of assets were routinely shuffled around then sloppily accounted for in a bad attempt to disguise laundering. They certainly did not know the financial records were homespun, that key corporate documents were incomplete or missing, or that FTX had no CFO.

Who *did* have the sophistication, industry expertise, close access, and ongoing partnerships with FTX to know the above? Indeed, whose business model relies on obtaining insider knowledge to evaluate a company's legitimacy? Defendants. Tellingly, Defendants do not challenge the underlying corporate failures or fraudulent conduct alleged. They argue instead that Plaintiffs insufficiently pled their knowledge and material assistance to FTX in perpetrating its scheme. But Plaintiffs have alleged Defendants aided and abetted the fraud by: (1) injecting necessary capital into the scheme; (2) publicly generating for FTX the appearance of credibility and trustworthiness, while  making material misrepresentations and omissions about the thorough due diligence they touted as performing; (3) actively lobbying on behalf of FTX; (4) advising FTX on regulatory, legal, and marketing matters intended to bolster its growth and bring the FTT tokens by which it operated to market; (5) concealing the fraud when the company began to falter. FTX could not have achieved the fraud at the scale that it did without Defendants' help.

Defendants would have the Court believe they, like the everyday crypto traders who lost billions in crypto and cash from their FTX accounts, were conned, too. But fraud on this scale could not be accomplished alone. It required the assent and assistance of actors like Defendants to leverage their own legitimacy and lend their own names and knowledge, while focused solely on enriching themselves in the process.

Plaintiffs' detailed allegations easily meet the requirements of Federal Rules of Civil Procedure 8 and 9(b), and Defendants' motion should be denied in its entirety. Plaintiffs' complaint sets forth the who, what, where, when and why of the scheme. Defendants are asking for a level of factual inquiry simply inappropriate for the pleading stage, particularly where information about the scheme is within Defendants' exclusive control.

## II.   RELEVANT FACTUAL BACKGROUND

### A.   Defendants infused SBF with hundreds of millions of dollars in exchange for ownership in FTX.

Defendants injected nearly $400 million in FTX, funding that was critical to the perpetuation of the FTX fraudulent scheme. First, on July 20, 2021, each Defendant participated in FTX Trading's Series-B funding, which raised almost $1 billion for FTX Trading. MDL ECF No. 783, ¶ 304.[3] Shortly thereafter, on October 21, 2021, Temasek and SoftBank, together with other investors, put up another $420.69 million in FTX Trading's Series B-1 funding. ¶ 305. Although FTX claimed this Series B-1 funding would help it "make strategic investments designed to grow the business and expand [its] regulatory coverage," SBF quickly diverted $300 million in stock—equivalent to *seventy-five percent* of the Series B-1 funds raised—*to himself*. ¶ 307. Nonetheless, and despite the public contradiction of purported use of the funds, Defendants proceeded to invest even more money. On January 31, 2022, FTX Trading announced it had raised $400 million in Series C Funding from investors, including Temasek and SoftBank, which FTX touted was "demonstrating [their] belief in the Company's vision and their continued support of FTX's explosive growth." ¶ 308. Just days before, on January 26, 2022, FTX US also closed on its $400 million Series A fundraising, securing yet more money from certain Defendants, including Temasek and SoftBank. ¶ 309.

All told, Temasek invested $275 million; SoftBank invested $100 million; and Sino Global maintains some anonymity but reported an amount in the "mid-seven" figures. ¶ 339. Each Defendant entered into one or more agreements to inject that start-up capital in exchange for their ownership interests and involvement summarized herein. Defendants' investments not only provided FTX with startup capital that it needed, but also the veneer of legitimacy: FTX didn't just need

---

[3] Unless otherwise noted, all citations hereafter are to MDL ECF No. 783 (Plaintiffs' FAC).

money, "it needed that money from credible sources so it could continue to distinguish itself from the bottom-feeders who came to crypto to fleece the suckers." ¶ 340.

### B. Defendants provided FTX with vital non-monetary assistance and developed close ties with SBF.

Defendants assisted FTX in other diverse, critical ways. *First,* each Defendant promoted the validity of FTX and the integrity of SBF. For example, Temasek tweeted that it was "privileged to extend partnership with FTX and [LedgerX d/b/a] FTX US Derivatives" and that it "[l]ook[ed] forward to supporting continued growth of the business!" ¶ 342. Similarly, upon closing FTX Trading's Series B funding, Sino Global managing partner Matthew Graham tweeted "Today, SBF is no longer merely a titan of crypto. He's now a titan of business, and he and our good friends at FTX are just getting started." ¶ 341. Softbank, too, lent its endorsement in furtherance of FTX's growth. *See, e.g.*, ¶ 349. Temasek and Sino Global sponsored Crypto Bahamas, a "four-day flex of FTX's expanding empire" fueling the normalization of FTX's cryptocurrency exchange, and presented on panels at the event in support of the expansion and legitimization of cryptocurrency. ¶¶ 359-61, 366.

Endorsements from Defendants carry monumental weight, as they were considered "powerful and well-known" by members of the public. ¶ 343. Sino Global, for its part, recognized in its own investor presentations that one of its "Key Advantages" is its "Reputation among crypto users and other investors" who "view [Sino Global] as [a] long-term, high-trust, community member." ¶ 347. The *Financial Times* described Temasek as one of FTX's "blue chip investors" who "prioritise[s] positioning FTX as the world's most transparent and compliant cryptocurrency exchange" and whose investment "shows the increasing appetite from traditional investors to back crypto companies despite intensifying regulatory scrutiny into the sector." ¶ 344. Likewise, Christy Goldsmith Romero, former Commissioner of the CFTC, observed that the venture capital firms that invested in FTX (e.g., Defendants, *see* Section II.C below) served as a "credibility and trust enhancer" to FTX and the "multi-dimensional public relations campaign was meant to build the public's trust in FTX." ¶ 350. Indeed, SBF repeatedly underscored the tremendous value that Defendants brought to FTX. He explained that "[t]he primary goal of the [Series B funding] raise was to [find] strategic allies who can help FTX grow its brand," and remarked thereafter that because of the fundraising he had "formed a hugely valuable set of partners." ¶ 304.

In addition to reputation laundering, Softbank provided lobbying and other hands-on assistance to FTX, including by submitting a letter in support of FTX Derivatives' application to

the CFTC for a license to operate as a derivatives clearinghouse. Under the proposal, FTX Derivatives would trade directly with investors using algorithms rather than traditional financial intermediaries such as brokers. ¶ 363. Brett Harrison, President of FTX.US, acknowledged that this application was "unprecedented, not just for crypto derivatives, but for traditional exchange-traded derivatives more generally," and the proposal was not without controversy, with opponents asserting that the application would "come at the expense of risk management best practices, market integrity and ultimately, financial stability." *Id*. Still, SoftBank chose to "strongly support[] FTX's application" and "urg[ed] the Commission to grant its approval" by submitting a formal letter touting the safety of the FTX exchange and representing that "[r]isk mitigation in the digital asset marketplace is a key pillar of the FTX proposal" and that "FTX will fund a guaranty fund of $250 million" as "an additional layer of protection." *Id*.

### C. Defendants gained awareness of FTX's misconduct through extensive due diligence and monitoring of FTX.

Defendants had knowledge of FTX's misconduct because, prior to investing, each Defendant undertook a diligence process to evaluate FTX's offerings and understand its business model and operations. ¶ 315. As fiduciaries to their own investors, Defendants were obligated to conduct significant due diligence before investing hundreds of millions of dollars into FTX. Such diligence typically includes a review of FTX's financial statements and projections, identification of basic corporate governance structures including formation documents and information about directors, officers and internal controls, an examination of the business model vis-a-vis financial records, and information concerning related party transactions, intercompany agreements, loans, debt instruments and other credit agreements. ¶ 315.

Each Defendant confirmed that it thoroughly vetted FTX before investing, as it was required to do. ¶¶ 292-94, 316-322. Temasek announced that it conducted multiple rounds of due diligence spanning eight months, including "significant regulatory and licensing due diligence on the business model of FTX, particularly on financial regulations, licensing, anti-money laundering (AML) / Know Your Customer (KYC) and sanctions across multiple jurisdictions[,] a review of [FTX's] audited financial statements and a cybersecurity review." ¶ 316. Temasek also specifically admitted to enquiring about "the relationship, preferential treatment, and separation between Alameda and FTX" through multiple fac-to-face interviews with SBF and other FTX personnel. ¶ 317. "Post investment, Temasek continued to engage [FTX] management

4

on business strategy and monitor performance." ¶ 318 (quoting Temasek's website). 

¶ 281.

SoftBank recognized that the cryptocurrency industry is fraught with risk and amenable to manipulation and for that reason, prior to FTX, the company "stayed away from coins." ¶ 320. SoftBank Group reported to its investors that it employed its "dedicated review department" to conduct due diligence on FTX's "business, technology, business model, market size, business plan, competitive environment, financial condition, legal compliance, etc." prior to making its reported $100 million dollar investment. ¶¶ 282, 319. Presumably, SoftBank conducted a particularly heightened diligence on FTX given its public statements about typically *not* investing in cryptocurrency because it is a risky, easily manipulable industry. ¶ 320.

Temasek and SoftBank gained additional knowledge of FTX's operations and finances by holding four seats on its Advisory Board, which met quarterly and held unique inside information about FTX. ¶¶ 357-59, 362. Two of Temasek's most senior executives, Pradyumna Agrawal and Antony Lewis, served on FTX's advisory board, as did two of SoftBank's—Rajeev Misra, CEO of both SoftBank Investment Advisers and SoftBank Global Advisers, and Tom Cheung, a San Francisco-based Partner of SoftBank Investment Advisers. ¶¶ 357-59, 362.

Sino Global, in the words of its managing partner Matthew Graham, did "a hell of a lot of due diligence" and then embarked on a particularly "deep relationship" with FTX as partners in a joint venture capital fund ("Liquid Value Fund"), as further detailed herein. ¶¶ 321, 367. Further, before bringing on the FTX Group as its co-general partner and anchor investor of the investment fund Liquid Value Fund, Sino Global undertook additional due diligence reviews of SBF, FTX, and Alameda. ¶¶ 322-23. Sino Global gladly received a $60 million investment

from Alameda and an undisclosed amount from FTX to start the $200 million Liquid Value Fund that traded in and propped up the very crypto tokens that ultimately brought down FTX. ¶ 293.

It is reasonable to infer that Defendants gained awareness of FTX's misrepresentations, fiduciary breach, and conversion from this diligence. To be sure, FTX's presentations to its equity investors (e.g., Defendants) highlighted financials statements in which some of the same assets appeared simultaneously on the balance sheets of FTX and … Alameda[,] despite claims by FTX that Alameda operated independently. ¶ 325. Moreover, FTX's audited financials, which Temasek claims to have reviewed and which would have been standard for Softbank and Sino Global to review, showed that neither FTX Trading nor FTX US paid federal income tax, although they "appeared to be profitable," and further documented a "number of complex, roundtrip and utterly confounding related-party transactions … so numerous that it [was reportedly] difficult to know where to begin to analyze them." ¶ 332. FTX's related party transactions included $300 million to SBF in October 2021 in exchange for shares he owned in the company; another $1 billion "loan" to SBF, a $543 billion "loan" to FTX Insider Nishad Singh; and a $55 million "loan" to FTX Insider Ryan Salame. ¶¶ 307, 155. And those audited financials showed that neither FTX Trading nor FTX US had adequate internal controls, as neither auditor would provide an opinion that such controls were in place. ¶ 330.

At the very least, from the foregoing investor disclosures alone, Defendants saw that FTX was hemorrhaging FTX customer money to Alameda, SBF, and other FTX insiders and that FTX had no internal controls in place, contrary to FTX's representations *inter alia* that FTX was "the safest and easiest way to buy and sell crypto;" that its "user funds and safety come first; " that customers' assets, including both fiat and digital assets including bitcoin and ether, were held in 'custody' by FTX and segregated from FTX's own assets (i.e., that "[a]ll cryptocurrency or dollars (or other supported currencies) … held in [a customer's] account are held by FTX.US for [the customer's] benefit" and that FTX Trading "does not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading"); and that Alameda and FTX were "wholly separate entitit[ies] . . . at arm's length," and, despite their overlapping ownership by SBF, the companies were kept "separate in terms of day-to-day operations" by way of "a Chinese wall . . . to ensure

that [Alameda wouldn't get] any sort of special treatment from FTX." ¶¶ 80, 167, 334, 338.[4] The FTX terms of service clearly contradicted its actual practices. ¶ 334. Defendants were motivated to assist FTX by the prospect of windfall profits.

Venture capitalists, like Defendants, do not make long-term investments; "[v]enture money is not long-term money. The idea is to invest in a company's balance sheet and infrastructure *until it reaches a sufficient size and credibility* so that it can be sold to a corporation or [on the market through an initial public offering ("IPO")]. In essence, the venture capitalist buys a stake in an entrepreneur's idea, nurtures it for a short period of time, and then exits with the help of an investment banker. ¶ 371. Put simply, Defendants stood to profit enormously from FTX's public or private sale, as long as Defendants could help keep the fraud afloat until FTX went on the selling block (and leave the next round of investors holding the bag).

In fact, in closing FTX Trading's Series B funding, SBF announced that FTX was "trying to get [itself] in a position where we could go public relatively quickly if we wanted to" and, by January 2022, an IPO or private sale seemed increasingly imminent. ¶¶ 371-72. FTX Trading's valuation reached $32 billion—one of the largest valuations in recent history, greater than the market cap of both Nasdaq and Twitter—while FTX US's valuation topped $8 billion. The Defendants' relentless efforts to promote the FTX exchange as reliable and trustworthy predominantly drove these unprecedented valuations, all with an eye on maximizing the returns on the Defendants' respective investments. ¶ 372. In announcing these valuations, SBF stated that he and others at FTX "look forward to working alongside our investors [i.e., the Defendants] to achieve our mission and continue our tremendous growth throughout 2022 and beyond." *Id*.

A few months later, however, cryptocurrencies entered a period of prolonged pricing declines, now known as the "Crypto Winter," and SBF embarked on a spending spree, buying up

---

[4] The speed with which others who spent far less time evaluating FTX's non-public records identified FTX's underlying misconduct provides further circumstantial evidence of Defendants' knowledge of same. Multiple other venture capitalists rejected investing in FTX following minimal diligence. In a story following the collapse, the *Financial Times* quoted an anonymous executive at a "top investor" in FTX explaining that he advised his firm against the investment after the firm's initial diligence and "wouldn't have touched" SBF after phone calls, but that the firm invested anyway. ¶ 337. Venture capital firm Social Capital similarly determined SBF didn't "make much sense" after one Zoom meeting, and prepared recommendations FTX could undertake if investment talks were to proceed—i.e., forming a board, creating dual-class stock, and providing investors with warranties around related party transactions—to which an FTX employee responded with expletives. ¶ 324. Venture capitalist Alex Pack, who conducted a fraction of the due diligence that Temasek touted conducting (one month vs. eight), likewise declined to invest in FTX after determining that "Alameda and FTX were tied at the hip." ¶ 326.

crypto companies to keep the industry afloat (and his house of cards, standing). ¶ 374. The collapse of FTX—then the second-largest cryptocurrency exchange on the market—could potentially result in a total crash of the cryptocurrency market. Because Defendants had stakes not only in FTX, but in crypto currencies and companies throughout the industry, and Defendants' interest in keeping SBF's fraud concealed had broadened.[5] ¶ 375. Defendants continued to promote FTX as stable and fostered the narrative that SBF was the "savior" of crypto. ¶ 375.

By mid-summer 2022, SBF had burned through the assets accessible to FTX (including Class Member funds) and was in need of an immediate capital injection of $1 billion. ¶ 377. Defendants declined to invest again yet made no mention of FTX's flatlining to the public. ¶ 377. So SBF traveled to the Middle East in a desperate effort to get his hands on more cash, a fact not known to the public at the time, as FTX's public image fostered by Defendants held tight. *Id.* In fact, throughout the summer of 2022, with FTX spiraling into a liquidity crisis and the crypto industry faltering writ large, the Defendants disclosed none of what they had gleaned from their diligence of and assistance to FTX. ¶ 378. Defendants conspired instead with FTX to keep Class Member funds flowing in and the fraud hidden because, for as long as Defendants could lure users to the FTX exchanges, their investments in FTX would continue to skyrocket in value, and their payout come IPO or private sale, would continue to grow. *Id.*

### D. Plaintiffs were injured by Defendants' conduct.

Plaintiffs have alleged a scheme through which all Defendants in this MDL action are responsible, by way of their respective roles in pushing the FTX fraud to the unprecedented limits that it reached, for the damages Plaintiffs have suffered. This includes specific allegations that Multinational VC Defendants caused Plaintiffs injury (¶¶ 2-6), for which there are common law and statutory damages available. *See e.g.,* ¶¶ 414, 424, 433, 444, 454, 468.

### III.   <u>ARGUMENT</u>

### A. Standard of Review.

A motion under Rule 12(b)(6) merely tests the legal sufficiency of a complaint, requires a court to construe the complaint liberally, assume all facts as true, and draw all reasonable

---

[5] For example, Sino Global held a portfolio of digital tokens totaling in excess of $129 million, many of which were directly associated with SBF or FTX, including, for example, Solana's native SOL tokens, in addition to serum (SRM), maps (MAPS), oxygen (OXY) and jet protocol (JET). The collapse of FTX led to price decreases of 80% or more for each of these tokens.

inferences in favor of plaintiff. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556–57 (2007). In deciding a motion to dismiss, the court is required to review the complaint in the light most favorable to plaintiff. *MSP Recovery Claims, Series LLC v. Metro. Gen. Ins. Co*., 40 F.4th 1295, 1301–02 (11th Cir. 2022). A 12(b)(6) motion should be granted only if it appears beyond a doubt that the plaintiff could not prove any set of facts in support of its claim which would entitle it to relief. *Conley v. Gibson*, 335 U.S. 41, 48 (1957) (emphasis added); see also Fed. R. Civ. P. 12(b)(6); *Twombly*, 550 U.S. at 570.

### B.  Plaintiffs' Allegations Are Sufficiently Pled.

#### i.   Defendants' argument that Plaintiffs' claims are implausible is a veiled demand for a level of detail not required at the pleadings stage.

Plaintiffs' claims are plausible because the facts pled allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Twombly*, 550 U.S. at 556.

In cases including allegations of fraud, Rule 9(b) of the Federal Rules of Civil Procedure requires that the allegations of fraud also be stated with particularity. Fed. R. Civ. P. 9(b). *Absolute* particularity is not required, particularly when some matters are beyond the knowledge of the pleader and can only be developed through discovery. *See Freeman v. Sharpe Res. Corp*., No. 6:12-CV-1584-ORL-22T, 2013 WL 2151723, at *10 (M.D. Fla. May 16, 2013); *Livingston v. H.I. Fam. Suites, Inc.*, No. 6:05-CV-860-ORL19KRS, 2005 WL 2077315, at *4 (M.D. Fla. Aug. 29, 2005); *Maison v. Ford Motor Co*., No. 1:04-CV-041-SPM, 2005 WL 1684159, at *2 (N.D. Fla., July 7, 2005). Consumer plaintiffs in fraud actions cannot be assumed to have the same knowledge as an insider to the fraud, especially when information was concealed. *Id*. Thus, even under the heightened pleading standard of Rule 9(b), allegations about the *nature* of a conspiracy are sufficient where information about the extent of the alleged conspiracy is within defendants' exclusive control. *United States v. Baxter Int'l, Inc.*, 345 F.3d 866, 881–82 (11th Cir. 2003) (internal citations omitted). A plaintiff need only "to detail the relevant aspects of the underlying fraud ... to explain the factual basis for concluding that defendants were aware of the fraud; and, to explain the factual basis for determining that they substantially assisted in its commission." *Id*.

Plaintiffs have clearly met this standard. They have pled, and with the requisite particularity where applicable, each element of each cause of action with detailed facts, which must be taken as true, in support of those allegations. Defendants are advocating for a reading of Rule 9(b) that would raise that pleading standard to a level akin to that at motion for summary judgment or at

9

trial, such that Plaintiffs somehow should prove all issues before discovery has even begun or engage in factual disputes about materiality and causation of the allegations stated.

Further, Defendants repeatedly state that the Complaint lacks detail, which is not only untrue but is no ground for dismissal under Rule 12(b)(6). *See In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 333 (S.D.N.Y. 2003); *see also Twombly*, 550 U.S. at 555 (a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations). If Defendants truly believed the pleadings are unclear, they should have moved for a more definite statement under Rule 12(e) and requested more detail. They did not. As the complaint is sufficiently clear and puts Defendants on notice of the allegations against them regarding the nature of the conspiracy; their illegal sale of unregistered securities and aiding and abetting of securities fraud; their aiding and abetting of fraud, fiduciary breach, and conversion; their material misrepresentations to the public; and their other statutory violations of unfair competition and deceptive practices laws, any argument to the contrary should be disregarded.

### ii. Shotgun pleadings are stricken to ensure parties know of the claims against them, which Defendants clearly do.

Defendants' claim that Plaintiffs' complaint is a shotgun pleading falls flat in a case of this breadth and magnitude. As described by the Eleventh Circuit, shotgun pleadings are those "calculated to confuse the 'enemy,' and the court, so that theories for relief not provided by law and which can prejudice an opponent's case, especially before the jury, can be masked . . . ." *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1320 (11th Cir. 2015) (*quoting T.D.S. Inc. v. Shelby Mut. Ins. Co.*, 760 F.2d 1520, 1544, n.14 (11th Cir. 1985)). The purpose of prohibiting shotgun pleading is to ensure defendants are adequately on notice of the claims against them. Unlike the cases cited, Plaintiffs' complaint asserts a litany of facts specific to each Defendant concerning, inter alia, their due diligence of FTX; relationships with FTX; amounts invested; timing of investments; lobbying efforts where applicable; advisory board membership where applicable; aiding the scheme through trading in tokens with cash and tokens provided by Alameda; and omissions of material fact when promoting FTX. See *id.* at 1324 (Complaint was not a shotgun pleading because "this is not a situation where a failure to more precisely parcel out and identify the facts relevant to each claim materially increased the burden of understanding the factual allegations underlying each count.").

Because "no specific connection between the fraudulent representations and particular Defendants is necessary in cases of corporate fraud brought against insiders and affiliates where the false information is disseminated in group-published documents," *In re Checkers Sec. Litig*., 858 F. Supp. 1168, 1178 (M.D. Fla. 1994), Defendants' argument that Plaintiffs have failed to break out which entity did what, when and to whom is without merit. MTD at 12-13. Plaintiffs allege which subsidiary entities were involved in the FTX investments, and which contracted with Alameda entities to prop up FTX. Under the group pleading doctrine, the identification of the individual sources of statements is unnecessary when the fraud allegations arise from group-published misstatements or omissions. *City Pension Fund for Firefighters & Police Officers in City of Miami Beach v. Aracruz Cellulose S.A.,* 41 F. Supp. 3d 1369, 1407 (S.D. Fla. 2011). Plaintiffs adequately identify which Defendant and subsidiary participated in which aspect of the FTX scheme and identify statements and other material omissions about basic internal controls that themselves were not attributed to a particular entity within Temasek, Sino Global or SoftBank when made. ¶¶ 48, 283, 321-323, 363-367.

Plaintiffs further allege which defendant corporations are agents or alter egos of their corporate parents. An agency relationship establishing vicarious liability for fraud generally does not have to be pleaded with particularity. *Commodity Futures Trading Comm'n v. Gibraltar Monetary Grp., Inc.*, No. 04-80132-CIV, 2004 WL 7334350, at *2 (S.D. Fla. July 23, 2004). A corporation will be vicariously responsible for the wrongful acts of its agents when the acts are: (1) related to and committed within the course of employment or agency; (2) committed in furtherance of the business of the corporation; and (3) authorized or subsequently acquiesced in by the corporation. *Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1406–07 (11th Cir.).

As alleged, Defendant Temasek Holdings (Private) Limited ("Temasek Holdings") has one employee, its CEO, and relies on its corporate agents to conduct its business, including Defendant Temasek International Private Limited ("Temasek International"), which shares the same CEO as Temasek Holdings, and Defendant Temasek International (USA) LLC ("Temasek USA") which facilitated its investment in FTX. ¶¶ 29-30. These subsidiaries are alleged to be agents of Temasek Holdings. ¶ 31. Temasek's Funds, Blakiston Investments Pte. Ltd., and Artz Fund Investments Private Limited are alleged with particularity to have been the vehicles by which Temasek invested in FTX and ████████████████████████████████████████████████████

███████ however, at all times Temasek's employees never distinguished between subsidiaries in describing its investments in FTX. ¶¶ 36-39.

Plaintiffs similarly describe the respective roles of the Sino Global entities in the scheme. Plaintiffs allege that the Sino Global-related entities are alter egos and agents of defendant Sino Global Capital Limited. ¶ 52. Matthew Graham is alleged to have ownership and control of all Sino-Global related entities, was responsible for aiding and abetting the scheme, and the misrepresentations and omissions about FTX's trustworthiness, and never himself distinguished between which Sino Global entity he was speaking on behalf of. ¶¶ 48-54, 312, 323, Ex. E. Sino Global entities do not distinguish between themselves and parent company Sino Global Capital Limited, yet share offices, websites, social media handles, majority ownership and control, and employees. ¶¶ 48-53. Matthew Graham speaks for all relevant Sino Global entities. Sino Global Capital and FTX are listed as co-General Partners in the $200 million Liquid Value Fund without distinguishing between Sino Global entities. ¶ 312.

### C. Plaintiffs Sufficiently Pled That Defendants Aided and Abetted the Sale of Unregistered Securities (Counts 1 and 3).

#### i. Plaintiffs have sufficiently pled their claims against Defendants for aiding and abetting FTX's sale of unregistered securities under both Florida and California law.

Defendants do not actively contest that FTX sold unregistered securities—the FTX tokens called FTTs (¶¶ 10, 263-264, 407, 426) and the Yield-Bearing Accounts (¶¶ 72, 282, 407, 426) by which FTX operated—in California and Florida. MTD at 15, n. 15. Rather, Defendants argue that they did not materially assist in FTX's underlying sale of those unregistered securities. MTD at 15. This assertion is baseless, and Defendants resort to mischaracterizing the necessary elements of the aiding and abetting claim to make it.

As alleged, each Defendant provided FTX with material assistance necessary to bring the FTX platform and its unregistered securities to the U.S. market. This assistance included the funding from each of them necessary to bring FTX to market (¶¶ 279-283, 303-311, 339); that SoftBank lobbied and made statements to the United States government to help establish FTX as a supposedly safe and trustworthy place to buy and keep crypto that Temasek and SoftBank both advised and controlled FTX by serving on its "Advisory Board," and acted as FTX's agents to overcome legal and regulatory hurdles to bring FTX's platform and unregistered securities to market (and also as FTX's control persons to the extent they themselves provided the actual legal

and regulatory governance for FTX given its total lack of internal governance or controls) (¶¶ 45-47, 282, 293, 358, 359, 362-363); that each Defendant actively promoted the FTX platform to crypto investors at investment conferences, lending the weight of their names to FTX as a safe and lucrative investment (¶¶ 359-361, 366-367, 381); and that Sino Global partnered with Alameda and FTX to start a fund that traded in and churned the FTTs at issue. ¶¶ 49, 312-314, 321-323, 440. All three MNVCs are alleged to have promoted FTX and provide FTX with the assistance FTX needed to access the U.S. market. ¶¶ 282, 293, 301-313, 363, 372-376.

FTX sold unregistered securities with virtually no internal controls, loaning and spending tokens and cash that belonged to their customers, fraud on an incredible scale. Defendants misrepresented as true that they conducted significant due diligence that led them to tout FTX as trustworthy and as having proper internal controls and risk measures. They omitted the truth they discovered about FTX every time they made public representations about and promoted FTX. ¶¶341-352, 381-382. This assistance in the commission of the fraud provides for aiding and abetting liability under both California and Florida law.

### ii. Defendants provided "material assistance" to FTX, which sold unregistered securities in violation of California law.

Section 25110 of the California Corporate Securities Law ("CSL") prohibits the offer or sale by any person in California of securities that are not qualified through registration. Section 25503 affords a statutory cause of action to purchasers of those unregistered securities for violations of Section 25110. Sections 25504 and 25504.1 establish joint and several liability on the part of certain actors, including control persons and agents who materially aid in the transaction constituting the violation and persons who materially assist in the violation with the intent to deceive or defraud. §§ 25504, 25504.1; *Moss v. Kroner*, 197 Cal. App. 4th 860, 873 (2011). Defendants do not contest the status of the YBAs and FTTs as unregistered securities, which Plaintiffs have alleged. *See* MTD at 15 n. 15. Thus, liability depends only on whether Defendants materially assisted in selling YBAs and FTTs under California law, or were partners, agents or control persons of FTX.

"California law provides for numerous other actors to be held secondarily liable for the illegal sale of a security in violation of section 25110." *Moss v. Kroner*, 197 Cal. App. 4th at 871. Every person or entity that provides "material assistance" in selling unregistered securities is jointly and severally liable along with the seller of those securities:

> Section 25504.1 provides that any person who materially assists in
> a violation of section 25110 with the intent to deceive or defraud is
> jointly and severally liable with any other person who is liable for
> an illegal sale of unregistered securities under section 25110. Intent
> to defraud is defined as the intent to induce reliance on a knowing
> misrepresentation or omission.

*Id.* (citing *Apollo Capital Fund v. Roth Capital Partners*, 158 Cal.App.4th 226, 257 (2007)).

"Materially assisting" an alleged securities law violation under California law "may 'take the form

of aiding in the preparation of offering documents relied upon by investors, communicating

misrepresentations directly to investors, or otherwise playing a material, facilitating role' in the

alleged securities law violation." *Schaffer Fam. Invs., LLC v. Sonnier*, 120 F. Supp. 3d 1028, 1045

(C.D. Cal. 2015) (*quoting AREI II Cases,* 216 Cal. App. 4th 1004, 1014, 157 Cal.Rptr.3d 368

(Cal.Ct.App.2013).

Each Defendant engaged in one or more of the activities described in *Schaffer Family*.

Defendants misrepresented material facts to investors. *See e.g.*, ¶¶ 310-323, 381-383, 510-512.

Defendants prepared official statements to the United States government to facilitate FTX's access

to the U.S. market. ¶¶ 358, 363, Ex. F. Defendants funded FTX (*e.g.*, ¶¶ 303-311); they advised

and controlled FTX by serving on its "Advisory Board," and acted as FTX's agents to overcome

legal and regulatory hurdles to bring FTX's platform and unregistered securities to market (e.g.,

¶¶ 357-363); and they started funds that traded in and churned the FTTs (*e.g.*, ¶¶ 49, 440 ). That is

material assistance under any bar.

### iii. Defendants "personally participated or aided" FTX in the sale of unregistered securities in violation of Florida law.

Section 517.07 of the Florida Securities and Investor Protection Act ("FSIPA") provides

that "[i]t is unlawful and a violation of this chapter for any person to sell or offer to sell a security

within this state unless the security ... is registered pursuant to this chapter." Fla. Stat. § 517.07(1);

*Scheck Invs., L.P. v. Kensington Mgmt., Inc.,* No. 04-21160-CIV, 2009 WL 10668565, at *2 (S.D.

Fla. June 17, 2009). Section 517.211(1) extends liability to those who aid in such sales:

> Every sale made in violation of [Fla. Stat. § 517.07] may be
> rescinded at the election of the purchaser.... Each person making the
> sale and every director, officer, *partner*, *or agent* of or for the seller,
> if the director, officer, *partner, or agent* has personally participated
> or *aided* in making the sale, is jointly and severally liable to the

14

> purchaser in an action for rescission, if the purchaser still owns the
> security, or for damages, if the purchaser has sold the security.

Fla. Stat. § 517.211(1) (emphasis added.); *Scheck Invs.,* 2009 WL 10668565 at \*2. Privity is not required. *J.P. Morgan Sec., LLC v. Geveran Invs. Ltd*., 224 So. 3d 316, 328 (Fla. Dist. Ct. App. 2017) ("Section 517.211, by its plain language, extends liability to. . . [s]uch parties [that] would not necessarily be in privity of contract with the buyer or seller in a strict sense.")).

Further, proof of loss causation is not required. *Arthur Young & Co. v. Mariner Corp.*, 630 So. 2d 1199, 1204 (Fla. Dist. Ct. App. 1994); *Rousseff v. E.F. Hutton Co.,* 867 F.2d 1281, 1282 (11th Cir. 1989). For an officer, director or agent to be held personally liable for the sale of illegal securities he must "engage in some act or acts which induce the purchaser to invest." *Dillon v. Axxsys Int'l, Inc.,* 385 F. Supp. 2d 1307, 1311 (M.D. Fla. 2005), aff'd, 185 F. App'x 823 (11th Cir. 2006) (citing *Ruden v. Medalie,* App., 294 So.2d 403 (1974)). The term "agent," in Section 517.211 extending liability to agents of or for purchaser or seller of security, incorporates the common-law definition of agency. *Arthur Young & Co.,* 630 So. 2d at 1204.

### iv. Defendants are partners and agents of FTX.

Here, Plaintiffs have alleged that Defendants undertook numerous acts as agents or partners of FTX. SBF literally referred to Defendants as his "partners." ¶¶ 300-306, 312-314. Temasek and Softbank advised on regulatory concerns on behalf of FTX to smooth the sale of FTX's unregistered securities in the U.S. ¶¶ 356, 358, 363, Ex. F. Temasek and SoftBank were control persons of FTX by virtue of their service on FTX's Advisory Board, FTX's *de facto* board of directors, in the total absence of corporate governance and controls at FTX. ¶¶ 55, 130, 279, 282, 454. Further, Sino Global, in an effort to legitimize and sell the FTX platform and the unregistered securities by which it operates, partner with FTX to create supposedly independent funds that then traded in the very securities at issue in this lawsuit, the FTTs, to prop them up. ¶¶ 49, 312-314, 321-323, 338. Defendants also personally participated in the sale of unregistered securities each time they lobbied for or promoted bringing the FTX platform to market and induce the Plaintiffs to purchase the unregistered YBAs with FTX.

### v. Plaintiffs have pled the requisite intent.

Defendants further claim that Plaintiffs' unregistered sale claim fails because Plaintiffs have not alleged that Defendants assisted in the sale with the intent to deceive or defraud. MTD at 16. First, scienter under Florida law is satisfied by a showing of mere negligence. *Arnold v. McFall,*

839 F. Supp. 2d 1281, 1286 (S.D. Fla. 2011). Second, Plaintiffs' allegations regarding the provision of legal and regulatory assistance to FTX satisfies the unlawful intent needed for aiding and abetting the sale of unregistered securities under California law. Intent to defraud is defined as the intent to induce reliance on a knowing misrepresentation or omission. *Moss v. Kroner*, 197 Cal. App. 4th at 872 (*citing Apollo Cap. Fund, LLC v. Roth Cap. Partners, LLC*, 158 Cal. App. 4th 226, 257, 70 Cal. Rptr. 3d 199, 224 (2007); *see also, People v. Salas*, 37 Cal.4th 967, 981 (2006) ("a defendant is not guilty of the crime of selling an unregistered security in violation of section 25110 if there is a reasonable doubt whether the defendant knew the security was not exempt from regulation or was criminally negligent in failing to know that the security was not exempt"). Plaintiffs' allegations about Defendants' knowledge of the underlying fraud obtained in the course of their partnerships and the affirmative misrepresentations and omissions they made at investor conferences regarding the due diligence they conducted and the safety of the platform thus suffice for the requisite intent of aiders and abettors under Florida and California law.

### vi.  Privity between Defendants and Plaintiffs is not required because they are in privity with FTX.

Defendants next argue that Plaintiffs failed to allege Defendants had direct contact or privity with Plaintiffs. MTD at 17. But privity is not an element of aiding and abetting the sale of unregistered securities in either Florida or California. *Viterbi v. Wasserman*, 191 Cal. App. 4th 927, 937 (2011) ("a 'control person' under section 25504 and an 'aider and abettor' under section 25504.1 can be sued for *damages* without privity of contract."); *Moss v. Kroner*, 197 Cal. App. 4th 860, 878 (2011) ("we conclude that the Legislature, when it enacted sections 25504 and 25504.1, intended to depart from those principles by placing these certain secondary actors in the shoes of the principal violator for the purpose of civil liability as long as the original direct violator was in privity with the plaintiff."); *see also Logan v. Morgan, Lewis & Bockius LLP*, 350 So. 3d 404, 410 (Fla. Dist. Ct. App. 2022) (stating in the context of breach of fiduciary duty that aiding and abetting liability requires "knowledge of the breach by the alleged aider and abettor" and "the aider and abettor's substantial assistance or encouragement of the wrongdoing" but not privity or direct contact with those the wrongdoer was in contact with). Defendants are wrong to suggest privity is required for aiding and abetting the sale of unregistered securities. These Defendants provided the regulatory and legal acumen to bring the FTX platform to market in the United States.

Defendants also argue that Plaintiffs fail to allege when they became FTX customers, opened YBAs, or bought tokens. MTD at 15. But Defendants offer no authority that such specific allegations beyond the existing allegations that Plaintiffs were FTX customers— i.e., held accounts, traded crypto, and therefore purchased unregistered securities—is required at this stage.

      **vii.  Defendants misstate the standard for Plaintiffs' unregistered broker-dealer claim for Count 3.**

Finally, Defendants argue Plaintiffs' unregistered broker-dealer claim fails because they did not allege privity and did not materially assist the sale. MTD at 17. But this is wrong. As CSL section 25210(b) provides: "No person shall, ... on behalf of an issuer, effect any transaction in, or induce or attempt to induce the purchase or sale of, any security in this state unless [a licensed] broker-dealer and agent have complied with any rules as the commissioner may adopt for the qualification and employment of those agents." Cal. Corp. Code § 25210(b) (emphasis added). FTX, the issuer of the YBAs and FTTs, has privity with the Plaintiffs. The Defendants helped induce the purchase of the YBAs as agents and control persons on behalf of FTX. To the extent Defendants, in addition to providing capital for the scheme to sell unregistered, unqualified securities, also promoted and invested in these unregistered securities, and advised FTX on how to induce their purchase by Plaintiffs, Defendants are jointly and severally liable under Section 25504 as agents and control persons of FTX for violations of section 25210(b), regardless of whether 25504.1 applies. ¶¶427, 430.

      **D.  Plaintiffs Sufficiently Pled That Defendants Aided and Abetted Securities Fraud and (Counts 2 and 4).**

Defendants next challenge the sufficiency of Plaintiffs' allegations that Defendants committed and/or aided and abetted in securities fraud under California and Florida law. MTD17-20. This includes Plaintiffs claims for aiding and abetting securities fraud under Florida law (Count 2, ¶¶ 412-22) and aiding and abetting securities fraud under California law (Count 4, ¶¶ 432-42). These Counts are properly pleaded under the relevant Florida and California law.

Plaintiffs allege Defendants' liability as "partners" and "agents" of FTX and based on their "material assistance" or "aid" critical to commission of the scheme—and that is all that is required. ¶ 414; Fla. Stat. § 517.211(2)(extending joint and several liability to "partners" and "agents" who "aid" in the scheme); ¶ 434, Cal. Corp. Code § 25504.1 (extending joint and several liability to those who "materially assist" in any violation of §25401 which prohibits the offer or sale of a

security "by means of any written or oral communication that includes an untrue statement of a material fact or omits to state a material fact necessary to make the statements made, in the light of the circumstances under which the statements were made, not misleading."). Defendants are alleged, by virtue of their repeated investments in FTX, to have known about the total lack of internal controls, the illegal undisclosed related party loans to Alameda and the total lack of corporate governance, yet nonetheless contributed in bring the FTX platform and its securities to market in Florida and California by acting as its "partners" in investing in FTX, in acting as FTX's agent in promoting and lobbying for FTX, and acting as its control person by controlling FTX from its Advisory Board and providing it the legal and regulatory guidance it needed given FTX's alleged non-existent corporate governance or internal controls.

**Florida**. The Florida Securities and Investor Protection Act ("FSIPA") prohibits any person "in connection with the offer, sale, or purchase of any investment or security" from "directly or indirectly" (1) employing "any device, scheme, or artifice to defraud"; (2) obtaining "money or property by means of an untrue statement or a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading"; or (3) engaging in "any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a person." Fla. Stat. § 517.301. Section 517.211(2) extends joint and several liability to liability to any "director, officer, partner, or agent of or for the seller if they personally participated or aided in making the sale or purchase."

The elements of a cause of action under Section 301 are identical to those under Rule 10b–5 of the Exchange Act, "except that the scienter requirement under Florida law is satisfied by [a] showing of ***mere negligence***." *Arnold v. McFall,* 839 F. Supp. 2d 1281, 1286 (S.D. Fla. 2011) (citing *Grippo v. Perazzo,* 357 F.3d 1218, 1222 (11th Cir. 2004)) (emphasis added); *see* 17 C.F.R. § 240.10b-5. Further, a plaintiff does not need to prove loss causation under Florida law. *Arnold,* 839 F. Supp. 2d at 1286. (citing *E.F. Hutton & Co., Inc. v. Rousseff*, 537 So.2d 978, 981 (Fla.1989)). Reliance is not required.

**California**. Section 25401 of the CSL makes it "unlawful for any person to offer or sell a security in this state, or to buy or offer to buy a security in this state, by means of any written or oral communication that includes an untrue statement of a material fact or omits to state a material fact necessary to make the statements made, in the light of the circumstances under which the statements were made, not misleading." Section 25501 provides a private right of action to

purchasers of securities injured by violation of Section 25401. Section 25501 imposes liability not only for statements known to be false or misleading, but also for those made without exercising reasonable care to determine the truth or falsity of the statement or omission. Section 25504.1 extends liability under Section 25501 to any person who "materially assists" in a violation of Section 25401 and makes them jointly and severally liable with any other person liable under Section 25501. The scienter standard in California under Section 25401 is whether Defendants were "aware, *or with reasonable care would have been aware*, that statements by which the sale was made were false or misleading." *People v. Simon*, 9 Cal. 4th 493, 516, 886 P.2d 1271, 1286 (1995); *Moss,* 197 Cal. App. 4th at 872 ("Intent to defraud is defined as the intent to induce reliance on a knowing misrepresentation or omission").

### i. Defendants participated and materially assisted in securities fraud.

In Count 2, Plaintiffs allege facts that satisfy both primary liability under Section 517.301 and secondary liability as FTX's "partners" and/or "agents" pursuant to Section 517.211(2). ¶¶ 412-422. Plaintiffs identify material misrepresentations and omissions with specificity (*e.g.*, ¶ 416), and that Defendants were SBF's and FTX's partners and agents and aided in the misrepresentations and omission to the public about the safety and trustworthiness of FTX (¶¶ 418-421 Plaintiffs also plead facts showing Defendants materially aided and abetted FTX's and SBF's primary violations of Section 25401 for making material misrepresentations and omissions about FTX's business and in conducting the broader scheme to defraud. ¶¶ 433-435. Such misstatements and omissions and their relations to the overall scheme are pled with specificity. ¶ 436. Defendants' citation to *AREI II Cases,* 216 Cal. App. 4th 1004, 1014 (2013) supports Plaintiffs' arguments. As explained by *AREI II*, "[t]o support liability under section 25504.1 for such a violation, the complaint must include allegations demonstrating how the defendant assisted in the act of selling or offering to sell securities by means of false and misleading statements. Such assistance may take the form of aiding in the preparation of offering documents relied upon by investors, communicating misrepresentations directly to investors, or otherwise playing a material, facilitating role in the act of selling or attempting to sell the securities by means of misrepresentations or omissions of material fact." *Id.* And as outlined above, Plaintiffs have alleged each of those as to each Defendant. Defendants financed FTX, sponsored FTX investor conferences, lobbied for FTX, lent their reputations and credibility to FTX, touted FTX in their public statements and press releases and prospectuses, and provided legal and regulatory guidance

to bring FTX and its unregistered securities to market. Such allegations are nothing like the facts in *Turk v. Pershing LLC,* No. 3:09-CV-2199-N, 2014 WL 12572906, at *4 (N.D. Tex. Dec. 8, 2014) where the plaintiff, did "not attempt to identify any conduct that could qualify as inducement," whereas here Plaintiffs allege the MNVCs participated in customer facing FTX sponsored crypto events and otherwise publicly touted FTX.

### ii.   Plaintiffs allege scienter.

Acknowledging that the scienter standard under Florida securities law is one of negligence, Defendants still argue that Plaintiffs have failed to plausibly allege that Defendants "acted negligently, much less with knowledge or intent." MTD at 19-20. Again, as the "scienter requirement under Florida law is satisfied by [a] showing of mere negligence," Plaintiffs have alleged in significant detail how Defendants pumped billions into FTX and propped them up on for business on the U.S. market after conducting significant due diligence that should have raised serious flags, and in fact that did raise red flags for others. *See Arnold v. McFall*, 839 F. Supp. 2d at 1286. That negligent conduct occurred under these facts is unquestionable. As for scienter under California law, intent to defraud is defined as "the intent to induce reliance on a knowing misrepresentation or omission." *Moss v. Kroner,* 197 Cal. App. 4th at 872. As discussed above and in the sections regarding Plaintiffs' material misrepresentations claims, this standard is also met.

### E.   Plaintiffs Sufficiently Pled Control Person Liability for FTX's Primary Violations Under California Law (Count 6).

Defendants argue Count 6 fails because Plaintiffs did not allege Defendants are directors, officers, partners, agents or control persons, MTD at 20, but Plaintiffs adequately alleged control person liability under California law. ¶¶ 452-454. (The Florida argument related to agency is discussed above.) "Every person who *directly or indirectly controls* a person liable under Section 25501 or 25503…*every person occupying a similar status or performing similar functions*, every employee of a person so liable who materially aids in the act or transaction constituting the violation, and every broker-dealer or *agent* who materially aids in the act or transaction constituting the violation, are also liable jointly and severally with and to the same extent as such person[.]" Cal. Corp. Code § 25504 (emphasis added). Defendants' secondary liability as an agent or control person of a primary violator does not require scienter (in contrast to Section 25504.1, which does). *See. e.g., Jackson v. Fischer*, 931 F. Supp. 2d 1049, 1073 (N.D. Cal. 2013); *Moss v. Kroner,* 197 Cal. App. 4th at 873. But "[u]nder California law, the general definition of 'control'

for use throughout the Corporations Code, including section 25504 (see § 5), is 'the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a corporation.' (§ 160, subd. (a); see also § 25403, subd. (a).)" *Hellum v. Breyer*, 194 Cal. App. 4th 1300, 1316 (2011). Plaintiffs have alleged Defendants acted both as agents in acting on behalf of FTX in legal and regulatory matters, and as control persons insofar as they served on an Advisory Board with total absence of internal governance or controls. Such allegations are sufficient to plead violations of Section 25504.

### F.   Market Manipulation Under California Law is Sufficiently Pled (Count 5).

Defendants attempt to lump Plaintiffs' market manipulation claim for violating Cal. Corp. Code § 25400 in with their arguments regarding aiding and abetting securities fraud, and do not address the substantive allegations that Sino Global illegally traded in FTTs. MTD 18-19. As alleged, Sino Global started the Liquid Value I fund with over a hundred million dollars from FTX and Alameda and worked closely with SBF to "churn" and "prop up" the FTT tokens and FTX's value. ¶¶49, 175, 312-314, 440. Such trading sustained the false and artificially inflated value of the FTTs and YBAs in violation of section 25400's prohibition on manipulative trading, creating a false or misleading appearance of active trading, or omitting material facts.

### G.   Plaintiffs Sufficiently Pled Defendants Engaged in a Conspiracy (Count 7).

Plaintiffs have sufficiently pled conspiracy under California and Florida law. Defendants argue Plaintiffs fail to allege an agreement only (1) by cherry-picking three allegations (*see* MTD. at 21) and (2) without substantively addressing the underlying causes of action that support the agreement (even though they acknowledge that a conspiracy requires underlying tortious conduct, *id.* at 20). Because Defendants do not challenge the multiple overt acts that Plaintiffs allege Defendants took in furtherance of the conspiracy, the vague opposition on this cause of action fails.

At the pleadings stage, the Court must "constru[e] inferences arising from the alleged facts in the light most favorable to Plaintiff[s]." *Escalante v. Villanueva*, No. CV 22-2590-MWF (KESx), 2023 WL 2344208, at *9 (C.D. Cal. Feb. 16, 2023). Indeed, "an agreement may be inferred 'from the relationship of the parties, their overt acts and concert of action, and the totality of their conduct.'" *N.R. by Ragan v. Sch. Bd. of Okaloosa Cnty., Fla.*, 418 F. Supp. 3d 957, 999 (N.D. Fla. 2019); *Freeney v. Bank of Am. Corp.*, No. CV 15-02376 MMM (PJWx), 2015 WL 12535021, at *29, *32 (C.D. Cal. Nov. 19, 2015) (same).

To state a conspiracy action under California law, Plaintiffs must show the (1) formation of an agreement to commit a wrong, (2) wrongful conduct in furtherance of the conspiracy and (3) damages arising from the wrongful conduct. *United Motors Int'l, Inc. v. Hartwick*, No. CV 17-00243 BRO (EX), 2017 WL 888304, at *10 (C.D. Cal. Mar. 6, 2017). Florida is similar. *Primerica Fin. Servs., Inc. v. Mitchell*, 48 F. Supp. 2d 1363, 1369 (S.D. Fla. 1999) (the elements are (1) conspiracy between two or more parties (2) to do an unlawful act or a lawful act by unlawful means, (3) an overt act in furtherance, and (4) damage to plaintiff as a result). In both states, "a showing that the alleged conspirators have committed acts that 'are unlikely to have been undertaken without an agreement'" is enough to infer a conspiracy. *Mendocino Env't Ctr. v. Mendocino Cnty.*, 192 F.3d 1283, 1301 (9th Cir. 1999); *Valderrama v. Rousseau*, No. 11-CIV-24637, 2012 WL 12925174, at *7 (S.D. Fla. Sept. 18, 2012) (same). Thus, though a conspiracy complaint must contain more than a bare allegation of such, it is sufficient if it apprises defendants of the character and type of facts and circumstances upon which the plaintiff is relying to establish the conspiracy. *AREI II Cases*, 216 Cal. App. 4th at 1022.

Further, allegations about the general nature of a conspiracy are sufficient even under the heightened Rule 9(b) pleading standard when information about the extent of the alleged conspiracy is within defendants' exclusive control. *United States v. Baxter Int'l, Inc.*, 345 F.3d 866, 881–82 (11th Cir. 2003) (citations omitted).[6] It is sufficient for the plaintiff to detail the relevant aspects of the underlying fraud, explain the factual basis for concluding defendants were aware of the fraud, and, explain the factual basis for determining they substantially assisted in its commission. *See Trinity Graphic, USA, Inc. v. Tervis Tumbler Co.*, 320 F. Supp. 3d 1285, 1297 (M.D. Fla. 2018); *see also Freeman v. Sharpe Res. Corp.*, No. 6:12-CV-1584-ORL-22T, 2013 WL 2151723, at *10 (M.D. Fla. May 16, 2013) ("[A]bsolute particularity is not required, especially when some matters are beyond the knowledge of the pleader and can only be developed through discovery.").

---

[6] Courts typically allow leeway in pleading when the information supporting the pleading is under exclusive control of the defendant. *See Peters v. Amoco Oil Co.*, 57 F.Supp.2d 1268, 1284–85 (M.D.Ala.1999) (holding that complaint setting forth general allegations about nature of conspiracy was sufficient despite heightened pleading standard, where information about extent of alleged conspiracy was within defendants' exclusive control); *see also Quality Foods de Centro Am., S.A. v. Latin Am. Agribusiness Dev. Corp., S.A.*, 711 F.2d 989, 995 (11th Cir.1983).

Here, the complaint puts Defendants on notice as to the "who, what, where, when, why" of the conspiracy. Plaintiffs allege agents of FTX and each Defendant formed a tacit agreement to deceive the public that took place from the time of due diligence and formation of partnerships until the collapse. Plaintiffs have pled facts permitting a reasonable inference that Temasek, SoftBank, and Sino Global were informed of FTX's plan to defraud the public (¶¶ 56, 315-323, 327-336) then committed overt acts in furtherance of the fraud, breach of fiduciary duty, and conversion by injecting necessary capital into the scheme (¶¶ 302-314, 339-340), publicly generating for FTX the appearance of credibility and trustworthiness (¶¶ 341-344, 346-351, 360-361, 364-366), advising FTX on regulatory, legal, and marketing matters intended to bolster its growth (¶¶ 354-359, 362, 363), which did in fact bolster its growth to Defendants' benefit (¶ 352), and concealing the fraud when the company began to falter, all with the purpose of keeping the fraud afloat until Defendants could cash out (¶¶ 371-378, n. 145). Each of these acts permitted the scheme to grow in scale and persist in duration, which directly resulted in injury to Plaintiffs.

As these actions are unlikely to have been taken without a tacit agreement in place, they sufficiently allege a conspiracy. *Freeney v. Bank of Am. Corp.*, No. CV 15-02376 MMM (PJWx), 2015 WL 12535021, at *29, *32 (C.D. Cal. Nov. 19, 2015) (close relationship, financial assistance, representation of co-conspirator in legal matters, misrepresentations, showed "'concurrence and knowledge'"); *United Motors Int'l, Inc. v. Hartwick*, No. CV 17-00243 BRO (EX), 2017 WL 888304, at *10 (C.D. Cal. Mar. 6, 2017) (finding allegations concerning individuals in the conspiracy, motive, acts directed at Plaintiffs, and intent of defendants were enough to show "formation and operation" of a conspiracy). Defendants were presented with repeated opportunities to determine that FTX was fraudulent, but were incentivized to prop up FTX and overlook or hide sloppy internal controls while quietly pushing the company towards an IPO, and thus impliedly agreed to assist FTX in its multiple forms of wrongful conduct.

### H. Plaintiffs Sufficiently Pled Defendants Aiding and Abetted the Common Law Claims of Fraud, Fiduciary Breach, and Conversion (Count 8, 9, 10).

Under both Florida and California law, the elements necessary to sustain an aiding and abetting claim are: (1) an underlying violation on the part of the primary wrongdoer; (2) knowledge of the underlying violation by the alleged aider and abettor; and (3) the rendering of substantial assistance in committing the wrongdoing by the alleged aider and abettor. *Lesti v. Wells Fargo Bank, N.A.*, 960 F. Supp. 2d 1311, 1321 (M.D. Fla. 2013) (citations omitted); *Acadia Partners,*

*L.P. v. Tompkins*, 759 So. 2d 732, 736-37 (Fla. 5th Dist. Ct. App. 2000) (quoting Restatement (Second) of Torts § 876 (1979)); *Saunders v. Superior Ct.*, 27 Cal. App. 4th 832, 846 (1994).

Because Defendants do not contest that FTX committed fraud, fiduciary breach, or conversion,[7] Plaintiffs discuss only the sufficiency of the allegations as to the second and third elements of aider and abettor liability—knowledge and substantial assistance.

As to knowledge, allegations of knowledge and intent are not subject to the same particularity requirement as fraud. Fed. R. Civ. P. 9(b); *Cordell Consultant, Inc. Money Purchase Plan & Tr. v. Abbott*, 561 F. App'x. 882, 884 (11th Cir. 2014). Courts have found pleadings sufficient if they allege generally that defendants had actual knowledge of a specific primary violation. *See*, *e.g.*, *Neilson v. Union Bank of Cal., N.A.*, 290 F. Supp. 2d. 1101, 1120 (C.D. Cal. Oct. 20, 2003) (citing *Dubai Islamic Bank v. Citibank, N.A.*, 256 F.Supp.2d 158, 167 (S.D.N.Y.2003)); *Smith v. Network Equip. Techs., Inc.*, No. C-90-1138 DLJ, 1990 WL 263846, at *7 (N.D. Cal. Oct.19, 1990) (citing *In re Thortec Securities Litig.,* 1989 WL 67429 (N.D.Cal.1989) ("[A] general averment of actual knowledge [is] sufficient to plead a claim of aiding and abetting liability")). "A defendant has knowledge of an underlying [violation] if it has a general awareness that its role was part of an overall improper activity." *Gilison v. Flagler Bank*, 303 So. 3d 999, 1003 (Fla. Dist. Ct. App. 2020) (citing *Woods v. Barnett Bank of Ft. Lauderdale*, 765 F.2d 1004, 1009 (11th Cir. 1985). Assistance is "substantial" when it "affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the [underlying wrongful conduct] to occur." *Chang v. JPMorgan Chase Bank, N.A.*, 845 F.3d 1087, 1097 (11th Cir. 2017).

Plaintiffs sufficiently pled Defendants aided and abetted FTX's underlying wrongful conduct because the allegations, taken as true, establish they (1) had knowledge of the underlying wrongful conduct committed by FTX and (2) provided FTX with substantial assistance in furtherance thereof.

First, through their expertise, knowledge of FTX's operations obtained through due diligence, and ongoing partnerships and close ties with FTX, Defendants came to know about FTX's fraud, including the lack of internal controls, misappropriation of funds, unsupported

---

[7]   Even so, it bears briefly noting that with respect to all three common law causes of action, Plaintiffs have more than sufficiently pled the first element of aiding and abetting—the underlying wrongful conduct on the part of FTX. *See, e.g.,* ECF No. 783 ¶¶ 147-168 (mechanics of scheme); 171-199 (utter lack of FTX corporate controls and management of assets, as well as FTX's public acknowledgment and evidence of its knowledge thereof).

financial statements, and the granting of exemptions and other special treatment to Alameda that enabled Alameda to margin trade and expose Plaintiffs to loss. Defendants' knowledge is substantiated by the evidence that so many other actors—less close to FTX and with less wherewithal—were able to identify red flags from the same materials Defendants were given, red flags Defendants that would have the Court believe they simply somehow missed. The Court should consider the complaint in its entirety: "the inquiry . . . is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter," not whether individual allegations in isolation meet the standard. *See Tellabs, Inc. v. Makor Issues and Rights, Ltd*, 551 U.S. 308, 310 (2007). If a reasonable person could deem the inference of knowledge cogent and at least as compelling as any opposing inference, a complaint should survive. *Id.* at 324.

Second, Defendants then substantially assisted FTX's commission of the fraud with that knowledge in tow. FTX could not have reached its success without the extensive assistance of Defendants, vis-à-vis their investments, efforts to legitimize FTX, and provision of hands-on support, guidance, infrastructure, networks, endorsements, promotion, publicity, and cover. FTX knew this was true and said it was true, as it publicly lauded its ability to go from a one-billion-dollar valuation with no VC investment to a twenty-five-billion-dollar valuation after "raising the largest round…from some of the best firms in the world" in less than a year. *E.g.* ¶ 300. FTX prominently advertised Defendants as integral to its reliability and legitimacy. Likewise, regulators acknowledge that the VC firms pumping FTX with cash and endorsing the exchange and its founder constituted necessary aid to FTX in gaining the public trust needed to carry out the scheme. Finally, Plaintiffs have alleged they were harmed by Defendants' substantial assistance to FTX.

While these allegations are pled specifically as to each Defendant as set forth herein, some standout allegations bear specific mention. For example, Temasek called itself an "active investor" of FTX and publicly reported on its extensive, "multiple," purportedly successful eight months of due diligence, which included evaluating the separation of FTX and Alameda, FTX's financial information, its anti-money laundering procedures, and other regulatory compliance measures, and on conducting interviews with FTX employees, industry insiders, and SBF himself. ¶¶ 316-318. After investing, Temasek continued to advise on strategy and monitor performance. *Id.*

With respect to SoftBank, the knowledge it obtained through due diligence presumably was particularly heightened, as the company publicly professed before investing to "stay[ing] away from coins" given the risky nature of the industry. Softbank not only invested, it enlisted two

executives to serve on the Advisory Board—both of whom were demoted or fired just weeks before the fraud was revealed. ¶ 362. These are not actions of a disinterested party.

While SoftBank was firing its insiders close to FTX right before the fraud was revealed, Sino Global made the equally suspicious choice of bringing insiders in. After the fraud went public, Sino Global (a ten-person company at the time) hired FTX financial executive Constance Wang to join its team as an executive. ¶ 368. A party who engages in atypical business transactions or actions which lack business justification may be found liable as an aider and abettor of fraud with a minimal showing of knowledge. *See Neilson*, 290 F. Supp. at 1120 (citing *Woods v. Barnett Bank of Fort Lauderdale*, 765 F.2d 1004, 1010 (11th Cir.1985)); *Woodward v. Metro Bank of Dallas*, 522 F.2d 84, 97 (5th Cir.1975).

Basic due diligence would have uncovered FTX's commingling and misappropriating of assets—indeed, without conducting the due diligence that Temasek, Sino Global, and SoftBank toted as undertaking, other investors, exchanges, and even non-profits unfamiliar with the landscape saw that FTX didn't make sense. These facts are unusual for such sophisticated firms, are suggestive of atypical business transactions, and don't comport with the assertion that these parties were also conned.

## I. Plaintiffs Sufficiently Pled Claims for Conversion and Aiding and Abetting Conversion against the Sino Global Defendants (Counts 11 and 12).

As to Sino Global Defendants, Plaintiffs adequately allege they converted Plaintiffs' property as "co-GPs" or co-general partners (¶¶ 312, 323; "¶ 338"[8] on pg. 180) of the Liquid Value Fund with FTX (Count 11, "¶¶ 337-341" on pg. 180), and that they aided and abetted in FTX's conversion of Plaintiffs' assets (Count 12, "¶¶342-347" on pg. 181). Partners, like Sino Global and FTX, acting within their authority and in pursuit of partnership business, bind all other partners and act as their agents. *Kelly v. State, Dep't of Ins.*, 597 So. 2d 900, 902 (Fla. Dist. Ct. App. 1992); *In re Westwood Plaza N.,* No. CV 13-00318-BRO, 2016 WL 11697903, at *2 (C.D. Cal. Sept. 26, 2016) (citing the "well established" partnership doctrine of imputing the knowledge and actions of one partner to all other partners). Sino Global's unsupported claim that its partnership with FTX does not impute FTX's knowledge or other elements of its conversion of Plaintiffs' property to it is incorrect. MTD at 24.

---

[8] For paragraphs in quotations, Plaintiffs note the page for clarity due to clerical error in consecutive paragraph numbering of the complaint.

Contrary to the Defendants' assertion otherwise, MTD at 24-25, Plaintiffs specifically identify the converted property in their allegations as the property, the tokens and cash, from their FTX accounts that SBF provided to the Liquid Value Fund as co-general partners with Sino Global Capital. ¶ 338" on pg. 180; "¶ 343" on pg. 181. Defendants argue without citation or support that Plaintiffs must allege the "exact amount they invested with FTX" to adequately identify the converted funds here. MTD at 25. This is incorrect. *See Vechten v. Elenson,* No. 12-80668-CIV, 2013 WL 12080759, at *5 (S.D. Fla. Nov. 12, 2013) (specific and identifiable sum of money found for conversion claim even where exact amount was still in dispute).

Plaintiffs also adequately allege that Sino Global, as general partners with FTX in the Liquid Value Fund, and through the due diligence in investing in FTX, had knowledge of FTX's conversion of its customers' assets in providing those assets to the Liquid Value Fund through Alameda entities. "¶345" on pg. 181. *See, e.g. Drummond Co., Inc. v. Conrad & Scherer, LLP,* 885 F.3d 1324, 1332 (11th Cir. 2018) (actions and knowledge of partner are attributable to other partners under agency principles). Sino Global's argument that Plaintiffs inadequately alleged its knowledge of FTX's conversion must be rejected as FTX's co-general partner in the Liquid Value Fund, which was the recipient of Plaintiffs' converted property.

### J.  Plaintiffs have Sufficiently Pled an Unjust Enrichment claim against the Sino Global Defendants.

Defendants' argument that Plaintiffs failed to plead an unjust enrichment claim against the Sino Global Defendants should be rejected for similar reasons. MTD at 25-26. The Sino Global Defendants' argument that Plaintiffs fail to plead any "direct relationship" with them ignores the fact that Sino Global Capital was co-general partners with SBF/FTX in the Liquid Value Fund, which SBF/FTX unjustly enriched with Plaintiffs' property from their FTX accounts. ¶¶ 49, 312-315. Similarly, FTX's knowledge of the source of those funds can be imputed to Matthew Graham and the Sino Global Defendants because they were co-general partners together with FTX. A partner's knowledge of facts relating to the partnership is "effective immediately" as knowledge by the partnership. Fla. Stat. § 620.8102(6); *Drummond Co., Inc*., 885 F.3d at 1332. Plaintiffs have therefore sufficiently stated a claim for unjust enrichment against the Sino Global Defendants.

### K. Plaintiffs Sufficiently Pled Their Claims Under the California Unfair Competition Law ("UCL") (Count 14).

Defendants' arguments that Plaintiffs fail to state a claim under the California UCL are wrong. MTD at 26-27. The UCL creates a cause of action for business practices that are (1) unlawful, (2) unfair, or (3) fraudulent. Cal. Bus. & Prof. Code § 17200. Each "prong" provides a separate and distinct theory of liability. *Hadley v. Kellogg Sales Co.,* 243 F. Supp. 3d 1074, 1089 (N.D. Cal. 2017); *Lozano v. AT & T Wireless Servs., Inc.*, 504 F.3d 718, 731 (9th Cir. 2007).

### i.   Plaintiffs state a UCL claim under the "unlawful prong."

As Plaintiffs have sufficiently alleged that Defendants aided and abetted securities fraud under California law (See Section D) as well as a violation of California's False Advertising Law (See Section L), Plaintiffs have successfully alleged a predicate violation under the "unlawful" prong. *Randall v. Ditech Fin., LLC*, 23 Cal. App. 5th 804, 811 (2018) ("The UCL's 'unlawful' prong borrows violations of other laws...and makes those unlawful practices actionable.")

Defendants argue Plaintiffs' "unlawful" claim should be dismissed because they are premised on securities transactions. MTD at 27 (citing *Bowen v. Ziasun Techs., Inc.*, 116 Cal. App. 4th 777, 788 (2004)). Since *Bowen*, however, courts have clarified that UCL claims may proceed to the extent they are unrelated, or merely tangentially related to securities transactions. *Miller Fam. Tr. v. Nielson,* No. 2:12-CV-00913-SVW-SH, 2013 WL 12474637, at *8 (C.D. Cal. Mar. 11, 2013). This is especially true when, like here, the claims are also based on aiding and abetting securities fraud. *Benson v. JPMorgan Chase Bank,* N.A., No. 09–5272, 2010 WL 1526394, at *7-8 (N.D. Cal. Apr. 15, 2010) (refusing to apply *Bowen* to UCL claim targeting bank's alleged aiding and abetting violation of section 10(b)). And, to the extent the Court does not hold the relevant assets are securities, Plaintiffs have the right to plead their UCL claims in the alternative. *Haas v. Travelex Ins. Servs. Inc.*, 555 F. Supp. 3d 970, 980 (C.D. Cal. 2021); *Cabrales v. Castle & Cooke Mortg., LLC*, No. 1:14-CV-01138-MCE, 2015 WL 3731552 at *4 (E.D. Cal. June 12, 2015) ("[A] litigant is entitled to assert inconsistent theories of recovery on both legal and equitable grounds at the pleadings stage.")

Defendants' argument that Plaintiffs do not have an injury-in-fact is completely unavailing. MTD at 27-28. Plaintiffs lost money and property due to the fraud that Defendants aided, which involved far more than material misstatements and omissions by either FTX or Defendants. Defendants attempt to couch Plaintiffs' UCL claims in only misstatements and omissions should be rejected as it ignores the larger scheme that they aided by: promoting FTX, advising FTX on corporate governance and legal and regulatory compliance; lobbying to bring the FTX platform to

market; and trading in the securities at issue to prop them up and give FTX legitimacy. Because the UCL requires that a plaintiff's economic injuries come "as a result of" the fraudulent conduct, ...a plaintiff must allege "a causal connection or reliance on the alleged misrepresentation*." Pirozzi v. Apple, Inc.*, 966 F. Supp. 2d 909, 920 (N.D. Cal. 2013) (citing Cal. Bus. & Prof. Code § 17204). But for Defendants' conduct in funding and controlling and acting as agents on behalf of FTX, and but for their omissions when promoting FTX to the public, Plaintiffs could not have and would not have opened accounts on the FTX platform. Further, contrary to Defendants' assertions, to the extent Plaintiffs' UCL claims are premised on omissions, Plaintiffs are entitled to a presumption of reliance on material omissions Defendants made about FTX every time they promoted FTX, after gaining access and learning the truth about its total lack of meaningful governance and internal controls. *See Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128 (1972).

### ii.  Plaintiffs state claims under the "unfair" and "fraudulent" prongs.

The arguments that Plaintiffs' UCL claims fail under the unfair and fraudulent prongs are equally unavailing. MTD at 29-30. A plaintiff alleges a UCL violation under the "unfair" prong by alleging an "immoral, unethical, oppressive or unscrupulous [business practice that] causes injury…which outweighs [the utility of the practice]." *Nagrampa v. MailCoups Inc.*, No. C03-00208 MJJ, 2007 WL 2221028, at *2 (N.D. Cal. July 30, 2007). Here, Plaintiffs allege Defendants knew of SBF's fraud, nonetheless promoted FTX, and were kicked back tens of millions of dollars to trade in those tokens and assist in the scheme. Such conduct equally qualifies under the "fraudulent" prong of the UCL, which prohibits deceptive or misleading conduct "likely to deceive" a "reasonable consumer." *Eidmann v. Walgreen Co.*, 522 F. Supp. 3d 634, 643 (N.D. Cal. 2021). Defendants knew FTX was not trustworthy when they offered their money and reputes.[9]

### L.  Plaintiffs Sufficiently Pled a False Advertising Law Claim (Count 15).

Plaintiffs adequately plead a violation of California's False Advertising Law ("FAL"). The FAL prohibits any statement in connection with the sale of goods or services "which is untrue or misleading." Cal. Bus. & Prof. Code §17500. As alleged, Defendants knew, or reasonably should

---

[9] Defendants' argument that money damages are adequate is not well taken given the tenuous legal status and economic value of their accounts at FTX and the tokens held in those FTX accounts. MTD at 30. Defendants' final argument that the UCL cannot apply because of an insufficient connection to California simply ignores that Plaintiffs Cabo and Henderson are from California and opened their FTX accounts in California. ¶¶ 14, 15. The UCL claim should be upheld.

have known, that their misstatements and omissions relating to the viability and safety of FTX and the results of their own due diligence activities were untrue or misleading. In the alternative, if Defendants did not carry out the robust due diligence efforts they advertised, then they knew, or reasonably should have known, that their claims relating to their due diligence were untrue or misleading. Defendants failed to adequately inform Plaintiffs and the Class of the true nature of FTX when advertising.

Defendants' grounds for dismissal of the FAL are weak. MTD at 31-32. First, Defendants again incorrectly rely on *Bowen,* 116 Cal. App. 4th at 788, to argue that 17500 claims cannot be based on securities claims. MTD at 31 (citing *Kainos Lab'ys, Inc. v. Beacon Diagnostics, Inc.,* No. C-97-4618 MHP, 1998 WL 2016634, at *17–18 (N.D. Cal. Sept. 14, 1998)). Like *Bowen, Kainos* involved a discrete federal security fraud claim, not an aiding and abetting state law claim as a part of a sprawling cryptocurrency fraud, where whether securities are involved is a legal issue in the first place. Thus, reliance on *Kainos* suffers from the same fatal flaw as the reliance on *Bowen*. Further, this argument ignores that Defendants aided in bringing FTX to market through direct marketing and sponsoring and participation in FTX investor conferences, including giving speeches regarding FTX and crypto, *after* conducting due diligence and knowing at the time FTX suffered from a total, and fatal, lack of governance and internal controls. Further, Defendants are alleged to have touted their FTX investments at crypto investment conferences, on podcasts and social media while omitting the truth each time they did.

Plaintiffs need not prove the misrepresentation or omission was the "only," "sole," "predominant," or "decisive" cause of the injury-causing conduct, rather, they may show that the misrepresentation or omission was a substantial factor in their decision-making process. *Sud v. Costco Wholesale Corp*., 229 F. Supp. 3d 1075, 1083 (N.D. Cal. 2017), aff'd, 731 F. App'x 719 (9th Cir. 2018). If an omission is material, the fact that one would have behaved differently "can be presumed, or at least inferred." *Id.* (citations omitted). Thus, Plaintiff have adequately alleged the advertising statements that included their omissions, along with the SBF statements the Multinational VC Defendants lent their names to as "partners," including SBF's press releases upon their repeated investments in FTX and Sino Global's pitch deck for its fund with alameda and FTX were deceptive.

### M. Plaintiffs Sufficiently Pled Their Claim under Florida's Deceptive and Unfair Trade Practices Act (Count 16)

Plaintiffs' FDUPTA claims survive largely for the same reasons they do under the UCL. The Florida Deceptive and Unfair Trade Practices Act (FDUPTA) "protect[s] the consuming public . . . from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. §501.202(2); *Stewart Agency, Inc. v. Arrigo Enters., Inc.*, 266 So. 3d 207, 212 (Fla. Dist. Ct. App. 2019); *Baptist Hosp., Inc. v. Baker*, 84 So. 3d 1200, 1204 (Fla. Dist. Ct. App. 2012). Like the UCL, a "violation of FDUPTA may be based on '[a]ny law, statute, rule, regulation, or ordinance which proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices." *Glynn v. Basil St. Partners, LLC*, No. 2:09-CV-585-FtM-36SPC, 2010 WL 11623025, at *5 (M.D. Fla. Sept. 21, 2010); Fla. Stat. § 501.203(3)(c). The Act is construed liberally to promote its policy of protecting the public. Fla. Stat. § 501.202(2).

To state a claim, Plaintiffs must plead (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages. *Baptist Hosp.*, 84 So.3d at 1204. A "deceptive act or unfair practice" may be found when "there is a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment." *Blair v. Wachovia Mortg. Corp.*, No. 5:11-CV-566-OC-37TBS, 2012 WL 868878, at *3 (M.D. Fla. Mar. 14, 2012) (quoting *Sundance Apartments I, Inc. v. General Elec. Capital Corp.*, 581 F.Supp.2d 1215, 1220 (S.D.Fla.2008)). Much like the unlawful prong under the UCL, a "*per se* violation of FDUPTA stems from the transgression of '[a]ny law, statute, rule, regulation, or ordinance which proscribes unfair methods of competition or unfair, deceptive, or unconscionable acts or practices.'" *Id.* (citing Fla. Stat. § 501.203(3)(c)). Defendants' argument that Plaintiffs' FDUTPA claim fails because it is based on securities fails for the same reasons it does in California under *Bowen*, *supra*.

### i.   Plaintiffs sufficiently pled a claim under the FDUTPA.

As set forth in detail throughout, Plaintiffs plead a deceptive act by Defendants. Defendants confuse the second element of causation with reliance (by arguing that Plaintiffs fail to allege causation because "Plaintiffs do not allege that they even saw or read the Multinational VCs' statements." (MTD at 33). But reliance is not a part of the causation standard of FDUTPA. *Fitzpatrick v. Gen. Mills, Inc.*, 635 F.3d 1279, 1283 (11th Cir. 2011) (whether allegedly deceptive conduct would deceive an objective reasonable consumer is a common issue for all the putative class members, amenable to classwide proof); *Davis v. Powertel, Inc.*, 776 So. 2d 971, 973 (Fla. Dist. Ct. App. 2000) ("A party asserting a deceptive trade practice claim need not show actual

reliance on the representation or omission at issue."); *State Office of Attorney Gen., Dep't of Legal Affairs v. Commerce Commercial Leasing, LLC,* 946 So. 2d 1253, 1258 (Fla. Dist. Ct. App. 2007) ("A deceptive or unfair trade practice constitutes a somewhat unique tortious act because, although it is similar to a claim of fraud, it is different in that, unlike fraud, a party asserting a deceptive trade practice claim need not show actual reliance on the representation or omission at issue.") (quotation omitted). Plaintiffs have adequately pled causation. *See* ¶ 505.

Third, Plaintiffs have adequately pled damages. ¶¶ 505-506. Here, Defendants simply recycle their incorrect reliance argument to argue that Plaintiffs suffered no damages, but this is a confusing, unsound position—Plaintiffs lost their entire crypto investments held on the FTX platform, which would not have achieved its reach without Defendants' assistance.

**N. Plaintiffs Sufficiently Pled Negligent Misrepresentation.**

In the event that Defendants did not conduct the robust due diligence they professed to undertake, Plaintiffs have pled negligent misrepresentation as an alternative cause of action, as Defendants made public statements intended to legitimatize FTX in the public eye that they knew or should have known were false, and that injured Plaintiffs as result.

Under California and Florida law, negligent misrepresentation generally requires: (1) misrepresentation of a material fact; (2) that the representation was made without knowledge as to its truth or falsity or that the representor should have known the representation was false; (3) the representor intended that the misrepresentation induce action; and (4) resulting injury from justifiable reliance on the misrepresentation. *Souran v. Travelers Ins. Co.*, 982 F.2d 1497, 1503 (11th Cir. 1993); *Ronpak, Inc. v. Elecs. for Imaging, Inc.*, No. 14-CV-04058-JST, 2015 WL 179560, at *2 (N.D. Cal. Jan. 14, 2015).

Plaintiffs sufficiently plead each element. First, Plaintiffs allege that each Defendant made multiple misleading statements publicly endorsing FTX as a safe exchange. Temasek publicly touted its due diligence activity regarding the safety and viability of FTX. ¶¶ 342, 349. It hosted and spoke at the Crypto Bahamas event, which was lauded as a "four-day flex of FTX" in support of the exchange. ¶¶ 359-361. SoftBank, in addition to toting its due diligence efforts, successfully lobbied the CFTC in support of FTX obtaining licensing to operate as a derivatives clearinghouse, and asserted that FTX's liquidity and protocols reduce the risk to the financial system—a statement that became demonstrably untrue. ¶ 363. Sino Global publicly endorsed both FTX's integrity and the extent of its due diligence of FTX. ¶¶ 341, 367. Each Defendant made representations regarding

the safety and legitimacy of FTX and their own due diligence activities in order to induce confidence in FTX and convince consumers to commit to using the platform, thereby increasing the value of Defendants' investments in FTX.

Second, Plaintiffs allege Defendants knew or should have known their statements were false. Defendants had access to and knowledge of FTX's corporate structure, transactions, and the nature of its internal controls through the course of due diligence. Temasek and Sino Global held seats on the board. As set forth herein, numerous other individuals and entities picked up on the concerning and shady nature of FTX's business practices after spending much less time and resource evaluating the company than Defendants did. Defendants were provided a plethora of materials that now are regarded as clearly demonstrating improper overlap between FTX and Alameda, insufficient internal controls, irregular transactions, unsubstantiated projections, questionable loans, inflated assets, untruthful statements about FTT, and more. It's simply implausible to think that Defendants did not know— *at the very least*, they certainly should have.

Third, there is an extremely logical inference to draw from Defendants' actions that they intended their misrepresentations to be relied on. *See*, e.g., ¶¶ 351-52, ¶ 371. Defendants' enthusiastic public endorsements of FTX paid off, as FTX's user base grew exponentially between rounds of funding (which meant, in turn, Defendants' investments skyrocketed). ¶ 372. Indeed, other investors have stated relying on the word of, and professed due diligence of, other "luminary venture capital investors" that invested in FTX. ¶ 344. As set forth herein, Plaintiffs were injured as result of relying on these misrepresentations about the safety and viability of FTX.

### O. Plaintiffs Sufficiently Pled Intentional Misrepresentation and Fraudulent Inducement.

Under California law, Plaintiffs must plead: (1) a false statement concerning a material fact; (2) the representer's knowledge that the representation is false; (3) an intention that the representation induce another to act on it; and (4) consequent injury by the party acting in reliance on the representation. *Specialty Marine & Indus. Supplies, Inc. v. Venus*, 66 So. 3d 306, 310 (Fla. Dist. Ct. App. 2011) (citing *Butler v. Yusem*, 44 So. 3d 102, 105 (2010)); *Johnson v. Davis*, 480 So.2d 625, 627 (Fla.1985).) Justifiable reliance is not a necessary element of fraudulent misrepresentation, which means "a recipient may rely on the truth of a representation, even though its falsity could have been ascertained had [the recipient] made an investigation, unless [the recipient] knows the representation to be false or its falsity is obvious." *Butler*, 44 So. 3d at 105;

*Gilchrist Timber Co. v. ITT Rayonier, Inc.*, 696 So. 2d 334, 336 (Fla.1997) (quoting *Besett v. Basnett*, 389 So. 2d 995, 998 (Fla.1980)).

As set forth in detail herein, first, Plaintiffs do allege false statements by Defendants concerning material facts about the reliability and legitimacy of FTX. These include Defendants' repeated representations about the adequate extent, nature, and findings of their due diligence; that FTX's services were safe; that SBF was a visionary who was focused on decreasing risk in trading; and that FTX was an exchange the public should trust. *See, e.g.*, ¶167. These statements were not, as Defendants argue, just opinions or subjective endorsements—they were factually untrue representations about the nature of FTX's business to the public. *See Stonecreek--AAA, LLC v. Wells Fargo Bank N.A.*, No. 1:12-CV-23850-MGC, 2013 WL 5416970, at *7–8 (S.D. Fla. Sept. 26, 2013) (statements not opinions when defendants knew the representations were false at the time they were made because they were aware of but concealed certain information).

As for the second element that Defendants knew their representations were false, Plaintiffs sufficiently plead that—at the very least—Defendants willfully turned a blind eye to what they knew and should have known and that they were incentivized to do so. Willful blindness is a viable theory of proof under Florida law which imputes actual knowledge where a person has "suspicion aroused about a particular fact, realized its probability, but deliberately refrained from obtaining confirmation because he or she wanted to remain in ignorance." *Rusty115 Corp v. Bank of Am., N.A.*, No. 22-CV-22541-BER, 2023 WL 6064518 (S.D. Fla. Sept. 18, 2023) (citing Florida Pattern Jury Instruction (Criminal) 3.3(h)). This theory of circumstantial proof can be applied in civil cases. *See*, *e.g.*, *Intel Corp. Inv. Pol'y Comm. v. Sulyma*, 140 S. Ct. 768, 779, 206 L. Ed. 2d 103 (2020) (citing *Global-Tech Appliances, Inc. v. SEB S. A.*, 563 U.S. 754 (2011)). Plaintiffs do not rely on an "assumption" of knowledge.

Third, while Defendants argue that Plaintiffs failed to point how their false factual statements evince intention to induce specific action, "[t]he law does not require that the false statement be made directly to the injured party, 'provided [that the statement is] made with the intent that it shall reach ... and be acted on by the injured party." *Kerruish v. Essex Holdings, Inc.*, No. 16-60877-CIV, 2017 WL 10457076, at *2 (S.D. Fla. Aug. 9, 2017) (quoting *Harrell v. Branson*, 344 So. 2d 604, 606 (Fla. Dist. Ct. App. 1977)). Notwithstanding, as alleged, Defendants' statements *did* induce action in the public sphere and normalized trading on the FTX platform. As also alleged, multiple other actors in the space have publicly stated relying on the due diligence

performed by FTX institutional investors. As for Defendants' argument here that Plaintiffs fail to mention an actual produce or service that FTX fraudulently induced consumers to purchase, the allegations are clear: consumers were paid a high yield for depositing fiat currency that FTX then laundered. The product, so to speak, is the high yield offered for depositing funds on the platform.

Fourth, Plaintiffs do allege how they acted in reliance as explained above.

Ultimately, Defendants repeatedly argue that Plaintiffs did not sufficiently plead that they made misrepresentations to the public by attempting to rebut the factual basis for Plaintiffs' claims, but offering competing versions of the facts as alleged is improper at the motion to dismiss stage. *Ronpak, Inc. v. Elecs. for Imaging, Inc.*, No. 14-CV-04058-JST, 2015 WL 179560, at \*3 (N.D. Cal. Jan. 14, 2015).

### P. Plaintiffs' Declaratory Judgment Claims Stand Because There is a Justiciable Controversy.

Defendants' four arguments in support of their request for dismissal of the declaratory judgment claims each fail. The test for the sufficiency of a complaint for declaratory judgment is not whether Plaintiffs will succeed in obtaining the decree sought, but whether they are entitled to a declaration of rights at all. *X Corp. v. Y Person*, 622 So. 2d 1098, 1101-02 (Fla. Dist. Ct. App. 1993) (citing *Platt v. General Dev. Corp.*, 122 So. 2d 48 (Fla. Dist. Ct. App. 1960), cert. dismissed, 129 So. 2d 143 (Fla.1961)). The relevant issue is whether a justiciable dispute involving plaintiffs' rights exists. *People's Tr. Ins. Co. v. Alonzo-Pombo*, 307 So.3d 840, 843 (Fla. Dist. Ct. App. 2020); *Rhea v. Dist. Bd. of Trs. of Santa Fe Coll.*, 109 So. 3d 851, 859 (Fla. Dist. Ct. App. 2013); *see also People's Tr. Ins. Co. v. Franco*, 305 So. 3d 579 (Fla. Dist. Ct. App. 2020); *Wilson & Wilson v. City Council of Redwood City*, 191 Cal. App. 4th 1559, 1582 (2011).

First, Defendants make the circular and unavailing argument that declaratory judgment is unavailable because there are no valid underlying claims. As set forth herein, Plaintiffs have adequately pled their UCL, FAL, and fraud claims for which they seek declaratory relief.

Second, Defendants take issue with Plaintiffs seeking an order for remedial measures in addition to declaratory relief, *e.g.,* restitution to the Plaintiffs and issuing public announcements. But the additional relief does not somehow detract from the need for the court to adjudicate the parties' rights as to whether Defendants illegally solicited Plaintiffs' transactions and is thus no basis for dismissal of the claim. Defendants' citation to *Garcia v. Kashi Co.*, which only clarifies what the two types of relief are, is inapt. 43 F. Supp. 3d, 1359, 1389 (S.D. Fla. 2014).

Third, Defendants maintain that Plaintiffs seeking compensatory damages forecloses a claim for declaratory relief because money damages are adequate and therefore the relief sought is duplicative. MTD at 37. While true that some California case law states that equitable relief may be barred where a party seeks compensatory damages which provide an adequate remedy at law,[10] the remedies here are distinct—as Plaintiffs seek monetary damages to remedy harm incurred and the prospective remedies of declaratory judgment and injunctive harm to curb future harm (¶¶ 531-538)—and such a determination would be improper at this early stage of litigation, *particularly* with concomitant proceedings that will impact the legal status and economic value of Plaintiffs' assets. *See Sierra Equity Group, Inc. v. White Oak Equity Partners, LLC*, 650 F.Supp. 2d 1213, 1230–1231 (S.D. Fla. 2009) (explaining that "other courts have held that 'declaratory judgment is inappropriate solely to adjudicate past conduct' [citations omitted]). A justiciable conflict exists for the court to provide declaratory relief even if the court addresses compensatory damages, given the injunctive relief claim and uncertainty of the valuation of the assets at issue.

Fourth, Defendants rely on *Sierra Equity Group, Inc. v. White Oak Equity Partners, LLC* for the proposition that Plaintiffs improperly seek factual determinations of possible tortious acts committed in the past, which is unrelated to the "purpose" of declaratory judgment. 650 F. Supp. 2d, 1213, 1230–1231; *See* MTD at 37. But as Plaintiffs' allegations make clear, the relief sought is not meant just to adjudicate past conduct or obtain a "purely legal ruling" but is instead meant to address an ongoing and actual controversy. Plaintiffs seek a determination of whether the YBAs were illegally sold by FTX and illegally solicited by Defendants, which will determine whether there is further escalation of this conflict or further litigation. Plaintiffs seek the court's guidance in determining their rights. In neither *Medmarc* nor *Sierra Equity Group* does the court state that it cannot rely upon the facts in the course of clarifying the legal relations between the parties, as opposed to utilizing a declaratory relief action as a vehicle for resolving of past disputes of fact. Accordingly, Plaintiffs have properly alleged claims for a declaratory judgment.

### Q.  Plaintiffs' Request for Punitive Damages Stand.

Defendants assert no cognizable basis for their assertion that Plaintiffs' request for punitive damages should be dismissed. MTD at 37. Their first argument is it should be dismissed because

---

[10] *See Flying Dutchman Park, Inc. v. City and Cnty. of San Francisco*,93 Cal. App. 4th 1129, 1138 (2001) (The rule in this state is that injunctive and declaratory relief will not be granted where there is a plain, complete, speedy, and adequate remedy at law).

it is not a stand-alone cause of action—but of course punitive damages are a form of relief. Indeed, because an allegation that Plaintiffs are entitled to a type of damages does not constitute a claim under Rule 8, it does not provide a basis for the court to dismiss a claim. *Cohen v. Office Depot, Inc.*, 184 F.3d 1292, 1297 (11th Cir.1999), vacated in part on other grounds by 204 F.3d 1069 (11th Cir. 2000); *see also Bowden v. City of Franklin*, Ky., 13 F. App'x 266, 276 (6th Cir.2001) ("Count VI is not a claim for relief but a request for punitive damages."). "[A] plain reading of Rule 12(b)(6) indicates that the rule may be used only to dismiss a 'claim' in its entirety." *Janis v. Nelson*, No. CR. 09-5019-KES, 2009 WL 4505935, at \*7 (D.S.D. Nov. 24, 2009). To the extent allegations in the complaint are styled as a claim for punitive damages, this is at worst surplusage, not grounds for dismissal of any substantive claim to which those allegations relate.

The relief Plaintiffs request is irrelevant to the determination of whether a plaintiff has stated a claim for relief, as dismissal rests not on whether Plaintiffs request a proper remedy but whether they are entitled to any remedy. *See City of L.A. v. Lyons*, 461 U.S. 95, 130 (1983).

Plaintiffs request punitive damages as an available form of relief arising out of their claims for fraud and intentional misconduct. *See Stowell v. Ted S. Finkel Inv. Servs., Inc.* 489 F. Supp. 1209, 1215 (S.D. Fla. 1980) (punitive damages may be recovered under Florida law in any action containing aggravating circumstances such as willfulness, wantonness, maliciousness, gross negligence, recklessness or fraud); *Pilliod v. Monsanto Co.*, 67 Cal. App. 5th 591, 642 (2021) (Punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence. Courts are to determine reprehensibility by considering five factors: "[whether] the harm caused was physical as opposed to economic; [whether] the tortious conduct evidenced an indifference to or a reckless disregard of the health or safety of others; [whether] the target of the conduct had financial vulnerability; [whether] the conduct involved repeated actions or was an isolated incident; and [whether] the harm was the result of intentional malice, trickery, or deceit, or mere accident.") (internal quotes and citations omitted).

## IV.   <u>CONCLUSION</u>

Plaintiffs respectfully request the Court deny Multinational VC Defendants' motion to dismiss Plaintiffs' complaint for failure to state a claim. To the extent this Court does not deny the motion outright, it should defer a ruling pending jurisdictional discovery, for which Plaintiffs have requested leave by way of motion (ECF No. 838), or until trial.

## REQUEST FOR ORAL ARGUMENT

Pursuant to L.R. 7.1(b), Plaintiffs respectfully request a 60-minute hearing on the Motion. This case presents matters of great public interest and legal complexity and a hearing will give the parties an opportunity to present their arguments and answer any questions the Court may have.

Dated: February 27, 2025

Respectfully submitted,

**By:** */s/ Adam Moskowitz*
Adam M. Moskowitz
Florida Bar No. 984280
Joseph M. Kaye
Florida Bar No. 117520
**THE MOSKOWITZ LAW FIRM, PLLC**
Continental Plaza
3250 Mary Street, Suite 202
Coconut Grove, FL 33133
Office: (305) 740-1423
adam@moskowitz-law.com
joseph@moskowitz-law.com
service@moskowitz-law.com

*Co-Lead Counsel*

**By:** */s/ David Boies*
David Boies
Alexander Boies
Brooke A. Alexander
**BOIES SCHILLER FLEXNER LLP**
333 Main Street
Armonk, NY 10504
914-749-8200
dboies@bsfllp.com
aboies@bsfllp.com
balexander@bsfllp.com

*Co-Lead Counsel*

James R. Swanson, La. Bar No. 18455
Kerry J. Miller, La. Bar. No. 24562
Molly L. Wells, La. Bar. No. 36721
C. Hogan Paschal, La. Bar No. 38495
**FISHMAN HAYGOOD L.L.P.**
201 St. Charles Avenue, 46th Floor
New Orleans, Louisiana 70170-4600
(504) 586-5252; (504) 586-5250 fax
jswanson@fishmanhaygood.com
kmiller@fishmanhaygood.com
mwells@fishmanhaygood.com
hpaschal@fishmanhaygood.com

Robert Lieff
P.O. Drawer A
Rutherford, CA 94573
rlieff@lieff.com

*Counsel to Plaintiffs and the Putative Classes*

Joseph R. Saveri
Christopher Young
**JOSEPH SAVERI LAW FIRM**
601 California Street, Suite 1505
San Francisco, CA 94108
Telephone: (415) 500-6800
jsaveri@saverilawfirm.com
cyoung@saverilawfirm.com

*Counsel to Plaintiffs and the Putative Classes*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a true and correct copy of the forgoing was filed on February 27, 2025, via the Court's CM/ECF system, which will send notification of such filing to all attorneys of record.

By: *<u>/s/ Adam Moskowitz</u>*

Adam Moskowitz