**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MDL No. 3076**
**CASE NO. 1:23-md-03076-KMM**

IN RE:

**FTX Cryptocurrency Exchange Collapse MDL Litigation**

_____

THIS DOCUMENT RELATES TO:

Bank Defendants

*O'Keefe v. Sequoia Capital Operations, LLC, et al.*, S.D. Fla.
Case No. 1:23-cv-20700

*O'Keefe v. Farmington State Bank d/b/a Moonstone Bank, et al.*, E.D. Wa. Case No. 2:23-cv-00213-TOR

_____/

**OPPOSITION TO DEFENDANT MOONSTONE BANK'S**
**MOTION TO DISMISS PLAINTIFFS' AMENDED ADMINISTRATIVE CLASS ACTION**
**COMPLAINT AND INCORPORATED MEMORANDUM OF LAW [ECF NO. 822]**

Plaintiffs file this opposition to the Motion to Dismiss Plaintiffs' Amended Administrative Class Action Complaint and Incorporated Memorandum of Law (R. Doc. 822) filed by Defendant Farmington State Bank d/b/a Moonstone Bank ("Moonstone").

## INTRODUCTION

The FTX disaster is the largest financial fraud in US history, resulting in billions of dollars in losses to Plaintiffs. Defendant Sam Bankman-Fried ("SBF"), founder and former CEO of FTX Trading Ltd. ("FTX Trading") and its domestic counterpart, West Realm Shires Services Inc. d/b/a FTX US ("FTX US" and collectively with FTX Trading, "FTX"), took in customer funds, in both fiat and cryptocurrencies, and rather than segregate those funds and hold them in custody for the benefit of FTX's customers, SBF stole customers' monies, laundered through sham loans and other transfers to Alameda Research, LLC ("Alameda" and collectively with FTX, "FTX Group"), the crypto hedge fund that SBF separately owned, and then paid to himself and other FTX insiders. SBF was convicted on seven criminal counts including wire fraud, and his top lieutenants pleaded guilty to same. SBF could not have perpetuated a scheme of such tremendous scale on his own. Indeed, it is long observed that one "can't run a Ponzi scheme without a bank … Banks are in a unique position to notice what is going on before the money is all gone."[1] SBF found that assistance in Moonstone, its chairman, Jean Chalopin, and Deltec Bank and Trust Company, its sister bank.

Moonstone provided necessary assistance to SBF, while from its "unique position" and as a result of its regulatory diligence and monitoring obligations, Moonstone knew FTX was converting customer funds by way of SBF's separately owned Alameda, in breach of its fiduciary duty to its customers and contrary to its representations, *inter alia*, that it was "the safest and easiest way to buy and sell crypto," that it maintained appropriate internal controls and risk management protections, and that it would hold customers' deposits in custody for the customers' benefit and segregated from FTX's own assets.

Notwithstanding its knowledge of FTX's misconduct, and in service of its own financial interests, Moonstone rendered critical and substantial assistance to the FTX fraud. Moonstone provided necessary, one-of-a-kind banking services to FTX when other financial institutions would not, including entry to the US banking system by way of the Federal Reserve and by serving

---

[1] Floyd Norris, *After Fraud, Regulators Go After A Bank*, N.Y. Times, Oct. 4, 2013, at B1.

as an outpost through which SBF trafficked customer assets offshore to its sister bank in The Bahamas, Defendant Deltec Bank and Trust Company Limited ("Deltec"). Moonstone and Deltec together were led by Defendant Jean Chalopin, a long-time friend of SBF and other FTX insiders. FTX rewarded Moonstone, Deltec, and Mr. Chalopin for their assistance by flushing the banks with tens of millions of dollars in needed capital—and, in the case of Moonstone, Alameda became a shareholder of the bank by way of an $11.5 million investment that doubled the then-value of the bank—and hundreds of millions of dollars of deposits.

<b>PLAINTIFFS' FACTUAL ALLEGATIONS</b>

**I.    FTX's fraud and underlying misconduct.**

SBF, along with his co-founders Gary Wang and Nishad Singh, launched FTX in May 2019. R. Doc. 155, ¶ 34.[2] FTX was conceived in Northern California before ultimately landing its domestic operations in Miami, Florida, where FTX US was headquartered and where, in early 2021, FTX purchased the naming rights to the Miami Heat's waterfront arena for more than $135 million, one of many extravagant purchases made with Class Member funds. ¶ 37.

FTX touted itself as the "safest[,] easiest" and "most trusted way to buy and sell" digital assets. ¶ 35. For example, FTX purported (1) to have adopted "investor protections" including "avoiding or managing conflicts of interest," (2) to hold customer funds in segregated accounts for the customers' benefit, never taking title to or lending out those assets itself, (3) to implement state-of-the-art risk management controls to prevent any customer from becoming overleveraged on the platform, and (4) to adhere strictly to all regulatory and compliance obligations. ¶¶ 35, 42-43. FTX led the public to believe that its competitive advantage was its safety, transparency, and trustworthiness. Based on these representations, FTX grew to become one of the largest cryptocurrency exchanges in the world, with a valuation topping $32 billion and trading volumes of $21 billion per day. ¶ 49.

FTX's representations were untrue and its cryptocurrency platform, a fraud. FTX omitted that it had no fundamental internal controls, risk management procedures, or other investor protections in place; it sought only to sidestep, if not flout entirely, its regulatory obligations; it did not hold customer funds in segregated accounts; and in truth, FTX was converting customer deposits, siphoning them to SBF so that he could prop up his own speculative ventures and enrich

---

[2] Unless otherwise noted, all citations hereafter are to paragraphs of the Amended Complaint, R. Doc. 779.

himself, his family, and his friends. ¶ 3.

SBF primarily routed the fraud through Alameda, the crypto hedge fund which he and Gary Wang formed two years before launching FTX and owned 90% and 10%, respectively. ¶ 86. SBF led Alameda as CEO until October 2021, when he installed Caroline Ellison, his close friend and former romantic partner, as CEO. ¶¶ 59, 86. From the time she joined Alameda in 2018 through the collapse of FTX, Alameda maintained an office in California where its "Settlements Team," comprised of Lena Ngoy and Carlos Mahoma, principally worked. ¶ 61. Alameda's Settlements Team directed transfers and settled transactions among FTX Group banks accounts and cryptocurrency wallets, communicated with Alameda's banks, lenders, and exchanges; communicated with trading counterparties, and settled traders. *Id.*

To effect the fraud, Alameda took in customer funds, either by bank transfer from FTX accounts or by direct deposit into accounts held by North Dimension, a fake electronics dealer that served as Alameda's front. ¶¶ 64-65, 91. From there, Alameda used customer funds to make highly leveraged trades and other risky investments or transferred the funds to SBF and other insiders in the form of sham "loans." *Id.* FTX stole more than $8 billion in customer deposits in this way. *Id.*

In November 2022, Alameda's misappropriation of FTX customer funds caused the FTX exchange to collapse, and the FTX Group filed for Chapter 11 bankruptcy. Recourse to Plaintiffs and Class Members in the bankruptcy is limited by the Petition Date value of their deposits. But the value of cryptocurrency has increased tremendously—and continues to increase—since the Petition Date. For example, the current market value of 1 bitcoin (BTC) is approximately $95,700—more than 5x its Petition Date value.[3] Plaintiffs will not therefore receive complete relief for their injuries through the bankruptcy and remain deprived of the fair market value of their deposits lost because of the FTX fraud and Defendants' knowing assistance therewith.

## II. Moonstone's knowing assistance of FTX's underlying misconduct.

Through diligence on FTX and close ties with SBF, Moonstone learned that FTX was operated as SBF's personal piggy bank, that as quickly as FTX customer funds flowed into FTX, they flowed back out to other entities SBF separately owned or controlled, and that FTX lacked the most basic internal controls, such that the enterprise was in fact a house of cards. ¶¶ 250-52. But Moonstone did not care. It, too, had money to make in the scheme, its interests aligned with SBF's, and SBF rewarded Moonstone handsomely for its assistance. ¶ 245. With shared objectives

---

[3] https://www.coindesk.com/price/bitcoin (last accessed Feb. 13, 2025).

and complementary motives, Moonstone conspired with FTX to perpetuate the fraud and committed critical overt acts in furtherance of it, including by providing FTX access to the U.S. banking system, as well as a suite of non-routine, high risk banking services to FTX, accepting and/or transferring Class Member funds into accounts that Moonstone knew were held by entities that SBF separately owned, and helping to fence Class Member funds across the U.S. border.

### A.  Moonstone's cozy history with FTX and its founder, SBF.

Moonstone's involvement in the FTX fraud originated with Defendant Jean Chalopin. A veteran of the crypto industry, Mr. Chalopin is both Moonstone's chief executive officer and chairman, as well as the largest shareholder and longtime chairman of Defendant Deltec, an offshore bank licensed and operating in The Bahamas. ¶¶ 27-29, 138. Deltec is one of the only banks in the world that offers a full suite of digital asset services, including multi-currency banking, digital asset custody, trading, market making, lending and borrowing, such that it is one of the few financial institutions through which clients can process cryptocurrency transactions. ¶ 27.

Recognizing the unique, if not unusual, suite of services his bank had to offer the crypto industry, Mr. Chalopin spent years assisting the Bahamian government in "transforming the country into a sandbox for digital asset startups." ¶¶ 138-139. This was no easy task. As Mr. Chalopin tells it, transforming The Bahamas into a crypto haven was like clearing a jungle, requiring a "machete [to] cut the branches." ¶ 139. Perhaps helpful in this regard was Ryan Pinder, The Bahamas' Attorney General, who served many years in The Bahamian Parliament before leaving in 2014 to take what he described as a "mind blowing" deal to serve as Chief Legal Officer at Deltec, Mr. Chalopin's bank. *Id.* With friends in the government, Mr. Chalopin succeeded in lobbying the Bahamian legislature to pass crypto-friendly legislation in 2020. ¶ 142. Mr. Chalopin credits these efforts, and the lenient regulation that resulted therefrom, with attracting FTX to The Bahamas (and, in turn, to his bank, Deltec). ¶ 143.

FTX and other entities under SBF's control opened no fewer than 17 accounts at Deltec in currencies of various kinds. ¶ 152. FTX quickly became one of Deltec's largest customers and transferred Class Member funds into and out of those accounts in furtherance of the FTX fraud, and Deltec accepted customer deposits directly into FTX's accounts. ¶¶ 191, 256, 258. At Mr. Chalopin's direction, Deltec assisted FTX in moving Class Member funds offshore through these accounts. *Id.* These funds included, upon information and belief, not only Class Members'

U.S. dollar deposits, but also Class Members' cryptocurrencies, as Deltec is one of few banks with the faculties necessary to do that, including taking custody of cryptocurrencies and trading, lending or borrowing digital assets. *Id.* FTX could not find these special services in other banks, and FTX relied on the provision of these crypto banking services by Deltec. ¶ 136. Deltec benefited greatly from its relationship with FTX, collecting millions of dollars in fees and profiting from hundreds of millions of deposits held in the FTX accounts.

The Tether fraud did not deter Mr. Chalopin nor Deltec, his bank, from expanding their crypto clientele and lucrative crypto business. To do this, Deltec co-sponsored with FTX the Crypto Bahamas summit, where Mr. Chalopin and SBF hosted "an exclusive gathering of the leading investors and builders in the blockchain, digital assets and web3 space." ¶ 147. Nearly a dozen FTX executives, including Brett Harrison, President of FTX US, and Zach Dexter, President of LedgerX, were also featured at the conference. *Id.* Deltec's sponsorship of Crypto Bahamas, at Mr. Chalopin's direction, helped to amplify SBF's reach. Press heralded the conference, with *CoinDesk* describing it as "a four-day flex of FTX's expanding empire … with a new era of 'corporate crypto' firmly on display," and the *New York Times* reporting, "Bankman-Fried was presiding over the first edition of the Crypto Bahamas conference, a showcase for FTX and a vivid demonstration of his growing celebrity and influence. Everywhere he went, crypto entrepreneurs offered handshakes and fist bumps, patting him on the back as they pitched projects or presented him with branded swag." ¶ 148. Deltec's hosting Crypto Bahamas also helped to normalize the FTX exchange "from the early days of 'shadowy super-coders' hearkening the end of banks." ¶ 149. Many news outlets reported the growing acceptance of crypto on display, with *Yahoo! Finance* noting that the summit was an introduction between "traditional investors and crypto native firms," and *Forbes* reporting that the panels "discussed how digital assets fit into modern investment portfolios and the broader maturation of the asset class." *Id.*

Mr. Chalopin was happy for Deltec to help FTX. At the conference, Mr. Chalopin touted that "Deltec has been a long-time friend of FTX, and it is our pleasure to support them." ¶ 150. Mr. Chalopin added "Deltec has probably 20 people on the ground here at the conference today. We are here because we embraced [FTX's] vision of the future." *Id.* FTX, in turn, was a great friend to Deltec. After an extended failure by Deltec to raise debt capital in New York, Mr. Chalopin turned to FTX and, in October 2021, Deltec's parent company, Deltec International Group, received a $50 million loan from Norton Hall Ltd., an entity controlled by Ryan Salame,

CEO of FTX's Bahamian outfit, the same entity through which Alameda "loaned" $55 million to Mr. Salame, paid for with Class Member funds. ¶ 90.

In furtherance of his long-time friendship with SBF, and in service of the mutually beneficial relationship between Deltec and FTX, Mr. Chalopin sought opportunity to assist the FTX fraud stateside. Mr. Chalopin found that opportunity in Farmington State Bank, then the 26th smallest of 4,800 banks in the United States with roughly no more than 25 employees and a single branch in Farmington, Washington, a rural town of only 150 residents. ¶ 246. So small was Farmington State Bank that, in 2010, the bank's president bragged that it did not offer credit cards and held more deposits than loans outstanding. *Id.* That changed in 2020, when Mr. Chalopin purchased Farmington State Bank and rebranded it Moonstone, purportedly to target digital assets and to support the "underserved cannabis industry." *Id.* Mr. Chalopin, who since purchasing Moonstone serves as its chairman and CEO (while concurrently serving as chairman of Deltec), further explained his motivation in acquiring Moonstone as filling a "massive gap in the U.S. for digital asset businesses, [that Moonstone] think[s] we can solve." ¶ 136. Moonstone would also fill a massive gap for FTX, which was then lacking sufficient entry points to the U.S. banking system and sufficient go-betweens from the United States to Deltec, FTX's offshore bank in The Bahamas. ¶ 254.

**B. Moonstone's knowledge of the FTX fraud.**

By the time Mr. Chalopin purchased Moonstone, the FTX fraud had been operating for at least a year, and Moonstone gained awareness of FTX's underlying misconduct immediately upon Mr. Chalopin's purchase of it. As the newly installed CEO and chairman of Moonstone, Mr. Chalopin brought with him knowledge of FTX's misconduct obtained as chairman of Deltec and long-time friend of SBF.[4] In particular, Mr. Chalopin had the benefit of Deltec's due diligence on FTX and Deltec's regulatory obligation to monitor FTX's banking activity thereafter. Other Deltec clients have explained that this diligence process, reportedly conducted over "several months," includes "an analysis of [the client's] compliance processes, policies and

---

[4] *See, e.g.*, *Beck v. Deloitte & Touche, Deloitte, Haskins & Sells, Ernest & Young, L.L.P.*, 144 F.3d 732, 736 (11th Cir. 1998) ("In normal circumstances, the knowledge of a corporation's directors (and therefore their discovery of malpractice) is imputed to the corporation [under Florida law]."); *Pearson v. Deutsche Bank AG*, 2023 WL 2610271, at *24 (S.D. Fla. Mar. 23, 2023); *Interlake Porsche & Audi, Inc. v. Bucholz*, 728 P.2d 597, 607 (Wash. 1986) ("As an IPA officer and director, Kreybig had knowledge which is imputed to the corporation.").

7

procedures; a full background check of the shareholders, ultimate beneficiaries and officers of [the] company; and, for crypto clients, assessments of [the client's] ability to maintain the USD-peg [i.e., the currency's stability by way of peg to the US dollar] at any moment and [the client's] treasury management policies." ¶ 155.

Moreover, as a Bahamian Supervised Financial Institution, Deltec was required to have in place policies that were consistent with the Central Bank of the Bahamas' Guidelines for Supervised Financial Institutions on the Prevention of Money Laundering, Countering the Financing of Terrorism & Proliferation Financing (the "Guidelines"). ¶ 156. All Supervised Financial Institutions of the Bahamian Central Bank must use these Guidelines to develop responsible procedures to prevent money laundering and terrorist financing. *Id.* For example:

- Deltec is required to "retain adequate documentation to demonstrate that its [Know Your Customer ("KYC")] procedures have been properly implemented, and that it has carried out the necessary verification procedures." *Id.* From this, Deltec would have learned SBF was the beneficial owner of FTX and Alameda.

- When seeking to verify the identity of corporate clients, Deltec is required to identify the client's "source of funds." *Id.* From this, Deltec would have identified that incoming transfers to FTX's accounts were of customer deposits.

- Moreover, cross-border wire transfers of $1,000 or more must contain complete payer and payee information for Deltec to process such wire transfers. *Id.* From this, Deltec would have learned that FTX customer deposits were being transferred to Alameda and other entities that SBF separately owned.

- And, per the Guidelines, where Deltec "observe[s] unusual activity in relation to any client account, [it] should question the customer concerned, even if it means asking difficult questions. If a customer fails to provide credible answers, this should invite further enquiry about his activities, make [Deltec] reconsider the wisdom of doing business with [the client] and, potentially lead to a [Suspicious Transaction Report ("STR")] being filed. [Deltec] should document the results of their enquiries into unusual activity." *Id.*

Under these regulations, Deltec was obligated to (1) identify the source of funds transferred into, out from, and among FTX's accounts at Deltec; (2) obtain payer and payee information for wire transfers into, out from, and among FTX's accounts for cross-border transfers and transfers in amounts greater than $1,000; and (3) question the customer about any unusual activity observed in the customer's accounts. For FTX, the source of funds was customer assets, including Class Member funds, and the payer and payee were FTX, Alameda, SBF, his friends, family and other

FTX insiders. *Id.* As a result, Deltec—and by extension, Chalopin, Deltec's chairman and largest shareholder—was aware that customer funds were being transferred to Alameda (and other accounts under SBF's control) from FTX.

To be sure, Chalopin learned of FTX's misconduct in courting Alameda to invest in his new bank, Moonstone. Shortly after purchasing Moonstone, Chalopin and his son Janvier Chalopin, Moonstone's chief digital officer, solicited Alameda for start-up capital and, in doing so, "pitched [Alameda] the whole roadmap" to invest in the then tiny bank in rural Washington state. ¶ 245. The Chalopins succeeded in securing financial backing from SBF, their long-time friend. In January 2022, Alameda invested $11.5 million in Moonstone—nearly double the bank's net worth at the time. *Id.* Alameda was Moonstone's largest investor and, in a press release dispatched from Bellevue, Washington, Chalopin boasted at that time "Alameda['s]investment into … Moonstone Bank signifies the recognition, by one of the world's most innovative financial leaders, of the value of what we are aiming to achieve. This marks a new step into building the future of banking." *Id.* It also meant that SBF, who owned 90% of Alameda, indirectly held a majority stake in Moonstone, one of the select banks through which he ran the FTX fraud.

In addition to the ordinary diligence that would come before taking in tens of millions of dollars in investment capital from Alameda, Moonstone obtained information concerning FTX's underlying misconduct from Chalopin's close personal bond with Defendant Dan Friedberg, who helped Chalopin secure Alameda's investment. ¶ 247. Friedberg is FTX's general counsel and chief compliance officer, licensed in Washington state and who, at the time, worked for FTX from the Seattle area. ¶ 248. Friedberg regularly met with Chalopin, often over dinner and, in or around August 2021, the two began to discuss Alameda's potential investment in Moonstone. ¶ 247. Over the course of the negotiations, as reported by FTX and Deltec employees, the Friedberg and Chalopin "spoke highly of one another." *Id.* Friedberg was considered one of the key decisionmakers within the FTX Group and was routinely identified as a member of the senior executive team. ¶ 248. Friedberg served simultaneously as FTX US's Chief Compliance Officer and Alameda's General Counsel, an overlap that Chalopin must have appreciated and one that revealed the total lack of "appropriate management, governance, and organizational structure" of FTX, as well as the conflicts of interest between FTX and Alameda. *Id.*

Moonstone, too, had regulatory obligations to understand and monitor FTX's banking activity through FTX's accounts at the bank and, as a bank in the United States, Moonstone must

adhere to certain anti-money laundering ("AML") and KYC laws and regulations, including the Bank Secrecy Act ("BSA"), Patriot Act, Anti-Money Laundering Act and regulations promulgated thereunder. ¶ 249.These obligations include developing a "Customer Identification Program" and "Customer Due Diligence" procedures reasonably designed to identify and verify all customers and, where applicable, including FTX's beneficial owners, source of funds, and the nature and intended purpose of the business relationship, to the extent warranted by the risk of money laundering or terrorist financing or as required by regulation." *Id.* Like Deltec, Moonstone, and in turn, Chalopin, Moonstone's chief executive and chairman, would have learned from this diligence (1) that SBF separately owned and controlled FTX and Alameda, and (2) the source of funds into FTX's accounts were FTX customer deposits.

Additionally, because FTX Trading was an offshore money service business ("MSB") incorporated in Antigua, a jurisdiction which the Financial Crimes Enforcement Network ("FinCEN") classifies as "high risk," Moonstone was required to conduct enhanced due diligence and ongoing monitoring of FTX Trading under the U.S. banking regulations and in accordance with the Federal Financial Institutions Examination Council Manual (the "FFEIC Manual"), which sets forth guidelines for compliance with the U.S. banking laws. ¶ 250. Specifically, with respect to FTX Trading and other of FTX's offshore MSBs, the FFEIC Manual required Moonstone to (1) understand the intended use and purposes of the accounts and anticipated account activity (both type and volume), (2) understand the types of products and services offered, as well as the location and markets served, and (3) conduct ongoing diligence and monitoring for suspicious activity, in each case in accordance with the BSA, encompassing, for example:

- A review of FTX Trading's BSA/AML program;

- A review of the results of FTX Trading's independent testing of its AML program;

- A review of written procedures for the operation of FTX Trading;

- On-site visits;

- A review of list of agents, including locations, within or outside the United States, which will be receiving services directly or indirectly through the FTX Trading account;

- A determination whether FTX Trading has performed due diligence on any third-party servicers or paying agents;

- A review of written agent management and termination practices for FTX

Trading;

- A review of written employee screening practices for FTX Trading.

*Id.* Relevant regulations, including those promulgated by FinCEN, the financial intelligence unit within the Department of Treasury, further require Moonstone to (1) monitor for and report suspicious transactions of $5,000 or more, (2) monitor and report currency transactions in excess of $10,000, (3) implement a customer identification program, and (4) conduct due diligence on its customers, including enhanced due diligence for FTX Trading accounts. *Id.* Again, like Deltec, Moonstone would have learned from this diligence and monitoring (1) that SBF separately owned and controlled FTX and Alameda, (2) the source of funds into FTX's accounts were FTX customer deposits, and (3) FTX transferred those customer deposits to Alameda and other entities that SBF separately owned.

Moonstone represented to the public that it maintained "first-in-class regulatory, compliance and risk expertise," and so certainly must have satisfied its diligence and monitoring regulatory obligations in keeping with that representation. ¶ 249. And that diligence encompassed fraudulent transfers by FTX: FTX held at least $50 million in accounts at Moonstone and, under information and belief, effected numerous transfers that qualify as suspicious under the regulations, requiring additional monitoring and reporting by Moonstone. ¶ 251.

Despite this knowledge, at the direction of Chalopin and to the benefit of both FTX and Alameda (not uncoincidentally, Moonstone's largest shareholder), Moonstone assisted the FTX fraud in critical fashion.

### C. Moonstone's assistance to the FTX fraud, despite knowledge of it.

Eager to help more with FTX's trafficking of customer deposits offshore and in service of the mutually beneficial relationship between Defendants and FTX, Chalopin sought opportunity to assist FTX Group. He found that opportunity in Farmington State Bank, then the 26th smallest bank in the United States with no more than 25 employees and a single branch in Farmington, Washington, a rural town of only 150 residents. ¶ 246. So small was Farmington State Bank that, in 2010, the bank's president bragged that it did not offer credit cards and held more deposits than loans outstanding. *Id.* That changed in 2020, when Chalopin purchased the bank and rebranded it Moonstone, purportedly to target digital assets and to support the "underserved cannabis industry." *Id.*

At Chalopin's direction, Moonstone promptly applied, and was approved, to become a

member of the Federal Reserve, and FTX gained entry to the U.S. banking system. *Id.*
Moonstone's membership in the Federal Reserve was imperative to the FTX fraud, as SBF
needed access to the U.S. banking system, and other major financial institutions in the United
States, wary of an emerging asset class that had been linked to money laundering and illegal
drugs, and refused to bank crypto exchanges and started blocking transfers by customers to buy
cryptocurrencies." ¶ 9. Indeed, Moonstone was one of only three U.S. banks willing to provide
banking services to FTX and its affiliates.

According to a former president of the Independent Community Bankers of America,
Moonstone's close relationship to Alameda was concerning, and the approval of Moonstone's
application to the Federal Reserve a cause for alarm: "The fact that an offshore hedge fund that
was basically a crypto firm [Alameda] was buying a stake in a tiny bank for multiples of its stated
book value should have raised massive red flags for the F.D.I.C., state regulators and the Federal
Reserve … It's just astonishing that all of this got approved." ¶ 253. The reason for the
astonishing approval was that Moonstone did not disclose its intention to service cryptocurrency
clients to the Federal Reserve. On August 17, 2023, the Federal Reserve announced an
enforcement action against Moonstone, because, upon information and belief, at Chalopin's
direction, Moonstone did not inform the Federal Reserve that Moonstone intended "to pursue a
strategy focused on digital banking services or digital assets" (i.e., banking FTX and Alameda),
and Moonstone "improperly chang[ed] its business plan" to provide such services (i.e., to FTX
and Alameda) without prior notification or approval from the Federal Reserve.[5]

With access to the U.S. banking system by way of Moonstone's membership in the
Federal Reserve fraudulently maintained, FTX quickly began to route its own fraud through
Moonstone and promptly deposited $50 million of FTX customer funds in two accounts at the
bank. ¶ 254. Moonstone, for its part, benefited tremendously from this quid pro quo. ¶ 256. FTX
was Moonstone's largest customer, and with FTX's accounts, Moonstone's deposits jumped to
$71 million, a 600% increase from Moonstone's historical average. ¶ 257.

Plaintiffs allege that, in pursuit of continued growth and unprecedented profits,

---

[5] *See* Turner Wright, "Federal Reserve issues enforcement action against FTX-linked US bank,"
Cointelegraph.com (Aug. 17, 2023), *available at* https://cointelegraph.com/news/federal-reserve-
issues-enforcement-action-against-ftx-linked-bank, (last accessed Nov. 3, 2023) (summarizing the
Federal Reserve's enforcement action and providing a link to the Federal Reserve's cease and
desist order arising from same).

Moonstone began fencing customer assets across the U.S. border and into FTX accounts at Deltec, Moonstone's sister bank in The Bahamas. ¶ 9. John Ray noted that the services Moonstone and Deltec provided to FTX were "certainly highly irregular" and transfers between the banks have "gotten [the Bankruptcy Estate's] attention." ¶ 258. Mr. Ray elaborated that he is "looking at what dollars were that went from the FTX group to [Moonstone] and looking at the connections of that bank to the Bahamas [i.e., Deltec] …. It's certainly highly irregular and has got our attention." *Id.* Moonstone provided these "highly irregular" services at Chalopin's direction and despite awareness of FTX's underlying misconduct.

On the basis of these factual allegations, Plaintiffs assert, on behalf of the putative class, claims of civil conspiracy, aiding and abetting fraud, aiding and abetting fiduciary breach, aiding and abetting conversion, Federal R.I.C.O. (18 U.S.C. 1962(d)), and unjust enrichment (as to Deltec only) against Deltec and Chalopin, arising under Florida and Washington common law.[6]

**D. The limited discovery that Plaintiffs have accessed to date demonstrate the plausibility of their claims against Moonstone.**









## LAW AND ARGUMENT

### I. PLAINTIFFS SUFFICIENTLY PLEADED THEIR CLAIMS.

To survive a motion to dismiss, a complaint must only contain sufficient factual matter that, when accepted as true, "states a claim for relief that is plausible on its face." *Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1337 (11th Cir. 2012). With respect to Plaintiffs' claims that sound in fraud, while "Rule 9(b) requires that the circumstances of the fraud [to] be stated with particularity . . . allegations of knowledge and intent are not subject to the particularity requirement." *Cordell Consultant, Inc. Money Purchase Plan & Tr. v. Abbott*, 561 F. App'x 882, 884 (11th Cir. 2014) (citations omitted).

#### A. Plaintiffs sufficiently pleaded that Moonstone aided and abetted fraud, fiduciary breach and conversion under Florida and Washington common law.

Moonstone argues that Plaintiffs' claims for aiding and abetting fraud, fiduciary duty and conversion fail for lack of sufficient allegations that it (1) "actually knew" of FTX's underlying misconduct; and (2) rendered substantial assistance in furtherance of FTX's misconduct. Mot. at 10-17. Moonstone is wrong on both counts.

##### 1. Plaintiffs pleaded the underlying fraud with the specificity required by Rule 9.

Moonstone does not contest that Plaintiffs adequately alleged FTX engaged in fraud. That fraud was based on FTX's misrepresentations that FTX (1) had adopted investor protections, including "avoiding or managing conflicts of interest," (2) held customer funds in segregated accounts for the customers' benefit, (3) had implemented state-of-the-art risk management controls, and (4) maintained strict regulatory compliance. Nor do they contest that Plaintiffs adequately alleged FTX breached its fiduciary duty to customers or that FTX converted customer assets in failing to segregate and hold customer deposits for the customers' benefit, instead

siphoning those deposits to and through Alameda to underwrite speculative investments and to enrich SBF, his friends, family, and top lieutenants.

Plaintiffs have alleged the "who, what, when, where" of the underlying FTX fraud in satisfaction of Rule 9(b). Moonstone is wrong to suggest that the pleading requirements of Rule 9(b) extend to allegations of Moonstone's knowledge of and assistance with FTX's misconduct. While "Rule 9(b) requires that the circumstances of the fraud [to] be stated with particularity, allegations of knowledge and intent are not subject to the particularity requirement." *Cordell Consultant, Inc. Money Purchase Plan & Tr. v. Abbott*, 561 F. App'x 882, 884 (11th Cir. 2014) (citations omitted); *United States ex rel. Anita Silingo v. WellPoint, Inc.*, 904 F.3d 667, 679 (9th Cir. 2018) ("Although the circumstances of a fraud must be pleaded with particularity, knowledge may be pleaded generally."); *United States v. Corinthian Colleges*, 655 F.3d 984, 996 (9th Cir. 2011) ("Under Rule 9(b), 'circumstances constituting fraud or mistake' must be stated with particularity, but 'malice, intent, knowledge, and other conditions of a persons mind,' including scienter, can be alleged generally." (citing Fed. R. Civ. P. 9(b))).

### 2. *Plaintiffs sufficiently pleaded Moonstone's aider-abettor knowledge.*

While Florida law requires that an alleged aider-abettor have "actual knowledge" of the wrongdoings giving rise to plaintiff's claims, that standard is satisfied where "[a] defendant has general awareness that its role was part of an overall improper activity." *Gilison v. Flagler Bank*, 303 So. 3d 999, 1003 (Fla. Dist. Ct. App. 2020). Under Washington law, "[a] defendant's 'conscious avoidance' of knowledge can be enough to satisfy the actual knowledge standard if 'it can almost be said that the defendant actually knew because he or she suspected a fact and realized its probability, but refrained from confirming it in order later to be able to deny knowledge.'" *In re Mastro*, 2017 WL 2889659, at *16 (Bankr. W.D. Wash. July 6, 2017).[20]

Further, "actual knowledge may be inferred and proven by circumstantial evidence" and

---

[20] With respect to Plaintiffs' claims that sound in fraud, while "Rule 9(b) requires that the circumstances of the fraud [to] be stated with particularity, allegations of knowledge and intent are not subject to the particularity requirement. *Cordell Consultant, Inc. Money Purchase Plan & Tr. v. Abbott*, 561 F. App'x 882, 884 (11th Cir. 2014) (citations omitted); *United States ex rel. Anita Silingo v. WellPoint, Inc.*, 904 F.3d 667, 679 (9th Cir. 2018) ("Although the circumstances of a fraud must be pleaded with particularity, knowledge may be pleaded generally."); *United States v. Corinthian Colleges*, 655 F.3d 984, 996 (9th Cir. 2011) ("Under Rule 9(b), 'circumstances constituting fraud or mistake' must be stated with particularity, but 'malice, intent, knowledge, and other conditions of a persons mind,' including scienter, can be alleged generally." (citing Fed. R. Civ. P. 9(b))).

indeed, is "nearly universally" done so. *In re Mastro*, 2017 WL 2889659; *Cabot E. Broward 2 LLC v. Cabot*, 2016 WL 8740484, at \*4 (S.D. Fla. Dec. 2, 2016) (citing *Amegy Bank Nat'l Ass'n v. Deutsche Bank Alex. Brown*, 619 Fed. Appx. 923, 931 (11th Cir. 2015)) ("[A]ctual knowledge of another's wrongful conduct is nearly universally found based upon circumstantial evidence," as "[i]t is difficult to imagine what sort of evidence, other than an admission[,] would constitute direct evidence of [the defendant's] knowledge of [the underlying] wrongful conduct.").).

Plaintiffs' Complaint satisfies these requirements.

> **a. Moonstone knew of FTX's misrepresentations to Class Members and illicit transfers of Class Member funds, such that Moonstone knew of the underlying fraud, fiduciary breach and conversion**.

Moonstone does not contest that Plaintiffs' adequately alleged FTX engaged in fraud, fiduciary breach, or conversion. The Complaint alleges that fraud was based on FTX's misrepresentations that FTX (1) had adopted investor protections, including "avoiding or managing conflicts of interest," (2) held customer funds in segregated accounts for the customers' benefit, (3) had implemented state-of-the-art risk management controls, and (4) maintained strict regulatory compliance. Nor does Moonstone contest that Plaintiffs' adequately alleged FTX breached its fiduciary duty to customers or that FTX converted customer assets in failing to segregate and hold customer deposits for the customers' benefit, as FTX promised to do, instead siphoning those deposits to and through Alameda to underwrite Alameda's speculative investments and to enrich SBF, his friends, family, and top lieutenants. Instead, Moonstone argues only that Plaintiffs failed to allege that it knew of this misconduct. Moonstone is wrong.

Plaintiffs allege Moonstone was obligated under the Bank Secrecy Act, Patriot Act, Anti-Money Laundering ("AML") Act and Know Your Customer ("KYC") laws and regulations promulgated thereunder to conduct diligence on FTX before opening its accounts, which diligence must include an understanding of FTX's beneficial owners, its source of funds, the types of products and services offered by FTX, the intended use and purposes of the FTX accounts, and the anticipated activity in those accounts. ¶ 249-52. Moreover, these regulations require that Moonstone maintain ongoing diligence and monitoring of FTX's banking activity, including any suspicious transactions of $5,000 or more and any currency transactions in excess of $10,000. *Id.* Plaintiffs allege this mandated diligence gives rise to the inference that Moonstone learned:

- FTX lacked fundamental internal controls, evidenced by the fact that, for example, it could produce no trustworthy financial documents responsive to Moonstone's

diligence requirements. ¶¶ 117, 252.

- The intended use and purpose of the FTX accounts was to hold customer assets, including Class Member funds, in custody for the customers' benefit as reiterated in FTX's terms of service (by virtue of the FFEIC Manual's requirement that Moonstone "understand the intended use and purposes of the accounts" and the FinCEN regulatory requirement that Moonstone "implement a customer identification program"). ¶¶ 250-51.

- The beneficial owner of FTX, Alameda, and the FTX affiliates was SBF (which Moonstone would have learned by virtue of its statutorily mandated Customer Identification Program and Customer Due Diligence procedures). ¶ 249.

- FTX transferred those customer funds to accounts held by Alameda or other entities that SBF or other FTX insiders separately owned (which Moonstone would have learned by virtue of the FinCEN regulatory requirement that Moonstone "monitor for and report suspicious transactions of $5,000 or more [and] currency transactions in excess of $10,000"), contrary to FTX's representation that it mitigated any and all conflicts of interest, segregated FTX customer deposits, and held those deposits in custody for the customers' benefit.¶ 249-252.

- FTX did not have appropriate risk management controls, including BSA/AML procedures, in place, such that it was not strictly adherent to its regulatory obligations as it claimed (which Moonstone would have learned from the FFEIC Manual's requirement that Moonstone "review FTX Trading's BSA/AML program and the results of FTX Trading's independent testing of [that] program"). *Id.*

In its motion to dismiss, Moonstone discounts these allegations as asserting only what Moonstone "would have" or "should have" known from "what diligence it 'certainly must have' done." Mot. at 10. Moonstone leaves out that, in their Complaint, Plaintiffs quote Moonstone's representation to the public that it *did* conduct this regulatory-mandated diligence and monitoring, giving rise to the inference that Moonstone obtained the knowledge outlined above. ¶¶ 245-48. But Moonstone was *required* to conduct this diligence by law, and Plaintiffs' allegations give rise to the inference that Moonstone *did* conduct that diligence and *did* obtain the knowledge outlined from that diligence in accordance with Moonstone's regulatory obligations. *See, e.g.*, *Bhatia v. Silvergate Bank*, 725 F. Supp. 3d 1079, 1115 (S.D. Cal. 2024) ("Here, the Court finds Plaintiffs have pled sufficient facts to make their allegations regarding actual knowledge plausible. Plaintiffs allege Defendants are required to comply with the Bank Secrecy Act, which requires Defendants to maintain anti-money laundering and due diligence programs, both of which require Defendants to take reasonable steps to ascertain the source of funds deposited into private banking accounts and the purpose and the expected use of those accounts [and] then allege Defendants followed

19

through and carried out these programs.").

Moreover, Plaintiffs allege that Moonstone learned of facts demonstrating FTX's underlying misconduct from its solicitation of Alameda's $11.5 million investment in Moonstone, which doubled Moonstone's net worth at that time. *Id.* Plaintiffs allege that Moonstone negotiated the deal at length with Dan Friedberg, who at once served as FTX US's Chief Compliance Officer and Alameda's General Counsel and whose public history is peppered with instances of fraud. *Id.* Plaintiffs allege that, from those negotiations, Moonstone learned that SBF separately owned and controlled FTX and Alameda but, despite FTX's representations that FTX and Alameda maintained strict corporate separateness, SBF operated FTX and Alameda as a common enterprise, riddled with conflicts of interest. *Id.* Plaintiffs further allege that Alameda paid for its investments with FTX customer funds, borrowings which Alameda secured with FTT, the FTX-minted cryptocurrency used to artificially prop up Alameda's books. Alameda's $11.5 million capital injection to Moonstone is one such investment, and in confirming that Alameda held sufficient proceeds to fund an investment so large that it doubled Moonstone's net worth, Moonstone would have seen those proceeds were backed by cryptocurrency that FTX fashioned from thin air. *Id.*

This is in addition to the knowledge that Mr. Chalopin acquired as the chairman of Deltec and longtime friend of SBF, knowledge imputed to Moonstone by law. ¶ 156. Specifically, Plaintiffs allege Deltec was obligated to conduct similar regulatory diligence and monitoring of the FTX, as well as their account activity, and from that diligence, acquired similar knowledge of FTX's underlying misconduct. *Id.* Further, Plaintiffs allege that, on a daily basis, Deltec individually identified incoming wires from FTX customers and manually transferred those funds to Alameda's account, though Deltec knew from FTX Group's opening account statements, diligence, and provision of services that those funds should have instead been segregated and held in custody for the benefit of FTX Customers. ¶ 166. It is reasonable to infer from Chalopin as *chairman* of Deltec was knowledgeable of the transactions effected by the bank on behalf of its largest customer. That knowledge is then imputed to Moonstone as a matter of Florida law.

From its regulatory diligence and monitoring of the FTX accounts, its solicitation of investments by Alameda, and Mr. Chalopin's close ties to SBF and other of the FTX Entities' executives, Moonstone could see what FTX's customers, Class Members included, could not. *First,* as to FTX's fraud, Moonstone could see that FTX's representations as to its investor protections, mitigation of conflicts of interest, risk management procedures, regulatory compliance

and other fundamental controls, were misleading—in truth, FTX had in place no internal controls, worked only to exacerbate its conflicts of interest with Alameda, exempting it from whatever risk management procedures it purported to have in place, and failed to comply with even its slightest regulatory obligations. *Second,* as to FTX's fiduciary breach and conversion, Moonstone could see that FTX was transferring customer deposits to and through Alameda, contrary to its representations that FTX would hold those assets in segregated accounts for the customers' benefit and never take title to or lend out those assets itself, constituting breach of FTX's fiduciary duties to its customers and conversion of customers' funds.

These allegations are not "conclusory"—they plead more than mere knowledge of "symptoms of [a] Ponzi scheme." Mot. at 1, 12. Plaintiffs allege Moonstone knew FTX's representations as to its investor protections, its conflicts of interest, its risk management procedures, and its regulatory compliance were false. Plaintiffs further allege that Moonstone knew FTX was not, in fact, holding customer deposits in custody, segregated from FTX's own assets and for the customers' benefit, and that FTX was instead siphoning those funds to and through Alameda to enrich SBF and other insiders. Plaintiffs therefore allege that Moonstone knew of FTX's fraud, as well as FTX's breaches of its fiduciary duty to its customers and conversion of the assets that those customers had entrusted to FTX.

### b. Moonstone demonstrated indicia of knowledge sufficient under Florida and Washington law.

Supplementing Plaintiffs' specific allegations of Moonstone's knowledge, Plaintiffs further allege that Moonstone exhibited indicia of knowledge, circumstantial evidence sufficient under Florida and Washington law. These indicia include (1) having exclusive and/or superior access to the primary violator's financial records,[21] (2) receiving kickbacks or otherwise benefiting from the underlying violations,[22] and (3) making false representations on behalf of the underlying

---

[21] *See, e.g., Gilison,* 303 So.3d at 1003 (finding knowledge adequately pleaded because complaint alleged, inter alia, "the bank was the only lender that had direct access to [primary violator's] financial records and the discrepancies within them").

[22] *See, e.g., id.* ("The [defendant] benefited when [the primary violator] made substantial interest payments to the bank while the plaintiffs' loans remained unpaid."); *Chang v. JPMorgan Chase Bank, N.A.,* 845 F.3d 1087, 1096-97 (11th Cir. 2017) (knowledge supported by allegation that defendant's employee "secretly received $100,000 from [primary violator] paid to an entity she controlled").

violator.[23] With respect to FTX, Moonstone took part in all three.

*First*, Moonstone had access to the FTX Entities' financial records and visibility of the transfers from FTX to Alameda that FTX customers, Class Members included, did not, by way of Moonstone's regulatory mandated diligence and monitoring of the FTX Entities and their banking activity. *Second*, Moonstone received a kickback from Alameda in the form of Alameda's $11.5 million investment in Moonstone, at "multiples of its stated book value," i.e., far in excess of what the tiny bank was actually worth at the time. *Third*, Moonstone made a false representation to the Federal Reserve in its application for membership to the benefit of FTX and Alameda, facts that came to light after Plaintiffs filed their Administrative Class Action Complaint. Together with Plaintiffs' specific allegations of Moonstone's knowledge of FTX's misconduct, these indicia of knowledge sufficiently plead that Moonstone knew of FTX's fraud, fiduciary duty, and conversion of FTX customer funds.

### 3. *Plaintiffs sufficiently pleaded Moonstone's substantial assistance.*

In both Florida and Washington, "[s]ubstantial assistance occurs when a defendant affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the [underlying] breach to occur." *Chang*, 845 F.3d at 1098; *In re Mastro*, 2017 WL 2889659, at *16 (same). Plaintiffs adequately alleged with specificity that Moonstone rendered substantial assistance to FTX's fraud, fiduciary breach, and conversion in satisfaction of these standards.

*First*, Plaintiffs' Complaint contains ample allegations of Moonstone's substantial assistance to FTX. For example, Plaintiffs allege Moonstone provided FTX necessary access to the U.S. banking system through its application for membership in the Federal Reserve, and that Moonstone's application for and membership in the Federal Reserve was unusual and concerning, given the fact that Alameda, "an offshore hedge fund that was basically a crypto firm" had purchased a stake in Moonstone "for multiples of its stated book value." ¶¶ 253-56. The public now knows that Moonstone maintained such membership through deceit of the Federal Reserve, concealing that it intended to provide "digital banking services" to the FTX Entities. *Id.* FTX

---

[23] *See, e.g., Chang*, 845 F.3d at 1096-97 (allegation that defendant's employee falsely represented the balance in the fraudster's account on defendant's letterhead supported adequate pleading of knowledge). With respect to Washington, see *In re Mastro*, 2017 WL 2889659, at *17 (noting that knowledge of irregular transactions with unusual terms and conditions supports inference of knowledge of misconduct); *In re Consol. Meridian Funds*, 485 B.R. 604, 617 (Bankr. W.D. Wash. 2013) ("[A]ctual knowledge may be inferred and proven by circumstantial evidence.").

needed the ability to take in customer deposits in the United States, which its accounts at Moonstone allowed it to do, and then traffic those deposits to Alameda beyond the reach of U.S. authorities, which it did so by transfer to accounts held by FTX at Deltec, Moonstone's sister bank. *Id.* Moonstone provided assistance that other U.S. banks refused to provide, and it was a one the FTX Entities relied on to perpetuate the fraud. ¶¶ 9, 258.

*Second*, Plaintiffs allege Moonstone substantially aided FTX's misconduct by effecting its banking transactions to and from FTX, Alameda, and other entities SBF separately owned or controlled, despite knowing that FTX was misappropriating customer assets by way of such transfers. FTX relied on these transfers to siphon customer funds to and through Alameda, offshore and into SBF's coffers. These allegations are bolstered by John Ray's sworn congressional testimony, reporting on his oversight of FTX's bankruptcy post-collapse, to support these allegations in their Complaint, including that the services Moonstone provided to FTX were "certainly highly irregular" such that FTX's transfers from Moonstone to The Bahamas (i.e., Deltec) have "gotten the [Bankruptcy Estate's] attention." ¶ 258.

*Third*, Plaintiffs allege, with membership in the Federal Reserve and by effecting transfers to and from FTX accounts both in the United States and abroad, Moonstone substantially assisted FTX in fencing customer funds across U.S. borders and beyond the reach of U.S. law enforcement agencies and officials. ¶ 259.

*Fourth*, Moonstone failed to disclose its knowledge of FTX's fraud, fiduciary breach, and conversion despite its obligation to do so, as "[i]t has long been the law in Washington that a bank has a duty to notify a beneficiary if it has both knowledge of [a] fiduciary relationship and knowledge of a breach of fiduciary duty," *In re Consol. Meridian Funds*, 485 B.R. 604, 626 (Bankr. W.D. Wash. 2013) (citing *Helig Trust v. First Interstate Bank of Wash.*, 93 Wash. App. 514, 969, P.2d 1082 (1998)), which aided in concealing the fraud and prolonging its duration.[24] Plaintiffs allege that, by way of its regulatory obligation to understand "the intended use and purpose" of the FTX accounts, Moonstone learned that FTX promised to hold customer assets,

---

[24] Notably, Florida law seems to relax the "actual knowledge" standard applicable to allegations of a defendant's failure to act despite its duty to do so. *See, e.g.*, *Ct. Appointed Receiver of Lancer Offshore, Inc. v. Citco Grp. Ltd.*, No. 05-60080CIV, 2008 WL 926509, at *6 (S.D. Fla. Mar. 31, 2008) ("If it is alleged that a defendant has a duty to disclose, liability could be imposed if he acts with a lesser degree of scienter.") (citing *Woods v. Barnett Bank of Ft. Lauderdale*, 765 F.2d 1004, 1010 (11th Cir. 1985)).

including Class Member funds, in custody for the customers' benefit, simultaneously promising never to take title of those assets or use them for its own benefit, promises reiterated in FTX's terms of service. ¶¶ 249-52. Moonstone therefore knew of the custodial nature of FTX's relationship to its customers and, therefore, the fiduciary duty it owed to each.[25] Moonstone likewise could see that FTX was misappropriating FTX customer funds, in breach of that duty, for reasons summarized in Section I.A.2. Its failure to disclose that misconduct to FTX customers constitutes substantial assistance.

With these allegations, Plaintiffs allege Moonstone (1) affirmatively assisted FTX's fraud, fiduciary breach and conversion, by applying for and obtaining membership in the Federal Reserve, by opening and servicing the FTX Entities' accounts, and by effecting transfers to and from FTX, Alameda and other entities that SBF separately owned and controlled, both here and abroad; (2) helped conceal FTX's misconduct by shielding its involvement from the Federal Reserve; and (3) failed to act when it had the duty to do so, in never disclosing FTX's misconduct to FTX customers upon learning of FTX's fiduciary duty and breach, as required by Washington law. Plaintiffs further allege that each of these forms of assistance proximately caused Class Members' injuries, as FTX could not have perpetuated the fraud without Moonstone's provision of these services, particularly because no other major U.S. financial institution would service FTX

---

[25] *See, e.g.*, *Stewart v. Bank of Am., N.A.*, No. 8:11-CV-2586-MSS-TBM, 2012 WL 1310 302, at *3 (M.D. Fla. Feb. 28, 2012) ("Plaintiffs allege that pursuant to the terms of the Claim Procedures, Bank of America was acting as an express escrow agent and as custodian for the insurance funds and that Bank of America owed a duty to Plaintiffs regarding all disbursements from escrow."); *Ricchetti v. Starfish Beach S., S.A.*, No. 10CV21754, 2010 WL 11451771, at *1 (S.D. Fla. Dec. 27, 2010) ("The Subscription Agreement states that Defendant Richards & Associates, P.A. is appointed 'Custodian' and that the firm shall serve as custodian of monies raised in the offering of shares '... until they are invested, pursuant to a custodial agreement....Given the language of the Subscription Agreement, it is not implausible that Defendants had a fiduciary duty to Plaintiff that was breached or that they negligently breached a duty to safeguard her funds when it disbursed to Starfish Holdings, S.A. and did so before the funds were 'invested.'); *Calvert v. Com. Bank of Washington, N.A.*, No. 10-17952, 2013 WL 3487562, at *2 (Bankr. W.D. Wash. May 14, 2013), *amended sub nom. In re Consol. Meridian Funds*, No. BR 10-17952-KAO, 2013 WL 3487732 (Bankr. W.D. Wash. May 21, 2013) ("The [amended complaint] alleges that with the knowledge that the accounts were custodial accounts into which investor funds were deposited for the sole purpose of the funds' investment of those funds in real estate investments, Commerce Bank nonetheless allowed Berg to commingle the funds in the custodial accounts with his own personal and related corporation funds and to misappropriate the funds to buy personal assets and pay personal obligations. . . . [T]hese allegations . . . state a plausible claim for substantial assistance of Berg's breach of fiduciary duty.").

in these ways and, without Moonstone's assistance, FTX could not have taken in customer deposits in the United States and transferred them to Alameda and other of SBF's separately owned entities offshore. ¶ 9.

Moonstone nevertheless objects that its aid to FTX constitutes nothing more than "routine banking services," insufficient to constitute "substantial assistance" under the law. Mot. at 12. But in sworn testimony before Congress, Mr. Ray testified that the services provided by Moonstone to the FTX Entities were not at all typical or routine and were instead "highly irregular," rendering Moonstone's objection without basis in the Complaint. ¶ 258. Even if Moonstone were correct that the services it provided to FTX were nothing but "ordinary banking transactions which a bank performs for its customer can support a claim for aiding and abetting if the bank has knowledge that the transactions are assisting the customer in committing a specific tort," *In re Consol. Meridian Funds*, 485 B.R. at 626 (citing *In re First Alliance Mortg. Co*., 471 F.3d 977, 994–95 (9th Cir.2006)), such that Moonstone is liable for providing those services in assistance to FTX.

### B. Plaintiffs sufficiently pleaded that Moonstone conspired with the FTX Entities and other Defendants in furtherance of FTX's fraud, fiduciary breach, and conversion.

In moving for dismissal of Plaintiffs' civil conspiracy claim, Moonstone argues only (1) Plaintiffs failed to state a claim for aiding and abetting FTX's wrongdoing, a required predicate to a civil conspiracy claim; and (2) Plaintiffs fail to plausibly plead any agreement by Moonstone to act in furtherance of that wrongdoing. Mot. at 17-19. For reasons above, Plaintiffs adequately pleaded claims for Moonstone's aiding and abetting FTX's fraud, fiduciary duty, and conversion, and Moonstone's first argument for dismissal of Plaintiffs' civil conspiracy claim requires no further argument here.

Plaintiffs likewise adequately pleaded Moonstone's agreement to act in furtherance of FTX's misconduct. In Florida, "[n]o requirement exists that parties formalize or even articulate the agreement—the parties' conduct may imply an agreement." *White v. Verizon Fla., LLC*, 2009 WL 10670227, at *2 (M.D. Fla. Nov. 9, 2009). Indeed, "[c]onspiracies are rarely evidenced by explicit agreements and must almost always be proven by inferences that may be fairly drawn from the behavior of the alleged conspirators." *Orange Lake Country Club, Inc. v. Reed Hein & Assocs*., LLC, 367 F. Supp. 3d 1360, 1368 (M.D. Fla. 2019). Similarly, in Washington, "[a] conspiracy may be based on circumstantial evidence," *Brown v. Transworld Sys. Inc*., 2022 WL 17750097, at *10 (W.D. Wash. Dec. 15, 2022) (citations omitted), "[s]ince direct evidence of a conspiracy is ordinarily in the possession and control of the alleged conspirators and is seldom attainable."

*Sterling Bus. Forms, Inc. v. Thorpe*, 82 Wash. App. 446, 453–54, 918 P.2d 531, 535 (1996).

Plaintiffs' Complaint gives rise to such an inference here. Plaintiffs allege that (1) Moonstone, by way of Defendant Chalopin, had maintained close ties with SBF for many years, and engaged in regular communications with Dan Friedberg, another of the FTX Entities' top executives, (2) as one of the only financial institutions willing to service the FTX Entities in the United States, Moonstone served as the FTX Entities' primary bank and sole entry point to the U.S. banking system, (3) Moonstone knew of FTX's underlying wrongdoing, (4) despite that knowledge, Moonstone effected the FTX Entities' "highly irregular" transfers of customer funds to offshore accounts after, Plaintiffs now know, deceiving the Federal Reserve to obtain the capabilities to do that, (5) in return for its assistance, Moonstone received an $11.5 million investment from Alameda, far exceeding the fair market value of Alameda's stake in the bank, and enjoyed $50 million in deposits from the FTX Entities, catapulting Moonstone from tiny, rural bank to multi-million dollar financial institution, and (5) as a result of Alameda's $11.5 million investment, Alameda became Moonstone's majority shareholder and SBF enjoyed overlapping ownership of Moonstone and the FTX Entities.

These allegations sufficiently establish that Moonstone agreed, at least impliedly, to act in furtherance of FTX's wrongdoing under Florida and Washington law.[26]

---

[26] *See Koch v. Royal Wine Merchants, Ltd.,* 907 F. Supp. 2d 1332, 1347 (S.D. Fla. 2012) (finding allegations of regular communications and other close contacts, plus knowledge of misconduct, sufficient to plead agreement); *BluestarExpo, Inc. v. Enis*, 568 F. Supp. 3d 1332, 1351 (S.D. Fla. 2021) (where defendant knew of and aided the fraud, "the Court is hard pressed to conclude that this was all done without any kind of agreement that plausible supports a civil conspiracy"); *Donofrio v. Matassini*, 503 So. 2d 1278, 1281 (Fla. Dist. Ct. App. 1987) (finding evidence that defendant had knowledge of, participated in, and benefitted from a fraud could give rise to the inference that defendant conspired in furtherance of the fraud); *Perkumpulan Inv. Crisis Ctr. Dressel—WBG v. Regal Fin. Banccorp, Inc.*, 781 F. Supp. 2d 1098, 1117 (W.D. Wash. 2011) (finding civil conspiracy sufficiently pled through allegations that primary violator's accounts made up 10% of defendant bank's deposits, primary violator was a major shareholder, defendant bank "wilfully ignored red flags that should have alerted the bank to problems" with the underlying violator, defendant maintained a banking relationship with the violator nonetheless, and defendant enriched itself by way of the fraudulent scheme); *Money Mailer, LLC v. Brewer*, No. C15-1215RSL, 2018 WL 1916665, at *3 (W.D. Wash. Apr. 23, 2018) ("[Plaintiff] alleges that the two companies, through their overlapping owners, officers, and directors, agreed on a scheme to negotiate and charge printing, production, mailing, freight, and delivery fees that were well above the actual cost of the services provided in order to create a secret profit center within the franchise relationship. The Court finds that Brewer has adequately alleged each of the elements of a civil conspiracy.").

Moreover, Florida courts have found that "civil conspiracy does not require more than knowledge and general participation in the conspiracy to commit a civil wrong." *In re Chira*, 353 B.R. 693, 731 (Bankr. S.D. Fla. 2006).[27] Washington law is in accord.[28] Plaintiffs have alleged that Moonstone knew of FTX's fraud, fiduciary breach, and conversion but participated in FTX's wrongdoing anyway, *see* Sections I.A.2, and so have sufficiently pleaded a civil conspiracy claim.

### C.   Plaintiffs sufficiently pleaded that Moonstone was unjustly enriched.

Moonstone argues that Plaintiffs' unjust enrichment claim should be dismissed, because Plaintiffs fail to identify (1) any benefit conferred by Plaintiffs to Moonstone; (2) that such benefit was "directly confer[red]" to Moonstone; and (3) and that Plaintiffs were not provided adequate consideration for the benefit. Mot. at 6-9.

Moonstone is wrong that Plaintiffs did not confer a benefit to Moonstone. Most immediately, Plaintiffs allege Alameda's $11.5 million investment in Moonstone, an investment that far exceeded the value of Alameda's stake in Moonstone, with FTX customer deposits, Class Members' funds included. Moreover, Plaintiffs allege that the FTX Entities deposited $50 million in FTX customer assets, Class Members' funds including, in accounts at Moonstone. As "[b]anks generally make money by borrowing money from depositors and … lend[ing] the money out to borrowers, charging the borrowers a higher interest rate and profiting off the interest rate spread,"[29] the $50 million in FTX customer assets that the FTX Entities held on deposit tremendously benefited Moonstone, serving as a primary profit source for the bank.

Plaintiffs need not plead that these benefits were conferred by Plaintiffs "directly" to

---

[27] *See also Gilison*, 303 So. 3d at 1004 ("A conspirator only needs to know of the scheme and assist in it in some way to be held responsible for all the acts of his conspirators."); *Logan v. Morgan, Lewis & Bockius LLP*, 350 So. 3d 404, 412 (Fla. Dist. Ct. App. 2022) ("A conspirator need not take part in the planning, inception, or successful conclusion of a conspiracy. The conspirator need only know of the scheme and assist it in some way to be held responsible for all of the acts of his coconspirators.").

[28] *See, e.g.*, *Brown*, 2022 WL 17750097, at *10 (plaintiff sufficiently stated a civil conspiracy claim, "even viewed under the heightened pleading standard of Federal Rule of Civil Procedure 9(b)," where defendants, who were alleged to have agreed to "undertake unlawful debt collection efforts" "are on notice of the misconduct underlying [the] claim – sending demand letters, initiating the Collection Actions, and filing affidavits in support of their ownership of the debt, all despite knowing they could not prove their ownership of the debt.").

[29] Corporate Finance Institute, "How Do Banks Make Money?", *available at* https://corporatefinanceinstitute.com/resources/economics/how-do-banks-make-money/, (last accessed Nov. 3, 2023).

Moonstone. Under Florida law, "[a] plaintiff may confer a direct benefit through indirect contact with a defendant through an intermediary." *See In re Takata Airbag Prods. Liab. Litig.*, 2017 WL 2406711, at *9 (quoting *Williams v. Wells Fargo Bank N.A.*, 2011 WL 4901346, at *5 (S.D. Fla. Oct. 14, 2011) ("It would not serve the principles of justice and equity to preclude an unjust enrichment claim merely because the 'benefit' passed through an intermediary before being conferred on a defendant.")).[30] Similarly, Washington law does not require that a plaintiff benefit the defendant through "direct" contact to sustain an unjust enrichment action. *See, e.g.*, *Irwin Concrete, Inc. v. Sun Coast Properties, Inc.*, 653 P.2d 1331, 1334 (Wash. 1982) (upholding an unjust enrichment claim by contractors who installed a water system in a mall against the bank that had loaned money to the mall's developer because the water system completed and added value to the mall and thereby conferred a benefit on the bank).

Finally, Moonstone's assertion that Plaintiffs were not provided adequate consideration for the benefit conferred is not well founded. Moonstone provided no consideration to Class Members for the benefit conferred by FTX's deposits of FTX customer assets, including Class Members' funds. Those funds are now gone, stolen by FTX, and Plaintiffs, victims of the FTX fraud, are left with nothing.

### D.   Plaintiffs sufficiently pleaded that Moonstone participated in a RICO conspiracy.

Moonstone argues that Plaintiffs' RICO claim must be dismissed only because Plaintiffs have failed to adequately plead that Moonstone "***agreed*** to participate in the conduct of an enterprise's illegal activities." Mot. at 20. Moonstone does not argue that Plaintiffs' RICO claim must fail for any other reason. *Id.* at 20-22. This argument is readily defeated.



*Lechter v. Aprio, LLP*, 565 F. Supp. 3d 1279, 1314 (N.D. Ga. 2021) (citing *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010)) ("Those wires further satisfy RICO's predicate act requirement, because they constitute wire fraud. "Under Federal RICO, … "Racketeering activity" includes such predicate acts as mail or wire fraud, *see* 18 U.S.C. § 1961(1), which "occurs when a person (1) intentionally participates in a scheme to defraud another of money or property and (2) uses the mails or wires in furtherance of that scheme.").

Plaintiffs sufficiently pleaded their RICO claim.

## II.     PLAINTIFFS' CLAIMS ARE NOT MOOT.

Moonstone is wrong that Plaintiffs' claims are moot as a result of the FTX Bankruptcy Plan. As a matter of fact, the FTX Bankruptcy Plan does not provide for Plaintiffs' to be paid in full for their claims in the instant suit; it provides only that Plaintiffs will be paid the value, plus interest, of the cryptocurrency held in their FTX accounts *as of the Petition Date. In re FTX Trading,* Doc. 26404, section 2.1.47 (defining "Customer Entitlement Claim" as a claim "for the value *as of the Petition Date* of Cash or Digital Assets held by such Person or Entity in an account

on any FTX Exchange"), section 4.3.6 (providing for Dotcom Customer Entitlement Claims), section 4.3.7 (providing for U.S. Customer Entitlement Claims), section 4.4 (providing that "the value of a Claim in respect of a Digital Asset shall be calculated by converting the value of such Digital Asset into Cash *as of the Petition Date*") (emphasis supplied). Because the value of cryptocurrency has increased—and continues to increase—tremendously since the Petition Date, Plaintiffs will not receive "complete relief" for their injuries through the bankruptcy. For example, pursuant to the FTX Bankruptcy Plan, the value of a Customer Entitlement Claim for 1 bitcoin (BTC) is $16,871.63. *In re FTX Trading*, Doc. 7090-1 at 4. The current market value of 1 bitcoin (BTC) is approximately $95,700, ***more than 5x its Petition Date value***.[31]

Here, Plaintiffs have asserted against Moonstone claims of civil conspiracy, aiding and abetting fraud, aiding and abetting fiduciary breach, and aiding and abetting conversion, and civil RICO, among others. Those causes of action entitle Plaintiffs to pursue from Moonstone the balance of the fair market value of their cryptocurrency lost in the collapse of the FTX cryptocurrency exchange (i.e., the highest value of the cryptocurrency between the time of the conversion and the date of the jury's verdict minus the Petition Date value paid through the FTX Bankruptcy), *plus* treble damages, punitive damages, costs, attorney fees and other remedies. *See, e.g.*, *Kadiyala v. Pupke*, No. 22-10211, 2024 WL 33910, at *1 (11th Cir. Jan. 3, 2024) (upholding jury award of compensatory and punitive damages for conspiracy to commit fraud and aiding and abetting fraud); *Kleiman v. Wright*, No. 18-CV-80176, 2021 WL 5447110, at *4 (S.D. Fla. Nov. 22, 2021) ("[T]he appropriate measure of compensatory damages is the highest value of the Bitcoin and IP at issue between the time of the conversion and the date of the jury's verdict."). The Petition Date value of their cryptocurrency and any interest on that amount will not, therefore, fully compensate Plaintiffs for their claims against Moonstone.

"[B]lackletter law instructs that 'partial relief in another tribunal—whether judicial, administrative, arbitral, or a combination—does not moot an action seeking additional relief, whether the other action involves the same parties or different parties." *In re Vizio, Inc., Consumer Priv. Litig.*, No. 816ML02693JLSKES, 2017 WL 11420284, at *5 (C.D. Cal. July 25, 2017) (quoting Charles Alan Wright et al., 13B Fed. Prac. & Proc. Juris. Section 3533.1 (3d ed. 2017)). "A case becomes moot only when it is impossible for a court to grant effectual relief whatever to the prevailing party." *Sec. & Exch. Comm'n v. Torchia*, 922 F.3d 1307, 1315 (11th Cir. 2019)

---

[31] *See* https://www.coindesk.com/price/bitcoin (last accessed Feb. 13, 2025.

(citing *Calderon v. Moore*, 518 U.S. 149, 150, 116 S.Ct. 2066, 135 L.Ed.2d 453 (1996) (per curiam) ("[T]he availability of a 'partial remedy' is 'sufficient to prevent [a] case from being moot.' "), *In re Transwest Resort Props., Inc.*, 801 F.3d 1161, 1172–73 (9th Cir. 2015) (citing the possibility of similar "partial relief" in a bankruptcy appeal), and *In re Tex. Grand Prairie Hotel Realty, L.L.C.*, 710 F.3d 324, 328 (5th Cir. 2013) (same)); *see also Flagstaff Med. Ctr., Inc. v. Sullivan*, 962 F.2d 879, 885 (9th Cir. 1992) ("Partial relief in another proceeding cannot moot an action that legitimately seeks additional relief.").Because Plaintiffs will not be fully compensated for the claims against Moonstone through the FTX Bankruptcy, the payments Plaintiffs may receive through the Bankruptcy do not moot their claims against Moonstone in this case.

## CONCLUSION

Plaintiffs respectfully request the Court deny Moonstone's motion to dismiss for failure to state a claim and lack of personal jurisdiction. To the extent this Court is inclined to agree with Moonstone that Plaintiffs have insufficiently stated their claims, Plaintiffs pray that this Court will grant them leave to amend—which should be "freely given" absent undue delay, bad faith, dilatory motive, repeated failures to cure deficiencies, undue prejudice, or futility, none of which is present here—to develop their allegations against Moonstone or to invoke Federal Rule of Civil Procedure 4(k)(2). *See, e.g.*, *Foman v. Davis*, 371 U.S. 178, 182 (1962).

## REQUEST FOR HEARING

Plaintiffs request a hearing on the Motion to Dismiss in order to provide the Court with additional details and respond to any questions the Court might have.

Dated: February 28, 2025                         Respectfully submitted,

**By: */s/ Adam Moskowitz***                 **By: */s/ David Boies***
Adam M. Moskowitz                         David Boies
Florida Bar No. 984280                    Alexander Boies
Joseph M. Kaye                            Brooke A. Alexander
Florida Bar No. 117520                    **BOIES SCHILLER FLEXNER LLP**
**THE MOSKOWITZ LAW FIRM, PLLC**          333 Main Street
Continental Plaza                         Armonk, NY 10504
3250 Mary Street, Suite 202               914-749-8200
Coconut Grove, FL 33133                   dboies@bsfllp.com
Office: (305) 740-1423                    aboies@bsfllp.com
adam@moskowitz-law.com                    balexander@bsfllp.com
joseph@moskowitz-law.com
service@moskowitz-law.com

*Co-Lead Counsel*                         *Co-Lead Counsel*

 

James R. Swanson, La. Bar No. 18455
Kerry J. Miller, La. Bar. No. 24562
Molly L. Wells, La. Bar. No. 36721
C. Hogan Paschal, La. Bar No. 38495
**FISHMAN HAYGOOD L.L.P.**
201 St. Charles Avenue, 46th Floor
New Orleans, Louisiana 70170-4600
(504) 586-5252; (504) 586-5250 fax
jswanson@fishmanhaygood.com
kmiller@fishmanhaygood.com
mwells@fishmanhaygood.com
hpaschal@fishmanhaygood.com

*Counsel to Plaintiffs and the Putative Classes*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on February 28, 2025, a true and correct copy of the foregoing was filed electronically with the Clerk of the Court, by using the CM/ECF system which will send an electronic notification of such filing to all counsel of record.

By: */s/ Adam M. Moskowitz*
**Adam M. Moskowitz**