**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MDL No. 3076**
**CASE NO. 1:23-md-03076-KMM/Sanchez**

IN RE:

**FTX Cryptocurrency Exchange Collapse MDL Litigation**
─────────────────────────────────────────────

THIS DOCUMENT RELATES TO:

Bank Defendants

*O'Keefe v. Sequoia Capital Operations, LLC, et al.*, S.D. Fla.
Case No. 1:23-cv-20700


*O'Keefe v. Farmington State Bank d/b/a Moonstone Bank, et al.*, E.D. Wa. Case No. 2:23-cv-00213-TOR
────────────────────────────────────────────────────── /

**OPPOSITION TO DEFENDANTS DELTEC BANK AND TRUST COMPANY LIMITED AND**
**JEAN CHALOPIN'S MOTION TO DISMISS THE AMENDED ADMINISTRATIVE CLASS**
**ACTION COMPLAINT [ECF NO. 823]**

Plaintiffs file this opposition to the Motion to Dismiss Plaintiffs' Amended Administrative Class Action Complaint ("AC") and Incorporated Memorandum of Law (R. Doc. 823) filed by Defendants Deltec Bank and Trust Company Limited ("Deltec") and Jean Chalopin.

## INTRODUCTION

The FTX disaster is the largest financial fraud in US history, resulting in billions of dollars in losses to Plaintiffs. Defendant Sam Bankman-Fried ("SBF"), founder and former CEO of FTX Trading Ltd. ("FTX Trading") and its domestic counterpart, West Realm Shires Services Inc. d/b/a FTX US ("FTX US" and collectively with FTX Trading, "FTX"), took in customer funds, in both fiat and cryptocurrencies, and rather than segregate those funds and hold them in custody for the benefit of FTX's customers, SBF stole customers' monies, laundered through sham loans and other transfers to Alameda Research, LLC ("Alameda" and collectively with FTX, "FTX Group"), the crypto hedge fund that SBF separately owned, and then paid to himself and other FTX insiders. SBF was convicted on seven criminal counts including wire fraud, and his top lieutenants pleaded guilty to same. SBF could not have perpetuated a scheme of such tremendous scale on his own. Indeed, it is long observed that one "can't run a Ponzi scheme without a bank … Banks are in a unique position to notice what is going on before the money is all gone."[1] SBF found that assistance in Deltec and its chairman, Chalopin.

As now evidenced by more than 7,000 text messages between Deltec and Alameda, produced by FTX Insider Caroline Ellison in this litigation and summarized in the AC, Deltec and Chalopin provided necessary assistance to SBF, while from their "unique position" and as a result of its regulatory diligence and monitoring obligations, Deltec and Chalopin knew FTX was converting customer funds by way of SBF's separately owned Alameda, in breach of its fiduciary duty to its customers and contrary to its representations, *inter alia*, that FTX was "the safest and easiest way to buy and sell crypto," that FTX maintained appropriate internal controls and risk management protections, and that FTX would hold customers' deposits in custody for the customers' benefit and segregated from FTX's own assets.

Notwithstanding their knowledge of FTX's misconduct, and in service of their own financial interests, Deltec and Chalopin took several overt acts rendering critical and substantial assistance to the FTX fraud. Deltec and Chalopin provided necessary, one-of-a-kind banking

---

[1] Floyd Norris, *After Fraud, Regulators Go After A Bank*, N.Y. Times, Oct. 4, 2013, at B1.

services to FTX when other financial institutions would not, including extending a secret *de facto* line of credit—sometimes exceeding $2 billion dollars—that Alameda used to buy and sell the stablecoin Tether and then paid off with FTX customer funds, as well as serving as an inflow through which SBF trafficked customer assets offshore from its sister bank in Farmington State Bank d/b/a Moonstone ("Moonstone"), which Chalopin purchased for FTX's use as a conduit of FTX customer funds from the U.S. to Deltec, in The Bahamas. Chalopin further paved the way for FTX's meteoric rise by making The Bahamas a crypto-friendly jurisdiction and then making FTX its star through the widely publicized and well-attended event, "Crypto Bahamas," and other means. FTX rewarded Moonstone, Deltec, and Chalopin for their assistance, flushing the banks with millions of dollars in needed capital and hundreds of millions more in lucrative deposits.

**PLAINTIFFS' FACTUAL ALLEGATIONS**

## I.     FTX's fraud and underlying misconduct.

SBF, along with his co-founders Gary Wang and Nishad Singh, launched FTX in May 2019. AC ¶ 34. FTX was conceived in Northern California before ultimately landing its domestic operations in Miami, Florida, where FTX US was headquartered and where, in early 2021, FTX purchased the naming rights to the Miami Heat's waterfront arena for more than $135 million, one of many extravagant purchases made with Class Member funds. AC ¶ 37.

SBF primarily routed the fraud through Alameda, the crypto hedge fund which he and Gary Wang formed two years before launching FTX and owned 90% and 10%, respectively. AC ¶ 86. SBF led Alameda as CEO until October 2021, when he installed Caroline Ellison, his close friend and former romantic partner, as CEO. AC ¶¶ 59, 86. From the time she joined Alameda in 2018 through the collapse of FTX, Alameda maintained an office in California where its "Settlements Team," comprised of Lena Ngoy and Carlos Mahoma, principally worked. AC ¶ 61. Alameda's Settlements Team directed transfers and settled transactions among FTX Group banks accounts and cryptocurrency wallets, communicated with Alameda's banks, lenders, and exchanges; communicated with trading counterparties, and settled traders. *Id.*

The fraud was simple. Alameda took in customer funds, either by bank transfer from FTX accounts or by direct deposit into accounts held by North Dimension, a fake electronics dealer that served as Alameda's front. AC ¶¶ 64-65, 91. Alameda used customer funds to make highly leveraged trades and other risky investments or transferred the funds to SBF and other insiders in the form of sham "loans." *Id.* FTX stole more than $8 billion in customer deposits in this way. *Id.*

3

In November 2022, Alameda's misappropriation of FTX customer funds caused the FTX exchange to collapse, and the FTX Group filed for Chapter 11 bankruptcy. Recourse to Plaintiffs and Class Members in the bankruptcy is limited by the Petition Date value of their deposits. But the value of cryptocurrency has increased tremendously—and continues to increase—since the Petition Date. For example, the current market value of 1 bitcoin (BTC) is approximately $95,700—more than 5x its Petition Date value.[2] Plaintiffs will not therefore receive complete relief for their injuries through the bankruptcy and remain deprived of the fair market value of their deposits lost because of the FTX fraud and Defendants' knowing assistance therewith.

## II. Deltec's and Chalopin's knowing assistance of FTX's underlying misconduct.

Deltec and Chalopin knew of FTX Group's misappropriation of FTX customer funds. Through mandated regulatory diligence on FTX and close ties with SBF, and through their provision of special treatment and non-routine baking services to Alameda and FTX, Deltec and Chalopin learned that FTX was operated as SBF's personal piggy bank, that as quickly as FTX customer funds flowed into FTX, they flowed back out to other entities SBF separately owned or controlled, and that FTX lacked the most basic internal controls, such that the enterprise was in fact a house of cards. *See, e.g.*, AC ¶¶ 134, 166, 173-74.

But Deltec and Chalopin did not care. They, too, had money to make in the scheme, their interests aligned with FTX Group's, and FTX Group rewarded Deltec and Chalopin handsomely for their assistance. AC ¶¶ 239, 245-46, 257. With shared objectives and complementary motives, Deltec and Chalopin conspired with FTX Group to perpetuate the fraud and committed critical overt acts in furtherance of it, including providing access to the U.S. banking system, as well as a suite of non-routine banking services, to FTX, transferring Class Member funds to and from accounts that Defendants knew were held by entities that SBF separately owned, extending a multi-billion-dollar *de facto* line of credit to Alameda, and helping to fence Class Member funds across the U.S. border. AC ¶ 139. Defendants were happy to help, with Chalopin noting, "Deltec has been a long-time friend of FTX, and it is our pleasure to support them." AC ¶ 150.

### A. Deltec's cozy history with FTX and its founder, SBF, by way of Chalopin.

Deltec's involvement in the FTX fraud originated with Chalopin. A veteran of the crypto industry, Chalopin was both the largest shareholder of Deltec and Moonstone's CEO. AC ¶¶ 27-29. Deltec is one of the only banks in the world that offers a full suite of digital asset services, such

---

[2] https://www.coindesk.com/price/bitcoin (last accessed Feb. 13, 2025).

that it is one of the few financial institutions through which clients can process cryptocurrency transactions. AC ¶¶ 9, 136.

FTX was not the first customer to run a cryptocurrency-based fraud through Deltec and under Chalopin's watch. In 2018, Chalopin delivered to Deltec the Tether Ltd., which mints the stablecoin "USDT" as a customer and which held $1.8 billion dollars on deposit at the bank, approximately half of Deltec's total deposits at the time. AC ¶ 140. Banking Tether was a risky endeavor—Deltec is reportedly "the only financial institution … willing to say it was working with Tether" as of mid-2021.[3] Hesitation to bank Tether was well founded, because Tether was perpetuating a fraud with striking similarity to that perpetuated by FTX. AC ¶ 141. Like FTX, Tether represented to its customers that it had sufficient levels of liquidity to protect the value of the customers' investments, when it did not, because Tether was siphoning hundreds of millions in customer funds to an affiliate, Bitfinex, just as FTX siphoned billions in customer funds to Alameda. *Id.* The scheme caught the attention of regulators in the United States and, in early 2021, Tether and Bitfinex reached an agreement with the New York Attorney General to settle claims of fraud. *Id.* Deltec banked Tether throughout the fraud. *Id.* Soon after, Deltec and Chalopin took on FTX Group and opened at least 17 accounts for FTX and Alameda in currencies of various kinds. AC ¶ 152. FTX Group quickly became one of Deltec's largest customers. AC ¶¶ 141, 165-70.

Defendants seized the opportunity to connect one fraudulent enterprise to another and secretly brokered a manipulative scheme through which Tether and Alameda could artificially inflate the market price of USDT to the benefit of both entities. Alameda would purchase FTX customer funds and then sell in an attempt at "arbitrage" trading, through which Alameda would try to capitalize on the inflated market prices. AC ¶¶ 194-228. The parties perpetuated the scheme through a Telegram group chat between Tether FTX Group executives, including Caroline Ellison and Ryan Salame, and Greg Pepin, Deltec's deputy CEO. AC ¶ 204. To further facilitate this manipulative scheme, Deltec extended to Alameda a secret *de facto* line of credit, which at times exceeded $2 billion, so that Alameda could purchase USDT before it had the funds (which it often took from FTX customers) to settle the transactions, which greatly enabled Alameda's operations and expanded its reach. AC ¶¶ 229-239. The FTX-Tether-Deltec Telegram messages make clear that the purpose of the scheme was "Make money for Sam [Bankman Fried]." AC ¶ 207.

---

[3] Zeke Faux, *Number Go Up: Inside Crypto's Wild Rise and Staggering Fall* (2023).

**B.  Defendants' knowledge of the FTX fraud.**

Deltec and Chalopin learned of FTX's misconduct in part through its mandated regulatory diligence and monitoring of FTX Group and from its provision of hands-on, non-routine banking services to FTX and Alameda.

As a Bahamian Supervised Financial Institution, Deltec was required to have in place policies that were consistent with the Central Bank of the Bahamas' Guidelines for Supervised Financial Institutions on the Prevention of Money Laundering, Countering the Financing of Terrorism & Proliferation Financing (the "Guidelines"). All Supervised Financial Institutions of the Bahamian Central Bank must use these Guidelines to develop responsible procedures to prevent money laundering and terrorist financing. AC ¶ 156. For example:

- Deltec is required to "retain adequate documentation to demonstrate that its [Know Your Customer ("KYC")] procedures have been properly implemented, and that it has carried out the necessary verification procedures." *Id.* From this, Deltec would have learned SBF was the beneficial owner of FTX and Alameda.

- When seeking to verify the identity of corporate clients, Deltec is required to identify the client's "source of funds." *Id.* From this, Deltec would have identified that incoming transfers to FTX's accounts were of customer deposits.

- Moreover, cross-border wire transfers of $1,000 or more must contain complete payer and payee information for Deltec to process such wire transfers. *Id.* From this, Deltec would have learned that FTX customer deposits were being transferred to Alameda and other entities that SBF separately owned.

- And, per the Guidelines, where Deltec "observe[s] unusual activity in relation to any client account, [it] should question the customer concerned, even if it means asking difficult questions. If a customer fails to provide credible answers, this should invite further enquiry about his activities, make [Deltec] reconsider the wisdom of doing business with [the client] and, potentially lead to a [Suspicious Transaction Report ("STR")] being filed. [Deltec] should document the results of their enquiries into unusual activity." *Id.*

Under these Guidelines, Deltec was obligated to (1) identify the source of funds transferred into, out from, and among FTX's accounts at Deltec; (2) obtain payer and payee information for wire transfers into, out from, and among FTX's accounts for cross-border transfers and transfers in amounts greater than $1,000; and (3) question the customer about any unusual activity observed in the customer's accounts. For FTX, the source of funds was customer assets, including Class Member funds, and the payer and payee were FTX, Alameda, SBF, his friends, family and other FTX insiders. *Id.* As a result, Deltec—and by extension, Chalopin—was aware that customer funds were being transferred to Alameda (and other accounts under SBF's control) from FTX.

The more than 7,000 pages of text messages between Deltec and Alameda produced by Caroline Ellison in this litigation show that Deltec did in fact collect the information required by the Guidelines, and even specifically inquired as to the nature and purpose of North Dimension, the sham electronics dealer that FTX Group installed as a front through which to receive FTX customer funds. *See, e.g.*, AC ¶¶ 157, 177, 178. The text messages further show that Greg Pepin, Deltec's deputy CEO, individually identified incoming FTX customer deposits and manually transferred those deposits into Alameda's Deltec bank account daily, even after Deltec learned of Alameda's looming insolvency and FTX's inevitable collapse. *See, e.g.*, AC ¶ 179, 180, 183, 189, 190. In those messages, Pepin refers to the reconciliation process as "MONEY TIME," AC ¶ 167:

| | |
|---|---|
| I HEAR A MONEY TIME IS HAPPENING HERE I THINK I NEED TO BE A PART OF IT | it is MONEY TIME INDEEDE [sic] |
| [...] | [...] |
| Hey Guys Moneyyyy time | doing my best to hold the wall but such money tsunami is hard to handle dude |
| [...] | [...] |
| Quick MONEYY TIME | MONEY TIME dear friends 😊 thank you for being here 😊 and ready to enjoy money time 😊 |
| [...] | [...] |
| I'm on a roll so let's do more MONEY TIME | MONEY PARTY THE BEST PARTY |
| [...] | |

Chalopin further learned of FTX's misconduct in courting Alameda to invest in his new bank, Moonstone. Shortly after purchasing Moonstone, Chalopin and his son Janvier, Moonstone's chief digital officer, solicited Alameda for start-up capital and "pitched [Alameda] the whole roadmap" to invest in the tiny bank. AC ¶ 245. In January 2022, Alameda invested $11.5 million in Moonstone, nearly double the bank's net worth at the time. *Id.* In a press release sent from Bellevue, Washington, Chalopin boasted that "Alameda['s] investment into … Moonstone Bank signifies the recognition, by one of the world's most innovative financial leaders, of the value of what we are aiming to achieve. This marks a new step into building the future of banking." *Id.* It also meant SBF, who owned 90% of Alameda, indirectly held a majority stake in Moonstone, one of the select banks through which he ran the FTX fraud.

In addition to the ordinary diligence that would come before taking in tens of millions of dollars in investment capital from Alameda, Deltec obtained information about FTX's misconduct from their close ties with FTX Group executives. Greg Pepin, Deltec's deputy CEO, was in constant communication with FTX Group executives, evidenced by the 7,000 pages of text produced by Caroline Ellison, in which they shared memes and inside jokes demonstrating the close nature of their relationships, including, for example:



¶ 153.

Meanwhile, Chalopin forged a particularly close bond with Dan Friedberg. ¶ 247. Friedberg served simultaneously as FTX US's Chief Compliance Officer and Alameda's General Counsel, was licensed in Washington state, and worked for FTX from the Seattle area. *Id.* Friedberg regularly met with Chalopin, and in or around August 2021, the two began to discuss Alameda's potential investment in Chalopin's other bank, Moonstone. *Id.* Over the course of the negotiations, as reported by FTX and Deltec employees, Friedberg and Chalopin "spoke highly of one another." *Id.* Friedberg was considered one of the key decision makers within FTX Group and was routinely identified as a member of the senior executive team. ¶ 248. Chalopin must have appreciated Friedberg's dual roles at FTX US and Alameda, revealing the total lack of "appropriate management, governance, and organizational structure" and conflicts of interest between FTX and Alameda, contrary to FTX's representations to Plaintiffs and Class Members. *Id.*

Mr. Chalopin's other bank, Moonstone, also had regulatory obligations to understand and monitor FTX's banking activity through FTX's accounts at the bank, and as a bank in the United States, Moonstone must adhere to certain anti-money laundering ("AML") and KYC laws and regulations, including the Bank Secrecy Act ("BSA"), Patriot Act, Anti-Money Laundering Act and regulations promulgated thereunder. AC ¶ 249. These obligations include developing a "Customer Identification Program" and "Customer Due Diligence" procedures designed to identify and verify all customers and, where applicable, including FTX's beneficial owners, source of funds, and the nature and intended purpose of the business relationship, to the extent warranted by the risk of money laundering or terrorist financing or as required by regulation." *Id.* Moonstone, and in turn, Chalopin, would have learned from this diligence (1) that SBF separately owned FTX and Alameda, and (2) the source of funds into FTX's accounts were FTX customer deposits.

Additionally, because FTX Trading was an offshore money service business ("MSB") incorporated in Antigua, a jurisdiction which the Financial Crimes Enforcement Network ("FinCEN") classifies as "high risk," Moonstone was required to conduct enhanced due diligence and ongoing monitoring of FTX Trading under the U.S. banking regulations and in accordance

with the Federal Financial Institutions Examination Council Manual (the "FFEIC Manual"), which sets forth guidelines for compliance with the U.S. banking laws. Specifically, with respect to FTX Trading and other of FTX's offshore MSBs, the FFEIC Manual required Moonstone to (1) understand the intended use and purposes of the accounts and anticipated account activity (both type and volume), (2) understand the types of products and services offered, as well as the location and markets served, and (3) conduct ongoing diligence and monitoring for suspicious activity, in each case in accordance with the BSA. AC ¶ 250. This diligence and monitoring encompassed:

- A review of FTX Trading's BSA/AML program;

- A review of the results of FTX Trading's independent testing of its AML program;

- A review of written procedures for the operation of FTX Trading;

- On-site visits;

- A review of agents, including locations, in or outside the United States, which will be receiving services directly or indirectly through the FTX Trading account;

- A determination whether FTX Trading has performed due diligence on any third-party servicers or paying agents;

- A review of written agent management and termination practices for FTX Trading;

- A review of written employee screening practices for FTX Trading. *Id.*

Moonstone represented to the public that it maintained "first-in-class regulatory, compliance and risk expertise," and so certainly must have satisfied its diligence and monitoring regulatory obligations in keeping with that representation and gleaned from that diligence and monitoring knowledge of FTX Group's misappropriation of customer funds. AC ¶ 249.

### C. Deltec and Chalopin assisted the FTX fraud, despite knowledge of it.

Notwithstanding their knowledge of FTX Group's misconduct, and to the benefit of FTX and Alameda (a shareholder of Chalopin's bank, Moonstone), Deltec and Chalopin assisted the FTX fraud by providing one-of-a-kind banking services to FTX Trading, FTX US, and Alameda; injecting capital into FTX Group; transferring FTX customer funds to Alameda or for Alameda's use; and extending a secret line of credit to Alameda totaling $2 billion at times. AC ¶ 133.

*First*, Deltec and Chalopin assisted in expanding FTX's reach, in part, by laundering its reputation. Deltec co-sponsored with FTX the Crypto Bahamas summit, where Chalopin and SBF hosted "an exclusive gathering of the leading investors and builders in the blockchain, digital assets and web3 space." ¶ 147. Nearly a dozen FTX executives, including Brett Harrison, President of

FTX US, and Zach Dexter, President of LedgerX, were also featured at the conference. *Id.* Deltec's sponsorship of Crypto Bahamas, at Chalopin's direction, helped to amplify SBF's reach. Press heralded the conference, with *CoinDesk* describing it as "a four-day flex of FTX's expanding empire … with a new era of 'corporate crypto' firmly on display," and the *New York Times* reporting, "Bankman-Fried was presiding over the first edition of the Crypto Bahamas conference, a showcase for FTX and a vivid demonstration of his growing celebrity and influence. Everywhere he went, crypto entrepreneurs offered handshakes and fist bumps, patting him on the back as they pitched projects or presented him with branded swag." AC ¶ 148. Deltec's hosting Crypto Bahamas also helped to normalize the FTX exchange "from the early days of 'shadowy super-coders' hearkening the end of banks," with many news outlets reporting on the growing acceptance of crypto on display. AC ¶ 149. Chalopin was happy for Deltec to help FTX, noting "Deltec has probably 20 people on the ground here at the conference today. We are here because we embraced [FTX's] vision of the future." *Id.* FTX, in turn, was a great friend to Deltec with *quid pro quo* payments and other benefits summarized herein. AC ¶ 150.

*Second*, recognizing the unique, if not unusual, suite of services his bank had to offer the crypto industry, Chalopin spent years assisting the Bahamian government in "transforming the country into a sandbox for digital asset startups." AC ¶ 138. This was no easy task. As Chalopin tells it, transforming The Bahamas into a crypto haven was like clearing a jungle, requiring a "machete [to] cut the branches." AC ¶ 139. Chalopin succeeded in lobbying the Bahamian legislature to pass crypto-friendly legislation in 2020, nearly one year after FTX launched. AC ¶¶ 142-43. Chalopin recognized that his lobbying and the passage of the pro-crypto legislation "attracted FTX." AC ¶ 143. Without the The Bahamas' lax regulatory landscape, FTX could not have at once publicly touted its devotion to strict compliance in the United States, fostering the "cleanest brand in crypto," and evaded regulatory scrutiny behind the scenes in The Bahamas.

*Third,* Defendants assisted FTX Group in transferring FTX customer funds to Alameda's accounts and in moving Class Member funds offshore through 17 accounts at the bank. AC ¶¶ 191, 256, 258. These funds included, upon information and belief, not only Class Members' U.S. dollar deposits, but also Class Members' cryptocurrencies, as Deltec is one of few banks with the faculties necessary to do that, including taking custody of cryptocurrencies and trading, lending or borrowing digital assets. AC ¶ 27. Deltec took in these funds by way of transfer from FTX and Alameda accounts at other banks and by direct deposit from unwitting FTX customers

themselves. AC ¶¶ 165, 173. As Caroline Ellison testified in a sworn affidavit attached as Exhibit A to the Amended Complaint, Deltec reviewed these incoming wires on an individual basis and allocated them to Alameda's accounts. R. Doc. 779-1, ¶ 19. ("Among the ways that these incoming deposits were tracked was that Deltec would periodically send via Telegram chat to Alameda's settlements team, including to [Lena] Ngoy and [Carlos] Mahomar in California, a list of wire transfers received by Deltec that day….The Alameda Settlements Team would then help Deltec identify which transfers had come from customers of FTX.com and into which Alameda or FTX Group account those transfers should go. This manual reconciliation process occurred regularly during the course of Alameda's banking relationship with Deltec."). Stated differently, not only did Deltec *know* that FTX customer funds were wired into FTX Group's Deltec accounts, Deltec went through the painstaking process to identify, match, and then manually move those funds into FTX Group accounts, *including Alameda's accounts*.

*Fourth*, Deltec secretly brokered and facilitated the manipulative scheme whereby Alameda would purchase USDT from Tether using a secret *de facto* multi-billion line of credit from Deltec, so to artificially inflate the market price for USDT, which Alameda would settle with FTX customer funds. No other Deltec customers received such special treatment and, as Caroline Ellison testified in her sworn affidavit attached as Exhibit A to the Amended Complaint, the line of credit was "helpful for Alameda's operations and trading, because it served as an additional source of capital," R. Doc. 779-1, ¶ 32, albeit, a source of capital underwritten by FTX customer funds. The 7,000 pages of text messages that Ms. Ellison produced demonstrate that the *de facto* line of credit was the brainchild of Greg Pepin, deputy CEO of Deltec and FTX Group's main contact at the bank and required his daily involvement. AC ¶ 236. The messages further show that Pepin offered the non-routine services after clearing the arrangement with Deltec's chief officers and regularly ran the line of credit transactions by his "treasury team." *Id.*

FTX Group could not find these special services in other banks, as FTX Insider Ryan Salame's September 7, 2023 indictment now confirms, and FTX relied on Deltec to provide these crypto banking services. AC ¶ 136.

Deltec benefited greatly from its relationship with FTX Group. After an extended failure by Deltec to raise debt capital in New York, Chalopin turned to FTX and, in October 2021, Deltec's parent company, Deltec International Group, received a $55 million loan from Norton Hall Ltd., an entity controlled by Ryan Salame, CEO of FTX's Bahamian outfit, paid for with

Class Member funds. AC ¶ 151.[4] On top of its $55 million kickback, collected millions of dollars in fees and profited immensely from the hundreds of millions of deposits—*in FTX customer assets*—held in the FTX accounts.

**D.  Chalopin's further assistance to the FTX fraud by way of Moonstone.**

Eager to help more with FTX's trafficking of customer deposits offshore and in service of the mutually beneficial relationship between Defendants and FTX, Chalopin sought opportunity to assist FTX Group. He found that opportunity in Farmington State Bank, then the 26th smallest bank in the United States with no more than 25 employees and a single branch in Farmington, Washington, a rural town of only 150 residents. AC ¶ 246. So small was Farmington State Bank that, in 2010, the bank's president bragged that it did not offer credit cards and held more deposits than loans outstanding. *Id.* That changed in 2020, when Chalopin purchased the bank and rebranded it Moonstone, purportedly to target digital assets and to support the "underserved cannabis industry." *Id.*

At Chalopin's direction, Moonstone promptly applied, and was approved, to become a member of the Federal Reserve, and FTX gained entry to the U.S. banking system. *Id.* Moonstone's membership in the Federal Reserve was imperative to the FTX fraud, as SBF needed access to the U.S. banking system, and other major financial institutions in the United States, wary of an emerging asset class that had been linked to money laundering and illegal drugs, and refused to bank crypto exchanges and started blocking transfers by customers to buy cryptocurrencies." AC ¶ 9. Indeed, Moonstone was one of only three U.S. banks willing to provide banking services to FTX and its affiliates.

According to a former president of the Independent Community Bankers of America, Moonstone's close relationship to Alameda was concerning, and the approval of Moonstone's application to the Federal Reserve a cause for alarm:  "The fact that an offshore hedge fund that was basically a crypto firm [Alameda] was buying a stake in a tiny bank for multiples of its stated book value should have raised massive red flags for the F.D.I.C., state regulators and the Federal Reserve … It's just astonishing that all of this got approved." AC ¶ 253. The reason for the

---

[4] Salame's indictment again confirms Plaintiffs' allegations, revealing that Salame, SBF, and other insiders recorded political contributions and other kickbacks as Alameda "loans" or "expenses," most of which were "outgoing wire payments … not documented in agreements or in term sheets [with] no set interest rates, no interest payments, no collateral, and no evidence of repayment." **Ex. 1**, Salame Indictment, ¶ 15.

astonishing approval was that Moonstone did not disclose its intention to service cryptocurrency clients to the Federal Reserve. On August 17, 2023, the Federal Reserve announced an enforcement action against Moonstone, because, upon information and belief, at Chalopin's direction, Moonstone did not inform the Federal Reserve that Moonstone intended "to pursue a strategy focused on digital banking services or digital assets" (i.e., banking FTX and Alameda), and Moonstone "improperly chang[ed] its business plan" to provide such services (i.e., to FTX and Alameda) without prior notification or approval from the Federal Reserve.[5]

With access to the U.S. banking system by way of Moonstone's membership in the Federal Reserve fraudulently maintained, FTX quickly began to route its own fraud through Moonstone and promptly deposited $50 million of FTX customer funds in two accounts at the bank. AC ¶ 254. Moonstone, for its part, benefited tremendously from this quid pro quo. AC ¶ 256. FTX was Moonstone's largest customer, and with FTX's accounts, Moonstone's deposits jumped to $71 million, a 600% increase from Moonstone's historical average. AC ¶ 257.

Plaintiffs allege that, in pursuit of continued growth and unprecedented profits, Moonstone began fencing customer assets across the U.S. border and into FTX accounts at Deltec, Moonstone's sister bank in The Bahamas. AC ¶ 9. John Ray noted that the services Moonstone and Deltec provided to FTX were "certainly highly irregular" and transfers between the banks have "gotten [the Bankruptcy Estate's] attention." AC ¶ 258. Mr. Ray elaborated that he is "looking at what dollars were that went from the FTX group to [Moonstone] and looking at the connections of that bank to the Bahamas [i.e., Deltec] …. It's certainly highly irregular and has got our attention." *Id.* Moonstone provided these "highly irregular" services at Chalopin's direction and despite awareness of FTX's underlying misconduct.

On the basis of these factual allegations, Plaintiffs assert, on behalf of the putative class, claims of civil conspiracy, aiding and abetting fraud, aiding and abetting fiduciary breach, aiding and abetting conversion, Federal R.I.C.O. (18 U.S.C. 1962(d)), and unjust enrichment (as to Deltec only) against Deltec and Chalopin, arising under Florida and Washington common law.[6]

**E. The limited discovery that Plaintiffs have accessed to date demonstrate the**

---

[5] *See* Turner Wright, "Federal Reserve issues enforcement action against FTX-linked US bank," Cointelegraph.com (Aug. 17, 2023), *available at* https://cointelegraph.com/news/federal-reserve-issues-enforcement-action-against-ftx-linked-bank, (last accessed Nov. 3, 2023) (summarizing the Federal Reserve's enforcement action and providing a link to the Federal Reserve's cease and desist order arising from same).
[6] AC ¶¶ 277-318.







## LAW AND ARGUMENT

I.   **THIS COURT HAS PERSONAL JURISDICTION OVER DELTEC AND CHALOPIN.**

Though Jean Chalopin and Greg Pepin are happy to avail themselves of the U.S. courts as plaintiffs in suits over their own business deals gone bad, *see Chalopin v. Casimir et al.*, Case No. 4:24-cv-04040 (S.D. Tex.), Defendants protest jurisdiction in defending Plaintiffs' claims here. Deltec and Chalopin contest personal jurisdiction in both Florida and Washington, arguing that they are "Bahamian resident[s] who are not alleged to have done anything in Florida," Mot. at 15, an argument both factually incorrect and unsupported by law. Jurisdiction over Deltec and Chalopin is firmly rooted in their connections to FTX Group, in Florida and California, and Moonstone, in Washington State.

### A.   Deltec and Chalopin are subject to personal jurisdiction in Florida.

Florida's long-arm statute confers jurisdiction over a non-resident defendant if the claim asserted arises from the defendant's forum-related contacts falling into one of nine categories enumerated by the statute. F.S.A. § 48.193; *GolTV, Inc. v. Fox Sports Latin Am. Ltd.*, 277 F. Supp. 3d 1301, 1311 (S.D. Fla. 2017). Relevant here, those contacts include (1) tortious conduct within the state; and (2) participation in a civil conspiracy in which at least one act in furtherance of the conspiracy is committed in Florida. *Id.; see also AXA Equitable Life Ins. Co.*, 608 F. Supp. 2d 1349, 1354 (S.D. Fla. 2009). Physical presence in the state is not required. *See, GolTV, Inc.*, 277 F. Supp. 3d at 1311–12 ("A nonresident defendant can commit a tortious act within Florida even if he commits tortious acts outside the state, if those acts cause injury *within* Florida.").

As to tortious conduct, "the Eleventh Circuit has held that allegations of intentional torts support the exercise of personal jurisdiction over a nonresident defendant with no other contacts with the forum." *AXA Equitable Life Ins. Co.*, 608 F. Supp. 2d at 1355. "[T]he Florida long-arm statute permits jurisdiction over the nonresident defendant who commits a tort outside of the state that causes injury inside the state." *Licciardello v. Lovelady*, 544 F.3d 1280, 1283 (11th Cir. 2008) (citing *Posner v. Essex Ins. Co.*, 178 F.3d 1209, 1216 (11th Cir. 1999) (adopting broad interpretation of long-arm statute by Florida courts that permits personal jurisdiction over nonresident defendant alleged to have committed a tort causing injury in Florida)); *Cable/Home Commc'n Corp. v. Network Prods., Inc.*, 902 F.2d 829, 858 (11th Cir. 1990) ("In our technologically sophisticated world permitting interstate business transactions by mail, wire and satellite signals, physical presence by the nonresident defendant is not necessary for personal

jurisdiction in the forum state."). Defendants are therefore wrong, as a matter of law,[19] that Plaintiffs' claims must be dismissed because "Plaintiffs do not allege that Deltec Bank or Mr. Chapolin engaged in *any* conduct in Florida." Mot. at 12.

Plaintiffs pleaded that Deltec and Chalopin committed the intentional torts of aiding and abetting fraud, fiduciary breach, and conversion by knowingly assisting FTX's misconduct, misconduct which emanated from Miami, where FTX US was headquartered when it collapsed and from where it had long maintained its primary domestic base of operations. As part of FTX Group, FTX US was one of Deltec's largest clients, and Plaintiffs specifically allege, and the limited discovery referenced herein shows, that Defendants serviced accounts for FTX US, conducted diligence on FTX US before doing so, traveled to Miami to service the FTX US accounts, engaged in steady communications with FTX US employees, including Dan Friedberg, FTX US's Chief Compliance Officer, and manually processed millions of dollars of transactions into and out of FTX US's accounts at Deltec—including dozens of wire transactions from FTX US customers—into Alameda's accounts (i.e., the very misappropriating of FTX customer funds giving rise to this case). AC ¶¶ 152-155, 165, 194. That was intentional tortious conduct directed at Florida by way of Defendants' business transactions with, and non-routine banking services to, FTX US, headquartered *in Florida*, which ultimately contributed to the collapse of FTX US *in Florida*. Florida's long-arm statute confers jurisdiction over Defendants in this case for their intentional tortious conduct directed at and which caused injury in Florida.

As to civil conspiracy, "Florida law construes the state's long-arm statute to reach all of the alleged participants in a civil conspiracy, at least one act in furtherance of which is committed in Florida," and "Florida courts may exercise personal jurisdiction over parties to a Florida civil conspiracy even if the alleged civil conspirator otherwise has no connection to the state." *AXA Equitable Life Ins. Co*., 608 F. Supp. 2d at 1354. "Florida's long-arm statute therefore reaches all participants in that conspiracy, even those not otherwise connected to Florida." *Id.*; *see also GolTV*, 277 F. Supp. 3d at 1313 (Statute "supports personal jurisdiction over an 'alleged conspirator where any other co-conspirator commits an act in Florida in furtherance of the conspiracy, even if the

---

[19] Defendants are wrong that "Plaintiffs do not allege that Deltec Bank or Mr. Chalopin engaged in *any* conduct in Florida." Mot. at 12. Plaintiffs allege Deltec officials "James Schaefer, Deltec Bank's Executive Vice President; Bruno Macchialli, Delchain's Chief Executive Officer; … Joseph Ziolkowski, Realm Insurance's Managing Director" and "[Gregory] Pepin," Deltec's deputy CEO, "traveled to Miami for business…to service the FTX Group accounts." ¶ 154.

defendant over whom personal jurisdiction is sought individually committed no act in, or had no relevant contact with, Florida.'"). Plaintiffs pleaded that Deltec and Chalopin participated in a civil conspiracy with FTX US, which was headquartered in Miami and committed acts in furtherance of FTX's misconduct therefrom. Deltec and Chalopin are therefore subject to personal jurisdiction pursuant to the long-arm statute in Florida. *See* Section II.B.

Separately, Plaintiffs sufficiently plead a civil claim under the Racketeering Influenced and Corrupt Organizations Act ("RICO"), *see* Section II.D, which confers jurisdiction over both their RICO claim and their pendant state law claims against Defendants. *Republic of Panama v. BCCI Holdings (Luxembourg) S.A.,* 119 F.3d 935, 942 (11th Cir. 1997) ("Section 1965(d) of the RICO statute provides for service in any judicial district in which the defendant is found. When a federal statute provides for nationwide service of process, it becomes the statutory basis for personal jurisdiction.").

Defendants admit they were served in The Bahamas, yet argue that jurisdiction is lacking still, because they were not served in the U.S. Mot. at 9-10. That is a misstatement of the law. Under RICO, a plaintiff "can … resort to state law authorization of process" "on defendants … outside the United States" to confer jurisdiction over its RICO and pendant claims against a foreign defendant. *Brink's Mat Ltd. v. Diamond,* 906 F.2d 1519, 1522 (11th Cir. 1990) ("[I]f an applicable federal statute authorizes service of process on … defendants … in other districts within the United States), but says nothing about service of process on other defendants (those outside the United States), can a plaintiff resort to state law authorization for service of process on the latter type of defendants? We hold a plaintiff may do so."). Because Florida state law authorizes service of foreign entities, service of Defendants in The Bahamas confers jurisdiction in this Court over Plaintiffs' RICO and pendant claims against them. The caselaw offered by Defendants are inapposite here, as those cases stand only for the proposition that foreign service *alone* is not enough to confer jurisdiction, _when no other defendant has been served in a U.S. jurisdiction_ or, as in the case of *Republic of Panama*, where the plaintiff's RICO claims against the only U.S. defendants were rejected, and RICO's jurisdiction provisions could not be relied upon in the first place. 119 F.3d at 950-951 (rejecting RICO claims against the only U.S. defendants whose actions were the only alleged ties to the United States); *cf. also Don't Look Media LLC v. Fly Victor Ltd.*, 999 F.3d 1284, 1288 (11th Cir. 2021) (no other defendant was served in the U.S. nor did the conspiracy have adequate ties to the U.S. to begin with); *Verdejo v. HP Inc.*, No. 21-20431-Civ-

Scola, 2021 WL 5933727, at *4 (S.D. Fla. Nov. 8, 2021) (no part of the alleged conspiracy had any ties to the United States). That is not the case here, where other defendant-conspirators have been served in the U.S. (e.g., Moonstone, served in Washington State), the conspiracy involves the U.S., and the foreign defendants do business in Florida and in Washington State.

### B.   Deltec and Chalopin are subject to personal jurisdiction in Washington.

In Washington, "[a]ny person, whether or not a citizen or resident of this state, who in person or through an agent" submits to jurisdiction with respect to "any cause of action" arising from that person's "transaction of any business" or "commission of a tortious act" within the state. Wash. Rev. Code Ann. § 4.28.185; *see also TRC Tire Sales, LLC v. Extreme Tire & Serv*., Inc., 2008 WL 3200727, at *2 (E.D. Wash. Aug. 6, 2008) ("A nonresident corporation submits itself to the jurisdiction of the courts of the State of Washington with respect to any cause of action that arises out of business which the corporation transacts in this state.").

Plaintiffs' causes of action against Deltec arise *inter alia* from its effecting of banking transfers with Moonstone, its sister bank located in Washington, while their causes of action against Chalopin arise from his purchase and takeover of Moonstone. Through these business transactions in Washington, Deltec and Chalopin provided assistance in furtherance of FTX's fraud, breach of fiduciary duty and conversion. Where, as here, a non-resident defendant purposefully directs tortious conduct into Washington or consummates some portion of a transaction within its borders, the non-resident defendant is subject to jurisdiction in the state. *See, e.g.*, *Starbucks Corp. v. Wellshire Farms, Inc.,* 2013 WL 6640124, at *2-3 (W.D. Wash. Dec. 17, 2013). Plaintiffs' allegations against Deltec and Chalopin give rise to jurisdiction within the state.

### C.   Jurisdiction over Deltec and Chalopin does not offend due process.

In Florida, "[j]urisdiction may be constitutionally asserted over the nonresident defendant whenever he has by his own purposeful conduct created a 'substantial connection' with the forum state. The Court has made clear, however, that '[s]o long as it creates a "substantial connection" with the forum, even a single act can support jurisdiction.' Intentional torts are such acts, and may support the exercise of personal jurisdiction over the nonresident defendant who has no other contacts with the forum." *Licciardello*, 544 F.3d at 1285. In Washington, jurisdiction is upheld where, in cases of intentional tort, a non-resident "purposefully direct[s] 'activities at the forum state'" pursuant to "an 'effects' test that focuses on the forum in which the defendant's actions were felt, whether or not the actions themselves occurred with the forum." *TRC Tire Sale*., 2008

WL 3200727, at *3 (quoting *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1206 (9th Cir. 2006)).

Both requirements are satisfied here. Plaintiffs allege that each of Deltec and Chalopin purposefully directed activities to Florida and Washington—by, for example, effecting banking transactions by FTX US or by purchasing Moonstone and fashioning it a tool by which FTX could funnel customer deposits to Deltec offshore—and that such activity was intentional and tortious in aiding FTX's misconduct with effects felt in Florida and Washington. As confirmed by Salame's September 7, 2023 indictment, this conduct was also a but for cause of Plaintiffs' injuries.[20] FTX needed bank accounts within the United States and corresponding accounts offshore but could not find banks willing to open and service its accounts. Without the assistance of Deltec and Chalopin, FTX could not open accounts to launder money, and FTX could not have perpetuated its fraud.

## II.    PLAINTIFFS SUFFICIENTLY PLEADED THEIR CLAIMS

To survive a motion to dismiss, a complaint must only contain sufficient factual matter that, when accepted as true, "states a claim for relief that is plausible on its face." *Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1337 (11th Cir. 2012). With respect to Plaintiffs' claims that sound in fraud, while "Rule 9(b) requires that the circumstances of the fraud [to] be stated with particularity . . .  allegations of knowledge and intent are not subject to the particularity requirement." *Cordell Consultant, Inc. Money Purchase Plan & Tr. v. Abbott*, 561 F. App'x 882, 884 (11th Cir. 2014) (citations omitted).

### A.   Plaintiffs sufficiently pleaded that Deltec and Chalopin aided and abetted fraud, fiduciary breach and conversion under Florida common law.

Deltec and Chalopin argue that Plaintiffs' claims for aiding and abetting fraud, fiduciary duty, and conversion fail for lack of sufficient allegations that Deltec and Chalopin (1) "actually knew" of FTX's underlying fraud, fiduciary duty, or conversion; and (2) rendered substantial assistance in furtherance of FTX's misconduct. Mot. at 22-26.  Deltec and Chalopin are wrong.

#### 1.   Plaintiffs pleaded the underlying fraud with the specificity required by Rule 9.

Neither Deltec nor Chalopin contests that Plaintiffs adequately alleged FTX engaged in fraud  in satisfaction of Rule 9(b). Defendants are wrong to suggest that the pleading requirements of Rule 9(b) extend to allegations of Defendants' knowledge of and assistance with FTX's misconduct. While "Rule 9(b) requires that the circumstances of the fraud [to] be stated with

---

[20] Ex. 1, Salame Indictment, ¶5.

particularity, allegations of knowledge and intent are not subject to the particularity requirement." *Cordell Consultant, Inc. Money Purchase Plan & Tr. v. Abbott*, 561 F. App'x 882, 884 (11th Cir. 2014) (citations omitted); *United States ex rel. Anita Silingo v. WellPoint, Inc*., 904 F.3d 667, 679 (9th Cir. 2018) ("Although the circumstances of a fraud must be pleaded with particularity, knowledge may be pleaded generally."); *United States v. Corinthian Colleges*, 655 F.3d 984, 996 (9th Cir. 2011) ("Under Rule 9(b), 'circumstances constituting fraud or mistake' must be stated with particularity, but 'malice, intent, knowledge, and other conditions of a persons mind,' including scienter, can be alleged generally." (citing Fed. R. Civ. P. 9(b))).

### 2. *Plaintiffs sufficiently pleaded Deltec and Chalopin's aider-abettor knowledge.*

Plaintiffs sufficiently pleaded Defendants knew of FTX's underlying misconduct. While Florida law requires that an alleged aider-abettor have "actual knowledge" of the wrongdoings giving rise to plaintiff's claims, that standard is satisfied where "[a] defendant has general awareness that its role was part of an overall improper activity." *Gilison v. Flagler Bank*, 303 So. 3d 999, 1003 (Fla. Dist. Ct. App. 2020). Further, "actual knowledge may be inferred and proven by circumstantial evidence" and is "nearly universally" done so. *In re Mastro*, 2017 WL 2889659; *Cabot E. Broward 2 LLC v. Cabot*, 2016 WL 8740484, at *4 (S.D. Fla. Dec. 2, 2016) (citing *Amegy Bank Nat'l. Ass'n v. Deutsche Bank Alex.Brown*, 619 Fed. App'x. 923, 931 (11th Cir. 2015)) ("It is difficult to imagine what sort of evidence, other than an admission by [a party], would constitute direct evidence of [the defendant's] knowledge of [the underlying] wrongful conduct."). Plaintiffs' Complaint satisfies these requirements.

### a. **Deltec and Chalopin knew of FTX's misrepresentations to Class Members and illicit transfers of Class Member funds, such that they knew of the underlying fraud, fiduciary breach and conversion**.

Plaintiffs allege Deltec was obligated as a Bahamian Supervised Financial Institution, pursuant to the Central Bank of the Bahamas' Guidelines, to conduct diligence on FTX before opening its accounts, which diligence must include verifying the client's identity (i.e., beneficial ownership) and sources of funds. Moreover, the Guidelines require that Deltec maintain ongoing diligence and monitoring of FTX's banking activity, including specifically any cross-border wire transfers of $1,000, which must contain complete payer and payee information before Deltec can process the transaction, and any "unusual activity in relation to any client account." AC ¶ 156. Plaintiffs allege, from this regulatory-mandated diligence, Deltec learned (1) the source of funds for the FTX Group accounts were FTX customer assets, which FTX promised to hold custody for

the customers' benefit as reiterated in FTX's terms of service; (2) SBF separately owned Alameda and FTX; and (3) FTX Group transferred FTX customer funds into Alameda's accounts.

Defendants discount these allegations as asserting "[a]t most, Plaintiffs appear to suggest that Defendants should have known that something was amiss." Mot. at 24. But Deltec was *required* to conduct this diligence by law, and Plaintiffs' allegations give rise to the inference that Deltec *did* conduct that diligence and *did* obtain the knowledge outlined from that diligence in accordance with Deltec's regulatory obligations as a Supervised Financial Institution under The Bahamas' Central Banking Authority. *See, e.g.*, *Bhatia v. Silvergate Bank*, 725 F. Supp. 3d 1079, 1115 (S.D. Cal. 2024) ("Here, the Court finds Plaintiffs have pled sufficient facts to make their allegations regarding actual knowledge plausible. Plaintiffs allege Defendants are required to comply with the Bank Secrecy Act, which requires Defendants to maintain anti-money laundering and due diligence programs, both of which require Defendants to take reasonable steps to ascertain the source of funds deposited into private banking accounts and the purpose and the expected use of those accounts [and] then allege Defendants followed through and carried out these programs.").

Whatever Defendants make of their regulatory diligence obligations, the Telegram messages produced by Caroline Ellison show that Deltec did in fact witness the FTX fraud play out in real time. Plaintiffs further allege that, in servicing the FTX Group accounts, Deltec manually processed dozens of transactions from FTX to Alameda, including incoming wires of FTX customer funds. AC ¶¶ 191, 256, 258. Plaintiffs allege that Deltec personnel, most often Greg Pepin, worked with Alameda's Settlements Team to specifically identify which incoming wires were coming from which FTX customers and *then proceeded to transfer those funds to Alameda's Deltec account*. AC ¶¶ 165-172. This, too, establishes "actual knowledge" on the part of Defendants. *See Bhatia*, 725 F. Supp. at 1115 ("Plaintiffs' FAC also alleges Defendants held numerous accounts for SBF-related entities, including FTX Ventures, Ltd., FTX US, Alameda, and North Dimension, and that "the FTX/Alameda accounts with Defendants featured [a number of unusual transfers]."). These allegations are supported by the 7,000 pages of Telegram text messages produced by Ms. Ellison and referenced in the Amended Complaint whereby Greg Pepin confirms his understanding of exactly what is happening by way of those transfers, texting, for example "**Hey guys I'm doing an internal of 700m from FTX → Alameda**" and "**so you guys are okay with me moving 180M usd equivalent from FTX to Alameda?**" AC ¶¶ 183, 190.

Moreover, Plaintiffs allege that Chalopin learned of FTX Group's underlying misconduct from his solicitation of Alameda's $11.5 million investment in Moonstone, which doubled Moonstone's net worth. AC ¶ 257. Chalopin negotiated the deal at length with Dan Friedberg, who at once served as FTX US's Chief Compliance Officer and Alameda's General Counsel and whose public history is peppered with instances of fraud. AC ¶¶ 247-48. From those negotiations, Chalopin learned that SBF separately owned and controlled FTX and Alameda but, despite FTX's representations that FTX and Alameda maintained strict corporate separateness, SBF operated FTX and Alameda as a common enterprise, riddled with conflicts of interest. *Id.* Alameda paid for its investments with FTX customer funds, borrowings which Alameda secured with FTT, the FTX-minted cryptocurrency used to artificially prop up Alameda's books. Alameda's $11.5 million capital injection to Moonstone is one such investment, and in confirming that Alameda held sufficient proceeds to fund an investment so large that it doubled Moonstone's net worth, Chalopin would have seen that those proceeds were backed by cryptocurrency that FTX fashioned from thin air. This is in addition to the knowledge that Chalopin acquired as the chief executive and chairman of Moonstone and longtime friend of SBF. Moonstone was obligated to conduct similar regulatory diligence and monitoring of FTX, as well as its account activity, and from that diligence, acquired knowledge of FTX's underlying misconduct. That knowledge is imputed to Deltec by law.[21]

From Deltec's regulatory diligence and monitoring of the FTX accounts, from Chalopin's solicitation of investments by Alameda and diligence of FTX at Moonstone, and from Chalopin's close ties to SBF and other of the FTX's executives, Deltec and Chalopin could see what FTX's customers, Class Members included, could not. *First,* as to FTX's fraud, Deltec and Chalopin could see that FTX's representations as to its investor protections, mitigation of conflicts of interest, risk management procedures, regulatory compliance and other fundamental controls, were misleading—in truth, FTX had in place no internal controls, worked only to exacerbate its conflicts of interest with Alameda, exempting it from whatever risk management procedures it purported to have in place, and failed to comply with even its slightest regulatory obligations. *Second,* as to FTX' s fiduciary breach and conversion, Deltec and Chalopin could see that FTX was transferring customer deposits to and through Alameda, contrary to its representations that FTX would hold

---

[21] *See, e.g., Beck v. Deloitte & Touche, Deloitte, Haskins & Sells, Ernest & Young, L.L.P.*, 144 F.3d 732, 736 (11th Cir. 1998) ("In normal circumstances, the knowledge of a corporation's directors … is imputed to the corporation [under Florida law].").

those assets in segregated accounts for the customers' benefit, constituting a breach of FTX's fiduciary duties to its customers and conversion of customers' funds.

These allegations are more than "conclusory" or "cosmetic," and they plead more than mere knowledge of "red flags." Plaintiffs allege Deltec and Chalopin knew FTX's representations as to its investor protections, its conflicts of interest, its risk management procedures, and its regulatory compliance were false. Plaintiffs therefore allege Deltec and Chalopin knew of FTX's fraud. Plaintiffs further allege Deltec and Chalopin knew FTX was not, in fact, holding customer deposits in custody, segregated from FTX's own assets and for the customers' benefit, and that FTX was instead siphoning those funds to and through Alameda to enrich SBF and other insiders. That, too, was fraudulent, and in breach of FTX's fiduciary duty to its customers and in conversion of the assets that those customers had entrusted to FTX. Plaintiffs therefore allege Deltec and Chalopin knew of FTX's fiduciary breach and conversion, too.

### b. Deltec and Chalopin demonstrated indicia of knowledge sufficient under Florida law.

Supplementing Plaintiffs' specific allegations of Deltec's and Chalopin's knowledge, Plaintiffs further allege that these defendants exhibited indicia of knowledge, circumstantial evidence sufficient under Florida and Washington law. These indicia include (1) having exclusive and/or superior access to the primary violator's financial records[22] and (2) receiving kickbacks or otherwise benefiting from the underlying violations.[23]

*First*, Deltec and Chalopin had access to FTX's financial records and visibility of the transfers from FTX to Alameda that FTX customers, Class Members included, did not, by way of Deltec's regulatory mandated diligence and monitoring of FTX and its banking activity, records that, according to Mr. Ray's congressional testimony and Ryan Salame's September 7, 2023 indictment, failed the slightest scrutiny. *Second*, Deltec's parent company received a kickback from an FTX affiliate by way of a $55 million "loan," and Chalopin received $11.5 million in

---

[22] *See, e.g., Gilison*, 303 So.3d at 1003 (finding knowledge adequately pleaded because complaint alleged, inter alia, "the bank was the only lender that had direct access to [primary violator's] financial records and the discrepancies within them").

[23] *See, e.g., id.* ("The [defendant] benefited when [the primary violator] made substantial interest payments to the bank while the plaintiffs' loans remained unpaid."); *Chang v. JPMorgan Chase Bank, N.A.*, 845 F.3d 1087, 1096-97 (11th Cir. 2017) (knowledge supported by allegation that defendant's employee "secretly received $100,000 from [primary violator] paid to an entity she controlled").

investment proceeds for Moonstone, his other bank. AC ¶¶ 151, 245.

### 3. *Plaintiffs sufficiently pleaded Deltec's substantial assistance.*

In Florida, "[s]ubstantial assistance occurs when a defendant affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the [underlying] breach to occur." *Chang*, 845 F.3d at 1098. Plaintiffs adequately, and specifically, alleged that Defendants rendered substantial assistance to FTX's fraud, fiduciary breach, and conversion .

*First*, Plaintiffs allege that "FTX needed bank accounts that would allow FTX customers to deposit dollars with FTX that could be used to purchase cryptocurrency and pay for transactions," services many banks were "reluctant to do." Chalopin happily stepped in, opening 17 accounts for FTX at Deltec and another two at Moonstone. Deltec took deposits of FTX customer assets into those accounts directly. *See* Section I.B.

*Second*, Plaintiffs allege Deltec and Chalopin substantially aided FTX's misconduct by effecting banking transactions to, from, and among FTX, Alameda, and other entities SBF separately owned or controlled, despite knowing that FTX was misappropriating customer assets by way of such transfers. FTX relied on these transfers to siphon customer funds to and through Alameda, offshore and into SBF's coffers. To effect the transfers, Deltec individually identified incoming FTX customer deposits and manually transferred those deposits into Alameda's Deltec bank account daily and by way of texting one another on the Telegram messaging platform. Deltec continued to manually, and knowingly, processed wires totaling billions of FTX customer funds out of Alameda's Deltec bank account and beyond the customers' reach—including *after* Deltec learned of Alameda's looming insolvency and FTX's collapse *Id.*

*Third*, Plaintiffs allege that Deltec secretly brokered a manipulative scheme between Tether and Alameda to artificially inflate the price of Tether's stablecoin, USDT, which Alameda purchased with FTX customer funds and immediately sold at the inflated price. *See* Section II.C.

*Fourth*, Plaintiffs allege, in furtherance of the Alameda-Tether scheme, Deltec extended a secret *de facto* line of credit that sometimes exceed 2 billion dollars. *See* Section *Id.*

*Fifth*, Plaintiffs allege, by effecting transfers to and from FTX accounts both in the United States and The Bahamas, Deltec and Chalopin substantially assisted FTX in fencing customer funds across U.S. borders and beyond the reach of U.S. law enforcement agencies and officials. Chalopin further assisted by purchasing Moonstone, applying for and obtaining Moonstone's membership (by way of deceit) in the Federal Reserve, and offering the tiny bank for FTX's use

as an outpost of U.S. customer deposits to The Bahamas and other risky jurisdictions offshore. *See Id.* These allegations are bolstered by John Ray's congressional testimony, including his testimony that the services Moonstone provided to FTX were "certainly highly irregular" such that FTX's transfers from Moonstone to The Bahamas (i.e., Deltec) have "gotten the [Bankruptcy Estate's] attention." *Id.*

*Sixth*, Plaintiffs allege Deltec assisted in expanding FTX's reach and normalizing perceptions of risk on the exchange, by featuring FTX at the Crypto Bahamas summit, a "showcase for FTX and a vivid demonstration of [SBF's] growing celebrity and influence." AC ¶ 148.

*Seventh*, Chalopin failed to disclose its knowledge of FTX's fraud, fiduciary breach, and conversion despite its obligation to do so, as "[i]t has long been the law in Washington that a bank has a duty to notify a beneficiary if it has both knowledge of [a] fiduciary relationship and knowledge of a breach of fiduciary duty," *In re Consol. Meridian Funds*, 485 B.R. 604, 626 (Bankr. W.D. Wash. 2013), which aided in concealing the fraud and prolonging its duration.[24] Plaintiffs allege that, by way of Moonstone's regulatory obligation to understand "the intended use and purpose" of the FTX accounts, Chalopin learned that FTX promised to hold customer assets, including Class Member funds, in custody for the customers' benefit, simultaneously promising never to take title of those assets or use them for its own benefit, promises reiterated in FTX's terms of service. *See* Section II.C. Chalopin therefore knew of the custodial nature of FTX's relationship to its customers and, therefore, the fiduciary duty it owed to each.[25] Chalopin could see that FTX was misappropriating FTX customer funds, in breach of that duty, for reasons

---

[24] Notably, Florida law seems to relax the "actual knowledge" standard applicable to allegations of a defendant's failure to act despite its duty to do so. *See, e.g.*, *Ct. Appointed Receiver of Lancer Offshore, Inc. v. Citco Grp. Ltd.*, 2008 WL 926509, at *6 (S.D. Fla. Mar. 31, 2008) ("If it is alleged that a defendant has a duty to disclose, liability could be imposed if he acts with a lesser degree of scienter.") (citing *Woods v. Barnett Bank of Ft. Lauderdale*, 765 F.2d 1004, 1010 (11th Cir. 1985)).

[25] *See, e.g.*, *e.g.*, *Stewart v. Bank of Am., N.A.*, 2012 WL 1310 302, at *3 (M.D. Fla. Feb. 28, 2012) ("Plaintiffs allege that pursuant to the terms of the Claim Procedures, Bank of America was acting as an express escrow agent and as custodian for the insurance funds and that Bank of America owed a duty to Plaintiffs regarding all disbursements from escrow."); *Ricchetti v. Starfish Beach S., S.A.*, 2010 WL 11451771, at *1 (S.D. Fla. Dec. 27, 2010) ("The Subscription Agreement states that Defendant Richards & Associates, P.A. is appointed 'Custodian' and that the firm shall serve as custodian of monies raised in the offering of shares '... until they are invested, pursuant to a custodial agreement....Given the language of the Subscription Agreement, it is not implausible that Defendants had a fiduciary duty to Plaintiff that was breached or that they negligently breached a duty to safeguard her funds when it disbursed to Starfish Holdings, S.A. and did so before the funds were 'invested.').

summarized in Section II.B. His failure to disclose that misconduct to FTX customers constitutes substantial assistance.

With these allegations, Plaintiffs allege Deltec and Chalopin (1) affirmatively assisted FTX's fraud, fiduciary breach and conversion, by opening and servicing the FTX Entities' accounts, and by effecting transfers to and from FTX, Alameda and other entities that SBF separately owned and controlled, both in the United States and abroad; (2) helped amplify FTX's reach, conceal FTX's misconduct, and prolong the fraud's duration by featuring FTX at the Crypto Bahamas summit and normalizing any attendant perceptions of risk. Chalopin, moreover, helped conceal FTX's misconduct by shielding its involvement from the Federal Reserve,[26]and failed to act when he had the duty to do so, in never disclosing FTX's misconduct to FTX customers upon learning of FTX's fiduciary duty and breach, as required by Washington law. Plaintiffs further allege that each of these forms of assistance proximately caused Class Members' injuries, as FTX could not have perpetuated the fraud without Moonstone's provision of these services, particularly because no other major U.S. financial institution would service FTX in these ways and, without Moonstone's assistance, FTX could not have taken in customer deposits in the United States and transferred them to Alameda and other of SBF's separately owned entities offshore.[27]

Deltec and Chalopin nevertheless object that their aid to FTX constitutes nothing more than "routine" activity insufficient to constitute substantial assistance under the law. *E.g.,* Mot. at 24. But in sworn testimony before Congress, Mr. Ray testified that the services provided by Deltec to FTX were actually "highly irregular," AC ¶ 258, rendering Deltec's objection without basis. Even if Deltec were correct that the services it provided to FTX were only routine, "ordinary banking transactions which a bank performs for its customer can support a claim for aiding and abetting if the bank has knowledge that the transactions are assisting the customer in committing a specific tort," *In re Consol. Meridian Funds*, 485 B.R. at 626 (citing *In re First Alliance Mortg. Co.*, 471 F.3d 977, 994–95 (9th Cir.2006)), such that Deltec is liable for providing those services in assistance to FTX.

---

[26] *See* Turner Wright, "Federal Reserve issues enforcement action against FTX-linked US bank," Cointelegraph.com (Aug. 17, 2023), *available at* https://cointelegraph.com/news/federal-reserve-issues-enforcement-action-against-ftx-linked-bank, (last accessed Nov. 3, 2023).

[27] *See* **Ex. 1**, Salame Indictment, ¶5.

**B.   Plaintiffs sufficiently pleaded Deltec and Chalopin conspired with FTX and other Defendants in furtherance of FTX's fraud, fiduciary breach, and conversion.**

In moving for dismissal of Plaintiffs' civil conspiracy claim, Deltec and Chalopin argue only Plaintiffs failed to plausibly plead (1) any agreement by Deltec or Chalopin to act in furtherance of FTX's wrongdoing and (2) that Deltec or Chalopin took any overt act in furtherance of FTX's misconduct. Mot. at 19-22. Deltec and Chalopin are again wrong on both counts.

*First*, Plaintiffs adequately pleaded agreement by Deltec and Chalopin to act in furtherance of FTX's misconduct. In Florida, "[n]o requirement exists that parties formalize or even articulate the agreement—the parties' conduct may imply an agreement." *White v. Verizon Fla., LLC*, 2009 WL 10670227, at *2 (M.D. Fla. Nov. 9, 2009). Indeed, "[c]onspiracies are rarely evidenced by explicit agreements and must almost always be proven by inferences that may be fairly drawn from the behavior of the alleged conspirators." *Orange Lake Country Club, Inc. v. Reed Hein & Assocs.*, LLC, 367 F. Supp. 3d 1360, 1368 (M.D. Fla. 2019).

Plaintiffs' Complaint gives rise to such inference. Plaintiffs allege, for example, that Deltec agreed to extend to Alameda a secret, undocumented *de facto* line of credit, exceeding at times $2 billion, which Alameda settled using FTX customer funds. Plaintiffs also allege that Deltec agreed to transfer incoming FTX customer funds to Alameda's accounts, though Deltec knew that those funds belonged to FTX customers. In return for its assistance, Deltec's parent company received an $55 million "loan" at a time in which it was in critical need of a capital injection, and enjoyed hundreds of millions in deposits from FTX—deposits comprised of FTX customer assets—such that FTX was one of, not the largest, customer at Deltec. FTX further rewarded Chalopin with an $11.5 million investment in Moonstone and $50 million in deposits at Deltec's sister bank, which Alameda co-owned.

These allegations sufficiently establish that Deltec and Chalopin agreed, at least impliedly, to act in furtherance of FTX's wrongdoing under Florida law.[28] To be sure, Florida courts have

---

[28] *See Koch v. Royal Wine Merchants, Ltd.,* 907 F. Supp. 2d 1332, 1347 (S.D. Fla. 2012) (finding allegations of regular communications and other close contacts, plus knowledge of misconduct, sufficient to plead agreement); *BluestarExpo, Inc. v. Enis*, 568 F. Supp. 3d 1332, 1351 (S.D. Fla. 2021) (where defendant knew of and aided the fraud, "the Court is hard pressed to conclude that this was all done without any kind of agreement that plausible supports a civil conspiracy"); *Donofrio v. Matassini*, 503 So. 2d 1278, 1281 (Fla. Dist. Ct. App. 1987) (finding evidence that defendant had knowledge of, participated in, and benefitted from a fraud could give rise to the inference that defendant conspired in furtherance of the fraud).

found that "civil conspiracy does not require more than knowledge and general participation in the conspiracy to commit a civil wrong." *In re Chira*, 353 B.R. 693, 731 (Bankr. S.D. Fla. 2006).[29] Plaintiffs allege that Defendnats knew of FTX's fraud, fiduciary breach, and conversion but participated anyway, *see* Section I.A.1, and so have sufficiently pleaded a civil conspiracy claim.

*Second*, as set forth above, Plaintiffs adequately pleaded that Deltec and Chalopin substantially aided FTX's fraud, fiduciary duty, and conversion by alleging overt acts that Deltec and Chalopin took in furtherance of FTX's underlying misconduct. *See* Section I.A.2. Defendants' objection that none of the actions that they took were in themselves "unlawful, *see* Mot. at 20, falls short as a matter of fact. It is very much unlawful to transfer FTX customer funds to Alameda's accounts at Deltec, which transfers Deltec manually effected each day, with the knowledge that the proceeds being transferred to Alameda's accounts belonged to FTX customers, not FTX or Alameda. And it is very much unlawful to extend to Alameda a secret line of credit, exceeding $2 billion at times. And it is very much unlawful to take in $11.5 million of FTX customer funds to prop up Moonstone and $55 million in a sham "loan" to Deltec, while knowing that those proceeds were supposed to be held for the benefit of FTX customers.

### C. Plaintiffs sufficiently pleaded that Deltec and Chalopin were unjustly enriched.

Deltec and Chalopin argue Plaintiffs' unjust enrichment claim should be dismissed, because Plaintiffs fail to identify any benefit that was "directly conferred" to them. Mot. at 26.

Plaintiffs conferred significant benefits to Deltec and Chalopin. FTX customer assets funded the sham $55 million loan to Deltec's parent company, as well as the $11.5 investment in Moonstone, and FTX customer assets inflated Deltec's deposits at the banks. "Banks generally make money by borrowing money from depositors and … lend[ing] the money out to borrowers, charging the borrowers a higher interest rate and profiting off the interest rate spread,"[30] so the

---

[29] *See also Gilison*, 303 So. 3d at 1004 ("A conspirator only needs to know of the scheme and assist in it in some way to be held responsible for all the acts of his conspirators."); *Logan v. Morgan, Lewis & Bockius LLP*, 350 So. 3d 404, 412 (Fla. Dist. Ct. App. 2022) ("A conspirator need not take part in the planning, inception, or successful conclusion of a conspiracy. The conspirator need only know of the scheme and assist it in some way to be held responsible for all of the acts of his coconspirators.").

[30] *See* Corporate Finance Institute, "How Do Banks Make Money?", *available at* https://corporatefinanceinstitute.com/resources/economics/how-do-banks-make-money/ (last accessed Oct. 19, 2023).

hundreds of millions in customer assets that FTX held on deposit tremendously benefited Deltec and its largest shareholder, Chalopin, serving as a primary profit source for the bank.

Plaintiffs need not plead that these benefits were conferred by Plaintiffs "directly" to Deltec and Chalopin. Under Florida law, "[a] plaintiff may confer a direct benefit through indirect contact with a defendant through an intermediary." *See In re Takata Airbag Prods. Liab. Litig.*, 2017 WL 2406711, at *9 (S.D. Fla. June 1, 2017) (quoting *Williams v. Wells Fargo Bank N.A.*, 2011 WL 4901346, at *5 (S.D. Fla. Oct. 14, 2011) ("It would not serve the principles of justice and equity to preclude an unjust enrichment claim merely because the 'benefit' passed through an intermediary before being conferred on a defendant.")).[31]

Defendants are also wrong that Plaintiffs' unjust enrichment claim must be dismissed because it is "duplicative" of their other claims. Mot. at 27. *First,* an unjust enrichment claim is duplicative only if the *remedy* would be duplicative; here, the damages that Plaintiffs seek by way of their unjust enrichment claim differ from the damages that they seek by way of their aiding and abetting and conspiracy claims. With their unjust enrichment claim, Plaintiffs seek to recoup the benefit of the ill-gotten gains to Defendants; with their other claims, Plaintiffs seek to recoup the value of their deposits lost. *Cf. Moreno v. Star Transportation A., Inc.*, No. 23-CV-23525-RAR, 2024 WL 2782880, at *2 (S.D. Fla. Mar. 29, 2024) (finding unjust enrichment claim is not duplicative of quantum meruit claim where the damages would be measured differently). *Second,* "the Eleventh Circuit has made clear that … unjust enrichment can be pled in the alternative." *Id.* Plaintiffs' unjust enrichment claim should not be dismissed.

### D.   Plaintiffs sufficiently pleaded that Deltec and Chalopin participated in a Federal R.I.C.O conspiracy in violation of 18 U.S.C. § 1962(d).

Defendants' challenges to Plaintiffs' RICO claim are contrary to Plaintiffs' allegations of the facts and unsupported by the law. Plaintiffs' plead that Defendants and FTX Group shared a common purpose, such that together they formed an association-in-fact enterprise, and engaged in racketeering activity with injury in the United States.

---

[31] *See also Aceto Corp. v. TherapeuticsMD, Inc.*, 953 F. Supp. 2d 1269, 1288 (S.D. Fla. 2013) ("There are several recent cases in this district that permit an unjust enrichment claim to stand where the benefit is conferred through an intermediary, pointing out that direct contact, or privity, is not the equivalent of conferring a direct benefit."); *Romano v. Motorola, Inc.*, 2007 WL 4199781, at *2 (S.D. Fla. Nov. 26, 2007) ("Defendant erroneously equates direct contact with direct benefit in arguing because plaintiff here did not purchase either his phone or his batteries from Motorola, plaintiff conferred no direct benefit on Motorola.") (cleaned up)).

1. *Plaintiffs sufficiently allege the existence of a RICO enterprise.*

"[A]n association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009). It "is simply a continuing unit that functions with a common purpose." *Id.* at 948. Fraud is a common purpose sufficient to find a RICO enterprise. *Cisneros v. Petland, Inc.*, 972 F.3d 1204, 1211-12 (11th Cir. 2020). All told, "the definitive factor in determining the existence of a RICO enterprise is the existence of an association of individual entities, however loose or informal, that furnishes a vehicle for the commission of two or more predicate crimes, that is, the pattern of racketeering activity requisite to the RICO violation." *Hyundai Motor Am. Corp. v. EFN W. Palm Motor Sales, LLC,* 641 F. Supp. 3d 1321, 1331 (S.D. Fla. 2022).

*First*, Plaintiffs sufficiently allege in the complaint that the enterprise consisting of Defendants, Moonstone, and the FTX Group, who all shared the common purposes of (1) siphoning into their own pockets FTX customer funds, (2) propping up their operations with same, and (3) growing their nascent ventures by luring in new accounts through FTX's misrepresentations.

With respect to Deltec, Plaintiffs allege: ███████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████ *See* Section II.E. Indeed, Caroline Ellison testified in a sworn affidavit attached as Exhibit A to the AC that Greg Pepin and others at Deltec reviewed incoming wires from FTX customers on an individual basis. R. Doc. 779-1, ¶ 19. Though Deltec knew the deposits in the FTX Group accounts belonged to FTX customers, Deltec manually processed transfers of FTX customer funds into or through the Alameda account, evidenced again by Pepin's text messages to the Alameda Settlements Team, including, for example, "**Hey guys I'm doing an internal of 700m from FTX → Alameda**" and "**so you guys are okay with me moving 180M usd equivalent from FTX to Alameda?**" AC ¶¶ 183, 190.  Deltec then brokered the manipulative scheme through which Alameda would mint and redeem USDT by way of the $2 billion secret, undocumented *de facto* line of credit that Deltec extended to Alameda, and which Alameda would pay down with FTX customer funds flowing into its accounts at Deltec. *See* Section II.C. Deltec benefited from the billions of dollars of deposits that flushed its accounts

courtesy of FTX Group. AC ¶ 209 ("[T]he larger the deposits held by Tether and FTX Group at Deltec Bank, the more money Deltec Bank could make off the deposits."). On top of that, FTX Group paid Deltec $55 million in sham loan proceeds for its service, also underwritten by FTX customer funds. Like FTX Group, Deltec propped up its operations and lined its own pockets with FTX customer funds, and Deltec shared those purposes with FTX Group.

Additionally, with respect to Chalopin, Plaintiffs allege:  Chalopin learned of FTX's misrepresentations to FTX customers and misappropriation of FTX customer funds through diligence and monitoring at his two banks, Deltec and Moonstone, and through his close friendship with Dan Freidberg. When FTX Group invested $11.5 million in Moonstone and agreed to deposit at least $50 million, if not $100 million, in deposits, as *quid pro quo* for ████████████████████████████████████ FTX Group's $50 million deposits brought Moonstone's deposits up to $71 million in the third quarter of 2020, resulting in unprecedented profits for the previously small bank and its owner.  AC ¶¶ 245, 246, 257. And, ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ████████████████████ Chalopin therefore shared with FTX Group the purpose of misappropriating FTX customer funds,███████████████████████████████████████ ████████████, and luring in new customers on the basis of FTX's misrepresentations as to the segregation of FTX customer deposits, the safety of the FTX platform, and the separation of Alameda and FTX.

Plaintiffs therefore do in fact plead, and the limited discovery to date shows, that Deltec, Chalopin, Moonstone, and the FTX Group (1) participated in an association-in-fact enterprise, including by way of the "specific interactions" referenced herein, (2) for the purpose of enriching themselves through criminal conduct, namely by obtaining new customers and misappropriating customer deposits through fraud, and (3) were "aware" of FTX's misrepresentations underlying that fraud. *Cf. Hyundai*, 641 F. Supp. 3d at 1334 ("[T]he record evidence … sufficiently establishes genuine issues of material fact that each defendant (or member of the enterprise) was aware of, and worked toward, defrauding HMA to financially enrich himself or itself.").

*Second*, Plaintiffs sufficiently establish the "requisite relationships," Mot. at 32, among those associated in the enterprise and explain the defendants' roles in the scheme and their specific actions. *See* a *State Farm Mut. Auto. Ins. Co. v. Lewin*, 535 F. Supp. 3d 1247, 1263 (M.D. Fla.

2021) ("The complaint also sufficiently establishes a relationship among those associated in the enterprise, explaining each of the defendants' roles in the scheme, and considering the fact that both 1-800-411-PAIN and Path Medical Center Holdings were owned by Dr. Lewin.") (citing *Cont'l 332 Fund, LLC v. Albertelli*, 317 F. Supp. 3d 1124 (M.D. Fla. 2018) ("The Third Amended Complaint also establishes ... a relationship between individuals that comprised the Scheme itself. First, it connects the acts with the Scheme's aims by alleging Defendants intended to defraud Continental[.] ... Second, it establishes each Defendant's relationship with the Scheme by specifying their purported actions."). "To show there is an association-in-fact enterprise at the motion to dismiss phase, the Eleventh Circuit has never required anything other than a loose or informal association of distinct entities." *Parm v. Nat'l Bank of Cal., N.A.*, 242 F. Supp. 3d 1321, 1344 (N.D. Ga. 2017) (citation and internal marks omitted).

Plaintiffs allege that Deltec manually processed transfers of FTX customer funds into or through the Alameda account, despite knowing that they were separately owned by SBF and that the deposits in the FTX Group accounts were comprised of FTX customer funds; that Defendants brokered the scheme between Tether and Alameda and then facilitated the manipulation of the price of USDT in part by extending the *de facto* line of credit; and that Defendants transferred FTX customer funds into and out of Moonstone, Chalopin's other bank, in the United States. Defendants dutifully played their part in exchange for tens of millions of dollars in sham "loans" and other kickbacks despite their knowledge that FTX Group was misappropriating FTX customer funds. Taken as a whole, the complaint describes in great detail the relationships among the Defendants, their individual roles in the scheme, and their involvement in the specific predicate acts.

### 2. *Plaintiffs sufficiently allege conduct amounting to a pattern of racketeering activity.*

"Under Federal RICO, … "Racketeering activity" includes such predicate acts as mail or wire fraud, *see* 18 U.S.C. § 1961(1), which "occurs when a person (1) intentionally participates in a scheme to defraud another of money or property and (2) uses the mails or wires in furtherance of that scheme." *Lechter v. Aprio, LLP*, 565 F. Supp. 3d 1279, 1314 (N.D. Ga. 2021) (citing *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010)). Plaintiffs allege multiple instances of wire fraud in the Amended Complaint, including (1) the wires incoming to and outgoing from FTX Group's accounts at Deltec, which Greg Pepin manually effected despite knowing that, with Deltec's assistance and to Deltec's benefit, FTX Group was misappropriating FTX customer funds, including in connection with the fraudulent Alameda-Tether-Deltec

manipulative scheme; (2) the $55 million sham "loan" from Norton Hall Ltd., to Deltec's parent company; and (3) the $11.5 million investment and $50 million in deposits that Chalopin solicited for Moonstone, his new bank, despite his knowledge that FTX Group was misappropriating FTX customer funds. That is not "ordinary banking activity." Mot. at 34. It is racketeering activity by Defendants and FTX Group.

### 3. *Plaintiffs sufficiently allege domestic injury.*

Defendants cannot reasonably argue that Plaintiffs have failed to allege a domestic injury resulting from their participation in an illegal RICO enterprise. That enterprise—comprised *at least* of FTX Group, Defendants, and Moonstone—engaged in a pattern of wire fraud activity included a number of wires of FTX customer funds to accounts held by FTX Group at Moonstone *in Washington State* and to accounts held by FTX Group at Silvergate Bank *in California* totaling billions of dollars, including at the time of FTX's collapse. ¶¶ 176, 184, 193, 254, 359. With those allegations, Plaintiffs have pleaded that the loss of those funds, sitting in accounts in Washington State and California, constitute a "domestic injury" for purposes of RICO.

### III.    PLAINTIFFS HAVE ESTABLISHED STANDING.

Plaintiffs need not "allege that their money or other assets were ever transferred to Deltec Bank" for standing to bring their claims in this suit (which Deltec surely must understand, as it cited no legal authority for any such requirement). ECF Doc. 823 at 29. Plaintiffs need only allege that their injuries are "fairly traceable to the challenged action of the Defendant[s]." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). "Said differently, the Complaint must allege facts showing a 'causal connection between the injury and the conduct complained of'" *Josefsberg v. Uber Techs., Inc.*, No. 22-CV-23961, 2023 WL 5670301, at *3 (S.D. Fla. Aug. 31, 2023) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). To be sure, "the causal connection for Article III standing is not the same as proximate cause," *id.* (citing *Ariz. St. Leg. v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 800 (2015)), and, indeed, "no authority even remotely suggests that proximate causation applies to the doctrine of standing." *Focus on the Fam. V. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1273 (11th Cir. 2003). As such, "A defendant does not need to "be the most immediate cause … of plaintiffs' injuries." *Josefsberg*, 2023 WL 5670301, at *3 (*Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 n.6 (2014) and citing *In re Mednax Services, Inc., Customer Data Security Breach Litigation*, 603 F. Supp. 3d 1183, 1197 (S.D. Fla. 2022)). In short, "[t]he fairly traceable requirement is satisfied

even if a 'plaintiff's injury is indirectly caused by a defendant's action." *Freeman v. JPMorgan Chase Bank N.A.*, 675 App'x 926, 931 (11th Cir. 2017); *see also Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1324 (11th Cir. 2012) ("Even a showing that a plaintiff's injury is indirectly caused by a defendant's actions satisfies the fairly traceable requirement."); *Garcia-Bengochera v. Carnival Corp.*, 57 F.l4th 916, 926-27 (11th Cir. 2023) ("As Resnick demonstrates, the presence of multiple actors in a chain of events that lead to the plaintiff's injury does not mean that traceability is lacking with respect to the conduct of a particular defendant."). Plaintiffs easily satisfy the fairly traceable requirement in their Amended Complaint. For example, had Deltec not, at Chalopin's direction, knowingly transferred billions of dollars of FTX customer funds to Alameda's account at Deltec and then wired billions more to Alamea's accounts at other banks, Alameda could not have brought down the FTX platform by misappropriating FTX customers funds.

Deltec is likewise wrong that Plaintiffs' claims are moot "because the FTX Bankruptcy Plan … provides for Plaintiffs to be paid in full, plus interest, for their claims." ECF Doc. 823 at 29. As a matter of fact, the FTX Bankruptcy Plan does not provide for Plaintiffs' to be paid in full for their claims in the instant suit; it provides only that Plaintiffs will be paid the value, plus interest, of the cryptocurrency held in their FTX accounts *as of the Petition Date. In re FTX Trading Ltd., et al.*, Case No. 22-11068-JTD (hereinafter "*In re FTX Trading*"), Doc. 26404, section 2.1.47 (defining "Customer Entitlement Claim" as a claim "for the value *as of the Petition Date* of Cash or Digital Assets held by such Person or Entity in an account on any FTX Exchange"), section 4.3.6 (providing for Dotcom Customer Entitlement Claims), section 4.3.7 (providing for U.S. Customer Entitlement Claims), section 4.4 (providing that "the value of a Claim in respect of a Digital Asset shall be calculated by converting the value of such Digital Asset into Cash *as of the Petition Date*") (emphasis supplied). Because the value of cryptocurrency has increased—and continues to increase—tremendously since the Petition Date, Plaintiffs will not receive "complete relief" for their injuries through the bankruptcy. . For example, pursuant to the FTX Bankruptcy Plan, the value of a Customer Entitlement Claim for 1 bitcoin (BTC) is $16,871.63. *In re FTX Trading*, Doc. 7090-1 at 4. The current market value of 1 bitcoin (BTC) is approximately $95,700—***more than 5x its Petition Date value***.[32]

Here, Plaintiffs have asserted against Deltec claims of civil conspiracy, aiding and abetting fraud, aiding and abetting fiduciary breach, and aiding and abetting conversion, among others.

---

[32] *See* https://www.coindesk.com/price/bitcoin (last accessed Feb. 13, 2025).

Those causes of action entitle Plaintiffs to pursue from Deltec the balance of the fair market value of their cryptocurrency lost in the collapse of the FTX cryptocurrency exchange (i.e., the highest value of the cryptocurrency between the time of the conversion and the date of the jury's verdict minus the Petition Date value paid through the FTX Bankruptcy), *plus* treble damages punitive damages, costs, attorney fees and other remedies. *See, e.g.*, *Kadiyala v. Pupke*, No. 22-10211, 2024 WL 33910, at *1 (11th Cir. Jan. 3, 2024) (upholding jury award of compensatory and punitive damages for conspiracy to commit fraud and aiding and abetting fraud); *Kleiman v. Wright*, No. 18-CV-80176, 2021 WL 5447110, at *4 (S.D. Fla. Nov. 22, 2021) ("[T]he appropriate measure of compensatory damages is the highest value of the Bitcoin and IP at issue between the time of the conversion and the date of the jury's verdict."). The Petition Date value of their cryptocurrency and any interest on that amount will notfully compensate Plaintiffs for their claims against Deltec.

"[B]lackletter law instructs that 'partial relief in another tribunal—whether judicial, administrative, arbitral, or a combination—does not moot an action seeking additional relief, whether the other action involves the same parties or different parties." *In re Vizio, Inc., Consumer Priv. Litig.*, No. 816ML02693JLSKES, 2017 WL 11420284, at *5 (C.D. Cal. July 25, 2017) (quoting Charles Alan Wright et al., 13B Fed. Prac. & Proc. Juris. Section 3533.1 (3d ed. 2017)). "A case becomes moot only when it is impossible for a court to grant effectual relief whatever to the prevailing party." *Sec. & Exch. Comm'n v. Torchia*, 922 F.3d 1307, 1315 (11th Cir. 2019) (citing *Calderon v. Moore*, 518 U.S. 149, 150, 116 S.Ct. 2066, 135 L.Ed.2d 453 (1996) (per curiam) ("[T]he availability of a 'partial remedy' is 'sufficient to prevent [a] case from being moot.' "), *In re Transwest Resort Props., Inc.*, 801 F.3d 1161, 1172–73 (9th Cir. 2015) (citing the possibility of similar "partial relief" in a bankruptcy appeal), and *In re Tex. Grand Prairie Hotel Realty, L.L.C.*, 710 F.3d 324, 328 (5th Cir. 2013) (same)); *see also Flagstaff Med. Ctr., Inc. v. Sullivan*, 962 F.2d 879, 885 (9th Cir. 1992) ("Partial relief in another proceeding cannot moot an action that legitimately seeks additional relief.").Because Plaintiffs will not be fully compensated for the claims against Deltec through the FTX Bankruptcy, the payments Plaintiffs may receive through the Bankruptcy do not moot their claims against Deltec in this case.

## IV.    *FORUM NON CONVENIENS* DOES NOT APPLY HERE.

"Because the plaintiff's forum choice 'should rarely be disturbed,' […] a *forum non conveniens* dismissal is subject to three conditions": (1) "an adequate and available alternative forum"; (2) "the balance of the relative private and public interests must weigh in favor of

dismissal"; and (3) "the plaintiffs must be able to reinstate their suit in the alternative forum without undue inconvenience or delay." *Otto Candies, LLC v. Citigroup, Inc.*, 963 F.3d 1331 (11th Cir. 2020) (citations omitted). "Private interests include the parties' relative ease of access to sources of proof, access to witnesses, ability to compel testimony, the possibility of viewing the premises, and the enforceability of a judgment." *Id.* (citing *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947)). "Public interests include a sovereign's interests in deciding the dispute, the administrative burdens posed by trial, and the need to apply foreign law." *Id.* (citing *Gulf Oil*, 330 U.S. at 508–09). "A defendant has the burden of persuasion as to all elements of a *forum non conveniens* motion[.]" *Id.* (quoting *Leon v. Millon Air, Inc.*, 251 F.3d 1305, 1311 (11th Cir. 2001)).

### A. Private Factors

In the Eleventh Circuit, there is a presumption that "the plaintiffs' choice of forum should rarely be disturbed 'unless the balance is strongly in favor of the defendant'" which is "at its strongest when the plaintiffs are citizens, residents, or corporations of this country." *SME Racks, Inc. v. Sistemas Mecanicos Para Electronica, S.A.*, 382 F.3d 1097, 1101 (11th Cir. 2004) (citations omitted); *see also Otto Candies, LLC v. Citigroup, Inc.*, 963 F.3d at 1339. This mandates that a district court "'require positive evidence of unusually extreme circumstances, and should be thoroughly convinced that material injustice is manifest before exercising any such discretion as may exist to deny a United States citizen access to the courts of this country.'" *SME Racks, Inc. v. Sistemas Mecanicos Para Electronica, S.A.*, 382 F.3d at 1101 (citations omitted). Because of the Eleventh Circuit's especially strong deference to the plaintiff's choice of forum, the analysis of the balancing of the private interest factors begins with the application of this "strong presumption against disturbing plaintiffs initial forum choice." *Id.* at 1100. The Defendants are unable to surpass this strong presumption in favor of Plaintiffs' forum choice.

Defendants conclusively argue that "the relevant evidence and witnesses are in The Bahamas." Mot. at 50. Defendants only add their side to the balance when in fact the ease of access to sources of evidence in this case weighs in favor of the United States forum. Crucial witnesses and participants of the FTX fraud are located in the United States and some are unable to leave the country due to criminal actions and sentences. Sam Bankman-Fried was convicted on November 2, 2023. ¶ 52. Caroline Ellison pled guilty to criminal charges. ¶ 58. Ryan Salame also pled guilty to criminal charges. ¶ 66. Certainly "all records and documentation of transactions at issue" (Mot. at 50) are not only in The Bahamas because Plaintiffs obtained "true and correct copies of the

Alameda-Tether-Deltec chat messages, along with other Telegram chat messages with Deltec personnel" from Caroline Ellison due to efforts conducted within the United States, which formed the basis of Declaration of Caroline Ellison and allegations in the Amended Complaint. ¶ 153. Further, the alleged misconduct and conspiracy with Defendants originated from Alameda's Settlements Team in the United States. ¶ 61-62. And in any case, Defendants admit that travel between Florida and The Bahamas "presents a minimal additional burden." Mot. at 51.

### B.      Public Factors

Although the private factors alone prevent dismissal, the public factors are also in favor of the United States forum. The "United States has a strong interest in providing a forum for its citizens' grievances against an allegedly predatory foreign business that actively solicited business and caused harm within the home forum." *SME Racks, Inc. v. Sistemas Mecanicos Para Electronica, S.A.*, 382 F.3d at 1104; *see also Wagner v. Island Romance Holidays, Inc.*, 984 F. Supp. 2d 1310, 1317 (S.D. Fla. 2013) ("[T]he public interest factors do not cut in favor of dismissing this case. The primary factor driving this decision is the United States' interest in providing a forum for its citizens in which to seek redress for injuries caused by foreign defendants who are subject to U.S. jurisdiction."). The United States has a very strong interest in providing a forum for this litigation, as demonstrated by it already being the forum for SEC civil enforcement actions (¶ 116), a Chapter 11 Bankruptcy (¶ 118), and criminal actions against insiders (¶ 52, 58, 66) related to the financial fraud which Defendants aided and abetted and conspired to conduct against Floridians and United States residents.

Additionally, "while the application of foreign law is an important factor to be considered in weighing the public interests, this factor cannot be accorded dispositive weight." *Id.* at 1104-05. Here, the primary applicable law is United States law, despite what Defendants argue. Although there may be some Bahamian Banking Guidelines to apply, the statutory and common law causes of action are based on Florida and United States law, and federal courts "can apply foreign law." *Lugones v. Sandals Resorts, Inc.*, 875 F. Supp. 821 (S.D. Fla. 1995).

**CONCLUSION**

Deltec and Chalopin's motion to dismiss for failure to state a claim and lack of personal jurisdiction should be denied. If the motion is not denied outright, this Court should defer ruling on the motion pending jurisdictional discovery, which Plaintiffs requested leave to propound by formal motion on November 3, 2023, *see* R. Doc. 348, or until trial on the merits. To the extent

this Court is inclined to grant the motion, Plaintiffs pray that this Court will grant them leave to amend—which should be "freely given" absent undue delay, bad faith, dilatory motive, repeated failures to cure deficiencies, undue prejudice, or futility, none of which is present here—to develop their allegations against Deltec and Chalopin or to invoke Federal Rule of Civil Procedure 4(k)(2). *See, e.g.*, *Foman v. Davis*, 371 U.S. 178, 182 (1962).

## REQUEST FOR HEARING

Plaintiffs request a hearing on the Motion to Dismiss in order to provide the Court with additional details and respond to any questions the Court might have.

Dated: February 28, 2025                    Respectfully submitted,

**By: */s/ Adam Moskowitz***              **By: */s/ David Boies***
Adam M. Moskowitz                         David Boies
Florida Bar No. 984280                    Alexander Boies
Joseph M. Kaye                            Brooke A. Alexander
Florida Bar No. 117520                    **BOIES SCHILLER FLEXNER LLP**
**THE MOSKOWITZ LAW FIRM, PLLC**          333 Main Street
Continental Plaza                         Armonk, NY 10504
3250 Mary Street, Suite 202               914-749-8200
Coconut Grove, FL 33133                   dboies@bsfllp.com
Office: (305) 740-1423                    aboies@bsfllp.com
adam@moskowitz-law.com                    balexander@bsfllp.com
joseph@moskowitz-law.com

*Co-Lead Counsel*                         *Co-Lead Counsel*

                                          James R. Swanson, La. Bar No. 18455
                                          Kerry J. Miller, La. Bar. No. 24562
                                          Molly L. Wells, La. Bar. No. 36721
                                          C. Hogan Paschal, La. Bar No. 38495
                                          **FISHMAN HAYGOOD L.L.P.**
                                          201 St. Charles Avenue, 46th Floor
                                          New Orleans, Louisiana 70170-4600
                                          (504) 586-5252; (504) 586-5250 fax
                                          jswanson@fishmanhaygood.com
                                          kmiller@fishmanhaygood.com
                                          mwells@fishmanhaygood.com
                                          hpaschal@fishmanhaygood.com

Robert Lieff
2925 Sycamore Canyon Road
Santa Barbara, CA 93108
rlieff@lieff.com

**Counsel to Plaintiffs and the Putative Classes**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on February 28, 2024, a true and correct copy of the foregoing was filed electronically with the Clerk of the Court, by using the CM/ECF system which will send an electronic notification of such filing to all counsel of record.

By: /s/ Adam M. Moskowitz
**Adam M. Moskowitz**