**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 1:23-md-3076-KMM

In RE

FTX CRYPTOCURRENCY EXCHANGE
COLLAPSE LITIGATION

_____/

**ORDER**

THIS CAUSE came before the Court upon the Celebrity Defendants'[1] Motion to Dismiss for Failure to State a Claim ("Celebrity Motion" or "Mot. I") (ECF No. 271) and the Youtuber Defendants'[2] Motion to Dismiss for Failure to State a Claim ("Youtuber Motion" or "Mot. II") (ECF No. 265). The Multidistrict Litigation ("MDL") Plaintiffs filed their opposition to the Celebrity and Youtuber Motions. ("Resp." or "Response") (ECF No. 372). The Celebrity and Youtuber Defendants filed replies. ("Reply") (ECF Nos. 407); *see also* (ECF No. 397). Several of the Celebrity Defendants filed a supplement to the Motion, *see* (ECF Nos. 270, 272, 273, 274, 277, 278, 279), Plaintiffs filed responses, *see* (ECF Nos. 351, 355, 356, 363, 364, 365, 366), and the Celebrity Defendants filed replies (ECF Nos. 392, 400, 414, 415, 416, 410, 409). The Court also considers the Celebrity Defendants' and the Youtuber Defendants' Motions to Dismiss for Lack of Personal Jurisdiction and for Improper Service, Plaintiffs' responses, Defendants' replies, and any subsequent supplemental

---

[1] "Celebrity Defendants" refers to Thomas Brady, Gisele Bündchen, Kevin O'Leary, Udonis Haslem, David Ortiz, Stephen Curry, Golden State Warriors, LLC, Shohei Ohtani, Naomi Osaka, Solomid Corporation d/b/a Team Solomid, TSM and/or TSM FTX. *See* Corrected Administrative Class Action Complaint ("CAC") (ECF No. 179) at 3. Although Shaquille O'Neal and William Trevor Lawrence are also named in Plaintiffs' CAC and the Motion to Dismiss, they have since settled this Action.

[2] "Youtuber Defendants" refers to Jaspreet Singh, Erika Kullberg and Creators Agency, LLC. Although Graham Stephan, Andrei Jikh, Brian Jung, Jeremy Lefebvre, and Tom Nash are named in the CAC, they have since settled this Action.

responses and replies.  *See* (ECF Nos. 266, 268, 353, 393, 396, 546, 554).  The Motions are now ripe for review.

## I.       BACKGROUND[3]

Stemming from what has been considered one of the largest instances of financial fraud in U.S. history, this case concerns whether the power brokers of the entertainment world—athletes, supermodels, comedians, and internet personalities—can be held liable for using their global influence to promote certain products.  *See* CAC ¶ 1.  The "FTX Group" or "FTX" was founded in 2019 "as an exchange or marketplace for the trading of crypto assets."  *Id.* ¶ 97.  By 2022, approximately $15 billion of assets were traded daily on the FTX platform.  *Id.*  Yet later that year, FTX suddenly collapsed, as customers withdrew approximately $5 billion from the exchange.  *Id.* ¶ 175.  Thereafter, FTX filed a chapter 11 bankruptcy petition in Delaware on an emergency basis. *Id.* The Court first provides a brief overview of the background of cryptocurrency exchanges, the FTX collapse, and the individuals relevant to the instant Motions.

### A.  Cryptocurrency Basics

Centralized cryptocurrency exchanges are like banks for the cryptocurrency industry.  *Id.* ¶ 125.  One major difference between a cryptocurrency exchange and a bank, however, is the way a cryptocurrency exchange is authorized to utilize customer assets.  *Id.*  Cryptocurrency exchanges accept deposits of cryptocurrency and a fiat currency on behalf of their customers.  *Id.* ¶ 126.  Once in receipt of the cryptocurrency, the exchange has dominion and control over those assets.  *Id.* ¶ 127.  Plaintiffs describe exchange accounts as being "custodial" in nature, where the customer needs to make a request to the exchange to be able to access and send the balance in his or her account.  *Id.* ¶

---

[3] The following facts are taken from the CAC and are accepted as true for purposes of ruling on the Motions to Dismiss.  *See MSP Recovery Claims, Series LLC v. Metro. Gen. Ins. Co.*, 40 F.4th 1295, 1302 (11th Cir. 2022).  They are construed in a light most favorable to Plaintiffs, the non–moving party.

129.  For a yield-bearing account ("YBA"), it is typical for an exchange to take customer assets and "leverage, loan or invest them in some way, and hopefully receive enough assets back to be able to pay out their customers back their principal." *Id.* ¶ 133.  While banks are subject to several capital control requirements to ensure protection of customer assets, exchanges are largely unregulated and subject to additional risk.  *Id.* ¶ 136.

### B. The FTX Collapse

In November 2017, Sam Bankman-Fried ("SBF") launched his quantitative crypto trading firm, Alameda Research ("Alameda").  Thereafter, in May 2019, SBF and his co-founders launched FTX, which was "purported to be a centralized digital asset exchange aimed at 'the mass market and first-time users' of cryptocurrencies." *Id.* ¶ 81.  The FTX Group was broken into two main parts: FTX (the exchange) and Alameda (the trading firm).  *Id.* ¶ 174.  Customers of FTX could open YBAs or other accounts, and could deposit an assortment of cryptocurrencies and fiat currency, including U.S. dollars through FTX's website or mobile app.  *Id.* ¶ 85.  FTX also offered FTT, which was the "native token" issued to both institutional and retail investors.  *Id.* ¶ 270.  The FTX exchange was extremely successful following its launch in May 2019.  *Id.* ¶ 167.  By 2022, approximately $15 billion of assets were traded daily on the platform.  *Id.*  At FTX's peak, founder SBF was worth $26 billion.  *Id.* ¶ 170.

In mid–2022, the value of cryptocurrencies began to rapidly decline globally.  *Id.* ¶ 171.  SBF started to "bail out" faltering crypto firms, including a $400 million revolving credit facility to crypto lender BlockFi.  *Id.*  Nevertheless, this decline took FTX with it, and by the end of the summer of 2022, SBF needed $1 billion to keep operations afloat.  *Id.* ¶ 172.  On November 2, 2022, it was revealed that FTX had lent billions (including much of its cryptocurrency reserves) to Alameda as capital for trading and to cover Alameda's losses.  *Id.* ¶ 173.  On November 11, 2022, following a series of *mea culpa* tweets from SBF, FTX filed for chapter 11 bankruptcy.

### C. The Parties

Plaintiffs are sixteen individuals who allegedly "purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform," and allege to have sustained damages from the MDL Defendants' asserted wrongdoing. *Id.* ¶¶ 39–54. Three of the Plaintiffs allegedly reside in Florida, while the others reside in Oklahoma, California, Illinois, Connecticut, Arizona, New Jersey, Virginia the United Kingdom, Canada, Germany, Brazil, and Australia. *Id.*

Celebrity Defendants are current and former professional athletes, a professional basketball team, a television personality, a sports organization, a supermodel, and a comedian. *Id.* ¶¶ 56–62, 65–68. Of the Youtuber Defendants, Defendant Singh is said to be a "YouTube star[]" based in the United States. *Id.* ¶¶ 69–73. Defendant Creators Agency LLC ("Creators Agency"), founded by Defendant Kullberg, is a "talent management firm and digital ad network which promoted FTX." *Id.* ¶ 75–76.

In FTX's advertising efforts, FTX allegedly paid certain Defendants to appear in commercials, appear at events, or lend their name, image, and likeness for FTX's use. *See generally id.* The CAC contains nearly 200 pages of allegations concerning Defendants' conduct in promoting the FTX brand, including a Super Bowl commercial, the use of the FTX logo, social media activity, and sponsorships at events. *See, e.g., Id.* ¶¶ 293–320, 339–55, 372–85, 402–09, 431–57, 477–83, 506–31, 583–92, 602–03, 607–14, 630–31, 636–42, 679–88.

In the CAC, Defendants collectively are alleged to have "(1) agreed to serve as 'Brand Ambassadors' or 'Digital Creators' for FTX; (2) all admittedly advertised and promoted the sale of the FTX Platform, YBAs and/or FTT, and; (3) failed to disclose, in any of their marketing campaigns and/or advertisements, that they were paid millions of dollars by FTX and profited from the sale of

cryptocurrency, the FTX Platform, YBAs and/or FTT, in clear violation of SEC, FTC and various federal and state regulations." *Id.* ¶ 55.

### D. The Multidistrict Litigation

The first filed action transferred into this Multidistrict Litigation ("MDL") was filed in Florida against the Celebrity Defendants and Youtuber Defendants. *See Garrison v. Bankman-Fried*, S.D. Fla. Case No. 1:22-cv-23753-KMM. Plaintiffs in that action sought to create this MDL, arguing that "jurisdictional arguments would fall by the wayside when all the actions were consolidated." CAC ¶ 9. At the request of the Court at a status conference on June 21, 2023, Plaintiffs have separated their complaint into seven versions, "each of which contains a similar set of general allegations and the specific allegations as to a single group of MDL Defendants." *Id.* at 3 n.1. Plaintiffs filed the CAC pursuant to Federal Rule of Civil Procedure 42 as the controlling document for pretrial purposes with respect to the Celebrity and Youtuber Defendants, and as transferred to this Court from several actions as listed in the CAC. *Id.* at 1. The CAC refers to "MDL Defendants" collectively as all Defendants named in the seven Administrative Class Action Complaints. *Id.* at 2. Plaintiffs incorporate by reference other versions of the complaint "[b]ecause certain claims, such as civil conspiracy, are pled across multiple groups of MDL Defendants." *Id.* at 3.

Plaintiffs assert fourteen claims against Defendants: one under the Federal Declaratory Judgment Act, five under Florida law, five alternative counts under California law, and three alternative counts under Oklahoma law. *See generally id.* Counts 1, 8, and 13 allege that the FTX Platform, YBAs, and/or FTT were unregistered securities, which FTX sold to Plaintiffs with "material assistance" from Defendants in violation of the Florida Securities and Investor Protection Act, the California Securities Law, and the Oklahoma Uniform Securities Act of 1980. *Id.* ¶¶ 768–75, 816–23, 850–53. Counts 2, 7, and 12 allege that Defendants engaged in "unfair and deceptive practices" in violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), the

California Unfair Competition Law ("UCL"), and the Oklahoma Consumer Protection Act ("OCPA"). *Id.* ¶¶ 776–85, 811–15, 842–49. Counts 3 and 11 allege that Defendants conspired with FTX to induce Plaintiffs to purchase interests in FTX, YBAs, and/or FTT. *Id.* ¶¶ 786–91, 836–41. Counts 4, 9, and 14 allege that Defendants "aided and abetted" FTX's fraud. *Id.* ¶¶ 792–97, 824–29, 854–59. Counts 5 and 10 allege that Defendants "aided and abetted" FTX's alleged conversion of Plaintiffs' "funds." *Id.* ¶¶ 798–803, 830–35. Count 6 seeks a declaratory judgment under the Federal Declaratory Judgment Act. *Id.* ¶¶ 804–10.

Now before the Court are the Celebrity Defendants' and the Youtuber Defendants' Motions to Dismiss. (ECF Nos. 264, 271). Defendants move to dismiss the CAC on several grounds,[4] including (1) the CAC is an impermissible shotgun pleading, (2) Plaintiffs fail to adequately plead causation, (3) Plaintiffs fail to plausibly allege Defendants' knowledge of FTX's fraud, (4) Plaintiffs fail to plead the facts necessary to support any of their claims, (5) Plaintiffs claims are barred under federal securities laws, (6) allowing Plaintiffs' claims to proceed would raise First Amendment concerns, and (7) the case should be dismissed because FTX is an indispensable party. *See generally id.* Defendants Shohei Ohtani, Thomas Brady, Gisele Bündchen, Lawrence Gene David, the Golden State Warriors LLC, Udonis Haslem, and David Ortiz also bring independent grounds for dismissal. *See* (ECF Nos. 270, 272, 273, 274, 275, 277, 278, 279).

## II.   LEGAL STANDARD

### A. Rule 12(b)(2) Standard

A court may dismiss a complaint for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2). *Future Tech. Today, Inc. v. OSF Healthcare Sys.*, 218 F.3d 1247, 1249 (11th Cir. 2000). When a federal court is sitting in diversity, the exercise of personal jurisdiction is governed

---

[4] The Celebrity Defendants and Youtuber Defendants raise several of the same arguments in their separate, respective Motions. The Court refers to Defendants' overlapping arguments in both Motions collectively, unless otherwise specified.

by a two-step inquiry which asks whether jurisdiction would be appropriate under: (1) the state long-arm statute, and (2) the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *See United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1274 (11th Cir. 2009) (citing *Horizon Aggressive Growth, L.P. v. Rothstein–Kass, P.A.*, 421 F.3d 1162, 1166 (11th Cir. 2005)).

"There are two types of personal jurisdiction: specific and general." *Madara v. Hall*, 916 F.2d 1510, 1516 n.7 (11th Cir. 1990). "General personal jurisdiction is based on a defendant's substantial activity in [a state] without regard to where the cause of action arose," whereas "specific personal jurisdiction authorizes jurisdiction over causes of action arising from or related to the defendant's actions within [a state]." *Miller v. Gizmodo Media Grp.*, LLC, 383 F. Supp. 3d 1365, 1370 (S.D. Fla. 2019) (quoting *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1352 (11th Cir. 2013)). Florida's long–arm statute provides for both general and specific jurisdiction. Fla. Stat. § 48.193.

**B.  Rule 12(b)(5) Standard**

"Before a federal court may exercise personal jurisdiction over a defendant, the procedural requirement of service of summons must be satisfied." *Rajbhandari v. U.S. Bank*, 305 F.R.D. 689, 693 (S.D. Fla. 2015) (quoting *Omni Capital Intern., Ltd. v. Rudolf Wolff & Co., Ltd.*, 484 U.S. 97, 104 (1987)). Federal Rules of Civil Procedure 12(b)(4) and 12(b)(5) "permit a defendant to dismiss for insufficient process and insufficient service of process, respectively." *Id.* (citing Fed. R. Civ. P. 12(b)(4) and (5)).

"Rule 12(b)(5) allows for dismissal for insufficient service of process." *Id.* (citing Fed. R. Civ. P. 12(b)(5)). "The defendant has the initial burden of challenging the sufficiency of service and 'must describe with specificity how the service of process failed to meet the procedural requirements of [Fed. R. Civ. P. 4].'" *Id.* (quoting *Hollander v. Wolf*, No. 09–80587–CIV, 2009 WL 3336012, at *3 (S.D. Fla. Oct. 14, 2009)). "The burden then shifts to the plaintiff to prove a *prima facie* case of proper service of process." *Id.* (citing *Hollander*, 2009 WL 3336012, at *3).

### C.  Rule 12(b)(6) Standard

Federal Rule of Civil Procedure 12(b)(6) permits a court to dismiss a complaint for failing to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation and internal quotation marks omitted).  This requirement "give[s] the defendant fair notice of what the claim is and the grounds upon which it rests."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citation and alterations omitted).  The court takes the plaintiff's factual allegations as true and construes them in the light most favorable to the plaintiff.  *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008).

A complaint must contain enough facts to plausibly allege the required elements.  *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1295–96 (11th Cir. 2007).  A pleading that offers "a formulaic recitation of the elements of a cause of action will not do."  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).  "[C]onclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal."  *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002).

### III.    DISCUSSION

### A.  Shotgun Pleading

Defendants first argue that the Court should dismiss the CAC because it is an impermissible shotgun pleading.  Mot. I at 10–11; Mot. II at 28.

The pleading requirements of the Federal Rules of Civil Procedure require that a complaint "give the defendant fair notice of what the claim is and the grounds upon which it rests."  *Twombly*, 550 U.S. at 555. The allegations in a complaint "must be simple, concise, and direct." Fed. R. Civ. P. 8(d)(1).  A "shotgun pleading"—one in which "it is virtually impossible to know which allegations

of fact are intended to support which claim(s) for relief"—does not comply with the standards of Rules 8(a) and 10(b). *Anderson v. Dist. Bd. of Trs. of Cent. Fla. Cmty. Coll.*, 77 F.3d 364, 366 (11th Cir. 1996); *see also Magluta v. Samples*, 256 F.3d 1282, 1284 (11th Cir. 2001).

The United States Court of Appeals for the Eleventh Circuit has described impermissible shotgun pleadings at length:

> Though the groupings cannot be too finely drawn, we have identified four rough types or categories of shotgun pleadings. The most common type—by a long shot—is a complaint containing multiple counts where each count adopts the allegations of all preceding counts, causing each successive count to carry all that came before and the last count to be a combination of the entire complaint. The next most common type, at least as far as our published opinions on the subject reflect, is a complaint that does not commit the mortal sin of re–alleging all preceding counts but is guilty of the venial sin of being replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action. The third type of shotgun pleading is one that commits the sin of not separating into a different count each cause of action or claim for relief. Fourth, and finally, there is the relatively rare sin of asserting multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against.

*Weiland v. Palm Beach Cty. Sheriff's Office*, 792 F.3d 1313, 1321–23 (11th Cir. 2015) (finding that a complaint is not a shotgun pleading, even if it is "not a model of efficiency or specificity," so long as it "adequately put[s] [defendants] on notice of the specific claims against them and the factual allegations that support those claims"). The key inquiry is whether the "failure to more precisely parcel out and identify the facts relevant to each claim materially increase[s] the burden of understanding the factual allegations underlying each count." *Id.* at 1324.

Defendants argue that the CAC is deficient because Plaintiffs fail to sufficiently distinguish what each Defendant is alleged to have done to give them fair notice as highlighted by the CAC's reference to "the MDL Defendants' [general] wrongdoing." Mot. I at 10–11; *see also* Mot. II at 28. Defendants also point to the CAC's "and/or" allegations, and statements that "lump[] together widely disparate parties . . . and widely disparate allegations of misconduct, providing no notice of the allegations against any [Defendant]." Mot. I at 11. However, while the CAC includes a general

factual section related to the many Parties involved in the FTX platform, SBF's fraudulent scheme, and FTX's downfall, the majority of the CAC is pleaded on a person-by-person basis, or when certain Defendants are alleged to engage in the same conduct, on a group-by-group basis.  Further, although lengthy, the factual allegations in the CAC are clearly stated and organized.   Consequently, Defendants are sufficiently put on notice of the specific claims against them, and the facts that support those claims.  Although there are issues related to the specificity of certain claims against Defendants, which the Court will discuss further, the CAC is not a shotgun pleading and Defendants' request to dismiss the CAC as an impermissible shotgun pleading is denied.

### B.  Failure to State a Claim: Plaintiffs' State Securities Law Claims

Counts 1, 8, and 13 allege claims under the Florida Securities Act, Fla. Stat. § 517.07, the California Securities Act, Cal. Code § 25110, and the Oklahoma Securities Act 71 O.S. § 1–301.  The Celebrity Defendants argue that all of these claims fail as a matter of law because (1) the FTX platform is not a security, (2) Florida, California, and Oklahoma all limit who may be liable for the sale of unregistered securities, (3) Plaintiffs fails to allege solicitation of, personal participation in, or material aid in the sale of YBAs or FTTs, (4) the CAC contains no plausible allegations that Defendants acted as agents, partners, directors or officers of FTX, and (5) Plaintiffs fail to allege intent to defraud.

#### i.    The FTX Products as Unregistered Securities

To state a claim under Florida Securities Act, Fla. Stat. § 517.07, the California Securities Act, Cal. Code § 25110, and the Oklahoma Securities Act 71 O.S. § 1-301, Plaintiffs must allege that the FTX products, that is, the FTX platform, YBAs, and FTT, are unregistered securities.

In the Motions, Defendants argue that FTX, broadly referring to the trading Platform, is not a security "and Plaintiffs identify no authority holding otherwise."  Mot. I at 16; *see also* Mot. II at 5. As for the YBAs and FTT, Defendants argue in a footnote that the question of whether these products

10

constitute securities is not pleaded by Plaintiffs and is unknown to Defendants who were not involved in the products.  Mot I. at 17 n.13.  Defendants concede that courts have found digital tokens to be securities "in some circumstances, depending on the facts."  *Id.*

In the CAC, Plaintiffs dedicate fourteen pages to explain the SEC's enforcement approach to cryptocurrency where it considers cryptocurrency to be securities, citing to enforcement actions, speeches, Congressional testimony, official SEC statements, and proclamations.  *See* CAC ¶¶ 200–46.  Plaintiffs describe the SEC's approach to securities regulation as intended to be "broad and all-encompassing," where "clarity is not just uncommon; it is deliberately avoided." *Id.* ¶ 200.  In doing so, Plaintiffs cite to several instances where either district courts established that digital assets were rendered unregistered securities, or digital asset companies settled claims with the SEC to conform their practices to U.S. securities laws.  *See, e.g., U.S. S.E.C. v. Kik Interactive, Inc.*, 2020 WL 5819770 (S.D.N.Y. Sept. 30, 2020) (finding that an initial coin offering was an offer and sale of unregistered securities); *S.E.C. v. Telegram Grp. Inc.*, 448 F. Supp. 3d 352 (S.D.N.Y. 2020) (granting the SEC's request for preliminary injunction, on the grounds that the sale and distribution of certain digital tokens were likely part of a scheme to distribute them in an unregistered offering of securities); *In the Matter of BlockFi Lending LLC, Administrative Proceeding File*, No. 3-20758 (Securities and Exchange Commission, Feb. 14, 2022) (settling the SEC's charges, and bringing its business within the provisions of the Investment Company Act).

Additionally, both in the CAC, and in response to the Motions, Plaintiffs cite to *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946) to support their argument that the FTX platform should be considered a security.  *See* CAC ¶¶ 201–46; Resp. at 5.  Plaintiffs assert that it is plausible that an FTX Platform is a security because customer investments through FTX were, by default, placed in YBAs, which are securities.  Resp. at 6.  Plaintiffs argue that FTX promoted this platform to obtain customer investments, pool them together, and use them to generate returns that would be

redistributed. *Id.* Plaintiffs assert that "Defendants cannot now dissociate themselves from the reality of what FTX was selling and why the FTX Platform existed." *Id.* at 5.

Before addressing the Parties' arguments, the Court begins by briefly addressing the standard the Supreme Court set forth in *Sec. & Exch. Comm'n v. W.J. Howey Co.*, 328 U.S. 293 (1946) for determining whether a particular economic arrangement may be classified as an "investment contract," one of the categories of products designated as a "security" by statute by the SEC. *Howey* concerned a transaction between a "citrus-grove" developer and investors, where the developer sold parcels of land to investors, with the promise of sharing profits that were generated from the land. *Id.* at 295–96. Under *Howey* the Supreme Court established that an "investment contract" is any "contract, transaction, or scheme whereby a person [(1)] invests his money [(2)] in a common enterprise and [(3)] is led to expect profits solely from the efforts of the promotor or a third party." *Id.* at 298–99.

Plaintiffs point to other courts' application of *Howey* in two recent cases concerning cryptocurrency assets, *Sec. & Exch. Comm'n v. Terraform Labs Pte. Ltd.*, 684 F. Supp. 3d 170 (S.D.N.Y. 2023) and *Sec. & Exch. Comm'n v. Genesis Global Capital, LLC and Gemini Trust Company, LLC*, No. 1:23-cv-00287-ER, ECF No. 54 (S.D.NY. Mar. 13, 2024). In *Terraform Labs*, a New York district court assessed whether a scheme concerning a digital asset called "Luna token" constituted an investment contract, where the Luna token sales were used to develop a cryptocurrency "blockchain," intended to increase the value of the Luna tokens. The court found that this scheme constituted an investment contract under the *Howey* test where Defendants pooled the proceeds of Luna token purchases together with a promise of further investment to the benefit of all Luna holders, and in doing so led investors to expect profits through social media promotions, investors reports, and meetings. *See id.* at 195–98. In this Action, Plaintiffs analogize *Terraform Labs* to the facts of this case, arguing that the FTX Platform is plausibly a security because it was created and sustained

through unregistered securities (FTT and YBAs), with customer investments being lent to third parties in exchange for FTT as collateral.  Resp. at 6.

In efforts to distinguish this case from *Terraform Labs*, Defendants argue that it is inapposite because *Terraform Labs* considered whether the specific cryptocurrency products were securities, not whether the platform through which those products were offered was a security.  Reply at 5. However, the court in *Terraform Labs* delineated its analysis to encompass not just the crypto-assets in isolation, but rather "whether the crypto-assets and the 'full set of contracts, expectations, and understandings centered on the sales and distribution of [these tokens]' amounted to an 'investment contract' under federal securities laws."  *Terraform Labs*, 684 F. Supp. 3d at 194.  The court even noted that the Luna tokens and the stable coin in question "as originally created and when considered in isolation, might not then have been, by themselves investment contracts."  *Id.*

Plaintiffs later filed a Notice of Filing Supplemental Authority in Support of their Response (ECF No. 535), citing to the Southern District of New York district court decision in *Securities and Exchange Commission v. Genesis Global Capital, LLC and Gemini Trust Company, LLC*, No. 1:23-cv-00287-ER, ECF No. 54 (S.D.N.Y. Mar. 13, 2024).  In *Gemini*, the court found that the SEC plausibly alleged that defendants offered and sold unregistered securities through a cryptocurrency program called the "Gemini Earn Program," where customers would earn interest from the defendants' lending activities if they held crypto assets in their accounts.  *See generally id.*

In an attempt to distinguish this case from *Gemini*, Defendants' arguments are somewhat contradictory.  First, Celebrity Defendants filed a Response to Plaintiffs' Notice of Supplemental Authority, describing Plaintiffs' reliance on the *Gemini* case as "puzzling," and stating that they "did not challenge whether Plaintiffs adequately alleged FTX's products are securities so *Gemini* is inapposite."  *See* (ECF No. 549) at 1.  Nevertheless, Celebrity Defendants (1) in their Motion highlighted district courts' rejection of digital tokens as securities, and (2) in their Reply, stated that

they "reserve the right to challenge whether YBAs and FTT are 'securities' at a later stage." Mot. I at 17; Reply at 3 n.2. As far as the Court can ascertain from these contradictory pleadings, Defendants appear to concede that the FTX *products* consisting of the YBAs and FTT may be considered securities, at least at this stage, and solely contest whether the "FTX Platform" is a security.

With this understanding, the Court notes Defendants' argument that there is no authority or holding recognizing a trading platform or exchange as a security. Plaintiffs do not allege that they actually *sold* the FTX Platform, but rather that they "purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform." CAC ¶¶ 39–54. On the other hand, the Court agrees with Plaintiffs that Defendants' promotion of FTX is an implicit promotion of the alleged securities offered by the platform. *See* CAC ¶¶ 30, 259. Defendants fail to address the application of *Howey* or *Terraform* to the facts and circumstances surrounding FTX. Given Defendants reserve the right to challenge whether the FTX products, specifically the YBAs and FTT, are securities, the Court need not reach the question of whether the FTX platform may be rendered a security at this stage. The Court thus declines to dismiss Plaintiffs' securities law claims on these grounds.

ii.   *Plaintiffs' Florida Securities Act, Fla. Stat. § 517.07 Claims (Count 1)*

Section 517.07 of the Florida Securities and Investor Protection Act ("FSIPA") provides that "[i]t is unlawful and a violation of this chapter for any person to sell or offer to sell a security within this state unless the security . . . is registered pursuant to this chapter." Fla. Stat. § 517.07(1). In addition, "every director, officer, partner, or agent of or for the seller" who "personally participated or aided in making the sale" is jointly and severally liable. Fla. Stat. § 517.211(1). Thus, in order to state a claim, Plaintiffs must allege that: (1) the FTX products were securities; (2) the securities were not registered; and (3) Defendants participated or aided in the sales as partners or agents of or for FTX. The Court has already established that Plaintiffs plausibly allege that the FTX products were

14

securities, and Defendants do not refute that the alleged securities were not registered in compliance with the FSIPA.  The Court thus turns to whether Defendants participated or aided in the sale as partners or agents of or for FTX.

Defendants contend that they are not liable under the FSIPA because they did not take part in the sale of any securities, and no Defendant was a director, officer, partner, or agent of the seller, FTX.  Mot I. at 19.  Specifically, Defendants first argue that Plaintiffs failed to prove not only that Defendants successfully solicited or personally participated in the sale of an unregistered security, but also that Plaintiffs purchased such unregistered securities as a result of Defendants' conduct.  *Id.* at 20 (citing *Wildes v. BitConnect Int'l PLC*, 25 F.4th 1341, 1346 (11th Cir. 2022) ("[F]or solicitation to occur, a person must 'urge or persuade' another to buy a particular security" and "purchases [of that security must] follow[].")).  Defendants state that none of Defendants' "statements (or non–statements) mentions—let alone could plausibly have 'actively and directly . . . influence[d] or induce[d] [Plaintiffs] to buy'—YBAs or FTT." *Id.* (quoting *Dillon v. Axxsys Int'l, Inc.*, 385 F. Supp. 2d 1307, 1311 (M.D. Fla. 2005), *aff'd,* 185 F. App'x 823 (11th Cir. 2006)).

Second, Defendants argue that Plaintiffs do not allege specific facts to plausibly show that any Defendants served as an agent, partner, director, or officer of FTX.  Mot. I at 21; Mot. II at 6. Defendants specifically argue that Defendants entering routine spokesperson, marketing, partnership, and brand ambassador roles is "insufficient as a matter of law to establish an agency relationship, let alone an agency relationship with respect to the sale of securities."  Mot. I at 21.

First, as to whether Defendants "personally participated or aided in making the sale," the Eleventh Circuit has clarified that the statute's language "requires some personal activity and involvement in the sale."  *See Dillon v. Axxsys Int'l, Inc.*, 185 F. App'x 823, 828 (11th Cir. 2006). Indeed, the language of the statute "implies some activity in inducing the purchaser to invest." *Nichols v. Yandre*, 9 So.2d 157, 160 (Fla. 1942).  Although this Court has not addressed the question

of whether solicitation through mass media can render a promoter liable under Florida law, the Eleventh Circuit in *Wildes v. BitConnect Int'l PLC* recently held that promoting cryptocurrency through mass communications on YouTube and the internet could give rise to liability under the Securities Act of 1933.  25 F.4th 1341, 1346 (11th Cir. 2022). The Eleventh Circuit explained:

> Technology has opened new avenues for both investment and solicitation. Sellers can now reach a global audience through podcasts, social media posts, or, as [t]here, online videos and web links. But under the district court's cramped reading of the Securities Act, a seller who could be liable for recommending a security in a personal letter could not be held accountable for making the exact same pitch in an internet video—or through other forms of communication listed as exemplars in the Act, like circulars, radio advertisements, and television commercials. *See* 15 U.S.C. §§ 77e(a)(1), 77b(a)(10). That makes little sense.

*Id.*  Further, another court in this circuit, relying on *BitConnect*, recently found that plaintiffs stated a claim for the sale of unregistered securities based on the promotion of cryptocurrency through social media, and allegations that such promotions were done to serve the promoter's financial interests. *See De Ford v. Koutoulas*, 2023 WL 2709816, at *15–16 (M.D. Fla. Mar. 30, 2023).

Defendants attempt to distinguish *BitConnect* by noting that the Eleventh Circuit was interpreting federal securities law, and was more broadly applying those laws to solicitations that were not directly targeted at a particular individual.  Reply at 7.  Defendants further contend that Florida law is more stringent than its federal counterpart because it requires "direct involvement in the sale of securities."  *Id.*  Florida courts, however, "have looked to interpretations of federal securities laws for guidance in interpreting Florida's securities laws." *Messer v. E.F. Hutton & Co.*, 847 F.2d 673, 676 (11th Cir. 1988) (collecting cases).  This Court has previously addressed this issue in *Bailey v. Trenam Simmons, Kemker, Scharf, Barkin, Frye & O'Neill, P.A.*, 938 F. Supp. 825 (S.D. Fla. 1996) and determined that the conduct sufficient to constitute solicitation for purposes of § 517.211 liability is similar to that deemed sufficient by the Supreme Court in *Pinter v. Dahl* 486 U.S. 622 (1988), to hold one liable as a seller under § 12(2) of the Securities Act of 1933.  In *Pinter*, the

Supreme Court reaffirmed the principle that liability as a "seller" under § 12(1) of the Securities Act, 15 U.S.C. § 77l(1) is not restricted to those who actually pass title to securities but is expansive enough to encompass the entire selling process, including the seller/agent transaction. 486 U.S. at 643. The Supreme Court also placed limits on this expansiveness by stating that liability only extends to persons who successfully solicit the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner. *Id.* at 647.

Applying this framework here, Plaintiffs plausibly assert that each of Defendants entered into agreements with FTX to promote its platform in exchange for a substantial compensation package. *See, e.g.*, CAC ¶¶ 293–328 (allegations regarding Defendants Thomas Brady and Gisele Bündchen's agreement to promote FTX in exchange for a substantial compensation package); CAC ¶¶ 339–60 (allegations regarding Kevin O'Leary's equity stake in FTX and his agreement to serve as an ambassador and spokesperson for the platform); *id.* ¶¶ 372–89 (allegations regarding Udonis Haslem's partnership with FTX to act as a spokesperson in exchange for a compensation package); *id.* ¶¶ 400–11 (allegations regarding David Ortiz's partnership to act as a brand ambassador for FTX, in exchange for cryptocurrency and NFTs); *id.* ¶¶ 423–866 (allegations regarding Stephen Curry's partnership to act as a brand ambassador for FTX in exchange for a substantial total compensation package and equity); *id.* ¶¶ 468–85 (allegations regarding the Golden State Warriors, LLC's "international rights partnership" in exchange for a compensation package and NFT sales); *id.* ¶¶ 578–96 (allegations regarding Shohei Ohtani's partnership to serve as a global ambassador in exchange for a substantial compensation package in equity and cryptocurrencies); *id.* ¶¶ 602–21 (allegations regarding Naomi Osaka's partnership to serve as a brand ambassador in exchange for an equity stake and payments in unspecified amounts); *id.* ¶¶ 630–46 (allegations regarding Larry David's Super Bowl commercial in exchange for allegedly $13 million); *id.* ¶¶ 661–93 (allegations regarding Team Solomid's partnership and naming rights agreement with FTX, including an

agreement to purchase $1 million of FTT to pay its employees and players with), *id.* ¶¶ 715, 7576 (allegations regarding YouTube influencers under the umbrella of Defendant Creators Agency LLC (founded by Erika Kullberg) paid to endorse FTX); *id.* ¶ 71 (allegation regarding Jaspreet Singh's FTX endorsement through his YouTube channel "Minority Mindset").

When Defendants urged people to invest in FTX, they solicited the purchases that followed. The substantial financial compensation packages offered to Defendants, including large direct payments and equity in FTX, demonstrate Defendants' motivations to serve their own financial interests. The Court is further unconvinced by Defendants' argument that by promoting FTX generally, they were not specifically promoting the YBAs and FTT. Promotion of the FTX platform generally (as discussed herein) connotes the specific investment in YBAs and FTT in support of FTX's broader scheme of alleged fraud. Moreover, Plaintiffs plausibly allege that FTX needed influencers like Defendants to continue to promote the sale of the YBAs. *See* CAC ¶¶ 728–29 (quoting then FTX President: "We know that we had to embark on some kind of mass branding, advertising, sponsorship type work in order to be able to [familiarize customers with FTX's platform].") The Court thus denies Defendants' request to dismiss the Florida securities claims on the grounds that Defendants did not "personally participate[] or aid[] in making the sale."

The Court next turns to Defendants' argument that they were not agents or partners of FTX as required by § 517.211. Plaintiffs allege that each Defendant was a "partner" of FTX, *see* CAC ¶¶ 313, 323, 435, 468, 581, 610, 618, 704, and that the objective of the partnerships included "help[ing] FTX successfully solicit or attempt to solicit investors in FTX's crypto–related securities." *See id.* The FSIPA extends liability to "partners" as defined by Florida partnership law. *See Dillon v. Axxsys Int'l, Inc.*, 385 F. Supp. 2d 1307, 1314–15 (M.D. Fla. 2005). A "partnership" is legally defined as "the association of two or more persons to carry on as co-owners a business for profit." Fla. Stat. § 620.8202(1). Plaintiffs do not allege that Defendants were "co-owners" of FTX, nor do they offer

any legal authority to demonstrate the term "partnership" in the endorsement context may constitute a partnership under Florida law. Defendants thus cannot be liable under Florida securities law as "partners" of FTX.

Whether Plaintiffs were agents of FTX, however, is a closer question. The term "agent" under the FSIPA "is given the common meaning—representation of a principal." *J.P. Morgan Sec., LLC v. Geveran Invs. Ltd.*, 224 So. 3d 316, 329 (Fla. Dist. Ct. App. 2017). Agency can either be actual or apparent. *Id.* "The elements of actual agency are: 1) acknowledgment by the principal of the agent; 2) the agent's acceptance; and 3) control of the agent by the principal." *Id.* When analyzing whether there is actual agency "the principal's actions are the primary indication of the relationship, and such examination is generally done by the trier of fact unless there is indisputably no connection." *S. Fla. Coastal Elec., Inc. v. Treasures on Bay II Condo Ass'n*, 89 So. 3d 264, 267 (Fla. 3d DCA 2012).

Defendants argue that advertising is insufficient as a matter of law to establish an agency relationship, particularly with respect to the sale of securities. *Dinaco, Inc. v. Time Warner, Inc.*, 346 F.3d 64, 69 (2d Cir. 2003) ("If advertising is the stuff of agency then every advertisement by a franchisee with the franchisor's mark would confirm an agency."); *Cawthon v. Phillips Petroleum Co.*, 124 So. 2d 517, 519 (Fla. Dist. Ct. App. 1960) (finding that "general advertisement" did not constitute an assertion of agency.). However, the allegations in the CAC go beyond the realm of "general advertising" and point to mass-influence campaigns designed to increase sales that were disseminated by Defendants who served as promoters and Brand Ambassadors. CAC ¶¶ 56–61, 63–67, 274, 280–81. For each of these campaigns, Plaintiffs allege that FTX had the ability to review and control the messages disseminated by FTX, *see, e.g., id.* ¶¶ 409, 453, 521, 522 (alleging FTX controlled and orchestrated the promotional activity). The Court recognizes that the scope and relationship between each of Defendants and FTX certainly varied. For example, while the allegations for Defendant Kevin O'Leary concern his agreement to serve as an ambassador and

spokesperson for the FTX platform in exchange for an equity stake, *id.* ¶¶ 339–60, the allegations against Defendant Larry David concern a single advertisement (albeit, for the Super Bowl), in exchange for a substantial compensation package, *id.* ¶¶ 630–46. As for the Youtuber Defendants, Plaintiffs allege the talent managed by Creators Agency, "netted hundreds of thousands, if not millions of dollars from signed contracts procured and/or facilitated by the agency" in their promotion of FTX. *Id.* ¶ 715.

At a minimum, Defendants have failed to show that there is "indisputably no connection between the principal and the agent," demonstrating that a factual dispute exists as to whether Defendants may be rendered agents to incur securities liability. *See S. Fla. Coastal Elec., Inc.*, 89 So. 3d at 267. The Court thus declines to decide this question of whether there was actual agency at this stage (or any agency relationship). *See also In re Sahlen & Assocs., Inc. Sec. Litig.*, 773 F. Supp. 342, 372 (S.D. Fla. 1991) (finding that a factual dispute existed whether auditor was an agent of securities seller); *Dinaco*, 346 F.3d at 69 (deciding agency question on a factual record, rather than on a motion to dismiss).

Accordingly, Plaintiffs have stated a § 517.07 securities claim against Defendants.

### iii.    California Securities Act, Cal. Code § 25110 Claims (Count 8)

To state a claim under California Corporations Code § 25504.1 for promoting unregistered securities, a plaintiff must allege that a defendant both (1) "materially assist[ed]" in the sale of the unregistered security and, (2) did so with the "intent to deceive or defraud." *Moss v. Kroner*, 197 Cal. App. 4th 860 (2011), 872; Cal. Corp. Code § 25504.1. The first element is substantially the same as the corresponding elements under Florida securities law and is thus satisfied for the reasons set forth above.

As for whether Plaintiffs allege that Defendants had the "intent to deceive or defraud," Defendants argue that Plaintiffs allege only that Defendants "were exposed to red flags of fraud,"

which does not suffice under California's securities law, requiring specific facts to show that each Defendant "intend[ed] to induce reliance on a knowing misrepresentation or omission." *Schaffer Fam. Invs., LLC v. Sonnier*, 120 F. Supp. 3d 1028, 1046 (C.D. Cal. 2015). In response, Plaintiffs argue that their allegations support an inference that Defendants "intended to induce customers to rely on their representations about FTX while omitting that (i) Defendants had no reasonable basis for their representations about FTX's purportedly being "safe"; and/or (ii) FTX had serious problems." Resp. at 10.

"Intent to defraud is defined as the intent to induce reliance on a knowing misrepresentation or omission." *Moss*, 197 Cal. App. 4th at 872. California courts have clarified that California securities law is "even stricter than [its federal securities counterpart because it] restricts liability for aiding and abetting a state securities violation to cases where it is shown that the defendant had an intent to deceive or defraud." *Orloff v. Allman*, 819 F.2d 904, 907 (9th Cir. 1987), *abrogated on other grounds by Hollinger v. Titan Cap. Corp.*, 914 F.2d 1564 (9th Cir. 1990). Indeed, California requires actual knowledge that the securities for sale were unregistered to establish the requisite scienter. *See Schaffer*, 120 F. Supp. 3d at 1046 ("Plaintiffs fail to allege that [the defendant] had any knowledge that the securities for sale were unregistered."). Here, the Court agrees with Defendants that Plaintiffs have failed to sufficiently plead the scienter requirement under Cal. Code § 25110. Plaintiffs allege that Defendants were "exposed to red flags of fraud—red flags problematic enough to cause other individuals to partner with FTX." Resp. at 10. Plaintiffs also allege that Defendants failed to disclose their financial motivations behind promoting FTX, and knew that they were using their fame to encourage Plaintiffs to "make risky financial decisions based on their uninformed recommendations." *Id.* at 11. While this behavior demonstrates that Defendants were uninformed, negligent, or even reckless, it does not demonstrate that Defendants had any knowledge of FTX's fraud, nor that they

had the requisite intent to deceive or defraud investors.  Accordingly, the Court grants the Motion to Dismiss as to Plaintiffs' California Securities Claims (Count 8) with leave to amend.

       *iv.*      *Oklahoma Securities Act 71 O.S. § 1–301 (Count 13)*

Under § 1-301(b) of Oklahoma's securities code, it is "unlawful for a person to offer or sell a security in this state" unless the security is registered or exempt. Okla. Stat. Ann. tit. 71, § 1-301. Under §1-509(B), "[a] person is liable to a purchaser if the person sells a security in violation of Section 1-301 of this title." Okla. Stat. Ann. tit. 71, § 1-509(B).  Section 1-509(G) extends liability "jointly and severally" to other categories of individuals identified in subsections (G)(3), (4), and (5) who "materially aid[] the conduct giving rise to the liability." Okla. Stat. Ann. tit. 71, § 1-509(G). These categories include people "associated with" the seller, "agents," and, most broadly, "[a]ny other person" who provided material aid to "the conduct giving rise to liability." *Id.* § 1509(G)(3)-(5)

Defendants argue that Plaintiffs' claims should be dismissed because Plaintiffs have not "pled particularized facts to establish any [Defendant's] knowledge that (or recklessness with respect to whether) the alleged securities were unregistered."  Mot. I at 22 n.15.  However, Defendants fail to provide any authority to support the contention that Oklahoma requires Plaintiffs to plead knowledge of the conduct giving rise to the securities violation.  As the Court has discussed, Plaintiffs plausibly allege that Defendants "materially aided" FTX in selling unregistered securities, *see* Section III.B.ii, and in addition to being "agents" of FTX, Defendants plausibly qualify as individuals "associated with" FTX, and "[a]ny other person[s]" who materially aided in FTX's violation of the Oklahoma securities laws. § 1–509(G)(3)–(5).  Accordingly, Plaintiffs have stated an Oklahoma Securities Act 71 O.S. § 1–301 claim against Defendants.

In sum, the Court denies Defendants' Motion to Dismiss with respect to Counts 1 and 13, and dismisses Count 8 with leave to amend.

### C. Failure to State a Claim: Plaintiffs' Consumer Protection Claims

Counts 2, 7, and 12 allege claims under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat § 501.201, the California Unfair Competition Law ("UCL"), § 17200, *et seq*, and the Oklahoma Consumer Protection Act ("OCPA"), Okla. Stat. Ann. tit. 15, § 751 *et seq*.  CAC ¶¶ 776–85, 811–15, 842–49.  Defendants argue (1) that such consumer protection laws do not apply to securities transactions, (2) Plaintiffs fail to sufficiently allege the elements of these claims, and (3) Plaintiffs fail to allege these claims with particularity as required by Federal Rule of Civil Procedure 9(b).  The Court addresses Defendants' arguments in turn.

### i.    Consumer Protection Claims' Application to Securities Transactions

Defendants first argue that the pertinent consumer protection statutes are inapplicable to the alleged misconduct, which is "rooted in [alleged] securities transactions."  *See* Mot. I at 23; Mot II at 12.  In response, Plaintiffs argue that there is other authority to support that the consumer protection statutes do not exclude claims relating to securities, consistent with the statute's plain language.  Resp. at 12.  Furthermore, Plaintiffs argue that the Court need not decide this question at this stage in the litigation because the consumer protection claims are not solely based on Defendants' sale or promotion of securities, but rather based on Defendants' "unfair and deceptive conduct that is not identical to the conduct underpinning the securities claims."  *Id*. at 14.

Florida, California, and Oklahoma courts have held that state consumer protection laws—like Section 5 of the Federal Trade Commission Act ("FTC" Act) on which they are modeled—preclude coverage of claims where the predicate acts are securities transactions.  *See Feng v. Walsh*, No. 19-24138-CIV, 2021 WL 8055449, at *13 (S.D. Fla. Dec. 21, 2021), *report and recommendation adopted*, No. 1:19-CV-24138, 2022 WL 669198 (S.D. Fla. Mar. 7, 2022) ("This [FDUTPA] provision indicates that the FDUTPA should be interpreted consistently with the FTC Act, which has been held inapplicable to securities claims."); *Betz v. Trainer Wortham & Co.*, 829 F. Supp. 2d 860, 866 (N.D.

Cal. 2011) ("No court, however, has allowed Section 17200 [UCL] claims to proceed where, as here, the predicate acts are securities transactions."); *Robertson v. White*, 633 F. Supp. 954, 978 (W.D. Ark. 1986) ("[O]nly the rare state consumer protection statute concerns itself with sales of securities.").

Here, the Court agrees with Defendants that Plaintiffs' consumer protection claims are rooted in alleged securities transactions. *See, e.g.,* CAC ¶¶ 329, 364, 393, 416–17, 486, 572, 597, 622, 649. Accordingly, the weight of authority demonstrates that consumer protection claims should not otherwise proceed in this case.  However, as the Court previously discussed, Defendants proffer that they reserve the right to dispute that FTX's products constitute securities.  Thus, it would be premature for the Court to dismiss the consumer protection claims on the grounds that they are predicated on the sale of securities, while there are factual disputes about what products Defendants were promoting, whether they were securities, and accordingly, whether Defendants' conduct is regulated by securities law.  *See also In re Ethereummax Inv*., No. CV2200163MWFSKX, 2023 WL 6787827 (C.D. Cal. June 6, 2023) ("[The Court cannot conclude at this stage that the State Consumer Law claims are barred by the securities law claims because whether the cryptocurrency at issue here is a "security" is a hotly contested topic and Defendants have expressly reserved the right to contest the characterization of the Tokens as a security.").  Accordingly, the Court declines to dismiss the consumer protection claims on the grounds that they are predicated on securities transactions.

    *ii.*    *Rule 9(b) Applies*

Defendants maintain that Plaintiffs' consumer protection claims must meet the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) ("Rule 9(b)").  In response, Plaintiffs argue that only the plausibility standard imposed by Federal Rule of Civil Procedure 8 ("Rule 8") applies.  "Where a claim is grounded in fraud, the complaint must also comply with the heightened pleading requirements of Federal Rule of Civil Procedure 9(b)." *State Farm Mut. Auto. Ins. Co. v. Performance Orthopaedics & Neurosurgery, LLC*, 278 F. Supp. 3d 1307, 1328 (S.D. Fla. 2017)

(citing *Curtis Inv. Co., LLC v. Bayerische Hypo-und Vereinsbank, AG*, 341 Fed.Appx. 487 (11th Cir. 2009)) (unpub).

Federal district courts are split as to whether FDUTPA claims are analyzed under Rule 9(b). *Compare Costa v. Kerzner Int'l Resorts, Inc.*, No. 11–60663–Civ, 2011 WL 2519244, at *2 (S.D. Fla. June 23, 2011) (finding Rule 9(b) does not apply) with *Llado–Carreno v. Guidant Corp.*, No. 09–20971, 2011 WL 705403, at *5 (S.D. Fla. Feb. 22, 2011) (finding that Rule 9(b) does apply). However, where the gravamen of the claim sounds in fraud, as here, the heightened pleading standard of Rule 9(b) applies. *See, e.g., Blair v. Wachovia Mortg. Corp.*, No. 5:11-CV-566-OC-37TBS, 2012 WL 868878, at *3–4 (M.D. Fla. Mar. 14, 2012); *Llado*, 2011 WL 705403 at *5 ("the particularity requirement of Rule 9(b) applies to all claims that sound in fraud, regardless of whether those claims are grounded in state or federal law.").

Here, Plaintiffs' CAC "sounds in fraud," *Llado*, 2011 WL 705403 at *5, because the gravamen of the CAC is that Defendants' conduct "contributed both to the perpetration of the fraud, and to the sale of unregistered securities, in a vital way." CAC ¶¶ 287, 331 (alleging that Defendants Brady and Bündchen should have known that they were "aiding and abetting FTX Group's fraud and/or conversion."); *id.* ¶ 364 (alleging that Defendant O'Leary should have known that he was "aiding and abetting FTX Group's fraud and/or conversion."); *id.* ¶ 396 (alleging that Defendant Haslem should have known that he was "aiding and abetting FTX Group's fraud and/or conversion."); *id.* ¶ 418 (alleging that Defendant Ortiz should have known that he was "aiding and abetting FTX Group's fraud and/or conversion."); *id.* ¶ 462 (alleging that Defendant Curry should have known that he was "aiding and abetting FTX Group's fraud and/or conversion."); *id.* ¶ 487 (alleging that Defendant Golden State Warriors should have known that it was "aiding and abetting FTX Group's fraud and/or conversion."); *id.* ¶ 599 (alleging that Defendant Ohtani should have known that he was "aiding and abetting FTX Group's fraud and/or conversion."); *id.* ¶ 649 (alleging that Defendant David should

25

have known that he was "aiding and abetting FTX Group's fraud and/or conversion."). Accordingly, the Court agrees with Defendants that Rule 9(b) governs Plaintiffs' consumer protection claims.[5]

      *iii.*    *Defendants' claims under Rule 9(b)*

To establish a cause of action under FDUTPA, UCL or OCPA, a plaintiff must sufficiently allege the following three elements: "(1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." *Kertesz*, 635 F. Supp. 2d 1339 at 1348; *see also Marolda*, 672 F. Supp. 2d at 1004 (N.D. Cal. 2009)*; Dinwiddie*, 111 F. Supp. 3d at 1215. "A deceptive practice is one that is likely to mislead consumers, and an unfair practice is one that 'offends established public policy' or is 'immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.'" *Bookworld Trade, Inc. v. Daughters of St. Paul, Inc.*, 532 F. Supp. 2d 1350, 1364 (M.D. Fla. 2007) (quoting *Rollins, Inc. v. Butland*, 951 So.2d 860, 869 (Fla. 2d DCA 2006)). Rule 9(b) requires a plaintiff to allege the "'who, what, when, where, and how' of misconduct." *Pop v. Lulifama.com LLC*, No. 8:22–CV–2698–VMC–JSS, 2023 WL 4661977 (M.D. Fla. July 20, 2023), *appeal dismissed*, No. 23–12684, 2024 WL 21403 (11th Cir. Jan. 2, 2024) (*citing Garfield v. NDS Health Corp.*, 466 F.3d 1255, 1262 (11th Cir. 2006)).

Defendants further argue that Plaintiffs' allegations regarding Defendants' advertising for and sponsorships of FTX fail entirely to establish that any Defendant engaged in knowingly false or deceptive practices, or that any Plaintiff actually suffered harm as a result of any Defendant's conduct. Mot. I at 24–25. Defendants argue that their statements are "indistinguishable from the non–actionable puffery that is routinely rejected by courts," and Plaintiffs fail to plausibly allege that Defendants "had knowledge of or participated in FTX's secret wrongdoing." *Id.* at 27; Reply at 13.

---

[5] Plaintiffs do not cite to any authority addressing this issue under California or Oklahoma law, but courts likewise apply Rule 9(b) to claims sounding in fraud under the UCL and OCPA. *See, e.g., Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009)*; T.D. Williamson, Inc. v. Lincoln Elec. Automation, Inc.*, 2022 WL 16842907, at *8 (N.D. Okla. Jan. 21, 2022).

In response, Plaintiffs argue that even under the more stringent Rule 9(b) standard, "Plaintiffs detailed pleading satisfies the 'deceptive act' element," which includes "promoting FTX as a safe investment and failing to disclose their paid relationships and financial incentives." Resp. at 17.

Here, the Court finds that Plaintiffs failed to meet the heightened pleading requirements of Rule 9(b) of their FDUTPA, UCL, and OCPA claims. The Court recognizes Plaintiffs' several examples of promotions, advertisements, and statements from and by Defendants as to FTX's safety, trustworthiness, and compliance with regulations, *see* CAC ¶¶ 8, 30, 82, 93, 139–44, 190, 272–74, 304, 330, 344–45, 351, 354–55, 438, 461, 478, 635–40, 648, 695, 705, 716, 703–05, 716–18, that FTX products were safe investments, *id.* ¶¶ 37, 274, 330, 394, 416, 434–35, 637–40, 502, 520, 527, 536, 610–12, 619, 687, 704–19, and allegations that Defendants failed to disclose that their compensation would increase the more people invested in FTX, *id.* ¶¶ 34, 37, 298, 306, 312, 329, 373–74, 381, 393, 395, 408–09, 414–16, 433, 442–43, 451–53, 460, 486, 582, 597, 604, 758, 764–66, 716 n.288. However, in the extensive list of promotions, advertisements, and statements, Plaintiffs have not provided any details related to Defendants' alleged scheme to engage in knowingly false or deceptive practices, other than that Defendants promoted the FTX products in exchange for a substantial compensation package. Plaintiffs provide ample examples of the substance of the fraudulent statements, without any details as to the time, place and substance of Defendants *acts*, "when they occurred, and who engaged in them." *U.S. ex rel. Matheny v. Medco Health Solutions, Inc.*, 671 F.3d 1217,1222 (11th Cir. 2012) (internal quotation marks omitted). In sum, Plaintiffs fail to allege facts "as to time, place, and substance of [Defendants'] alleged fraud."[6] *Id.* at 1222. On this basis, the Court dismisses Counts 2, 7 and 12 with leave to amend.

---

[6] Given the Court finds that Plaintiffs fail to allege Defendants' unfair or deceptive acts with particularity, the Court need not reach the question of causation or damages. However, the Court takes note that when a plaintiff is a part of a class related to an advertising campaign, the plaintiff need not prove actual reliance on defendant's alleged misconduct. *See Marolda*, 672 F. Supp. at 1004 ("When the plaintiff is part of a class, which defendant has targeted by an 'extensive and long–term

### D.  Failure to State a Claim: Plaintiffs' Civil Conspiracy Claims

Counts 3 and 11 allege that Defendants conspired with FTX to induce Plaintiffs to purchase interests in FTX, YBAs, and/or FTT under Florida law and California law, respectively.  Defendants argue that (1) Plaintiffs fail to plausibly and particularly allege an unlawful agreement among Defendants under Rule 9(b), and (2) Plaintiffs fail to allege that Defendants conspired to commit an unlawful act.  *See* Mot. I at 29–30; Mot. II at 15–17 .

Under Florida law, "[t]o plead civil conspiracy, a plaintiff must allege '(a) an agreement between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff as a result of the acts done under the conspiracy.'" *Alhassid v. Bank of Am., N.A.*, 60 F. Supp. 3d 1302, 1316 (S.D. Fla. 2014) (quoting *Cordell Consultant, Inc. Money Purchase Plan & Tr. v. Abbott*, 561 F. App'x 882, 886 (11th Cir. 2014)).  Similarly, California law requires "(1) the formation and operation of the conspiracy; (2) the wrongful act or acts done pursuant thereto; and (3) the damage resulting." *Mosier v. S. Cal. Physicians Ins. Exch.*, 63 Cal. App. 4th 1022, 1048 (1998).

First, the Parties dispute whether Plaintiffs must plead with specificity how each coconspirator furthered each part of the large FTX conspiracy under Rule 9(b).  Defendants argue that because Plaintiffs allege that Defendants entered into a "conspiracy with the FTX entities to commit *fraud*," they must plead this claim with particularity.  Mot. I at 30.  Plaintiffs disagree, citing to authority to support that they may rely on "circumstantial evidence" and need not plead civil conspiracy with specificity.  Resp. at 26.

Plaintiffs are correct that "[t]he existence of a conspiracy and an individual's participation in it may be inferred from circumstantial evidence." *Donofrio v. Matassini*, 503 So. 2d 1278, 1281 (Fla.

---

advertising campaign,' individual class members need not prove reliance, a significant factor to consider at the certification stage.") (citations omitted).

2d DCA 1987).  However, as the Court has already discussed, "where a claim is grounded in fraud, the complaint must also comply with the heightened pleading requirements of Federal Rule of Civil Procedure 9(b)." *State Farm*, 278 F. Supp. 3d, at 1328.  This principle is no different for conspiracy claims.  *See Am. United Life Ins. Co. v. Martinez*, 480 F.3d 1043, 1067–68 (11th Cir. 2007*)* ("[W]here a conspiracy claim alleges that two or more parties agreed to commit fraud, the plaintiffs must plead this act with specificity.").  Accordingly, because Plaintiffs allege a "conspiracy with the FTX Entities to commit fraud," Plaintiffs must plead this claim with particularity.  *See* CAC ¶ 791.

Here, the Court finds that the CAC does not adequately allege with particularity an unlawful agreement between Defendants and the FTX entities.  Plaintiffs allege that Defendants had partnership agreements with FTX where they were paid in cash, cryptocurrency, and FTX equity, which in turn gave them financial incentives to convince customers to invest in FTX and advance the crypto market.  Plaintiffs also allege that Defendants were exposed to "red flags of fraud" that should have put them on notice that consumers investing in FTX would be exposed to risks.  However, Defendants cannot be found liable for civil conspiracy for merely receiving payments and other monetary benefits in exchange for their promotional content.  *See GE Real Est. Servs., Inc. v. Mandich Real Est. Advisors, Inc.*, 337 So. 3d 416, 421 (3d DCA 2021) ("To assume or speculate . . . that the [appellees] participated in a conspiracy . . . merely because they ultimately received some benefits from the [investments] is insufficient for the imposition of liability against them.").  Additionally, although Plaintiffs provide detailed allegations related to the advertisements, partnerships, and promotions, the allegations related to the alleged conspiracy vaguely groups Defendants together, without any details describing the scheme or the acts or omissions that comprised said fraudulent scheme.  *See Apex Toxicology, LLC v. United HealthCare Servs., Inc.*, No. 17-61840-CIV, 2020 WL 13551299, at *3 (S.D. Fla. July 7, 2020) ("[Defendant's] civil conspiracy claim must be dismissed for failure to meet the requirements of Rule 9(b) because the First Amended Complaint lumps

Defendants together and lacks specificity.").  In making the conclusory allegation that Defendants entered agreements in order to "induce confidence and to drive consumers to invest in what was ultimately a Ponzi scheme," *see* CAC ¶¶ 787, 837, Plaintiffs have not detailed the required "who, what, where, when, and how" of the alleged conspiracy. *Apex*, 2020 WL 13551299, at *6.

Accordingly, the Court dismisses Counts 3 and 11, with leave to amend.

### E.  Failure to State a Claim: Plaintiffs' Aiding & Abetting Claims

Counts 4, 9, and 14 allege that Defendants aided and abetted FTX's fraud under Florida, California, and Oklahoma law, respectively.  Counts 5 and 10 allege that Defendants aided and abetted FTX in the conversion of FTX's funds under Florida and California law, respectively.  Aiding and abetting and conspiracy have been regarded as "closely allied forms of liability," *Neilson v. Union Bank of Cal*., *N.A.,* 290 F. Supp. 2d 1101, 1133 (C.D. Cal. 2003), although aiding and abetting does not require an agreement, nor an overt act.  To state an aiding and abetting claim under Florida, California, or Oklahoma law, Plaintiffs must allege (1) an underlying violation by the primary wrongdoer; (2) the alleged aider and abettor's knowledge of the underlying violation; and (3) the alleged aider and abettor's substantial assistance in commission of the wrongdoing.  *Lawrence v. Bank of Am., N.A.*, 455 F. App'x 904, 906 (11th Cir. 2012); *Impac Warehouse Lending Grp. v. Credit Suisse First Bos. LLC*, 270 F. App'x 570, 572 (9th Cir. 2008); *Almeida v. BOKF, NA*, 471 F. Supp. 3d 1181, 1197 (N.D. Okla. 2020).

Defendants do not contest that Plaintiffs detail FTX's wrongdoing, and instead argue that Plaintiffs fail to plead the second and third elements, that (1) Plaintiffs fail to plead actual knowledge, and (2) Plaintiffs fail to plead substantial assistance.  Mot. I. at 31–32

### i.    Actual Knowledge

Defendants argue that Plaintiffs fail to sufficiently allege that Defendants knew about any underlying "fraud" or "conversion," but rather allege conclusory allegations of negligence and a

failure to investigate red flags.  Mot. I at 31.  In response, Plaintiffs largely point to their allegations related to Defendants' promotion of FTX and its products, highlighting Defendant O'Leary's admission that "[w]e all look like idiots.  Let's put that on the table.  We relied on each other's due diligence. . . ."  *See* CAC ¶¶ 22, 31, 139–44, 163–64, 176, 184–98, 207–09, 265–67, 275–78, 331, 338, 363–64, 396–97, 417–18, 439–41, 462, 487–89, 599, 621–22, 647–50, 694–98, 720–24.

Although courts may consider either direct or circumstantial evidence to establish actual knowledge, "courts 'stress that the requirement is actual knowledge' and the circumstantial evidence must demonstrate that the aider-and-abettor actually knew of the underlying wrongs committed." *Wiand v. Wells Fargo Bank, N.A.*, 938 F. Supp. 2d 1239, 1244 (M.D. Fla. 2013) (emphasis in original).  Furthermore, red flags and suspicions do not create actual knowledge.  *See Platinum Estates, Inc. v. TD Bank, N.A.*, 2012 WL 760791, at *4–5 (S.D. Fla. Mar. 8, 2012) ("Plaintiff has failed to allege sufficiently the requisite degree of scienter, because 'red flags or aroused suspicions do not constitute actual awareness of one's role in a fraudulent scheme.'"); *Cordell*, 2012 WL 13148744, at *5 (S.D. Fla. July 11, 2012) ("'Red flags,' or 'aroused suspicions,' do not constitute actual awareness.").

The CAC alleges that Defendants "should have known" of potential concerns regarding FTX selling unregistered crypto securities based on Defendants' "substantial investment experience," "experience with sponsorship deals" and "vast resources to obtain outside advisers."  CAC ¶¶ 462, 487, 574, 599, 622, 649, 696, 631, 364, 396, 417.  The "red flags" Plaintiffs discuss and Defendants' access to financial advisors and resources may show that Defendants were on notice that some impropriety was taking place.  However, allegations of negligence, recklessness, or even that

Defendants "look like idiots," *see* CAC ¶ 274, are insufficient to establish that Defendants had actual knowledge of FTX's fraud and conversion.[7]

Given the Court finds that Plaintiffs fail to plead actual knowledge, the Court need not address whether Plaintiffs sufficiently alleged the "substantial assistance" element for Plaintiffs' aiding and abetting claims. Accordingly, the Court dismisses Counts 4, 9 and 14, with leave to amend.

### F. Plaintiffs' Claim for Declaratory Relief (Count 6)

Pursuant to the Federal Declaratory Judgment Act, Plaintiffs request that the Court declare that the YBAs were unregistered securities, the FTX Platform did not work as represented, and Defendants were paid and had financial interest in promoting FTX. CAC ¶¶ 804–10. Defendants argue that there is no basis for declaratory relief because (1) a claim for declaratory relief must be dismissed where the substantive claims fail, (2) Plaintiffs do not allege any forward-looking harms, much less any immediate threat of irreparable harm, and (3) a declaratory judgment is not for the purpose of making factual determinations regarding Plaintiffs' claims. *See* Mot. I at 33; Mot. II at 17. In response, Plaintiffs argue that as the "largest securities fraud in history," the FTX victims will continue to suffer unless there is a "workable, coordinated, and organized structure" established. Resp. at 29. Furthermore, Plaintiffs argue that there is a justiciable controversy over whether the YBAs were sold illegally and whether Defendants illegally solicited their purchases. *Id.* at 29–30.

Even where a claim is otherwise adequately pleaded, "district courts possess discretion in determining whether and when to entertain an action under the Declaratory Judgment Act. . . ." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 282 (1995); *see also Edge Sys. LLC v. Aguila*, No. 1:14-CV-24517-KMM, 2015 WL 6447502, at *5 (S.D. Fla. Oct. 26, 2015). In fact, the Supreme Court has "repeatedly

---

[7] As for the Golden State Warriors, Plaintiffs allege that the NBA warned teams that in order to enter a sponsorship deal with a cryptocurrency company, the team needed to ensure regulatory compliance of the crypto product and obtain NBA approval. *See* CAC ¶ 488. However, allegations that Defendants should have conducted due diligence falls short of any actual knowledge of fraud or conversion.

characterized the Declaratory Judgment Act as an enabling Act, which confers a discretion on the courts rather than an absolute right upon the litigant." *Wilton*, 515 U.S. at 287 (internal citations and quotations omitted). Although "district courts may not decline to hear actions for declaratory relief on the basis of whim or personal disinclination, the standard is clearly generous." *Lumbermens Mut. Cas. Co. v. Ins. Co. of State of Pa.*, 45 F. Supp. 2d 1349, 1351 (S.D. Fla. 1999) (citation and internal quotation marks omitted); *see also Manuel v. Convergys Corp.*, 430 F.3d 1132, 1137–38 (11th Cir. 2005) ("In short, the range of considerations available to the district court in deciding whether to entertain the declaratory action is vast and the deference afforded to its decision is substantial."). The Supreme Court explained that, in the declaratory judgment context, courts are governed by "considerations of practicality and wise judicial administration." *Wilton*, 515 U.S. at 288.

As is important here, "[a] district court should not grant a declaratory judgment unless such adjudication would serve a useful purpose." *Blue Hill Investments, Ltd.*, 2015 WL 9319394 at *3 (citing *Sierra Equity Grp., Inc. v. White Oak Equity Partners, LLC*, 650 F. Supp. 2d 1213, 1230 (S.D. Fla. 2009)); *see also Allstate Ins. Co. v. Employers Liab. Assur. Corp.*, 445 F.2d 1278, 1280 (5th Cir. 1971) ("The declaratory judgment remedy is an all-purpose remedy designed to permit an adjudication whenever the court has jurisdiction, there is an actual case or controversy and an adjudication would serve a useful purpose.").[8]

Notwithstanding the claims the Court has dismissed herein, Plaintiffs have not identified any imminent and concrete likelihood of future injury. The only likelihood of future harms stem from the potential use of cryptocurrencies by organized crime syndicates and nation states for illicit purposes, or any harms from FTX's past conduct. However, any harms related to FTX's past misconduct cannot be remedied by declaratory relief, nor are the actions of organized crime syndicates and nation states

---

[8] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) the Eleventh Circuit adopted as binding precedent all the decisions the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

related to Plaintiffs' claims against Defendants. *See Medmarc Cas. Ins. Co. v. Pineiro & Byrd PLLC*, 783 F. Supp. 2d 1214, 1216 (S.D. Fla. 2011) ("If a district court determines that a complaint requesting a declaratory judgment will not serve a useful purpose, the court cannot be required to proceed to the merits before dismissing the complaint."); *see also Wilton*, 515 U.S. at 288 ("If a district court, in the sound exercise of its judgment, determines after a complaint is filed that a declaratory judgment will serve no useful purpose, it cannot be incumbent upon that court to proceed to the merits before staying or dismissing the action."). Accordingly, Plaintiff's claim for declaratory relief (Count 6) is dismissed without prejudice.

### G. FTX as an Indispensable Party

Defendants also seek to dismiss the CAC for failing to join a party under Federal Rule of Civil Procedure 19. *See* Fed. R. Civ. P. 12(b)(7). Specifically, Defendants assert that FTX is a necessary and indispensable party. *See* Mot. I at 36; Mot. II at 24–27.

Under Federal Rule of Civil Procedure 19, the joinder of certain parties is mandatory. A party must be joined if, "in that person's absence, the court cannot accord complete relief among existing parties," Fed. R. Civ. P. 19(a)(1)(A), or "that person claims an interest relating to the subject of the action is so situated that disposing of the action in the person's absence may" work a prejudice on an absent or named party, Fed. R. Civ. P. 19(a)(1)(B). *Combe v. Flocar Inv. Grp. Corp.*, 977 F. Supp. 2d 1301, 1305 (S.D. Fla. 2013). Accordingly, failure to join a required party under Rule 19 is grounds for dismissal.

Defendants argue that FTX is a necessary and indispensable party because (1) it has a "direct interest in this case," (2) Defendants would be unable to obtain critical evidence from FTX and would suffer harm in FTX's absence, and (3) a remedy in FTX's absence would not be "adequate" because

it would not provide full relief.[9]  Mot. I at 36.  The Court disagrees.  FTX has not claimed an interest, nor have Defendants demonstrated how FTX's possession of discovery is relevant.  Furthermore, the CAC provides that Defendants are jointly and severally liable, indicating that the Court can accord complete relief among the existing parties in this case.  Thus, the Court finds that Plaintiff has not failed to join an indispensable party.

### H. First Amendment Does Not Bar Plaintiffs' Claims

Defendants argue that the First Amendment mandates dismissal because principles of constitutional avoidance strongly discourage interpreting state laws to impose liability for "innocent commercial speech."  Mot. I at 33; *see also* Mot II. at 23.  Defendants rely on *Lowe v. SEC*, 472 U.S. 181, 210 n.58 (1985), where the Supreme Court cautioned against finding liability for "the expression of an opinion about marketable securities."  In response, Plaintiffs note *Lowe* is inapposite because the Supreme Court simply suggested in a footnote that an opinion about marketable securities might be protected like opinions about commercial products.  Resp. at 30.

The Court agrees with Plaintiffs that a First Amendment defense is not appropriate at this stage.  Notwithstanding the inapposite authority upon which Defendants rely, Defendants fail to identify any specific commercial speech from Defendants that is protected.  Accordingly, Defendants' request for dismissal on First Amendment grounds is denied.

### I. Plaintiffs Brought Claims Under the Appropriate State Law[10]

The Youtuber Defendants make two additional arguments related to choice of law.  First, the Youtuber Defendants argue that Florida securities law does not apply because no securities were sold

---

[9] Defendants further argue that "Plaintiffs can obtain complete relief through the ongoing adversary proceedings in the bankruptcy court." Mot. I at 36.  Since filing their Motion, FTX has emerged from chapter 11 bankruptcy, and Defendants have not provided any supplemental authority to support that Plaintiffs have obtained the necessary relief through FTX's chapter 11 proceedings.

[10] The Youtuber Defendants' Motion also argues that Plaintiffs' claims are barred under the Private Securities Litigation Reform Act.  Mot. II at 21.  The Court need not address this argument because the Parties who raised it have since settled this litigation.

in Florida.  Mot. II at 9.  Second, the Youtuber Defendants argue that out-of-state plaintiffs cannot bring claims under another state's law because there is not sufficient state interest for Florida, California, and Oklahoma to apply their respective laws.  *Id.* at 19.

As to the first argument, Youtuber Defendants argue that Plaintiffs do not adequately specify from which FTX entity they allegedly purchased their YBAs or FTTs, including whether that entity was a U.S. entity and whether that entity was located in the state of Florida.  *Id.* at 19. (citing *Kahan Novoa v. Safra Nat. Bank of New York*, 313 F. Supp. 2d 1347 (S.D. Fla. 2003) ("[A]s a condition precedent to liability under the relevant provisions of Florida Statutes, the [securities] must have been sold or offered for sale in Florida.").  The Youtuber Defendants point to several cases supporting dismissal where the securities were not sold in the State of Florida.  Mot. II at 10 (citing *Kahan*, 313 F. Supp. 2d 1347; *Safra Nat'l Bank of N.Y.*, 313 F. Supp. 2d 1347, 1355 (S.D. Fla. 2003); *Edgar v. MITE Corp.*, 457 U.S. 624, 642-43 (1982)).  However, those cases were either decided on a factual record, or where there was clear evidence that the sale of securities entirely took place out of state. Here, Plaintiffs sufficiently allege at the pleading stage that FTX's scheme took place in its Miami offices, and that FTX offered to sell YBAs and FTT from the state of Florida.  CAC ¶¶ 18–31, 38, 297–317, 321.  Accordingly, the Youtuber Defendants' request to dismiss Plaintiffs' Florida securities claims on these grounds is denied.

As to the second argument, the Youtuber Defendants argue that there is not a sufficient state interest for Florida, California, and Oklahoma to apply their respective laws to out-of-state Plaintiffs. Mot. II at 19.  Specifically, the Youtuber Defendants argue that (1) Plaintiffs fail to allege any connection to Florida, (2) only two named Plaintiffs are alleged to be residents of California, and these alternative claims were brought on behalf of non-defined California sub-classes, and (3) only one alleged Plaintiff is a resident of Oklahoma.  *Id.* at 19–21.  The Court declines to dismiss this action as to the Youtuber Defendants on these grounds.  As a threshold matter, courts in this circuit

have established that the issue of which states' laws apply is more appropriate to resolve under a factual record, particularly where there are implications for class certification. *See, e.g., Fitzpatrick v. Vital Pharms., Inc.*, 2021 WL 6776238, at \*9–11 (S.D. Fla. June 7, 2021). Furthermore, the Youtuber Defendants do not provide any authority that would bar multiple states' laws from applying to multiple claims. And as discussed above, Plaintiffs have provided an adequate relationship between Florida and their claims at the pleading stage. Plaintiffs likewise plausibly allege a relationship between California and Oklahoma and the claims alleged. Accordingly, the Youtuber Defendants' request to dismiss the relevant state law claims on these grounds is denied.

### J. Defendants' Rule 12(b)(2) Arguments

The Court also considers the relevant Celebrity Defendants' and Youtuber Defendants' Motions to Dismiss for Lack of Personal Jurisdiction. Defendants Stephen Curry, Larry David, Golden State Warriors, LLC, Naomi Osaka, and Solomid Corporation (the "California Defendants") filed a Motion to Dismiss for Lack of Personal Jurisdiction. (ECF No. 268). Therein, the California Defendants argue (1) there is no specific or general jurisdiction over the California Defendants in the Florida Action, and (2) the Florida Action should be dismissed for improper claim-splitting. *See generally id.* The Youtuber Defendants also filed a Motion to Dismiss for Lack of Personal Jurisdiction (ECF No. 266) arguing that there is no specific or general jurisdiction over the Youtuber Defendants in the Florida Action. The Court addresses the Parties' arguments in turn.

### i.   *The Court Need Not Address Defendants Rule 12(b)(2) Arguments*

After the Rule 12(b)(2) Motions were fully briefed, Plaintiffs sought and obtained leave to conduct jurisdictional discovery. (ECF No. 422). Thereafter, Defendants Osaka, Golden State Warriors, Solomid Corporation, and Curry filed Notices of Withdrawal of the Motion to Dismiss for Lack of Personal Jurisdiction, but preserved their arguments related to improper claim splitting. (ECF Nos. 443, 444, 473). Plaintiffs proceeded to take jurisdictional discovery over the remaining

Youtuber Defendants and Celebrity Defendants and at the conclusion of discovery, filed a supplemental brief in support of Plaintiffs' Opposition to Defendants' Motion to Dismiss. (ECF No. 547).

Plaintiffs note in their supplement that of the four Defendants who maintain jurisdictional challenges, Defendants Singh, Creators Agency, LLC, David, and Kullberg, three will remain in this MDL regardless of the outcome of their jurisdictional challenges, because they have each been sued in another action, properly transferred to the MDL, in which they do not dispute they are subject to general personal jurisdiction. (ECF No. 547) at 2.[11]

"A transfer under Section 1407 is, in essence, a change of venue for pretrial purposes. Following a transfer, the transferee judge has all the jurisdiction and powers over pretrial proceedings in the actions transferred to him that the transferor judge would have had in the absence of transfer." *In re FMC Corp. Pat. Litig.*, 422 F. Supp. 1163, 1165 (J.P.M.L. 1976). Accordingly, the Court has the same basis for asserting jurisdiction as the transferor courts and has general jurisdiction for the claims at issue in the MDL. In light of the fact that all jurisdictional arguments are related to the Florida action only, these arguments are an issue if and when the actions are remanded to the transferor Court at the conclusion of the MDL. Accordingly, the Court need not address such jurisdictional arguments, as these cases are currently stayed.

As for Defendant Kullberg ("Ms. Kullberg"), she has not been sued in a non-Florida action, and did not withdraw her jurisdictional challenge following jurisdictional discovery. Ms. Kullberg, together with the other Youtuber Defendants, argues that there is no jurisdiction under Florida's long-arm statute because Plaintiffs never allege that any acts or injuries occurred in Florida, and Plaintiffs

---

[11] Plaintiffs brought an action against (1) Defendant Singh, a Michigan resident, in Michigan, (2) Defendant Creators Agency, a Wyoming limited liability company, in Wyoming, and (3) Defendant David, a California resident, in California. These actions were subsequently transferred to this MDL Court by the JPML.

"rely on the fact that the YouTube channels can be viewed in Florida."  (ECF No. 266) at 10.  Ms. Kullberg further argues that Plaintiffs allege no facts to support that she entered into an actionable conspiracy.  *Id.*  In response, and after Plaintiffs conducted jurisdictional discovery, Plaintiffs argue that discovery supports a finding that Defendants, including Ms. Kullberg, participated in a conspiracy, and acts in furtherance of the conspiracy took place in Florida.  (ECF No. 554).

As discussed above, the Court has dismissed Plaintiffs' conspiracy claims, with leave to amend.  *See* Section III.D.  Given much of the Parties' jurisdictional arguments relate to the alleged conspiracy, for the sake of efficiency, the Court need not address Ms. Kullberg's jurisdictional arguments at this juncture.  The Court denies Ms. Kullberg's Motion to Dismiss for Lack of Jurisdiction without prejudice.  Ms. Kullberg may re-raise any jurisdictional arguments, with the benefit of this Court's decision, once Plaintiffs file an amended complaint.

ii.      *Defendants' Claim Splitting Arguments*

Lastly, the California Defendants argue that the Florida action should independently be dismissed because it is improper for Plaintiffs to simultaneously maintain both the Florida action and the California action against the California Defendants.  (ECF No. 268) at 15.  The California Defendants argue that the duplicative action should be barred under the "claim-splitting" doctrine. *Id.*; *see also Vanover v. NCO Fin. Servs., Inc.*, 857 F.3d 833, 841 (11th Cir. 2017) ("The rule against claim-splitting requires a plaintiff to assert all of its causes of action arising from a common set of facts in one lawsuit.").  However, this argument is premature.  All potentially "duplicative" cases have been administratively closed pending remand.  At this stage, the Court denies without prejudice the California Defendants' request to dismiss for improper claim-splitting.  *See In re Zantac (Ranitidine) Prod. Liab. Litig.*, 546 F. Supp. 3d 1152, 1182 (S.D. Fla. 2021) (denying Defendants' request to dismiss for improper claim-splitting because "there is but one case pending before the Court—this MDL—and all other cases have been administratively closed pending remand.").

### K.  Ms. Kullberg's Rule 12(b)(5) Arguments

Ms. Kullberg separately filed a Motion to Dismiss for Insufficient Service of Process.  (ECF No. 263).  In support, Ms. Kullberg argues that service was invalid because "she was not served personally, it was not left at her dwelling or usual place of abode, and it was not left with an authorized agent." *Id.* at 2.  Plaintiffs filed a Return of Service, *see* Case No. 23-cv-21023 at (ECF No. 25), alleging that on April 6, 2023, a process server perfected substitute service by serving "Jerry Doe," a doorman at a New York City apartment building.  (ECF No. 263) at 1.  The Return of Service further provides that the doorman called the apartment resident, Arzu Malik, and "was told to accept the documents." (ECF No. 263) at 1.  Plaintiffs believed that Ms. Kullberg was the resident or owner of the apartment.  (ECF No. 546) at 1.  However, Ms. Kullberg attached a Declaration of Arzu Malik to the Motion, where Ms. Malik declared that Ms. Kullberg does not live at that residence and never has, nor does she own or lease the apartment in question. *Id.*  Ms. Malik's Declaration further provides that she never received a call from the doorman, but instead, someone aggressively banged on the door to her apartment, and after she did not answer the door, that individual left papers taped to the front door of the apartment. *Id.*

After Ms. Kullberg's Motion for Insufficient Service of Process was fully briefed, Magistrate Judge Sanchez granted limited discovery to Plaintiffs based solely on the events of April 6, 2023.  Following this limited discovery, Plaintiffs filed a Supplement in opposition to Ms. Kullberg's Motion, to further support that service was proper.  (ECF No. 546).  Through deposition testimony, Plaintiffs learned that Ms. Kullberg is a resident of Dubai and was there on April 6, 2023. *Id.* at 1.  Plaintiffs learned that given Ms. Kullberg operates many U.S. businesses, Ms. Kullberg has mail sent to her sister's New York address, and for this reason, an investigation into Ms. Kullberg's residence resulted in her name being attached to her sister's residence. *Id.*  Plaintiffs argue that after Plaintiffs served what they now know was Ms. Kullberg's sister's New York residence, Ms. Kullberg obtained

a declaration from her sister's roommate, Arzu Malik, to give the appearance that Ms. Kullberg had zero connection to the New York address.  *Id.* at 2.  Plaintiffs characterize this as a "false narrative to give the appearance that [Ms. Kullberg's] due process rights were somehow violated, while the evidence illustrates that the truth is closer to Ms. Kullberg's attempted perpetration of a fraud upon this Court in order to attempt to avoid answering Plaintiffs' claims on their merits."  *Id.* at 3.

In response to the supplement, Ms. Kullberg argues that Plaintiffs' arguments and exhibits do not change the fact that Ms. Kullberg never resided at the address where the summons and complaint were left, thus failing to satisfy the legal requirements of service of process under New York law. (ECF No. 562) at 3 (citing *Doe v. Alsaud*, 12 F. Supp. 3d 684, 687 (S.D.N.Y. 2014)).

"A process server's return of service on a defendant, which is regular on its face, is presumed to be valid absent clear and convincing evidence presented to the contrary."  *Happy Tax Franchising, LLC v. Hill*, No. 19-CV-24539-FAM, 2022 WL 6744545, at *3 (S.D. Fla. July 22, 2022).  "Generally, service is sufficient when made upon an individual who stands in such a position as to render it fair, reasonable and just to imply the authority on his part to receive service."  *Bishop v. United States*, 1999 WL 357939, at *5 (N.D. Fla. Mar. 18, 1999) (citation omitted).  Given the sufficiency of service has been questioned, the plaintiff bears the burden of showing proper service of process.  *Reeves v. Wilbanks*, 542 F. App'x. 742, 746 (11th Cir. 2013) (citing *Aetna Bus. Credit, Inc. v. Universal Decor & Interior Design, Inc.*, 635 F.2d 434, 435 (5th Cir. 1981)).

Here, the Court finds that service as to Ms. Kullberg was proper.  The declarations provided by Ms. Malik and Ms. Kullberg to contest the validity of service are indisputably misleading.  Ms. Kullberg failed to disclose that her sister resided at the New York apartment, that she frequently received mail on Ms. Kullberg's behalf at that address, and that Ms. Kullberg became aware of the April 6, 2023 service based on communications with her sister.  She also failed to disclose that she frequently uses this address for matters related to her company, Co-Defendant Creators Agency LLC,

which lists this address on the Articles of Incorporation. Plaintiffs further cite to a voice memo produced by Ms. Kullberg, which she sent to Ms. Malik a month after she was served with the lawsuit. (ECF No. 546) at 2 n.2. In the voice memo, Ms. Kullberg requests a meeting with Ms. Malik to discuss the April 6, 2023 service, and states, among other things, "I don't know how they found out that I was connected to that apartment," "unless we can prove that [the process server] lied, I have to be looped into this crazy lawsuit," "I'll show you what the server said and how he lied," and "they are playing really dirty." *Id.* This is not the type of "clear and convincing evidence presented to the contrary" that disputes the validity of Plaintiffs' Return of Service. *Happy Tax Franchising*, 2022 WL 6744545, at *3.

Additionally, New York courts have permitted service effected on a defendant by delivering the summons to a relative of the defendant. *See Leab v. Streit*, 584 F.Supp. 748, 763 (S.D.N.Y 1984) (permitting service by delivery of the summons and complaint to the defendants' parents and grandmother); *Deason v. Deason*, 73 Misc.2d 964, 966 (Sup.Ct. Albany Cty.1973) ("[S]ervice of the summons by mailing to the addresses of a defendant's relatives satisfies the demands of procedural due process . . . where a plaintiff has demonstrated that he or she has exhausted all reasonable possibilities of serving the summons personally."). Accordingly, the Court denies Ms. Kullberg's Motion to Dismiss for Improper Service.

### L.  Defendants' Individual Motions to Dismiss

Finally, the Court addresses the Celebrity Defendants' supplemental motions to dismiss. *See* (ECF Nos. 351, 355, 356, 363, 364, 365, 366).

### i.     Shohei Ohtani ("Mr. Ohtani").

Mr. Ohtani argues (1) Plaintiffs have not alleged any conduct that could conceivably form the basis of a tort or fraud claim under U.S. law against Mr. Ohtani, and (2) Plaintiffs Garrison and Kavuri's claims "are barred and should be dismissed pursuant to the 'two-dismissal' rule and res

judicata because they already filed and voluntarily dismissed two separate cases against Mr. Ohtani stemming out of the same operative facts."  (ECF No. 270) at 2.

First, as to the alleged conduct in the CAC, Mr. Ohtani argues that his public statements about FTX were not in English and were primarily directed towards the Japanese market.  *Id.*  The Court disagrees.  The CAC indisputably alleges that Mr. Ohtani's conduct, promotions, and advertising were targeted at the U.S. market.  *See* CAC ¶¶ 583, 586–87, 592–94.  Moreover, the Court already considered Mr. Ohtani's arguments regarding his advertisements and involvement with FTX when dismissing Plaintiffs' California securities claims, consumer protection claims, aiding and abetting claims, and conspiracy claims. *See* Sections III.B.iii, III.C, III.D., III.E.  Mr. Ohtani's arguments, however, fail to provide any support for dismissing the remaining Florida and Oklahoma securities claims.

Second, Mr. Ohtani moves to dismiss the CAC because Plaintiffs Garrison and Kavuri filed and voluntarily dismissed at least two actions against Mr. Ohtani.  *See* (ECF No. 270) at 4 (citing *Garrison v. Bankman-Fried*, 1:22-cv-23753-KMM at ECF 14 (S.D. Fla. Dec. 8, 2022); *Kavuri v. Bankman-Fried*, 1:22-cv-23817-DPG at ECF 5 (S.D. Fla. Dec. 8, 2022); *Garrison v. Ohtani*, 2:23-cv-05951-AB at ECF 10 (C.D. Cal. July 24, 2023)).  As such, Mr. Ohtani argues that dismissal is warranted under Federal Rule of Civil Procedure 41(a)(1)(B), which provides "if the plaintiff previously dismissed any federal-or state-court action based on or including the same claim, a notice of dismissal operates as an adjudication on the merits."  Mr. Ohtani argues that the two voluntary dismissals invoke the doctrine of res judicata and bar a subsequent lawsuit.

In response, Plaintiffs argue that Rule 41(a)(1)(B) is not applicable in this case.  (ECF No. 355) at 3.  Specifically, Plaintiffs clarify that the California action was filed to resolve Mr. Ohtani's jurisdictional concerns.  *Id.*  Mr. Ohtani then waived his personal jurisdiction objection, which led to the dismissal of that action.  *Id.*  Plaintiffs argue that the dismissal of the California action "was not a

43

dismissal of a previously filed action, but rather, the dismissal of a simultaneous, later-filed action." *Id.* Plaintiffs urge the Court to focus on the wording of Rule 41(a)(1)(B) which states that it is only applicable where the plaintiff "*previously* dismissed any federal-or state-court action," suggesting that actions dismissed amid simultaneous actions do not apply. *Id.*

Both Parties provide very little authority regarding this theory, none of which is binding on this Court. Mr. Ohtani cites to one recent case in this district, which addressed the question of whether the two-dismissal rule applies, when one of the plaintiff's dismissals was not unilateral. *See Great Lakes Ins. SE v. Crabtree*, 673 F. Supp. 3d 1301, at *5 (S.D. Fla. 2023). There, the court found that even where the plaintiff and the defendant informally agreed to one of the two dismissals, the two-dismissal rule still applied. *See id.* ("[W]e ask only two questions: (1) Did the plaintiff dismiss two prior cases? (2) If so, are all three cases—this case plus the two dismissed cases- based on or including the same claim?"). Two federal circuit courts have held to the contrary. *See Poloron Prod., Inc. v. Lybrand Ross Bros. & Montgomery*, 534 F.2d 1012, 1018–19 (2d Cir. 1976) ("[W]e hold that the filing of a notice of dismissal preceded by a dismissal by stipulation knowingly consented to by all parties does not activate the 'two dismissal' bar against bringing an action based on or including the same claim."); *15 TCW Special Credits v. Fishing Vessel Chloe Z*, 238 F.3d 431, at *2 (9th Cir. 2000) ("Although the Hawaii dismissal was not formally 'stipulated,' it was not unilateral as all parties tacitly agreed to the dismissal in favor of litigating the action in Guam. Also, there is no evidence that the filings and dismissals were part of a strategy to harass the CHLOE Z.").

In this case, the Parties do not indicate whether they informally agreed to one of the dismissals. However, a tacit agreement is suggested where Mr. Ohtani waived service after Plaintiffs filed a separate action to resolve any jurisdictional concerns.

While there is no definitive interpretation of Rule 41(a)(1)(B) from the Eleventh Circuit, "[t]he basic purpose of the Federal Rules is to administer justice through fair trials, not through summary

dismissals as necessary as they may be on occasion." *Surowitz v. Hilton Hotels Corp.*, 383 U.S. 363, 373 (1966). Moreover, some courts have declined to strictly apply the rule where "the purpose of the rule–to avoid harassing the defendant–would not be served." *15 TCW Special Credits*, 238 F.3d 431, at *1 (citing *Poloron*, 534 F.2d at 1017) (quotations omitted). Based on the circumstances here, the Court finds that application of Rule 41(a)(1)(B) is not proper. By Plaintiffs filing the California action to resolve any jurisdictional concerns, and subsequently dismissing such action when those concerns were resolved, application of the rule "would be to close the courthouse doors to an otherwise proper litigant." *Poloron*, 534 F.2d at 1017. Moreover, the Parties have not provided, nor has this Court been able to find, any authority suggesting whether the two-dismissal rule is applicable for simultaneous actions, rather than "previously dismissed" actions. Accordingly, Mr. Ohtani's Motion to Dismiss on these grounds is denied.

      ii.               *Thomas Brady ("Mr. Brady"), Gisele Bündchen ("Ms. Bündchen"), and Lawrence Gene David ("Mr. David").*

Mr. Brady, Ms. Bündchen, and Mr. David each argue that Plaintiffs fail to plead facts demonstrating that they (1) sold or solicited the sale of securities, or (2) were aware of or involved in FTX's fraud. *See* (ECF Nos. 272, 273, 274). The Court already considered these arguments when dismissing Plaintiffs' California securities claims, consumer protection claims, aiding and abetting claims, and conspiracy claims. *See* Sections III.B.iii, III.C, III.D, III.E. These arguments, however, fail to provide any support for dismissing the remaining Florida and Oklahoma securities claims. Accordingly, Mr. Brady, Ms. Bündchen, and Mr. David's Motions to Dismiss on these grounds are denied.

      iii.               *Golden State Warriors, LLC ("GSW").*

GSW argues that Plaintiffs' consumer protection claims should be dismissed because GSW is immune from liability as an alleged "publisher" of FTX's advertisements. (ECF No. 277). The Court

has since dismissed Plaintiffs' consumer protection claims, and thus need not reach the merits of GSW's argument.

   *iv.*   *Udonis Haslem ("Mr. Haslem").*

  Mr. Haslem argues (1) that Plaintiffs fail to state to claim based on Mr. Haslem's commercial, where he states "You in, Miami?", and (2) that service was improper and untimely.  (ECF No. 278). First, the Court already considered the contents of Mr. Haslem's advertisements and his involvement with FTX when dismissing Plaintiffs' California securities claims, consumer protection claims, aiding and abetting claims, and conspiracy claims.  *See* Sections III.B.iii, III.C, III.D, III.E.  These arguments, however, fail to provide any support for dismissing the remaining Florida and Oklahoma securities claims.

  Second, regarding whether Mr. Haslem was properly served, Mr. Haslem asserts two arguments: (1) he was untimely served after the 90-day deadline expired; and (2) the process server improperly served Mr. Haslem through his wife.  *See* (ECF No. 278) at 3.  In response, Plaintiffs argue that Mr. Haslem was not untimely served because Plaintiffs refiled the action on December 16, 2022, and then timely served Mr. Haslem on February 28, 2023.  Plaintiffs further argue that they did not improperly serve Mr. Haslem through his spouse, given the process server (1) twice attempted to serve process at Mr. Haslem's residence, (2) followed his wife when she fled over three miles from their home, (3) identified himself, his authority, and purpose, (4) read the summons aloud, and (5) placed the documents on the windshield of Mr. Haslem's wife's car.  (ECF No. 365) at 2.

  Under Florida law, a person has the legal obligation to accept service of process when service is attempted reasonably.  *Coffin v. Brandau*, 642 F.3d 999 (11th Cir. 2011) (citing *Haney v. Olin Corp.*, 245 So.2d 671, 673 (Fla. 4th DCA 1971)) ("An officer's reasonable attempt to effect personal service of process upon a person in his own home, when the person reasonably should know the officer's identity and purpose, cannot be frustrated by the simple expedient of the person closing the

front door in the officer's face and willfully refusing to accept service of process."). Fla. Stat. § 48.031(2)(a) provides that "[s]ubstitute service may be made on the spouse of the person to be served at any place in the county . . . if the spouse requests such service, and if the spouse and the person to be served are residing in the same dwelling." Fla. Stat. § 48.031(2)(a).

The district court decision in *Selvas v. Atlas One Financial Group*, LLC, 2011 WL 13223728, at *2 (S.D. Fla. Aug. 26, 2011) is instructive here. There, the court found there was invalid substitute service where a copy of the summons and complaint was delivered to the defendant's spouse in the parking lot of grocery store across the street from the defendant's home, and where the defendant's spouse refused process. *Id*. at *2. Here, like *Selvas,* Plaintiffs have not proffered any evidence that Mr. Haslem's wife requested service, as required by Fla. Stat. § 48.031(2)(a). Moreover, the evidence suggests that she refused process when the process server stopped her vehicle and identified himself over three and a half miles from her residence. (ECF No. 278) at 3. Plaintiffs point to several Florida cases where service upon the spouse of the defendant was proper, however, in those instances, service took place either in the residence, or "eight to ten feet from the residence." *Coffin v. Brandau*, 642 F.3d 999, 1003–04 (11th Cir. 2011); *see also Rokeach v. Glickstein*, 718 So. 2d 831, 832 (Fla. 4th DCA 1998)**;** *Haney v. Olin Corp.*, 245 So. 2d 671, 673 (Fla. 4th DCA 1971). Accordingly, the Court finds that service was improper.

Plaintiffs request in the alternative that the Court grant them an extension of time to serve process on Mr. Haslem. (ECF No. 365) at 4. The Court recognizes that the "adequacy of [substitute service] so far as due process is concerned is dependent on whether or not the form of substituted service . . . employed is reasonably calculated to give [the defendant] actual notice of the proceedings and an opportunity to be heard." *Milliken v. Meyer*, 311 U.S. 457, 463 (1940). Plaintiffs' attempted service of process on Mr. Haslem through his wife, albeit defective, gave him notice of the lawsuit

and the claims against him.  In light of Plaintiffs' efforts, the Court grants Plaintiffs an extension of time to properly serve Mr. Haslem no later than twenty (21) days from the date of this Order.

      *v.*     *David Ortiz ("Mr. Ortiz").*

Mr. Ortiz argues that the CAC is devoid of any allegations connecting Mr. Ortiz to Plaintiffs' claims, specifically Mr. Ortiz's "phone call from the Moon" advertisement or posts on X (formerly Twitter).  *See* (ECF No. 366).  The Court already considered the contents of Mr. Ortiz's advertisements and his involvement with FTX when dismissing Plaintiffs' California securities claims, consumer protection claims, aiding and abetting claims, and conspiracy claims.  *See* Sections III.B.iii, III.C, III.D, III.E.  These arguments, however, fail to provide any support for dismissing the remaining Florida and Oklahoma securities claims.  Accordingly, Mr. Ortiz's Motion to Dismiss on these grounds is denied.

In sum, the Court finds that Plaintiffs have failed to state a claim regarding Counts 2–12 and 14 of the CAC.  The Court further finds that a ruling as to Counts 1 and 13 is premature at this juncture.

## IV.    CONCLUSION

UPON CONSIDERATION of the Corrected Administrative Class Action Complaint (ECF No. 179), the pertinent portions of the record, and being otherwise fully advised in the premises, it is hereby ORDERED AND ADJUDGED that Defendants' Motions to Dismiss (ECF Nos. 265, 266, 268, 271, 270, 272, 273, 274, 277, 278, 279) are GRANTED IN PART and DENIED IN PART.  Counts 2–12 and 14 of the Corrected Administrative Class Action Complaint are DISMISSED WITHOUT PREJUDICE.  It is FURTHER ORDERED that Defendant Erika Kullberg's Motion to Dismiss for Insufficient Service of Process (ECF No. 263) is DENIED.  Plaintiffs' request for an extension of time to serve Defendant Udonis Haslem, *see* (ECF No. 365), is GRANTED.  Pursuant to Rule 15(a)(2) of the Federal Rules of Civil Procedure, Plaintiffs are granted leave to file an

amended complaint within twenty-one (21) days of the date of this Order.

DONE AND ORDERED in Chambers at Miami, Florida, this _7th_ day of May, 2025.

_K. M. Moore_

K. MICHAEL MOORE
UNITED STATES DISTRICT JUDGE

c:  All counsel of record