**Anthony Scordo, Esq.**
**Attorney ID NJ 024591987**
**69 E. Saddle River Rd.**
**Saddle River, New Jersey 07458**
**(973) 476-0143**
**anthonyscordo@msn.com**

**Edward E. Lehman, Esq.**
**Attorney ID IL ARDC #6194489**
    *Attorneys for Plaintiff,*

**In Re Cryptocurrency Exchange**
**Collapse Litigation**

_____

| | | |
|---|---|---|
| **Lucky D. et al** | **:** | **United States District Court for** |
| | | **the Southern District of Florida** |
| **Plaintiffs,** | **:** | **Case No. 1:23-md-3076-KMM** |
| | | **MDL No. 3076** |
| | **:** | |
| **v.** | **:** | **Originally venued in the District of** |
| | | **New Jersey, Civ. No. 23-389** |
| **:** | | |
| **Prager Metis, et. al** | | |
| | **:** | **CIVIL ACTION** |
| **Defendants** | **:** | |

_____


LEGAL MEMORANDUM OF LUCKY D PLAINTIFFS IN
FURTHER SUPPORT OF THEIR PENDING MOTION TO INTERVENE
IN SETTLEMENT APPROVAL PROCEEDINGS PERTAINING TO
AUDITOR DEFENDANTS AND IN REPLY TO JOINT FILED
OPPOSITION SUBMISSION OF PARTIES SEEKING SETTLEMENT
APPROVAL

Please accept this memorandum on behalf of plaintiffs in the matter captioned <u>Lucky D v.</u>
<u>Prager Metis, Armanino,  et al,</u> U.S. District Court, District of New Jersey,  2:23-cv-00389 which
was transferred over plaintiffs' strenuous objection by the Multi District Panel to this court,  in
support of their motion seeking to intervene in proceedings pertaining to approval of the
settlement with auditor defendant Prager Metis and in reply to the objections filed to their
intervention application.

## STATEMENT OF FACTS

Lucky D plaintiffs hereby rely upon the facts as set forth in their original motion to
intervene as if fully set forth herein.

## LEGAL ARGUMENT

I.THE LUCKY D PLAINTIFFS MUST BE PERMITTED TO INTERVENE IN THE
AUDITOR SETTLEMENT APPROVAL PROCEEDINGS AS THE CLASS ACTION
PLAINTIFFS HAVE FAILED TO PROPERLY PRESENT THE STRENGTHS OF THE CASE
AGAINST THE AUDITORS AND HAVE

As set forth in their original submissions seeking leave to intervene both as of right and with
court permission pursuant to Rule 23,  only the two auditor defendants Prager Metis and Armanino
are named in the Lucky D Complaint (with federal jurisdiction asserted on diversity grounds) and
only three state causes of action are asserted, namely professional malpractice, common law
fraud and consumer fraud. The so-called Lucky D plaintiffs are 20 or so foreign-based individual
customers of FTX whose original losses varied , but all suffered substantial monetary losses
relative to the proposed customer putative class.  There are no Rule 23 class allegations asserted

in the Lucky D Complaint.  Defendants in their joint motion to dismiss the putative class action complaint on the pleadings (Doc. 281)  take a number of positions that are not in any way applicable to the Lucky D complaint. The Lucky d plaintiffs here can for these purposes only presume that the auditor defendants primary defenses to the claims against them are asserted in their pending 12(b)(6) motion and thereby played a role in negotiating the material terms of the settlement with Prager Metis for which approval of this court is now sought. The Lucky D plaintiffs have essentially been ignored throughout these negotiations by both the auditors and those seeking to form a Rule 23 class who were supposed to have been advocating their interest thus raising clear due process concerns when all parties agree limited funds are available to satisfy the claims made against the auditors, most likely in the form of professional liability insurance proceeds . As the court is aware, the Lucky D plaintiffs are not able to broach the sealed proposal and are forced to engage in primarily speculation in this application. As noted in their initial moving papers, the Lucky D plaintiffs vehemently request a hearing to assure they have been afforded due process as this Circuit require lower courts to afford in these circumstances. In re Temple, 851 F. 2d 1269 (11th Cir. 1988).

    A.    The Lucky D plaintiffs even at the very outset set forth a much stronger case than the representatives of the putative class against the auditors and must be permitted to intervene and participate in the settlement approval process and, at their independently object in a full-blown plenary hearing.

The most important factor to be considered by a reviewing court in addressing whether to approve of a negotiated class action settlement is the strength of the case for the plaintiffs on the merits as balanced against the amount offered. An additional factor is the reaction of the class itself to the settlement. Where there are allegations of improprieties and fraud in the conducting

of audits, one cannot qualify as a class member unless reliance on the audit actually caused the loss. See e.g. Robertson v. Seidman & Seidman , 1981 US Dist. LEXIS 10564 (SDNY 1981) (corporate investor class action against accounting firm for certifying fraudulent financial statements).  The auditors in their 12(b)(6) motion claim that in the putative class complaint "plaintiffs do not allege that (a single plaintiff)  saw any audit reports from Armanino or Prager Metis." In contrast, in the Lucky D complaint, which was filed very soon after the FTX collapse in January 2023, lead plaintiff Lucky D (a fictitious name created to protect his identity) specifically indicated he was lured to FTX to sign up for an FTX international trading account "because of its reputation for having professionals assuring confidence in their strong fiduciary duty to their users and creditors." Another named plaintiff Jong JD alleges "when he became aware that FTX had issued audit reports reporting compliance with recognized auditing standards, (he) decided to move significantly more assets from other platforms to FTX." Yet another named plaintiff B. Ken indicates in the Complaint he chose FTX "mainly because he was aware that other exchanges (were) not subject to audits and their financial statements were not certified and essentially unreliable... and deposited more than $600,000 prior to the bankruptcy."

Furthermore, the auditors in their 12(b)(6) motion credibly allege that the class representatives make unduly ambiguous allegations against both of them  that would not satisfy heightened pleading standards for fraud (not mentioning malpractice for some reason). That is not true with the Lucky D allegations. Prior to filing their complaint, the Lucky D plaintiffs consulted an expert (a CPA and accounting professor) knowing that New Jersey law requires an Affidavit of Merit to proceed with professional malpractice claims. While discovery never even got off the ground, the Lucky D plaintiffs at all times have been able to produce to this court this qualified expert's

draft report, both for intervention and objection purposes *in camera* . Even without the availability of an expert report, this court, upon close perusal, cannot fail to recognize that the Lucky D Complaint, unlike the putative class complaint, is very specific and unambiguously sets forth (quoting the Complaint) "an extensive but far from exhaustive list of steps which were absolutely necessary to conduct a proper audit and arrive a reliable audit report. Here none of these steps were employed by defendants... and provided no useful or accurate information to the targeted audience including these plaintiffs."

Far from ambiguous, the Lucky D plaintiffs, as far back as two and a half years ago, set forth a specific enumeration of  egregious professional and even personal transgressions of these auditors which represent only the tip of the iceberg of their professional transgressions all motivated by one. Why preserving their personal assets has apparently become a high priority is baffling. Their hands are as unclean as those of as enumerated therein :

(a) Defendants failed to perform a thorough search of content of traditional and social media regarding the FTX exchange and management prior to accepting the engagement. Even minimal investigation of prior public statements of founder Samuel Bankman-Fried readily accessible in ordinary media and social media should have raised red flags that further investigation was warranted. In said interviews FTX' principal Samuel BankmanFried spoke candidly about pump and dump schemes designed to increase the value FTX' related sister company Alameda Research LLC. Violations of AU-C-Section 325, 200.
(b) Defendants should have posed simple questions to FTX representative and make ordinary observations which would have revealed that no management internal control systems existed or ever had been implemented by either FTX entity. This finding should have resulted in heightened caution going forward in conducting the audit. and every type of accounting transaction the FTX entities engaged in both on and off chain (Accounts Payable, Accounts Receivable, payroll, investments, financing, transfers, assets, liabilities) should have been made subject to risk assessment and sampling (or examined 100%) for detailed examination. Defendants failed to verify in depth the origins of each figure in the balance sheet, cash flow and income statements whether on or off chain. Both on-chain transactions and off-chain amounts should have been verified based on a review of both endogenous and exogenous data. Non-public company audits do not require an assurance of management and corporate internal controls; however,

establishing and enforcing such controls is an expected governance practice for most business entities, in particular those that deal with a large amount of assets, complex Case 2:23-cv-00389 Document 1 Filed 01/24/23 Page 16 of 26 PageID: 16 technologies and/or financial trading instruments. Non-public company audits do not require an assurance of management and corporate internal controls; however, establishing and enforcing such controls is an expected governance practice for most business entities, in particular those that deal with a large amount of assets, complex technologies and/or financial trading instruments. Numerous violations of AU-C-Section 265, 325,450 and others.

(c) Defendants should have immediately observed FTX' failure to implement even elementary internal accounting functions in any of its entities. Despite the appointment of a Chief Financial Officer the lack of any semblance of a financial department was a telltale signs of inaccuracy of financial statements and potential for fraud. Most businesses of any substantial size have established an accounting department as well as an internal audit and compliance department. Issuance of unqualified audit reports under these circumstances would be ludicrous for any audit conducted by a licensed accounting professional. Violations of section AU-325, 330, 450.

(d) Defendants' discovery that FTX was utilizing widely marketed accounting software for all entries into the books of account should have been an obvious premonition of inaccuracy and fraud. This well-known widely available program is essentially designed for use by non-professionals at small and medium sized unconsolidated businesses, completely the opposite of FTX large worldwide operations. Any competent accounting professional aware of the software being used would have had no doubt that the books of FTX prepared using this software alone evidenced extremely high risks of material misstatement of actual financial condition, thus warranting further detailed investigation. The blatant lack of formal accounting training of management and absence of staff implementing internal accounting functions was another obvious red flag. Furthermore, the relationship with Alameda, known to be related to the FTX entities, should have been closely examined as a risk for related party transactions. Link analysis software should have been used that connects and traces on and off chain behavior – if this software had been deployed, there is no way that they would have missed transfers to Alameda and other entities/persons. Violations of AU-C-200, 325, 330 450.

(e) Defendants should have immediately recognized FTX' violation of basic accounting practices in classification of customer deposits as assets, rather than as liabilities of FTX. Had they been properly classified as deposits FTX was required to hold readily available reserves as collateral if customers choose to close their accounts. In fact, FTX permitted deposits to be used as collateral for lines of credit for the related company Alameda FTX claimed in its user agreements that its customers retained title and ownership to their accounts, and that these cryptocurrencies do not belong to FTX, nor would they be transferred to FTX. The Defendants, FTX, and FTX.US failed to extensively examine and trace transactions to verify that this was indeed the case – that the customers' assets were untouched. Violations of AU-C-200, 325.

(c) Defendants failed to recognize the necessity of assigning to the FTX engagement partners

and other CPAs with demonstrable training or expertise in the complex blockchain technology.

The Defendants had a professional obligation to familiarize themselves with blockchain technology and cryptocurrency exchange functionality and operations, and the implications of trading financial assets via the technology. Violations of AU-C-200, 450/

(d) Defendants failed to recognize the import of the lack of an independent Board of Directors as required to manage the vast assets FTX had access to. Instead, the fact that the FTX entities were managed solely by a small group of insiders should have raised a strong red flag that management fundamentally lacked transparency and oversight, inviting mismanagement and increasing risk of related party transactions. Violations of AU-C-200, 240, 450, 550.

(e) Public claims by FTX of offering 20% interest earnings on investments held on the platform should have been examined at by the auditors with a high degree of professional skepticism. Defendants should have immediately been concerned with clarifying how such interest was generated and paid by the FTX entities in a profitable and sustainable manner. Furthermore, the auditors should have recognized that FTX' Form D registration, seeking exemption from SEC oversight of private funding in the hundreds of millions. was highly suspicious. Violations of AU-C-200, 325, 450, 240.

(f) The relationship with Alameda, a separate entity known to be related to the FTX entities, should have been closely examined as a risk for related party transactions. Link analysis software should have been used that connects and traces on and off chain behavior – if this software had been deployed, there is no way that they would have missed transfers to Alameda and other entities/persons. Violation of AU-C-330, 550.

(g) Defendants had a duty to examine records of all transactions, whether via traditional banking system, or conducted on the blockchain. There is no indication that the Defendants made any effort to investigate or understand the FTX entities' history of transactions, particular as regards blockchain transactions.

(h) The realizations that two different audit firms had been retained, Prager for FTX Trading and Armanino for FTX US was an obvious red flag. Such division of the audits and separating relating companies reduces overall transparency and inhibits information sharing across engagements which necessarily should and would have raised more red flags significantly clouding overall transparency and inhibiting information sharing across engagements. Furthermore, as the main entity (FTX Trading) was offshore alone justified a higher level of scrutiny than took place. Offshore entities are known to be subject to less regulation and oversight. Defendants should have sought to understand the implications of the offshore structure, including ownership and cash flows. Violations of AU-C- 200, 450.

(quoting Complaint, First Cause of Action, para. 4)

In summary, the Lucky D plaintiffs must be permitted to intervene. They are the only ones who have even made a serious attempt to formulate a strong case against these auditors. The defendants' motion to dismiss was, unfortunately, all too accurate. The class action plaintiffs have glossed over the claims against these auditors and have never bothered to even try show how strong they really are and how reprehensible the auditors' conduct actually was. They are now trying to sweep under the carpet the claims of real people who were really harmed by these so-called professionals. Rather they have turned the claims against the auditors into a sideshow and laughed at everyone who questioned them. This court must grant the Lucky D plaintiffs' motion to intervene so real victims can have their day in court as opposed to windbag politicos who took over this proceeding on day one.

CONCLUSION

Based on the above facts and law and those set forth in their original motion to intervene, this court should and must grant the Lucky D plaintiffs' motion to intervene either as of right or with the court's permission pursuant to Rule 23.

Respectfully submitted,

s/ Anthony Scordo

Anthony Scordo, Esq.
Attorney ID NJ 024591987

s/ Edward E. Lehman

Edward E. Lehman, Esq.
Attorney ID IL ARDC #6194489
*Attorneys for Plaintiff*

Dated : January 22, 2026