# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW JERSEY

Edward Lehman (IL SBN 6194489)*
elehman@lehmanlaw.com

LEHMAN, LEE & XU LLC (Saipan #25977-001-1)

c/o LEHMAN, LEE & XU
Suite 3313, Tower One, Times Square
1 Matheson Street, Causeway Bay, Hong Kong
Telephone: (852) 3588-2188
Facsimile: (852) 3588-2088

Admitted  *pro hac vice Attorney for Plaintiffs*


Anthony Scordo, Esq., PC
NJ Atty ID - 024591987
1425 Pompton Avenue, Suite 2-2
Cedar Grove, New Jersey 07009
(973) 837-1861
*Attorney for Plaintiffs*

_____

**LUCKY D., an individual; JONG R.D., an individual; HOW YUAN, an individual; S. ROBERTS, an individual; B. KEN, an individual; J. BELL, an individual; MoreBet Limited., a United Kingdom Limited liability company; L. ZHAO, an individual; KHOO WING, an individual; P. DEVIN, an individual; SUNLI, an individual; LOODS B.V., a European Union limited liability company; S. JAMES, an individual; YANG HOW, an individual; K. DAVID, an individual; EDWARD JOHNS, an individual; NICKLE LEE, an individual; S. JONG, an individual; DRAKE HK, a Hong Kong limited liability company; and JUSTIN BERK, an individual, Apex Digital Limited**

      *Plaintiffs,*

v.

**PRAGER METIS, LLP**
**a New York limited liability partnership; and**

**Civil Action No.: 2:23-cv-00389**

**ARMANINO, LLC**
**a California limited liability partnership;**

**GLENN L. FRIEDMAN, an individual**

**LORI A. ROTH, an individual ; and**

**CRAIG MICHAELSON, an individual**

**and**

**JOHN DOES 1-4 (being fictitiously named persons whose names are presently unknown)**


      *Defendants,*

_____

**FIRST AMENDED COMPLAINT FOR PROFESSIONAL MALPRACTICE, FRAUD, CONSUMER FRAUD, AIDING AND ABETTING FRAUD, DISGORGEMENT OF FEES**

**NATURE OF ACTION**

Plaintiffs Lucky D., Jong R.D., How Yuan, S. Roberts, B. Ken, J. Bell, L. Zhao, Khoo Wing, P. Devin, Sun Lee, Loods B.V., S. James, Yang How, K. David, Edward Johns, Nickle Lee; S. Jong, Drake HK, Justin Berk, and Apex Digital Limited.   complain of Defendants Prager Metis LLC and Armanino LLC and John Does 1 -4 (being fictitiously named and are presently unknown respondents in claims seeking monetary damages as follows:

**THE PARTIES**

1.  Plaintiff Lucky D. is a resident of Hong Kong, People's Republic of China.

2.  Plaintiff Jong R.D. is a citizen and resident of EU.

3.  Plaintiff How Yuan is a resident of Hong Kong, People's Republic of China.

4.  Plaintiff S. Roberts is a resident of Republic of Singapore.

5.  Plaintiff B. Ken is a resident of Republic of Singapore.

6.  Plaintiff J. Bell is a resident of the United Kingdom.

7.  MoreBet, Limited. is a limited liability company doing business in the United Kingdom.

8.  Plaintiff L. Zhao is resident of Hong Kong, People's Republic of China,

9.  Plaintiff Khoo Wing is a resident of the Republic of Singapore.

10. Plaintiff P. Devin is a resident of the Republic of Singapore.

11. Plaintiff Sun Lee  is a resident of the Republic Singapore.

12. Plaintiff Loods B.V. is a limited liability company doing business in the European Union.

13. Plaintiff S. James is a resident of the European Union.

14. Plaintiff Yang How is a resident of Hong Kong, People's Republic of China.

15. Plaintiff K. David is a resident of Hong Kong, People's Republic of China.

16. Plaintiff Edward Johns is a resident of Hong Kong, People's Republic of China.

17. Plaintiff Nickle Lee is a resident of Hong Kong, People's Republic of China.

18. Plaintiff S. Jong is a resident of Korea.

19. Plaintiff Drake HK is a limited liability company doing business in Hong Kong, People's Republic of China.

20. Plaintiff Justin Berk is a resident of Hong Kong, People's Republic of China.

21. Plaintiff Apex Digtal Limited is resident of Hong Kong, People's Republic of China.

22. Defendant Prager Metis LLP is, upon information and belief, a New York limited liability partnership with its principal place of business located at Fourteen Penn Plaza, Suite 1800, New York NY 10122 and qualified to do business as a foreign business entity in the State of New Jersey.

23. Defendant Armanino LLC is a California limited liability partnership duly qualified to do business in the States of New York, County of New York with a principal place of business located at 12657 Alcosta Boulevard, Suite 500, San Ramon California 54583 and a place of business located at Fourteen Penn Plaza, Suite 2000, New York NY 10122 being registered

to conduct business as a foreign business entity in the States of New York and New Jersey.

24. Defendant Glenn L. Friedman, an individual upon information and belief,  residing in the State of New York is, also upon information and belief at all relevant times Chief Executive Officer of defendant Prager Metis LLP.

25. Defendant Lori A. Roth, an individual upon information and belief,  residing in the State of New Jersey is, also upon information and belief at all relevant times Managing Member of defendant Prager Metis LLP.

26. Defendant Craig Michaelson, an individual upon information and belief,  residing in the State of New York is, also upon information and belief at all relevant times Chief Operating Officer of defendant Prager Metis LLP.

27. John Doe 1, whose name remains unknown, is the person identified in the Complaint for Injunctive and Other Relief filed by the Securities and Exchange Commission ("SEC" )in the U.S. District Court for the Southern District of Florida (Case No. 1:23-cv-23723)  as "Partner In-Charge-of Assurance" if not previously identified herein.

28. John Doe 2, whose name remains unknown, is the person identified in the Complaint for Injunctive and Other Relief filed by the Securities and Exchange Commission ("SEC" )in the U.S. District Court for the Southern District of Florida (Case No. 1:23-cv-23723)  as "Partner-in Charge of Prager's Public Company Audit Practice" if not previously identified herein.

29. John Doe 3, whose name remains unknown, is the person identified in the Complaint for Injunctive and Other Relief filed by the Securities and Exchange Commission ("SEC" )in the

U.S. District Court for the Southern District of Florida (Case No. 1:23-cv-23723)  as "New

Issuer Engagement Partner" if not previously identified herein.

30. John Doe 4, whose name remains unknown, is the person identified in the Complaint for

Injunctive and Other Relief filed by the Securities and Exchange Commission ("SEC" )in the

U.S. District Court for the Southern District of Florida (Case No. 1:23-cv-23723)  as "New

BD Engagement Partner" if not previously identified herein.

**<u>JURISDICTION AND VENUE</u>**

1.      This Court has original jurisdiction of this action pursuant to U.S.C. 1332(c)(1) because

the Plaintiffs are either foreign citizens or resident in foreign jurisdictions and Defendants are

legal entities formed and existing in the State of New York and California respectively.

Defendant Prager Metis has its principal place of business located in the State of New Jersey;

this matter in controversy is for Plaintiffs is approximately $800,000,000 USD (including

potential trebled damages under the New Jersey Consumer Fraud Act, (N.J.S.A. 56:8-1 et. seq.)

which is well more than the required statutory sum of $75,000.00 USD, exclusive of costs and

interest, and the parties herein are citizens of different states/nations.

2.       Venue is proper in the district pursuant to U.S.C. 1391 because defendant Prager Metis,

while a New York limited liability partnership, has its principal place of business in the State of

New Jersey, resides within the District of New Jersey, and a substantial part of the events or

omission and damages giving rise to this action occurred in this District.

## FACTS COMMON TO ALL COUNTS

1.      All named Plaintiffs are foreign resident individuals, foreign nationals, and/or foreign

business entities that utilized trading platforms maintained by FTX entities that had functioned as

cryptocurrency exchanges. Cryptocurrency[1] exchanges (CEX) such as FTX' exist to facilitate

trades utilizing blockchain technology for a small percentage fee or transaction cost to

customers. These exchanges promise to hold readily available reserves as collateral if customers

choose to withdraw cryptocurrency or close their accounts. The FTX entities retained Defendants

Certified Public Accountant firms Prager Metis, a Limited Liability Partnership formed under the

laws of the state of New York and Armanino, a Limited Liability Partnership formed under the

laws of the state of California to audit their financial statements  and issue reports as to their

opinion as to their accuracy containing how  they arrived at their opinion.

2.      Upon information and belief, the principal place of business for Prager Metis is in the

state of New Jersey and the audits that form the conduct surrounding the subject matter of the

complaint, upon information and belief, took place in the State of New Jersey. Also, upon

information and belief, though the terms of engagement were entered into in the State of New

---

[1] Cryptocurrencies are just one type of implementation of the technology called blockchain. Cryptocurrency transactions on the blockchain typically involve cryptographic tokens. These tokens are stored within and exchanged between wallets, which are unique addresses on the blockchain. Transactions involving transfer of cryptographic tokens over the blockchain will often generate a transaction fee, known in the industry as "gas fees" received by the blockchain node which processes a particular transaction. Such gas fees will typically apply to any type of transaction on the blockchain, whether it be a currency type transaction, an investment/securities transaction, a utility/service type of transaction, or a representation of physical property (NFTs). Note that all crypto and blockchain oriented entities such as FTX, while largely conducting business virtually via blockchain addresses and transactions, simultaneously "exist" as ordinary businesses in the physical world and typically maintain two sets of records for off-chain transactions and on-chain transactions.

York and the law of the State of New York applies in adjudicating these claims according to New Jersey choice of law rules.  Defendant licensed public accounting firms are independent entities unaffiliated with FTX entity. The FTX entities both filed for protection in the United States Bankruptcy Courts and  elsewhere, including the Commonwealth of the Bahamas, in November 2022. 4. As Chief Executive Officer, defendant Friedman exercised domination over the firm (for example, signing the 2018 merger certificate dated November 16, 2018, as Chief Executive Officer of the surviving entity Prager Metis Certified Public Accountants, Limited Liability Company, merging with E. Martin Davidoff & Associates Certified Public Accountants, Limited Liability Company), using it to issue negligent FTX audits per Securities and Exchange Commission findings on Generally Accepted Auditing Standards violations. His control and abuse waived any immunity provided under New York Partnership Law sec 26(b) and, or the New Jersey Uniform Partnership Act N.J.S.A. 42:1-1-49 and renders him individually liable for damages caused by malpractice and fraud in  auditing FTX and reporting the results of said audits.

5. Defendant Lori A. Roth, an individual residing in New Jersey, is and at all relevant times was Managing Member of Prager Metis Limited Liability Partnership. She dominated the firm (for example, signing the 2017 certificate of amendment dated October 24, 2017, as an authorized representative, changing the name from Metis Group Certified Public Accountants Limited Liability Company to Prager Metis Certified Public Accountants, Limited Liability Company), and led deficient audits, overlooking related-party risks per Securities and Exchange Commission charges. Her control and abuse waived any immunity provided under New York Partnership Law sec 26(b) and, or the New Jersey Uniform Partnership Act N.J.S.A. 42:1-1-49 and renders her individually liable for damages caused by malpractice and fraud in  auditing of FTX and reporting the results of said audits.

6. Defendant Craig Michaelson, an individual residing in New York, is and at all relevant times was Chief Operating Officer of Prager Metis Limited Liability Partnership. He managed operations, implicated in Securities and Exchange Commission independence violations, enabling misleading audits. His control and abuse waived any immunity provided under New York Partnership Law sec 26(b) and, or the New Jersey Uniform Partnership Act N.J.S.A. 42:1-1-49 and renders him individually liable for damages caused by malpractice and fraud in auditing FTX and reporting the results of said audits.

Plaintiff Lucky D. had always placed a high level of trust in professional auditors, Lucky D. was drawn to FTX because of its reputation for having professional auditors assuring confidence in their strong fiduciary duty to their users and creditors. Lucky D. entrusted funds to FTX after they had been given a clean bill of health by a team of professional auditors, and therefore decided to sign up for a trading account as an international trader on FTX.com. As part of the setup process, the platform instructed him to set up two-factor authentication (2FA) and separate sub accounts for spot and futures trading. FTX.com was well-structured in the onboard flow and enforced high security best practices to secure his fund on FTX.com, which gave Lucky D. a sense of confidence and security in keeping his fund and using FTX.com for his trades.

3. Lucky D. was provided with information on how to fund his account with fiat, sending it to the Beneficiary account: Northern Dimension Inc., number: 5090028738 on the Receiving bank: Silvergate Bank, with Routing number: 322286803, and Swift code: SIVGUS66. For cryptocurrencies, Lucky D. was given the corresponding chain wallet address owned by FTX.com that is associated to his account.

4. Lucky D. made fiat and cryptocurrency deposits and withdrawals without issues, and
actively traded both spot and futures on FTX.com, building up a diverse portfolio of
assets.

5. In September 2022, Lucky D. decided to exit most of his cryptocurrency positions and
kept mostly fiat currency (USD) on FTX.com, along with a few blue-chip
cryptocurrencies (ETH and MATIC) and stablecoins (USDT).

6. On November 8th, 2022, Lucky D. Lucky D. lost a total account balance in FTX.com
close to USD$ 1,564,5715.67.

7. One thing that Lucky D. could not understand was despite the thorough and rigorous
assessments that were supposed to be carried out by the professional auditors, how could
they have failed to identify these problems and warn the public about them.  The duty of
the auditors is supposed to have been professionally sceptic, providing an honest
financial health of the company, but it failed.  The experience was a harsh reminder of
how even the most reputable company can fail us and never entrusting them with his
hard-earned money. It also served as a cautionary tale about the fallibility of even the
most highly trained and respected professionals.

8.    Plaintiff Jong R. D. first entered into a user agreement with an FTX entity on January 15,
2020 having become aware of FTX through informal communications among fellow traders.
Jong R.D. executed the basic user agreement and his first transaction after providing FTX KYC
which included his nationalty, passport number, and residence. Jong used the platform for crypto
trading spot and derivative, arbitrage trading liquidity and stock trading.  He chose the FTX
entities because they were considered a professional exchange with a good reputation, because

they reportedly hired competent professionals. When he became aware that FTX had issued audit reports reporting compliance with recognized auditing standards Jong J.D. decided to move significantly more assets from other platforms to FTX. On November 11, 2022 Jong R. D. initiated withdrawal requests for deposits in bitcoin and USDT. The status remained requested indefinitely and no transfers were executed.  He has not been able to recover his deposits to date.

9.      Plaintiff S. Roberts signed up for the FTX by depositing Bit Coin tokens (BTC) in a safe, interest-bearing account, BTC and ETH tokens in a separate main trading account. Prior to signing up, S. Roberts reviewed the security section of the FTX website which specified that FTX had audited account financials. This was an important factor in convincing him to choose the FTX platform. At the time of FTX' bankruptcy declaration, S. Roberts had deposits worth approximately $3.7 million USD. He first attempted to withdraw his deposits in a safe interest earning account and was not permitted to. He then transferred that amount to his trading account attempted to withdraw 8 tokens and the withdrawal request was refused. He was never able to recover any of his assets to date.

10.      Plaintiff Yang How  signed up for the FTX international users account in August 2020 knowing that they were a rapidly growing exchange. Yang used Binance and FTX as his primary exchanges. On November 6, 2022, Yang began hearing rumors as to FTX liquidity issues and on November 7, 2022 successfully withdrew tokens. After Samuel Bankman-Fried sought to reassure customers in November and assured a 7-day redemption period, on November 8, Yang tried to withdraw all his remaining assets and the withdrawal request was refused. His deposits valued at about $900,000 prior to the withdrawal's freezes are gone. He also forfeited other assets including perpetual  futures position locked up tokens and other token investments his losses are  more than $3,000,000 USD.

11.     Plaintiff  B. Ken  opened an account with FTX.com on October, 2021. He was aware that defendant Prager Metis was vouching for FTX in advertising to the general public and by directly communicating to existing and potential customers, particularly as to the reliability of FTX' financial reporting and security of customer assets, particularly cryptocurrency. Ken chose FTX mainly because he was aware that other exchanges not subject to audits and their financial statements were not certified and essentially unreliable.

Ken  deposited prior to the bankruptcy. On November 9, 2022, Ken  sought to withdraw all his holdings and close his accounts. He received confirmation of the request, but the withdrawal never took place. His estimated his losses at  more than  $1,300,000 in US currency at the time of the bankruptcy.

12. Apex Digital replied on the Defendants and lost more that $510,000,000 USD.

13.      At all times, Prager Metis and Armanino (hereinafter jointly referred to as Defendants) held themselves out to the general public to be experts in the specialized industry of cryptocurrency accountancy Services offered supposedly tailored to the cryptocurrency industry included auditing of financial statements, asset valuation, and taxation. They held themselves out as capable of performing audits which reflected not only off-(block)chain traditional transactions but also on-chain transactions. They actually represented to the public at large and directly to their customers that they were accountants to the "metaverse" and not tied to one state or even nation. Private companies such as FTX are not required to request annual audits as required of public companies. [2] However, private companies may independently decide to submit to an audit

---

[2] While audits of publicly traded companies are required annually, with reports being made publicly available that must comply with standards of the Public Company Accounting Oversight Board, (PCAOB). PCAOB was created after enactment of the Sarbanes Oxley Act in 2002

performed by a CPA firm for their own reasons. These private audits may be limited in scope with results only disclosed to the intended audience or released to the public.

14.     Throughout 2021 and 2022 the principal of FTX Samuel Bankman-Fried (Samuel Bankman-Fried) made public statements that FTX Trading and FTX US had successfully completed several Generally Accepted Accounting Principal (GAAP) Audits and in March 2022 both defendants issued certified reports that apparently found FTX.com and FTX.US to be in good financial health.   While the audit reports issued pursuant to the audits referred to have not been publicly released, upon information and belief, FTX customers and potential customers and potential customers were advised about the audits in the security section of the FTX website and specifically told that the audit reports were unqualified[3] and were also told that the audit reports opined that the financial statements presented an accurate representation of the FTX entities' financial condition.

---

enacted  after legislative criticism of Arthur Anderson's audits of Enron. This resulted in the auditing section of one of the world's largest CPA firms folding.

[3] An auditor's report contains either an expression of opinion on the financial statements, taken as a whole, or an assertion that an opinion cannot be expressed. Statement on Auditing Standards (SAS) No. 134 and PCAOB Auditing Standard (AS) 3105. These standards discuss the circumstances that may require the auditor to depart from the auditor's unqualified report and provides reporting guidance in the following circumstances:

- *Qualified opinion*. A qualified opinion states that, except for the effects of the matter(s) to which the qualification relates, the financial statements present fairly, in all material respects, the financial position, results of operations, and cash flows of the entity in conformity with generally accepted accounting principles. *See* paragraphs .02–.39.

- *Adverse opinion*. An adverse opinion states that the financial statements do not present fairly the financial position, results of operations, or cash flows of the entity in conformity with generally accepted accounting principles. *See* paragraphs .40–.43.

- *Disclaimer of opinion.* A disclaimer of opinion states that the auditor does not express an opinion on the financial statements. *See* paragraphs .44–.47.

15.     Even though not bound by uniform standards for publicly traded companies as set forth by the PCAOB, auditors of private companies like defendants are still required to comply with the American Institute of Certified Public Accounting's (AICPA) Auditing Standards Board (ASB) Statements on Auditing Standards (SAS) for nonpublic companies in conducting the audit.   Plaintiffs, and those similarly situated, whether already having accounts with FTX at the time of such audits, or potentially opening accounts with FTX after these audits, constituted a large portion of the specific audience for which Defendants audit reports of the FTX entities were targeted. The audits were clearly conducted in order to provide current and potential customers of FTX such as plaintiffs a level of assurance over that offered by competitors as well as supposedly   complete financial transparency in contrast to their competitors. FTX' intent in retaining defendants to conduct private audits and issue unqualified reports opining such that, that upon announcement of the audit results by FTX would make such customers more likely to hold digital assets on the FTX exchange, transfer new assets into FTX' exchange accounts and to rely upon FTX promise that said assets would remain safe and readily accessible by FTX' customers. Defendants after initially being retained, effectively acted as promoters for the FTX entities in social media and print furthering the audit purpose. Defendants negligently, recklessly, and willfully conducted the audits of defendants financial statements and issued unqualified reports as a means of persuading existing and potential customers that their cryptocurrency assets in FTX accounts were safer and would remain more readily accessible than if held by their competitors. Plaintiffs heavily relied upon the audit reports in deciding to open accounts with FTX as opposed to using a competitor and then, also in reliance on said reports, transferring their tokens into FTX custody.

16.     Defendants' negligence, recklessness, and willfulness in conducting the audits in a

manner far below the professional standards of licensed certified public accounts in the community, and preparation of reports of same expressing unqualified opinions of the accuracy of FTX financial statements, proximately caused plaintiffs to suffer and to continue to suffer damage as the entirety or vast majority of their assets were converted or otherwise lost.

17.    The deficiencies in defendants' professional conduct fell below and grievously violated numerous standards of auditing practice, including but not limited to the following:

a.  Even before accepting an auditing engagement, accounting professionals are required to obtain a sufficient understanding of the company they will be auditing, and its environment,  and take steps to "understand the events, conditions and company activities that might reasonably be expected to have a significant effect on the risks of material misstatement." AU-C Section 325.

b. The auditor is required to obtain an understanding of the internal controls and financial reporting at the target company in order to:

A.  identify the types of potential misstatements,
B.  assess the factors that affect the risks of material misstatement, and
C.  design further audit procedures. An auditor's understanding of internal controls over financial reporting includes evaluating the design of controls that are relevant to the audit and determining whether the controls have been implemented. In this regard, an auditor is required to evaluate the extent to which existing control deficiencies are indicative of a fraud risk factor. GAAS Au-C Section 265.

c. The auditor is required to perform audit procedures designed to identify the areas that might represent specific risks relevant to the audit, including the existence of unusual transactions and events, and amounts, ratios and trends that warrant investigation. AU-C Section 330.

d. The auditor is required to design and perform the audit procedures in a manner that are specifically responsive to evident risks of material misstatement for each relevant assertion of each significant account and disclosure, including fraud risk. AU-C Section 450.

e. The auditor is required to adhere to the objective of a financial statement and by expressing an opinion on the fairness with which the financial statements are presented reflecting in all material respects, the financial position, results of operations and the cash flows of the reporting entity, inconformity with GAAP. AU-C Section 200. Additionally, auditors must apply "due professional care," including the appropriate "professional skepticism." Professional skepticism requires the auditors to maintain a questioning mind and critically assess the audit evidence it obtains. In this regard, GAAS expressly requires that the auditors should not be satisfied with less than persuasive evidence beyond simply a belief that management is honest. The standard AU-C Section 200 also requires that auditors maintain independence in thought and appearance and remain at arm's length from its clients, among other practices as set forth in the audit standards.

f. Accounting/ auditing professionals are required to implement audit procedures in a manner specifically responsive to evident risk of material misstatement for each relevant assertion of each significant accounting and disclosure including fraud by "evaluating the design of controls that are relevant to the audit and determining whether the controls have been implemented." AU-C-450. Auditors must consider the possibility of fraud during the audit of financial statements, in particular that of management fraud that causes a material misstatement. Note that management fraud is particularly difficult to detect because management is frequently in a position to manipulate accounting records directly or indirectly.AU-C-240.

g. The auditor is required to consider related party relationships and transactions in an audit of financial statements. AU-C-550.

### FIRST CAUSE OF ACTION FOR PROFESSIONAL MALPRACTICE

1.      Plaintiffs repeat the allegations in the Facts Common to All Counts as if fully set forth herein.

2.      Professional standards as set forth previously were blatantly violated by defendants at every stage of the audits from the initiation of the engagement right through to the issuance of the audit reports and then continuing right to the present by their failure to amend or retract their opinions in the reports.  As noted, FTX directly disclosed to these plaintiffs the occurrence and results of the audits as a means of inducing these plaintiffs to transfer their assets into FTX possession and control, where they were lost or converted and not returned despite all of the plaintiffs withdrawal attempts.

3.      Even before implementing the audit plan, defendants should and would, through routine preparation, preliminary investigation, and observations, have recognized the need for caution and necessity of proceeding with a higher level of thoroughness and professional skepticism than with a more traditional audit client. Once the engagement commenced the numerous red flags should have arisen almost immediately.  Listed below is an extensive but far from exhaustive list of steps which were absolutely necessary to conduct a proper audit and arrive at a reliable audit report. Here none of these steps were employed by defendants and resulted in meaningless and unreliable audit reports which provided no useful or accurate information to the targeted audience, which certainly includes these plaintiffs.

4.      These reports prevented plaintiffs making an informed decisions whether or not to utilize FTX services, and whether to continue utilizing same prior to losing possession and ownership

of their cryptocurrency assets. Specifically, while not an exhaustive list of defendants' negligent, reckless and willful conduct in conducting the private audits of the FTX entities here  and reporting on same to the audience they were intended for ,  both  defendants blatantly violated many or most of the numerous professional standards  of as set forth above contained in  the GAAS  on multiple occasions evidencing and creating a presumption of professional malpractice: '

(a)  Defendants failed to perform a thorough search of content of traditional and social media regarding the FTX exchange and management prior to accepting the engagement. Even minimal investigation of prior public statements of founder Samuel Bankman-Fried readily accessible in ordinary media and social media should have raised red flags   that further investigation was warranted. In said interviews FTX' principal Samuel Bankman-Fried spoke candidly about pump and dump schemes designed to increase the value FTX' related sister company Alameda Research LLC. Violations of AU-C-Section 325, 200.

(b)   Defendants should have posed simple questions to FTX representative and make ordinary observations which would have revealed that no management internal control systems existed or ever had been implemented by either FTX entity. This finding should have resulted in heightened caution going forward in conducting the audit. and every type of accounting transaction the FTX entities engaged in both on and off chain (Accounts Payable, Accounts Receivable, payroll, investments, financing, transfers, assets, liabilities) should have been made subject to risk assessment and sampling (or examined 100%) for detailed examination. Defendants failed to verify in depth the origins of each figure in the balance sheet, cash flow and income statements whether on or off chain. Both on-chain transactions and off-chain amounts should have been verified based on a

review of both endogenous and exogenous data. Non-public company audits do not require an assurance of management and corporate internal controls; however, establishing and enforcing such controls is an expected governance practice for most business entities, in particular those that deal with a large amount of assets, complex technologies and/or financial trading instruments. Non-public company audits do not require an assurance of management and corporate internal controls; however, establishing and enforcing such controls is an expected governance practice for most business entities, in particular those that deal with a large amount of assets, complex technologies and/or financial trading instruments. Numerous violations of AU-C-Section 265, 325,450 and others.

(c)  Defendants should have immediately observed FTX' failure to implement even elementary internal accounting functions in any of its entities. Despite the appointment of a Chief Financial Officer the lack of any semblance of a financial department was a telltale signs of inaccuracy of financial statements and potential for fraud.  Most businesses of any substantial size have established an accounting department as well as an internal audit and compliance department. Issuance of unqualified audit reports under these circumstances would be ludicrous for any audit conducted by a licensed accounting professional. Violations of section AU-325, 330, 450.

(d) Defendants' discovery that FTX was utilizing widely marketed accounting software for all entries into the books of account should have been an obvious premonition of inaccuracy and fraud. This well-known widely available program is essentially designed for use by non-professionals at small and medium sized unconsolidated businesses, completely the opposite of FTX large worldwide operations.  Any competent accounting

professional aware of the software being used would have had no doubt that the books of FTX prepared using this software alone evidenced extremely high risks of material misstatement of actual financial condition, thus warranting further detailed investigation. The blatant lack of formal accounting training of management and absence of staff implementing internal accounting functions was another obvious red flag. Furthermore, the relationship with Alameda, known to be related to the FTX entities, should have been closely examined as a risk for related party transactions. Link analysis software should have been used that connects and traces on and off chain behavior – if this software had been deployed, there is no way that they would have missed transfers to Alameda and other entities/persons. Violations of AU-C-200, 325, 330 450.

(e) Defendants should have immediately recognized FTX' violation of basic accounting practices in classification of customer deposits as assets, rather than as liabilities of FTX. Had they been properly classified as deposits FTX was required to hold readily available reserves as collateral if customers choose to close their accounts. In fact, FTX permitted deposits to be used as collateral for lines of credit for the related company Alameda FTX claimed in its user agreements that its customers retained title and ownership to their accounts, and that these cryptocurrencies do not belong to FTX, nor would they be transferred to FTX. The Defendants, FTX, and FTX.US failed to extensively examine and trace transactions to verify that this was indeed the case – that the customers' assets were untouched. Violations of AU-C-200, 325.

(5) Defendants failed to recognize the necessity of assigning to the FTX engagement partners and other CPAs with demonstrable training or expertise in the complex blockchain technology.

The Defendants had a professional obligation to familiarize themselves with blockchain technology and cryptocurrency exchange functionality and operations, and the implications of trading financial assets via the technology. Violations of AU-C-200, 450/

(a)  Defendants failed to recognize the import of the lack of an independent Board of Directors as required to  manage the vast  assets FTX had access to.  Instead, the fact that the FTX entities were managed solely by a small group of insiders should have raised a strong red flag that management fundamentally lacked transparency and oversight, inviting mismanagement and increasing risk of related party transactions. Violations of AU-C-200, 240, 450, 550.

(b) Public claims by FTX of offering 20% interest earnings on investments held on the platform should have been examined at by the auditors with a high degree of professional skepticism. Defendants should have immediately been concerned with clarifying how such interest was generated and paid by the FTX entities in a profitable and sustainable manner. Furthermore, the auditors should have recognized that FTX' Form D registration, seeking exemption from SEC oversight of private funding in the hundreds of millions. was highly suspicious.   Violations of AU-C-200, 325, 450, 240.

(c) The relationship with Alameda, a separate entity known to be related to the FTX entities, should have been closely examined as a risk for related party transactions. Link analysis software should have been used that connects and traces on and off chain behavior – if this software had been deployed, there is no way that they would have missed transfers to Alameda and other entities/persons. Violation of AU-C-330, 550.

(d)  Defendants had a duty to examine records of all transactions, whether via traditional banking system, or conducted on the blockchain. There is no indication that the Defendants made any effort to investigate or understand the FTX entities' history of transactions, particular as regards blockchain transactions.

(e) The realizations that two different audit firms had been retained, Prager for FTX Trading and Armanino for FTX US was an obvious red flag. Such division of the audits and separating relating companies reduces overall transparency and inhibits information sharing across engagements which necessarily should and would have raised more red flags significantly clouding overall transparency and inhibiting information sharing across engagements. Furthermore, as the main entity (FTX Trading) was offshore alone justified a higher level of scrutiny than took place. Offshore entities are known to be subject to less regulation and oversight. Defendants should have sought to understand the implications of the offshore structure, including ownership and cash flows. Violations of AU-C- 200, 450.

6.      As a direct result of defendants' negligence in performing their professional responsibilities in a manned woefully below the standards set by even an average licensed Certified Public Accountant in the community these plaintiffs have sustained extensive damage in the form of actual monetary losses, consequential damages, damage to reputation, and severe emotional distress. Plaintiffs also have incurred and will continue to incur legal fees which would have been unnecessary in the absence of defendant's negligence.

**WHEREFORE,** plaintiffs seek judgment from defendant in the form of compensatory damages, exemplary damages, legal fees, and costs of suit.

## SECOND CAUSE OF ACTION FOR COMMON LAW FRAUD

1.    Plaintiff repeats and realleges all allegations contained in the preceding paragraphs as if fully set forth herein.

2.    Defendants Prager Metis and Armanino in providing professional services to FTX provided professional opinions after conducting private audits purportedly performed pursuant to GAAS as promulgated by the AICPA under false pretenses, false representations, and actual fraud. At all times, defendants were aware that said audits were not performed pursuant to GAAS, and the opinion rendered purportedly based upon such opinions as to the financial condition of FTX were essentially worthless and deceiving.

3.    Plaintiffs relied upon these fraudulent audit opinions that were being offered with the intent to deceive and persuade potential and existing FTX customers to deposit their assets with the FTX entities. Defendants knew at all times the precarious financial position of FTX and the fact that FTX related companies were utilizing fraudulent financial statements as collateral for borrowing from financial institutions as well as providing enticement to investors. At the time defendants made these written statements, they knew or should have known that they were materially false.

4.    Defendants' false statements as made in their private audit reports were the result of complete failure to adhere to GAAS in conducting audits, were communicated directly to existing and potential customers, including each plaintiff respectively. Means of communication, included but were not limited to, representations made through their website customer login process, representations made through the media directly targeting these individual plaintiffs and numerous other similarly situated, and also via statements made specifically to these plaintiffs and others similarly situated by texting, email, and phone calls.

5.     Defendants' conduct and plaintiffs' reliance on defendants' representations proximately caused plaintiffs to lose all, or a significant portion of the amount deposited with the FTX entities as well as experience emotional harm, anguish, and distress.

6.     Upon information and belief, Plaintiffs reasonably relied upon defendants' false pretenses, false representations, and fraudulent conduct against Debtors in the full amount deposited,  plus interest and costs.

**WHEREFORE,** plaintiffs seek judgment from defendant in the form of compensatory damages, exemplary damages, legal fees and costs of suit.

## THIRD CAUSE OF ACTION FOR CONSUMER LAW FRAUD

1.      Plaintiff repeats and realleges all allegations contained in the preceding paragraphs as if fully set forth herein.

2.     At all relevant times, the Defendants, their agents, servants and/or employees were licensed to do business in the State of New Jersey and employed within their professional capacity as accountants.

3.     Defendants' actions performed intentionally and willfully relied upon by plaintiffs to their detriment, constituted consumer fraud in violation of N.J.S.A. 56:8-1 et. seq. resulting in ascertainable loss and statutory damages to Plaintiff.

**WHEREFORE,** plaintiffs seek judgment from defendant in the form of compensatory damages trebled pursuant to the Consumer Fraud Act, legal fees and costs of suit.

## FOURTH CAUSE OF ACTION: AIDING AND ABETTING FRAUD

1.     Plaintiffs repeat and reallege all allegations contained in the preceding paragraphs as if fully set forth herein.

2.      Defendants substantially assisted FTX's fraud by issuing unqualified audits despite known risks. Plaintiffs relied on said audits in entrusting their assets to FTX proximately causing them to suffer monetary damage.

**WHEREFORE,** plaintiffs seek judgment from defendants in the form of compensatory damages, exemplary damages, legal fees and costs of suit.

## FIFTH CAUSE OF ACTION: NEGLIGENT MISREPRESENTATION

1. Plaintiffs repeat and reallege all allegations contained in the preceding paragraphs as if fully set forth herein.

2. Defendants negligently issued false audit opinions foreseeable to be relied upon by customers such as  Plaintiffs.

3. Plaintiffs relied on said audits in entrusting their assets to FTX proximately causing them to suffer monetary damage.

**WHEREFORE,** plaintiffs seek judgment from defendants in the form of compensatory damages, exemplary damages, legal fees and costs of suit.

## SIXTH CAUSE OF ACTION: CIVIL CONSPIRACY

1. Plaintiffs repeat and reallege all allegations contained in the preceding paragraphs as if fully set forth herein.

2. Defendants conspired with FTX to conceal insolvency, agreeing to prepare and vouch for misleading audit reports which concealed FTX's financial condition.

3. Plaintiffs relied on said audits in entrusting their assets to FTX proximately causing them to suffer monetary damage.

**WHEREFORE,** plaintiffs seek judgment from defendants in the form of compensatory damages, exemplary damages, legal fees and costs of suit.

## SEVENTH CAUSE OF ACTION: UNJUST ENRICHMENT

1. Plaintiffs repeat and reallege all allegations contained in the preceding paragraphs as if fully set forth herein.

2. Defendants retained audit fees from fraudulent operations and must disgorge same not having fulfilled their professional obligation to act in a manner and up to a standard befitting an accounting professional in the community.

**WHEREFORE,** plaintiffs seek judgment from defendants in the form of compensatory damages, exemplary damages, legal fees and costs of suit.

Dated: February 5, 2026

_____

Attorneys for plaintiffs


Edward Lehman (IL SBN 6194489)*
elehman@lehmanlaw.com

Admitted  *pro hac vice*


LEHMAN, LEE & XU LLC (Saipan #25977-001-1)

c/o LEHMAN, LEE & XU
Suite 3313, Tower One, Times Square
1 Matheson Street, Causeway Bay, Hong Kong
Telephone: (852) 3588-2188
Facsimile: (852) 3588-2088


Anthony Scordo, Esq., PC
NJ Atty ID – 024591987
69 East Allendale Road
Saddle River NJ 07458
Phone (973) 837-1861
*Attorney for Plaintiff*

Dated:  January 31, 2026


## **CERTIFICATION**

I hereby certify that the matter in controversy is not the subject of any other action pending in any court or arbitration proceeding, nor is any other action or arbitration proceeding contemplated.

I further certify that there is/are no other parties who should be joined in the within action.

_____
ANTHONY SCORDO
Dated: February 5, 2026, 2026                                    Attorney for Plaintiffs

## DESIGNATION OF TRIAL COUNSEL

Please take notice that Anthony Scordo, Esq., is hereby designated as trial counsel in this matter.

_____
ANTHONY SCORDO
Attorney for Plaintiffs
Dated:  February 5, 2026, 2026

## JURY DEMAND

The Plaintiff hereby demands a jury trial as to each and every issue in this action so triable.

_____
ANTHONY SCORDO
Attorney for Plaintiffs
Dated:  February 5, 2026